# Exhibit 1

## to Government's Amended Complaint against JPMorgan Chase Bank, N.A.



**FILED**
November 30, 2022 12:02 PM
ST-2020-CV-00014
**TAMARA CHARLES**
**CLERK OF THE COURT**

# IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN
**********************************

GOVERNMENT OF THE UNITED STATES
VIRGIN ISLANDS,

                PLAINTIFF,

     V.

DARREN K. INDYKE, in his individual capacity
and in his capacity as the EXECUTOR FOR THE
ESTATE OF JEFFREY E. EPSTEIN and
ADMINISTRATOR OF THE 1953 TRUST;
RICHARD D. KAHN, in his individual capacity and
in his capacity as the EXECUTOR FOR THE
ESTATE OF JEFFREY E. EPSTEIN, and
ADMINISTRATOR OF THE 1953 TRUST;
ESTATE OF JEFFREY E. EPSTEIN; THE 1953
TRUST; PLAN D, LLC; GREAT ST. JIM, LLC;
NAUTILUS, INC.; HYPERION AIR, LLC; POPLAR,
Inc.; SOUTHERN TRUST COMPANY, INC.;
CYPRESS, INC.; MAPLE, INC.; LAUREL, INC.;
AND JOHN AND JANE DOES,

              DEFENDANTS.

_____

Case No.:  ST-20-CV-14

**ACTION FOR DAMAGES**

<u>JURY TRIAL DEMANDED</u>

## <u>SECOND AMENDED COMPLAINT</u>

      **COMES NOW,** the Government of the United States Virgin Islands ("Government") and

files this Second Amended Complaint containing information that has become known through

further investigation and third-party discovery and in support thereof, would show unto the Court

as follows:

## JURISDICTION AND PARTIES

      1.  The Attorney General of the United States Virgin Islands (herein after "Virgin

Islands") brings this action on behalf of the Plaintiff, Government of the Virgin Islands, pursuant

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **2** of **76**

to 3 V.I.C. § 114 and 14 V.I.C. §607 and her statutory authority to enforce the laws of the Virgin

Islands, and advocate for the public interest, safety, health and well-being of persons in the

Virgin Islands.

2.      This Court has subject matter jurisdiction over this civil matter pursuant to 4

V.I.C. § 76 and 14 V.I.C. § 607.

3.      This Court has personal jurisdiction over the parties pursuant to 5 V.I.C. § 4903.

4.      The Virgin Islands is an unincorporated territory of the United States. It consists

of St. Thomas, St. Croix, St. John, and Water Island, and more than 40 surrounding islands and

Cays, some of which are privately owned. Among these privately owned islands are Little St.

James and Great St. James.

5.      Jeffrey E. Epstein ("Epstein") was a resident of the Virgin Islands and he

maintained a residence on Little St. James, which he acquired in 1998 and in 2016 he also

purchased Great St. James.

6.      Epstein registered as a sex offender in the Virgin Islands in 2010. He was a Tier 1

offender under Virgin Islands law based upon his Florida conviction of procuring a minor for

prostitution. As a Tier 1 offender, Epstein was required to register annually with the Virgin

Islands Department of Justice ("VIDOJ") and give advance notice of his travel to and from the

Virgin Islands. Epstein was also subject to random address verification by VIDOJ.

7.      Epstein was found dead on August 10, 2019 while in custody in New York for sex

crimes.

8.      Defendant Darren K. Indyke ("Defendant Indyke") is co-executor of the Estate of

Jeffrey E. Epstein and Administrator of The 1953 Trust and was and/or is a participant in the

activity of the "Epstein Enterprise," as set forth below.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **3** of **76**

9.      Defendant Richard D. Kahn ("Defendant Kahn") is co-executor of The Estate of Jeffrey E. Epstein and Administrator of The 1953 Trust and was and/or is a participant in the activity of the "Epstein Enterprise," as set forth below.

10.     Defendants Indyke and Kahn, in addition to administering the Estate under the laws of the Virgin Islands, engaged in conduct in the Virgin Islands through their participation in businesses, financial transactions, and accounts registered, held, and operating in the Virgin Islands, and by filing documents with the Government of the Virgin Islands.

11.     Defendant, the Estate of Jeffrey E. Epstein ("Estate"), created upon Epstein's death, is domiciled in the Virgin Islands. On August 15, 2019, Defendants Indyke and Kahn filed a Petition for Probate and Letters Testamentary which included Epstein's last will and testament with the Probate Division of the Superior Court of the Virgin Islands.

12.     The Petition reported the value of the real and personal property in The Estate located in the Virgin Islands at $577,672,654.00 dollars.

13.     According to the Petition, the assets in the Virgin Islands thus far included:

        a.  $56.5 million in cash;

        b.  $127 million in fixed income and equity investments;

        c.  $195 million in hedge fund and private equity investments; and

        d.  $18.5 million in planes, boats, and automobiles.

The Estate did not originally value his fine arts, antiques, and other valuables.

14.     The Estate also included shares of various corporate entities which hold residences and real property used by Epstein, namely:

        a.  Brownstone in New York City valued at $56 million;

        b.  Ranch in New Mexico valued at $72 million;

    c.   Gated home in Palm Beach, Florida, valued at $12 million;

    d.   Seven units in an apartment building in Paris, valued at $8 million; and

    e.   Great St. James and Little St. James, collectively valued at $86 million.

15.    At the time of this Second Amended Complaint filing, the Estate's most recent accounting, filed February 1, 2021, valued its total assets at $240,782,955.84, which is almost 60% lower than the Estate's starting valuation less than 18 months earlier when Defendants Indyke and Kahn began their Co-Executorship of the Estate.

16.    The Estate is responsible to pay penalties and damages for the acts committed by Epstein and the Epstein Enterprise described below.

17.    Defendant The 1953 Trust ("The Trust") was created by Epstein, who "amended and restated" its terms only two days before his suicide. That same day, Epstein revised his Last Will and Testament, transferring all of his "property, real and personal, wherever situated" to The Trust. The Trust also contains Epstein's financial assets and is also responsible to pay damages for the acts committed by Epstein and the Epstein Enterprise described below. Defendants Indyke and Kahn, filed a Certificate of Trust in the Superior Court of the Virgin Islands for The Trust on August 26, 2019.

18.    Epstein maintained a deliberately complex web of Virgin Islands corporations, limited liability companies, foundations, and other entities, not all of which are yet known to the Government of the Virgin Islands, through which he carried out and concealed his criminal conduct.

19.    Epstein regularly created new entities in the territory and transferred properties and funds between them in order to preserve and shield Epstein's assets and to facilitate and conceal the unlawful acts described in this Complaint.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **5** of **76**

20.    These entities held properties, including Little St. James and Great St. James, at which Epstein trafficked and sexually abused women and underage girls. Epstein owned and arranged for private planes, helicopters, boat and automobiles to transport victims to, from, and within the Virgin Islands, and provided money to pay these young women and underage girls.

21.    Epstein sat at the hub of this web, serving as president, member, manager, or director of each of the entities and, upon information and belief, directing their activities.

22.    Defendant, Nautilus, Inc., is a corporation established and organized under the laws of the Virgin Islands. It was incorporated on November 22, 2011.

23.    According to records of the Virgin Islands Recorder of Deeds, Nautilus, Inc. owns Little St. James, a/k/a Parcel Number 109803010100, a parcel of 3.1 million square feet valued at $3.2 million, with buildings and improvements valued at $4 million.

24.    Epstein was president and director of Nautilus, Inc., which corporate filings describe as "holding property for personal use." Defendants Indyke and Kahn are the secretary and treasurer of Nautilus, Inc., respectively. The Estate values Epstein's holdings of Nautilus, Inc., which holds title to Little St. James at $63.9 million.

25.    A deed recorded with the Virgin Islands Recorder of Deeds on December 30, 2011 reflects that the property was transferred from a Delaware entity, L.S.J., LLC, to Nautilus, Inc. for "TEN DOLLARS ($10.00) and other good and valuable consideration." The quitclaim deed lists Jeffrey Epstein as the sole member of L.S.J., LLC, which it acquired Little Saint James via a warranty deed dated April 27, 1998.

26.    As described below, Epstein engaged in a pattern and practice of trafficking and sexually abusing young women and female children on this private, secluded island of Little St. James where Epstein and his associates could avoid detection of their illegal activity from Virgin

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **6** of **76**

Islands and federal law enforcement and prevent these young women and underage girls from

leaving freely and escaping the abuse.

27.     Thus, Nautilus, Inc. participated in carrying out, facilitating and concealing

Epstein's crimes, hence Little St. James became an instrumentality of those crimes.

28.     Defendant, Great St. Jim, LLC, is a limited liability company established and

organized under the laws of the Virgin Islands. Great St. Jim, LLC was organized on October 26,

2015. Great St. Jim, LLC, according to records of the Virgin Islands Recorder of Deeds, owns at

least three properties that make up Great St. James acquired on January 28, 2016: Parcel Number

109801010100, consisting of 3.5 million square feet and valued at $17.5 million; Parcel Number

109801010200, consisting of 450,000 square feet of land, valued at $2.8 million; and Parcel

Number 109801010300, 1.2 million square feet of land, valued at $2.7 million. According to a

warranty deed filed with the Virgin Islands Recorder of Deeds, Epstein, through Great St. Jim,

LLC, acquired the last two parcels for $5 million each.

29.     Epstein is listed as manager and a member of Great St. Jim, LLC and the nature of

its business is described as "holding assets." Upon information and belief, Epstein purchased

these Great St. James properties—the island with closest proximity to Little St. James—to further

shield his conduct on Little St. James from view, prevent his detection by law enforcement or the

public, and allow him to continue and conceal his criminal enterprise. Epstein's significant

investment in the purchase of Great St. James demonstrates his intent to expand his illegal

operation in the Virgin Islands for years to come. Thus, Great St. Jim, LLC participated in

carrying out, concealing, facilitating and continuing Epstein's crimes, and Great St. James became

an instrumentality of those crimes.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **7** of **76**

30.     Defendant, Poplar, Inc., is a corporation established and organized under the laws of the Virgin Islands. Poplar, Inc. was incorporated on November 22, 2011. Epstein was president and director of Poplar, Inc., and its purpose was described in corporate filings as "holding property for personal use." Defendants Indyke and Kahn are secretary and treasurer of Poplar, Inc., respectively.

31.     A certificate of incumbency provided to the Department of Planning and Natural Resources ("DPNR") also lists Epstein as president of Poplar, Inc. and expressly authorizes the incorporators to conduct "transactions related to permitting matters submitted on behalf of Great St. Jim, LLC."

32.     Poplar, Inc. is listed as the signatory for the 2017 Annual Report for Great St. Jim, LLC, and the signature appears to be Epstein's. The Petition for Probate and Letters Testamentary filed by The Estate lists Poplar, Inc. as holding title to Great St. James. Thus, Poplar, Inc. participated in carrying out, concealing, facilitating and continuing Epstein's crimes.

33.     Defendant, Plan D, LLC is a limited liability company established and organized under the laws of the Virgin Islands. In its original Articles of Organization, filed October 19, 2012, and Annual Report filings, Epstein's pilot, Larry Visoski, was listed as Plan D, LLC's sole manager/member. However, the July 31, 2019 Annual Report revealed Epstein as the principal behind Plan D, LLC.

34.     Upon information and belief, Plan D, LLC owns one or more of the airplanes and helicopters that Epstein used to transport young women and children to and from the Virgin Islands to carry out the criminal pattern of activity described below. Among the airplanes owned by Plan D, LLC is a Gulfstream with N-number N212JE. Flight logs and travel notices indicate

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **8** of **76**

that Epstein used this plane to traffic and transport and young women and underage girls to the

Virgin Islands.

35.     Defendant, Hyperion Air, LLC is a limited liability company established and

organized under the laws of the Virgin Islands on October 19, 2012. Jeffrey Epstein is a

manager/member of Hyperion Air, LLC, along with his pilot, Larry Visoski. The purpose of

Hyperion Air, LLC is listed in its Annual Report as "holding assets."

36.     Hyperion Air, LLC is the registered owner of a Bell helicopter with N-number

N331JE and a Keystone helicopter with N-number N722JE. Upon information and belief,

Epstein used these helicopters to transport young women and underage girls between St. Thomas

and Little St. James.

