**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

—————————————————————————
                                        )
GOVERNMENT OF THE UNITED                )
STATES VIRGIN ISLANDS,                  )         Case No. 1:22-cv-10904-JSR
                                        )
                 Plaintiff,             )
                                        )
v.                                      )
                                        )
JPMORGAN CHASE BANK, N.A.,              )
                                        )
                 Defendant.             )
—————————————————————————)

**GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS'**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**JPMORGAN CHASE BANK, N.A.'S MOTION TO DISMISS**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 3

ARGUMENT ....................................................................................................................... 6

I.   The Government Pleads an Actionable TVPA Claim. .................................................. 6

    A.  Section 1595(d) Applies to JPMorgan's Conduct. ..................................................... 6

    B.  The Government Has *Parens Patriae* Standing Under § 1595(d). ............................. 9

    C.  The Government Pleads All Elements of a § 1591(a)(2) Violation ............................ 10

        1.  JPMorgan's Participation in Epstein's Commercial Sex-Trafficking Venture ..... 10

        2.  JPMorgan Knew or Acted with Reckless Disregard that Minors Would Be Caused to Engage in Commercial Sex ................................................................. 14

        3.  JPMorgan's Knowledge or Reckless Disregard of the Use of Force, Threats, Fraud, or Coercion ....................................................................................... 15

        4.  JPMorgan Knowingly Benefited ..................................................................... 18

II.  The Government Pleads Actionable CICO Counts. ..................................................... 19

    A.  CICO Applies to JPMorgan's Conduct. .................................................................. 19

    B.  The Government Pleads Actionable CICO Claims. ................................................. 20

        1.  Elements of CICO Claim ................................................................................ 20

            a)  Association with and Participation in Enterprise ........................................ 20

            b)  Pattern of Criminal Activity ...................................................................... 22

        2.  Predicate Criminal Activity ............................................................................ 23

    C.  The Government Has Standing for its BSA-Based CICO Claim. ............................. 24

III. The Government Pleads a CFDBPA Claim ................................................................. 25

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) ........................................... 9, 10

*Alvarez-Machain v. United States*, 107 F.3d 696 (9th Cir. 1996) ................................................... 7

*American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cty.*, 221 F.3d 1211 (11th Cir. 2000)......................................................................................................................... 20

*AU Optronics Corp. v. South Carolina*, 699 F.3d 385 (4th Cir. 2012)........................................ 10

*Cabello v. Fernández-Larios*, 402 F.3d 1148 (11th Cir. 2005) ..................................................... 7

*Canosa v. Ziff*, 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019)............................................ 11, 12, 19

*Feld Entm't, Inc. v. ASPCA*, 873 F. Supp. 2d 288 (D.D.C. 2012)................................................ 22

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ........................... 22

*G.G. v. Salesforce.com*, 603 F. Supp. 3d 626 (N.D. Ill. 2022) ....................................... 11, 12, 13

*Geiss v. Weinstein Co.*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019) ......................................... 11, 12, 18

*Gerald v. R.J. Reynolds Tobacco Co.*, 68 V.I. 3 (V.I. Super. Ct. 2017)........................................ 23

*Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997)............................................................. 21, 22

*HH v. G6 Hospitality, Inc.*, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019)................................... 18

*Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939 (1997)........................................... 7, 8

*M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019) ..................... 14

*Niles Freeman Equip. v. Joseph*, 161 Cal. App. 4th 765 (Cal. Ct. App. 2008)............................. 8

*Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) ................................................. 12

*Ratzlaf v. U.S.*, 510 U.S. 135 (1994)........................................................................................... 24

*Stuto v. Fleishman*, 164 F.3d 820 (2d Cir. 1999)........................................................................ 17

*Taylor v. Bettis*, 976 F. Supp. 2d 721 (E.D.N.C. 2013)............................................................... 22

*United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103 (1st Cir. 2016)..... 17

*United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 984 (2d Cir. 1984) ............... 10

*Unites States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680 (S.D.N.Y. 2018) ........................................................................................................................................ 17

*Velez v. Sanchez,* 693 F.3d 308 (2d Cir. 2012) ............................................................................. 7

*Winfree v. N. Pacific R. Co.*, 227 U.S. 296 (1913) ....................................................................... 8

## Statutes

12A V.I.C. § 304............................................................................................................................ 25

12A V.I.C. § 328(b) ...................................................................................................................... 25

12A V.I.C. § 336 .................................................................................................... 25

14 V.I.C. § 604(e) ................................................................................................. 23

18 U.S.C. § 1591 ................................................................................................... 17

18 U.S.C. § 1591(a) .............................................................................................. 16

18 U.S.C. § 1591(a)(2) ............................................................................... 8, 14, 15

18 U.S.C. § 1595(a) ........................................................................................... 7, 11

18 U.S.C. § 1595(d) ..................................................................... 6, 7, 9, 10, 11

5 V.I.C. § 31(3)(B) ................................................................................................ 25

Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. 115-164, 132 Stat. 1253 (2018) .......................................................................................... 6

Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 301-336 ........................ 2

Trafficking Victims Protection Act, 18 U.S.C. §§ 1580-1597 ............................................... 2

Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. 108-193, 117 Stat. 2875 (2003) ............................................................................................................... 7

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. 106-386, 114 Stat. 1464 (2000) ............................................................................................................... 6

Virgin Islands Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. §§ 600-614 ....... 2

**Other Authorities**

164 Cong. Rec. H1290-02, 2018 WL 1073890 (Feb. 27, 2018) .................................................. 8

164 Cong. Rec. S1849-08, 2018 WL 1415014 (Mar. 21, 2018) .................................................. 8

Federal Trade Commission, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act*, (Nov. 10, 2022) ........... 25

## INTRODUCTION

For two decades, Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") facilitated and sustained Jeffrey Epstein's sex-trafficking by handling and ███████ his payments to young women and girls who were his victims and recruiters.  Sex-trafficking was the principal business of Epstein's accounts held by JPMorgan, and JPMorgan profited handsomely from the hundreds of millions of dollars in assets in those accounts, in addition to Epstein's connections and referrals of ultrawealthy and powerful clients.   Far from the so-called "ordinary" banking services JPMorgan claims it provided to Epstein, JPMorgan *broke every rule* to facilitate Epstein's sex-trafficking and feed off his wealth and connections.  In 2008, after Epstein pled guilty to felony charges for procuring a child for prostitution—conduct that is child sex-trafficking under the TVPA—the expectation was that JPMorgan would cut ties with or, at a minimum, closely monitor the convicted felon and registered sex offender.  It did neither.  Instead—and decided at the highest level ("pending Dimon review")—JPMorgan continued to facilitate and sustain Epstein's sex-trafficking by making the payments and covering up the trafficking, including for many years after it no longer held Epstein's accounts, which predictably enabled ongoing and future trafficking by Epstein.  JPMorgan—through its head of Private Bank assigned to manage Epstein and Epstein's accounts—made multiple visits to Epstein's Virgin Islands residence where women and girls were sex-trafficked.  Only when there was nothing left to be gained upon Epstein's arrest and death in federal prison in 2019, ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████

