N3GQdoe1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    GOVERNMENT OF THE UNITED
3   STATES VIRGIN ISLANDS
                    Plaintiffs
4           v.                          22 Civ. 10904 (JSR)
    JPMORGAN CHASE BANK N.A.
5               Defendants
    ------------------------------x
6   JANE DOE 1, Individually and on
    behalf of all others similarly
7   situated,
                    Plaintiffs
8           v.                          22 Civ. 10019 (JSR)
    JPMORGAN CHASE & CO.,                  ORAL ARGUMENT
9               Defendants

10  ------------------------------x

11                                       New York, N.Y.

12                                       March 16, 2023
                                         4:30 p.m.
13
    Before:
14
                            HON. JED S. RAKOFF
15
                                         District Judge
16

17

18

19

20

21

22

23

24          (Continued on next page)

25
```

N3GQdoe1

1
                                    APPEARANCES
2

OFFICE OF THE ATTORNEY GENERAL
3        Attorneys for Plaintiff USVI
MIMI LIU
4   MICHAEL J. QUIRK
LINDA SINGER
5

BOIES SCHILLER & FLEXNER LLP
6        Attorneys for Plaintiff Jane Doe and USVI
ANDREW VILLACASTIN
7

EDWARDS POTTINGER LLC
8        Attorneys for Plaintiffs Jane Doe and USVI
BRADLEY J. EDWARDS
9   BRITTANY HENDERSON

10  WILMER CUTLER PICKERING HALE & DORR LLP
         Attorneys for Defendant JPMorgan Chase Bank NA
11  FELICIA ELLSWORTH
BOYD JOHNSON
12  JOHN BUTTS

13  ROPES & GRAY LLP
         Attorneys for Defendants
14          Deutsche Bank Entities 22Cv.10018
DAVID HENNES
15  ANDREW TODRES

16  WILLIAMS & CONNOLLY LLP
         Attorney for Defendant Staley
17  BRENDAN V. SULLIVAN JR.

18  SMITH VILLAZOR LLP
         Attorney for Nonparty Feldman
19  PATRICK J. SMITH

20

21

22

23

24

25

N3GQdoe1

```
 1                  (In open court; case called)

 2            DEPUTY CLERK:  Will everyone please be seated and will

 3       the parties please identify themselves for the record.

 4            MS. LIU:  Good afternoon, your Honor.  Mimi Liu on

 5       behalf of the U.S. Virgin Islands.

 6            MR. QUIRK:  Good afternoon, your Honor.  Michael Quirk

 7       on behalf of the U.S. Virgin Islands.

 8            MS. SINGER:  Linda Singer, your Honor.

 9            MR. EDWARDS:  Good afternoon.  Brad Edwards on behalf

10       of Jane Doe.

11            MR. VILLACASTIN:  Good afternoon.  Andrew Villacastin

12       on behalf Jane Doe and in both the JPM and Deutsche Bank cases.

13            MS. HENDERSON:  Good afternoon.  Brittany Henderson on

14       behalf of Jane.

15            MS. ELLSWORTH:  Good afternoon, your Honor.  Felicia

16       Ellsworth, Boyd Johnson and John Butts on behalf of JPMorgan

17       Chase.

18            MR. HENNES:  Good afternoon, your Honor.  David Hennes

19       and Andrew Todres from Ropes & Gray on behalf of the Deutsche

20       Bank, and at the Court's invitation.

21            MR. SMITH:  Good afternoon, your Honor.  Patrick Smith

22       for non-party Jordana Feldman.

