# ATTACHMENT TO GOVERNMENT OF THE UNITED STATES VIRGIN ISLAND'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO AMEND TO ADD 18 U.S.C.§ 1591(d) OBSTRUCTION COUNT

# SECOND AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Case Number: 1:22-cv-10904-JSR |
| | ) | |
| JPMORGAN CHASE BANK, N.A. | ) | |
| | ) | **ACTION FOR DAMAGES** |
| Defendant/Third-Party Plaintiff. | ) | |
| _____ | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| JPMORGAN CHASE BANK, N.A. | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| JAMES EDWARD STALEY | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| _____ | ) | |

## SECOND AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiff Government of the United States Virgin Islands ("Government") files this Complaint against JPMorgan Chase Bank, N.A. ("JP Morgan") for violations of Trafficking Victims Protection Act, 18 U.S.C. §§ 1591 to 1595, the Virgin Islands Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. §§ 600 to 614, and the Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 301 to 336, and in support thereof alleges as follows:

## PARTIES

1.      The Attorney General of the United States Virgin Islands (hereinafter "Virgin Islands") brings this *parens patriae* action on behalf of the Plaintiff, Government of the Virgin

Islands, pursuant to 15 U.S.C. § 1595(d) and 3 V.I.C. § 114 and her statutory authority to enforce the laws of the Virgin Islands and protect public safety.

2.      The Attorney General, pursuant to her authority to represent the Government of the United States Virgin Islands, also acts on behalf of, and with the lawfully delegated authority of, the Virgin Islands Department of Licensing and Consumer Affairs under 12 V.I.C. § 327 in regard to Count Four of the Government's Complaint alleging violations of the Virgin Islands Consumer Fraud and Deceptive Business Practices Act.

3.      This action stems from an enforcement action the Government filed against the Estate of Jeffrey E. Epstein, the Co-Executors of the Estate, and various entities relating to Jeffrey Epstein ("Epstein"), under the Virgin Islands' Criminally Influenced and Corrupt Organizations Act ("CICO Act"), *see Government of the U.S. Virgin Islands v. Indyke et al.*, Case No. ST-20-CV-14 (Super. Ct. V.I. Jan. 15, 2020). The Attorney General brings this action, after presenting her findings to JP Morgan in September 2022, in her ongoing effort to protect public safety and to hold accountable those who facilitated or participated in, directly or indirectly, the trafficking enterprise Epstein helmed. The investigation revealed that JP Morgan knowingly, negligently, and unlawfully provided and pulled the levers through which recruiters and victims were paid and was indispensable to the operation and concealment of the Epstein trafficking enterprise. Financial institutions can connect—or choke—human trafficking networks, and enforcement actions filed and injunctive relief obtained by attorneys general are essential to ensure that enterprises like Epstein's cannot flourish in the future.

4.      Defendant JPMorgan Chase Bank, N.A. is an American multinational investment bank and financial services company headquartered in New York City and incorporated in Delaware.

5.      At all relevant times, JP Morgan engaged in business in the Virgin Islands, including, but not limited to, the acts and practices described herein.

6.      As described below, based on documents reviewed and interviews conducted by the Government, JP Morgan knowingly facilitated, sustained, and concealed the human trafficking network operated by Jeffrey Epstein from his home and base in the Virgin Islands, and financially benefitted from this participation, directly or indirectly, by failing to comply with federal banking regulations, ███████████████████████████████. JP Morgan facilitated and concealed wire and cash transactions that raised suspicion of—and were in fact part of—a criminal enterprise whose currency was the sexual servitude of dozens of women and girls in and beyond the Virgin Islands. Human trafficking was the principal business of the accounts Epstein maintained at JP Morgan.

7.      Upon information and belief, JP Morgan turned a blind eye to evidence of human trafficking over more than a decade because of Epstein's own financial footprint, and because of the deals and clients that Epstein brought and promised to bring to the bank. These decisions were advocated and approved at the senior levels of JP Morgan, including by the former chief executive of its asset management division and investment bank, whose inappropriate relationship with Epstein should have been evident to the bank. Indeed, it was only after Epstein's death that JP Morgan belatedly complied with federal banking regulations regarding Epstein's accounts.

## JURISDICTION, VENUE, AND RELATED CASE

8.      This action is brought pursuant to and based on federal and Virgin Islands statutes, including the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1591 to 1595 ("TVPA"), and the federal Bank Secrecy Act, 31 U.S.C. §§ 5311 to 5336 and its implementing regulations ("BSA").

9. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Government's TVPA and BSA-based causes of action arise under federal law.

10. This Court has supplemental jurisdiction over the Government's Virgin Islands law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to those arising under or based on federal law as to form part of the same case or controversy under Article III of the United States Constitution.

11. This Court is an "appropriate district court of the United States" in which for the Government to obtain appropriate relief under 18 U.S.C. § 1595(d) and venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant maintains its principal place of business within this judicial district, so that this Court may exercise general personal jurisdiction over Defendant, and because many of the alleged acts and omissions of Defendant giving rise to the Government's claims took place within this judicial district, so that this Court may exercise specific personal jurisdiction over Defendant.

12. Pursuant to Local Civil Rule 1.6(a), the undersigned believe that this action is related to *Doe 1 v. JP Morgan Chase & Co.*, No. 1:22-cv-10019 (S.D.N.Y. Nov. 24, 2022), because both actions arise from a common nucleus of operative fact involving Defendant JP Morgan's alleged participation, directly or indirectly, in Epstein's sex-trafficking venture by facilitating payments to women and girls, channeling funds to Epstein to fund the operation, and concealing Epstein's criminal conduct by failing to comply with federal banking regulations.

## BACKGROUND

## I.    JP Morgan's Federal and State Legal Requirements

13. JP Morgan is subject to federal laws, including the BSA and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct

Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 ("USA PATRIOT Act"), which amended

certain BSA regulations.

14.     Under both the BSA and USA PATRIOT Act, JP Morgan is required to implement

adequate, risk-based anti-money laundering ("AML") policies and systems to detect and prevent

money laundering or other use of the institution's services to facilitate criminal activities. This

includes, but is not limited to, maintaining a due diligence program, filing suspicious activity

reports ("SARs") when the financial institutions detect suspicious behavior and currency

transaction reports ("CTRs") for currency transactions or series of currency transactions that

exceed $10,000 in a 24-hour period, preventing structuring or assistance with structuring of

transactions undertaken for the purpose of evading federal reporting requirements, and maintaining

systems to prevent money laundering.

15.     The FDIC and the other federal banking regulators, including the Federal Reserve

Board and Office of the Comptroller of the Currency, formed an interagency organization known

as Federal Financial Institutions Examination Council ("FFIEC").

16.     To provide further guidance to banks on what BSA compliance requires, FFIEC

published a Bank Secrecy Act/Anti-Money Laundering Examination Manual ("BSA Manual").

