# EXHIBIT 1

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

| | |
|---|---|
| Government of the United States Virgin Islands | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   22-cv-10904-JSR |
| JPMorgan Chase Bank, N.A. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:        Celestino White, Sr., in his personal and official capacity

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place:  Law Offices of K. A. Rames, P.C.<br>2111 Company Street, Suite 3<br>Christiansted, St. Croix U.S. Virgin Islands 00820 | Date and Time:<br>May 15, 2023 at 9:00 am |
|---|---|

The deposition will be recorded by this method:    By a stenographer and videographer

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Attachment A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        05/01/2023

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Felicia H. Ellsworth |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
JPMorgan Chase Bank, N.A.                                               , who issues or requests this subpoena, are:
Felicia H. Ellsworth, 60 State Street, Boston, MA, 02109, 617 526 6687, Felicia.Ellsworth@wilmerhale.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   22-cv-10904-JSR

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

       I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

      ❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

      ❏ I returned the subpoena unexecuted because: _____

_____ .

      Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

      I declare under penalty of perjury that this information is true.

Date: _____

                                   _____
                                          *Server's signature*

                                   _____
                                          *Printed name and title*

                                   _____
                                          *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

**DEFINITIONS**

1.      "Amended Complaint" means the Second Amended Complaint filed by Plaintiff in the Litigation on April 12, 2023.

2.      "Jeffrey Epstein" or "Epstein" refers to both Epstein and his estate, including any executors or persons working on behalf of his estate.

3.      "Epstein-Related Entity" and "Epstein-Related Entities" mean any entity associated with Jeffrey Epstein, including, without limitation, ███████████████

████████████████████████████

████████████████████████████

████████████████████████████████

█████████████████████████████

█████████████████████████████

██████████████████████████████

███████████████████████████████

█████████████████████████████

███████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

███████████████████████████

██████████████████████████████

████████████████████████████████

███████████████████████████ as well as, but not limited to, the entities identified in Exhibit C.  *See*

## ATTACHMENT A

Consent Order ¶ 24 ("Over the course of the relationship, Mr. Epstein, his related entities, and associates would eventually open and fund more than 40 accounts at the Bank.").

4.      "Epstein-Related Individual" and "Epstein-Related Individuals" mean any person who was associated with Jeffrey Epstein, including, without limitation, ████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████ ██████████████████ and all individuals identified in Exhibit C.

5.      "JPMC" means Defendant JPMorgan Chase Bank, N.A., including any past or present officers or employees thereof.

6.      "Litigation" means *USVI v. JPMorgan Chase Bank, N.A.* No. 22-cv-10904-JSR (S.D.N.Y.).

7.      "USVI" refers to the United States Virgin Islands.

8.      "You" and "Your" means Celestino White, Sr., former Senator of the Legislature of the Virgin Islands and current member of the Board of Governors of the Virgin Islands Port Authority.

9.      The terms "all," "any," and "each" will be consistent with the definitions set forth in Local Civil Rule 26.3.

10.     Unless otherwise indicated, the terms "communication," "document," "person," and "concerning" will have the definitions provided in Local Civil Rule 26.3.

11.     The terms "including," "includes," and "include" will be construed to mean those

**ATTACHMENT A**

terms, in each case, without limitation. Under no circumstance should the use of "including" in any request be construed to limit the scope of the request.

12.      The use of the singular form of any word includes the plural, and the use of the plural form of any word includes the singular.

13.      To the extent these requests employ terms used in the Amended Complaint, such use is without prejudice to the rights of JPMC.

**INSTRUCTIONS**

1.      Produce all responsive documents or communications in your possession, custody, or control.  You must produce documents either as they are kept in the ordinary course of business or organized and labeled to correspond with the categories of the requests below. *See* Rule 45(e) of the Federal Rules of Civil Procedure.

2.      If, in responding to any of these requests, you encounter any ambiguity in construing either the request or a definition or instruction relevant to it, set forth the supposedly ambiguous matter and the construction selected or used in your response to the request.

3.      If any document requested was, but no longer is, in your possession or subject to your control and cannot be produced by you, state for each such document whether the document is missing or lost, has been destroyed, has been transferred voluntarily or involuntarily to others, or has been otherwise disposed of, and in each instance explain the circumstances of the disposition of the document, state the date or approximate date of that disposition, and identify the person who you believe has control of the document.

4.      In the event You withhold a document on a claim of attorney-client privilege, attorney work-product immunity, or any other privilege from disclosure, You must produce a privilege log that provides the basis for such claim, and provides the following information:

**ATTACHMENT A**

    a.  the title of the document;

    b.  a brief description of the subject matter of the document;

    c.  the known or approximate date of the document;

    d.  the source of the document;

    e.  the purpose for which the document was prepared;

    f.  any portion of the document that is not privileged;

    g.  any person to whom that information was disclosed; and

    h.  any fact, statute, rule, decision, or any other basis upon which you rely in withholding the document.

5.      When a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material. You must then log the redacted portion on a privilege log as described above.

6.      A copy of the Second Amended Complaint is attached as Exhibit A. A copy of the protective order governing the Litigation is attached as Exhibit B. A list of Epstein-Related Entities and Epstein-Related Individuals is attached as Exhibit C.

**REQUESTS FOR PRODUCTION**

1.      All documents relating to and communications between You and Epstein.

2.      All documents relating to and communications between You and any Epstein-Related Individual.

3.      All documents relating to and communications between You and any Epstein-Related Entity.

**Exhibit A**

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Case Number: 1:22-cv-10904-JSR |
| | ) | |
| JPMORGAN CHASE BANK, N.A. | ) | |
| | ) | **ACTION FOR DAMAGES** |
| Defendant/Third-Party Plaintiff. | ) | |
| ———————————————— | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| JPMORGAN CHASE BANK, N.A. | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| JAMES EDWARD STALEY | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| ———————————————— | ) | |

## SECOND AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiff Government of the United States Virgin Islands ("Government") files this Complaint against JPMorgan Chase Bank, N.A. ("JP Morgan") for violations of Trafficking Victims Protection Act, 18 U.S.C. §§ 1591 to 1595, the Virgin Islands Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. §§ 600 to 614, and the Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 301 to 336, and in support thereof alleges as follows:

### PARTIES

1.     The Attorney General of the United States Virgin Islands (hereinafter "Virgin Islands") brings this *parens patriae* action on behalf of the Plaintiff, Government of the Virgin

Islands, pursuant to 15 U.S.C. § 1595(d) and 3 V.I.C. § 114 and her statutory authority to enforce the laws of the Virgin Islands and protect public safety.

2.     The Attorney General, pursuant to her authority to represent the Government of the United States Virgin Islands, also acts on behalf of, and with the lawfully delegated authority of, the Virgin Islands Department of Licensing and Consumer Affairs under 12 V.I.C. § 327 in regard to Count Four of the Government's Complaint alleging violations of the Virgin Islands Consumer Fraud and Deceptive Business Practices Act.

3.     This action stems from an enforcement action the Government filed against the Estate of Jeffrey E. Epstein, the Co-Executors of the Estate, and various entities relating to Jeffrey Epstein ("Epstein"), under the Virgin Islands' Criminally Influenced and Corrupt Organizations Act ("CICO Act"), *see Government of the U.S. Virgin Islands v. Indyke et al.*, Case No. ST-20-CV-14 (Super. Ct. V.I. Jan. 15, 2020). The Attorney General brings this action, after presenting her findings to JP Morgan in September 2022, in her ongoing effort to protect public safety and to hold accountable those who facilitated or participated in, directly or indirectly, the trafficking enterprise Epstein helmed. The investigation revealed that JP Morgan knowingly, negligently, and unlawfully provided and pulled the levers through which recruiters and victims were paid and was indispensable to the operation and concealment of the Epstein trafficking enterprise. Financial institutions can connect—or choke—human trafficking networks, and enforcement actions filed and injunctive relief obtained by attorneys general are essential to ensure that enterprises like Epstein's cannot flourish in the future.

4.     Defendant JPMorgan Chase Bank, N.A. is an American multinational investment bank and financial services company headquartered in New York City and incorporated in Delaware.

5.     At all relevant times, JP Morgan engaged in business in the Virgin Islands, including, but not limited to, the acts and practices described herein.

6.     As described below, based on documents reviewed and interviews conducted by the Government, JP Morgan knowingly facilitated, sustained, and concealed the human trafficking network operated by Jeffrey Epstein from his home and base in the Virgin Islands, and financially benefitted from this participation, directly or indirectly, by failing to comply with federal banking regulations, ███████████████████████████████████. JP Morgan facilitated and concealed wire and cash transactions that raised suspicion of—and were in fact part of—a criminal enterprise whose currency was the sexual servitude of dozens of women and girls in and beyond the Virgin Islands. Human trafficking was the principal business of the accounts Epstein maintained at JP Morgan.

7.     Upon information and belief, JP Morgan turned a blind eye to evidence of human trafficking over more than a decade because of Epstein's own financial footprint, and because of the deals and clients that Epstein brought and promised to bring to the bank. These decisions were advocated and approved at the senior levels of JP Morgan, including by the former chief executive of its asset management division and investment bank, whose inappropriate relationship with Epstein should have been evident to the bank. Indeed, it was only after Epstein's death that JP Morgan belatedly complied with federal banking regulations regarding Epstein's accounts.

## JURISDICTION, VENUE, AND RELATED CASE

8.     This action is brought pursuant to and based on federal and Virgin Islands statutes, including the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1591 to 1595 ("TVPA"), and the federal Bank Secrecy Act, 31 U.S.C. §§ 5311 to 5336 and its implementing regulations ("BSA").

9.      This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Government's TVPA and BSA-based causes of action arise under federal law.

10.     This Court has supplemental jurisdiction over the Government's Virgin Islands law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to those arising under or based on federal law as to form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court is an "appropriate district court of the United States" in which for the Government to obtain appropriate relief under 18 U.S.C. § 1595(d) and venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant maintains its principal place of business within this judicial district, so that this Court may exercise general personal jurisdiction over Defendant, and because many of the alleged acts and omissions of Defendant giving rise to the Government's claims took place within this judicial district, so that this Court may exercise specific personal jurisdiction over Defendant.

12.      Pursuant to Local Civil Rule 1.6(a), the undersigned believe that this action is related to *Doe 1 v. JP Morgan Chase & Co.*, No. 1:22-cv-10019 (S.D.N.Y. Nov. 24, 2022), because both actions arise from a common nucleus of operative fact involving Defendant JP Morgan's alleged participation, directly or indirectly, in Epstein's sex-trafficking venture by facilitating payments to women and girls, channeling funds to Epstein to fund the operation, and concealing Epstein's criminal conduct by failing to comply with federal banking regulations.

## BACKGROUND

### I.      JP Morgan's Federal and State Legal Requirements

13.     JP Morgan is subject to federal laws, including the BSA and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct

Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 ("USA PATRIOT Act"), which amended

certain BSA regulations.

14.     Under both the BSA and USA PATRIOT Act, JP Morgan is required to implement

adequate, risk-based anti-money laundering ("AML") policies and systems to detect and prevent

money laundering or other use of the institution's services to facilitate criminal activities. This

includes, but is not limited to, maintaining a due diligence program, filing suspicious activity

reports ("SARs") when the financial institutions detect suspicious behavior and currency

transaction reports ("CTRs") for currency transactions or series of currency transactions that

exceed $10,000 in a 24-hour period, preventing structuring or assistance with structuring of

transactions undertaken for the purpose of evading federal reporting requirements, and maintaining

systems to prevent money laundering.

15.     The FDIC and the other federal banking regulators, including the Federal Reserve

Board and Office of the Comptroller of the Currency, formed an interagency organization known

as Federal Financial Institutions Examination Council ("FFIEC").

16.     To provide further guidance to banks on what BSA compliance requires, FFIEC

published a Bank Secrecy Act/Anti-Money Laundering Examination Manual ("BSA Manual").

The BSA Manual explains that an effective SAR program is essential:

> Suspicious activity reporting forms the cornerstone of the BSA reporting system. It
> is critical to the United States' ability to utilize financial information to combat
> terrorism, terrorist financing, money laundering and other financial crimes.
> Examiners and banks should recognize that the quality of SAR content is critical to
> the adequacy and effectiveness of the suspicious activity reporting system.[1]

17.     Pursuant to the BSA Manual, "[p]roper monitoring and reporting processes are

---

[1] FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual, Suspicious Activity
Reporting at 1 (2014)
https://bsaaml.ffiec.gov/docs/manual/06_AssessingComplianceWithBSARegulatoryRequirement
s/04.pdf.

essential to ensuring that the bank has an adequate and effective BSA compliance program. Appropriate policies, procedures, and processes should be in place to monitor and identify unusual activity."[2] When a bank detects suspicious activity, it is required to report that information within 30 days to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). The reporting requirement ensures that the government is able to monitor and act when alerted to potential illegal conduct.

18.     Appendix F of the BSA Manual includes examples of suspicious transactions that may indicate money laundering, terrorist financing, or fraud, including:

    a.     Funds transfer activity is unexplained, repetitive, or shows unusual patterns;

    b.     The currency transaction patterns of a business show a sudden change inconsistent with normal activities;

    c.     Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals;

    d.     Currency is deposited or withdrawn in amounts just below identification or reporting thresholds;

    e.     Regarding nonprofit or charitable organizations, financial transactions occur for which there appears to be no logical economic purpose or in which there appears to be no link between the stated activity of the organization and the other parties in the transaction;

    f.     Funds are sent or received via international transfers from or to higher-risk locations.

19.     In addition, the CICO Act, 14 V.I.C. § 600, incorporates violations of Virgin Islands

_____

[2] *Id*. at 2.

Law and federal felonies, which includes the BSA's criminal-liability provisions.

## II.     Jeffrey Epstein's Criminal Conduct

20.     Jeffrey Epstein was a resident of the Virgin Islands.

21.     In 2008, Epstein pled guilty to one count of solicitation of prostitution with a minor in Palm Beach, Florida. As a result of that conviction, Epstein was forced to register as a sex offender in the Virgin Islands.

22.     Epstein was a Tier 1 offender under Virgin Islands law based upon his Florida conviction of procuring a minor for prostitution.

23.     On January 15, 2020, the Government filed a lawsuit against Jeffrey Epstein's estate and related individuals and entities for violation of the CICO Act, 14 V.I.C. §§ 600 to 614, and civil conspiracy, which the Government recently settled. As laid out in the Government's Second Amended Complaint, ST-20-CV-14, ("SAC") (attached as Exhibit 1), Epstein created a network of companies and individuals who participated in, directly or indirectly, and conspired with him in a pattern of criminal activity related to the sex trafficking, forced labor, sexual assault, child abuse, and sexual servitude of these young women and children. SAC ¶¶ 43-75. Epstein and his associates trafficked underage girls to the Virgin Islands, held them captive, and sexually abused them, causing them grave physical, mental, and emotional injury. *Id.*

24.     To accomplish this criminal activity, Epstein formed an association in fact with both companies and non-profit organizations that he owned and operated, as well as individuals, who were willing to participate in, directly or indirectly, facilitate, and conceal Epstein's criminal activity in exchange for Epstein's bestowal of financial and other benefits, including sexual services and forced labor from victims. *Id.* ¶¶ at 157-195.

25.     In October 2012, the Southern Trust Company—one of the companies Epstein

owned—applied for economic benefits from the Virgin Islands Economic Development Commission ("EDC") so the company could provide "cutting edge consulting services" in the area of "biomedical and financial informatics." *Id*. ¶¶ 157-158. Southern Trust Company received a 10-year package of economic incentives running from February 1, 2013 until January 31, 2023 that included a 90% exemption from income taxes and 100% exemptions from gross receipts, excise, and withholding taxes in the Virgin Islands. *Id*. ¶ 159.

26.     Southern Trust, in fact, appeared to perform no informatics or data-mining services during this period. Instead, Southern Trust funded the Epstein Enterprise (defined below), acting as a conduit for payment to foreign women, credit cards, airplanes and other instrumentalities. *Id*. ¶¶ 167-173.

27.     This illicit association of Epstein, businesses, and his associates constitutes what is referred to herein as the "Epstein Enterprise." Specifically included in the Epstein Enterprise were the following companies and non-profit organizations, all of which had accounts with JP Morgan: 2013 Butterfly Trust, Coatue Enterprises, LLC, C.O.U.Q. Foundation, Enhanced Education, Financial Trust Company, Inc., HBRK Associates, Inc., Hyperion Air, Inc, JEGE, Inc., JEGE, LLC, NES, LLC, Plan D, LLC, Southern Financial, LLC, and Southern Trust Company.

28.     Epstein used his wealth and power to create the Epstein Enterprise, which engaged in a pattern of criminal activity by repeatedly procuring and subjecting underage girls and young women to unlawful sexual conduct, sex trafficking, and forced labor.

29.     Many of these women, particularly after Epstein's conviction in 2008, were trafficked from Eastern Europe. As the Government explained in its Second Amended Complaint, these women were recruited and, in several instances, required to marry other Epstein victims in order to maintain their immigration status and their availability to Epstein. *Id*. ¶¶ 62- 63, 78, 86.

8

30.     As also alleged in the Second Amended Complaint, recruiters and victims were paid in cash or through entities set up by Epstein and/or his associates. *Id*. ¶ 100. Many of these companies were shell companies, that existed merely to transfer money to other accounts, or to shelter Epstein's assets from judgment. *Id*. ¶ 116.

31.     Epstein's lawyer, Darren K. Indyke, and accountant, Richard Kahn, now the Co-Executors of Epstein's Estate, authorized or directed many of the transactions in JP Morgan accounts held by Epstein or related entities. *Id*. ¶¶ 8-10, 76-117.

32.     Epstein and the Epstein Enterprise continued trafficking and sexually abusing young women and female children until Epstein was arrested by federal law enforcement authorities on July 6, 2019 on federal charges for the sex trafficking of minors.

33.     Epstein was found dead on August 10, 2019 while in custody in a federal detention center in New York on charges for sex-trafficking crimes. *Id*. ¶ 7.

## ALLEGATIONS

**I.     Jeffrey Epstein Was an Extremely High-Risk Customer**

34.     Jeffrey Epstein's reputation as a sex trafficker and abuser of women and girls was well-known and well-publicized for more than a decade before his death.

35.     Between 2005 and 2013, there were numerous press reports that Epstein sexually abused women and girls.

36.     In March 2005, there were press reports that Epstein paid a 14-year old girl in Palm Beach, Florida for a "massage" and then molested her. Following these allegations, multiple underage girls, many of them high school students, told police that Epstein also hired them to give sexual massages.

37.     Throughout 2006—when Epstein was arrested in Palm Beach, Florida for

solicitation of a minor—there was extensive press regarding the nature and extent of Epstein's sexual offenses, including the existence of dozens of victims.

38.     In 2008, Epstein pled guilty to sexual offenses in Palm Beach, Florida, including soliciting a minor for prostitution. Epstein was sentenced to 18 months in jail and was required to register as a sex offender.

39.     In 2009, the non-prosecution agreement between Epstein and the United States became public. It revealed allegations that Epstein may have used interstate commerce to induce minors to engage in prostitution, engaged in illicit sexual conduct with minors, and trafficked minors.

40.     In 2010, press reports noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought "young girls . . . often from Eastern Europe" to the United States on Epstein's private jets.[3]

## II.     JP Morgan Knew Epstein Was a Felon, Registered Sex Offender, and Alleged Child Trafficker

41.     JP Morgan did business with Jeffrey Epstein from as early as 1998 to 2013. In that time, JP Morgan serviced approximately fifty-five Epstein-related accounts collectively worth hundreds of millions of dollars.

42.     On information and belief, based on the Government's review of financial records, information from and regarding victims of Epstein's trafficking, and other publicly available information, at least 20 individuals paid through JP Morgan accounts were victims of trafficking and sexual assault in Little St. James, New York, and/or other Epstein properties. These women were trafficked and abused during different intervals between at least 2003 and July 2019, when

---

[3] Conchita Sarnoff, *Jeffrey Epstein Pedophile Billionaire and His Sex Den*, The Daily Beast (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den.

Epstein was arrested and jailed, and these women received payments, typically multiple payments, between 2003 and 2013 in excess of $1 million collectively. Epstein also withdrew more than $775,000 in cash over that time frame from JP Morgan accounts, especially significant as Epstein was known to pay for "massages," or sexual encounters, in cash. Financial information also reflects payments drawn from JP Morgan accounts of nearly $1.5 million to known recruiters, including to the MC2 modeling agency, and another $150,000 to a private investigative firm.

43.     JP Morgan knew early on that Epstein was an extremely high-risk client but decided, at multiple points during the relationship, to continue servicing Epstein's accounts because of his vast wealth and connections with other high net worth individuals.

44.     In 2006, JP Morgan's Global Corporate Security Division found "[s]everal newspaper articles . . . that detail the indictment of Jeffrey Epstein in Florida on felony charges of soliciting underage prostitutes." At that time, JP Morgan decided to continue doing business with Epstein but concluded his account "should be classified as high risk" and require special approval.

45.     In a 2010 internal email, JP Morgan's risk management division discussed new allegations against Epstein: "See below new allegations of an investigation related to child trafficking – are you still comfortable with this client who is now a registered sex offender." Another JP Morgan employee responded: "In my short tenure working on the account these stories pop up including these from the summer."

46.     In January 2011, JP Morgan's AML compliance director requested re-approval for the bank's relationship with Epstein from JP Morgan's then-General Counsel "in light of the new allegations of human trafficking . . ." Another JP Morgan employee responded: "I thought we did that in approving a $50 million new line of credit last month?"

47.     In JP Morgan's January 2011 review of Epstein's accounts, the bank concluded

there were "no material updates" but noted:

> A few news stories during 2010 connects Jeffrey Epstein to human trafficking. The coverage team . . . all met to discuss the situation and agreed to enhance monitoring and document a discussion with the client. Jes Staley discussed the topic with Jeffrey Epstein who replied there was no truth to the allegations, no evidence and was not expecting any problems. We will continue to monitor the accounts and cash usage closely going forward.

