# EXHIBIT 10

**In the Matter Of:**

GOV. OF U.S. vs JPMORGAN CHASE BANK

1:22-cv-10904-UA

**STACEY E. PLASKETT**

*May 09, 2023*

*Confidential*

800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF NEW YORK

---------------------------

GOVERNMENT OF THE UNITED STATES OF AMERICA,

Plaintiff,

v Case No. 1:22-cv-10904-UA

JPMORGAN CHASE BANK, N.A.,

Defendant,

----------------------------

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

STACEY E. PLASKETT

Tuesday, May 9, 2023

9:00 a.m. EST

Reported by: Goldy Gold, RPR

Job No. J9647388

STACEY PLASKETT - CONFIDENTIAL

Q. What was your book going to be? 09:23

A. It was going to be a historical book about earlier life, maybe a generation or so ago, in the Virgin Islands. 09:23 09:23 09:23

Q. And what was the law firm that you worked for initially? 09:23 09:24

A. I worked with Nichols Newman Logan. 09:24

Q. And how long were you with Nichols Newman Logan? 09:24 09:24

A. I was there until 2007. 09:24

Q. Which was how -- I didn't ask you actually when you first moved down? 09:24 09:24

A. I think I moved down in 2005, so approximately two years. 09:24 09:24

Q. Okay. And what kind of work were you doing at Nichols Newman for those two years? 09:24 09:24

A. Primarily transactional. And also in the Virgin Islands at that time, all attorneys did court-appointed work. Most of the lawyers in the firm were not courtroom attorneys, and so I did a lot of the courtroom appearances for the law firm. 09:24 09:24 09:24 09:24 09:24 09:24

Q. Okay. And then 2007, you moved to a new job? 09:24 09:24



STACEY PLASKETT - CONFIDENTIAL

A. Yes. 09:24

Q. What was that? 09:24

A. I was hired as the counsel for the Virgin Islands Economic Development Authority. 09:24 09:25

(Court reporter clarification.)

BY MR. NEIMAN: 09:25

Q. What is the Virgin Islands Economic Development Authority? 09:25 09:25

A. The Virgin Islands Economic Development Authority is a semi-autonomous agency in the Virgin Islands, which handles many incentives to bring as well as grow businesses in the territory through various vehicles: A government development bank, which gives loans to businesses, small businesses predominantly; a tax incentive program under the U.S. code, which allows businesses and individuals to receive tax reductions on federal taxes for businesses and employment that they bring to the territory. 09:25 09:25 09:25 09:25 09:25 09:25 09:25 09:25 09:25 09:25 09:25

Q. And you described this as a semi-autonomous agency? 09:25 09:26

A. Correct. 09:26

Q. Can you explain what you meant by that? 09:26 09:26



STACEY PLASKETT - CONFIDENTIAL

texts with him during your time at the Economic Development Authority? 10:48

A. I do not recall. 10:48

Q. When do you think you first met Mr. Epstein in person? 10:48

A. After leaving the Economic Development Authority. 10:48

Q. How did that first meeting come about, as best as you can recall? 10:48

A. Well, I was running for office. I was, as individuals running for office do, looking for contributors, donors. Erika Kellerhals introduced me to Mr. Epstein as a potential donor. 10:48

