**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

GOVERNMENT OF THE UNITED
STATES VIRGIN ISLANDS,

               Plaintiff,

v.

JP MORGAN CHASE BANK, N.A.,

               Defendant.

Case No. 22-cv-10904 (JSR)

**JPMORGAN CHASE BANK, N.A.'S OPPOSITION TO**
**USVI'S MOTION TO STRIKE AFFIRMATIVE DEFENSES**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ......................................................................................................... 1

    A.    Epstein Courted USVI's Officials ............................................................. 2

    B.    USVI Paid Returns On Epstein's Investment ........................................... 6

    C.    USVI Aided Epstein's Criminal Activity ................................................. 8

        1.    Epstein exerted influence over USVI sex offender legislation and received lax monitoring ............................................................. 8

        2.    USVI officials knew of and facilitated Epstein's crimes ................. 12

    D.    USVI Seeks To Avoid Accountability By Moving To Strike ........................ 14

ARGUMENT ............................................................................................................. 15

I.    JPMC's Affirmative Defenses Are Legally And Factually Cognizable ..................... 16

    A.    JPMC's Affirmative Defenses Do Not Infringe On Prosecutorial Discretion .......................................................................................... 19

    B.    USVI Is Acting As A Private Civil Litigant Subject To All Applicable Defenses ........................................................................................... 20

II.    USVI Cannot Demonstrate Prejudice From Past Discovery ................................. 24

CONCLUSION .......................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*City of New York v. FedEx Ground Package System, Inc.*,
    314 F.R.D. 348 (S.D.N.Y. 2015) .................................................................................. *passim*

*EEOC v. UPS*,
    2017 WL 2829513 (E.D.N.Y. June 29, 2007) ........................................................................24

*Estee Lauder, Inc. v. Fragrance Counter, Inc.*,
    189 F.R.D. 269 (S.D.N.Y. 1999) ..........................................................................................24

*FDIC v. Eckert Seamans Cherin & Mellott*,
    754 F. Supp. 22 (E.D.N.Y. 1990) .........................................................................................24

*In re Google Digital Advertising Antitrust Litigation*,
    2022 WL 4226932 (S.D.N.Y. Sept. 13, 2022)..........................................................21, 22, 23

*Index Fund, Inc. v. Hagopian*,
    107 F.R.D. 95 (S.D.N.Y. 1985) .....................................................................................15, 24

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976).................................................................................................15

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C.), *aff'd sub nom. New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023).........................................................................................22, 23

*New York v. Kraft General Foods, Inc.*,
    862 F. Supp. 1030 (S.D.N.Y.), *aff'd*, 14 F.3d 590 (2d Cir. 1993) ...................................16, 22

*New York v. United Parcel Service, Inc.*,
    160 F. Supp. 3d 629 (S.D.N.Y. 2016), *vacated in part on other grounds on recons.*,
    2016 WL 10672074 (S.D.N.Y. June 21, 2016) ............................................................. *passim*

*PenneCom B.V. v. Merrill Lynch & Co.*,
    372 F.3d 488 (2d Cir. 2004)................................................................................................19

*Radiancy, Inc. v. Viataek Consumer Products Group, Inc.*,
    138 F. Supp. 3d 303 (S.D.N.Y. 2014)..................................................................................15

*Specialty Minerals, Inc. v. Pluess–Staufer AG*,
    395 F. Supp. 2d 109 (S.D.N.Y. 2005)............................................................................15, 24

*United States v. Wharton*,
    514 F.2d 406 (9th Cir. 1975) ...............................................................................................19

*Walsh v. City of New York*,
   585 F. Supp. 2d. 555 (S.D.N.Y. 2008)........................................................................24

**Statutes & Codes**

18 U.S.C.
   § 1595(a).............................................................................................................23
   § 1595(d).............................................................................................................23
   § 1963.................................................................................................................21
   § 1964(c).............................................................................................................21
   § 2346(b)(1)........................................................................................................18

## PRELIMINARY STATEMENT

Plaintiff Government of the United States Virgin Islands ("USVI") is complicit in the crimes of Jeffrey Epstein.  Epstein could have lived anywhere in the world.  He chose USVI. Discovery obtained in this case reveals why.  For two decades, Epstein maintained a quid pro quo relationship with USVI's highest ranking officials.  He gave them money, advice, influence, and favors.  In exchange, they shielded and even rewarded him, granting him more than $██llion in tax incentives, ████████████████████, looking the other way when he walked through USVI airports accompanied by girls and young women, and even ███████ ██████████████████████████████.  And, ████████████ █████████████████████████████████████████████████████ ████████████████████████████████.  For two decades, and for long after JPMC exited Epstein as a client, the entity that most directly failed to protect public safety and most actively facilitated and benefited from Epstein's continued criminal activity was the plaintiff in this case—the USVI government itself.

Though the USVI government hopes to shroud itself in exemptions, it is a plaintiff in civil litigation like any other.  Tellingly, USVI's motion seeks to strike *only* those specific defenses that threaten to expose its relationship with Epstein.  The law affords defendants equitable defenses to protect them against precisely this sort of one-sided presentation of the evidence.  This Court should see the USVI's gambit for what it is and deny its motion.

## BACKGROUND

Discovery in this case is ongoing but has established at least the following.  In 2009, upon his release from prison for procuring a minor for prostitution, Epstein sought to arrange for supervision of his parole to be transferred from Florida to USVI.  He registered with the USVI as a sex offender in 2010 and maintained his primary residence there.  This put him under USVI law

enforcement's direct jurisdiction and supervision.  The decades-long quid pro quo between Epstein and the USVI government took three forms.  First, high-ranking USVI officials spent years courting and gladly accepting Epstein's influence in the form of gifts, favors, and political donations.  Second, in exchange, USVI granted Epstein preferential treatment in the form of more than $███llion in tax incentives, among other benefits.  Third, and most troublingly, USVI protected Epstein, fostering the perfect conditions for Epstein's criminal conduct to continue undetected.  Rather than stop him, they helped him.

### A.    Epstein Courted USVI's Officials

Epstein's corrupt relationship with USVI began with gifts.  Epstein courted USVI officials with money and favors—which USVI gladly accepted.  Epstein funneled money in three ways.

