UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS<br><br>Plaintiff,<br><br>V.<br><br>JPMORGAN CHASE BANK, N.A.<br><br>Defendant/Third-Party Plaintiff.<br><br>JPMORGAN CHASE BANK, N.A.<br><br>Third-Party Plaintiff,<br><br>V.<br><br>JAMES EDWARD STALEY<br><br>Third-Party Defendant. | Case Number: 1:22-cv-10904-JSR |

**CORRECTED - GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS'
REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE
<u>DEFENDANT'S AFFIRMATIVE DEFENSES 5 THROUGH 8</u>**

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

ARGUMENT ............................................................................................................................ 3

    A.  The Government's TVPA *Parens Patriae* Claims Are Public Enforcement Claims to Which the Prohibition of Equitable and Fault-Shifting Defenses Applies. ........................ 3

    B.  The Government's Alleged Conduct Involves Discretionary Law Enforcement and Administration to Which the Prohibition of Fault-Shifting Defenses Applies. ................... 5

    C.  Maintaining JPMorgan's Prohibited Defenses Prejudices the Government. ...................... 9

CONCLUSION ...................................................................................................................... 10

i

# **TABLE OF AUTHORITIES**

**Cases**

*Alfred I. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982) ............................................................................................................... 3

*City of New York v. FedEx Ground Package System, Inc.,*
  314 F.R.D. 348 (S.D.N.Y. 2016) ........................................................................................4-5, 7

*Coach, Inc. v. Kmart Corps.,*
  756 F. Supp. 2d 421 (S.D.N.Y. 2010) .................................................................................. 10

*FTC v. Crescent Publ. Grp., Inc.,*
  129 F. Supp. 2d 311 (S.D.N.Y. 2001) ................................................................................. 2, 7

*Goldberg v. Weinberger,*
  546 F.2d 477 (2d Cir. 1976) ................................................................................................ 6

*Ludwig v. Learjet, Inc.,*
  830 F. Supp. 995 (E.D. Mich. 1993) ..................................................................................... 2

*Nevada v. U.S.,*
  463 U.S. 110 (1983) ............................................................................................................. 7

*Specialty Minerals, Inc. v. Pluess-Staufer AG,*
  395 F. Supp. 2d 109 (S.D.N.Y. 2005) ............................................................................... 9-10

*State of New York v. Facebook, Inc.,*
  549 F. Supp. 3d 6 (D.D.C. 2021) .......................................................................................... 5

*State of New York v. Kraft Gen. Foods, Inc.,*
  862 F. Supp. 1030 (S.D.N.Y. 1993) ..................................................................................... 5

*State of New York v. United Parcel Service, Inc.,*
  160 F. Supp. 3d 629 (S.D.N.Y. 2016) ............................................................................. 4, 5-6

*United States v. Wharton,*
  514 F.2d 406 (9th Cir. 1975) ................................................................................................ 6

**Statutes**

15 U.S.C. § 26 ............................................................................................................................ 5

18 U.S.C. §§ 1581-1597 ............................................................................................................. 1

18 U.S.C. § 1591 ........................................................................................................................ 1

18 U.S.C. § 1591(d) ............................................................................................................... 10

18 U.S.C. § 1595(d) ..................................................................................................... 1, 3, 5, 10

18 U.S.C. § 1964(c) ............................................................................................................. 4, 5

18 U.S.C. § 2346(b) ................................................................................................................. 4

14 V.I.C. § 1724(b)(4)……………………………………………………………………….7

17 V.I.C. § 454……………………………………………………………………………....7

29 V.I.C. § 543……………………………………………………………………….....…..7

29 V.I.C. § 705……………………………………………………………………………….7

## INTRODUCTION

Plaintiff, the Government of the United States Virgin Islands ("Government"), claims and will prove that Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") violated the Trafficking Victims Protection Act, 18 U.S.C. §§ 1581-1597 ("TVPA"), by knowingly participating in and benefitting from Jeffrey Epstein's sex-trafficking and by obstructing investigation through its concealment of Epstein's suspicious transactions from law enforcement.  Discovery confirms that JPMorgan knowingly, recklessly, and unlawfully provided and pulled the levers through which Epstein's recruiters and victims were paid and was indispensable to the operation and concealment of Epstein's trafficking.  JPMorgan had real-time information on Epstein's payments that the Government did not and had specific legal duties to report this information to law enforcement authorities, which it intentionally decided not to do.

