N5j2DoeA

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
JANE DOE, individually and on
behalf of all others similarly
situated,

          Plaintiff,                      New York, N.Y.

          v.                              22 Civ. 10019 (JSR)

JPMORGAN CHASE BANK, N.A.,

          Defendant/Third-Party
          Plaintiff.
------------------------------x
GOVERNMENT OF THE UNITED
STATES VIRGIN ISLANDS,

          Plaintiff,

          v.                              22 Civ. 10904 (JSR)

JPMORGAN CHASE, N.A.,

          Defendant/Third-Party
          Plaintiff.
------------------------------x
JPMORGAN CHASE, N.A.,

          Third-Party Plaintiff,

          v.

JAMES EDWARD STALEY,

          Third-Party Defendant.
------------------------------x       Argument

                                      May 19, 2022
                                      3:00 p.m.


Before:


                    HON. JED S. RAKOFF,

                                      District Judge
```

1                                    APPEARANCES

2

3    BOIES, SCHILLER & FLEXNER, LLP
          Attorneys for Plaintiff Jane Doe
4    BY:  SABINA MARIELLA

5

6    MASSEY & GAIL, LLP
          Attorneys for Defendant
     BY:  LEONARD A. GAIL
7         MATTHEW M. COLLETTE

8

9    WILMER CUTLER PICKERING HALE & DORR, LLP
          Attorneys for Defendant
     BY:  FELICIA H. ELLSWORTH
10        BOYD M. JOHNSON
          HILLARY CHUTTER-AMES

11

12   WILLIAMS & CONNOLLY, LLP
          Attorneys for Third-Party Defendant
13   BY:  STEPHEN L. WOHLGEMUTH
          EDEN SCHIFFMANN
14        ZACHARY K. WARREN

15

16

17

18

19

20

21

22

23

24

25

N5j2DoeA

1          (Case called)

2          THE DEPUTY CLERK:  Will everyone please be seated and

3     will the parties please identify themselves for the record.

4          MS. MARIELLA:  Good afternoon.  Sabina Mariella, from

5     Boies Schiller Flexner, on behalf of Jane Doe.

6          MR. WOHLGEMUTH:  Good afternoon, your Honor.  Steve

7     Wohlgemuth, from Williams & Connolly, on behalf of third-party

8     defendant, Mr. Staley; and I am joined by Mr. Warren and

9     Mr. Schiffmann of Williams & Connolly, as well.

10          MR. GAIL:  Good day, your Honor.  Lenny Gail, G-A-I-L,

11     and Matt Collette, of Massey & Gail, on behalf of defendant

12     JPMorgan.

13          MS. ELLSWORTH:  Good afternoon, your Honor.  Felicia

14     Ellsworth, Boyd Johnson, and Hillary Chutter-Ames, from Wilmer

15     Hale, on behalf of JPMorgan Chase.

16          THE COURT:  Good afternoon, everyone.

17          I am ready to hear argument on Mr. Staley's motion to

18     dismiss.

19          MR. WOHLGEMUTH:  Thank you, your Honor.

20          THE COURT:  I should mention for the record that each

21     side has been given 20 minutes to make their initial

22     presentation and ten minutes for rebuttal.

23          MR. WOHLGEMUTH:  Thank you, your Honor.

24          I recognize that the Court is familiar with the

25     allegations against Mr. Staley and obviously has devoted a lot

1    of time and attention to this case, which we appreciate, so I

2    will just jump right in with what I view as the first major

3    issue presented by our motion, which is JPMorgan's attempt to

4    use contribution and indemnity claims to apportion liability

5    under the TVPA.  These claims --

6         THE COURT:  I wasn't clear from the papers--maybe I

7    missed it--is there a contribution claim with respect to the

8    negligence claims as opposed to the federal claims?

9         MR. WOHLGEMUTH:  I believe that JPMorgan, with respect

10   to the Doe complaint, is alleging a contribution claim that

11   covers -- tries to cover both the negligence claims and the

12   federal claims under the TVPA.

13        THE COURT:  So let's assume for the sake of argument

14   that you are right about the federal claims.  There would still

15   be, would there not, contribution claims against your client

16   with respect to the negligence claims.

17        MR. WOHLGEMUTH:  Not with respect to the USVI

18   complaint, where the only claims remaining are the TVPA claims.

19   With respect to Doe, we believe that the negligence claims or

20   the negligence-based contribution claims are meritless for

21   other reasons.

22        And also, your Honor, this gets to the shotgun

23   pleading point that we raised in our complaint.  The way that

24   these claims were pled, where they sort of mush all of these

25   theories of liability together, precludes us from being able

1    to attack each one in a motions to dismiss.  You can't plead a

2    claim like that under Rule 8, under Rule 10(b).  That's what

3    they have tried to do.  We think that that is a basis, an

4    independent basis for dismissing the claim.

5         THE COURT:  Well, I saw that in your papers, but I

6    just want to be sure I understand.  I think you raise a

7    significant issue with respect to the federal claim, and I

8    want to hear from both sides on that.

9         But other than your argument that the claims are too

10   mushed together——a well-known legal principle——what is your

11   basis, if any, for saying that you have a dismissal motion

12   with respect to the contribution claims, the state claims?

13        MR. WOHLGEMUTH:  With respect to the -- if I

14   understand your Honor's question, it is directed toward the

15   negligence claims alleged by Doe, for which JPMorgan is

16   seeking contribution.  My answer to that is that there are two

17   problems with those claims.

18        Under New York State law, they have to allege——"they"

19   being JPMorgan——that either a duty to the plaintiffs or to

20   JPMorgan was breached.  They haven't done that here.

21        And with respect to the other element of a

22   contribution claim, they have to identify what the harm is that

23   Mr. Staley allegedly caused and show that it's the same or

24   plead that it's the same as the harm --

25        THE COURT:  Okay.  So those are independent arguments,

1    but now I understand what your position is.  Okay.

2              So let's go to the federal claim you were starting to

3    talk to me about.

4              MR. WOHLGEMUTH:  Absolutely.  In our view, these

5    claims are clearly meritless and should have -- well, they are

6    foreclosed by binding Second Circuit precedent.  After we

7    received JPMorgan's opposition brief, we see the basis for

8    this claim is a New York State law contribution statute which

9    JPMorgan is trying to use to divvy up liability under a

10   federal --

11             THE COURT:  You are saying that, among other things,

12   in this Circuit that's foreclosed by the *Madoff* decision, where

13   the Second Circuit, in a moment of weakness, affirmed my

14   decision.  So I am going to ask them, of course, how they

15   distinguish that case.

16             But was there anything else -- it is clear that that

17   is a significant argument, the clear holding of that case, if

18   it is applicable here.  Is there anything further that you

19   wanted to say on contribution?

20             MR. WOHLGEMUTH:  Just briefly, touching on some of

21   their cases──the *NYSEG* case, the *Jackson* case, the *Too* case.

22             Two of those cases──*NYSEG* and *Jackson*──predate *Madoff*,

23   so don't have the benefit of that clear pronouncement of the

24   Second Circuit with respect to using contribution claims just

25   as JPMorgan is trying to do here.  And with respect to the

N5j2DoeA

*Jackson* case, that actually supports our view.  I believe that

