WILMERHALE

June 9, 2023

**By ECF**

John J. Butts

+1 617 526 6515 (t)
+1 617 526 5000 (f)
john.butts@wilmerhale.com

Hon. Jed S. Rakoff
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., New York, NY 10007-1312

      Re:    *Gov't of the U.S. Virgin Islands v. JPMorgan Chase Bank, N.A.*, Case No. 1:22-cv-10904-JSR (S.D.N.Y.) – Opposition to Motion Seeking Leave to Reopen Depositions

Dear Judge Rakoff:

      On behalf of JPMorgan Chase Bank, N.A. ("JPMC"), the Government of the United States Virgin Islands' ("USVI") misleadingly titled "Motion seeking leave to reopen depositions" should be denied. It is a request to take new document discovery, depose a witness that was not previously deposed, and to re-open two depositions on specious grounds.

      Underscoring how thin their case is after taking extensive discovery, USVI has turned to litigating the litigation, falsely claiming that JPMC did not produce documents quickly enough. The reality is that JPMC moved mountains to respond to never-ending, unfocused discovery requests from two plaintiffs. Altogether, JPMC has responded to 74 document requests from USVI and 59 document requests from Doe, as well as near-constant informal requests from both plaintiffs, scores of interrogatories, and hundreds of requests for admission. As part of discovery, JPMC scoured the emails of nearly 60 custodians, many of which had time periods of more than 20 years. Also, to accommodate depositions on the schedule Plaintiffs desired, JPMC made over 70 individual productions—often more than one a day—in which it produced nearly one million pages and over 82,000 documents.

      It is because of Plaintiffs' unending requests—USVI served six sets of document requests and Doe served three sets—that a small fraction of JPMC's production (approximately 2% of the

**WILMERHALE**

Hon. Jed S. Rakoff
June 9, 2023
Page 2

total documents produced) came in the final week of discovery.[1] There was, however, no prejudice to USVI. JPMC worked diligently to prioritize productions based on depositions so that USVI and Doe had a deponent's custodial documents prior to a deposition. Now, USVI ignores JPMC's efforts and tries to manufacture issues in the hope of getting a do-over to try to fill in the many gaps in its case or to change strategic decisions it made during discovery. There is no reason to give USVI a second bite at the apple. Discovery in the USVI case is over.

I.   **Background**

In response to hyperbole on a telephone application about perceived discovery slights, the Court permitted plaintiffs, if they "believe[d] that a document was produced in an untimely fashion, and that they would have confronted a witness at a deposition with that document if it were produced in a more timely fashion," to submit a letter application "seeking to recall the pertinent witness." The Court further noted that, if any such "re-deposition" of a witness were granted, it would "proceed remotely" and would be limited to one hour. This relief is limited and, in order to receive it, USVI must be able to identify a purportedly late-produced document and explain how the allegedly untimely production of that document prejudiced its ability to effectively cross-examine a witness at that witness's deposition. This was not an invitation, as USVI seems to believe, to make broad demands for new depositions or new requests for document production.

USVI's application is premised almost entirely on a single document. That document, JPM-SDNYLIT-00901998, Dkt. 172-4, is an "e-comms summary" created in October 2019. This is after Epstein's arrest on sex trafficking charges and his suicide in a jail cell, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. That review raised some questions about emails between Epstein and Jes Staley, who had left JPMC in 2013. The employees who created the summary had no contemporaneous knowledge of Epstein's banking relationship with JPMC or any other facts at issue in this case. They gathered emails between Epstein and Staley and prepared a summary of 222 email exchanges (including a handful that did not involve Staley). Because JPMC prioritized, as plaintiffs requested, the production of documents from witnesses who were being deposed, and the custodian of this document was not

---

[1]   1,652 documents out of 82,000 were produced in the last week and only two documents—which had been withheld due to a coding error—were produced shortly after the deadline. And while USVI notes that this included 115,000 pages, it does not explain that over 80% of these pages came from massive, irrelevant spreadsheets containing confidential information from thousands of JPMC customers with no relevance to these cases and therefore requiring extensive redactions. Nor that Plaintiffs were told repeatedly about documents of this type and informed, without objection, that they would be deprioritized in favor of producing relevant, substantive documents. Tellingly, USVI does not seek any relief related to these spreadsheets.

