# EXHIBIT 1

Confidential - Pursuant to Protective Order

```
 1              UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
    GOVERNMENT OF THE UNITED      )
 3  STATES VIRGIN ISLANDS         )
                                  )
 4        Plaintiff,              )
                                  )
 5  vs.                           ) 1:22-cv-10904-JSR
                                  )
 6  JPMORGAN CHASE BANK, N.A.,    )
                                  )
 7        Defendant/Third-        )
          Party Plaintiff.        )
 8  _____      )
    JPMORGAN CHASE BANK, N.A.     )
 9                                )
          Third-Party            )
10        Plaintiff,              )
                                  )
11  vs.                           )
                                  )
12  JAMES EDWARD STALEY,          )
                                  )
13        Third-Party             )
          Defendant.              )
14
                 FRIDAY, MAY 26, 2023
15
      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16
    **CONFIDENTIAL BSA PORTIONS UNDER SEPARATE COVER**
17                   - - -
18              Videotaped deposition of James
    Dimon, held at the offices of JPMorgan Chase,
19  383 Madison Avenue, New York, New York,
    commencing at 9:02 a.m. Eastern, on the above
20  date, before Carrie A. Campbell, Registered
    Diplomate Reporter and Certified Realtime
21  Reporter.
22
23                   - - -
24           GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
25              deps@golkow.com
```

Confidential - Pursuant to Protective Order

```
 1       a deferred prosecution agreement is?

 2                    MR. BUTTS:  Objection.

 3                    You may answer.

 4                    THE WITNESS:  Generally, yes.

 5       QUESTIONS BY MR. SULLIVAN:

 6            Q.     And that means that you

 7       essentially plead guilty, but they don't do

 8       anything except take your money for a number

 9       of years.  But if you do it again, it's

10       more -- they can prosecute you for the

11       original matter.

12                    Do you understand that?

13                    MR. BUTTS:  Objection.

14                    You may answer.

15                    THE WITNESS:  I'm not a lawyer,

16            but generally I understand it that

17            way, yes.

18       QUESTIONS BY MR. SULLIVAN:

19            Q.     Most of us lawyers don't

20       understand it.  It's what it is.

21                    MR. SULLIVAN:  Thank you, sir.

22            That's all I have.

23                    MR. BUTTS:  Thank you.

24                    MR. SULLIVAN:  Have a good day.

25            Nice holiday.  I have to go.  I have a
```

Confidential Pursuant to Protective Order

```
 1          trial Monday.  Take care.

 2               MR. BUTTS:  Sounds like no

 3          holiday for you.

 4               MS. FRIEDMAN:  Should we take a

 5          break?

 6               MR. BUTTS:  Yeah, let's do.

 7               VIDEOGRAPHER:  We're going off

 8          record.  The time is 10:30.

 9           (Off the record at 10:30 a.m.)

10               VIDEOGRAPHER:  We're going back

11          on record.  The time is 10:39.

12               DIRECT EXAMINATION

13     QUESTIONS BY MS. SINGER:

14          Q.    Good morning, Mr. Dimon.  My

15     name is Linda Singer.  I would like to say I

16     bring down the average age of the examiners

17     on our side, but I don't know that that's

18     true, actually, so I'm going to skip that.

19               I don't think we did this at

20     the outset, so could you state your position

21     for the record, please?

22          A.    I am chairman and chief

23     executive officer of JPMorgan Chase.

24          Q.    And where generally do you

25     reside?
```

```
1          A.     New York City.

2          Q.     And do you have any plans of

3   moving your residence between now and

4   November of 2023?

5          A.     No.

6          Q.     When did you first learn that

7   Jeffrey Epstein was a customer of JPMorgan?

8          A.     I don't recall knowing anything

9   about Jeffrey Epstein until the stories broke

10  sometime in 2019.  And I was surprised that I

11  didn't even -- had never even heard of the

12  guy, pretty much, and how involved he was

13  with so many people.

14         Q.     Were you aware that Jeffrey

15  Epstein was promoting you to contacts as a

16  candidate for Secretary of the Treasury?

17              MR. BUTTS:  Objection.

18              You may answer.

19              THE WITNESS:  Nope.

20  QUESTIONS BY MS. SINGER:

21         Q.     Were you aware that JPMorgan

22  entered into a settlement or settlements with

23  Jeffrey Epstein?

24         A.     Not until recently, no.

25         Q.     When did you learn that?
```

1          Q.      And what did you rely on to

2    state that JPMorgan did not have

3    contemporaneous knowledge of Epstein's

4    offenses?

