# EXHIBIT 7

1    UNITED STATES DISTRICT COURT FOR THE
        SOUTHERN DISTRICT OF NEW YORK
2            -  -  -

3  GOVERNMENT OF THE UNITED    : Case Number:
  STATES VIRGIN ISLANDS      : 1:22-cv-
4      Plaintiff,        : 10904-JSR
      v.               :
5  JPMORGAN CHASE BANK, N.A.  :
      Defendant/Third-Party  :
6      Plaintiff.       :
  _____
7  JPMORGAN CHASE BANK, N.A.   :
      Third-Party Plaintiff, :
8      v.              :
  JAMES EDWARD STALEY      :
9      Third-Party Defendant. :

10

             -  -  -
11        MAY 24, 2023
        HIGHLY CONFIDENTIAL
12            -  -  -

13       Videotaped deposition of

14  STEPHEN CUTLER, taken pursuant to notice,

15  was held at the law offices of Boies

16  Schiller Flexner LLP, 55 Hudson Yards,

17  New York, New York, commencing at

18  9:40 a.m., on the above date, before

19  Amanda Dee Maslynsky-Miller, a Certified

20  Realtime Reporter and Notary Public in

21  and for the State of New York.

22            -  -  -
     GOLKOW LITIGATION SERVICES, INC.
23    877.370.3377 ph| 917.591.5672 fax
          deps@golkow.com
24

1  investigations?

2      A.   No.

3      Q.   What is a Wells notice?

4      A.   A Wells notice is a notice

5  provided by the enforcement staff of the

6  SEC to a person or entity, when the staff

7  has drawn a preliminary conclusion that

8  an enforcement action is warranted.

9      Q.   Are you familiar with Towers

10  Financial?

11      A.   The name -- the name sounds

12  familiar.

13      Q.   Does the name Steve

14  Hoffenberg sound familiar?

15      A.   It does.

16      Q.   Do you recall that before

17  Bernie Madoff, Towers Financial was

18  responsible for the largest Ponzi scheme

19  in U.S. history?

20      A.   I don't recall that.

21      Q.   Do you recall anything about

22  Towers Financial and Steve Hoffenberg

23  being involved in a Ponzi scheme?

24      A.   I mean, that rings a bell.

1   But I think you've now exhausted my

2   recollection of the Towers Financial

3   matter.

4         Q.    Is the reason it might ring

5   a bell is because Towers Financial and

6   Steve Hoffenberg were prosecuted by the

7   SEC?

8             Mr. EDELMAN:  Objection to

9         form.

10            THE WITNESS:  It rings a

11        bell that the SEC sued Towers

12        Financial.  And I can't say

13        whether it also sued

14        Mr. Hoffenberg.  I just don't

15        remember.

16  BY MS. LIU:

17        Q.    Are you aware of the 2003

18  Vanity Fair article, The Talented

19  Mr. Epstein?

20        A.    I don't know.

21        Q.    Do you recall being sent a

22  document that referenced that article

23  when you were general counsel at

24  JPMorgan?

1        A.    I don't have a recollection

2   of that.

3        Q.    Are you aware that the

4   article states that Jeffrey Epstein was

5   said to have been involved with Towers

6   Financial and Steve Hoffenberg?

7              MR. GAIL:  Objection.

8              THE WITNESS:  I don't recall

9        that.

10  BY MS. LIU:

11       Q.    When you were head of

12  enforcement at the SEC, you went after

13  JPMorgan, correct?

14             MR. GAIL:  Objection.

15             THE WITNESS:  I know the SEC

16       sued JPMorgan during my tenure at

17       the SEC.

18  BY MS. LIU:

19       Q.    And what did they sue

20  JPMorgan for?

21       A.    I believe it was a matter

22  related to transactions that may have

23  concerned Enron.

24       Q.    Right.  JPMorgan was alleged

1      A.     Yes.

2      Q.     And Bear Stearns had all but

3  collapsed; is that your recollection?

4      A.     I think my recollection

5  would be, I think, absent an acquisition,

6  they might have collapsed.

7      Q.     And WilmerHale, the law firm

8  representing JPMorgan here in this case,

9  was also part of the legal team involved

10  in the acquisition of Bear Stearns,

11  correct?

