

www.motleyrice.com

"I will stand for my client's rights.
I am a trial lawyer."
–Ron Motley (1944–2013)

401 9th St. NW, Suite 630
Washington, DC 20004
**o.** 202.232.5504 **f.** 202.232.5513

**Linda Singer**
*Licensed in DC, NY*
direct: 202.386.9626
lsinger@motleyrice.com

**CONFIDENTIAL, FILED UNDER SEAL**

June 7, 2023

**BY ECF**

Hon. Jed S. Rakoff
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

RE: *Gov't of the U.S. Virgin Islands v. JPMorgan Chase Bank, N.A.*, Case No. 1:22-cv-10904-JSR (S.D.N.Y.) – Motion Seeking Leave to Reopen Depositions

Dear Judge Rakoff:

On May 31, 2023, the Court ordered Plaintiffs to submit letter briefs no later than 5:00 PM on June 7, 2023 seeking to recall a witness if they believe "that a document was produced in an untimely fashion, and that they would have confronted a witness at a deposition with that document if it were produced in a more timely fashion."

Based on several documents produced late in the discovery period, Plaintiff the Government of the United States Virgin Islands ("USVI") respectfully requests that the Court:

1. grant leave to recall Mr. Dimon for one additional hour; and

2. grant leave to reopen the Rule 30(b)(6) deposition on the topic of Epstein client referrals; and

3. grant leave to take the deposition of Howard Maleton; and

4. compel JPMorgan to produce specific categories of documents about Bear Stearns employees' knowledge of Epstein's activities and relationship with Bear Stearns until and after it was acquired by JPMorgan in 2008.





***Background***

Between and including May 26, the day of Jamie Dimon's deposition, and June 4, five days after the last day of discovery, JPMorgan produced 1,654 documents, or 115,702 pages of documents. Many of the documents produced late in discovery were from the custodial files of individuals involved in "Project Jeep," a 2019 investigation by JPMorgan [REDACTED] None of these custodians were identified as persons with knowledge in JPMorgan's initial disclosures.

On May 30, JPMorgan produced an unredacted version of an email chain dated July 22, 2019. The redacted version was produced on May 23. It begins with an email from Darin Oduyoye, the Chief Communications Officer for JPMorgan Asset Management, about a New York Times article of the same date, "Jeffrey Epstein's Deep Ties to Top Wall Street Figures." Exhibit 1 (JPM-SDNYLIT-00790944). Much of the article focused on Epstein's relationship with Jes Staley, and the "dozens of wealthy clients" Epstein had "funneled . . . to Mr. Staley and his bank." *Id.* Peter Neilson (Managing Director and Global Head of Financial Crimes Compliance) forwarded Oduyoye's email to Jeremy Bell (Chief Compliance Officer, JPMorgan Securities) and Frank Pearn (Chief Compliance Officer and Head of Operational Risk). *Id.* The text of Neilson's email was redacted in the version of the email produced on May 23. *Id.*

The unredacted email from Peter Neilson to Bell and Pearn, produced on May 30, states: "Have been working on this (Epstein et al) today. ***Top of house*** requested that we expand our analysis to related parties and put together slides. Should have in a few days. We are treating it as a project at this point. There is a highbridge angle and one dating back to Bear. More as I know it." Exhibit 2 (JPM-SDNYLIT-00790944_R) (emphasis added).

This "project" ordered by "top of house" was what became known as Project Jeep. *See* JPM-SDNYLIT-00791805 ("[REDACTED]" . . . "[REDACTED]").

