

401 9th St. NW, Suite 630
Washington, DC 20004
o. 202.232.5504  f. 202.232.5513

**Linda Singer**
*Licensed in DC, NY*
direct: 202.386.9626
lsinger@motleyrice.com

www.motleyrice.com
"I will stand for my client's rights.
I am a trial lawyer."
–Ron Motley (1944–2013)

**CONFIDENTIAL**

July 14, 2023

**BY ECF**

Hon. Jed S. Rakoff
U.S. District Court, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

> Re: *Gov't of the U.S. Virgin Islands v. JPMorgan Chase Bank, N.A.*, Case No. 1:22-cv-10904-JSR (S.D.N.Y.) – Letter Brief Pursuant to July 7, 2023 Order

Dear Judge Rakoff:

The Government of the United States Virgin Islands ("USVI"), submits this Letter Brief in further support of its Motion to Strike Defendant's Affirmative Defenses 5 Through 8 (Dkt. 138, 139) and in response to the Court's July 7, 2023 Order (Dkt. 204), requesting further briefing on "the interests [USVI] is asserting and the kinds and amounts of damages it is seeking." *Id.* at 2.

Pursuant to its claims under the TVPA and CICO, the USVI's initial Complaint sought proprietary damages in the form of tax revenue, in addition to traditional *parens patriae* remedies. In light of the Court's decision on the Motion to Dismiss, the USVI dropped its claims for proprietary damages for its own losses or harms. Dkt. 200 at 2. Each of the remedies the USVI now seeks will vindicate quasi-sovereign interests. Thus, as explained in the initial briefing, JPMorgan's affirmative defenses are unavailable.

The Court previously found that:

> The USVI's asserted interest in "assuring its residents it will act to protect them from the harmful effects of criminal sex-trafficking enterprises flourishing in the Islands that are their home" is indeed general (as all interests that ground parens patriae standing must be); but it directly parallels the interest that Puerto Rico successfully asserted in Snapp which was an interest in "assuring its residents that it will act to protect them from ... the harmful effects of discrimination." [Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 609 (1982)]. Indeed, the similarities between the interest asserted by the USVI here and that asserted by Puerto Rico in Snapp are considerable. Dkt. 130 at 18.

Like the government plaintiff in *Snapp*, the USVI seeks "declaratory relief with respect to the past practices of petitioners and injunctive relief requiring petitioners to conform to the relevant

federal statutes and regulations in the future." *Snapp*, 458 U.S. at 598-99; *see* FAC ¶109 (seeking injunctive relief and such other relief as the Court deems appropriate); SAC ¶119 (same). The USVI seeks an injunction to prevent JPMorgan from participating in sex trafficking ventures in the future and to protect and prevent potential future victims of traffickers. FAC ¶109; 2AC, ¶¶ 119, 168 (same). An injunction is widely recognized to be appropriate (even quintessential) relief for a state attorney general bringing suit as *parens patriae*.[1]

The injunction the USVI seeks is guided by the opinions of its expert witnesses:

**Professor Robert L. Jackson, Jr.**, former Commissioner of the U.S. Securities and Exchange Commission ("SEC"), describes "alternative relief" that he approved and oversaw as Commissioner in cases involving Bank Secrecy Act ("BSA") violations that apply and are important in this case. Ex. A (excerpt of Report of Robert L. Jackson, Jr.) at 31-34. The first is an independent compliance consultant ("ICC") to provide "oversight of reporting-related risk from a social point of view" needed to overcome the economic incentives to underreport suspicious activity. *Id.* at 33, ¶ 70. The other is a permanent injunction against future violations of the TVPA, which facilitates future enforcement through contempt proceedings, "reducing the cost of future action and, in turn, increasing the *ex ante* deterrent effects of the relevant judgment." *Id.* at 33-34, ¶¶ 71-72. Finally, Professor Jackson opines on the need for structural changes at JPMorgan:

> The information financial institutions are required to provide to law enforcement is crucial to the prevention of wrongdoing. But because they lack economic incentive to report their suspicions about their own clients, separation of banks' business and compliance function is necessary to ensure banks report all the information the law requires when the law requires it. JPM's internal governance did not achieve that separation, and the tragic events that followed have imposed untold costs upon society. *Id.* at 34, ¶ 74.

