**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) |
| JPMORGAN CHASE BANK, N.A. | ) ) |
| Defendant/Third-Party Plaintiff. | ) |

Case Number: 1:22-cv-10904-JSR

| | |
|---|---|
| JPMORGAN CHASE BANK, N.A. | ) ) |
| Third-Party Plaintiff, | ) ) |
| v. | ) ) |
| JAMES EDWARD STALEY | ) ) |
| Third-Party Defendant. | ) |

**GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS'**
**MEMORANDUM OF LAW IN SUPPORT OF**
<u>**MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

LEGAL STANDARD............................................................................................................... 3

ARGUMENT ............................................................................................................................ 4

I.   JPMORGAN PARTICIPATED IN EPSTEIN'S SEX-TRAFFICKING VENTURE IN VIOLATION OF TVPA 18 U.S.C. § 1591(a)(2) .................................................... 4

A.   Epstein Engaged in a Sex-Trafficking Venture ..................................................... 4

B.   JPMorgan Knew or Recklessly Disregarded that Epstein Ran a Sex-Trafficking Venture 5

i.   In 2006, JPMorgan Knew Epstein Was Engaged in Sex-Trafficking ......................... 5

a.   Epstein Admitted the Conduct (but Not the "Ages") to Staley ............................. 6

b.   JPMorgan's Own Diligence Gave It Reason to Suspect Epstein and Ghislaine Maxwell Early On ............................................................. 7

c.   JPMorgan Had Corroborating Information on ███████ and ████ ████████ ........................................................................................ 7

d.   JPMorgan Had Information about Epstein's Cash Withdrawals .......................... 9

ii.   After July 2006, JPMorgan Learned More Information that Fed Its Knowledge of Epstein's Sex-Trafficking, including that Epstein's High-Powered Lawyers Helped Him Avoid Federal Sex-Trafficking Charges ..................................................... 10

iii.   JPMorgan Knew Epstein Was Connected to the MC2 Modeling Agency He Was Accused of Using to Traffic and Abuse "Underage Models"....................................... 11

iv.   JPMorgan Knew of Reports that Epstein Settled Dozens of Civil Lawsuits Alleging Child Sex-Trafficking ................................................................. 12

v.   JPMorgan Knew Epstein's 2008 Conviction Covered Sex-Trafficking Conduct ...... 13

vi.   Based on Its Own Human Trafficking Work, JPMorgan Knew Epstein Was Engaged Human Trafficking......................................................................... 13

vii.   In 2008, JPMorgan Knew the Feds Were Connecting Certain Transactions to Epstein's Sex-Trafficking ................................................................. 14

viii.   JPMorgan Employees Had Personal Knowledge of Epstein's Sex-Trafficking... 15

C.   JPMorgan Participated in Epstein's Sex-Trafficking Venture........................................... 16

D.   JPMorgan Benefited from Participation in Epstein's Sex-Trafficking Venture .............. 21

II.   JPMORGAN OBSTRUCTED ENFORCEMENT OF THE TVPA IN VIOLATION OF 18 U.S.C. § 1591(d) ........................................................................... 24

III.   THE USVI'S REQUESTED RELIEF FOR VIOLATIONS OF THE TVPA.................. 27

IV.   JPMORGAN'S EQUITABLE AND FAULT-SHIFTING DEFENSES DO NOT APPLY TO THE GOVERNMENT'S TVPA PARENS PATRIAE CLAIMS .............................. 27

A.  JPMorgan's Defenses are Barred as Applied to Sex Offender Registry Issues................ 30

    i.  The Government's Investigations or Monitoring of Epstein Cannot Form the Basis of Viable Affirmative Defenses ...................................................................... 31

    ii.  The Discretionary Act of Granting a Waiver of Notification Periods for Overseas Travel is Not Grounds to Shift Fault to the Government............................................ 33

B.  JPMorgan's Defenses are Barred as Applied to the Economic Development Commission's Grant of Tax Benefits to Epstein's Companies ....................................... 35

C.  JPMorgan Has No Viable Defenses Based on Activity of Cecile De Jongh ................... 38

CONCLUSION.................................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp v. Puerto Rico*,
  458 U.S. 592 (1982) ........................................................................................... 27

*City of New York v. FedEx Ground Package System, Inc.*,
  314 F.R.D. 348 (S.D.N.Y. 2016)........................................................ 27, 29, 30, 34

*Coffey v. C.I.R.*,
  663 F.3d 947 (8th Cir. 2011)............................................................................... 35

*Donovan v. Fed. Clearing Die Casting Co.*,
  655 F.2d 793 (7th Cir. 1981)............................................................................... 31

*FTC v. Crescent Publ. Grp., Inc.*,
  129 F. Supp. 2d 311 (S.D.N.Y. 2001) ................................................................. 29

*Groh v. Ramirez*,
  540 U.S. 551 (2004) ........................................................................................... 31

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ........................................................................................... 35

*HH v. G6 Hospitality, Inc.*,
  No 2:19-cv-755, 2019 WL 6682152 (S.D. Ohio Dec 6, 2019) ................................. 21

*Maldonado by and through Ochoa v. City of Sibley*,
  58 F.4th 1017 (8th Cir. 2023)............................................................................. 34

*McGaughey v. District of Columbia*,
  684 F.3d 1355 (D.C. Cir. 2012) ..................................................................... 34, 37

*Olin Corp. v. Lamorak Ins. Co.*,
  332 F. Supp. 3d 818, 839 (S.D.N.Y. 2018) (Rakoff, J.)........................................... 4

*Perez v. Gov't of the Virgin Islands*,
  847 F.2d 104 (3d Cir. 1988)........................................................................... 34, 36

*State of New York v. UPS, Inc.*,
  160 F. Supp. 3d 629 (S.D.N.Y. 2016) ................................................................. 30

*U.S. v. One White Crystal Covered Bat Tour Glove & Other Michael Jackson Memorabilia*,
  2013 WL 12196595 (C.D. Cal. Aug. 19, 2013) ...................................................... 32

*United States v. Angell*,
  292 F.3d 333 (2d Cir. 2002) ............................................................................... 29

*United States v. Philip Morris Inc.*,
  300 F. Supp. 2d 61 (D.D.C. 2004) ...................................................................... 29

*United States v. Vineland Chem. Co., Inc.*,
  692 F. Supp. 415 (D.N.J. 1988) .......................................................................... 30

**Statutes**

14 V.I.C. § 1724 .................................................................................................... 31

14 V.I.C. § 1724(b)(4) ......................................................................................... 33

14 V.I.C. § 1728(a) ............................................................................................... 33

18 U.S.C. § 1591(a)(1) ...................................................................................... 4, 7

18 U.S.C. § 1591(a)(2) ................................................................................. 3, 4, 27

18 U.S.C. § 1591(c) ................................................................................................ 7

18 U.S.C. § 1591(d) ..................................................................................... 3, 24, 27

18 U.S.C. § 1595(d) ........................................................................................ 29, 30

26 U.S.C. § 934(b)(1) ........................................................................................... 35

29 V.I.C. § 701(a) ................................................................................................. 35

29 V.I.C. § 701(c) ................................................................................................. 37

29 V.I.C. § 705(a) ................................................................................................. 36

29 V.I.C. § 708 ..................................................................................................... 37

29 V.I.C. § 722(4) ................................................................................................. 37

29 V.I.C. § 1101(a) ............................................................................................... 35

29 V.I.C. § 1101(b) ............................................................................................... 35

**Rules**

Fed. R. Civ. P. 56(c). ............................................................................................. 3

**Regulations**

12 C.F.R. § 21.11(c)(2) ........................................................................................ 20

12 C.F.R. § 21.11(d). ........................................................................................... 20

## INTRODUCTION

In July 2006, after his arrest for felony sex crimes and extensive news coverage detailing unlawful sex acts with underage girls, Jeffrey Epstein admitted to James (Jes) Staley (then CEO Asset and Wealth Management ("AWM")), who reported it to Mary Erdoes (then CEO Global Private Bank ("PB")), that he had engaged in sex with multiple young women for money, only denying the girls' "ages." At that time, JPMorgan could have immediately exited Epstein—but the Bank knew, from Douglas (Sandy) Warner, when he was head of JPMorgan, Epstein is "one of the most connected people I know in New York." In 2003, Epstein was, by double, the top revenue generator in the Private Bank, and the source of Google co-founder Sergey Brin ("one of the largest [relationships] in the Private Bank, of +$4BN"), Glenn Dubin (billionaire founder of Highbridge), and many other ultra-wealthy clients and connections, which would come to include Bill Gates, Leon Black, Larry Summers, the Sultan of Dubai, Prince Andrew, Ehud Barak, Thomas Pritzker, Lord Peter Mandelson, and Prime Minister Netanyahu. In 2004, Epstein—together with Jamie Dimon (then CEO-in-waiting)—was an integral part of JPMorgan's game-changing acquisition of Highbridge. The next year, ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████ *Epstein was too big to fail.*

So, JPMorgan did not exit Epstein in 2006. Or 2007. Or 2008. Or 2009. Or 2010. Or 2011. Or 2012. Or the first half of 2013, ███████████████████████████████. SUF ¶386.[1] And, even after his exit right up until his arrest in 2019, JPMorgan continued to work with Epstein. Only months before his arrest in July 2019, ███████████████████████████████

---

[1] "SUF" references are to the Statement of Material Facts as to which Government of the United States Virgin Islands Contends there is No Genuine Dispute (filed concurrently).

