# EXHIBIT 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

M.J.,

        Plaintiff,

vs.

JEFFREY EPSTEIN and
SARAH KELLEN,

        Defendants.
_____/

## COMPLAINT

        Plaintiff, M.J., by and through her undersigned counsel, sues the Defendants, Jeffrey Epstein and Sarah Kellen, and alleges:

    1.    This is an action in an amount in excess of $15,000.00, exclusive of interest and costs and is within the jurisdictional limits of this Court.

    2.    This Complaint is brought under a fictitious name in order to protect the identity of the Plaintiff because this Complaint makes allegations of sensitive nature of offenses against a then minor child.

    3.    At all times material to this cause of action, the Plaintiff, M.J. (hereinafter referred to as "Plaintiff"), was a resident of Palm Beach County, Florida.

    4.    At all times material to this cause of action, Defendant, Jeffrey Epstein, had a residence located at 358 El Brillo Way, West Palm Beach, Palm Beach County, Florida.

    5.    Defendant, Jeffrey Epstein, is currently a citizen of the United States Virgin Islands.

1

6. At all times material to this cause of action, Defendant, Jeffrey Epstein, was an adult male born in 1953.

7. Defendant, Sarah Kellen, is currently a citizen of New York, where she currently resides.

8. At all times material, the Defendants Jeffrey Epstein and Sarah Kellen both owed a duty unto Plaintiff to treat her in a non-negligent manner and to not commit or conspire to commit intentional or tortious illegal acts against her.

## FACTUAL ALLEGATIONS

9. At all times material, Defendant, Jeffrey Epstein, was an adult male, over 50 years old. Defendant Epstein is known as a billionaire, yet even those closest to him, including family members, long time employees and those that he considers his closest friends have no idea what he does or did to earn money to support his lifestyle.

10. Defendant Epstein owns, directly or through nominee individuals used to conceal his interests, a fleet of airplanes, motor vehicles, boats and a helicopter. He owns numerous properties and homes, including a 51,000-square-foot mansion in Manhattan, a $30 Million 7,500-acre ranch in New Mexico, a 70-acre private island formerly known as Little St. James in St. Thomas, U.S. Virgin Islands (he is alleged to have renamed this island Little St. Jeff's after himself), a mansion in London, England, a home in Paris, France, and a mansion in Palm Beach County, FL. The allegations herein primarily concern the defendant's conduct while at his mansion in Palm Beach County, FL.

11. Defendant Epstein has a sexual preference and obsession for underage minor females, specifically targeting female children age 12 to 17, and Defendant Epstein acts on that obsession by luring underage minor females to him where he attempts to sexually molest and batter these

2

underage minor females on an everyday basis, oftentimes 2 or 3 different underage minor females on one day.

12. Sometime prior to 1998, Defendant Epstein devised a complex plan, scheme and criminal enterprise to gain access to countless underage minor females, some as young as 12 years old, for the purpose of coercing the minor females into various acts of sexual misconduct that he committed upon them. His enterprise operated with a definite hierarchal structure with his various employees/assistants and associates, including Defendant Sarah Kellen, Jean Luc Brunel, Ghislaine Maxwell, Leslie Groff, Adriana Ross, Nadia Marcinkova, various housekeepers, butlers and pilots, performing their respective roles to ensure the goals of the enterprise: operate an organized and efficient system to maximize the number of underage minor females for Defendant Epstein (and others) to sexually abuse and exploit while avoiding law enforcement detection.

13. Defendant Epstein, with help from his assistants and associates, recruited and procured underage minor females, lured them to one of his mansions, had the underage minor female taken to a room to be alone with him, then he would appear naked or wearing only a towel and sexually batter or otherwise sexually exploit the underage minor female. He would then pay the underage minor female for the sex acts he committed against her (typically between $200 and $300 per molestation session, or as his criminal enterprise commonly refers to it – per "massage"). Prior to leaving, Defendant Epstein's assistant would get the phone number of the underage minor female and input it into his computer system or otherwise keep it on file. He would then offer the underage minor female to return to his house to make money in exchange for him committing sexual acts against her, and he also typically informed her of another option - make more money recruiting and procuring other underage minor females for him to sexually

3

abuse. He would tell the underage minor female that he will pay her for each underage minor female that she brings to him (again, typically between $200 and $300), and he encouraged, and oftentimes forcefully demanded, her to bring him as many underage minor females as she was able. Through this general pitch, Defendant Epstein created a vast pyramid of underage minor females recruiting and procuring other underage minor females for his purpose of coercing these underage females into sexual acts for money.

