# EXHIBIT 32

Mary Casey Confidential, Attorneys' Eyes Only

```
 1                UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
     GOVERNMENT OF THE UNITED     )
 3   STATES VIRGIN ISLANDS        )
                                  )
 4         Plaintiff,             )
                                  )
 5   vs.                          ) 1:22-cv-10904-JSR
                                  )
 6   JPMORGAN CHASE BANK, N.A.,   )
                                  )
 7         Defendant/Third-       )
           Party Plaintiff.       )
 8   _____)
     JPMORGAN CHASE BANK, N.A.    )
 9                                )
           Third-Party            )
10         Plaintiff,             )
                                  )
11   vs.                          )
                                  )
12   JAMES EDWARD STALEY,         )
                                  )
13         Third-Party            )
           Defendant.             )
14

15              FRIDAY, APRIL 7, 2023

16       CONFIDENTIAL - ATTORNEYS' EYES ONLY

17                     - - -

18           Videotaped deposition of Mary
     Casey, held at the offices of Boies Schiller
19   & Flexner, 100 SE 2nd Street, Suite 2800,
     Miami, Florida, commencing at 9:23 a.m.
20   Eastern, on the above date, before Carrie A.
     Campbell, Registered Diplomate Reporter,
21   Certified Realtime Reporter, Illinois,
     California & Texas Certified Shorthand
22   Reporter, Missouri, Kansas, Louisiana & New
     Jersey Certified Court Reporter.
23                     - - -

24            GOLKOW LITIGATION SERVICES
                   877.370.DEPS
25               deps@golkow.com
```

Mary Casey - Confidential, Attorneys' Eyes Only

1  includes understanding source of wealth,
2  understanding activities within an account,
3  and ensuring that it's in keeping with your
4  understanding of the client.
5      Q.   And ensuring that it's in
6  keeping with your understanding of the
7  client's line of business or businesses,
8  correct?
9           MR. BUTTS:  Objection.
10          You may answer.
11          THE WITNESS:  That is correct.
12 QUESTIONS BY MS. LIU:
13     Q.   And as part of due diligence,
14 you reviewed news reports or news
15 publications that come out with respect to
16 the client or the client's businesses,
17 correct?
18     A.   They would be included within
19 the due diligence review, yes.
20     Q.   And you also review any civil
21 or any other form of lawsuits that may be
22 filed by or against the client, correct?
23     A.   They are included within the
24 due diligence review, yes.
25     Q.   How many Jane Doe victim

1  grappling with how Jeffrey should be covered
2  in PB."
3           And PB is private bank,
4  correct?
5       A.    That is correct.
6       Q.    "My product partners and I have
7  expressed a reluctance to proactively cover
8  him, as every transaction becomes
9  problematic."
10          Do you see that?
11      A.    I do.
12      Q.    And you wrote that on August 7,
13 2006, correct?
14      A.    That is correct.
15      Q.    "My sense is that it should
16 evolve into a banking and client service-only
17 relationship."
18          Do you see that?
19      A.    I do.
20      Q.    "Would you agree."
21          Do you see that?
22      A.    I do.
23      Q.    And again, you wrote those
24 words to Jes Staley and Mary Erdoes on
25 August 7, 2006, correct?

```
 1       A.      That is correct.
 2       Q.      And Jes Staley responds to you
 3   and Ms. Erdoes, and he says, "I agree with
 4   your second point."
 5               Do you see that?
 6       A.      I do.
 7       Q.      And your second point was "to
 8   evolve it into a banking and client
 9   service-only relationship," correct?
10       A.      That is correct.
11       Q.      Does this refresh your
12   recollection at all about having a discussion
13   by phone with Mr. Staley?
14       A.      I spoke to Mr. Staley on the
15   phone.  I can't tell you exactly when.
16       Q.      Do you recall what you and
17   Mr. Staley discussed on that phone call?
18       A.      For this particular phone
19   call --
20       Q.      Yes.
21       A.      -- that is referenced in point
22   2, we were discussing the challenges of
23   covering Jeffrey because he was a difficult
24   investment client.
25       Q.      So it had nothing to do with
```

1  the Palm Beach Post news article related to
2  his indictment for child sex offenses that
3  you forwarded to Mr. Staley approximately a
4  week and a half earlier and asked him to give
5  you a ring?
6      A.    This particular phone call
7  cited in this e-mail, we are discussing an
8  investment-related concern.  We had...
9      Q.    So your reluctance -- your
10 testimony here today under penalty of
11 perjury, Ms. Casey --
12     A.    Yes.
13     Q.    -- your reluctance "to
14 proactively cover him, as every transaction
15 becomes problematic," had nothing to do with
16 the news reports related to the child sex
17 offenses?
18     A.    This particular -- this
19 particular e-mail and that particular
20 conversation referenced here relates to the
21 challenges of Mr. Epstein as being a very
22 difficult client from an investment point of
23 view.
24           We had separate conversations
25 with respect to the reputational risk of

1  Mr. Epstein.
2      Q.    And what were those separate
3  conversations?
4      A.    We have a process for
5  escalation of reputational risk issues, and
6  in the course of that process, we had
7  meetings related to that.
8      Q.    And who were your product
9  partners who also expressed a reluctance to
10 proactively cover him?
11     A.    At this point in time, I
12 believe my investment partner was Phil
13 Schlakman.
14           And it also relates -- if you
15 look at the paragraph 1, we had a portfolio
16 manager also involved on that relationship
17 and, again, not getting paid for the fees for
18 the account.
19     Q.    And your reluctance to
20 proactively cover Jeffrey Epstein, your
21 testimony is that that had -- your reluctance
22 had nothing to do with the reports related to
23 Jeffrey Epstein being indicted for child sex
24 offenses?
25           MR. BUTTS:  Objection.

