# EXHIBIT 99

```
 1        UNITED STATES DISTRICT COURT FOR THE
             SOUTHERN DISTRICT OF NEW YORK
 2                      -  -  -

 3   GOVERNMENT OF THE UNITED     : Case Number:
     STATES VIRGIN ISLANDS        : 1:22-cv-
 4        Plaintiff,              : 10904-JSR
          v.                      :
 5   JPMORGAN CHASE BANK, N.A.     :
          Defendant/Third-Party   :
 6        Plaintiff.              :
     _____
 7   JPMORGAN CHASE BANK, N.A.     :
          Third-Party Plaintiff,  :
 8        v.                      :
     JAMES EDWARD STALEY           :
 9        Third-Party Defendant.  :

10
                       -  -  -
11               MAY 24, 2023
               HIGHLY CONFIDENTIAL
12                      -  -  -

13            Videotaped deposition of

14   STEPHEN CUTLER, taken pursuant to notice,

15   was held at the law offices of Boies

16   Schiller Flexner LLP, 55 Hudson Yards,

17   New York, New York, commencing at

18   9:40 a.m., on the above date, before

19   Amanda Dee Maslynsky-Miller, a Certified

20   Realtime Reporter and Notary Public in

21   and for the State of New York.

22                      -  -  -
          GOLKOW LITIGATION SERVICES, INC.
23        877.370.3377 ph| 917.591.5672 fax
                  deps@golkow.com
24
```

1    you know that there was a federal

2    non-prosecution agreement, you just don't

3    know when you knew that?

4         A.    I know at a certain point I

5    understood that there was a federal

6    non-pros agreement.  I can't tell you

7    exactly when.  And I can't tell you that

8    I knew precisely what the terms of it

9    were.

10        Q.    But you knew at some point

11   while you were general counsel at

12   JPMorgan and Jeffrey Epstein was a client

13   of the bank; is that fair?

14        A.    I believe I knew that there

15   was a non-pros agreement.

16        Q.    Okay.  You can put that

17   document away.

18             Do you recall, in 2008,

19   after Jeffrey Epstein pled guilty to the

20   child sex offenses, that private bank

21   wanted to exit Jeffrey Epstein as a

22   client of the bank?

23        A.    I do not.

24                  -  -  -

1          MR. GAIL:  Objection.

2          THE WITNESS:  I don't know

3      why you don't think it would make

4      any sense, but I could -- I could

5      conceive of -- if I had been

6      involved in approval in '08, I

7      could also conceive, in 2011,

8      having this view.

9  BY MS. LIU:

10      Q.    What happened between

11  possibly your approving him in 2008 and

12  your having this view in 2011,

13  Mr. Cutler?

14      A.    Well, among other things, I

15  think we would have seen the non-pros

16  agreement.  We would have reviewed a lot

17  of press that arose, I want to say in the

18  2010, early 2011 period.  We had some

19  direct experience with him in connection

20  with the claims that he was raising

21  against Bear Stearns.

22          And so I think whatever

23  judgment I had had in 2008, clearly by

24  this date in 2011, I did not believe that

1  Jeffrey Epstein should be a client of the

2  firm.

3       Q.    The press that arose said he

4  was being investigated for child sex

5  trafficking and human trafficking,

6  correct?

7       A.    I don't remember the

8  precise, but -- the precise parameters of

9  the press, but I remember there was a

10 series of articles about a new

11 investigation.  There were articles that

12 I remember pointed that he was -- he had

13 resolved claims with -- with a very large

14 number of women.

15            And, yeah, so I remember

16 those being among the articles, you know,

17 that we saw in 2010 or '11.

18      Q.    Who is Nina Shenker?

19      A.    At this point, she was the

20 general counsel of the asset management

21 business.

22      Q.    She was Mary Erdoes's

23 general counsel, correct?

24      A.    I'd never put it that way,

1    I'll represent to you, and you can -- you

2    can check me on this, 7/21/11, when you

3    say, I would like to put it and him

4    behind us, not a person we should do

5    business with period, was a Thursday.

