# EXHIBIT 120

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3      _____
                                     |
 4   GOVERNMENT OF THE UNITED        |
     STATES VIRGIN ISLANDS,          |
 5                                   |
             Plaintiff,              |
 6                                   |
        vs.                          | Case No.
 7                                   | 1:22-cv-10904-JSR
     JPMORGAN CHASE BANK, N.A.,      |
 8                                   |
             Defendant.              |
 9      _____|
                                     |
10   JPMORGAN CHASE BANK, N.A.,      |
                                     |
11           Third-Party            |
             Plaintiff,             |
12                                   |
        vs.                          |
13                                   |
     JAMES EDWARD STALEY,            |
14                                   |
             Third-Party            |
15           Defendant.             |
        _____|
16
17            Wednesday, April 19, 2023
18        CONFIDENTIAL - ATTORNEYS' EYES ONLY
19
             Videotaped deposition of Phillip DeLuca, held
20   at the offices of Ulmer & Berne, 65 East State Street,
     Columbus, Ohio, commencing at 9:06 a.m., on the above
21   date, before Carol A. Kirk, Registered Merit Reporter,
     Certified Shorthand Reporter, and Notary Public.
22
23            GOLKOW LITIGATION SERVICES
                   877.370.DEPS
24                deps@golkow.com
```

Confidential - Attorneys' Eyes Only

```
 1          Q.    And then you say, "I hope they do

 2   not cave."

 3                What did you mean by that?

 4          A.    I hope the Private Bank exits the

 5   relationship.

 6                MS. OLIVER:  We've all signed the

 7          NDA now, right?  Has everybody signed

 8          it?

 9                Okay.

10                        - - -

11      (DeLuca Deposition Exhibit 12 marked.)

12                        - - -

13   BY MS. OLIVER:

14          Q.    Mr. DeLuca, I'm handing you what

15   has been marked as Exhibit 12.  Take a look at

16   that.

17          A.    Okay.

18          Q.    This is an e-mail chain involving

19   you, Ms. Ryan, and Arthur Middlemiss, correct?

20          A.    Yes.

21          Q.    Who is Arthur Middlemiss?

22          A.    Art was a direct report of mine.

23          Q.    Did he have the same -- what was

24   his job?
```

Confidential - Attorneys' Eyes Only

```
 1          A.    At this point in time, Art was the
 2   person who was responsible for more of that
 3   proactive work that we were doing.
 4          Q.    On human trafficking?
 5          A.    On typologies.
 6          Q.    So if you could look -- start with
 7   the e-mail that's at the bottom half of that
 8   first page from Ms. Ryan to you with a CC to Art
 9   Middlemiss, "Subject:  Jeffrey Epstein."
10                Do you see that?
11          A.    I do.
12          Q.    And then at the end of the first
13   paragraph, it says, "It involves an ask of
14   William, so I'm sending to you first."
15                William is William Langford?
16          A.    Wait a minute.  I'm lost here.
17          Q.    The end of the first paragraph.
18                MR. KRAUSE:  Before you do that,
19          I have just have a question for you.
20                At the end of the page, it appears
21          to end in the middle of a sentence.  Is
22          there -- it's on the back.  Thank you.
23   BY MS. OLIVER:
24          Q.    So the end of the first paragraph
```

1    says, "It involves an ask of William, so I am

2    sending to you first."

3           A.    Oh, I see that.

4           Q.    William is William Langford there?

5           A.    Yes.

6           Q.    The next paragraph she lists

7    attendees at the rapid response meeting,

8    correct?

9           A.    Yes.

10          Q.    Catherine Keating, Anne Verdon.

11                Do you know who Anne Verdon was?

12          A.    Anne was an attorney for the bank.

13   I believe she was specifically assigned to the

14   Private Bank.

15          Q.    The current and former banker, do

16   you know if that -- do you know who that was?

17          A.    No, I really don't.

18          Q.    Kevin, that's Kevin McCleerey,

19   right?

20          A.    I believe that's Kevin McCleerey.

21          Q.    Jim is Jim Dalessio?

22          A.    I believe that's Jim Dalessio.

23          Q.    And Bonnie Perry from risk?

24          A.    Yes.

1          Q.     And Art -- do you understand that

2    to be Art Middlemiss?

3          A.     Art Middle- -- Art handled the

4    rapid response meetings.

5          Q.     All of them?

6          A.     For a period of time.

7          Q.     How often were the rapid response

8    meetings?

9          A.     I don't know.  There was no set

10   schedule, that I recall.

11         Q.     Were rapid response meetings

12   unique to Private Bank, or did other segments of

13   the bank have them?

14         A.     They happen for any line of

15   business.

16         Q.     Do you know if Anne Verdon was

17   general counsel of the Private Bank at this

18   point in time?

19         A.     General counsel of the Private

20   Bank?  I'm not sure if that was a term -- I know

21   there was a general counsel, and that was

22   Cutler.  But I don't know if -- I don't know if

23   she was general counsel of Private Bank.  I knew

24   she was affiliated with Private Bank somehow.

1       Q.    Why does Ms. Ryan keep e-mailing

2   articles if the recommendation had been made

3   lots and lots of months earlier and still

4   nothing had been done?  Does the

5   investigation -- does her investigation just

6   remain ongoing at that point?

7                 MR. KRAUSE:  Objection.

8                 MR. GAIL:  Objection.

9       A.    You'll have to ask Maryanne that

10  question.

11      Q.    Well, as a matter of procedure,

12  I'm trying to understand --

13      A.    That wouldn't be a part of

14  procedure.

15      Q.    Keeping the investigation open?

16      A.    No.

17                MR. KRAUSE:  Objection.

18      A.    No.  Sending e-mails wouldn't be a

19  part of procedure.

20      Q.    So did you have an understanding

21  about why she was doing it?

22      A.    Maryanne was all -- as I mentioned

23  before, Maryanne was all over this, and like

24  myself and William, Maryanne wanted to see this

Confidential - Attorneys' Eyes Only

1    client gone, the relationship terminated.

2         Q.    So was there -- did you or ALM

3    investigations generally ever receive word, "No,

4    we are not exiting Mr. Epstein"?

5              MR. KRAUSE:  Objection.

6              You can answer.

7         A.    I don't know if we ever received

8    word specific to that.

9         Q.    But all this information that

10   she's e-mailing is part of her ongoing

11   investigation into Mr. Epstein, correct?

12             MR. KRAUSE:  Objection.

13        A.    It appears to be.

14        Q.    And does there come a point in

15   time at which she's supposed to stop her

16   investigation?

17        A.    Good luck.  Try to tell Maryanne

18   to stop.

19                    - - -

20      (DeLuca Deposition Exhibit 21 marked.)

21                    - - -

22   BY MS. OLIVER:

23        Q.    I've handed to you what has been

24   marked as Exhibit 21.