# EXHIBIT 274

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Expert Report of Shaun O'Neill, CPA, CFF, CFE**

**Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)**

*Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A.*
**Case No. 1:22-cv-10904-JSR**

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## Table of Contents

Introduction and Background ....................................................................................... 3

U.S. Anti-Trafficking Law ........................................................................................... 5

Bank Secrecy Act ........................................................................................................ 6

U.S. Money Laundering and Structuring Law ............................................................ 9


Conclusion 1:    The numerous accounts of underage victims being recruited by Jeffrey Epstein and associates into an organized ring of commercial sex exploitation is consistent with human trafficking.  JPMC had actual knowledge of information demonstrating Epstein's involvement in human trafficking. .............................................................................. 11

Conclusion 2:    ███████████████████████, there would have been law enforcement inquiry at an earlier stage. This information would have led to federal charges against Epstein. ...................................................................... 15

Conclusion 3:    JPMC's ████████████████████████████ ██████ impeded federal law enforcement's ability to learn of Jeffrey Epstein's crimes as well as the crimes of those who aided him. ......... 19


Appendix A:    Curriculum Vitae ................................................................................. 27

Appendix B:    Materials Relied On ............................................................................. 29

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Introduction and Background**

My name is Shaun O'Neill. I am Managing Director of Prism Investigations and Examinations ("Prism") located in New London, North Carolina.  Prior to my position at Prism in 2023, I was a liaison to law enforcement and state agencies for General Dynamics IT working on the Healthcare Fraud Prevention Partnership ("HFPP"), a Centers for Medicare and Medicaid Services fraud, waste, and abuse contract.  Before the HFPP, I was a Special Agent with the Federal Bureau of Investigation ("FBI") for over 23 years, retiring in 2021.

During my career, I have conducted and led investigations of health care fraud, securities fraud, public corruption, obstruction of justice, human trafficking, money laundering, asset forfeiture and seizures, organized crime, and narcotics. As part of these investigations, I have performed extensive financial analysis to include investigating allegations of money laundering and structuring of financial transactions. Prior to retiring from the Bureau, I spent five years supervising a squad of Agents and Analysts who investigated health care fraud, human trafficking, public corruption, and civil rights.  I have investigated and supervised more than ten human trafficking cases that included child sex trafficking.  In the majority of both white collar crime and human trafficking cases in which I have been involved, either money laundering and structuring of financial transactions, or both were implicated.  As part of those investigations, I reviewed Suspicious Activity Reports and Currency Transaction Reports.  Each of those investigations were enhanced by the timely filing of a detailed SAR as well as receiving amended SARs as the suspicious activity continued.   Additionally, I served as the Human Trafficking Program Coordinator for the FBI Miami Division for three years and was a member of the Palm Beach Human Trafficking Task Force.  My responsibilities included case intake for all Human Trafficking cases within the Southern District of Florida, liaison with both state and

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

federal prosecutors and delivering training.  I also am the Co-Founder of the Greater Palm Beach Health Care Fraud Task Force.

I am a Certified Public Accountant licensed in the States of Maryland and Florida, as well as accredited Certified in Financial Forensics by the American Institute of Certified Public Accountants ("AICPA").  I am also a Certified Fraud Examiner.  I have a Bachelor of Science in Economics from Towson University.

I have also been drawn heavily into the criminal justice and professional training environments to share the expertise in human trafficking that I have developed. I have delivered human trafficking trainings for public/private organizations, which include fire rescue, hospital personnel, airline employees, prosecutors, students, and law enforcement.

I have personal knowledge of the matters and materials stated in this report and accompanying exhibits and would testify truthfully to them if called upon to do so. I was initially provided with a production of records to begin my examination and subsequently I requested additional documents to aid in my review.  This report does not purport to set forth all of my knowledge of the investigation into this matter.  I reserve the right to supplement my report as additional information is obtained.  In reaching my conclusions regarding this case, I draw on my over 23 years of law enforcement experience conducting complex investigations involving financial transactions, my experience in human trafficking investigations, as well as my background in financial forensics. I am being compensated at the rate of $300 per hour for my work in this matter.  No part of my compensation is contingent on the outcome of the case.  As regards this case specifically, I have reviewed the relevant parts of the materials listed in **Appendix B.**

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**U.S. Anti-Trafficking Law**

I provide the description of the relevant legal framework in order to establish context for my opinions and definitions of terms as I use them, not as expert opinion regarding legal questions.

"'Trafficking in persons,' 'human trafficking,' and 'modern slavery' are umbrella terms - often used interchangeably – to refer to a crime whereby traffickers exploit and profit at the expense of adults or children by compelling them to perform labor or engage in commercial sex. When a person younger than 18 is used to perform a commercial sex act, it is a crime regardless of whether there is any force, fraud, or coercion involved."[1]  Human trafficking under U.S. law was transformed with the enactment of the Trafficking Victims Protection Act (the TVPA) in 2000.[2] The TVPA equipped law enforcement, prosecutors and victim advocates with new tools and resources to mount a comprehensive and coordinated strategy to combat modern forms of slavery both domestically and internationally.  The TVPA established three pillars to fight human trafficking: protection, prevention, and prosecution.  The TVPA enhanced the ability of federal prosecutors to bring human traffickers to justice by adding new criminal provisions with respect to all forms of trafficking to include sex trafficking of children.  The law provided a definition of human trafficking, specifically defining "severe forms of trafficking in persons" as "sex trafficking in which a commercial sex act that is induced by force, fraud, or coercion, or in

---

[1] Trafficking In Persons Report, U.S. Dep't of State (2022), at 39, https://www.state.gov/wp-content/uploads/2022/10/20221020-2022-TIP-Report.pdf.
[2] *See* Victims of Trafficking and Violence Protection Act of 2000, Division A of the Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 – 114 Stat. 1491, 22 U.S.C. § 7101-§ 7110.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

which the person induced to perform such act has not attained 18 years of age."[3] The law

expanded the actions that may be part of a sex trafficking scheme:

> Whosoever knowingly—
> (1) …recruits, entices, harbors, transports, provides, or obtains by any means a person; or
> (2) benefits, financially or by receiving anything of value . . . knowing that force, fraud, or coercion . . . will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished….[4]

In reference to sex trafficking of a minor with great relevance to the numerous victims at

the hands of Jeffrey Epstein, minors need not demonstrate force, fraud, or coercion were used

against them to induce them to engage in a commercial sex act.  Rather, U.S. law has firmly

established that minors cannot consent to commercial sex.  Additionally, there is recognition that

many forms of human trafficking do not involve force but rather occur through psychological

manipulation against victims.

