# FILED UNDER SEAL

# EXHIBIT 278

1          UNITED STATES DISTRICT COURT FOR THE

2              SOUTHERN DISTRICT OF NEW YORK

3          CASE NUMBER:  22-CV-10904-JSR

4                ACTION FOR DAMAGES

5
   GOVERNMENT OF THE UNITED STATES      )
6  VIRGIN ISLANDS,                      )
                                        )
7                         Plaintiff,   )
                                        )
8  VS.                                  )
                                        )
9  JP MORGAN CHASE BANK, N.A.,          )
                                        )
10                        Defendant.   )
                                        )
11 -------------------------------------

12

13

14

15          VIDEO RECORDED DEPOSITION OF

16                VINCENT FRAZER

17          THURSDAY, JULY 13, 2023

18

19

20
   REPORTED BY:
21
   DENISE D. HARPER-FORDE
22 Certified Shorthand Reporter (CSR)
   Certified RealTime Reporter (CRR)
23 Certified LiveNote Reporter (CLR)
   Registered Professional Reporter (RPR)
24 Notary Public (FLORIDA)

25



1    give specific information as to where

2    he would be residing when he was not

3    in one of his own homes, when he was

4    out Of the country particularly or out

5    of whatever it's -- away from one of

6    his own homes.

7            His concern was out of having

8    to disclose whose residence he may

9    have been staying in, and they

10   expressed some apprehensions about

11   making that information publicly

12   available.

13       Q.   Okay.  What was your reaction

14   to the various issues that his lawyers

15   were raising?

16           ATTORNEY ACKERMAN:  Object to

17   form.

18           THE WITNESS:  Initially my

19   reaction was we would apply the law

20   strictly the way the law was written.

21   And so it required him, as other

22   registrants, to come in and provide

23   all of the information that is

24   required by statute.

25           (BY ATTORNEY NEIMAN):



VINCENT FRAZER                                    July 13, 2023
U.S. VIRGIN ISLANDS vs JP MORGAN CHASE                    12

1        Q.   You said that was your initial
2   reaction.
3        A.   Yes.
4        Q.   Did that change over time?
5        A.   When -- yes.  When his lawyer
6   then began to explain and provide
7   justification for their requests.
8        Q.   And how did it change?
9        A.   Well, we began to consider --
10  we, myself and my staff, began to
11  consider the facts that they had
12  brought.  Because until I received the
13  request from Epstein's lawyers, I did
14  not know him personally or by
15  reputation.  I didn't know anything
16  about him.
17            So when the correspondence and
18  information they provided indicated
19  and explained that he was a --
20  basically a financier, investment
21  banker or something of that sort that
22  required him to be very mobile and in
23  and out of the territory on very short
24  notice because he was in the type of
25  business that required him to travel



1   frequently.  Then we considered that.

2          So we began to see whether or

3   not the law could accommodate it.

4   And, for the most part, initially it

5   was determined that we could not

6   accommodate the requests he was

7   making.

8          Q.  And, again, did that

9   subsequently change over time?

10          A.  Yes.

11          Q.  In what way?

12          A.  It changed in the discretion

13   was given to the Attorney General that

14   provided for a relaxation of some of

15   the time requirement and notice, prior

16   notice requirement for his travels.

17          Q.  Okay.  Did you ultimately

18   grant him the accommodations that he

19   was seeking?

20          A.  To my recollection, we granted

21   some by -- through the discretion of

22   the Attorney General, we granted some

23   relaxation.

24          Q.  Was there -- withdrawn.

25          Was Mr. Epstein the first time



1  the placement of the registrant to

2  particular tiers.  That's my

3  recollection.

4      Q.  Uh-huh.  Let's look at Exhibit

5  54 for a second -- or Tab 54 for --

6  for which we'll call Exhibit 3.

7          (Whereupon, Defendant's

8           Exhibit No. 3, Bill No.

9           29-0239, was marked for

10          identification)

11          (BY ATTORNEY NEIMAN):

12      Q.  All right.  Sir, do you

13  recognize Exhibit 3 as the sex

14  offender legislation that was passed

15  in the summer of 2012?

16      A.  I recognize Exhibit 3 to be a

17  copy of Article 7372, which shows it

18  was passed in 2012.

19      Q.  Okay.  If you look at the last

20  page of the exhibit, you can see the

21  seal of the Governor.  Do you see

22  that?

23      A.  Yes.

24      Q.  And it's dated July 18th of

25  2012.  Do you see that?



1        A.   Yes.

2        Q.   So that's the day in which

3   this bill was signed into law?