37.     Defendant Southern Trust Company, Inc. was originally incorporated in the Virgin

Islands on November 18, 2011 as Financial Informatics, Inc., but changed its name to Southern

Trust Company in September 2012. Southern Trust Company is a tenant at American Yacht

Harbor in Red Hook, St. Thomas, and Epstein is a "passive investor" in IGY-AYH, d/b/a

American Yacht Harbor. By the end of 2013, according to its corporate filings, Southern Trust

Company has assets of $198.5 million; four years later, its assets reached $391.3 million. From

2011 until at least 2018, Jeffrey Epstein was the President/Director of Southern Trust Company,

and Defendants Kahn and Indyke were Treasurer/Director and Secretary/Director, respectively.

Epstein was the sole owner of Southern Trust Company.

38.     Defendant Cypress, Inc. is a Virgin Islands corporation that was formed and first

licensed in or about November 2011. As of December 31, 2018, Epstein was listed as

President/Director and Defendants and Co-Executors Indyke and Kahn were listed, respectively,

as Vice President/Secretary/Director and Treasurer/Director of Cypress, Inc. Cypress, Inc. owns

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **9** of **76**

the property 49 Zorro Ranch Road in Stanley, New Mexico, which was transferred to it in or about December 2011, shortly after it was incorporated.

39.     Defendant Maple, Inc. is a Virgin Islands corporation that was formed and first licensed in or about November 2011. As of December 31, 2018, Epstein was listed as President/Director and Defendants and Co-Executors Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Maple, Inc.  Maple, Inc. owns the property 9 East 71st Street in New York, New York, which was transferred to it on or about December 23, 2011, shortly after it was incorporated.

40.     Defendant Laurel, Inc. is a Virgin Islands corporation that was formed and first licensed in or about November 2011.  As of December 31, 2018, Epstein was listed as President/ Director and Defendants and Co-Executors Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Laurel, Inc.  Laurel, Inc. owns the property 358 Brillo Way in Palm Beach, Florida, which was transferred to it in or about December 2011, shortly after it was formed.

41.     John and Jane Does represent individuals and entities whose identities or involvement with Epstein are currently unknown. The Government of the Virgin Islands will amend the Complaint to add these individuals and entities when discovered.

42.     The Attorney General brings this action to seek all remedies available to the Government of the Virgin Islands in enforcing its laws and protecting the public interest and public safety. These claims are distinct from, and are not intended to supplant, the claims of victims who were unconscionably harmed by Jeffrey Epstein and his associates.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **10** of **76**

## FACTUAL ALLEGATIONS
### A.   The Conduct of the "Epstein Enterprise" in the Virgin Islands

43.     Epstein and his associates, including Defendants, identified and recruited female victims, including children, and transported them to the Virgin Islands where they were abused and injured. Epstein, through and in association with Defendants, trafficked, raped, sexually assaulted and held captive underage girls and young women at his properties in the Virgin Islands.

44.     Epstein created a network of companies and individuals who participated in and conspired with him in a pattern of criminal activity related to the sex trafficking, forced labor, sexual assault, child abuse, and sexual servitude of these young women and children. Epstein and his associates trafficked underage girls to the Virgin Islands, held them captive, and sexually abused them, causing them grave physical, mental, and emotional injury.

45.     To accomplish his illegal ends, Epstein formed an association in fact with multiple Defendants and others (both companies and individuals) who were willing to participate in, facilitate, and conceal Epstein's criminal activity in exchange for Epstein's bestowal of financial and other benefits, including sexual services and forced labor from victims.

46.     This illicit association of Epstein, Defendants, and his associates constitute what is referred to herein as the "Epstein Enterprise." Epstein's associates in the Epstein Enterprise, including, but not limited to, those named as Defendants knowingly facilitated, participated in, and concealed Epstein's illegal conduct.

47.     Epstein used his wealth and power to create the Epstein Enterprise which engaged in a pattern of criminal activity in the Virgin Islands by repeatedly procuring and

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **11** of **76**

subjecting underage girls and young women to unlawful sexual conduct, sex trafficking, and forced labor.

48.     The Epstein Enterprise engaged in a pattern of criminal activity in the Virgin Islands (and elsewhere) with the criminal purpose and goal of placing a steady supply of vulnerable female children and young women into sexual servitude in service of Epstein's desires, and those of his associates. The Epstein Enterprise maintained and made available young women and underage girls for the purpose of engaging them in forced labor and sexual activities and used coercion and deception to procure, abuse, and harbor its victims.

49.     Flight logs and other sources establish that between 2001 and 2019 the Epstein Enterprise transported underage girls and young women to the Virgin Islands, who were then taken via helicopter or private vessel to Little St. James where they were then deceptively subjected to sexual servitude, forced to engage in sexual acts and coerced into commercial sexual activity and forced labor.

50.     In furtherance of its criminal activities, the Epstein Enterprise used its aircrafts to transport the young women and underage girls to the Virgin Islands for purposes of sexual abuse and exploitation.

51.     The Epstein Enterprise facilitated and participated in the sexual molestation and exploitation of numerous girls between the age of 12 and 17 years old.

52.     On the pretext of providing modeling opportunities, careers and contracts, associates of the Epstein Enterprise, funded by the Epstein Enterprise, lured and recruited young women and underage girls to travel to locations including the Virgin Islands where, upon information and belief, based on the pattern and practice of the Epstein Enterprise, they were sexually abused and exploited.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **12** of **76**

53.     Associates in the Epstein Enterprise recruited both victims and abusers into the Epstein Enterprise, participated in sexual acts of rape and abuse of minors and witnessed Epstein and others engage in sexual acts with children.

54.     As recent as 2018, air traffic controllers and other airport personnel reported seeing Epstein leave his plane with young girls some of whom appeared to be between the age of 11 and 18 years.

55.     Upon information and belief, based on Epstein's pattern of trafficking and sexually abusing young girls, the Epstein Enterprise trafficked and abused these girls, and others, in the Virgin Islands through 2018.

56.     When sued in civil court for committing sex trafficking and sex crimes, Epstein never denied engaging in sexual acts with underage females and procuring underage females for prostitution, but instead consistently invoked his Fifth Amendment privilege against self-incrimination.

57.     Upon information and belief, the Epstein Enterprise kept a computerized list of underage girls who were in or proximate to the Virgin Islands, and able to be transported to Epstein's residence at Little St. James in the Virgin Islands.

58.     The Epstein Enterprise engaged in a pattern of criminal conduct by trafficking children and young women and placing them in sexual servitude and forced labor in the Virgin Islands. The Epstein Enterprise repeatedly violated 14 V.I.C. §§ 133 to 138, which prohibit trafficking and sexual abuse. The Epstein Enterprise also repeatedly violated laws against child abuse and neglect, including 14 V.I.C. § 505, which defines the crime of child abuse as knowingly or recklessly causing "a child to suffer physical, mental, or emotional injury," or causing a child to be placed in a situation where such injury is foreseeable, and 14 V.I.C. § 506, which applies, as

here, where the child suffers serious physical, mental, or emotional injury as a result of that abuse.

The harm to Epstein's victims was both fully foreseeable and deeply damaging.

59.     The Epstein Enterprise knowingly recruited, transported, transferred, harbored, received, procured, obtained, isolated, maintained, and enticed young women and girls to engage in forced labor (such as providing massages) and, ultimately, sexual servitude at his little St. James residence.

60.     A 15-year old victim was forced into sexual acts with Epstein and others and then attempted to escape by swimming off the Little St. James Island. Epstein and others organized a search party that located her and kept her captive by, among other things, confiscating her passport. Another victim, who was first engaged in provide massages to Epstein, was then forced to perform sexual acts at Little St. James in the Virgin Islands. When she attempted to escape the "private island," Epstein and a search party found her, returned her to his house, and suggested physical restraint or harm if she failed to cooperate.

61.     Another victim was flown by Epstein and his associates to New York or Palm Beach and then to the Virgin Islands dozens of times from 2004, when she was age 20, to 2017. She was repeatedly abused by Epstein and also was pressed to have sex with Epstein's business colleagues.

62.     During the latter part of this period, she was forced into an arranged marriage to another victim that was facilitated by Defendant/Co-Executor Indyke to prevent the other victim from being deported. Indyke and a New York immigration lawyer retained by Epstein prepared the victim for communications with U.S. immigration officials almost immediately after the wedding. Defendant/Co-Executor Kahn provided a letter of reference for the immigration proceeding. When the victim inquired about ending the marriage and leaving Epstein's circle,

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **14** of **76**

Indyke repeatedly tried to talk her out of a divorce and threatened that she would lose Epstein's

and his associates' protection.

63.     The Epstein Enterprise forced at least three separate arranged marriages, in each

case requiring American female victims to marry foreign victims to avoid their deportation.  The

victims were coerced into to participating in these arranged marriages, and understood that there

would be consequences, including serious reputational and bodily harm, if they refused to enter

a marriage or attempted to end it.  In each instance, Indyke and Kahn knowingly facilitated the

fraudulent and coerced marriages, performing and securing the legal and accounting work

involved and enabling a fraud that would further bind Epstein's victims to him and enable

Epstein to continue to control and abuse these victims sexually.

64.     The Epstein Enterprise deceptively lured underage girls and women into its

sex trafficking ring with money and promises of employment, career opportunities and

school assistance. The Epstein Enterprise preyed on their financial and other vulnerabilities,

and promised victims money, shelter, gifts, employment, tuition and other items of value.

For example, participants in the Epstein Enterprise targeted young and underage females

under the pretext that they would be paid substantially merely to provide massages to him

and others. However, once drawn in, victims were then pressured and coerced to engage in

sexual acts.

65.     The Epstein Enterprise forced underage victims to recruit others to perform

services and engage in sexual acts—a trafficking pyramid scheme.

66.     The Epstein Enterprise paid girls for each "meeting," with additional money if

they brought additional girls. Epstein reportedly required three meetings per day.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **15** of **76**

67.     The Epstein Enterprise used the term "work" as a code for sexual abuse, and, upon information and belief, reportedly kept computer records of the contact information for the victims.

68.     Consistent with his creation and use of a complex web of entities to carry out and conceal the criminal trafficking enterprise in the Virgin Islands, the Epstein Enterprise sometimes paid young women and underage girls he exploited and trafficked through his charitable foundations.

69.     Once the girls and women were recruited, participants in the Epstein Enterprise enforced their sexual servitude of victims by coercion, including but not limited to, confiscating passports, controlling and extinguishing external communications, and threatening violence. They also made fraudulent statements to family members of victims, claiming victims were being well cared for and supported financially in college and other educational opportunities.

70.     One of the victims, who was flown by Epstein and his associates to the Virgin Islands dozens of times up until as late as 2017, described how Epstein exercised strict control over her and other victims' activity. The girls had to give notice if they left the main residence and were kept to a rigid set of roles and rules. Epstein brought victims to business meetings, where they were often required to massage his feet or run errands. Victims had to use Epstein-approved doctors and sign consent forms for access to their medical records. Epstein also required them to give him their email passwords.  Each of these was a means of demonstrating and reinforcing his control over the women and girls.

71.     During this time period through 2017, this victim observed a succession of girls and young women who were transported to Little St. James and while there were called into Epstein's office or sauna to engage in sexual acts.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **16** of **76**

72.      Another victim, who was brought to Little St. James more than 50 times during

the years 2000 to 2002, when she was 17 to 19 years old, was required to have sexual relations

with "guests" of Epstein, and was subjected to sexual abuse virtually every day, and on some

days, multiple times a day by Epstein or his guests.

73.      This victim, too, observed a large number of young women and girls around

Epstein at Little St. James. Many of them did not speak English, which was Epstein's preference

since they spoke less.

74.      Epstein sent these victims out to night clubs or on shopping trips to try to

identify and recruit other young women and girls, at times paying them a fee for each recruit.

75.      The Epstein Enterprise transported, held, sexually abused, trafficked, and

concealed women and children at his property in the Virgin Islands dozens of times over nearly

two decades.

**B.      Defendants and Co-Executors Indyke and Kahn were Instrumental to the
Epstein Enterprise's Human Trafficking and Financial Fraud.**

76.      Defendants Kahn and Indyke organized, controlled, and directed almost every

aspect of the Epstein Enterprise. They were officers in virtually every corporate entity that

Epstein created to fund and conceal his activities.  They were deeply involved in the financial

activities of the Epstein-owned entities, including those of Defendant Southern Trust Company,

which made clear that Southern Trust did not provide the services described to the Government

as the basis for tax incentives that allowed Epstein to fraudulently obtain more than $80 million

from the Government.