The Government of the United States Virgin Islands ("Government") brings this action as *parens patriae* seeking relief for JPMorgan's participation in Epstein's sex-trafficking that took

place in and was directed from the Virgin Islands.  Throughout the decades when JPMorgan handled and ███████ Epstein's payments to victims and recruiters, Epstein lived in the Virgin Islands on his secluded private island (Little St. James).  The Government asserts claims for JPMorgan's violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1580-1597, the Virgin Islands Criminally Influenced and Corrupt Organizations Act ("CICO"), 14 V.I.C. §§ 600-614, and the Consumer Fraud and Deceptive Business Practices Act ("CFDBPA"), 12A V.I.C. §§ 301-336.

JPMorgan tries to shift the blame for its participation onto the Government, contending that the Government had access to the same information on Epstein that JPMorgan did.  This belies both the facts, ignoring the allegations detailing Epstein's ███████████████████████ ██████████████████████████, *see* First Am. Compl. ("FAC") Ex. 1, and the law, ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████.  The TVPA establishes liability for those who participate in human trafficking, and JPMorgan's efforts at misdirection do not alter its legal responsibility for its own conduct and the profound consequences for the dozens of women whose trafficking was uniquely visible to and made possible by this bank.  Unlike the Government,

- JPMorgan had real-time knowledge of millions of dollars of payments Epstein was making to young women who were his victims and recruiters, FAC ¶ 42, which had no conceivable relationship to Epstein's stated business interests, *id.* ¶¶ 25-26, 68-69, 76-77;

- JPMorgan had real-time knowledge that Epstein was using accounts of his charitable organizations to make payments to young women, *id.* ¶ 68, which had no conceivable relationship to the charities' stated purposes, *id.* ¶ 68-69, 77;

- JPMorgan's Global Corporate Security Division, Risk Management Division, and AML Compliance director over the course of years repeatedly identified evidence of Epstein's child trafficking and human trafficking, *id.* ¶¶ 44-48;

- JPMorgan identified ███████████████████████████████████████
████████████████████████████████ *id.*, ¶ 75; and

- JPMorgan had a more than close-up view of Epstein's sex-trafficking, through the senior executive JPMorgan assigned to manage Epstein and Epstein's accounts who, in this role, built a close relationship with Epstein, visited Epstein's properties in the Virgin Islands and elsewhere, exchanged hundreds of messages with Epstein from his JPMorgan email account in full view of JPMorgan, including some with photos of young women, discussed Epstein's provision of services to him during his travel on dates that closely corresponded with Epstein's payments to the same young woman from his JPMorgan accounts, and discussed young women or girls procured by Epstein using the names of Disney princesses ("Snow White" and "Beauty and the Beast"), *id.* ¶¶ 52-62.

JPMorgan's failed attempt to divert attention from its participation in Epstein's sex-trafficking is understandable, as its attempted defenses to the Government's TVPA, CICO, and CFDBPA claims have no merit.

## FACTUAL BACKGROUND

Between 1998 and 2013, JPMorgan serviced approximately 55 Epstein-related accounts valued in the hundreds of millions of dollars.  FAC ¶ 41.  During this time, JPMorgan handled payments by Epstein to at least 20 young women or girls whom he trafficked and subjected to sexual assault in the Virgin Islands and elsewhere.  *Id.* ¶ 42.  The payments had no conceivable relationship to Epstein's stated business interests.  *Id.* ¶¶ 25-26, 68-69.  Epstein also withdrew hundreds of thousands of dollars in cash over that time from JPMorgan accounts, especially significant as Epstein was known to pay for "massages" (sexual encounters) with young girls in cash.  During this time, JPMorgan also processed payments by Epstein totaling almost $1.5 million to known recruiters of victims to Epstein's sex-trafficking enterprise, including the MC2 modeling agency.  *Id.* ¶ 42.  Among the recipients of these payments were numerous women with Eastern European surnames who were publicly and internally identified as Epstein recruiters and/or victims, including $600,000 to Jane Doe 1, a woman who JPMorgan's own due diligence reports stated Epstein purchased at the age of 14.  *Id.* ¶ 66, 40.

3

Throughout its relationship with Epstein, JPMorgan's internal investigation teams identified evidence that he was engaged in criminal sex-trafficking.  In 2006, JPMorgan's Global Corporate Security Division reported that Epstein was indicted in Florida for felony solicitation of minors for prostitution.  *Id.* ¶ 44.  In 2008, Epstein pled guilty in Florida to solicitation or procurement of a minor for prostitution and became a registered sex offender.  *Id.* ¶¶ 21, 22, 38.  JPMorgan's continued relationship with Epstein after his criminal plea was reviewed and approved at the highest levels of the bank.  An August 2008 internal email states, "I would count Epstein's assets as a probable outflow for '08 ($120mm or so?) as I can't imagine it will stay (pending Dimon review)."  *Id.* ¶ 51. Yet the assets did stay, ████████████████████████████ ██████████████████████████████████.  In 2010, JPMorgan's risk management division discussed new allegations of an investigation of Epstein involving child sex-trafficking.  *Id.* ¶ 45.  Throughout 2010 and 2011, JPMorgan's compliance and security divisions reported evidence of Epstein's engagement in sex-trafficking, including his settlement of a dozen civil lawsuits and his payments of $1 million to the MC2 modeling agency engaged with Epstein in child sex-trafficking, "luring" girls on the pretext of providing modeling opportunities and careers.  *Id.* ¶¶ 46-48, 23 (citing Ex. 1 ¶ 52).