23            MR. SULLIVAN:  Your Honor, Brendan Sullivan for Jes

24       Staley by invitation of the Court.

25            THE COURT:  So thank you all for coming.  I think we
```

N3GQdoe1

1    need to, with apologies to everyone, take whatever time is

2    necessary even into this evening, if necessary, to get

3    everything that's outstanding resolved so we could be

4    completely up to date.  Plus it's been, what, at least three or

5    four days since I saw most of you, so I was really feeling

6    lonely and missing you.

7            So, in any event, here we are.  Let's start with the

8    schedule.  I just want to make sure that we have everything

9    properly scheduled.  So the trial for Doe v. Deutsche Bank is

10   set to begin on August 8.  The trial for both Doe v. JPMorgan

11   and Virgin Islands v. JPMorgan is scheduled to begin on

12   September 5.

13           Now, because we are just now hearing this week

14   arguments on the motions to dismiss the amended complaints,

15   then I think we need to move some of the interim dates.  I have

16   already indicated in the arguments we heard earlier this week

17   that I will give you a bottom line rule at least by the end of

18   March, and that will be true of the argument we're going to

19   hear today as well.

20           So, against that background -- there's one other

21   complication, which is the third-party complaint that JPMorgan

22   has filed against Mr. Staley.  But putting that third-party

23   complaint aside for one second, does anyone want to suggest new

24   dates for the completion of discovery and the like?

25           I'm not going to move the trial dates, so it's just a

N3GQdoe1

1    question of whether we need to, for example, previously all

2    discovery was to be completed by April 24 and class

3    certification reports were due on March 1, and the motions on

4    class certification were to be made and responded to in various

5    dates in March and April.  We were going to have an oral

6    argument on May 12, and then there was argument leading up to a

7    final pretrial conference on June 12.  I am happy to move any

8    and all of those dates, but not the trial date.

9            So does anyone want to make any suggestions in that

10   regard?

11           MS. SINGER:  Linda Singer, your Honor.  I'm happy to

12   open the bidding on this one.

13           So the U.S. Virgin Islands and the Doe plaintiffs had

14   previously been in touch with JPMorgan which had asked us about

15   extending the schedule.  What we had proposed to them was

16   moving the deadline for plaintiffs' expert reports till the end

17   of April, which I think takes some of the pressure off some of

18   the discovery issues because depositions can then move back.

19   So that would be one suggestion.  Obviously, we can't speak to

20   the class certification issues

21           THE COURT:  Okay, anyone disagree with that?

22           MR. BUTTS:  Your Honor, John Butts for JPMorgan.  We

23   are happy to proceed on any schedule.  The schedule that -- I

24   know you're asking this, with Mr. Staley's third-party

25   complaint aside, our interest is doing everything in one

N3GQdoe1

 1    efficient shot, so I'm happy to answer questions in that

 2    regard, but that's just something that would be considered.

 3              THE COURT:  Who is here for Mr. Staley?

 4              MR. SULLIVAN:  Brendan Sullivan your Honor.

 5              THE COURT:  Welcome back, Mr. Sullivan.

 6              MR. SULLIVAN:  Thank you, sir.

 7              THE COURT:  So when last you were here, my Court --

 8    and I was talking to the jury after the verdict, and one of the

 9    jurors said, "Was that really Brendan Sullivan?"

10              And when I told him that:  Yes, it was the real McCoy,

11    he practically collapsed from enthusiasm right there on the

12    spot.  So welcome back.

13              MR. SULLIVAN:  Thank you, your Honor.  You're always

14    very nice in the compliments, but you always deny my motions.

15              THE COURT:  Seems like the fair thing to do.

16              Anyway, what is the -- when is your answer due in the

17    Staley matter?

18              MR. SULLIVAN:  60 days, your Honor.

19              THE COURT:  60 days from?

20              MR. SULLIVAN:  From March 8 or 9.

21              Just so the Court knows, I think on Wednesday,

22    March 8, I was informed Mr. Staley would be sued by JPMorgan.

23    They asked if I would accept service.  I did accept service on

24    March 9.  On Friday, March 10, I did receive the Court's

25    invitation to appear today for purposes of scheduling.

N3GQdoe1

1          THE COURT:  I'm sorry, I should have made it the

2     evening of March 9, but I'm a little belated.

3          MR. SULLIVAN:  The only important day to avoid any

4     important conflict is tomorrow.  As you know, it's St.

5     Patrick's Day.  It's a holy day.

6          THE COURT:  Everyone knows that, but I am not sure

7     that you should bring religion into the courts.

8          MR. SULLIVAN:  That is true.

9          Your Honor, just to fill out the situation, so I'm

10    here today to announce that I know nothing about this case.

11    Nothing.  I don't know about the discovery.  I haven't read the

12    pleadings.  I haven't seen any discovery or subpoenas.  I don't

13    know the name of the plaintiff.  And I think I'm probably

14    entitled to a *Guinness Book of World Records* in having appeared

15    the quickest between the date of suit and today, which is eight

16    days, so --

17         THE COURT:  Well, I appreciate that.

18         Now, last I heard your law firm, whose excellence is

19    well-known throughout the United States, held itself out as

20    being able to act promptly and efficiently on virtually any

21    matter brought to it.

22         MR. SULLIVAN:  That is absolutely true.

23         THE COURT:  So you don't really need 60 days, right?

24         MR. SULLIVAN:  No, I really don't, but I'm not going

25    to waive the 60 days.

1          Let me be serious for a moment, your Honor.  There is

2     only one thing you're concerned about is getting cases properly

3     tried and all parties having an opportunity to be fairly

4     prepared and heard in your court.  There is no question about

5     that.

6          I come late to this, and there has to be a major

7     adjustment.  I am -- frankly, if this was a brand new case and

8     we were all arriving, I would say based on my experience, the

9     minimum trial date should be March of '24, just 12 months, 12

10    months.  Maybe that can be cut back.  My point is, your Honor,

11    there is apparently an enormous amount to do.  Some lawyers

12    have been in these cases for more than a decade.  This is new

13    to us, and we need the proper time to prepare.

14         So according to Rule 4, we do have 60 days, and I

15    don't anticipate filing until that time.  And I would ask the

16    Court's consideration given our arrival in the case to consider

17    moving the trial date closer to March of 2024 than the day

18    after Labor Day 2023.

19         THE COURT:  Well, see, against that is the Court's

20    perception, which I have repeated perhaps too often for 27

21    years, which is that if there is one major problem with the

22    American civil justice system, it's delay:  Endless delay,

23    expensive delay, delay that is not only bad for the parties but

24    is bad for the cause of justice.  And while this case has its

25    factual minutiae, legal issues are not nearly as complex as in

N3GQdoe1

1    many cases that come before the courts of the Southern District

2    of New York.  So there is no way I am going to push this case,

3    the trial of this case off or these cases off to March of 2024.

4    And I'm reinforcing that belief by the expertise and the

5    resources that all the firms involved in these cases have.

6            But I would, in light of your late entry, consider,

7    and in addition to, of course, giving you at least one day of

8    delay for St. Patrick's Day, consider a later date.

9            MR. SULLIVAN:  May I mention one more thing that could

10   be a factor for the Court?

11          THE COURT:  Yes.

12          MR. SULLIVAN:  I have a trial ten weeks from now in

13   criminal court presided over by Judge Denny Chin, and he has

14   set aside the entire month of June for that trial.  And I know

15   it may not be --

16          THE COURT:  An entire month?

17          MR. SULLIVAN:  Yes, your Honor.  You should talk to

18   him about speeding it up perhaps.

19          THE COURT:  I intend to do that.

20          MR. SULLIVAN:  The trial starts jury selection May 30,

21   and the judge had identified every day of trial, there are some

22   half days, and the last day he has on his calendar is June 28.

23          THE COURT:  What about evenings and weekends.

24          MR. SULLIVAN:  That's fully occupied, as you know,

25   your Honor.

N3GQdoe1

1          THE COURT:  So let me ask one other question,

2     something that I really reserved on earlier when these cases

3     were first presented.

4          But let me ask counsel in the Deutsche Bank case, what

5     about consolidating that trial with the trial of the other

6     cases?  What would be in it for you, so to speak, is your trial

7     is now due to start August 8, and nothing involving Mr. Staley

8     and his counsel implicates anything about that date; but if it

9     were one trial of all these cases, which I think also makes a

10    lot of sense, then I would be willing to move your trial to a

11    consolidated trial date of -- and I was beginning to explore

12    that with Mr. Sullivan, but that would probably be October,

13    November, something like that.

14          So what about that?

15          MR. HENNES:  Your Honor, David Hennes from Ropes &

16    Gray on behalf of Deutsche Bank.  It's an issue we haven't

17    considered in the last several months.  I don't think we

18    thought it made sense at the time to do that, given the

19    differing time periods in which --

20          THE COURT:  I understand why, and that's why initially

21    I set two different trials, and I understand those arguments.

22    But, on the other hand, you might prefer to balance that

23    against the advantage of having a later trial.

24          MR. HENNES:  That's right, your Honor, and I would

25    like the opportunity to talk to client about that.  It's an

N3GQdoe1

1   important issue.

2           THE COURT:  Well, that's fine.  So we'll leave your

3   trial date where it is for now.  We'll set a date with all

4   other parties for an extended trial date, and can you let me

5   know by Tuesday whether you prefer the extended trial date?

6           MR. HENNES:  I will, your Honor.  Can I raise one

7   other issue as we are thinking about this?

8           There are many overlapping issues in this case, both

9   those of fact of discovery and legal arguments, as you've heard

10  from the arguments on Monday, and there are some overlapping

11  issues.  So we do believe it makes sense to keep the schedules

12  linked.  I will get back to you on the trial date, but in terms

13  of any dates that move, it makes sense to keep the cases on the

14  same track.

15          THE COURT:  I agree with that, but I wasn't planning

16  to move discovery -- excuse me -- I wasn't proposing to move

17  discovery beyond the trial date we had originally set.  Now I

18  see that, that is maybe a little bit -- if we modify that at

19  all, I think we're only going to modify it as to discovery

20  involving Mr. Staley.

21          MR. HENNES:  I think there will likely be some

22  adjustments proposed.  I don't want to speak for counsel for

23  JPMorgan, but I think there will be some interim proposals of

24  moving some of the dates slightly.  We think it makes sense for

25  all the cases or for both cases for that to happen.

N3GQdoe1

1        THE COURT:  Okay.  I think I -- I'll tell you what.  I

2   didn't see this coming.  It need to go grab my calendar.  We

3   are going to take a two-minute break, not a three-minute break.

4        (Pause)

5        THE COURT:  By the way, I meant to ask counsel for

6   JPMorgan, why didn't you serve Mr. Staley personally?

7        MR. BUTTS:  We asked Mr. Sullivan to accept service.

8   He accepted service --

9        THE COURT:  Well, so he could take advantage of the 60

10  days as opposed to the 30 days, but presumably you could still

11  serve Mr. Staley on Monday, in which case he would only have 30

12  days from that.

13       MR. BUTTS:  If that moves things forward, we will do

14  that.

15       THE COURT:  So that's a thought.

16       MR. SULLIVAN:  I wish you were in my law firm.  That

17  is a good thought.  But the purpose of acting as counsel did is

18  to avoid the hassle of chasing people down and the cost of it.

19  That's the purpose of Rule 4.  I think he acted perfectly

20  properly, and I responded very quickly to avoid that.  And I

21  think -- we can't rewrite history now.  We've been served, and

22  I would suggest --

23       THE COURT:  Well, he's offered to serve your client on

24  Monday if I find it helpful to the Court in moving things

25  along, but I will for the moment -- I want to see how this

N3GQdoe1

1    plays out in terms of timing, but I will for the moment stick

2    to the 60 days.

3            MR. SULLIVAN:  Thank you, sir.

4            MR. EDWARDS:  Your Honor, may I be heard?

5            THE COURT:  Yes.

6            MR. EDWARDS:  Bradley Edwards on behalf of Jane Does.

7            Maintaining the trial date is extraordinarily

8    important to our clients, and so we would move -- if it is the

9    third-party complaint that is going to disrupt that, we would

10   move at this time to sever the third-party complaint and just

11   proceed on the way that -- on the track that we're all

12   scheduled to be on.

13           MS. SINGER:  Your Honor, if I may add to that for the

14   U.S. Virgin Islands.  Obviously, the Court has discretion under

15   Rule 14(a)(4) to sever and stay a third-party complaint in this

16   case.

17           THE COURT:  Last I heard, I have that discretion even

18   without the rule.

19           MS. SINGER:  Understood.  In the same vein of service

20   and all things, understood.  In this case, we do believe it's

21   in the interest of judicial economy, particularly because most

22   of the claims against Mr. Staley are contingent claims, and

23   this is an instance with proceeding with the case-in-chief

24   allowing the plaintiffs to proceed to trial.

25           And then, you know, if a secondary trial is needed on

N3GQdoe1

1   the claims between Chase and Staley, that can be done after the

2   case has proceeded with the benefit of the record, so that

3   Mr. Staley doesn't need to do any duplicative discovery.

4               THE COURT:  All right.  So before I hear from JPMorgan

5   on that, you don't have any objection to that, do you?

6               MR. SULLIVAN:  No objection.

7               THE COURT:  So let's hear from JPMorgan.

8               MR. BUTTS:  We do have an objection, your Honor, and

9   we'd be happy to brief this.  This is the first we're hearing

10  of it from the plaintiffs.  Certainly, it's an area of

11  discretion, but the joinder of claims is strongly encouraged

12  and, concomitantly, quoting from your opinion in *Compania*

13  *Embotelladora*.  Forgive my mispronunciation.

14              Severance should be granted only in exceptional

15  circumstances.  There's five factors that go to that

16  exceptional circumstances test looking at essentially the risk

17  of prejudice and confusion of the issues.

18              1.  Do the claims arise out of the same transaction

19  and occurrence?  They absolutely do.  All roads go through

20  Mr. Staley.  He will be at the center of this case no matter

21  whether there's one or two.

22              2.  JPMC's claims against him are derivative of the

23  claims that the plaintiffs have asserted against JPMorgan.  In

24  fact, our complaint uses allegations directly from the

25  complaint in both cases.

N3GQdoe1

1          3.   Judicial economy.  This is literally a question of

2     one trial or two with all of the same witnesses.

3          4.   Is severance necessary to avoid prejudice to any

4     party?  It is not.  Currently, we are on a schedule that has us

5     in for trial within ten months of the Doe plaintiffs' filings,

6     which is wonderful but a rare thing in --

7          THE COURT:  You know, I think you've made good points

8     up till then.  On that one, you're treading on thin ice because

9     in this Court's view, the overwhelming majority of cases

10    brought in the Southern District of New York, which are

11    typically brought as here by highly competent counsel, can be

12    tried within six months of when the complaint is brought.  So I

13    think you've already had the benefit of more time than I

14    frankly would have normally allowed.

15         MR. BUTTS:  Fair enough.  I won't fight you on that,

16    your Honor.

17         Just pointing out the simple difference in the

18    calendar versus the trial date when it was scheduled, and the

19    filing of this case.

20         But I would like to come back to that point in a

21    slightly different way.

22         But factor five:  Separate claims.  Would they require

23    different witnesses and documentary proof?  And here they would

24    be the same.

25         The thing I would like to say is that while Mr. Staley

N3GQdoe1

is a new party to the case, he is not new to this subject

matter.  He has produced documents.  He was scheduled for a

two-day deposition that is scheduled to begin on Thursday.  He

produced documents to the United States Virgin Islands in their

indict case, which is the case against the Epstein estate that

has now settled.  There has been a multi-year case in the

United Kingdom from the Financial Conduct Authority focused on

Mr. Staley and Mr. Epstein.

THE COURT:  Who is representing Mr. Staley at the

deposition on Thursday?

MR. BUTTS:  I understand it Mr. Sullivan was.

THE COURT:  So surely someone in your firm has been

preparing if the deposition is next Thursday.

MR. SULLIVAN:  Your Honor, there could be no further

difference between a witness's deposition than a party's.

THE COURT:  Of course.  I understand that.  That

doesn't mean that you wouldn't prepared for a deposition.

MR. SULLIVAN:  Certainly.

THE COURT:  And that would require knowing a lot about

what the case is about.

MR. SULLIVAN:  Your Honor, I asked JPMorgan for

documents.  I don't remember the exact date.  At least a month

ago.  I forget when our first meeting was.  We received no

documents.  In that capacity, he's a witness.  He's a -- I need

not underscore the difference between a witness and a party.

N3GQdoe1

1    We are now a party.

2              THE COURT:  So now I come back to the question of

3    judicial economy, and that leads me once again to the other

4    case because the -- it clearly would be in the interest of

5    judicial economy to have one overall case that, yes, there are

6    important differences, but there are also important

7    similarities.  And the legal issues on the whole are very

8    similar.  So I wonder if you'd had any further thoughts on

9    that.

10             MR. HENNES:  In the last three minutes, your Honor, I

11   have not, other than --

12             THE COURT:  What a disappointment.

13             MR. HENNES:  I knew I was going to disappoint you at

14   least once today.  The only suggestion I might make -- and

15   obviously, it doesn't solve the efficiencies of consolidation,

16   which I will consider and be back to the Court in the timeline

17   which the Court requested after talking to the client -- is you

18   can keep the cases linked, meaning the trial can move to the

19   same time if ours is right before the JPMorgan trial as it

20   stands.  They can both move, let's call it, in tandem, so ours

21   continues to go forth --

22             THE COURT:  I don't think that's the same economy, but

23   thank you for mentioning that.

24             MR. HENNES:  But I will be back with the client -- or

25   we will consider the issue and be back before your Honor.

N3GQdoe1

1          THE COURT:  All right.  Let me ask if any counsel

2     wants to -- maybe I should ask plaintiff's counsel first.  How

3     long a trial -- assuming one overall trial of everyone, how

4     long a trial are we talking?

5          MR. EDWARDS:  I think we've estimated between ten and

6     14 days.

7          THE COURT:  I'm sorry?

8          MR. EDWARDS:  We've estimated between ten and 14 days.

9          THE COURT:  I think -- this is not a ruling because I

10     want to hear more about plaintiffs' arguments for sticking to

11     the current trial dates, but if we were to have one overall

12     trial, I could do it beginning October 23.  I have one trial

13     already scheduled for that date, but I can move that other

14     case, and I am basically free for at least three weeks, which I

15     think would be more than enough even if it was one trial.

16          I don't think because of intervening stuff I have that

17     I could meaningfully move the trial involving Deutsche Bank

18     except into the slot that would be vacated by the trial slotted

19     for JPMorgan Chase.

20          So the alternatives are:  Either we leave the trials

21     where they are, and we sever the case against Staley.

22          Second, we have one overall trial of everything

23     starting October 23.

24          Third, that we have one October 23, everything

25     involving JPMorgan Chase, including the Staley part of it, and

N3GQdoe1

1    that we move the Deutsche Bank case to September 5.

2              So I think those are the only three realistic options.

3              So I heard -- and I think it's not without some

4    force -- plaintiff's counsel's feeling desire to move this case

5    forward rapidly.  It's a case of public importance.  It's a

6    case that counsel have worked hard to meet the schedule of the

7    Court.  On the other hand, I am not really clear why a modest

8    delay, essentially in the case of the JPMorgan case, a month

9    and a half, is really so prejudicial.

10             But let me hear anything further that plaintiff's

11   counsel wanted to say on that.

12             MR. VILLACASTIN:  Good afternoon, your Honor.  Andrew

13   Villacastin from Boies Schiller Flexner.

14             Jane Doe's preference is to keep the trial dates.  I

15   think your inclination in the beginning of the hearing where

16   you noted that there was some play in the joints, you had the

17   ability -- we have a separate trial on June 20 and a two-month

18   delay before the beginning of trial.  We have ten unripe

19   applications.  We don't know how Mr. Staley's entering into the

20   case necessarily will affect the schedule, and I think we

21   should hear what he intends to do before we necessarily move