The BSA Manual explains that an effective SAR program is essential:

> Suspicious activity reporting forms the cornerstone of the BSA reporting system. It
> is critical to the United States' ability to utilize financial information to combat
> terrorism, terrorist financing, money laundering and other financial crimes.
> Examiners and banks should recognize that the quality of SAR content is critical to
> the adequacy and effectiveness of the suspicious activity reporting system.[1]

17.     Pursuant to the BSA Manual, "[p]roper monitoring and reporting processes are

---

[1] FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual, Suspicious Activity
Reporting at 1 (2014)
https://bsaaml.ffiec.gov/docs/manual/06_AssessingComplianceWithBSARegulatoryRequirement
s/04.pdf.

essential to ensuring that the bank has an adequate and effective BSA compliance program. Appropriate policies, procedures, and processes should be in place to monitor and identify unusual activity." [2] When a bank detects suspicious activity, it is required to report that information within 30 days to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). The reporting requirement ensures that the government is able to monitor and act when alerted to potential illegal conduct.

18.    Appendix F of the BSA Manual includes examples of suspicious transactions that may indicate money laundering, terrorist financing, or fraud, including:

      a.    Funds transfer activity is unexplained, repetitive, or shows unusual patterns;

      b.    The currency transaction patterns of a business show a sudden change inconsistent with normal activities;

      c.    Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals;

      d.    Currency is deposited or withdrawn in amounts just below identification or reporting thresholds;

      e.    Regarding nonprofit or charitable organizations, financial transactions occur for which there appears to be no logical economic purpose or in which there appears to be no link between the stated activity of the organization and the other parties in the transaction;

      f.    Funds are sent or received via international transfers from or to higher-risk locations.

19.    In addition, the CICO Act, 14 V.I.C. § 600, incorporates violations of Virgin Islands

---

[2] *Id.* at 2.

Law and federal felonies, which includes the BSA's criminal-liability provisions.

## II.   Jeffrey Epstein's Criminal Conduct

20.   Jeffrey Epstein was a resident of the Virgin Islands.

21.   In 2008, Epstein pled guilty to one count of solicitation of prostitution with a minor in Palm Beach, Florida. As a result of that conviction, Epstein was forced to register as a sex offender in the Virgin Islands.

22.   Epstein was a Tier 1 offender under Virgin Islands law based upon his Florida conviction of procuring a minor for prostitution.

23.   On January 15, 2020, the Government filed a lawsuit against Jeffrey Epstein's estate and related individuals and entities for violation of the CICO Act, 14 V.I.C. §§ 600 to 614, and civil conspiracy, which the Government recently settled. As laid out in the Government's Second Amended Complaint, ST-20-CV-14, ("SAC") (attached as Exhibit 1), Epstein created a network of companies and individuals who participated in, directly or indirectly, and conspired with him in a pattern of criminal activity related to the sex trafficking, forced labor, sexual assault, child abuse, and sexual servitude of these young women and children. SAC ¶¶ 43-75. Epstein and his associates trafficked underage girls to the Virgin Islands, held them captive, and sexually abused them, causing them grave physical, mental, and emotional injury. *Id*.

24.   To accomplish this criminal activity, Epstein formed an association in fact with both companies and non-profit organizations that he owned and operated, as well as individuals, who were willing to participate in, directly or indirectly, facilitate, and conceal Epstein's criminal activity in exchange for Epstein's bestowal of financial and other benefits, including sexual services and forced labor from victims. *Id*. ¶¶ at 157-195.

25.   In October 2012, the Southern Trust Company—one of the companies Epstein

owned—applied for economic benefits from the Virgin Islands Economic Development Commission ("EDC") so the company could provide "cutting edge consulting services" in the area of "biomedical and financial informatics." *Id*. ¶¶ 157-158. Southern Trust Company received a 10-year package of economic incentives running from February 1, 2013 until January 31, 2023 that included a 90% exemption from income taxes and 100% exemptions from gross receipts, excise, and withholding taxes in the Virgin Islands. *Id*. ¶ 159.

26.     Southern Trust, in fact, appeared to perform no informatics or data-mining services during this period. Instead, Southern Trust funded the Epstein Enterprise (defined below), acting as a conduit for payment to foreign women, credit cards, airplanes and other instrumentalities. *Id*. ¶¶ 167-173.

27.     This illicit association of Epstein, businesses, and his associates constitutes what is referred to herein as the "Epstein Enterprise." Specifically included in the Epstein Enterprise were the following companies and non-profit organizations, all of which had accounts with JP Morgan: 2013 Butterfly Trust, Coatue Enterprises, LLC, C.O.U.Q. Foundation, Enhanced Education, Financial Trust Company, Inc., HBRK Associates, Inc., Hyperion Air, Inc, JEGE, Inc., JEGE, LLC, NES, LLC, Plan D, LLC, Southern Financial, LLC, and Southern Trust Company.

28.     Epstein used his wealth and power to create the Epstein Enterprise, which engaged in a pattern of criminal activity by repeatedly procuring and subjecting underage girls and young women to unlawful sexual conduct, sex trafficking, and forced labor.

29.     Many of these women, particularly after Epstein's conviction in 2008, were trafficked from Eastern Europe. As the Government explained in its Second Amended Complaint, these women were recruited and, in several instances, required to marry other Epstein victims in order to maintain their immigration status and their availability to Epstein. *Id*. ¶¶ 62- 63, 78, 86.

30.     As also alleged in the Second Amended Complaint, recruiters and victims were paid in cash or through entities set up by Epstein and/or his associates. *Id*. ¶ 100. Many of these companies were shell companies, that existed merely to transfer money to other accounts, or to shelter Epstein's assets from judgment. *Id*. ¶ 116.

31.     Epstein's lawyer, Darren K. Indyke, and accountant, Richard Kahn, now the Co-Executors of Epstein's Estate, authorized or directed many of the transactions in JP Morgan accounts held by Epstein or related entities. *Id*. ¶¶ 8-10, 76-117.

32.     Epstein and the Epstein Enterprise continued trafficking and sexually abusing young women and female children until Epstein was arrested by federal law enforcement authorities on July 6, 2019 on federal charges for the sex trafficking of minors.

33.     Epstein was found dead on August 10, 2019 while in custody in a federal detention center in New York on charges for sex-trafficking crimes. *Id*. ¶ 7.

## ALLEGATIONS

### I.     Jeffrey Epstein Was an Extremely High-Risk Customer

34.     Jeffrey Epstein's reputation as a sex trafficker and abuser of women and girls was well-known and well-publicized for more than a decade before his death.

35.     Between 2005 and 2013, there were numerous press reports that Epstein sexually abused women and girls.

36.     In March 2005, there were press reports that Epstein paid a 14-year old girl in Palm Beach, Florida for a "massage" and then molested her. Following these allegations, multiple underage girls, many of them high school students, told police that Epstein also hired them to give sexual massages.

37.     Throughout 2006—when Epstein was arrested in Palm Beach, Florida for

solicitation of a minor—there was extensive press regarding the nature and extent of Epstein's sexual offenses, including the existence of dozens of victims.

38.     In 2008, Epstein pled guilty to sexual offenses in Palm Beach, Florida, including soliciting a minor for prostitution. Epstein was sentenced to 18 months in jail and was required to register as a sex offender.

39.     In 2009, the non-prosecution agreement between Epstein and the United States became public. It revealed allegations that Epstein may have used interstate commerce to induce minors to engage in prostitution, engaged in illicit sexual conduct with minors, and trafficked minors.