48.     In March 2011, JP Morgan's Global Corporate Security Division reported: "Numerous articles detail various law enforcement agencies investigating Jeffrey Epstein for allegedly participating, directly or indirectly, in child trafficking and molesting underage girls. Jeffrey Epstein has settled a dozen civil lawsuits out of court from his victims regarding solicitation for an undisclosed amount." The report also identified the following "derogatory information":

> a.     "Jean Luc Brunel, owner of MC2 Model Management and Jeffrey Epstein engaged in racketeering that involved luring in minor children for sexual play for money. In addition, Brunel was a frequent passenger on Epstein's private jet and often visited Epstein in jail."

> b.     "MC2 Model Management received $1 million from Epstein in 2005. It is unknown if the money was given as a secret investment or payment for services as a procurer."

49.     In August 2011, when conducting a Know-Your-Customer review, JP Morgan flagged an account relating to Ghislaine Maxwell—Epstein's former companion who recently was sentenced to 20 years in prison for conspiring with Epstein to sexually abuse minors. Maxwell wanted to set up an account for her "personal recruitment consulting business." In an internal email, JP Morgan's AML Director asked: "What does she mean by personal recruitment?? Are you sure this will have nothing to do with Jeffrey? If you want to proceed, I suggest that we flag this as a High Risk Client."

50.     In 2013—the year that JP Morgan terminated its relationship with Epstein—JP Morgan flagged in Epstein's history that "[p]er bank policy, felons [like Epstein] are considered high risk and require additional approval."

51.     JP Morgan's banking relationship with Epstein was known at the highest levels of the bank. For instance, an August 2008 internal email states, "I would count Epstein's assets as a probable outflow for '08 ($120mm or so?) as I can't imagine it will stay (pending Dimon review)."

### III.     Head of JP Morgan's Private Bank Had Close Personal Relationship With Epstein

52.     Former senior executive, Jes Staley ("Staley"), developed a close relationship with Epstein when Staley was the head of JP Morgan's Private Bank, which is a segment of JP Morgan's business dedicated to extremely wealthy clients with at least $10 million in assets.

53.     Between 2008 and 2012, Staley exchanged approximately 1,200 emails with Epstein from his JP Morgan email account. These communications show a close personal relationship and "profound" friendship between the two men and even suggest that Staley may have been involved in Epstein's sex-trafficking operation. They also reveal that Staley corresponded with Epstein while Epstein was incarcerated and visited Epstein's Virgin Islands residence on multiple occasions.  Epstein even advised Staley in connection with Staley's salary negotiations at JP Morgan in July of 2008.

54.     On December 30, 2008, Epstein and Staley discussed via email Staley's visit to Epstein's residence in Palm Beach, Florida. Epstein wrote that he would not be home the following Sunday, but that Staley was welcome to use the house. Staley replied that he would instead make arrangements to visit Epstein in Palm Beach in early January. On January 8, 2009—around the time of Staley's scheduled visit to Palm Beach—Epstein wired $2,000 from his JP Morgan account to a woman with an Eastern European surname.

55.     Between August 27 and 29, 2009, Staley communicated via email to Epstein that he would be in London in a week. Epstein inquired whether Staley would need anything while in London, and Staley replied, "Yep." On August 31, 2009, Epstein wired $3,000 from his JP Morgan account to the same Eastern European woman Epstein paid in January 2009.

56.     Staley sent an email to Epstein on November 1, 2009, when Epstein was incarcerated and Staley was presumably visiting Little St. James, saying:

> So when all hell breaks lo[o]se, and the world is crumbling, I will come here, and be at peace. Presently, I'm in the hot tub with a glass of white wine. This is an amazing place. Truly amazing. Next time, we're here together. I owe you much. And I deeply appreciate our friendship. I have few so profound.

57.     On December 4, 2009, Staley told Epstein via email: "I realize the danger in sending this email. But it was great to be able, today, to give you, in New York City, a long heartfelt, hug."

58.     The next day, Epstein wrote to Staley, "you were with Larry, and I had to put up with . . ." and attached a picture of a young woman (shown below). Staley quipped, "don't tell me a French wine." Epstein replied, "always thoughts of alcohol."



59.     On December 20, 2009, Epstein sent an email to Staley that was blank except for a picture of a young woman (shown below).



60.     On January 15, 2010, Staley emailed Epstein, referring to Little St. James, "Arrived at your harbor. Someday, we have to do this together."

61.     In July 2010, Staley sent an email to Epstein, saying: "Maybe they're tracking u? That was fun. Say hi to Snow White." Epstein responded: "[W]hat character would you like next?" When Staley said "Beauty and the Beast", Epstein replied: "well one side is available."

62.     None of the emails between Epstein and Staley were flagged in connection with risk reviews of Epstein's accounts. Moreover, JP Morgan allowed Staley to remain a decision-maker on Epstein's accounts. JP Morgan even tasked Staley to discuss the human trafficking allegations with Epstein.

63.     In July 2013—several months after Staley left JP Morgan to join another financial institution—JP Morgan's Compliance Officer terminated JP Morgan's relationship with Epstein.

15

64.     At the time of Epstein's death in 2019, Staley was the Chief Executive Officer of Barclays; however, Staley stepped down from that position in November 2021 after British financial regulators concluded an investigation into Staley's characterization of his relationship with Epstein.

## IV.     JP Morgan Ignored Obvious Red Flags Relating to Epstein's Accounts

65.     Despite JP Morgan's claims that it would closely monitor Epstein's accounts, JP Morgan ignored numerous red flags related to Epstein's accounts and failed to comply with federal banking regulations.

66.     Between 2003 and 2013, Epstein and/or his associates used Epstein's accounts to make numerous payments to individual women and related companies. Among the recipients of these payments were numerous women with Eastern European surnames who were publicly and internally identified as Epstein recruiters and/or victims. For example, Epstein paid more than $600,0000 to Jane Doe 1, a woman who—according to news reports contained in JP Morgan's due diligence reports—Epstein purchased at the age of 14. Like other women who received payments from Epstein, Jane Doe 1 listed Epstein's apartments on 66th Street in New York City as her address, which should have been a red flag to JP Morgan.

67.     Epstein and/or his associates also made significant cash withdrawals and 95 foreign remittances with no known payee. For example, Hyperion Air, Inc.—the Epstein-controlled company that owned Epstein's private jet—issued over $547,000 in checks payable to cash purportedly for "fuel expenses when traveling to foreign countries." Additionally, between January 2012 and June 2013, Hyperion converted more than $120,000 into foreign currency. Many of these cash withdrawals either exceeded the $10,000 reporting threshold or were seemingly structured to avoid triggering the reporting requirement. This is particularly significant since it is well known

that Epstein paid his victims in cash. SAC ¶ 100.

68.     In addition, Epstein and/or his representatives appeared to be misusing JP Morgan accounts for Epstein's purported charitable organizations, including the C.O.U.Q. Foundation and Enhanced Education. Epstein made payments from these accounts with no clear nexus to the organization's charitable purpose. For example, Epstein and/or his representative used the C.O.U.Q. Foundation account to pay $29,464.66 to three young women, including two known victims, and over $20,000 to a company called Phoenix Realty Home Inc. Similarly, Epstein and/or his representative used the Enhanced Education fund to pay $124,232 to Leslie Wexner and $15,000 to ▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮, a firm owned by Epstein's reportedly prior girlfriend.

69.     Each of these red flags was serious; together, they suggest a pattern of potentially illegal conduct that should have prompted action by JP Morgan. Despite this, JP Morgan's 2013 compliance report describes "nothing unusual" in Epstein's account transactions, confirms that Epstein's transaction activity appears "reasonable, normal, and expected for the type of business or industry in which the client engages", and denies that any "unusual . . . activity" was detected, noting that "Compliance reviews activity regularly." Moreover, the frequency of Epstein's payments and the fact that the vast majority of account activity was payments to women and cash withdrawals rather than business activity should have been enough to trigger action.

70.     Even as late as May 2013—mere months before JP Morgan terminated Epstein's account—JP Morgan provided lines of credit to Epstein of up to $50 million.

## V.    Epstein Brought Additional High Net Worth Clients to JP Morgan

71.     In addition to his own holdings with JP Morgan, Epstein helped, or promised to help, Staley recruit ultrawealthy clients to JP Morgan. A few examples are laid out below.

72.     In 2004, Epstein introduced Staley to Glenn Dubin, the owner of Highbridge Capital Management—one of the country's largest hedge funds. This laid the groundwork for JP Morgan's acquisition of Highbridge—a move that helped catapult Staley's career.

73.     In 2011, Epstein and Staley had extensive discussions regarding the creation of a "very HIGH profile" donor advised fund ("DAF"), which is an investment account established to support charitable organizations, headed by the ███████████. Epstein pitched the ████ DAF as an "exclusive club" with a minimum $100 million donation where JP Morgan would act as the fiduciary.

**VI.     JP Morgan's ████████████████████████████████
Reveals Systematic Failures**

74.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████.

75.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

76.     Further, it does not appear from the Government's investigation that JP Morgan engaged in any investigation of the source of Epstein's funds. For example, in 2012, an internal email from JP Morgan identified the following questions for Epstein regarding his account activity:

> QUESTION: For checking account:
> Review the activity for the period overall and explain how the client's transactions profile agrees with or doesn't agree with expectations for the client based on the client relationship (purpose of accounts, occupation, business activity, etc.[)]
> Compliance reviewed regularly
>
> Questions for Asset/brokerage Account:
> What is the purpose/intended use of the account(s)? Please provide a detailed description of how the Client Direct Asset/Brokerage Account(s) will be used by the client.
> Investments/trading/wealth accumulation
> **Review the activity for the period overall and explain how the client's transaction profile agrees with or doesn't agree with expectations for the client based on the client relationship (purpose of accounts, occupation, business activity, etc.):
> Compliance reviewed regularly

Yet, there is no evidence that JP Morgan pursued or received a response from Epstein even though JP Morgan was required to conduct this minimum level of due diligence pursuant to 31 C.F.R. § 1010.620(b)(3).

77.     JP Morgan also seemingly did no due diligence on the nature of the various business entities for which it held accounts for Epstein, which appear to have no legitimate business purpose and, upon information and belief, were part of Epstein's criminal enterprise in the Virgin Islands.

78.     In January 2013—the year JP Morgan terminated Epstein's accounts—the Office of the Comptroller of the Currency ("OCC") entered into a consent order with JP Morgan regarding deficiencies in the bank's overall program for BSA/AML compliance. The OCC found— consistent with the Government's findings here—that JP Morgan failed to develop adequate due diligence on customers and failed to comply with federal banking regulations. In fact, the OCC

noted that JP Morgan "failed to identify significant volumes of suspicious activity".[4]

79.     After JP Morgan terminated Epstein's accounts, Epstein moved his accounts to Deutsche Bank from 2013 to 2018.

80.     The New York State Department of Financial Services ("NYSDFS") investigated Deutsche Bank for failures to monitor Epstein's accounts. On July 6, 2020, the NYSDFS and Deutsche Bank entered into a Consent Order with a $150 million penalty, which stated, in relevant parts:

      a.    "The Bank's fundamental failure was that, although the Bank properly classified Mr. Epstein as high-risk, the Bank failed to scrutinize the activity in the accounts for the kinds of activity that were obviously implicated by Mr. Epstein's past. The Bank was well aware not only that Mr. Epstein had pled guilty and served prison time for engaging in sex with a minor but also that there were public allegations that his conduct was facilitated by several named co-conspirators. Despite this knowledge, the Bank did little or nothing to inquire into or block numerous payments to named co-conspirators, and to or on behalf of numerous young women, or to inquire how Mr. Epstein was using, on average, more than $200,000 per year *in cash*."

      b.    "Whether or to what extent those payments or that cash was used by Mr. Epstein to cover up old crimes, to facilitate new ones, or for some other purpose are questions that must be left to the criminal authorities, but the fact that they were suspicious should have been obvious to Bank personnel

---

[4] NYSDFS Consent Order at 2-4 (Jan. 14, 2013), https://www.occ.treas.gov/news-issuances/news-releases/2013/nr-occ-2013-8a.pdf.

at various levels. The Bank's failure to recognize this risk constitutes a major compliance failure."

c.      "These errors are unacceptable in the context of a major international bank and inexcusable in the context of the heightened scrutiny that should have occurred in the monitoring of a high-risk customer."

81.     The NYSDFS also found fault with Deutsche Bank's failure to obtain answers regarding Epstein's use of his accounts to pay women with Eastern European surnames: "In a May 2018 email, a compliance officer submitted an inquiry . . . about payments to the accounts of women with Eastern European surnames at a Russian bank, and asking for an explanation of the purpose of the wire transactions and Epstein's relationship with the counterparties."[5]

82.     JP Morgan's failures to appropriately monitor Epstein's accounts and comply with federal banking regulations are even more egregious than Deutsche Bank's failures because JP Morgan failed to demonstrate even basic due diligence and continued its relationship with Epstein for over a decade, despite the glaring indications of criminal activity.

83.     ███████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████.

84.     So, too, was JP Morgan's decision to allow Jes Staley to serve as an investigator and decision-maker with respect to Epstein's accounts, despite glaring red flags regarding Staley's relationship with Epstein, was a blatant failure of compliance.

## VII.   JP Morgan Fraudulently Concealed Its Continuing Violations

85.     JP Morgan's continuous illegal conduct has caused repeated and continuous injury.

---

[5] *Id*. at 15.

86.     JP Morgan knew—including at the highest level of the bank—that Epstein was an extremely high-risk client. Between 2005 and 2013, there were myriad reports that Epstein sexually abused women and girls. In 2008, Epstein pled guilty to sexual offenses and registered as a sex offender. Despite JP Morgan's acknowledgement that it needed to closely monitor Epstein, JP Morgan ignored numerous red flags and failed to comply with federal banking regulations until years later after JP Morgan was no longer benefiting from Epstein's business.

87.     JP Morgan also engaged in a course of conduct aimed at fraudulently concealing its illegal conduct, including by failing to timely comply with federal banking regulations in order to profit from Epstein's wealth and connections.

88.     A key purpose of federal banking regulations is to give law enforcement real-time information so that it can act to detect violations of the law and protect public safety.

89.     The Government of the Virgin Islands did not know, and could not have known, that Epstein used JP Morgan to facilitate his trafficking enterprise or that JP Morgan turned a blind eye to unusual cash transactions and wires and failed to carry out or follow up on basic due diligence and to timely comply with federal banking regulations, as required by the law.

90.     Over more than a decade, JP Morgan clearly knew it was not complying with federal regulations in regard to Epstein-related accounts as evidenced by its too-little too-late efforts after Epstein was arrested on federal sex trafficking charges and shortly after his death, when JP Morgan belatedly complied with federal law.

91.     The continued illegal conduct by JP Morgan has caused repeated and continuous injury. JP Morgan's illegal conduct was not completed nor were all damages incurred until the wrongdoing ceased in August 2019 when JP Morgan began belatedly complying with federal banking regulations in regard to Epstein-related accounts.

VIII.   **Additional Factual Allegations Regarding JP Morgan's Obstruction Conduct**

92.     In 2006, a JP Morgan Rapid Response Team noted that Epstein "routinely" made cash withdrawals in amounts from $40,000 to $80,000 several times per month, totaling over $750,000 per year.

93.     In addition, Mary Erdoes admitted in her deposition that JP Morgan was aware by 2006 that Epstein was accused of paying cash to have underage girls and young women brought to his home.

94.     In the years that followed, JP Morgan employees, including senior executives, emailed internally that Epstein was under investigation or had been sued for trafficking or sexual abuse. This includes an email in 2010 between Mary Erdoes and Jes Staley regarding a federal investigation of Epstein for child trafficking; a 2011 email summarizing a few 2010 news stories connecting Epstein to human trafficking and promising to "monitor the accounts and cash usage closely going forward;" and a 2011 compliance memo noting that "[n]umerous articles detail various law enforcement agencies investigating Jeffrey Epstein for allegedly participating in child trafficking and molesting underage girls" and that "Epstein had settled a dozen civil lawsuits out of court from his victims regarding solicitation for an undisclosed amount." Internal emails also questioned who Epstein's clients were, circulating an article regarding whether Epstein was running a Ponzi scheme.

95.     Indeed, Epstein's behavior was so widely known at JPMorgan that senior executives joked about Epstein's interest in young girls. In 2008, for example, Mary Erdoes received an email asking her whether Epstein was at an event "with miley cyrus."

96.     In her deposition, Mary Erdoes testified that JP Morgan terminated Epstein as a customer in 2013 after she became aware that the withdrawals were "actual cash." However,

Epstein had made substantial cash withdrawals every year he banked with JP Morgan, including more than $800,000 per year in 2004 and 2005.

97.     The cash activity continued in the years after Epstein's plea, though JP Morgan accepted, without proof, that the cash was for fuel and landing fees associated with Epstein's planes (even during the years when Epstein was incarcerated or under house arrest). Ms. Erdoes has rightly dismissed this explanation. ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

98.     In 2010, JP Morgan compliance officials decided that Epstein "should go." One senior compliance official reviewing JP Morgan's information on Epstein in 2011 declared that there was: "Lots of smoke. Lots of questions." This included that:

- Epstein "is alleged to be involved in the human trafficking of young girls and law enforcement is also allegedly investigating his involvement in this activity."

- "He is also an alleged personal associate of the CEO of the Investment Bank (Jes Staley)"

- "AML Operations went to a [Private Bank] risk meeting late last week requesting that we exit this relationship."

- "whether Epstein if further exposed could have a potential serious impact."

- "The one new concerning thing is the one article about the DOJ investigation is saying they brought under age girls to the US via a modeling agency M2 that is owned by a guy named Brunel. Turns out the banker said today we extended Epstein a loan in relation to this modeling agency." The writer claims that the agency is "legit" and that "it would be hard for us to tell" if "girls were exploited via their contract or arrangement." The loan was a letter of credit provided by JP Morgan to MC2 Model Management.

- In 2004, Epstein sponsored private bank accounts and credit cards for two 18 year olds "that appear to be part of his inner entourage. One is mentioned in many of the recaps of the escapades as a willing participant and assistant when hosting visitors. She has received about 450,000 since opening from Epstein . . . . Both can be put in Palm Beach during 2004, by way of debit charges, which was when

most allegations were from . . . .  He did pay other girls, many models no huge amounts.  Sugar Daddy!"

- "His foundation account did pay donations to the Palm Beach Police Dept as reported just before the case started.  The same foundation account did pay monies direct to models and payments direct to specialty schools (massage, culinary) and university's on behalf of models/aspiring actresses.  Nothing was astronomical."

- "His business accounts Fiduciary we saw no client activity.  I know his biggest client, Wexner parted ways when he was convicted.  His [Due Diligence Reports] say he manages a few private clients money but never says who.  I would like to know if in fact he is managing anyone's money at this point or is it all his money.  We saw no evidence of disbursements even in the rocky years 08-09. When the well to do were running to their mattresses, he did not have any distributions from his accounts at Bear or JP.  He does have money at other institutions so maybe it happened there."

99.     One internal document describes the account of Epstein's "assistant or young lady he brought over from Prague (or some place like that)," clearly referring to Jane Doe 1.  The document describes charges in New York, Palm Beach, and St. Thomas for lingerie and other sexually explicit material.  Elsewhere, JP Morgan describes media reports referring to the fact that Epstein purchased her at age 14.  She remained a customer of JP Morgan, and Epstein paid her more than $600,000, from his accounts at JP Morgan, including more than $165,000 after Epstein's plea.  A recruiter given immunity through Epstein's non-prosecution agreement was paid more than $728,000 from Epstein's JP Morgan accounts, virtually all of it after the same Florida conviction.  Epstein also transferred more than $23 million dollars to Ghislaine Maxwell between 1999 and 2002.  ███████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████.

100.     Concerns about the risks that Epstein posed were well known enough that numerous JP Morgan senior executives, including Steven Cutler, Mary Erdoes, Catherine Keating, and Jes Staley met in various groupings in July and October 2008, January 2011, August 2011, and July

2013. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████.

101.     This is so even though memos from compliance meetings specifically referenced articles regarding a federal investigation into "whether a modeling agency run by a friend . . . fed his appetite for underage foreign girls" and noted that "Epstein was known to fly young women from Eastern Europe to Palm Beach where they'd massage him, among other services." *JP Morgan had information that it knew was directly relevant to the federal investigation of Epstein's suspected trafficking, including regarding Epstein's line of credit to the modeling agency and payments to Eastern European women, and* ████████████████████

### CAUSES OF ACTION

### COUNT ONE
#### Participating in a Sex-Trafficking Venture
#### Violation of Trafficking Victims Protection Act
#### 18  U.S.C. §§ 1591(a)(2), 1595(d) (*Parens Patriae*)

102.     The Government restates and realleges paragraphs 1 to 101 of this Complaint as if fully set forth herein.

103.     The Government brings this Count as *parens patriae* on behalf of the residents and visitors of the United States Virgin Islands and pursuant to the Attorney General's express statutory authority.

104.     JP Morgan knowingly and intentionally participated in Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2) by facilitating payments to women and girls, channeling funds to Epstein to fund the operation, and concealing Epstein's criminal conduct by failing to comply with federal banking law.

26

105.    JP Morgan knowingly and intentionally benefitted financially from and received value for its participation in the sex-trafficking venture in which Epstein and his co-conspirators, with JP Morgan's knowledge or reckless disregard of the fact, would use means of force, threats of force, fraud, coercion, and a combination of such means to sexually abuse young women and underage girls, including by causing them to engage in commercial sex acts, in the Virgin Islands and elsewhere.

106.    Among the financial benefits that JP Morgan received for participating in and facilitating Epstein's sex-trafficking venture was the deposit of funds that Epstein—a Virgin Islands resident—and Epstein-controlled entities located in the Virgin Islands made to JP Morgan. JP Morgan profited from the use of these deposits. Epstein and Epstein-controlled entities located in the Virgin Islands deposited these funds in exchange for JP Morgan's facilitation of and participation in Epstein's sex-trafficking venture.

107.    Also, among the financial benefits that JP Morgan received for participating in and facilitating Epstein's sex-trafficking venture were referrals of business opportunities from Epstein and his co-conspirators. JP Morgan profited from, or expected to profit from, these referred business opportunities. Epstein referred business entities and business opportunities to JP Morgan in exchange for its facilitation of and participation in Epstein's sex-trafficking venture.