Q. At the time that you were introduced -- withdrawn. 10:48

And where was the first meeting with Mr. Epstein? 10:48

A. At his office in St. Thomas. 10:48

Q. Do you remember about how many times you met with Mr. Epstein? 10:48

A. I do not recall. 10:49

Q. Do you think it was more than five times? 10:49



STACEY PLASKETT - CONFIDENTIAL

A. No. 10:49

Q. Where else did you meet with him other than in his offices at St. Thomas? 10:49

A. I met him in his home in New York. 10:49

Q. Did you ever meet him on Little Saint James? 10:49

A. No. 10:49

Q. About how many times were you at his home in New York? 10:49

A. I believe one time. 10:49

Q. Okay. About how many times did you meet with him in his office? 10:49

A. I would have to speculate -- in -- office in St. Thomas? 10:49

Q. Yes. 10:49

A. I would have to speculate. 10:49

Q. More than once, do you believe? 10:49

A. Yes. 10:49

Q. But less than five times? 10:49

A. Yes. 10:49

Q. About how many times did you speak to Mr. Epstein on the phone? 10:49

A. I did not recall. 10:49

Q. More than five times? 10:49



STACEY PLASKETT - CONFIDENTIAL

A. Yes. 10:49
Q. More than ten times? 10:49
A. I do not recall. 10:49
Q. What do you recall discussing with him when you met him in person? 10:49 10:50
A. About my intentions -- the first -- 10:50
Q. Yeah. Let's start with the first time. 10:50 10:50
A. Related to campaign contributions. 10:50
Q. In what way? 10:50
A. I cannot recall at that point in time what the specifics were. 10:50 10:50
Q. Is it fair to say you were asking for money? 10:50 10:50
A. Correct. 10:50
Q. Do you remember how much you asked for? 10:50 10:50
A. I do not recall at that meeting if the contribution was solely for myself. 10:50 10:50
Q. Ah. Who else might it have been for? 10:50 10:50
A. The Democratic Party. 10:50
Q. Okay. So fair to say that, during the course of your multiple discussions with 10:50 10:50



STACEY PLASKETT - CONFIDENTIAL

you were going to run for Congress again? 11:04
A. When I lost. 11:04
Q. Okay. And when you went to work for the Kellerhals firm, how long did you work there? 11:04
A. I don't recall the time frame, but it would have been 2013. 11:04
Q. I know that in the past, at least, Ms. Kellerhals had done work for Mr. Epstein and/or his companies. 11:04
Did you, while you were at the firm, do any work for Epstein or any Epstein-related businesses? 11:04
A. I don't recall. 11:04
Q. What kind of work did you do at the firm? 11:04
A. Predominantly transactional for companies that were in the Virgin Islands and for a few advice related to the economic development. 11:05
Q. And I take it that Epstein and his businesses remained a client of the Kellerhals firm during the time that you were there; is that fair? 11:05
A. Yes. 11:05
Q. All right. Let's talk about a 11:05



STACEY PLASKETT - CONFIDENTIAL

A. I don't recall. 12:28

Q. Did you talk to Mr. Epstein about this press release? 12:28

A. I don't recall. 12:28

Q. Just going back to the press release for a moment. I'm sorry. 12:28

You'll see in the third paragraph, there's a description of you having received $5,400 in two separate contributions from Epstein on August 2nd, according to federal campaign finance records, right? 12:28

A. Yes. 12:28

Q. And that was true, right? You had gotten two donations from Mr. Epstein personally on or about August 2nd of 2016? 12:29

A. Yes, totaling $5,400. 12:29

Q. Okay. And that was -- so August 2nd was about two weeks after the text exchange with Erika about what building you should be going to for a meeting with Mr. Epstein, right? That's Exhibit 20? 12:29

A. State the date again? 12:29

Q. I said it's about two weeks after -- 12:29

A. Yes. 12:29



STACEY PLASKETT - CONFIDENTIAL

didn't want his name on the host committee? 02:13

A. I learned that he donated to the campaign. 02:13 02:13

Q. Did you learn that he didn't want his name included on the invitation? 02:13 02:13

A. I don't recall at that point. 02:13

Q. Did you want his name on your invitation? 02:13 02:13

A. I don't recall expressing an opinion. 02:13 02:13

Q. Yeah. And I'm asking a slightly different question, not so much whether you recall expressing an opinion. 02:13 02:13 02:13

But in 2018, did you think having Jeffrey Epstein's name on your campaign invitations would be a good idea? 02:13 02:13 02:13

A. I don't recall. 02:13

Q. Do you remember meeting with Mr. Epstein in the fall of 2018? 02:13 02:13

A. I don't recall. 02:13

Q. Do you remember -- you testified before that you thought you had met with him at his home once in New York? 02:13 02:14 02:14

A. Yes. 02:14



STACEY PLASKETT - CONFIDENTIAL

Q. Tell me about his home. What do you remember about him? 02:14

A. I remember it being off of Lexington Avenue. I recall going to the address, ringing the bell, someone coming from outside which I assumed to be a security person. 02:14

Q. Uh-huh.

A. Someone opening the door, coming into a large foyer area, meeting Lesley Groff, telling me that he would be with me. Walking through an even larger foyer stairwell area to a room immediately there that would appear to be a dining room, where he was sitting at a very long table having a conversation with another gentleman. Wrapping up the conversation, that person leaving -- making introductions, that person leaving, and me sitting down and having a conversation with him. 02:15