First, he funded and advised on the finances of the USVI government itself.  For example, in February 2017, Epstein wrote to USVI First Lady Cecile de Jongh referencing her husband, USVI Governor John de Jongh: "the vi govt is desperate for cash. does john know of any asset they might have that i can use as collateral. islands. etc[.]"  The amount to be collateralized was $50 million, and First Lady de Jongh replied that she would "get a list of GOVI properties."  Ex. 1.  Epstein also gave money to fund the USVI Department of Planning and Natural Resources ("DPNR").  Ex. 2.  For example, in 2017, he directed that a $25,000 check be cut from his company Southern Trust Company, Inc. ("STC") to the DPNR.  *Id.*  Not only did the DPNR take his money, Dawn Henry, the DPNR's commissioner, actively facilitated Epstein's apparent preference to donate to a *school* library, writing to him: "If you prefer to donate to school libraries I can connect you with the Commissioner for Education.  Either way the Territory wins."  *Id.*  In an email sent just a week prior, Epstein wrote to Commissioner Henry that he had given "25 k to the home for girls in st croix" and asked her where to direct another $25,000.  Ex. 3.  That same Commissioner later stated that, "when [Epstein] was alive, we weren't really willing to hold him accountable."

Ex. 4.  And "Epstein, who was jailed for soliciting girls as young as 14 for prostitution," gave gifts to school pupils and financed events for young children.  Ex. 5.

Similarly, in 2018, the now-current USVI Governor Albert Bryan facilitated donations by Epstein to USVI's schools and little leagues.[1]  *E.g.*, Ex. 6 (Governor Bryan's suggestions for which schools Epstein should donate $50,000); Ex. 7 ("Albert [Bryan] asked that the $30K go to the VI Little League.").  Epstein also transferred payments alongside others ████████████████████████ such as ██████████████████████████.  *See* Ex. 8 at ████.  Epstein made these payments to ████████████ despite knowing that they risked provoking suspicion.  For example, in 2012 he wrote to First Lady de Jongh regarding his potential funding of a training program for VIPD: "I always would like to support these things.   in the past. it was looked upon with suspicioun [sic]."  She responds: "Suspicion locally? My thought was that this would be ok because it is specifically homicide training."  To avoid leaving a written record, he responds curtly: "face to face."  Ex. 9.

Second, Epstein gave money to USVI politicians.   For example, Epstein supported Congresswoman Stacey Plaskett, who successfully ran to be USVI's delegate to Congress—after working for the USVI Economic Development Authority ("EDA"), the USVI agency responsible for awarding Epstein his massive tax benefits, Ex. 10 at 14:24-15:5; *see infra* pp. 6-8, and one of the private law firms that represented Epstein in his USVI business affairs, Ex. 10 at 86:4-24.  Epstein personally gave the maximum amount to Ms. Plaskett's campaigns over multiple election cycles, Ex. 11; Ex. 10 at 148:8-17, 221:7-10.  He asked that his contributions be kept secret.  Ex. 12.  And he directed others to contribute as well. *See* Ex. 13.  The reason: "[W]e would have a

---

[1]  The USVI has had three governors over the last 16 years: John de Jongh (2007-2015); Kenneth Mapp (2015-2019); and Albert Bryan (2019-present).  As detailed herein, Epstein had close ties to each of them.

friend in Stacey." *Id.*  In total, Epstein and his employees donated over $30,000 across three of Ms. Plaskett's congressional races.  Ex. 10 at 303:17-305:20.[2]

Third, Epstein funneled money via his business entities.  *See* Ex. 15 (First Lady de Jongh noting that USVI Governor Kenneth Mapp and USVI Senator Celestino White wished to see Epstein and asking Epstein "[f]rom which entity" he wished to donate to the St. Croix Democratic Party, to which Epstein replied "personal"); Ex. 14 (confirming a $15,000 donation from Southern Trust "for the benefit of Stacey Plaskett").  And Epstein contributed through super PACs and like entities that fall under different public reporting requirements.  *E.g.*, Ex. 16 ("prepare a check for [Governor] mapps super pac for 75k"); Ex. 17 (confirming intent to donate "$10,000 to the Mapp-Potter Inaugural committee and that it should come from Southern Trust"); Ex. 18 (discussing a $25,000 private gift to current Governor Bryan's inaugural committee).

Epstein's primary conduit for spreading money and influence throughout the USVI government was First Lady de Jongh.  *See* Ex. 19 ("Epstein has contributed to the political campaigns of various senatorial, gubernatorial, and congressional candidates within the local Democratic Party. … Unequivocally, a political culture was fostered within the local Democratic Party of the Virgin Islands that allowed Epstein to remain unchecked in exchange for his sponsorship and financial contributions.").  For example, First Lady de Jongh drove donations from Epstein to support her husband and allies, *e.g.*, Ex. 20 (reflecting Epstein's $15,000 donation to Governor de Jongh's "Special Events Fund"); Ex. 22 (Epstein paying USVI Senator Celestino White $10,000 to consult on changing the name of one of Epstein's islands); Ex. 21.  And the

---

[2] What is more, Plaskett also solicited donations from Epstein on behalf of the Democratic Party of the Virgin Islands—for which she raked in $13,000, Ex. 14—and the Democratic Congressional Campaign Committee—to which Epstein attempted to donate $30,000 to assist Plaskett, only to be rebuffed for failing to meet the DCCC's vetting requirements, Ex. 10 at 219:7-221:10, 226:10-227:12.