The Government asserts its claims under 18 U.S.C. § 1595(d), which specifically provides a state attorney general a right of civil action as *parens patriae* for appropriate relief to protect residents who have been threatened or adversely affected by any person who has violated 18 U.S.C. § 1591, as JPMorgan did by participating in and concealing Epstein's trafficking.  After the Court denied its motions to dismiss, JPMorgan answered the Government's Complaint in part by trying to deflect blame and distract attention from its own conduct through affirmative defenses based on equitable and fault-shifting doctrines.  Since well-established authority in this Court and elsewhere holds that these defenses do not apply to a government plaintiff suing to vindicate public interests, as here, the Government moved to strike these defenses.

In its Opposition, JPMorgan doubles down on its efforts to distract and deflect.  While the Government's Motion raises straightforward questions of law based on authority holding that these defenses do not apply to public enforcement claims, JPMorgan's only legal argument in response

is that the Government's TVPA claims are private (not public) in nature, which contradicts both the Act and the Court's dismissal opinion holding to the contrary. JPMorgan's Opposition—including the 114 exhibits attached largely for purposes of attracting media attention—underscores the weaknesses of its legal arguments. A sophisticated, multinational financial organization like JPMorgan may not avoid the consequences of its actions by piecing emails together to concoct hyperbolic conspiracy theories regarding the Government's conduct. The Government activity JPMorgan focuses on—provision of airport security; administering notice requirements for sex-offender travel; scheduling university courses—are precisely the types of discretionary public functions to which the prohibition against equitable and fault-shifting defenses to public enforcement claims applies. *See Ludwig v. Learjet, Inc.*, 830 F. Supp. 995, 1000 (E.D. Mich. 1993) ("[D]efendant Fair's duty to supervise the maintenance and operation of the airport is a public duty and he therefore is protected from all of plaintiff's tort; claims[.]"); *see generally FTC v. Crescent Publ. Grp., Inc.*, 129 F. Supp. 2d 311, 324 (S.D.N.Y. 2001) ("As a general rule . . . neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest.") (internal quotation marks and citation omitted).

JPMorgan's attempt to portray the Government as identically situated with respect to knowledge and facilitation of Epstein's trafficking is not only legally flawed, but also factually baseless. Documents and testimony demonstrate that JPMorgan kept Epstein as a client for over a decade despite having overwhelming evidence from its internal transaction monitoring of his sex trafficking. JPMorgan's senior executives broke the rules under the TVPA and otherwise to conceal Epstein's suspicious transaction patterns and expand his capacity by opening account after account without regard to the trafficking the evidence before them demonstrated. JPMorgan's Opposition thus has no legal or factual merit and the Government's Motion should be granted.

**ARGUMENT**

A. **The Government's TVPA *Parens Patriae* Claims Are Public Enforcement Claims to Which the Prohibition of Equitable and Fault-Shifting Defenses Applies.**

The Government's causes of action against JPMorgan arise under the TVPA's express *parens patriae* provision for state attorneys' general, under which:

> In any case in which the attorney general of a State has reason to believe that *an interest of the residents of that State has been or is threatened or adversely affected* by any person who violates section 1591, the attorney general of the state, *as parens patriae*, may bring a civil action against such person *on behalf of the residents of the State* in an appropriate district court of the United States *to obtain appropriate relief*.

18 U.S.C. § 1595(d) (emphasis added). Notwithstanding the foregoing, JPMorgan's primary legal argument in opposition is that the Government "is acting as a *private* civil litigant subject to all applicable defenses." Opp. at 20 (emphasis added). This position is untenable and ignores the clear language of the TVPA and this Court's prior ruling on the Motion to Dismiss. The Court should summarily reject JPMorgan's attempts to rewrite both the statute and the Court's opinion.