case is post-*Madoff*.  That case holds that there can be no

contribution claim for a federal copyright liability.  That's

exactly --

THE COURT:  So what about *O'Melveny & Myers v. FDIC,*

a decision by another prominent court, namely, the

Supreme Court of the United States, which says, "Matters left

unaddressed by a federal statutory scheme are presumably left

subject to the disposition provided by state law."  What about

that?  I'm not sure.  If the *Madoff* case governs, I would not

have the power to say it's contrary to that federal case, but

it might be an issue for the Second Circuit.  But what about

that on the merits?

MR. WOHLGEMUTH:  I think my answer to that is that the

*Madoff* case does govern.  The *Madoff* case, I think it's fair to

say, is motivated by preemption principles, but it creates a

bright-line rule that you cannot use state law contribution

statutes to apportion federal liability no matter what the

source of the federal liability is.

I think the *NYSEG* case actually demonstrates this

tension pretty well, which is the case that JPMorgan tries to

rely on.  According to *NYSEG*, operating in a pre-*Madoff* world,

it looked at the federal/state statute and it said, yeah, it

is silent as to whether or not it can apply to federal

statutes. The Court noted that there was a group of mostly

1    Southern District of New York cases that found that there was

2    a categorical rule that the state law contribution statute

3    cannot ever apply to federal statutory liability.  It rejected

4    those cases and then did a sort of first-principles analysis

5    along the lines that your Honor is alluding to with the

6    *O'Melveny* reference.  But the Second Circuit in *Madoff* adopted

7    that categorical rule and, in fact, cited many of the cases

8    that the *NYSEG* case sort of shrugged off in 2007.

9            I do want to address very briefly the *A.B.* case, which

10   is a case from the Eastern District of Pennsylvania.  I think

11   that is plainly distinguishable for a couple of reasons.  The

12   first and most important is that it is not from this circuit.

13   The Second Circuit's case --

14           THE COURT:  No, but it's from Philadelphia, which is

15   my hometown, so I have to give it a lot of close study,

16   anyway.

17           Go ahead.

18           MR. WOHLGEMUTH:  That notwithstanding, the Second

19   Circuit's decision in *Madoff* was not binding precedent for

20   that Court, and the mechanics of the *Madoff* decision are very

21   clear as applied to any federal liability.

22           I don't read the bank to be pursuing any implied

23   claim of contribution under the TVPA or any implied claim of

24   indemnity under the TVPA anymore, as I understand their

25   opposition.  But just for good order, that is also foreclosed.

N5j2DoeA

1    The TVPA is completely silent as to indemnity and

2    contribution.  The legislative history is completely silent as

3    to contribution and indemnity.  The remedial scheme, as

4    several circuit courts have held, is comprehensive.  And, if

5    anything, implying contribution claims and indemnity claims

6    where none exist is contrary to the purposes of the statute

7    because it takes control away from victims of human

8    trafficking over their litigation and only increases the

9    complexity of the cases that they have to litigate.

10           So I think that handles the federal law issues from

11   our perspective, unless the Court has any questions.

12           I do want to turn to the other defects of what I will

13   call the contingent or derivative claims, first being

14   indemnification.

15           I think it is worth pointing out at the outset the

16   oddity of these claims, implied indemnity claims, where a

17   defendant is being sued and it says, though I'm being sued and

18   may in fact be liable, every single penny of a judgment has to

19   be paid by a third party.  Given the oddity of that claim, it's

20   not surprising that it applies in only very limited

21   circumstances, and there are three prongs I want to highlight

22   for the Court.

23           The first is, essentially what an indemnity claim is,

24   it's an implied contract claim.  And so when courts see that

25   the parties have already thought about indemnification and

N5j2DoeA

1      there is a contract governing indemnification and the right

2      only flows one way but not the other, that precludes the Court

3      from implying a right going the anti-contractual way.

4              THE COURT:  So if I understand their argument——and I,

5      again, want to hear from them on this——they are saying that

6      even though it is a contract and it only flowed one way, not in

7      the way they are now claiming, that that portion of the

8      contract is void or defective, and therefore you are back to

9      square one of no contracts, so to speak.

10             What about that argument?

11             MR. WOHLGEMUTH:  So that is what they say and our

12     response is that it doesn't matter.  What matters is not --

13     I'm not claiming, I'm not arguing right now, I may later, but

14     I'm not arguing that Mr. Staley is in fact entitled to be

15     indemnified.  All that matters for this analysis is that there

16     is an indemnification right, it exists, it was bargained for,

17     and that precludes implying something that goes the other way.

18             And if you look at the state law cases that we

19     cite——the *Serv. Sign* case, the *Lamela* case, the *Honeywell*

20     case——none of them involve grappling with whether or not the

21     indemnification provision at issue in that case, the

22     contractual one, not the implied one, actually applied on the

23     facts.  All that matters is its existence.

24             The second and third defects that we point out in

25     our brief with respect to the indemnification claim I think

N5j2DoeA

1    can really be analyzed together.  They are two sides of the

2    same coin.  Indemnification claims are only cognizable when

3    the third-party plaintiff is solely liable because of the

4    third-party defendant's conduct and where the wrongdoing is

5    within the sole province of a matter delegated to the

6    third-party defendant.  Another way of saying that is that you

7    have to be completely passive in order to take benefit of,

8    again, this very odd claim, and that's just not the case here.

9    The plaintiffs allege all sorts of things that JPMorgan did

10   that Mr. Staley didn't do.  Mr. Staley didn't have --

11             THE COURT:  Yeah, but is that really a motion to

12   dismiss issue?  Because let's assume a jury found that

13   JPMorgan's liability rests solely on Mr. Staley's conduct or

14   failure to act or whatever.  Wouldn't that, then, eliminate

15   the argument you are now making?

16             MR. WOHLGEMUTH:  A jury could not find that on the

17   claims as JPMorgan itself has alleged them.  JPMorgan

18   recognizes in its complaint, third-party complaint——I will cite

19   for the Court at least 40 and 61——that Mr. Staley or others at

20   the bank other than Mr. Staley had authority to fire

21   Mr. Epstein as a client of the bank.  That means that there is

22   someone else making a decision.  Whether or not it's reliant

23   on information supposedly provided by Mr. Staley is beside the

24   point.  What matters is that there is someone else doing

25   something.  They are not purely passive.  They have to make