**WILMERHALE**

being deposed, the summary was produced on May 28, 2023. But notwithstanding all the bluster from the USVI about how crucial it would have been to their case to be able to question these deponents on these documents, in fact, 216 of the 222 emails had been produced long before. In fact, more than 200 of them were produced in February and March, prior to any depositions in this matter, and were, in fact, reproductions of the same documents JPMC produced to USVI in response to a third-party subpoena *over a year ago*. Indeed, USVI used many of those emails in depositions.[2]

Nor was the production of the summary document itself untimely. JPMC's discovery efforts involved running over 350 search terms, reviewing, and ultimately producing documents stretching across a 20-year period, multiple computer systems, back-up systems, and back-up tape repositories. Further—in addition to the 25 custodians whose documents JPMC agreed to search in its initial ESI agreement with plaintiffs—JPMC also agreed to conduct an additional collection, review, and production for custodians ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Because these additional custodians were supplemental, the review of their documents followed the review of documents for the original 25 custodians. Further, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ these documents required meticulous review and, ▓▓▓▓▓▓▓▓ significant redactions. As USVI also knows—because it was done at USVI's request—JPMC prioritized the search, review, and production of underlying documents from custodians who had been noticed for depositions. Thus, that JPMC did not produce until later in the discovery period a 2019 summary (of already-produced documents) pulled from the custodial file of an individual with no first-hand knowledge of the relevant facts who was not among the custodians USVI requested is neither surprising nor improper.

## II.    Argument

USVI seeks four different forms of relief based on the email summary: (1) to re-open Jamie Dimon's deposition; (2) to re-open the 30(b)(6) deposition of Francis Pearn; (3) to issue a new deposition notice to former JPMC employee Howard Maleton; and (4) to serve a broad set of new document requests that implicate a number of unspecified individuals that were not part of the parties' negotiated ESI search. USVI, however, has not demonstrated any prejudice resulting from the production of the "e-comms summary" on May 28, 2023, let alone something sufficient to warrant any of its requested relief. Moreover, much of the relief it seeks plainly goes far beyond the scope of the Court's authorization.

---

[2]    Following Plaintiffs raising this issue, JPMC voluntarily searched for the other six. Five were produced to plaintiffs in a supplemental production prior to the filing of these motions. Only one—a brief, irrelevant exchange with non-custodian Maurice Sonnenberg regarding the use of biology for foreign code breaking efforts—has not been located. *See* Dkt. 172-4 at -004.

**WILMERHALE**

Hon. Jed S. Rakoff
June 9, 2023
Page 4

### A. Dimon Deposition

There is no basis to re-open Mr. Dimon's deposition. In a full-day deposition in which JPMC gave Plaintiffs more time for record testimony with Mr. Dimon than the 5-hours the Court allowed, Mr. Dimon made crystal clear that he had no contemporaneous knowledge or understanding of Jeffrey Epstein, and that what he now knows came from discussions with JPMC's counsel following Epstein's 2019 arrest or in connection with this litigation. Ex. 1, Dimon Tr. 83:8-13, 85:12-86:14, 87:16-24, 249:21-25, 251:17-25. USVI points to no custodial document of Mr. Dimon's as a basis to re-open the deposition, nor any document that Mr. Dimon actually saw. Instead, it relies on the "e-comms summary" as basis to claim it needs to examine him for even longer. That argument is meritless for the following reasons.

*First*, neither the "e-comms summary" itself nor the cover email to which it was attached have any independent substance or relevance, as it relates to plaintiffs' deposition of Mr. Dimon. Most notably, USVI admits, as it must, that it has long had access to the key documents in the summary, including the ten documents that reference Mr. Dimon, none of which come from his own custodial files. All 10 documents, in fact, were produced to Plaintiffs in February. And at his deposition, Plaintiffs questioned Mr. Dimon about a number of these documents. *See* Ex. 1, Dimon Tr. 155:15-162:5, 249:4-250:15; Ex. 2 (Dimon Ex. 11); Ex. 3 (Dimon Ex. 101). In other words, USVI had in its possession for months before his deposition the substantive communications referencing Mr. Dimon.