5                  MR. BUTTS:  Objection.

6                  THE WITNESS:  I didn't say

7          that.

8    QUESTIONS BY MS. SINGER:

9          Q.      Okay.  You did say hindsight is

10   fabulous, correct?

11         A.      I did.

12         Q.      Okay.  So prior to your

13   interview, what information did you have

14   about what JPMorgan knew or didn't know about

15   Jeffrey Epstein and JPMorgan's handling of

16   his accounts?

17                 MR. BUTTS:  Objection.  And

18         I'll instruct you not to answer to the

19         extent that any knowledge comes from

20         counsel.

21                 THE WITNESS:  I knew very

22         little about any of this until this

23         case was opened.  And then of course

24         I've learned quite a bit since then.

25

Confidential - Pursuant to Protective Order

```
 1     QUESTIONS BY MS. SINGER:
 2          Q.    Okay.  So in making your
 3     comment that hindsight is fabulous, what
 4     information had you reviewed about what
 5     JPMorgan knew or didn't know about its
 6     handling of Jeffrey Epstein's business?
 7                    MR. BUTTS:  Objection.
 8                    And the same caution, you
 9          should not reveal any information you
10          reviewed in the context of discussions
11          with counsel.
12                    THE WITNESS:  Well, I mean,
13          almost all of it was done in
14          consultation with counsel.
15                    MR. BUTTS:  Then you can't
16          answer the question.
17                    THE WITNESS:  Okay.
18     QUESTIONS BY MS. SINGER:
19          Q.    Other than conversations with
20     your lawyers, which I never mean for you to
21     reveal, nor would Mr. Butts allow you, did
22     you have any knowledge of what JPMorgan had
23     done or knew about Jeffrey Epstein prior to
24     your interview with CNN?
25                    MR. BUTTS:  Objection.
```

1           You may answer.

2           THE WITNESS:  I don't recall

3     the specific knowledge I had before I

4     sat down with counsel relating to

5     these lawsuits.

6  QUESTIONS BY MS. SINGER:

7     Q.    And --

8     A.    And that was after I sat down

9  with counsel.

10          MR. BUTTS:  The interview was

11    after --

12          THE WITNESS:  The interview was

13    after I spent considerable time with

14    counsel.

15 QUESTIONS BY MS. SINGER:

16    Q.    And apart from your preparation

17 in connection with this litigation, how much

18 time have you spent personally looking at the

19 bank's conduct with respect to Jeffrey

20 Epstein?

21          MR. BUTTS:  Objection to form.

22          THE WITNESS:  Before these

23    lawsuits and the time with counsel,

24    very little.

25

Confidential Pursuant to Protective Order

```
 1        A.     No.

 2        Q.     Okay.

 3               MR. BUTTS:  Are you finished

 4        with this document?

 5               MS. SINGER:  Yes, if y'all want

 6        a break.

 7               MR. BUTTS:  Hold on.  I think

 8        it's been an hour.  It's 11:40.

 9        What's -- do you want --

10               THE WITNESS:  I eat at 12, so

11        let's go right to -- let's wait until

12        12 to eat lunch.

13               MR. BUTTS:  Yeah, there it is.

14               (Dimon Exhibit 11 marked for

15        identification.)

16   QUESTIONS BY MS. SINGER:

17        Q.     Okay.  All right.  Let's go to

18   Exhibit 11, which is going to be

19   JPM-SDNYLIT-0006171.

20               All right.  This document is an

21   e-mail between Jes Staley and Jeffrey

22   Epstein, correct?

23        A.     Yes.

24        Q.     Okay.  And it's dated

25   August 30, 2009, at the very top, correct?
```

Confidential Pursuant to Protective Order

1        A.      Yes.

2        Q.      Prior to your preparation for

3    this deposition, had you seen this e-mail

4    before?