12      A.     I don't -- I don't know

13  that.

14      Q.     So it's possible, you just

15  don't recall one way or the other?

16      A.     I just -- I actually

17  remember our principal counsel being

18  Wachtell Lipton.

19      Q.     Do you recall securities

20  counsel being WilmerHale?

21      A.     In connection with the Bear

22  Stearns acquisition?

23      Q.     Yes.

24      A.     I actually don't.

1      Q.    Okay.  And you were aware
2  and involved in discussions related to
3  Jeffrey Epstein and Jeffrey Epstein's
4  Financial Trust Corporation, or FTC's,
5  lawsuit against Bear Stearns, correct?
6      A.    I wouldn't have known FTC or
7  that doesn't sound familiar to me.  But I
8  remember having some involvement in
9  Mr. Epstein's claims against Bear Stearns
10  that we inherited as -- "we" being
11  JPMorgan, inherited in connection with
12  the Bear Stearns transaction.
13      Q.    Right.  And so when you
14  acquired Bear Stearns in 2008, was it the
15  case that you understood Jeffrey Epstein
16  had already sued Bear Stearns or was
17  about to sue Bear Stearns?  Do you
18  recall?
19      A.    I don't recall that.
20      Q.    And what did you -- what do
21  you recall Jeffrey Epstein was suing Bear
22  Stearns over?
23      A.    I think it was principally
24  around the drop in stock price, that Bear

1  Stearns had traded as high as, I don't

2  know what, and ultimately when we

3  acquired Bear Stearns it was at, you

4  know, a much lower price than he had

5  acquired the stock for.

6        Q.    Do you recall that part of

7  his lawsuit was related to losses for

8  investments in asset-backed securities?

9        A.    I don't -- I don't remember

10  that.  It's entirely possible that he was

11  invested in a hedge fund, a Bear

12  Stearns-sponsored hedge fund that had

13  invested in asset-backed securities, I

14  just can't remember.

15        Q.    And you recall that the

16  success of the Bear Stearns acquisition

17  was important to JPMorgan?

18        A.    Sure.

19        Q.    And as the top lawyer

20  involved in that acquisition, was it

21  important to you?

22        A.    Yes.  I mean, we acquired

23  Bear Stearns largely because the

24  government of the United States wanted

1        A.    That's correct.

2        Q.    Do you know who Thomas Smith

3   is?  Thomas J. Smith, if that helps,

4   working with Anne Verdon, possibly.

5              Does that ring a bell?

6        A.    I would have said he may

7   have been a lawyer at JPMorgan in the

8   asset management area, but I can't

9   remember.

10       Q.    I'm sorry, did you say a

11  lawyer?

12       A.    I think so.  I'm just not

13  sure.

14       Q.    Do you recall if you ever

15  had conversations with Thomas Smith

16  related to Jeffrey Epstein?

17       A.    I don't recall.

18       Q.    Do you recall having

19  conversations, in the 2009 time period,

20  with Anne Verdon related to Jeffrey

21  Epstein?

22       A.    In 2009?  I don't recall

23  that.

24       Q.    Who is Alan Greenberg?

1    A.    He was a former Bear Stearns

2  senior executive.  And then when we

3  effected the transaction with Bear

4  Stearns, he continued his association

5  with the combined firm, if you will, on

6  the broker side.

7    Q.    So he was with Bear Stearns,

8  after the acquisition came over to

9  JPMorgan, correct?

10    A.    Correct.

11    Q.    Do you recall that Alan

12  Greenberg was specifically discussed in

13  Jeffrey Epstein's lawsuit against Bear

14  Stearns?

15    A.    I don't know.

16    Q.    Alan Greenberg went by the

17  name Ace, correct?

18    A.    Correct.

19    Q.    Were you friends with him?

20    A.    No.

21    Q.    Who at JPMorgan, if you

22  know, was Alan Greenberg close to?

23    A.    Oh, I don't know.

24    Q.    So you don't know if he was

1   friends with Mary Erdoes, for example?

2       A.    I don't know that.

3       Q.    Was he friends with Jamie

4   Dimon?

5       A.    I -- I don't know that.

6       Q.    Was he friends with Jes

7   Staley?

8       A.    Not that I know of.

9           - - -

10        (Whereupon, Exhibit

11        Cutler-14, JPM-SDNYLIT-00274324,

12        8/11/10 E-mail, was marked for

13        identification.)