On May 28, JPMorgan produced an email dated October 28, 2019, with subject line, "Project Jeep Current Review" and its attachment, which was a 22-page "summary of the e-comms review that Trade Surveillance conducted regarding Epstein and Staley." Exhibit 3 (JPM-SDNYLIT-00901997); Exhibit 4 (JPM-SDNYLIT-00901998). The summary was a 22-page bulleted list of quotes from and descriptions of emails primarily between and among Jeffrey Epstein, Jes Staley, Mary Erdoes, and occasionally others. The e-comms summary groups the emails by topic, and includes emails dating back to 2008. The following topics, which are significant because they reflect JPMorgan's own analysis of the documents, are included:

- "Jes Staley appears to have a close relationship with Jeffrey Epstein, regularly communicating with him and seeking advice from him including while Epstein is






incarcerated. Other employees also communicated with Epstein intermittently on a variety of matters."

- "Jeffrey Epstein makes limited references to his interest in women but no explicit references to age. There are also some comments which, while unconfirmed, may have the appearance of relating to inappropriate behavior with one reference between Epstein and Staley to a modeling agency."

- "Jeffrey Epstein appears to maintain relationships with a number of senior business executives and senior government officials globally."

- "Jeffrey Epstein appears to maintain a particularly close relationship with Prince Andrew the Duke of York and Lord Peter Mandelson, a senior member of the British Government. He also appears to have a close relationship with Sultan Ahmed Bin Sulayem who is a senior UAE official involved in ownership of the Dubai Ports."

- "Beginning in 2011 Jes Staley and Mary Erdoes have regular communication with Jeffrey Epstein relating to certain strategic initiatives and business proposals. There are occasional personal e-mails between Erdoes and Epstein interspersed within this time period."

- "Certain messages appear to relate to lawsuits and litigation involving Epstein, JPMC, Bear Stearns, Highbridge, Zwirn etc. or the Firm's maintenance of a relationship with Epstein in general."

*See* Exhibit 4.

The cover email to the e-comms summary refers to a "timeline combining the e-comms with the relevant transactional activity." Exhibit 3. The USVI has been unable to locate that timeline in JPMorgan's production and does not believe that JPMorgan has produced the document. The USVI asked that it be produced and has received no response.

JPMorgan has produced additional documents late in the discovery period that highlight other, previously unknown deficiencies in its document production. There are a handful of emails indicating involvement by certain Bear Stearns employees in the Epstein relationship in the fall of 2008 and the summer of 2010, including one that indicates that Alan "Ace" Greenberg (former Bear Stearns CEO, Chairman of the Board, and Chairman of the Executive Committee) went to Steve Cutler (former JPMorgan Executive Vice President and General Counsel) "for an exception to the felony policy" for Epstein. *See, e.g.*, Exhibit 5 (JPM-SDNYLIT-00752910) (produced May 21); Exhibit 6 (JPM-SDNYLIT-00892560) (produced May 28). All of these documents, and no





doubt other Bear Stearns documents that JPMorgan has not produced, are responsive to the USVI's document requests.

In an email about the documents described in the e-comms summary, counsel for JPMorgan represented that "over 95% of the referenced documents were produced. The few that were not, were not captured by the negotiated scope of search and we do not believe they are relevant." Email from J. Butts to B. Narwold, L. Singer re "Fwd: New Production" (Jun. 5, 2023).

Among the documents in the e-comms summary that were not produced—that counsel for JPMorgan does not believe are relevant—is a January 19, 2011 email from Laura Schreiner from JPMS to Epstein, "Ace would love to speak to Jeffrey. Can you please call Ace at 212-272-4605, or e-mail him a phone number where Jeffrey can be reached?" Exhibit 4 at 00902007. The timing of the call suggests the document is highly relevant to discussions that were occurring in January 2011 about whether Epstein would be terminated or retained by the bank. *See, e.g.*, Exhibit 7 (JPM-SDNYLIT-00152756_R) (email documenting meeting among compliance personnel and executives of Private Bank on January 7, 2011 at which Catherine Keating, head of the U.S. Private Bank, stated, "no one on today's call was in favor of having retained him as a client. Seems it was all due to Jes's personal relationship.").