**Professor Jonathan J. Rusch**, Director of the U.S. and International Anti-Corruption Law Program at American University, Washington College of Law, and former Senior Vice President and Head of Anti-Bribery & Corruption Governance at Wells Fargo, opines that in his experience as a compliance professional, it would be appropriate to require JPMorgan to: (1) perform a root-cause analysis of the violations evidenced in its handling of Epstein's accounts and activities; and (2) develop a remediation plan in consultation with the USVI and subject to the Court's approval and oversight. Ex. B (excerpt of Expert Opinion Report of Jonathan J. Rusch) at 191-92.

---

[1] *See, e.g., Snapp, supra*; *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 215 (2d Cir. 2013) (State Attorney General sought, *inter alia*, "equitable and injunctive relief based on 'quasi-sovereign interests' in protecting the health and safety of citizens"); *People of the State of New York by Vacco v. Mid Hudson Med. Grp.*, 877 F. Supp. 143, 144 (S.D.N.Y. 1995) (State Attorney General sought, *inter alia*, "to enjoin defendant from such unlawful discrimination"); *People by Underwood v. LaRose Indus. LLC*, 386 F. Supp. 3d 214, 218 (N.D.N.Y. 2019) ("New York argues that, 'when, as here, a State sues in its *parens patriae* capacity to enforce laws that protect its citizens and seeks civil penalties and injunctive relief to prevent future violations, the State is the real party in interest.' The Court agrees.") (citation omitted).

**Professor Bridgette Carr** is Co-Director of the Human Trafficking Clinic + Lab at the University of Michigan Law School and co-creator of the University's Human Trafficking Collaborative. Professor Carr recommends that JPMorgan involve trafficking experts and, importantly, trafficking victims in a review to "identify missed opportunities to prevent human trafficking, and implement changes that could prevent such missed opportunities from occurring in the future;" developing "accommodations or banking products and protocols to address the unique needs trafficking victims face after being exploited and financially abused;" prohibiting participation of employees who have personal relationships with a private banking client in decisions to retain or exit that client; and providing "an opportunity for any of Epstein's victims to present information . . . about the harm they experienced and the ways in which the bank could have intervened to identify or address their abuse." Ex. C (excerpt of Expert Report of Bridgette Carr) at 75-76.

These sets of recommendations aim to address the same core problem: JPMorgan's knowledge of and failure to report Epstein's trafficking because it lacked the economic incentive and motivation to place compliance with the law and prevention of trafficking ahead of its own profits.

The USVI also seeks civil penalties, disgorgement, restitution, damages, including punitive damages, and reasonable attorneys' fees, FAC, ¶ 109; SAC, ¶ 119, as "appropriate relief" under 18 U.S.C. § 1595(d) to further this provision and the TVPA's remedial, punitive, and deterrent objectives. *See* 164 Cong. Rec. S1849-08, S1865, 2018 WL 1415014 (Mar. 21, 2018) ("Let's unleash those [resources] in the States to help us address this growing problem throughout our country."). Civil liability already existed in the TVPA, and the Court held that allowing State Attorneys General the right to vindicate such existing liabilities under its *parens patriae* authority was permissible. Dkt. 130 at 22-23.

Civil penalties are an appropriate remedy to further the TVPA's deterrent objective in *parens patriae* actions.[2] Professor Jackson presents a quantitative analysis showing that, in the past, penalties related to the non-filing of SARs "have provided limited reason for bank executives to resist their incentives to report less suspicious activity than the law requires," and thus requiring more meaningful levels to deter misconduct. Ex. A (excerpt of Jackson Rpt.) at 8-13.