█████████████████████████████████████████████████████████

████████████████████████████████████████

Rather than exit Epstein in 2006, JPMorgan handled millions of dollars in payments to Epstein's other "rock star" lawyers who the Bank knew were working to discredit Epstein's victims and help Epstein avoid federal sex-trafficking charges. ████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████ JPMorgan banked *all* the girls and women publicly alleged in 2006 to be recruiters, accomplices, or victims, including ███████ ████████████ ████████, and Ghislaine Maxwell. JPMorgan knew that ███████—who Epstein was reported to have referred to as his "Yugoslavian sex slave"—in fact came from Yugoslavia as a teenager in 2004 supposedly to work as a "model" and was sponsored by Epstein. For years, JPMorgan handled Epstein business with MC2 Model Management knowing Epstein was accused of using the supposed modeling agency to traffic and abuse underage girls.

At the same time, and for the next seven years, JPMorgan—self-described as Epstein's "#1 bank" at the time, SUF ¶174—continued to participate in Epstein's sex-trafficking venture. It "really never stopped" handling his excessive cash withdrawals despite tying them to his felony sex crimes; did not question his cash-for-fuel to travel to foreign countries explanation, even when he was in jail and on house arrest; made millions of dollars more in payments to co-conspirators, including Maxwell, recruiters and victims, including many girls and women with Eastern European surnames or located in Eastern Europe, from where JPMorgan knew Epstein was reported to have trafficked girls; and continued to extend the loan to MC2, which, for all it knew,

was a "payment for services as a procurer."  Even when JPMorgan knew that federal prosecutors had subpoenaed Bear Stearns (which it acquired in 2008) for account and specific transaction information tied to Epstein, JPMorgan ███████████████████████████████████ and went right on handling many more. The entire time, the cynical jokes within the company also never stopped—from ████████████ asking if Epstein was at a party with "Miley Cyrus," to David Brigstocke (then CFO AWM) comparing another client's house to Epstein's: ***"Reminded me of JE's house, except it was more tasteful, and fewer nymphettes."*** SUF ¶¶181-82, 190, *see also* SUF ¶¶179-180, 183-89. Only in August 2019—after Epstein's arrest and death and when there were no more referrals or other benefits to be had—███████████████████████ ████████████████████████████████████████████████ ██████████████████████████████—even though it had all the information in real-time, not "[h]indsight" as Dimon (CEO) misrepresented to CNN. SUF ¶418. Accordingly, the Government is entitled to judgment as a matter of law for JPMorgan's participation in Epstein's sex-trafficking venture and obstruction of federal prosecutors' enforcement of the law in violation of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1591(a)(2) and (d).

The Government also is entitled to judgment as a matter of law on JPMorgan's equitable and fault-shifting affirmative defenses (Defenses 5 to 8). The legal deficiencies that left the Court "skeptical" that the defenses would survive summary judgment persist and no facts have been developed during discovery that would revive these deficient defenses.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). "Where the moving party

has documented particular facts in the record, the burden shifts to the opposing party to adduce contrary record evidence sufficient to create a genuine dispute of material fact." *Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 839 (S.D.N.Y. 2018) (Rakoff, J.). "To do so, the opposing party cannot merely make conclusory assertions to the contrary[.]" *Id.*

## ARGUMENT

### I.   JPMORGAN PARTICIPATED IN EPSTEIN'S SEX-TRAFFICKING VENTURE IN VIOLATION OF TVPA 18 U.S.C. § 1591(a)(2)

#### A.   Epstein Engaged in a Sex-Trafficking Venture

JPMorgan does not dispute Epstein was engaged in sex-trafficking: "Epstein was engaged in horrendous criminal activity, including sex trafficking. That's not something being contested at all by JPMorgan." SUF ¶1. "Epstein's behavior was monstrous … the survivors … suffered unimaginable abuse at the hands of this man …[who] commit[ted] heinous crimes." SUF ¶2. JPMorgan acknowledged ███████████████████ in its own due diligence, respectively, that Epstein ███████████ and ran a "sex-trafficking ring." SUF ¶¶3-5. Epstein was arrested on July 6, 2019 on federal charges of sex-trafficking of minors and on August 10, 2019 died in prison. SUF ¶¶6-7. Ghislaine Maxwell was convicted in 2022 for conspiring with Epstein to engage in sex-trafficking. SUF ¶8. In 2008, Epstein was convicted for solicitation of an underage girl for prostitution, SUF ¶9, a covered act under the TVPA. 18 U.S.C. § 1591(a)(1). In upholding his Level 3 sex offender status imposed with that conviction, a New York appeals court found "clear and convincing" evidence Epstein had "committed multiple offenses against a series of underage girls." SUF ¶¶10-11. Over the years, many victims have come forward and described being sex-trafficked by Epstein, including in the U.S. Virgin Islands ("USVI"). ████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████ SUF ¶¶12-31. JPMorgan also

handled millions of dollars in payments from Epstein to known co-conspirators, recruiters, victims,

girls and women until 2019, including payments to women in years that coincided with their trips

to the USVI. SUF ¶32 and *infra* Part I.C.

**B.    JPMorgan Knew or Recklessly Disregarded that Epstein Ran a Sex-Trafficking Venture**

JPMorgan had "knowledge of Epstein's sex-trafficking venture, either directly or by

recklessly disregarding what was plainly to be seen." Op. and Order, May 1, 2023 (Dkt. 130) at

28 ("Order"). The Government uses "knew" or "knowledge" herein to mean direct knowledge or

reckless disregard.

**i.    In 2006, JPMorgan Knew Epstein Was Engaged in Sex-Trafficking**

In July 2006, Epstein was indicted for felony solicitation of prostitution and arrested.

Numerous JPMorgan senior executives (including Staley, Erdoes, Catherine Keating (then CEO

US PB)) knew of Epstein's arrest and related news coverage, including a Palm Beach Post article

which stated: "Epstein paid to have underage girls and young women brought to his home, where

he received massages and sometimes sex" and "police thought there was probable cause to charge

Epstein with unlawful sex acts with a minor and lewd and lascivious molestation." SUF ¶¶33, 41-

46. JPMorgan's own due diligence process required that it monitor news reports about customers.

SUF ¶¶34-40. The Palm Beach Post article detailed evidence from police documents, including:

o   A college student gave Epstein a naked massage and then "brought him six girls, ages 14 to 16, for massage and sex-tinged sessions" at Epstein's home.

o   Police obtained statements from five alleged victims and 17 witnesses. Police contend Epstein "had sex with the girls" on three occasions.

o   ████████████ met Epstein at age 17 and was recruited to massage him. Epstein told her he would "pay her to bring him more girls—the younger the better."  She stated she once brought

5

a 23-year-old woman to him and "Epstein said she was too old…."  She brought six girls to Epstein and said the girls were paid $200 for each session.

o   ███████████ told police, "I'm like a Heidi Fleiss."

o   A 27-year-old Epstein employee, ███████████, would arrange the sessions and prepare the massage table.

o   One 14-year-old victim recounted the details of her encounter in February 2005 including being paid $300 for a massage in her bra and panties. For bringing this child to Epstein, ███████ ███████ received $200.

o   Police scoured the trash from Epstein's house and found notes with names and phone numbers, sex toys and female hygiene products. Notes stated that one girl could not "come over at 7 p.m. because of soccer. Another said a girl had to work Sunday—'Monday after school?' Another said a girl leaves school at 11:30 a.m. and would come over the next day[.]"

SUF ¶¶43-46. Another July 2006 news report said the police submitted arrest warrant requests for ███████████ and ███████████. The same report stated a girl told police she was paid by Epstein to have sex with ███████████ as Epstein watched, and "Epstein bragged he brought ███████████ into the United States to be his Yugoslavian sex slave."  SUF ¶¶48-49; *see also* SUF ¶50 (August news report). JPMorgan knew from its own work on human trafficking that "Sexual Slavery" means "the coercion of the unwilling into various sexual practices."  SUF ¶51. News around the time of Epstein's arrest also reported that "[t]wo of Epstein's former employees told investigators that young-looking girls showed up to perform massages two or three times a day when Epstein was in town."  SUF ¶52. The news explained that Epstein paid $200 or $300 cash to the girls and $200 cash to ███████ for recruiting the girls. SUF ¶¶43, 45.

### a.   Epstein Admitted the Conduct (but Not the "Ages") to Staley

On July 25, 2006, Staley met with Epstein in person, and Epstein admitted to the alleged conduct of engaging in sex for money with young women—only denying the "ages." SUF ¶53. Staley communicated the exchange to Erdoes the next day: "I went and saw him last night. I've never seen him so shaken. He also adamantly denies the ages." SUF ¶54. Solicitation of a minor

for prostitution is a covered act under the TVPA, and Epstein "had a reasonable opportunity to observe [the victim]," so it need not be proved "the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years." 18 U.S.C. §§ 1591(a)(1) and (c). Staley also spoke to Dimon about the "very public" indictment of the Bank's client, Epstein. SUF ¶55.