14. Defendants Epstein and Kellen and the criminal enterprise specifically targeted underprivileged and economically disadvantaged children to sexually exploit and molest and otherwise prey upon the vulnerabilities of these young girls.

15. It is unknown exactly how long Defendant Epstein's aforementioned criminal enterprise operated, although information and belief indicates that it was continuously and actively in operation from at least 1998 through Defendant Epstein's criminal arrest in 2006.

16. The complete list of underage minor females that were sexually abused by Defendant Epstein over the years is believed to have been kept on a computer system controlled by Defendant Epstein and accessible by several of his employees, including Defendant Sarah Kellen. It is also known that much of the data regarding the names, addresses and whereabouts of each underage minor female was input by one of his assistants, including Defendant Kellen.

17. Defendant Sarah Kellen was listed in the Federal Non-prosecution Agreement related to Defendant Epstein's criminal plea on sex charges against minors as a criminal co-conspirator for her role in the criminal activity that was committed by Defendant Epstein against many underage minor females. She was employed by Defendant Epstein to maintain his schedule, arrange for underage minor females to be with Defendant Epstein, maintain contact with the underage minor females, schedule the underage minor females' transportation to and from Defendant Epstein's

4

mansion, and greet the underage minor female at the house before taking her upstairs to be alone with Mr. Epstein. Upon information and belief, Defendant Kellen remains employed by Defendant Epstein and continues to work for Defendant Epstein in furtherance of the goals of the criminal enterprise.

18. Defendant Epstein used his vast wealth and power to lure underprivileged minor females to him, and to coerce them into prostitution once he was alone with the underage minor female. He sexually battered, molested, committed lewd and lascivious acts upon and otherwise exploited numerous underage minor females and then gave them money. So long as the underage minor female followed his demands and advances, he assumed the role of a friend or mentor or father figure to the minor female in an attempt to groom the minor female; however, if any minor female resisted his sexual advances, Defendant Epstein became frustrated, angry and threatening towards the underage minor. His intent was to groom each minor female into engaging in sexual acts with him as well as to "work" for him, i.e. bring him other underage minor females to sexually molest, batter and exploit. He was masterful in his exploitation and grooming of these minor females with an additional intent of gaining trust and cooperation from these minors to prevent any one of them from reporting his criminal acts to law enforcement. Certain of his many co-conspirator associates, including Ghislane Maxwell and Jean Luc Brunel, helped in this recruiting process by creating the impression that legitimate modeling opportunities were available for the minor females.

19. Through information and belief, Defendant Epstein has been successful in luring hundreds of underage minor girls to him for the purpose of him (and sometimes others) sexually abusing them. He intentionally preys upon underage minor females that are middle school or high school children who are not working prostitutes, and he takes pleasure in using his power

5

and influence to coerce these minor females into acts of prostitution with him personally and sometimes with his friends and associates as well, including but not limited to Ghislaine Maxwell and Nadia Marcinkova.

20. Over time, Defendant Epstein fine-tuned his operation to further his goals of gaining access to a greater number and variety of underage girls while avoiding detection by law enforcement. He also provided the roadmap for his enterprise should the illegal sexual exploitation of the enterprise be detected – he or the criminal enterprise would (and did) retain legal representation for each criminal enterprise member who would instruct each member to invoke his/her 5th amendment rights, they would hide behind the 5th amendment to avoid turning over incriminating materials (i.e. computer system that logged information about the underage sexual molestation victims, scheduling books, message pads, and tangible items such as vibrators and dildos), they would destroy evidence and refuse all cooperation with law enforcement.

21. The plan and scheme was developed by Defendant Epstein, and he and his assistants and associates carried it out with each underage minor female in a well-planned and ritualistic manner; Epstein ran this criminal enterprise as an experienced Mob boss would run any organized crime family – in a well-planned, organized, arrogant and ruthless manner, with complete cooperation from his co-conspirator associates and underlings and an absolute dedication to carrying out the illegal operations of the criminal enterprise.