Mary Casey Confidential, Attorneys' Eyes Only

```
 1   QUESTIONS BY MS. LIU:
 2        Q.    And so even the head of global
 3   credit, I think you said, is concerned.  The
 4   credit team.
 5             Are you aware whether or not
 6   Mary Erdoes was concerned at that time?
 7             MR. BUTTS:  Objection to form.
 8             Is the question, are you aware
 9        Mary Erdoes was concerned?
10             MS. LIU:  Yes.
11             THE WITNESS:  I don't know.
12   QUESTIONS BY MS. LIU:
13        Q.    Okay.  So you see that's
14   10/25/07, right?
15        A.    Correct.
16             (Casey Exhibit 23 marked for
17        identification.)
18   QUESTIONS BY MS. LIU:
19        Q.    Okay.  I'm about to show you an
20   e-mail chain on the same date and the next
21   day.  And we'll mark that as Exhibit 23.
22             So you'll see the top e-mail,
23   the next day, 10/26, Mary Casey to
24   Christopher French, 10/26/07, re: Jeffrey
25   Epstein new line of credit.
```

1                    Do you see that?

2         A.      I do.

3         Q.      Okay.  So if you go down to the
4   very bottom, you'll see similar e-mails about
5   the Rich Kahn requests on the letter of
6   credit, and it gets forwarded up.  You've
7   asked -- it shows you the e-mail where you're
8   asking Steve Sonnick and Mary Erdoes for
9   their guidance at approximately the middle of
10  the page 2.

11        A.      Uh-huh.

12        Q.      And then you forward -- or you
13  write to Chris French on 10/25/07, 7 p.m. --
14  or he writes to you, I'm sorry, "Mary, we are
15  moving forward on this," meaning the letter
16  of credit.

17                Correct?

18        A.      Uh-huh.

19        Q.      Okay.  "Not sure if you knew
20  this, but we do still have an existing 1
21  million LC that we issued a few years ago" --
22  so this is a few years ago from 2007 -- "that
23  is secured by the Tween stock, formerly TOO.
24  That was the LC supporting the modeling
25  agency's loan to Mellon."

Mary Casey Confidential, Attorneys' Eyes Only

1        MS. LIU:  You can ask her
2    whatever you want on redirect,
3    Mr. Butts.  I would ask you,
4    especially because you're the one
5    complaining about time, to not make
6    inappropriate speaking objections.
7    Thank you very much.
8        MR. BUTTS:  I haven't
9    complained a bit.
10 QUESTIONS BY MS. LIU:
11    Q.    Ms. Casey, you knew that since
12 2005, two years before this news article
13 comes out, that JPMorgan was extending a
14 letter of credit to the tune of a million
15 dollars to backstop a loan that Mellon Bank
16 was making to MC2 modeling agency, correct?
17        MR. BUTTS:  Objection.  Form.
18        THE WITNESS:  Correct.
19 QUESTIONS BY MS. LIU:
20    Q.    Thank you.
21    A.    And Jeffrey was a guarantor --
22 was -- the letter of credit was Jeffrey's
23 credit, if you will, creditworthiness.
24    Q.    If we could go back to 23.
25        You write back to Christopher

```
 1   French, "I did know," on the first page,
 2   "that we had that existing LOC," or letter of
 3   credit.
 4              Correct?
 5       A.     Correct.
 6       Q.     And then Christopher French
 7   writes you, and he says, "I spoke to Mary and
 8   Sonnick."
 9              And "Mary" is Mary Erdoes,
10   correct?
11       A.     I suspect that's true, yes.
12   Yes.
13       Q.     "Mary wants us to move forward
14   based on our earlier decision to continue
15   doing business with Jeffrey Epstein."
16              Do you see that?
17       A.     I do.
18       Q.     "Not a big deal with Catherine.
19   She just wasn't aware of the existing letter
20   of credit."
21              Correct?
22       A.     Correct.
23       Q.     And your response is, "Thank
24   you.  I am relieved to hear, exclamation
25   mark."
```

```
 1                Correct?
 2       A.       Correct.
 3       Q.       And this is in 2007 when you
 4  yourself want to transition off the
 5  relationship with Jeffrey Epstein because he
 6  has been indicted, and you believe he may be
 7  convicted for child sex offenses, correct?
 8                MR. BUTTS:  Objection.
 9       Mischaracterizes.
10                THE WITNESS:  Yeah, that was
11       not what my e-mail says.
12                "I am relieved to hear" refers
13       to the fact that I was concerned that
14       Catherine was surprised.  Catherine
15       was the head of the private bank.  I
16       didn't want to be doing anything out
17       of lockstep with her.
18                He says, "not a big deal."  I
19       say, "I am relieved to hear."
20  QUESTIONS BY MS. LIU:
21       Q.       So Catherine Keating is now
22  informed the letter of credit with the
23  modeling agency --
24       A.       The letter of credit is with
25  Mellon Bank.
```