6            A.    Okay.

7            Q.    And the him, just so it's

8    perfectly clear for the record, is

9    Jeffrey Epstein, correct?

10           A.    I believe that's right.

11                    -   -   -

12                (Whereupon, Exhibit

13           Cutler-23,

14           JPM-SDNYLIT-00754982-984, 7/22/11

15           E-mail, was marked for

16           identification.)

17                    -   -   -

18   BY MS. LIU:

19           Q.    I'm showing you what's been

20   marked as Exhibit-23.

21                So you'll see the top e-mail

22   on Exhibit-23 is from Nina Shenker to

23   Mary Erdoes on 7/22/2011 --

24           A.    I see it.

Stephen Cutler     Highly Confidential

1          Q.     -- the next day, correct?

2                 She writes, Imagine lots to

3     do upon your return to U.S. and for next

4     week.

5                 Do you see that?

6          A.     Yes.

7          Q.     And then there's a redacted

8     portion.  And then the next line says,

9     FYI, Steve, at conclusion of JE approval,

10    asked when we are off-boarding JE.  I

11    reminded him that we have the other

12    matter outstanding.

13                Do you see that?

14         A.     I do.

15         Q.     What was the JE approval?

16         A.     I don't know.  I mean, I

17    could make an assumption that it related

18    to this lawsuit, but I don't know.

19         Q.     So the day before you said

20    to Mary Erdoes, I want to put him behind

21    us?

22         A.     Correct.

23         Q.     Not a person we should do

24    business with?

1      A.    Correct.

2      Q.    Do you believe that Nina

3  Shenker is referring to an approval of

4  Jeffrey Epstein that predated July 21st,

5  2011?

6           MR. GAIL:  Objection.

7           MR. EDELMAN:  Objection to

8      form.

9           THE WITNESS:  I'm sorry, an

10     approval of him as a client?

11 BY MS. LIU:

12     Q.    Yes.

13     A.    No.

14     Q.    Okay.  Let me understand.

15           What do you believe, FYI

16 Steve, at conclusion of JE approval,

17 asked when we are off-boarding JE?

18     A.    I -- I don't think I would

19 have said when are we off-boarding him if

20 we were speaking about an approval of his

21 account.  It just -- the two things in

22 conjunction don't make sense to me.

23           I would think, just based on

24 the juxtaposition of Exhibit-22 versus

1   Exhibit-23 that it's somehow the approval

2   of the settlement.

3        Q.    I see.

4              Steve, at the conclusion of

5   the Jeffrey Epstein settlement approval?

6        A.    I -- that makes more sense

7   to me.

8        Q.    Okay.

9        A.    I don't remember it.

10       Q.    Okay.  Fine.  Just want to

11  try to understand what you think it

12  means.

13             So -- asked when we are

14  off-boarding Jeffrey Epstein.

15             That's consistent with your

16  telling Mary Erdoes and others in the

17  e-mail before this is not a person we

18  should be doing business with?

19             MR. GAIL:  Objection.

20             THE WITNESS:  Well, I think

21        the notion of off-boarding

22        somebody that I don't think we

23        should be doing business with, I

24        see how those things are

Stephen Cutler    Highly Confidential

```
1          consistent, yes.
2    BY MS. LIU:
3          Q.    And it's also consistent
4    that JPMorgan retained Jeffrey Epstein as
5    a client to deal with the Bear Stearns
6    litigation that Jeffrey Epstein had,
7    correct?
8          A.    I don't know that.
9          Q.    Because then she writes, I
10   reminded him that we have the other
11   matter outstanding.
12              Do you see that?
13         A.    I do.
14         Q.    So we had the one, it's been
15   approved, settlement is done.  But Steve,
16   from Nina, we've got that other
17   litigation with Jeffrey Epstein.
18              Do you recall that?
19         A.    I don't.
20         Q.    Do you recall the Zwirn
21   Highbridge Dubin litigation?
22         A.    I've now seen documents that
23   remind me there was -- there was another
24   claim that Epstein had.
```

Stephen Cutler          Highly Confidential

1          embarked upon was the only reason,

2          or even a primary reason, to exit

3          Mr. Epstein.

4    BY MS. LIU:

5          Q.    You had already decided

6    there were other reasons?