**Bank Secrecy Act**

Criminals have long used money-laundering schemes to conceal or "clean" the source of

fraudulently obtained funds and to further promote illegal activity. Money laundering poses

significant risks to the safety and integrity of the U.S. financial industry as well as to the safety

of the public. Through sound operations, banks play an important role in helping investigative

and regulatory agencies identify money-laundering entities and take appropriate action.

The Bank Secrecy Act (BSA) establishes program, recordkeeping and reporting

requirements for national banks, federal savings associations, federal branches, and agencies of

---

[3] *Id.*
[4] *Id.*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

foreign banks.[5] Furthermore, the U.S. Treasury Department's Office of the Comptroller of the Currency ("OCC") prescribes regulations, conducts supervisory activities and, when necessary, takes enforcement actions to ensure that national banks have the necessary controls in place as well as to provide the requisite notices to law enforcement to deter and detect money laundering, terrorist financing and other criminal acts and the misuse of our nation's financial institutions. The OCC has implemented suspicious activity reporting to combat violations of Federal law, money laundering, and violations of the BSA.[6]  The BSA was also amended to incorporate the provisions of the USA PATRIOT Act which requires every bank to adopt a customer identification program as part of its BSA compliance program.[7]

Within the framework of the BSA are two important reporting functions: Suspicious Activity Reports ("SARs") and Currency Transaction Reports ("CTR").[8]  Under the BSA, financial institutions are required to assist U.S. government agencies in detecting and preventing money laundering, such as: (i) keep records of cash purchases of negotiable instruments, (ii) file reports of cash transactions exceeding $10,000 (daily aggregate amount), and (iii) report suspicious activity that might signal criminal activity (e.g., money laundering, tax evasion).[9]  A financial institution is required to file a suspicious activity report no later than 30 calendar days after the date of initial detection of facts that may constitute a basis for filing a suspicious activity report.[10] If no suspect was identified on the date of detection of the incident requiring the filing, a financial institution may delay filing a suspicious activity report for an additional 30

---

[5] 31 U.S.C.  §5311 et seq.
[6] 12 CFR § 21.11 and 12 CFR § 21.21.
[7] 31 CFR § 1020.220.
[8] 31 U.S.C. § 5311 et seq.
[9] *Id.*
[10] *Id.*

calendar days to identify a suspect.[11] In no case shall reporting be delayed more than 60 calendar days after the date of initial detection of a reportable transaction.[12]

Furthermore, under the BSA and related anti-money laundering laws, banks must: (i) establish effective BSA compliance programs; (ii) establish effective customer due diligence systems and monitoring programs; (iii) screen against Office of Foreign Assets Control (OFAC) and other government lists; (iv) establish an effective suspicious activity monitoring and reporting process; and (v) develop risk-based anti-money laundering programs.  Therefore, woven into the BSA is the requirement that a bank must know its client ("KYC"). KYC includes knowing the client's source of wealth, business, and derogatory or other information.

Training conducted by JPMC's AML staff on their presentation of "ABCs of AML Compliance" reflects these requirements of the BSA:

- "AML procedures are critical in assessing customer risk required by federal law, and aim to prevent banks from being used in criminal activities."
- "**Customer Due Diligence** is an ongoing responsibility to monitor the customer's actual activity or transactions.  That includes cash, as well as other account activity, such as check, wires, credit card charges, and loans."
- "Due diligence is conducted in light of what the bank knows about the customer's business and any derogatory information."
- "The level of due diligence corresponds with risk, with high-risk customers reviewed more frequently and rigorously."[13]

As William Langford testified, with regard to JPMC's KYC obligations, "Banks need to make sure a potential customer is trustworthy."[14]

---

[11] *Id.*

[12] *Id.*

[13] Langford Dep. Ex. 3.

[14] Langford Dep. Ex. 3.  Epstein became a JPMC client in 1985, yet some 25 plus years later JPMC AML Group was unable to identify Epstein's source of wealth or his clients, effectively rendering useless their KYC compliance component as it regards Epstein.  On January 14, 2011, the primary JPMC AML Investigator looking into Epstein emailed senior management, "Here is

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

### U.S. Money Laundering and Structuring Law

To be criminally culpable of money laundering under 18 U.S.C. § 1956, a defendant must conduct or attempt to conduct a financial transaction, knowing that the property involved in the financial transaction represents the proceeds of some unlawful activity, with one of the four specific intents discussed below, and the property must *in fact* be derived from a specified unlawful activity.[15]  In conducting the financial transaction, the defendant must have acted with one of the following four specific intents:  (1) intent to promote the carrying on of specified unlawful activity; (2) intent to engage in tax evasion or tax fraud; (3) knowledge that the transaction was designed to conceal or disguise the nature, location, source, ownership or control of proceeds of the specified unlawful activity; or (4) knowledge that the transaction was designed to avoid a transaction reporting requirement under State or Federal law in violation of Currency Transaction Reports, Currency and Monetary Instruments Reports or Internal Revenue Service Form 8300.[16]

Similarly, prosecutions under 18 U.S.C. § 1957 for illegal monetary transactions arise when the defendant knowingly conducts a *monetary* transaction in criminally derived property in an amount greater than $10,000, which is in fact proceeds of a specified unlawful activity.[17] A monetary transaction is defined as a deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument.[18]

---

why I would like to know who his clients are" in response to an article about whether Epstein was running a Ponzi scheme.  Langford Dep. Ex. PM11 (JPM-SDNYLIT-00152808).

[15] 18 U.S.C. § 1956 et seq.

[16] *Id.*

[17] 18 U.S.C. § 1957 et seq.

[18] *Id.*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The most significant difference from § 1956 prosecutions is the intent requirement. Under § 1957, the four intents have been replaced with a $10,000 threshold amount for each non-aggregated transaction and the requirement that a financial institution be involved in the transaction.[19]  Although the prosecutor need not prove any intent to promote, conceal or avoid the reporting requirements, it still must be shown that the defendant knew the property was derived from some criminal activity and that the funds were in fact derived from a specified unlawful activity.

The law governing structuring transactions to evade reported requirements is contained in 31 U.S.C. § 5324.[20]  Structuring involves the following:  (1) knowledge of the currency transaction reporting requirements; (2) knowingly and willfully structured, assisted in structuring, attempted to structure or attempted to assist in structuring a currency transaction; (3) the purpose of the structured or attempted transaction was to evade the currency transaction reporting requirements of § 5313(a); (4) the defendant knew that structuring was unlawful; and (5) that the structured transaction(s) involved one or more domestic financial institutions.[21]

Human trafficking is considered one of the most profitable criminal enterprises in the world, with the potential to generate significant ongoing profits for its perpetrators.[22]  With those factors in mind, human trafficking qualifies as a money laundering predicate offense – which means that it is a criminal offense which necessitates money laundering as a subsequent, connected criminal offense.