4        A.   Yes.

5        Q.   Okay.  And this is a law

6   you're familiar with?

7            ATTORNEY ACKERMAN:   Object to

8   form.

9            THE WITNESS:   I used to be

10  familiar.

11           (BY ATTORNEY NEIMAN):

12       Q.   Sure.  I'm not expecting you

13  to remember off the top of your head

14  every detail.  But there was a time

15  when it was part of your job to be

16  familiar with this law?

17       A.   Yes.

18       Q.   Okay.  And let's just take a

19  look at the tiering statute, tiering

20  portion of the statute just so we can

21  see if we agree on how this works.

22           If you turn to page 9 of the

23  statute, you'll see a Section 1721B,

24  Tier Defenses.  Do you see that?

25       A.   Yes.



1  has concluded its effort to draft

2  proposed legislation."

3          Do you see that?

4      A.  Yes.

5      Q.  What was this task force?

6      A.  Well, it was a task force we

7  assembled to assist us with drafting

8  new and upgrading of our SORNA law.

9      Q.  All right.  And the article

10 references a 2011 deadline for

11 upgrading the law to be in compliance

12 with SORNA.  Do you see that?

13     A.  Okay.  You say it here.  I

14 haven't seen it yet, but...

15     Q.  What was that deadline as you

16 recall it?

17     A.  I don't recall.

18     Q.  All right.

19     A.  They may have had a deadline

20 for us to be in compliance with

21 Federal law.  I don't remember what it

22 was.

23     Q.  And was compliance with that

24 Federal law important to getting

25 funding to support your registration



```
 1   program?
 2        A.  Yes.
 3            ATTORNEY ACKERMAN:  Object to
 4   form.
 5            (BY ATTORNEY NEIMAN):
 6        Q.  Did the Virgin Islands get its
 7   new legislation passed by the July
 8   2011 deadline?
 9        A.  I don't recall.
10        Q.  We just looked at some
11   legislation that was passed in the
12   summer of 2012, correct?
13        A.  Yes.
14        Q.  So that would be a year after
15   the deadline, right?
16        A.  If that's what the dates
17   show.
18        Q.  Take a look.
19        A.  Yeah.
20        Q.  Do you remember why it was
21   that the Virgin Islands missed the
22   statutory deadline?
23        A.  I don't recall.  We may have
24   gotten an extensions, I think.  I
25   think we had gotten extensions on it.
```



1        Q.  Do you know why if the statute

2    was drafted by the task force in April

3    of 2011, as this article indicates,

4    that it didn't get passed for another

5    more than a year?

6             ATTORNEY ACKERMAN:  Object to

7    form.

8             THE WITNESS:  I don't recall

9    why.  You notice the -- the proposed

10   legislation required Federal review as

11   well.  So that may have been part of

12   the time span as well.

13            (BY ATTORNEY NEIMAN):

14       Q.  Do you remember that that was

15   part of the time span or are you just

16   guessing?

17       A.  No, I see reference to it in

18   the article.

19       Q.  The article says that the

20   legislation will be sent to the Office

21   of the Governor, the U.S. Department

22   of Justice and the Virgin Islands

23   legislature for adoption.  Do you see

24   that?

25       A.  Yes.



1        Q.  Do you know whether DoJ --

2   excuse me -- whether U.S. DoJ approval

3   was required before the Virgin Islands

4   legislature could adopt the statute?

5        A.  Yes, sir.

6        Q.  Yes, you do know or yes, it

7   was required?

8        A.  The answer is yes, it was

9   required.

10        Q.  Okay.  Do you remember there

11   being any delay in getting the

12   approval from the U.S. Department of

13   Justice?

14        A.  I wouldn't say there was --

15   there were back and forth between us

16   and Department of Justice, adjustments

17   they may have required that we may

18   have had to send back up to get the

19   approval.

20        Q.  Uh-huh.  Do you recall that

21   being a significant source of delay in

22   getting --

23        A.  I don't recall.

24        Q.  -- the statute passed?

25            ATTORNEY ACKERMAN:  Object to



1  days.  Otherwise, I could not go for a

2  day trip to Tortola at the last

3  minute."

4          Do you see that?

5      A.  Okay.  Yes.

6      Q.  From your point of view, sir,

7  how important was it in constructing

8  sex offender registration legislation

9  that it permit Mr. Epstein to make

10  spontaneous trips to Tortola?

11          ATTORNEY ACKERMAN:  Object to

12  form.

13          THE WITNESS:  My understanding

14  of the SORNA law, purpose was not to

15  restrict a person's movement.  It was

16  to follow, to monitor the movement.