77.      Defendants Indyke and Kahn also directed, approved, enabled, and justified

millions of dollars in payments that fueled the Epstein Enterprise's sex trafficking, including

payments to women who were forced to have sex with Epstein and/or recruited others to be

victimized.  Defendants Indyke and Kahn obtained large and frequent stocks of cash for Epstein

which, based on public knowledge, would have funded Epstein's cash payments for

"massages"—code for forced sex.

78.     Defendants Indyke and Kahn participated with Epstein in coercing his sex

trafficking victims, in at least three cases, to enter into arranged and forced marriages in order to

obtain immigration status for the foreign women so that they could continue to be available to

Epstein for his abuse – a doubly-deep assault on their will and dignity.  Defendant Kahn

provided a letter of reference for at least one immigration application and tax services to the

spouses, and Defendant Indyke paid the immigration lawyer who applied for citizenship for the

women and threatened at least one who indicated that she would seek a divorce.  They used

their professional skills and authority to carry out this abhorrent scheme.

79.     Indyke and Kahn were, in short, the indispensable captains of Epstein's criminal

enterprise, roles for which they were richly rewarded.

80.     Defendants Kahn and Indyke controlled and directed the activities of the other

entities and personal bank accounts of Epstein accounts after they were funded.  One, and

frequently both, of them were officers or directors of Butterfly Trust; of companies holding

Epstein's real property (as laid out below); and of ████████████████████; ████

████; FT Real Estate Inc.; Gratitude America, Inc.; ███████████; J. Epstein Virgin

Islands Foundation, Inc.; Jeepers, Inc.; Mort, Inc.; Nautilus, Inc.; and Zorro Development

Corporation; among others.

81.     Along with their officer and director roles, Defendants Kahn and/or Indyke also

had signatory authority over virtually all of the accounts held by the Epstein Enterprise entities,

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **18** of **76**

which allowed them to personally authorize and sign off on payments totaling hundreds of

thousands of dollars to the Enterprise's sex-trafficking and abuse victims, including those who

also acted as recruiters, and other expenses including legal fees, apartment rent, and tuition.

Further, they routinely withdrew cash in various ways, including ATMs, checks, or by

converting U.S. Dollars to Euros.  In many instances, Kahn and/or Indyke structured these

transactions in order to evade the bank's reporting requirements.

82.     Defendant Kahn also oversaw the accounting and tax reporting for the other

entities in the Epstein Enterprise.  As discussed below the "Tree entities," Laurel, Maple, and

Cypress, filed materially false and misleading financial statements by not including the

properties in other states they owned or related expenses.  These financial statements were

submitted to the Office of Lieutenant Governor of the Virgin Islands and signed by Defendant

Kahn.  In addition, in 2013, Defendant Kahn also directed the outside accountant not to report

the properties on their respective tax returns.

83.     The J. Epstein Virgin Islands Foundation, Inc. (the "Foundation") is a 501(c)(3)

tax-exempt private foundation that was founded in June 2000 and registered in the Virgin

Islands.

84.     As of October 23, 2007, Indyke was listed as President of the Foundation. ██

████████████████████████████████████████████

85.     Between September 2015 and June 2019, Indyke ███████████████

████████████████████████████████████████████

████████████████████████████████████████████ made

over a period of more than three and a half years until the middle of 2019.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **19** of **76**

86.     In November 2017, Indyke ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

87.     These payments were inconsistent with the charitable purpose of the Foundation

and designed to serve the private benefit and criminal activities of Epstein and the Epstein

Enterprise.

88.     Earlier in 2017, Indyke signed a Foundation check for $160,000 to resolve a fine

Epstein had incurred for construction on Great St. James Island that violated Virgin Islands

environmental regulations and attempted to make the payment appear to be a charitable

donation.  Over two years later, the Estate had to repay this amount to the Foundation after

questions were raised to Epstein's lawyer about the propriety of the Foundation payment.

89.     With help from Indyke and Kahn, Epstein established and operated separate

businesses through which he could pay victims and recruiters, and, upon information and belief,

which he used to maintain their immigration status.

90.     ████████████████ is a New York Limited Liability Company, the Articles of

Organization of which were filed in November 2014. The Articles list ████, who was forced and

coerced to have sex with Epstein, ██████████████████████. ████ was manipulated,

exploited, and controlled by the Epstein Enterprise.

91.     According to ████ operating agreement, Kahn was to be the initial Manager of

the company, with full and complete authority, power, and discretion to do all things necessary

or convenient to manage, control, and carry out the business. Kahn also had signatory authority

for ████ bank accounts.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **20** of **76**

92.     One of ███ bank accounts was funded entirely with money transferred from
Epstein's personal bank accounts.

93.     ███ payroll was paid to two persons, one of whom was the listed sole owner.
Kahn gave conflicting reports to ███ bank about the second person on the company's payroll
and the reasons for its payments to her. Once, he described her as an ████████, which
would justify the payments in light of ███ purported line of business, but which appears to
have been false. The other time, Kahn described this payroll recipient ██████, which would
not justify ███████ payments to her, but which appears to be true.

94.     LSJE, LLC is a Virgin Islands Limited Liability Company that was organized on
October 27, 2011.  Defendants Indyke and Kahn were authorized signatories on the company's
checking account.

95.     Indyke and Kahn signed company checks for combined value of almost
$300,000 made out personally to young women or to, again, the immigration lawyer in New
York who was involved in one or more forced marriages arranged among Epstein's victims to
secure a victim's immigration status.

96.     Upon information and belief, after his guilty plea in Florida for soliciting
prostitution from a minor, Epstein began to focus on procuring and abusing women from
Eastern Europe.  These women's immigration status and language barriers made them more
isolated, dependent, and vulnerable to Epstein's abuse and manipulation.

97.     The Butterfly Trust is a trust created for the benefit of numerous persons who
performed work for Epstein, including numerous young women with Eastern European
surnames and also including Indyke and Kahn themselves. Indyke and Kahn were authorized
signatories on the Trust's checking account.

98.     Indyke and Kahn signed trust checks for combined value of over $1,000,000 made out personally to young women, or their associated entities, who in some instances were not beneficiaries of the trust.

99.     Defendants and Co-Executors Indyke and Kahn also were deeply involved with transactions made in and out of Epstein's personal accounts, for which Indyke had signatory authority, that were flagged by bank representatives and the New York Department of Financial Services as potentially suspicious.

100.    Indyke also engaged in repeated transactions that seem designed to have provided Epstein with cash in small enough increments to avoid triggering financial reporting requirements.  It is well known that Epstein paid girls and women in cash for sexual encounters that began as or were euphemistically described as massages, or for recruiting other girls to provide such massages.

101.    On July 20, 2016, Indyke brought two checks to a branch teller window for withdrawal, one for $7,500 drawn on Epstein's personal account and one for $4,000 drawn on Indyke's business account.  Indyke presented the $7,500 check for cashing and stated that he would be cashing the other check the next business day to avoid all the paperwork.  On July 21, 2016, Indyke returned to cash the $4,000 check.

102.    From June 2018 to February 2019, there was a series of 97 separate withdrawals of $1,000 made from this account at an ATM that is a short walk from Indyke's law office.

103.    From this same account, Indyke wrote 11 checks, between April 2016 and April 2019, for the purpose of converting U.S. dollars to Euros totaling over $126,000.  Some of the checks contained the notation "Euros for safe."

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **22** of **76**

104.     Also, Indyke withdrew large amounts of cash in single transactions. For

instance, on January 17, 2018, Indyke cashed a check for $100,000.  Although Indyke cashed

the check, Kahn arranged with the Bank representative to have the cash ready for pickup.

105.     Payments from this account, for which Indyke had signatory authority, totaling

over $2,500,000 were made to dozens of women with Eastern European surnames, purportedly

for hotel expenses, tuition, and rent, and to, again, the immigration lawyer in New York who was

involved in one or more forced marriages arranged among Epstein's victims to secure victims'

immigration status.

106.     For another of Epstein's personal accounts with the same bank, Indyke, from

2014 to 2016, made almost 45 separate check-cashing withdrawals at a pace of two to three per

month, each for the amount of $7,500, which was the bank's limit for third-party withdrawals.

107.     From this same account, between June 2014 and September 2015, Indyke wrote

eight checks for the purpose of converting U.S. dollars to Euros.  Each of the checks to

effectuate the conversion approximated $7,500, presumably in order to evade reporting

requirements, with some containing the notation "Euros for safe."

108.     Payments from this account totaling over $1,000,000 were made to dozens of

women with Eastern European surnames and to, again, the immigration lawyer in New York

who was involved in one or more forced marriages arranged among Epstein's victims to secure

a victim's immigration status.

109.     Indyke made wire transfers from another of Epstein's personal accounts with a

different bank totaling almost ████ between November 2016 and July 2019 (just before

Epstein's arrest) to █████████████████████████████

████████████████████████████.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **23** of **76**



110.    From another of Epstein's personal accounts with another different bank, for which ███████████████████, someone acting on Epstein's behalf made a total of ██ ██████████████████████████████████████████████████████████ ████████████████

111.    Payments from this account totaling almost ███████████████████ ██████████████████████████████████████████████████.

112.    Upon information and belief, based on their authority for the accounts, their interactions with the relevant banks, and records indicating that they made or approved the transactions, these payments could have only been made with the knowledge and/or at the direction of Indyke and Kahn.

113.    The sheer complexity of the infrastructure that Epstein set up and maintained with the participation of Kahn and Indyke suggest their unlawful purpose.  Based on the Government's current knowledge, Epstein, with Kahn and Indyke, held and managed at least 140 different bank accounts for Epstein and Epstein-owned entities, many of which existed only to transfer payments to other entities and accounts.

114.    Kahn and Indyke profited substantially from their relationship with Epstein. The amount of their payments is further evidence of the illicit nature of the work they performed.

115.    From 2011 to 2019, Epstein and Epstein-owned entities paid over ███████ ██ to Defendant/Co-Executor Indyke, and over ████████████ to Defendant/Co-Executor Kahn.  This includes ██████████████████████████████████.  Based on records obtained so far, ████████████████████████████████████ ██████████████████████████.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **24** of **76**

116.    Indyke and Kahn were paid through multiple entities, including HBRK
Associates, Inc. (Kahn), Coatue Enterprises, LLC (Kahn), Birch Tree BR, LLC (Indyke)
Harlequin Dane, LLC (Indyke) and Darren K Indyke, PLLC, which functioned as shell
companies and engaged in no activities other than to coordinate the activities of Epstein's
Enterprise, including the receiving and sending money to other entities they held.

117.    Since they were appointed as Co-Executors of the Epstein Estate in 2019,
Defendants Indyke and Kahn have approved the release of Estate funds to pay for the legal fees
and costs of persons who—like the Co-Executors themselves—are alleged herein to have
participated in the criminal activity of the Epstein Enterprise.

### C.  The "Epstein Enterprise" Abused Privileges of Residency to Carry out its Criminal Scheme

118.    The Epstein Enterprise in 1998 acquired Little St. James in the Virgin Islands as
the perfect hideaway and haven for trafficking young women and underage girls for sexual
servitude, child abuse and sexual assault. Little St. James is a secluded, private island, nearly
two miles from St. Thomas with no other residents. It can be visited only by private boat or
helicopter; no public or commercial transportation is available to carry persons on or off the
island, and no bridge connects the island to St. Thomas. Epstein had easy access to Little St.
James from the private airfield on St. Thomas, only 10 minutes away by his private helicopter,
but the women and children he trafficked, abused, and held there were not able to leave without
his permission and assistance, as it was too far and dangerous to swim to St. Thomas.

119.    In 2016, upon information and belief, using a straw purchaser to hide Epstein's
identity, the Epstein Enterprise acquired Great St. James the nearest island to Little St. James. By
then, Epstein was a convicted sex offender. Upon information and belief, the Epstein Enterprise

purchased the island for more than $20 million because its participants wanted to ensure that the island did not become a base from which others could view their activities or visitors. By acquiring ownership and control of Great St. James to the exclusion of others, the Epstein Enterprise created additional barriers to prevent those held involuntarily on Little St. James from escaping or obtaining help from others.

120.    Great St. James and Little St. James are environmentally sensitive locations, with native coral and wildlife protected by federal and territorial law and enforcement authorities. The Department of Planning and Natural Resources ("DPNR") regulates and monitors construction in the Coastal Zone to protect, maintain and manage the precious natural resources of the Virgin Islands. Under its authority, DPNR repeatedly issued citations and assessed thousands of dollars of fines for violations of the Virgin Islands construction code and environmental protection laws on both Little St. James and Great St. James—significant penalties to the agency and to the average resident of the Virgin Islands. But because of Epstein's enormous wealth, these fines had little effect in curbing or stopping the Epstein Enterprise's unlawful conduct or conforming its activities to the law.