JPMorgan, through senior executive Jes Staley, engaged in multiple visits to Epstein's residence on Little St. James where the sex-trafficking took place as part of its management of its business relationship with Epstein.  At the time of these visits, Staley was serving in the role of JPMorgan's head of Private Bank, which was dedicated to extremely wealthy clients like Epstein.  JPMorgan assigned Staley to manage Epstein and his accounts for his wealth, connections, and referrals of ultrawealthy and powerful clients.  Thus, Staley's *job* was to maintain a close relationship with Epstein so that his money, connections, and referrals would continue to flow to

JPMorgan.  Between 2008 and 2012, Staley exchanged over 1,000 messages with Epstein from his JPMorgan email account in full view of JPMorgan, including emails about his visits to Little St. James.  *Id.* ¶¶ 52-53, 56, 60, 62, 84, 47, 71, 73, 87.  A December 2008 email shows Staley planning to visit Epstein in early January 2009.  Around the time of Staley's scheduled visit, Epstein wired $2,000 from his JPMorgan account to a woman with an Eastern European surname. *Id.* ¶ 54.  In late August 2009, Staley emailed that he was visiting London; Epstein asked if he needed anything; Staley replied "Yep."  *Id.* ¶ 55.  Soon after, JPMorgan wired $3,000 from an Epstein account to the same Eastern European woman.  *Id.*  In July 2010, Staley emailed Epstein saying "That was fun. Say hi to Snow White[,]" to which Epstein responded "[W]hat character would you like next?" and Staley said "Beauty and the Beast."  *Id.* ¶ 61.  Epstein also emailed Staley photos of young women in seductive poses. *Id.* ¶¶ 58-59.  Following the internal reports of additional law enforcement investigations into Epstein's sex-trafficking in 2010 and 2011, JPMorgan's response was to send Staley in 2011 to obtain Epstein's denial, on which the bank hung its hat.  *Id.* ¶ 47.

JPMorgan was at all times required by federal law to perform due diligence on its customers and file Suspicious Activity Reports ("SARs") with the Treasury Department's Financial Crimes Enforcement Network ("FinCEN").  *Id.* ¶¶ 13-19.  While Epstein was a customer, ████████████████████████████████████████████████████████████████ ███████████████████████████████████ or perform even basic due diligence on Epstein though he was "high risk."  *Id.* ¶¶ 75-78, 66-69, 44, 50.  During this time, JPMorgan benefited from Epstein's wealth and connections.  *Id.* ¶¶ 7, 71-73, 87, 96-98.  Epstein helped and promised to help Staley recruit ultrawealthy clients to JPMorgan.  Epstein introduced Staley to the owner of Highbridge Capital Management, LLC, one of the country's largest hedge funds.  JPMorgan

subsequently acquired Highbridge, which catapulted Staley's career with and beyond JPMorgan. *Id.* ¶ 72.  In 2011, Epstein helped Staley to pitch the creation of a donor advised fund which would be an "exclusive club" with a minimum $100 million donation.  *Id.* ¶ 73.  Epstein continued trafficking and sexually abusing young women and female children until his arrest in 2019.  *Id.* ¶ 42.  It was only after Epstein's death in federal detention in August 2019 that ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████.  *Id.* ¶ 75, 40, 66.  JPMorgan acknowledged that ████

███████████████████████████████████████████████ *Id.* ████████████

███████████████████████████████████████████████████████████████

████████.  *Id.* ¶¶ 6, 32, 42, 91.  JPMorgan's illegal conduct which continued until 2019 caused repeated and continuous harm to the Virgin Islands and its residents.  *Id.* ¶¶ 91, 107, 118, 128.

## ARGUMENT

### I.     The Government Pleads an Actionable TVPA Claim.

#### A.     Section 1595(d) Applies to JPMorgan's Conduct.

In 2018, Congress added subsection (d)—which recognizes a right of action for state attorneys general to prosecute sex-trafficking—to § 1595's existing civil remedy.  *See* Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. 115-164, § 6, 132 Stat. 1253, 1255 (2018) ("FOSTA").  JPMorgan argues that § 1595(d) "increase[d] [its] liability" "by widening the universe of possible plaintiffs and relief" and thus cannot be applied retroactively. Mot. at 5.  There is no increased liability.  Section 1595(d) applies to a defendant whose conduct violated § 1591, a criminal prohibition enacted in 2000.  *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. 106-386, § 112, 114 Stat. 1464 (2000).  This conduct also was a

basis for civil liability in 2003.  *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. 108-193, § 4, 117 Stat. 2875 (2003).  So, too, was relief the Government seeks under § 1595(d), including damages and attorneys' fees, previously recoverable under § 1595(a).  Injunctive relief and civil fines were also recoverable under CICO for violations of the TVPA, as the Government seeks in Count Two.  FAC ¶ 119 and Prayer for Relief.  *See Alvarez-Machain v. United States*, 107 F.3d 696, 702 (9th Cir. 1996) ("act does not impose new duties or liabilities on defendants" where other laws, including state law, already prohibited conduct and afforded relief), *overruled on other grounds by Marley v. United States*, 548 F.3d 1286 (9th Cir. 2008); *Cabello v. Fernández-Larios*, 402 F.3d 1148, 1154 (11th Cir. 2005) (same).  In *Velez v. Sanchez*, cited by JPMorgan, Mot. at 5, by contrast, the 2003 TVPA amendment created a civil remedy where only criminal liability previously existed.  693 F.3d 308, 325 (2d Cir. 2012).

*Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939 (1997), does not support JPMorgan's argument against retroactivity.  There, the Supreme Court held that "[t]he extension of an FCA cause of action to private parties in circumstances where the action was previously foreclosed . . . . essentially creates a new cause of action" because it materially changed the incentives and stakes of False Claims Act cases.  *Id.* at 949-50.  "As a class of plaintiffs, *qui tam* relators are different in kind than the Government.  They are motivated primarily by prospects of monetary reward rather than the public good" and have greater incentives than the "public vessel" to prosecute claims "under the strong stimulus of personal ill will or the hope of gain."  *Id.* at 949.  "Qui tam relators are," *Hughes* concluded, "*thus less likely than is the Government to forgo an action* arguably based on a mere technical noncompliance with reporting requirements that involved no harm to the public fisc."  *Id.* at 949 (emphasis added).  In these particular circumstances, *Hughes* held the amendment "essentially creates a new cause of action, not just an

increased likelihood that an existing cause of action will be pursued." *Id.* at 950 (citing *Winfree v. N. Pacific R. Co.*, 227 U.S. 296, 302 (1913)).

Here, the legislative history makes clear that the amendment created "a right of action"—not a new cause of action—for state attorneys general to pursue sex-trafficking.  164 Cong. Rec. H1290-02, H1292, 2018 WL 1073890 (Feb. 27, 2018).  Further, the Government has no incentives making it *more likely* than victims to bring a civil action under § 1595, and JPMorgan has asserted none.  The legislative history shows that the amendment was intended to have states fight *alongside* victims to provide "extra litigation leverage for individuals who are impacted in a devastating manner."  *Id.* at H1303.  Congress intended "more resources, more investigators, and more prosecutors for the perpetrators of these heinous crimes," 164 Cong. Rec. S1849-08, S1865, 2018 WL 1415014 (Mar. 21, 2018), thereby increasing the likelihood an existing cause of action would be pursued.  Such "a more efficient and complete remedy" is not impermissibly retroactive.  *Winfree*, 227 U.S. at 301-02; *see also Niles Freeman Equip. v. Joseph*, 161 Cal. App. 4th 765, 783-87 (Cal. Ct. App. 2008) ("merely … broaden[ing] [the public entities] authorized to bring [an existing cause of action] . . . . is not an impermissible retroactive effect") (distinguishing *Hughes Aircraft*, 520 U.S. at 950).