22   it.

23             You know, there was a mention of severance as well.  I

24   think, you know, we can consider what the parties' intentions

25   are.  The parties have not yet conferred on this, as I think

N3GQdoe1

1   Mr. Butts mentioned.

2            So just to state Jane Doe's preference --

3            THE COURT:  Although counsel for JPMorgan, quite

4   rightly, cited the factors that the Court needs to take account

5   of, and most of those factors weigh against severance, JPMorgan

6   really has created this situation.  JPMorgan surely knew from

7   its years of investigation what its views were with respect to

8   Mr. Staley.  JPMorgan certainly could have served him

9   personally.  I mean, I find that extraordinary that given the

10  deadline in this case, that that wasn't done.  So in many ways

11  JPMorgan has created the problem with respect to Mr. Staley

12  from a timestamp point, and so maybe we should sever it as

13  simple justice or payback or however you like to -- that's Rule

14  97.3.

15           MS. SINGER:  Household rule.  My house, your Honor.

16  If I may --

17           MR. VILLACASTIN:  Just to move quickly, sir.

18           THE COURT:  Maybe I should interrupt you guys for a

19  minute to hear from JPMorgan.  Yes?

20           MR. BUTTS:  Your Honor, I will not take with you on

21  the issue with you on the piece with regard to service, right?

22  We did it as a professional accommodation to Mr. Sullivan.

23  We're happy to have him served personally tomorrow.

24           But this is not, respectfully, a problem of JPMorgan's

25  making.  This is an issue of part of this case has gone on and

N3GQdoe1

part of what we have known about.  And we had argument in front

of you.  We moved the impleader date because we were trying to

get information from Ms. Doe about one of her allegations in

the complaint as to who is the powerful financial executive who

participated in her assault.

            We asked that for awhile.  Threatened to move to

compel multiple times.  And only -- it was in

interrogatories -- it should have been answered in

interrogatories.  And only 48 hours before we were coming upon

the -- 48 hours before we called asking for an extension of

that date when we were upon the original impleader date did

counsel finally share that it was that, she is alleging,

Mr. Staley.

            What we asked for -- when we asked the Court for

permission to extend that was, this wasn't a question for

counsel, but for Ms. Doe, and our ability to hear from her in a

deposition where in an open courtroom the plaintiffs have been

sensitive about what is said in that deposition.  I'm happy to

share it with you at sidebar, or if you'll permit me, but what

happened at that deposition fundamentally changed things, and

that's why we are here today.

            MR. VILLACASTIN:  If I could respond, your Honor?  I

am the attorney who told them who that powerful financial

executive was.  To be clear, the Court's schedule had a date

for joinder of additional parties by December 16, 2022.  It was

N3GQdoe1

over our objection, I guess -- we may have consented for them
to enter an application, but we saw no reason for JPMorgan to
have additional time for that deadline.

          To be clear, even assuming -- and this is an assertion
that JPMorgan itself did not know who that powerful financial
executive was, there were interim dates before that.  The
conversation that Mr. Butts is referencing happened on
February 14, which is more than a month ago, right?  More than
a month ago, and then he requested that verification in writing
the day after.  I gave it to him in writing the day after.  And
the verified interrogatory response was on February 23.

          So you know that the third-party complaint is upon
information and belief.  That's what they put into their
complaint.  And they had that information and belief way before
now.  And we see no reason on that basis to overturn the
schedule.

          And to be clear, U.S. Virgin Islands, Jane Does, and
JPMorgan we meet and confer weekly.  We talk about schedules
weekly.  We've heard about extensions to schedules and, you
know, extensions to schedules have been discussed, and, you
know, for example, Jane Doe would consent to a reasonable
request for an extension, such as U.S. Virgin Islands mentioned
earlier on expert discovery, but it -- you know, we do not
consent necessarily to the timing of a third-party complaint
leading to the overthrowing a schedule, which is important to

1    our clients, to be clear, and we dispute the other factors for

2    severance.  You know, allegations specific to Mr. Staley are

3    not shared by our -- the entirety of our class, for example,

4    and we see no reason to prejudice their ability to get to trial

5    on their claims.

6             THE COURT:  I'm sorry, other counsel wanted to be

7    heard?

8             MS. SINGER:  Yes, your Honor.  A few issues here.

9    Echoing your Honor's point that this is a problem of JPMorgan

10   Chase's own making.  Their third-party complaint largely

11   recites the fact of the Doe complaint and the U.S. Virgin

12   Islands complaint, and, importantly, the United States Virgin

13   Islands complaint relies almost entirely on JPMorgan Chase's

14   own documents:  Mr. Staley's emails to Jeffrey Epstein, all of

15   which occurred on JPMorgan's server, his meetings with Jeffrey

16   Epstein which were on the calendar, including numerous meetings

17   at Mr. Epstein's home, and the case against JPMorgan Chase is

18   not solely or limited to the case against Jes Staley.

19            The parties took a deposition yesterday that was very

20   instructive, but as the complaints in this case make clear, the

21   information about Jeffrey Epstein's human trafficking was known

22   widely at JPMorgan Chase.  It was known from his financial

23   records.  It was known from media articles that were circulated

24   widely among the bank.  This case is not just Jes Staley.  And

25   I say that with no intent of excusing or minimizing his conduct

N3GQdoe1

here, which is, of course, important to the case, but it was
not just Jes Staley.  There will be numerous other witnesses
and documents that go far beyond his office, throughout the
executive suite and elsewhere at JPMorgan.

As your Honor noted, this is a case of enormous
importance as an enforcement matter and to victims, and it
should proceed.  I understand that you are talking about six
weeks, but it is time that matters to us in securing justice
here.  Discovery has been proceeding.  There has probably been
four or five, maybe six weeks of document exchanges.  The case
is not so far along that Mr. Sullivan and his firm could not
jump in quickly even if the cases weren't severed.  But this is
a case -- and Mr. Butts cited your decision and the Rule 14
factors, and three and four, I'm not going to argue about
whether these are common facts, common occurrences questions of
law.  They are certainly overlapping.  But they are also
distinct.

And if you look at other case law in the circuit, one
of the things that courts look at is whether severance or stay
facilitates judicial economy by possibly eliminating the need
for a trial of separated claim or issue.  That's the case of
*Crown Cork & Seal*.

Whether there are additional discovery burden.  And
obviously the burden to victims here, for instance, in sitting
for another deposition with Mr. Staley, one of the key

N3GQdoe1

1    depositions, has already happened.  It adds an additional

2    discovery burden to the case.

3          And, finally, as to your own decision which I wouldn't

4    presume to recite to you, but that was a different

5    circumstance.  The *Compania Embotelladora* -- which I've

6    butchered as badly as Mr. Butts -- that was a case that

7    involved not a third-party claim but a counterclaim, and the

8    factors in severing a counterclaim are very different than a

9    third-party complaint when the U.S. Virgin Islands and the Doe

10   plaintiffs purposely chose to sue the company here because

11   that's where the conduct, I guess it's a flip term, but that's

12   where the buck stops in this case with JPMorgan Chase.

13         THE COURT:  So all of you made, as I would have

14   expected, excellent arguments, but I think we need to move this

15   along.  So I am going to move the trial involving JPMorgan and

16   Mr. Staley jointly, and without severance, to October 23.  And

17   as far as I'm concerned, it would take something -- it would

18   take an act of God for me to move that any further.  So that is

19   a firm and fixed date.  And I think it's still important to

20   move these matters as expeditiously as possible.  So if

21   Deutsche Bank doesn't want to join in that combined trial on

22   October 23, the trial against Deutsche Bank will remain for

23   August 8.

24         In terms of how this affects case management, maybe I

25   can prevail on counsel for Deutsche Bank to get me a decision

N3GQdoe1

1   instead of Tuesday, on Monday.  Is that doable?

2            MR. HENNES:  Yes, your Honor.  Monday is fine.  I

3   would ask if you wouldn't mind moving us into the September 5

4   slot, regardless of what happens.  We have a lot to do.  There

5   are discovery disputes that are ongoing, and there's a

6   tremendous amount --

7            THE COURT:  Let me think about that for a moment.

8   Here is the point I want to get to.

9            So we will know by close of business Monday whether

10  Deutsche Bank wants to join in the overall case or not.  If it

11  doesn't -- yes, I agree with you.  I see no harm in moving it

12  to September, to what is it, September 5?

13           MR. HENNES:  Yes, your Honor.

14           THE COURT:  Of course that will also destroy your

15  Labor Day weekend, so that's an added benefit.

16           MR. HENNES:  Thank you, your Honor.

17           THE COURT:  So counsel will then, depending on the

18  answer, confer jointly, including counsel for Mr. Staley, on

19  Tuesday, and get me by no later than noon on Wednesday a

20  proposed new case management plan filling in all the necessary

21  dates that will allow those two trials to go forward on either

22  the two dates or one date that is elected.

23           And if for some reason, which I'm quite sure you can

24  all work that out, but if for some reason you can't, just

25  indicate that in your submission, and I'll resolve that later

N3GQdoe1

1    in the afternoon on Wednesday.  So we'll have this all set by

2    Wednesday afternoon.

3              Okay.  I think the next item is the argument on the

4    motion to dismiss the Virgin Islands' claim.  If some of you

5    who are not involved in that feel the need for a break, feel

6    free to take it.  I don't expect that -- because many of the

7    issues are similar to ones we've already covered, but some are

8    unique, but I'm hopeful we can resolve that -- or not resolve

9    it, but hear that full argument in the next half hour.  So be

10   back in a half hour, or you can stay and watch, but let's

11   proceed with that argument.  So let's hear first from moving

12   counsel.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

N3G1DOE2

1          MS. ELLSWORTH:  Thank you, your Honor.

2          So there are several important differences in the

3     motion to dismiss the U.S. Virgin Islands complaint from the

4     motion your Honor heard on Monday.  There are threshold reasons

5     why the U.S. Virgin Islands complaint cannot proceed under both

6     TVPA, the federal statute, as well as under the two territorial

7     law statutes they attempted to bring.

8          First, under the TVPA, the U.S. Virgin Islands cannot

9     invoke Section 1595(d) because it is not retroactively

10    applicable.  That section was added to the statute in 2018, and

11    the conduct that the U.S. Virgin Islands accuses of violating

12    the statute all predate 2018.  The statute doesn't apply

13    retroactively so they cannot proceed under 1595(d) at all.

14         Even if they could proceed under that statutory

15    provision, the U.S. Virgin Islands has failed to plead *parens*

16    *patriae* standing as is required under both the plain text of

17    1595(d) as well as under the law of *parens patriae* standing.

18    U.S. Virgin Islands has to indicate that it is proceeding on

19    behalf of an interest of the population; it cannot be trying to

20    vindicate individual rights.  It didn't plead this at all in

21    its complaint other than to say *parens patriae*.  It didn't

22    include any facts to suggest the interest of the citizens that

23    it is seeking to vindicate, and under the various cases that we

24    have cited to you in our papers, they do not have a basis for

25    asserting a *parens patriae* claim here, so under those two

N3G1DOE2

1     threshold issues ——

2          THE COURT:  So I'm not totally sure I'm following.

3     Are you saying that the person who is trafficked to a location

4     within, in this case, the Virgin Islands, isn't a resident of

5     that location under 1595(d), I guess it is, or are you saying

6     that even assuming that person is a resident, you still think

7     they don't have standing?

8          MS. ELLSWORTH:  I think it might be both, your Honor.

9     So the Section 1595(d) allows the attorney general to vindicate

10    an interest of the residents of that state; they believe it has

11    been or is threatened to be adversely affected by a violation

12    of 1591.  So the Virgin Islands cannot bring a complaint, nor

13    do they suggest that they are trying to bring a complaint, on

14    behalf of the victims of Epstein.  Instead, the complaint is

15    purported to be brought on behalf the residents of the Virgin

16    Islands, of the territory.

17         THE COURT:  Yes.  But so the interesting word there is

18    "residents," not citizens or something like that.  And

19    supposing, in a hypothetical, someone forced a thousand people

20    into the Virgin Islands to take advantage of forced labor or

21    something like that.  Are you saying that people, even though

22    forced there and even though residing in some physical sense

23    there, would not be residents?

24         MS. ELLSWORTH:  No, that's not what I'm saying, and I

25    don't think that's what the Virgin Islands is trying to plead

N3G1DOE2

1   here.  They're not trying to plead a claim on behalf of victims

2   of Epstein.  That would be an improper invocation of 1595(d)

3   and of the *parens patriae* doctrine.  Instead, they are trying

4   to plead a complaint on behalf of the residents writ large of

5   the Virgin Islands for some amorphous and, I would say,

6   insufficiently pleaded harm that the residents have suffered

7   from the actions of Epstein.  So that's the *parens patriae*

8   claim as pled by the complaint.

9           Now they have not actually alleged a sufficient

10  quasi-sovereign interest to allow them to proceed under that

11  doctrine, even, again, putting aside the gateway issue if the

12  Court could even find that 1595(d) were to apply here, which it

13  does not, because that would be an improper retroactive

14  application of that statute.

15          THE COURT:  So there's that case, I think it's called

16  *Snapp* —

17          MS. ELLSWORTH:  That's the one.

18          THE COURT:  — where Puerto Rico had *parens patriae*

19  standing to assure its residents that it would protect them

20  from the harmful effects of discrimination.  Here, the Virgin

21  Islands, as I understand it, asserts that it wants to assure

22  its residents that it will act to protect them from the harmful

23  effects of criminal sex trafficking enterprises flourishing in

24  the islands.  So how do you distinguish those two situations?

25          MS. ELLSWORTH:  There's no allegation in the complaint

N3G1DOE2

1    in this case of any criminal sex trafficking that is ongoing or

2    threatened to happen in the future.  We all know that Epstein

3    is deceased.  There's no allegation that there is some imminent

4    harm of some other sex trafficking enterprise resident on the

5    island.  So I think it's a very different situation than the

6    *Snapp* case in Puerto Rico, where there was potential ongoing

7    discrimination against the residents of Puerto Rico in their

8    employment opportunities elsewhere.  I would say that, again,

9    what has been alleged here is in paragraph 93 of the complaint,

10   which is simply a bald allegation, of pleading *parens patriae*

11   is insufficient to actually plead the quasi-sovereign interest.

12   But even if we put that to the side, they haven't actually

13   articulated what that interest is or why this is the

14   appropriate vehicle to try and vindicate it.  And again,

15   there's nothing, no facts pled that suggest there's some

16   ongoing harm from a sex trafficking operation that they are

17   trying to vindicate.  All they really, at bottom, are trying to

18   do is invoke, potentially invoke the right to victims, and of

19   course that's an improper exercise of the *parens patriae*

20   doctrine —— that's the *Missouri* case that we cited to your

21   Honor in the papers —— to try and invoke the rights of victims.

22           But I would like to return to the retroactivity point

23   because I'm not sure the Court even needs to reach the *parens*

24   *patriae* ——

25           THE COURT:  Well, I think the retroactivity point is a

N3G1DOE2

1    very important point.  I do want to hear from your adversary

2    particularly about that point, but just to go to the point you

3    were just making ── I'm looking at 1595(d) ── "in any case in

4    which the attorney general of a State has reason to believe

5    that an interest of the residents of that State has been or is

6    threatened or adversely affected," they can bring a civil

7    action.  So doesn't on its face the statute say it doesn't have

8    to be that you have future harm that you're trying to prevent

9    but it also, for obvious deterrent and other reasons, includes

10   an action for past harm?

11            MS. ELLSWORTH:  Those are the words of the statute,

12   but again, the Virgin Islands hasn't articulated what that harm

13   to the residents of the state was, what the quasi-sovereign

14   interest that it's seeking to invoke here.  It has articulated

15   nothing about ──

16            THE COURT:  You seem to be arguing that they can't

17   bring an action if they can't articulate a current danger, and

18   I don't see that the statute has that limitation.

19            MS. ELLSWORTH:  I think they need to argue either a

20   past harm or a current danger.

21            THE COURT:  Yes.  And why aren't they satisfying past

22   harm?

23            MS. ELLSWORTH:  They haven't argued either.  I mean,

24   they haven't pled in their complaint what that past harm is.

25            THE COURT:  Oh, I see.  All right.  But you agree if

N3G1DOE2

1    it's a past harm, it would still support an action.

2            MS. ELLSWORTH:  A past harm could support an action,

3    but the only —— again, not in the complaint, but in their

4    motion papers, the only interest that the Virgin Islands has

5    articulated that they are attempting to vindicate here is to

6    protect their citizens from the harms of sex trafficking, and

7    they haven't identified any factual basis for that.

8            THE COURT:  And I want to move on.  But if the

9    citizens, the residents, have —— because it's not the citizens,

10   it's the residents —— have suffered from sex trafficking in the

11   past, and let's assume for the sake of argument that the

12   particular perpetrator of that sex trafficking is no longer

13   around to do it, I don't read the statute as I think you're

14   trying to suggest, that that precludes their bringing an action

15   because the harm is over, so to speak, as involving this

16   particular perpetrator, because this statute very clearly, as a

17   classic hybrid statute —— civil/criminal —— has both the

18   general deterrent aspects as well as more immediate

19   compensatory aspects, so they're entitled to get back monies

20   that should have been paid because of the sex trafficking in

21   the past and —— for example, I think these cases often involve

22   punitive damages —— to deter others from using the Virgin

23   Islands as a headquarters for sex trafficking.  So I understand

24   you're saying that they haven't articulated that.  That's a

25   different question and an important one.  But I'm not sure it

N3G1DOE2

1      has to be prospectively in ——

2              MS. ELLSWORTH:  I don't mean to argue that it has to

3      be prospective.  What I'm saying is that they have not

4      articulated what the past harm is that is a quasi-sovereign

5      interest.  It isn't harm to victims, so that's not —— those are

6      not the residents on whose behalf the Virgin Islands purports

7      to be moving.  And the future harm that they've articulated is

8      not a future harm that has any factual basis in the complaint

9      or otherwise.  That's the point I'm trying to make.

10             THE COURT:  All right.  So let's move on.  And I think

11     you already articulated some of this may become moot if the

12     statute is not retroactive.  I have a lot of questions for your

13     adversary on that, but quickly, anything you wanted to say, and

14     then I'll put the questions to them.

15             MS. ELLSWORTH:  So I don't think that the Virgin

16     Islands contests that the statute doesn't have any explicit

17     reference to retroactivity.  The harm and the conduct that is

18     pled as violating the statute ends in 2013, which is when

19     JPMorgan Chase exited —— ended its relationship with Epstein as

20     a client.  I'll point to the cases cited in our brief but

21     particularly the *Kellogg Brown & Root* case from the Fifth

22     Circuit that found an extraterritorial application of the TVPA

23     to be an expansion of liability and therefore could not apply

24     retroactively; and the *Ditullio* case from the Ninth Circuit

25     which found the addition of the civil action to be an expansion

N3G1DOE2

1    of the statute that couldn't apply retroactively.  The addition

2    of 1595(d), which allows an attorney general to bring a case,

3    is also an expansion of the statute.  It is a different set of

4    harms, a different set of claims that they have to bring.  I

5    just articulated why I think they haven't done so.  But it is

6    not the same harm that a victim under the statute, under

7    1595(a), could bring.  It is different, it is more, and by

8    expanding liability, it can't apply retroactively, and so

9    simply can't apply here at all.

10          Let me move on to the territorial law claims, if I

11    could.

12          THE COURT:  Yes.  Go ahead.

13          MS. ELLSWORTH:  So those also fail at the outset, for

14    several reasons.

15          The first is, for both the CICO and the consumer

16    protection statute, Virgin Islands has not articulated a

17    justification for why those apply extraterritorially.  The