40.     In 2010, press reports noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought "young girls . . . often from Eastern Europe" to the United States on Epstein's private jets.[3]

## II.     JP Morgan Knew Epstein Was a Felon, Registered Sex Offender, and Alleged Child Trafficker

41.     JP Morgan did business with Jeffrey Epstein from as early as 1998 to 2013. In that time, JP Morgan serviced approximately fifty-five Epstein-related accounts collectively worth hundreds of millions of dollars.

42.     On information and belief, based on the Government's review of financial records, information from and regarding victims of Epstein's trafficking, and other publicly available information, at least 20 individuals paid through JP Morgan accounts were victims of trafficking and sexual assault in Little St. James, New York, and/or other Epstein properties. These women were trafficked and abused during different intervals between at least 2003 and July 2019, when

---

[3] Conchita Sarnoff, *Jeffrey Epstein Pedophile Billionaire and His Sex Den*, The Daily Beast (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den.

Epstein was arrested and jailed, and these women received payments, typically multiple payments, between 2003 and 2013 in excess of $1 million collectively. Epstein also withdrew more than $775,000 in cash over that time frame from JP Morgan accounts, especially significant as Epstein was known to pay for "massages," or sexual encounters, in cash. Financial information also reflects payments drawn from JP Morgan accounts of nearly $1.5 million to known recruiters, including to the MC2 modeling agency, and another $150,000 to a private investigative firm.

43.     JP Morgan knew early on that Epstein was an extremely high-risk client but decided, at multiple points during the relationship, to continue servicing Epstein's accounts because of his vast wealth and connections with other high net worth individuals.

44.     In 2006, JP Morgan's Global Corporate Security Division found "[s]everal newspaper articles . . . that detail the indictment of Jeffrey Epstein in Florida on felony charges of soliciting underage prostitutes." At that time, JP Morgan decided to continue doing business with Epstein but concluded his account "should be classified as high risk" and require special approval.

45.     In a 2010 internal email, JP Morgan's risk management division discussed new allegations against Epstein: "See below new allegations of an investigation related to child trafficking – are you still comfortable with this client who is now a registered sex offender." Another JP Morgan employee responded: "In my short tenure working on the account these stories pop up including these from the summer."

46.     In January 2011, JP Morgan's AML compliance director requested re-approval for the bank's relationship with Epstein from JP Morgan's then-General Counsel "in light of the new allegations of human trafficking . . ." Another JP Morgan employee responded: "I thought we did that in approving a $50 million new line of credit last month?"

47.     In JP Morgan's January 2011 review of Epstein's accounts, the bank concluded

there were "no material updates" but noted:

> A few news stories during 2010 connects Jeffrey Epstein to human trafficking. The coverage team . . . all met to discuss the situation and agreed to enhance monitoring and document a discussion with the client. Jes Staley discussed the topic with Jeffrey Epstein who replied there was no truth to the allegations, no evidence and was not expecting any problems. We will continue to monitor the accounts and cash usage closely going forward.

48.     In March 2011, JP Morgan's Global Corporate Security Division reported: "Numerous articles detail various law enforcement agencies investigating Jeffrey Epstein for allegedly participating, directly or indirectly, in child trafficking and molesting underage girls. Jeffrey Epstein has settled a dozen civil lawsuits out of court from his victims regarding solicitation for an undisclosed amount." The report also identified the following "derogatory information":

> a.  "Jean Luc Brunel, owner of MC2 Model Management and Jeffrey Epstein engaged in racketeering that involved luring in minor children for sexual play for money. In addition, Brunel was a frequent passenger on Epstein's private jet and often visited Epstein in jail."
>
> b.  "MC2 Model Management received $1 million from Epstein in 2005. It is unknown if the money was given as a secret investment or payment for services as a procurer."

49.     In August 2011, when conducting a Know-Your-Customer review, JP Morgan flagged an account relating to Ghislaine Maxwell—Epstein's former companion who recently was sentenced to 20 years in prison for conspiring with Epstein to sexually abuse minors. Maxwell wanted to set up an account for her "personal recruitment consulting business." In an internal email, JP Morgan's AML Director asked: "What does she mean by personal recruitment?? Are you sure this will have nothing to do with Jeffrey? If you want to proceed, I suggest that we flag this as a High Risk Client."

50. In 2013—the year that JP Morgan terminated its relationship with Epstein—JP Morgan flagged in Epstein's history that "[p]er bank policy, felons [like Epstein] are considered high risk and require additional approval."

51. JP Morgan's banking relationship with Epstein was known at the highest levels of the bank. For instance, an August 2008 internal email states, "I would count Epstein's assets as a probable outflow for '08 ($120mm or so?) as I can't imagine it will stay (pending Dimon review)."

### III.   Head of JP Morgan's Private Bank Had Close Personal Relationship With Epstein

52. Former senior executive, Jes Staley ("Staley"), developed a close relationship with Epstein when Staley was the head of JP Morgan's Private Bank, which is a segment of JP Morgan's business dedicated to extremely wealthy clients with at least $10 million in assets.

53. Between 2008 and 2012, Staley exchanged approximately 1,200 emails with Epstein from his JP Morgan email account. These communications show a close personal relationship and "profound" friendship between the two men and even suggest that Staley may have been involved in Epstein's sex-trafficking operation. They also reveal that Staley corresponded with Epstein while Epstein was incarcerated and visited Epstein's Virgin Islands residence on multiple occasions.  Epstein even advised Staley in connection with Staley's salary negotiations at JP Morgan in July of 2008.

54. On December 30, 2008, Epstein and Staley discussed via email Staley's visit to Epstein's residence in Palm Beach, Florida. Epstein wrote that he would not be home the following Sunday, but that Staley was welcome to use the house. Staley replied that he would instead make arrangements to visit Epstein in Palm Beach in early January. On January 8, 2009—around the time of Staley's scheduled visit to Palm Beach—Epstein wired $2,000 from his JP Morgan account to a woman with an Eastern European surname.

55.     Between August 27 and 29, 2009, Staley communicated via email to Epstein that he would be in London in a week. Epstein inquired whether Staley would need anything while in London, and Staley replied, "Yep." On August 31, 2009, Epstein wired $3,000 from his JP Morgan account to the same Eastern European woman Epstein paid in January 2009.

56.     Staley sent an email to Epstein on November 1, 2009, when Epstein was incarcerated and Staley was presumably visiting Little St. James, saying:

> So when all hell breaks lo[o]se, and the world is crumbling, I will come here, and be at peace. Presently, I'm in the hot tub with a glass of white wine. This is an amazing place. Truly amazing. Next time, we're here together. I owe you much. And I deeply appreciate our friendship. I have few so profound.

57.     On December 4, 2009, Staley told Epstein via email: "I realize the danger in sending this email. But it was great to be able, today, to give you, in New York City, a long heartfelt, hug."

58.     The next day, Epstein wrote to Staley, "you were with Larry, and I had to put up with . . ." and attached a picture of a young woman (shown below). Staley quipped, "don't tell me a French wine." Epstein replied, "always thoughts of alcohol."



59.     On December 20, 2009, Epstein sent an email to Staley that was blank except for a picture of a young woman (shown below).



60.     On January 15, 2010, Staley emailed Epstein, referring to Little St. James, "Arrived at your harbor. Someday, we have to do this together."