108.    JP Morgan financially profited from the deposits made by Epstein and Epstein-controlled entities located in the Virgin Islands and from the business opportunities referred to JP Morgan by Epstein and his co-conspirators in exchange for its known facilitation of and implicit participation in Epstein's sex trafficking venture.

109.    JP Morgan knew and recklessly disregarded and concealed the fact that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign

commerce to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls for purposes of causing them to engage in commercial sex acts in violation of 18 U.S.C. § 1591(a)(1).

110.    JP Morgan and its employees had actual knowledge that they were facilitating Epstein's sexual abuse and sex-trafficking conspiracy to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls to engage in commercial sex acts through the means of force, threats of force, fraud, abuse of process, and coercion.

111.    Despite this knowledge, JP Morgan intentionally paid for, concealed, facilitated, and participated in Epstein's and his co-conspirators' violations of 18 U.S.C. § 1591(a), which JP Morgan knew and was in reckless disregard of the fact that Epstein and his co-conspirators would use its bank accounts and financial transactions to coerce, defraud, and force young women and underage girls to engage in commercial sex acts.

112.    JP Morgan, through its employees and agents and their role in facilitating the financial aspect of Epstein's enterprise, actively facilitated or participated in the sex-trafficking conspiracy in which Epstein and his co-conspirators led young women and underage girls in the Virgin Islands and elsewhere to believe that they would be rewarded if they cooperated with Epstein and his co-conspirators and acquiesced to their demands.

113.    JP Morgan committed this affirmative conduct knowing or in reckless disregard of the fact that Epstein would use cash transactions and financial support provided by JP Morgan as a means to defraud, force, and coerce commercial sex acts from young women and underage girls.

114.    In addition to having actual knowledge that it was participating in and facilitating the Epstein sex-trafficking venture, JP Morgan also knew that it was participating in and

facilitating a venture that was engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

115.    In exchange for facilitating and covering up Epstein's commercial sex trafficking, JP Morgan's employees received financial benefits and career advancement from JP Morgan.

116.    Facilitating and covering up Epstein's sex trafficking venture was a means for JP Morgan employees to obtain economic success and promotion within JP Morgan.

117.    JP Morgan's knowing and intentional conduct has caused serious harm to the Virgin Islands and its residents, including without limitation financial harm, by facilitating the commission of sexual abuse against young women and underage girls, including their engagement in commercial sex acts, in the Virgin Islands.

118.    JP Morgan's tortious conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex-trafficking venture operated in and from the Virgin Islands. JP Morgan's tortious conduct also evidenced a high degree of moral turpitude and demonstrated such wanton disregard for the safety of young women and underage girls in the Virgin Islands and elsewhere as to imply a deliberate indifference to its legal obligations.

119.    By virtue of these knowing and intentional violations of 18 U.S.C. § 1591(a)(2), JP Morgan is liable to the Government for all appropriate relief under 18 U.S.C. § 1595(d), including damages suffered by the Government and/or Epstein's victims, punitive damages, restitution, appropriate injunctive relief, fines, reasonable attorneys' fees, and all such other relief as the Court deems appropriate.

**COUNT TWO**
**Criminal Activity—Participating, Directly or Indirectly, in a Sex-Trafficking Venture**
**Violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(2),**
**actionable under Virgin Islands Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. §§ 604(e) and 605(a)**

120.    The Government restates and realleges paragraphs 1 to 119 of this Complaint as if funny set forth herein.

121.    The Virgin Islands Legislature enacted the CICO Act with the purpose to "curtail criminal activity and lessen its economic and political power in the Territory of the Virgin Islands by establishing new penal prohibitions and providing to law enforcement and the victims of criminal activity new civil sanctions and remedies." 14 V.I.C. § 601.

122.    At all times material herein, JP Morgan was a "person" identified in 14 V.I.C. § 604(l).

123.    At all times material herein, Epstein and his co-conspirators were engaged in an illicit sex-trafficking "enterprise" as defined in 14 V.I.C. § 604(h).

124.    At all times material herein, JP Morgan supported and/or was associated with the Epstein sex-trafficking enterprise by providing banking and payment-processing services to Epstein, who resided in the Virgin Islands, and Epstein-controlled entities that were located and/or incorporated in the Virgin Islands.

125.    In providing banking and payment-processing services to Epstein and Epstein-controlled entities in return for profits realized both from Epstein's and Epstein-controlled entities' accounts and from receiving referrals by Epstein of other high-value banking clients, JP Morgan knowingly, intentionally, and willfully benefitted financially and by receiving things of value from its participation, directly or indirectly, in Epstein's sex-trafficking venture and enterprise, in violation of 18 U.S.C. § 1591(a)(2).

126.     JP Morgan's knowing, intentional, and willful receipt of financial benefits and things of value from its facilitation and participation in Epstein's sex-trafficking venture and enterprise through the financial infrastructure it provided and concealed constitutes a felony under 18 U.S.C. § 1591(b) and "criminal activity" as defined in 14 V.I.C. § 604(e).

127.     By knowingly, intentionally, and willfully receiving financial benefits and things of value from its participation, directly or indirectly, via financing in Epstein's sex-trafficking venture and enterprise, JP Morgan enabled Epstein to have ready and reliable access to and use of resources with which to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls for purposes of causing them to engage in commercial sex acts in the Virgin Islands and elsewhere. JP Morgan thereby unlawfully conducted and/or participated in, directly or indirectly, the affairs of the Epstein sex-trafficking enterprise through a pattern of illegal activity in violation of 14 V.I.C. § 605(a).

128.     JP Morgan's illegal activity has caused serious harm to the Virgin Islands and its residents, including without limitation financial harm, by facilitating the commission of sexual abuse against young women and underage girls, including their facilitation and participation, directly or indirectly, in commercial sex acts, in the Virgin Islands.

129.     By virtue of this pattern of illegal activity in furtherance of the Epstein sex-trafficking enterprise, JP Morgan is liable to the Government for all appropriate civil remedies under 14 V.I.C. § 607, including treble damages suffered by the Government and/or Epstein's victims, civil penalties, restitution and/or disgorgement of ill-gotten gains, appropriate injunctive relief, attorneys' fees and costs, and all such other relief as the Court deems appropriate.

## COUNT THREE
**Criminal Activity—Willfully Failing To Comply With Federal Banking Law,
Violation of Bank Secrecy Act, 31 U.S.C. § 5322(a), as it incorporates
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, actionable under Virgin Islands
Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. §§ 604(e) and 605(a)**

130.    The Government restates and realleges paragraphs 1 to 129 of this Complaint as if fully set forth herein.

131.    The Virgin Islands Legislature enacted the CICO Act with the purpose to "curtail criminal activity and lessen its economic and political power in the Territory of the Virgin Islands by establishing new penal prohibitions and providing to law enforcement and the victims of criminal activity new civil sanctions and remedies." 14 V.I.C. § 601.

132.    At all times material herein, JP Morgan was a "person" as defined in 14 V.I.C. § 604(l).

133.    At all times material herein, Epstein and his co-conspirators were engaged in an illicit sex-trafficking "enterprise" as defined in 14 V.I.C. § 604(h).

134.    At all times material herein, JP Morgan was employed by and/or associated with the Epstein sex-trafficking enterprise by providing banking and payment-processing services to Epstein, who resided in the Virgin Islands, and Epstein-controlled entities that were located and/or incorporated in the Virgin Islands.

135.    In providing banking and payment-processing services to Epstein and Epstein-controlled entities, JP Morgan knowingly, intentionally, and willfully failed to comply with federal banking regulations in violation of 31 U.S.C. § 5322(a), ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████. From accounts maintained and served at JP Morgan, Epstein and Epstein-controlled entities received payments of large dollar amounts for no apparent business or other lawful purpose and made repeated cash payments, sometimes in amounts and patterns designed to evade federal reporting requirements, to young women and/or underage girls who were sexually abused and coerced into engaging in commercial sexual acts in the Virgin Islands and elsewhere.

136.    JP Morgan's knowing, intentional, and willful failure to comply with federal banking regulations constitutes a felony under 31 U.S.C. § 5322(a) and "criminal activity" as defined in 14 V.I.C. § 604(e).

137.    By knowingly, intentionally, and willfully failing to comply with federal banking regulations, JP Morgan enabled Epstein to have ready and reliable access to and use of resources with which to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls for purposes of causing them to engage in commercial sex acts in the Virgin Islands and elsewhere. JP Morgan thereby unlawfully conducted and/or participated in, directly or indirectly, the affairs of the Epstein sex-trafficking enterprise through a pattern of illegal activity in violation of 14 V.I.C. § 605(a).

138.    JP Morgan's illegal activity has caused serious harm to the Virgin Islands and its residents, including without limitation financial harm, by facilitating the commission of sexual abuse against young women and underage girls, including their engagement in commercial sex acts, in the Virgin Islands.

139.    By virtue of this pattern of illegal activity in furtherance of the Epstein sex-trafficking enterprise, JP Morgan is liable to the Government for all appropriate civil remedies under 14 V.I.C. § 607, including treble damages suffered by the Government and/or Epstein's victims, civil penalties, restitution and/or disgorgement of ill-gotten gains, appropriate injunctive relief, attorneys' fees and costs, and all such other relief as the Court deems appropriate.

**COUNT FOUR**
**Unfair Methods of Competition**
**Violation of Virgin Islands Consumer Fraud**
**and Deceptive Business Practices Act, 12A V.I.C. § 304**

140.    The Government restates and realleges paragraphs 1 to 139 of this Complaint as if fully set forth herein.

141.    Section 304 of Title 12A of the Virgin Islands Code provides that "[i]t is unlawful for any person to engage in unfair methods of competition . . . in the conduct of any trade or commerce."

142.    JP Morgan is a "person" as defined in 12A V.I.C. § 303(h).

143.    JP Morgan's provision of banking services and payment processing for Epstein and Epstein-controlled entities constitutes "[t]rade or commerce" as defined in 12 V.I.C. § 303(k).

144.    In return for knowingly and intentionally participating in, directly or indirectly, facilitating, and concealing by failing to comply with federal banking regulations regarding Epstein-related accounts, JP Morgan both profited from the use of the funds in their accounts and received referrals of other high-value business opportunities from Epstein and his co-conspirators.

145.    By receiving referrals of high-value business opportunities from Epstein and his co-conspirators in return for participating in, directly or indirectly, facilitating, and concealing by failing to comply with federal banking regulations regarding Epstein-related accounts, JP Morgan unlawfully and unjustly enriched itself at the expense of other banks that complied with their legal

34

obligations. This conduct constitutes an unfair method of competition in violation of 12A V.I.C. § 304.

146.    By virtue of its knowing, intentional, and repeated acts constituting unfair competition, JP Morgan is liable to the Government for all appropriate civil remedies under 12A V.I.C. §§ 328 and 332, including damages, civil penalties awarded on a per-violation basis pursuant to 12A V.I.C. § 328(b), appropriate injunctive relief, attorneys' fees and costs, and all such other relief as the Court deems appropriate.

**COUNT FIVE**
**Obstruction of Enforcement of Trafficking Victims Protection Act**
**19  U.S.C. §§ 1591(d), 1595(d) (*Parens Patriae*)**

147.    The Government restates and realleges paragraphs 1 to 146 of this Complaint as if fully set forth herein.

148.    The Government brings this Count as *parens patriae* on behalf of the residents and visitors of the United States Virgin Islands and pursuant to the Attorney General's express statutory authority.

149.    JP Morgan and its officers and employees knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d).  This activity is hereinafter referred to collectively as "obstruction."

150.    JP Morgan's obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1591(d), and JP Morgan thereby violated Chapter 77, Title 18.  JP Morgan's obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed women and girls in the Virgin Islands by directly resulting in them being caused to engage in commercial sex acts and in other ways.

151.    The United States Department of Justice (including the U.S. Attorney's Offices for the Southern District of New York and the Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 8, 2019.  On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA.  Later, on or about July 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein.  The federal criminal investigation of Maxwell included investigation of possible violations of the TVPA.

152.    By providing financing for Epstein's sex trafficking organization from at least 2000 through about August 2013, and concealing its actions thereafter, JP Morgan obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein.  To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of these charges was delayed by JP Morgan's actions.  Because of that delay, women and girls in the Virgin Islands were coercively caused to engage in commercial sex acts.

153.    As one example of how JP Morgan obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, JP Morgan permitted large withdrawals of cash to Epstein and his associates so that the coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies.  JP Morgan permitted these large cash withdrawals to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

154.    As another example of how JP Morgan obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, JP Morgan did not follow

anti-money laundering (AML) and anti-structuring reporting requirements found in the Bank Secrecy Act and other laws. These requirements included an obligation that JP Morgan would review transactions in Epstein's JP Morgan accounts for a determination of whether they involved suspicious transactions. If JP Morgan had observed these requirements imposed by law, then it would have prevented many of the subsequent transactions committed by the Epstein sex-trafficking venture. JP Morgan knowingly did not follow these requirements because it knew that doing so would have prevented Epstein's secret cash transactions that were necessary to his sex-trafficking operation from escaping knowledge of federal investigative and prosecuting agencies. Without JP Morgan's cash, women and girls in the Virgin Islands would not have been coercively forced to engage in commercial sex acts.

155.    As another example of how JP Morgan obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

156.    JP Morgan is not protected from liability for ████████████████.

157.    JP Morgan's ████████████████ about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

158.   If JP Morgan had  , the appropriate federal agencies would have been well positioned to investigate Epstein's sex-trafficking venture and TVPA violations.  JP Morgan's obstructed the federal government's ability to investigate those TVPA violations, including violations harming women and girls in the Virgin Islands.  If JP Morgan had , it would have prevented the continuation of Epstein's sex-trafficking venture, which required the ability to secretly use cash to pay of victims.

159.   By permitting the large cash withdrawals by and for Epstein and his associates, JP Morgan intended and knew that Epstein's coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies for some period of time.  JP Morgan permitted cash withdrawals to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

160.   JP Morgan's obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly.  For example, JP Morgan knew that Epstein was high-risk—specifically, high-risk to violate the TVPA through continuing criminal sex-trafficking activities.

161.   JP Morgan was well aware that Epstein had pleaded guilty and served prison time for engaging in sex with a minor—a crime closely connected with sex-trafficking in violation of the TVPA.  JP Morgan also was well aware that there were public allegations that his illegal conduct was facilitated by several named co-conspirators.  But JP Morgan concealed from the federal government its numerous cash payments to those co-conspirators.  JP Morgan continued its affirmative conduct of allowing Epstein to access cash so that he could make those cash payments to his co-conspirators with knowledge that such cash transactions did not produce a clear

paper trail. JP Morgan's intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

162. JP Morgan's relationship with Epstein in allowing his sex-trafficking venture to access large sums of cash each year went far beyond a normal (and lawful) banking relationship. JP Morgan knew, and intended, that its relationship with Epstein would go far beyond a normal banking relationship. JP Morgan knew that its decision to go beyond a normal banking relationship with Epstein obstructed the ability of federal law enforcement and prosecuting agencies to enforce the TVPA.

163. JP Morgan's obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful and, therefore, JP Morgan intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with women and girls in the Virgin Islands through its obstruction supporting the concealment of Epstein's sex-trafficking venture. JP Morgan knew that Epstein and his other co-conspirators would use means of force, threats of force, fraud, coercion, and a combination of such means to cause women and girls, including those in the Virgin Islands, to engage in commercial sex acts.

164. JP Morgan knew and acted in reckless disregard of the fact that its obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including those in the Virgin Islands.

165. JP Morgan's obstruction has caused women and girls in the Virgin Islands serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

166.    JP Morgan's obstruction has caused women and girls in the Virgin Islands harm that is sufficiently serious, under all of the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

167.    This case does not involve mere fraud.  Instead, JP Morgan's criminal conduct in obstructing enforcement of the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  JP Morgan's obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to its legal obligations.  JP Morgan's obstruction was directed specifically at women and girls, including those in the Virgin Islands, who were the victims of Epstein's sex-trafficking organization.

168.    JP Morgan has caused serious harm to the Virgin Islands and its residents, including without limitation, financial harm, by obstructing federal law enforcement which facilitated the commission of sexual abuse against women and girls, including their engagement in commercial sex acts, in the Virgin Islands. By virtue of these knowing and intentional violations of 18 U.S.C. § 1591(d), JP Morgan is liable to the Government for appropriate relief under 18 U.S.C. § 1595(d).

## REQUEST FOR RELIEF

The Government respectfully requests that the Court enter judgment in its favor, and against JP Morgan, as follows:

A.    That the Court award the Government compensatory, consequential, general, and nominal damages, as suffered by the Government and/or Epstein's victims, and punitive damages, all against JP Morgan in amounts to be awarded at trial;

B.    That the Court award the Government punitive and exemplary damages against JP Morgan in an amount to be determined at trial;

C.    That the Court order JP Morgan to pay appropriate fines to the Government pursuant to 18 U.S.C. § 1591(b) in amounts to be determined at trial;

D.    That the Court order JP Morgan to provide restitution of all ill-gotten gains to the Government pursuant to 18 U.S.C. § 1593 and 14 V.I.C. § 607(a)(6) and pursuant to 14 V.I.C. § 608(c)(4) to protect the rights of victims and innocent persons in the interest of justice and consistent with the purposes of the CICO Act, in amounts to be determined at trial;

E.    That the Court award the Government treble damages against JP Morgan pursuant to 14 V.I.C. § 607(c) in an amount to be determined at trial;

F.    That the Court order JP Morgan to pay appropriate civil penalties to the Government pursuant to 14 V.I.C. § 607(e) and 12A V.I.C. § 328(b) and pursuant to 14 V.I.C. § 608(c)(4) to protect the rights of victims and innocent persons in the interest of justice and consistent with the purposes of the CICO Act, in amounts to be determined at trial;

G.    That the Court enter an injunction pursuant to 14 V.I.C. § 607(a)(2) and 12A V.I.C. § 328(a)(2) to prevent further illegal conduct and any concealment of illegal conduct;

H.    That the Court order JP Morgan to provide disgorgement of all ill-gotten gains to the Government pursuant to 14 V.I.C. § 607(a)(6) and pursuant to 14 V.I.C. § 608(c)(4) to protect the rights of victims and innocent persons in the interest of

justice and consistent with the purposes of the CICO Act, in amounts to be determined at trial;

I. That the Court award the Government attorneys' fees and costs pursuant to 18 U.S.C. § 1595, 14 V.I.C. § 607(c), and 12A V.I.C. § 332 in amounts to be determined after trial; and

J. That the Court award the Government and order JP Morgan to provide all such other relief as the Court deems appropriate.

### JURY DEMAND

The Government demands a jury trial on all issues so triable.

Dated: April 3, 2023

**CAROL THOMAS-JACOBS, ESQ.**
**ACTING ATTORNEY GENERAL**

/s/ *Linda Singer*
Linda Singer (*pro hac vice*)
Mimi Liu (*pro hac vice*)
David I. Ackerman
Paige Boggs (*pro hac vice*)
MOTLEY RICE LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504 / Fax: (202) 232-5513
lsinger@motleyrice.com
mliu@motleyrice.com
dackerman@motleyrice.com
pboggs@motleyrice.com

Carol Thomas-Jacobs (*pro hac vice*)
Acting Attorney General of the
United States Virgin Islands
Virgin Islands Department of Justice
34-38 Kronprindsens Gade
St. Thomas, U.S. Virgin Islands 00802
Tel: (340) 774-5666 ext. 10101
carol.jacobs@doj.vi.gov

*Attorneys for Plaintiff Government of the*
*United States Virgin Islands*

42

# Exhibit 1

## to Government's Second Amended Complaint against JPMorgan Chase Bank, N.A.



**FILED**
November 30, 2022 12:02 PM
ST-2020-CV-00014
**TAMARA CHARLES**
**CLERK OF THE COURT**

## IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN
******************************

GOVERNMENT OF THE UNITED STATES
VIRGIN ISLANDS,

                PLAINTIFF,

        V.

DARREN K. INDYKE, in his individual capacity
and in his capacity as the EXECUTOR FOR THE
ESTATE OF JEFFREY E. EPSTEIN and
ADMINISTRATOR OF THE 1953 TRUST;
RICHARD D. KAHN, in his individual capacity and
in his capacity as the EXECUTOR FOR THE
ESTATE OF JEFFREY E. EPSTEIN, and
ADMINISTRATOR OF THE 1953 TRUST;
ESTATE OF JEFFREY E. EPSTEIN; THE 1953
TRUST; PLAN D, LLC; GREAT ST. JIM, LLC;
NAUTILUS, INC.; HYPERION AIR, LLC; POPLAR,
Inc.; SOUTHERN TRUST COMPANY, INC.;
CYPRESS, INC.; MAPLE, INC.; LAUREL, INC.;
AND JOHN AND JANE DOES,

                DEFENDANTS.

Case No.:  ST-20-CV-14

**ACTION FOR DAMAGES**

JURY TRIAL DEMANDED

---

### SECOND AMENDED COMPLAINT

    **COMES NOW,** the Government of the United States Virgin Islands ("Government") and

files this Second Amended Complaint containing information that has become known through

further investigation and third-party discovery and in support thereof, would show unto the Court

as follows:

### JURISDICTION AND PARTIES

    1.   The Attorney General of the United States Virgin Islands (herein after "Virgin

Islands") brings this action on behalf of the Plaintiff, Government of the Virgin Islands, pursuant

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **2** of **76**

to 3 V.I.C. § 114 and 14 V.I.C. §607 and her statutory authority to enforce the laws of the Virgin

Islands, and advocate for the public interest, safety, health and well-being of persons in the

Virgin Islands.

2.      This Court has subject matter jurisdiction over this civil matter pursuant to 4

V.I.C. § 76 and 14 V.I.C. § 607.

3.      This Court has personal jurisdiction over the parties pursuant to 5 V.I.C. § 4903.

4.      The Virgin Islands is an unincorporated territory of the United States. It consists

of St. Thomas, St. Croix, St. John, and Water Island, and more than 40 surrounding islands and

Cays, some of which are privately owned. Among these privately owned islands are Little St.

James and Great St. James.

5.      Jeffrey E. Epstein ("Epstein") was a resident of the Virgin Islands and he

maintained a residence on Little St. James, which he acquired in 1998 and in 2016 he also

purchased Great St. James.