Q. Do you remember who the other person was who was there meeting with Mr. Epstein? 02:15

A. I don't recall the person's name. 02:15

Q. Were there any women present in the home when you visited? 02:15

A. Other than Ms. Groff, no. 02:15



STACEY PLASKETT - CONFIDENTIAL

Q. Did you ever hear that when Mr. Epstein traveled to the Virgin Islands, he often had young women with him? 02:15 02:15 02:15

A. What time frame are you asking me did I know? 02:15 02:15

Q. Ever. 02:15

A. Yes. 02:15

Q. When do you recall? 02:15

A. I don't recall the exact time of hearing that. 02:16 02:16

Q. Do you think it was before or after September of 2018? 02:16 02:16

A. I don't recall. 02:16

Q. So it could have been earlier than that? 02:16 02:16

A. It could have. 02:16

Q. Okay. So what happened -- how long was your meeting with Mr. Epstein at his home? 02:16 02:16

A. I don't recall. 02:16

Q. Was it more than an hour? 02:16

A. No. 02:16

Q. Okay. Half an hour, roughly? 02:16

A. Potentially. 02:16

Q. What do you recall talking about? 02:16



STACEY PLASKETT - CONFIDENTIAL

A. Virgin Islands' politics, national politics, campaign contribution. 02:16 02:16

Q. Okay. Do you remember what your ask was? 02:16 02:16

A. No. 02:16

Q. Were you trying to raise money for the DCCC at this time? 02:16 02:17

A. I think I was always trying to raise money for the Democratic Congressional Campaign Committee. 02:17 02:17 02:17

Q. That's one of the jobs of being a Democratic congressperson, correct? 02:17 02:17

A. Yes. 02:17

Q. And you had a total of $250,000 that you were supposed to try to raise? 02:17 02:17

A. Members of Congress, based upon their seniority and committee assignments, have dues as well as raise amounts that are requested. 02:17 02:17 02:17

Q. And do you recall yours being around $250,000 in this time period? 02:17 02:17

A. I don't recall at that time period what it was, but that does not sound unreasonable. 02:17 02:17 02:17

Q. It does not sound unreasonable? 02:17



STACEY PLASKETT - CONFIDENTIAL

A. No. 02:17

Q. Okay. And that's a lot of money? 02:17

A. Yes. 02:17

Q. So who were your prospects for raising that kind of money? 02:17

A. Individuals who had donated before, alumni, individuals who were interested in the same topics for which committees I sat on, other Democratic donors throughout the country, et cetera. 02:18

Q. Was Mr. Epstein on that list of people who would be a potential help in raising money for the DCCC? 02:18

A. Yes. 02:18

Q. Did you ask him to contribute to that? 02:18

A. Yes. 02:18

Q. Was that part of what was discussed at this meeting in September? 02:18

A. I don't recall if it's that specific, but it's possible, yes. 02:18

Q. Are there limits to the amount that any individual can donate to the DCCC? 02:18

A. Yes. 02:18



STACEY PLASKETT - CONFIDENTIAL

Q. What are the limits? 02:18

A. At that time, I believed an individual could give over 30,000. I can't remember the exact amount, but it was in the range of 30,000. 02:18

Q. How much did you ask Mr. Epstein to give? 02:18

A. To the maximum, whatever that maximum was. 02:18

Q. Okay. How do you get somebody to give that much money? 02:19

A. You ask them. 02:19

Q. Okay. Did Mr. Epstein ever ask for anything from you? 02:19

A. No. 02:19

MR. NEIMAN: Let me know mark now as Plaskett Exhibit 40, a one-page text exchange. 02:19

[Exhibit 40, September 2018 text exchange, was marked for identification.] 02:20

BY MR. NEIMAN: 02:20

Q. All right. Ms. Plaskett, I've handed you Exhibit 40, which is a text exchange between you and Jerome, your chief of staff, in 02:20