relationship went deeper.  Despite her public role and official duties, First Lady de Jongh managed Epstein's USVI-based companies from January 2007 to January 2015—receiving from Epstein a salary, bonuses, and other benefits, including $200,000 in 2007 alone.  Ex. 23.  Epstein paid her children's tuition—*i.e.*, the children of sitting Governor de Jongh, including when he was the sitting USVI governor.[3]  *See, e.g.*, Exs. 25-26.  And he also offered to fund Governor de Jongh's defense in the Governor's criminal case.  Ex. 27 (Epstein writes: "I will play any role in this you guys like.  I can lend john the money so he immediatly has it. .  i woulld gladly be on thephone (anonymouse) with john[,] quinn and the prosecutor offering suggestions. 25 a year for 20 years. . . 490 now. with an income tax credit for the full amount. 250 now, and 250 in 15 years. etc)").  Lest there be doubt that Epstein's goal was to gain influence, First Lady de Jongh explicitly advised Epstein on how to buy control of the USVI political class.  Ex. 28 (email from First Lady de Jongh to Epstein outlining the "VI Political Landscape" and advising him to "give wide but nominal support" in the primary to solidify relationships, then "strongly support" the winner of the primary).  She told him how to vote and whom to support.  Ex. 29 (email from Epstein asking First Lady de Jongh: "do you have the list of who i shoudl vote for?"); Ex. 30 (Epstein asking who "we" backed for the USVI Governor's race).  And, at First Lady de Jongh's suggestion, Epstein explored paying monthly retainers to USVI politicians to ensure their "loyalty and access."  Ex. 31 (First Lady de Jongh suggested that Epstein "consider putting Celestino [White] on some sort of monthly retainer. That is what will get you his loyalty and access.").[4]

---

[3] These tuition payments allowed the USVI Governor to funnel additional money to his political campaigns.  *See* Ex. 24 (email from First Lady de Jongh: "John and I have put money into the campaign based on what we thought was going to happen with the tuition payments.").

[4] Epstein's donations came with strings attached.  For example, First Lady de Jongh advised Epstein to cancel a check to Governor Mapp's campaign to discourage him from launching attack ads on her husband, Governor de Jongh.  Ex. 32 (the First Lady writes: "The [USVI

**B.     USVI Paid Returns On Epstein's Investment**

Epstein got what he paid for.  For example, Epstein's donations to Congresswoman Plaskett bought him easy access.  Ex. 10 at 72:21-74:4.  In fact, Ms. Plaskett went to New York and met with Epstein at his townhouse in Manhattan less than a year before his arrest on federal sex trafficking charges in 2019.  Ex. 10 at 216:19-224:14.  Other USVI officials (including Governor Mapp, Dawn Henry, and First Lady de Jongh) visited Epstein's islands, Little St. James ("LSJ") and Great St. James ("GSJ"), with regularity.  Exs. 33-35.

But the far more lucrative return on Epstein's investment came in the form of tax breaks given to his companies by the USVI EDA through its Economic Development Commission tax incentive program ("EDC Program").  Epstein received these benefits through two entities: Financial Trust Company, which was later renamed Southern Trust Company.  Ex. 36.

The EDA's relationship with Epstein ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, when Epstein's FTC applied for EDC Program benefits.  Ex. 37.  FTC's application was approved in 1999 and granted him tax incentives spread over 10 years set to terminate in 2009.  *Id.*; *see also* Ex. 36.  In 2012, FTC's tax incentives were extended to be spread over ▮▮▮▮, from ▮▮▮ to ▮▮▮.  Ex. 38; *see also* Ex. 36. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮  *See* Exs. 39-52.  And, in 2014, Epstein's STC was granted tax incentives spread over 10 years, from 2013 to 2023.  Ex. 53; *see also* Ex. 36. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Exs. 54-59.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Governor] Mapp campaign is going to take the $ that you gave to attack John. … Can we stop payment on the check to send a message.").

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████. Ex. 60 at -13522. ███████████████████████████

█████████████████████████████████████████. *See, e.g.*, Exs. 61-64.  Indeed,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ Ex. 65 at ██████. Yet,

when Governor de Jongh was contacted by a reporter regarding the potential conflict of interest

inherent in the USVI government granting millions in tax incentives to his wife's employer, the

First Lady suggested to Epstein that they respond with the following statement: "Cecile de Jongh

currently works for Financial Trust Company in the capacity of office manager.  She had nothing

to do with Financial Trust Company receiving EDC tax benefits."  Ex. 66.[5]

The EDA was well aware of Epstein's past, even requesting an assessment of the potential

impact on STC's business in light of "current media discussions surrounding a principal of

Southern Trust Company."  Ex. 70.  Yet, despite the numerous red flags, STC continued to enjoy

EDA benefits ██████████████. ████████████████████████████████

███████████████████████████████████████████████████

---

[5] The millions of dollars in incentives to FTC and STC were granted by USVI with little to
no diligence.  Despite ███████████████████████████████████████████
██████████ Ex. 65 at █████ ██, Ex. 67.
████████████████████████████████
████████████████████████████████████████ *see, e.g.*,
Ex. 39, ██████████████████████████████████████████████
██████████████████, *see, e.g.*, Ex. 39 at ████████; Ex. 65 at ██████. And,
according to the minutes related to approving tax breaks for STC in 2012, no one asked questions
regarding Epstein's criminal conviction or registered sex offender status.  Exs. 68-69.



████████████████████████████████████████████████████
████████████████████████████████████████ Ex. 71. ███████████████
████████████████████████████████████████████████████████
███████████████████████████████. Ex. 72.

In addition to the more than $██ million in tax benefits from EDA, Epstein was given inside information about executive branch deliberative process on banking regulations related to International Banking Entities ("IBEs").  *See* Ex. 73 (First Lady de Jongh forwards Epstein an email exchange between Governor de Jongh and the office of the lieutenant governor regarding status of IBE rules and regulations).  Epstein had been attempting since 2013 to take advantage of tax benefits provided by creating an IBE, *see* Ex. 74, a status which appears to have been conferred beginning in December 2014 and January 2015, Ex. 75 (approving Epstein's entity Financial Strategy Group, Ltd. as an IBE); Ex. 76 (████████████████████████████████).

**C.    USVI Aided Epstein's Criminal Activity**

In addition to accepting payments from Epstein and giving him "loyalty and access," along with over $██ million in tax incentives, USVI government officials actively facilitated Epstein's crimes.  Though discovery is ongoing, documents obtained to date show this happened in two primary ways.  First, USVI permitted Epstein—a registered sex offender under its supervision—to ████████████████████████████████████████████.  Second, USVI granted ███████████████████████████████████████████████████ ████████████████████████.