The TVPA makes clear that a state plaintiff like the Government here does not bring suit as a private litigant on behalf of itself. Rather, it sues under section 1595(d) "as parens patriae" (*i.e.*, the sovereign) "on behalf of the residents of the State" to "obtain appropriate relief" for "an interest of [those] residents" that "has been or is threatened or adversely affected" by JPMorgan's prohibited conduct. In denying JPMorgan's motion to dismiss, the Court confirmed this plain reading of the statute, finding that the Government satisfies the requirements for *parens patriae* standing, *i.e.* that it "(1) allege[s] an injury to a quasi-sovereign interest that affects a sufficiently substantial segment of its population and (2) seek[s] relief to the territory's injury that would be unavailable to individual plaintiffs." Opinion and Order (Dkt. 130) at 17 (citing *Alfred I. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)). The Court explained that the

3

Government's "asserted interest in assuring its residents it will act to protect them from the harmful effects of criminal sex-trafficking enterprises flourishing in the Islands that are their home is indeed general (as all interests that ground *parens patriae* standing must be)" and that this interest "directly parallels the interest that Puerto Rico successfully asserted in *Snapp*[.]" *Id.* at 18 (internal quotation marks omitted).[1]  The Court having found that the Government alleges a generalized quasi-sovereign interest and seeks relief beyond that available to individual plaintiffs, JPMorgan's contrary argument that the Government is acting as a private litigant necessarily fails.

The cases JPMorgan relies on are readily distinguishable because they address statutes that only permit state governments to sue through private rights of action. *State of New York v. United Parcel Service, Inc.*, 160 F. Supp. 3d 629 (S.D.N.Y. 2016) held that equitable defenses were barred "as a matter of law" as applied to the state and city plaintiffs' Contraband Cigarette Trafficking Act ("CCTA") claims under 18 U.S.C. § 2346 because, "[i]n the context of these statutes, the State and City are acting in a law enforcement capacity in their roles as government entities" where "the claims they assert may exclusively be pursued by local government entities, and not by private parties." *Id.* at 647.  This ruling supports the Government's Motion. The Court also held, however, that equitable defenses *were not* barred as to the government plaintiffs' RICO claims, which arose under RICO's private cause of action provision, 18 U.S.C. § 1964(c), which is "available to any aggrieved private party (or local government entity) who meets standing and other requirements" so that the "plaintiffs are acting in a role that is more akin to that of a private actor, rather than in a role of a public enforcer of the public interest." 160 F. Supp. 3d at 648.[2]

---

[1] JPMorgan's contention that the Court recognized the Government "as a private enforcer," Opp. at 23, cannot be squared with the Court's actual holding that the Government alleges injury to a quasi-sovereign interest for which it seeks appropriate relief.
[2] *See also City of New York v. FedEx Ground Package System, Inc.*, 314 F.R.D. 348, 358 (S.D.N.Y. 2016) (striking laches, unclean hands and *in pari delicto* defenses as to CCTA claim; denying

Here, the Government's TVPA claim under section 1595(d) is one exclusively pursued by state governments, and not by private parties, just as under the CCTA. The TVPA makes this clear by predicating a state government's claim on its showing that "an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591[.]" 18 U.S.C. § 1595(d).[3] The dismissal opinion makes it clearer still that the Government is acting in a public enforcement capacity by holding that the Government "allege[s] an injury to a quasi-sovereign interest" and "seek[s] relief to the territory's injury that would be unavailable to individual plaintiffs." Opinion at 18. JPMorgan ignores this clear language and the Court's holding in order to smear the Government and its current and former employees. Since the Government is enforcing the TVPA in its traditional public law enforcement capacity, JPMorgan's equitable and fault-shifting defenses are barred and should be struck.