```
1    the decision: fire/don't fire.  That takes them out of the
2    realm of indemnification simply on the basis of the
3    allegations that they make.
4              THE COURT:  Okay.
5              MR. WOHLGEMUTH:  With respect to the contribution
6    claims, I alluded to these arguments a little earlier in the
7    presentation.  On breach, there are three ways they could
8    satisfy the existence of a duty and the breach of that duty.
9    They could allege a duty to either one of the plaintiffs.  They
10   don't do that and concede in their brief that they
11   intentionally did not do that.  So there is no allegation of
12   breach of a duty to Doe or to the USVI.
13             Instead, they hang their hat on breach of a fiduciary
14   duty to the bank.  The fiduciary duty claim that they have set
15   out sounds in fraud.  I don't think there is any dispute about
16   that.  The bank recognizes that.  That means that 9(b) applies.
17   The Second Circuit, this Court, courts all over the country
18   have said in 9(b) cases you have to plead them with
19   particularity, you have to give the who, what, where, when,
20   how, why of the fraud.  It is just completely absent from their
21   complaint.
22             THE COURT:  Well, assuming for the sake of argument
23   that's true, wouldn't that at most get you an opportunity for
24   them to replead to see if they can supply those now that
25   substantial discovery has occurred?
```

N5j2DoeA

1          MR. WOHLGEMUTH:  We do not believe so, your Honor.

2     There are classes of plaintiffs who have the opportunity to

3     conduct pre-suit discovery.  The government often in

4     enforcement action has that right.  Bankruptcy trustees often

5     have that right.  JPMorgan in this case had that right.  They

6     had several months of discovery to look into Mr. Staley's

7     e-mails, to subpoena other folks, and bring their best shot

8     when they brought this claim in March.  Just like courts are

9     hard on those plaintiffs that get pre-suit discovery, like

10     bankruptcy trustees and the government, I believe it should

11     take an extra -- it should be hard on JPMorgan here, as well.

12     These are details that are not hard to provide if they are in

13     fact true.  They have access to all the witnesses.  All of the

14     statements by Mr. Staley, this alleged vouching that occurred,

15     would have happened to JP -- would have been made to JPMorgan

16     employees.

17          THE COURT:  My recollection is they did -- well,

18     while being careful always to assert that they factually

19     disagree with Jane Doe's allegations and the Virgin Islands's

20     allegations, they did incorporate them by reference with

21     respect to the claims that they were then making against your

22     client.  So doesn't that supply a lot of the particulars?

23          MR. WOHLGEMUTH:  It doesn't supply the particularity.

24     Well, first of all, I will push back against the premise a

25     little bit, and then I will answer the question directly.

1          Pushing back against the premise, I don't think

2    they——and expressly they do not——incorporate all of the

3    allegations of the plaintiffs in their complaint, and they pick

4    and choose which ones they want and which ones they like.  And,

5    as your Honor notes, I think the more important part is they

6    disclaim the truth of those allegations.

7          But to answer the Court's question more directly, that

8    doesn't matter because their theory of fraud, their theory of

9    misrepresentation depends upon vouching that occurred inside

10   the walls of JPMorgan.  They are the ones who know the who,

11   what, where, when, how.  Who did he say it to?  What did he

12   say?  They are the only ones who could supply that detail.

13   The plaintiffs certainly don't because they are not within

14   those four walls.  That's on them, that's their burden, and

15   they haven't even tried to meet it.

16         With respect to the harm point, again, this is just a

17   clear pleading failure.  In order for a contribution claim to

18   be cognizable, a third-party plaintiff has to identify the

19   harm, and it has to point out and allege that it's the same as

20   the harm that it is alleged to have caused.  They do not do

21   that at all.  The complaint is completely absent of

22   allegations identifying the harm that Mr. Staley caused the

23   USVI or Doe.

24         And I think, your Honor, that that was probably

25   intentional because, for example, with respect to the USVI, I'm

1    not even sure what harm they could plead that Mr. Staley

2    caused.  As I understand the remaining claims by the USVI, all

3    that is left is a claim under the TVPA where the USVI is

4    proceeding as a regulator.  It is a government enforcement

5    action where they are seeking civil penalties.  I don't know

6    how Mr. Staley can be claimed to have caused harm to the USVI

7    in that capacity.

8           So, again, we just have a clear pleading failure with

9    respect to this claim.

10          THE COURT:  I'm going to remind you that, regretfully

11   I have to limit you to 20 minutes, as I have to limit your

12   adversary, because I have a 4:00 matter.

13          MR. WOHLGEMUTH:  Absolutely, your Honor.  I will turn,

14   then, briefly to the employment law claims which are

15   independent of the contribution and indemnity claims.

16          Here, we think the indemnity claims and contribution

17   claims have got to go for the reasons that I just --

18          THE COURT:  Yeah, and if they go, then the other

19   claims go, as well, right?

20          MR. WOHLGEMUTH:  Correct.  Rule 14 is the rule that

21   governs third-party practice, and it says that only contingent

22   claims that are derivative of or depend upon the plaintiffs'

23   claims are properly pled.  Now, once you have properly pled

24   contingent claims, you can hang other claims on, I think, under

25   Rule 18.  But if the main derivative claims are gone, the other

N5j2DoeA

two employment claims have to be dismissed, in our view.

          But they are also defective on the merits.  There is a
huge statute of limitations problem with these claims.
Mr. Staley left the bank, JPMorgan, over a decade ago.  The
claims and the conduct that is alleged and underlines their
theories of liability occurred about almost 15 years ago in
some cases.  And New York law, as the Court knows, is --

          THE COURT:  You are saying that even if the discovery
extension occurs, by the time they got around to firing him,
they had to know much of what the plaintiffs are alleging or at
least they were on notice of it.

          MR. WOHLGEMUTH:  Absolutely.  By the time they got
around to firing Mr. Epstein, they should have been on notice
of a lot of what the plaintiffs allege.  They had access to
Mr. Staley's e-mails and could have been on notice of a lot of
what the plaintiffs allege which, of course, is basically a
large portion of the basis of the USVI's allegations against
Mr. Staley relating solely to his e-mails which JPMorgan has
had.  And certainly by the time 2018 and 2019 roll around and
there are articles about Mr. Staley -- sorry, about
Mr. Epstein, sort of renewing the scrutiny and renewing the
thought that he maybe was much worse than people had thought
back in 2006 through 2013, they were on notice certainly by
that point.  And even with the two-year discovery rule,
JPMorgan is out of time, and these claims are stale.

1          THE COURT:  All right.  I'm going to need to cut you

2     off at this point, but thank you very much.  We will hear now

3     from your adversary.

4          MR. GAIL:  Good afternoon, your Honor.

5          There is a lot to cover, partially because we have got

6     a grab bag of allegations and then we have some stuff like

7     *Madoff* that I really want to dig into with the Court.  So let

8     me try and cover both of those.  Obviously, your Honor will

9     drive the proceedings.

10          We well know all well-pleaded allegations are taken

11     as true.  The plaintiffs' well-pleaded allegations, which were

12     incorporated and attached essentially by attaching the

13     complaints to our third-party complaint, essentially allege

14     Staley violated the TVPA, that he knew of Epstein's sex

15     trafficking because he observed it, and Doe further alleges

16     that he participated in his sex trafficking by, among other

17     things, engaging in a violent sexual assault of Doe.

18          JPMorgan alleges that if the plaintiffs' allegations

19     are true, then Staley caused some or all of the plaintiffs'

20     claim because Staley vouched for Epstein within the bank which

21     allowed Epstein to continue to access the funds plaintiffs

22     contend was essential for his trafficking.  All harm or injury

23     that the plaintiffs allege flows from him being a JPMorgan

24     client.  So our position is, in the third-party claim, had he

25     done what he was supposed to do, had he observed his

N5j2DoeA

1  obligations, Epstein would not have been a client, and no harm

2  or injury or a substantial amount of harm or injury would not

3  have occurred.

4         So let's go through some of the grab bag arguments if

5  we can.

6         First, contribution is clearly available, as the Court

7  recognized, for Doe's negligence claims.  There are two

8  arguments why it wouldn't apply or make weight.  Under the

9  New York statutory law, the only question is whether the injury

10  is shared, whether it is the same injury, which is clearly met

11  here.  JPMorgan and Staley are both subject to liability for

12  damages from their alleged participation according to the

13  plaintiffs from their banking Epstein.

14         The legal grounds by which JPMorgan and the

15  third-party defendant Staley may be liable can be different

16  under the statute.  There is no question, though, that the

17  injury is the same because we continued to bank him and

18  therefore the contribution claim is appropriate.

19         I am going to skip over the TVPA for a quick second

20  and go to these other ones and then spend the meat of the time

21  on that.

22         Contribution is not an end-around for what the

23  plaintiffs -- from the plaintiffs' complaint.  Rule 14 makes

24  clear the right of plaintiffs to control whom to sue is not

25  implicated by third-party claims.  As the Second Circuit held

N5j2DoeA

in *Chemung Canal*, plaintiffs should not be indifferent to the

presence of contribution claims because it should be

indifferent because it doesn't affect their ability to recover

the full amount of their damages.

     The Court already decided that there are

countervailing issues of judicial committee and prejudice to

JPMorgan that warrant inclusion of Staley as a third-party

defendant when you rejected their motion to sever.  And Staley

is staying in this case because, as the Court observed, we get

contribution for Doe's negligence claims.

     Let's talk about the indemnification bylaw for a

second.  Staley apparently contends that our corporate bylaws,

which provide indemnification to the extent permitted by

Delaware law, means he can never be sued for indemnification

ever.  That's the upshot of their argument.

     That isn't a serious argument.  No company ever

provides indemnification to its officers and directors that

can -- for all purposes and for all acts.  Even if they

committed criminal acts that caused liability to the company,

that's the upshot of Staley's argument, and that's not right

under Delaware law, and Delaware law incorporated in the bylaws

put the contours of what they are calling a contract in place.

That is 8 Del. Code 145(a).

     That's why the JPMorgan bylaw isn't what they are

calling a one-way indemnification.  If the plaintiffs'

N5j2DoeA

1  allegations are true, Staley acted in bad faith against the

2  interests of the corporation, and he will be held liable for

3  indemnification against JPMorgan under Delaware law.

4          Now, not surprising --

5          THE COURT:  Just so I understand --

6          MR. GAIL:  Sure.

7          THE COURT:  -- this last argument, so you have a

8  contract, in effect, between the employer and the employee,

9  and the contract says with respect to indemnification if you

10  do X, Y, or Z we will indemnify you, but nothing else, but is

11  totally silent about the other direction.  And you are saying

12  that that silence doesn't mean that, as part of the contractual

13  deal, the agreement was that there would be no indemnification

14  going the other way?

15          MR. GAIL:  No, your Honor.  Let me be clearer, and two

16  responses.

17          One, the bylaws just say we are going to indemnify to

18  the fullest extent by Delaware law.  That's all they say.  And

19  Delaware law has its own limits which, in this world of a

20  contract -- and I'm going to come back to argue this is not

21  really a contract within the meaning of the one-way

22  indemnification cases.  But even pretending it's a contract,

23  the contract never contemplated he could never be sued for

24  indemnification.  Because Delaware law is incorporated,

25  Delaware law absolutely prohibits indemnification for acts

N5j2DoeA