*Second*, because USVI is unable to argue that it did not have any of the summarized emails that reference Mr. Dimon, it attempts to argue that the "summary and its cover email have independent significance" because the "e-comms summary was prepared as part of Project Jeep," which USVI speculates, "may have been ordered by Dimon himself, not the legal department." But Mr. Dimon already testified that he did not recognize the name "Project Jeep," *see* Exhibit 1, Dimon Tr. 386:7-387:18, and that after Mr. Epstein's arrest and death in 2019, he instructed JPMC's current general counsel to "[d]o everything" to determine the facts and circumstances regarding Epstein's relationship with JPMC and to "understand all the issues." *See* Ex. 1, Dimon Tr. 221:22-224:6, 229:16-230:8. USVI provides no basis to question Mr. Dimon's testimony beyond speculation that the phrase "[t]op of the house," which is referenced in a 2019 email from a senior compliance officer months earlier, might mean that Mr. Dimon made the request.[3] As Mr. Dimon testified, he did not make any such request.[4] Moreover, Mr. Dimon did not receive

---

[3] Though USVI includes a 2008 email, involving entirely different people, to suggest that "top of the house" refers to Mr. Dimon, it neglected to include a follow-up email sent 8 minutes later that makes clear the reference to "top of the house" referred to Mr. Cutler, JPMC's then-General counsel. *See* Ex. 13, JPM-SDNYLIT-00892562.

[4] In addition, the author of the email has confirmed that his reference was to the current General Counsel, Stacey Friedman, and not Mr. Dimon.

**WILMERHALE**

Hon. Jed S. Rakoff
June 9, 2023
Page 5

the document as evidenced by its absence in his custodial files, which were searched in discovery. Even if he had, anything Mr. Dimon would have learned through this hearsay created in October 2019, after Epstein's death, would not be relevant to USVI's claims.

*Finally*, the "e-comms summary" does not provide any basis to reopen Mr. Dimon's deposition to question him about any alleged "Epstein referrals." Contrary to the USVI's claims, the "e-comms summary" in no way "confirmed" a series of Epstein referrals to JPMC. Rather, it summarizes communications almost entirely between Epstein and Staley in which Epstein routinely referenced high-profile figures in connection with a wide variety of subjects. In any event, USVI had each of the underlying communications months in advance of Mr. Dimon's deposition. There is nothing new here with respect to alleged "Epstein referrals." And, as USVI admits, USVI specifically asked Mr. Dimon questions about several of these alleged referrals, including Boris Nikolic, *see* Ex. 1, Dimon Tr. 395:14-21, Bill Gates, *see* Ex. 1, Dimon Tr. 392:8-15, Peter Mandelson, *see* Ex. 1, Dimon Tr. 251:17-252:9, Leon Black, *see* Ex. 1, Dimon Tr. 243:24-244:8, and Ehud Barak, *see* Ex. 1, Dimon Tr. 252:18-253:4. USVI has not articulated any argument as to how the "e-comms summary" contradicts Mr. Dimon's clear testimony or in any way would have affected their questions to Mr. Dimon about these alleged "Epstein referrals."

**B.    JPMC 30(b)(6) Deposition**

USVI's request to reopen its 30(b)(6) deposition of JPMC's corporate designee, based entirely on communications between Epstein and Staley summarized in the "e-comms summary," is similarly without merit and should be denied. USVI argues that these communications between Epstein and Staley evidence client referrals on which USVI should be allowed to question a corporate designee. As explained above, the USVI's characterization of these communications is incorrect and does not warrant reopening the 30(b)(6) deposition for at least four reasons.

*First*, as JPMC has already explained, each of these communications has long been in USVI's possession and were produced to USVI in response to a third-party subpoena well before this litigation began. USVI had them when they first noticed a 30(b)(6) deposition, when they agreed to accept a written interrogatory response in lieu of testimony with respect to Epstein referrals, and for the two months after it took that 30(b)(6) deposition prior to the close of fact discovery. Indeed, USVI has not even bothered to articulate a basis on which any of these long-since produced documents, or the rote summary of them contained in the "e-comms summary," would warrant another hour with a corporate designee.

*Second*, as noted above, none of the communications between Epstein and Staley in which Epstein made references to high profile individuals about a range of subjects contain any evidence that Epstein referred those individuals to JPMC or that those individuals became clients of JPMC on the basis of Epstein's supposed referral.