5        A.      No.

6        Q.      And if we go to the middle of

7    this e-mail, Jes Staley indicates to Jeffrey

8    Epstein, "Back in the saddle Monday in London

9    with Jamie mid-week."

10              Do you recall a trip to Jes

11   Staley -- a trip to London with Jes Staley in

12   August or September 2009?

13       A.      Do I recall it, like, back

14   then, no, but as a part of preparing for

15   this.  And my records are known, so you guys

16   can just check.

17              And I think I went there for a

18   big conference, not for Jes.

19       Q.      Okay.  But you don't have an

20   independent recollection of a trip to London

21   that Jes Staley was also on in August 2009,

22   correct?

23       A.      Correct.

24       Q.      Okay.  At the top of the -- I'm

25   sorry.  Towards the top of the e-mail,

1    Jeffrey Epstein asked Jes Staley, "How long

2    London?  Do you need anything there?"

3              And Jes Staley responds, "Yep."

4              Have I read both of those

5    segments correctly?

6         A.    Yes.

7         Q.    Were you aware of this

8    interaction between -- I'm sorry.  Were you

9    aware of -- I'm going to try one more time on

10   this one.

11             Are you currently aware of what

12   happened between Jeffrey Epstein and Jes

13   Staley with regards to this e-mail?

14             MR. BUTTS:  And is the question

15        about your current awareness --

16             THE WITNESS:  I'm neither

17        currently aware, nor was I back then.

18   QUESTIONS BY MS. SINGER:

19        Q.    Okay.  So you don't know what

20   this exchange refers to, do you?

21             MR. WOHLGEMUTH:  Objection.

22             THE WITNESS:  Who objected?

23             MR. BUTTS:  That's -- that's --

24        that's right.  You can answer the

25        question.  That's Mr. Staley's

Confidential - Pursuant to Protective Order

1          counsel.

2                    THE WITNESS:  Oh.

3                    Repeat the question?

4     QUESTIONS BY MS. SINGER:

5          Q.     Yes.

6                    Do you have any understanding

7     of what this e-mail exchange between Jeffrey

8     Epstein and Jes Staley refers to?

9                    MR. WOHLGEMUTH:  Objection.

10                    THE WITNESS:  No.

11     QUESTIONS BY MS. SINGER:

12          Q.     Were you aware of -- are you

13     currently -- are you currently aware that

14     Jeffrey Epstein transferred $3,000 to a woman

15     named ██████ on August 31st from Jeffrey

16     Epstein's account at JPMorgan?

17                    MR. BUTTS:  Objection.  You

18          should not answer to the extent you're

19          revealing anything learned form

20          counsel.

21                    THE WITNESS:  I was not aware.

22     QUESTIONS BY MS. SINGER:

23          Q.     When did you first learn of the

24     transfer that Jeffrey Epstein made to ██████?

25                    MR. BUTTS:  Same objection and

```
 1          instruction.

 2                  THE WITNESS:  Only after being

 3          prepared for this.

 4   QUESTIONS BY MS. SINGER:

 5          Q.    Okay.  This wasn't -- and

 6   you've since come to understand that Jeffrey

 7   Epstein did make a transfer to a woman named

 8   ███████  around this time, correct?

 9                  MR. BUTTS:  Objection.

10                  And you may ask {sic} that

11          question based on your state of

12          knowledge prior to starting your

13          preparation for this deposition.

14                  THE WITNESS:  I do not know.

15   QUESTIONS BY MS. SINGER:

16          Q.    Okay.

17          A.    I don't know if it took place

18   or didn't take place or...

19          Q.    Are you aware of other

20   transfers that Jeffrey Epstein made to women

21   from his JPMorgan accounts?

22                  MR. BUTTS:  Same objection and

23          instruction.

24                  THE WITNESS:  I was not aware.

25
```

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MS. SINGER:

2         Q.    And at no point prior to 2019

3    did you become aware of Jeffrey Epstein's

4    payments to women from his JPMorgan accounts.