14           - - -

15   BY MS. LIU:

16       Q.    I'm handing you what has

17   been marked as Exhibit-14.

18        So you'll see the bottom

19   e-mail is from somebody named Todd Cook

20   to Alan Greenberg.

21        Do you see that?

22       A.    Yes.

23       Q.    And Todd Cook is in

24   JPMorgan's securities legal department.

1              Do you see that?

2      A.    Yes.

3      Q.    And he would have been

4  someone who also reported up to you,

5  correct?

6      A.    I mean, yes, ultimately he

7  would have reported -- he indirectly

8  reported to me, that's correct.

9      Q.    All right.  So in -- in

10  August of 2010 at this time Jeffrey

11  Epstein, I think we confirmed, was still

12  a client at JPMorgan, correct?

13      A.    Correct.

14      Q.    Todd writes, Alan, I'm

15  following up on our conversation about

16  Jeffrey Epstein.  As mentioned, he is

17  suing us over investments made in the

18  Bear Stearns ABS and high-grade funds.

19              Do you see that?

20      A.    I do.

21      Q.    Does that refresh your

22  recollection that there was a lawsuit by

23  Jeffrey Epstein against Bear Stearns?

24      A.    Yes.

1        Q.    So then --

2        A.    Well, I think I spoke too

3   quickly.

4              I don't know whether he

5   actually brought a lawsuit or he had just

6   asserted claims.  I just don't know.  I

7   see that this says he is suing us, but I

8   don't -- I don't recall an actual

9   lawsuit.  It's possible.

10       Q.    And you don't recall being

11  involved in discussions, in June of 2008,

12  related to potential litigation or

13  anticipated litigation of Jeffrey Epstein

14  versus Bear Stearns?

15             MR. GAIL:  Did you say 2008?

16        I'm sorry.

17             THE WITNESS:  2008?

18             MS. LIU:  June of 2008.

19             THE WITNESS:  I certainly

20        recall discussions in 2008 about

21        Bear Stearns' potential

22        liabilities, including lawsuits or

23        claims against Bear Stearns.

24             I don't recall discussions

1          about Jeffrey Epstein in that

2          context in 2008.

3     BY MS. LIU:

4          Q.    I assume you haven't

5     reviewed the priv log that JPMorgan

6     provided to us in this case, correct?

7          A.    Correct.

8          Q.    Do you recall somebody by

9     the name of David Weintraub --

10          A.    Yes.

11          Q.    -- at bear.com?

12          A.    Yes.

13          Q.    And do you recall that as

14     early as June 11th of 2008 he was

15     communicating with you related to

16     rendering and discussing legal advice as

17     prepared because of anticipated or

18     current litigation regarding Epstein's

19     Bear Stearns?

20          A.    I don't.

21          Q.    But you have no reason to

22     doubt the accuracy that David Weintraub

23     at Bear Stearns was e-mailing with you

24     related to possible litigation by Jeffrey

1  Epstein in June of 2008?

2         MR. EDELMAN:  Objection to

3     form.

4  BY MS. LIU:

5     Q.    Could that be true?

6     A.    That Mr. Weintraub was

7  communicating with me about potential

8  litigation by Mr. Epstein concerning Bear

9  Stearns matters?

10    Q.    Correct.

11        MR. EDELMAN:  The question

12    is, could that be true?

13        THE WITNESS:  Yes, it could

14    have been true -- it could be

15    true.

16 BY MS. LIU:

17    Q.    And you recall June of 2008

18 is the month and year that Jeffrey

19 Epstein pled guilty and became a

20 convicted felon, correct?

21    A.    I know that, yes.

22    Q.    And so brewing at the same

23 time that he is being kept on at the bank

24 is a lawsuit that he has against Bear

1    Stearns, correct?

2              MR. GAIL:  Objection.

3              THE WITNESS:  If I

4         understand your question, at the

5         same time that he is potentially

6         asserting claims against Bear

7         Stearns, he is also pleading

8         guilty to the crimes he pled

9         guilty to, that lines up.