***Argument***

**1. Dimon Deposition**

Although Plaintiff had most of the documents included in the e-comms summary before Dimon's deposition, the summary and its cover email have independent significance. At his deposition, Dimon testified repeatedly that almost everything he knew about Epstein's relationship with the bank he learned from his lawyers. *See, e.g.*, Exhibit 10 (excerpts of Transcript of Deposition of Jamie Dimon) at 83:8-13; 85:2-16. On that basis, he was instructed not to answer many questions about JPMorgan's contemporaneous knowledge of Epstein's activities, an objection and instruction sustained by the Court. The e-comms summary was prepared as part of Project Jeep, which the documents suggest may have been ordered by Dimon himself, not by the legal department and not in relation to any pending or anticipated litigation. That summary outlines JPMorgan's ongoing knowledge of Epstein's (and Staley's) activities and Epstein's relationship with JPMorgan. It is confounding that this document—which relates to core issues in the case alleged by the USVI and Does, and put at issue by JPMorgan in its own third party complaint—was not produced until the very end of discovery.[1]

[1] To the extent JPMorgan contends that the custodian for this document was not added until the end of the discovery period at the request of the USVI, which raised concerns that JPMorgan had





The USVI is entitled to ask, and would have asked, if the "top of house" order that began Project Jeep came from Dimon,[2] whether it was precipitated by the New York Times article or other news coverage, and if so, what the scope and objective of the project was intended to be, along with other relevant follow-up questions, such as whether he reviewed the "slides" or other materials prepared as part of Project Jeep. It is entitled to ask, and would have asked, about the non-privileged e-comms summary prepared as part of Project Jeep that shows an extensive analysis of internal documents, and the yet-to-be-produced "timeline" incorporating both internal emails and transactional activity, as well as more than four pages of Epstein referrals to JPMorgan confirmed in the e-comms summary, including Andrew Farkas, Boris Nikolic, Bill Gates, and Peter Mandelson. Dimon was dismissive of Epstein's referrals: "We did not need introductions to anybody." Exhibit 10 at 252:18-253:4.

**2. Corporate deponent on Epstein's business referrals**

As noted above, the e-comms summary also indicates that JPMorgan was aware of business referrals by Epstein to Staley throughout his relationship with the bank. Exhibit 4 at 00902006-2012. Dimon was dismissive of any such referrals at his deposition, *see e.g.*, Exhibit 10 at 252:18-253:4; 385:16-18, and JPMorgan represented in its May 30 written discovery responses in lieu of 30(b)(6) testimony that, of a long list of potential referrals, only Ghislaine Maxwell became a client of the bank, Exhibit 8 at 8-9. In light of the e-comms summary produced on May 30 and

---

failed to identify any custodians related to Project Jeep [REDACTED] [REDACTED], it is notable that: (1) the USVI has been requesting documents, custodians, and information related to [REDACTED] Project Jeep since early April; (2) Project Jeep was only first disclosed in a document produced the night before Mary Erdoes's deposition on March 15, 2023; (3) relevant 2019 and Project Jeep custodians were only disclosed in JPMorgan's interrogatory answers in lieu of 30(b)(6) testimony on April 14, 2023; and (4) it is JPMorgan's responsibility to identify custodians with knowledge of the facts at issue in the case. *See e.g., Gardner-Alfred v. Fed. Reserve Bank of N.Y.*, 22-cv-01585 (LJL), 2023 WL 3495091, at *15 (S.D.N.Y. May 17, 2023); *The Raine Group LLC v. Reign Capital, LLC*, No. 21-CV-1898 (JPC) (KHP), 2022 WL 538336, at *1 (S.D.N.Y. Feb. 22, 2022). It is hard to imagine a document that would be more central to the issues in the case than this 22-page internal review of Jes Staley's and other JPMorgan executives' communications with Jeffrey Epstein, and that JPMorgan did not review the document in connection with the preparation of its third-party complaint.

[2] Another email produced by JPMorgan at the end of discovery used the phrase "top of the house" to refer to Jaime Dimon. Exhibit 9 (JPM-SDNYLIT-00892568) ("My understanding is that JPM requires top of the house ok for clients who are convicted felons. (ie PCS Legal to Asset Mgt Legal to Cutler to Jaime Daimnon [sic]).").