The USVI seeks civil penalties consistent with the duration, egregiousness, and impact of JPMorgan's violations. The New York Department of Financial Services ("NYDFS") issued a $150 million agreed-to penalty on Deutsche Bank for its "inexcusable fail[ure] to detect or prevent millions of dollars of suspicious transactions" related to Epstein, including payments to alleged co-conspirators; settlement payments and dozens of payments to law firms for legal expenses of Epstein and co-conspirators; payments to Russian models and to numerous women with Eastern

---

[2] *See generally State of New Mexico ex rel. Balderas v. Real Estate Law Ctr., P.C.*, 430 F. Supp. 3d 761, 875 (D.N.M. 2019) (State, as *parens patriae*, seeks "civil penalties against the Defendant" to "deter future action like the Defendants' conduct"); *LaRose Indus.*, 386 F. Supp. 3d at 219 ("New York seeks to enjoin Defendant from conduct that is illegal under New York law and to impose civil statutory fines to punish Defendant and deter other businesses from similarly harming New York consumers."); *see also SEC v. Lek Securities Corp.*, 612 F. Supp. 3d 287, 298 (S.D.N.Y. 2020) ("Neither of those remedies carries the same deterrent effect as a robust civil penalty.").

Hon. Jed S. Rakoff
Case No. 1:22-cv-10904-JSR
July 14, 2023
Page 4

European surnames; and periodic suspicious cash withdrawals totaling more than $800,000 over four years.[3] The USVI will prove even greater participation by JPMorgan in Epstein's sex-trafficking venture over more than a decade, and seeks at least $150 million in civil penalties.

Disgorgement also appropriately furthers the TVPA's deterrent objectives in *parens patriae* actions.[4] The USVI will prove that JPMorgan profited significantly from its relationship with Epstein. Conservatively, the USVI will prove that Epstein generated more than $20 million in fees and revenues for the Bank through 2013 when he was exited. In addition, Epstein referred many ultra-high net worth clients to the bank, including Sergey Brin, Bill Gates, Leslie Wexner, Glenn Dubin, and the USVI will prove, also conservatively, that those clients generated an additional $20 million in fees. Thus, the USVI conservatively estimates that until Epstein's exit from the Bank at the end of 2013, JPMorgan received at least $40 million from its relationship with Epstein. This does not include the difficult to quantify value of Epstein introducing JPMorgan to high profile individuals, such as Prince Andrew, Ehud Barack, and Lord Peter Mandelson, connecting JPMorgan with the Gates Foundation, or consulting services that Epstein provided to the Bank including related to the Highbridge acquisition.

The USVI further seeks compensatory damages suffered by victims and punitive damages in amounts to be proven to redress, punish, and deter the harms and threats to its residents' interests in physical health, safety, and well-being posed by JPMorgan's facilitation of Epstein's sex-trafficking. Compensatory damages of persons harmed by unlawful conduct affecting quasi-sovereign interests is an appropriate remedy in *parens patriae* cases.[5] Punitive damages likewise is an appropriate remedy that furthers the TVPA's deterrence and punishment objectives in *parens*

---

[3] NYDFS Press Release, July 7, 2020 (https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202007071#:~:text=Lacewell%20announced%20today%20that%20Deutsche,(%E2%80%9CDFS%E2%80%9D%20or%20the%20%E2%80%9C) (last checked July 14, 2023); Consent Judgment, July 6, 2020 (available at https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf) (last checked July 14, 2023).

[4] *See generally Balderas*, 430 F. Supp. 3d at 875 (State plaintiff as *parens patriae* seeks disgorgement "to deter future action like the Defendants' conduct"); *State of Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*, 761 F.3d 1027, 1032-33 (9th Cir. 2014) (disgorgement and other remedies sought in actions "brought by the State of Hawaii in its sovereign capacity on behalf of the State and its citizens . . . and also under the State's *parens patriae* authority") (internal quotation marks and citations omitted).

[5] *See, e.g., State of New York by Abrams v. General Motors Corp.*, 547 F. Supp. 703, 706-07 (S.D.N.Y. 1982) ("The State's goal of securing an honest marketplace in which to transact business is a quasi-sovereign interest. . . . This conclusion is not altered by the State's decision to seek . . . damages on behalf of those who allegedly have been defrauded by GM."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 560693, at *5 (N.D. Cal. Feb. 15, 2011) ("The damages that California seeks, while on behalf of its consumers, would first be paid to the State and distributed on an equitable basis. The fact that private parties may benefit from the States' actions does not negate the States' substantial interests in these cases.").