### b. JPMorgan's Own Diligence Gave It Reason to Suspect Epstein and Ghislaine Maxwell Early On

By 2006, JPMorgan already had reason to suspect Epstein's sex-trafficking—and Maxwell's involvement. In 2003, as part of the Bank's due diligence for an Epstein account, JPMorgan reviewed the Vanity Fair profile "The Talented Mr. Epstein," which reported Epstein's penchant for "young," "foreign," "model types," and his "best friend" Maxwell "summon[ing]" a young woman for him and throwing a party attended by Prince Andrew and "filled" with "young Russian models." SUF ¶¶56-59. In 2003, JPMorgan also knew that Maxwell was involved with Epstein in structuring cash withdrawals, SUF ¶¶60-62, a red flag for trafficking, SUF ¶¶63-64. Yet, the Private Bank opened an account for Maxwell in 2003, on Epstein's referral, noting Maxwell was a "companion/long-time friend of Jeffrey Epstein." SUF ¶65. By Epstein's arrest, JPMorgan knew it had made over $25 million in payments to Maxwell from Epstein. SUF ¶67. News reports related to Epstein's 2006 arrest again described Epstein's relationship with Maxwell. SUF ¶52. JPMorgan continued to handle payments from Epstein to Maxwell, including $7 million for the purchase of a helicopter. SUF ¶223. Later reports again alleged Maxwell "solicited young girls for Epstein"—identified as a "human rights" issue by JPMorgan. SUF ¶66.

### c. JPMorgan Had Corroborating Information on ██████████ and ██████████

JPMorgan had significant corroborating evidence of Epstein's sex crimes by July 2006—and knowledge of ongoing conduct after July 2006. JPMorgan knew that alleged accomplice

██████ worked for Epstein and had—just months prior to his arrest—██████████████ ████████████████████████████████████████████████████. SUF ¶68.  ██████ was also a customer of the Bank. SUF ¶¶69-70. JPMorgan, in 2005, made two separate $25,000 payments from Epstein's accounts to ████████ SUF ¶71. After police reports identified her as a recruiter in 2006, JPMorgan continued to handle payments to ███████ totaling over $675,000 from Epstein's accounts. SUF ¶72.

JPMorgan also had information related to trafficking victim and accomplice ████████ also a customer of the Bank. SUF ¶73. In 2004, sponsored by Epstein, JPMorgan opened accounts and credit cards for two teenagers, ████████, another victim, SUF ¶23, and ████████, "models in NYC and friends of Jeffrey Epstein."  SUF ¶¶74, 75, 77. JPMorgan's Due Diligence Report ("DDR") on ████████ was approved by the Private Bank even though the report had no birthdate, confirmed SSN, or a Passport or Driver's License Number. SUF ¶76. Epstein's Banker at the time (Mary (Rieth) Casey) never met ████████ as JPMorgan's process contemplated— even after news reports that Epstein referred to her as his "Yugoslavian sex slave." SUF ¶76. JPMorgan knew that Epstein said ████████ came to the US from Yugoslavia and lived at a building owned by Epstein's brother. SUF ¶¶77, 79. Further, JPMorgan knew it had made more than $36,000, $67,000, and $82,000 in payments from Epstein's account to ████████ in 2004, 2005, and 2006, respectively, even though Epstein represented her net worth was $100,000 from supposed "modeling assignments." SUF ¶¶80, 78. JPMorgan also knew ████████'s "debit transactions" at the time—which AML compliance only reviewed more than four years later— were "enlighting [sic] as compared to countless stories related to [Epstein's] escapades. Lots of salon, lingerie shops, drug stores ny palm beach and in st Thomas (his places of residence). Plus lots of video like girls gone wild and some other shops not fit for my good catholic upbringing!"

SUF ¶81. JPMorgan's own Human Trafficking white paper discussed "upscale" sex-trafficking operations "incurr[ing] expenses such as jewelry, lingerie, cosmetics, [and] sex toys." SUF ¶82.

Even after she was identified in 2006, JPMorgan continued to handle payments to ███████ totaling over $600,000 from Epstein's JPMorgan accounts. SUF ¶83. JPMorgan ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████." SUF ¶¶84-85. JPMorgan also knew that Epstein sponsored credit cards for █████ and ██████████ for "travel[] through Paris, Europe and US Virgin Islands and US monthly."  SUF ¶86.

### d.    JPMorgan Had Information about Epstein's Cash Withdrawals

On October 17, 2006, in light of the derogatory information related to Epstein's "felony charges of soliciting underage prostitutes," JPMorgan Private Bank held a "Rapid Response" meeting, which were "escalations of derogatory information to management." Private Bank identified Epstein's frequent cash withdrawals as worthy of note in conjunction with his "felony charges of soliciting underage prostitutes." "Cash withdrawals are routinely made in amounts for $40,000 to $80,000 several times a month, which total over $750,000 year to date." SUF ¶¶90-93. JPMorgan compliance staff acknowledged Epstein was "known to pay cash for his massages" and "minors are the issue." SUF ¶94. Three "massages" a day with girls paid $200-$300 cash and recruiters paid $200 cash—as JPMorgan knew was reported—is about $40,000 cash per month. JPMorgan knew that in the time period of the incidents investigated by the Palm Beach police, and prior to Epstein's plea, it had handled nearly $1.75 million in cash withdrawals for Epstein. SUF ¶95. ███████████████████████████████████████████████████████████ ████████████████████████████████████ SUF ¶¶96-97.

The large cash withdrawals "really never stopped"—and were ultimately the claimed reason for JPMorgan's parting with Epstein in 2013 when "combined with his personal history." SUF ¶¶98-99. Epstein's 2011 explanation that the cash was for jet fuel for his foreign travel was ███████████████████████████████████████████████████ and not supported by any receipts or other documentation. ████████████████████████████████████████████████ ███████ Further, JPMorgan knew Epstein was in jail and on house arrest from July 2008 through July 2010 and thus not traveling overseas. SUF ¶¶100-106. In any event, JPMorgan's diligence cited reports that Epstein traveled to foreign countries to traffic young women, SUF ¶107, so whether to pay for that travel, or to pay victims and recruiters, or both, JPMorgan knew the cash was connected to Epstein's sex-trafficking.

> ii.     **After July 2006, JPMorgan Learned More Information that Fed Its Knowledge of Epstein's Sex-Trafficking, including that Epstein's High-Powered Lawyers Helped Him Avoid Federal Sex-Trafficking Charges**

JPMorgan also knew that Epstein's wealth and "high-powered" lawyers allowed him to escape more serious charges including federal sex-trafficking charges. In 2006, JPMorgan's diligence included multiple news reports that Epstein "assembled a team of star lawyers"—including Alan Dershowitz, Gerald Lefcourt, Roy Black, and Jack Goldberger—"to undermine the credibility of the 14- to 17-year-old girls" and challenge the "distorted" view of the case "presented by the Palm Beach Police." SUF ¶¶ 108, 110. Reports said Epstein used Black to hire private investigators to "pos[e] as police officers" and to review with witnesses what to say to actual police officers. SUF ¶110. In 2006 and 2007, JPMorgan reviewed reports that federal prosecutors were looking to bring child sex-trafficking charges against Epstein and that his lawyers were "negotiating a deal" to avoid those charges. SUF ¶112, *see also* SUF ¶50 (FBI considering investigating for federal child sex crimes). JPMorgan later acknowledged reports that Epstein

"supposedly bought his way to a lesser sentencing" and "paid a whole series of girls to stay quiet." SUF ¶113. JPMorgan was handling millions of dollars in payments to those lawyers at that time—including numerous ███████ $100,000 payments—and continued to handle tens of millions in payments to lawyers. SUF ¶¶ 127.

On September 24, 2007, Epstein agreed to plead guilty to two prostitution charges in state court, including the solicitation of a minor to engage in prostitution, in exchange for a federal non-prosecution agreement ("NPA") providing him with immunity from federal child sex-trafficking charges. Under the NPA, Epstein also waived his right to contest liability and damages in civil lawsuits by minor girls identified by the NPA. The NPA identified ███████ ██████, and Lesley Groff as Epstein's co-conspirators in soliciting underage girls for commercial sex. SUF ¶¶114, 118-21. JPMorgan knew of reports of the plea deal beginning in 2007. SUF ¶115; *see also* SUF ¶¶116-17 (2008). The NPA later became public, and JPMorgan was aware of it. SUF ¶¶122-24.

In October 2007, Anne Verdon (then General Counsel PB) received requested information about Epstein, his transactions, and the news coverage. This research connected the dots between Epstein's financial transactions at the Bank—his large, frequent cash withdrawals, credit cards for ███████ and ██████, and transfers to ███████—and his illegal conduct. The diligence showed █████, who had talked to police ("I'm like a Heidi Fleiss"), had a "revoked" credit card, while █████, who did not talk to police, still had an "active" credit card under Epstein. SUF ¶¶ 125-27, 43. JPMorgan continued with business as usual.

### iii. JPMorgan Knew Epstein Was Connected to the MC2 Modeling Agency He Was Accused of Using to Traffic and Abuse "Underage Models"

A news report surfaced in 2007 of "industry speculation that massage maven Jeffrey Epstein is a secret financial backer of the agency being run by scandal-scarred Jean-Luc Brunel, who was once accused of taking advantage of underage models." "Epstein reportedly gave millions

to start MC2, which opened in October 2005." "[Epstein's] a desperate old man that fantasizes and takes advantage of young girls.'" Epstein's rep, Howard Rubenstein, said, "He has no business relationship with [Brunel and MC2]." SUF ¶128. But JPMorgan knew at the time of the report that Rubenstein was covering up for Epstein. In 2005, JPMorgan had extended a $1 million Stand By Letter of Credit ("SBLC") for Epstein to backstop a loan to MC2. SUF ¶129.