22. Defendant Epstein frequently traveled between his various mansions and either he or an authorized agent would call to inform a recruiter, assistant, or scheduler at his next destination as to his arrival time. His scheduler, usually Defendant Sarah Kellen, would then contact an underage minor female and schedule her to be at Defendant Epstein's mansion or to bring another underage minor female to his mansion at a particular time. Once the minor female was

6

brought to Defendant Epstein's residence, she was greeted at the door of the mansion and lead inside by one of Defendant Epstein's employees, oftentimes Defendant Sarah Kellen.

23. Defendant Sarah Kellen would lead the underage minor female up to Defendant Epstein's room and leave the underage minor alone in the room. Defendant, Jeffrey Epstein, himself would then appear naked or wearing only a towel. He would then demand a massage and during the massage he would attempt, usually successfully, to perform one or more lewd, lascivious, and sexual acts, including, but not limited to, masturbation, touching of the underage minor female's sexual organs, coercing or forcing the underage minor female to perform sex acts with him, using vibrators or sexual toys on the underage minor female, coercing the underage minor female into sexual intercourse with himself or others, and digitally penetrating the underage minor female. He would then give the Plaintiff money for engaging in this sexual activity.

24. Consistent with Defendants Epstein and Kellen's foregoing scheme or plan, in or around the summer of 2002, Plaintiff, an economically poor and vulnerable child, was told by another one of Epstein's underage minor sex abuse victims, that she could make $300 cash by giving an old man a massage on Palm Beach.

25. Plaintiff's then minor acquaintance (also a sexual abuse victim of Epstein) telephoned Defendant Epstein and scheduled for Plaintiff to go to Defendant Epstein's house to give him a massage. During that call, Defendant Epstein himself got on the phone and spoke with Plaintiff MJ and asked her personally to come to his mansion in Palm Beach.

26. Plaintiff then took a taxicab to Defendant Epstein's mansion and was greeted by Epstein's top assistant, Defendant Sarah Kellen.

27. Defendant Kellen, in furtherance of the scheme to exploit Plaintiff, escorted Plaintiff upstairs to Defendant Jeffrey Epstein's large bathroom, where Defendant Kellen set up the

7

massage table and showed Plaintiff different massage lotions to use. Defendant Kellen then left Plaintiff alone in the room. Plaintiff was alone in Defendant Epstein's bathroom until Defendant Jeffrey Epstein emerged wearing only a towel.

28. Defendant Epstein then walked to the massage table that was already open in the room. He lied face down on the table and told Plaintiff to start massaging him, at which time he engaged in a conversation with Plaintiff. During the conversation, Defendant Epstein asked Plaintiff her age and she told him she had recently turned 16.

29. Consistent with all of Defendant Epstein's known underage minor female victims, Plaintiff had no massage experience whatsoever and she informed him of that, and Defendant Epstein began instructing Plaintiff on how he liked his massage.

30. After approximately 15 minutes, Defendant Epstein turned over onto his back, and he commanded Plaintiff to massage his chest.

31. Defendant Epstein then suddenly removed his towel and his penis was already erect. He then commanded Plaintiff to remove her shirt and bra and to begin "pinching his nipples" as he began masturbating with his right hand.

32. As he was masturbating, Defendant Epstein began fondling Plaintiff's breasts.

33. Defendant Jeffrey Epstein, while masturbating with his right hand, reached out his left hand and grabbed Plaintiff's vagina and butt over her clothes. Plaintiff pushed Defendant's hand away and told him repeatedly not to touch her like that. Epstein was persistent in his attempt to grab Plaintiff's vagina and continued to grab her vagina and butt on multiple occasions after she told him not to.

34. Defendant Epstein continued to masturbate his exposed penis until he ejaculated in front of the then minor Plaintiff.

8

35. Plaintiff was shocked and embarrassed by the events and Defendant Epstein talked to her to persuade her that everything he was doing with he was normal.

36. Epstein paid Plaintiff $300 for allowing him to grope her and masturbate in her presence.

37. Plaintiff returned to Epstein's home on approximately 20 occasions. On each occasion Epstein grabbed Plaintiff's bare breasts, exposed his penis, masturbated and ejaculated in Plaintiff's presence, and paid her $300 each time.

38. Defendant Epstein coerced Plaintiff into acts of prostitution, preying on her low economic status and troubled upbringing, complimenting Plaintiff for being "special" to him and having a "very pretty body" and making promises to Plaintiff such as – he told Plaintiff that if she graduated high school, then he would buy her a computer, something that she wanted yet could not afford.