Mary Casey - Confidential, Attorneys' Eyes Only

```
 1        Q.     With Mellon Bank to backstop
 2   the loan to the modeling agency?
 3        A.     Mellon Bank's loan to the
 4   modeling agency, yes.
 5        Q.     And you were aware -- and you
 6   said you were already aware, correct?
 7              MR. BUTTS:  Of what?
 8              THE WITNESS:  Of what?
 9        Correct.
10   QUESTIONS BY MS. LIU:
11        Q.     The letter of credit to Mellon
12   Bank to backstop the loan with the MC2 --
13        A.     Yes.
14        Q.     -- modeling agency.
15        A.     Yes, I said that I was aware,
16   correct.
17        Q.     So we have Catherine Keating is
18   aware, Mary Casey is aware, Christopher
19   French was aware.
20              He was the one reminding you,
21   correct?
22        A.     Correct.
23        Q.     Presumably Mary Erdoes is
24   aware, and Mr. Sonnick is aware, correct?
25        A.     I -- well, I don't know what
```

Mary Casey - Confidential, Attorneys' Eyes Only

1  they were aware of, but, anyway -- maybe.  I
2  don't want to misspeak.  I can read the
3  e-mails to see if they're actually aware of
4  the specific letter of credit.
5       Q.   Well, if we were closely
6  monitoring Jeffrey Epstein at this time, all
7  of these persons who had been involved in the
8  rapid response meeting in 2006, you would
9  agree with me, should have been aware of his
10 credit exposure, correct?
11      A.   That we --
12           MR. BUTTS:  Objection to form
13      and argumentative.
14           You may answer.
15           THE WITNESS:  A client's credit
16      exposure is part of the overall
17      relationship, so one can assume we are
18      aware that we have credit outstanding
19      to him.  Not the --
20 QUESTIONS BY MS. LIU:
21      Q.   Including the million dollar
22 letter of credit to Mellon Bank to backstop
23 the loan to MC2 modeling agency, correct?
24      A.   Not correct to that level of
25 detail.  That is an extraordinary level of

```
 1          written here.
 2   QUESTIONS BY MS. LIU:
 3          Q.    Right?
 4          A.    Yes.
 5          Q.    Okay.  The next page contains
 6   an article, a news article, correct?
 7          A.    Correct.
 8          Q.    And the next pages also contain
 9   additional news articles, correct?
10          A.    Correct.
11          Q.    Or at least one additional news
12   article.
13                So that -- is that the norm,
14   that prior to the rapid response meeting any
15   derogatory information would be collected and
16   provided to the folks who are going to
17   participate in the meeting?
18          A.    It's relative -- relevant to
19   the client, I presume, yes.
20          Q.    Okay.  Then you get to a
21   relationship list.
22                Do you see that?
23          A.    Hold on.
24                Yes.
25          Q.    Okay.  And it goes on for a few
```

1  pages, right?  One, two, three, four.  And at
2  the very end it says, "PCM market value,
3  121,571,000," correct?
4       A.    Correct.
5       Q.    So you'll recall in 2006 when
6  you had listed the amount in his accounts, it
7  was 32 million.
8             Do you recall that?
9       A.    I do.
10      Q.    And now following the
11 indictment and a few weeks after his
12 conviction, his accounts have grown to
13 $121 million, correct?
14      A.    Of all these accounts here
15 combined, yes.  Some of them are not his,
16 but, yes.
17      Q.    These are Jeffrey Epstein
18 relationship list, party name, Jeffrey
19 Epstein, correct?
20      A.    Correct.
21      Q.    And if you look at -- on the
22 first page, Financial Trust Company, that is
23 Jeffrey Epstein's account, correct?
24      A.    Financial Trust Company is,
25 yes.

Mary Casey - Confidential, Attorneys' Eyes Only

```
 1        Q.    And that account contains 112
 2   million of the $121 million?
 3        A.    Correct.
 4        Q.    And I will represent to you I
 5   counted how many accounts are included on
 6   this relationship list, and it's 72.
 7              That seems about right,
 8   correct?
 9        A.    Of open accounts?
10        Q.    No, of all accounts listed on
11   here.
12        A.    Oh, whether they were opened in
13   the past and closed?
14        Q.    Yes.
15        A.    Could be.
16        Q.    You have no reason to disagree
17   that you're not seeing approximately 72
18   accounts listed here?
19        A.    I mean, eyeballing it, that
20   sounds right.
21        Q.    Okay.  And you asked me my next
22   question, which is a number of the accounts
23   are inactive, correct?
24        A.    A number of them are marked
25   closed, yes.
```