7          A.    Yeah.   I don't think I was

8    oblivious to the issue that William

9    raised.   But I -- in my own mind, I don't

10   remember it as being the core of the --

11   of the issue that drove my conclusion.

12         Q.    Do you recall William

13   Langford saying to you, AML

14   investigations does not want -- believe

15   we should retain Jeffrey Epstein as a

16   client, in early 2011?

17         A.    I don't remember him

18   referring to AML investigations in

19   particular.   I think what he communicated

20   to me was concern about the reputational

21   issues.   Those concerns are heightened,

22   if you will, by the human trafficking

23   initiative that we're doing, given that

24   he was convicted of these crimes.

Stephen Cutler   Highly Confidential

1

2

3

4

5

6

7   BY MS. LIU:

8       Q.   You can put that document

9   away.

10          Mr. Cutler, are you aware

11  that in or around 2020, Deutsche Bank was

12  fined by the New York State Department of

13  Financial Services $150 million in

14  connection with its conduct related to

15  Jeffrey Epstein's accounts?

16      A.   I believe I read about that.

17              -  -  -

18          (Whereupon, Exhibit

19      Cutler-39, No Bates, Department of

20      Financial Services Article, was

21      marked for identification.)

22              -  -  -

23  BY MS. LIU:

24      Q.   So I'm going to hand you the

1   press release that was issued by the New

2   York State Department of Financial

3   Services.  It's Exhibit-39.

4              And at the same time, I'm

5   going to hand you the actual consent

6   order by the New York State Department of

7   Financial Services.  And it's Exhibit-40.

8                    -  -  -

9              (Whereupon, Exhibit

10         Cutler-40, No Bates, Consent Order

11         Under New York Banking Law 39 and

12         44, was marked for

13         identification.)

14                    -  -  -

15  BY MS. LIU:

16       Q.    I would ask you to first

17  take a look at Exhibit-40 and see if you

18  recall that being the consent order that

19  you recall reading?

20             MR. GAIL:  Objection.  That

21         misstates.

22             THE WITNESS:  I don't think

23         I ever read the consent order.

24  BY MS. LIU:

1          Q.     Oh, you --

2          A.     I think you --

3          Q.     -- read about this at the

4    time?

5          A.     I think you asked me if I

6    was aware of it.  And I believe I read

7    about it.

8          Q.     Fair enough.  I

9    misunderstood you.

10         A.     And I don't -- I don't

11   believe I've ever seen this document

12   before.

13         Q.     You can put that document

14   away.  I just want to look at the press

15   release, then.

16         A.     Okay.

17         Q.     So you'll see the title is,

18   Superintendent Lacewell Announces DFS,

19   Department of Financial Services, Imposes

20   a $150 Million Penalty on Deutsche Bank

21   in Connection with Bank's Relationship

22   with Jeffrey Epstein.

23                And it also mentions

24   something unrelated to Jeffrey Epstein.

Stephen Cutler -- Highly Confidential

1              Do you see that?

2       A.    I do.

3       Q.    And if you turn to the

4  second page of the document and you go to

5  the first full paragraph, With respect to

6  the case of Jeffrey Epstein, before the

7  bullets.

8              Do you see that?

9       A.    Yes.

10      Q.    All right.  The bank failed

11 to properly monitor account activity

12 conducted on behalf of the registered sex

13 offender, despite ample information that

14 was publicly available concerning the

15 circumstances surrounding Mr. Epstein's

16 earlier criminal misconduct.

17             Do you see that?

18      A.    I do.

19      Q.    The bank -- The result was

20 that the bank processed hundreds of

21 transactions totalling millions of

22 dollars that, at the very least, should

23 have prompted additional scrutiny, in

24 light of Mr. Epstein's history.

1              And then it lists a number

2    of things, correct?

3         A.    Yes.

4         Q.    All right.  Payments to

5    individuals who were publicly alleged to

6    have been Mr. Epstein's co-conspirators

7    in sexually abusing young women.

8              Do you see that?

9         A.    I do.

10         Q.    JPMorgan also made

11    payments -- handled payments from

12    Mr. Epstein's accounts to individuals who

13    are publicly alleged to have been

14    Mr. Epstein's co-conspirators in sexually

15    abusing young women, correct?