---

[19] *See* 18 U.S.C § 1956 et seq and 18 U.S.C § 1957 et seq.
[20] *See* 31 U.S.C § 5324 et seq.
[21] *Id.*
[22] *See, e.g.*, Trafficking In Persons Report, U.S. Dep't of State (2022), at 39, https://www.state.gov/wp-content/uploads/2022/10/20221020-2022-TIP-Report.pdf.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Conclusion 1:**       **The numerous accounts of underage victims being recruited by Jeffrey Epstein and associates into an organized ring of commercial sex exploitation is consistent with human trafficking.**

                                        **JPMC had actual knowledge of information demonstrating Epstein's involvement in human trafficking.**

Based on my law enforcement experience in investigating human trafficking cases and interviewing victims of human trafficking, it is my opinion that Epstein was engaged in human trafficking. In reaching that conclusion, I rely on Epstein's targeting of underage victims that are members of a vulnerable population, which is a characteristic of the human trafficking cases I have worked and supervised. ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

█████████.[23] Based on the review of the 17 victim statements contained within the July 25, 2006 Palm Beach Police Department Incident Report, more than ten victims were under the age of 18.[24] The elements of child sex trafficking were present as the allegations referenced a commercial sex act involving a minor and there is no such thing as a "child prostitute." The allegations reflected a textbook definition of human trafficking. I have reviewed the expert report of Bridgette Carr and rely on her report, with which I concur, which articulates why Epstein was a human trafficker. Hence, in July 2006, Epstein was an alleged human trafficker, and JMPC was aware of the allegations. Then, in 2008, Epstein's guilty plea established definitively that he was a human trafficker. JPMC again was aware of this fact.

The Florida Epstein investigation was well documented in both local and national news media. The news coverage was closely monitored by JPMC employees who reviewed

---

[23] JPM-SDNYLIT-00000183.
[24] Palm Beach Police Incident Report (July 25, 2006).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

derogatory information on clients as part of their duties.  From inception, Epstein vigorously

challenged the allegations, hiring a team of lawyers that included Gerald Lefcourt, Jay

Lefkowitz, Ken Starr, Michael Tein, Roy Black, Alan Dershowitz, and others. Epstein's primary

criminal defense was an attack on the credibility of the victims; this is known as "victim

shaming."  The case involved young, economically disadvantaged children from the Palm Beach

community saying they had been sexually molested by Epstein and that they had been paid

hundreds of dollars of cash in hush money payments.[25]  Epstein's criminal defense team

portrayed him as a legitimate businessman and philanthropist who had never engaged in any

even marginally suspicious activity in his life prior to that point. While dozens of children were

telling the same stories, in large part, the case was Epstein's word against theirs.  The

information in the possession of JPMC, including information about Epstein's cash withdrawals,

would have corroborated the victims' accounts of receiving cash in exchange for sexually

charged massages.

Shortly after Epstein's guilty plea on June 30, 2008,[26] JPMC published a document titled,

"AML Operations Human Trafficking Overview."[27]  The document states, "In most cases the

victims of human trafficking are targeted based on the vulnerability of their current situation.

Children and women are often the victims that are coerced. . . ."  It further describes major forms

of human trafficking and that "[e]very year thousands of women and children are lured into

sexual slavery by various means.  While the average age of most victims is between 18 and 24, it

is estimated that nearly ten percent are younger."[28]  Also referenced is "a 2005 report published

---

[25] *See, e.g.*, Palm Beach Police Incident Report (JDoe_DBAG_005374).
[26] Samuel Goldsmith, *Jeffrey Epstein Pleads Guilty to Prostitution Charges*, N.Y. Post (June 30, 2008) https://nypost.com/2008/06/30/jeffrey-epstein-pleads-guilty-to-prostitution-charges.
[27] Langford Dep. Ex. 14 (JPM-SDNYLIT-00174047).
[28] Langford Dep. Ex. 14 (JPM-SDNYLIT-00174047-00174052).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

by the U.S. Department of State," which found that "about $9.5 billion are generated from trafficking activities, with almost half coming from sexual exploitation."[29]   JPMC thereby evidenced a detailed institutional awareness of the nature of human trafficking, its victims, and the interplay with trafficking and money laundering.

JPMC deepened its awareness of human trafficking in 2010, when it initiated a Human Trafficking Project that included both transactional analysis as well as input from law enforcement and victim advocates.  As part of the research, JPMC met with a human trafficking victim.  The victim provided multiple insights on how sex trafficking rings conduct business to include what human traffickers look for when seeking out a financial institution and reg flags.

"Notably, she [the victim] stated that the ring targeted bankers who could be enticed to 'look the other way' when taking cash deposits…." [30]

Furthermore, she went on to describe payments for sexual services in round-dollar transactions from $300 to $500, up to $1,500.[31]  The pattern of activity described is similar to Epstein's as further discussed in this report.

Contained within the November 2010 presentation titled, "JPMC Corporate AML Compliance Human Trafficking Finance: Nature, Scope and Control Project," included the following findings:

"Most troubling, the project uncovered nine accountholders that posted advertising abroad seeking workers to come to the U.S. for legitimate purposes while, at the same time, were advertising the sex trade in the U.S. under false pretenses.  Project execution related to this typology resulted in recommendations to exit almost 200 accounts."[32]

---

[29] *Id.*
[30] Deluca Dep. Ex. 2 (JPM-SDNYLIT-00173983).
[31] *Id.*
[32] JPMC Corporate AML Compliance "Human Trafficking Finance: Nature, Scope and Control Project" (Nov. 2010) (JPM-SDNYLIT-00173974).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Notably, however, not included in the recommendations to exit accounts were any of Epstein's accounts.  In my professional experience, in every case on which I have investigated, human traffickers require means to launder their funds.  JPMC had acknowledged what human trafficking looked like and exited almost 200 accounts based on this awareness, but omitted the Epstein accounts.  It cannot be claimed that JPMC did not know who Epstein was.  The bank's communications make clear that it had information on exactly who he was and what he had been accused of and pled guilty to.  JPMC personnel referenced him in emails in the following manner: "Sugar Daddy"[33], "I was just Googling Maryanne's perv.  What a slime."[34], "…Epstein, the sleazy PB client,"[35] "a known child sleaze,"[36] and "I sent you an e-mail yesterday on that scum Epstein."[37]  The comment referencing Epstein's activities as a "Sugar Daddy" is a mischaracterization of what human trafficking is and is not.  The victims of human trafficking, many of whom in this case were children, cannot consent.  This is coercion of a child paying a nominal amount of money for sexually victimizing them.  The terms Sugar Daddy and human trafficker are not synonymous.