17          (BY ATTORNEY NEIMAN):

18      Q.  Okay.  Let me ask you the

19  question in a slightly different way,

20  sir.  From your point of view -- well,

21  withdrawn.

22          Sir, do you think there was

23  any law enforcement interest in

24  structuring a sex offender

25  registration law such that it would



1          A.   -- and poor people.

2          Q.   And you -- we're not talking

3    about -- Mr. Epstein going to Tortola

4    for a day because he's a charter boat

5    captain and needs to do it for his

6    work.  We're talking about someone who

7    is expressing desire to go for

8    pleasure.  Was that important to

9    facilitate in the SORNA legislation?

10         A.   The SORNA legislation, you

11   referenced the conference that was

12   held in the -- working on the SORNA

13   law.  One of the reasons that the task

14   force was assembled, which was --

15   included persons from various agencies

16   within the government and some private

17   -- private stakeholders, was because

18   our law was what I would call a

19   first-generation SORNA law.  And there

20   hadn't been any upgrade of that law

21   for quite some time.

22              And there was a

23   requirement the feds recognized, and

24   we agreed with them, we need to

25   upgrade the law.  And there were --



 1        A.  Right.  I'm --

 2             ATTORNEY ACKERMAN:

 3   Objection.

 4             THE WITNESS:  I'm saying that

 5   I may have seen that -- whether what I

 6   saw was this Exhibit 10 I don't

 7   recall.

 8             (BY ATTORNEY NEIMAN):

 9        Q.  Don't recall one way or the

10   other?

11        A.  I don't recall.

12        Q.  You were certainly involved in

13   some of the discussions with

14   Mr. Epstein's counsel about what

15   changes they wanted to see in the

16   legislation?

17             ATTORNEY ACKERMAN:  Objection;

18   misstates prior testimony.

19             THE WITNESS:  What changes

20   they proposed as suggestions or

21   changes, yes.

22             (BY ATTORNEY NEIMAN):

23        Q.  Okay.  And then you can see on

24   the first page that Ms. Carbon writes

25   to Ms. Hodge on June 25th, "Attached



```
 1   is our counterproposal."
 2            Do you see that?
 3       A.  Yes.
 4       Q.  Was it important from your
 5   perspective to try to reach some kind
 6   of agreement on a proposal with
 7   counsel for Mr. Epstein?
 8            ATTORNEY ACKERMAN:  Objection
 9   to form.
10            THE WITNESS:  It was no less
11   important as how -- consideration we
12   would give to any citizen that has an
13   interest in pending legislation that
14   we may be willing to hear from them.
15            (BY ATTORNEY NEIMAN):
16       Q.  Uh-huh.  So it's normal in
17   your practice when you're considering
18   criminal justice regulation to make
19   sure it's agreeable to the prospective
20   offenders that the legislation --
21       A.  We have had --
22       Q.  -- will regulate -- to the
23   prospective offenders that the
24   legislation will regulate?
25            ATTORNEY ACKERMAN:  Objection
```



 1   to form.
 2             THE WITNESS:  We have had --
 3   I've had -- my experience, several
 4   times, in maybe legislation that is
 5   pending that we receive commends and
 6   concerns from defense counsel, whether
 7   it be private counsel or the Public
 8   Defender's Office, and we give some
 9   consideration to what they may be
10   requesting.
11             It doesn't mean we would agree
12   them and put what they want in it.
13   But if we feel that it does not
14   obstruct the objective and efficacy of
15   the legislation, we would engage in
16   that discussion.
17             (BY ATTORNEY NEIMAN):
18        Q.  So you're saying it would be
19   typical for you to share back and
20   forth drafts and see if you can reach
21   agreement with the offenders on
22   whether they like the legislation
23   you're proposing?
24             ATTORNEY ACKERMAN:  Objection
25   to form.



```
1              THE WITNESS:  That's not what
2    I said.
3              (BY ATTORNEY NEIMAN):
4         Q.  Okay.  Would you agree that
5    that's what happened here?
6         A.  No.
7              ATTORNEY ACKERMAN:  Objection
8    to form.
9              (BY ATTORNEY NEIMAN):
10        Q.  There wasn't a back and forth
11   with counsel for the offender?
12             ATTORNEY ACKERMAN:  Objection
13   to form.
14             (BY ATTORNEY NEIMAN):
15        Q.  You can answer.
16        A.  I had discussions back and
17   forth with legal counsel.
18        Q.  For the offender?
19        A.  Maria -- Maria Hodge represent
20   a whole lot of different people.  When
21   I speak to Maria -- when I speak to
22   Maria Hodge in -- in this exchange on
23   this, I am extending a courtesy to a
24   member of the Virgin Islands bar in
25   trying to craft a legislation that
```