121.    As a result of illegal construction activity of the Epstein Enterprise, the Virgin Islands has incurred, and will incur, significant expenses to remove the illegal construction or remediate its effects on natural resources in and around Little St. James and Great St. James. The extent of the potential environmental damage is unknown at this time as the illegal construction has not been removed or remediated.

122.    The Epstein Enterprise continues to attempt to prevent or limit DPNR authorities from conducting random inspections on the Little St. James and Great St. James necessary to comply with Virgin Islands law.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **26** of **76**

123.    The Epstein Enterprise's violation of the construction and environmental laws was part of a pattern of behavior in flouting the laws of the Virgin Islands and holding itself above the law. Upon information and belief, as described above, the Epstein Enterprise undertook construction at Great St. James after 2016 to continue the scheme to carry out and conceal his trafficking and sexual abuse of young women and children in the Virgin Islands. These actions are also indicative of the Epstein Enterprise's disregard for Virgin Islands' law. The Epstein Enterprise used the Virgin Islands' land, resources, people, and laws for its illicit purposes. Rather than participating lawfully in this community, the Epstein Enterprise took advantage of the secluded nature of the islands in furtherance of its crimes.

124.    As a result of its deplorable and unlawful conduct, the Epstein Enterprise has subjected the Virgin Islands to public portrayals as a hiding place for human trafficking and sex crimes.

**D. The "Epstein Enterprise" Fraudulently Concealed its Conduct**

125.    The Epstein Enterprise fraudulently concealed its actions to prevent detection by the Government of the Virgin Islands.

126.    The secluded properties at Little St. James and Great St. James were repeatedly used by the Epstein Enterprise as the locations for unlawfully soliciting, transporting, transferring, harboring, receiving, providing, isolating, patronizing, maintaining, deceiving, coercing, and sexually abusing young women and children and concealing these crimes.

127.    The Epstein Enterprise was able to hide the trafficking ring from law enforcement, despite the fact that Epstein was a registered sex offender. Given the isolation of the Little St. James and Great St. James and the nature of the crimes and of the victims targeted by the Epstein Enterprise, the activities of the Epstein Enterprise were not readily detectable.

Moreover, Epstein's great wealth and power likely made witnesses reluctant to report their observations to the local law enforcement.

128.    Upon information and belief, the Epstein Enterprise prevented its employees from cooperating with law enforcement. Employees and others were required to sign confidentiality agreements that prohibited them from speaking to or sharing information with law enforcement. If they were contacted by law enforcement they were to notify the Epstein Enterprise and be represented by Epstein's counsel.

129.    The employees were directed not to communicate or interact with guests visiting Little St. James and were also directed not to disclose to anyone events that occurred on the island.

130.    Monitoring a sex offender with his own private islands and the resources to fly victims in and out on private planes and helicopters presented unique challenges and allowed the Epstein Enterprise to limit scrutiny by the Government of the Virgin Islands.

131.    Sexual Offender Registration and Community Protection Act ("SORCPA") 14 V.I.C. § 1721, *et. seq.* requires sex offenders to register in their resident jurisdictions and to make periodic in-person appearances to verify and update their registration information.

132.    Epstein renewed his registration each year in the Virgin Islands. In addition, beyond this statutory requirement, the Virgin Islands periodically visited—or attempted to visit—Little St. James to conduct additional address verifications.

133.    At his last verification in July 2018, Epstein refused to permit Virgin Islands Department of Justice Investigators, assisted by United States Marshals, to enter Little St. James beyond its dock, claiming that the dock was his "front door." Instead, Epstein arranged to be met at his office on St. Thomas.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **28** of **76**

134.    Epstein also misled the Government regarding his travel plans. On March 19, 2019,

the Virgin Islands was notified that Epstein would be traveling to France for 10 days on the private

plane owned by Plan D, LLC. His notification form did not disclose travel to any other countries. It

was later found by law enforcement authorities that Epstein also travelled to Vienna and Monaco

during that trip.

135.    Similarly, the Epstein Enterprise sought to prevent DPNR from conducting

routine site visits to inspect unpermitted and potentially damaging construction activity on Great

St. James. The Epstein Enterprise repeatedly objected to DPNR's inspections referring to them as

"invasions" of Epstein's constitutional right to privacy in his home, which he described defined

as the entire island. These DPNR inspections are required for all construction and Virgin Islands

residents are required to cooperate with the inspections to assure compliance with the law

throughout the construction phases.

136.    These efforts represent Epstein Enterprise's intent to conceal its unlawful activity

on Little St. James and Great St. James.

137.    The Epstein Enterprise also created numerous corporations and limited liability

companies in the Virgin Islands to help conceal its unlawful activity. Most of these companies were

created in 2011 and 2012, soon after Epstein registered as a sex offender in the Virgin Islands.

138.    Epstein's pilot, Larry Visoski is identified as member or co-member in companies

that serviced and maintained the planes that the Epstein Enterprise used to traffick young women

and children — Freedom Air Petroleum, LLC (registered November 28, 2011 to hold assets);

and JEGE, LLC (registered October 19, 2012 to hold assets).

139.    Other Epstein entities include LSJ Employees, LLC (registered October 27, 2011 to provide services); Southern Financial, LLC (registered February 25, 2013 to provide services) and LSJ Emergency, LLC (registered December 2, 2015 to provide services).

140.    Some of these companies held considerable assets: Financial Informatics, Inc. (incorporated November 18, 2011, also known as Southern Trust Company, Inc.) had assets of approximately $391 million in 2015; and Financial Trust Company, Inc. (incorporated November 6, 1998) had assets of $212 million when it publicly filed its last balance sheet in 2012.

141.    Though often absent in the original incorporation or registration documents or annual filings, Epstein ultimately appeared as president, director, manager, or sole member of each of these companies. Upon information and belief, the purpose of this complex array of corporate entities—some of which may still be discovered—was to allow Epstein to shelter his assets in order to fund, carry out, and conceal his identity and pattern of criminal conduct.

142.    The Estate continues to engage in a course of conduct aimed at concealing the criminal activities of the Epstein Enterprise. On November 24, 2019, Epstein's Estate filed an Expedited Motion for Establishment of a Voluntary Claims Resolution Program in the Superior Court of the Virgin Islands. ("Motion"). According to the Motion, the proposed program was to be designed to "establish an independent and voluntary claims resolution program for purposes of resolving sexual abuse claims against Jeffrey E. Epstein." (Motion, at 1).

143.    The program proposed by the Estate, whose executors are trustees of The 1953 Trust and officers in at least two Epstein entities, imposes confidentiality requirements and requires any claimant accepting an award under the program to sacrifice any other claims against "any person or entity arising from or related to Mr. Epstein's conduct." (Motion, at 5). It acts to

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **30** of **76**

conceal the criminal activities of the Epstein Enterprise and shield its participants from liability

and accountability for the injury they caused to the victims.

144. The Estate also refused to agree to preserve documents or to release individuals

from the non-disclosure agreements.

145. Two days before his death, Epstein amended The Trust and his Last Will and

Testament. Upon information and belief, he did so, as part of a pattern and ongoing effort to

conceal and shield his assets from potential recovery by claimants.

### E. The "Epstein Enterprise" Violated Numerous Virgin Islands Laws

146. The pattern of criminal activity engaged in by Epstein and other participants in

the Epstein Enterprise violated 14 V.I.C. §§ 605 and 607 of the Criminally Influenced and

Corrupt Organizations Act ("CICO").

147. The Epstein Enterprise also violated Title 14, Chapter 3A, The Virgin Islands

Uniform Prevention of and Remedies for Human Trafficking Act relating to Trafficking of

Persons; Title 14, Chapter 24, relating to Child Protection and Child Abuse and Neglect; Title

14, Chapter 81, relating to Prostitution and Related Offenses; Title 18, Chapter 85, relating to

Rape and Sexual Assault and other related offenses, as well as other Virgin Islands laws.

148. The Epstein Enterprise violated Virgin Islands laws by engaging in the human

trafficking of underage girls and young women and commercial sex with young women and

underage girls by force, fraud, enticement, or coercion, which serve as predicates to the Epstein

Enterprise's violations of CICO.

149. Certain participants who recruited women and underage girls to be trafficked

and forced into sexual servitude themselves were sexually trafficked and abused by the Epstein

Enterprise and may be afforded the protections of 14 V.I.C. § 145.

150.     Specifically, Plan D, LLC knowingly and intentionally facilitated the trafficking scheme by flying underage girls and young women into the Virgin Islands to be delivered into sexual servitude. Plan D LLC repeatedly made flights from the mainland to St. Thomas with Epstein and underage girls and young women for the purpose of engaging in sexual activity on Little St. James. On some occasions, they would transport Epstein and female children by helicopter to Little St. James. On other occasions, Epstein and the young women and girls would be transported by boat.

151.     Great St. Jim, LLC and Nautilus, Inc. knowingly participated in the Epstein Enterprise and facilitated the trafficking and sexual servitude of young women and underage girls by providing the secluded properties at, from, or to which Epstein and his associates were able to transport, transfer, receive, maintain, isolate, harbor, provide, entice, deceive, coerce, and sexually abuse underage girls and young women.

152.     The Epstein Enterprise engaged in a continuing course of unlawful conduct.

153.     After Epstein's suicide, the Epstein Enterprise continued to exist as each of the participants continued to conspire to prevent detection of the breadth and scope of the Epstein Enterprise's criminal wrongdoing and to prevent accountability. These conspiratorial acts are ongoing.

154.     The conduct of the Epstein Enterprise offends the core purpose of the Virgin Islands Uniform Prevention of and Remedies for Human Trafficking Act, 14 V.I.C. §131 *et seq,* and violates CICO, enacted to "curtail criminal activity and lessen its economic and political power in the Territory of the Virgin Islands by establishing new penal prohibitions and providing to law enforcement and the victims of criminal activity new civil sanctions and remedies." 14 V.I.C. § 601.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **32** of **76**

155.     The Epstein Enterprise is an illicit enterprise within the meaning of 14 V.I.C. §§ 604 and 605.

156.     The Government is entitled to recover civil penalties, damages and other remedies and to extinguish and recoup from the Epstein Enterprise and its participants any and all financial and other benefits, and any personal and real property that was used during the course of, or intended for use in the Course of the conduct or criminal activity in violation of the laws of the Virgin Islands. The Government is entitled to obtain through divestiture, forfeiture, or other equitable relief all properties and instrumentalities used by the Epstein Enterprise in the criminal pattern of trafficking and sexual abuse in the Virgin Islands, including but not limited to Great St. James and Little St. James, and all other remedies and penalties permitted by law in the interest of justice.

### F. The Epstein Enterprise Used Corporate Entities to Defraud the Government and Fund its Criminal Activities

### 1. Defendant Southern Trust Company, Inc.

157.     In October 2012, the Southern Trust Company applied for economic benefits from the Economic Development Commission ("EDC"). The EDC is a subsidiary of the Virgin Islands Economic Development Authority ("EDA"), a semi-autonomous governmental instrumentality created and governed pursuant to 29 VIC § 1101.

158.     In sworn testimony at a public hearing on the tax incentive application conducted by the EDC on November 15, 2012, Epstein and his attorney, Ericka Kellerhals, described Southern Trust Company as providing "cutting edge consulting services" in the area of "biomedical and financial informatics."

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **33** of **76**

159.    The EDC granted Southern Trust Company a 10-year package of economic incentives running from February 1, 2013 until January 31, 2023 that included a 90% exemption from income taxes and 100% exemptions from gross receipts, excise, and withholding taxes in the Virgin Islands.

160.    Between 2013 and 2019, Southern Trust Company employed 13 different individuals (not including Epstein). Of those 13 individuals, 11 served in administrative or support roles: six as personal, administrative, or executive assistants, receptionists, or as a driver/helper, one as an office manager, one as a clerk, and three in accounting or payroll functions (though only one was licensed as a certified public accountant). There was one network administrator/IT manager, and a second who was added in 2019.

161.    In fact, several of those individuals seemed to perform other personal services for Jeffrey Epstein. Though he was reported by Southern Trust Company to be resident of the Virgin Islands, the network administrator/IT manager was issued a Florida driver's license, which listed an address in Miami. Further, he appears, in fact, to have served as Epstein's driver and picked up luggage and cargo from Epstein's private planes on his behalf.