Even if the amendment did not apply retroactively, the Government alleges post-enactment conduct by JPMorgan violating § 1591(a)(2).  ██████████████████████████████████
████████████████████████████████████████.  JPMorgan is wrong that its post-enactment conduct is irrelevant because, it contends, it no longer was processing new payments.  Mot. at 4.  The Government alleges JPMorgan continued facilitating Epstein's ongoing trafficking  by  ██████████████████████████████████████████████████

███████ for over a year after § 1595(d)'s enactment.  FAC ¶¶ 6, 32, 42, 91, 94.  Section 1595(d) thus does not have impermissible retroactive effect.

### B.    The Government Has *Parens Patriae* Standing Under § 1595(d).

JPMorgan is wrong that the Government "does not assert any quasi-sovereign interest sufficient to support *parens patriae* standing."  Mot. at 6.  The Supreme Court has long recognized that a state "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982).  The Government asserts that interest here.  *See, e.g.*, FAC ¶ 3 ("Attorney General brings this action . . . in her ongoing effort to protect public safety and to hold accountable those who facilitated or participated in . . . the trafficking enterprise"); *id.* ("Financial institutions can connect—or choke—human trafficking networks, and [state] enforcement actions filed . . . are essential to ensure that enterprises like Epstein's cannot flourish in the future"); *id.* ¶ 107 (JPMorgan "has caused serious harm to the Virgin Islands and its residents . . . by facilitating the commission of sexual abuse against young women and underage girls, including their engagement in commercial sex acts, in the Virgin Islands"); *id.* ¶ 108 (JPMorgan's conduct furthered "a widespread and dangerous criminal sex-trafficking venture operated in and from the Virgin Islands" and demonstrated "such wanton disregard for the safety of young women and underage girls in the Virgin Islands").

JPMorgan argues the Government "does not allege that Epstein's victims included any USVI residents, but even if it did, USVI would still need to articulate how JPMC's conduct directly or indirectly injured a 'substantial' portion of its population."  Mot. at 7.  The Government alleges that a number of Epstein's victims were trafficked to, held captive in, and sexually abused in the Virgin Islands, causing them grave physical, mental, and emotional injury.  FAC ¶¶ 23, 42.   The

Government also alleges that it has a substantial interest in assuring its residents it will act to protect them from the harmful effects of criminal sex-trafficking enterprises flourishing in the Islands that are their home.  *Cf. Snapp*, 458 U.S. at 609 ("State has a substantial interest in assuring its residents that it will act to protect them from . . . the harmful effects of discrimination").  In any event, neither § 1595(d) ("an interest of the residents") nor *parens patriae* requires the Government to allege injury to specific numbers of persons.  *See United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 984 (2d Cir. 1984) (injury to "a fairly narrow class of persons").

JPMorgan also argues in *parens patriae* cases, "a State seeks injunctive relief for ongoing conduct[.]"  Mot. at 6.  This argument fails under the plain language of § 1595(d), which provides the Government with a right of action where an interest of its residents "*has been* or is threatened or adversely affected," and under *Snapp,* which "involve(d) the 1978 apple harvest on the east coast," but was filed in 1979, after the conduct occurred, and sought relief for "past practices of petitioners" and sought injunctive relief—not to enjoin ongoing conduct—but to require defendants "to conform to the relevant federal statutes and regulations in the future," 458 U.S. at 597-99.  Whether the State seeks damages or restitution that may inure to individuals does not alter the State's quasi-sovereign interest where the purpose of this case is the protection of the public health and safety of the residents of the Virgin Islands.  *See AU Optronics Corp. v. South Carolina*, 699 F.3d 385, 394 (4th Cir. 2012) ("claim for restitution, when tacked onto other claims being properly pursued by the State" does not "alter the State's quasi-sovereign interest").

    **C.**    **The Government Pleads All Elements of a § 1591(a)(2) Violation.**

        **1.**    **JPMorgan's Participation in Epstein's Commercial Sex-Trafficking Venture**

JPMorgan is wrong that the Government fails to allege that it participated by "knowingly assisting, supporting, or facilitating a sex-trafficking venture."[1]  Mot. at 8 (citing § 1591(e)(4)). The Government alleges that JPMorgan participated by facilitating payments to women and girls who were Epstein's victims and recruiters, channeling funds to Epstein to fund the operation, and ███████████████████████████████████████████████████████████████.  FAC ¶ 94. JPMorgan's facilitation and ████████ made the sex-trafficking venture possible and allowed ongoing and future sex-trafficking.  "Financial institutions can connect—or choke—human trafficking networks . . . ."  *Id.* ¶ 3.

The Government's allegations are on all fours with *Canosa v. Ziff*, No. 18 Civ. 4115, 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019).  Mot. at 9.  There, the Court found that a Weinstein-victim plaintiff sufficiently alleged participation by production companies where the complaint alleged "specific means and methods used by multiple company employees to facilitate Weinstein's sexual assault and to cover them up afterwards . . . with the predictable effect of enabling future assaults by Weinstein."  *Canosa*, 2019 WL 498865, at *24.  So too here, the Government alleges that JPMorgan facilitated Epstein's sex-trafficking by facilitating payments to women and girls who were Epstein's trafficking victims and recruiters totaling millions of dollars and ██████████ ███████████████████████████████████████████████████████████████████████

---

[1] JPMorgan's own cited cases also show it is incorrect that the "knowingly" criminal scienter in § 1591(e)(4) applies to a civil action under § 1595(a).  *See Geiss v. Weinstein Co.*, 383 F. Supp. 3d 156, 167 n.3 (S.D.N.Y. 2019) (constructive knowledge applies in civil action); *G.G. v. Salesforce.com*, 603 F. Supp. 3d 626, 644 (N.D. Ill. 2022) (same).  This issue has not been decided under § 1595(d).  While subsection (d) does not explicitly reference the "should have known" language in subsection (a), to the extent subsection (d) was added to give "extra litigation leverage to individuals" and "more resources" to pursue a civil action against sex-trafficking, Congress of course did not intend to apply a higher scienter requirement to a government civil action than to the parallel action brought by a victim.  In any event, the Government alleges that JPMorgan knowingly facilitated Epstein's sex-trafficking.

███████, which also allowed Epstein to continue to engage in sex-trafficking until he was arrested in 2019. FAC ¶¶ 6, 32, 41, 42, 66, 75, 91, 94. In efforts to distinguish *Canosa*, JPMorgan argues there the production company gave Weinstein "medications and other paraphernalia to perform sex acts." Mot. at 9. No different here where JPMorgan processed the payments for Epstein and his associates to perform sex acts. The Government also alleges JPMorgan issued payments to recruiters like the *Canosa* companies paying employees "whose responsibilities includ[ed] introducing Weinstein to young women." 2019 WL 498865, at *23.