18    Virgin Islands Code 1, Section 2 has a presumption that the law

19    applies only within the territory.  Of course they're trying to

20    bring this case in the Southern District of New York against a

21    bank that is based in Delaware and has a principal place of

22    business here in New York.  They have not alleged conduct by

23    JPMorgan Chase in the Virgin Islands.  And in fact, in

24    paragraph 11 of their complaint, they allege that the conduct

25    of JPMorgan Chase was in New York.  So the laws just can't

1    apply extraterritorially at all.

2           Even if they could apply, moving first to the CICO

3    claim, which is their version of RICO —— I know the Court was

4    just hearing an argument about RICO in the prior case —— they

5    have to show participation, they have to show venture, and they

6    have to show an underlying predicate act.  The CICO law follows

7    federal RICO law, so I won't recite it.  I know the Court is

8    very familiar with it.  But let me tell you why they can't

9    satisfy it.

10          First, there's no enterprise, so even if there is an

11   Epstein enterprise of some sort, under the law of RICO or CICO,

12   they need to show that JPMorgan shared a common purpose with

13   that Epstein enterprise in order to establish an enterprise

14   under the statute.  There's no pleading of that, nor could they

15   possibly plead something fact sufficient to meet that element

16   of the claim.  Also can't show the participation.

17          But let me move to the predicate acts because that may

18   be another easier way to dispose of this claim.  Under CICO, it

19   requires the underlying predicate criminal act to have taken

20   place within five years of the filing of the claim.  Again, the

21   underlying criminal acts that are alleged here all occurred

22   earlier than 2013.  Now the Virgin Islands does make some

23   arguments in their papers about some ongoing violation or

24   ongoing conduct that would somehow make the claim more timely.

25   Those allegations are not sufficient to get them over this

1     five-year bar because the allegations are a failure to follow

2     the requirements of the bank's secrecy act and the failure to

3     file a SAR earlier than JPMorgan did.

4          THE COURT:  Yes.  As I read it —— I want to hear from

5     plaintiff's counsel —— it was mostly a failure to file

6     suspicious activity reports.

7          MS. ELLSWORTH:  And again, that failure —— to the

8     extent that there was one, which we don't agree with —— would

9     have taken place prior to 2013.  The activity that supposedly

10    JPMorgan should have acted on all predates 2013.

11         I also would just note that even if that was a

12    cognizable claim, even if there weren't the other threshold

13    problems I've identified with it, the chain of causation simply

14    doesn't exist.  Even a SAR with the Treasury would not go to

15    the U.S. Virgin Islands, so there's no connection to why the

16    alleged failure to make those regulatory filings would somehow

17    have changed anything in the Virgin Islands conduct.

18         Finally, on the consumer protection, that also has a

19    six-year statute of limitations, that is outside —— this claim

20    is outside the unfair competition law.  That claim is barred by

21    the statute of limitations.  That also —— it's very thinly

22    pled, I will say.  As best I understand the allegations, it's a

23    suggestion that somehow other banks would have had different

24    business had JPMorgan not engaged in the conduct alleged in the

25    complaint.  There's not sufficient factual information to

N3G1DOE2

1    support that, nor have they articulated why that would harm

2    consumers in the Virgin Islands.  And so if the Court has no

3    questions on that, I'm happy to move on.

4            THE COURT:  Yes, that's fine.  Let me hear from the

5    Virgin Islands.  Thank you.

6            MS. ELLSWORTH:  Thank you.

7            MS. LIU:  May it please the Court.  I'll begin with

8    the TVPA retroactivity argument.

9            The critical question there, your Honor, is does the

10   amendment increase JPMorgan's liability for past conduct, and

11   the answer is no.  The *Hughes Aircraft* case makes clear that

12   you can't just say there are differences.  The differences must

13   increase JPMorgan's liability or past conduct.  That case

14   involved an amendment to add *qui tam* plaintiffs.  The court

15   said that effectively created a new cause of action because the

16   *qui tam* plaintiffs had greater incentives to bring a cause of

17   action than did the government.  Here, the legislative history

18   is abundantly clear, contrary to my adversary's arguments, that

19   Congress intended this to be a right of action, not a cause of

20   action.  Specifically, the language in the legislative history

21   states, the amendment "creates a right of action for state

22   attorneys general to file federal causes of action for sex

23   trafficking."  Obviously Congress intended to distinguish

24   between a right of action and a cause of action.  As the Court

25   well knows, a right of action is procedural, and the *Landgraf*

1    case, at page 275, makes abundantly clear that applying a new

2    procedural rule is not impermissibly retroactive.

3            My adversary also argues that if we have to show

4    post-2018 amendment conduct, we have not done so.  That is not

5    true.  They argue that there was no financial benefit

6    post-2018.  The first amended complaint at paragraph 86, among

7    other places, makes clear that JPMorgan continued to benefit

8    until after Epstein's arrest and death in 2019, so there is a

9    full year of conduct alleged in the complaint post amendment.

10           With respect to the ——

11           THE COURT:  Well, are you saying that the fact that

12   they continued to benefit in a financial sense by itself

13   extends the statute of limitations?

14           MS. LIU:  Certainly not, your Honor.  I was just

15   addressing a point in their reply, which is that of the

16   elements of the TVPA that we need to prove, they assert we

17   didn't prove the "knowingly benefit" prong for ——

18           THE COURT:  All right.  Just hypothetically, because I

19   haven't made any decision or anything in this matter yet, but

20   assuming that the statute is not retroactive in the sense that

21   they're talking about, so you have to show something in 2018,

22   what, other than the failure to file suspicious activity

23   reports, do you allege?

24           MS. LIU:  Yes, your Honor.  The ongoing violation of

25   federal banking laws which allowed them to continue to conceal

N3G1DOE2

the misconduct constitutes a violation post-2018 through and
after Jeffrey Epstein's arrest and death in mid-2019.

THE COURT:  So they say that if anyone was a direct
victim of that failure to file, it was not the Virgin Islands
but it was the banking authorities in Washington.  What about
that?

MS. LIU:  Well, certainly those consequences
reverberated to including the Virgin Islands.  This is a *parens
patriae* case and I think this segues nicely into the *parens
patriae* argument, which allows the U.S. Virgin Islands to bring
this case on behalf of the interests of its residents.  And to
answer your question earlier, your Honor, certainly the direct
interest of the victims, as residents of the Virgin Islands,
are implicated here as well as the indirect interests of the
other residents of the Virgin Islands.  And I would note that
of course the victims, who were trafficked to, held captive in,
and sexually assaulted in the Virgin Islands, they were
residents for purposes of the *parens patriae* authority, and
that is because the nature of human trafficking is such that
the victims do not have any legal residence.  We're talking
about conduct that is necessarily cross-border.  The TVPA only
contemplates conduct that occurs in or affecting interstate
commerce or foreign commerce.  Yet the federal law explicitly
authorizes *parens patriae* action on behalf of the direct
interests of the residents and the indirect interests of the

1    residents in this context.  I would add that the *Spitzer v.*

2    *Cain* case that my adversary cited in their motion, that was a

3    case involving women seeking abortion services in New York

4    City.  We know that women seeking abortion services —— and the

5    court does not consider this —— often have to cross state

6    lines.  The court didn't say, oh, my goodness, those women are

7    not New York legal residents and thus we're not going to

8    consider them for purposes of a *parens patriae* case.  That's

9    just not what ——

10             THE COURT:  Yes.  I mean, I think the point is telling

11   here.  What is telling here is that Congress used the term

12   "residents."  They didn't say "lawful residents"; they didn't

13   say "citizens"; they didn't use any of the other terms that

14   they've used in other statutes.  And the sort of common sense

15   would be "resident" is someone who is residing in that

16   particular location, whether by choice or by force, or

17   trafficking.

18             MS. LIU:  Absolutely, your Honor.

19             And my adversary also mentioned that we did not allege

20   any quasi-sovereign interests on behalf of the Virgin Islands

21   and its residents.  I would just point the Court to our

22   opposition brief at pages 9 and 10, where we cite multiple

23   passages from the first amended complaint, where we allege the

24   interest in protecting public safety, in protecting young women

25   from the criminal human trafficking, ensuring that criminal

N3G1DOE2

1    human trafficking does not flourish in the Virgin Islands.

2    There were three, four, five allegations in the complaint about

3    the Virgin Islands's quasi-sovereign interests here in

4    protecting the health and well-being of its residents, as

5    recognized in the *Snapp* case.

6              I want to address a few issues that were brought up on

7    Monday, your Honor, that Wilmer Hale did not address today, but

8    the first being that we have pled all of the elements of a TVPA

9    claim.  JPMorgan Chase participated in a commercial sex

10   trafficking venture.  In the ordinary course, after Jeffrey

11   Epstein pled guilty to conduct that constitutes child sex

12   trafficking under the TVPA, in 2008, in the ordinary course,

13   the bankers at JPMorgan expected that JPMorgan would exit

14   Epstein; and instead, what happened?  Pending Dimon review ——

15   that's Jamie Dimon —— pending Dimon review, Jeffrey Epstein

16   remained as a client of the bank for an additional five years

17   JPMorgan broke the rules.  In addition, after he got out of

18   jail for conduct that constitutes child sex trafficking, and

19   their compliance department got more allegations of more sex

20   trafficking, who did they assign to investigate those

21   allegations?  Not their lawyers, not their investigators; they

22   assigned the CEO of the private bank and the investment bank.

23   Why did they do that?  Because they knew if they did that, the

24   answer would come back clean.

25              I would also note that there's certainly not ordinary

N3G1DOE2

banking services here.  We talk about the *Deutsche Bank* case,

and the New York banking regulator went after Deutsche Bank for

conduct that we say is similar but less egregious than here.

The banking regulator found this banking conduct to be so

nonroutine and to be so extraordinary that they imposed a

$150 million penalty on Deutsche Bank.  Again, JPMorgan broke

all the rules.

I also want to make a note about Mr. Staley.  We can

put Mr. Staley to the side, as my colleague Ms. Singer noted,

and we have still alleged that JPMorgan knew and detected

Epstein's sex trafficking.  In 2008, again, Jeffrey Epstein

pled guilty to conduct that constitutes child sex trafficking,

solicitation of a minor for prostitution.  That's what he pled

guilty to.  The TVPA bars soliciting a person who has not

attained 18 years of age for a commercial sex act.  Those are

identical, your Honor, so they knew as early as 2008, if not

earlier.

In addition, for persons over 18, they knew about

force, fraud, and coercion.  They had massive internal

investigation teams reporting for years that Jeffrey Epstein

was involved in child trafficking and human trafficking.  The

term "human trafficking" means force, fraud, or coercion.

There are also specific internal reports of force, fraud, and

coercion ⸺ fraudulently luring young girls with promises of

modeling contracts, bringing young women over from Eastern

N3G1DOE2

1    Europe when they could not voluntarily leave.

2           And last but certainly not least, Little St. James,

3    which we allege was the base for the human trafficking, that

4    was Epstein's private secluded island.  It's miles off the

5    coast of St. Thomas.  Young women brought there, obviously and

6    inferably, could not leave.

7           So now let's put Staley back into the case.  First of

8    all, as my colleague Ms. Singer said, everything, everything

9    that we allege about Mr. Staley in the first amended complaint

10   comes from JPMorgan's corporate documents.  These are all their

11   documents.  These were not Mr. Staley's private documents;

12   these were JPMorgan's documents.  Everything we know, JPMorgan

13   knew.  JPMorgan obviously had firsthand knowledge and view of

14   the sex trafficking through Staley.  On Monday, my adversary

15   argued, but there's no allegations of force, fraud, or

16   coercion.  Your Honor, of course there is.  As I just

17   mentioned, Mr. Staley visited little St. James multiple times,

18   a private secluded island, miles from anywhere.  Women could

19   not leave.  They also said, but they didn't allege money

20   changing hands.  You'll recall that.  We do allege money

21   changing hands, in full view of JPMorgan, timed with

22   Mr. Staley's visits to Epstein's sex mansion.  JPMorgan was

23   sending, through Epstein's accounts, thousands of dollars to

24   the same Eastern European women.  There was money changing

25   hands.  But in any event, it doesn't matter what JPMorgan knew

N3G1DOE2

1   or didn't know.  Everything that Mr. Staley did was within the

2   scope of his employment, and thus imputed to JPMorgan.

3          We talked a little, you'll recall, about the hotel

4   cases.  They cited to you *Choice Hotels* from the Eastern

5   District of New York numerous times.  Well, what they didn't

6   say about that case, Judge, is that that's a

7   franchisor/franchisee case, and what the court specifically

8   said is the general rule there, no agency, no imputation.  The

9   case they didn't mention at oral argument on Monday or today is

10   a case that Wilmer Hale and my adversary litigated on behalf of

11   the TVPA victim, Lisa Ricchio.  That's the *Ricchio v. McLean*

12   case, Judge.  That went all the way up to the First Circuit,

13   and Justice Souter, retired from the Supreme Court, sitting by

14   designation, he —— they sued both the offsite hotel defendant

15   and the on-site hotel employee.  If you will, analogize that to

16   JPMorgan and Jeff Staley.  And what did they argue there?  Of

17   course the on-site hotel employees are agents for the offsite

18   corporation, and of course —— and Justice Souter agreed —— they

19   are the agents, and anything they know, they knew and saw, is

20   imputed to the offsite hotel.

21          THE COURT:  Whoa, whoa, whoa.  It's one thing what the

22   court decided.  I don't see anything wrong —— maybe I'm missing

23   your point —— between a law firm arguing one position in one

24   lawsuit and the opposite position in another lawsuit.  I

25   thought that's what we all learned in law school.

N3G1DOE2

1          MS. LIU:  And I wasn't suggesting there's anything

2     wrong there, your Honor.  My point was that that is perhaps the

3     most famous of the TVPA cases, of the hotel cases.  It's one

4     that was not mentioned, and it's one where the court said,

5     without any pause, of course what the hotel employees saw can

6     be imputed to their owners, the hotel chain.

7          And also, I just want to add the note, if Staley is,

8     as JPMorgan argues, a rogue employee, if Staley is a rogue

9     employee, why isn't Jamie Dimon?  Because the question is not,

10    as has been sort of alluded to —— the question is not whether

11    or not Mr. Staley raped any young women in the Virgin Islands.

12    That's not the question.  The question is:  What did he know?

13    And Jamie Dimon knew in 2008 that his billionaire client was a

14    child sex trafficker.  Staley knew, Dimon knew, JPMorgan knew.

15         With respect to the extraterritoriality arguments,

16    this is very puzzling to me, your Honor.  They cite this case

17    *InfoSpan* for this point.  *InfoSpan* involved a UAE bank

18    defendant, a Cayman Islands plaintiff, and the issue there was

19    credit card services to UAE customers.  And the lawsuit was

20    brought in California.  There, the court found that there were

21    not sufficient contacts with California.  Here, JPMorgan

22    targeted and transacted business for decades with Jeffrey

23    Epstein, a resident of the Virgin Islands, who we allege his

24    home base for trafficking was in the Virgin Islands, and the

25    principal purpose of the accounts that JPMorgan held for

N3G1DOE2

Jeffrey Epstein was human trafficking.  Of course we have alleged sufficient connections with the Virgin Islands.

With respect to CICO, we've proved each element.  The best case that they could cite for association with a CICO enterprise is the *Rosner* case, Judge.  If you look at the *Rosner* case, here's what the allegations were there — six months of a relationship in conduct between a bank and the individual involving 38 or roughly three dozen transfers that the court said was insufficient to get us beyond sort of regular banking services.  Here, we have a nearly 20-year relationship, hundreds of millions of dollars in accounts, countless transactions to young women who were Epstein's victims and recruiters, by JPMorgan.  In short, they broke every rule to facilitate his sex trafficking and then to conceal it in exchange for Epstein's wealth, connections, and referrals.  This is a far cry from the six months and the handful of transactions at issue in *Rosner*.

I will also mention the *Daddario* case that they cite from the Second Circuit, that case says that operation or management — which we have alleged, but nonetheless, that case says that test must be applied based — it's a test of — it's based on the facts.  It is not appropriate, the court said, to make that determination at this early stage on a motion to dismiss.

Last, with respect to the pattern of criminal

N3G1DOE2

1    activity, the five-year statute of limitations applies to the

2    look-back rule, I would just note for your Honor that

3    604(j)(2)(B) specifically says that does not apply in the

4    context of criminal human trafficking.  It references Title 5,

5    Section 3541.  If you look at Title 5, Section 3541, that's a

6    criminal statute of limitations.  The first section of that

7    statute specifically says, when it pertains to human

8    trafficking, there is no time limitation.  We've alleged

9    conduct within five years, but we don't need to because there

10   is no time limitation under CICO to go after JPMorgan for human

11   trafficking.

12          THE COURT:  So just while we're on the subject of

13   CICO, so you allege a so-called association-in-fact enterprise,

14   and the enterprise that you're positing is an

15   association-in-fact enterprise between JPMorgan and

16   Mr. Epstein's sex trafficking, or his sex trafficking venture.

17   But your adversary says that really all you've shown that was

18   the common enterprise, if at all, was an enterprise for making

19   money, and you allege that JPMorgan's services furthered the

20   trafficking enterprise's purposes, but you don't allege that

21   JPMorgan shared the purpose of trafficking.  So I'm not sure if

22   I'm making myself totally clear, but as I understand the

23   argument from your adversary, it's one thing to allege that for

24   various claims that JPMorgan knew of and, through its services,

25   facilitated Mr. Epstein's sex trafficking; it's something else

N3G1DOE2

to say that they together formed a single enterprise whose

purpose that was.  My grammar may be a little off, but anyway,

you get the point.  What about that?

MS. LIU:  So under the *People v. McKenzie* case, which

is the Virgin Islands CICO case upon which JPMorgan relies,

what is required for association with an enterprise is, yes, a

common purpose, longevity, and relationship.  They don't argue

longevity or relationship.  Obviously those two are shown.

With respect to common purpose, what the cases look at

is were these routine, run-of-the-mill services that were being

provided, or is there somehow something more going on here, and

does that something more go to the heart of the enterprise?

And certainly, Judge, we have alleged that here.  We have

alleged that at every turn, they broke every rule and engaged

in not run-of-the-mill banking services but rather

extraordinary banking services to facilitate, to promote

Jeffrey Epstein's sex trafficking enterprise.  Why?  First of

all, the principal business of those accounts at JPMorgan, we

allege in the complaint, was sex trafficking.  So the money,

the referrals, the connections, all of the business related to

sex trafficking, and JPMorgan facilitated that transacted

business, and fed off the wealth, connections, and referrals of

Jeffrey Epstein for almost two decades.  Of course they were

not only associated with the enterprise; their conduct, in

making the transactions, in channeling the funds, and in

N3G1DOE2

1    concealing the conduct, allowed that sex trafficking enterprise

2    to flourish, including in the Virgin Islands.

3            THE COURT:  Well, so I'm more familiar with the term

4    "enterprise" in the context of RICO than in CICO, and I need to

5    get more familiar with it in the latter context, but at least

6    in the RICO context, we're usually talking about something that

7    has a common organization.  It may be an implicit organization,

8    but it's not the same as a criminal organization that uses

9    someone else's services and this person who provides the

10   services knows he's providing it to a criminal organization.

11   In my hypothetical, the aider and abettor, if you will, may

12   have liability as an aider and abettor, but he's not part of a

13   common enterprise.  So I'm still having a little difficulty

14   seeing why there's a common enterprise here.

15           MS. LIU:  Sure.  So we allege that had it not been for

16   JPMorgan, that Jeffrey Epstein's sex trafficking enterprise or

17   sex trafficking venture could not have flourished as it did.

18   JPMorgan provided the banking services, the extraordinary

19   banking services and later the coverup, to allow Jeffrey