61.     In July 2010, Staley sent an email to Epstein, saying: "Maybe they're tracking u? That was fun. Say hi to Snow White." Epstein responded: "[W]hat character would you like next?" When Staley said "Beauty and the Beast", Epstein replied: "well one side is available."

62.     None of the emails between Epstein and Staley were flagged in connection with risk reviews of Epstein's accounts. Moreover, JP Morgan allowed Staley to remain a decision-maker on Epstein's accounts. JP Morgan even tasked Staley to discuss the human trafficking allegations with Epstein.

63.     In July 2013—several months after Staley left JP Morgan to join another financial institution—JP Morgan's Compliance Officer terminated JP Morgan's relationship with Epstein.

64.     At the time of Epstein's death in 2019, Staley was the Chief Executive Officer of Barclays; however, Staley stepped down from that position in November 2021 after British financial regulators concluded an investigation into Staley's characterization of his relationship with Epstein.

**IV.     JP Morgan Ignored Obvious Red Flags Relating to Epstein's Accounts**

65.     Despite JP Morgan's claims that it would closely monitor Epstein's accounts, JP Morgan ignored numerous red flags related to Epstein's accounts and failed to comply with federal banking regulations.

66.     Between 2003 and 2013, Epstein and/or his associates used Epstein's accounts to make numerous payments to individual women and related companies. Among the recipients of these payments were numerous women with Eastern European surnames who were publicly and internally identified as Epstein recruiters and/or victims. For example, Epstein paid more than $600,0000 to Jane Doe 1, a woman who—according to news reports contained in JP Morgan's due diligence reports—Epstein purchased at the age of 14. Like other women who received payments from Epstein, Jane Doe 1 listed Epstein's apartments on 66th Street in New York City as her address, which should have been a red flag to JP Morgan.

67.     Epstein and/or his associates also made significant cash withdrawals and 95 foreign remittances with no known payee. For example, Hyperion Air, Inc.—the Epstein-controlled company that owned Epstein's private jet—issued over $547,000 in checks payable to cash purportedly for "fuel expenses when traveling to foreign countries." Additionally, between January 2012 and June 2013, Hyperion converted more than $120,000 into foreign currency. Many of these cash withdrawals either exceeded the $10,000 reporting threshold or were seemingly structured to avoid triggering the reporting requirement. This is particularly significant since it is well known

that Epstein paid his victims in cash. SAC ¶ 100.

68.     In addition, Epstein and/or his representatives appeared to be misusing JP Morgan accounts for Epstein's purported charitable organizations, including the C.O.U.Q. Foundation and Enhanced Education. Epstein made payments from these accounts with no clear nexus to the organization's charitable purpose. For example, Epstein and/or his representative used the C.O.U.Q. Foundation account to pay $29,464.66 to three young women, including two known victims, and over $20,000 to a company called Phoenix Realty Home Inc. Similarly, Epstein and/or his representative used the Enhanced Education fund to pay $124,232 to Leslie Wexner and $15,000 to ███████████ and ███████████, a firm owned by Epstein's reportedly prior girlfriend.

69.     Each of these red flags was serious; together, they suggest a pattern of potentially illegal conduct that should have prompted action by JP Morgan. Despite this, JP Morgan's 2013 compliance report describes "nothing unusual" in Epstein's account transactions, confirms that Epstein's transaction activity appears "reasonable, normal, and expected for the type of business or industry in which the client engages", and denies that any "unusual . . . activity" was detected, noting that "Compliance reviews activity regularly." Moreover, the frequency of Epstein's payments and the fact that the vast majority of account activity was payments to women and cash withdrawals rather than business activity should have been enough to trigger action.

70.     Even as late as May 2013—mere months before JP Morgan terminated Epstein's account—JP Morgan provided lines of credit to Epstein of up to $50 million.

## V.     Epstein Brought Additional High Net Worth Clients to JP Morgan

71.     In addition to his own holdings with JP Morgan, Epstein helped, or promised to help, Staley recruit ultrawealthy clients to JP Morgan. A few examples are laid out below.

72.     In 2004, Epstein introduced Staley to Glenn Dubin, the owner of Highbridge Capital Management—one of the country's largest hedge funds. This laid the groundwork for JP Morgan's acquisition of Highbridge—a move that helped catapult Staley's career.

73.     In 2011, Epstein and Staley had extensive discussions regarding the creation of a "very HIGH profile" donor advised fund ("DAF"), which is an investment account established to support charitable organizations, headed by the ███████████. Epstein pitched the ████ DAF as an "exclusive club" with a minimum $100 million donation where JP Morgan would act as the fiduciary.

## VI.    JP Morgan's ███████████████████████████████
   Reveals Systematic Failures

74.     ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████.

75.     ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████.

76.     Further, it does not appear from the Government's investigation that JP Morgan

engaged in any investigation of the source of Epstein's funds. For example, in 2012, an internal

email from JP Morgan identified the following questions for Epstein regarding his account activity:

> QUESTION: For checking account:
> Review the activity for the period overall and explain how the client's transactions
> profile agrees with or doesn't agree with expectations for the client based on the
> client relationship (purpose of accounts, occupation, business activity, etc.[)]
> Compliance reviewed regularly
>
> Questions for Asset/brokerage Account:
> What is the purpose/intended use of the account(s)? Please provide a detailed
> description of how the Client Direct Asset/Brokerage Account(s) will be used by
> the client.
> Investments/trading/wealth accumulation
> **Review the activity for the period overall and explain how the client's transaction
> profile agrees with or doesn't agree with expectations for the client based on the
> client relationship (purpose of accounts, occupation, business activity, etc.):
> Compliance reviewed regularly

Yet, there is no evidence that JP Morgan pursued or received a response from Epstein even though

JP Morgan was required to conduct this minimum level of due diligence pursuant to 31 C.F.R.

§ 1010.620(b)(3).

77.     JP Morgan also seemingly did no due diligence on the nature of the various business

entities for which it held accounts for Epstein, which appear to have no legitimate business purpose

and, upon information and belief, were part of Epstein's criminal enterprise in the Virgin Islands.

78.     In January 2013—the year JP Morgan terminated Epstein's accounts—the Office

of the Comptroller of the Currency ("OCC") entered into a consent order with JP Morgan regarding

deficiencies in the bank's overall program for BSA/AML compliance. The OCC found—

consistent with the Government's findings here—that JP Morgan failed to develop adequate due

diligence on customers and failed to comply with federal banking regulations. In fact, the OCC

noted that JP Morgan "failed to identify significant volumes of suspicious activity".[4]

79.     After JP Morgan terminated Epstein's accounts, Epstein moved his accounts to Deutsche Bank from 2013 to 2018.

80.     The New York State Department of Financial Services ("NYSDFS") investigated Deutsche Bank for failures to monitor Epstein's accounts. On July 6, 2020, the NYSDFS and Deutsche Bank entered into a Consent Order with a $150 million penalty, which stated, in relevant parts:

    a.    "The Bank's fundamental failure was that, although the Bank properly classified Mr. Epstein as high-risk, the Bank failed to scrutinize the activity in the accounts for the kinds of activity that were obviously implicated by Mr. Epstein's past. The Bank was well aware not only that Mr. Epstein had pled guilty and served prison time for engaging in sex with a minor but also that there were public allegations that his conduct was facilitated by several named co-conspirators. Despite this knowledge, the Bank did little or nothing to inquire into or block numerous payments to named co-conspirators, and to or on behalf of numerous young women, or to inquire how Mr. Epstein was using, on average, more than $200,000 per year *in cash*."

    b.    "Whether or to what extent those payments or that cash was used by Mr. Epstein to cover up old crimes, to facilitate new ones, or for some other purpose are questions that must be left to the criminal authorities, but the fact that they were suspicious should have been obvious to Bank personnel

---

[4] NYSDFS Consent Order at 2-4 (Jan. 14, 2013), https://www.occ.treas.gov/news-issuances/news-releases/2013/nr-occ-2013-8a.pdf.

at various levels. The Bank's failure to recognize this risk constitutes a major compliance failure."

c.   "These errors are unacceptable in the context of a major international bank and inexcusable in the context of the heightened scrutiny that should have occurred in the monitoring of a high-risk customer."