6.      Epstein registered as a sex offender in the Virgin Islands in 2010. He was a Tier 1

offender under Virgin Islands law based upon his Florida conviction of procuring a minor for

prostitution. As a Tier 1 offender, Epstein was required to register annually with the Virgin

Islands Department of Justice ("VIDOJ") and give advance notice of his travel to and from the

Virgin Islands. Epstein was also subject to random address verification by VIDOJ.

7.      Epstein was found dead on August 10, 2019 while in custody in New York for sex

crimes.

8.      Defendant Darren K. Indyke ("Defendant Indyke") is co-executor of the Estate of

Jeffrey E. Epstein and Administrator of The 1953 Trust and was and/or is a participant in the

activity of the "Epstein Enterprise," as set forth below.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **3** of 76

9.  Defendant Richard D. Kahn ("Defendant Kahn") is co-executor of The Estate of Jeffrey E. Epstein and Administrator of The 1953 Trust and was and/or is a participant in the activity of the "Epstein Enterprise," as set forth below.

10.  Defendants Indyke and Kahn, in addition to administering the Estate under the laws of the Virgin Islands, engaged in conduct in the Virgin Islands through their participation in businesses, financial transactions, and accounts registered, held, and operating in the Virgin Islands, and by filing documents with the Government of the Virgin Islands.

11.  Defendant, the Estate of Jeffrey E. Epstein ("Estate"), created upon Epstein's death, is domiciled in the Virgin Islands. On August 15, 2019, Defendants Indyke and Kahn filed a Petition for Probate and Letters Testamentary which included Epstein's last will and testament with the Probate Division of the Superior Court of the Virgin Islands.

12.  The Petition reported the value of the real and personal property in The Estate located in the Virgin Islands at $577,672,654.00 dollars.

13.  According to the Petition, the assets in the Virgin Islands thus far included:

    a.  $56.5 million in cash;

    b.  $127 million in fixed income and equity investments;

    c.  $195 million in hedge fund and private equity investments; and

    d.  $18.5 million in planes, boats, and automobiles.

The Estate did not originally value his fine arts, antiques, and other valuables.

14.  The Estate also included shares of various corporate entities which hold residences and real property used by Epstein, namely:

    a.  Brownstone in New York City valued at $56 million;

    b.  Ranch in New Mexico valued at $72 million;

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **4** of **76**

     c.   Gated home in Palm Beach, Florida, valued at $12 million;

     d.   Seven units in an apartment building in Paris, valued at $8 million; and

     e.   Great St. James and Little St. James, collectively valued at $86 million.

15.     At the time of this Second Amended Complaint filing, the Estate's most recent accounting, filed February 1, 2021, valued its total assets at $240,782,955.84, which is almost 60% lower than the Estate's starting valuation less than 18 months earlier when Defendants Indyke and Kahn began their Co-Executorship of the Estate.

16.     The Estate is responsible to pay penalties and damages for the acts committed by Epstein and the Epstein Enterprise described below.

17.     Defendant The 1953 Trust ("The Trust") was created by Epstein, who "amended and restated" its terms only two days before his suicide. That same day, Epstein revised his Last Will and Testament, transferring all of his "property, real and personal, wherever situated" to The Trust. The Trust also contains Epstein's financial assets and is also responsible to pay damages for the acts committed by Epstein and the Epstein Enterprise described below. Defendants Indyke and Kahn, filed a Certificate of Trust in the Superior Court of the Virgin Islands for The Trust on August 26, 2019.

18.     Epstein maintained a deliberately complex web of Virgin Islands corporations, limited liability companies, foundations, and other entities, not all of which are yet known to the Government of the Virgin Islands, through which he carried out and concealed his criminal conduct.

19.     Epstein regularly created new entities in the territory and transferred properties and funds between them in order to preserve and shield Epstein's assets and to facilitate and conceal the unlawful acts described in this Complaint.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **5** of **76**

20.     These entities held properties, including Little St. James and Great St. James, at which Epstein trafficked and sexually abused women and underage girls. Epstein owned and arranged for private planes, helicopters, boat and automobiles to transport victims to, from, and within the Virgin Islands, and provided money to pay these young women and underage girls.

21.     Epstein sat at the hub of this web, serving as president, member, manager, or director of each of the entities and, upon information and belief, directing their activities.

22.     Defendant, Nautilus, Inc., is a corporation established and organized under the laws of the Virgin Islands. It was incorporated on November 22, 2011.

23.     According to records of the Virgin Islands Recorder of Deeds, Nautilus, Inc. owns Little St. James, a/k/a Parcel Number 109803010100, a parcel of 3.1 million square feet valued at $3.2 million, with buildings and improvements valued at $4 million.

24.     Epstein was president and director of Nautilus, Inc., which corporate filings describe as "holding property for personal use." Defendants Indyke and Kahn are the secretary and treasurer of Nautilus, Inc., respectively. The Estate values Epstein's holdings of Nautilus, Inc., which holds title to Little St. James at $63.9 million.

25.     A deed recorded with the Virgin Islands Recorder of Deeds on December 30, 2011 reflects that the property was transferred from a Delaware entity, L.S.J., LLC, to Nautilus, Inc. for "TEN DOLLARS ($10.00) and other good and valuable consideration." The quitclaim deed lists Jeffrey Epstein as the sole member of L.S.J., LLC, which it acquired Little Saint James via a warranty deed dated April 27, 1998.

26.     As described below, Epstein engaged in a pattern and practice of trafficking and sexually abusing young women and female children on this private, secluded island of Little St. James where Epstein and his associates could avoid detection of their illegal activity from Virgin

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **6** of **76**

Islands and federal law enforcement and prevent these young women and underage girls from

leaving freely and escaping the abuse.

27.    Thus, Nautilus, Inc. participated in carrying out, facilitating and concealing

Epstein's crimes, hence Little St. James became an instrumentality of those crimes.

28.    Defendant, Great St. Jim, LLC, is a limited liability company established and

organized under the laws of the Virgin Islands. Great St. Jim, LLC was organized on October 26,

2015. Great St. Jim, LLC, according to records of the Virgin Islands Recorder of Deeds, owns at

least three properties that make up Great St. James acquired on January 28, 2016: Parcel Number

109801010100, consisting of 3.5 million square feet and valued at $17.5 million; Parcel Number

109801010200, consisting of 450,000 square feet of land, valued at $2.8 million; and Parcel

Number 109801010300, 1.2 million square feet of land, valued at $2.7 million. According to a

warranty deed filed with the Virgin Islands Recorder of Deeds, Epstein, through Great St. Jim,

LLC, acquired the last two parcels for $5 million each.

29.    Epstein is listed as manager and a member of Great St. Jim, LLC and the nature of

its business is described as "holding assets." Upon information and belief, Epstein purchased

these Great St. James properties—the island with closest proximity to Little St. James—to further

shield his conduct on Little St. James from view, prevent his detection by law enforcement or the

public, and allow him to continue and conceal his criminal enterprise. Epstein's significant

investment in the purchase of Great St. James demonstrates his intent to expand his illegal

operation in the Virgin Islands for years to come. Thus, Great St. Jim, LLC participated in

carrying out, concealing, facilitating and continuing Epstein's crimes, and Great St. James became

an instrumentality of those crimes.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **7** of **76**

30.     Defendant, Poplar, Inc., is a corporation established and organized under the laws of the Virgin Islands. Poplar, Inc. was incorporated on November 22, 2011. Epstein was president and director of Poplar, Inc., and its purpose was described in corporate filings as "holding property for personal use." Defendants Indyke and Kahn are secretary and treasurer of Poplar, Inc., respectively.

31.     A certificate of incumbency provided to the Department of Planning and Natural Resources ("DPNR") also lists Epstein as president of Poplar, Inc. and expressly authorizes the incorporators to conduct "transactions related to permitting matters submitted on behalf of Great St. Jim, LLC."

32.     Poplar, Inc. is listed as the signatory for the 2017 Annual Report for Great St. Jim, LLC, and the signature appears to be Epstein's. The Petition for Probate and Letters Testamentary filed by The Estate lists Poplar, Inc. as holding title to Great St. James. Thus, Poplar, Inc. participated in carrying out, concealing, facilitating and continuing Epstein's crimes.

33.     Defendant, Plan D, LLC is a limited liability company established and organized under the laws of the Virgin Islands. In its original Articles of Organization, filed October 19, 2012, and Annual Report filings, Epstein's pilot, Larry Visoski, was listed as Plan D, LLC's sole manager/member. However, the July 31, 2019 Annual Report revealed Epstein as the principal behind Plan D, LLC.

34.     Upon information and belief, Plan D, LLC owns one or more of the airplanes and helicopters that Epstein used to transport young women and children to and from the Virgin Islands to carry out the criminal pattern of activity described below. Among the airplanes owned by Plan D, LLC is a Gulfstream with N-number N212JE. Flight logs and travel notices indicate

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **8** of **76**

that Epstein used this plane to traffic and transport and young women and underage girls to the

Virgin Islands.

35.     Defendant, Hyperion Air, LLC is a limited liability company established and

organized under the laws of the Virgin Islands on October 19, 2012. Jeffrey Epstein is a

manager/member of Hyperion Air, LLC, along with his pilot, Larry Visoski. The purpose of

Hyperion Air, LLC is listed in its Annual Report as "holding assets."

36.     Hyperion Air, LLC is the registered owner of a Bell helicopter with N-number

N331JE and a Keystone helicopter with N-number N722JE. Upon information and belief,

Epstein used these helicopters to transport young women and underage girls between St. Thomas

and Little St. James.

37.     Defendant Southern Trust Company, Inc. was originally incorporated in the Virgin

Islands on November 18, 2011 as Financial Informatics, Inc., but changed its name to Southern

Trust Company in September 2012. Southern Trust Company is a tenant at American Yacht

Harbor in Red Hook, St. Thomas, and Epstein is a "passive investor" in IGY-AYH, d/b/a

American Yacht Harbor. By the end of 2013, according to its corporate filings, Southern Trust

Company has assets of $198.5 million; four years later, its assets reached $391.3 million. From

2011 until at least 2018, Jeffrey Epstein was the President/Director of Southern Trust Company,

and Defendants Kahn and Indyke were Treasurer/Director and Secretary/Director, respectively.

Epstein was the sole owner of Southern Trust Company.

38.     Defendant Cypress, Inc. is a Virgin Islands corporation that was formed and first

licensed in or about November 2011. As of December 31, 2018, Epstein was listed as

President/Director and Defendants and Co-Executors Indyke and Kahn were listed, respectively,

as Vice President/Secretary/Director and Treasurer/Director of Cypress, Inc. Cypress, Inc. owns

the property 49 Zorro Ranch Road in Stanley, New Mexico, which was transferred to it in or about December 2011, shortly after it was incorporated.

39.     Defendant Maple, Inc. is a Virgin Islands corporation that was formed and first licensed in or about November 2011. As of December 31, 2018, Epstein was listed as President/Director and Defendants and Co-Executors Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Maple, Inc.  Maple, Inc. owns the property 9 East 71st Street in New York, New York, which was transferred to it on or about December 23, 2011, shortly after it was incorporated.

40.     Defendant Laurel, Inc. is a Virgin Islands corporation that was formed and first licensed in or about November 2011.  As of December 31, 2018, Epstein was listed as President/ Director and Defendants and Co-Executors Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Laurel, Inc.  Laurel, Inc. owns the property 358 Brillo Way in Palm Beach, Florida, which was transferred to it in or about December 2011, shortly after it was formed.

41.     John and Jane Does represent individuals and entities whose identities or involvement with Epstein are currently unknown. The Government of the Virgin Islands will amend the Complaint to add these individuals and entities when discovered.

42.     The Attorney General brings this action to seek all remedies available to the Government of the Virgin Islands in enforcing its laws and protecting the public interest and public safety. These claims are distinct from, and are not intended to supplant, the claims of victims who were unconscionably harmed by Jeffrey Epstein and his associates.

## FACTUAL ALLEGATIONS
### A.    The Conduct of the "Epstein Enterprise" in the Virgin Islands

43.    Epstein and his associates, including Defendants, identified and recruited female victims, including children, and transported them to the Virgin Islands where they were abused and injured. Epstein, through and in association with Defendants, trafficked, raped, sexually assaulted and held captive underage girls and young women at his properties in the Virgin Islands.

44.    Epstein created a network of companies and individuals who participated in and conspired with him in a pattern of criminal activity related to the sex trafficking, forced labor, sexual assault, child abuse, and sexual servitude of these young women and children. Epstein and his associates trafficked underage girls to the Virgin Islands, held them captive, and sexually abused them, causing them grave physical, mental, and emotional injury.

45.    To accomplish his illegal ends, Epstein formed an association in fact with multiple Defendants and others (both companies and individuals) who were willing to participate in, facilitate, and conceal Epstein's criminal activity in exchange for Epstein's bestowal of financial and other benefits, including sexual services and forced labor from victims.

46.    This illicit association of Epstein, Defendants, and his associates constitute what is referred to herein as the "Epstein Enterprise." Epstein's associates in the Epstein Enterprise, including, but not limited to, those named as Defendants knowingly facilitated, participated in, and concealed Epstein's illegal conduct.

47.    Epstein used his wealth and power to create the Epstein Enterprise which engaged in a pattern of criminal activity in the Virgin Islands by repeatedly procuring and

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **11** of **76**

subjecting underage girls and young women to unlawful sexual conduct, sex trafficking, and forced labor.

48.     The Epstein Enterprise engaged in a pattern of criminal activity in the Virgin Islands (and elsewhere) with the criminal purpose and goal of placing a steady supply of vulnerable female children and young women into sexual servitude in service of Epstein's desires, and those of his associates. The Epstein Enterprise maintained and made available young women and underage girls for the purpose of engaging them in forced labor and sexual activities and used coercion and deception to procure, abuse, and harbor its victims.

49.     Flight logs and other sources establish that between 2001 and 2019 the Epstein Enterprise transported underage girls and young women to the Virgin Islands, who were then taken via helicopter or private vessel to Little St. James where they were then deceptively subjected to sexual servitude, forced to engage in sexual acts and coerced into commercial sexual activity and forced labor.

50.     In furtherance of its criminal activities, the Epstein Enterprise used its aircrafts to transport the young women and underage girls to the Virgin Islands for purposes of sexual abuse and exploitation.

51.     The Epstein Enterprise facilitated and participated in the sexual molestation and exploitation of numerous girls between the age of 12 and 17 years old.

52.     On the pretext of providing modeling opportunities, careers and contracts, associates of the Epstein Enterprise, funded by the Epstein Enterprise, lured and recruited young women and underage girls to travel to locations including the Virgin Islands where, upon information and belief, based on the pattern and practice of the Epstein Enterprise, they were sexually abused and exploited.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **12** of **76**

53.     Associates in the Epstein Enterprise recruited both victims and abusers into the

Epstein Enterprise, participated in sexual acts of rape and abuse of minors and witnessed

Epstein and others engage in sexual acts with children.

54.     As recent as 2018, air traffic controllers and other airport personnel reported

seeing Epstein leave his plane with young girls some of whom appeared to be between the age

of 11 and 18 years.

55.     Upon information and belief, based on Epstein's pattern of trafficking and

sexually abusing young girls, the Epstein Enterprise trafficked and abused these girls, and

others, in the Virgin Islands through 2018.

56.     When sued in civil court for committing sex trafficking and sex crimes, Epstein

never denied engaging in sexual acts with underage females and procuring underage females for

prostitution, but instead consistently invoked his Fifth Amendment privilege against self-

incrimination.

57.     Upon information and belief, the Epstein Enterprise kept a computerized list of

underage girls who were in or proximate to the Virgin Islands, and able to be transported to

Epstein's residence at Little St. James in the Virgin Islands.

58.     The Epstein Enterprise engaged in a pattern of criminal conduct by trafficking

children and young women and placing them in sexual servitude and forced labor in the Virgin

Islands. The Epstein Enterprise repeatedly violated 14 V.I.C. §§ 133 to 138, which prohibit

trafficking and sexual abuse. The Epstein Enterprise also repeatedly violated laws against child

abuse and neglect, including 14 V.I.C. § 505, which defines the crime of child abuse as knowingly

or recklessly causing "a child to suffer physical, mental, or emotional injury," or causing a child to

be placed in a situation where such injury is foreseeable, and 14 V.I.C. § 506, which applies, as

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **13** of **76**

here, where the child suffers serious physical, mental, or emotional injury as a result of that abuse.
The harm to Epstein's victims was both fully foreseeable and deeply damaging.

59.     The Epstein Enterprise knowingly recruited, transported, transferred, harbored,
received, procured, obtained, isolated, maintained, and enticed young women and girls to
engage in forced labor (such as providing massages) and, ultimately, sexual servitude at his little
St. James residence.

60.     A 15-year old victim was forced into sexual acts with Epstein and others and then
attempted to escape by swimming off the Little St. James Island. Epstein and others organized a
search party that located her and kept her captive by, among other things, confiscating her passport.
Another victim, who was first engaged in provide massages to Epstein, was then forced to
perform sexual acts at Little St. James in the Virgin Islands. When she attempted to escape the
"private island," Epstein and a search party found her, returned her to his house, and suggested
physical restraint or harm if she failed to cooperate.

61.     Another victim was flown by Epstein and his associates to New York or Palm
Beach and then to the Virgin Islands dozens of times from 2004, when she was age 20, to 2017.
She was repeatedly abused by Epstein and also was pressed to have sex with Epstein's business
colleagues.

62.     During the latter part of this period, she was forced into an arranged marriage to
another victim that was facilitated by Defendant/Co-Executor Indyke to prevent the other victim
from being deported. Indyke and a New York immigration lawyer retained by Epstein prepared
the victim for communications with U.S. immigration officials almost immediately after the
wedding. Defendant/Co-Executor Kahn provided a letter of reference for the immigration
proceeding. When the victim inquired about ending the marriage and leaving Epstein's circle,

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **14** of **76**

Indyke repeatedly tried to talk her out of a divorce and threatened that she would lose Epstein's

and his associates' protection.

63.     The Epstein Enterprise forced at least three separate arranged marriages, in each

case requiring American female victims to marry foreign victims to avoid their deportation.  The

victims were coerced into to participating in these arranged marriages, and understood that there

would be consequences, including serious reputational and bodily harm, if they refused to enter

a marriage or attempted to end it.  In each instance, Indyke and Kahn knowingly facilitated the

fraudulent and coerced marriages, performing and securing the legal and accounting work

involved and enabling a fraud that would further bind Epstein's victims to him and enable

Epstein to continue to control and abuse these victims sexually.

64.     The Epstein Enterprise deceptively lured underage girls and women into its

sex trafficking ring with money and promises of employment, career opportunities and

school assistance. The Epstein Enterprise preyed on their financial and other vulnerabilities,

and promised victims money, shelter, gifts, employment, tuition and other items of value.

For example, participants in the Epstein Enterprise targeted young and underage females

under the pretext that they would be paid substantially merely to provide massages to him

and others. However, once drawn in, victims were then pressured and coerced to engage in

sexual acts.

65.     The Epstein Enterprise forced underage victims to recruit others to perform

services and engage in sexual acts—a trafficking pyramid scheme.

66.     The Epstein Enterprise paid girls for each "meeting," with additional money if

they brought additional girls. Epstein reportedly required three meetings per day.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **15** of **76**

67.     The Epstein Enterprise used the term "work" as a code for sexual abuse, and, upon information and belief, reportedly kept computer records of the contact information for the victims.

68.     Consistent with his creation and use of a complex web of entities to carry out and conceal the criminal trafficking enterprise in the Virgin Islands, the Epstein Enterprise sometimes paid young women and underage girls he exploited and trafficked through his charitable foundations.

69.     Once the girls and women were recruited, participants in the Epstein Enterprise enforced their sexual servitude of victims by coercion, including but not limited to, confiscating passports, controlling and extinguishing external communications, and threatening violence. They also made fraudulent statements to family members of victims, claiming victims were being well cared for and supported financially in college and other educational opportunities.

70.     One of the victims, who was flown by Epstein and his associates to the Virgin Islands dozens of times up until as late as 2017, described how Epstein exercised strict control over her and other victims' activity. The girls had to give notice if they left the main residence and were kept to a rigid set of roles and rules. Epstein brought victims to business meetings, where they were often required to massage his feet or run errands. Victims had to use Epstein-approved doctors and sign consent forms for access to their medical records. Epstein also required them to give him their email passwords.  Each of these was a means of demonstrating and reinforcing his control over the women and girls.

71.     During this time period through 2017, this victim observed a succession of girls and young women who were transported to Little St. James and while there were called into Epstein's office or sauna to engage in sexual acts.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **16** of **76**

72.     Another victim, who was brought to Little St. James more than 50 times during the years 2000 to 2002, when she was 17 to 19 years old, was required to have sexual relations with "guests" of Epstein, and was subjected to sexual abuse virtually every day, and on some days, multiple times a day by Epstein or his guests.

73.     This victim, too, observed a large number of young women and girls around Epstein at Little St. James. Many of them did not speak English, which was Epstein's preference since they spoke less.

74.     Epstein sent these victims out to night clubs or on shopping trips to try to identify and recruit other young women and girls, at times paying them a fee for each recruit.

75.     The Epstein Enterprise transported, held, sexually abused, trafficked, and concealed women and children at his property in the Virgin Islands dozens of times over nearly two decades.

**B.     Defendants and Co-Executors Indyke and Kahn were Instrumental to the Epstein Enterprise's Human Trafficking and Financial Fraud.**

76.     Defendants Kahn and Indyke organized, controlled, and directed almost every aspect of the Epstein Enterprise. They were officers in virtually every corporate entity that Epstein created to fund and conceal his activities.  They were deeply involved in the financial activities of the Epstein-owned entities, including those of Defendant Southern Trust Company, which made clear that Southern Trust did not provide the services described to the Government as the basis for tax incentives that allowed Epstein to fraudulently obtain more than $80 million from the Government.

77.     Defendants Indyke and Kahn also directed, approved, enabled, and justified millions of dollars in payments that fueled the Epstein Enterprise's sex trafficking, including

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **17** of **76**

payments to women who were forced to have sex with Epstein and/or recruited others to be

victimized.  Defendants Indyke and Kahn obtained large and frequent stocks of cash for Epstein

which, based on public knowledge, would have funded Epstein's cash payments for

"massages"—code for forced sex.