STACEY PLASKETT - CONFIDENTIAL

September of 2018. Do you see that? 02:20
A. Yes. 02:20
Q. And what is it that Mr. Murray is sending you? What is that a picture of? Can you tell? 02:20
A. That is a picture of me. I think that is me sending to him. 02:20
Q. Oh, I'm sorry. What are you sending him? 02:21
A. A call list. 02:21
Q. What is a call list? 02:21
A. A list of individuals to call to ask for money, either for myself or the Democratic Party. 02:21
Q. Got it. And you're sending that to him for what reason? 02:21
A. So he can be apprised of who I have called and who I have not called and to harass me about calling the ones that have not been called. 02:21
Q. Got it. And then you're telling him in the next text down, at 11:11 p.m., that you're going to have a meeting with Mr. Epstein when you arrive in New York? 02:21
A. Yes. 02:21



STACEY PLASKETT - CONFIDENTIAL

Q. That's the meeting that we've been talking about? 02:21

A. Yes. 02:21

Q. Okay. Does the name Thorbjon Jagland mean anything to you? 02:21

A. No, I don't recall a name like that. 02:22

COURT REPORTER: Can you spell that on the record?

MR. NEIMAN: 02:22

T-h-o-r-b-j-o-n, J-a-g-l-a-n-d. 02:22

THE WITNESS: If I could see it? 02:22

BY MR. NEIMAN:

Q. Yes, sure. I'll show it to you. This is... 02:22

COURT REPORTER: Can you state what exhibit it will be?

MR. NEIMAN: 72. 02:22

MR. ACKERMAN: 41. 02:22

MR. ECKARD: 41.

MR. NEIMAN: Oh, sorry. Yes. It's my Binder 72, your Exhibit 41.

[Exhibit 41, Groff, Epstein email exchange, was marked for identification.] 02:22

BY MR. NEIMAN: 02:22



STACEY PLASKETT - CONFIDENTIAL

Q. All right. And you can see, Ms. Plaskett, that Exhibit 41 us an email from Ms. Groff to Mr. Epstein giving his schedule for the day. Do you see that? 02:22 02:23 02:23 02:23

A. Yes.

Q. And the person immediately before you on this schedule is this name, Thorbjon Jagland. So I was just asking if that refreshed your recollection at all about who it was that you were introduced to when you met with Mr. Epstein? 02:23 02:23 02:23 02:23

A. It possibly could be. As I stated, they were in the dining room when I arrived. 02:23 02:23

Q. I could show you a quick picture. 02:23

MR. ACKERMAN: If I can mark it on the record. 02:23 02:23

MR. NEIMAN: It's not that important. 02:23 02:23

Okay. Let's take a look now at the next exhibit which will be Plaskett Exhibit 42. 02:23 02:24

[Exhibit 42, Plaskett, Murray email exchange, was marked for identification.] 02:24 02:24

BY MR. NEIMAN: 02:24

Q. All right. So Exhibit 42 is an 02:24



STACEY PLASKETT - CONFIDENTIAL

email exchange between Mr. Murray and you, correct? 02:24

A. Yes. 02:24

Q. And this is a follow-up to the meeting with Jeffrey Epstein that we've just been talking about; fair? 02:24

A. Yes. 02:24

Q. This is an email that Mr. Murray is drafting for the purposes of sharing with Erika so that she can pass it on to Mr. Epstein? 02:25

A. I don't know who the email was to. 02:25

Q. Well, you'll see that Ms. Plaskett writes -- that you write -- excuse me. Withdrawn. 02:25

Yeah. You'll see that you, in the top email on the page, say: "This looks fine. Please send the email to Erika." Do you see that? 02:25

A. Yes. 02:25

Q. So you're instructing Mr. Murray to send this email that he's drafted to Erika, correct? 02:25

A. Yes. 02:25

Q. And for her to pass this on to 02:25



STACEY PLASKETT - CONFIDENTIAL

Jeffrey Epstein, right? 02:25

A. Yes. I believe I'm instructing Jerome to send it to Erika and to let her know about the conversation I had with him about it. 02:25

Q. With the idea that she would then reach out to Mr. Epstein to arrange the contribution? 02:25

A. Yes. 02:25

Q. And do you recall that the DCCC rejected Mr. Epstein's contribution? 02:25

A. Yes. 02:26

Q. Tell me what you remember about that. 02:26

A. To the best of my recollection, I recall that I was informed by my chief of staff that the DCCC informed him that Mr. Epstein's contribution would not be accepted by the DCCC. 02:26