**1.    Epstein exerted influence over USVI sex offender legislation and received lax monitoring**

In 2011, the USVI legislature took up a bill to update its sex offender monitoring laws and bring them in line with federal standards.  On May 15, 2011, while the language of the bill was

being drafted, First Lady de Jongh emailed Epstein the draft language for the proposed bill, writing "This is the suggested language; will it work for you?" Ex. 77 at -24493.  Epstein responded: "We should add out of country for more than 7 days , otherwise I could not go for a day trip to Tortola ,at the last minute." *Id.* at -24492.  And "Ithese files rcould be also accessible by the press. If we are not careful. A list of who I stay with should violate my privacy. Restrict my business and livelihood." *Id.*  The First Lady responded that she did not "want to email back and forth" and that "[t]his needs to be settled by Thursday because J [Governor John de Jongh] goes away for a week and AG [Vincent Frazer] needs to submit by June 1." *Id.*

Epstein monitored the progress of the legislation closely.  *See* Ex. 78 at -25219 (Epstein writes to the First Lady regarding the Attorney General's comments on the legislation at a rules committee hearing); Ex. 79 at -16427 (First Lady de Jongh writes Epstein: "Is there anything you want me to do re the hearing tomorrow?  I am going to try to find out if anyone from justice has been asked to testify again on Monday.").  Epstein's personal attorney, Maria Hodge, exchanged emails and phone calls with the USVI DOJ and the Attorney General regarding changes to the bill. Ex. 80 at -25222-25223 (Ms. Hodge email to USVI DOJ officials arguing that a proposed version of the legislation by the Attorney General "would create many complications and problems" and referencing "a phone call I received from the AG today").

Ultimately, the law passed on June 28, 2012.  Epstein was disappointed by the final form of the bill, but First Lady de Jongh offered comfort: "I know this was a horrible week and i am really sorry about how things panned out.  Not being able to take someone at their word is incredibly frustrating.  However, all is not lost and we will figure something out by coming up with a game plan to get around these obstacles."  Ex. 81.  First Lady de Jongh was correct: all hope was not lost for Epstein.  She crafted a plan to facilitate Epstein's easy travel to and from USVI—

specifically:  "We will need to work through [then-USVI Senator Carlton] Dowe and [then-USVI

Senator Celestino] White to get this accomplished.  In the meantime, we will work with [then

USVI-Attorney General] Vincent [Frazer] to give the discretion for status quo for you - that's the

least he can do."  *Id.*





Even as to the regulations USVI *did* enforce, it did so incompetently.  For example, ██████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████.  *See, e.g.*, Ex. 84 at ██████; Ex. 85 at ██████.

On other occasions, ████████████████████████████████████████████████████████

██████████.  *See, e.g.*, Ex. 82 at ███████████ (███████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████); *id.* at ██████ (████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████); Ex. 86 at ██████████████ (███████████████████████████████████████

██████████████████████████████████████████████████████)

These lapses extended beyond Epstein's ██████████████.  On multiple occasions, ██████

████████████████████████████████████████████ the Sex Offender Registration and

Notification Act ("SORNA")████████████████████████████████████████████████████

██████████████████.  *See, e.g.*, Ex. 87 (██████████████████████████████); Ex. 88 (██

██████████); Ex. 89 (██████████████); Ex. 90 at ██████; Ex. 91 at ██████.  The ██████████ also

failed to completely maintain ████████████████████████████████████████.[6]  *See* Ex. 93 at

██████.  Further, while the USVI did conduct site visits of Epstein's residence, those inspections

were cursory at best.  █████████████████████████.  *See, e.g.*, Ex. 94 at ████████████████████.

And at least once, ████████████████████████████████████████████████████████████

█████████████████.  *Id.* at ██████.

---

[6] █████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████

### 2. USVI officials knew of and facilitated Epstein's crimes

Despite the direct infusions of lucrative tax incentives, ███████████████████

███████████████, and lax enforcement, Epstein still could not freely transport and exploit

young women without assistance from USVI government officials.  First Lady de Jongh once

again proved to be a ready partner.  For example, several of Epstein's victims needed visas.  To

that end, First Lady de Jongh arranged for Epstein to meet with a local immigration lawyer to assist

at least one woman, Ex. 95 at -25196, and contacted the University of the Virgin Islands ("UVI")

to find out whether three young women could enroll there to obtain student visas.  Ex. 96 at

-24114; *see* Ex. 97 at -20206 (First Lady de Jongh asking Epstein what visas the "ladies" have and

trying to arrange English as a Second Language classes for them); Ex. 96 at -24115-24117 (First

Lady de Jongh corresponding with the Vice President for Institutional Advancement at UVI about

enrolling students for English as a Second Language classes at UVI); Ex. 98 at -24119 (Epstein

suggesting to First Lady de Jongh to enroll three young women); Ex. 97 at -20206 (showing that

two of the women's forms were sent to UVI).  The women had to enroll in person and show their

ability to pay through a letter.  Perhaps cognizant of the risk in having a registered sex offender

sign the letter, First Lady de Jongh wrote to Epstein that he should think about whether "[he]

should sign [the letter] or one of us." Ex. 99 at -24130.  Ultimately UVI *structured a bespoke class*

to enroll victims and provide cover for their presence in the territory—the same year Epstein

donated $20,000 to the university through one of his companies.  Ex. 100 at -20983.

In addition to visas, some of the young women Epstein brought to the island also needed

employment.  One of their stories is representative.  To find employment in the USVI, the young

woman needed a dental license.  First Lady de Jongh reached out to the Director for the Office of

Professional Licensure and Health Planning at the USVI Department of Health regarding a "new

practice act" that would have "significant changes and allowances for reciprocity."  Ex. 101 at

-23450-23451.  The Director wrote to Ms. de Jongh that once the act went before the Senate Committee she would have a "clearer idea on what [the young woman's] options are moving forward."  *Id.* at -23450.[7]  First Lady de Jongh also reached out to her contacts at the Attorney General and Solicitor General offices about the new rules.  Ex. 103 at -15784 (First Lady de Jongh writing "[b]ad news re the dental licensure rules and regs – the AG's office does not have them," but that the "Acting Solicitor General is a good friend of mine" so she will "alert" him to "get it fast tracked").  Ultimately, First Lady de Jongh was successful.  The young woman eventually set up a local dental practice in the USVI and shared an office with Epstein's companies.  Ex. 104 at -15122; *see* Ex. 105.