**B. The Government's Alleged Conduct Involves Discretionary Law Enforcement and Administration to Which the Prohibition of Fault-Shifting Defenses Applies.**

JPMorgan correctly recognizes that "defendants cannot 'challenge a government entity's decision-making as to when and under what circumstances to enforce a statute[.]'" Opp. at 17

---

motion to strike as to RICO claim); *State of New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 38-39 (D.D.C. 2021) (equitable defense of laches may apply to state plaintiff's claim under federal antitrust statute where Congress "drew no distinction between states and private litigants: both simply came within the statute's authorization of '[a]ny person' to 'sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws.'") (quoting 15 U.S.C. § 26), *aff'd sub nom. State of New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023); *State of New York v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030, 1033 (S.D.N.Y. 1993) ("Although the State of New York is a governmental actor, it is considered a private party when seeking an injunction pursuant to the Clayton Act.").

[3] *Contra* 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws[.]"); 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee[.]").

5

(quoting *State of New York v. UPS*, 160 F. Supp. 3d at 640).  But that is *exactly* what it is trying to do.  JPMorgan's assertion that it intends to use its affirmative defenses "to hold USVI to account for participating in and benefiting from Epstein's criminal enterprise, not its failure to prosecute," *Id.* at 19, fails as a matter of both law and fact.

First, JPMorgan's "participating in and benefitting from" argument does not find support in applicable law governing affirmative defenses to public enforcement claims.  JPMorgan cites *United States v. Wharton*, 514 F.2d 406 (9th Cir. 1975), as purportedly "distinguishing between 'mere neglect' and 'affirmative misconduct'" by the Government.  Opp. at 19 (quoting *Wharton*, 514 F.2d at 409).  The Second Circuit, however, long ago rejected *Wharton*'s analysis of when alleged affirmative misconduct—in both cases, misrepresentations to victim plaintiffs—permits a party to invoke equity (estoppel) against the government:

> It is well established that estoppel cannot be set up against the Government on the basis of an unauthorized representation or act of an officer or employee who is without authority in his individual capacity to bind the Government.  Although at least one court has evidenced a willingness to depart from this principle in certain circumstances, *see, e.g., United States v. Wharton*, 514 F.2d 406, 412-13 (9th Cir. 1975) [and earlier Ninth Circuit cases], we decline to do so here.
>
> The government could scarcely function if it were bound by its employees' unauthorized representations.

*Goldberg v. Weinberger*, 546 F.2d 477, 480-81 (2d Cir. 1976) (internal quotation marks and separate citation omitted).  So too here, the Government could not function as law enforcement authority if every alleged misapplication of a regulation or customary practice were deemed to abrogate its public enforcement claims. JPMorgan's "affirmative misconduct" argument in support of its equitable and fault-shifting defenses thus fails as a matter of law.

Second, this argument also fails as a factual matter.  What JPMorgan characterizes as "affirmative misconduct"—alleged mis-enforcement of sex-offender registry travel reporting

6

regulations; University's scheduling of English as a Second Language (ESL) course; and alleged airport security failures—is exactly the kind of alleged government negligence or neglect in the performance of discretionary duties that is not a basis for a defense to government enforcement of public statutory rights.  *See Crescent Publ.*, 129 F. Supp. 2d at 324 ("'As a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest.'") (quoting *Nevada v. U.S.*, 463 U.S. 110, 141 (1983) (internal citation omitted)); *City of New York v. FedEx*, 314 F.R.D. at 359 ("The core premise of the defense is that Plaintiffs were negligent in their discretionary tax enforcement, a contention that is impermissible where the government seeks to vindicate the public interest via enforcement of a public statutory right.").  Although JPMorgan seeks to predicate its defense on the fact that prior Attorneys General modified Mr. Epstein's notification requirements as a registered sex offender, it fails to advise the Court that Virgin Islands law authorizes the Attorney General to modify those requirements "at his discretion." *See* 14 V.I.C. § 1724(b)(4). Activities such as awarding economic development benefits, airport security and provision of classes at universities are also expressly permitted under Virgin Islands law. *See, e.g.,* 29 V.I.C. § 705 (enumerating "powers and duties" of the Economic Development Commission); 29 V.I.C. § 543 (enumerating the "powers" and "purposes" of the Virgin Islands Port Authority); 17 V.I.C. § 454 (enumerating the "powers and duties" of the University).  JPMorgan's argument amounts to little more than an attempt to second-guess the Government's administration of its laws, which is *precisely* what is barred in a *parens patriae* action like this one.