```
 1   that are considered in bad faith or violation of law.  So it
 2   was never a part of the contract, therefore it is not a
 3   one-way.
 4            Second, look at their cases closely.  It won't take
 5   you long.  Their cases deal with bilateral negotiated
 6   contracts from which the Court can infer a one-way
 7   relationship because nobody on the other side said, hey, I
 8   want indemnification going the other way.  Those are actual
 9   bilateral negotiations.  They provide you zero cases that talk
10   about a generic bylaw indemnification, and that's why.  It's
11   what we just discussed.
12            THE COURT:  Okay.  Let's turn to what I am most
13   anxious to hear you --
14            MR. GAIL:  Okay.
15            THE COURT:  -- talk about --
16            MR. GAIL:  Let's get to the meat.
17            THE COURT:  -- which is the Madoff case.
18            MR. GAIL:  All right.  Terrific.
19            The question at bar is whether the TVPA displaces and
20   precludes contribution and indemnification claims that would
21   otherwise be permissible.  That inquiry with respect to the
22   TVPA and other federal statutes does not begin and end by
23   looking at the text.  No case anywhere says so.
24            Whether evaluating using a full preemption rubric or
25   a more truncated analysis, like in Madoff, the question is
```

N5j2DoeA

|     |
|-----|

1    always statute specific.  Is indemnification and contribution

2    consistent or inconsistent with the statutes, objectives, and

3    legislative history?  Does the federal statute sound in tort

4    or in trust or in other state law?  Is the statutory scheme so

5    comprehensive that it supersedes under preemption rules and

6    displaces state statutes, including contribution?  Or, like

7    here, does the statute leave room for negligence claims

8    brought under common law or other remedies, like punitive

9    damages, even though the statute is silent --

10            THE COURT:  Well, let me see if I understand that

11   argument completely.  So in the *Madoff* case, the Second

12   Circuit, hereinafter referred to as my esteemed bosses --

13            MR. GAIL:  Boss.

14            THE COURT:  Right.

15            -- says, "It is settled in this Circuit that there is

16   no claim for contribution unless the operative federal statute

17   provides one."

18            Now, there is nothing in the wording of the statute

19   that we are concerned with that says anything about

20   contribution, so your argument is, nevertheless, it implicitly

21   provides one?  Is that the argument?

22            MR. GAIL:  I'm not sure I would use the word

23   "implicitly."  I think they were using shorthand, and let me

24   explain, if I might.

25            *Madoff* rejected the New York contribution statute

1    under SIPA, and we will talk about it did not do that for all

2    federal claims.  Right?  The language its quoting wasn't at

3    bar.  As your Honor put it in the case below, "New York's

4    contribution statute didn't apply under SIPA.  While the

5    trustee is obligated to pay customer claims pursuant to a

6    statutory scheme, he is not subject to liability for damages

7    in the sense contemplated by the contribution law of the State

8    of New York."

9              *Madoff* upstairs held that "the New York contribution

10   statute requires some form of compulsion, that is, the party

11   seeking contribution must have been compelled in some way, such

12   as the entry of a judgment, to make a payment."  But again, the

13   Second Circuit says, "SIPA does not require customers to

14   establish a basis of liability as a prerequisite for the

15   trustee's disbursement."  As such, these SIPA cases did not

16   determine if 1401 could ever apply to federal law, much less a

17   statute that sounds in tort like the TVPA.

18             So let me make a few more points about *Madoff*.

19             Second, *Madoff* recognized elsewhere in the opinion──I

20   think it may even be the next paragraph, your Honor──that a

21   contribution right could be found by implication.  So did the

22   Supreme Court in *Northwest Airlines*, which *Madoff* relies on and

23   cites, and in *Texas Industries*.  All of those cases recognized

24   that implied rights of contribution for federal claims can be

25   appropriate.

1          So the question is, is it appropriate here in the

2    face of silence?  All those cases, when they say "clearly

3    implied" or "implied," they mean in the face of the silence

4    that we are talking about.  And that is what is appropriate

5    here.  The right of contribution furthers the TVPA's express

6    purpose of punishing traffickers.

7          As we say, the legislative history has three

8    objectives expressly stated in the house report—to compensate

9    plaintiffs, to punish traffickers, and to do justice,

10   essentially.  And in this case, reading the right of

11   contribution or not preempting New York's statute, where the

12   legislature said we want to give contribution, is consistent

13   with the notion of punishing traffickers.

14         Third, and the broader point that you alluded to when

15   you were asking our friends on the other side, *Madoff* should

16   be read in light of preemption principles.  I think

17   Mr. Wohlgemuth said honestly it was motivated by preemption

18   principles, and he is right on that.

19         Your Honor's *Picard* opinion contained a preemption

20   analysis, albeit a brief one.  You wrote, "Given that these

21   payments are being made pursuant to a comprehensive statutory

22   scheme, the Court concludes the trustee cannot rely on state

23   law."  Here, the TVPA does not establish a comprehensive

24   statutory scheme.  One, it leaves room for negligence claims,

25   as your Honor -- as we have discussed; and, second, courts