**WILMERHALE**

Hon. Jed S. Rakoff
June 9, 2023
Page 6

*Third*, USVI agreed months ago to accept written interrogatory responses in lieu of testimony from a 30(b)(6) witness on the question of referrals from Epstein, which JPMC provided and has since supplemented. JPMC's 30(b)(6) designee therefore, with USVI's explicit consent, did not provide testimony on this topic as part of the USVI's notice.[5]

### C.    Howard Maleton Deposition

USVI's request to serve a new deposition notice to depose Howard Maleton should be rejected. At the threshold, this request is beyond the scope of relief USVI is permitted to seek under the Court's May 31, 2023, Order, which only permitted applications seeking to "recall" a previously noticed and deposed witness based on the purportedly untimely production of documents that could have been used at the prior deposition. This request is clearly not that. Instead, it is a request to add a new deponent, one about whom USVI has known since April 14, 2023, when Mr. Maleton was disclosed in an interrogatory answer as among those who ████ ██████████████ that USVI claims are critical because, they supposedly reflect when JPMorgan's alleged misconduct ceased, *see* Dkt. 119, ¶ 91. JPMC produced that answer 8 days after ████ ██████████████████████████, to all parties in this action.[6]

Despite the purported significance of ████████, and USVI's knowledge that they were part of "Project Jeep" which it now tries to mythologize as something secretive and special, in the month and a half of discovery that followed JPMC's interrogatory answer, USVI did not try to depose *anyone* who was involved ████████. USVI now openly resorts to gamesmanship by arguing that based on documents produced in the last "two weeks" of discovery that Mr. Maleton is "the appropriate deponent" to examine "out of the 28 people" JPMC disclosed in its April 14 interrogatory answers. That is a determination USVI could, and should, have made prior to the end of discovery. At the very least, if USVI truly believed that Project Jeep information was probative of their claims, they could have sought to depose *someone* from the list JPMC provided six weeks before the end of fact discovery.

There is simply no reason to give USVI a do-over now. That is especially so as Mr. Maleton has no firsthand knowledge of facts related to the time when Mr. Epstein was a customer of JPMC. He is not a percipient witness as to facts from the relevant time period. Instead, he has exactly the same level of knowledge as counsel for USVI: secondhand, *post hoc* information derived from a review of historical documents years after Epstein was exited from the bank and

---

[5]    JPMC did provide Rule 30(b)(6) testimony to Doe pursuant to a notice served well after JPMC responded in writing to USVI. Doe has not joined this request.

[6]    Mr. Maleton is no longer employed by JPMC, having departed the company for another position in August 2022. USVI's request is therefore even further afield, seeking to depose a third-party witness after the close of fact discovery.

**WILMERHALE**

Hon. Jed S. Rakoff
June 9, 2023
Page 7

well after his highly publicized death. Since USVI has access to all of the same information that Mr. Maleton had—and has had that primary source information for months—it has provided no justification for its request to depose Mr. Maleton.

        **D.**       **USVI's Belated Request To Expand Document Discovery**

USVI's final request—that it be allowed to serve new document requests for five broad categories of documents and require JPMC to search decades of email and other custodial documents for new custodians—should be denied. To begin with, this request is well beyond the limited scope of the applications authorized by the Court, which permitted USVI to submit an application to re-depose specific witnesses remotely for one hour based on the production of specific documents. The Court did not invite briefing on broad requests for the production of documents more than a week after the close of fact discovery. For that reason alone, USVI's request is untimely, improper and should be denied.