5              Is that correct?

6         A.    I don't recall being aware, no.

7    And I don't know when I became aware of some

8    of it, so...

9         Q.    Would you expect, in light of

10   Jeffrey Epstein's sex offenses, that JPMorgan

11   would pay special attention to payments he

12   was making to women?

13             MR. BUTTS:  Objection.  Form.

14             You may answer.

15             THE WITNESS:  I would expect my

16        experts to review what they thought

17        was appropriate to review.

18   QUESTIONS BY MS. SINGER:

19        Q.    And do you think that would

20   include for a sex offender like Jeffrey

21   Epstein paying for women -- paying women and

22   recruiters for sex, that that would include

23   review of his payments to women?

24             MR. BUTTS:  Objection to form.

25             You may answer.

Confidential - Pursuant to Protective Order

```
 1                THE WITNESS:  I would have

 2           asked them to make sure they do proper

 3           reviews of all things, yes.

 4     QUESTIONS BY MS. SINGER:

 5           Q.    And sitting here today, do you

 6     have an opinion as to whether that would

 7     include -- do you have a view as to whether

 8     that would include looking at his transfers

 9     of money to women?

10                MR. BUTTS:  Objection.  And

11           objection to form.

12                You may answer.

13                THE WITNESS:  My expectation

14           would be they would be looking at

15           things like that, among all of the

16           other things they looked at.  And I

17           don't know if it was put in front of

18           the group.  I don't know if they saw

19           it.

20     QUESTIONS BY MS. SINGER:

21           Q.    And when you refer to "group"

22     in your response, you don't know if that was

23     put in front of the group, what do you mean

24     by "group"?

25           A.    The people who review these
```

Confidential - Pursuant to Protective Order

1    types of things.

2        Q.    Compliance, regulatory, the

3    bankers --

4        A.    Generally, yes.

5        Q.    -- correct?

6              Okay.  All right.  On

7    September 1, 2009, Jes Staley became CEO of

8    JPMorgan's investment bank; is that right?

9        A.    I'll accept the date from you.

10   Yeah.  I don't know -- I don't remember the

11   exact date.

12       Q.    Okay.  But you do recall

13   somewhere around there, he became CEO of

14   JPMorgan's investment bank, correct?

15       A.    Yes.

16       Q.    And that was a change that you

17   directed, Mr. Dimon?

18       A.    Yes.

19       Q.    Why did you -- well, was it a

20   promotion?

21       A.    I would say so, yes.

22       Q.    Okay.  And why did you direct

23   that change?

24       A.    I had -- for a whole bunch of

25   reasons, I had to make a change.  I wanted to

Confidential Pursuant to Protective Order

1    was -- had been a customer of the bank?

2         A.    I don't recall specifically.

3         Q.    Did somebody from the bank tell

4    you that?

5         A.    Most likely my general counsel

6    right there.

7         Q.    Now, when you found out that

8    this person had been a customer of the bank

9    and you found out that he had been engaged in

10   this sex trafficking, did you, in your

11   capacity as chief executive officer and

12   chairman of the bank, try to find out what

13   the facts had been concerning the bank's

14   relationship to Mr. Epstein?

15             MR. BUTTS:  Objection to form.

16             And for the moment, I'll let

17        you do a yes -- a yes or no answer to

18        the question.

19             THE WITNESS:  What is the

20        question again?

21   QUESTIONS BY MR. BOIES:

22        Q.    After you found out that

23   Jeffrey Epstein existed, that he'd been a sex

24   trafficker and he'd been a customer of the

25   bank, did you, in your capacity as CEO and

1    chairman, want to find out what the

2    circumstances were concerning the bank's

3    relationship to this man?

4                MS. FRIEDMAN:  Can I just -- I

5          just want to make sure of privilege.

6                THE WITNESS:  This is

7          privileged, yeah.  I can --

8                MS. FRIEDMAN:  Just give me a

9          minute.

10               MR. BUTTS:  Okay.  Yeah, so you

11         should not reveal anything you learned

12         or -- in connection with Ms. Friedman,

13         her staff or outside counsel.