10   BY MS. LIU:

11        Q.    Right.  And it also lines up

12   that it's the same time period that the

13   company had a decision to make about

14   whether or not to retain Jeffrey Epstein

15   as a client, and they did so, correct?

16        A.    Correct.

17        Q.    So if you look at the top of

18   the exhibit I just shared with you --

19        A.    Yes.

20        Q.    -- you'll see Dominique

21   Pranito e-mails you on 8/11/2010 and

22   says, Alan Greenberg just called and

23   wants to know -- and then there's a

24   redaction -- see details below.

```
 1                Do you see that?

 2        A.    I do.

 3        Q.    So, presumably, Alan

 4   Greenberg called related to something

 5   about Jeffrey Epstein and the lawsuit; is

 6   that fair?

 7                MR. GAIL:  Objection.

 8                THE WITNESS:  I don't know.

 9   BY MS. LIU:

10        Q.    Who is Dominique Pranito?

11        A.    My assistant.  I should say

12   she was my assistant.

13                     -  -  -

14                (Whereupon, Exhibit

15          Cutler-15, JPM-SDNYLIT-00009597,

16          8/26/10 E-mail, was marked for

17          identification.)

18                     -  -  -

19   BY MS. LIU:

20        Q.    I'm handing you what has

21   been marked as Exhibit-15.

22                You'll see this is an e-mail

23   from Jeffrey Epstein,

24   jeevacation@gmail.com, to Jes Staley on
```

1  August 26th, 2010.

2              Do you see that?

3        A.    I do.

4        Q.    And this says, Steve Cutler

5  sent Alan Greenberg a note telling him

6  you and I settled, question mark,

7  question mark, question mark.  I haven't

8  seen anything since our conversation,

9  period, question mark, question mark.

10             Do you see that?

11       A.    I do.

12       Q.    Do you recall sending Alan

13  Greenberg a note or a communication

14  around this time?

15       A.    I do not.

16                  -  -  -

17             (Whereupon, Exhibit

18        Cutler-16, JPM-SDNYLIT-00274402,

19        9/24/10 E-mail, was marked for

20        identification.)

21                  -  -  -

22  BY MS. LIU:

23       Q.    I'm handing you what has

24  been marked as Exhibit-16.

1          So you'll see from the top

2   e-mail this is, approximately, a month

3   later from the last e-mail we looked at.

4   It's from Melissa Getler to you, Stephen

5   M. Cutler, 9/24/10.

6          Do you see that?

7   A.    I do.

8   Q.    Who is Melissa Getler?

9   A.    I think she was a litigator,

10  but I'm not positive.

11  Q.    So she worked for --

12  A.    She was -- she was in the

13  legal department.  I just don't recall

14  which area.

15  Q.    So you'll see the bottom

16  e-mail is from Jeffrey Epstein to Jes

17  Staley, Please forward to Cutler?

18  A.    I do.

19  Q.    Do you see that?

20  A.    Yes.

21  Q.    And then Jes Staley forwards

22  you something, and it's redacted,

23  privileged.

24          Do you see that?

1          A.    I see that.

2          Q.    And you forward it to

3    Melissa Getler.

4                Do you see that?

5          A.    I do.

6          Q.    And then she writes

7    something to you that we can't see

8    because it's redacted.

9                Do you see that?

10         A.    I do.

11         Q.    Okay.  So do you recall that

12   Melissa Getler was also involved in

13   discussions related to the litigation

14   that Jeffrey Epstein had against Bear

15   Stearns?

16         A.    I don't have an independent

17   recollection of that.  Seeing this

18   document, that -- it's entirely possible

19   that she would have been involved in

20   litigation against -- or with

21   Mr. Epstein.

22                    -   -   -

23                (Whereupon, Exhibit

24         Cutler-17,

1    JPM-SDNYLIT-00010065-080, 9/23/10

2    E-mail, was marked for

3    identification.)

4              -  -  -

5  BY MS. LIU:

6    Q.    I'm handing you what has

7  been marked as Exhibit-17.

8            You'll recall in the last

9  exhibit, 16, the bottom e-mail was

10  Jeffrey Epstein, September 23rd, with a

11  please forward to Cutler to Jes Staley,

12  right?