JPMorgan's written responses served on May 30, the USVI believes it should be permitted to question a corporate designee for one hour on Epstein's business referrals to the bank.

### 3. Deposition of Howard Maleton

Howard Maleton is a JPMorgan VP and Compliance Manager who was involved in Project Jeep. He is identified as the custodian of the 22-page e-comms summary, which was produced on the last day of discovery, and several other late-produced documents relating to Project Jeep. He was one of 28 individuals identified by JPMorgan in its written responses in lieu of 30(b)(6) testimony [REDACTED]. It was not until after review and analysis of documents produced in the last two weeks of discovery that the USVI has been able to determine that Maleton is the appropriate deponent out of the 28 individuals identified in JPMorgan's April 14 written responses. The USVI has now determined that Howard Maleton has knowledge of both Project Jeep [REDACTED], and is likely well-qualified to testify about many of the later-produced documents. The USVI therefore respectfully requests leave to depose him.

### 4. Production of responsive, relevant Bear Stearns documents

Finally, the USVI asks that JPMorgan be compelled to produce all responsive Bear Stearns documents that fall into the following categories:

1. Bear Stearns AML Group's Epstein Case File, including documents and correspondence relating to any Epstein-related subpoena received by Bear Stearns, and any other due diligence conducted by Bear Stearns AML Group on Epstein or related individuals or entities;

2. Emails or documents relating to Epstein--Bear Stearns litigation;

3. Emails between Alan "Ace" Greenberg and Jeffrey Epstein;

4. Emails about Epstein between or among Greenberg and Dimon, Erdoes, Staley, Cutler, Schwartz, or other JPMorgan compliance employees or bankers; and

5. Emails and documents showing involvement by Bear Stearns employees in discussions about retaining or exiting Epstein.

To learn as the USVI did, only on the last day of discovery, that Ace Greenberg, who had previously intervened on Epstein's behalf, had reached out to Epstein in January 2011 in the midst of a massive push to exit him from the bank, raises serious concerns about deficiencies in





JPMorgan's production of highly relevant, responsive Bear Stearns documents in its control. Exhibit 4 at 00902007. According to counsel for JPMorgan, that highly relevant document was not produced[3] because it was not within the "negotiated scope of search." But that "negotiated scope of search" depended on a forthright identification of custodians, including Bear Stearns employees, that did not occur here. Throughout discovery, JPMorgan identified a single Bear Stearns compliance employee who became a JPMorgan compliance employee (Arthur Middlemiss). It identified no Bear Stearns bankers, executives, or individuals who had contact with Epstein. Moreover, JPMorgan is required to "search custodians and locations it identifies on its own as sources for relevant information as part of its obligations under Rules 26 and 34 . . . ." *Raine Group*, 2022 WL 538336, at *1. Negotiated search terms and custodians "work in tandem with the parties' obligations under the Federal Rules and do not replace a party's independent obligation to produce electronic (or paper) documents that are reasonably accessible, relevant, and responsive within the meaning of Rule 34." *Id.*; *see also Gardner-Alfred*, 2023 WL 3495091, at *15 (discussing inappropriate limitation by custodian and stating "the producing party, even absent agreement or discussion about the appropriate terms, still has an independent obligation to craft search terms to fulfill the requirements of Rules 26 and 34").

Because late-produced documents have established the relevance and responsiveness of Bear Stearns documents, and because the negotiated search protocol in this case does not absolve JPMorgan of its independent obligation under the Rules to produce relevant and responsive documents, the USVI respectfully requests that the Court compel JPMorgan to produce the five categories of Bear Stearns documents identified in this filing.

Respectfully submitted,

*/s/ Linda Singer*
Linda Singer

cc: Counsel of record (via ECF)

[3] After a specific request from the USVI, that document was produced on June 7, 2023.