*patriae* actions.[6] The USVI also will seek its attorneys' fees and costs for successful prosecution of its TVPA claims against JPMorgan.[7]

JPMorgan's potential settlement of individual victims' claims for damages does not—and cannot—release or compromise the USVI's claims for damages as *parens patriae* remedies. The USVI alone controls these claims.[8] The individual victims, none of whom have received and some of whom will not receive payment through the proposed class action settlement, do not control the USVI's claims for this relief, which the USVI will recover and seek to distribute on an equitable basis to those victims or else appropriate *cy pres* beneficiaries.[9] This relief is important to vindicate the USVI's interests under the TVPA by punishing and deterring JPMorgan's violations of law. Victims also do not have TVPA claims for disgorgement or civil penalties (or injunctive relief). *See* 18 U.S.C. § 1595(a) (victim remedies). As *parens patriae*, USVI is the real party in interest to and likewise controls its claims for civil penalties and other deterrent relief.[10]

The remedies the USVI pursues are anchored in, and necessary to discharge, its quasi-sovereign interest and authority under the TVPA to protect the health and safety of its residents and to deter and restrain JPMorgan's conduct in order to rein in sex trafficking and protect those who might otherwise become victims in the future. In light of the nature of this relief, and for the reasons previously argued, the Motion to Strike should be granted.

---

[6] *See, e.g., U.S. v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 972 (2d Cir. 1984) (State co-plaintiff sought, *inter alia*, "compensatory and punitive damages" as part of *parens patriae* claim); *see also Banxcorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 621 (S.D.N.Y. 2010) (under New York law, "to recover punitive damages there must be a wrong against the public interest") (internal quotation marks and citation omitted).

[7] Attorneys' fees are an appropriate TVPA remedy, 18 U.S.C. § 1595(a), that incentivize State Attorneys General to file enforcement actions as *parens patriae*. *See People of the State of New York by Abrams v. 11 Cornwell Co.*, 718 F.2d 22, 24-25 (2d Cir. 1983) ("Also supportive of an award of fees to a state . . . is the state's role as *parens patriae* on behalf of a disadvantaged group of its citizens, as distinguished from a state's suing to vindicate its own interests.").

[8] *See State of Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 671 (9th Cir. 2012) ("[T]he restitution that Nevada seeks, while on behalf of its consumers, would first be paid to the State and distributed on an equitable basis. That individual consumers may also benefit from this lawsuit does not negate Nevada's substantial interest in this case.") (internal quotation marks and citations omitted); *General Motors*, 547 F. Supp. at 706-07 (conclusion that quasi-sovereign interest makes State a real party in interest "is not altered by the State's decision to seek . . . damages on behalf of those who allegedly have been defrauded").

[9] *See In re Am. Investors Life Ins. Co. Annuity Mktg. and Sales Practs. Litig.*, 263 F.R.D. 226, 241 (E.D. Pa. 2009) ("The attorneys' general law enforcement powers are not claims the [class action] plaintiffs have, and as such, the plaintiffs do not release any of these claims.").

[10] *See, e.g., LaRose Indus.*, 386 F. Supp. 3d at 218 ("New York argues that, when, as here, a State sues in its *parens patriae* capacity to enforce laws that protect its citizens, and seeks civil penalties and injunctive relief to prevent future violations, the State is the real party in interest. The Court agrees.").

Hon. Jed S. Rakoff
Case No. 1:22-cv-10904-JSR
July 14, 2023
Page 6

          Respectfully submitted,

          **ARIEL SMITH, ESQ.**
          **ATTORNEY GENERAL**

          By counsel,

          /s/ *Linda Singer*
          **LINDA SINGER**
          Admitted *Pro Hac Vice*
          Motley Rice LLC
          401 9th Street NW, Suite 630
          Washington, DC 20004
          Tel: (202) 232-5504
          lsinger@motleyrice.com