Only two weeks after the news about Epstein's ties to Brunel and MC2, Casey, among others, discussed the MC2 SBLC, which the Bank renewed through March 2011. SUF ¶¶ 130-32. Even though Epstein was set to plead guilty to felony sex crimes, JPMorgan did not determine—and as late as 2011 still did not know—if the $1 million was a "payment for services as a procurer." SUF ¶¶138-39. JPMorgan would review multiple reports about child sex-trafficking by Epstein, Brunel, and MC2—"Brunel, owner of MC2 and Jeffrey Epstein engaged in racketeering that involved luring in minor children for sexual play for money"—all the while continuing to extend the $1 million SBLC. SUF ¶¶130-31, 134-39. ████████—who JPMorgan was supposed to but did not meet with—██████████████████████████████████████████████ ██████████████████████████████████████████████ SUF ¶140,

### iv.   JPMorgan Knew of Reports that Epstein Settled Dozens of Civil Lawsuits Alleging Child Sex-Trafficking

Then came the reports of the civil lawsuits—another category of information that was supposed to be part of JPMorgan's due diligence. SUF ¶14. In 2007, Epstein was "bracing for a slew of lawsuits from as many as 40 young women[.]" SUF ¶142. By early 2008, Erdoes and Lisa Waters (then a Managing Director AWM), among others, knew of multiple news outlets reporting the first lawsuit "against JE- sexual abuse of minor etc. etc." Then the next: "the teen … says she was lured to Epstein's Palm Beach mansion and then sexually assaulted in his massage room." SUF ¶¶143-45. In 2010, JPMorgan knew of reports that "Epstein had settled more than two dozen

lawsuits and claims against him by teen-agers who say they were lured to his Palm Beach mansion to give him sexually charged massages and/or sex in exchange for money." "These same civil complaints allege that young girls from South America, Europe, and the former Soviet republics … were recruited for Epstein's sexual pleasure." SUF ¶¶137-38.

### v.    JPMorgan Knew Epstein's 2008 Conviction Covered Sex-Trafficking Conduct

On June 30, 2008, Epstein pled guilty to felony solicitation of prostitution and procurement of a 14-year-old minor to engage in prostitution and was "sentenced to 18 months in jail" and "required to register as a sex offender."  SUF ¶146-47. ███████████████████████████

██████████████████████████████████████████████████████████

██████    as described above, ████████████████████████████

████████    SUF ¶¶3-4, 148. In 2011, William Langford (then Global Head of Compliance) communicated to Steve Cutler (then General Counsel) "concern" about retaining Epstein as a client. Cutler testified: "Those concerns are heightened, if you will, by the human trafficking initiative that we're doing, given that he was convicted of these crimes." SUF ¶149.

### vi.    Based on Its Own Human Trafficking Work, JPMorgan Knew Epstein Was Engaged Human Trafficking

Around the time of Epstein's conviction in 2008, JPMorgan's AML (Anti-Money Laundering) compliance group (under Langford) created a "Human Trafficking Overview."  The overview reported that "nearly two-thirds of the women trafficked for prostitution worldwide come from Eastern Europe" and "former Eastern bloc countries such as Albania, Moldova, Romania, Bulgaria, Russia, Belarus and Ukraine have been identified as major trafficking source countries for women and children." SUF ¶151. JPMorgan knew and had assembled evidence that Epstein had made at least tens of thousands of dollars of payments to ████████ and was reported to refer

13

to her as his "Yugoslavian sex slave." SUF ¶¶48-50, 125-26. JPMorgan also knew it had made more than $1.2 million in payments to girls or women, many with Eastern European surnames, from Epstein's accounts from 2003 to 2008. SUF ¶225. ████████████████████████████████ ████████████████████████████████████████████████████████████████████████. SUF ¶¶227, 229. Beginning in 2008, several payments were sent to high-risk locations, such as Belarus, Lithuania, and Russia. SUF ¶230.

AML compliance—JPMorgan's in-house human trafficking experts—wanted Epstein gone from the Bank. SUF ¶¶162-66. In 2010, when additional "news stories … connect[ed] Jeffrey Epstein to human trafficking," SUF ¶¶152-53, AML compliance was concerned about continuing to bank a human trafficker while trumpeting the Bank's efforts to rein in human trafficking through the bank. "My fear is will all our touting of good will on the [Human Trafficking] work, if anyone should ever say yet we bank Epstein, a known child sleaze." SUF ¶¶154-55, 159-60. "I sent you an e-mail yesterday on that scum Epstein …. I reminded McCleerey [then Head of PB Risk Management] that he listened to 2 days of [Human Trafficking] at the forum and this account could be problematic in several ways." SUF ¶157. AML compliance requested the Bank "responsor this client in light of the new allegations of human trafficking which the firm has been actively assisting law enforcement in uncovering *others* engaged in this practice." SUF ¶158. Langford, the public face of JPMorgan's human trafficking initiative and the Global Head of Compliance, believed JPMorgan "should exit Jeffrey Epstein as a client." SUF ¶164. But business—including Erdoes (then CEO AWM)—decided otherwise. SUF ¶¶167-68, 260, 262-63.

### vii. In 2008, JPMorgan Knew the Feds Were Connecting Certain Transactions to Epstein's Sex-Trafficking

JPMorgan also knew that it made many payments from Epstein's accounts that federal prosecutors believed could be evidence of sex trafficking. In 2008, JPMorgan acquired Bear

Stearns, where it knew Epstein conducted his brokerage business. SUF ¶¶169-70. Around the time

of Epstein's guilty plea, Arthur Middlemiss, formerly a compliance officer at Bear Stearns,

assumed a similar role at JPMorgan and worked on Epstein investigations. SUF ¶¶171-72.



SUF ¶¶173, 175.

SUF ¶¶ 176-77.

SUF ¶236,

SUF ¶¶235, 178.

SUF ¶¶235-36.

### viii.   JPMorgan Employees Had Personal Knowledge of Epstein's Sex-Trafficking

Many e-mails over JPMorgan e-mail between Staley and Epstein demonstrate that Staley

had personal knowledge of Epstein's sex-trafficking. SUF ¶¶ 195, 197-203. Staley met Epstein's

co-conspirators at Epstein's townhouse. SUF ¶¶ 204-06.

SUF ¶207. JPMorgan handled more than $210,000 in payments to          from Epstein. SUF ¶231.

JPMorgan admits Staley was "the senior person at JPMorgan with a business relationship with

Epstein," SUF ¶¶191-92, 208-13; thus, Staley's knowledge is imputed to JPMorgan. Order at 29.

Brigstocke (CFO of AWM) wrote Erdoes comparing a client's house to Epstein's: "Reminded me

of JE's house, except it was more tasteful, and fewer nymphettes." SUF ¶190.

## C.  JPMorgan Participated in Epstein's Sex-Trafficking Venture

Even if participation requires active engagement, Order at 24, there is no genuine dispute that JPMorgan actively participated in Epstein's sex-trafficking venture from 2006 until 2019. The Court found allegations that the Bank allowed Epstein to use its accounts to send dozens of payments to then-known co-conspirators; ██████████████████████████████████ ████████████; provided excessive and unusual amounts of cash to Epstein; and structured cash withdrawals so that those withdrawals would not appear suspicious "went well beyond merely providing their usual [banking] services to Jeffrey Epstein and his affiliated entities" and were sufficient to allege active engagement. Order at 25-26. The New York State Department of Financial Services ("NYSDFS") entered into a Consent Order and issued a $150 million penalty to Deutsche Bank for its "inexcusable fail[ure] to detect or prevent millions of dollars of suspicious transactions" related to Epstein, including: payments to publicly alleged co-conspirators; settlement payments and dozens of payments to law firms for legal expenses of Epstein and co-conspirators; payments to Russian models, including for school tuition and hotel and rent expenses, and to numerous women with Eastern European surnames; and periodic suspicious cash withdrawals totaling more than $800,000 over four years. SUF ¶214. ██████████████████ ██████████████████████████████████████

*Payments to Co-Conspirators* ████████ *and* ██████████████: From August 2006 through 2013, JPMorgan handled $678,741.57 and $607,804.30 in payments, respectively, from Epstein's JPMorgan accounts to ██████████ and ██████████████, Epstein's co-conspirators, recruiters, and/or victim (██████████). SUF ¶¶216, 218. Even after it decided to terminate Epstein's accounts in July 2013, JPMorgan still handled a payment of $15,000 from Epstein's JPMorgan accounts to ██████. SUF ¶217. ████████████████████████████████████

16

██████████████████████████████████████████████████████████

████████ SUF ¶¶220, 84. In addition to payments from Epstein, JPMorgan also opened credit

cards for ██████ and ████████ "through NES, LLC c/o Jeffrey Epstein" only months after

Epstein was indicted. NES, LLC is an Epstein entity for which JPMorgan had not conducted the

required due diligence, and ██████████████████████████████████████████

████████████████████████████. SUF ¶¶86, 88-89, 60-61.

**Payments to Co-Conspirator Ghislaine Maxwell:** After August 2006, JPMorgan

continued to handle payments to Maxwell, who, by July 2006, it had reason to suspect was

involved with Epstein in the alleged sex crimes. *See supra* Part I(B)(i)(b). JPMorgan's payments

to Maxwell included more than $7 million to purchase a helicopter. SUF ¶¶222-23.

**Millions of Dollars in Payments to Girls and Women, Many with Eastern European**

**Surnames and/or Located in Eastern Europ** ██████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████, SUF ¶226, ████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████ SUF ¶¶107, 151, 153, 48-50, 125-26. JPMorgan sent several of the

payments by foreign wire to girls or women to locations in Eastern Europe including Belarus,

Lithuania, and Russia. SUF ¶230. JPMorgan also handled payments to women for school tuition

and rent expenses. SUF ¶¶232, 234. ████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████ SUF ¶228.