39. On multiple occasions Defendant Epstein pressured Plaintiff to bring him other underage minor females to abuse; he told Plaintiff that he would pay her $300 for each girl she brought him, but Plaintiff refused to bring other girls.

40. Defendant Epstein told Plaintiff that he would pay her more money if she would give him oral sex and that he would pay her $600 for actual sexual intercourse. Plaintiff refused.

41. Defendant Epstein personally called Plaintiff at least five times to tell her when she should be at his house to "work" or give him a "massage" (Epstein's criminal enterprise's learned code words for paying minors for Epstein and others to interact with them sexually).

42. Every other time (approximately 15) Defendant Kellen called to inform Plaintiff of the date and time when she needed and was expected to be at Epstein's mansion to "work".

43. The acts referenced above, committed by Defendant, Jeffrey Epstein, against the then minor Plaintiff were committed in violation of numerous State and Federal criminal statutes

condemning battery, assault and the exploitation of minor children, contributing to the delinquency of a minor and other crimes, specifically including, but not limited to, those criminal offenses outlined in Chapters 796, 800, and 827 of the Florida Statutes, as well as those designated in Florida Statutes §796.03, §796.07, §796.045, §796.04, §796.09, §39.01, §450.151, and §827.04.

44. The above-described acts took place in Palm Beach County, Florida at the residence of the Defendant, Jeffrey Epstein. Any assertions by Defendants, Jeffrey Epstein and Sarah Kellen, that they were unaware of the age of the then minor Plaintiff are belied by their actions and rendered irrelevant by the provisions of applicable Florida Statutes concerning the sexual exploitation and abuse of a minor child. The Defendants, Jeffrey Epstein and Sarah Kellen, at all times material to this cause of action, knew and should have known of the Plaintiff's minority as Plaintiff specifically told Epstein her age and Defendant Epstein and criminal organization has a history of seeking out underage minor children to sexually abuse. In fact, one primary goal of the organization is to sexually abuse females who are under the age of 18, and oftentimes Defendant Epstein has turned away females (i.e. refused to engage in sexual acts with them) for being "too old" once she reaches 18 years of age, and he has reprimanded girls for bringing him other girls who are over the age of majority.

45. In June 2008, in the Fifteenth Judicial Circuit in Palm Beach County, Florida, Defendant Epstein entered pleas of "guilty" to various Florida State crimes related to his exploitation of minors for sex.

46. As a condition of that plea and in exchange for the Federal Government entering into a Non-Prosecution Agreement with Defendant Epstein, wherein the Federal Government agreed to effectively stay any prosecution of Jeffrey Epstein, Sarah Kellen and other criminal co-

conspirators Nadia Marcinkova and Leslie Groff, Defendant Epstein agreed to admit that approximately 40 underage minor females, whose names were provided to Defendant Epstein, were his victims. Plaintiff was not included in that list as she moved away from the West Palm Beach area in part to escape from Epstein, and she has lived in fear of Epstein and his organization and has not yet been contacted by law enforcement.

47. Beginning in or about June 2008 and continuing to the present time, defendant Epstein has been aware he faces significant financial liability for his sexual offenses, both to MJ and to many other similarly-situated girls whom he abused. MJ and these other girls are creditors of Epstein, in that have filed and can file tort actions against him under both Florida and Federal laws. Accordingly, Epstein has conveyed substantial assets and property into the names of other persons and into overseas bank accounts and other financial institutions. These assets and properties could have been attachable and used to pay the debts owed to MJ and to the other girls that Epstein has abused.

48. As an example of the fraudulent conveyances that Epstein has attempted, in approximately October 2009, Epstein placed his personal 727 aircraft up for sale, with the intent that the proceeds of that sale would be hidden so that MJ and other creditors of Epstein would not be able to secure payment from that substantial asset.

49. While Epstein is clearly distinct from the criminal enterprise that he oversees that asset, as well as his other airplanes and helicopters and other assets, have been used continuously and repeatedly to further the interest and endeavors of Epstein and his criminal enterprise.

50. As another example of the fraudulent transfers that Epstein has made, Epstein has titled a Ford F-150 Truck in the name of Larry Visoki (Epstein's personal pilot). Visoski was unaware that the truck was titled in his name when he was questioned under oath in a deposition.

11