16              MR. GAIL:  Objection.

17              THE WITNESS:  Are you

18         referring to the non-pros

19         agreement, which refers to certain

20         people as potential

21         co-conspirators?

22    BY MS. LIU:

23         Q.    Yes.

24         A.    And I'm -- just based on

1   what you said here today and what you

2   have shown me, there are payments that

3   were made out of Epstein accounts to one

4   or more of those individuals.

5        Q.    Next bullet, Settlement

6   payments totalling over $7 million

7   dollars, as well as dozens of payments to

8   law firms totalling over $6 million for

9   what appears to have been the legal

10  expenses of Mr. Epstein and his

11  co-conspirators.

12            Do you see that?

13       A.    I do.

14       Q.    And you recall earlier this

15  morning I showed you a spreadsheet that

16  contained many payments, many in the

17  amount of $100,000, from Jeffrey

18  Epstein's accounts to law firms and

19  lawyers?

20            Do you recall that?

21       A.    I do.

22       Q.    The next bullet, Payments to

23  Russian models, payments for women's

24  school tuition, hotel and rent

1    expenses -- and rent expenses and,

2    consistent public allegations of prior

3    wrongdoing, payments directly to numerous

4    women with Eastern European surnames.

5                Do you see that?

6        A.    I do.

7        Q.    And you'll recall we looked

8    at a document that showed payments to

9    women whose names, you said, could be

10   Russian or could be Eastern European.

11               Do you recall that?

12       A.    I should clarify, I mean,

13   they could be Americans with those names.

14               But I get the point that

15   there are certain names that you might

16   associate with Russian heritage or

17   Eastern European heritage.

18       Q.    Next one, Periodic

19   suspicious cash withdrawals, in total,

20   more than $800,000 over approximately

21   four years.

22               Do you see that?

23       A.    I do.

24       Q.    ████████████████████████

Stephen Cutler        Highly Confidential

1 ████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████████████████████████

4 ██████████████████████

5     ██   ████

6     ████████████████████████████████

7 ████████████████████████████████████

8 ████████████████████████████████████

9 ████████████████████████████████████

10 ███████████████████████████████████

11 ████████████████████████████████████

12 ████████████████████████████████████

13 ████████████████

14        Q.    And then if you turn to the

15 next page, you'll see the second sentence

16 begins, For example, certain conditions

17 imposed upon the Epstein accounts by a

18 bank reputational risk committee,

19 conditions that, if followed, might have

20 detected and prevented many subsequent

21 suspicious transactions were either not

22 transmitted to the majority of the

23 account relationship team or were

24 misinterpreted by a compliance officer.

1              Do you see that?

2       A.    I do.

3       Q.    Okay.  So you'll recall that

4  I -- we talked about this condition that

5  was imposed following rapid response

6  meetings that Epstein was to be a banking

7  only client.

8              Do you recall that?

9       A.    I do.

10      Q.    And then you'll recall

11  later, in the Justin Nelson KYC, there

12  were numerous entries which referred to

13  him as an active brokerage client?

14      A.    Right.

15            I -- what I don't know is

16  whether that was contemplated within the

17  panoply of activities that could take

18  place at the bank.

19      Q.    And then --

20      A.    Nor do I know that any of

21  those activities or the -- you know, if

22  those activities hadn't been affected,

23  that would have allowed for detection and

24  prevention of suspicious transactions as

Stephen Cutler   Highly Confidential

1    reflected in the sentence that you just

2    read.

3         Q.    And then after this section

4    I just read, related to Epstein, it moves

5    on to a different account, Don Esconia,

6    right?

7         A.    Yes.  I gather that the fine

8    imposed here was both for Epstein and for

9    other relationships that Deutsche Bank

10   had.

11        Q.    You can put that document

12   away.

13             MR. GAIL:  We've got you

14        with one minute left.

15             MS. LIU:  I have no further

16        questions, Mr. Cutler.  I

17        appreciate your time.

18             MR. GAIL:  Let me just

19        confer with my colleague, but I'm

20        sure we're done.

21             VIDEO TECHNICIAN:  Do you

22        want to go off the record?

23                  -  -  -

24             (Whereupon, a discussion off