The information gleaned from the project was so important that JPMC's Managing Director of Global Financial Intelligence Unit touted the findings from major AML Conferences all the way to the White House.[38]  Human trafficking training was also provided to JPMC's investigations staff.[39]

---

[33] Langford Dep. 377:13-14.
[34] DeLuca Dep. 215: 10-13.
[35] DeLuca Dep. Ex. 11 (JPM-SDNYLIT-00194062).
[36] DeLuca Dep. 127:20-24 128:1-7 (JPM-SDNYLIT-00194018).
[37] Langford Dep. 276:16-20.
[38] DeLuca Dep. 98:19-21.
[39] DeLuca Dep. 97:12-21.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Epstein was a convicted felon and a level 3 sex offender.  But he was also an ultra-high net worth, Private Banking client, who at times had an asset balance of more than $200 million in JPMC accounts.[40]  In the face of an onslaught of additional allegations, JPMC Executive Management determined the best course of action in 2011 was instead simply to ask Epstein (and his attorney Ken Starr) whether Epstein was continuing the behavior which led to his guilty plea and conviction.  On January 27, 2011, Paul Morris emailed James Delassio, "Jes Staley discussed the topic with Jeffrey Epstein who replied there was no truth to the allegations, no evidence and was not expecting any problems.  We will continue to monitor the accounts and cash usage closely going forward."[41]  Hence, despite its deep institutional knowledge of the warning signs for human sex trafficking, JPMC ignored those signs and instead took the word of Epstein as true.

**Conclusion 2:**       ████████████████████████████████████████████ **there would have been law enforcement inquiry at an earlier stage. This information would have led to federal charges against Epstein.**

Two sets of individuals and/or entities view financial transactions in real time.  One is the individual initiating the transaction and the other is the financial institution and its employees who process and review the transaction.  Jeffrey Epstein's trafficking crimes always required significant amounts of cash on hand.[42] ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[40] Langford Dep. Ex. 29 (JPM-SDNYLIT-00152757).
[41] Langford Dep. 399:2-20; Langford Dep. Ex 42 (JPM-SDNYLIT-00012641).
[42] Palm Beach Police Incident Report (July 25, 2006) at 71.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

███████████████████████  ████████████████████████[43]  ██████

███████████████████████████████████

████████████████████████████████████████████

████████████████████████  █  █████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████

The 2003 FINCEN "Guidance on Preparing A Complete & Sufficient Suspicious

Activity Report Narrative" details the importance of not only the substance of the SAR, but the

timeliness:

- o "In many instances, SARs have been instrumental in enabling law enforcement to initiate or supplement major money laundering or terrorist financing investigations and other criminal cases."
- o "Financial institutions are required to submit SAR forms that are complete, sufficient and timely filed."
- o "Because the SAR narrative serves as the only free text area for summarizing suspicious activity, it is essential that financial institutions' staff write narratives that are clear, concise, and thorough."[45]

Epstein was able to withdraw large amounts of cash from his JPMC accounts for years

████████████████████████████████.  In the year 2003, Epstein was able to

---

[43] *See, e.g.*, JPM-SDNYLIT-W-00025790 ████████████████████████████.

[44] JPM-SDNYLIT-W-00025790 ████████████████████████████.

[45] Langford Dep. Ex. 7.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

withdraw highly suspicious amounts of cash totaling $175,311. In 2004, he withdrew $840,000.

In 2005, he withdrew $904,337. In 2006, he withdrew $938,625. In 2007, he withdrew $526,000.

In 2008, he withdrew $469,000. In 2009, he withdrew $165,011. In 2010, he withdrew $253,397.

In 2011, he withdrew $260,000. In 2012, he withdrew $290,000. In 2013, he withdrew

$197,152.[46]

"All crime causation theories agree that both opportunity and motivation must exist for a

crime to occur."[47] Illicit financial activity, including money laundering and structuring, are the

lifeblood of an ongoing criminal enterprise.  FBI Agents, Analysts, and Forensic Accountants

trace illegal proceeds in organized crime investigations; simply put, they "follow the money."

Investigations are puzzles and financial transactions are one of the most valuable pieces of

evidence.  With each puzzle piece gained, associates are identified, businesses are linked, new

crimes uncovered, and timelines are completed.

The FBI relies on financial institutions as a key partner to comply with federal

regulations to obtain the information necessary to answer the questions of who, what, when,

where, and why.  Financial transactions provide investigators with invaluable information to

connect the dots.  If during the course of the FBI's investigation into Epstein, the FBI had

learned of the evidence held by JPMC in a timely manner, Epstein likely would have been

charged with money laundering, structuring, and likely other federal financial crimes at a much

earlier point of time.  It is not uncommon for major financial institutions to meet with the FBI.

Based on my experience as a Special Agent, the FBI has an InfraGard program that allows

---

[46] Expert Report of Jorge Amador, Figure 8: CTRs Relating to Epstein Accounts By Year.
[47] J.W. Coleman, *Crime and Money: Motivation and Opportunity in a Monetarized Economy*, 35
Am. Behavioral Scientist 6 (July 1992), https://www.ojp.gov/ncjrs/virtual-
library/abstracts/crime-and-money-motivation-and-opportunity-monetarized-economy.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

members to share information in a trusted environment. [48]   This is a partnership between the FBI and private companies, including banks, with approximately two-thirds of Fortune 500 companies as members.

Phillip DeLuca testified he met daily with the FBI and on one occasion, specifically about Epstein. [49]   He testified "…The purpose of my call was specifically to exchange information…To gather information on what their investigation was…"  This vague reference to contacting the FBI raises more questions than it answers.  Did DeLuca provide the information in writing?  Was the information provided detailed in nature to include Epstein's associates, his businesses and types of activities such as large amounts of cash?  Did DeLuca reference a SAR or state one would be filed in a timely manner?  DeLuca stated he did not hear back from the Agent.  Did DeLuca follow-up?  The method for reporting such suspicious activity is to file a SAR and follow-up with a phone call or an email given the allegations reference human trafficking.  This information is important and in my many years of law enforcement experience should have warranted a constant stream of information from JPMC to the FBI about Epstein's ongoing suspicious activity.