1  affects the -- the whole Virgin

2  Islands, everyone in the Virgin

3  Islands.

4          So that's who I'm negotiating

5  with.  I'm not negotiating with

6  Epstein.  I don't have anything with

7  Epstein.  I wasn't -- I had the

8  exchange and proposals with Attorney

9  Hodge --

10      Q.  All right.

11      A.  -- who at the same time had, I

12  think from -- from what you show from

13  Exhibit 12 -- well, I'm sorry, one of

14  the exhibits, was having -- was

15  making -- submitting her proposal to

16  the legislature as well.  So the

17  passage of the law, I mean, it comes

18  from many different sources.

19      Q.  Yeah.  Did you think Ms. Hodge

20  was working for anybody other than

21  Mr. Epstein?

22      A.  I had an exchange with

23  Attorney Maria Hodge as a respected

24  member of the Virgin Islands bar.  And

25  regardless of who she's working for, I



1   will give her the same respect.

2         Q.   That's not what I asked you,

3   sir.

4         A.   Well, that's what I'm telling

5   you, that's how it is.

6         Q.   Did you --

7         A.   That's what -- but regardless

8   of who -- if Maria Hodge represents

9   someone who is a murderer --

10        Q.   Uh-huh.

11        A.   -- and there is a legislation

12  that is -- that is going through that

13  she has an interest that may have an

14  impact with her client, I will engage

15  in a discussion with her with regard

16  to the law, a proposed law, as a

17  courtesy and respect to her as a

18  respected member of the bar.

19        Q.   So I'm going to resist the

20  urge here.  I'll ask you a different

21  question.  Let me just make sure I

22  understand who you thought Ms. Hodge

23  represented in the time that you were

24  having this dialogue.  Am I correct

25  that you understood that Ms. Hodge



```
 1              THE WITNESS:  No, I'm good.
 2              ATTORNEY NEIMAN:  All right.
 3   Let's keep going then.
 4              ATTORNEY NEIMAN:  Let's go to
 5   -- I'll will show you a new exhibit,
 6   sir.
 7              ATTORNEY ACKERMAN:  Is this
 8   18?
 9              ATTORNEY NEIMAN:  Yeah.  We'll
10   call this Exhibit 18.
11              (Whereupon, Defendant's
12               Exhibit No. 18, Letter dated
13               March 14, 2019, was marked for
14               identification)
15              (BY ATTORNEY NEIMAN):
16         Q.  All right.  And if you could
17   turn in Exhibit 31 to the page with
18   Bates number 12480.
19         A.  To Exhibit 18?
20         Q.  Exhibit 18.  Yeah, I'm sorry.
21   It's Exhibit 31 in my book, but it's
22   Exhibit 18 for you.  If you could turn
23   to the page 12480 at the bottom.  All
24   right, sir?
25         A.  What page?  I was looking at
```



```
 1   the date.

 2        Q.  12480.  Let me know when

 3   you're there.

 4        A.  Okay.

 5        Q.  Okay.  So this is a letter

 6   dated July 16th, 2012 to you from Ms.

 7   Hodge.  Do you see that?

 8        A.  Yes.

 9        Q.  And the topic of the letter in

10   the Re line is a request pursuant to

11   Bill 29-0239 for reduction/approval of

12   notice procedures for travel outside

13   the Virgin Islands by Jeffrey Epstein.

14   Do you see that?

15        A.  Yes.

16        Q.  And in the first sentence of

17   the letter, Ms. Hodge thanks you for

18   meeting with her and Mr. Indyke on

19   Friday, July 13th, to discuss

20   implementation of the new travel

21   notice procedures for registered sex

22   offenders.  Do you see that?

23        A.  Yes.

24        Q.  And that's a meeting that you

25   had with them actually before the
```



1   Governor had even signed the bill into
2   law.  Isn't that right?
3          A.  I'm sorry.  You have a
4   question?
5          Q.  Yeah.  My question was --
6          A.  I'm sorry.
7          Q.  -- the meeting that you had
8   with Mr. Epstein's counsel to discuss
9   giving him a reduction of notice
10  procedures was before the law, the new
11  bill, had even been signed into law by
12  the Governor, right?
13         A.  Yes, it appears so.
14         Q.  Okay.
15         A.  Uh-huh.
16         Q.  Do you recall that meeting?
17         A.  No, I do not.
18         Q.  All right.  You can see this
19  is a several-page letter that they
20  have submitted to you with laying out
21  what they're asking for.  And then if
22  you turn to page 12483, you can see a
23  letter from you to Ms. Hodge on July
24  25th, so about nine days after her
25  letter to you.  Do you see that?