162.    Another executive assistant lived at 301 E. 66th Street, Apartment 11B, New York, New York. Epstein's address book lists various units in this building as providing "Apt. for models" and she is publicly identified as a model. As noted above, the Epstein Enterprise used modeling opportunities and contracts as a pretext for recruiting underage girls and young women into its sex trafficking scheme.

163.    Financial records more recently obtained show that the employee described above whom Kahn represented to be, alternatively, █████████████████████, was *also* a

████████████████████████, which did not actually or even pretend to perform

either ██████████████████████, in 2019.

164.     During several time periods, Southern Trust Company affirmed to EDC that it

had no employees who were non-residents, even though it employed non-residents.

165.     Southern Trust company does not appear to have had any clients and performed

no visible informatics services. According to financial records, it held no investments for others.

Instead, its employees performed tasks related to any number of other Epstein-owned companies

or properties, such as Little St. James.

166.     Despite having no visible clients and only one full-time employee working on

information technology during the bulk of the period, Southern Trust Company reportedly

generated net income of $50.3 million in 2013, $67.5 million in 2014, $52.8 million in 2015, and

$4.8 million in 2016 and $17.1 million in 2017, with aggregate income of $117.8 million in 2014,

$170.6 million in 2015, $175.3 million in 2016 and $192.4 million in 2017, or aggregate income

for the period of $656 million.

167.     Money received by Southern Trust was then funneled, frequently by Defendant

Indyke as authorized signatory, and often with copies given to Defendant Kahn, through other

Epstein-owned entities and accounts, funding payments to foreign women and for credit cards,

airplanes, and other instrumentalities of the Epstein Enterprise.

168.     In fact, the main source of funds for the Epstein Enterprise came from Southern

Trust. Between 2013 and 2017, Southern Trust reported approximately $184 million in

revenues.

169.     Defendants Kahn and Indyke directed and controlled the day-to-day activities of

Southern Trust in form and in substance, serving as members of its Board of Directors, along

with Epstein.  Indyke was a signatory on Southern Trust's primary bank account to which funds

were wired, primarily from a single source, as described below.  Kahn, as Southern Trust's

treasurer, oversaw its accounting, invoicing, and tax reporting.  Indyke also authorized a

majority of the wire transfers from Southern Trust's bank account in order to fund the various

entities and personal bank accounts of Epstein, and had full inquiry capabilities over the

account.

170.    Bank records show that virtually all of Southern Trust Company's income came

from a single source (including related entities).

171.    In all, the single source paid $158 million to Defendant Southern Trust Company

from 2013 to 2017, which constitutes 85% of the total revenues reported by Southern Trust

Company.  These funds appear to have not been used to pay for informatics or datamining

services.

172.    These payments to Southern Trust were the main source of funds for Epstein's

Enterprise.  Indeed, no other entity in Epstein's Enterprise generated revenues.  Funds received

from the single source were funneled, at the direction of Kahn and Indyke, to Epstein's personal

accounts, and other Epstein entities to fund his criminal activities.

173.    For the period between January 1, 2013 and December 31, 2017, Southern Trust

Company received tax exemptions totaling $73.6 million.

174.    As of December 31, 2017, Southern Trust Company, Inc. elected to file its

income tax as an S-corporation, which elects to pass corporate income, losses, deductions and

credits through to its sole shareholder—Jeffrey Epstein—for tax purposes. For this time period,

Epstein's income tax exemption was $71.3 million.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **36** of **76**

175.    Including gross receipt taxes, the Government currently estimates that, as a
result of the EDC incentive, Epstein was able to avoid paying $80,576,236 in taxes.

176.    Based upon these facts, it is clear that Southern Trust Company did not perform
the "informatics" business represented to the EDC and could not have generated the business
income attributable to that business. Instead, upon information and belief, Southern Trust
Company existed to secure tax benefits for Epstein, to employ individuals associated with the
Epstein Enterprise, and to provide a source of income to support his criminal activities and
properties in the Virgin Islands.

**2.    Defendants Cypress, Inc.; Maple, Inc.; and Laurel, Inc.**

177.    Epstein formed Cypress, Inc.; Maple, Inc.; and Laurel, Inc. as Virgin Islands
corporations in or about November 2011.

178.    As of December 31, 2018, Epstein was listed as President Director and
Defendants and Co-Executors Indyke and Kahn were listed, respectively, as Vice President/
Secretary/Director and Treasurer/Director of each of Cypress, Inc.; Maple, Inc.; and Laurel, Inc.

179.    Defendant Cypress, Inc. acquired ownership of the property 49 Zorro Ranch
Road in Stanley, New Mexico in or about December 2011, shortly after Cypress was formed.

180.    Defendant Maple, Inc. acquired ownership of the property 9 East 71st Street in
New York, New York on or about December 23, 2011, shortly after Maple was formed.  Maple
acquired ownership of the property from Nine East 71st Street Corporation, which was owned by
Epstein.

181.    Defendant Laurel, Inc. acquired ownership of the property 358 Brillo Way in
Palm Beach, Florida in or about December 2011, shortly after Cyrpess was formed.  Laurel
acquired ownership of the property from Epstein personally.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **37** of **76**

182.     Epstein appears to have maintained divided ownership of these properties,

transferred ownership of them to the Virgin Islands, and then concealed this fact even from

Virgin Islands authorities in an attempt to shield the properties from any judgment in the states

where they are located.

183.     The financial statements submitted by each of these three Defendant corporations

to the Office of Lieutenant Governor of the Virgin Islands were false and misleading due to their

failure to include the above properties owned by each company or the related expenses incurred

by each company, such as property taxes.

184.     For instance, Cypress's Balance Sheet as of December 31, 2018 did not reflect

any assets other than cash of $18,824. Further, Cypress reported only $301 in expenses for the

year ended December 31, 2018, despite it paying ███████████████████████████████

███████████████.

185.     Similarly, in 2017, Cypress reported as its only asset cash in the amount of

$29,736 and expenses of $150, despite it paying ███████████████████████████████

██████████████████████.

186.     Similarly, for the tax years 2011 through 2016, Cypress did not include the value

of the New Mexico property in the total assets it reported and did not include any expenses

related to the New Mexico property in the total expenses it reported to the Government.

187.     Likewise, Maple's balance sheet as of December 31, 2018 did not reflect any

assets other than cash of $21,265. Further, Maple reported only $300 in expenses for the year

ended December 31, 2018, despite it paying ███████████████████████████████

████████.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **38** of **76**

188.     Similarly, in 2017, Maple reported as its only asset cash in the amount of $18,281 and expenses of $150, despite it paying ████████████████████ ████████████████.

189.     Similarly, for the tax years 2011 through 2016, Maple did not include the value of the New York property in the total assets it reported and did not include any expenses related to the New York property in the total expenses it reported to the Government.

190.     Likewise, Laurel's balance sheet as of December 31, 2018 did not reflect any assets other than cash in the amount of $20,155. Further, Laurel reported only $300 in expenses for the year ended December 31, 2018, despite it paying ████████████████████ ████████████████.

191.     Similarly, in 2017, Laurel reported as its only asset cash in the amount of $37,129 and expenses of $150, despite it paying ████████████████████ ████████████.

192.     Similarly, for the tax years 2011 through 2016, Laurel did not include the value of the Palm Beach property in the total assets it reported and did not include any expenses related to the Palm Beach property in the total expenses it reported to the Government.

193.     Neither Cypress's, Maple's, nor Laurel's financial statements ever reflected the reality of the above assets held or the above expenses incurred by each entity.

194.     The Annual Reports submitted on behalf of Cypress, Maple, and Laurel all were signed by Epstein and Defendant and Co-Executor Kahn with the representation that "ALL STATEMENTS CONTAINED IN THIS APPLICATION, AND ANY ACCOMPANYING DOCUMENTS, ARE TRUE AND CORRECT . . ."

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **39** of **76**

195.    In fact, Indyke and Kahn knew or should have known that their attestations were false.  Upon information and belief, particularly given the absence of any other justification for these transactions and the fraudulent nature of their reporting, these transactions were made for the sole purpose of sheltering these assets from collection.

## STATUTES OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FROM ASSERTING STATUTES OF LIMITATIONS AS DEFENSES

### 1.    Equitable Estoppel and Fraudulent Concealment

196.    Defendants are equitably estopped from relying upon a statute of limitations defense for conduct that occurred prior to the limitation period because they undertook active efforts to deceive the Government and to purposefully conceal their unlawful conduct and fraudulently assure public authorities that their conduct was in compliance with the laws, all with the goal of avoiding punishment.

197.    Defendants were deliberate in taking steps to conceal their criminal sex trafficking and abuse conduct and their fraudulent conduct in obtaining unearned tax benefits from the Government.  Defendants' acts of concealment include, but are not limited to, the following.

198.    Defendants used Epstein's secluded island of Little St. James and his later purchase of the nearby island of Great St. James to shield their trafficking and sexual abuse of young women and female children from detection by law enforcement authorities and to prevent their victims from escaping.

199.    Defendants used Epstein's private aircraft to transport young women and female children to the Virgin Islands and to Little St. James while limiting public observation of this trafficking activity.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **40** of **76**

200.    Defendants used Epstein's businesses and ostensibly charitable foundations in the Virgin Islands to make payments to the victims who were trafficked and sexually abused while concealing these payments from detection by law enforcement authorities.

201.    Defendants also prevented Epstein Enterprise entity employees from cooperating with law enforcement by requiring them to sign confidentiality and non-disclosure agreements.

202.    Defendants also actively obstructed law enforcement by denying investigators access to Little St. James beyond its boat dock.



203.

204.

205.

206.    Defendants also concealed their fraud on the Government in obtaining unearned tax benefits by providing false testimony and submitting false and inaccurate reporting to the Economic Development Commission to prevent detection of Defendant Southern Trust Company's non-compliance with requirements concerning the nature of its business and the residency of the persons it employed.

207.    The discovery of the nature, scope, and magnitude of Defendants' unlawful conduct and could not have been acquired earlier through the exercise of reasonable diligence.

### 2.     Continuing Violations

208.     The continuous criminal conduct by the Defendants has caused repeated and continuous injury.

209.     Defendants criminal trafficking and sexual abuse of young women and female children in the Virgin Islands occurred continuously from Epstein's purchase of Little St. James in 1998 through his arrest and death in prison in 2019.

210.     Flight logs and other sources establish that between 2001 and 2019, Defendants transported young women and female children to the Virgin Islands, where they were then transported by private helicopter or boat to Little St. James.

211.     Air traffic controllers and airport personnel have reported seeing, as recently as 2018, Epstein leaving his private jet with young girls who appeared to be between the ages of 11 and 18 years.

212.     One victim was brought by Defendants more than 50 times between 2000 and 2002, when she was around 18 to 20 years old, to Little St. James, where she was required to have sexual relations with Epstein or his guests multiple times per day and where she saw large numbers of other young women and female children subject to the same treatment.

213.     Another victim was brought by Defendants dozens of times between 2004 and 2017 to Little St. James, where she too observed a succession of young women and female children who likewise were transported to the island and were required to have sexual relations with Epstein and his guests.

214.     Defendants' fraud on the Government in obtaining unearned tax benefits through Defendant Southern Trust Company likewise was continuous inasmuch as Southern Trust's failure to perform the informatics services that it represented to the Economic Development

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **42** of **76**

Commission and its false reporting of the residency and job descriptions of its employees were continuous from the start of the tax benefits in 2013 through Epstein's arrest and death in prison in 2019.

215.    The continued criminal conduct by Defendants has caused repeated and continuous injury.  The criminal conduct of the Epstein Enterprise was not completed nor were all damages incurred until the wrongdoing ceased.

**COUNT ONE**
**Human Trafficking — Trafficking an Individual**
**Violation of the Criminally Influenced and Corrupt Organizations Act ("CICO"),**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C § 133**

216.    The Government restates and realleges paragraphs 1 to 215 of this Complaint as if fully set forth herein.

217.    At all times material herein, each Defendant directly and indirectly participated in or associated with the Epstein Enterprise, an illicit enterprise.

218.    The Epstein Enterprise engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by CICO, including, but not limited to, knowingly recruiting, transporting, transferring, harboring, receiving, providing, obtaining, isolating, maintaining, or enticing female children and young women in the furtherance and performance of forced labor, sexual servitude and commercial sexual activity in violation of Virgin Islands laws codified in 14 V.I.C. §§ 133-138.