JPMorgan is also wrong that the allegations as to JPMorgan "are even more deficient than those deemed insufficient in *Geiss*, *Noble*, and *Lawson*." Mot. at 8-9. In *Geiss* and *Lawson*, the only purported participation alleged was making hush payments or drafting of NDAs—conduct that took place after the trafficking and was not alleged as here to have enabled ongoing sex-trafficking. *See Geiss*, 383 F. Supp. 3d at 168 n.4 (discussing *Lawson*). In those narrow circumstances, the allegations were deemed insufficient to demonstrate participation in the trafficking. *Noble v. Weinstein* involved only allegations that defendant facilitated perpetrator's travel. 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018). Here, as explained, JPMorgan was involved in both carrying out and ████████████████████. In further contrast, ████████████ ████████████████████████████████████████████—enabled ongoing and future sex-trafficking by Epstein until his arrest in 2019.

*G.G. v. Salesforce.com, Inc.*, 603 F. Supp. 3d 626 (N.D. Ill. 2022), also does not support JPMorgan's argument that the Government does not sufficiently allege participation. Mot. at 9. In *Salesforce.com*, the court held that the plaintiff failed to allege participation by a software supplier whose software was used by an online marketplace to post advertisements for commercial sex. 603 F. Supp. 3d at 646-47. The Court found no plausible allegations that Salesforce did

anything but "just sell Backpage off-the-shelf software." *Id.* at 648 (finding no personalized services tailored to Backpage or customization of its software to meet Backpage's needs). In other words, Salesforce merely supplied its regular product to Backpage.

Unlike Salesforce.com, JPMorgan did much more than provide Epstein with its regular banking services. It handled payments Epstein was making to young women who were his victims and recruiters totaling millions of dollars, FAC ¶ 42, which had no conceivable relationship to Epstein's stated business interests, *id.* ¶¶ 25-26, 68-69, 77. It further handled payments from the accounts of Epstein's charitable organizations to young women, which again had no conceivable relationship to the charities' stated purposes, *id.* ¶¶ 68-69, 77. It ignored obvious red flags relating to Epstein's accounts that in the normal course would have prompted action by JPMorgan and instead reported "nothing unusual" in Epstein's account transactions. *Id.* ¶¶ 65-69. It failed to demonstrate even basic due diligence on Epstein's accounts—particularly irregular given Epstein was a "high-risk" customer. *Id.* ¶¶ 76-78, 82, 43-44, 47, 50. It continued to maintain Epstein's assets for over a decade despite the fact that he pled guilty to criminal felony charges constituting child trafficking and its internal security, risk management, and compliance teams repeatedly identified evidence of child and human trafficking. *Id.* ¶¶ 21-22, 44-48, 51. ███████████ ████████████████████████████████████████████████████████████████ █████████████████████████████. JPMorgan gave Epstein the most "personalized" and "customized"—and illegal—services. Moreover, unlike Salesforce.com, JPMorgan had █ ██████████████████████████████████████████.

Further, *Salesforce.com* differentiated cases where there was "'a showing of a continuous business relationship between the trafficker and the [defendant] such that it would appear that the trafficker and the [defendant] have established a pattern of conduct or could be said to have a tacit

agreement' as to the venture[.]"  603 F. Supp. 3d at *644.  In *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 962, 970-71 (S.D. Ohio 2019), for example, the court found a sufficiently continuous relationship to constitute participation where the defendant hotel operator repeatedly rented rooms to a trafficker over 17 months.  Here, while doing business with Epstein in and beyond his accounts, JPMorgan handled and ███████ Epstein's payments to victims and recruiters for over *ten years*, FAC ¶ 42, and ██████████████████████████████████ ████████████████████████, *id.* ¶¶ 75, 91.

JPMorgan separately contends that its ████████████████████████████████ ████████████████████████ does not constitute participation because ███████████ ████████████████████████████████ Mot. at 10.  Putting aside that JPMorgan ignores the Government's allegations that it facilitated the sex-trafficking by handling payments to victims and recruiters, the Government's claim is that JPMorgan *did* detect Epstein's sex-trafficking, *see* FAC ¶¶ 44-48, 54-55, 61 (Staley), 75, 86, but ██████████████████ ████████████████████████████████████, *id.* ¶¶ 14-19, 74-75, in turn allowing Epstein's ongoing and future sex-trafficking, *id.* ¶¶ 6, 32, 42, 91.

### 2.  JPMorgan Knew or Acted with Reckless Disregard that Minors Would Be Caused to Engage in Commercial Sex

JPMorgan acted with knowledge or reckless disregard that Epstein was sex-trafficking minors based on law enforcement indictments, Epstein's own criminal guilty plea, and numerous additional law enforcement investigations.  In 2006, JPMorgan knew that Epstein had been indicted for and later pled guilty to federal criminal charges of solicitation and procurement of a minor for prostitution.  FAC ¶¶ 21-22, 37-38, 44, 45, 50.  Solicitation and procurement of a minor for prostitution are acts covered by § 1591(a)(2):  "[R]ecruits, entices, harbors, transports, provides, obtains . . . maintains . . . or solicits by any means a person" and "the person has not

attained the age of 18 years and will be caused to engage in a commercial sex act[.]"   The Government further alleges that in 2009 the non-prosecution agreement between Epstein and the United States became public and revealed additional federal law enforcement allegations that Epstein may have used interstate commerce to induce minors to engage in prostitution, engaged in illicit sexual conduct with minors, and trafficked minors.  FAC ¶ 39.

The Complaint details other law enforcement investigations of child sex-trafficking by Epstein of which JPMorgan was aware based on investigations and reports by its own security, risk management, and compliance teams.  In a 2010 internal email, JPMorgan's risk management division wrote of new allegations "of an investigation related to child trafficking – are you still comfortable with this client who is now a registered sex offender."  FAC ¶ 45.  In March 2011, JPMorgan's Global Corporate Security Division reported that it was aware of numerous articles detailing "various law enforcement agencies investigating Jeffrey Epstein for allegedly participating, directly or indirectly, in child trafficking and molesting underage girls.  Jeffrey Epstein has settled a dozen civil lawsuits out of court from his victims regarding solicitation for an undisclosed amount."  *Id.* ¶ 48.  The same internal JPMorgan reports pointed to "derogatory information" that "Jean Luc Brunel, owner of MC2 Model Management and Jeffrey Epstein engaged in racketeering that involved *luring in minor children for sexual play for money*."  *Id.* (emphasis added).  The Government also alleges that Epstein, through JPMorgan, paid more than $600,000 to Jane Doe 1, a woman with an Eastern European surname, who JPMorgan's own due diligence reports stated Epstein purchased at the age of 14.  *Id.* ¶ 66.