20   Epstein's sex trafficking venture to flourish.  And under the

21   case law, including the *Handeen* case we cite from the Eighth

22   Circuit, for example, when the courts are looking at whether or

23   not professional services can be part of an enterprise or can

24   be associated with an enterprise, what they look at is, are

25   these run-of-the-mill services or not run-of-the-mill services,

N3G1DOE2

1    and if the latter, did they go to the heart of the enterprise?

2    And we've alleged 20 years of not run-of-the-mill services that

3    enabled, facilitated, and allowed Jeffrey Epstein's enterprise,

4    the sex trafficking enterprise, to flourish, including in the

5    Virgin Islands.

6          THE COURT:  All right.  So unless there was anything

7    else you needed to cover, I think we need to hear rebuttal from

8    your adversary.

9          MS. LIU:  Very well.  Thank you, your Honor.

10         THE COURT:  Thank you.

11         MS. ELLSWORTH:  Thank you, your Honor.

12         As to the question of the retroactive application of

13   Section 1595(d), counsel cited so-called legislative history.

14   That is a single —— a floor statement from a single member of

15   Congress.  I know different courts have different views of

16   legislative history writ large, but a single floor statement is

17   certainly not persuasive history of anything.

18         I would also note, as to the *parens patriae*

19   requirement, counsel just stated that the case the U.S. Virgin

20   Islands is bringing is on behalf of the victims of Epstein who

21   were, in her articulation, somehow residents of the island.

22   That is an impermissible *parens patriae* case.  That is a case

23   on behalf of a particular individual interest.  They need to

24   plead a quasi-sovereign interest.  They have not pled it in

25   their complaint, they attempted to backfill it in the motion to

1    dismiss opposition, and they still have not identified any

2    facts to support a quasi-sovereign interest.  What was just

3    articulated is contrary to a quasi-sovereign interest and

4    instead is a vindication of private interests.

5            THE COURT:  I'll have to go back and look at the

6    complaint.  Certainly what your adversary said here was that

7    Virgin Islands's interest was in not allowing the Virgin

8    Islands to become an easy base for sex trafficking, which,

9    given its remote islands and its other situations, it could

10   otherwise easily become.  And assuming for the sake of argument

11   that that's articulated or could be articulated in the

12   complaint, why isn't that enough?

13           MS. ELLSWORTH:  Because there's no factual suggestion

14   that there's some risk of that happening in the future, and as

15   to past harm, there's no articulation of how that harms the

16   residents of the Virgin Islands.  Certainly not in the

17   complaint.  Again, there's one paragraph in the complaint

18   that's conclusory at best but even in the paragraphs that are

19   cited on page 9 of the opposition brief that counsel just cited

20   to you, paragraph 107, doesn't have any articulation of harm to

21   the Virgin Islands that they're seeking to protect.  In order

22   to proceed as a quasi-sovereign, they need to articulate an

23   interest that is different ——

24           THE COURT:  Yes, but I guess my question is:  Assuming

25   for the sake of argument that they had articulated the interest

N3G1DOE2

they've now articulated in oral argument, why isn't that

sufficient that the Epstein trafficking situation showed that

the Virgin Islands were too easy a target for people like

Mr. Epstein to engage in sex trafficking because it presented,

for example, remote islands that could be used for this purpose

from which the victims could not escape, because it was less in

the public eye.  One could go on.  I understand fully your

point that their complaint has not articulated it and it may be

the end of that, but assuming for the sake of argument that

what was articulated just a moment ago had been properly pled

or could be properly pled, why isn't that sufficient?

MS. ELLSWORTH:  I don't think it's sufficient to make

sort of generalized statements about sex trafficking

threatening public safety or somehow threatening the residents

of the Virgin Islands.  It's a very amorphous and ill-pleaded,

even if it were pled, which it's not — I know your Honor will

look carefully at the complaint.  It doesn't sort of identify

the concrete interests.  They do need both *parens patriae*

interest and Article III standing, right?  *Snapp* makes that

clear, as do the cases out of the Second Circuit.

THE COURT:  Why isn't this an easier case just on

standing?  I remember thinking of the famous case of

*Massachusetts v. EPA*, where Massachusetts was able to gain

standing by saying that global warming is partly caused by

emissions from vehicles throughout the United States but it

1    erodes land in the coast of Massachusetts and therefore we have

2    standing.  Why isn't this a much easier case than that?

3                MS. ELLSWORTH:  Well, *Massachusetts v. EPA*, the

4    ongoing harm there was the continued both past erosion and

5    future erosion that was expected to occur, and unfortunately

6    has occurred, on the shoreline of Cape Cod and elsewhere in

7    Massachusetts.

8                THE COURT:  Yes, but then if you keep talking about

9    the future, I keep coming back to the words of the statute,

10   which is "has been."

11               MS. ELLSWORTH:  I understand, but they haven't pled

12   either.  That's why I'm ——

13               THE COURT:  I understand that point.

14               MS. ELLSWORTH:  There's no factual articulation of

15   some future imminent harm necessary under *Mass. v. EPA* or

16   *Spokeo v. Robins* or any of the other Article III cases, and

17   there's no articulation of what the past harm to residents that

18   is a quasi-sovereign interest that has been inflicted.

19               THE COURT:  This goes back to an earlier argument.  If

20   the residents include the victims who were transported there,

21   then ——

22               MS. ELLSWORTH:  Then that harm is not a

23   quasi-sovereign interest, that's a private interest that the

24   U.S. Virgin Islands would be trying to advance on behalf of

25   individuals.

N3G1DOE2

1          THE COURT:  All right.

2          MS. ELLSWORTH:  That's being advanced, quite ably, by

3     other parties sitting in this courtroom.

4          THE COURT:  Okay.

5          MS. ELLSWORTH:  If I can make a few other points, your

6     Honor.

7          THE COURT:  Yes, absolutely.

8          MS. ELLSWORTH:  So —

9          THE COURT:  I wanted to hear what you had to say about

10     the enterprise issue.

11          MS. ELLSWORTH:  Yes, I think your Honor's questions

12     were correctly directed towards trying to identify what that

13     enterprise is.  I don't think, number one, it has been pleaded;

14     number two, I don't think counsel was able to articulate an

15     enterprise that would satisfy either the federal RICO or the

16     CICO case law that has been cited to you.  Again, there needs

17     to be more than we — we've talked about participation and what

18     that means in the context of TVPA cases.  In RICO, there needs

19     to be a meeting of the minds; there needs to be a more overt

20     act than it's both participation or an enterprise.

21          THE COURT:  Basically, this is not the only

22     possibility, but most common association-in-fact under RICO are

23     conspiracies.  And this is not an agreement that would

24     constitute a conspiracy, or at least that is the argument

25     you're making.  I think it has some force.

N3G1DOE2

1          MS. ELLSWORTH:  That is correct, your Honor.  I would

2      also note that as counsel noted, the U.S. Virgin Islands used

3      its enforcement power to obtain documents from JPMorgan Chase

4      on which it based the allegations of its complaint, so it has

5      already received the discovery that it might need in order to

6      make out or attempt to make out a well-pleaded complaint on all

7      of these counts and it has not done so.  I do feel compelled to

8      note that the Court is constrained by the allegations of the

9      complaint.  Counsel's argument today was not so constrained.

10     There were several statements made that are not supported by

11     the complaint at all; in particular, the suggestion of

12     Mr. Dimon having any knowledge of anything.

13         THE COURT:  Well, I know all about constraints because

14     I'm a married man.  But in any event, I take your point.

15         MS. ELLSWORTH:  The final point I'd make, your Honor,

16     is just, I didn't argue the factors of the TVPA to you.  We do

17     have separate arguments as to why, even if 1595(d) applies

18     retroactively and even if they have sufficiently made out a

19     *parens patriae* complaint, the TVPA claim still fails on the

20     merits.  I won't repeat them, but I will just point out to the

21     Court that the knowledge requirement for the attorney general

22     statute is different than the knowledge requirement that needs

23     to be pled by a victim, such as the Jane Doe case.  There is no

24     constructive knowledge or no "should have known" aspect of the

25     claim that the U.S. Virgin Islands is bringing.  They do have

N3G1DOE2

1      to show actual knowledge in order to proceed under the TVPA.

2                  THE COURT:  Okay.  The only thing that was sort of new

3      was that last point.  If counsel for the Virgin Islands wanted

4      to respond to that last point, I'll allow her; otherwise, we'll

5      move on.

6                  MS. LIU:  I'm sorry, your Honor.  My colleagues were

7      distracting me and I missed the last point.

8                  THE COURT:  Oh, wow.  Boy.  You're sure he's not a

9      fifth column?

10                 So there was argument being made as to what knowledge

11     had to be shown, but, you know, I think, in all fairness, I

12     wanted this argument to go a half hour.  It's already gone

13     almost an hour.  I will look at your papers carefully, and if

14     there's anything further I need, I'll let you know and you can

15     submit something.

16                 MS. LIU:  Thank you, your Honor.  Yes.  We briefed

17     that issue in our papers.

18                 THE COURT:  Okay.  So I will reserve judgment, but as

19     already indicated, we'll get you a bottom-line ruling by the

20     end of the month.  And by the way, I will, of course, write a

21     full opinion on all these issues.  I just don't think I'll have

22     a chance to finish that by the end of the month.  But there

23     will be a full opinion as well as a bottom line preceding it.

24                 All right.  Now we need to turn to some discovery

25     matters.  And the first one on my list is the motion by

N3G1DOE2

1   JPMorgan to compel the production of documents from the Epstein

2   Victims Compensation Program.  And I appreciate that counsel

3   for that program has patiently been here, but let me hear first

4   from counsel for JPMorgan.

5          MS. ELLSWORTH:  Me again, your Honor.

6          So we have a motion to compel the production of

7   documents relating not just to the plaintiff — this isn't just

8   the Doe case right now, but from the victims compensation

9   program for the applications and other information submitted

10  by —

11         THE COURT:  What about that?  As I understand, the

12  administrator argues, among other things, that there's a

13  privacy concern here that can be outweighed, but it has to be

14  outweighed by some very special need.

15         MS. ELLSWORTH:  There certainly is a privacy concern,

16  and I think that concern is ably addressed by the protective

17  order in this case.  We have also offered to have the

18  information, names redacted and other information like that.

19  We're not seeking that information right now.

20         The reason why this information is so important, and

21  the reason why we're able to overcome whatever privacy concern

22  might exist and has been articulated, is because this

23  repository of information is quite critical to the class

24  certification arguments that your Honor will hear.  This will

25  identify differently situated individuals who are thought to be

N3G1DOE2

1    or who are part of the putative class right now and will

2    identify —— go to issues such as typicality, commonality,

3    predominance, etc., to allow the Court to understand whether a

4    class can be certified at all in this case and, if so, what the

5    contours of that class might be.  So we think we've more than

6    overcome ——

7              THE COURT:  So for example, I'm looking at request 7,

8    documents sufficient to show the total number of applicants

9    that the program approved for any compensation and the reason

10   for those approvals; and request Number 8, documents sufficient

11   to show the total number of applicants that the program denied

12   any compensation, the reasons for those denials.  What does the

13   exercise of their judgment in that regard have anything to do

14   with this case?

15             MS. ELLSWORTH:  Well, perhaps the exercise of the

16   program's judgment may be —— we don't know what these documents

17   look like so we don't know what information is being weighed,

18   but certainly the submission that different individuals made to

19   the program that would demonstrate differences in the length of

20   time during which they were abused, differences in the effect

21   or impact that that abuse may have had on them, differences in

22   how they came to be involved with Epstein and how they came to

23   no longer be involved with him, those are all differences that

24   —— both the way they might be weighed by the program but, more

25   importantly, information that was submitted to the program

N3G1DOE2

1   would be very important for understanding the class

2   certification question.

3          I would also note that this is a repository of this

4   information that typically doesn't exist in a case where you

5   have a putative class, such as like we do in this case.  It's a

6   repository that would allow the information to be considered by

7   the Court and to be marshaled by JPMorgan without having to

8   invade the interests of unjoined class members at this point,

9   and so that is a reason why there's — again, with the

10  appropriate privacy protections of the protective order and

11  potentially something more, this information already exists and

12  can be provided and can be considered by the Court to

13  understand whether in fact the class certification requirements

14  are met here.

15         THE COURT:  All right.

16         MS. ELLSWORTH:  The other point I'd like to make, your

17  Honor, is we did attach — I don't know if the Court has the

18  attachments there, but — the protocol that is publicly

19  available that the program used or announced.  I can pass up a

20  copy if you don't have one.

21         THE COURT:  Yes.  Let me see that.

22         MS. ELLSWORTH:  So the protocol — and I point the

23  Court to page 9 of the protocol — at the very end indicates

24  two things that I think are important for the Court's

25  consideration.  The first is that all confidentiality

N3G1DOE2

requirements are subject to law, regulation, and judicial

process.  I don't think the Court needed the program's

recognition of that in order to exercise its power, but

certainly that was recognized by the program and by those who

participated in it that these confidentiality obligations would

have some — would be subject to something like this.

          The other point I would raise to the Court is the

paragraph directly preceding that indicates that individual

claimants are not bound by any confidentiality if they choose

to disseminate the information that they submitted.  If they

choose to disseminate their experience with the program, they

are free to do so, under the weight of the confidentiality

protections that were put in place for this program.  So the

program has made a suggestion of a mediation privilege that

applies here.  This is unlike a mediation privilege that the

Court I think would typically see because it's only one way;

apparently, it doesn't apply necessarily to the other

counterparties to the privilege.  And so that as a matter of

fairness, if the Court is — one of the factors that the Court

considers in determining whether a mediation privilege, once

invoked, can be overcome, the fact that one side of the

equation can use this information and JPMorgan is not being

allowed to access it is we think unfair because it would be

necessary for the Court's full consideration of the class

consideration.

N3G1DOE2

1          THE COURT:  All right.  Thank you very much.

2          Let me now hear from counsel for the program.

3          MR. SMITH:  Good afternoon, your Honor.  Patrick Smith

4    for nonparty Jordana Feldman in her capacity as administrator

5    of the program.

6          You know, we've been going here for roughly two and a

7    half hours, and the first hour was ——

8          THE COURT:  Well, I'm just getting going.

9          MR. SMITH:  Just getting going.  And I listened for an

10   hour as the Court made its schedule on two cases with trial

11   dates, etc., and then we heard able counsel argue motions to

12   dismiss for approximately another hour.

13         I think it's worth pointing out what a marvel this

14   program was, and is, because in this program, about 130 claims

15   were sort of adjudicated through this ADR process in an

16   efficient manner, in about one year's time.  Many of those

17   claims had already been subject to filed litigation, and other

18   claims were filed with the administrator after the program was

19   publicized.  The program paid out in a sufficient manner

20   approximately $121 million.  And at the cornerstone of this

21   program is the promise of confidentiality.  The program was

22   built around confidentiality, and it was confidentiality as

23   to ——

24         THE COURT:  Why isn't that problem —— which I agree

25   with you is a serious matter —— solved for all these immediate

N3G1DOE2

1   purposes by (a) redacting the names, and (b) having the

2   documents subject to the Court's protective order?

3   MR. SMITH:  Well, let me start with the protective

4   order first, because "protective order" is quite broad.  It

5   includes literally hundreds of potential people, including all

6   of the personnel at JPMorgan, which is a company that employs

7   tens of thousands.  The protective order is also no guarantee

8   that the documents would become part of the public record at a

9   trial.  The protective order ——

10  THE COURT:  Well, that's true, but that's in the

11  Court's discretion.

12  MR. SMITH:  The protective order really is, I would

13  submit, a slippery slope towards eventual publicizing of the

14  document and the circumstances of the individuals.

15  THE COURT:  In virtually every case, of any size, this

16  and every other judge in this court gets a confidentiality

17  order, and the main difference between some of those orders and

18  my order is that I put the parties on notice that the Court

19  reserves the right to make something public if it has to do

20  with a motion or has to do with evidence at trial or something

21  like that, so that no one can claim that they were surprised

22  when the Court does that, but obviously, like every other

23  court, this Court is very sensitive to protecting the

24  confidential information of victims.  So I don't understand why

25  you think it's any different here.

N3G1DOE2

1              First of all, the names are redacted.  And I

2     understand that's not the end of the question.  Second, though,

3     you might want to ask me to make it attorneys' eyes only.  That

4     might be a good resolution.  But in any event, just like your

5     agreement had a confidentiality provision, this case has a

6     confidentiality provision.

7              (Continued on next page)

N3GQdoe3

1          (Continued)

2          MR. SMITH:  Well, so here's what I think makes it

3    different, and some of it goes to the nature of the private

4    intimate details of the nature of the abuse that the claimant

5    suffered.  But there's a substantial number of the claimants in

6    the information that's sought by JPMorgan on their motion who

7    are claimants that never would have stepped forward and

8    asserted their claim but for the principle of confidentiality

9    at the core of the program and wouldn't have signed up for the

10   process --

11         THE COURT:  Well, I mean, that's relevant, but, first

12   of all, this was not itself a court order.

13         MR. SMITH:  It was --

14         THE COURT:  At least so far as I can see from what was

15   handed to me.

16         And, second, more importantly, as was pointed out by

17   your adversary, it says, in a whole separate paragraph when

18   they're getting to confidentiality, "All confidentiality

19   requirements are subject to law, regulation, and judicial

20   process."

21         And one would have to be very cloistered not to know

22   that the issues involving the Epstein victims were going to be

23   the subject of other litigation.

24         MR. SMITH:  Your Honor, this was a court-approved and

25   authorized program.

N3GQdoe3

1          THE COURT:  Okay, what court approved it?

2          MR. SMITH:  The Superior Court of the Virgin Islands

3     in the matter of the Estate of Jeffrey Epstein.  The architects

4     of this program -- Ken Feinberg, Camille Biros and our client,

5     Jordana Feldman -- traveled to St. Thomas and testified about

6     the circumstances of this program, including testimony from Ken

7     Feinberg, who was questioned under oath, back on February 4,

8     2020, about the nature of the program.  Concerns about

9     confidentiality were raised by the Attorney General of the U.S.

10    Virgin Islands, and Mr. Feinberg gave testimony about how

11    important it was that the protocol expressly secures the

12    confidentiality of anything provided by the claimant.

13         He also testified that the claimant, and the claimant

14    alone, decides the extent of transparency or disclosure; not

15    the program, not the administrator, or the estate.  I have

16    extra copies of what I'm reading from.

17         THE COURT:  No.  No.  I appreciate that and like most

18    people, I'm a great admirer of Mr. Feinberg, and that is

19    despite the fact that he and I served in the U.S. Attorney's

20    Office together, so I know what a bad sense of humor he had.

21    But, of course, that court -- and I'm glad to know, it's

22    important to know that the court approved this order, but, of

23    course, that's not binding on this Court.

24         MR. SMITH:  No, but now I think we're in the terrain

25    sort of covered by the Second Circuit's case in *Telligen* and

N3GQdoe3