81.   The NYSDFS also found fault with Deutsche Bank's failure to obtain answers regarding Epstein's use of his accounts to pay women with Eastern European surnames: "In a May 2018 email, a compliance officer submitted an inquiry . . . about payments to the accounts of women with Eastern European surnames at a Russian bank, and asking for an explanation of the purpose of the wire transactions and Epstein's relationship with the counterparties."[5]

82.   JP Morgan's failures to appropriately monitor Epstein's accounts and comply with federal banking regulations are even more egregious than Deutsche Bank's failures because JP Morgan failed to demonstrate even basic due diligence and continued its relationship with Epstein for over a decade, despite the glaring indications of criminal activity.

83.   ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████.

84.   So, too, was JP Morgan's decision to allow Jes Staley to serve as an investigator and decision-maker with respect to Epstein's accounts, despite glaring red flags regarding Staley's relationship with Epstein, was a blatant failure of compliance.

## VII.   JP Morgan Fraudulently Concealed Its Continuing Violations

85.   JP Morgan's continuous illegal conduct has caused repeated and continuous injury.

---

[5] *Id*. at 15.

86.     JP Morgan knew—including at the highest level of the bank—that Epstein was an extremely high-risk client. Between 2005 and 2013, there were myriad reports that Epstein sexually abused women and girls. In 2008, Epstein pled guilty to sexual offenses and registered as a sex offender. Despite JP Morgan's acknowledgement that it needed to closely monitor Epstein, JP Morgan ignored numerous red flags and failed to comply with federal banking regulations until years later after JP Morgan was no longer benefiting from Epstein's business.

87.     JP Morgan also engaged in a course of conduct aimed at fraudulently concealing its illegal conduct, including by failing to timely comply with federal banking regulations in order to profit from Epstein's wealth and connections.

88.     A key purpose of federal banking regulations is to give law enforcement real-time information so that it can act to detect violations of the law and protect public safety.

89.     The Government of the Virgin Islands did not know, and could not have known, that Epstein used JP Morgan to facilitate his trafficking enterprise or that JP Morgan turned a blind eye to unusual cash transactions and wires and failed to carry out or follow up on basic due diligence and to timely comply with federal banking regulations, as required by the law.

90.     Over more than a decade, JP Morgan clearly knew it was not complying with federal regulations in regard to Epstein-related accounts as evidenced by its too-little too-late efforts after Epstein was arrested on federal sex trafficking charges and shortly after his death, when JP Morgan belatedly complied with federal law.

91.     The continued illegal conduct by JP Morgan has caused repeated and continuous injury. JP Morgan's illegal conduct was not completed nor were all damages incurred until the wrongdoing ceased in August 2019 when JP Morgan began belatedly complying with federal banking regulations in regard to Epstein-related accounts.

## VIII.   Additional Factual Allegations Regarding JP Morgan's Obstruction Conduct

92.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

93.   In addition, Mary Erdoes admitted in her deposition that JP Morgan was aware by

████████████████████████████████████████████████████

████████.

94.   In the years that followed, JP Morgan employees, including senior executives, emailed internally that Epstein was under investigation or had been sued for trafficking or sexual abuse. This includes ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████   Internal emails also questioned who Epstein's clients were, ████████████████████████████

████████████████████

95.   Indeed, Epstein's behavior was so widely known at JPMorgan that senior executives joked about Epstein's interest in young girls.   In 2008, for example, Mary Erdoes received an email asking her ████████████████████████████████████

96.   In her deposition, Mary Erdoes testified that ████████████████████

████████████████████████████████████████████   However,

Epstein had made substantial cash withdrawals every year he banked with JP Morgan, ███████ ██████████████████████████████████.

97.    The cash activity continued in the years after Epstein's plea, though JP Morgan ████████████████████████████████████████████████████ ███████(even during the years when Epstein was incarcerated or under house arrest).  Ms. Erdoes ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████

98.    In 2010, JP Morgan compliance officials decided that ████████████████  One senior compliance official reviewing JP Morgan's information on Epstein in 2011 declared that there was: ████████████████████  This included that:

- Epstein ███████████████████████████████████████ ████████████████████████████████████

- ████████████████████████████████████████████████ ██████

- ████████████████████████████████████████████████ ████████████

- ████████████████████████████████████████████████

- ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████The loan was a letter of credit provided by JP Morgan to ████████████████.

- In 2004, Epstein sponsored private bank accounts and credit cards for ██████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

24



99.     One internal document describes the account of Epstein's ████████████████ ████████████████████████████████████████████" clearly referring to Jane Doe 1.  The document describes charges in New York, Palm Beach, and St. Thomas for ████████████ ████████████████.  Elsewhere, JP Morgan describes ███████████████████████████ ████████████████.  She remained a customer of JP Morgan, and Epstein paid her more than $600,000, from his accounts at JP Morgan, including more than ███████████████ ████.  A recruiter given immunity through Epstein's non-prosecution agreement was paid more than ████████ from Epstein's JP Morgan accounts, virtually all of it after the same Florida conviction.  Epstein also transferred more than $23 million dollars to Ghislaine Maxwell between 1999 and 2002.  ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████.

100.    Concerns about the risks that Epstein posed were well known enough that numerous JP Morgan senior executives, including ██████████████████████████████████ ████████████████████████████████████████████████████████



101.    This is so even though memos from compliance meetings ▮▮▮▮▮▮▮▮▮▮▮▮ and noted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *JP Morgan had information that it knew was directly relevant to the federal investigation of Epstein's suspected trafficking, including regarding Epstein's* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *and payments to Eastern European women, and* ▮▮▮▮▮▮▮▮▮▮▮▮*.*

## CAUSES OF ACTION

### COUNT ONE
### Participating in a Sex-Trafficking Venture
### Violation of Trafficking Victims Protection Act
### 18  U.S.C. §§ 1591(a)(2), 1595(d) (*Parens Patriae*)

102.    The Government restates and realleges paragraphs 1 to 101 of this Complaint as if fully set forth herein.

103.    The Government brings this Count as *parens patriae* on behalf of the residents and visitors of the United States Virgin Islands and pursuant to the Attorney General's express statutory authority.