78.     Defendants Indyke and Kahn participated with Epstein in coercing his sex

trafficking victims, in at least three cases, to enter into arranged and forced marriages in order to

obtain immigration status for the foreign women so that they could continue to be available to

Epstein for his abuse – a doubly-deep assault on their will and dignity.  Defendant Kahn

provided a letter of reference for at least one immigration application and tax services to the

spouses, and Defendant Indyke paid the immigration lawyer who applied for citizenship for the

women and threatened at least one who indicated that she would seek a divorce.  They used

their professional skills and authority to carry out this abhorrent scheme.

79.     Indyke and Kahn were, in short, the indispensable captains of Epstein's criminal

enterprise, roles for which they were richly rewarded.

80.     Defendants Kahn and Indyke controlled and directed the activities of the other

entities and personal bank accounts of Epstein accounts after they were funded.  One, and

frequently both, of them were officers or directors of Butterfly Trust; of companies holding

Epstein's real property (as laid out below); and of ████████████████████; ██████████

████████; FT Real Estate Inc.; Gratitude America, Inc.; ████████████████; J. Epstein Virgin

Islands Foundation, Inc.; Jeepers, Inc.; Mort, Inc.; Nautilus, Inc.; and Zorro Development

Corporation; among others.

81.     Along with their officer and director roles, Defendants Kahn and/or Indyke also

had signatory authority over virtually all of the accounts held by the Epstein Enterprise entities,

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **18** of **76**

which allowed them to personally authorize and sign off on payments totaling hundreds of

thousands of dollars to the Enterprise's sex-trafficking and abuse victims, including those who

also acted as recruiters, and other expenses including legal fees, apartment rent, and tuition.

Further, they routinely withdrew cash in various ways, including ATMs, checks, or by

converting U.S. Dollars to Euros.  In many instances, Kahn and/or Indyke structured these

transactions in order to evade the bank's reporting requirements.

82.     Defendant Kahn also oversaw the accounting and tax reporting for the other

entities in the Epstein Enterprise.  As discussed below the "Tree entities," Laurel, Maple, and

Cypress, filed materially false and misleading financial statements by not including the

properties in other states they owned or related expenses.  These financial statements were

submitted to the Office of Lieutenant Governor of the Virgin Islands and signed by Defendant

Kahn.  In addition, in 2013, Defendant Kahn also directed the outside accountant not to report

the properties on their respective tax returns.

83.     The J. Epstein Virgin Islands Foundation, Inc. (the "Foundation") is a 501(c)(3)

tax-exempt private foundation that was founded in June 2000 and registered in the Virgin

Islands.

84.     As of October 23, 2007, Indyke was listed as President of the Foundation. ██

███████████████████████████████████████████

85.     Between September 2015 and June 2019, Indyke ████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████ made

over a period of more than three and a half years until the middle of 2019.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **19** of **76**

86.     In November 2017, Indyke 

87.     These payments were inconsistent with the charitable purpose of the Foundation and designed to serve the private benefit and criminal activities of Epstein and the Epstein Enterprise.

88.     Earlier in 2017, Indyke signed a Foundation check for $160,000 to resolve a fine Epstein had incurred for construction on Great St. James Island that violated Virgin Islands environmental regulations and attempted to make the payment appear to be a charitable donation.  Over two years later, the Estate had to repay this amount to the Foundation after questions were raised to Epstein's lawyer about the propriety of the Foundation payment.

89.     With help from Indyke and Kahn, Epstein established and operated separate businesses through which he could pay victims and recruiters, and, upon information and belief, which he used to maintain their immigration status.

90.     ▮▮▮▮▮▮▮▮▮▮ is a New York Limited Liability Company, the Articles of Organization of which were filed in November 2014. The Articles list ▮▮▮, who was forced and coerced to have sex with Epstein, ▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮ was manipulated, exploited, and controlled by the Epstein Enterprise.

91.     According to ▮▮▮ operating agreement, Kahn was to be the initial Manager of the company, with full and complete authority, power, and discretion to do all things necessary or convenient to manage, control, and carry out the business. Kahn also had signatory authority for ▮▮▮ bank accounts.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **20** of **76**

92.     One of ▓▓▓▓ bank accounts was funded entirely with money transferred from Epstein's personal bank accounts.

93.     ▓▓▓▓ payroll was paid to two persons, one of whom was the listed sole owner. Kahn gave conflicting reports to ▓▓▓▓ bank about the second person on the company's payroll and the reasons for its payments to her. Once, he described her as an ▓▓▓▓▓▓▓▓▓, which would justify the payments in light of ▓▓▓▓ purported line of business, but which appears to have been false. The other time, Kahn described this payroll recipient ▓▓▓▓▓▓, which would not justify ▓▓▓▓▓▓ payments to her, but which appears to be true.

94.     LSJE, LLC is a Virgin Islands Limited Liability Company that was organized on October 27, 2011.  Defendants Indyke and Kahn were authorized signatories on the company's checking account.

95.     Indyke and Kahn signed company checks for combined value of almost $300,000 made out personally to young women or to, again, the immigration lawyer in New York who was involved in one or more forced marriages arranged among Epstein's victims to secure a victim's immigration status.

96.     Upon information and belief, after his guilty plea in Florida for soliciting prostitution from a minor, Epstein began to focus on procuring and abusing women from Eastern Europe.  These women's immigration status and language barriers made them more isolated, dependent, and vulnerable to Epstein's abuse and manipulation.

97.     The Butterfly Trust is a trust created for the benefit of numerous persons who performed work for Epstein, including numerous young women with Eastern European surnames and also including Indyke and Kahn themselves. Indyke and Kahn were authorized signatories on the Trust's checking account.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **21** of **76**

98.     Indyke and Kahn signed trust checks for combined value of over $1,000,000 made out personally to young women, or their associated entities, who in some instances were not beneficiaries of the trust.

99.     Defendants and Co-Executors Indyke and Kahn also were deeply involved with transactions made in and out of Epstein's personal accounts, for which Indyke had signatory authority, that were flagged by bank representatives and the New York Department of Financial Services as potentially suspicious.

100.    Indyke also engaged in repeated transactions that seem designed to have provided Epstein with cash in small enough increments to avoid triggering financial reporting requirements.  It is well known that Epstein paid girls and women in cash for sexual encounters that began as or were euphemistically described as massages, or for recruiting other girls to provide such massages.

101.    On July 20, 2016, Indyke brought two checks to a branch teller window for withdrawal, one for $7,500 drawn on Epstein's personal account and one for $4,000 drawn on Indyke's business account.  Indyke presented the $7,500 check for cashing and stated that he would be cashing the other check the next business day to avoid all the paperwork.  On July 21, 2016, Indyke returned to cash the $4,000 check.

102.    From June 2018 to February 2019, there was a series of 97 separate withdrawals of $1,000 made from this account at an ATM that is a short walk from Indyke's law office.

103.    From this same account, Indyke wrote 11 checks, between April 2016 and April 2019, for the purpose of converting U.S. dollars to Euros totaling over $126,000.  Some of the checks contained the notation "Euros for safe."

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **22** of **76**

104.     Also, Indyke withdrew large amounts of cash in single transactions. For
instance, on January 17, 2018, Indyke cashed a check for $100,000.  Although Indyke cashed
the check, Kahn arranged with the Bank representative to have the cash ready for pickup.

105.     Payments from this account, for which Indyke had signatory authority, totaling
over $2,500,000 were made to dozens of women with Eastern European surnames, purportedly
for hotel expenses, tuition, and rent, and to, again, the immigration lawyer in New York who was
involved in one or more forced marriages arranged among Epstein's victims to secure victims'
immigration status.

106.     For another of Epstein's personal accounts with the same bank, Indyke, from
2014 to 2016, made almost 45 separate check-cashing withdrawals at a pace of two to three per
month, each for the amount of $7,500, which was the bank's limit for third-party withdrawals.

107.     From this same account, between June 2014 and September 2015, Indyke wrote
eight checks for the purpose of converting U.S. dollars to Euros.  Each of the checks to
effectuate the conversion approximated $7,500, presumably in order to evade reporting
requirements, with some containing the notation "Euros for safe."

108.     Payments from this account totaling over $1,000,000 were made to dozens of
women with Eastern European surnames and to, again, the immigration lawyer in New York
who was involved in one or more forced marriages arranged among Epstein's victims to secure
a victim's immigration status.

109.     Indyke made wire transfers from another of Epstein's personal accounts with a
different bank totaling almost ███████ between November 2016 and July 2019 (just before
Epstein's arrest) to ████████████████████████████████
████████████████████████████.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **23** of **76**

110.     From another of Epstein's personal accounts with another different bank, for

which ██████████████, someone acting on Epstein's behalf made a total of ██

███████████████████████████████████████████████████████████████████████████

███████████████

111.     Payments from this account totaling almost ████████████████████████

████████████████████████████████████████.

112.     Upon information and belief, based on their authority for the accounts, their

interactions with the relevant banks, and records indicating that they made or approved the

transactions, these payments could have only been made with the knowledge and/or at the

direction of Indyke and Kahn.

113.     The sheer complexity of the infrastructure that Epstein set up and maintained

with the participation of Kahn and Indyke suggest their unlawful purpose.  Based on the

Government's current knowledge, Epstein, with Kahn and Indyke, held and managed at least

140 different bank accounts for Epstein and Epstein-owned entities, many of which existed only

to transfer payments to other entities and accounts.

114.     Kahn and Indyke profited substantially from their relationship with Epstein.

The amount of their payments is further evidence of the illicit nature of the work they

performed.

115.     From 2011 to 2019, Epstein and Epstein-owned entities paid over ███████████

██ to Defendant/Co-Executor Indyke, and over ██████████ to Defendant/Co-Executor

Kahn.  This includes ████████████████████████████████████████.  Based

on records obtained so far, ████████████████████████████████████████████

████████████████████████.

116.    Indyke and Kahn were paid through multiple entities, including HBRK

Associates, Inc. (Kahn), Coatue Enterprises, LLC (Kahn), Birch Tree BR, LLC (Indyke)

Harlequin Dane, LLC (Indyke) and Darren K Indyke, PLLC, which functioned as shell

companies and engaged in no activities other than to coordinate the activities of Epstein's

Enterprise, including the receiving and sending money to other entities they held.

117.    Since they were appointed as Co-Executors of the Epstein Estate in 2019,

Defendants Indyke and Kahn have approved the release of Estate funds to pay for the legal fees

and costs of persons who—like the Co-Executors themselves—are alleged herein to have

participated in the criminal activity of the Epstein Enterprise.

## C.  The "Epstein Enterprise" Abused Privileges of Residency to Carry out its Criminal Scheme

118.    The Epstein Enterprise in 1998 acquired Little St. James in the Virgin Islands as

the perfect hideaway and haven for trafficking young women and underage girls for sexual

servitude, child abuse and sexual assault. Little St. James is a secluded, private island, nearly

two miles from St. Thomas with no other residents. It can be visited only by private boat or

helicopter; no public or commercial transportation is available to carry persons on or off the

island, and no bridge connects the island to St. Thomas. Epstein had easy access to Little St.

James from the private airfield on St. Thomas, only 10 minutes away by his private helicopter,

but the women and children he trafficked, abused, and held there were not able to leave without

his permission and assistance, as it was too far and dangerous to swim to St. Thomas.

119.    In 2016, upon information and belief, using a straw purchaser to hide Epstein's

identity, the Epstein Enterprise acquired Great St. James the nearest island to Little St. James. By

then, Epstein was a convicted sex offender. Upon information and belief, the Epstein Enterprise

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **25** of **76**

purchased the island for more than $20 million because its participants wanted to ensure that the

island did not become a base from which others could view their activities or visitors. By acquiring

ownership and control of Great St. James to the exclusion of others, the Epstein Enterprise created

additional barriers to prevent those held involuntarily on Little St. James from escaping or

obtaining help from others.

120.    Great St. James and Little St. James are environmentally sensitive locations, with

native coral and wildlife protected by federal and territorial law and enforcement authorities. The

Department of Planning and Natural Resources ("DPNR") regulates and monitors construction in

the Coastal Zone to protect, maintain and manage the precious natural resources of the Virgin

Islands. Under its authority, DPNR repeatedly issued citations and assessed thousands of dollars

of fines for violations of the Virgin Islands construction code and environmental protection laws

on both Little St. James and Great St. James—significant penalties to the agency and to the

average resident of the Virgin Islands. But because of Epstein's enormous wealth, these fines had

little effect in curbing or stopping the Epstein Enterprise's unlawful conduct or conforming its

activities to the law.

121.    As a result of illegal construction activity of the Epstein Enterprise, the Virgin

Islands has incurred, and will incur, significant expenses to remove the illegal construction or

remediate its effects on natural resources in and around Little St. James and Great St. James. The

extent of the potential environmental damage is unknown at this time as the illegal construction

has not been removed or remediated.

122.    The Epstein Enterprise continues to attempt to prevent or limit DPNR authorities

from conducting random inspections on the Little St. James and Great St. James necessary to

comply with Virgin Islands law.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **26** of **76**

123.     The Epstein Enterprise's violation of the construction and environmental laws was part of a pattern of behavior in flouting the laws of the Virgin Islands and holding itself above the law. Upon information and belief, as described above, the Epstein Enterprise undertook construction at Great St. James after 2016 to continue the scheme to carry out and conceal his trafficking and sexual abuse of young women and children in the Virgin Islands. These actions are also indicative of the Epstein Enterprise's disregard for Virgin Islands' law. The Epstein Enterprise used the Virgin Islands' land, resources, people, and laws for its illicit purposes. Rather than participating lawfully in this community, the Epstein Enterprise took advantage of the secluded nature of the islands in furtherance of its crimes.

124.     As a result of its deplorable and unlawful conduct, the Epstein Enterprise has subjected the Virgin Islands to public portrayals as a hiding place for human trafficking and sex crimes.

### D. The "Epstein Enterprise" Fraudulently Concealed its Conduct

125.     The Epstein Enterprise fraudulently concealed its actions to prevent detection by the Government of the Virgin Islands.

126.     The secluded properties at Little St. James and Great St. James were repeatedly used by the Epstein Enterprise as the locations for unlawfully soliciting, transporting, transferring, harboring, receiving, providing, isolating, patronizing, maintaining, deceiving, coercing, and sexually abusing young women and children and concealing these crimes.

127.     The Epstein Enterprise was able to hide the trafficking ring from law enforcement, despite the fact that Epstein was a registered sex offender. Given the isolation of the Little St. James and Great St. James and the nature of the crimes and of the victims targeted by the Epstein Enterprise, the activities of the Epstein Enterprise were not readily detectable.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **27** of **76**

Moreover, Epstein's great wealth and power likely made witnesses reluctant to report their

observations to the local law enforcement.

128.     Upon information and belief, the Epstein Enterprise prevented its employees from

cooperating with law enforcement. Employees and others were required to sign confidentiality

agreements that prohibited them from speaking to or sharing information with law enforcement.

If they were contacted by law enforcement they were to notify the Epstein Enterprise and be

represented by Epstein's counsel.

129.     The employees were directed not to communicate or interact with guests visiting

Little St. James and were also directed not to disclose to anyone events that occurred on the island.

130.     Monitoring a sex offender with his own private islands and the resources to fly

victims in and out on private planes and helicopters presented unique challenges and allowed the

Epstein Enterprise to limit scrutiny by the Government of the Virgin Islands.

131.     Sexual Offender Registration and Community Protection Act ("SORCPA") 14

V.I.C. § 1721, *et. seq.* requires sex offenders to register in their resident jurisdictions and to make

periodic in-person appearances to verify and update their registration information.

132.     Epstein renewed his registration each year in the Virgin Islands. In addition,

beyond this statutory requirement, the Virgin Islands periodically visited—or attempted to

visit—Little St. James to conduct additional address verifications.

133.     At his last verification in July 2018, Epstein refused to permit Virgin Islands

Department of Justice Investigators, assisted by United States Marshals, to enter Little St. James

beyond its dock, claiming that the dock was his "front door." Instead, Epstein arranged to be met

at his office on St. Thomas.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **28** of **76**

134.    Epstein also misled the Government regarding his travel plans. On March 19, 2019,

the Virgin Islands was notified that Epstein would be traveling to France for 10 days on the private

plane owned by Plan D, LLC. His notification form did not disclose travel to any other countries. It

was later found by law enforcement authorities that Epstein also travelled to Vienna and Monaco

during that trip.

135.    Similarly, the Epstein Enterprise sought to prevent DPNR from conducting

routine site visits to inspect unpermitted and potentially damaging construction activity on Great

St. James. The Epstein Enterprise repeatedly objected to DPNR's inspections referring to them as

"invasions" of Epstein's constitutional right to privacy in his home, which he described defined

as the entire island. These DPNR inspections are required for all construction and Virgin Islands

residents are required to cooperate with the inspections to assure compliance with the law

throughout the construction phases.

136.    These efforts represent Epstein Enterprise's intent to conceal its unlawful activity

on Little St. James and Great St. James.

137.    The Epstein Enterprise also created numerous corporations and limited liability

companies in the Virgin Islands to help conceal its unlawful activity. Most of these companies were

created in 2011 and 2012, soon after Epstein registered as a sex offender in the Virgin Islands.

138.    Epstein's pilot, Larry Visoski is identified as member or co-member in companies

that serviced and maintained the planes that the Epstein Enterprise used to traffick young women

and children — Freedom Air Petroleum, LLC (registered November 28, 2011 to hold assets);

and JEGE, LLC (registered October 19, 2012 to hold assets).

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **29** of **76**

139.    Other Epstein entities include LSJ Employees, LLC (registered October 27, 2011
to provide services); Southern Financial, LLC (registered February 25, 2013 to provide services)
and LSJ Emergency, LLC (registered December 2, 2015 to provide services).

140.    Some of these companies held considerable assets: Financial Informatics, Inc.
(incorporated November 18, 2011, also known as Southern Trust Company, Inc.) had assets of
approximately $391 million in 2015; and Financial Trust Company, Inc. (incorporated November
6, 1998) had assets of $212 million when it publicly filed its last balance sheet in 2012.

141.    Though often absent in the original incorporation or registration documents or
annual filings, Epstein ultimately appeared as president, director, manager, or sole member of
each of these companies. Upon information and belief, the purpose of this complex array of
corporate entities—some of which may still be discovered—was to allow Epstein to shelter his
assets in order to fund, carry out, and conceal his identity and pattern of criminal conduct.

142.    The Estate continues to engage in a course of conduct aimed at concealing the
criminal activities of the Epstein Enterprise. On November 24, 2019, Epstein's Estate filed an
Expedited Motion for Establishment of a Voluntary Claims Resolution Program in the Superior
Court of the Virgin Islands. ("Motion"). According to the Motion, the proposed program was to
be designed to "establish an independent and voluntary claims resolution program for purposes
of resolving sexual abuse claims against Jeffrey E. Epstein." (Motion, at 1).

143.    The program proposed by the Estate, whose executors are trustees of The 1953
Trust and officers in at least two Epstein entities, imposes confidentiality requirements and
requires any claimant accepting an award under the program to sacrifice any other claims against
"any person or entity arising from or related to Mr. Epstein's conduct." (Motion, at 5). It acts to

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **30** of **76**

conceal the criminal activities of the Epstein Enterprise and shield its participants from liability

and accountability for the injury they caused to the victims.

144.    The Estate also refused to agree to preserve documents or to release individuals

from the non-disclosure agreements.

145.    Two days before his death, Epstein amended The Trust and his Last Will and

Testament. Upon information and belief, he did so, as part of a pattern and ongoing effort to

conceal and shield his assets from potential recovery by claimants.

### E. The "Epstein Enterprise" Violated Numerous Virgin Islands Laws

146.    The pattern of criminal activity engaged in by Epstein and other participants in

the Epstein Enterprise violated 14 V.I.C. §§ 605 and 607 of the Criminally Influenced and

Corrupt Organizations Act ("CICO").

147.    The Epstein Enterprise also violated Title 14, Chapter 3A, The Virgin Islands

Uniform Prevention of and Remedies for Human Trafficking Act relating to Trafficking of

Persons; Title 14, Chapter 24, relating to Child Protection and Child Abuse and Neglect; Title

14, Chapter 81, relating to Prostitution and Related Offenses; Title 18, Chapter 85, relating to

Rape and Sexual Assault and other related offenses, as well as other Virgin Islands laws.

148.    The Epstein Enterprise violated Virgin Islands laws by engaging in the human

trafficking of underage girls and young women and commercial sex with young women and

underage girls by force, fraud, enticement, or coercion, which serve as predicates to the Epstein

Enterprise's violations of CICO.

149.    Certain participants who recruited women and underage girls to be trafficked

and forced into sexual servitude themselves were sexually trafficked and abused by the Epstein

Enterprise and may be afforded the protections of 14 V.I.C. § 145.

150. Specifically, Plan D, LLC knowingly and intentionally facilitated the trafficking scheme by flying underage girls and young women into the Virgin Islands to be delivered into sexual servitude. Plan D LLC repeatedly made flights from the mainland to St. Thomas with Epstein and underage girls and young women for the purpose of engaging in sexual activity on Little St. James. On some occasions, they would transport Epstein and female children by helicopter to Little St. James. On other occasions, Epstein and the young women and girls would be transported by boat.

151. Great St. Jim, LLC and Nautilus, Inc. knowingly participated in the Epstein Enterprise and facilitated the trafficking and sexual servitude of young women and underage girls by providing the secluded properties at, from, or to which Epstein and his associates were able to transport, transfer, receive, maintain, isolate, harbor, provide, entice, deceive, coerce, and sexually abuse underage girls and young women.

152. The Epstein Enterprise engaged in a continuing course of unlawful conduct.

153. After Epstein's suicide, the Epstein Enterprise continued to exist as each of the participants continued to conspire to prevent detection of the breadth and scope of the Epstein Enterprise's criminal wrongdoing and to prevent accountability. These conspiratorial acts are ongoing.