Q. What did you do when you heard that? 02:26

A. I'm not sure who -- if I can recall who I reached out to at that point to inform. 02:26

Q. Okay. Did you do anything to try to find out why the Democratic Congressional Campaign Committee had rejected Mr. Epstein's donation? 02:26



STACEY PLASKETT - CONFIDENTIAL

A. I don't recall if it was already expressed to me in his letting me know that it was denied or if I got additional information. I don't recall. 02:26 02:26 02:27

Q. Do you recall what you learned was the reason why the DCCC would not accept Mr. Epstein's contribution? 02:27 02:27 02:27

A. Yes. 02:27

Q. What was that? 02:27

A. That he had not passed their vetting. 02:27 02:27

Q. What did you understand that to be a reference to? 02:27 02:27

A. I did not know the specifics of what that vetting was. 02:27 02:27

Q. Did you assume that it related to his status as a sex offender? 02:27 02:27

MR. ECKARD: Object to form. 02:27

THE WITNESS: I was not sure of the totality of the circumstances. 02:27 02:27

BY MR. NEIMAN: 02:27

Q. Did learning that the DCCC had declined to accept Mr. Epstein's contribution because he had not passed their vetting cause you 02:27 02:27 02:27



STACEY PLASKETT - CONFIDENTIAL

record at 4:21. 04:22

BY MR. NEIMAN: 04:22

Q. All right. Congresswoman, this won't take too much longer. 04:22

MR. NEIMAN: I'm going to hand you a document that's marked as Plaskett Exhibit 54. 04:22

[Exhibit 54, 2014 to 2020 donor list, was marked for identification.] 04:22

MR. ECKARD: Counsel, this one doesn't have a Bates number. Was it produced? 04:22

MR. NEIMAN: Yes. This was produced as a native. 04:22

BY MR. NEIMAN: 04:22

Q. So, Congresswoman, you were asked some questions about the number of donors that you have and the like by Mr. Ackerman, and I just want to show you your actual list that you produced of your donors, at least from the 2014 cycle through the 2020 cycle. Okay? 04:22

Do you see that? 04:23

A. Yes. 04:23

Q. And what we've done is we've 04:23



STACEY PLASKETT - CONFIDENTIAL

highlighted the particular individuals on this list who are either Epstein or Epstein-affiliated persons who made contributions to your campaign in those cycles. Okay? 04:23

A. I'm looking through it. 04:23

Q. Yes. Let me know when you're ready. 04:23

A. Okay. Yes. 04:23

Q. And you can see on page 3 that Mr. Epstein appears as a donor, and that his lifetime total to your campaigns for the 2014 through 2020 campaign cycles was $8,100 personally, correct? 04:24

A. I see that number, yes. 04:24

Q. And then if you look at the next page, you can that Lesley Groff, who you corresponded with in connection with Mr. Epstein, also donated to your campaign? 04:24

A. Yes. 04:24

Q. And she donated 2,600. Do you see that? 04:24

A. Yes, I see that. 04:24

Q. And then if you look at the next page after that, you can see that Darren Indyke, who we saw was the person who presented on behalf 04:24



STACEY PLASKETT - CONFIDENTIAL

of FTC, seeking a tax -- extension of tax breaks from the development authority while you were there, gave $10,700 to your campaign. 04:24

Do you see that? 04:24

A. Yes. 04:24

Q. And that Mr. Kahn, who is also associated with Mr. Epstein, gave $10,700 to your campaign as well. 04:24

Do you see that? 04:24

A. Okay. I see. 04:24

Q. And that Bella Klein, who is described in this document as Darren Indyke's administrative assistant, also donated $2,600 to your campaign? 04:25

A. I see that. 04:25

Q. So across those five people, there's total donations in excess of $30,000, correct? 04:25

A. I'm adding that up. That sounds correct. 04:25

Q. Did you have any other contributor who donated either directly themselves, or by themselves, and with a group of people associated with them, more than $30,000? 04:25

MR. ACKERMAN: Objection to form. 04:25



STACEY PLASKETT - CONFIDENTIAL

CERTIFICATE OF REPORTER/NOTARY PUBLIC

I, Goldy Gold, a Notary Public within and for the State of New York and for the District of Columbia, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to the law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 10th day of April, 2023.

__________________________
GOLDY GOLD, RPR
Notary Public

My Commission for the State of New York Expires: January 27, 2026

My Commission for the District of Columbia Expires: February 29, 2028