Finally, to get to Epstein's island, the victims needed to fly to and from the airport—run by the USVI Port Authority ("VIPA"), where Epstein leased hangar space.  Ex. 106 at -23269; Ex. 107 at -16129.[8]  Given the extent of his use of the airport's services, Epstein met with VIPA leadership often, sometimes meeting with them just after he landed at the airport.  Ex. 109 at -15782 (First Lady de Jongh writing to Epstein that his "wheels-down time is at 2:45 and [the executive director of VIPA] said that he can meet you at the hangar at that time").  In particular, Epstein had close ties to the Executive Director of VIPA.  Ex. 110 at -16521 (First Lady de Jongh asking Epstein (on her husband's behalf) if he would "support [then-USVI senator] Carlton Dowe's bid to go back to VIPA" who would be a "good person for us" there).  Based on his government connections, when traveling through the USVI's airport accompanied by young

---

[7] Epstein became frustrated that the process was not moving fast enough and suggested calling the Governor's Chief of Staff.  Ex. 102 at -21434.

[8] Indeed, employees at the airport noticed the young women he traveled with; one article quoted a former air traffic controller at the local airstrip on St. Thomas as saying "[m]y colleagues and I definitely talked about how we didn't understand how this guy was still allowed to be around children."  Ex. 108.  A current airstrip employee added that "it was like he was flaunting it."  *Id.*

women as a registered sex offender, Epstein could count on his "great relationship" with the officials there to avoid scrutiny or detection.  *See* Ex. 111 at -24879 (Epstein emailing Ms. de Jongh in 2010 to ask "who is [in] charge of customs in the v.i. I used to have a great relationship with gloria Lambert the airport supervisor . . . .there is a mr carpenter who has been difficult lately").  And when he did encounter difficulties, Epstein had but to email the USVI's First Lady, who gamely intervened on his behalf by reaching out to the future Governor.  *Id.*; *see also* Ex. 112 at -16458 (November 15, 2012 Epstein email to de Jongh regarding sending "all 78 [USVI customs agents] a turkey" for Thanksgiving); Ex. 113 at -25693; Ex. 114 at -22234.

In sum, in exchange for Epstein's cash and gifts, USVI made life easy for him.  The government mitigated any burdens from his sex offender status.  And it made sure that no one asked too many questions about his transport and keeping of young girls on his island.

### D.     USVI Seeks To Avoid Accountability By Moving To Strike

Rather than investigating its own twenty-year history of enabling Epstein's criminal activity, USVI filed this action against JPMC.  JPMC filed its Answer on April 24, 2023.  Dkt. 124 ("Answer").  As relevant here, and given the extensive record exposing USVI's complicity in furthering an Epstein sex-trafficking venture recounted above, JPMC pleaded that USVI's claims are barred by the doctrines of *in pari delicto*, unclean hands, and laches, *see id.* at 26 (Fifth, Sixth, and Seventh Affirmative Defenses), and that any damages suffered by USVI should be barred or reduced in accordance with the doctrines of comparative and contributory negligence or fault, *see id.* (Eighth Affirmative Defense).

In keeping with its efforts to avoid accountability, and to purge the record of inconvenient facts, USVI moved to strike JPMC's Fifth, Sixth, Seventh, and Eighth Affirmative Defenses.  Dkt. 139.  As grounds, USVI argues that it would be burdened by the "additional discovery" these defenses purportedly require.  But striking JPMC's valid affirmative defenses will not change the

scope of USVI's discovery obligations; indeed, discovery has all but ended.  This motion does not seek to shield USVI from intrusive discovery; it attempts to insulate USVI from legitimate questions about its complicity in an Epstein sex-trafficking venture.  It should be denied.

## ARGUMENT

"[C]ourts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).  Accordingly, "[m]otions to strike an affirmative defense are generally disfavored, and will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense."  *City of New York v. FedEx Ground Package Sys., Inc.*, 314 F.R.D. 348, 354-355 (S.D.N.Y. 2015) (cleaned up).  "In assessing the sufficiency of an affirmative defense, the Court should construe the pleadings liberally to give the defendant a full opportunity to support its claims at trial, after full discovery has been made."  *Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.*, 138 F. Supp. 3d 303, 313 (S.D.N.Y. 2014).  Thus, even if the law and facts are in equipoise as to the propriety of a particular defense, a motion to strike should be denied.  *See Index Fund, Inc. v. Hagopian*, 107 F.R.D. 95, 100 (S.D.N.Y. 1985) ("If the sufficiency of the defense depends upon disputed questions of fact or law, then the motion to strike will be denied.").

To carry its heavy burden, USVI must "satisfy a stringent three-pronged test: "'(1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense.'"  *FedEx*, 314 F.R.D. at 355 (quoting *Specialty Minerals, Inc. v. Pluess–Staufer AG*, 395 F. Supp. 2d 109, 111 (S.D.N.Y. 2005)).  USVI cannot satisfy any of these three "stringent" requirements.

As to the first and second prongs, USVI cannot show there is "no question of fact" nor "substantial question of law" that "might allow the defense to succeed." The facts recounted above speak for themselves. As to the law, USVI is correct that defendants may not dictate government policy, nor raise certain equitable defenses to law enforcement actions—but JPMC's affirmative defenses offend neither principle. JPMC seeks to hold the government to account for its *affirmative complicity* in Epstein's crimes. And USVI cannot invoke *parens patriae* as a talisman against civil procedure where Congress has afforded it a civil cause of action, and nothing else. *E.g.*, *New York v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030, 1033 (S.D.N.Y.) ("The State of New York sues as *parens patriae* on behalf of the citizens of New York. Although the State of New York is a governmental actor, it is considered a private party[.]"), *aff'd*, 14 F.3d 590 (2d Cir. 1993).

As to the third prong, USVI's sole claim of prejudice—burdens of discovery—should not be countenanced. JPMC has already taken substantial discovery demonstrating the potent applicability those defenses will have at trial. Fact discovery will close the same day that briefing on this motion will be complete. There can be no prejudice arising from discovery that has already been provided. Rather, the only "prejudice" USVI seeks to avoid is accountability for its complicity—but that is no basis for striking JPMC's defenses.