While the foregoing suffices to grant the Motion to Strike, the Court also should reject JPMorgan's transparent purpose in its Opposition to publicly and misleadingly set up a strawman that the Government's conduct and knowledge mirrors JPMorgan's.  The evidence shows

7

otherwise—that JPMorgan had unique real-time knowledge of Epstein's trafficking and payments to victims and recruiters and consciously chose to continue to facilitate and conceal these transactions in derogation of its legal duties so that his trafficking could continue. This evidence includes the following:

- October 2007—email to Anne Verdon, General Counsel of U.S. Private Bank connecting the dots between payments made from JPMorgan account to woman whom Epstein publicly identified as his "Yugoslavian sex slave," describing payments to recruiters and high-value cash withdrawals; Ex. 1 (JPM-SDNYLIT-00269651 and attachments);

- January 2008—emails with Epstein's Private Banker at JPMorgan, anticipating Private Bank's exiting from Epstein's accounts—"We need to have the felony he pleads guilty to. So march. No one wants him.", though JPMorgan nonetheless continued to serve and failed to address signs of Epstein's trafficking for another 5 years even after Epstein's guilty plea; Ex. 2 (JPM-SDNYLIT-00002141);

- July 2008--rapid response tracking database, stating that former head of Private Bank, Catherine Keating, did not want to retain Epstein after his conviction; Ex. 3 (JPM-SDNYLIT-00269848).

- December 2010—emails to Vice President of Anti-Money Laundering Operations describing recent press report and describing Epstein as a "known child sleaze"; Ex. 4 (JPM-SDNYLIT-00194018);

- January 2011—email from Ryan forwarded to Global Head of Compliance, William Langford, describing "rapid response" meeting with CEO and General Counsel of U.S. Private Bank, and other business and compliance personnel—"no one on today's call was in favor of having retained [Epstein] as a client." Ex. 5 (JPM-SDNYLIT-00157192);

- January 2011 – Langford conveyed to JPMorgan General Counsel and Former SEC Head of Enforcement, Stephen Cutler, "concern" about retaining Epstein as a client, "heightened, if you will, by the human trafficking initiative that we're doing, given that he was convicted of these crimes" Ex. 6 (Cutler Dep.) at 343:12-24;

- Cutler testified that lawyers and compliance personnel looked at "whether or not Jeffrey Epstein was continuing to be involved in criminal activity, namely human trafficking" and his and their "evaluation was he should not be a client at the bank," Ex. 6 (Cutler Dep.) at 363:16-365:24;

- July 2011—two years before JPMorgan exited Epstein, email from Cutler to Staley, Erdoes, and others on Epstein: "This is not an honorable person in any way. He should not be a client."; Ex. 7 (JPM-SDNYLIT-00274561);

- July 2011—tracking database stating that John Duffy, Keating's successor as head of Private Bank wanted to exit Epstein "while things are a bit settled" Ex. 3 (JPM-SDNYLIT-00269848);

- March 2012—over one year before JPMorgan exited Epstein, emails between Erdoes and head of Private Bank, John Duffy, in which Epstein is identified as a "high risk client" and both acknowledge their awareness of issues with continued cash withdrawal activity; Ex. 8 (JPM-SDNYLIT-00136519);

- June 2013—lync conversation in which JPMorgan employee describes reported FBI investigation of "claims that under-age girls were moved abroad for sex," which "paves the way for the FBI to prosecute him for offences committed outside Florida under the Trafficking Victims Protection Act."; also states that Private Bank "did not want to keep him but do [*sic*] to his relationship with the old head of the PB (Jes Staley) they were overruled," even though numerous witnesses have acknowledged that other JPMorgan executives had the authority to exit Epstein's business; Ex. 9 (JPM-SDNYLIT-00100935);