```
1    have implied a right to punitive damages which they would not
2    if the remedial scheme at issue here were truly comprehensive.
3    The New York State Electric case, from the Northern District,
4    basically frames it as exactly the preemption point we are
5    making.
6              So, in short, this case is about the TVPA, not SIPA,
7    which we discussed, what you and the Second Circuit say
8    doesn't invoke the contribution statute of the State of New
9    York.  TVPA is not a labor statute, like the FLSA and Equal
10   Pay Act, as in Northwest Airlines and in Herman, where there is
11   clearly preemption.  Those are comprehensive.  And it is not
12   like the antitrust laws in Texas Industries, where there is a
13   whole discussion specific to the antitrust laws, you know, how
14   do you look attribution?  Do you look at market share?  Do you
15   look at revenue?  Do you look at culpability?  None of those
16   questions are present here.  The jury will allocate
17   responsibility on the V when you instruct them on contribution.
18             So the question at bar is whether the TVPA's silence
19   should be read to displace state indemnification and
20   contribution law.  Here, a state statute that when you read
21   it——and I'm sure your Honor has or will——that expressly
22   contemplates contribution under federal statutes, because it
23   exempts federal worker's compensation, which they wouldn't
24   have put in if it didn't apply to federal statutes, we submit
25   that individuals who have contributed to injuries for TVPA
```

1    violations should be held accountable with civil damages, and

2    that purpose is implied by the TVPA itself and legislative

3    history.  Here is the exact quote from the House report is "to

4    ensure punishment of traffickers."  That's at page 2,

5    H.R. Rep. 108-264(II).

6            The same approach, as I mentioned, to the statutory

7    silence is reflected in the cases that have consistently found

8    the propriety of punitive damages awards despite the TVPA's

9    silence where, as here, the TVPA sounds in tort and state law

10   permits those damages.

11           THE COURT:  All right.  So only because, again, I need

12   to be mindful of the time, did you want to say anything about

13   the 9(b) argument on the employment claims?

14           MR. GAIL:  I can do that quickly.

15           I mean, as your Honor pointed out, we essentially

16   incorporate the plaintiffs' complaints.  There is a specific

17   reference in one of them, just as an example, of a January '11

18   meeting, January 2011 meeting, after which they went to Staley,

19   the JPMorgan people, and he vouched for Epstein and remained as

20   a client.  And we allege that that is part of the vouching for

21   him that had JPMorgan continuing to keep him as a client.

22           We also have this fraudulent concealment position,

23   where we specify, with specificity, that on his departure he

24   signed -- affirmed his obedience to the code of conduct which

25   he never could have signed if the plaintiffs' allegations are

1    true.  He would have done a thousand things in violation of the

2    code of conduct.

3             There is one point I wanted to make, oh, where

4    Mr. Wohlgemuth seems to suggest, I mean suggests -- it is

5    nowhere in the pleadings, it is nowhere outside the pleadings,

6    that somehow Staley was fired because of Epstein?  There is

7    zero evidence -- there is zero allegations, which as you know,

8    we are all about here, it's what the allegations are, and there

9    is zero evidence of that.

10            In fact, the same thing with these newspaper articles

11   and the subpoena that he alleges that are not in the

12   complaints.  We will have a debate, if he wants it, on statute

13   of limitations on summary judgment, but on the four corners of

14   the complaint, there is zero -- there is nothing that would

15   have put us on inquiry notice, and we have gone further and

16   alleged fraudulent concealment.

17            Let me make a few other points.

18            THE COURT:  Do you want to give me a hint?  I agree

19   with you totally that I govern in this motion totally by the

20   pleadings, but just out of curiosity, so why was he fired?

21            MR. GAIL:  Well, I -- let's say that -- can I get

22   away with telling you that it had absolutely nothing to do

23   with Epstein?

24            THE COURT:  Well, you can get away with it --

25            MR. GAIL:  I mean, is it okay?

N5j2DoeA

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | THE COURT:  -- for today's purposes, anyway.  Okay.                       |
| 2  | It is --                                                                  |
| 3  | MR. GAIL:  If your Honor would like us --                                 |
| 4  | THE COURT:  It's not --                                                   |
| 5  | MR. GAIL:  -- if that's --                                                |
| 6  | THE COURT:  I doubt that it's going to be a material                      |
| 7  | issue in my decision in this motion, but curiosity got the                |
| 8  | better of me.                                                             |
| 9  | MR. GAIL:  Fair enough.                                                   |
| 10 | I have a little more time where, unless there is                          |
| 11 | anything else, I would like to go back to the meat of the                 |
| 12 | TVPA --                                                                   |
| 13 | THE COURT:  Go ahead.                                                     |
| 14 | MR. GAIL:  -- issue.                                                      |
| 15 | So consistent with that whole schtick I gave you                          |
| 16 | earlier, courts have allowed --                                           |
| 17 | THE COURT:  Another legal term like "mush."                               |
| 18 | MR. GAIL:  Yes.                                                           |
| 19 | Courts have allowed contribution for claims under                         |
| 20 | federal statutes even when the statute is silent.  *City of*              |
| 21 | *Los Angeles v. AECOM* had a state -- recognized a state law              |
| 22 | right to contribution for violations of the Americans with               |
| 23 | Disabilities Act, a federal statute.  *A.B. v. Marriott* is your          |
| 24 | hometown case that is consistent with -- that says -- it's one            |
| 25 | of two cases, only one of which is not *in dicta*, that rules             |

N5j2DoeA

that contribution, under state law, is appropriate under the
TVPA.

And by the way, if you pause for a second, their
position on indemnification, as I mentioned earlier, would
mean that Marriott couldn't have joined the actual
traffickers.  Had their position on this one way
indemnification been true in this case, we couldn't join
Staley and we couldn't even join Epstein if Epstein were alive
because, according to them, there is no right of contribution
and no indemnification.  That can't be the law, and it's not
the law.

Other federal statutes for which there has been state
contribution, the Lanham Act in *Too v. Kohl's* and, as I
mentioned, the *New York State Electric & Gas Corporation*,
which found a state right to contribution under CERCLA.
States can also -- in addition to this, states have used
federal law as a predicate for claims under state law whether
for contribution or for a separate cause of action.

I mentioned the statute itself contemplates a federal