In addition, Bear Stearns is not relevant. JPMC acquired Bear Stearns in a rescue acquisition during the 2008 financial crisis and, along with many other Bear Stearns customers, a brokerage account of Mr. Epstein. Bear Stearns did not provide banking services and ceased to exist after the transaction. This case has never been about Epstein's trading of securities in a Bear Stearns related brokerage account. This case has unequivocally been about JPMC's provision of banking services to Epstein, namely JPMC allegedly facilitating Epstein's crimes by providing him bank accounts through which he withdrew cash and made wire payments. Dkt. 119, ¶6 (alleging that JPMC "fail[ed] to comply with federal banking regulations" by facilitating "wire and cash transactions . . . that raised suspicion of—and were in fact part of—a criminal enterprise whose currency was the sexual servitude of dozens of women and girls in and beyond the Virgin Islands"); *id.*, ¶104 (alleging JPMC breached the TVPA "by facilitating payments to women and girls, channeling funds to Epstein to fund the operation, and concealing criminal conduct by failing to comply with federal banking law"). Those allegations plainly do not implicate securities trading. Nevertheless, JPMC has produced records of Epstein's securities trading, which are reflected on JPMC's OMNI client management platform and identified on the OMNI account statements and transaction data JPMC has already produced. In addition, on February 1, 2023, JPMC produced in this case 728 pages of available Epstein account statements associated with his Bear Stearns accounts from August 2008 through March 2014. *See* Ex. 4JPM-SDNYLIT-00098108.[7]

Moreover, USVI cannot seriously claim that it was surprised to learn Epstein had a relationship with Bear Stearns that continued after the acquisition in 2008. Prior to filing this case, USVI was involved in multi-year litigation with the Epstein estate in which it took extensive

---

[7] Because of the length of this document, JPMC has included only a representative excerpt as an exhibit.

**WILMERHALE**

Hon. Jed S. Rakoff
June 9, 2023
Page 8

discovery of Epstein's representatives and documents and served numerous third-party subpoenas, including one to JPMC. Through that discovery, USVI was, before this litigation began, fully aware of Epstein's brokerage relationship with Bear Stearns. For example, JPMC first produced Epstein's Bear Stearns account statements on August 2, 2021, in response to USVI's third-party subpoena.[8] *See* Ex. 4, JPM-SDNYLIT-00098108. And even earlier, on September 16, 2020, JPMC produced a May 2009 Due Diligence Report ("DDR") that clearly and unambiguously reported "Bear Stearns will hold the brokerage relationship with Mr. Epstein." *See* Ex. 5, JPM-USVI-00000465. USVI's actual knowledge is also evident from the fact that it has asked many deponents about Bear Stearns, including about the May 2009 DDR. *See, e.g.*, Ex. 6, Casey Tr. 389:8-391:12[9]; Ex. 7, Cutler Tr. 212:1-214:14, 219:24-235:21, 247:7-251:8, 258:7-22; Ex. 1, Dimon Tr. 396:12-397:4; Ex. 8, Erdoes Tr. 81:23-82:19; Ex. 9, Langford Tr. 358:6-9, 388:10-389:1. In addition, on a meet and confer call on April 18, six weeks before the end of fact discovery, counsel for USVI sought revenue information for Epstein outside JPMC's Private Bank, including from "Bear Sterns." Ex. 10, April 17, 2023 email from Mimi Liu to John Butts.

That knowledge belies USVI's feigned surprise that no Bear Stearns custodians were included in the ESI search protocol it negotiated. If it believed Bear Stearns was relevant, USVI had full opportunity to articulate their relevance and seek inclusion of Bear Stearns employees as ESI custodians. After lengthy negotiations, plaintiffs together selected more than half of JPMC's ESI custodians, and never asked for any Bear Stearns custodians. USVI cannot now complain that it was somehow in the dark about Epstein's relationship with Bear Stearns. It knew from its extensive litigation with the Epstein estate, that Epstein was a Bear Stearns customer before and after JPMC's acquisition. USVI also had ample notice of its former executive, Alan C. Greenberg's relationship with Epstein and his role at Bear Stearns, which had been public knowledge since, at the latest, 2003 when it was included as part of Vanity Fair's "The Talented Mr. Epstein" article about which USVI has also questioned multiple witnesses. *See* Ex. 11,

---

[8] This document was initially produced in response to USVI's third-party subpoena as JPM-USVI-00089427.

[9] USVI specifically questioned Ms. Casey about this document, which they have had for more than two-and-a-half years and was reproduced in this litigation as JPM-SDNYLIT-00037171. When counsel for USVI began referencing this language about Bear Stearns, she withdrew her question and instead stated: "Yeah, I really don't have a question on Bear Stearns." Ex. 6, Casey Tr. 391:10-11.