14               THE WITNESS:  Okay.  What --

15               MR. BOIES:  Remember, all I

16         asked him is whether he wanted to find

17         out.  It's a yes or no question.

18               MR. BUTTS:  Okay.  I'll give

19         you that yes or no.  That's fine.

20               MS. FRIEDMAN:  We're fine.

21               THE WITNESS:  The protocol,

22         what I did, was I asked my general

23         counsel there, do what you got to do.

24         Do everything.

25               It wasn't about whether I had

Confidential - Pursuant to Protective Order

```
 1          personal knowledge.  It was about

 2          whether we, the company, were doing

 3          the right things.

 4                  MR. BUTTS:  Okay.

 5                  THE WITNESS:  And then after

 6          that, she did give me some of that

 7          information I didn't have before.

 8   QUESTIONS BY MR. BOIES:

 9          Q.     In order to determine whether

10   the company was, in your words, doing the

11   right thing, did you, as chairman and chief

12   executive officer, want to know what the

13   facts were?

14                  MR. BUTTS:  Did you want to

15          know what the facts were.

16                  THE WITNESS:  Did I want to

17          know?

18                  I wanted to know what I should

19          know.  I didn't spend hours and hours

20          going through "the facts."

21   QUESTIONS BY MR. BOIES:

22          Q.     Well, when you say you wanted

23   to know what you should know, what did you

24   think you should know?

25          A.     That the company was properly
```

1    working with law enforcement, that we should

2    look -- that we should make sure that it's in

3    the general counsel's court and not somewhere

4    in the bowels of the company, and if there

5    were lessons learned, we should deploy those,

6    too.

7        Q.     Okay.  Now, in terms of lessons

8    learned and deploying those lessons, did you

9    make an attempt to find out whether there

10   were lessons to have been learned from this

11   experience that would change your business

12   practices?

13       A.     Well, we're still in the

14   process because we're obviously -- I'm being

15   distracted doing this today, but I have never

16   in my life not experienced a thing where you

17   don't learn lessons and try to do better in

18   the future than you did in the past.

19       Q.     I agree with that.

20            And what did you do -- and

21   again, I'm not asking you about what you did

22   in this litigation and what you did for this

23   litigation.

24            I'm simply asking, what did you

25   do for your business?  What did you do as

Confidential - Pursuant to Protective Order

```
 1              MR. BUTTS:  Objection.  Asked

 2         and answered.

 3              THE WITNESS:  I want you to

 4         review controls at banks around the

 5         world, other people, what we've done

 6         and haven't done, best practices, what

 7         we're allowed to do, what we're not

 8         allowed to do.  And when you're ready,

 9         Stacey, come back to me and talk to me

10         about it.  Have other people in the

11         room that would be happy to do it.

12    QUESTIONS BY MR. BOIES:

13         Q.    When did you --

14         A.    It's called delegation.  I

15    can't do that myself.

16         Q.    Okay.  When did you first ask

17    your general counsel to begin this project of

18    identifying best practices and how you could

19    improve controls?

20         A.    Well, we've been doing it my

21    whole career when it comes to multiple

22    things, including AML.  The laws change, the

23    requirements change, the regulations change.

24              About this particular matter?

25    About anything relating to the human
```

1    trafficking?  I think that came up because of

2    this case.

3         Q.    And this case was filed a few

4    months ago; is that correct?

5              MR. BUTTS:  Objection.

6              THE WITNESS:  I meant it came

7         up as a result of the Epstein

8         indictment, suicide.

9    QUESTIONS BY MR. BOIES:

10        Q.    Okay.  Now, focusing on what

11   you did before this litigation was filed,

12   before the litigation was filed against Chase

13   Bank, before that litigation was filed, were

14   you concerned that the bank had any legal

15   liability for what happened?

16             MR. BUTTS:  Objection.

17             And you should not reveal any

18        information or view you had based on

19        discussions with counsel.

20             MR. BOIES:  This is still just

21        a yes or no question.

22             MR. BUTTS:  It was not a yes or

23        no question.  You asked him about

24        concern about legal liability.