13    A.    I do.

14    Q.    Okay.  So now you can see

15  that this e-mail, which contains that

16  same bottom e-mail, then forwards

17  something to Jes Staley, which he then

18  forwards to you, 9/23/2010, DKI 9/23

19  draft FTC settlement agreement.

20            Do you see that?

21    A.    I do.

22    Q.    And do you recognize the

23  initials DKI?

24    A.    No.

1    Q.   Do you recall Darren K.

2  Indyke being the lawyer for Jeffrey

3  Epstein?

4    A.   I think I've seen documents

5  recently that suggested that -- that

6  Mr. Indyke was someone who was associated

7  with Mr. Epstein.  I don't -- I don't

8  have any knowledge of that.

9    Q.   So, then, this -- if you

10  turn to the first page of the attachment,

11  you'll see there's a draft, Settlement

12  agreement and release.

13       Do you see that?

14    A.   I do.

15    Q.   And it's entered into by and

16  among Jeffrey Epstein Financial Trust

17  Company.

18       Do you see that?

19    A.   I do.

20    Q.   And others -- and the Bear

21  Stearns companies and some others.

22       Do you see that?

23    A.   I do.

24    Q.   Does this refresh your

1  recollection in any way about the lawsuit

2  that Jeffrey Epstein had brought against

3  Bear Stearns?

4      A.    I still don't know if there

5  was an actual lawsuit, but I can read --

6  I just read that first paragraph.

7          I don't know whether there

8  was, in fact, a lawsuit or whether there

9  were claims.  But you may not be -- that

10  distinction may not be important to you

11  in your question.  I just don't know.

12      Q.    Well, it looks like, I think

13  on the next page, it's referring to an

14  arbitration proceeding.  Maybe I'm

15  calling that a lawsuit.

16          Is that fair?

17      A.    I see that.  And I wouldn't

18  have known that either.  But okay, I see

19  that.

20      Q.    So if you turn to Page 15 of

21  this document, there's an Exhibit A.

22      A.    Yes.

23      Q.    And it says, Party, and it

24  lists the three parties.

1                    Do you see that?

2         A.    I do.

3         Q.    And it talks about fund,

4    date, contribution.

5                    Do you see that?

6         A.    I do.

7         Q.    And the contribution totals,

8    for the three parties, approximately $41

9    million.

10                   Do you see that?

11                   MR. EDELMAN:  Objection to

12        form.

13                   THE WITNESS:  I do.

14   BY MS. LIU:

15        Q.    Does that refresh your

16   recollection in any way that Jeffrey

17   Epstein was suing Bear Stearns over

18   losses that were approximately $41

19   million?

20                   MR. EDELMAN:  Objection to

21        form.

22                   THE WITNESS:  I don't think

23        that's what it says.

24   BY MS. LIU:

1          Q.    What does it say?

2          A.    I would have to read the

3    whole document, but I would read, if

4    I'm -- I'm just focusing on Exhibit A,

5    having not read the remainder of the

6    document.

7                It looks like that's the

8    amount that those parties invested.

9          Q.    I'm sorry.

10         A.    But I'm not sure.

11         Q.    Okay.  And that -- fair

12   enough.

13               It looks like that's the

14   contribution amount made by those parties

15   in the Bear Stearns funds; is that fair?

16         A.    That's what it -- that's

17   what it looks like.  I don't know if

18   that's what is meant.

19         Q.    Okay.

20         A.    If you want me to study the

21   document, I can study it.

22                    -  -  -

23               (Whereupon, Exhibit

24         Cutler-18, JPM-SDNYLIT-00010100,

1    there.

2           A.    Okay.

3           Q.    Maybe not coincidentally,

4    Todd called me about Epstein last week.

5                 Do you see that?

6           A.    I do.

7           Q.    Ace Greenberg wants to do

8    business with him.

9                 Do you see that?

10          A.    I do.

11          Q.    And at this time, Ace, or

12   Alan Greenberg, was already at JPMorgan,

13   correct?

14          A.    Yes.

15          Q.    And he's the person we were

16   talking about who was formerly with Bear

17   Stearns, correct?

18          A.    Correct.

19          Q.    And I think you did not

20   remember or recall, but he was named in a

21   lawsuit that Jeffrey Epstein brought

22   against Bear Stearns.