██████████████████████████████████████████████████████████

██████████████████████████████████ SUF ¶229.

***$1000 and Smaller Dollar Payments to Girls or Women and $100,000 Payments:***  ████

████████████████████████████████████████████████████████████████

███████████████████████████████████████  SUF ¶¶235-36. As explained

above, JPMorgan knew from the federal prosecutors' subpoena to Bear Stearns that law

enforcement considered these payments suspicious and evidence of Epstein's federal sex crimes.

SUF ¶¶176-177.

***MC2 Modeling Agency SBLC:***  As described above, from 2005 to March 2011, JPMorgan

extended an SBLC to Brunel and MC2 despite reports it supported "payment for services as a

procurer." By 2007, there were reports that Epstein was engaged in sexual abuse of minors through

MC2, yet JPMorgan continued to extend the SBLC. ███████████████████████

███████████████████████  SUF ¶237, who it knew was covering up Epstein's

involvement with MC2. *See supra* Part I(B)(iii).

***Payments to "High-Powered" Lawyers Covering Up Epstein's Sex Crimes:***  Following

Epstein's arrest for felony sex crimes and confession to Staley and prior to the NPA, ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████  SUF ¶¶238-39. After the NPA through 2013, ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

***Excessive and Unusual Cash Withdrawals:***  The NYSDFS found inexcusable Deutsche

Bank's failure to monitor "suspicious cash withdrawals [of] more than $800,000 over four years."

SUF ¶214. Between September 2003 and November 2013, or approximately ten years, JPMorgan

handled ***more than $5 million*** in outgoing cash transactions for Epstein, SUF ¶242—ignoring its

18

own policy discouraging large cash withdrawals, SUF ¶241. From August 2006 to 2013, JPMorgan

facilitated nearly $2.5 million in cash withdrawals for Epstein, SUF ¶247, even though it was

widely publicized that Epstein paid for sexual encounters with minors in cash and ███████████

████████████████████████████████████████████████████████████████████████████

███████ *See supra* Part I(B)(i)(d). ████████████████████████████████████████████

███████████████████████████████████████████████████████████████ SUF ¶249.

████████████████████████████████████████████████████████████

███████████████████████████████ JPMorgan did not seek an explanation for Epstein's excessive

cash withdrawals until 2011, again in violation of its own policy. SUF ¶241. ███████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

SUF ¶101; *see also supra* Part I(B)(i)(d). ██████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████████████████████ JPMorgan

must file SARs to report suspicious financial transactions "[w]henever the national bank detects

… a transaction or transactions conducted through the bank and involving or aggregating $5,000

or more in funds or other assets where the bank believes . . . that it was used to facilitate a criminal

transaction, and the bank has a substantial basis for identifying a possible suspect." 12 C.F.R. § 21.11(c)(2). JPMorgan must file a SAR "no later than 30 calendar days after the date of the initial detection of facts that may constitute a basis for filing a SAR. 12 C.F.R. § 21.11(d).

From 2003 to 2013, JPMorgan helped Epstein withdraw over $5 million in cash, make millions of dollars in payments to co-conspirators and accomplices, send more than $3 million in wires to women and girls, and █████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

███████ At the 2006 Rapid Response meeting following Epstein's indictment on "felony charges of soliciting underage prostitutes," JPMorgan explicitly noted "[c]ash withdrawals … made in amounts for $40,000 to $80,000 several times a month" ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████ *See supra* Part I(B)(i)(d) and (ii).
      █████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████ SUF ¶97. ██████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

**D.      JPMorgan Benefited from Participation in Epstein's Sex-Trafficking Venture**

JPMorgan argued the Government must allege that it received revenue from Epstein in exchange for the Bank's furtherance of Epstein's sex-trafficking venture. The Court "is not convinced that the benefit element should be read in this way," Order at 31, and, indeed, "the statutory language imposes no such [causal relationship] requirement." *HH v. G6 Hospitality, Inc.*, No 2:19-cv-755, 2019 WL 6682152, at *2 (S.D. Ohio Dec 6, 2019). JPMorgan admits it received fees and other revenue from providing services to Epstein and his affiliated entities. Order at 31; SUF ¶¶252-53. In any event, from at least 2006 to Epstein's arrest in 2019, JPMorgan knowingly benefited from furthering Epstein's sex-trafficking venture.

In or about the 2000 time period, Sandy Warner, then head of JPMorgan, told Staley (then head PB), "[Y]ou should meet Epstein. He's one of the most connected people I know of in New York."  SUF ¶275. Warner was right. By 2003, Epstein introduced Staley and Google's founders, Sergey Brin and Larry Page, and helped source billionaire hedge fund (Highbridge) owner Glenn Dubin. SUF ¶¶280-81, 311, 314-16. By then, Epstein was also bringing in over $8 million in revenues to the Private Bank—the top revenue and nearly double the amount of the next highest client. In 2003, "Epstein, through the trading of his accounts and that of Leslie Wexner, generates one of the largest annual revenue flows of private clients in the private bank." SUF ¶¶254-58.

The following year, Epstein facilitated JPMorgan's acquisition of Highbridge, a game-changing acquisition for JPMorgan. Highbridge, a hedge fund with $7 billion in assets under

management, was co-founded by Epstein's close friend Dubin, and Epstein was a founding investor. Epstein advised both JPMorgan and Highbridge on the acquisition and worked with Dimon, then CEO-in-waiting, Bill Harrison, then CEO, and other "JPMorgan Chase Executive Management" on the acquisition. Epstein was paid a $15 million consulting fee for his work on the acquisition. SUF ¶¶370-381. Epstein also continued to facilitate introductions to the Bank, including a meeting between Staley and the Sultan of Dubai. SUF ¶¶333-35.

This sets the stage for 2006, after Epstein was arrested for felony sex crimes and confessed his conduct to Staley, when JPMorgan could have exited Epstein but did not. Instead, at the Rapid Response meeting, the Private Bank imposed a condition on his accounts supposedly to "mitigate the risk"—he could remain a "banking" but not an investment client. SUF ¶¶382-84. But, when it later benefited the Bank, the restrictions were ignored, and by 2011, Epstein was the Private Bank's investment arm's "biggest revenue producer." SUF ¶¶385, 267-72. The Rapid Response meeting was a fiction in other respects. Though JPMorgan was supposedly considering terminating its relationship with Epstein, at precisely the same time, the Bank was actively trying to find a New York home for Epstein's accounts "as the advisor to the Google founders"—a relationship that would become "one of the largest in the Private Bank, of +$4BN." SUF ¶¶322, 314-327, 331-32.

The Bank was also actively growing the Epstein relationship—between post-indictment and post-conviction Rapid Response meetings, Epstein's assets under management increased four-fold from $32 million to over $120 million. SUF ¶¶ 259, 264. By September 3, 2008, when Epstein's Private Banker (Casey) thought his assets were a "probable outflow (pending Dimon review)," Epstein's accounts were worth more than $156 million—and, needless to say, were not "outflow[ed]." SUF ¶¶ 265-66. Within months of public reports that Epstein was engaged in sexual abuse of girls potentially tied to MC2, JPMorgan moved forward with renewing Epstein's loan to

MC2. The Bank's only concern: "Are we comfortable taking on additional credit exposure just ahead of his pending plea arrangement?" SUF ¶133.

JPMorgan also kept banking Epstein, despite its knowledge of his sex-trafficking, because it was trying to settle lawsuits he had against the bank—one related to his investments at Bear Stearns and another in ███████████████. In 2011, as JPMorgan had near-settled Epstein's claims against Bear Stearns, Cutler wrote to Erdoes "I would like to put it and HIM behind us. Not a person we should do business with – period."  But—as Shenker (then General Counsel AWM), explained to Erdoes—"[Cutler] at conclusion of JE approval [of Bear Stearns settlement], asked when we are offboarding JE. I reminded him that we have *the other matter* outstanding."  At the time, the Bank was still trying to settle ███████ SUF ¶¶387-98.

In 2008, Bear Stearns, now part of JPMorgan, had made it known that it wanted to keep Epstein as a brokerage client despite his felony conviction. Alan "Ace" Greenberg, former Chairman of Bear Stearns (and now with JPMorgan), also "wanted to continue to do business with Epstein" and sought an "exception to the felon policy," which, on paper, required that the GC (Cutler) approve retaining Epstein. SUF ¶¶399-403. In addition, throughout spring and summer 2011, Epstein helped Erdoes and Staley—who JPMorgan admits were involved in the decision to maintain Epstein at the Bank—put together a proposal for a $100 billion Donor Advised Fund for the Gates Foundation, which Erdoes and Staley presented to the Gates Foundation on August 31, 2011. Erdoes communicated frequently and familiarly with Epstein—███████████████ ███████—during the DAF development and pitch process. SUF ¶¶404-12.

Throughout, Epstein continued to connect JPMorgan with the world's dignitaries and wealthiest people, including, among others, Gates, Boris Nikolic (advisor to Gates), Summers, the Sultan of Dubai, Prince Andrew, Barak, Netanyahu, David Gergen (former advisor to Nixon, Ford,

Reagan, and Clinton), Pritzker, and Mandelson. SUF ¶¶276-313. Epstein also continued to bring in significant revenues to the Bank. SUF ¶¶267-74.