Based on my experience, the minimum sentence for the crimes that Epstein committed would have been 20 years.  Epstein's crimes were not misdemeanors.  They were, by all accounts, horrific crimes against women and children.  Human trafficking is an ongoing crime, with harm incurred every day that the crime continues.  With the crime of human trafficking

---

[48] John S. Pistole, Deputy Director, U.S. Fed. Bureau of Investigation, Prepared Remarks for American Bankers Association/American Bar Association Money Laundering Enforcement Conference (Oct. 22, 2007),  https://archives.fbi.gov/archives/news/speeches/the-fbi-and-the-financial-sector-working-together-to-protect-our-citizens-and-our-economy.
[49] DeLuca Dep. 150:12-24, 151:1-18.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

requiring large amounts of cash, the timely filing of accurate and complete SARs is critical for

law enforcement to do its part to stop the crime.

**Conclusion 3:**   **JPMC's** ███████████████████████████
███████ **impeded federal law enforcement's ability to learn of Jeffrey Epstein's crimes as well as the crimes of those who aided him.**

The definition of "impede" is "to make it more difficult for something to happen or more

difficult for someone to do something."[50]

William Langford in his deposition agreed with the statement: "'It is the responsibility --

of every staff member of the Firm to determine, to the extent practical, whether transactions

performed for a client are consistent with the legitimate conduct of the customer's business or

personal affairs. The purpose is to ensure that the Firm,' capital F, 'does not unwittingly assist in

any illegal practices or assist a client seeking to deceive law enforcement agencies by not

providing information as required by law or regulation."[51]

Langford went on to agree that:

- o   "The failure to adequately describe the factors making the transaction or activity
  suspicious undermines the very purpose of the SAR and lessons its usefulness to
  law enforcement."
- o   "[L]ate filings, absence of supplementary SARs, and/or inaccuracies in SARs
  have an impact upon law enforcement's ability to determine whether a crime was
  committed or continues to be committed, and the extent of any possible criminal
  activity that has been committed."[52]

These are part of the Bank Secrecy Act.  Epstein continued his criminal activity after his

arrest in 2006 and conviction in 2008.  This was an ongoing sex trafficking ring.[53]  JPMC

---

[50]"Impede," Cambridge Dictionary,
https://dictionary.cambridge.org/us/dictionary/english/impede.
[51] Langford Dep. Ex. 11, 155:1-17.
[52] Langford Dep. Ex. 7; Langford Dep. at 121:12-121:9.
[53] *See, e.g.*, Expert Report of Bridgette Carr.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

knew of the urgency to report activity involving the human trafficking.  As part of their research

and findings on human trafficking, they learned that members of the Central Ohio Rescue and

Restore Coalition included a "***24-hour response to victims*** [emphasis added]...."[54]  Human

trafficking and the financial crimes used as a vehicle to continue those crimes require an

immediate response.  Ideally, an institution not only files a SAR but in a severe case also picks

up the phone and calls law enforcement for actions deemed necessary.  ███████████████

████████████████████████████████████████████████████████████

███████.  ████████████████████████████████████████████  The sheer

amount of cash being disbursed by Epstein year after year with continual derogatory information

obtained by JPMC is – on its face – suspicious.  Epstein's pattern of using cash as a vehicle to

commit crimes did not stop until he was ultimately exited from JPMC in 2013, and disclosure of

the continued use of large amounts of cash and the payments to women would have supported

the investigation before Epstein's plea in 2008 and after, including the investigation(s) reported

in or around 2011.  This information, along with the information on MC2 discussed below, ██

████████████████ and outreach to law enforcement, would have been especially

important to show that Epstein's trafficking did not end when he left jail.  Financial institutions

have this information; law enforcement agencies and governments do not.  This hindered law

enforcement's ability to understand Epstein's continuing crimes.  The FBI vigorously

investigates crimes involving human trafficking and money laundering.  Had the FBI been

notified of this ████████ banking activity all being related to Epstein, there would have been

---

[54] DeLuca Dep. Ex. 2 (JPMC-SDNYLIT-00173983).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

much earlier law enforcement inquiry, investigation, and charges.  He would not have been able

to continue his criminal activity from 2008 onward.

JPMC had the following:

- o Experienced AML Staff
- o Knowledge of BSA Law and its requirements
- o Software systems implemented to monitor for suspicious activity
- o Knowledge Epstein was a convicted felon and level 3 sex offender
- o Knowledge Epstein was a high-risk, ultra high net worth, Private Bank client with extensive derogatory information
- o Real time transactions of Epstein, his businesses, and his associates
- o Deep understanding of Human Trafficking and red flag indicators
- o Knowledge Epstein had a deep friendship with Jes Staley

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████

Kevin McCleery's November 13, 2008 email to James Dalessio with a copy to Bonnie

Perry stated, "█████████████████"[55] responding to ███████████████

█████████████████████████████████

On May 28, 2010, an email exchange between James Dalessio, Matthew Lupo, and

Bonnie Perry writes, "███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████"[56]  On December 3, 2010, a group email that included Kevin McCleerey and

James Delessio "…████████████████████████████████."[57] ███████████

[55] McCleerey Dep. Ex. 14 (JPM-SDNYLIT-W-00024117).
[56] JPMC-SDNYLIT-00100197-98.
[57] JPMC-SDNYLIT-00152738; JPM-SDNYLIT-00100349.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

███████████████████████████████████████████████████

██████████████████████.

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████. [58]  Several 2010 news articles were also included in full about new allegations of sex trafficking naming Epstein.  Incredibly, as with the prior two RRT meetings, the conclusion was "no change to relationship approach." [59] Even more surprising was that thereafter, JPMC expanded its business footprint with Epstein.

What was notably lacking at the RRT meetings was a discussion about the law, Epstein's ongoing suspicious cash withdrawals, and the reporting of the information at their fingertips to law enforcement.  Rather, with each RRT memo recapping the meeting, a reference was always made to how many millions of dollars of assets Epstein maintained in JPMC accounts.  The implicit emphasis, thereby, appeared to be on the importance of the client due to the account balance rather than on the legal compliance requirements.

From 1985 until he was exited in the summer of 2013, Epstein maintained over 100 JPMC accounts.  The money movement between these accounts is highly suspicious.  Wire transfers were made between different Epstein accounts and then disbursements were made directly or indirectly to women.  For the ten-year time period 2003 to 2013, more than $3 million was paid by Epstein to women, many of whom had Eastern European surnames. One of the women who received more than $700,000 was ███████████, who was identified in JPMC due diligence documents as being "████████████████████████████.