1          A.   Yes.  I see that.

2          Q.   All right.  And you indicate

3   in -- withdrawn.

4               I take it this July 25th, 2012

5   letter is your response to Ms. Hodge's

6   letter to you of July 16th.  Fair?

7          A.   Yes.

8          Q.   And what you say in your

9   letter in the second paragraph is,

10  quote, "It is my understanding that

11  Mr. Epstein's business activities

12  require him to make frequent and often

13  unexpected trips out of the territory

14  to United States destinations and to

15  international destinations."

16               Do you see that?

17          A.   Yes.

18          Q.   And you say in the next

19  paragraph, "Based upon your

20  representation and that of Attorney

21  Darren Indyke, we will grant the

22  waiver."

23               Do you see that?

24          A.   Yes.

25          Q.   And then you lay out certain



1    conditions for the waiver, correct?

2         A.   Yes.

3         Q.   Am I correct, sir, that this

4    grant of a waiver, as you say here,

5    was based on the representations of

6    Ms. Hodge and Mr. Indyke and not on

7    any evidence they presented to you?

8              ATTORNEY ACKERMAN:   Objection

9    to form.

10             THE WITNESS:   It was based on

11   the information's that they

12   provided.

13             (BY ATTORNEY NEIMAN):

14        Q.   And that information was

15   what's set forth in the letter of July

16   16th, correct?

17             ATTORNEY ACKERMAN:   Objection

18   to form.

19             THE WITNESS:   At least that at

20   minimum.

21             (BY ATTORNEY NEIMAN):

22        Q.   Can you identify any --

23        A.   If there's anything else, I

24   can't recall.

25        Q.   Okay.  You can't identify



1   anything else they provided you?

2        A.   I can't recall if there was

3   anything else.

4        Q.   Okay.  All right.  And then

5   you can see that if you turn the page

6   again to page 12485, you will see that

7   you got an immediate letter back from

8   Ms. Hodge asking for further waivers.

9             You see that?

10       A.   Yeah.

11       Q.   And what Ms. Hodge writes to

12  you in the first paragraph of her

13  response letter is -- let's see.  The

14  first sentence indicates that she's

15  received your letter.  In the second

16  sentence, he says, "We appreciate the

17  consideration given to Mr. Epstein's

18  frequent travel requirements.

19  However, we still have serious

20  concerns regarding what we believe are

21  undue restrictions placed on

22  Mr. Epstein's travel in the conduct of

23  his business and professional

24  activities."

25            Do you see that?



1          A.   Yes.

2          Q.   Can you recall anything

3    specific that Ms. Hodge told you about

4    the nature of Mr. Epstein's business

5    and professional activities?

6          A.   I don't recall.

7          Q.   And do you recall ever seeing

8    any documents or any evidence from

9    anyone other than his lawyers showing

10   that his business and professional

11   activities required frequent travel?

12         A.   I don't recall if I received

13   anything else.

14         Q.   Okay.  Do you recall that you

15   granted the waiver that Ms. Hodge

16   requested in this follow-up letter?

17         A.   Yes.

18         Q.   Why did you grant it?

19         A.   I was satisfied with the

20   representations that were made by his

21   counsel; and to the extent there was

22   additional materials submitted, I --

23   it was sufficient for me to reconsider

24   my decision.

25         Q.   Are you saying that there was



1   there were less information about his

2   activities at that time --

3          Q.   Uh-huh.

4          A.   -- than now.

5          Q.   Okay.  But we saw that in the

6   file of your organization, there was

7   the 2010 article from The Daily Beast

8   about how he had more -- that the --

9   how the federal investigation had

10  identified more than 40 victims.

11  Remember that?

12         A.   That wasn't sufficient to

13  me.

14         Q.   Did the staff tell you that?

15         A.   I don't recall if they told me

16  that.

17         Q.   Okay.  But it wouldn't have

18  mattered?

19         A.   Would it have mattered to --

20  for me to say -- to try to restrict

21  him in the Virgin Islands from going

22  to Los Angeles?  Probably not.  That's

23  not my role.

24         Q.   Okay.

25         A.   My role is that when he's in



1    the Virgin Islands I know where he is.