219.    Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

220.    Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

221.    At all times material herein, Defendants engaged in said pattern of criminal

activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO.14 V.I.C. §600 *et seq.*

### COUNT TWO
### Human Trafficking — Trafficking an Individual
### Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C § 133

222.    The Government restates and realleges paragraphs 1 to 221 of this Complaint as

if fully set forth herein.

223.    At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting human trafficking.

224.    Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy by recruiting, transporting, transferring, harboring, receiving, providing,

obtaining, isolating, maintaining or enticing female children and young women in the

furtherance and performance of forced labor, sexual servitude and commercial sexual activity in

violation of Virgin Islands laws codified in 14 V.I.C. § 133 -138.

225.    Defendants knowingly benefited financially and/or obtained other non-financial

value from participation in the Epstein Enterprise, which has engaged in human trafficking,

forced labor, sexual servitude and commercial sexual activity of girls and young women in

knowing or reckless disregard of the laws of the Virgin Islands.

226.    At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **44** of **76**

227.     At all times material herein, Defendants engaged in said pattern of criminal

activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation

of CICO. 14 V.I.C. §600 *et seq.*

## COUNT THREE
### Human Trafficking — Forced Labor
### Violation of the Criminally Influenced and Corrupt Organizations Act,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C § 134

228.     The Government restates and realleges paragraphs 1 to 227 of this Complaint as

if fully set forth herein.

229.     At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

230.     The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including, but not limited to, knowingly

using coercion to compel underage girls and young women to provide labor or services by

forced labor in violation of 14 V.I.C. § 134.

231.     The Epstein Enterprise knowingly provided or obtained the labor services of

individuals by means of force, threats of force, physical restraint, and/or threats of physical

restraint; by means of serious harm or threats of serious harm; by means of abuse or threatened

abuse of law or legal processes; and by means of the Epstein Enterprise with the intent to cause

individuals to believe that, if individuals did not perform such labor or services, individuals

would suffer serious harm or physical restraint.

232.     Defendants through a pattern of criminal activity directly and indirectly

participated in or associated with the Epstein Enterprise, an illicit enterprise.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **45** of **76**

233.    Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

234.    Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

235.    At all times material herein, Defendants engaged in said pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO. 14 V.I.C. §600 *et seq.*

**COUNT FOUR**
**Human Trafficking — Forced Labor**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C § 134**

236.    The Government restates and realleges paragraphs 1 to 235 of this Complaint as if fully set forth herein.

237.    At all times material herein, each Defendant joined in a conspiracy to violate laws prohibiting human trafficking.

238.    Each Defendant engaged in acts that revealed its intent to join and participate in the criminal conspiracy by knowingly using coercion to compel underage girls and young women to provide labor or services by forced labor in violation of 14 V.I.C. § 134.

239.    Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude and commercial sexual activity of girls and young women in knowing or reckless disregard of the laws of the Virgin Islands.

240.     At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

241.     At all times material herein, Defendants engaged in said pattern of criminal

activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation

of CICO. 14 V.I.C. §600 *et seq.*

**COUNT FIVE**
**Human Trafficking — Sexual Servitude**
**Violation of the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C § 135**

242.     The Government restates and realleges paragraphs 1 to 241 of this Complaint as

if fully set forth herein.

243.     At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

244.     The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including, but not limited to, knowingly

maintaining or making available minors for the purpose of engaging the minors in commercial

sexual activities or using coercion or deception to force young women to engage in commercial

sexual activity in violation of 14 V.I.C. § 135.

245.     On the pretext of providing modeling opportunities, careers and contracts,

Defendants facilitated the transporting or recruiting of young women and girls or lured and

recruited young women and underage girls to travel to the Virgin Islands where they engaged in

sexual acts with Epstein and others. In some instances, young women and underage girls were

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **47** of **76**

given scholarships, money, gifts or other items of value in exchange for engaging in sexual acts

with Epstein and others.

246.    Defendants through a pattern of criminal activity directly and indirectly

participated in or associated with the Epstein Enterprise, an illicit enterprise.

247.    Defendants through a pattern of criminal activity acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

248.    Defendants benefited, directly and indirectly, from the pattern of criminal

activity conducted by the Epstein Enterprise.

249.    At all times material herein, Defendants engaged in said pattern of criminal

activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation

of CICO. 14 V.I.C. §600 *et seq.*

## COUNT SIX
### Human Trafficking — Sexual Servitude
### Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. § 600 *et seq.* and 14 V.I.C § 135

250.    The Government restates and realleges paragraphs 1 to 249 of this Complaint as

if fully set forth herein.

251.    At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting human trafficking.

252.    Each Defendant engaged in acts that revealed its intent to join the criminal

conspiracy by knowingly maintaining or making available minors for the purpose of engaging

the minors in commercial sexual activities or using coercion or deception to force young women

to engage in commercial sexual activity in violation of 14 V.I.C. § 135.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **48** of **76**

253.     On the pretext of providing modeling opportunities, careers and contracts, Defendants facilitated the transporting or recruiting of young women and girls or lured and recruited young women and underage girls to travel to the Virgin Islands where they engaged in sexual acts with Epstein and others. In some instances, young women and underage girls were given scholarships, money, gifts or other items of value in exchange for engaging in sexual acts with Epstein and others.

254.     Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude and commercial sexual activity of girls and young women in knowing or reckless disregard of the laws of the Virgin Islands.

255.     At all times material herein, each Defendant conspired with Epstein and other Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking, forced labor, and sexual servitude. 14 V.I.C. §604(j).

256.     At all times material herein, Defendants engaged in said pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO. 14 V.I.C. §600 *et seq.*

**COUNT SEVEN**
**Human Trafficking — Patronizing Minors and Victims of Sexual Servitude**
**Violation of the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 136-37**

257.     The Government restates and realleges paragraphs 1 to 256 of this Complaint as if fully set forth herein.

258.     At all times material herein, each Defendant directly and indirectly participated in or associated with the Epstein Enterprise, an illicit enterprise.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **49** of **76**

259.    The Epstein Enterprise engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by CICO, including, but not limited to, knowingly giving, agreeing to give, or offering to give items of value to young women and minors so that the young women and minors would engage in commercial sexual activity with Epstein, other Defendants, and other individuals in violation of 14 V.I.C. §§ 136-137.

260.    In some instances, young women and underage girls were given scholarships, money, gifts or other items of value in exchange for engaging in sexual acts with Epstein and others.

261.    Defendants through a pattern of criminal activity directly and indirectly participated in or associated with the Epstein Enterprise, an illicit enterprise.

262.    Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

263.    Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

264.     At all times material herein, Defendants engaged in said pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO 14 V.I.C. §600 *et seq.*

## COUNT EIGHT
**Human Trafficking — Patronizing Minors and Victims of Sexual Servitude**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 136-37**

265.    The Government restates and realleges paragraphs 1 to 264 of this Complaint as if fully set forth herein

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **50** of **76**

266.     At all times material herein, each Defendant joined in a conspiracy to violate laws prohibiting human trafficking.

267.     Each Defendant engaged in acts that revealed its intent to join and participate in the criminal conspiracy by knowingly giving, agreeing to give, or offering to give items of value to young women and minors so that the young women and minors would engage in commercial sexual activity with Epstein, other Defendants, and other individuals in violation of 14 V.I.C. §§ 136-137.

268.     In some instances, young women and underage girls were given scholarships, money, gifts or other items of value in exchange for engaging in sexual acts with Epstein and others.

269.     Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude and commercial sexual activity of girls and young women in knowing or reckless disregard of the laws of the Virgin Islands.

270.     At all times material herein, each Defendant conspired with Epstein and other Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking, forced labor, and sexual servitude.

271.     At all times material herein, Defendants engaged in said pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO 14 V.I.C. §600 *et seq.*

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **51** of **76**

## COUNT NINE

### Child Abuse and Neglect—All Defendants Except Darren K. Indyke and Richard D. Kahn in Their Individual Capacities
### Violation of the Criminally Influenced and Corrupt Organization Act, 14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 505, 506 and 507

272.     The Government restates and realleges paragraphs 1 to 271 of this Complaint as if as if fully set forth herein.

273.     At all times material herein, each Defendant directly and indirectly participated in or associated with the Epstein Enterprise, an illicit enterprise.

274.     The Epstein Enterprise engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by CICO, including, but not limited to, knowingly or recklessly causing a child to suffer physical, mental or emotional injury, or knowingly or recklessly causing a child to be placed in a situation where it is reasonably foreseeable that such child may suffer physical, mental or emotional injury, in violation Virgin Islands criminal laws prohibiting Child Abuse and Neglect in Title 14 V.I.C. § 500 *et. seq.*

275.     As a result of the Epstein Enterprise's actions numerous young girls suffered serious physical, mental and emotional injury.

276.     Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

277.     Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

278.     At all times material herein, Defendants engaged in a pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO. 14 V.I.C. §600 *et seq.*

## COUNT TEN

## Child Abuse and Neglect

## Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act —All Defendants Except Darren K. Indyke and Richard D. Kahn in Their Individual Capacities,

## 14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 505, 506 and 507

279.     The Government restates and realleges paragraphs 1 to 278 of this Complaint as if as if fully set forth herein.

280.     At all times material herein, each Defendant joined in a conspiracy to violate laws prohibiting child abuse and neglect.

281.     Each Defendant engaged in acts that revealed its intent to join and participate in the criminal conspiracy as they knowingly or recklessly caused a child to suffer physical, mental or emotional injury, or knowingly or recklessly caused a child to be placed in a situation where it is reasonably foreseeable that such child may suffer physical, mental or emotional injury, in violation Virgin Islands criminal laws prohibiting Child Abuse and Neglect in Title 14 V.I.C. § 500 *et seq.*

282.     As a result of Defendants' actions, numerous young girls suffered serious physical, mental and emotional injury.

283.     Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude and commercial sexual activity of girls and young women in knowing or reckless disregard of the laws of the Virgin Islands.

284.     At all times material herein, each Defendant conspired with Epstein and other Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking, forced labor, and sexual servitude. 14 V.I.C. §604(j).

285.     At all times material herein, Defendants engaged in a pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO. 14 V.I.C. §600 *et seq.*

### COUNT ELEVEN
**Aggravated Rape—All Defendants Except Darren K. Indyke and Richard D. Kahn in Their Individual Capacities
Violation of the Criminally Influenced and Corrupt Organization Act,
14 V.I.C. § 600 *et seq.* and 14 V.I.C § 1700a**

286.     The Government restates and realleges paragraphs 1 to 285 of this Complaint as if fully set forth herein.

287.     At all times material herein, each Defendant directly and indirectly participated in or associated with the Epstein Enterprise, an illicit enterprise.

288.     The Epstein Enterprise engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by CICO, including, but not limited to, conduct that constituted or facilitated the rape of minors by force, intimidation, or the perpetrator's position of authority over the victim.

289.     Epstein and others, using force or intimidation, engaged in sexual intercourse with underage girls without their consent in violation of 14 V.I.C. § 1700a.

290.     As a result of the Epstein Enterprise's actions, numerous underage girls suffered serious physical, mental and emotional injury.

291.     Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

292.     Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **54** of **76**

293.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

### COUNT TWELVE
### Aggravated Rape
### Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,
### —All Defendants Except Darren K. Indyke and Richard D. Kahn in Their Individual Capacities,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C § 1700a

294.     The Government restates and realleges paragraphs 1 to 293 of this Complaint as

if fully set forth herein.

295.     At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting aggravated rape.

296.     Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy by engaging in conduct that constituted or facilitated the rape of minors

by force, intimidation, or the perpetrator's position of authority over the victim.

297.     Epstein and others, using force or intimidation, engaged in sexual intercourse

with underage girls without their consent in violation of 14 V.I.C. § 1700a.

298.     As a result of Defendants' actions, numerous underage girls suffered serious

physical, mental and emotional injury

299.     Defendants knowingly benefited financially and/or obtained other non-financial

value from participation in the Epstein Enterprise, which has engaged in human trafficking,

forced labor, sexual servitude and commercial sexual activity of girls and young women in

knowing or reckless disregard of the laws of the Virgin Islands.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **55** of **76**

300.     At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

301.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

### COUNT THIRTEEN
**Rape in the Second Degree—All Defendants Except Darren K. Indyke and Richard D.
Kahn in Their Individual Capacities
Violation of the Criminally Influenced and Corrupt Organization Act,
14 V.I.C. § 600 *et seq.* and 14 V.I.C § 1702
14 V.I.C. § 600 *et seq.* and 14 V.I.C § 1700a**

302.     The Government restates and realleges paragraphs 1 to 301 of this Complaint as

if fully set forth herein.