### 3.   JPMorgan's Knowledge or Reckless Disregard of the Use of Force, Threats, Fraud, or Coercion

With respect to victims 18 and over, § 1591(a)(2) requires that a beneficiary of sex-trafficking like JPMorgan has acted with knowledge or reckless disregard of the fact that means

of force, fraud, and/or coercion will be used to cause a victim to engage in a commercial sex act. The Government alleges that JPMorgan knew it was processing Epstein's payments to specific young women around the world, FAC, ¶ 42, that these women were trafficked by or recruiters of victims for Epstein, *id.*, that JPMorgan knew these payments had no conceivable relationship to Epstein's stated business interests, *id.*, ¶¶ 25-26, 65-69, and that JPMorgan knew Epstein was being connected repeatedly to "human trafficking" activity, *id.*, ¶¶ 44-49.  After Epstein's arrest and death in 2019, JPMorgan acknowledged that recipients of the payments "may be victims of human trafficking."  *Id.* ¶ 75.

In addition to consistent references to "human trafficking" by JPMorgan, the Government alleges that JPMorgan's internal reports showed accounts of MC2 modeling agency and Epstein "luring" victims.  *Id.* ¶ 48.  It is inferable that the young women would have been "lured" by a modeling agency with the fraudulent promise of modeling opportunities and careers.  *Id.* ¶ 23 (citing to Ex. 1 at ¶¶ 43-75).  Moreover, JPMorgan handled payments for numerous women with Eastern European surnames who were publicly and internally identified as Epstein recruiters and/or victims, including Jane Doe 1 who JPMorgan's own internal reports stated Epstein "purchased" when she was a child; it is inferable these young women from Eastern Europe were subject to fraud, force, or coercion.  FAC ¶¶ 66, 75, 40.

JPMorgan argues that the Government fails to allege knowledge of trafficking of a specific victim.  Mot. at 10.  This argument is incorrect for two reasons.  First, JPMorgan omits § 1591(a)'s coverage of a defendant having "reckless disregard."   Second, JPMorgan ignores that the Government identifies 20 specific young women who were trafficked by Epstein in the Virgin Islands and elsewhere for whom JPMorgan handled Epstein's payments knowing there was no conceivable relationship to Epstein's stated business interests, knowing that Epstein was

repeatedly being connected to trafficking, and recognizing that these women "may be victims of human trafficking." FAC ¶ 75. JPMorgan's own internal reports stated that Epstein purchased Jane Doe 1 at 14, yet it processed $600,000 in payments by Epstein to her. *Id.* ¶ 66. The Government also alleges that JPMorgan had an up-close view of Epstein's conduct. *Id.* ¶¶ 53-59, 61 (Staley). These allegations support a plausible inference that JPMorgan knew or at a minimum acted with reckless disregard for the probability that these women were being subjected to force, threats, fraud, and/or coercion. *See, e.g., Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (reckless disregard shown by recognition of substantial probability of harm and action with disregard for its occurrence).

JPMorgan separately argues that the Government cannot establish knowledge based solely on JPMorgan's awareness of "allegations" of Epstein's trafficking. Mot. at 11 (citing *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 701 (S.D.N.Y. 2018) (Rakoff, J.) (quoting *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016))). Again, JPMorgan omits reckless disregard, Epstein's *guilty* plea to conduct that constitutes child sex-trafficking under § 1591—which is *knowledge*, not an allegation—and its own observation of red flags and adoption of the trafficking allegations. FAC ¶¶ 44-45, 53-62, 65-69, 75. Moreover, the allegations (or lack thereof) in *Grubea* are a far cry from this case. *Grubea* found that there was no evidence of knowledge of wrongdoing—not even "allegations." 318 F. Supp. 3d at 701 (argument that government knew of the fraudulent conduct at issue is "pure speculation"). In *Escobar*, the "allegations" that were held insufficient to give rise to knowledge were some complaints by private individuals to state regulators about a healthcare provider. 842 F.3d at 108, 112. The allegations here were numerous, widely reported, in many cases involved law enforcement investigations, and extended over a number of years.

Given Epstein was a registered sex offender, felon, and high-risk client, JPMorgan's failure to follow up on these allegations, other than to assign Staley—whose JPMorgan emails strongly suggest he was involved in Epstein's sex-trafficking and whose relationship with Epstein catapulted his career—to talk to Epstein, FAC ¶¶ 52-62, 72, 47, at a minimum shows reckless disregard.

JPMorgan cites *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020), *see* Mot. at 12-13, for the proposition that "knowledge or willful blindness of a general sex trafficking problem . . . does not satisfy the *mens rea* requirements of the [TVPA]." This is inapposite because the Government alleges not that JPMorgan had general knowledge of trafficking, but that it had knowledge of the "specific sex trafficking venture," *id.*, Epstein was operating through the foregoing evidence that was uniquely in its sights.

### 4.    JPMorgan Knowingly Benefited

JPMorgan argues that the Government does not plausibly allege a "causal relationship" between JPMorgan's participation in Epstein's sex-trafficking venture and its receipt of a benefit, again relying on *Geiss*. Mot. at 13. This is wrong. *Geiss* is not controlling.[2] Other cases, including those relied on by JPMorgan, hold that "the statutory language imposes no such [causal relationship] requirement" and requires only that the defendant "knowingly benefit financially." *HH v. G6 Hospitality, Inc.*, No. 2:19-cv-755, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019) (allegation that "rental of a room constitutes a financial benefit from a relationship with the

---

[2] Further, in *Geiss*, the Court found that Weinstein benefited the production company with his continued employment there which generated revenue for the company "in spite of" – not because of – the company's alleged facilitation of his misconduct. 383 F. Supp. 3d at 169-70. Here, the Complaint alleges human trafficking was the principal business of the accounts JPMorgan managed for Epstein. FAC ¶ 6. Epstein thus benefited JPMorgan with the money in those accounts *because of* JPMorgan's facilitation of Epstein's sex-trafficking venture by processing payments to the young women and girls who were Epstein's victims and recruiters.

trafficker" is sufficient).  There is no question JPMorgan received financial benefits in the form of servicing accounts with hundreds of millions in assets and referrals of business opportunities from its relationship with Epstein, including the acquisition of one of the country's largest hedge funds as a customer.  FAC ¶¶ 7, 71-73, 87, 96-98.

If the Government must allege a causal relationship, it has. *Canosa* is again instructive.  There, the court found that the complaint adequately pled "a symbiotic relationship between the [companies] and Weinstein, in which the companies affirmatively enabled and concealed Weinstein's predations as a means of keeping him happy, productive, and employable" which led to financial and other benefits for the company.  2019 WL 498865, at *24.  So too here, the Government alleges a long-standing and close relationship between JPMorgan and Epstein in which JPMorgan knowingly received value from Epstein's business, connections, and referrals in exchange for JPMorgan's participation in his sex-trafficking venture.  FAC ¶¶ 7, 71-73, 87, 95-98.