```
1    your colleague, Judge Furman's, very sort of thoughtful

2    decision in Accent Delight, and what are the reasons for

3    applying a mediation privilege in this circumstance, and that

4    is to incentivize -- among other things, incentivize

5    participants to use an alternative dispute resolution program

6    to settle matters, to provide information and arguments on a

7    confidential basis, and keep litigation from clogging the

8    courts, and that's exactly --

9              THE COURT:  And, of course, Judge Furman is another

10   great judge.  But there have been other judges who have

11   questioned the entire effect of that in keeping from the public

12   important information and allowing people who have committed

13   wrongdoing to, in effect, buy off their victims under a promise

14   of confidentiality, and so it's, I think, a controversial area.

15             MR. SMITH:  Well, I don't think the non-disclosure

16   agreements that your Honor is referring to potentially from the

17   MeToo cases over the last four or five years really are what

18   this program was about.  So the types of programs, and this

19   program, indeed, that Mr. Feinberg and others have worked on

20   and structured, such as the 9/11 Program and allegations of

21   sexual abuse in the Catholic Church have really efficiently

22   dealt with hundreds and hundreds of claims in a way that

23   benefits the victims --

24             THE COURT:  And that's laudable.  No one could be

25   other than impressed by that, but I don't think that's
```

N3GQdoe3

dispositive -- I'm still not understanding.  Let's assume for

the sake of argument that these documents were provided on a

attorneys' eyes only basis so that they could, for example,

make use of summary information on a confidential basis in

submissions in class certifications so they might want to

argue, for example, on class certification that we now know

that the situations involving these victims are also

*sui generis* that there shouldn't be a class.  And I might

accept that or reject it, but the point is, they would be in a

much better position to make that kind of argument if they knew

about all the particulars that had been furnished in your

program.  But if we kept it to attorneys' eyes only, I'm not

sure why anyone is harmed.

         MR. SMITH:  Well, there are several instances of this.

Claimants came in as part of the program, spoke to Ms. Feldman

and her colleagues in the program and were quite explicit, they

had never told the details of what happened to them to any

other person before, and now those details will be shared with

a class of people in violation of the promise of

confidentiality to induce them to participate in the program.

It's a --

         THE COURT:  It's a class of people, if we limit it to

attorneys' eyes only, would be a rather small class -- a

wealthy class, admittedly, but a small class -- and given the

attorneys we have in this case, I don't have any hesitation in

N3GQdoe3

believing they would adhere very strictly to any limitation to

attorneys' eyes only.

          MR. SMITH:  But your Honor would have to agree that is

just an interim step, and the limitation on the use of the

materials is not just for the class certification process.

Once the materials go over into the hands of JPMorgan and the

other lawyers in this case, it's for all purposes in discovery.

And I think, your Honor, the part about --

          THE COURT:  That's right, but it's also still

limited -- none of it can be disclosed because it's attorneys'

eyes only.  And the disclosures, if any, are governed by this

Court, and, of course, if I made any disclosures at all, I

would only do so after giving you first an opportunity to be

heard.

          MR. SMITH:  Well, your Honor notes the potential for

the application, opposing class certification, could be better

or stronger if JPMorgan had access to these individualized

statements.  There is -- and this goes to the need aspect of

getting through the *Telligen* standard, the heightened standard

that applies to mediation materials, there's a wealth of

material that's available to JPMorgan.

          As I think someone noted, they've been investigating

these issues for years.  There are scores of publicly filed

lawsuits with individual detail about the abuse that the

victims suffered.  There's information --

N3GQdoe3

1          THE COURT:  Wait a minute.  I don't understand how you

2      -- how that's consistent with the argument you just made.  If

3      you think 98 percent of what you have is already a matter of

4      public, then no one can complain about your turning over the --

5      because there is no confidentiality because it's all out there

6      in the public domain.

7          MR. SMITH:  I'm not saying 98 percent, your Honor.

8      I'm saying there is sufficient sample size of information about

9      the abuse that victims suffered with Jeffrey Epstein and others

10     in the public record and in the hands of others where it is not

11     subject to confidentiality of the program.  And that's on the

12     public docket in scores of lawsuits.  It's in the hands of

13     statements --

14         THE COURT:  Your position has got to be, if I

15     understand it, that -- for example, let's take the two I just

16     referred to.  Request number 7.  Documents to show the total

17     number of applicants that the program approved for any

18     compensation and the reasons for those approvals.

19         Let's just take the first part of that.  Documents

20     sufficient to show the total number of applicants that the

21     program approved for any compensation.  What possible objection

22     would you have to that?

23         MR. SMITH:  We didn't have an objection to the number.

24     We gave them the number of applications that were approved.

25         THE COURT:  So and then -- and if the reasons for

N3GQdoe3

1    those approvals did not include the names of the persons, this

2    is really -- I'm not sure -- it's really the program's thought

3    processes that are being revealed there, which may not be

4    relevant.  That's a different question.

5              MR. SMITH:  I think your Honor already observed that--

6              THE COURT:  But I don't see the confidentiality being

7    implicated.

8              MR. SMITH:  If we got to that level, we'd have some

9    pretty thorny issues of attorney-client privilege in there

10   since Ms. Feldman is an attorney and had attorneys on her staff

11   making those determinations.  So the reasoning beyond approval,

12   which is really the question --

13             THE COURT:  Okay.  And of course any document demand

14   can always be accompanied by a claim of privilege on

15   particularized documents, so...

16             MR. SMITH:  If your Honor is moving on to request

17   number 8, we also gave them the number of applications that

18   were denied.  I've been talking about the total number of

19   claims made --

20             THE COURT:  How about -- because this has been an

21   issue in this case in the scope of releases.  So request number

22   12:  All releases, including drafts and final versions, whether

23   executed or non-executed, and all communications concerning the

24   releases.

25             Now, let's assume that I found that overbroad and

N3GQdoe3

1   limited.  For example -- I'm not making any ruling now, but

2   just, for example, to all releases.  Again, with the names

3   redacted and so forth, where's the harm there?

4            MR. SMITH:  Well, number one, we gave them or offered

5   to give them a blank form of the release.  I might note here

6   that we've had similar discussion with the attorneys for

7   Deutsche Bank who served a similar subpoena on us.  We worked

8   it out.

9            THE COURT:  Yes, because they're relying on arguments

10   about the release in their case.

11            MR. SMITH:  And they have the form of the release.  I

12   believe it we made it available to JPMorgan.  The program's

13   perspective covered by the promise of confidentiality, there's

14   an alternative source for this.  This whole argument about

15   central repository, that's a matter of convenience for

16   JPMorgan.  If they put the work in your Honor, and they have

17   resources -- sometimes we talk about we're up against the

18   government.  The government has unlimited resources.

19   JPMorgan & Co. is the next best thing they have virtually

20   unlimited resources, and the estate has copies of all these

21   releases because they're a party to the releases.  If they want

22   the releases, they can subpoena the estate.  And then deal with

23   the question of redacting names with the estate.

24            The program, which is foundedd on this promise of

25   confidentiality and all the benefits to the litigants and

N3GQdoe3

society more generally -- think about the next time one of

these programs is designed, your Honor.  Without the promise of

confidentiality, it just won't be as effective.  So we're not

just talking about the claimants in this particular case, the

130 successful claims, and the others who were denied.

Obviously, they still get the promise of confidentiality too.

We're talking about the next situation that involves sensitive

details of personnel abuse, sexual or otherwise, who would be

willing to participate in a program on a confidential basis but

not willing to participate if it involved the prospect of what

your Honor is sketching out here; that their details are first

made available to many lawyers who will keep them to themselves

potentially, but then on the slippery slope to later disclosure

in a litigation.  That's not what these folks signed up for, in

fairness to them and future claimants.

THE COURT:  But, you know, they knew because it says

it right in the agreement, which you now tell me was a court

order, that there were possible limitations to this.  It says

it right in the agreement.  You know, the most basic principle

of all is a party and a court is entitled to every person's

evidence.  That's a principle that goes back about a thousand

years in the common law of England and carried over here.

Privacy is a very important contrary of consideration, and I

don't want to be misunderstood.  I take that very close to my

heart in a case like this.  But it's not a right for a private

N3GQdoe3

citizen to say, okay, I want some money because I've been done

wrong, and I'll sign up to get that money, and anything I

provide you with is, as a matter of law, universally without

disclosure of any kind whatsoever.  And, therefore, where the

agreement says that all confidentiality requirements are

subject to law, regulation and judicial process, I, the victim,

say I understand that that means zero, and is just some

language some lawyer put in there and some court approved.

That can't be right.

MR. SMITH:  I'm not suggesting it's right.  I'm

suggesting the law, regulation, and judicial process is the law

in the Second Circuit decision in *Telligen*, and further

extended by the *Accent Delight* case by Judge Furman, and we

think that standard applies here.  They've not shown heightened

need.  The materials are available elsewhere.  And --

THE COURT:  I apologize, but I do want to give your

adversary one last shot to be heard.

Is there anything else you want to say.

MR. SMITH:  Yes, because the suggestion that redaction

is the solution is a solution that would be, I think for the

program such as it is, there's no program any more.  It's shut

down.  There's no staff.  There's the administrator, and I

think one lawyer working with her, moving on to other projects.

In the Maxwell case in front of Judge Nathan, which was quite a

limited different application, different interest at stake, the

N3GQdoe3

1    materials relating to four witnesses were ordered to be turned

2    over, but just the submissions, nothing else.  There were 6,000

3    pages of material for four.  We have hundreds of claim files.

4    And to go through them and redact -- they're not readily

5    available.  They're not in a searchable database.  They're just

6    sort of sitting electronically offline.  To say to go in and

7    pull those and redact out names, that's a project that will

8    take many more lawyers than are in this courtroom many, many,

9    many hours to get done.

10        THE COURT:  I don't know about that.  If I used the

11   lawyers in this courtroom, they'd get it done in about two

12   minutes, but the -- but maybe the argument is that to the

13   extent you have to use time of lawyers who have already -- who

14   are no longer involved, that they need to be paid by JPMorgan.

15        MR. SMITH:  Well, I suppose that's up to JPMorgan and

16   maybe we can work something out.  I'm talking about --

17        THE COURT:  I don't think it's up to JPMorgan.  I

18   think it's up to me.

19        THE COURT:  I'm talking about burden on the

20   administrator, Ms. Feldman, who -- the program is essentially

21   shut down.  I think has one lawyer on staff and maybe an

22   assistant that this falls to her and them to, in the first

23   instance, figure out what's there.  I'm making a burden

24   argument under --

25        THE COURT:  Let me ask you this:  When was this

N3GQdoe3

1    program shut down?

2              MR. SMITH:  That's a very interesting question because

3    under the protocol, one year from final date.

4              THE COURT:  That's what I'm asking.

5              MR. SMITH:  More than a year ago, so but the

6    subpoenas --

7              THE COURT:  So why do you have anything if according

8    to this what you say is an order, it says to protect the

9    privacy of claimants participating in the program, all personal

10   information provided by the claimant during the process will be

11   returned or destroyed within one year after the conclusion of

12   the program.  So have you done that?

13             MR. SMITH:  Not yet.  In part, because of the

14   litigation in front of Judge Nathan, and in part because there

15   was an ongoing process to clear liens with respect to many of

16   the claims.  And that process didn't wind down -- there was

17   still -- the year hadn't finished yet and the subpoena from

18   JPMorgan was served, so ...

19             THE COURT:  Thank you very much.

20             Let me hear from JPMorgan.

21             MS. ELLSWORTH:  Thank you, your Honor.

22             Just briefly on the confidentiality concerns that the

23   Court was discussing with counsel, we agree with the Court that

24   a protective order, including modifications, to make the

25   production subject to attorneys' eyes only, outside counsel

N3GQdoe3

eyes only, whatever appropriate modifications the Court may see
fit to protect confidentiality would be the way to address that
articulated concern.

          THE COURT:  Let me ask you this:  I understand that
the program offered you a compromise, which was a chart showing
the total number of individuals who applied to the program
through the registration or claims filing process.

          Second, the total number of claimants who applied to
the program.

          Third, the total number of claimant deemed ineligible.

          Fourth, the total number of claimants deemed eligible
who received an award and signed a release.

          Five, the total number of claimants deemed eligible
who declined an award or did not timely respond within the
response deadline.

          And, sixth, the aggregate amount of payment made to
eligible claimant who received an award and signed a release.

          Now, putting aside the fact that that makes me a
little skeptical of your adversary's argument about how
burdensome this is all going to be, because it's certainly
going to have to do a lot of review to supply the chart, but
why isn't that sufficient for your immediate purpose?

          MS. ELLSWORTH:  Your Honor, we do have that chart.
It's actually Exhibit 1 to our letter brief, and the Court has
it as well.  I agree that it does seem to undercut a bit the

N3GQdoe3

1    arguments of burden that we heard there at the very end.

2          What it does not provide is any information about the

3    types of claims that were submitted and how differently

4    situated or not the individuals who submitted claims were,

5    whether they were granted some compensation or a larger amount,

6    a smaller amount, if they were rejected compensation, the

7    information that was provided goes to the questions that the

8    Court will have to consider at class certification, including

9    commonality, including whether the named plaintiff is typical,

10   typicality, of the class she seeks to represent, and including

11   some of the questions that relate to the predominance of the

12   injuries suffered by the named plaintiff here versus the

13   members of the class.

14         THE COURT:  What about -- since your immediate reason

15   for this demand relates to the class certification, what about

16   a requirement that in addition to being attorneys' eyes only,

17   that all the information be returned and no record kept of it

18   by your client after class certification is resolved.

19         MS. ELLSWORTH:  I think that could be a possible

20   compromise.  I would want to think there -- one aspect of the

21   request we made does relate to the named of plaintiffs and

22   certain information.  We have information provided by the

23   plaintiff that was submitted.  What we don't have is what was

24   considered by the program in determining what relief to grant

25   that individual.  I think if the class is not certified, then

N3GQdoe3

1    returning all that information would potentially be a

2    compromise.  I'd have to understand what is in there to know

3    whether there's some other merits reason that that information

4    might be --

5             THE COURT:  Well, you could always reapply upon a more

6    specific showing as to an individual file or something like

7    that.

8             All right.  Here is where I think I come out, and this

9    is not going to resolve this until next week, but it gives you

10   the -- I think there are at least some of these requests that

11   the Court will grant.  I think many of them are overbroad and

12   will have to be narrowed, and some I may not grant at all.

13   Those I do grant will be granted on attorneys' eyes only and

14   with the qualification that all documents -- no copies could be

15   made, and all documents provided have to be returned to the

16   program after class certification is resolved.  But with those

17   limitations, I think there will at least be some of this that I

18   will grant.

19            To move this along, notwithstanding now that we've

20   extended the trial endlessly to what, oh, 2029 -- no, it's

21   October 23, 2023 -- I will get you an order on this by the end

22   of next week.

23            MS. ELLSWORTH:  Thank you very much, your Honor.

24            MR. EDWARDS:  Your Honor, may the Does be heard on

25   this issue?

N3GQdoe3

          1          THE COURT:  Yes.

          2          MR. EDWARDS:  And, just briefly, your Honor, a couple

          3     considerations.  One, even if your Honor is going to grant

          4     this, at least in part, were to be turned over for attorneys'

          5     eyes only, if we were to do that, the names of the individuals

          6     victims are totally irrelevant for class certification

          7     purposes.

          8          THE COURT:  I'm sorry, I meant to add that, and the

          9     name -- while it will be turned over, it will redact the names.

         10     Thank you.

         11          MR. EDWARDS:  Because I know what these submissions

         12     consisted of.  In fact, with respect to the named plaintiffs in

         13     this case, we have no objection to those records being turned

         14     over.  We've turned them over.  We have no problems from the

         15     program.  But because the submissions also include the names of

         16     other victims, for instance, the way in which this scheme

         17     worked --

         18          THE COURT:  That's why we're going to redact the

         19     names.

         20          MR. EDWARDS:  Okay.  Family members other identifying

         21     information such as that.

         22          THE COURT:  Yes, anything that on its face would

         23     identify who the person was will be redacted.  But that's not

         24     the same as saying, oh, if you wanted to do a lot of homework

         25     after you've got this, you might be able to figure out who that

N3GQdoe3

is.  That would be too burdensome I think and too impossible to
carry out.  But family members, yes, that will also be
redacted.

      MR. EDWARDS:  We would also ask in that same vein that
medical records not be produced as well.  They would be
identifying, probably violate HIPAA as well, but not something
that's going to be play into the class certification.

      THE COURT:  I'm not sure they asked for medical
records.

      MR. EDWARDS:  That's part of the submission, so I just
didn't want that to be included, even though it might not have
been specifically requested.

      THE COURT:  Anyway, yes, I agree.  No medical records.
By the way, on that one, as opposed to the other ones, if after
receiving the information JPMorgan thinks that in a particular
case it is vital for class certification purposes for them to
have the redacted medical records without the name, but what's
in -- I doubt that will be the case, but I will give them leave
to then separately apply, and you'll be heard, of course, in
opposition.

      MR. EDWARDS:  Thank you, your Honor.

      Also, the time frames for complaints against JPMorgan,
the earliest timeframe begins 1998.  There were victims that
were abused prior to that that would in no way fall within the
class.  I don't think that it would be discoverable then for

N3GQdoe3

1     their files to now be turned over, especially given the fact --

2     and I think that your Honor has --

3              THE COURT:  Why isn't that potential -- it may not

4     relate to class certification, you may be right about that.  If

5     the case were to go to trial, it would be 404(b) material.  But

6     maybe you're right, it doesn't have anything to do with class

7     certification.

8              MR. EDWARDS:  Yes, your Honor.  So at this stage I

9     think that would just -- that would not appropriate.

10             THE COURT:  I want to hear from your adversary on that

11    one.

12             MR. EDWARDS:  Okay.  Lastly -- and I think your Honor

13    touched on this -- there were two representations that many

14    relied upon, and I think that counsel for the program referred

15    to them as promises.  And they were promises.

16             One was that this was going to be entirely

17    confidential for the victims, meaning it was a one-way street.

18    If the victim chose at the program to disseminate information,

19    they could.  And that goes along with the rights of crime

20    victims.  But the program would not.

21             And so some of these individuals that applied to the

22    program, they relied on that promise is when they applied to

23    the program.  And I understand are there are exceptions to

24    that.  Not only that promise.  It was the promise that as soon

25    as it was over, their documents would be returned or destroyed,

N3GQdoe3

1    and they have all believed that their documents had been

2    destroyed, only to now find out -- and probably not even now,

3    when the press reports it tomorrow -- that these promises upon

4    which they relied were false, promises and now to their

5    detriment there is going to be a large class of --

6         THE COURT:  Wait a minute.  If you're saying that the

7    program did not fulfill its contractual duty, then that's -- I

8    suppose they would have a claim against the program.  But if --

9    I mean, I'm reminded, and this is not a perfect analogy, but it

10   is I think relevant.  So every company has its document

11   "retention policy" which really means a document destruction

12   policy.  And all documents are supposed to be destroyed every

13   three years, whatever it is, depending on the company, but once

14   litigation has started, that automatically comes to a halt.

15        And as I understand it, the reason apparently why

16   initially this came to a halt was in Judge Nathan's case.  At

17   least that's what I understood from what the attorney for the

18   program says.

19        MR. EDWARDS:  That didn't stop the time limit for the

20   entire destruction process.  That related to the four victims

21   that were testifying in that particular case.  But --

22        THE COURT:  Well, if it didn't, then the question is

23   why hasn't it been destroyed?

24        MR. EDWARDS:  We're still asking that question, but

25   there's going to be victims asking that question tomorrow

N3GQdoe3

1   morning.

2           THE COURT:  Let's find out from the program counsel

3   why that hasn't happened.

4           MR. EDWARDS:  Thank you, your Honor.

5           THE COURT:  Thank you.  I do want to hear from

6   JPMorgan in a minute on that one aspect, but let me hear from--

7           MR. SMITH:  On that point the program wasn't wound up,

8   the year hadn't run, and because there was still cleanup to do

9   with respect to lifting liens, with respect to certain

10  Medicare, Medicaid benefits, I think it is, the work of the

11  program wasn't done.  The year was running, and we got the

12  subpoena.  So, you know, we were really right at the edge and

13  the implementation of the retention policy was about to be

14  acted on, we got the subpoena.  It was very poor timing, as it

15  turned out.

16          THE COURT:  Let me hear from JPMorgan.

17          MS. ELLSWORTH:  Thank you, your Honor.  Two points

18  that I wanted to make or address.  First, as to Mr. Edwards

19  mentioned medical records, what we have seen in the one

20  submission that we've seen is medical record was the only thing

21  that was submitted to the program.  There's a formd that was

22  filled out and a narrative, but in terms of some of the

23  information factual information that allowed the program to

24  make determinations about preexisting conditions, et cetera,

25  that was all in medical records and evaluations.  So I heard

N3GQdoe3

1    the Court to say that maybe medical records --

2              THE COURT:  I don't see how it relates to class

3    certification.

4              MS. ELLSWORTH:  Well, it relates to whether there are

5    any preexisting conditions that any individual victim had that

6    either affects the compensation that the program was willing to

7    give them or affects --

8              THE COURT:  How does that relate to class

9    certification?

10             MS. ELLSWORTH:  Again, it relates to whether damages

11   can be determined on an individualized or class-wide basis,

12   among other things.  It also relates to the different aspects

13   of alleged trafficking, and the force, fraud and coercion

14   requirement that needs to be shown and whether there are

15   different victims who are differently situated in terms of

16   their interactions with Epstein.  So I think the medical --

17   I'll be happy to come back with another application if we get

18   information and it turns out that the medical --

19             THE COURT:  I think I'm still going to exclude the

20   medical records without prejudice to your coming back in any

21   individual case and saying we need the medical records for this

22   particular person and here is why, and then we will deal with