104.    JP Morgan knowingly and intentionally participated in Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2) by facilitating payments to women and girls, channeling funds to Epstein to fund the operation, and concealing Epstein's criminal conduct by failing to comply with federal banking law.

105.    JP Morgan knowingly and intentionally benefitted financially from and received value for its participation in the sex-trafficking venture in which Epstein and his co-conspirators, with JP Morgan's knowledge or reckless disregard of the fact, would use means of force, threats of force, fraud, coercion, and a combination of such means to sexually abuse young women and underage girls, including by causing them to engage in commercial sex acts, in the Virgin Islands and elsewhere.

106.    Among the financial benefits that JP Morgan received for participating in and facilitating Epstein's sex-trafficking venture was the deposit of funds that Epstein—a Virgin Islands resident—and Epstein-controlled entities located in the Virgin Islands made to JP Morgan. JP Morgan profited from the use of these deposits. Epstein and Epstein-controlled entities located in the Virgin Islands deposited these funds in exchange for JP Morgan's facilitation of and participation in Epstein's sex-trafficking venture.

107.    Also, among the financial benefits that JP Morgan received for participating in and facilitating Epstein's sex-trafficking venture were referrals of business opportunities from Epstein and his co-conspirators. JP Morgan profited from, or expected to profit from, these referred business opportunities. Epstein referred business entities and business opportunities to JP Morgan in exchange for its facilitation of and participation in Epstein's sex-trafficking venture.

108.    JP Morgan financially profited from the deposits made by Epstein and Epstein-controlled entities located in the Virgin Islands and from the business opportunities referred to JP Morgan by Epstein and his co-conspirators in exchange for its known facilitation of and implicit participation in Epstein's sex trafficking venture.

109.    JP Morgan knew and recklessly disregarded and concealed the fact that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign

commerce to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls for purposes of causing them to engage in commercial sex acts in violation of 18 U.S.C. § 1591(a)(1).

110.    JP Morgan and its employees had actual knowledge that they were facilitating Epstein's sexual abuse and sex-trafficking conspiracy to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls to engage in commercial sex acts through the means of force, threats of force, fraud, abuse of process, and coercion.

111.    Despite this knowledge, JP Morgan intentionally paid for, concealed, facilitated, and participated in Epstein's and his co-conspirators' violations of 18 U.S.C. § 1591(a), which JP Morgan knew and was in reckless disregard of the fact that Epstein and his co-conspirators would use its bank accounts and financial transactions to coerce, defraud, and force young women and underage girls to engage in commercial sex acts.

112.    JP Morgan, through its employees and agents and their role in facilitating the financial aspect of Epstein's enterprise, actively facilitated or participated in the sex-trafficking conspiracy in which Epstein and his co-conspirators led young women and underage girls in the Virgin Islands and elsewhere to believe that they would be rewarded if they cooperated with Epstein and his co-conspirators and acquiesced to their demands.

113.    JP Morgan committed this affirmative conduct knowing or in reckless disregard of the fact that Epstein would use cash transactions and financial support provided by JP Morgan as a means to defraud, force, and coerce commercial sex acts from young women and underage girls.

114.    In addition to having actual knowledge that it was participating in and facilitating the Epstein sex-trafficking venture, JP Morgan also knew that it was participating in and

facilitating a venture that was engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

115. In exchange for facilitating and covering up Epstein's commercial sex trafficking, JP Morgan's employees received financial benefits and career advancement from JP Morgan.

116. Facilitating and covering up Epstein's sex trafficking venture was a means for JP Morgan employees to obtain economic success and promotion within JP Morgan.

117. JP Morgan's knowing and intentional conduct has caused serious harm to the Virgin Islands and its residents, including without limitation financial harm, by facilitating the commission of sexual abuse against young women and underage girls, including their engagement in commercial sex acts, in the Virgin Islands.

118. JP Morgan's tortious conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex-trafficking venture operated in and from the Virgin Islands. JP Morgan's tortious conduct also evidenced a high degree of moral turpitude and demonstrated such wanton disregard for the safety of young women and underage girls in the Virgin Islands and elsewhere as to imply a deliberate indifference to its legal obligations.

119. By virtue of these knowing and intentional violations of 18 U.S.C. § 1591(a)(2), JP Morgan is liable to the Government for all appropriate relief under 18 U.S.C. § 1595(d), including damages suffered by the Government and/or Epstein's victims, punitive damages, restitution, appropriate injunctive relief, fines, reasonable attorneys' fees, and all such other relief as the Court deems appropriate.

**COUNT TWO**
**Criminal Activity—Participating, Directly or Indirectly, in a Sex-Trafficking Venture**
**Violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(2),**
**actionable under Virgin Islands Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. §§ 604(e) and 605(a)**

120.    The Government restates and realleges paragraphs 1 to 119 of this Complaint as if funny set forth herein.

121.    The Virgin Islands Legislature enacted the CICO Act with the purpose to "curtail criminal activity and lessen its economic and political power in the Territory of the Virgin Islands by establishing new penal prohibitions and providing to law enforcement and the victims of criminal activity new civil sanctions and remedies." 14 V.I.C. § 601.

122.    At all times material herein, JP Morgan was a "person" identified in 14 V.I.C. § 604(l).

123.    At all times material herein, Epstein and his co-conspirators were engaged in an illicit sex-trafficking "enterprise" as defined in 14 V.I.C. § 604(h).

124.    At all times material herein, JP Morgan supported and/or was associated with the Epstein sex-trafficking enterprise by providing banking and payment-processing services to Epstein, who resided in the Virgin Islands, and Epstein-controlled entities that were located and/or incorporated in the Virgin Islands.

125.    In providing banking and payment-processing services to Epstein and Epstein-controlled entities in return for profits realized both from Epstein's and Epstein-controlled entities' accounts and from receiving referrals by Epstein of other high-value banking clients, JP Morgan knowingly, intentionally, and willfully benefitted financially and by receiving things of value from its participation, directly or indirectly, in Epstein's sex-trafficking venture and enterprise, in violation of 18 U.S.C. § 1591(a)(2).

126.    JP Morgan's knowing, intentional, and willful receipt of financial benefits and things of value from its facilitation and participation in Epstein's sex-trafficking venture and enterprise through the financial infrastructure it provided and concealed constitutes a felony under 18 U.S.C. § 1591(b) and "criminal activity" as defined in 14 V.I.C. § 604(e).

127.    By knowingly, intentionally, and willfully receiving financial benefits and things of value from its participation, directly or indirectly, via financing in Epstein's sex-trafficking venture and enterprise, JP Morgan enabled Epstein to have ready and reliable access to and use of resources with which to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls for purposes of causing them to engage in commercial sex acts in the Virgin Islands and elsewhere. JP Morgan thereby unlawfully conducted and/or participated in, directly or indirectly, the affairs of the Epstein sex-trafficking enterprise through a pattern of illegal activity in violation of 14 V.I.C. § 605(a).

128.    JP Morgan's illegal activity has caused serious harm to the Virgin Islands and its residents, including without limitation financial harm, by facilitating the commission of sexual abuse against young women and underage girls, including their facilitation and participation, directly or indirectly, in commercial sex acts, in the Virgin Islands.