154. The conduct of the Epstein Enterprise offends the core purpose of the Virgin Islands Uniform Prevention of and Remedies for Human Trafficking Act, 14 V.I.C. §131 *et seq,* and violates CICO, enacted to "curtail criminal activity and lessen its economic and political power in the Territory of the Virgin Islands by establishing new penal prohibitions and providing to law enforcement and the victims of criminal activity new civil sanctions and remedies." 14 V.I.C. § 601.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **32** of **76**

155.    The Epstein Enterprise is an illicit enterprise within the meaning of 14 V.I.C. §§ 604 and 605.

156.    The Government is entitled to recover civil penalties, damages and other remedies and to extinguish and recoup from the Epstein Enterprise and its participants any and all financial and other benefits, and any personal and real property that was used during the course of, or intended for use in the Course of the conduct or criminal activity in violation of the laws of the Virgin Islands. The Government is entitled to obtain through divestiture, forfeiture, or other equitable relief all properties and instrumentalities used by the Epstein Enterprise in the criminal pattern of trafficking and sexual abuse in the Virgin Islands, including but not limited to Great St. James and Little St. James, and all other remedies and penalties permitted by law in the interest of justice.

## F. The Epstein Enterprise Used Corporate Entities to Defraud the Government and Fund its Criminal Activities

### 1.   Defendant Southern Trust Company, Inc.

157.    In October 2012, the Southern Trust Company applied for economic benefits from the Economic Development Commission ("EDC"). The EDC is a subsidiary of the Virgin Islands Economic Development Authority ("EDA"), a semi-autonomous governmental instrumentality created and governed pursuant to 29 VIC § 1101.

158.    In sworn testimony at a public hearing on the tax incentive application conducted by the EDC on November 15, 2012, Epstein and his attorney, Ericka Kellerhals, described Southern Trust Company as providing "cutting edge consulting services" in the area of "biomedical and financial informatics."

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **33** of **76**

159. The EDC granted Southern Trust Company a 10-year package of economic incentives running from February 1, 2013 until January 31, 2023 that included a 90% exemption from income taxes and 100% exemptions from gross receipts, excise, and withholding taxes in the Virgin Islands.

160. Between 2013 and 2019, Southern Trust Company employed 13 different individuals (not including Epstein). Of those 13 individuals, 11 served in administrative or support roles: six as personal, administrative, or executive assistants, receptionists, or as a driver/helper, one as an office manager, one as a clerk, and three in accounting or payroll functions (though only one was licensed as a certified public accountant). There was one network administrator/IT manager, and a second who was added in 2019.

161. In fact, several of those individuals seemed to perform other personal services for Jeffrey Epstein. Though he was reported by Southern Trust Company to be resident of the Virgin Islands, the network administrator/IT manager was issued a Florida driver's license, which listed an address in Miami. Further, he appears, in fact, to have served as Epstein's driver and picked up luggage and cargo from Epstein's private planes on his behalf.

162. Another executive assistant lived at 301 E. 66th Street, Apartment 11B, New York, New York. Epstein's address book lists various units in this building as providing "Apt. for models" and she is publicly identified as a model. As noted above, the Epstein Enterprise used modeling opportunities and contracts as a pretext for recruiting underage girls and young women into its sex trafficking scheme.

163. Financial records more recently obtained show that the employee described above whom Kahn represented to be, alternatively, ███████████████, was *also* a

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **34** of **76**

██████████████████████████, which did not actually or even pretend to perform

either ██████████████████████, in 2019.

164.     During several time periods, Southern Trust Company affirmed to EDC that it

had no employees who were non-residents, even though it employed non-residents.

165.     Southern Trust company does not appear to have had any clients and performed

no visible informatics services. According to financial records, it held no investments for others.

Instead, its employees performed tasks related to any number of other Epstein-owned companies

or properties, such as Little St. James.

166.     Despite having no visible clients and only one full-time employee working on

information technology during the bulk of the period, Southern Trust Company reportedly

generated net income of $50.3 million in 2013, $67.5 million in 2014, $52.8 million in 2015, and

$4.8 million in 2016 and $17.1 million in 2017, with aggregate income of $117.8 million in 2014,

$170.6 million in 2015, $175.3 million in 2016 and $192.4 million in 2017, or aggregate income

for the period of $656 million.

167.     Money received by Southern Trust was then funneled, frequently by Defendant

Indyke as authorized signatory, and often with copies given to Defendant Kahn, through other

Epstein-owned entities and accounts, funding payments to foreign women and for credit cards,

airplanes, and other instrumentalities of the Epstein Enterprise.

168.     In fact, the main source of funds for the Epstein Enterprise came from Southern

Trust. Between 2013 and 2017, Southern Trust reported approximately $184 million in

revenues.

169.     Defendants Kahn and Indyke directed and controlled the day-to-day activities of

Southern Trust in form and in substance, serving as members of its Board of Directors, along

with Epstein.  Indyke was a signatory on Southern Trust's primary bank account to which funds

were wired, primarily from a single source, as described below.  Kahn, as Southern Trust's

treasurer, oversaw its accounting, invoicing, and tax reporting.  Indyke also authorized a

majority of the wire transfers from Southern Trust's bank account in order to fund the various

entities and personal bank accounts of Epstein, and had full inquiry capabilities over the

account.

170.    Bank records show that virtually all of Southern Trust Company's income came

from a single source (including related entities).

171.    In all, the single source paid $158 million to Defendant Southern Trust Company

from 2013 to 2017, which constitutes 85% of the total revenues reported by Southern Trust

Company.  These funds appear to have not been used to pay for informatics or datamining

services.

172.    These payments to Southern Trust were the main source of funds for Epstein's

Enterprise.  Indeed, no other entity in Epstein's Enterprise generated revenues.  Funds received

from the single source were funneled, at the direction of Kahn and Indyke, to Epstein's personal

accounts, and other Epstein entities to fund his criminal activities.

173.    For the period between January 1, 2013 and December 31, 2017, Southern Trust

Company received tax exemptions totaling $73.6 million.

174.    As of December 31, 2017, Southern Trust Company, Inc. elected to file its

income tax as an S-corporation, which elects to pass corporate income, losses, deductions and

credits through to its sole shareholder—Jeffrey Epstein—for tax purposes. For this time period,

Epstein's income tax exemption was $71.3 million.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **36** of **76**

175.    Including gross receipt taxes, the Government currently estimates that, as a result of the EDC incentive, Epstein was able to avoid paying $80,576,236 in taxes.

176.    Based upon these facts, it is clear that Southern Trust Company did not perform the "informatics" business represented to the EDC and could not have generated the business income attributable to that business. Instead, upon information and belief, Southern Trust Company existed to secure tax benefits for Epstein, to employ individuals associated with the Epstein Enterprise, and to provide a source of income to support his criminal activities and properties in the Virgin Islands.

### 2.    Defendants Cypress, Inc.; Maple, Inc.; and Laurel, Inc.

177.    Epstein formed Cypress, Inc.; Maple, Inc.; and Laurel, Inc. as Virgin Islands corporations in or about November 2011.

178.    As of December 31, 2018, Epstein was listed as President Director and Defendants and Co-Executors Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of each of Cypress, Inc.; Maple, Inc.; and Laurel, Inc.

179.    Defendant Cypress, Inc. acquired ownership of the property 49 Zorro Ranch Road in Stanley, New Mexico in or about December 2011, shortly after Cypress was formed.

180.    Defendant Maple, Inc. acquired ownership of the property 9 East 71st Street in New York, New York on or about December 23, 2011, shortly after Maple was formed.  Maple acquired ownership of the property from Nine East 71st Street Corporation, which was owned by Epstein.

181.    Defendant Laurel, Inc. acquired ownership of the property 358 Brillo Way in Palm Beach, Florida in or about December 2011, shortly after Cyrpess was formed.  Laurel acquired ownership of the property from Epstein personally.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **37** of **76**

182.    Epstein appears to have maintained divided ownership of these properties,
transferred ownership of them to the Virgin Islands, and then concealed this fact even from
Virgin Islands authorities in an attempt to shield the properties from any judgment in the states
where they are located.

183.    The financial statements submitted by each of these three Defendant corporations
to the Office of Lieutenant Governor of the Virgin Islands were false and misleading due to their
failure to include the above properties owned by each company or the related expenses incurred
by each company, such as property taxes.

184.    For instance, Cypress's Balance Sheet as of December 31, 2018 did not reflect
any assets other than cash of $18,824. Further, Cypress reported only $301 in expenses for the
year ended December 31, 2018, despite it paying ███████████████████████
██████████████.

185.    Similarly, in 2017, Cypress reported as its only asset cash in the amount of
$29,736 and expenses of $150, despite it paying ████████████████████████
██████████████████.

186.    Similarly, for the tax years 2011 through 2016, Cypress did not include the value
of the New Mexico property in the total assets it reported and did not include any expenses
related to the New Mexico property in the total expenses it reported to the Government.

187.    Likewise, Maple's balance sheet as of December 31, 2018 did not reflect any
assets other than cash of $21,265. Further, Maple reported only $300 in expenses for the year
ended December 31, 2018, despite it paying █████████████████████████
████████.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **38** of **76**

188.     Similarly, in 2017, Maple reported as its only asset cash in the amount of
$18,281 and expenses of $150, despite it paying ████████████████████████████
█████████████████████████.

189.     Similarly, for the tax years 2011 through 2016, Maple did not include the value
of the New York property in the total assets it reported and did not include any expenses related
to the New York property in the total expenses it reported to the Government.

190.     Likewise, Laurel's balance sheet as of December 31, 2018 did not reflect any
assets other than cash in the amount of $20,155. Further, Laurel reported only $300 in expenses
for the year ended December 31, 2018, despite it paying ███████████████████████
█████████████████████████.

191.     Similarly, in 2017, Laurel reported as its only asset cash in the amount of
$37,129 and expenses of $150, despite it paying ████████████████████████████
████████████.

192.     Similarly, for the tax years 2011 through 2016, Laurel did not include the value
of the Palm Beach property in the total assets it reported and did not include any expenses related
to the Palm Beach property in the total expenses it reported to the Government.

193.     Neither Cypress's, Maple's, nor Laurel's financial statements ever reflected the
reality of the above assets held or the above expenses incurred by each entity.

194.     The Annual Reports submitted on behalf of Cypress, Maple, and Laurel all were
signed by Epstein and Defendant and Co-Executor Kahn with the representation that "ALL
STATEMENTS CONTAINED IN THIS APPLICATION, AND ANY ACCOMPANYING
DOCUMENTS, ARE TRUE AND CORRECT . . ."

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **39** of **76**

195.     In fact, Indyke and Kahn knew or should have known that their attestations were false.  Upon information and belief, particularly given the absence of any other justification for these transactions and the fraudulent nature of their reporting, these transactions were made for the sole purpose of sheltering these assets from collection.

**STATUTES OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FROM ASSERTING STATUTES OF LIMITATIONS AS DEFENSES**

**1.     Equitable Estoppel and Fraudulent Concealment**

196.     Defendants are equitably estopped from relying upon a statute of limitations defense for conduct that occurred prior to the limitation period because they undertook active efforts to deceive the Government and to purposefully conceal their unlawful conduct and fraudulently assure public authorities that their conduct was in compliance with the laws, all with the goal of avoiding punishment.

197.     Defendants were deliberate in taking steps to conceal their criminal sex trafficking and abuse conduct and their fraudulent conduct in obtaining unearned tax benefits from the Government.  Defendants' acts of concealment include, but are not limited to, the following.

198.     Defendants used Epstein's secluded island of Little St. James and his later purchase of the nearby island of Great St. James to shield their trafficking and sexual abuse of young women and female children from detection by law enforcement authorities and to prevent their victims from escaping.

199.     Defendants used Epstein's private aircraft to transport young women and female children to the Virgin Islands and to Little St. James while limiting public observation of this trafficking activity.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **40** of **76**

200.    Defendants used Epstein's businesses and ostensibly charitable foundations in

the Virgin Islands to make payments to the victims who were trafficked and sexually abused

while concealing these payments from detection by law enforcement authorities.

201.    Defendants also prevented Epstein Enterprise entity employees from cooperating

with law enforcement by requiring them to sign confidentiality and non-disclosure agreements.

202.    Defendants also actively obstructed law enforcement by denying investigators

access to Little St. James beyond its boat dock.



206.    Defendants also concealed their fraud on the Government in obtaining unearned

tax benefits by providing false testimony and submitting false and inaccurate reporting to the

Economic Development Commission to prevent detection of Defendant Southern Trust

Company's non-compliance with requirements concerning the nature of its business and the

residency of the persons it employed.

207.    The discovery of the nature, scope, and magnitude of Defendants' unlawful

conduct and could not have been acquired earlier through the exercise of reasonable diligence.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **41** of **76**

## 2.     Continuing Violations

208.     The continuous criminal conduct by the Defendants has caused repeated and continuous injury.

209.     Defendants criminal trafficking and sexual abuse of young women and female children in the Virgin Islands occurred continuously from Epstein's purchase of Little St. James in 1998 through his arrest and death in prison in 2019.

210.     Flight logs and other sources establish that between 2001 and 2019, Defendants transported young women and female children to the Virgin Islands, where they were then transported by private helicopter or boat to Little St. James.

211.     Air traffic controllers and airport personnel have reported seeing, as recently as 2018, Epstein leaving his private jet with young girls who appeared to be between the ages of 11 and 18 years.

212.     One victim was brought by Defendants more than 50 times between 2000 and 2002, when she was around 18 to 20 years old, to Little St. James, where she was required to have sexual relations with Epstein or his guests multiple times per day and where she saw large numbers of other young women and female children subject to the same treatment.

213.     Another victim was brought by Defendants dozens of times between 2004 and 2017 to Little St. James, where she too observed a succession of young women and female children who likewise were transported to the island and were required to have sexual relations with Epstein and his guests.

214.     Defendants' fraud on the Government in obtaining unearned tax benefits through Defendant Southern Trust Company likewise was continuous inasmuch as Southern Trust's failure to perform the informatics services that it represented to the Economic Development

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **42** of **76**

Commission and its false reporting of the residency and job descriptions of its employees were

continuous from the start of the tax benefits in 2013 through Epstein's arrest and death in prison

in 2019.

215.     The continued criminal conduct by Defendants has caused repeated and

continuous injury.  The criminal conduct of the Epstein Enterprise was not completed nor were

all damages incurred until the wrongdoing ceased.

**COUNT ONE**
**Human Trafficking — Trafficking an Individual**
**Violation of the Criminally Influenced and Corrupt Organizations Act ("CICO"),**
**14 V.I.C. § 600 *et seq*. and 14 V.I.C § 133**

216.     The Government restates and realleges paragraphs 1 to 215 of this Complaint as

if fully set forth herein.

217.     At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

218.     The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including, but not limited to, knowingly

recruiting, transporting, transferring, harboring, receiving, providing, obtaining, isolating,

maintaining, or enticing female children and young women in the furtherance and performance

of forced labor, sexual servitude and commercial sexual activity in violation of Virgin Islands

laws codified in 14 V.I.C. §§ 133-138.

219.     Defendants through a pattern of criminal activity acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

220.     Defendants benefited, directly and indirectly, from the pattern of criminal

activity conducted by the Epstein Enterprise.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **43** of **76**

221.    At all times material herein, Defendants engaged in said pattern of criminal

activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO.14 V.I.C. §600 *et seq.*

## COUNT TWO
### Human Trafficking — Trafficking an Individual
### Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C § 133

222.    The Government restates and realleges paragraphs 1 to 221 of this Complaint as

if fully set forth herein.

223.    At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting human trafficking.

224.    Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy by recruiting, transporting, transferring, harboring, receiving, providing,

obtaining, isolating, maintaining or enticing female children and young women in the

furtherance and performance of forced labor, sexual servitude and commercial sexual activity in

violation of Virgin Islands laws codified in 14 V.I.C. § 133 -138.

225.    Defendants knowingly benefited financially and/or obtained other non-financial

value from participation in the Epstein Enterprise, which has engaged in human trafficking,

forced labor, sexual servitude and commercial sexual activity of girls and young women in

knowing or reckless disregard of the laws of the Virgin Islands.

226.    At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **44** of **76**

227.    At all times material herein, Defendants engaged in said pattern of criminal

activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation

of CICO. 14 V.I.C. §600 *et seq.*

## COUNT THREE
### Human Trafficking — Forced Labor
### Violation of the Criminally Influenced and Corrupt Organizations Act,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C § 134

228.    The Government restates and realleges paragraphs 1 to 227 of this Complaint as

if fully set forth herein.

229.    At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

230.    The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including, but not limited to, knowingly

using coercion to compel underage girls and young women to provide labor or services by

forced labor in violation of 14 V.I.C. § 134.

231.    The Epstein Enterprise knowingly provided or obtained the labor services of

individuals by means of force, threats of force, physical restraint, and/or threats of physical

restraint; by means of serious harm or threats of serious harm; by means of abuse or threatened

abuse of law or legal processes; and by means of the Epstein Enterprise with the intent to cause

individuals to believe that, if individuals did not perform such labor or services, individuals

would suffer serious harm or physical restraint.

232.    Defendants through a pattern of criminal activity directly and indirectly

participated in or associated with the Epstein Enterprise, an illicit enterprise.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **45** of **76**

233.    Defendants through a pattern of criminal activity acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

234.    Defendants benefited, directly and indirectly, from the pattern of criminal

activity conducted by the Epstein Enterprise.

235.    At all times material herein, Defendants engaged in said pattern of criminal

activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation

of CICO. 14 V.I.C. §600 *et seq.*

**COUNT FOUR**
**Human Trafficking — Forced Labor**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C § 134**

236.    The Government restates and realleges paragraphs 1 to 235 of this Complaint as

if fully set forth herein.

237.    At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting human trafficking.

238.    Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy by knowingly using coercion to compel underage girls and young

women to provide labor or services by forced labor in violation of 14 V.I.C. § 134.

239.    Defendants knowingly benefited financially and/or obtained other non-financial

value from participation in the Epstein Enterprise, which has engaged in human trafficking,

forced labor, sexual servitude and commercial sexual activity of girls and young women in

knowing or reckless disregard of the laws of the Virgin Islands.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **46** of **76**

240.     At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

241.     At all times material herein, Defendants engaged in said pattern of criminal

activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation

of CICO. 14 V.I.C. §600 *et seq.*

## COUNT FIVE
## Human Trafficking — Sexual Servitude
## Violation of the Criminally Influenced and Corrupt Organizations Act,
## 14 V.I.C. § 600 *et seq.* and 14 V.I.C § 135

242.     The Government restates and realleges paragraphs 1 to 241 of this Complaint as

if fully set forth herein.

243.     At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

244.     The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including, but not limited to, knowingly

maintaining or making available minors for the purpose of engaging the minors in commercial

sexual activities or using coercion or deception to force young women to engage in commercial

sexual activity in violation of 14 V.I.C. § 135.

245.     On the pretext of providing modeling opportunities, careers and contracts,

Defendants facilitated the transporting or recruiting of young women and girls or lured and

recruited young women and underage girls to travel to the Virgin Islands where they engaged in

sexual acts with Epstein and others. In some instances, young women and underage girls were

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **47** of **76**

given scholarships, money, gifts or other items of value in exchange for engaging in sexual acts

with Epstein and others.

246.     Defendants through a pattern of criminal activity directly and indirectly

participated in or associated with the Epstein Enterprise, an illicit enterprise.

247.     Defendants through a pattern of criminal activity acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

248.     Defendants benefited, directly and indirectly, from the pattern of criminal

activity conducted by the Epstein Enterprise.

249.     At all times material herein, Defendants engaged in said pattern of criminal

activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation

of CICO. 14 V.I.C. §600 *et seq.*

**COUNT SIX**
**Human Trafficking — Sexual Servitude**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C § 135**

250.     The Government restates and realleges paragraphs 1 to 249 of this Complaint as

if fully set forth herein.

251.     At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting human trafficking.

252.     Each Defendant engaged in acts that revealed its intent to join the criminal

conspiracy by knowingly maintaining or making available minors for the purpose of engaging

the minors in commercial sexual activities or using coercion or deception to force young women

to engage in commercial sexual activity in violation of 14 V.I.C. § 135.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **48** of **76**

253.     On the pretext of providing modeling opportunities, careers and contracts, Defendants facilitated the transporting or recruiting of young women and girls or lured and recruited young women and underage girls to travel to the Virgin Islands where they engaged in sexual acts with Epstein and others. In some instances, young women and underage girls were given scholarships, money, gifts or other items of value in exchange for engaging in sexual acts with Epstein and others.

254.     Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude and commercial sexual activity of girls and young women in knowing or reckless disregard of the laws of the Virgin Islands.

255.     At all times material herein, each Defendant conspired with Epstein and other Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking, forced labor, and sexual servitude. 14 V.I.C. §604(j).

256.     At all times material herein, Defendants engaged in said pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO. 14 V.I.C. §600 *et seq.*

### COUNT SEVEN
**Human Trafficking — Patronizing Minors and Victims of Sexual Servitude
Violation of the Criminally Influenced and Corrupt Organizations Act,
14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 136-37**

257.     The Government restates and realleges paragraphs 1 to 256 of this Complaint as if fully set forth herein.

258.     At all times material herein, each Defendant directly and indirectly participated in or associated with the Epstein Enterprise, an illicit enterprise.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **49** of **76**

259.    The Epstein Enterprise engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by CICO, including, but not limited to, knowingly giving, agreeing to give, or offering to give items of value to young women and minors so that the young women and minors would engage in commercial sexual activity with Epstein, other Defendants, and other individuals in violation of 14 V.I.C. §§ 136-137.

260.    In some instances, young women and underage girls were given scholarships, money, gifts or other items of value in exchange for engaging in sexual acts with Epstein and others.

261.    Defendants through a pattern of criminal activity directly and indirectly participated in or associated with the Epstein Enterprise, an illicit enterprise.

262.    Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

263.    Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

264.     At all times material herein, Defendants engaged in said pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO 14 V.I.C. §600 *et seq.*

## COUNT EIGHT
### Human Trafficking — Patronizing Minors and Victims of Sexual Servitude
### Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 136-37

265.    The Government restates and realleges paragraphs 1 to 264 of this Complaint as if fully set forth herein

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **50** of **76**

266.    At all times material herein, each Defendant joined in a conspiracy to violate
laws prohibiting human trafficking.