I.   **JPMC'S AFFIRMATIVE DEFENSES ARE LEGALLY AND FACTUALLY COGNIZABLE**

USVI's motion rests on a pair of cases arising from the government's enforcement actions in this district against UPS and FedEx relating to sale and transportation of contraband cigarettes. *See New York v. United Parcel Serv., Inc.*, 160 F. Supp. 3d 629 (S.D.N.Y. 2016), *vacated in part on other grounds on recons.*, 2016 WL 10672074 (S.D.N.Y. June 21, 2016); *FedEx*, 314 F.R.D. 348 (S.D.N.Y. 2016). In each case, as relevant here, the government brought claims under two statutes: the Contraband Cigarette Trafficking Act ("CCTA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See UPS*, 160 F. Supp. 3d at 633; *FedEx*, 314 F.R.D. at

353.  Both defendants pleaded several affirmative defenses—including unclean hands and *in pari delicto*—which the government moved to strike, claiming (as USVI does here) that said defenses were an "improper collateral attack on plaintiffs' enforcement decisions," *UPS*, 160 F. Supp. 3d at 633, that "impermissibly [sought] to interfere with the City and State's executive discretion to enforce their tax and public health laws," *FedEx*, 314 F.R.D. at 355-356.

In each case, the court first rejected the breadth of the government's motion and declined to categorically immunize governmental plaintiffs from the equitable defenses generally available in civil litigation.  *See UPS*, 160 F. Supp. 3d at 641 (nothing "stand[s] for the sweeping proposition that there is no set of facts pursuant to which an equitable defense might be asserted against a governmental entity"); *FedEx*, 314 F.R.D. at 357 (same).  The courts then identified two principles about affirmative defenses in government actions.

The first is that defendants cannot "challenge a government entity's decision-making as to when and under what circumstances to enforce a statute," *UPS*, 160 F. Supp. 3d at 640; *FedEx*, 314 F.R.D. at 356 (noting "the existence of a basic principle against allowing a party to dictate when and under what circumstances a particular law is to be enforced or not enforced."). Accordingly, each court struck the affirmative defenses that specifically sought to dictate or assign fault to the government's discretionary tax enforcement decisions.  *See FedEx*, 314 F.R.D. at 357-359 (striking three defenses that were "nothing more than FedEx's request that Plaintiffs collect lost taxes from other parties," another defense that would "stand as a judicial mandate forcing the City and State to re-prioritize their tax enforcement efforts," and another whose "core premise" was that the government was "negligent in their discretionary tax enforcement"); *UPS*,

160 F. Supp. 3d at 634 ("only" striking defenses that were "purely and properly cast as seeking redress based solely on a law enforcement choice"). [9]

The second principle is that certain equitable claims are unavailable when the government "enforce[s] certain laws in their traditional public capacity," *UPS*, 160 F. Supp. 3d at 634, but *are* available when the government acts "akin to" a "private actor," *id*. at 648; *FedEx* 314 F.R.D. at 358. Thus, both courts *allowed* the affirmative defenses (including unclean hands and *in pari delicto*) to stand as to the government's RICO claims, as those claims were brought pursuant to RICO's civil remedy provision. *See UPS*, 160 F. Supp. 3d at 648 ("The RICO … claims must be distinguished because, as to these claims, plaintiffs are acting in a role that is more akin to that of a private actor[.]"); *FedEx*, 314 F.R.D. at 358 (same reasoning). In contrast, the courts struck the equitable affirmative defenses as to enforcement of the CCTA, because (unlike the TVPA) that law afforded no "private right of action," *FedEx*, 314 F.R.D. at 357-358, and can be pursued "exclusively … by local government entities," such that in every CCTA case, the government acts "in a law enforcement capacity," "seeking civil penalties."[10]  *UPS*, 160 F. Supp. 3d at 646-648.

JPMC's affirmative defenses abide the guardrails established by these cases. JPMC does not ground its defenses of unclean hands and *in pari delicto* in prosecutorial inaction, but rather in affirmative governmental complicity—which no case or principle immunizes. And USVI is not here enforcing its own statute pursuant to an exclusive law enforcement prerogative, but instead seeks damages under the TVPA's "civil remedy," which does nothing more than give USVI the

---

[9] USVI cites various cases invoking the "public duty doctrine" and its purported applicability to JPMC's comparative fault defense. Mem. 8-9. These cases merely repeat the first principle in *UPS* and *FedEx*—*i.e.*, that JPMC's affirmative defenses "are not available against government plaintiffs for alleged failure to enforce or regulate." Mem. 8.

[10] Unlike with the TVPA, Congress specifically authorized the states to enforce the CCTA. *See* 18 U.S.C. § 2346(b)(1) (CCTA section titled "Enforcement and regulations," permitting state attorneys general to "bring an action … to prevent and restrain violations of this chapter[.]").

same standing its residents already enjoy.  In short, USVI is a civil TVPA plaintiff like any other, and must answer to the affirmative defenses raised against its pursuit for civil damages.

### A.    JPMC's Affirmative Defenses Do Not Infringe On Prosecutorial Discretion

Invoking the first principle in *UPS* and *FedEx*, the gravamen of USVI's motion is that JPMC cannot "second-guess the USVI's discretionary governance decisions."  Mem. 7; *see also id.* 8-10 (same argument as to JPMC's comparative fault defense); Dkt. 147 at 5 (arguing that JPMC "may not 'second-guess' governmental policy decisions.").  As explained, JPMC does not contest the basic principle that private litigants cannot dictate discretionary government policy. *E.g.*, *UPS*, 160 F. Supp. 3d at 639 ("It is well-established, and both parties on this motion agree, that government actors have broad executive discretion in law enforcement decisions.").  But JPMC's affirmative defenses do no such thing.  Rather, JPMC's affirmative defenses seek to hold USVI to account for participating in and benefiting from Epstein's criminal enterprise, not its failure to prosecute.  *See United States v. Wharton*, 514 F.2d 406, 409-412 (9th Cir. 1975) (distinguishing between "mere neglect" and "affirmative misconduct").