- July 2013—email from Duffy to Erdoes describing "JE talking pts." for JPMorgan's exiting from his accounts, emphasizing the "repetitive nature of your cash transactions," which JPMorgan had been observing for over five years; Ex. 10 (JPM-SDNYLIT-00100966);

- Even after exiting Epstein, JPMorgan did not close Epstein accounts and continued to handle large direct payments from Epstein's accounts to women with Eastern European names and to known recruiters and victims; Ex. 6 (Cutler Dep.) at 442:10-451:17.

In light of the substantial evidence of JPMorgan's knowledge of and participation in Epstein's trafficking activity, JPMorgan's attempt to drag the Government into the swamp with it fails miserably. It also provides no justification whatsoever for the equitable and fault-shifting defenses at issue, which should be struck.

### C. Maintaining JPMorgan's Prohibited Defenses Prejudices the Government.

A plaintiff is "prejudiced" for purposes of a motion to strike where inclusion of a facially deficient defense would require "additional discovery" and/or "expend the length and scope of the

9

trial." *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 114 (S.D.N.Y. 2005); *see also Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 426 (S.D.N.Y. 2010) ("Increased time and expense of trial may constitute sufficient prejudice to warrant striking an affirmative defense."). Both concerns are present in abundance here, as further evidenced by JPMorgan's filing of *114 exhibits* in response to a nine-page motion.

JPMorgan's arguments in opposition on prejudice are not substantial. First, it argues that there is no prejudice from additional discovery because "fact discovery closes the same day briefing on this motion is complete, and USVI has already produced documents relevant to JPMC's affirmative defenses (as evidenced in the background provided)." Opp. at 24. The Court should reject this argument because depositions are ongoing and maintaining the meritless defenses also would expand the scope of expert discovery. Second, JPMorgan argues that Government conduct will be at issue at trial regardless of its defenses because it purportedly is relevant to obstruction and damages. Opp. at 25. This argument fails because the Government's TVPA obstruction claim turns on *federal* investigations, *see* 18 U.S.C. § 1591(d) (addressing "[w]however obstructs, attempts to obstruct, or in any way interferes with or prevents *the enforcement of this section*") (emphasis added), while damages are tied not to harm (or alleged benefit) to the Government, but to resident victims, *see* 18 U.S.C. § 1595(d) (Government may bring civil action "on behalf of the residents of the State . . . to obtain appropriate relief"). Testimony and JPMorgan's 100+ exhibits on alleged Government conduct thus would needlessly increase the time and expense of trial, and for this additional reason JPMorgan's Affirmative Defenses 5 through 8 should be struck.

## CONCLUSION

For all of the reasons set forth, the Government's Motion to Strike JPMorgan's Affirmative Defenses 5 Through 8 should be granted.

Dated: June 12, 2023          **ARIEL SMITH, ESQ.**
**ATTORNEY GENERAL NOMINEE**

By counsel,

/s/ *Linda Singer*
**LINDA SINGER**
Admitted *Pro Hac Vice*
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
lsinger@motleyrice.com

**VENETIA VELAZQUEZ**

Admitted *Pro Hac Vice*
Acting Chief, Civil Division
Virgin Islands Department of Justice
Office of the Attorney General
213 Estate La Reine, RR1 Box 6151
Kingshill, St. Croix
U.S. Virgin Islands 00850
Tel: (340) 773-0295 ext. 202481
venetia.velazquez@doj.vi.gov

**DAVID I. ACKERMAN**
**MIMI LIU** (Admitted *Pro Hac Vice*)
**PAIGE BOGGS** (Admitted *Pro Hac Vice*)
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
dackerman@motleyrice.com
mliu@motleyrice.com
pboggs@motleyrice.com

*Attorneys for Plaintiff Government of the United States Virgin Islands*