hook for contribution, and the violation of federal statutes,
as the Court undoubtedly knows, is often used as a predicate
for negligence, which are state law claims, or state unfair
competition claims.  All of those are using a federal statute
and allowing parties—in those cases mostly plaintiffs, but a
third-party plaintiff is similar—to provide contribution or

1   other relief even when the statute is silent.  And they are

2   doing that because the federal statute does not fully preempt.

3           The only way for this Court to conclude that the

4   contribution law enacted by the legislature of the State of

5   New York, duly elected, does not apply is to conclude that the

6   TVPA preempts it.  Let me quote from the *New York State*

7   *Electric & Gas* case.  "*Herman* and *Northwest Airlines* are better

8   understood in presenting questions of conflict preemption

9   rather than standing for the proposition that the use of a

10  state rule of contribution is never appropriate when the

11  underlying liability arises under federal law."

12          THE COURT:  All right.  Thank you very much.  I think

13  we are ready to hear rebuttal.

14          MR. GAIL:  Do I get my minute-ten on the other side.

15          THE COURT:  We will see if we have got anything.

16          MR. GAIL:  Okay.  Thank you.

17          THE COURT:  I'm sorry.  My watch was different.  So I

18  will give you in your rebuttal 11 minutes and 10 seconds.

19          MR. GAIL:  Thank you, your Honor.

20          THE COURT:  And you could take that time, too, if you

21  want.

22          MR. WOHLGEMUTH:  Thank you, your Honor.

23          A couple of points to respond to Mr. Gail's

24  presentation.

25          I will probably start with the *Madoff* case and that

N5j2DoeA

federal issue.  I didn't hear from Mr. Gail an identification

of a single case decided after *Madoff* that proceeds in an

analysis that looks anything like what the bank is arguing, not

one.  *New York State Electric & Gas*, or *NYSEG*, as I referred to

it, is pre-*Madoff*.  It focused on cases that it said adopted a

categorical rule and rejected those cases, and *Madoff* then

adopted the categorical rule.  He is citing old law that has

been abrogated by *Madoff*.  And this argument, frankly, it

requires the Court -- their argument requires them to say to

the Court the Second Circuit did not mean what it said in

*Madoff*, and the language that you read very clearly spoke of

any federal liability.

          The same is true for the *Herman* case, which was even

decided before *Madoff*, where they say, "Federal courts

recognize a right to contribution under state law only in

cases in which state law supplies the appropriate rule of

decision."  that ends the matter.  There is no need to talk

about the *NYSEG* case or any other case.  The Second Circuit has

spoken very clearly.

          And even with respect to the *Too* case, which I heard

come up and was surprised to hear come up, frankly, in the

Southern District of New York that case has received

unfavorable treatment, where other courts in the Southern

District have said the parties didn't even brief the issue

that we are talking about here today and in fact that case was

N5j2DoeA

1    against the weight of the well-reasoned decisions coming the

2    other way.

3           THE COURT:  So if you are right, I don't have to

4    reach the issue about preemption.  But to make sure we cover

5    everything, what about the argument that this is not a

6    preemptive statute?  There was a criminal statute, they tacked

7    on a civil right of action to accompany it.  It doesn't have

8    the feel, if you will, of a preemption statute, such as the

9    ones they cite.  What about that?

10          MR. WOHLGEMUTH:  The Ninth Circuit and the Sixth

11   Circuit have both called the TVPA comprehensive in scope.  And,

12   again, the implied right of contribution analysis is fairly

13   straightforward.  Look at the text.  It's not there.  Look at

14   the legislative history.  All I heard from Mr. Gail was a

15   generic statement of something like we don't like traffickers?

16   I don't see how you read a contribution claim given that

17   statement.  And, three, I would disagree and push back

18   strongly against the idea that a contribution claim is what

19   Congress intended.  I think it is very disruptive to

20   plaintiffs, who are choosing who to sue in a trafficking case,

21   to have defendants decide who in fact they have to sue.

22   That's not what Congress intended, and in fact Congress has

23   amended the TVPA and they have not added a contribution claim,

24   and they know how to do that if they want to.

25          A couple of points on the state law claims.

1          THE COURT:  I'm not sure I fully understand what you

2     just said.  If you are right in your reading in the scope of

3     *Madoff*, we know you can reach this issue.  But I thought you

4     were making the additional argument or alternative argument

5     that this is a preemptive statute or should be read at

6     preempting the field, and therefore state contribution law is

7     irrelevant because Congress did the whole thing.  I'm not

8     clear why you say it is that, when a typical preemptive

9     statute will, frankly, go on for pages, with lots of

10    accompanying regulations and so forth, and this doesn't seem

11    like one of those.

12         MR. WOHLGEMUTH:  Your Honor, we believe it is a

13    comprehensive remedial scheme.  Other courts have called it a

14    comprehensive remedial scheme.  But even just backing up, how

15    can they imply a cause of action?  How can they have a cause

16    of action for contribution relating to liability --

17         THE COURT:  No, I think their argument, at least in

18    part—again, there are many arguments before me from both

19    sides—is that if the federal statute is silent and if *Madoff*

20    doesn't apply, that then you look to whether it is, for lack of

21    a better way to put it, a classic tort to which the state laws,

22    including the state laws of contribution, should be relevant.

23    I think that's sort of one of their arguments.

24         MR. WOHLGEMUTH:  So in a world in which *Madoff* does

25    not exist, I still think we are correct, but we are in a world

N5j2DoeA

where *Madoff* does exist.

THE COURT:  There is no doubt that's your strongest
argument.  I just wanted to make sure I understood your
fallback argument.

MR. WOHLGEMUTH:  Correct.  Yes.  Our argument, our
fallback argument is that there is a comprehensive scheme and
that it would not be appropriate to use state law to graft on
a remedy that Congress expressly has chosen not to provide.

I do want to clarify one thing.  I think I may have
misunderstood your Honor's argument -- or your Honor's
statement about JPMorgan would have been on notice by the time
they fired him.  I thought "him" was referring to Mr. Epstein,
not Mr. Staley.  I didn't mean to imply in any sense that
Mr. Staley was fired because -- or even that he was fired for
any reason relating to Mr. Epstein.

On the contribution point, I heard Mr. Gail address
the same injury point, but what I did not hear was a reference
to any paragraph number in his complaint in which they allege
what the injury was that Mr. Staley caused.  It's just not
there, it wasn't in the presentation, and it's a clear pleading
failure.

On the indemnification point, Mr. Gail makes a lot of
the fact that the bylaws state the bank will indemnify officers
and directors to the fullest extent of the law.  Well, that's
all any indemnity obligation can provide.  No state, at least

N5j2DoeA