**WILMERHALE**

Hon. Jed S. Rakoff
June 9, 2023
Page 9

Talented Mr. Epstein article; *see also* Ex. 6, Casey Tr. 54:5-19, 56:7-58:22; Ex. 7, Cutler Tr. 45:17-47:2; Ex. 12, Pearn Tr. 216:7-221:21.[10]

USVI also cannot claim surprise that following Epstein's guilty plea in 2008, people from legacy Bear Stearns, including Mr. Greenberg, in connection with post-acquisition transition of accounts, may have attempted to speak with Stephen Cutler, then JPMC's General Counsel, about application of JPMC's corporate policy requiring approval of its General Counsel (or Chief Risk Officer) to retain a brokerage account for a client with a felony conviction. That decision, which was made by Mr. Cutler, has been the subject of intense document discovery, including a search of Mr. Cutler's custodial files, and depositions, including a deposition of Mr. Cutler. There is no reason to expand it further to cover duplicative documents for a legacy Bear Stearns' employee's side of communications to Mr. Cutler. The same is true of USVI's other duplicative requests such as emails about Epstein between Mr. Greenberg and Mr. Dimon, Mary Erdoes, Jes Staley, Stephen Cutler, or Jonathan Schwartz. With the exception of Mr. Greenberg, they are all ESI custodians,

---

[10] USVI suggests that because it now believes, after the close of fact discovery, that Bear Stearns documents are relevant, JPMC was obligated to identify search terms and custodians that would have produced these documents back in February. That is, of course, incorrect. As the cases cited by USVI make clear, Rules 26 and 34 of the Federal Rules of Civil Procedure "require parties to conduct a *reasonable* search for documents that are relevant to the claims and defenses." *Raine Grp. LLC v. Reign Capital, LLC*, 2022 WL 538336, at *1 (S.D.N.Y. Feb. 22, 2022) (emphasis added) (noting that "[s]earching all files of all employees of Plaintiff [] is certainly overbroad"). The applicable standard with respect to ESI discovery is not perfection, it is whether the search is reasonable and proportional. *Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon*, 2018 WL 2215510, at *7 (S.D.N.Y. May 15, 2018) (collecting cases). "[A] party requesting discovery may not be entitled 'under the rules of proportionality, to every single [relevant] document.'" *Id.* (quoting *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2013 WL 4838796, at *2 (S.D.N.Y. Sept. 11, 2013)). The Rules required JPMC "to search custodians and locations it identifie[d] on its own as sources for relevant information." *Raine Grp.*, 2022 WL 538336, at *1. It did so, and more, throughout fact discovery in this case, searching the emails of nearly 60 custodians, many over a 20-year period, applying more than 350 search terms and producing 82,000 documents across over 70 separate productions. The cases cited by USVI, one of which involves a dispute over search terms applicable to *six* identified custodians, *see Raine Grp.*, 2022 WL 538336, at *2, and another in which the universe of discovery comprised a couple hundred documents and involved repeated violations of court orders, *see Gardner-Alfred v. Fed. Reserve Bank of N.Y.*, 2023 WL 3495091, at *7 (S.D.N.Y. May 17, 2023), are completely inapposite and have no bearing on JPMC's discovery obligations in this case.

WILMERHALE

Hon. Jed S. Rakoff
June 9, 2023
Page 10

and they do not have responsive communications with Mr. Greenberg.[11]  Finally, the fact that Mr. Greenberg was apparently willing to speak to Epstein in January 2011 is irrelevant and no basis to re-open and expand discovery.  There is no evidence that Mr. Greenberg had anything to do with Epstein's accounts at the Private Bank or had discussions within anyone relating to keeping or exiting Epstein in 2011 (or ever).

### III.     Conclusion

The Court has repeatedly cautioned that it will not grant extensions of time or allow further delays in the schedule that would jeopardize the trial date in this case.  As it stands, fact discovery in this matter for both Doe and USVI is over.  Expert discovery ends in three weeks, with motions for summary judgment due shortly thereafter.  The USVI should not be allowed to unnecessarily reopen discovery at this late stage.

Respectfully submitted,

*/s/ John J. Butts*
John J. Butts

cc: Counsel of record

---

[11] Other requests are also irrelevant and would only serve to add to an already lengthy privilege log, such as USVI's request for emails or documents relating to Epstein's litigation against Bear Stearns.