25             MR. BOIES:  Well, I said did he

Confidential Pursuant to Protective Order

```
 1         identification.)

 2    QUESTIONS BY MR. BOIES:

 3         Q.    Let me ask you to look at a

 4    document that has been previously marked as

 5    Exhibit 114.

 6              And the e-mail I'm interested

 7    in is the e-mail at the top which is from

 8    Paul Morris to Jeffrey Epstein, dated

 9    June 30, 2012, at 1:49 a.m.

10              Do you see that e-mail?

11         A.    Yes.

12         Q.    And it's a short e-mail, and

13    I'll just read it for the record.

14              "Jeffrey, sorry for being so

15    limited on the e-mails, but I guess I'm too

16    discrete.  Anyway, I really appreciate

17    everything you're doing, and this is a

18    fantastic opportunity that you are opening

19    the door to.  I briefed our CEO, and I think

20    he will get a sense of the LB relationship

21    over the weekend.  Come back to you ASAP, and

22    thank you again.  Paul Morris, JPMorgan

23    private bank."

24              Did Mr. Epstein help JPMorgan

25    develop a relationship with Leon Black?
```

Confidential Pursuant to Protective Order

```
 1              MR. BUTTS:  Objection.

 2              You may answer.

 3              THE WITNESS:  I don't know if

 4        that's what LB refers to.

 5              We've -- I've known Leon Black

 6        for -- way before this, and the

 7        company has been doing business with

 8        Apollo for a long time.  So we didn't

 9        need his introduction.

10   QUESTIONS BY MR. BOIES:

11        Q.    You know Mr. Black?

12        A.    I do know Mr. Black.

13        Q.    Have you --

14        A.    This could have been Limited

15   Brands, and the CEO was unlikely not me --

16   was likely not me.

17              MR. BUTTS:  The testimony has

18        been it's not you.

19              THE WITNESS:  Right.

20   QUESTIONS BY MR. BOIES:

21        Q.    Did you ever discuss

22   Mr. Epstein with Mr. Black?

23        A.    No.

24        Q.    When was the last time you

25   talked to Mr. Black?
```

Confidential -- Pursuant to Protective Order

```
 1              (Dimon Exhibit 101 marked for
 2         identification.)
 3    QUESTIONS BY MR. BOIES:
 4         Q.    I'm going to ask you to look
 5    next at Exhibit 104 -- 101.
 6              This is an exchange of e-mails
 7    between Mr. Staley and Mr. Epstein on
 8    June 17, 2009.
 9              Mr. Epstein writes Mr. Staley.
10    "Peter will be staying at 71st Street over
11    the weekend.  Do you want to organize either
12    you, or you and Jamie, quietly?  Up to you."
13              Do you see that?
14         A.    Yes.
15         Q.    Did you meet with Mr. Epstein
16    and/or Mr. Staley at 71st Street over the
17    weekend?
18         A.    Absolutely not.
19         Q.    Do you know what Mr. Epstein is
20    referring to here?
21         A.    I think I've testified many
22    times, I didn't know Jeff Epstein.  I never
23    met Jeff Epstein.  I never went to his house.
24    I never went to his island.  And I do not
25    know exactly what he's referring to here.
```

Confidential Pursuant to Protective Order

```
 1              Maybe -- I mean, I can surmise
 2    that he wanted Jes to introduce me to him --
 3    introduce me to him.
 4        Q.    Now, Mr. Staley responds the
 5    next day to Mr. Epstein, saying, "Jamie is in
 6    Asia.  I just got back from London, and I'm
 7    in Boston.  Let me what's up for the weekend.
 8    If I'm in the city, for sure."
 9              Do you have any explanation as
10    to why Mr. Staley would write that e-mail if
11    you had no contact at all with Mr. Epstein?
12              MR. BUTTS:  Objection.
13              MR. WOHLGEMUTH:  Objection.
14              MR. BUTTS:  You may answer.
15              THE WITNESS:  I have no idea.
16              (Dimon Exhibit 102 marked for
17         identification.)
18    QUESTIONS BY MR. BOIES:
19        Q.    Let me ask you look -- to look
20    next at the document that's been previously
21    marked as Exhibit 102.
22              And do you know who Lesley
23    Groff is, by any chance?
24        A.    Not that I can recall.
25        Q.    Have you seen her mentioned in
```

1    connection with Mr. Epstein?