23                Do you know that?

24          A.    That -- that Mr. Greenberg

1   was named in a lawsuit?

2          Q.    He was -- there were

3   allegations related to Mr. Greenberg in

4   the lawsuit.

5          A.    I don't recall that.

6          Q.    Okay.  Ace Greenberg wants

7   to do business with him.  I told Todd --

8   and then there's a redaction.

9                Do you see that?

10         A.    I do.

11         Q.    So maybe Ace is pushing it.

12               Do you see that?

13         A.    I do.

14         Q.    Did you know at this time,

15  in 2010, that Alan "Ace" Greenberg wanted

16  to do business with Jeffrey Epstein?

17         A.    Well, I thought you showed

18  me another e-mail that suggested that.  I

19  don't know.

20               I don't remember that.

21         Q.    You're thinking about

22  Exhibit --

23         A.    Yeah, I see it says, Alan

24  Greenberg just called and wants to know.

1    I don't know what it is that

2  he wanted to know, because it's redacted.

3    Q.    So I'm asking, at the

4  time --

5    A.    It may well be that

6  Mr. Greenberg was doing brokerage

7  business with Mr. Epstein.  I just don't

8  remember.

9    Q.    So Melissa Getler writes

10  back to James Condren, Okay.  That

11  provides some context, maybe.  Thanks.

12    Do you see that?

13    A.    I do.

14    Q.    Okay.  James Condren then

15  forwards it to Todd Cook.

16    Do you see that?

17    A.    I do.

18    Q.    Todd Cook is another lawyer,

19  right?

20    A.    Yes.

21    Q.    Todd Cook then forwards it

22  to James Condren, Melissa Getler, Anne

23  Verdon, Greg Quental.

24    Do you see that?

1    A.    I do.

2    Q.    Who is Greg Quental?

3    A.    I don't remember.  I don't

4 think he was a lawyer.  I think he was a

5 business person.

6    Q.    After we spoke -- this is

7 Todd writing to James Condren, Melissa

8 Getler, Anne Verdon and Greg Quental,

9 August 16th, 2010.

10         After we spoke, I realized

11 that not only is Epstein suing us, but

12 since he's a convicted felon, the

13 approval of Cutler or Zubrow would be

14 required by the firm's felon policy.  It

15 looks like Ace may have reached out to

16 Cutler.

17         Do you see that?

18    A.    I do.

19    Q.    Do you recall Mr. Greenberg

20 reaching out to you on or about this

21 time?

22    A.    I mean, I see this -- where

23 is that e-mail?

24         I mean, I see the -- this is

1   Exhibit-14, my assistant writing to me

2   that Mr. Greenberg just called and wants

3   to know something, and it relates to

4   Jeffrey Epstein.

5           I don't -- I don't have an

6   independent recollection of this.  I

7   believe -- I believe Mr. Greenberg was

8   servicing the -- the Epstein account.

9       Q.   And Melissa Getler writes to

10  Todd Cook, James Condren, Anne Verdon,

11  Greg Quental, We are in contact with

12  Cutler on this.

13          Do you see that?

14      A.   I do.

15      Q.   And then Todd Cook writes

16  back to Melissa Getler, Anne Verdon, Greg

17  Quental, Did Ace go to him for an

18  exception to the felon policy?

19          Do you see that?

20      A.   I do.

21      Q.   What was an exception to the

22  felon policy?

23          MR. EDELMAN:  Objection to

24      the form.

1    requirement in the policy that we

2    reviewed earlier today that says

3    that it must go to Jamie Dimon

4    somehow, if that's the policy that

5    we're talking about.

6  BY MS. LIU:

7    Q.    I'm asking if you know, that

8  if Alan Greenberg came to you and said, I

9  want to do business with Jeffrey Epstein,

10  I would like an exception to the felon

11  policy, and you said okay, would that

12  have to go up to Jamie Dimon for final

13  blessing?

14    MR. EDELMAN:  Objection to

15    form.

16    THE WITNESS:  I don't

17    believe Mr. Greenberg came to me

18    and said we need -- I need an

19    exception to a felon policy.

20    So I'm not sure I

21    understand, then, the -- how to

22    answer the question.

23  BY MS. LIU:

24    Q.    Melissa Getler, the person