Epstein was also a personal resource to Staley and Erdoes, two business executives who JPMorgan does not dispute were involved in the decision to maintain Epstein at the Bank. Epstein helped Staley with ███████████████████████████. In 2005, Erdoes personally sought Epstein's help in resolving a $600 million tax issue for ███████████████████ ██████████████████████████████████████████████████████████ ████████████████ In December 2008, after Bernie Madoff's investment scandal was uncovered, Erdoes wrote Staley: "glenn and I have been going back and forth all night. We have HUNDREDS of clients .... Can you call JE to get the scoop from down there?" SUF ¶¶413-17.

Post-exit, JPMorgan continued to benefit from Epstein until months before his 2019 arrest. Duffy (then CEO US PB) gave Epstein's former JPMorgan Banker (Justin Nelson) permission to continue a relationship with Epstein as "a potential source of referrals." Nelson met with Epstein 8-10 times, twice as many times as Casey who had been his main Banker for a decade prior to his exit, including about business with Leon Black, CEO of private equity behemoth Apollo Global Management. SUF ¶¶353-65, 369. In 2019, a few months before Epstein was arrested, JPMorgan was still taking referrals from Epstein. ██████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████ SUF ¶¶366-68. All the while, JPMorgan continued to ████████████████████████████.

## II.   JPMORGAN OBSTRUCTED ENFORCEMENT OF THE TVPA IN VIOLATION OF 18 U.S.C. § 1591(d)

By 2007, JPMorgan knew of "an effort to enforce the TVPA" and "intentionally obstruct[ed] or attempt[ed] to obstruct that enforcement effort." Order at 33. Though Epstein

confessed the conduct (except the "ages"), JPMorgan ████████████████████████████
████████████, and, instead, actively handled payments to Epstein's lawyers who it knew were discrediting the victims, hiring private investigators to target witnesses, and negotiating a deal where federal prosecutors would (and did) defer prosecution of TVPA charges. *Supra* Part I(B)(ii).

Further, ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████ *Supra* Part I.

JPMorgan ████████████████████████████ the payments to ██████████ ██████, and Maxwell; the credit cards to ██████████ and ██████, including for monthly travel "through Paris, Europe and US Virgin Islands and US;" the revoked credit card to ██████ who had talked to police; the DDR information Epstein provided for ██████████ (or any of the other girls Epstein referred to the Bank); the payments to the girls and women, including with Eastern European names, or their names and location, which it also had. JPMorgan ████████████████████████████
████████████ that it helped Epstein financially back Brunel and MC2 since 2005. *Supra* Part I. In 2019, Brunel was charged with rape of minors and under investigation for trafficking tied to Epstein and was widely known, including by JPMorgan, years earlier as "among the sleaziest people in the fashion industry … a conveyor belt, not a casting couch."  SUF ¶421-22.

Even when it knew that the feds had subpoenaed Bear Stearns for Epstein's account and transaction information related to its investigation, ███████████████████████

███████████████████████████████████████████████████████████

███████████████ *Supra* Part I. In 2010, JPMorgan learned of new federal investigations of Epstein for child sex-trafficking, but ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ *Supra* Part I.

JPMorgan's own due diligence on Epstein shows it knew that "names and contact information of material witnesses and additional victims" would have been "extremely useful in investigations and prosecuting the [federal] case." SUF ¶420. JPMorgan had the names and information for dozens of accomplices, victims, and other material witnesses—including, for example, his pilots, SUF ¶87, his assistants, and his accountant, who JPMorgan later acknowledged "controlled the movement of Epstein funds that potentially assisted in facilitating the sex trafficking ring," SUF ¶5, as well as the long list of dignitaries and ultra-wealthy men Epstein referred or connected to the Bank—███████████████████████████████

███████. *Supra* Part I. By Epstein's arrest in 2006, there should have been "a constant stream of information from JPMC to the FBI about Epstein's ongoing ███████████ …. Human trafficking is an ongoing crime, with harm incurred every day that the crime continues." ████

26

███████████████████████████████████████████████████████████

████████████████████████████████████████████, there is no genuine

dispute Epstein would have been federally charged with sex-trafficking much earlier. SUF ¶419.

## III.   THE USVI'S REQUESTED RELIEF FOR VIOLATIONS OF THE TVPA

*Declaratory Judgment and Injunction:* The Government requests that the Court declare

JPMorgan violated TVPA §§ 1591(a)(2) and (d) by participating in Epstein's sex-trafficking

venture and obstructing federal law enforcement efforts to enforce the TVPA against Epstein from

2006 to 2019. The Government seeks an injunction to prevent JPMorgan from participating in

trafficking ventures in the future and obstructing efforts to stop such ventures in violation of the

TVPA. *See Alfred L. Snapp v. Puerto Rico*, 458 U.S. 592, 598-99 (1982).

*Civil Penalties:* The Government has proven even greater participation by JPMorgan in

Epstein's sex-trafficking than the NYSDFS found against Deutsche Bank and seeks at least $150

million in civil penalties.

*Other Remedies:* The Government defers its request for disgorgement, compensatory and

punitive damages, and other appropriate relief for JPMorgan's TVPA violations until trial.

## IV.   JPMORGAN'S EQUITABLE AND FAULT-SHIFTING DEFENSES DO NOT APPLY TO THE GOVERNMENT'S TVPA PARENS PATRIAE CLAIMS

This is an action by the Government of the Virgin Islands to vindicate public rights. While

JPMorgan seeks to shift focus away from its own failings and point blame on the Government,

such equitable or fault-shifting defenses are legally barred. *See, e.g., City of New York v. FedEx

Ground Package System, Inc.*, 314 F.R.D. 348, 357 (S.D.N.Y. 2016) ("'[W]hen acting in a capacity

to enforce public rights in the public interest . . . government entities are not subject to all equitable

defenses—such as laches or estoppel—that could ordinarily be invoked against a private actor.'")

(quoting *State of New York v. UPS, Inc.*, 160 F. Supp. 3d 629, 640 (S.D.N.Y. 2016)); *id.* at 359

(contention that government plaintiffs were "negligent in their discretionary tax enforcement . . . is impermissible where the government seeks to vindicate the public interest via enforcement of a public statutory right"). The Court therefore should grant summary judgment for the Government on JPMorgan's Affirmative Defenses No. 5 ("*in pari delicto*"), 6 ("unclean hands"), 7 ("laches"), and 8 ("comparative and contributory negligence or fault"). Answer and Affirmative Defenses (Dkt. 124) at 26, because they seek to do precisely what the law prohibits—shift fault to a government plaintiff bringing suit to vindicate public rights.[2]

JPMorgan's attempts to distract from its violations of the TVPA described above by claiming that the *Government* should have done more are particularly galling. The Government must comply with constitutional and legal principles that protect all individuals by ensuring that investigations cannot proceed without concrete evidence. JPMorgan had that evidence—in spades—in its own files; the Government did not.  JPMorgan knowingly handled virtually every financial transaction Epstein needed to operate his sex-trafficking venture, from the millions in cash withdrawals and payments to co-conspirators, recruiters, and victims, to the millions in payments to lawyers and publicists for the ongoing cover-up. JPMorgan had virtually every financial detail of Epstein's venture—from payments to young women in Lithuania and Russia, to transfers for the purchase of a helicopter by Maxwell, to a "revoked" credit card for an alleged recruiter who talked to the police—in real-time and kept virtually all of it, and thus its own outsized role, under wraps until Epstein was dead and gone.  *Supra* Part I.

---

[2] The Government previously moved to strike these same defenses. *See* Dkt. 138, 139, 168, 205. The Court denied the motion to strike without prejudice to the USVI's right to move for summary judgment on these defenses. Order (Dkt. 215) at 1 ("Although the Court is skeptical that some or all of the defenses will survive summary judgment (let alone prevail at trial), the Court is satisfied they should not be stricken as a matter of pleading.").

The Government's causes of action against JPMorgan arise under the TVPA's *parens patriae* provision for state attorneys' general, which provides that where:

> [T]he attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591, the attorney general of the state, as parens patriae, may bring a civil action against such person on behalf of the residents of the State in an appropriate district court of the United States to obtain appropriate relief.

18 U.S.C. § 1595(d). The TVPA makes clear that a State Attorney General plaintiff brings suit not as a private litigant on behalf of itself, but "as parens patriae" (*i.e.*, the sovereign) "on behalf of the residents of the State" to "obtain appropriate relief" for "an interest of [those] residents" that "has been or is threatened or adversely affected" by JPMorgan's prohibited conduct.

In denying JPMorgan's motion to dismiss, the Court confirmed this plain reading of the TVPA. The Court found that the Government satisfies the elements of *parens patriae* standing, including that it "allege[s] an injury to a quasi-sovereign interest that affects a sufficiently substantial segment of its population[.]" Order at 17 (citing *Snapp*, 458 U.S. at 607). The Court explained that the Government's asserted interest in protecting residents "from the harmful effects of criminal sex-trafficking enterprises flourishing in the Islands . . . directly parallels the interest that Puerto Rico successfully asserted in *Snapp*[.]" *Id.* at 18 (cleaned up). Having found that the Government alleges a quasi-sovereign interest and is vindicating public rights, the Court now should hold that JPMorgan's equitable and fault-shifting defenses do not apply as a matter of law.[3]

---

[3] *See, e.g., United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002) ("[L]aches is not available against the federal government when it undertakes to enforce a public right or protect the public interest."); *FedEx*, 314 F.R.D. at 358 (striking laches, unclean hands, and *in pari delicto* defenses as to Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2346, public enforcement claims); *UPS*, 160 F. Supp. 3d at 647 (same); *United States v. Philip Morris Inc.*, 300 F. Supp. 2d 61, 75-77 (D.D.C. 2004) (granting government plaintiff partial summary judgment on equitable defenses of, *inter alia*, laches, unclean hands, and *in pari delicto*); *FTC v. Crescent Publ. Grp., Inc.*, 129 F. Supp. 2d 311, 324 (S.D.N.Y. 2001) ("'As a general rule . . . neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a

The Government's TVPA claim under section 1595(d) is one exclusively pursued by state governments, and not by private parties, just as under the CCTA in *FedEx* and *UPS*. The TVPA makes this clear by predicating a state's claim upon its showing that "an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591[.]" 18 U.S.C. § 1595(d). The dismissal opinion makes it clearer still that the Government is acting in a public enforcement capacity by holding that the Government "allege[s] an injury to a quasi-sovereign interest" and "seek[s] relief to the territory's injury that would be unavailable to individual plaintiffs." Order at 18. Since the Government is enforcing the TVPA in its capacity as sovereign, not as a privately-interested litigant, JPMorgan's equitable and fault-shifting defenses are barred as a matter of law and discovery has not shown otherwise.