---

[58] JPMC-SDNYLIT-00119644_R_002.
[59] *Id.*

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

████████████████████████████████████████████████████████████████████

████████████████████████████████

For example, Phillip DeLuca emailed Maryanne Ryan, on January 3, 2011, "████████████

████████████████████████?"  Response: "█████████████████████████████"[60]

Four days later, Maryanne Ryan writes to Phillip DeLuca with a cc: Arthur Middlemiss

referencing two Palm Beach Post articles saying the Department of Justice may be investigating

Epstein for child trafficking via a modeling agency in which he is a part owner.  The email goes

on "…I also spent a good deal of time looking at his assistant or young lady he brought over

from Prague…she opened accounts in PB sponsored by him…DOJ investigation is saying they

brought under age girls to the US via a modeling agency M2 that is owned by a guy named

Brunel.  Turns out the banker said today we extended a loan in relation to this modeling

agency…"[61]  JMPC's own research on how people were lured into human trafficking was via

modeling agencies.  Langford went on to state that using model agencies was "Among the many

ways in which we were looking to try to identify possible recruitment and selection."[62]  On

January 13, 2011, Shari James emailed Paul Morris "The Stand by Letter of Credit is in the name

of Jeffrey Epstein for $1mm…to backstop a loan from Mellon to MC2 Models Management,

LLC…"[63] ████████████████████████████████████████████

████████████

On August 5, 2011, Bonnie Perry stated via email, "██████████████████████

████████████████████████████████████████████████████

---

[60] DeLuca Dep. Ex. 12 (JPM-SDNYLIT—W-00021926).
[61] Langford Dep. Ex. 29 (JPM-SDNYLIT-00152757).
[62] Langford Dep. at 202:8-19.
[63] Mary Casey Dep. Ex. 14 (JPM-SDNYLIT-00152810).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████.”[64]

On July 18, 2013, Maryanne Ryan exchanged emails with Phillip DeLuca with an email captioned, "Epstein more info found."   "…Original account did large withdrawals in subsequent years and then he switched it from personal to Hyperion air account…" detailing 27 transactions totaling over $1 million.  Deluca replies "███████████████"  Ryan retorts "███████████ ***Issue is he really never stopped the large cash withdrawals*** [emphasis added]."[65]

Belatedly, and within the context of exiting Epstein as a client, ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████[66] Epstein was "exited" as a JPMC client in the summer of 2013.  Epstein was arrested on July 9, 2019 on federal charges of sex trafficking of minors and conspiring to commit sex trafficking of minors.[67]  Over one month later, ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████[68]

All of this information would have been extremely valuable to law enforcement ███ ████████████████████████████  ██████████████████████████████

---

[64] JPM Chronology v.6 (JPM-SDNYLIT-00020856).
[65] DeLuca Dep. Ex. 26 (JPM-SDNYLIT-W-00021965).
[66] JPM-SDNYLIT-W-00019086 (██████████████████████████).
[67] *U.S. v. Jeffrey Epstein*, 19 Cr. 490, Sealed Indictment, https://www.justice.gov/usao-sdny/press-release/file/1180481/download.
[68] JPM-SDNYLIT-W-00017133; JPM-SDNYLIT-W-00000001.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

██████████████ It shocks the conscience that it was not until Epstein's death in prison that JPMC

suddenly recognized Epstein's prior banking transactions as "██████████."  I have reviewed the

2019 Federal Indictment charging Epstein with sex trafficking.  Contained within the charging

document are the facts that would have been supported and enhanced by ████████████████

███████████████████████████████████████████████

JPMC's ███████████████████████████████████████

impeded federal law enforcement's ability to learn of Jeffrey Epstein's crimes at the time they

were being committed as well as those who aided him.  JPMC's ███████████████████

███████████████████████████ also impeded the investigation

conducted by federal law enforcement. When it became public that Jeffrey Epstein had been

arrested and that he had used cash to commit his sexual crimes against children, JPMC's ██████

█████████████████ impaired the government's ability to prosecute the crimes that it was

investigating against Epstein.  Had JPMC cooperated with federal law enforcement and ██████

███████████████████████████ Epstein would have been federally charged at a

much earlier date.  He likely would not have received the Florida Non-Prosecution Agreement,

and he would have been imprisoned for the sex trafficking and money laundering crimes that he

committed at an earlier time, thereby shrinking his overall list of victims.

JPMC ███████████████████████████████.  In my expert

opinion, the information was of such value that ██████████████  ██████████████

███████████████████████████████████████████████

████████ while simultaneously communicating with law enforcement.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Signature**

I declare, under the penalty of perjury, under the laws of the United States of America, that the

foregoing is true and correct. Signed this 13th day of June, 2023, in New London, North Carolina.

*Shaun O'Neill*

Shaun O'Neill

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Appendix A**
**Curriculum Vitae**
**Shaun O'Neill, CPA, CFF, CFE**
Prism Investigations & Examinations, LLC
P.O. Box 101
New London, NC  28127



**WORK EXPERIENCE:**

**PRISM Investigations & Examinations**
Managing Director
February 2023 - Present
Consultant providing unparalleled experience in federal investigations and evaluations of misconduct, including conducting independent investigations, providing expert testimony, and responding to allegations.

**General Dynamics IT**
Healthcare Fraud Prevention Partnership – Partner Liaison
July 2021 – February 2023
Subject Matter Expert on a Centers for Medicare & Medicaid Services contract to detect and prevent healthcare fraud through data and information sharing.  Primary liaison to federal law enforcement and state agencies.

**Federal Bureau of Investigation**
Supervisory Special Agent
September 2015 – May 2021 (Retired)
Led Special Agents, Analysts and Task Force Officers in the investigation of Health Care Fraud, Human Trafficking, Public Corruption and Civil Rights.

Human Trafficking Program Coordinator for the FBI Miami Division.  Member of the Palm Beach County Human Trafficking Task Force.  Co-Founder/Director of the Greater Palm Beach Health Care Fraud Task Force.

Special Agent
April 1998 – September 2015
Led investigations pertaining to White Collar Crime, Health Care Fraud, Money Laundering, Public Corruption, Narcotics and Organized Crime.

**University of Maryland Medical System**
Financial Analyst
May 1995 – August 1998

**Integrated Health Services**
Staff Accountant
May 1993 – May 1995

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**PROFESSIONAL CERTIFICATIONS**

Certified Public Accountant
      Maryland - 25464
      Florida – AC50028

AIPCA / Certified in Financial Forensics - 5435425

Certified Fraud Examiner - 581044

**EDUCATION**

Towson University
Bachelors of Science – Economics
1993

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Appendix B
### Materials Relied On

April 19, 2023 Deposition of Phillip DeLuca & Exhibits

April 28, 2023 Deposition of Kevin McCleerey & Exhibits

May 3, 2023 Deposition of William Langford & Exhibits

May 10, 2023 Deposition of Bonnie Perry

May 24, 2023 Deposition of Maryanne Ryan

*U.S. v. Jeffrey Epstein*, 19 Cr. 490, Sealed Indictment, https://www.justice.gov/usao-sdny/press-release/file/1180481/download

Samuel Goldsmith, *Jeffrey Epstein Pleads Guilty to Prostitution Charges*, N.Y. Post (June 30, 2008) https://nypost.com/2008/06/30/jeffrey-epstein-pleads-guilty-to-prostitution-charges.