2    When he's not in the Virgin Islands, I

3    know where he is.  That's what the

4    role of our monitor, our registry was.

5         Q.  Okay.  And you think you know

6    where he is if you know what city he's

7    in --

8         A.  If I know what city he's in --

9         Q.  -- even though you don't know

10   where -- hold on.  Let me finish

11   asking my question.

12        A.  Sorry.

13        Q.  You think it satisfied the law

14   enforcement interest in knowing where

15   he is if you know what city he's in?

16             ATTORNEY ACKERMAN:  Objection

17   to form.

18             THE WITNESS:  It was

19   satisfactory to me in 2012.

20             (BY ATTORNEY NEIMAN):

21        Q.  Okay.  Did your staff tell you

22   that he had settled cases with a dozen

23   women paying more than a million

24   dollars each?

25        A.  I don't recall.



1   it's a matter of an agent going to

2   their place of residence in a car and

3   making a check.  It required more than

4   that to go to Little St. James to

5   check on him also.  So we didn't have

6   a planned program of how many times he

7   will be checked.

8              ATTORNEY NEIMAN:  Okay.  Let's

9   take a look, if we could, at --

10             COURT REPORTER:  If we could

11  take a quick break?

12             ATTORNEY NEIMAN:  Sure.

13             COURT REPORTER:  Thank you.

14             VIDEOGRAPHER:  Off the record

15  at 5:12.

16                  (Off the record)

17                (Back on the record)

18             VIDEOGRAPHER:  On the record.

19  The time is 5:27 P.M.

20          (BY ATTORNEY NEIMAN):

21      Q.  Good afternoon, Mr. Frazer.

22      A.  Good afternoon.

23      Q.  Sir, am I correct that in

24  order to enter or leave the Virgin

25  Islands from the United States, you



1   need to clear customs?

2        A.  Yes.

3        Q.  And that's true even if you're

4   flying on a private plane?

5        A.  Yes.

6        Q.  As the Attorney General of the

7   Virgin Islands, did you have the

8   ability, if you had a law enforcement

9   reason, to find out who was traveling

10  on a particular plane that entered the

11  Virgin Islands?

12           ATTORNEY ACKERMAN:  Object to

13  form.

14           THE WITNESS:  Yes, I imagine I

15  could.

16           (BY ATTORNEY NEIMAN):

17       Q.  Did you ever try to find out

18  who was traveling with Jeffrey Epstein

19  on his private jet?

20       A.  No.

21       Q.  All right.  We were taking

22  before the break about the monitoring

23  program.  I was going to show you a

24  document related to that.

25           ATTORNEY NEIMAN:  If we could



VINCENT FRAZER                                      July 13, 2023
U.S. VIRGIN ISLANDS vs JP MORGAN CHASE                        250

1   that she worked for him.

2        Q.   Okay.  And how did you learn

3   that she worked for him?

4        A.   I don't recall how I knew, how

5   it came to my attention then.  It

6   didn't --

7        Q.   Okay.  Your letter granting

8   the discretionary waiver states

9   that -- in fact, let's just pull it

10  out.

11          Do you have Exhibit 4 in front

12  of you?

13       A.   Yeah.

14       Q.   If you would turn at the

15  bottom to the page that's 12263,

16  please.  Let me know when you have

17  that in front of you.

18       A.   Yes.

19       Q.   And this is one of the letters

20  that you sent to Attorney Hodge

21  specifying the conditions of the

22  discretionary waiver that you granted

23  Mr. Epstein, correct?

24       A.   Yes.

25       Q.   Okay.  And if you look at the



1   third full paragraph of that letter,

2   it states, "Based upon your

3   representation and that of Attorney

4   Indyke."

5          Did I read that correctly?

6      A.  Yes.

7      Q.  And what representations were

8   you referring to there?

9      A.  I believe you saw in the

10  record several letters from Attorney

11  Maria Hodge and Attorney Indyke and

12  the meetings that were had.  So the

13  representation includes the totality

14  of all of the correspondence and the

15  discussions and the meetings.

16     Q.  So if you would go to Exhibit

17  5, please.  I'm sorry.  Nope, stick

18  with Exhibit 4, and go to the page

19  that is the letter that begins at

20  Bates number 12246.  Let me know when

21  you're there.

22     A.  Okay.  Yes.

23     Q.  And is this letter that begins

24  at page 12246 a letter that you

25  received from Mr. Indyke?



1        A.   Yes.

2        Q.   And does this letter contain

3   representations upon which you relied

4   in exercising your discretion to make

5   decisions regarding Mr. Epstein's

6   notification requirements?