303.     At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

304.     The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including, but not limited to, conduct that

constituted or facilitated the rape of girls under 18 years of age.

305.     Epstein and others who engaged in rape were over 18 years old at the time of the

incidents.

306.     As a result of the Epstein Enterprise's actions, numerous minors suffered serious

physical, mental and emotional injury.

307.     Defendants through a pattern of criminal activity acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **56** of **76**

308.    Defendants benefited, directly and indirectly, from the pattern of criminal

activity conducted by the Epstein Enterprise.

309.    At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

### COUNT FOURTEEN
### Rape in the Second Degree
### Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,
### —All Defendants Except Darren K. Indyke and Richard D. Kahn in Their Individual
### Capacities,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C § 1702

310.    The Government restates and realleges paragraphs 1 to 309 of this Complaint as

if fully set forth herein.

311.    At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting rape in the second degree.

312.    Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy by engaging in conduct that constituted or facilitated the rape of girls

under 18 years of age.

313.    Epstein and others who engaged in rape were over 18 years old at the time of the

incidents.

314.    As a result of Defendants' actions, numerous minors suffered serious physical,

mental and emotional injury.

315.    Defendants knowingly benefited financially and/or obtained other non-financial

value from participation in the Epstein Enterprise, which has engaged in human trafficking,

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **57** of **76**

forced labor, sexual servitude and commercial sexual activity of girls and young women in

knowing or reckless disregard of the laws of the Virgin Islands.

316.    At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

317.    At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

### COUNT FIFTEEN
**Unlawful Sexual Contact in the First or Second Degree—All Defendants Except Darren K.
Indyke and Richard D. Kahn in Their Individual Capacities
Violation of the Criminally Influenced and Corrupt Organization Act,
14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 1708 and 1709**

318.    The Government restates and realleges paragraphs 1 to 317 of this Complaint as

if as if fully set forth herein.

319.    At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

320.    The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including, but not limited to, using or

facilitating the use of force or coercion to accomplish sexual contact or engaging in sexual

contact with a minor between 13 and 16 years of age.

321.    Epstein and others who engaged in the sexual contact were over 18 years old at

the time of the incidents.

322.    As a result of the Epstein Enterprise's actions numerous young women and

minors suffered serious physical, mental and emotional injury.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **58** of **76**

323.     Defendants through a pattern of criminal activity acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

324.     Defendants benefited, directly and indirectly, from the pattern of criminal

activity conducted by the Epstein Enterprise.

325.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO

14 V.I.C. §600 *et seq.*

**COUNT SIXTEEN**
**Unlawful Sexual Contact in the First or Second Degree**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act**
**—All Defendants Except Darren K. Indyke and Richard D. Kahn in Their Individual**
**Capacities,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 1708 and 1709**

326.     The Government restates and realleges paragraphs 1 to 325 of this Complaint as

if as if fully set forth herein.

327.     At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting unlawful sexual contact.

328.     Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy by using or facilitating the use of force or coercion to accomplish sexual

contact or engaging in sexual contact with a minor between 13 and 16 years of age.

329.     Epstein and others who engaged in the sexual contact were over 18 years old at

the time of the incidents.

330.     As a result of Defendants' actions, numerous young women and minors suffered

serious physical, mental and emotional injury.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **59** of **76**

331. Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude and commercial sexual activity of girls and young women in knowing or reckless disregard of the laws of the Virgin Islands.

332. At all times material herein, each Defendant conspired with Epstein and other Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking, forced labor, and sexual servitude. 14 V.I.C. §604(j).

333. At all times material herein, Defendants engaged in a pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO 14 V.I.C. §600 *et seq.*

**COUNT SEVENTEEN**
**Prostitution and Keeping House of Prostitution**
**Violation of the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C. §§ 1622, 1624**

334. The Government restates and realleges paragraphs 1 to 333 of this Complaint as if fully set forth herein.

335. At all times material herein, each Defendant directly and indirectly participated in or associated with the Epstein Enterprise, an illicit enterprise.

336. The Epstein Enterprise engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by CICO, including the engaging in or facilitating the knowing and/or reckless abuse of minors through the acts alleged herein.

337. The Epstein Enterprise knowingly persuaded, induced, enticed, and/or coerced women and children to travel to the Virgin Islands to engage in prostitution and/or sexual activity, and/or attempted to do the same.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **60** of **76**

338.     The Epstein Enterprise kept, maintained, and/or permitted his property at Little St. James to be used for the purpose of prostitution, lewdness or assignation with knowledge or reasonable cause to know the same.

339.     The Epstein Enterprise received or offered or agreed to receive women and children at his property at Little St. James for the purposes of prostitution, lewdness or assignation, and/or permitted women and children to remain there for such purposes.

340.     The Epstein Enterprise directed, took, transported, and or offered or agreed to take or transport women and children to Little St. James with the knowledge or reasonable cause to know that the purpose of such directing, taking or transporting was prostitution, lewdness or assignation.

341.     The Epstein Enterprise knew or should reasonably have known that individuals that were the subjects of the actions described in this Count were minors.

342.     As a result of Defendants' actions, numerous young women and minors suffered serious physical, mental and emotional injury.

343.     Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

344.     Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

345.     At all times material herein, Defendants engaged in a pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO. 14 V.I.C. §600 *et seq.*

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **61** of **76**

## COUNT EIGHTEEN
**Prostitution and Keeping House of Prostitution**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C. §§ 1622, 1624.**

346.    The Government restated and realleges paragraph 1 to 345 of this Complaint as if fully set forth herein.

347.    At all times material herein, each Defendant joined a conspiracy to laws against prostitution.

348.    Each Defendant engaged in acts that revealed its intent to join and participate in the criminal conspiracy by engaging in or facilitating the persuasion, inducement, enticement or coercion of women and children to travel to the Virgin Islands to engage in prostitution and/or sexual activity, and/or attempted to do the same; keeping, maintaining, and/or permitting Epstein's property at Little St. James, to be used for the purpose of prostitution, lewdness or assignation with knowledge or reasonable cause to know the same; receiving, offering, or agreeing to receive individuals at his property at Little St. James for the purposes of prostitution, lewdness or assignation, and/or permitted women and children to remain there for such purposes; and directing, taking, transporting, and/or offering or agreeing to take or transport women and children to Little St. James with the knowledge or reasonable cause to know that the purpose of such directing, taking or transporting was prostitution, lewdness or assignation, in violation of 14 V.I.C. §§ 1622 and 1624.

349.    Defendants knew or should reasonably have known that individuals that were the subjects of the actions described in this Count were minors.

350.    As a result of Defendants' actions numerous young women and minors suffered serious physical, mental and emotional injury.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **62** of **76**

351.     Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude and commercial sexual activity of girls and young women in knowing or reckless disregard of the laws of the Virgin Islands

352.     At all times material herein, each Defendant conspired with Epstein and other Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking, forced labor, and sexual servitude. 14 V.I.C. §604(j).

353.     At all times material herein, Defendants engaged in a pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO 14 V.I.C. §600 *et seq.*

**COUNT NINETEEN**
**Sex Offender Registry—Estate of Jeffrey E. Epstein**
**Violation of the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C. § 1721 *et seq.***

354.     The Government restates and realleges paragraphs 1 to 353 of this Complaint as if fully set forth herein.

355.     Epstein was required to, and did, register under the Virgin Islands Sexual Offender Registration and Community Protection Act ("SORCPA") codified at 14 V.I.C. § 1721 *et seq.*

356.     SORCPA requires that offenders required to register provide information relating to intended travel in foreign commerce.

357.     On at least two occasions, Epstein traveled to Vienna and Monaco without disclosing that travel to the Virgin Islands sex offender registry.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **63** of **76**

358.    Epstein's failure to disclose this travel before, during, or even after his travel was

knowing.

359.    Epstein's violation SORPCA was part of a pattern of criminal activity that was

not isolated but was related to the affairs of the Epstein Enterprise. 14 V.I.C. §604(j).

### COUNT TWENTY
### Fraudulent Conveyance
### Violation of the Criminally Influenced and Corrupt Organizations Act,
### 14  V.I.C. § 600 *et seq.* and 14 V.I.C. §§ 832-833

360.    The Government restates and realleges paragraphs 1 to 359 of this Complaint as

if fully set forth herein.

361.    At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

362.    Each Defendant engaged in two or more occasions of conduct that constitute

criminal predicate acts as defined by CICO, including, but not limited to transferring assets to

and between various entities controlled by Epstein and the Epstein Enterprise to avoid, defeat,

hinder or delay claims against them.

363.    Upon information and belief, in an effort to defeat the claims of creditors and

avoid the oversight of the court probating his estate, Epstein, days before his death, transferred

significant assets, including assets held by other Defendants, into The 1953 Trust.

364.    At the time of these transfers, Epstein had numerous actions pending against

him related to his trafficking and sexual assaults seeking financial judgments.

365.    Through these transfers, Epstein and the Epstein Enterprise fraudulently

removed property and effects beyond the jurisdiction of the probate court.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **64** of **76**

366.    Epstein and the Epstein Enterprise were parties to the fraudulent conveyance of the property, real or personal, and/or the interests or rights arising out of property, contracts, or conveyances of Epstein and the Epstein Enterprise.

367.    Epstein and the Epstein Enterprise acted with the intent to defeat, hinder, or delay creditors and claimants, including the Government of the Virgin Islands, in collecting on their judgements, debts and demands

368.    Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

369.    Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

370.    At all times material herein, Defendants engaged in a pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO. 14 V.I.C. §600 *et seq.*

### COUNT TWENTY-ONE
### Fraudulent Conveyance
### Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C. §§ 832-833

371.    The Government restates and realleges paragraphs 1 to 370 of this Complaint as if fully set forth herein.

372.    At all times material herein, each Defendant joined in a conspiracy to commit fraudulent conveyances.

373.    Each Defendant engaged in acts that revealed its intent to join and participate in the criminal conspiracy, including, but not limited to, transferring assets to and between various

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **65** of **76**

entities controlled by Epstein and the Epstein Enterprise to avoid, defeat, hinder or delay claims against them.

374.    Upon information and belief, in an effort to defeat the claims of creditors and avoid the oversight of the court probating his estate, Epstein, days before his death, transferred significant assets, including assets held by other Defendants, into The 1953 Trust.

375.    At the time of this transfer, Epstein had numerous actions pending against him related to his trafficking and sexual assaults seeking financial judgments.

376.    Through this transfer, Epstein and the Epstein Enterprise fraudulently removed property and effects beyond the jurisdiction of the probate court.

377.    Epstein and the Epstein Enterprise were parties to the fraudulent conveyance of the property, real or personal, and/or the interests or rights arising out of property, contracts, or conveyances of Epstein and the Epstein Enterprise.

378.    Epstein and the Epstein Enterprise acted with the intent to defeat, hinder, or delay the Government of the Virgin Islands and other creditors and claimants to collect on their judgements, debts and demands.

379.    Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude and commercial sexual activity of girls and young women in knowing or reckless disregard of the laws of the Virgin Islands.

380.    At all times material herein, each Defendant conspired with Epstein and other Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking, forced labor, and sexual servitude. 14 V.I.C. §604(j).

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **66** of **76**

381.    At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

## COUNT TWENTY-TWO
### Civil Conspiracy

382.    The Government restates and realleges paragraphs 1 to 381 of this Complaint as

if fully set forth herein.

383.    Defendants acted in concert and joined with others to perform the wrongful acts

identified in Counts 1 to 13, among others, concealing the sexual abuse of minor females by

unlawful means.

384.    Each co-conspirator knew, or in the exercise of reasonable care should have

known, about the conduct of the others and about the common unlawful scheme.

385.    These unlawful acts could not have been carried to the length and extent

accomplished without the common understanding shared by Epstein and the Epstein Enterprise

Defendants.

386.    Each of the Defendants had a duty to report, stop or terminate the wrongful

conduct, but instead each Defendant concealed, assisted and furthered the wrongful acts by use

of civil conspiracy.

387.    As a direct and proximate result of Defendants' conspiracy, the Virgin Island has

been injured.

388.    Each co-conspirator is jointly and severally liable for the acts alleged herein.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **67** of **76**

## COUNT TWENTY-THREE
**Fraudulent Claims Upon the Government—Southern Trust Company, Inc.**
**Violation of the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C. § 843**

389.     The Government restates and realleges paragraphs 1 to 388 of this Complaint as if fully set forth herein.

390.     At all times relevant and material herein, each Defendant directly and indirectly participated in or associated with the Epstein Enterprise, an illicit enterprise.