## II.     The Government Pleads Actionable CICO Counts.

### A.  CICO Applies to JPMorgan's Conduct.

JPMorgan baselessly contends that its conduct "occurred entirely in New York."  Mot. at 15.  JPMorgan's criminal activity under CICO occurred almost entirely in the Virgin Islands.  For two decades, JPMorgan transacted business with a Virgin Islands resident and his Virgin Islands entities, including managing accounts worth hundreds of millions of dollars, the principal business of which was trafficking including in and from the Virgin Islands.  JPMorgan processed and ███████ payments to women and girls sex-trafficked in the Virgin Islands who it knew "may be victims of human trafficking."  FAC ¶¶ 5, 6, 20, 41, 42, 75, 114.  JPMorgan, through Staley, engaged in multiple visits to Epstein's residence on Little St. James where the sex-trafficking took

place as part of its management of its business relationship with Epstein.  Far from acting "for only wholly personal reasons," Mot. at 16 n.9, at the time of these visits, Staley was serving in the role of JPMorgan's senior executive and head of Private Bank, which was dedicated to extremely wealthy clients like Epstein.  JPMorgan assigned Staley to manage Epstein and his accounts for his wealth, connections, and referrals of ultrawealthy and powerful clients.  Thus, Staley's *job* was to maintain a close relationship with Epstein so that his money, connections, and referrals would continue to flow to JPMorgan.  Staley emailed freely with Epstein about his visits to Little St. James over his *work* email account in full view of JPMorgan.  FAC ¶¶ 52-53, 56, 60, 62, 84, 47, 71, 73, 87.  JPMorgan's conduct threatened public safety and caused serious harm to the Virgin Islands and its residents by facilitating sex-trafficking and the commission of sexual abuse against young women and underage girls in the Virgin Islands.  *Id.* ¶¶ 3, 6, 20, 42, 91, 118, 128.  By sharp contrast, in *American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cty.*, which JPMorgan claims is "analogous," Mot. at 15, 16, there were no allegations that "the plaintiffs purposefully direct their efforts to, or specifically advise on solicitations aimed at, Pinellas County."  221 F.3d 1211, 1217 (11th Cir. 2000).

**B.**   **The Government Pleads Actionable CICO Claims.**

**1.   Elements of CICO Claim**

**a)     Association with and Participation in Enterprise**

JPMorgan argues that all the Government pleads is that JPMorgan "earned money by providing ordinary banking services to a client, which is insufficient" to establish a shared common purpose.  Mot. at 17-18.  This is incorrect.  The Government alleges that JPMorgan, rather than provide ordinary banking services, processed Epstein's payments to recruiters and young women who were trafficked in the Virgin Islands and elsewhere, FAC, ¶ 42, with knowledge that Epstein

20

was procuring women to perform commercial sex acts, *id.*, ¶¶ 54-55, 61 (Staley), had been indicted

for and pled guilty to solicitation of a minor for prostitution and was a criminal felon and registered

sex offender, *id.* ¶¶ 21-22, 44, and was repeatedly under law enforcement investigations for and

associated with trafficking activity, *id.*, ¶¶ 44-47, while also ███████████████████████████

████████████████████████████████████████████████, *id.*, ¶¶ 66-69, 74-84.   JPMorgan

handled Epstein's payments even though they had no discernible business or other legitimate

purpose and engaged in a years-long pattern of ignoring obvious red flags and failing to

demonstrate even basic due diligence on Epstein's accounts—which is particularly out-of-the-

ordinary conduct by JPMorgan for a customer it designated high-risk. *Id.* ¶¶ 25-26, 66-69, 76-78,

82, 43, 44, 50, 80.c.   Further, JPMorgan catapulted Staley's career based on Staley's profitable

work with Epstein and directed Staley to manage JPMorgan's relationship with Epstein in the

pursuit of more profits and referrals of business opportunities.   Staley filled his end of the bargain,

establishing a close relationship with Epstein.   In 2009 and 2010, after Epstein pled guilty to

conduct that is child sex-trafficking under the TVPA, Staley's JPMorgan email account—in full

view of JPMorgan—shows multiple emails with Epstein discussing visits to Epstein's residences,

including in the Virgin Islands; women who they referred to by the names of Disney princesses

that Epstein procured for Staley; discussions of sex with young women; and photos of young

women in suggestive poses. *Id.* ¶¶ 52-62.   In 2011, following additional news stories about

Epstein's human trafficking, JPMorgan's investigation extraordinarily consisted of asking Staley

to discuss those reports with Epstein. *Id.* ¶ 47.

This unlawful conduct in furtherance of the trafficking enterprise's unlawful purpose

constitutes association with and participation in the enterprise by JPMorgan. *See, e.g., Handeen*

*v. Lemaire*, 112 F.3d 1339, 1350 (8th Cir. 1997) (law firm's assistance with sham transactions and

false court filings in furtherance of client's misuse of bankruptcy to shield enterprise assets constitutes association and participation); *Taylor v. Bettis*, 976 F. Supp. 2d 721, 735 (E.D.N.C. 2013) ("If a doctor or lawyer provides services that go to the heart of the allegedly fraudulent scheme, the professional may be liable for providing some direction in the affairs of the enterprise.").

The Government also sufficiently pleads participation.  JPMorgan argues that "providing banking services—even with knowledge of [an underlying] fraud—is not enough" to establish participation.  Mot. at 19.  Here too the Government alleges more than that JPMorgan provided banking services with knowledge of wrongdoing.  It alleges that JPMorgan directly or indirectly participated in the wrongdoing by handling payments for Epstein's sex-trafficking with no conceivable relationship to Epstein's stated business interests, having a close-up view of Epstein's sex-trafficking through Staley and also over JPMorgan email, and ████████████████████████ ████████████████████████████████████████████████, in the face of evidence of illicit purpose, which allowed the ongoing trafficking.  FAC ¶¶ 42, 44-47, 54-55, 66-69, 74-84. *See Handeen*, *supra*; *Feld Entm't, Inc. v. ASPCA*, 873 F. Supp. 2d 288, 327 (D.D.C. 2012) (service providers "may be liable for operating or managing the enterprise when they participate in the central activities of the enterprise"); *see generally First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) (it is "no great leap to find that one who assists in the fraud also conducts or participates in the conduct of the affairs of the enterprise").