23   that then one way or the other.

24             MS. ELLSWORTH:  Okay.  I will tell your Honor, I think

25   we will be back before you on that, but I'm happy to wait and

N3GQdoe3

1   see what we get --

2               THE COURT:  It's always a pleasure to have you back.

3               MS. ELLSWORTH:  Your Honor asked about information

4   outside of the class period or application for individuals.

5               THE COURT:  Yes.

6               MS. ELLSWORTH:  To the extent that there is no

7   allegation of abuse that takes place within the class period, I

8   don't think we're seeking that, but there are many

9   individuals--

10               THE COURT:  Where there is a continuing abuse.

11               MS. ELLSWORTH:  Yes.

12               THE COURT:  Well, I agree with that.  If you're not

13   seeking it for ones that ended before the class period, they

14   don't have to produce that, but they do have to produce --

15               MS. ELLSWORTH:  If there's anybody that falls within

16   the proposed class definition, then that --

17               THE COURT:  But I'm going to -- one thing that I think

18   should be made clearer, including to any victims, a lot of

19   these requests have nothing to do with any individual victim

20   and don't reveal even on their face anything of a personal or

21   private nature.  It's one thing that's already been provided

22   documents sufficient to show the total number of applicants.

23   That's a number.  All releases -- I may limit that to all

24   signed releases -- but, in any event, all releases with the

25   names redacted.  That's of relevance, if at all, because of

N3GQdoe3

important arguments that have already been made in this case
about the scope of the class, who was released, who was not
released, and so forth, and has nothing to do with any
individual's personal private information.

I'm not sure whether I'm going to grant this, but
documents showing why the program decided to award to some
victims and not to award to others, and putting aside any
attorney-client privilege or any other privilege that might or
might not apply to that.  I don't see once the names are
redacted how that's likely to get into anything that would
compromise the privacy of any individual.

If you are told, we decided to reject individual
unknown X because that individual could not show any injury,
you know, something in that broad form doesn't implicate
privacy.

Would the medical records that are relevant to that
maybe implicate privacy?  Yes, that's why I'm at least
initially excluding medical records.

Some of the other things that I've already excluded,
and most obviously the name, implicate privacy?  Of course.

So that's why we're counting that all out.

But I think the -- I suspect that these documents as
now limited and, of course, limited to attorneys' eyes only,
will be ones that probably no victim in fact would object to
turning over if they could actually see it.  And, of course,

N3GQdoe3

1    the victims themselves retain the right to disclose

2    information.  That's not the issue here.  They're not being

3    asked for their permission.  But I think the -- it's the

4    assertions of privacy here can be easily protected in all

5    relevant ways by the many limitations that the Court has now

6    already indicated it is going to impose, as well as further

7    limitations on the scope of particular requests that I will

8    make evident in my ruling next week.

9            MS. ELLSWORTH:  Thank you, your Honor.  We do, of

10   course, takes the confidentiality obligations very, very

11   seriously, and I know your Honor understands that.

12           THE COURT:  Very good.  Thanks very much.

13           All right.  So moving right along.  The next item is

14   the plaintiffs motion seeking production of documents from

15   prior to 2006.  So let me hear first I note for the record that

16   this motion was filed without the Court having expressly

17   granted leave to file the motion in violation of my individual

18   rules, so naughty, naughty, but I don't think it was a

19   significant violation.  So let me hear from moving counsel.

20           MR. VILLACASTIN:  Good evening, your Honor.

21           Andrew Villacastin from Boies Schiller Flexner.

22           On the procedural matter, our understanding was when

23   we spoke to chambers, that we raised that we would have issues

24   slight variations from the --

25           THE COURT:  I'm sorry, I granted the Virgin Islands

N3GQdoe3

leave, but I didn't grant leave to Jane Doe.

MR. VILLACASTIN:  Right.  Our understanding from the conference, it wasn't reflected in the email order explicitly, but --

THE COURT:  And it's really -- I just couldn't resist, but in any event, it's not a violation that I considered of any materiality whatsoever.

MR. VILLACASTIN:  Thank you for saying that.

I think at 7:00, you yourself said that evidence predating 1998 would be relevant under Federal Rule of Evidence 404(b).  Five minutes later, Ms. Ellsworth said she would be seeking documents from 1998 onwards from the Epstein Victims Compensation Program.  Our motion for the same reason as seeking documents from 1998 to 2000, which is a run period that exists after the Court granted USVI's motion at Docket 73 on March 9.  We are requesting that the date for our discovery go back two years to 1998, which is to encompass our class period.

I don't think there's a real argument that document discovery into 1998 would be relevant.  So the knowledge would shift to any burden arguments that the other side would have. We have asked them to substantiate their burdens.  We have not received any number substantiating that burden.

I will point to their brief where in a footnote on page 8, they say they have not even collected ESI or can confirm its existence, and therefore, you know, they have no

N3GQdoe3

1    basis to oppose this request.  So unless the Court has any

2    questions --

3              THE COURT:  Well, let me hear from the opposition.

4              MR. BUTTS:  Good evening, your Honor.  I will be brief

5    on this.  I will start where you started, which is the absence

6    of the request or the permission to file.  I'm not standing on

7    that, but it's relevant in this way.  You didn't give

8    permission to file because they didn't ask for it because they

9    never raised this issue for us.  This was a negotiated process

10   where the parties would negotiate a custodian's burden in the

11   context of burden, custodian search terms, 300 of them, and

12   time period.

13             And in the record before you is the documents where we

14   identified the custodians from 2000 to then 2013.  We took it

15   forward.  The Virgin Islands had an issue with the end date.

16   Nothing in that record about anything of 1998 and 1999.  They

17   asked for more custodians, and we offered a number from --

18   because of the burden with particularized periods for

19   individuals positioned in relevant spots, right, JPMorgan's a

20   big company, employees move around the company a lot, decades

21   does not make sense for every person.  We see in that, and it's

22   also in the record before you, those we had particularized

23   periods for in the second, and the earliest was 2006, which was

24   really an inflection point in this case when Mr. Epstein was

25   arrested in Florida, his first arrest.

N3GQdoe3

1          And the response back from Ms. Singer, but with a note

2     that she was speaking on behalf of both plaintiffs, because

3     we've been dealing with discovery in a consolidated way, is:

4     Thank you for the compromise.  Please add these three

5     additional custodians which we negotiated over time.  To be

6     sure, there was lots about the notion of 2013, we extended to

7     '14.  It was the subject of a separate motion.  We're executing

8     your Honor orders to take that out to 2019, but there was never

9     the idea that, oh, and also '98 and '99.

10         What we got when we were inspecting the Virgin Islands

11    motion on the tail end was the pair move of, well, we'll at the

12    couple years to the front end.  So it was never discussed in

13    that context, and I think it's improper in that regard.

14         The other thing is there really isn't a reason for it.

15    It's an arbitrary notion that the Doe plaintiffs are here

16    trying to say let's have a class starting in 1998.  Ms. Doe

17    alleges specifically she was -- claims to have been victimized

18    between 2006 and 2012.  When you look at the body of her

19    complaint, which we have cited in the papers, and there's no --

20    nothing contrary from Ms. Doe's side is the allegations about

21    what JPMorgan's conduct supposedly changed based on Mr. Staley,

22    and the allegation is expressly around 2000, Mr. Staley gets

23    involved with Mr. Epstein and develops this relationship and

24    the case goes on.

25         So the period that we offered was tied to those

N3GQdoe3

1    allegations.  It was never any contrary argument.  There was

2    never any requests for permission to come in at 1998 and 1999.

3    And, candidly, this is an exercise in adding burden when we're

4    moving through quite a lot of things on an appropriate

5    schedule.

6             The reason that counsel points out, and we pointed

7    out, that we have not collected 1998 and 1999 is because it was

8    always dealt with as a -- in the context of negotiations that

9    we were starting off in 2000.

10            THE COURT:  The one thing I'm a little unclear about,

11   so did you agree as part of these negotiation to go back to

12   those two years for certain limited purposes, or not at all?

13            MR. BUTTS:  Not at all, because it was never asked.

14   We always started at 2000, and so 2000 --

15            THE COURT:  That answers my question.  So back to

16   moving counsel.

17            MR. VILLACASTIN:  I will say that our request for

18   production to define a date period of 1998 through 2019, 1998

19   is not arbitrary.  It's our class definition of people who were

20   abused from 1998 onward.  There's also the -- it's coterminous

21   with the banking relationship between Jeffrey Epstein and

22   JPMorgan.

23            Now, you know, he is talking -- Mr. Butts is talking a

24   lot about agreements.  However, there was no clear agreement

25   which is evidenced by the fact that both the USVI and Jane Doe

N3GQdoe3

1    filed motions to compel.  I will note that there were side

2    discussions between JPMorgan and USVI.  I will direct the Court

3    to docket 52-3, which reflects emails between February 8 and

4    February 12.  Generally, our position is that while we may have

5    been backfilled on some of it, it was never our understanding

6    that we were giving up two years.  And I think if Mr. Butts is

7    raising some sort of due process or procedural issue, I think

8    he's been on notice of our position, at least since February 23

9    when we filed our motion, and I do believe, even though I

10   wasn't on the call myself, that we did preview the issue when

11   we called chambers.

12            THE COURT:  All right.  So I think that tells me what

13   I need to know.  And I will again resolve this brought by an

14   Order issued no later than the end of next week.

15            MR. VILLACASTIN:  Thank you, your Honor.

16            THE COURT:  Now the next item is two motions that were

17   raised telephonically.  One I previously denied, but I think

18   the other is still alive.  And this is a motion of the Virgin

19   Islands to compel JPMorgan to answer two of its

20   interrogatories.  The interrogatories are interrogatory number

21   3.  Identify all consultants and investigators you retained to

22   assist, assess, implement, test, or improve your BSA/AML

23   compliance program.

24            And the second interrogatory, number four:  Identify

25   all individuals who served on board or staff committees

N3GQdoe3

involved in your BSA/AML compliance program, including, but not

limited to, the compliance committee established pursuant to

the consent order and the officer responsible for

communications to the office of the comptroller of currency,

and indicate the dates of their service.

And the Virgin Islands also I think has applied to

compel compliance with certain subpoenas on "Topic 21."  And I

asked for the description of Topic 21, and Topic 21 is "Your

knowledge of Epstein's sex trafficking scheme described in

paragraphs 2033 of the Virgin Islands first amended complaint."

Now, interrogatories under local rules of the Southern

and Eastern Districts of New York -- no, this rule is only a

Southern District Rule 33.3(a).

"Unless otherwise ordered by the Court,

interrogatories will be restricted to those seeking names of

witnesses with information relevant to the subject matter of

the action, the computation of each category of damage alleged

in the existence, custodian location and general description of

relevant documents."

So these two interrogatories are apparently directed

at finding out the names of witnesses with knowledge of

information relevant to the subject matter of the action.

So let me find out whether there is still opposition

to comply with those two interrogatories, and if so, on what

basis?

N3GQdoe3

1          So this would be question to JPMorgan.

2          MR. BUTTS:  Yes, your Honor, there is opposition.  I

3     don't think this needs to take the amount of time that some of

4     the other issues have taken, but --

5          THE COURT:  I'm so disappointed.

6          MR. BUTTS:  I'm sure.  I am too, personally.  But be

7     that as it may, those interrogatories have nothing to do with

8     Jeffrey Epstein.  They are seeking over multiple decades

9     anybody who had anything to do with something related to

10    JPMorgan's BSA/AML compliance program.  We're one of the -- we

11    are the fifth largest financial institution in the world.

12         THE COURT:  Just because of my ignorance, what do

13    those initials stand for?

14         MR. BUTTS:  The Bank Secrecy Act and Anti-Money

15    Laundering.

16         THE COURT:  Go ahead.

17         MR. BUTTS:  The only tangential tie of those issues to

18    the U.S. Virgin Islands' claim you heard about in some of the

19    motion to dismiss argument falls under that CICA claim.  And

20    one of the predicates or CICA is the -- a federal felony, and

21    here what the effort to do is to make a failure to file a SAR a

22    federal felony to be a CICA predicate.  It's conceded in the

23    papers.  Everybody agrees.  The only way you get to federal

24    felony standard with regard to a failure to file a SAR is a

25    willful failure to file a SAR.  Was there a willful failure to

1    file a SAR with regard to Jeffrey Epstein?  Not, "How is your

2    program?  Could have been better here?  Was it great here?"  If

3    I came in and said, "We've got the best program over here, but

4    there was a problem with Jeffrey Epstein," none of it matters.

5    So our view is wildly overbroad, not relevant, and therefore

6    not tied to the local rule.

7           And on top of that, this is a high-burden exercise by

8    dint of the time period and by dint of the breadth of JPMorgan.

9           Thank you.

10          THE COURT:  Let me hear response.

11          MS. SINGER:  Yes, your Honor, so I think the request

12   is relevant to both of the U.S. Virgin Islands claims in the

13   case, both the TVPA and the CICA claim, including its bank

14   secrecy act predicate.  And your Honor asked what the acronym

15   stands for the BSA/AML program at JPMorgan Chase was the

16   program responsible for ensuring compliance with respect to

17   Jeffrey Epstein's accounts.  So that is the compliance program

18   that was at issue in this case.

19          THE COURT:  Yes, but the -- remember, this is an

20   interrogatory, and it's very broadly worded.  You presumably

21   are taking a 30(b)(6) witness and you might ask the 30(b)(6)

22   witness to address how the program ran, and whether there were

23   any special circumstances related to Mr. Epstein and so forth

24   and that might generate rate a further request for documents or

25   depositions.  But here you're just very broadly saying

N3GQdoe3

1    identify -- all of this as number 3.  Identify all consultants

2    and investigators you retained to assist, assess, implement,

3    test or approve this overall compliance program over a period

4    of many, many years.  That seems to me overbroad.

5           MS. SINGER:  So it is, your Honor, for the time period

6    for the discovery, right, which for the Virgin Islands is 2006

7    through 2019, and there's a particular context that is relevant

8    here.  So Jeffrey Epstein was a client of the bank, and

9    although he continued to do business with them, he was a client

10   until 2013.  In 2013, JPMorgan Chase also entered into a

11   consent order with the Office of the Comptroller of Currency,

12   and that consent order acknowledged widespread failures in the

13   BSA/AML compliance effort that are four-squared with the

14   allegations of this complaint; that they were not only a

15   failure to file SARs, which was why --

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

N3G1DOE4

1          THE COURT:  Well, and if that's a consent order, so of

2     course, to the extent that's relevant, it's admissible on its

3     face, right?  It's a statement of a party adversary.

4          So what do you need?  Everyone who was involved for

5     years with this program could find out, which I think is what

6     you want to find out, which was, did those failures in

7     particular relate to Mr. Epstein or in what way did they impact

8     the failure of the bank to cease doing business with him or

9     anything like that?

10          MS. SINGER:  And let me speak to the generalized

11     particulars, if I may.

12          So in particular, the Office of Comptroller of

13     Currency consent order had specific requirements that JPMorgan

14     Chase first do a SAR look-back, Suspicious Activity Report

15     look-back, from 2013 backwards, to examine its failure to file

16     SARs.  It also required separately an account and transactions

17     look-back, to look back to see if there were any failures in

18     compliance during that time period —— again, the same time

19     period that Mr. Epstein was a customer of the bank.  So we

20     think that process in the specific either touched or didn't

21     touch Epstein's accounts and are relevant for either reason.

22     Certainly, to the extent that JPMorgan Chase went back and

23     looked —— and I don't want to run afoul of FinCEN requirements

24     that talk about filing of SARs, but to the extent JPMorgan did

25     not file a SAR, hypothetically, during that period, and looked

N3G1DOE4

1    back to figure out why that was, that's directly relevant.

2    Same to financial transactions that showed cash payments, when

3    Epstein is an individual who trafficked in cash, quite

4    literally.  He paid his victims and recruiters in cash and also

5    sent wire transactions, none of which, as our complaint

6    alleges, were picked up and reported, picked up and acted on,

7    in the context of due diligence.  So there is an

8    Epstein-specific point.  There is also ——

9            THE COURT:  Yes, but I don't understand how receiving

10   from them, if I allowed these interrogatories, this endless

11   list of names will help you with respect to that particularized

12   argument.  It sounds to me like something you want to put to a

13   30(b)(6) witness.

14           MS. SINGER:  And the issue there, your Honor, is that

15   JPMorgan has resisted any discovery related to its general

16   compliance program, its BSA/AML compliance program or the OCC

17   consent order.  So that's not going to get covered in the ——

18           THE COURT:  Well, let me ask you this.  Where do

19   things stand on the 30(b)(6) witness?

20           MS. SINGER:  The 30(b)(6) is scheduled —— the first

21   day of it is scheduled for the 29th of this month.

22           THE COURT:  And have you requested, as one of the

23   subject matters to be covered, information about how this

24   program worked and how it applied, if at all, to Mr. Epstein?

25           MS. SINGER:  We did, your Honor.

N3G1DOE4

1          THE COURT:  And was that refused?

2          MS. SINGER:  Well, I don't have the full state of

3     play, and I apologize for that.  I know that anything related

4     to Mr. Epstein's accounts specifically has been agreed to and

5     is either being covered in the 30(b)(6) deposition with

6     document productions or deposition upon written questions.

7          THE COURT:  Here's what I think.  Well, let me ask

8     JPMorgan, on the more ——

9          MR. BUTTS:  I can speak to a lot of those issues.

10          THE COURT:  Okay.  And we'll come back to ——

11          MR. BUTTS:  There are substantial pieces of

12     information that were —— this is a 28-topic 30(b)(6).  There's

13     one topic, apparently, that's still at issue.  We've resolved

14     all of the other ones.  Some of them are by document requests

15     and some of them by interrogatories, and some of them by

16     testimony.  Some of the things that we are doing is providing

17     budget and staffing levels for the BSA/AML compliance program;

18     we've provided every BSA/AML policy over the 20-year period

19     that's at issue; we've provided training documents related to

20     BSA/AML training; we are putting up a witness to talk about

21     efforts with regard to combating sex trafficking.  We've

22     addressed Epstein six ways till Sunday.  This is overkill

23     through this 30(b)(6) and, frankly, all of the discovery ——

24     everything counsel said in their argument was about Jeffrey

25     Epstein.  Nothing about Jeffrey Epstein is in those two

N3G1DOE4

1    interrogatories, and that's the issue that we're dealing with,

2    but in the context of the 30(b)(6), we are providing them

3    context plus.

4            THE COURT:  All right.  Let me go back to plaintiff's

5    counsel.

6            MS. SINGER:  So, your Honor, the broader point I also

7    want to make —— so with respect to the OCC order and

8    identification of the individuals who conducted those

9    look-backs, the SAR look-backs and the account and transaction

10   look-backs, is relevant to understanding what they did and

11   found with respect to Epstein and what they didn't do or find

12   with respect to Epstein.  The OCC consent order also required

13   that JPMorgan engage outside consultants to do a wholesale

14   examination of its BSA ——

15           THE COURT:  Your interrogatories are not limited to

16   that.  The first one is not limited at all.  The second one

17   just says "including but not limited to," and then mentions

18   that one.

19           So here's my ruling on this one.  This one I don't

20   think I have to wait.  The two interrogatories are quashed

21   without prejudice to a more limited interrogatory being

22   propounded if, after the 30(b)(6) witness or witnesses have

23   testified, there is still information about who was involved

24   in, for example, the compliance committee established pursuant

25   to the consent order, so far as it bears on this case.  I can't

N3G1DOE4

1   predict exactly how that would be framed.  But the way they're

2   each currently framed, I think they are indeed overbroad.  But

3   this is not a permanent ban.  This is just until after the

4   30(b)(6) witness testifies.

5          MS. SINGER:  Understood, your Honor.  And we will do

6   that to the extent that there is still a need after the

7   30(b)(6) happens.

8          I would like to make, if I could, just one more

9   general point on this issue.

10          THE COURT:  Yes.

11          MS. SINGER:  Which is that the general context of

12   JPMorgan's compliance with the OCC consent order and the

13   effectiveness of its AML —— its BSA/AML program is we believe a

14   relevant issue in the case, and it has been a point of dispute

15   throughout discovery, and in these interrogatories and the

16   30(b)(6) and requests for production, and all of the discovery

17   requests that were teed up in this chambers conversation, all

18   relate to that same point.  And it's ——

19          THE COURT:  Well, you've indicated that.  That's what

20   I'm here for.  If you can't reach agreement, you need to bring

21   it to me and I'll resolve it.  I can only deal with what you

22   bring to me.

23          MS. SINGER:  Understood, your Honor.

24          THE COURT:  So Virgin Islands said that it wanted to

25   compel compliance with subpoenas on topic 21, which is

N3G1DOE4

1    "knowledge of Epstein's sex trafficking scheme described in

2    paragraphs 20-33 of the government's first amended complaint,"

3    the government there being the government of the Virgin

4    Islands.  And what were the subpoenas that there's opposition

5    to compliance with?

6             So let me hear from the Virgin Islands on that.

7             MS. SINGER:  So this is —— I think what your Honor is

8    referring to is topic 21 and topic 27.  So this was a topic ——

9    and again, let me just give you some context.  So there were 28

10   different topics.  We had narrowed this down through a

11   productive process of meeting and conferring.  JPMorgan is

12   producing a witness on eight of them; the rest —— two we've

13   withdrawn; the rest are being answered, as Mr. Butts said, by

14   interrogatory responses or document productions in another six

15   weeks.  The two we couldn't agree on are 21 and 27.  21, it's

16   my understanding that JPMorgan's position is that we can figure

17   that out from documents.  But in fact, what JPMorgan Chase's

18   knowledge was of Epstein's sex trafficking is a central issue

19   in the case.

20            THE COURT:  So this is topics for the 30(b)(6)

21   witness?

22            MS. SINGER:  That's correct, your Honor.

23            THE COURT:  Okay.  And I know what 21 is.  What's 27?

24            MS. SINGER:  27 is in the same spirit of the

25   interrogatories.  So topic 27 is any government investigations

N3G1DOE4

and/or actions against JPMorgan related to its BSA/AML

compliance program —— that's the one that has *inter alia* —— the

2013 consent order with OCC, communications with the OCC

leading up to the 2013 consent order, compliance with the 2013

consent order, and then a second action in the same time

period, which may be familiar to your Honor, which is a 2014

deferred prosecution agreement in connection with Madoff

investment securities, which involved the same BSA/AML

compliance program.

          THE COURT:  So I want to hear from your adversary, but

just looking at topic 21, it seems to be somewhat ambiguously

worded because what it says is, "your knowledge," meaning the

bank's knowledge, "of Epstein's sex trafficking scheme

described in paragraphs 20-33 of the government's first amended

complaint."  So there are at least two ambiguities there.  For

example, the first is, does that mean that if you have

knowledge of anything alleged in paragraphs 20-33, that's

responsive to this topic?  So for example, paragraph 20 is,

"Jeffrey Epstein was a resident of the Virgin Islands."  So

does the 30(b)(6) witness have to say, well, we knew that from

the following 14 bases?  That seems not a sensible way to

proceed.  A sensible way to proceed would be to supply the

documents.  Then the item Number 22 in the complaint is,

"Epstein was a Tier 1 offender under Virgin Islands law based

upon his fraud or conviction of procuring a minor for

N3G1DOE4