129.    By virtue of this pattern of illegal activity in furtherance of the Epstein sex-trafficking enterprise, JP Morgan is liable to the Government for all appropriate civil remedies under 14 V.I.C. § 607, including treble damages suffered by the Government and/or Epstein's victims, civil penalties, restitution and/or disgorgement of ill-gotten gains, appropriate injunctive relief, attorneys' fees and costs, and all such other relief as the Court deems appropriate.

**COUNT THREE**
**Criminal Activity—Willfully Failing To Comply With Federal Banking Law,**
**Violation of Bank Secrecy Act, 31 U.S.C. § 5322(a), as it incorporates**
██████████████████████████████████**, actionable under Virgin Islands**
**Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. §§ 604(e) and 605(a)**

130.    The Government restates and realleges paragraphs 1 to 129 of this Complaint as if fully set forth herein.

131.    The Virgin Islands Legislature enacted the CICO Act with the purpose to "curtail criminal activity and lessen its economic and political power in the Territory of the Virgin Islands by establishing new penal prohibitions and providing to law enforcement and the victims of criminal activity new civil sanctions and remedies." 14 V.I.C. § 601.

132.    At all times material herein, JP Morgan was a "person" as defined in 14 V.I.C. § 604(l).

133.    At all times material herein, Epstein and his co-conspirators were engaged in an illicit sex-trafficking "enterprise" as defined in 14 V.I.C. § 604(h).

134.    At all times material herein, JP Morgan was employed by and/or associated with the Epstein sex-trafficking enterprise by providing banking and payment-processing services to Epstein, who resided in the Virgin Islands, and Epstein-controlled entities that were located and/or incorporated in the Virgin Islands.

135.    In providing banking and payment-processing services to Epstein and Epstein-controlled entities, JP Morgan knowingly, intentionally, and willfully failed to comply with federal banking regulations in violation of 31 U.S.C. § 5322(a), ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████. From accounts maintained and served at JP Morgan, Epstein and Epstein-controlled entities received payments of large dollar amounts for no apparent business or other lawful purpose and made repeated cash payments, sometimes in amounts and patterns designed to evade federal reporting requirements, to young women and/or underage girls who were sexually abused and coerced into engaging in commercial sexual acts in the Virgin Islands and elsewhere.

136.   JP Morgan's knowing, intentional, and willful failure to comply with federal banking regulations constitutes a felony under 31 U.S.C. § 5322(a) and "criminal activity" as defined in 14 V.I.C. § 604(e).

137.   By knowingly, intentionally, and willfully failing to comply with federal banking regulations, JP Morgan enabled Epstein to have ready and reliable access to and use of resources with which to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls for purposes of causing them to engage in commercial sex acts in the Virgin Islands and elsewhere. JP Morgan thereby unlawfully conducted and/or participated in, directly or indirectly, the affairs of the Epstein sex-trafficking enterprise through a pattern of illegal activity in violation of 14 V.I.C. § 605(a).

138.   JP Morgan's illegal activity has caused serious harm to the Virgin Islands and its residents, including without limitation financial harm, by facilitating the commission of sexual abuse against young women and underage girls, including their engagement in commercial sex acts, in the Virgin Islands.

139.     By virtue of this pattern of illegal activity in furtherance of the Epstein sex-trafficking enterprise, JP Morgan is liable to the Government for all appropriate civil remedies under 14 V.I.C. § 607, including treble damages suffered by the Government and/or Epstein's victims, civil penalties, restitution and/or disgorgement of ill-gotten gains, appropriate injunctive relief, attorneys' fees and costs, and all such other relief as the Court deems appropriate.

**COUNT FOUR**
**Unfair Methods of Competition**
**Violation of Virgin Islands Consumer Fraud**
**and Deceptive Business Practices Act, 12A V.I.C. § 304**

140.     The Government restates and realleges paragraphs 1 to 139 of this Complaint as if fully set forth herein.

141.     Section 304 of Title 12A of the Virgin Islands Code provides that "[i]t is unlawful for any person to engage in unfair methods of competition . . . in the conduct of any trade or commerce."

142.     JP Morgan is a "person" as defined in 12A V.I.C. § 303(h).

143.     JP Morgan's provision of banking services and payment processing for Epstein and Epstein-controlled entities constitutes "[t]rade or commerce" as defined in 12 V.I.C. § 303(k).

144.     In return for knowingly and intentionally participating in, directly or indirectly, facilitating, and concealing by failing to comply with federal banking regulations regarding Epstein-related accounts, JP Morgan both profited from the use of the funds in their accounts and received referrals of other high-value business opportunities from Epstein and his co-conspirators.

145.     By receiving referrals of high-value business opportunities from Epstein and his co-conspirators in return for participating in, directly or indirectly, facilitating, and concealing by failing to comply with federal banking regulations regarding Epstein-related accounts, JP Morgan unlawfully and unjustly enriched itself at the expense of other banks that complied with their legal

obligations. This conduct constitutes an unfair method of competition in violation of 12A V.I.C. § 304.

146.    By virtue of its knowing, intentional, and repeated acts constituting unfair competition, JP Morgan is liable to the Government for all appropriate civil remedies under 12A V.I.C. §§ 328 and 332, including damages, civil penalties awarded on a per-violation basis pursuant to 12A V.I.C. § 328(b), appropriate injunctive relief, attorneys' fees and costs, and all such other relief as the Court deems appropriate.

**COUNT FIVE**
**Obstruction of Enforcement of Trafficking Victims Protection Act**
**19  U.S.C. §§ 1591(d), 1595(d) (*Parens Patriae*)**

147.    The Government restates and realleges paragraphs 1 to 146 of this Complaint as if fully set forth herein.

148.    The Government brings this Count as *parens patriae* on behalf of the residents and visitors of the United States Virgin Islands and pursuant to the Attorney General's express statutory authority.

149.    JP Morgan and its officers and employees knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d).  This activity is hereinafter referred to collectively as "obstruction."

150.    JP Morgan's obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1591(d), and JP Morgan thereby violated Chapter 77, Title 18.  JP Morgan's obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed women and girls in the Virgin Islands by directly resulting in them being caused to engage in commercial sex acts and in other ways.

151.     The United States Department of Justice (including the U.S. Attorney's Offices for the Southern District of New York and the Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 8, 2019.  On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA.  Later, on or about July 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein.  The federal criminal investigation of Maxwell included investigation of possible violations of the TVPA.

152.     By providing financing for Epstein's sex trafficking organization from at least 2000 through about August 2013, and concealing its actions thereafter, JP Morgan obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein.  To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of these charges was delayed by JP Morgan's actions.  Because of that delay, women and girls in the Virgin Islands were coercively caused to engage in commercial sex acts.

153.     As one example of how JP Morgan obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, JP Morgan permitted large withdrawals of cash to Epstein and his associates so that the coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies.  JP Morgan permitted these large cash withdrawals to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

154.     As another example of how JP Morgan obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, JP Morgan did not follow

anti-money laundering (AML) and anti-structuring reporting requirements found in the Bank Secrecy Act and other laws. ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████ If JP Morgan had observed these requirements imposed by law, then it would have prevented many of the subsequent transactions committed by the Epstein sex-trafficking venture.  JP Morgan knowingly did not follow these requirements because it knew that doing so would have prevented Epstein's secret cash transactions that were necessary to his sex-trafficking operation from escaping knowledge of federal investigative and prosecuting agencies. Without JP Morgan's cash, women and girls in the Virgin Islands would not have been coercively forced to engage in commercial sex acts.