267.    Each Defendant engaged in acts that revealed its intent to join and participate in
the criminal conspiracy by knowingly giving, agreeing to give, or offering to give items of value
to young women and minors so that the young women and minors would engage in commercial
sexual activity with Epstein, other Defendants, and other individuals in violation of 14 V.I.C. §§
136-137.

268.    In some instances, young women and underage girls were given scholarships,
money, gifts or other items of value in exchange for engaging in sexual acts with Epstein and
others.

269.    Defendants knowingly benefited financially and/or obtained other non-financial
value from participation in the Epstein Enterprise, which has engaged in human trafficking,
forced labor, sexual servitude and commercial sexual activity of girls and young women in
knowing or reckless disregard of the laws of the Virgin Islands.

270.    At all times material herein, each Defendant conspired with Epstein and other
Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,
forced labor, and sexual servitude.

271.    At all times material herein, Defendants engaged in said pattern of criminal
activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation
of CICO 14 V.I.C. §600 *et seq.*

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **51** of **76**

**COUNT NINE**

**Child Abuse and Neglect—All Defendants Except Darren K. Indyke and Richard D. Kahn
in Their Individual Capacities
Violation of the Criminally Influenced and Corrupt Organization Act,
14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 505, 506 and 507**

272.     The Government restates and realleges paragraphs 1 to 271 of this Complaint as
if as if fully set forth herein.

273.     At all times material herein, each Defendant directly and indirectly participated
in or associated with the Epstein Enterprise, an illicit enterprise.

274.     The Epstein Enterprise engaged in two or more occasions of conduct that
constitute criminal predicate acts as defined by CICO, including, but not limited to, knowingly
or recklessly causing a child to suffer physical, mental or emotional injury, or knowingly or
recklessly causing a child to be placed in a situation where it is reasonably foreseeable that such
child may suffer physical, mental or emotional injury, in violation Virgin Islands criminal laws
prohibiting Child Abuse and Neglect in Title 14 V.I.C. § 500 *et. seq.*

275.     As a result of the Epstein Enterprise's actions numerous young girls suffered
serious physical, mental and emotional injury.

276.     Defendants through a pattern of criminal activity acquired and maintained,
directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

277.     Defendants benefited, directly and indirectly, from the pattern of criminal
activity conducted by the Epstein Enterprise.

278.     At all times material herein, Defendants engaged in a pattern of criminal activity
that was not isolated but was related to the affairs of the Epstein Enterprise in violation of
CICO. 14 V.I.C. §600 *et seq.*

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **52** of **76**

**COUNT TEN**
**Child Abuse and Neglect**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act**
**—All Defendants Except Darren K. Indyke and Richard D. Kahn in Their Individual**
**Capacities,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 505, 506 and 507**

279.    The Government restates and realleges paragraphs 1 to 278 of this Complaint as if as if fully set forth herein.

280.    At all times material herein, each Defendant joined in a conspiracy to violate laws prohibiting child abuse and neglect.

281.    Each Defendant engaged in acts that revealed its intent to join and participate in the criminal conspiracy as they knowingly or recklessly caused a child to suffer physical, mental or emotional injury, or knowingly or recklessly caused a child to be placed in a situation where it is reasonably foreseeable that such child may suffer physical, mental or emotional injury, in violation Virgin Islands criminal laws prohibiting Child Abuse and Neglect in Title 14 V.I.C. § 500 *et seq.*

282.    As a result of Defendants' actions, numerous young girls suffered serious physical, mental and emotional injury.

283.    Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude and commercial sexual activity of girls and young women in knowing or reckless disregard of the laws of the Virgin Islands.

284.    At all times material herein, each Defendant conspired with Epstein and other Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking, forced labor, and sexual servitude. 14 V.I.C. §604(j).

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **53** of **76**

285.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

## COUNT ELEVEN
**Aggravated Rape—All Defendants Except Darren K. Indyke and Richard D. Kahn in
Their Individual Capacities
Violation of the Criminally Influenced and Corrupt Organization Act,
14 V.I.C. § 600 *et seq.* and 14 V.I.C § 1700a**

286.     The Government restates and realleges paragraphs 1 to 285 of this Complaint as

if fully set forth herein.

287.     At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

288.     The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including, but not limited to, conduct that

constituted or facilitated the rape of minors by force, intimidation, or the perpetrator's position

of authority over the victim.

289.     Epstein and others, using force or intimidation, engaged in sexual intercourse

with underage girls without their consent in violation of 14 V.I.C. § 1700a.

290.     As a result of the Epstein Enterprise's actions, numerous underage girls suffered

serious physical, mental and emotional injury.

291.     Defendants through a pattern of criminal activity acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

292.     Defendants benefited, directly and indirectly, from the pattern of criminal

activity conducted by the Epstein Enterprise.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **54** of **76**

293.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

**COUNT TWELVE**
**Aggravated Rape**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,**
**—All Defendants Except Darren K. Indyke and Richard D. Kahn in Their Individual**
**Capacities,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C § 1700a**

294.     The Government restates and realleges paragraphs 1 to 293 of this Complaint as

if fully set forth herein.

295.     At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting aggravated rape.

296.     Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy by engaging in conduct that constituted or facilitated the rape of minors

by force, intimidation, or the perpetrator's position of authority over the victim.

297.     Epstein and others, using force or intimidation, engaged in sexual intercourse

with underage girls without their consent in violation of 14 V.I.C. § 1700a.

298.     As a result of Defendants' actions, numerous underage girls suffered serious

physical, mental and emotional injury

299.     Defendants knowingly benefited financially and/or obtained other non-financial

value from participation in the Epstein Enterprise, which has engaged in human trafficking,

forced labor, sexual servitude and commercial sexual activity of girls and young women in

knowing or reckless disregard of the laws of the Virgin Islands.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **55** of **76**

300.     At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

301.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

### COUNT THIRTEEN
**Rape in the Second Degree—All Defendants Except Darren K. Indyke and Richard D.
Kahn in Their Individual Capacities
Violation of the Criminally Influenced and Corrupt Organization Act,
14 V.I.C. § 600 *et seq.* and 14 V.I.C § 1702
14 V.I.C. § 600 *et seq.* and 14 V.I.C § 1700a**

302.     The Government restates and realleges paragraphs 1 to 301 of this Complaint as

if fully set forth herein.

303.     At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

304.     The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including, but not limited to, conduct that

constituted or facilitated the rape of girls under 18 years of age.

305.     Epstein and others who engaged in rape were over 18 years old at the time of the

incidents.

306.     As a result of the Epstein Enterprise's actions, numerous minors suffered serious

physical, mental and emotional injury.

307.     Defendants through a pattern of criminal activity acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **56** of **76**

308.     Defendants benefited, directly and indirectly, from the pattern of criminal

activity conducted by the Epstein Enterprise.

309.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

## COUNT FOURTEEN
### Rape in the Second Degree
### Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,
### —All Defendants Except Darren K. Indyke and Richard D. Kahn in Their Individual Capacities,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C § 1702

310.     The Government restates and realleges paragraphs 1 to 309 of this Complaint as

if fully set forth herein.

311.     At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting rape in the second degree.

312.     Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy by engaging in conduct that constituted or facilitated the rape of girls

under 18 years of age.

313.     Epstein and others who engaged in rape were over 18 years old at the time of the

incidents.

314.     As a result of Defendants' actions, numerous minors suffered serious physical,

mental and emotional injury.

315.     Defendants knowingly benefited financially and/or obtained other non-financial

value from participation in the Epstein Enterprise, which has engaged in human trafficking,

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **57** of **76**

forced labor, sexual servitude and commercial sexual activity of girls and young women in

knowing or reckless disregard of the laws of the Virgin Islands.

316.     At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

317.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

**COUNT FIFTEEN**
**Unlawful Sexual Contact in the First or Second Degree—All Defendants Except Darren K.**
**Indyke and Richard D. Kahn in Their Individual Capacities**
**Violation of the Criminally Influenced and Corrupt Organization Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 1708 and 1709**

318.     The Government restates and realleges paragraphs 1 to 317 of this Complaint as

if as if fully set forth herein.

319.     At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

320.     The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including, but not limited to, using or

facilitating the use of force or coercion to accomplish sexual contact or engaging in sexual

contact with a minor between 13 and 16 years of age.

321.     Epstein and others who engaged in the sexual contact were over 18 years old at

the time of the incidents.

322.     As a result of the Epstein Enterprise's actions numerous young women and

minors suffered serious physical, mental and emotional injury.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **58** of **76**

323.    Defendants through a pattern of criminal activity acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

324.    Defendants benefited, directly and indirectly, from the pattern of criminal

activity conducted by the Epstein Enterprise.

325.    At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO

14 V.I.C. §600 *et seq.*

**COUNT SIXTEEN**
**Unlawful Sexual Contact in the First or Second Degree**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act**
**—All Defendants Except Darren K. Indyke and Richard D. Kahn in Their Individual**
**Capacities,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C §§ 1708 and 1709**

326.    The Government restates and realleges paragraphs 1 to 325 of this Complaint as

if as if fully set forth herein.

327.    At all times material herein, each Defendant joined in a conspiracy to violate

laws prohibiting unlawful sexual contact.

328.    Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy by using or facilitating the use of force or coercion to accomplish sexual

contact or engaging in sexual contact with a minor between 13 and 16 years of age.

329.    Epstein and others who engaged in the sexual contact were over 18 years old at

the time of the incidents.

330.    As a result of Defendants' actions, numerous young women and minors suffered

serious physical, mental and emotional injury.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **59** of **76**

331.    Defendants knowingly benefited financially and/or obtained other non-financial

value from participation in the Epstein Enterprise, which has engaged in human trafficking,

forced labor, sexual servitude and commercial sexual activity of girls and young women in

knowing or reckless disregard of the laws of the Virgin Islands.

332.    At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

333.    At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO

14 V.I.C. §600 *et seq.*

**COUNT SEVENTEEN**
**Prostitution and Keeping House of Prostitution**
**Violation of the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. § 600 *et seq.* and 14 V.I.C. §§ 1622, 1624**

334.    The Government restates and realleges paragraphs 1 to 333 of this Complaint as

if fully set forth herein.

335.    At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

336.    The Epstein Enterprise engaged in two or more occasions of conduct that

constitute criminal predicate acts as defined by CICO, including the engaging in or facilitating

the knowing and/or reckless abuse of minors through the acts alleged herein.

337.    The Epstein Enterprise knowingly persuaded, induced, enticed, and/or coerced

women and children to travel to the Virgin Islands to engage in prostitution and/or sexual

activity, and/or attempted to do the same.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **60** of **76**

338.    The Epstein Enterprise kept, maintained, and/or permitted his property at Little

St. James to be used for the purpose of prostitution, lewdness or assignation with knowledge or

reasonable cause to know the same.

339.    The Epstein Enterprise received or offered or agreed to receive women and

children at his property at Little St. James for the purposes of prostitution, lewdness or

assignation, and/or permitted women and children to remain there for such purposes.

340.    The Epstein Enterprise directed, took, transported, and or offered or agreed to

take or transport women and children to Little St. James with the knowledge or reasonable cause

to know that the purpose of such directing, taking or transporting was prostitution, lewdness or

assignation.

341.    The Epstein Enterprise knew or should reasonably have known that individuals

that were the subjects of the actions described in this Count were minors.

342.    As a result of Defendants' actions, numerous young women and minors suffered

serious physical, mental and emotional injury.

343.    Defendants through a pattern of criminal activity acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

344.    Defendants benefited, directly and indirectly, from the pattern of criminal

activity conducted by the Epstein Enterprise.

345.    At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **61** of **76**

## COUNT EIGHTEEN
### Prostitution and Keeping House of Prostitution
### Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C. §§ 1622, 1624.

346.    The Government restated and realleges paragraph 1 to 345 of this Complaint as if fully set forth herein.

347.    At all times material herein, each Defendant joined a conspiracy to laws against prostitution.

348.    Each Defendant engaged in acts that revealed its intent to join and participate in the criminal conspiracy by engaging in or facilitating the persuasion, inducement, enticement or coercion of women and children to travel to the Virgin Islands to engage in prostitution and/or sexual activity, and/or attempted to do the same; keeping, maintaining, and/or permitting Epstein's property at Little St. James, to be used for the purpose of prostitution, lewdness or assignation with knowledge or reasonable cause to know the same; receiving, offering, or agreeing to receive individuals at his property at Little St. James for the purposes of prostitution, lewdness or assignation, and/or permitted women and children to remain there for such purposes; and directing, taking, transporting, and/or offering or agreeing to take or transport women and children to Little St. James with the knowledge or reasonable cause to know that the purpose of such directing, taking or transporting was prostitution, lewdness or assignation, in violation of 14 V.I.C. §§ 1622 and 1624.

349.    Defendants knew or should reasonably have known that individuals that were the subjects of the actions described in this Count were minors.

350.    As a result of Defendants' actions numerous young women and minors suffered serious physical, mental and emotional injury.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **62** of **76**

351.     Defendants knowingly benefited financially and/or obtained other non-financial

value from participation in the Epstein Enterprise, which has engaged in human trafficking,

forced labor, sexual servitude and commercial sexual activity of girls and young women in

knowing or reckless disregard of the laws of the Virgin Islands

352.     At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

353.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO

14 V.I.C. §600 *et seq.*

## COUNT NINETEEN
### Sex Offender Registry—Estate of Jeffrey E. Epstein
### Violation of the Criminally Influenced and Corrupt Organizations Act,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C. § 1721 *et seq.*

354.     The Government restates and realleges paragraphs 1 to 353 of this Complaint as

if fully set forth herein.

355.     Epstein was required to, and did, register under the Virgin Islands Sexual

Offender Registration and Community Protection Act ("SORCPA") codified at 14 V.I.C. § 1721

*et seq.*

356.     SORCPA requires that offenders required to register provide information

relating to intended travel in foreign commerce.

357.     On at least two occasions, Epstein traveled to Vienna and Monaco without

disclosing that travel to the Virgin Islands sex offender registry.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **63** of **76**

358.     Epstein's failure to disclose this travel before, during, or even after his travel was

knowing.

359.     Epstein's violation SORPCA was part of a pattern of criminal activity that was

not isolated but was related to the affairs of the Epstein Enterprise. 14 V.I.C. §604(j).

### COUNT TWENTY
### Fraudulent Conveyance
### Violation of the Criminally Influenced and Corrupt Organizations Act,
### 14  V.I.C. § 600 *et seq.* and 14 V.I.C. §§ 832-833

360.     The Government restates and realleges paragraphs 1 to 359 of this Complaint as

if fully set forth herein.

361.     At all times material herein, each Defendant directly and indirectly participated

in or associated with the Epstein Enterprise, an illicit enterprise.

362.     Each Defendant engaged in two or more occasions of conduct that constitute

criminal predicate acts as defined by CICO, including, but not limited to transferring assets to

and between various entities controlled by Epstein and the Epstein Enterprise to avoid, defeat,

hinder or delay claims against them.

363.     Upon information and belief, in an effort to defeat the claims of creditors and

avoid the oversight of the court probating his estate, Epstein, days before his death, transferred

significant assets, including assets held by other Defendants, into The 1953 Trust.

364.     At the time of these transfers, Epstein had numerous actions pending against

him related to his trafficking and sexual assaults seeking financial judgments.

365.     Through these transfers, Epstein and the Epstein Enterprise fraudulently

removed property and effects beyond the jurisdiction of the probate court.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **64** of **76**

366.     Epstein and the Epstein Enterprise were parties to the fraudulent conveyance of the property, real or personal, and/or the interests or rights arising out of property, contracts, or conveyances of Epstein and the Epstein Enterprise.

367.     Epstein and the Epstein Enterprise acted with the intent to defeat, hinder, or delay creditors and claimants, including the Government of the Virgin Islands, in collecting on their judgements, debts and demands

368.     Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

369.     Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

370.     At all times material herein, Defendants engaged in a pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO. 14 V.I.C. §600 *et seq.*

## COUNT TWENTY-ONE
### Fraudulent Conveyance
### Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. § 600 *et seq.* and 14 V.I.C. §§ 832-833

371.     The Government restates and realleges paragraphs 1 to 370 of this Complaint as if fully set forth herein.

372.     At all times material herein, each Defendant joined in a conspiracy to commit fraudulent conveyances.

373.     Each Defendant engaged in acts that revealed its intent to join and participate in the criminal conspiracy, including, but not limited to, transferring assets to and between various

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **65** of **76**

entities controlled by Epstein and the Epstein Enterprise to avoid, defeat, hinder or delay claims against them.

374.    Upon information and belief, in an effort to defeat the claims of creditors and avoid the oversight of the court probating his estate, Epstein, days before his death, transferred significant assets, including assets held by other Defendants, into The 1953 Trust.

375.    At the time of this transfer, Epstein had numerous actions pending against him related to his trafficking and sexual assaults seeking financial judgments.

376.    Through this transfer, Epstein and the Epstein Enterprise fraudulently removed property and effects beyond the jurisdiction of the probate court.

377.    Epstein and the Epstein Enterprise were parties to the fraudulent conveyance of the property, real or personal, and/or the interests or rights arising out of property, contracts, or conveyances of Epstein and the Epstein Enterprise.

378.    Epstein and the Epstein Enterprise acted with the intent to defeat, hinder, or delay the Government of the Virgin Islands and other creditors and claimants to collect on their judgements, debts and demands.

379.    Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude and commercial sexual activity of girls and young women in knowing or reckless disregard of the laws of the Virgin Islands.

380.    At all times material herein, each Defendant conspired with Epstein and other Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking, forced labor, and sexual servitude. 14 V.I.C. §604(j).

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **66** of **76**

381.     At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

## COUNT TWENTY-TWO
### Civil Conspiracy

382.     The Government restates and realleges paragraphs 1 to 381 of this Complaint as

if fully set forth herein.

383.     Defendants acted in concert and joined with others to perform the wrongful acts

identified in Counts 1 to 13, among others, concealing the sexual abuse of minor females by

unlawful means.

384.     Each co-conspirator knew, or in the exercise of reasonable care should have

known, about the conduct of the others and about the common unlawful scheme.

385.     These unlawful acts could not have been carried to the length and extent

accomplished without the common understanding shared by Epstein and the Epstein Enterprise

Defendants.

386.     Each of the Defendants had a duty to report, stop or terminate the wrongful

conduct, but instead each Defendant concealed, assisted and furthered the wrongful acts by use

of civil conspiracy.

387.     As a direct and proximate result of Defendants' conspiracy, the Virgin Island has

been injured.

388.     Each co-conspirator is jointly and severally liable for the acts alleged herein.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **67** of **76**

## COUNT TWENTY-THREE
### Fraudulent Claims Upon the Government—Southern Trust Company, Inc.
### Violation of the Criminally Influenced and Corrupt Organizations Act,
### 14 V.I.C. § 600 *et seq.* and 14 V.I.C. § 843

389.    The Government restates and realleges paragraphs 1 to 388 of this Complaint as if fully set forth herein.

390.    At all times relevant and material herein, each Defendant directly and indirectly participated in or associated with the Epstein Enterprise, an illicit enterprise.

391.    Each Defendant engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by CICO, including, but not limited to, making fraudulent claims upon the Government.

392.    The Epstein Enterprise misrepresented the purpose, activities, employment, and income of the Southern Trust Company, Inc., in order to obtain and maintain valuable tax incentives in order to fund the criminal activities of the Epstein Enterprise. In addition, the Epstein Enterprise, with the active participation of Defendants Indyke and Kahn, used Southern Trust Company to employ, pay, and conceal the activities of participants in the criminal activities of the Enterprise.

393.    The Epstein Enterprise made and presented an application for tax incentives, testimony, and quarterly reports to the EDC, a commission of the Government, regarding the Southern Trust Company, knowing such claims to be false, fictitious, or fraudulent; knowingly and willfully falsified, concealed or covered up material facts regarding the Southern Trust Company; made false or fraudulent statements or representations about the purpose, activities, income, and employment of Southern Trust Company; and made and submitted false affidavits knowing the same to contain any fraudulent or fictitious statement or entry.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **68** of **76**

394.     These false statements and documents included affidavits, testimony, an application, and other documents that misrepresented that Southern Trust Company was engaged in, and failed to disclose it did not and could not carry out, in its stated purpose of providing consulting services in financial and biomedical informatics.

395.     Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking, forced labor, sexual servitude, and commercial sexual activity of underage girls and young women in knowing and reckless disregard of the laws of the Virgin Islands.

396.     Defendants through a pattern of criminal activity acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

397.     Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

398.     At all times material herein, Defendants engaged in a pattern of criminal activity that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO. 14 V.I.C. § 600 *et seq.*

### COUNT TWENTY-FOUR
**Fraudulent Claims Upon the Government—Southern Trust Company, Inc.**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,**
**14 VI.C. § 600 *et seq.* and 14 V.I.C. § 843**

399.     The Government restates and realleges paragraphs 1 to 398 of this Complaint as if fully set forth herein.

400.     At all times material herein, each Defendant joined in a conspiracy to commit fraudulent conveyances.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **69** of **76**

401.    Each Defendant engaged in acts that revealed its intent to join and participate in the criminal conspiracy, including, but not limited to, transferring assets to and between various entities controlled by Epstein and the Epstein Enterprise to avoid, defeat, hinder or delay claims against them.

402.    The Epstein Enterprise misrepresented the purpose, activities, employment, and income of the Southern Trust Company, Inc., in order to obtain and maintain valuable tax incentives in order to fund the criminal activities of the Epstein Enterprise. In addition, the Epstein Enterprise, with the active participation of Defendants Indyke and Kahn, used Southern Trust Company to employ, pay, and conceal the activities of participants in the criminal activities of the Enterprise.

403.    The Epstein Enterprise made and presented an application for tax incentives, testimony, and quarterly reports to the EDC, a commission of the Government, regarding the Southern Trust Company, knowing such claims to be false, fictitious, or fraudulent; knowingly and willfully falsified, concealed or covered up material facts regarding the Southern Trust Company; made false or fraudulent statements or representations about the purpose, activities, income, and employment of Southern Trust Company; and made and submitted false affidavits knowing the same to contain any fraudulent or fictitious statement or entry.