For example, as to "unclean hands," "New York courts have long applied the maxim that one who comes to equity must come with clean hands," and that no relief will lie for parties who "ha[ve] committed some unconscionable act that is directly related to the subject matter in litigation."  *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004) (internal citations and quotation marks omitted).  Similarly, "the doctrine of *in pari delicto* may ba[r] a claim where the plaintiff bears at least substantially equal[]responsibility for its injury."  *UPS*, 160 F. Supp. 3d at 646.[11]  As applied here, these defenses share a common theme:  USVI should

---

[11] Similarly, comparative fault hinges on USVI's complicity in the subject matter complained of, and laches turns on USVI's "unreasonable and inexcusable delay that [] result[s] in prejudice to the defendant."  *UPS*, 160 F. Supp. 3d at 646.

not be heard to allege that JPMC "facilitated or participated" in Epstein's criminality and was "indispensable to the operation," Mem. 1, when it is itself culpable of those very allegations.  In other words, USVI cannot claim a sovereign interest in enabling Epstein's crimes.

Discovery has revealed the merit of these defenses and how they apply to this case.  USVI did not simply fail to prosecute Epstein or protect his victims.  Worse, USVI actively worked *with* Epstein, reaping the benefits of his wealth while lending official services in aid of his crimes.  As recounted above, USVI's officials accepted Epstein's cash while the USVI government doled out millions.  USVI facilitated Epstein's transportation of young women and girls to and from his islands, securing visas and arranging for their enrollment in ESL classes.  USVI's First Lady worked for Epstein's companies and extensively lobbied on his behalf with government officials, including the governor.  USVI dutifully considered Epstein's input into its sex offender legislation ████████████████████████████████.  These choices have nothing to do with prosecutorial discretion—or in USVI's words, its "discretionary governance decisions." Mem. 7.  Rather, these facts demonstrate beneficial participation in Epstein's ventures and that the doctrines of unclean hands and *in pari delicto* squarely apply.  To grant USVI immunity from these defenses would be to allow it to profit from Epstein twice: first directly, then again in a civil suit which it could just as easily see reflected in a mirror.

### B.   USVI Is Acting As A Private Civil Litigant Subject To All Applicable Defenses

Nor can USVI avail itself of the second principle in *FedEx* and *UPS* that shields the government when acting in its traditional law enforcement capacity.  As the *FedEx* and *UPS* courts recognized in allowing the defenses of unclean hands and *in pari delicto* to proceed against New York's civil RICO claims, there is a fundamental distinction between government actions brought as "a public enforcer" and those "more akin to that of a private actor."  *UPS*, 160 F. Supp. 3d at

647-649; *FedEx*, 314 F.R.D. at *358.  Comparing USVI's civil TVPA claims to the civil RICO claims in *UPS* and *FedEx* demonstrates that USVI is acting as a civil plaintiff like any other.

RICO claims, like TVPA claims, can be brought in two ways.  First, the United States may seek criminal RICO penalties under 18 U.S.C. § 1963.  In so doing, everyone agrees the government acts in a "traditional public capacity."  *E.g.*, *UPS*, 160 F. Supp. 3d at 634.  But Congress also afforded "civil remedies" to any "person injured" by a RICO violation, including treble damages and attorneys' fees.  18 U.S.C. § 1964(c).  The distinction is critical.  When "[governments] sue under this civil provision … unlike the provision providing for RICO's criminal penalties, which are recoverable only by the United States," *FedEx*, 314 F.R.D. at 354, they act "in a role that is more akin to that of a private actor, rather than in the role of a public enforcer of the public interest."  *UPS*, 160 F. Supp. 3d at 648; *FedEx*, 314 F.R.D. at 358.  As such, courts allow affirmative defenses to stand as to governments' civil RICO claims.  The same analysis applies here.  USVI brings these claims pursuant to the TVPA's "civil remedy" provision—it cannot do otherwise.  In so doing, USVI is vindicating civil interests—Section 1595(d) does not authorize any other remedy.  And USVI seeks from JPMC "damages," including "exemplary damages" and "attorneys' fees"—quintessential civil remedies.  SAC at ¶¶ 40-42; *FedEx*, 314 F.R.D. at 354 ("A civil RICO plaintiff can recover treble damages, costs, and attorney's fees.").  USVI is thus a civil plaintiff subject to standard applicable defenses, just as *UPS* and *FedEx* held as to New York's RICO claims.

It is no answer that USVI claims immunity as *parens patriae*.  Mem. 7.  This district recently rejected similar arguments in the antitrust context.  In *In re Google Digital Advertising Antitrust Litig.*, 2022 WL 4226932, at *41 (S.D.N.Y. Sept. 13, 2022), several state attorneys general (like USVI here) asserted "claims 'in their respective sovereign capacities' and [as] *parens*

*patriae* on behalf of their citizens."  Google raised laches in defense, and the attorneys general (like USVI here) argued that "as sovereigns acting to vindicate the rights of the public, principles of equity afford them power not granted to private litigants."  *Id.*  at *42.  The court disagreed.  First, the court noted that originally only the United States could enforce federal antitrust law.  *Id.* at *43.  Congress later "expand[ed] antitrust enforcement" to permit civil actions by the states, but (as the court explained) states "proceeding [under that law] do[] not act in the capacity of a sovereign but as a private enforcer."  *Id.*  Accordingly, equitable defenses "may be applied to the States' claims[.]"  *Id.*  The court in *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C.), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023), drew a similar conclusion.  There, New York (like USVI here) invoked *parens patriae* as a shield against equitable defenses.  The court observed Congress's distinction between actions brought by the United States and those brought by states pursuant to a civil cause of action, and held equitable defenses apply against the latter.  "The fact that the States bring this *parens patriae* suit in the public interest does not counsel a different result."  549 F. Supp. 3d at 39 (internal citations and quotation marks omitted);[12] *see also Kraft Gen. Foods, Inc*, 862 F. Supp. at 1033 ("Although the State of New York is a government actor, it is considered a private party … [.]").