```
1    that I'm aware of, allows indemnification for any liability

2    such as fraud.  There is all kinds of carveouts always.  But

3    the New York courts don't do this dance that Mr. Gail would

4    have the Court do of figuring out whether or not the

5    indemnification clause actually covers the conduct or not.

6    They just say is it there?  Yes or no?  Up or down?  It's

7    there.  We are not going to imply one going the other way.

8            And contrary to Mr. Gail's point, bylaws are in fact

9    contractual in nature.  The Delaware Court of Chancery has

10   held that.  I believe there are cases in the Southern District

11   of New York that have also held that.  They are contractual

12   arrangements --

13           THE COURT:  The argument, again, as I understand it,

14   is, okay, we agreed by contract to indemnify you to the extent

15   Delaware law permits.  The argument is that doesn't mean that

16   we were contractually giving up our right to sue you for

17   indemnification if Delaware law otherwise permitted us to sue

18   you for indemnification.  That's, I think, the argument they

19   are making.

20           MR. WOHLGEMUTH:  Well, that is an analysis that I am

21   not familiar with under any of the cases.  I don't think it is

22   supported.  The cases look at is there a right?  Does it

23   exist?  If it does, we are not going to apply one going the

24   other way.  That's the end of the matter.  It's actually a

25   fairly simple --
```

1          THE COURT:  Again, I don't mean to be putting words

2     in your adversary's mouth, but at least as I understood his

3     argument, he says the cases that say that are where the whole

4     thing was negotiated as opposed to simply an, if you will,

5     almost boilerplate inclusion of to the extent Delaware law says

6     we have to indemnify you, we agree we have to indemnify you.

7          MR. WOHLGEMUTH:  What matters not is whether it is

8     negotiated.  What matters is whether one side is promising the

9     other we will indemnify you to the fullest extent permitted by

10    law.  And what has happened is the bank is promising its

11    directors and officers that it will indemnify them to the

12    fullest extent of the law, and it is doing nothing to extract

13    a promise going the other way.  It just hasn't happened.  It's

14    not in the complaint.  It's not in the record.

15         Last point on the Rule 9(b), again, I heard Mr. Gail

16    refer to the plaintiffs' complaint about the fact that there

17    had maybe been vouching after one meeting, well, what does the

18    bank say?  Was there vouching?  What did Mr. Staley actually

19    say?  The plaintiffs——both Doe and the USVI——were not there at

20    the meeting in 2011 at JPMorgan Chase's offices.  Mr. Gail's

21    clients were.  So what did Mr. Staley say, who did he say it

22    to, and why did they rely on it?  That is what Rule 9(b)

23    provides or requires, it's very straightforward, and it's just

24    completely absent from their complaint.

25         THE COURT:  The problem I am having with that

N5j2DoeA

1   argument, as you may have gathered from my question to you

2   previously, is typically a 9(b) failure in the pleadings gives

3   rise, at most, to an opportunity to replead.  You are saying,

4   well, they had all this time before they even sued us and, you

5   know, eh.  But my recollection is that federal law is clear

6   that the opportunity to replead should be liberally granted.

7            MR. WOHLGEMUTH:  The first response is we do believe

8   it should be dismissed with prejudice.  They had every

9   opportunity to make this allegation and they didn't.  But even

10  if this Court did allow them to replead, they still have to

11  make the allegation.

12           THE COURT:  Okay.

13           MR. WOHLGEMUTH:  They have to say what's true and

14  what's not.

15           THE COURT:  So you know what you are facing is what

16  you are saying.

17           MR. WOHLGEMUTH:  Yes.

18           THE COURT:  I think you have reached the end of your

19  time, and let me hear from your adversary.

20           MR. WOHLGEMUTH:  Thank you, your Honor.

21           THE COURT:  Thank you.

22           MR. GAIL:  Okay.  Let's spend real time on *Madoff*.

23           So, first, *Madoff* did not change the world.  *Madoff*

24  applied, by its terms, *Northwest Airlines*, and *Northwest*

25  *Airlines* was applying *Texas Industries*.

N5j2DoeA

1            Second, *Madoff* recognized expressly that the question

2     of whether contribution is displaced, preempted, precluded is

3     always statute specific.

4            Third, *Madoff* contemplates on its terms and it says

5     if a right of contribution is implied, it will be recognized.

6     It didn't say that it was implied by SIPA for the reasons we

7     discussed earlier.  But on its -- even the language, the

8     categorical what I was calling shorthand that the Court used is

9     internally modified by the notion that contribution can be

10    implied.  And this is what we argue here.

11           Fourth, as I mentioned, the language we are quoting

12    here is shorthand.  With all respect, I believe it is

13    shorthand for preemption, but at a minimum it is shorthand and

14    it is arguably *dicta* in a world where *Madoff* concludes that

15    SIPA didn't invoke the circumstances of the New York State

16    statute because there were no damages like your Honor found

17    below and they just phrased it differently above.

18           And then finally, sixth, I think, and this occurred

19    to me recently, I think we have to step back.  Is there any

20    reason why the rule, the supremacy clause, anything would be

21    different with respect to a statute that contemplates

22    contribution as opposed to a statute that contemplates or

23    doesn't contemplate punitive damages or other remedial

24    measures, aiding and abetting, something like that.  There is

25    nothing about contribution that suggests there should be a

N5j2DoeA

1    unique rule about it, it should be read just like all questions

2    of statutory interpretation and construction, and that is what

3    we are suggesting here.

4           *Herman* is easy.  In the last paragraph of *Herman* they

5    explicitly say it is preempted.  It is a preemption case.  So

6    that is consistent, not inconsistent.

7           On the notion of the completeness of the complaint and

8    whether the plaintiff should control their complaint, remember,

9    the complaint references -- the complaints reference -- one of

10   them references Staley 91 times and the other 40 such times.

11   So the question of Staley's role has been interposed by the

12   plaintiff.  They control their complaint, but federal rules

13   don't let them control the question of impleader.

14          On this notion of Congress amended the TVPA but didn't

15   change, include contribution.  That's just another measure of

16   silence.  And as the Supreme Court explained in *Bob Jones*,

17   silence is really only a useful tool if the question that's

18   being debated is in the public discourse.  That's 461 U.S. 599.

19   If contribution and indemnification under the TVPA was not in

20   the discourse—and there is no evidence that it was—then the

21   congressional silence means nothing.  If anything, the only

22   opinion that ruled on whether the TVPA permitted contribution

23   was the *Marriott* case, the other case that ruled it not in

24   *dicta*, and that was consistent with finding the right of

25   contribution because the Court there said to conclude

N5j2DoeA