2         A.     No.

3         Q.     Are you aware of whether or not

4    she worked for Mr. Epstein?

5         A.     Nope.

6         Q.     On February 26, 2010, Lesley

7    Groff writes Mr. Epstein on the subject of

8    Peter, Jes and Jamie.  "Shall I have Lynn

9    prepare heavy snacks for your evening

10   appointments with Peter Mandelson, Jes Staley

11   and Jamie Dimon?  Or is this to be a nice,

12   sit-down dinner at 9 p.m.?"

13            And Mr. Epstein replies,

14   "Snacks."

15            Do you see that?

16        A.     Yes.

17        Q.     Did you in fact have an

18   appointment with Peter Mandelson, Jes Staley

19   and Jamie Dimon?

20        A.     I have never had an appointment

21   with Jeff Epstein.  I've never met Jeff

22   Epstein.  I never knew Jeff Epstein.  I never

23   went to Jeff Epstein's house.  I never had a

24   meal with Jeff Epstein.  I have no idea what

25   they're referring to here.

Confidential - Pursuant to Protective Order

1             I did know Peter Mandelson, and

2    obviously I knew Jes.

3        Q.    Do you have an explanation why

4    Lesley Groff would have written this e-mail?

5             MR. BUTTS:  Objection.

6             You may answer.

7             THE WITNESS:  Likely

8        misinformed.  Not likely.

9        Misinformed.

10   QUESTIONS BY MR. BOIES:

11       Q.    Now, Mr. Epstein does not write

12   back to her saying, you're misinformed, Jamie

13   Dimon is not coming.

14            You see that?

15       A.    I don't know what he thought at

16   the time.  He was obviously misinformed.  I

17   never -- this never took place.

18       Q.    Okay.  Did Mr. Epstein arrange

19   for you to meet with Ehud Barak?

20       A.    Who?

21            MR. BUTTS:  Objection.

22            You may answer.

23            THE WITNESS:  Who?

24   QUESTIONS BY MR. BOIES:

25       Q.    Ehud Barak.

Confidential - Pursuant to Protective Order

```
 1        A.     I don't think Jeff Epstein ever
 2   arranged for me to meet with anybody, to my
 3   knowledge.  And I knew Ehud Barak.  We did
 4   not need introductions to anybody.
 5             (Dimon Exhibit 113 marked for
 6        identification.)
 7   QUESTIONS BY MR. BOIES:
 8        Q.     Let me ask you to look at a
 9   document that has been previously marked as
10   Exhibit 113.
11             This is a series of e-mails.
12   The one at the bottom, January 23, 2008, at
13   12:44 p.m., says, "Hello Rosa, I think █████
14   may have already e-mailed you, but wanted to
15   follow up just in case.  Jeffrey was talking
16   to me on the phone and to ██████  who was
17   standing with him at the same time, so not
18   sure which one of us was actually to e-mail
19   you.  Jeffrey requested that we give you the
20   contact e-mail for Ehud Barak so that you
21   could organize the meeting with Jamie Dimon
22   and Barak on your end for simplification."
23             And then Rosa writes to Jes
24   Staley, "Jes, is it okay for me to contact
25   Ehud Barak directly to arrange a meeting with
```

Confidential Pursuant to Protective Order

```
 1                   Is that not right?

 2        A.     That's what it lists.  I don't

 3   know if it's true.

 4                   (Dimon Exhibit 22 marked for

 5        identification.)

 6   QUESTIONS BY MS. SINGER:

 7        Q.     Okay.  We're also going to take

 8   a look at Exhibit 22, JPM-SDNYLIT-00150148_R.

 9                   Do you recognize Project Jeep,

10   Mr. Dimon?

11        A.     I do not.

12        Q.     Okay.  So this document is

13   headed "Project Jeep - Client Review October

14   2019."

15                   Correct?

16        A.     Yes.

17        Q.     And have you seen this document

18   before?

19        A.     No.

20        Q.     At the top --

21        A.     Not that I recall.

22        Q.     Okay.  At the top, it indicates

23   that it is reviewing three client

24   relationships related to Jeffrey Epstein

25   media.
```