JPMorgan has generally cited three issues forming the basis of its fault-shifting affirmative defenses: (1) Epstein's registration as a sex offender; (2) the Virgin Islands Economic Development Commission's ("EDC's") provision of tax benefits to Epstein's companies under a federally-authorized tax benefit program; and (3) actions taken by Cecile de Jongh, whom Epstein employed. As explained below, JPMorgan's claims of a Government-wide conspiracy to protect Epstein are both legally unsound and factually unsupported. The defenses based on these allegations cannot survive summary judgment.

### A.    JPMorgan's Defenses are Barred as Applied to Sex Offender Registry Issues

JPMorgan argues that the Government's purportedly improper enforcement of sex-offender registry requirements with respect to Epstein supports its equitable and/or fault-shifting

---

public interest.'") (quoting *Nevada v. U.S.*, 463 U.S. 110, 141 (1983)); *United States v. Vineland Chem. Co., Inc.*, 692 F. Supp. 415, 423 (D.N.J. 1988) ("[T]he equitable doctrine of unclean hands may not be asserted against the United States when it acts in its sovereign capacity to protect the public welfare.").

defenses. *See* Opp'n Mot. Strike (Dkt. 157) ("MTS Opposition") at 8-11. This argument is without basis.

<strong>i.    The Government's Investigations or Monitoring of Epstein Cannot<br>Form the Basis of Viable Affirmative Defenses</strong>

JPMorgan essentially argues that the Government should have more aggressively investigated Epstein or monitored his whereabouts. But that argument suffers from a fatal flaw. Even as a convicted sex offender, Epstein possessed constitutional rights that the Government was required to respect. (Nothing, however, granted Epstein a constitutional right to conduct business with JPMorgan or to be free from JPMorgan's scrutiny.) JPMorgan's attempts to equate its own compliance failures with the Government's actions have no legal basis and thus amount to little more than a brazen attempt to distract from its own regulatory failings. The officials within the Virgin Islands Government responsible for sex offender registration and monitoring are not responsible for Epstein's crimes. SUF ¶ 424. The laws required Epstein to register—which he did— and to provide notification of travel overseas. 14 V.I.C. § 1724. But the Government could not enter his island or conduct searches without concrete evidence that crimes were being committed. All witnesses confirmed that the Government never received such evidence. SUF ¶¶ 429-30.

JPMorgan has attempted to point to news articles or complaints filed by anonymous victims in other states as "evidence" that the Virgin Islands Government failed to pursue. But those documents do not and cannot underpin a government investigation. The Government could not search Epstein's property without a warrant, which can only issue upon probable cause. *See, e.g.,* *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). Newspaper reports or anonymous statements do not constitute sufficient basis for probable cause because "[m]ere journalistic prose is not the kind of underlying factual data upon which a magistrate can exercise [appropriate] judgment." *Donovan v. Fed. Clearing Die Casting Co.*, 655 F.2d 793, 797 (7th Cir. 1981) ("We need not belabor the

point that all newspaper reports are not of sufficient reliability to form the basis of Fourth Amendment probable cause determination"); *see also U.S. v. One White Crystal Covered Bat Tour Glove & Other Michael Jackson Memorabilia*, 2013 WL 12196595, at *4 (C.D. Cal. Aug. 19, 2013). These cases are consistent with the undisputed witness testimony confirming that the Department of Justice could not initiate investigations or pursue warrants based upon these types of hearsay statements. SUF ¶426-27. As witnesses confirmed, absent an actual complaint from a victim or eyewitness evidence brought to the Department of Justice's attention, the Department could not initiate investigations. SUF ¶428.

JPMorgan's complaints concerning the adequacy of address verification checks fare no better. No provision in the law requires the Virgin Islands to perform such checks, which are done to confirm that the registrant resides at the address provided to the Government. The checks were performed roughly annually in conjunction with U.S. Marshalls and other federal partners. SUF ¶431. The applicable law required address checks to verify that an offender is living where reported. They do not, however, authorize entry onto private property or dispense with the requirements of the Fourth Amendment. Government officials may not enter a sex offender's property or conduct a search absent consent or a warrant based on probable cause. SUF ¶432.

That protection is the reason that, in certain years, the U.S. Marshalls and Virgin Islands officials did not proceed beyond Epstein's dock. If an offender refused entry, the government officials performing the check did not possess authorization to enter. SUF ¶433. One Virgin Islands witness testified that she conferred with the federal government concerning this practice and was told that it was similar to a situation where a landowner has placed a gate at the border to his property. The officials were not permitted to proceed beyond that gate without a warrant. SUF

¶434. Nor was it improper or unusual for the Government to confirm addresses at a sex offender's place of employment, as was done one year with Epstein. SUF ¶435.

### ii.    The Discretionary Act of Granting a Waiver of Notification Periods for Overseas Travel is Not Grounds to Shift Fault to the Government

Following his conviction in Florida, Epstein was required to register as a sex offender with the Virgin Islands Department of Justice. In 2012, the Legislature amended its sex offender laws, in part to obtain federal funding for its sex offender unit. SUF ¶436. The U.S. Government approved the changes to the law in advance. SUF ¶437. JPMorgan has sought to make hay of the fact that Epstein's attorneys consulted with lawmakers concerning the proposed changes. But those arguments prove nothing. The Legislature rejected Epstein's proposed changes. SUF ¶438.

The amended statute required that "[a]ll sex offenders required to register in this jurisdiction shall appear in person at the Department of Justice at least twenty one (21) calendar days prior to any intended travel *outside of the United States* and provide information about their intended travel as provided in [14 V.I.C.] section 1726[.]" 14 V.I.C. § 1724(b)(4) (emphasis added). The same provision then states that "that Attorney General may *at his discretion* reduce this twenty-one (21) day notice requirement if a sex offender requests such a reduction and provides information in support of his request." *Id.* (emphasis added). Other statutory provisions confirm that "[n]othing under this chapter shall be construed as a waiver of sovereign immunity for the United States Virgin Islands, its departments and agencies." 14 V.I.C. § 1728(a).

Epstein applied for and received a discretionary waiver of his travel notification requirements pursuant to these statutory provisions. SUF ¶439. But this waiver does not constitute misconduct or otherwise form the basis of a valid affirmative defense. The provision of streamlined travel notice requirements upon satisfactory proof is statutorily mandated and/or vested in the Attorney General's *discretion*. Caselaw is clear that such discretionary actions do not support

shifting fault to the Government. *See, e.g., City of New York v. FedEx*, 314 F.R.D. at 359; *see also Perez v. Gov't of the Virgin Islands*, 847 F.2d 104, 107 (3d Cir. 1988) (Virgin Islands law recognizes the "public duty doctrine," which "preclud[es] suit for governmental negligence based only on the Government's failure to comply with a duty owed to the public in general[.]").[4]

The defense fails as a factual matter as well. The statutory waiver of which JPMorgan complains applied only to *international* travel. While the Government had a "policy in place" to require notification of travel outside of the Territory but within the United States, nothing in the federally-approved Virgin Islands statute required such notification. SUF ¶442. Nor did the provision of such a waiver somehow enable Epstein's crimes. Testimony is clear that Epstein never failed to register as a sex offender and there is no evidence that he failed to notify of travel. SUF ¶425. There is no evidence that permitting Epstein to email his international travel notifications 24 hours in advance instead of appearing in person 21 days in advance somehow enabled him more latitude to commit his crimes. Notifications are not authorizations or requests; the Government has no ability to restrict his travel. SUF ¶443. Moreover, entry into the Territory from overseas is controlled by federal authorities, not the Virgin Islands Governments. SUF ¶444.

Any attacks on the granting of the waiver itself are meritless. Then-Attorney General Frazer testified that he relied on representations of Epstein's counsel in forming his decision, and that those "representations" were "satisfactory to conclude that there was not an undue risk to the community" that would arise from the waiver. SUF ¶440. Epstein's lawyers represented to Mr.

---

[4] *See also Maldonado by and through Ochoa v. City of Sibley*, 58 F.4th 1017, 1022 (8th Cir. 2023) ("[T]he public-duty doctrine generally applies when the government fails to adequately enforce criminal or regulatory laws for the benefit of the general public or . . . protect the general public from somebody else's instrumentality.") (cleaned up); *McGaughey v. District of Columbia*, 684 F.3d 1355, 1358 (D.C. Cir. 2012) (public duty doctrine barred claims against government for failure to investigate rape allegation: "Courts and juries are ill-equipped to review legislative and executive decisions about how to allocate limited municipal resources to best protect the public.").