Doe v. JPMC Chase Bank Class Action Complaint (original and amended)

USVI v JPMC Complaint (second amended)

*Doe v. United States of America*, S.D. Fla., Case No. 9:08-cv-90736, Notice by Jane Doe re Motion for Summary Judgment, Ex. 35 (ECF No. 362-35)

J.W. Coleman, *Crime and Money: Motivation and Opportunity in a Monetarized Economy*, 35 Am. Behavioral Scientist 6 (July 1992), https://www.ojp.gov/ncjrs/virtual-library/abstracts/crime-and-money-motivation-and-opportunity-monetarized-economy

John S. Pistole, Deputy Director, U.S. Fed. Bureau of Investigation, Prepared Remarks for American Bankers Association/American Bar Association Money Laundering Enforcement Conference (Oct. 22, 2007), https://archives.fbi.gov/archives/news/speeches/the-fbi-and-the-financial-sector-working-together-to-protect-our-citizens-and-our-economy

Expert Report of Jorge Amador

Expert Report of Bridgette Carr

JDoe_DBAG_005374

2019-11-22_JPM-SDNYLIT-W-00022540

2019-09-26_JPM-SDNYLIT-W-00017211

2019-09-26_JPM-SDNYLIT-W-00000001

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

2019-09-25_JPM-SDNYLIT-W-00000183

2019-09-11_JPM-SDNYLIT-W-00020952

2019-09-10_JPM-SDNYLIT-W-00008055

2019-08-14_JPM-SDNYLIT-W-00022634

2019-08-13_JPM-SDNYLIT-W-00017133

2019-08-06_JPM-SDNYLIT-W-00022515

2019-07-26_JPM-SDNYLIT-W-00022528

2019-07-19_Fincen_BSA_xx48290

2019-07-19_Fincen_BSA_xx40679

2019-07-13_Fincen_BSA_xx16250

2019-07-12_Fincen_BSA_xx45439

2019-07-12_Fincen_BSA_xx20301

2019-07-11_Fincen_BSA_xx59184

2019-07-11_Fincen_BSA_xx59182

2019-07-11_Fincen_BSA_xx59180

2019-04-17_JPM-SDNYLIT-W-00022650

2019-03-12_JPM-SDNYLIT-W-00022507

2018-12-19_JPM-SDNYLIT-W-00022673

2018-11-15_JPM-SDNYLIT-W-00022499

2018-10-04_JPM-SDNYLIT-W-00022490

2018-07-20_JPM-SDNYLIT-W-00022471

2017-10-06_JPM-SDNYLIT-W-00022481

2017-08-17_Fincen_BSA_xx44793

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

2017-06-02_Fincen_BSA_xx84765

2017-04-19_JPM-SDNYLIT-W-00022463

2016-09-07_Fincen_BSA_xx90333

2016-09-01_JPM-SDNYLIT-W-00002185

2016-09-01_Fincen_BSA_xx31036

2015-10-28_Fincen_BSA_xx50868

2015-03-06_JPM-SDNYLIT-W-00018180

2015-03-06_Fincen_BSA_xx89100

2014-09-08_Fincen_BSA_xx79085

2014-06-30_Lyons_JPM-SDNYLIT-W-00019356

2014-06-20_Fincen_BSA_xx71995

2014-01-31_Lyons_JPM-SDNYLIT-W-00019456

2013-09-09_JPM-SDNYLIT-W-00022716

2013-08-08_JPM-SDNYLIT-W-00019086

2013-08-08_Fincen_BSA_xx27861

2008-08-18_Fincen_BSA_xx12365

2008-08-15_JPM-SDNYLIT-W-00033764

2008-08-15_JPM-SDNYLIT-W-00031028

2008-08-15_JPM-SDNYLIT-W-00025204

2008-08-15_JPM-SDNYLIT-W-00025192

2008-08-15_JPM-SDNYLIT-W-00025179

2003-10-31_Fincen_BSA_xx85122

2003-07-11_Fincen_BSA_xx36307

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

2003-07-11_Fincen_BSA__xx36307

2003-04-15_Fincen_BSA__xx91513

2003-02-23_Fincen_BSA__xx86838

2002-12-16_Fincen_BSA__xx50492

2002-04-18_Fincen_BSA__xx52905

████████████████

2020-08-31_JPM-SDNYLIT-W-00008144

2020-05-04_JPM-SDNYLIT-W-0000812

2020-01-08_JPM-SDNYLIT-W-00022549

2020-01-07_JPM-SDNYLIT-W-00008100

JPM-SDNYLIT-00015747

JPM-SDNYLIT-00016243

JPM-SDNYLIT-00020773

JPM-SDNYLIT-00020774

JPM-SDNYLIT-00020856

JPM-SDNYLIT-00025843

JPM-SDNYLIT-00027541

JPM-SDNYLIT-00029049

JPM-SDNYLIT-00029055

JPM-SDNYLIT-00029233

JPM-SDNYLIT-00029694

JPM-SDNYLIT-00030437

JPM-SDNYLIT-00031178

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

JPM-SDNYLIT-00031831

JPM-SDNYLIT-00100605

JPM-SDNYLIT-00100941

JPM-SDNYLIT-00100966

JPM-SDNYLIT-00100981

JPM-SDNYLIT-00100988

JPM-SDNYLIT-00101010

JPM-SDNYLIT-00136519

JPM-SDNYLIT-00136972

JPM-SDNYLIT-00146812

JPM-SDNYLIT-00174949

JPM-SDNYLIT-00189175

JPM-SDNYLIT-00194154

JPM-SDNYLIT-00194367

JPM-SDNYLIT-00194385

JPM-SDNYLIT-00194394

JPM-SDNYLIT-00194464

JPM-SDNYLIT-00194470

JPM-SDNYLIT-00194488

JPM-SDNYLIT-00194621_R

JPM-SDNYLIT-00231925

JPM-SDNYLIT-00374146

JPM-SDNYLIT-00792078

JPM-SDNYLIT-W-00021926

JPM-SDNYLIT-W-00021942

JPM-SDNYLIT-W-00021965

JPM-SDNYLIT-W-00021967

JPM-SDNYLIT-W-00021971

JPM-SDNYLIT-W-00021977