7        A.   Yes.

8        Q.   Okay.

9        A.   This was included.

10       Q.   Okay.  I'm sorry.  You said

11  this was?

12       A.   Included, yes.

13       Q.   Okay.  If you would turn,

14  please, to page 2 of this letter --

15       A.   Uh-huh.

16       Q.   -- I want to direct your

17  attention to the paragraph that begins

18  first.  It's the first full paragraph

19  on that page.

20       A.   Yes.

21       Q.   Are you with me?

22       A.   Yes.

23       Q.   Okay.  The second -- yes.  The

24  second sentence of that paragraph

25  reads, "Mr. Epstein has followed the



1   same procedure in the State of

2   Florida, the very same jurisdiction of

3   Mr. Epstein's conviction which gave

4   rise to his registration requirement,

5   where Mr. Epstein is permitted to

6   provide E-mail notification of his

7   arrival and departure."

8            Did I read that correctly?

9       A.  Yes.

10       Q.  And is that a representation

11   upon which you relied in formulating

12   your decision --

13       A.  That representation --

14   however, remember that I also had my

15   staff to research the requirements

16   from Florida and New York, the two

17   particular jurisdictions that we were

18   dealing with Epstein.

19       Q.  Okay.  And if you look at the

20   next sentence, it reads, "Mr. Epstein

21   provides E-mail notification to the

22   State of New Mexico when he travels to

23   and from his vacation home in that

24   jurisdiction."

25            Did I read that correctly?



1         A.   Yes.

2         Q.   And is that a representation

3    upon which you relied?

4         A.   Yes.

5         Q.   Okay.  That same sentence

6    references the State of New York.  Do

7    you see that?

8         A.   Yes.

9         Q.   And did you rely on Mr.

10   Indyke's representations regarding the

11   State of New York?

12        A.   That and the research that we

13   had done --

14        Q.   Okay.

15        A.   -- my staff had done.

16        Q.   If you look at the next

17   paragraph, sir, the one that begins

18   "Communication between the Department

19   of Justice," let me know when you're

20   there?

21        A.   Yes.

22        Q.   Okay.  Would you please

23   read -- well, let me read the last

24   sentence of that paragraph where Mr.

25   Indyke writes, "In short, I believe,



1   as do the states of Florida, New

2   Mexico and New York, that there is no

3   public safety necessity in requiring

4   Mr. Epstein to notify the Department

5   in person each time he travels to or

6   from the jurisdiction."

7           Did I read that correctly?

8       A.  Yes.

9       Q.  And is that part of the -- of

10  the representations made upon which

11  you relied?

12      A.  We took it into

13  consideration.

14      Q.  Okay.  I'll ask you a

15  question, sir, while I look for this

16  next document.  You mentioned earlier

17  that you believe there was not the

18  same type of information about

19  Mr. Epstein known in 2012 or available

20  in 2012 as is available now.  What did

21  you mean by that?

22      A.  I think in 2012, as I

23  indicated, I think 2011, at the time

24  that Mr. Epstein came up on our radar

25  in the sexual offender office was the



1  and the law provide for latitude for

2  an exercise of discretion.  Based on

3  the totality of the information that

4  was given  to me, I made a decision

5  based on that.

6        Q.  If you would look at Exhibit

7  22, please.  Actually take it back.

8  We can -- let's stick with Exhibit 21.

9        A.  Uh-huh.

10       Q.  There's an insinuation in

11  Exhibit 21 that either you or Senator

12  Russell did one thing or said one

13  thing and did another.  Do you see

14  that?

15       A.  Yes.

16       Q.  Do you have any -- any

17  suspicion as to where that suggestion

18  may have come from?

19       A.  No, I don't.  Certainly I

20  don't know what -- in reference to

21  what Senator Russell may have done, I

22  don't know what they may be speaking

23  of.  In some of these it makes to, I

24  suppose it's suggestion that I did

25  something contrary to what I may have



VINCENT FRAZER                                              July 13, 2023
U.S. VIRGIN ISLANDS vs JP MORGAN CHASE                              263

1  indicated previously.  And I think

2  it's kind of a vague notion on what

3  may be referenced.

4        Q.  Okay.  And what is that vague

5  notion?

6        A.  I think the meetings that they

7  -- the meetings that were had when we

8  -- you saw that Attorney Anderson and

9  Attorney Carbon met with Maria Hodge

10  and Attorney Indyke.  I was off

11  island.  I think I may have been on

12  vacation or something or at a

13  conference or something.  And they

14  were -- they met with Maria Hodge, and

15  there may have been some exchange and

16  some, I think, misunderstanding as to

17  our agreement on language.