391.     Each Defendant engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by CICO, including, but not limited to, making fraudulent claims upon the Government.

392.     The Epstein Enterprise misrepresented the purpose, activities, employment, and income of the Southern Trust Company, Inc., in order to obtain and maintain valuable tax incentives in order to fund the criminal activities of the Epstein Enterprise. In addition, the Epstein Enterprise, with the active participation of Defendants Indyke and Kahn, used Southern Trust Company to employ, pay, and conceal the activities of participants in the criminal activities of the Enterprise.

393.     The Epstein Enterprise made and presented an application for tax incentives, testimony, and quarterly reports to the EDC, a commission of the Government, regarding the Southern Trust Company, knowing such claims to be false, fictitious, or fraudulent; knowingly and willfully falsified, concealed or covered up material facts regarding the Southern Trust Company; made false or fraudulent statements or representations about the purpose, activities, income, and employment of Southern Trust Company; and made and submitted false affidavits knowing the same to contain any fraudulent or fictitious statement or entry.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **68** of **76**

394.    These false statements and documents included affidavits, testimony, an application, and other documents that misrepresented that Southern Trust Company was engaged in, and failed to disclose it did not and could not carry out, in its stated purpose of providing consulting services in financial and biomedical informatics.

395.    Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude, and commercial sexual activity of underage girls and young women in knowing and reckless disregard of the laws of the Virgin Islands.

396.    Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

397.    Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

398.    At all times material herein, Defendants engaged in a pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO. 14 V.I.C. § 600 *et seq.*

### COUNT TWENTY-FOUR
**Fraudulent Claims Upon the Government—Southern Trust Company, Inc.
Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,
14 VI.C. § 600 *et seq.* and 14 V.I.C. § 843**

399.    The Government restates and realleges paragraphs 1 to 398 of this Complaint as if fully set forth herein.

400.    At all times material herein, each Defendant joined in a conspiracy to commit fraudulent conveyances.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **69** of **76**

401.     Each Defendant engaged in acts that revealed its intent to join and participate in the criminal conspiracy, including, but not limited to, transferring assets to and between various entities controlled by Epstein and the Epstein Enterprise to avoid, defeat, hinder or delay claims against them.

402.     The Epstein Enterprise misrepresented the purpose, activities, employment, and income of the Southern Trust Company, Inc., in order to obtain and maintain valuable tax incentives in order to fund the criminal activities of the Epstein Enterprise. In addition, the Epstein Enterprise, with the active participation of Defendants Indyke and Kahn, used Southern Trust Company to employ, pay, and conceal the activities of participants in the criminal activities of the Enterprise.

403.     The Epstein Enterprise made and presented an application for tax incentives, testimony, and quarterly reports to the EDC, a commission of the Government, regarding the Southern Trust Company, knowing such claims to be false, fictitious, or fraudulent; knowingly and willfully falsified, concealed or covered up material facts regarding the Southern Trust Company; made false or fraudulent statements or representations about the purpose, activities, income, and employment of Southern Trust Company; and made and submitted false affidavits knowing the same to contain any fraudulent or fictitious statement or entry.

404.     These false statements and documents included affidavits, testimony, an application, and other documents that misrepresented that Southern Trust Company was engaged in, and failed to disclose it did not and could not carry out, in its stated purpose of providing consulting services in financial and biomedical informatics.

405.     Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking,

forced labor, sexual servitude, and commercial sexual activity of underage girls and young

women in knowing and reckless disregard of the laws of the Virgin Islands.

406.     At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

407.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

## COUNT TWENTY-FIVE
### Fraudulent Claims Upon the Government—Cypress, Inc.; Maple, Inc.; Laurel, Inc.
### Violation of the Criminally Influenced and Corrupt Organizations Act,
### 14  V.I.C. §§ 600 *et seq.* and 14 V.I.C. § 843

408.     The Government restates and realleges paragraphs 1 to 407 of this Complaint as if

fully set forth herein.

409.     At all times relevant and material herein, each Defendant directly and indirectly

participated in or associated with the Epstein Enterprise, an illicit enterprise.

410.     Each Defendant engaged in two or more occasions of conduct that constitute

criminal predicate acts as defined by CICO, including but not limited to making fraudulent

claims upon the Government.

411.     Defendants Cypress, Maple, and Laurel misrepresented the values of their assets

held and expenses incurred in their annual reporting to the Government of the United States

Virgin Islands for each of the tax years from 2011 to 2018.

412.     Defendant Cypress misrepresented the value of its assets held during each of these

years by omitting the value of the 49 Zorro Ranch Road, Stanley, New Mexico property that it

acquired in or about December 2011, and misrepresented the value of its expenses incurred during each of these years by omitting the annual amounts of property taxes it paid for the New Mexico property.

413.   Defendant Maple misrepresented the value of its assets held during each of these years by omitting the value of the 9 East 71st Street, New York, New York property that it acquired in or about December 2011, and misrepresented the value of its expenses incurred during each of these years by omitting the annual amounts of property taxes it paid for the New York property.

414.   Defendant Laurel misrepresented the value of its assets held during each of these years by omitting the value of the 358 Brillo Way, Palm Beach, Florida property that it acquired in or about December 2011, and misrepresented the value of its expenses incurred during each of these years by omitting the annual amounts of property taxes it paid for the Palm Beach property.

415.   Epstein and Defendant/Co-Executor Kahn signed each of Cypress, Maple, and Laurel's annual reports for these years in which they represented that "ALL STATEMENTS CONTAINED IN THIS APPLICATION, AND ANY ACCOMPANYING DOCUMENTS, ARE TRUE AND CORRECT . . . ."

416.   Epstein appears to have maintained divided ownership of these properties, transferred ownership of them to the Virgin Islands, and then concealed this fact even from Virgin Islands authorities in an attempt to shield the properties from any judgment in the states where they are located.

417.   Defendants' knowingly and willfully made false representations to the Government regarding the assets and expenses of Cypress, Maple, and Laurel, and their conduct

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **72** of **76**

in failing to inform the Government of each company's true assets and expenses, constitute fraud

upon the Government. 14 V.I.C. § 843.

418.    Defendants, through a pattern of criminal activity, acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or of real property.

419.    Defendants benefitted directly and indirectly from the pattern of criminal activity

conducted by the Epstein Enterprise. Defendants knowingly benefitted financially and/or

obtained non-financial value from participation in the Epstein Enterprise, which has engaged in

human trafficking, forced sexual servitude, and commercial sexual activity of underage girls and

young women, in knowing and reckless disregard of the laws of the Virgin Islands.

420.    At all material times herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO,

14 V.I.C. §§ 600 *et seq.*

### COUNT TWENTY-SIX
**Fraudulent Claims Upon the Government—Cypress, Inc.; Maple, Inc.; Laurel, Inc.
Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,
14 V.I.C. §§ 600 *et seq.* and 14 V.I.C. § 843**

421.    The Government restates and realleges paragraphs 1 to 420 of this Complaint as if

fully set forth herein.

422.    At all material times herein, each Defendant engaged in a conspiracy to commit

fraudulent conveyances.

423.    Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy, including, but not limited to, transferring assets to and between various

entities controlled by Epstein and the Epstein Enterprise to avoid, defeat, hinder, or delay claims

against them.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **73** of **76**

424.     These false statements and documents included annual financial statements for the years 2011 to 2018 submitted by each Cypress, Maple, and Laurel to the Office of Lieutenant Governor of the Virgin Islands that misrepresented the value of the assets held and the amount of the expenses incurred by each company during each of these years.

425.     Epstein appears to have maintained divided ownership of these properties, transferred ownership of them to the Virgin Islands, and then concealed this fact even from Virgin Islands authorities in an attempt to shield the properties from any judgment in the states where they are located.

426.     Defendants knowingly benefitted financially and/or obtained other non-financial value from their participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude, and commercial sexual activity of underage girls and young women, in knowing and reckless disregard of the laws of the Virgin Islands.

**Notice of Allegation of
PUNITIVE DAMAGES**

427.     The purpose of punitive damages in the common law is to punish the defendant for outrageous conduct that is reckless or intentional and to deter others from engaging in such conduct in the future.

428.     This Complaint describes intentional conduct so egregious, persistent, and injurious that it shocks the conscience and offends a civilized society.

429.     Punitive damages are especially important in the case of persons or companies that have so money, assets, and power that mere fines, penalties, and economic damages are simply not sufficient.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **74** of **76**

430.    At all times material herein, Epstein and the Epstein Enterprise engaged repeatedly in wrongful acts which were intentional and outrageous. The Government gives notice that it intends to pursue the possibility of punitive damages in any jury verdict.

## PRAYER FOR RELIEF

**WHEREFORE,** the Government respectfully requests that the Court:

A.    Enter a judgment in favor of the Government and against Defendants on all counts;

B.    Declare that Defendants, through the Epstein Enterprise, have engaged in a pattern of criminal activity in the Virgin Islands including but not limited to human trafficking, forced labor and sexual servitude of female children and young women, unlawful sexual contact, child sexual abuse, child abuse and neglect, rape, prostitution civil conspiracy and other offenses related offenses, and civil conspiracy;

C.    Pursuant to 14 V.I.C. § 610, enforce and maintain the criminal activity liens the Government is filing contemporaneously with this lawsuit, or shall file in connection with this action;

D.    Pursuant to 14 V.I.C. § 607(a)(1) and 14 V.I.C. § 141, issue an order forfeiting and divesting in favor of the Government of the Virgin Islands all of Defendants' interests in any real and personal property used to facilitate the criminal enterprise carried out by the Epstein Enterprise, including but not limited to Little St. James Island and Greater St. James Island;

E.    Issue an order forfeiting to the Government of the Virgin Islands any proceeds or funds obtained by Defendants, whether directly or indirectly, during the course of the criminal activity of the Epstein Enterprise;

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **75** of **76**

F.      Pursuant to 14 V.I.C. § 607(a)(1), require Defendants to divest themselves of any

real property or other interests in favor of the Government of the Virgin Islands used to further

the goals of the Epstein Enterprise;

G.      Pursuant to 14 V.I.C. § 607(a)(3) and (5), order the dissolution of the Epstein

Enterprise, including but not limited to, order the dissolution of the corporate Defendants;

H.      Pursuant to 14 V.I.C. § 607(a)(2) enter an injunction to prevent the further

criminal conduct, and concealment of the criminal conduct, by the Epstein Enterprise;

I.      Pursuant to 14 V.I.C. § 607(a)(4), order the revocation of any and all licenses,

permits and approvals that had been granted by any agency of the Territory, and require the

repayment of any tax benefits that had been bestowed on any Defendant;

J.      Pursuant to 14 V.I.C. §§ 607(a)(6) and 607(k), order all assets and funds of the

Estate of Jeffrey E. Epstein be placed into receivership;

K.      Pursuant to 14 V.I.C. § 607(e), award the Government the maximum civil

penalty for each and every violation of law committed by the Epstein Enterprise;

L.      Pursuant to 14 V.I.C. § 607, award treble damages and all other available

remedies, including attorneys' fees and costs;

M.      Award compensatory and punitive damages for Defendants' civil conspiracy;

N.      Void the transfer of assets as fraudulently conveyed to the The 1953 Trust;

O.      Award such equitable relief, including disgorgement of all ill-gotten gains, as may

be just and proper and appropriate, pursuant to 14 V.I.C. § 608(c)(4), to protect the rights of

victims and innocent persons in the interest of justice and consistent with the purposes of CICO;

P.      Assess and award a judgment in favor of the Government and against the

Defendants for attorneys' fees and costs and pre- and post-judgment interest; and

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **76** of **76**

       Q.       Award any and all other relief this Court deems appropriate.


       **The Government demands a jury trial on all issues so triable.**

                                 **RESPECTFULLY SUBMITTED,**

                                 DENISE N. GEORGE, ESQ.
                                 ATTORNEY GENERAL

Dated: <u>February 10, 2021</u>         /s/ Carol Thomas-Jacobs
                                 **CAROL THOMAS-JACOBS, ESQ.**
                                 Assistant Attorney General
                                 Virgin Islands Department of Justice
                                 Office of the Attorney General
                                 34-38 Kronprindsens Gade
                                 St. Thomas, U.S. Virgin Islands 00802
                                 Email: ariel.smith@doj.vi.gov
                                 (340) 774-5666 ext. 10101