### b)      Pattern of Criminal Activity

JPMorgan argues that the Government does not allege conduct related to the enterprise's affairs.  Mot. at 19.  To the contrary, the Government alleges extensive conduct by JPMorgan associated with the trafficking enterprise.  *See supra* § II.B.1.a.  JPMorgan also argues that the

Government does not allege conduct within the past five years because its termination of Epstein's accounts in 2013 effectively ended its conduct.  Mot. at 20.  It did not.  The Government alleges ██████████████████████████████████████████████████████ that occurred through 2019, and which allowed Epstein's ongoing sex-trafficking.  FAC ¶¶ 7, 32, 42, 74-75, 83, 90-91.  This satisfies CICO's requirement of a pattern of criminal activity, an instance of which was within five years of the filing of suit, and triggers equitable tolling of a statute of limitations under Virgin Islands law.  *Id.* ¶¶ 85-91; *Gerald v. R.J. Reynolds Tobacco Co.*, 68 V.I. 3, 136 (V.I. Super. Ct. 2017) (tolling for fraudulent concealment triggered by affirmative concealment, knowledge or reason to know of concealment, prevention of discovery, and lack of reasonable opportunity to discover).

### 2.     Predicate Criminal Activity

Under CICO, "criminal activity" includes conduct violating "any Federal criminal law, the violation of which is a felony[.]"  14 V.I.C. § 604(e).  This includes the TVPA and the BSA.  The Government claims that JPMorgan violated the TVPA on the grounds discussed above, FAC Count Two, ¶¶ 110-117, and the BSA by █████████████████████████████████ ████████ or to perform due diligence on Epstein, *id.* Count Three, ¶¶ 121-126 (citing 31 C.F.R. §§ ████████, 1010.620).

JPMorgan repeats by reference its arguments on the TVPA as grounds for dismissing the Government's TVPA-based CICO claim.  Motion at 20.  The Government restates by reference its arguments in opposition.  *See supra* § I.C.

On the BSA-based CICO claim, JPMorgan argues that the Government does not adequately ████████████████████████████████████████████████████████ ████████████████████████████████████.  Motion at 21-22.  Just the opposite,

JPMorgan's ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████. *Ratzlaf v. U.S.*, 510
U.S. 135, 138 (1994) (BSA's willfulness element requires knowledge of unlawfulness). JPMorgan
argues that Epstein's July 2019 arrest on trafficking charges changed the meaning of these earlier
transactions. Mot. at 21. It did not. JPMorgan elsewhere argues that allegations are not enough.
*See* Mot. at 11. By the time Epstein was charged in 2019, he had already pled guilty to a child sex
offense a decade earlier and been repeatedly alleged to be engaged in trafficking. FAC ¶¶ 43-50.
The 2019 charges highlighted what JPMorgan already knew—that the women receiving his
payments through JPMorgan "may be victims of human trafficking." *Id.* ¶75. The Government
sufficiently alleges a willful violation.

### C.      The Government Has Standing for its BSA-Based CICO Claim.

JPMorgan argues that the Government lacks standing for its BSA-based CICO claim
because it does not allege an injury fairly traceable to the BSA violation. Mot. at 23-24. This
argument fails because the Government plausibly alleges that JPMorgan's ████████████████
████████████████████████████████████████ harmed the Virgin Islands and its
residents by facilitating the continuation of Epstein's trafficking. FAC ¶¶ 6, 32, 42, 91, 107, 118,
128. Suspicious activity reporting "is critical to the United States' ability to utilize financial
information to combat" criminal activity and ensures that the government act when alerted to
potential illegal conduct. *Id.* ¶¶ 16-18. "A key purpose of federal banking regulations is to give
law enforcement real-time information so that it can act to detect violations of the law and protect
public safety." *Id.* ¶ 88. In fact, the federal government did ultimately take action to bring
Epstein's trafficking to a halt. *Id.* ¶¶ 32, 42, 90-91.

III.    **The Government Pleads a CFDBPA Claim.**

The CFDBPA makes it "unlawful for any person to engage in unfair methods of competition . . . in the conduct of any trade or commerce."  12A V.I.C. § 304.  The Government claims that JPMorgan engaged in unfair competition by facilitating and ███████ Epstein's trafficking to gain referrals over other banks.  FAC ¶ 135.  The Government seeks civil penalties under 12A V.I.C. § 328(b).  *Id.* Prayer for Relief.  JPMorgan is wrong that this claim is barred by the Act's six-year statute of limitations.  Mot. at 25 (citing 12A V.I.C. § 336).  12A V.I.C. § 336 provides "The statute of limitations under this Chapter is governed by Title 5 Virgin Islands Code § 31(3)(B)."  Section 31(3)(B) does not apply to a government enforcement action for a penalty, as here, but only to "[a]n action upon a liability created by statute, *other than a penalty* or forfeiture," which this of course is not.  5 V.I.C. § 31(3)(B) (emphasis added).  In any event, JPMorgan's ████████████████ continued into 2019.  FAC ¶¶ 7, 74-75, 83, 90-91.

JPMorgan also incorrectly argues that the Government pleads insufficient facts about the business opportunities and competitors at issue.  Mot. at 25.  The Government identifies the business referral at issue, FAC ¶ 72, and alleges that compliant banks were unfairly denied this opportunity, *id.* ¶ 135.  Moreover, the Federal Trade Commission clarified in its recently issued policy statement regarding unfair methods of competition that it is not necessary to show actual anticompetitive effects, but rather that the challenged conduct negatively affects competitive conditions.  *See* Federal Trade Commission, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act*, 9-10 (Nov. 10, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P221202Section5PolicyStatement.pdf.

## CONCLUSION

For all the reasons set forth above, the motion to dismiss should be denied.

Dated: February 15, 2023

**CAROL THOMAS-JACOBS, ESQ.**
**ACTING ATTORNEY GENERAL**

/s/ *Linda Singer*
Linda Singer (*pro hac vice*)
Mimi Liu (*pro hac vice* pending)
David I. Ackerman
Paige Boggs (*pro hac vice*)
MOTLEY RICE LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
Fax: (202) 232-5513
lsinger@motleyrice.com
mliu@motleyrice.com
dackerman@motleyrice.com
pboggs@motleyrice.com

Carol Thomas-Jacobs (*pro hac vice*)
Acting Attorney General of the
United States Virgin Islands
Virgin Islands Department of Justice
34-38 Kronprindsens Gade
St. Thomas, U.S. Virgin Islands 00802
Tel: (340) 774-5666 ext. 10101
carol.jacobs@doj.vi.gov

*Attorneys for Plaintiff Government of the*
*United States Virgin Islands*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2023, I electronically filed the foregoing Memorandum of Law in Opposition to Motion to Dismiss with the Clerk of the Court and served on counsel of record using the Court's CM/ECF system.  Notice of this filing will be sent to all parties of record by operation of, and parties may access this filing through, the Court's CM/ECF system.

By: _/s/ Linda Singer_____
      Linda Singer