```
1    prostitution."  So does your topic mean that the 30(b)(6)

2    witness has to find out whether anyone knew whether Epstein was

3    a Tier 1 offender under Virgin Islands law?  That seems

4    certainly an overbearing requirement.  And then knowledge is

5    itself I think somewhat ambiguous.  Normally when I see

6    30(b)(6) requests, they are more like, what information did you

7    have about this?  "Knowledge" is a more loaded term.  So I have

8    some question about that wording as well.  But I think the

9    overall thrust of this is a legitimate matter to be inquired

10   into with the 30(b)(6) witness but I think it's mostly probably

11   directed at documents.

12            But let me hear from JPMorgan and then we'll come back

13   to plaintiff's counsel.

14            MS. SINGER:  And I will tell you, your Honor, we did

15   not mean to be metaphysical, and the paragraphs were meant to

16   provide a frame for this, but those are certainly defects that

17   can be cured.  And they may be ——

18            THE COURT:  Well, there's nothing like being

19   metaphysical, especially at 7:45 p.m.

20            MS. SINGER:  It's the only way to be at this hour.

21            And just perhaps to aid in JPMorgan's response, the

22   reason we asked for information or knowledge —— and I do

23   recognize the Court's constructive reading on that.  So if we

24   revised this to "information," the reason we ask is because

25   there are things that are clearly reflected in documents ——
```

N3G1DOE4

1    circulating news articles, due diligence reports, things like

2    that.  What isn't reflected in the documents and we think is

3    core to the case and is most efficiently discovered through a

4    30(b)(6) are the things that JPMorgan —— I don't want to use

5    the word "know" again —— information it has from sources that

6    don't necessarily get reflected in documents.

7            So we know, for instance, that numerous JPMorgan

8    employees went to Jeffrey Epstein's townhome, which is

9    notorious for its artwork, naked pictures, massage rooms, etc.

10   We know that JPMorgan, in various documents, talked about

11   checking news sources and complaints, and the level of

12   investigation that we think was appropriate.  That kind of

13   investigation would not necessarily be reflected in the

14   documents.

15           THE COURT:  Okay.  So let me hear from ——

16           MR. BUTTS:  Your Honor, this is being dealt with in

17   documents.  It's being dealt with in a number of depositions.

18   One of —— there are many challenges with this and, to use

19   Ms. Singer's word, this is a metaphysical interrogatory, and I

20   read it differently than apparently she meant the thrust of it

21   to be, and that's half the problem.

22           The other parts of the problem are all of the embedded

23   legal language in there.  And let's start with "your

24   knowledge."  You just heard lots of argument about what the

25   company's knowledge is and what Mr. Staley knows and in what

N3G1DOE4

1    context and to what extent that is ——

2         THE COURT:  No, I totally agree.  I think if nothing

3    else, this has to be reframed, because "knowledge" is a loaded

4    term in the context of this case.

5         MR. BUTTS:  On top of that, I submitted to Mr. Kern

6    the full list of the embedded allegations from the complaint,

7    paragraphs 20-23 of the complaint, and some of the things that

8    they're asking for knowledge about are the government's —— the

9    Virgin Islands's lawsuit against Jeffrey Epstein's estate and

10   related individuals for violation of CICO and civil conspiracy,

11   which is recently settled, and Epstein-created network of

12   individuals who participated directly and indirectly and

13   conspired with him in a pattern of criminal activity, so on and

14   so forth.  And paragraph 27, an illicit enterprise of Epstein

15   businesses and associated constituting what's referred to as

16   "the Epstein Enterprise," listing a number of companies.

17   There's issues in here too about associations-in-fact.  And all

18   of those issues are legal in nature.  They're disputed.  And

19   that's why I come back to a JPMorgan case that you decided,

20   *JPMorgan v. Liberty Mutual*, where, to your point about

21   information, 30(b)(6)s are designed to learn facts, not legal

22   contentions and legal theories.

23        THE COURT:  Yes, I agree with all of that, but also, I

24   think what I got from what plaintiff's counsel was just telling

25   me is they think there is information that is not in

N3G1DOE4

1    documentary form that is relevant, nevertheless, to their case,

2    and therefore a 30(b)(6) witness is the ideal witness to

3    identify what information JPMorgan collectively had.

4              So I think that, as presently worded, I'm going to

5    strike topic 21 and 27, but I think before the 30(b)(6) witness

6    testifies, these can be reworded in a much more narrow fashion

7    in ways that probably the Court will approve.

8              MR. BUTTS:  A different topic would be a different

9    discussion.  The parties —— we've acted reasonably.  I think,

10   you know, 28 requests and you're hearing about two of them ——

11             THE COURT:  I'm all for working it out.  It sounds

12   like everyone's proceeding in good faith.  But I make it very

13   easy.  I call my system the "dial-a-judge" system because if

14   you can't work it out, all you need to do is get on the phone

15   and I'll work it out for you.

16             So I'm sustaining the objection to topic 21 and 27 as

17   currently worded, but before the 30(b)(6) witness testifies,

18   plaintiff's counsel can propound new narrower topics.  28 is a

19   funny number, where 30 would be so much more satisfying.

20             MR. BUTTS:  Or 10.

21             THE COURT:  And then if you can't work it out, you'll

22   call me, and I'm here and ready to decide.

23             MR. BUTTS:  Yes.  We were hoping that Mr. Kern had

24   some time to do some other work apart from this case.  The one

25   thing I will say, we'll work it out.  We've had success in that

N3G1DOE4

 1   regard, albeit success through a number of pointed

 2   conversations.

 3        THE COURT:  Yes.  Let me just repeat.  What I do think

 4   should be provided is stuff related to information that was

 5   available to JPMorgan regarding Mr. Epstein's sex trafficking

 6   or similar conduct that is not reflected in documents.

 7        MR. BUTTS:  We can do that, your Honor.  The one thing

 8   I would say —— you tied it to the upcoming deposition.

 9        THE COURT:  Oh, you're right.  You're going to have

10   that ——

11        MR. BUTTS:  It may be a different designee, so the

12   parties ——

13        THE COURT:  That's fine.  You'll just work it out.

14   That's fine.

15        MR. BUTTS:  And your Honor, on that vein, could I ask

16   you to come back to a scheduling question.  I know you're

17   probably getting to the end of your agenda.  I just want to

18   make sure I leave here with ——

19        THE COURT:  I'm here till midnight if you want.

20        MR. BUTTS:  Yeah.  So the direction at the start of

21   the day was shift in trial date, the parties should come back

22   to you with a revised case management plan, and somebody's

23   written down the date we're supposed to do that.  What I want

24   to make sure is there are deadlines, including one today, that

25   we think ought to be part of that.  It's tied to —— directly

N3G1DOE4

1      related to the EDCP issue.

2              THE COURT:  Put in anything you think is relevant.  So

3      you're not limited to the topics presently in the case

4      management plan, if you think there are other topics that ought

5      properly to be part of the case management plan.

6              MR. BUTTS:  And it's the service of an expert report,

7      so we would not be serving it tonight.

8              THE COURT:  Yes.  All current deadlines are suspended

9      till I get the new schedule.

10             MR. BUTTS:  Thank you, your Honor.

11             MR. HENNES:  Including the Deutsche Bank case.

12             THE COURT:  Yes.

13             MR. HENNES:  Thank you, your Honor.

14             THE COURT:  All right.  So originally I was going to

15     end this proceeding at 8 because my wife and I were going

16     dancing at 8:30, which is our hobby, but she let me know

17     earlier today that unfortunately she slightly injured her toe,

18     and strangely enough, it wasn't for the usual reason, which is

19     my stepping on it.  So I do have time for more if there's

20     anything else.  But if you don't have anything else, then,

21     reluctantly ─── ah, we have a taker.

22             MR. TODRES:  Yes.  Andrew Todres for Deutsche Bank.

23     We can deal with this in two minutes, I think.  I tried to

24     raise it earlier but we were told to try to raise it here if we

25     could.

N3G1DOE4

1            THE COURT:  Okay.

2            MR. TODRES:  So we have an issue in our case

3       concerning the productions that we've been receiving from

4       plaintiff in the document collection in the case.  In

5       particular, we have now on two occasions determined that the

6       plaintiff's counsel has not collected email for multiple email

7       accounts for plaintiff that we know have highly relevant

8       responsive documents to our document requests.  Originally, at

9       the outset of this matter, they told us that she had been

10      locked out of an email account that they were regaining access

11      to and that they would produce documents from it.  After

12      initial production that contained only printouts from that

13      email account, they represented that the production was

14      complete.

15           Subsequent to our negotiation, they did agree to begin

16      searching that email account for some documents from it.

17      However, in the course of that document production, we learned

18      that she had —— Jane Doe had an additional email account that

19      we raised to the attention of plaintiff's counsel and said

20      there appears to be another account here that you need to

21      collect and produce documents from.  And we said that despite

22      their having previously represented that they were not aware of

23      an additional account.  So they then began to produce documents

24      from that additional account.

25           Then just today, literally an hour before we came

N3G1DOE4

1    here, we received a production from a third party in response

2    to a third-party subpoena that identified yet another email

3    account belonging to the Jane Doe that we had no idea existed

4    despite, again, numerous representations by plaintiff's counsel

5    that they had given us all of — or collected all the email

6    from Jane Doe's email accounts.  So as a threshold matter, your

7    Honor —

8              THE COURT:  Let me stop you right there.

9              Let me hear from counsel on that.

10             MR. VALLACASTIN:  Good evening, your Honor.

11             We're trying our best.  Certainly when we represent —

12             THE COURT:  As all judges, I rely on counsel to

13    cross-examine their own clients.  The clients, being, of their

14    nature, very protective in a litigation context, are often not

15    as forthcoming with their lawyers as they should be, even

16    though, of course, what they say is protected by privilege.

17    But my experience is, notwithstanding privilege, clients tend

18    to not provide all the information that counsel needs to be

19    responsive to their adversaries and the Court, except upon

20    heavy pressure from the lawyers.  So it sounds like you really

21    need to push Jane Doe.  Did you ask her for her emails, or did

22    she only say, all I've got is one and I've been locked out or

23    whatever and not reveal the other two?

24             MR. VALLACASTIN:  Yes, that's correct, your Honor.  So

25    we have —

N3G1DOE4

1          THE COURT:  Have you now asked her about the other

2    two?

3          MR. VALLACASTIN:  We've asked several times and she's

4    confirmed all three ⸺

5          THE COURT:  What does she say?

6          MR. VALLACASTIN:  She only recalled the gmail one

7    first; the second account is an iCloud account, which I think a

8    lot of people here don't realize that they have because it's,

9    you know, just a function of having ⸺

10         THE COURT:  So it may have been an innocent mistake.

11   But when you're questioning her, you need to say, and by the

12   way, do you have an iCloud account, do you have this, do you

13   have that?  And really push her hard.  I'm sure you know that.

14   I don't mean to be preachy about this.  It's just that in case

15   after case, I've seen situations where, precisely because of

16   the close relationship between a lawyer and his or her clients,

17   the tight, tough questioning has not occurred.  So I encourage

18   you to do that and supply, obviously, the results to your

19   adversary.

20         MR. VALLACASTIN:  Yes, your Honor.  I appreciate that.

21         THE COURT:  Very good.

22         MR. TODRES:  And your Honor, to that point, the second

23   issue does relate to results.  So we do not believe that there

24   has been a reasonable search conducted of the email that has

25   been collected, setting aside the email that has not been

1    collected.  Originally plaintiff's counsel proposed to use a

2    sum total of 11 search terms to search plaintiff's email, three

3    of which were actually terms related to JPMorgan that had, as

4    far as we know, nothing to do with our case, and over the

5    course of discussions, we asked —— we did the work for them and

6    prepared, to the best of our ability, search terms for them to

7    run.  And I should add that of those 11 search terms, they

8    didn't include, for instance, the word "Jeff," as in Jeffrey

9    Epstein, they didn't include "Maxwell," they didn't include any

10   of the co-conspirators save for a few exceptions that are

11   identified in plaintiff's complaint, and I think your Honor

12   should be aware that what we have learned so far in this case

13   is that plaintiff had thousands of communications with Jeffrey

14   Epstein, was part of his inner circle, and had very regular

15   communications with numerous people in the complaint identified

16   as co-conspirators.  So these are issues that are not only

17   important as to merits but vital as to class certification.

18             THE COURT:  Yes.

19             MR. TODRES:  So as a result, we proposed a number of

20   additional search terms and said to them that we expected in

21   good faith that they would run standard variations on the

22   search terms.  So for instance, if you run the search term for

23   the name Jean-Luc Brunel, who is an individual identified in

24   the complaint as having assisted in Epstein's ——

25             THE COURT:  No, no, no.  I think it's your job to give

N3G1DOE4

1   them all the terms you want, and I don't think you can rely on

2   them to say, you asked for Jeffrey and we also have to do Jeff.

3   You have to say you want Jeff.  But once you say that, if they

4   improperly refuse, of course, come to me, because they'd be in

5   deep trouble.

6          MR. TODRES:  Well, they have now — we have, since

7   this discussion, have provided them with a more fulsome list of

8   terms.

9          THE COURT:  Okay.

10          MR. TODRES:  And we would ask — we have not received

11   a commitment that they are going to run and produce results of

12   those terms, which we find particularly troubling.

13          THE COURT:  Well, let's deal with that.

14          MR. VALLACASTIN:  Your Honor, with apologies again,

15   things are moving really fast in this case.  My update for you

16   is we have reviewed every document hitting the terms that

17   Mr. Todres provided us yesterday, as well as on March 1st.  In

18   total, just so the Court is aware, there are 408 search terms.

19   We have produced all but 10, which, you know, I have an email

20   that I have to respond to to release, either today or tomorrow,

21   depending on whether we can access the new email address —

22          THE COURT:  So if I understand what you're saying,

23   you're not objecting to the new terms; it's just you're working

24   your way through it.

25          MR. VALLACASTIN:  We are almost finished, your Honor.

N3G1DOE4

It's the new email address that we have to run the terms.  Just
to explain our approach in the beginning, it's not the number
of terms, not to get into the details of e-discovery ——

      THE COURT:  It sounds to me like I'm glad we had this
discussion, but I think things are moving in the right
direction.  I will just say this, so you're all aware of it.
If the case goes to trial or to an evidentiary hearing on some
prior motion and I learn that a party has not produced a
document that is reasonably within any fair reading of what
they agreed to produce, I will impose sanctions.  And you won't
like the sanctions.  The sanctions could be things like
striking your case.  So be aware of that consequence.  But
sounds like everything is proceeding favorably and so I don't
think there's anything I need to rule on tonight.

      MR. EDWARDS:  Your Honor, in the spirit of saving the
most important issue for last, we have requested and had many
telephone calls about the SARs that were filed by JPMorgan or
Deutsche Bank, the timing of them, and we are told —— at least
I'm under the impression there's no objection to turning them
over but they're just not permitted to turn them over without
the permission of FinCEN, the regulatory agency, to produce the
SARs.

      THE COURT:  I think unless someone tells me I'm wrong,
I think this Court has the power to override that, and I just
now decided I will.

N3G1DOE4

1          MR. EDWARDS:  Thank you, your Honor.  Yes.

2          MR. BUTTS:  Respectfully, your Honor, I don't think

3     that's right.

4          THE COURT:  You don't think I have that power?

5          MR. BUTTS:  It's a statutory obligation and so I fear

6     of being put in the betwixt and ——

7          THE COURT:  This is FINRA?

8          MR. EDWARDS:  FinCEN.

9          MR. BUTTS:  FinCEN.

10         THE COURT:  FinCEN.  Yeah.  So this will be really

11    fun.  Explain to them that if they still object to your turning

12    those over, that we will conduct a hearing in my court, that

13    they must appear in person, at a time and place set by the

14    Court but no later than next week, and I will want present not

15    only a lawyer but a decision-maker, if necessary, the highest

16    decision-maker, to explain why they haven't consented, if they

17    haven't, and if that person is not willing to appear, then I'll

18    have no choice but to ask the U.S. Marshals to arrest that

19    person and bring them before me for that hearing.  So they may

20    want to consent.  But just a thought.

21         MR. BUTTS:  We'll deliver that message.

22         MR. EDWARDS:  Thank you, your Honor.

23         MS. SINGER:  Your Honor, related to that, the U.S.

24    Virgin Islands has previously been authorized to receive this

25    information but there has been a holdup in getting an

N3G1DOE4

1   authorization for us in this litigation, so we'd ask that that

2   be included within the frame of what FinCEN has to ——

3          THE COURT:  Yes.  Even though I beat the drums there,

4   my experience is from prior cases that the government, once

5   they know the situation, will be very happy to comply, and I

6   can't imagine that they would not comply, but if they can't and

7   don't want to —— and I'm not sure, by the way, that I don't

8   have the power to overrule that, but it will be an interesting

9   question.  The Supreme Court has so few good issues this day,

10  that will be another one for them.

11         MR. EDWARDS:  Your Honor, in the interim, the problems

12  that this has caused, I'm hoping we can alleviate that as well.

13  For instance, there's telephone discussions where we, the Does,

14  have to jump off the calls so these BSA matters could be

15  discussed; depositions, including the Erdoe deposition

16  yesterday, when we had to leave the room so that certain

17  questions could be asked and we were not able to hear those

18  things.  There's a deposition set for Jeff Staley next week.  I

19  would just ask that there isn't a circumstance where we're

20  kicked out of the room any longer.

21         THE COURT:  So there again, here's how I handle that.

22  When that situation comes up in a deposition, you should

23  jointly call me, right there, from the deposition.  And if I'm

24  not on the bench, I'll hear you right then and there.  If I am

25  on the bench, my clerk will inform you to call back in the next

N3G1DOE4

1    break in whatever I'm doing on the bench, and so I'll resolve

2    it.  It always makes much more sense to resolve those things

3    right then and there rather than, you know, waiting for later.

4              MR. EDWARDS:  Thank you, your Honor.  I appreciate it.

5              MR. TODRES:  And your Honor, I just have one more

6    issue to address from our prior discussion.

7              THE COURT:  Yes.

8              MR. TODRES:  We had asked for medical releases in

9    respect of the medical records for our Jane Doe.  We've asked

10   for them dating back to — I don't know — probably a month ago

11   now, and the third party that we received documents from today

12   actually had a document production ready to go to us last week,

13   and they said the only reason they couldn't make it was because

14   they had not obtained the release from plaintiff.  And so we

15   have seen unexplained delay in providing us documents that,

16   again, we believe are critical to not only merits issues but

17   class certification issues, and we'd ask that plaintiffs be

18   required, as they committed to do, to provide all medical

19   records and releases as soon as possible because we cannot

20   afford this repeated delay.

21             THE COURT:  Any problem?

22             MS. SINGER:  No, your Honor.

23             THE COURT:  All right.  Well, this was fun.  Anything

24   else?

25             Well, if there is nothing else, I notice that most of

N3G1DOE4

1    the audience has wimped out long ago, but there are a few

2    stragglers still here.  So in all seriousness, I thank all of

3    you for this very helpful conference.

4              ALL COUNSEL:  Thank you, your Honor.

5                             o0o