155.    As another example of how JP Morgan obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, ████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

156.    JP Morgan is not protected from liability for ████████████████████████.

157.    JP Morgan's ████████████████████ about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

158.   If JP Morgan had ██████████████████████████████████████████
████████████████████████, the appropriate federal agencies would have been well
positioned to investigate Epstein's sex-trafficking venture and TVPA violations.  JP Morgan's
████████████████████████ obstructed the federal government's ability to investigate
those TVPA violations, including violations harming women and girls in the Virgin Islands.  If JP
Morgan had █████████████████, it would have prevented the continuation of Epstein's
sex-trafficking venture, which required the ability to secretly use cash to pay of victims.

159.   By permitting the large cash withdrawals by and for Epstein and his associates, JP
Morgan intended and knew that Epstein's coercive commercial sex acts would escape the detection
of federal law enforcement and prosecuting agencies for some period of time.  JP Morgan
permitted cash withdrawals to further the Epstein sex-trafficking venture and with the purpose of
helping Epstein evade criminal liability for violating the TVPA.

160.   JP Morgan's obstruction, attempted obstruction, interference with, and prevention
of the enforcement of the TVPA were all done intentionally and knowingly.  For example, JP
Morgan knew that Epstein was high-risk—specifically, high-risk to violate the TVPA through
continuing criminal sex-trafficking activities.

161.   JP Morgan was well aware that Epstein had pleaded guilty and served prison time
for engaging in sex with a minor—a crime closely connected with sex-trafficking in violation of
the TVPA.  JP Morgan also was well aware that there were public allegations that his illegal
conduct was facilitated by several named co-conspirators.  But JP Morgan concealed from the
federal government its numerous cash payments to those co-conspirators.  JP Morgan continued
its affirmative conduct of allowing Epstein to access cash so that he could make those cash
payments to his co-conspirators with knowledge that such cash transactions did not produce a clear

paper trail. JP Morgan's intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

162.   JP Morgan's relationship with Epstein in allowing his sex-trafficking venture to access large sums of cash each year went far beyond a normal (and lawful) banking relationship. JP Morgan knew, and intended, that its relationship with Epstein would go far beyond a normal banking relationship. JP Morgan knew that its decision to go beyond a normal banking relationship with Epstein obstructed the ability of federal law enforcement and prosecuting agencies to enforce the TVPA.

163.   JP Morgan's obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful and, therefore, JP Morgan intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with women and girls in the Virgin Islands through its obstruction supporting the concealment of Epstein's sex-trafficking venture. JP Morgan knew that Epstein and his other co-conspirators would use means of force, threats of force, fraud, coercion, and a combination of such means to cause women and girls, including those in the Virgin Islands, to engage in commercial sex acts.

164.   JP Morgan knew and acted in reckless disregard of the fact that its obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including those in the Virgin Islands.

165.   JP Morgan's obstruction has caused women and girls in the Virgin Islands serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

166.    JP Morgan's obstruction has caused women and girls in the Virgin Islands harm that is sufficiently serious, under all of the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

167.    This case does not involve mere fraud.  Instead, JP Morgan's criminal conduct in obstructing enforcement of the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  JP Morgan's obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to its legal obligations.  JP Morgan's obstruction was directed specifically at women and girls, including those in the Virgin Islands, who were the victims of Epstein's sex-trafficking organization.

168.    JP Morgan has caused serious harm to the Virgin Islands and its residents, including without limitation, financial harm, by obstructing federal law enforcement which facilitated the commission of sexual abuse against women and girls, including their engagement in commercial sex acts, in the Virgin Islands. By virtue of these knowing and intentional violations of 18 U.S.C. § 1591(d), JP Morgan is liable to the Government for appropriate relief under 18 U.S.C. § 1595(d).

### REQUEST FOR RELIEF

The Government respectfully requests that the Court enter judgment in its favor, and against JP Morgan, as follows:

A.    That the Court award the Government compensatory, consequential, general, and nominal damages, as suffered by the Government and/or Epstein's victims, and punitive damages, all against JP Morgan in amounts to be awarded at trial;

B.      That the Court award the Government punitive and exemplary damages against JP Morgan in an amount to be determined at trial;

C.      That the Court order JP Morgan to pay appropriate fines to the Government pursuant to 18 U.S.C. § 1591(b) in amounts to be determined at trial;

D.      That the Court order JP Morgan to provide restitution of all ill-gotten gains to the Government pursuant to 18 U.S.C. § 1593 and 14 V.I.C. § 607(a)(6) and pursuant to 14 V.I.C. § 608(c)(4) to protect the rights of victims and innocent persons in the interest of justice and consistent with the purposes of the CICO Act, in amounts to be determined at trial;

E.      That the Court award the Government treble damages against JP Morgan pursuant to 14 V.I.C. § 607(c) in an amount to be determined at trial;

F.      That the Court order JP Morgan to pay appropriate civil penalties to the Government pursuant to 14 V.I.C. § 607(e) and 12A V.I.C. § 328(b) and pursuant to 14 V.I.C. § 608(c)(4) to protect the rights of victims and innocent persons in the interest of justice and consistent with the purposes of the CICO Act, in amounts to be determined at trial;

G.      That the Court enter an injunction pursuant to 14 V.I.C. § 607(a)(2) and 12A V.I.C. § 328(a)(2) to prevent further illegal conduct and any concealment of illegal conduct;

H.      That the Court order JP Morgan to provide disgorgement of all ill-gotten gains to the Government pursuant to 14 V.I.C. § 607(a)(6) and pursuant to 14 V.I.C. § 608(c)(4) to protect the rights of victims and innocent persons in the interest of

justice and consistent with the purposes of the CICO Act, in amounts to be determined at trial;

I.    That the Court award the Government attorneys' fees and costs pursuant to 18 U.S.C. § 1595, 14 V.I.C. § 607(c), and 12A V.I.C. § 332 in amounts to be determined after trial; and

J.    That the Court award the Government and order JP Morgan to provide all such other relief as the Court deems appropriate.

### JURY DEMAND

The Government demands a jury trial on all issues so triable.

Dated: April 3, 2023

**CAROL THOMAS-JACOBS, ESQ.**
**ACTING ATTORNEY GENERAL**

/s/ *Linda Singer*
Linda Singer (*pro hac vice*)
Mimi Liu (*pro hac vice*)
David I. Ackerman
Paige Boggs (*pro hac vice*)
MOTLEY RICE LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504 / Fax: (202) 232-5513
lsinger@motleyrice.com
mliu@motleyrice.com
dackerman@motleyrice.com
pboggs@motleyrice.com

Carol Thomas-Jacobs (*pro hac vice*)
Acting Attorney General of the
United States Virgin Islands
Virgin Islands Department of Justice
34-38 Kronprindsens Gade
St. Thomas, U.S. Virgin Islands 00802
Tel: (340) 774-5666 ext. 10101
carol.jacobs@doj.vi.gov

*Attorneys for Plaintiff Government of the*
*United States Virgin Islands*