404.    These false statements and documents included affidavits, testimony, an application, and other documents that misrepresented that Southern Trust Company was engaged in, and failed to disclose it did not and could not carry out, in its stated purpose of providing consulting services in financial and biomedical informatics.

405.    Defendants knowingly benefited financially and/or obtained other non-financial value from participation in the Epstein Enterprise, which has engaged in human trafficking,

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **70** of **76**

forced labor, sexual servitude, and commercial sexual activity of underage girls and young

women in knowing and reckless disregard of the laws of the Virgin Islands.

406.    At all times material herein, each Defendant conspired with Epstein and other

Defendants to fulfill the primary criminal purposes of the Epstein Enterprise: human trafficking,

forced labor, and sexual servitude. 14 V.I.C. §604(j).

407.    At all times material herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of

CICO. 14 V.I.C. §600 *et seq.*

## COUNT TWENTY-FIVE
**Fraudulent Claims Upon the Government—Cypress, Inc.; Maple, Inc.; Laurel, Inc.**
**Violation of the Criminally Influenced and Corrupt Organizations Act,**
**14  V.I.C. §§ 600 *et seq.* and 14 V.I.C. § 843**

408.    The Government restates and realleges paragraphs 1 to 407 of this Complaint as if

fully set forth herein.

409.    At all times relevant and material herein, each Defendant directly and indirectly

participated in or associated with the Epstein Enterprise, an illicit enterprise.

410.    Each Defendant engaged in two or more occasions of conduct that constitute

criminal predicate acts as defined by CICO, including but not limited to making fraudulent

claims upon the Government.

411.    Defendants Cypress, Maple, and Laurel misrepresented the values of their assets

held and expenses incurred in their annual reporting to the Government of the United States

Virgin Islands for each of the tax years from 2011 to 2018.

412.    Defendant Cypress misrepresented the value of its assets held during each of these

years by omitting the value of the 49 Zorro Ranch Road, Stanley, New Mexico property that it

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **71** of **76**

acquired in or about December 2011, and misrepresented the value of its expenses incurred

during each of these years by omitting the annual amounts of property taxes it paid for the New

Mexico property.

413.    Defendant Maple misrepresented the value of its assets held during each of these

years by omitting the value of the 9 East 71st Street, New York, New York property that it

acquired in or about December 2011, and misrepresented the value of its expenses incurred

during each of these years by omitting the annual amounts of property taxes it paid for the New

York property.

414.    Defendant Laurel misrepresented the value of its assets held during each of these

years by omitting the value of the 358 Brillo Way, Palm Beach, Florida property that it acquired

in or about December 2011, and misrepresented the value of its expenses incurred during each of

these years by omitting the annual amounts of property taxes it paid for the Palm Beach property.

415.    Epstein and Defendant/Co-Executor Kahn signed each of Cypress, Maple, and

Laurel's annual reports for these years in which they represented that "ALL STATEMENTS

CONTAINED IN THIS APPLICATION, AND ANY ACCOMPANYING DOCUMENTS, ARE

TRUE AND CORRECT . . . ."

416.    Epstein appears to have maintained divided ownership of these properties,

transferred ownership of them to the Virgin Islands, and then concealed this fact even from

Virgin Islands authorities in an attempt to shield the properties from any judgment in the states

where they are located.

417.    Defendants' knowingly and willfully made false representations to the

Government regarding the assets and expenses of Cypress, Maple, and Laurel, and their conduct

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **72** of **76**

in failing to inform the Government of each company's true assets and expenses, constitute fraud

upon the Government. 14 V.I.C. § 843.

418.     Defendants, through a pattern of criminal activity, acquired and maintained,

directly or indirectly, an interest in or control of the Epstein Enterprise or of real property.

419.     Defendants benefitted directly and indirectly from the pattern of criminal activity

conducted by the Epstein Enterprise. Defendants knowingly benefitted financially and/or

obtained non-financial value from participation in the Epstein Enterprise, which has engaged in

human trafficking, forced sexual servitude, and commercial sexual activity of underage girls and

young women, in knowing and reckless disregard of the laws of the Virgin Islands.

420.     At all material times herein, Defendants engaged in a pattern of criminal activity

that was not isolated but was related to the affairs of the Epstein Enterprise in violation of CICO,

14 V.I.C. §§ 600 *et seq.*

**COUNT TWENTY-SIX**
**Fraudulent Claims Upon the Government—Cypress, Inc.; Maple, Inc.; Laurel, Inc.**
**Conspiracy to Violate the Criminally Influenced and Corrupt Organizations Act,**
**14 V.I.C. §§ 600 *et seq.* and 14 V.I.C. § 843**

421.     The Government restates and realleges paragraphs 1 to 420 of this Complaint as if

fully set forth herein.

422.     At all material times herein, each Defendant engaged in a conspiracy to commit

fraudulent conveyances.

423.     Each Defendant engaged in acts that revealed its intent to join and participate in

the criminal conspiracy, including, but not limited to, transferring assets to and between various

entities controlled by Epstein and the Epstein Enterprise to avoid, defeat, hinder, or delay claims

against them.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **73** of **76**

424.     These false statements and documents included annual financial statements for the
years 2011 to 2018 submitted by each Cypress, Maple, and Laurel to the Office of Lieutenant
Governor of the Virgin Islands that misrepresented the value of the assets held and the amount of
the expenses incurred by each company during each of these years.

425.     Epstein appears to have maintained divided ownership of these properties,
transferred ownership of them to the Virgin Islands, and then concealed this fact even from
Virgin Islands authorities in an attempt to shield the properties from any judgment in the states
where they are located.

426.     Defendants knowingly benefitted financially and/or obtained other non-financial
value from their participation in the Epstein Enterprise, which has engaged in human trafficking,
forced labor, sexual servitude, and commercial sexual activity of underage girls and young
women, in knowing and reckless disregard of the laws of the Virgin Islands.

## Notice of Allegation of
## PUNITIVE DAMAGES

427.     The purpose of punitive damages in the common law is to punish the defendant
for outrageous conduct that is reckless or intentional and to deter others from engaging in such
conduct in the future.

428.     This Complaint describes intentional conduct so egregious, persistent, and
injurious that it shocks the conscience and offends a civilized society.

429.     Punitive damages are especially important in the case of persons or companies
that have so money, assets, and power that mere fines, penalties, and economic damages are
simply not sufficient.

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **74** of **76**

430.    At all times material herein, Epstein and the Epstein Enterprise engaged repeatedly in wrongful acts which were intentional and outrageous. The Government gives notice that it intends to pursue the possibility of punitive damages in any jury verdict.

## PRAYER FOR RELIEF

**WHEREFORE,** the Government respectfully requests that the Court:

A.    Enter a judgment in favor of the Government and against Defendants on all counts;

B.    Declare that Defendants, through the Epstein Enterprise, have engaged in a pattern of criminal activity in the Virgin Islands including but not limited to human trafficking, forced labor and sexual servitude of female children and young women, unlawful sexual contact, child sexual abuse, child abuse and neglect, rape, prostitution civil conspiracy and other offenses related offenses, and civil conspiracy;

C.    Pursuant to 14 V.I.C. § 610, enforce and maintain the criminal activity liens the Government is filing contemporaneously with this lawsuit, or shall file in connection with this action;

D.    Pursuant to 14 V.I.C. § 607(a)(1) and 14 V.I.C. § 141, issue an order forfeiting and divesting in favor of the Government of the Virgin Islands all of Defendants' interests in any real and personal property used to facilitate the criminal enterprise carried out by the Epstein Enterprise, including but not limited to Little St. James Island and Greater St. James Island;

E.    Issue an order forfeiting to the Government of the Virgin Islands any proceeds or funds obtained by Defendants, whether directly or indirectly, during the course of the criminal activity of the Epstein Enterprise;

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **75** of **76**

F.      Pursuant to 14 V.I.C. § 607(a)(1), require Defendants to divest themselves of any

real property or other interests in favor of the Government of the Virgin Islands used to further

the goals of the Epstein Enterprise;

G.      Pursuant to 14 V.I.C. § 607(a)(3) and (5), order the dissolution of the Epstein

Enterprise, including but not limited to, order the dissolution of the corporate Defendants;

H.      Pursuant to 14 V.I.C. § 607(a)(2) enter an injunction to prevent the further

criminal conduct, and concealment of the criminal conduct, by the Epstein Enterprise;

I.      Pursuant to 14 V.I.C. § 607(a)(4), order the revocation of any and all licenses,

permits and approvals that had been granted by any agency of the Territory, and require the

repayment of any tax benefits that had been bestowed on any Defendant;

J.      Pursuant to 14 V.I.C. §§ 607(a)(6) and 607(k), order all assets and funds of the

Estate of Jeffrey E. Epstein be placed into receivership;

K.      Pursuant to 14 V.I.C. § 607(e), award the Government the maximum civil

penalty for each and every violation of law committed by the Epstein Enterprise;

L.      Pursuant to 14 V.I.C. § 607, award treble damages and all other available

remedies, including attorneys' fees and costs;

M.      Award compensatory and punitive damages for Defendants' civil conspiracy;

N.      Void the transfer of assets as fraudulently conveyed to the The 1953 Trust;

O.      Award such equitable relief, including disgorgement of all ill-gotten gains, as may

be just and proper and appropriate, pursuant to 14 V.I.C. § 608(c)(4), to protect the rights of

victims and innocent persons in the interest of justice and consistent with the purposes of CICO;

P.      Assess and award a judgment in favor of the Government and against the

Defendants for attorneys' fees and costs and pre- and post-judgment interest; and

GVI v. Estate of Jeffrey Epstein
GVI's Second Amended Complaint
Page **76** of **76**

        Q.      Award any and all other relief this Court deems appropriate.


**The Government demands a jury trial on all issues so triable.**

                                            **RESPECTFULLY SUBMITTED,**

                                            DENISE N. GEORGE, ESQ.
                                            ATTORNEY GENERAL

Dated: <u>February 10, 2021</u>         <u>/s/ Carol Thomas-Jacobs</u>
                                            **CAROL THOMAS-JACOBS, ESQ.**
                                          Assistant Attorney General
                                          Virgin Islands Department of Justice
                                          Office of the Attorney General
                                          34-38 Kronprindsens Gade
                                          St. Thomas, U.S. Virgin Islands 00802
                                          Email: ariel.smith@doj.vi.gov
                                          (340) 774-5666 ext. 10101

**Exhibit B**

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

GOVERNMENT OF THE UNITED ) Case Number: ᓂᒦ - cv - 10904
STATES VIRGIN ISLANDS )
 )       **ACTION FOR DAMAGES**
        PLAINTIFF, )
 )       JURY TRIAL DEMANDED
V. )
 )
JP MORGAN CHASE BANK, N.A. )
 )
        DEFENDANT. )

### PROTECTIVE ORDER

The parties having agreed to the following terms of confidentiality, and the Court having found that good cause exists for issuance of an appropriately tailored confidentiality order governing the pre-trial phase of this action, it is therefore hereby

ORDERED that any person subject to this Order -- including without limitation the parties to this action, their representatives, agents, experts and consultants, all third parties providing discovery in this action, and all other interested persons with actual or constructive notice of this Order -- shall adhere to the following terms, upon pain of contempt:

1.     Any person subject to this Order who receives from any other person any "Discovery Material" (*i.e.*, information of any kind provided in the course of discovery in this action) that is designated as "Confidential" pursuant to the terms of this Order shall not disclose such Confidential Discovery Material to anyone else except as expressly permitted hereunder.

2.     The person producing any given Discovery Material may designate as Confidential only such portion of such material as consists of:

        a.     previously nondisclosed financial information (including without

limitation profitability reports or estimates, percentage fees, design fees, royalty rates, minimum guarantee payments, sales reports and sale margins);

b.   previously nondisclosed confidential reporting to law enforcement agencies;

c.   previously nondisclosed material relating to ownership or control of any non-public company;

d.   previously nondisclosed business plans, product development information, or marketing plans;

e.   any information of a personal or intimate nature regarding any individual;

f.   any information maintained by JPMorgan Chase Bank, N.A. or its affiliates that is required to be kept confidential pursuant to the Bank Secrecy Act, 31 U.S.C. §§ 5311 to 5336, or its implementing regulations ("BSA") but for which the appropriate regulatory authority has authorized disclosure, including but not limited to the fact that no BSA information exists, ("BSA-Protected Information")[1] and any information that, pursuant to 31 U.S.C. 5318(g)(2)(A)(1), 31 C.F.R. § 1020.320, 12 C.F.R § 21.11, Section 314(a) or (b) of the PATRIOT ACT,  12 U.S.C. §§ 3414(a)(3) and (c) or any other applicable regulations

---

[1] BSA-Protected Information maintained by other financial institutions are not within the scope of this Order and remain subject to the standard confidentiality requirements of the BSA and its implementing regulations.

concerning potential suspicious activity ("SAR-Related Information"), is not permitted to be produced unless authorized by the appropriate regulatory authority ("SAR-Protected Information");

g.    any information that is confidential supervisory information ("CSI") of the Board of Governors of the Federal Reserve System as set forth in 12 C.F.R. § 261.2(c), non-public information of the Office of the Comptroller of the Currency or the former Office of Thrift Supervision as set forth in 12 C.F.R. § 4.32(b), exempt information of the Federal Deposit Insurance Corporation as set forth in 12 C.F.R. §§ 309.2, 309.5, and 309.6, and confidential information of the Consumer Financial Protection Board as set forth in 12 C.F.R. § 1070.2, and any other records concerning supervision, regulation, and examination of banks, savings associations, their holding companies and affiliates, and records compiled in connection with the enforcement responsibilities of federal and state financial regulatory agencies that is not permitted to be disclosed to a third party absent consent of the applicable regulator or government agency unless authorized by the appropriate regulatory authority ("CSI-Protected Information"); or

h.    any other category of information hereinafter given confidential status by the Court.

3. With respect to the Confidential portion of any Discovery Material other than deposition transcripts and exhibits, the producing person or that person's counsel may designate such portion as "Confidential" by stamping or otherwise clearly marking as "Confidential" the protected portion in a manner that will not interfere with legibility or audibility, and by also producing for future public use another copy of said Discovery Material with the confidential information redacted. For the avoidance of doubt, nothing herein is intended to prevent a party from designating the entirety of a given document as "Confidential" if the party reasonably believes the entire document falls within one or more of the categories in paragraph 2, above. With respect to deposition transcripts and exhibits, a producing person or that person's counsel may indicate on the record that a question calls for Confidential information, in which case the transcript of the designated testimony shall be bound in a separate volume and marked "Confidential Information Governed by Protective Order" by the reporter.

4. If at any time prior to the trial of this action, a producing person realizes that some portion[s] of Discovery Material that that person previously produced without limitation should be designated as Confidential, he may so designate by so apprising all parties in writing, and such designated portion[s] of the Discovery Material will thereafter be treated as Confidential under the terms of this Order. If a party has disclosed such designated portion[s] of Discovery Material to anyone other than the individuals set forth in paragraph 5 below, that party shall make reasonable efforts to promptly retrieve such Discovery Material, and inform any recipient of the terms of the Order.

5. With the exception of the qualifications pertaining to BSA-Protected

Information, SAR-Protected Information and/or CSI-Protected Information in paragraph 6, no person subject to this Order other than the producing person shall disclose any of the Discovery Material, designated by the producing person as Confidential excluding any material containing BSA-Protected Information, SAR-Protected Information and/or CSI-Protected Information to any other person whomsoever, except to:

    a.    the parties to this action;

    b.    counsel retained specifically for this action, including any paralegal, clerical and other assistant employed by such counsel and assigned to this matter;

    c.    as to any document, its author, its addressee, and any other person indicated on the face of the document as having received a copy;

    d.    any witness who counsel for a party in good faith believes may be called to testify at trial or deposition in this action, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

    e.    any person retained by a party to serve as an expert witness or otherwise provide specialized advice or services to counsel in connection with this action (including but not limited to professional jury or trial consultants, mock jurors, and persons or entities providing litigation support services – such as photocopying, videotaping, translating, preparing exhibits or demonstrations, and processing, hosting, organizing, storing, or

retrieving data in any form or medium – and their employees and subcontractors), provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

    f.    any mediator or other dispute-resolution personnel, or any employee thereof, provided such person has first executed a Non-Disclosure Agreement in the form annexed as Exhibit hereto;

    g.    insurers, reinsurers, insurance adjusters, and/or third party administrators of insurance policies that do or may provide insurance coverage applicable to this action;

    h.    stenographers engaged to transcribe depositions conducted in this action and videographers engaged to record depositions conducted in this action; and

    i.    the Court and its support personnel.

6.    No person subject to this Order shall disclose any BSA-Protected Information, SAR-Protected Information, and/or CSI-Protected Information to any other person whomsoever, except to the following persons, consistent with any authorization received from the appropriate regulatory authority:

    a.    the Government of the U.S. Virgin Islands and its counsel and JPMorgan Chase and its counsel, including any paralegal, clerical and other assistant employed by such counsel and assigned to this matter;

    b.    any witness employed or formerly employed by JPMorgan Chase who counsel for the Government of the U.S. Virgin Islands or

6

JPMorgan Chase in good faith believes may be called to testify at trial or deposition in this action, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

c.      any person retained by the Government of the U.S. Virgin Islands or JPMorgan Chase to serve as an expert witness or otherwise provide specialized advice to counsel in connection with this action, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

d.      stenographers engaged to transcribe depositions conducted in this action and videographers engaged to record depositions conducted in this action provided such person has first executed a Non-Disclosure Agreement in the form annexed as Exhibit hereto; and

e.      the Court and its support personnel.

7.      Prior to any disclosure of any Confidential Discovery Material to any person referred to in subparagraphs 5(d), 5(e), or 5(f) above, such person shall be provided by counsel with a copy of this Protective Order and shall sign a Non-Disclosure Agreement in the form annexed as an Exhibit hereto stating that that person has read this Order and agrees to be bound by its terms. Said counsel shall retain each signed Non-Disclosure Agreement, hold it in escrow, and produce it to opposing counsel either prior to such person being permitted to testify (at deposition or trial) or at the conclusion of the case, whichever comes first.

7

8.     All Confidential Discovery Material filed with the Court, and all portions of pleadings, motions or other papers filed with the Court that disclose such Confidential Discovery Material, shall be filed under seal with the Clerk of the Court and kept under seal until further order of the Court. The parties will use their best efforts to minimize such sealing. In any event, any party filing a motion or any other papers with the Court under seal shall also publicly file a redacted copy of the same, via the Court's Electronic Case Filing system, that redacts only the Confidential Discovery Material itself, and not text that in no material way reveals the Confidential Discovery Material.

9.     Any party who either objects to any designation of confidentiality, or who, by contrast, requests still further limits on disclosure (such as "attorneys' eyes only" in extraordinary circumstances), may at any time prior to the trial of this action serve upon counsel for the designating person a written notice stating with particularity the grounds of the objection or request. If agreement cannot be reached promptly, counsel for all affected persons will convene a joint telephone call with the Court to obtain a ruling.

10.     All persons are hereby placed on notice that the Court is unlikely to seal or otherwise afford confidential treatment to any Discovery Material introduced in evidence at trial, even if such material has previously been sealed or designated as Confidential. The Court also retains unfettered discretion whether or not to afford confidential treatment to any Confidential Document or information contained in any Confidential Document submitted to the Court in connection with any motion, application, or proceeding that may result in an order and/or decision by the Court.

11.     Each person who has access to Discovery Material that has been

8

designated as Confidential shall take all due precautions to prevent the unauthorized or inadvertent disclosure of such material.

12.     If, in connection with this litigation, a party inadvertently discloses information subject to a claim of attorney-client privilege or attorney work product protection, including any privilege or immunity from production associated with BSA, SAR-Related Information, and/or CSI ("Inadvertently Disclosed Information"), such disclosure shall not constitute or be deemed a waiver or forfeiture of any claim of privilege or work product or such other applicable protection with respect to the Inadvertently Disclosed Information and its subject matter.  For avoidance of doubt, outside of authorization from an appropriate regulatory authority, the disclosure of BSA, SAR-Related Information and/or CSI shall not constitute or be deemed a waiver or forfeiture of any claim of privilege or work product or such other applicable protection with respect to such information.

13.     If a disclosing party makes a claim of inadvertent disclosure, the receiving party shall not thereafter review the Inadvertently Disclosed Information for any purpose, except by order of the Court. The receiving party shall, within five business days, return or destroy all copies of the Inadvertently Disclosed Information, and provide a certification of counsel that all such information has been returned or destroyed.

14.     Within five business days of the notification that such Inadvertently Disclosed Information has been returned or destroyed, the disclosing party shall produce a privilege log with respect to the Inadvertently Disclosed Information.

15.     As with any information redacted or withheld, the receiving party may

9

move the Court for an Order compelling production of the Inadvertently Disclosed Information. The motion shall be filed under seal, and shall not assert as a ground for entering such an Order the fact or circumstances of the inadvertent production.

16.     The disclosing party retains the burden of establishing the privileged or protected nature of any Inadvertently Disclosed Information. Nothing in this Order shall limit the right of any party to request an in camera review of the Inadvertently Disclosed Information.

17.     This Protective Order shall survive the termination of the litigation. Within 30 days of the final disposition of this action, all Discovery Material designated as "Confidential," and all copies thereof, shall be promptly returned to the producing person, or, upon permission of the producing person, destroyed.  For the avoidance of doubt, counsel of record in this action shall be permitted to keep copies of filings and work product that incorporates any Confidential Discovery Material, so long as counsel continues to treat such Confidential Discovery Material in accordance with this Order.

18.     This Court shall retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

**SO STIPULATED AND AGREED**.

*/s/ Linda Singer*
**LINDA SINGER**
Admitted *Pro Hac Vice*
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
lsinger@motleyrice.com

Dated: January 9, 2023

*/s/ Boyd Johnson*
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
Boyd M. Johnson III
Robert L. Boone
Hillary Chutter-Ames
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888
boyd.johnson@wilmerhale.com
robert.boone@wilmerhale.com
hillary.chutter-ames@wilmerhale.com

Felicia H. Ellsworth
60 State Street
Boston, MA 02109
(t) (617) 526-6687
(f) (617) 526-5000
felicia.ellsworth@wilmerhale.com

Dated: January 9, 2023

**SO ORDERED**.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
1~10~23

11

**Exhibit C**