Those analyses map exactly onto USVI's claims here.  The TVPA, like the Sherman Act analyzed by the *Facebook* and *Google* courts, is first and foremost a federal statute enforceable only by the United States.  When the United States enforces the TVPA, it acts "in a law

---

[12] The *Facebook* court noted that in "expanding the universe of antitrust enforcers beyond the United States itself, Congress [] drew no distinction between states and private litigants."  *Id.* at 39.  The same analysis applies to the TVPA's civil remedy.  Although Congress conferred a private right of action on citizens and attorneys general via two different subsections of § 1595, the rights are coterminous—there are two subsections simply because Congress passed them at different times.

enforcement capacity," and "ordinarily applicable equitable defenses do not apply." *UPS*, 160 F. Supp. 3d at 647-648.  As it did with the Sherman Act (via the Clayton Act), Congress separately codified a "civil remedy" for private citizens at 18 U.S.C. § 1595(a); and later, Congress expanded that civil remedy to include state attorneys general (§ 1595(d)).  But like with the Sherman/Clayton Acts, Congress *did not* authorize state attorneys general to "enforce" the TVPA.  *Compare Facebook*, 549 F. Supp. 3d at 39 ("Congress, however, specifically rejected an amendment that would have authorized the attorney general of any state to bring suit in the name of the United States to enforce any of the antitrust laws." (internal quotation marks omitted)).  Rather, Congress granted the states a TVPA remedy akin to the civil cause of action afforded to all citizens.  As such, just as in an antitrust context, when a state acts pursuant to the TVPA civil cause of action, it does so "not [] in the capacity [as] a sovereign but as a private enforcer," subject to standard equitable defenses.  *In re Google*, 2022 WL 4226932, at *43.

Indeed, this Court has already recognized as much in permitting retroactive application of the TVPA's civil remedy.  As this Court explained, "in 2018, when Congress empowered state attorneys general to assert TVPA claims, it merely gave a new set of plaintiffs the right to vindicate potential liabilities which already existed," and thus "did not expand any party's liability[.]"  Op. & Order on Mot. to Dismiss, Dkt. 130, at 23; *id.* at 21 (the "quasi-sovereign interests that give states standing to sue under section 1595(d) are tied to injuries that would give individual plaintiffs a right to sue under section 1595(a)").  Had Congress in fact authorized the states, as sovereigns, to *enforce* a *criminal* law like the TVPA, certainly they could not do so retroactively.

* * *

*UPS* and *FedEx* are USVI's principal authorities, and they (along with *In re Google* and *Facebook*) plainly require denying the motion.  That is critical, as the burden is on USVI, not

JPMC, to "demonstrate[e] to the Court *to a certainty* that [it] would succeed despite *any set of facts* which could be proved in support of the defenses." *Walsh v. City of New York*, 585 F. Supp. 2d. 555, 557 (S.D.N.Y. 2008) (internal quotation marks omitted) (emphasis added).  There must be "no question of fact," nor any "substantial question of law that might allow the defense to succeed." *Specialty Minerals, Inc*, 395 F. Supp. 2d at 111.  And if there are "disputed questions of law or fact, then the motion to strike will be denied." *Index Fund, Inc.*, 107 F.R.D. at 100.  The fact is, "the law as to the applicability of equitable defenses to government agencies is not as settled as Plaintiff suggests, and even where the defense presents a purely legal question, the courts are very reluctant to determine disputed or substantial issues of law on a motion to strike." *EEOC v. UPS*, 2017 WL 2829513, at *12 (E.D.N.Y. June 29, 2007) (internal quotation marks and citations omitted).  USVI neither acknowledges this burden nor shoulders it.

## II.    USVI CANNOT DEMONSTRATE PREJUDICE FROM PAST DISCOVERY

Finally, USVI fails to meet the third prong.  A motion to strike will not be granted unless the plaintiff can "show that it is prejudiced by the inclusion of the defense." *Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999).  Where "there is no prejudice that could possibly result" from the inclusion of an affirmative defense, USVI's own authority indicates that a court will "decline[] to strike it." *FedEx*, 314 F.R.D. at 366.   That is the case here.

USVI argues that prejudice will result from "additional discovery."  Mem. 7.  But fact discovery closes the same day briefing on this motion is complete, and USVI has already produced documents relevant to JPMC's affirmative defenses (as evidenced in the background provided). JPMC's defenses have not and will not extend the discovery period, and their continued existence in the pleadings cannot harm a party that has already substantially complied with the discovery obligations attendant to those defenses.  In short, as there is no "extra cost and [] delay in bringing

the case to trial," *FDIC v. Eckert Seamans Cherin & Mellott*, 754 F. Supp. 22, 23 (E.D.N.Y. 1990), USVI's motion to strike is baseless.

USVI should also not be heard to complain about "expending trial time on questions" about its complicity in an Epstein sex-trafficking venture, as that complicity will be an issue at trial regardless of JPMC's affirmative defenses. Mem. 7. For example, USVI's complicity goes directly to issues surrounding its obstruction charge, including the existence (*vel non*) and nature of any USVI investigation into Epstein's crimes, and USVI's continued knowledge of Epstein's enterprise. Further, USVI's alleged damages must be balanced against the considerable benefits that USVI reaped from its facilitation of Epstein's crimes. At bottom, USVI will not be able to present a *prima facie* case that JPMC violated the TVPA or obstructed its enforcement without confronting questions about USVI's own actions. USVI may indeed feel prejudiced by the nature of its actions coming to light, but that is no basis to grant this motion to strike.

## CONCLUSION

For the foregoing reasons, the Court should deny USVI's motion to strike JPMC's affirmative defenses.

Dated: May 23, 2023                  Respectfully submitted,

                                     **WILMER CUTLER PICKERING
                                        HALE AND DORR LLP**

                                     _/s/ Felicia Ellsworth_
                                     Felicia H. Ellsworth
                                     John J. Butts
                                     60 State Street
                                     Boston, MA 02109
                                     (t) (617) 526-6000
                                     (f) (617) 526-5000
                                     felicia.ellsworth@wilmerhale.com
                                     john.butts@wilmerhale.com

                                     Boyd M. Johnson III
                                     Robert L. Boone
                                     Hillary Chutter-Ames
                                     7 World Trade Center
                                     250 Greenwich Street
                                     New York, NY 10007
                                     (t) (212) 230-8800
                                     (f) (212) 230-8888
                                     boyd.johnson@wilmerhale.com
                                     robert.boone@wilmerhale.com
                                     hillary.chutter-ames@wilmerhale.com

                                     _Attorneys for JPMorgan Chase Bank, N.A._