```
 1   otherwise would give immunity to traffickers and the Court
 2   said that's not the right way to read the TVPA.
 3            Finally, at the time of the TVPA's enactment of its
 4   civil remedies in 2003, contribution was a common and accepted
 5   part of tort law, Restatement of torts, apportionment
 6   liability, section 23, and that is against which Congress was
 7   legislating.
 8            The --
 9            THE COURT:  I agree that congressional silence is
10   normally not much of a basis for reaching a definitive
11   conclusion because, at least in my experience, the
12   representatives in Washington are very talkative, and for them
13   to be silent is quite extraordinary.
14            MR. GAIL:  Not in this case, because no one had
15   contribution --
16            THE COURT:  Right.  I'm really saying that as a joke
17   but --
18            MR. GAIL:  I'm with you.
19            THE COURT:  -- that is only because I wanted to
20   exhaust more of your limited time.
21            MR. GAIL:  Let me move then fast, fast, fast, fast.
22            The argument that we don't allege the injury is silly.
23   We allege basically the injury the plaintiffs allege, and that
24   injury comes from Epstein continuing to bank at JPMorgan.  To
25   the extent they are injured, we are injured.  We also, as we
```

1    allege in our third-party complaint, have reputational costs

2    and so forth.

3         And then finally on this indemnification question,

4    look at their cases.  They are bilateral negotiations.  The

5    idea that an indemnification given wholesale and corporate

6    bylaws means the company can never sue for violations for

7    someone who is alleged of, what's the word, sexually

8    assaulting with force is -- as we say, that can't be the law

9    and it's not the law.

10        Let me just go back to the supplemental jurisdiction

11   question, and I want to push that a little bit because there

12   is a nonzero chance you may feel compelled by the rhetoric of

13   *Madoff* but not the holding of *Madoff*, and therefore you may

14   feel like you can't give us the right of contribution of the

15   TVPA much like we think we have -- they have the right of

16   punitive damages, they have the right of negligence, courts

17   have read that in in the face of silence and so should we be

18   allowed to use state contribution law.

19        There are two questions:

20        One is, does the third-party claims, the employment

21   claims, do we get to continue to bring those, if the TVPA

22   claims do not permit contribution but negligence does, state

23   common law and negligence does, where we will have a

24   contribution claim?  And we think they don't even contest

25   basically the idea that if our contribution claim for

1    negligence persists, then we would be allowed to bring the

2    employment claims, the fiduciary duty and faithless servant

3    claims, because the factual overlap is extraordinary.  It's

4    essentially what the Court said on severance.

5            But there is an even more aggressive position, which I

6    will tender for your consideration, which is, in the unlikely

7    event you thought that we didn't have a right to seek

8    contribution under the negligence theories, which I hope and

9    expect the Court will not, but even if you went there, even if

10   there were no contribution, we believe that supplemental

11   jurisdiction would allow you to continue to permit JPMorgan in

12   the same case to pursue the fiduciary duty and faithless

13   servant claims because we are not at the beginning of the case.

14   Discovery has moved on.  They have attended something like ten

15   depositions, literally hundreds of thousands of documents have

16   been exchanged, and in those circumstances, judicial economy

17   would be served, the four criteria under supplemental

18   jurisdiction would be served by allowing us to bring those

19   claims in the same case where the plaintiffs.  The overlap in

20   witnesses, facts, documents, is extraordinary.

21           I have a couple minutes, if your Honor would like to

22   ask any questions.  Otherwise, I will give the time back to

23   you.

24           THE COURT:  No, I think I have heard from both sides

25   everything I need, and so you can sit down.

N5j2DoeA

1           First and foremost, I want to express my tremendous

2     appreciation, because this was a terrific argument by two very

3     skilled advocates.  One of the joys of being a judge is

4     hearing lawyers of this quality.  So I thank you both.

5           Although this case is, in my view, plodding along at

6     a slow pace, that is not perhaps the only view of it, so I

7     will get you at least a bottom line decision by the end of

8     this month because I have given Mr. Staley time beyond the

9     discovery cutoff for the other parties, but he should know

10    what the story is with respect to this motion before he has to

11    proceed, if at all.  So I will -- I don't know that I will get

12    you a full opinion, but I will certainly get you the bottom

13    line by May 31.

14          I really think that's all on my agenda.  Was there

15    anything else either counsel needed to raise or any counsel

16    needed to raise for the Court?

17          MR. WOHLGEMUTH:  Nothing for Mr. Staley.

18          MR. GAIL:  Nothing for JPMorgan.

19          THE COURT:  Thanks again.

20                              oOo

21

22

23

24

25