Confidential - Pursuant to Protective Order

1                Correct?

2        A.     Yes.

3        Q.     Okay.  And one of those, if you

4    look about a third of the way down, is Leon

5    Black, correct?

6        A.     Yes.

7        Q.     And if we turn to the second

8    page, Bates number 148, you can see that the

9    Leon Black relationship assets are valued at,

10   when you add them together, $465 million.

11               Is that correct?

12       A.     That's what this says.

13       Q.     And do you have any independent

14   knowledge of the value of Leon Black's assets

15   at JPMorgan in 2019?

16       A.     I don't.

17       Q.     Okay.  You can put that one

18   aside, please.

19               We saw on JPMorgan's privilege

20   log for this deposition an October 4, 2019

21   e-mail to you about Project Yellow.

22               Are you familiar with Project

23   Yellow?

24       A.     Not that I recall.

25       Q.     Okay.  You don't have any sense

Confidential Pursuant to Protective Order

1          A.     Or what came out with Epstein

2     before.

3          Q.     So prior to 2015, were you

4     aware of efforts at JPMorgan to launch a

5     donor-advised fund with Bill Gates through

6     The Gates Foundation?

7          A.     I don't -- I was not, no.

8          Q.     Okay.  So I take it you also

9     were not aware that Jeffrey Epstein played a

10    role in those discussions?

11               MR. BUTTS:  Objection.

12               You may answer.

13               THE WITNESS:  Oh, absolutely I

14          was not aware.  Nor do we need Jeff

15          Epstein to talk to Bill Gates.

16    QUESTIONS BY MS. SINGER:

17         Q.     Were you aware that Mary Erdoes

18    and Jes Staley had regular communications

19    with Jeffrey Epstein about that donor-advised

20    fund?

21         A.     I am now.

22               MR. BUTTS:  Objection.

23    QUESTIONS BY MS. SINGER:

24         Q.     And were you aware that the

25    hope was that donor-advised fund would reach

Confidential Pursuant to Protective Order

```
 1    see," tomorrow, "TMR what is the extent of

 2    damage."

 3              Do you have any recollection of

 4    Mary Erdoes arranging for you to invite Bill

 5    Gates to an event?

 6              MR. BUTTS:  Objection.

 7              You may answer.

 8              THE WITNESS:  I don't recall

 9         the specific event.  That happened

10         typically, yes.

11    QUESTIONS BY MS. SINGER:

12         Q.    Okay.  Do you know Ace

13    Greenberg?

14         A.    I did.  He's dead.

15         Q.    I should have asked it in the

16    past tense.  I'm sorry.

17              And who did you know him to be?

18         A.    The chairman of Bear Stearns.

19    And then when we bought Bear Stearns, he came

20    over as an investment advisor.

21         Q.    Okay.  And you know him

22    personally, or you knew him personally, I

23    take it?

24         A.    For 40 years.

25         Q.    I'm sorry.
```

Confidential Pursuant to Protective Order

1          Did Ace Greenberg ever talk to

2   you about his desire that JPMorgan retain

3   Jeffrey Epstein as a client of the bank?

4          A.     He did not.

5          Q.     Okay.  You've talked a little

6   bit about Jes Staley's departure from

7   JPMorgan and the terms and tenor of his

8   departure.

9          Is one of the reasons for Jes

10  Staley's departure from JPMorgan your

11  understanding that Mr. Staley had made

12  unauthorized statements to the press about

13  the London Whale?

14          MR. BUTTS:  Objection.

15          You may answer.

16          THE WITNESS:  That was a part

17      of it.

18  QUESTIONS BY MS. SINGER:

19          Q.     And what were those statements,

20  to your understanding?

21          MR. BUTTS:  Objection.

22          You may answer.

23          THE WITNESS:  I don't recall

24      specifically today.

25