Frazer that other states permitted Epstein to provide email notification of his travels and affirmed

that "there is no public safety necessity in requiring Epstein to notify the Department in person

each time he travels to or from the jurisdiction."  SUF ¶441. JPMorgan's defense thus rests not on

whether the decision was authorized under law—it most certainly was—but on whether the

Attorney General in 2012 exercised sufficient discretion in granting the waiver. This is precisely

what the caselaw cited above precludes. *Cf. Harlow v. Fitzgerald*, 457 U.S. 800, 817-818 (1982)

("[G]overnment officials performing discretionary functions generally are shielded from liability

for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known").

**B.      JPMorgan's Defenses are Barred as Applied to the Economic Development Commission's Grant of Tax Benefits to Epstein's Companies**

The EDC operates under the umbrella of the USVI Economic Development Authority

("EDA"), which is a "semi-autonomous instrumentality of the Government" and is governed by a

board of individuals appointed by the Governor. 29 V.I.C. § 1101(a). The EDA "is a public

corporation having legal existence and personality separate and apart from the Government of the

Virgin Islands and the officers controlling it."  29 V.I.C. § 1101(b). Thus, to the extent JPMorgan

conflates entities and treats EDC actions as attributable to the Government, *see* MTS Opp'n at 2,

its arguments find no support in Virgin Islands law.

The tax benefits are authorized by a federal statute (26 U.S.C. § 934(b)(1)), pursuant to

which, the EDC administers "a unique economic development program for the USVI," allowing

residents of the Territory to exempt certain income if it is "'connected with the conduct of a trade

or business within the Virgin Islands.'" *Coffey v. C.I.R.*, 663 F.3d 947, 949 (8th Cir. 2011) (quoting

26 U.S.C. § 934(b)(1)). The substance and procedures for the EDC's provision of tax benefits are

set by statute and regulation. *See, e.g.*, 29 V.I.C. § 701(a) ("[I]t is the policy and determination of

the Government of the Virgin Islands that certain industrial development benefits should be made available for development and expansion of such industrial or business activities as are determined, pursuant to this subchapter, to be in the public interest by advancing the growth, development and/or diversification of the economy of the Territory of the Virgin Islands."); 29 V.I.C. § 705(a) ("The Commission shall[,] [b]ased upon the investigation and recommendations of the Director, review all applications for economic development benefits, hold public hearings thereon as provided in section 717 of this chapter, and (1) grant certificates for same, or (2) deny such certificate, subject to reconsideration in accordance with section 717."). The provision, continuation, and/or revocation of economic development-related tax benefits thus is statutorily mandated and/or vested in the EDC's discretion, not evidence of government misconduct or grounds for fault-shifting. *See Perez*, 847 F.2d at 107.[5]

The factual record bears this out. The EDC granted tax incentives to two of Epstein's companies: Financial Trust Company and Southern Trust Company. SUF ¶445. The first grant of benefits to an Epstein-owned company occurred in 1999 to Financial Trust. SUF ¶446. In 2009, Financial Trust applied for and received an extension of benefits. SUF ¶447. Epstein formed a new company—Southern Trust—which applied for and received tax benefits in 2012. SUF ¶448. In each of those cases, the grant of benefits was performed in compliance with all statutory and regulatory procedures and requirements. The companies submitted applications for the benefits. SUF ¶449. EDC held public hearings during which the benefits were discussed and the applicants were provided the opportunity to present their case and answer questions. SUF ¶450. The EDC then held decision meetings where the board considered the applications and rendered decisions.

---

[5] The EDC's grant of economic development-related tax benefits to Epstein also is irrelevant. The Government has abandoned claims for damages based on lost revenues from the grant of tax benefits. *See* USVI Letter-Brief (Dkt. 205) at 1; USVI Opp'n Mot. Sanctions (Dkt. 200) at 2.

SUF ¶451. To the extent JPMorgan questions the *reasoning* behind those decisions, that is precisely the type of second-guessing the law precludes. *See McGaughey, supra*, 684 F.3d at 1358 ("Courts and juries are ill-equipped to review legislative and executive decisions about how to allocate limited municipal resources to best protect the public.").

Once benefits are granted, Virgin Islands law limits the EDC's ability to modify them. "The Commission may not require an applicant to meet qualifications or requirements in excess of those representations made by the applicant to the Commission during the application process as a condition of granting an initial certificate." 29 V.I.C. § 708. Indeed, the law specifies that benefits granted are "consider[ed] . . . as being in the nature of a contract between [the] government and the beneficiary." 29 V.I.C. § 701(c).

The EDC could not revoke, suspend or modify the benefits based upon a felony conviction unless it concerned conduct "connected with the operation of the beneficiary's business or industry." 29 V.I.C. § 722(4). Thus, Epstein's Florida conviction was not grounds for revocation at that time because no evidence was available to the EDC that Epstein's solicitation of a minor for prostitution in Florida was "connected with the operation" of his USVI businesses. SUF ¶452. Unlike JPMorgan, the EDC did not have access to Epstein's companies' daily financial transactions, and was not aware of any connection between his conduct and the operations of his business. SUF ¶453. Indeed, the EDC reached out to Epstein's attorney in January 2015 to inquire whether media reporting regarding allegations of misconduct had any connection to the business of Epstein's Southern Trust Company. His attorney responded to confirm "[w]e do not believe that these media discussions will have any impact on the business activities of STC." SUF ¶454.

JPMorgan has pointed to a "cost-benefit" ratio that purportedly shows in many years that the Territory (not the Government) received less in benefits than it gave up in tax revenue. Fact

witness testimony, however, shows this analysis to be irrelevant because it uses an artificial baseline. A long-tenured EDC employee who was personally involved in the granting of benefits testified that the ratio "doesn't give the full picture" and "can be misleading" because, unless the business already operated in the Territory, the Government would not receive the tax revenue in the first place and has not "lost" anything. SUF ¶¶455-56. This analysis applies to both the initial grants of benefits to both companies and to Financial Trust's extension request. During a March 2009 public hearing, Epstein's attorney explained that a denial of an extension would likely cause "a responsible business person . . . to seriously consider relocating the business" if another territory offered similar benefits. SUF ¶458. Thus, the EDC could not assume that it would collect Epstein's tax revenue if the benefits were not extended. SUF ¶459. The ratio further ignores ancillary benefits that accrue to the Territory from the presence of high-net-worth individuals, who engage in economic activity unrelated to their businesses that benefits the territory. SUF ¶457.[6]

### C.     JPMorgan Has No Viable Defenses Based on Activity of Cecile De Jongh

JPMorgan also argues that the activity of Cecile de Jongh, former First Lady of the U.S. Virgin Islands and Office Manager for Epstein, supports its defenses. MTS Opp'n at 20. Not so.

As First Lady, Ms. de Jongh had no statutory or regulatory authority. Ms. de Jongh confirmed that "there's no office of the first lady with a budget," and she did not have an office. First Lady was largely a ceremonial position that entailed giving speeches and attending social events. SUF ¶461. Moreover, the factual record shows that during the time her husband was Governor, Ms. de Jongh was widely known and recognized to be employed by Epstein's businesses and acting on their behalf. SUF ¶462. Unlike the information that JPMorgan ███████

---

[6] To the extent JPMorgan may allege that EDC gave Epstein favorable treatment compared to other applicants, the record evidence shows otherwise. SUF ¶460.

███, de Jongh's employment with Epstein was widely reported and numerous witnesses confirmed their familiarity with her employment. SUF ¶463.

Most importantly, Ms. de Jongh had no responsibility for governmental decisions that form the basis of JPMorgan's flawed affirmative defenses. She had no contact with Department of Justice personnel responsible for sex offender registration and monitoring. SUF ¶464. Decisions concerning tax benefits were made by the EDC's board members. SUF ¶465. Although the law at the time required the Governor (her husband) to sign tax benefit certificates, that process was a formality and could not happen without the EDC's recommendation in the first place. SUF ¶465.

Ms. de Jongh vehemently denied knowing about or facilitating Epstein's crimes in the Virgin Islands. SUF ¶467. Although JPMorgan has pointed to emails about arranging an ESL class for women in the Virgin Islands, Ms. de Jongh testified that she was not aware these individuals were potential trafficking victims, and documents make clear that the University merely agreed to offer an existing class for them. SUF ¶¶468-69. Although Ms. de Jongh's emails may have provided salacious fodder for JPMorgan, she ultimately was not responsible for any government decisions.

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's motion for partial summary judgment.

Dated: July 24, 2023            **ARIEL SMITH, ESQ.**
**ATTORNEY GENERAL**

/s/ *Mimi Liu*
**MIMI LIU**
Admitted *Pro Hac Vice*
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
mliu@motleyrice.com

**VENETIA VELAZQUEZ**
Admitted *Pro Hac Vice*
Acting Chief, Civil Division
Virgin Islands Department of Justice
Office of the Attorney General
213 Estate La Reine, RR1 Box 6151
Kingshill, St. Croix
U.S. Virgin Islands 00850
Tel: (340) 773-0295 ext. 202481
venetia.velazquez@doj.vi.gov

**LINDA SINGER** (Admitted *Pro Hac Vice*)
**DAVID I. ACKERMAN**
**PAIGE BOGGS** (Admitted *Pro Hac Vice*)
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
lsinger@motleyrice.com
dackerman@motleyrice.com
pboggs@motleyrice.com

*Attorneys for Plaintiff Government of the*
*United States Virgin Islands*