JPM-SDNYLIT-W-00021995

JPM-SDNYLIT-W-00022428

JPM-SDNYLIT-W-00025395

JPM-SDNYLIT-W-00026007

JPM-SDNYLIT-W-00031025

JPM-SDNYLIT-W-00031041

JPM-SDNYLIT-W-00033740

JPM-SDNYLIT-W-00033754

JPM-SDNYLIT-W-00033761

JPM-SDNYLIT-00002017

JPM-SDNYLIT-00002159

JPM-SDNYLIT-00002247

JPM-SDNYLIT-00002743

JPM-SDNYLIT-00002921

JPM-SDNYLIT-00004251

JPM-SDNYLIT-00004425

JPM-SDNYLIT-00004562

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

JPM-SDNYLIT-00005701

JPM-SDNYLIT-00007719

JPM-SDNYLIT-00008237

JPM-SDNYLIT-00001695

JPM-SDNYLIT-00001752

JPM-SDNYLIT-00001889

JPM-SDNYLIT-00001912

JPM-SDNYLIT-00002141

JPM-SDNYLIT-00002157

JPM-SDNYLIT-00002921

JPM-SDNYLIT-00002944

JPM-SDNYLIT-00002947

JPM-SDNYLIT-00002952

JPM-SDNYLIT-00002957

JPM-SDNYLIT-00003026

JPM-SDNYLIT-00003036

JPM-SDNYLIT-00003799

JPM-SDNYLIT-00004564

JPM-SDNYLIT-00006045

JPM-SDNYLIT-00006049

JPM-SDNYLIT-00007206

JPM-SDNYLIT-00007221

JPM-SDNYLIT-00007233

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

JPM-SDNYLIT-00007281

JPM-SDNYLIT-00007638

JPM-SDNYLIT-00008259

JPM-SDNYLIT-00008334

JPM-SDNYLIT-00008335

JPM-SDNYLIT-00008341

JPM-SDNYLIT-00008367

JPM-SDNYLIT-00008669

JPM-SDNYLIT-00010807

JPM-SDNYLIT-00010816

JPM-SDNYLIT-00011951

JPM-SDNYLIT-00011967

JPM-SDNYLIT-00012000

JPM-SDNYLIT-00012074

JPM-SDNYLIT-00012120

JPM-SDNYLIT-00012176

JPM-SDNYLIT-00012649

JPM-SDNYLIT-00013105

JPM-SDNYLIT-00013497

JPM-SDNYLIT-00013501

JPM-SDNYLIT-00013519

JPM-SDNYLIT-00013526

JPM-SDNYLIT-00013576

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

JPM-SDNYLIT-00013743

JPM-SDNYLIT-00015981

JPM-SDNYLIT-00018829

JPM-SDNYLIT-00019114

JPM-SDNYLIT-00019503

JPM-SDNYLIT-00021801

JPM-SDNYLIT-00025486

JPM-SDNYLIT-00025492

JPM-SDNYLIT-00025705

JPM-SDNYLIT-00029231

JPM-SDNYLIT-00029324

JPM-SDNYLIT-00030061

JPM-SDNYLIT-00099331

JPM-SDNYLIT-00099334

JPM-SDNYLIT-00099335

JPM-SDNYLIT-00099337

JPM-SDNYLIT-00099338

JPM-SDNYLIT-00099348

JPM-SDNYLIT-00099497

JPM-SDNYLIT-00099500

JPM-SDNYLIT-00099502

JPM-SDNYLIT-00099504

JPM-SDNYLIT-00099506

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

JPM-SDNYLIT-00099547

JPM-SDNYLIT-00099549

JPM-SDNYLIT-00099550

JPM-SDNYLIT-00099894

JPM-SDNYLIT-00099895

JPM-SDNYLIT-00100251

JPM-SDNYLIT-00100362

JPM-SDNYLIT-00100387

JPM-SDNYLIT-00100434

JPM-SDNYLIT-00100637

JPM-SDNYLIT-00100690

JPM-SDNYLIT-00100691

JPM-SDNYLIT-00100692

JPM-SDNYLIT-00100955

JPM-SDNYLIT-00100966

JPM-SDNYLIT-00105789

JPM-SDNYLIT-00107171

JPM-SDNYLIT-00134087

JPM-SDNYLIT-00134385

JPM-SDNYLIT-00134475

JPM-SDNYLIT-00136383

JPM-SDNYLIT-00137063

JPM-SDNYLIT-00152713

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

JPM-SDNYLIT-00152756_R

JPM-SDNYLIT-00152829

JPM-SDNYLIT-00153174

JPM-SDNYLIT-00153462

JPM-SDNYLIT-00153464

JPM-SDNYLIT-00154016

JPM-SDNYLIT-00154163

JPM-SDNYLIT-00157100

JPM-SDNYLIT-00194008

JPM-SDNYLIT-00194023

JPM-SDNYLIT-00194062

JPM-SDNYLIT-00194066

JPM-SDNYLIT-00194067_R

JPM-SDNYLIT-00194071_R

JPM-SDNYLIT-00194074_R

JPM-SDNYLIT-00194385

JPM-SDNYLIT-00372999

JPM-SDNYLIT-00373047

JPM-SDNYLIT-00373176

JPM-SDNYLIT-00373195

JPM-SDNYLIT-00373253

JPM-SDNYLIT-00373649

JPM-SDNYLIT-00394774

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

JPM-SDNYLIT-00450110

JPM-SDNYLIT-00751685

JPM-SDNYLIT-00762477

JPM-SDNYLIT-00792077

JPM-SDNYLIT-W-00021924

JPM-SDNYLIT-W-00021988

JPM-SDNYLIT-W-00021990

JPM-SDNYLIT-W-00022000

JPM-SDNYLIT-W-00031020

JPM-SDNYLIT-W-00031023

JPM-SDNYLIT-W-00031025

JPM-SDNYLIT-W-00031035

JPM-SDNYLIT-W-00033739

JPM-SDNYLIT-W-00033740

JPM-SDNYLIT-W-00033750

JPM-SDNYLIT-W-00033752

JPM-SDNYLIT-W-00033754

JPM-SDNYLIT-W-00033759

JPM-SDNYLIT-W-00036856

JPM-SDNYLIT-00000183

JPM-SDNYLIT-00000314

JPM-SDNYLIT-00001091

JPM-SDNYLIT-00001188

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

JPM-SDNYLIT-00107777_R

JPM-SDNYLIT-00119644_R

JPM-SDNYLIT-00127953

JPM-SDNYLIT-00173973

JPM-SDNYLIT-00174087

JPM-SDNYLIT-W-00029041

JPM-SDNYLIT-W-00029043

JPM-SDNYLIT-W-00029042

JPM-SDNYLIT-00026257