18          And when I got back, my

19  representation from me may have been

20  contrary to what they may have

21  misunderstood.  And so where they may

22  have thought we had agreement, we may

23  not have had agreement on it.  And

24  that may be some of what they were

25  talking about.



1            As to exactly what part of it,

2   I don't recall what part, but I think,

3   as I think back, that may be some of

4   what they're referring to.

5            Q.  Okay.  Speaking of going on

6   vacation, there was some testimony

7   earlier today, earlier this afternoon

8   about trips to Tortola.  Do you recall

9   that?

10           A.  Yes.

11           Q.  Okay.  Where -- how does one

12  get to Tortola from the U.S. Virgin

13  Islands?

14           A.  Take a ferry from Red Hook,

15  close over here, or a ferry from

16  downtown St. Thomas.

17           Q.  How long a ferry ride is it?

18           A.  It's about 45 minutes.

19           Q.  How common -- or how often

20  does that ferry run?

21           A.  The ferry runs about probably

22  maybe every -- probably not every

23  hour.  Maybe probably every -- because

24  you have three ferry companies.

25  So probably like maybe three within



1   three-hour time of ferries leaving.

2        Q.  Okay.  And does that run --

3        A.  Very frequent.

4        Q.  Does it run seven days a

5   week?

6        A.  Yes.

7        Q.  And is it -- in your

8   experience as a native Virgin

9   Islander, is it common for residents

10  of the Virgin Islands to visit

11  Tortola?

12       A.  Very much so.

13       Q.  Okay.  There was reference

14  earlier to the U.S. Customs and Border

15  Protection.  Do you recall that

16  testimony?

17       A.  Yes.

18       Q.  And so just to be clear, when

19  an individual leaves the Virgin

20  Islands, that individual has to clear

21  customs, correct?

22       A.  Yes.

23       Q.  And is that customs check

24  performed by the Government of the

25  Virgin Islands?



1          A.  No, it's not.
2          Q.  Who performs that customs
3     check?
4          A.  The custom check is done by
5     the Federal United States Custom and
6     Border Protection agency.
7          Q.  Did the -- to your knowledge,
8     did the Federal Custom and Border
9     Protection agency ever advise law
10    enforcement officials in the Virgin
11    Islands of any suspicion or suspicious
12    activity concerning Mr. Epstein's
13    travels?
14         A.  They never informed me.  I'm
15    not aware they ever informed the
16    Police Commissioner.
17         Q.  Mr. Frazer, or Attorney
18    Frazer --
19         A.  Uh-huh.
20         Q.  -- do you believe that the
21    waivers that you granted in your
22    discretion enabled Mr. Epstein to
23    engage in sex trafficking?
24              ATTORNEY NEIMAN:  Objection,
25    foundation.  You can answer it.



1          THE WITNESS:  No, I don't

2     believe so.

3          (BY ATTORNEY ACKERMAN):

4     Q.  And why don't you believe so?

5     A.  Our job was to monitor his

6     presence within the territory or out

7     of the territory.  What he does while

8     he's out of the territory we have no

9     way of knowing.  When he's on there --

10    when he is in the territory, what he's

11    doing in his home, we are not aware

12    of.

13          As related to your question

14    you just asked, it's when he comes

15    into the territory, we know he -- he

16    is present in the territory by virtue

17    of his registration at Department of

18    Justice.  Who may be -- who may have

19    flew in with him on his private jet,

20    the Government of the Virgin Islands

21    officials would not know.  U.S.

22    Customs and Border Patrol would know.

23    But they've never indicated that they

24    had any reason, any suspicious as to

25    who was coming in with him and going



 1   out with him.
 2             So I -- you know, I don't
 3   believe that there was anything that
 4   we did that accommodated  from the
 5   Department of Justice in the sexual
 6   offender office that accommodated or
 7   -- or in any way facilitated his
 8   illegal activity.
 9        Q.  Are you aware under the Virgin
10   Islands SORNA Statute of a requirement
11   for an offender to register in person
12   at least once a year?
13        A.  I can't recall honestly.
14        Q.  Okay.
15        A.  Well, let me think about it.
16   I believe at minimum, all registrants
17   are required to register at least once
18   a year.  Those on lower tiers may have
19   to -- or higher tiers have to report
20   more than once a year.
21        Q.  Do you know whether
22   Mr. Epstein registered in person at
23   the Department of Justice at least
24   once a year?
25        A.  I would expect that he did.  I

