# FILED UNDER SEAL

# EXHIBIT 280

1            UNITED STATES DISTRICT COURT FOR THE

2                 SOUTHERN DISTRICT OF NEW YORK

3              CASE NUMBER:  22-CV-10904-JSR

4                    ACTION FOR DAMAGES

5
     GOVERNMENT OF THE UNITED STATES        )
6    VIRGIN ISLANDS,                        )
                                            )
7                            Plaintiff,     )
                                            )
8    VS.                                    )
                                            )
9    JP MORGAN CHASE BANK, N.A.,            )
                                            )
10                           Defendant.     )
                                            )
11   -------------------------------------

12

13

14

15              VIDEO RECORDED DEPOSITION OF

16                    SHANI A. PINNEY

17                   30(B)(6) WITNESS

18               TUESDAY, JULY 18, 2023

19

20

21   REPORTED BY:

22   DENISE D. HARPER-FORDE
     Certified Shorthand Reporter (CSR)
23   Certified RealTime Reporter (CRR)
     Certified LiveNote Reporter (CLR)
24   Registered Professional Reporter (RPR)
     Notary Public (FLORIDA)
25



1   Justice.

2       Q.  Did any of the jobs you had

3   before working for DoJ involve law

4   enforcement?

5       A.  No.

6       Q.  Did they involve sex offender

7   monitoring in any way?

8       A.  No.

9       Q.  When did your employment with

10  DoJ begin?

11      A.  In 2011, November 2011.

12      Q.  What position did you have?

13      A.  Sexual offender registry.  I

14  believe it's now it was coordinator.

15      Q.  And what were your roles and

16  responsibilities?

17      A.  My role was for the St.

18  Thomas, St. John Jurisdiction to

19  register sexual offenders who were

20  living or working on the two

21  Islands.

22      Q.  Anything else?

23      A.  Paperwork.  Updating the

24  online registry for the sexual

25  offenders to reflect their addresses,



1   Ackerman.  It was just myself and

2   Attorney Ackerman.

3        Q.  So what was the reference you

4   just made to Attorney Carbon or Monica

5   Carbon?

6        A.  So I understand that Attorney

7   Carbon met with Attorney Ackerman, and

8   her -- a brief review of -- of that

9   meeting was provided to me as well

10  too.

11       Q.  Okay.  So you never met with

12  Ms. Carbon, but a summary of that

13  meeting was provided to you?

14       A.  That's correct.

15       Q.  Okay.  Do you have that

16  document with you today?

17       A.  No, I don't.

18       Q.  Does your Counsel?

19           ATTORNEY ACKERMAN:  Yes, I

20       have it.  I can provide it.

21           ATTORNEY O'LAUGHLIN:  Okay.

22       Could you enter it as the first

23       exhibit please?

24           ATTORNEY ACKERMAN:  Well -- so

25       I'm going to enter it into the



```
1                    ATTORNEY ACKERMAN:   Okay.
2                    (BY ATTORNEY O'LAUGHLIN):
3          Q.   Is this the document that you
4   reviewed in preparation for your
5   testimony today?
6          A.   Yes.   I skimmed over this
7   yesterday evening.
8          Q.   So the first time you saw this
9   document was yesterday evening?
10         A.   Yes.
11         Q.   And how did this document help
12  you prepare for your testimony
13  today?
14                   ATTORNEY ACKERMAN:   Object to
15         form.
16                   THE WITNESS:   How it helped me
17         to prepare for today?   It
18         explained the beginning of how the
19         sexual offender registry statute
20         came to be.   How it was -- how and
21         why it was improved here in the
22         Virgin Islands.   And then --
23                   ATTORNEY ACKERMAN:   You can
24         scroll this document if you need
25         to.
```



1          THE WITNESS:  Thank you.  And

2      then it also went on to explain,

3      you know, the -- in regards to

4      Jeffrey Epstein and his

5      classification and his

6      registration here in the Virgin

7      Islands.

8          (BY ATTORNEY O'LAUGHLIN):

9      Q.  What is the sex offender

10  registry for?

11      A.  The sex offender registry

12  board was a combination of

13  professionals here in the Virgin

14  Islands.  And within the statute it

15  details that their duties are, you

16  know, to review -- if I recall, is to

17  review sex offender, their

18  classifications.

19          You know, to also review sex

20  offenders who seek to be removed from

21  the registry.  That's like some of  --

22  that's like one or two of the duties

23  that the SOR board -- I'm not that

24  familiar with it, because while I was

25  there, it was defunct.  You know, it



1        questions.

2            THE WITNESS:  I'm sorry.

3            ATTORNEY O'LAUGHLIN:  Yes.

4            THE WITNESS:  Sorry, sorry,

5       sorry.

6            (BY ATTORNEY O'LAUGHLIN):

7       Q.   There's a section at the end

8  that says "Monitoring visits to LSJ

9  when she wasn't there."

10           This section is about what?

11       A.   The bullets under here.  The

12  first bullet says, "She doesn't recall

13  much."  She has to be Attorney Carbon.

14  "She just recalls that Pinney,"

15  myself, "mentioned a question as to

16  whether they had the authority to go

17  past the dock."

18           Okay.  So that first bullet.

19  The second one, "She recalls the U.S.

20  Marshals will go out and invite them,

21  because they had the boat.  She

22  doesn't recall" a -- "discussions

23  regarding getting a warrant.  If there

24  were concerns she'd have passed it on

25  to the AAG, but does not recall" --



1            COURT REPORTER:  Speak up,

2    please.

3            THE WITNESS:  "If there were

4        concerns she would have passed it

5        to the AAG, but does not recall

6        ever doing so."

7            Okay.  So this section here

8        refers to when we would do our

9        address verifications for all

10       registered offenders here in the

11       Virgin Islands.

12           She doesn't recall much, but

13       she's saying that I mentioned to

14       her -- question -- because where

15       they had the authority to go past

16       the dock.

17           Okay.  So the question was

18       whether or not the dock was

19       Jeffrey Epstein's front door to

20       his home.  When we do the address

21       verifications, they are not search

22       warrants.

23           We go, we knock on the      door,

24       and we introduce ourselves.  We

25       say, "Hello," you know, We're here



1  with the -- "This is DoJ.  We're

2  here with the U.S. Marshals here.

3  We're VIPD.  And we are here to

4  conduct an address verification."

5     At that point, they can say

6  whether or not we can enter into

7  their home.  They have that right

8  to say "no."  This question in

9  regards to being able to pass his

10  dock.  Because the question came

11  up whether his dock would be his

12  front door.

13     So essentially, if we pull up

14  there, you know, with U.S.

15  Marshals services, with VIPD --

16  and we used to go out on -- if I

17  recall, one time we went on the

18  U.S. Coast Guard boat.  Another

19  time we went out on a vessel from

20  DPNR.

21     The question amongst all of

22  the entities was essentially, is

23  this dock his front door?  Do we

24  have the legal authority to

25  actually force ourselves past the



```
1              dock since he actually owned the
2              island?  So that is what that
3              first bullet is referencing.
4                  (BY ATTORNEY O'LAUGHLIN):
5         Q.  Was that question resolved?
6         A.  Was that question resolved?
7    Basically, when -- even when we had a
8    telephone call with our liaisons from
9    USDoJ, they were not able to provide
10   any real guidance on that, because he
11   -- he owned the island.
12              And so, like I said before,
13   when we knock on the door they can say
14   "yes" or "no" you can come in.  So we
15   have conducted address verifications
16   in the yard of a sexual offender.  It
17   doesn't have to be inside their home.
18              So they were really unsure as
19   to what the laws are.  They -- they
20   really were not able to provide any
21   real guidance regarding whether or not
22   Epstein's dock was essentially, you
23   know, representative of his front
24   door.
25         Q.  So there was a question, but
```



1    DoJ never determined the answer?

2         A.  DoJ wasn't able -- was unable

3    to provide guidance.  That's correct.

4    No -- no answer was every really

5    received from DoJ about that.

6         Q.  Why not?

7              ATTORNEY ACKERMAN:  Object to

8         form.

9              THE WITNESS:  I'm not sure why

10        not.  They weren't sure.

11             (BY ATTORNEY O'LAUGHLIN):

12        Q.  And in the absence of guidance

13   from DoJ, how did you approach the

14   question of whether you could go past

15   the dock or not?

16             ATTORNEY ACKERMAN:  Object to

17        form.  You can answer.

18             THE WITNESS:  So, if Epstein

19        was on-island or if his staff

20        allowed us to, that would be when

21        we would go past the dock --

22             (BY ATTORNEY O'LAUGHLIN):

23        Q.  Okay.

24        A.  -- and actually be on the

25   island, actually on the island



```
 1    itself.
 2         Q.  So barring guidance to the
 3    contrary, you treated the dock as a
 4    front door?
 5             ATTORNEY ACKERMAN:  Object to
 6         form.
 7             THE WITNESS:  It was agreed
 8         amongst the different entities,
 9         the U.S. Marshals services, VIPD
10         and also DoJ, that the dock had to
11         be considered as his front door.
12             (BY ATTORNEY O'LAUGHLIN):
13         Q.  So it was agreed that that's
14    the way you would all proceed, but
15    there was never a formal decision that
16    that was in fact the right answer;
17    correct?
18             ATTORNEY ACKERMAN:  Object to
19         form.
20             THE WITNESS:  When you say
21         formal decision, do you mean some
22         -- what do you mean when you say
23         formal decision?
24             (BY ATTORNEY O'LAUGHLIN):
25         Q.  Well, you said you never got
```



```
 1    the guidance you were looking for.  So

 2    that's what I mean.

 3         A.  From USDoJ, no we did not.

 4         Q.  Okay.  But you -- but USVIDoJ

 5    did have -- come to a conclusion, even

 6    though USDoJ didn't?

 7              ATTORNEY ACKERMAN:  Object to

 8               form.

 9              THE WITNESS:  Okay.  So we

10              concluded that his dock was his

11              front door.  That was the

12              conclusion amongst -- jointly

13              amongst all of the entities there

14              that.

15              You know, U.S. Marshals

16              services were not sure, neither

17              was VIPD.  So we said, "Okay.

18              Let's consider his dock as his

19              front door."

20              (BY ATTORNEY O'LAUGHLIN):

21         Q.  Okay.  So USVI Department of

22    Justice did have a view that the dock

23    was the front door.  And the thing

24    they were wanting confirmation from

25    was USDoJ.  And that's the opinion
```



1    they never got?

2          ATTORNEY ACKERMAN:  Object to

3       form.

4          THE WITNESS:  I wouldn't say

5       that we had that view.  If we were

6       able to, we would like to go into

7       the homes of all offenders, you

8       know, to -- because the offender

9       address checks are not warrants.

10         The same way that we would not

11      force ourselves into any offenders

12      home through their front door, we

13      did not want to force our way onto

14      his island pass the dock.

15         So we said we will conduct the

16      checks if they were allowed to

17      come on the island from Epstein or

18      from his employers, his staff, we

19      would go past the dock onto the

20      island.

21         And that will be the same way

22      if any offender, if John Doe on

23      the registry said we can come in,

24      we would come into their home past

25      your front door as well too.



1      Q.  Got it.  And USVIDoJ had

2  thought about the question and had

3  determined we're going to treat the

4  dock as his front door for our

5  purposes?

6          ATTORNEY ACKERMAN:  Object to

7      form.  Asked and answered.

8      Misstates prior testimony.  You

9      can answer.

10         THE WITNESS:  Yes.  So, you

11     know, the -- the sex offender

12     address checks, you know, it was

13     done by U.S. Marshals services,

14     VIPD and DoJ.

15         And it's important to

16     understand also that these address

17     checks are really a function of

18     the U.S. Marshal services.  You

19     know, that is something that they

20     receive funding to do throughout

21     the U.S.

22         So they would bring down their

23     team of Marshals from Florida and

24     Georgia, I guess, you know, the

25     Southeast region.



```
1        So we -- although we were
2    registering the offenders here in
3    the Virgin Islands, we were also
4    taking their lead as to since it
5    was essentially -- I don't want to
6    say their operation.
7        But they received the funding
8    and they would let us know, you
9    know, when the possible dates for
10   the -- we used to refer to them as
11   registration sweeps, you know,
12   when the sweeps could occur.
13       So I also want to highlight
14   that even U.S. Marshals services
15   -- you know, the Marshals, they
16   were also not 100 percent sure as
17   to whether or not we can actually,
18   you know, just go on and pass the
19   dock without the permission.
20       So the -- you know, that
21   guidance, you know, the -- a
22   little bit of unsure from USDoJ
23   as well too.  We said, "Okay.
24   That must mean that we have to
25   consider his dock as his front
```



1         door."  Did we want to do it that

2         way?  No.

3             You know, we would have loved

4         to.  And it was actually, you know

5         -- like I said, we would love to

6         be able to go into the home of

7         every offender, including Epstein,

8         when -- when he was registering.

9             But we came to the -- you

10        know, the decision that his dock

11        had to essentially be considered

12        as his -- as his front door.

13            (BY ATTORNEY O'LAUGHLIN):

14        Q.  Why weren't you on the Friday

15   call with Ms. Carbon?

16        A.  Oh, I've been on family

17   vacation.  I just came back yesterday

18   evening.  I've been gone since July

19   5th.  So I wasn't available for the

20   call on Friday.  Actually Ms. -- the

21   E-mail invite for -- for that

22   meeting.

23        Q.  Okay.  So you were invited to

24   the meeting by your counsel, but you

25   didn't see the invite, and so didn't



```
 1   well.
 2        Q.  Do you recall which of these
 3   attorneys were specifically involved
 4   with Epstein?
 5             ATTORNEY ACKERMAN:  Object to
 6        form.
 7             THE WITNESS:  All of the
 8        offend -- all of the attorneys
 9        assisted with the offenders.
10        Okay.  So if I backtrack, I said
11        it would be attorneys specifically
12        will assist with any warrants, any
13        absconders.
14             Epstein didn't have any
15        warrants.  You know, he always
16        appeared to register.  So there --
17        you Know, there were no warrants
18        for him or anything.  But in
19        regards to his initial
20        classification, the attorney who
21        dealt with that would have been
22        Attorney Carbon.
23             (BY ATTORNEY O'LAUGHLIN):
24        Q.  Okay.  And then did the
25   Attorney Generals -- the Attorneys
```



```
 1   General themselves get involved in
 2   monitoring Epstein at any point?
 3           ATTORNEY ACKERMAN:  Object to
 4       form.
 5           THE WITNESS:  In monitoring
 6       Epstein, no.  That -- those were
 7       the duties of the coordinators,
 8       myself as a manager and also the
 9       investigators.  So the attorneys
10       were not involved in the
11       monitoring of the offenders.
12           (BY ATTORNEY O'LAUGHLIN):
13       Q.  Were they involved in any way
14   with Epstein?
15           ATTORNEY ACKERMAN:  Object to
16       form.
17           THE WITNESS:  Only in regards
18       to his classification.  Epstein
19       was not -- Epstein was never found
20       to be in noncompliance.
21           So there was never a warrant
22       for an attorney to be involved
23       with him in that aspect.  With
24       regards to his classification
25       regarding which tier he fell into,
```



```
 1              there was -- there was an attorney
 2         who dealt with that.
 3              (BY ATTORNEY O'LAUGHLIN):
 4         Q.  So I'm talking specifically
 5    about the Attorneys General of the
 6    USVI during your time period there.
 7    And I'm asking were they involved in
 8    any way with Epstein's sex offender
 9    registration or monitoring?
10              ATTORNEY ACKERMAN:  Object to
11         form.
12              THE WITNESS:  In any way --
13         when he first came on, Attorney
14         Carbon, you know, she dealt with
15         him in regards to his
16         classification.  Okay?
17              ATTORNEY ACKERMAN:  Ms.
18         Pinney, he's asking you about
19         Attorney General --
20              THE WITNESS:  Attorneys
21         General.
22              ATTORNEY ACKERMAN:  --
23         Attorneys General.
24              THE WITNESS:  Okay.
25              ATTORNEY ACKERMAN:  Yes.
```



1          Q.   Okay.  So let me ask the

2     question this way:  If there was a new

3     employee in the group and you had to

4     give them an orientation, you would

5     hand them the statute and say, read

6     this.

7              And then you would describe

8     the practices, but there wasn't a

9     handbook or any other thing you would

10    give them to be like, this is how we

11    do our work.

12              ATTORNEY ACKERMAN:  Objection

13         to form, scope.

14              (BY ATTORNEY O'LAUGHLIN):

15         Q.   Correct?

16         A.   Outside of the statute, there

17    was no other written handbook or

18    policy for employees relative to the

19    sex offender registry.

20         Q.   Okay.  And you -- so with

21    regard to the practices, you said

22    there was a practice regarding

23    interaction with VIPD; correct?

24         A.   Uh-huh.

25         Q.   What was that practice?



1          A.   That VIPD will assist the US

2     Marshals Services and VI DoJ with the

3     sex offender registration sweeps.

4          Q.   What would you need to do --

5     what would DoJ need to do in order to

6     get that assistance?

7               ATTORNEY ACKERMAN:   Object to

8          form, scope.

9               THE WITNESS:   The AAG will

10          draft a letter to the head of VIPD

11          requesting assistance.

12               (BY ATTORNEY O'LAUGHLIN):

13          Q.   Were there ever times that DoJ

14     would reach out for help with a

15     specific sex offender?

16               ATTORNEY ACKERMAN:   Object to

17          form, scope.

18               THE WITNESS:   No.

19               (BY ATTORNEY O'LAUGHLIN):

20          Q.   So at no point in the time

21     that you were at DoJ did USVI DoJ ever

22     reach out to you US VIPD for

23     assistance with any registered sex

24     offender?

25               ATTORNEY ACKERMAN:   Objection,



1  registered sex offenders and our

2  statutes.  Any questions that we may

3  have had, such as what we spoke about;

4  you know, the dock of Epstein.

5       Q.  Who at US DoJ would you reach

6  out to with those questions?

7       A.  I can't remember the title,

8  but at one point it was Lori

9  McPherson.

10      Q.  How many times did you reach

11 out to Lori McPherson regarding

12 Epstein?

13      A.  Oh, I -- I cannot recall the

14 amount of times.  I -- I can't recall.

15      Q.  Were there times?

16      A.  The only time I can recall in

17 what would have been in regards to the

18 dock, and that was held when I

19 attended a training for, you know, for

20 -- for -- they had a training for all

21 SORNA, all sex offender registries to

22 attend.

23          And in person when I saw Ms.

24 McPherson, we spoke about, you know,

25 the question regarding Epstein and his



1   dock.

2        Q.   Okay.   What did you say to

3   her?

4        A.   I explained to her that we

5   were doing the address verifications.

6   And I mean, I can't remember word for

7   word.   But all in all, the scope was

8   whether or not we can forcibly come

9   onto the island or you know, is --

10  when I say forcibly, I mean, you know,

11  if we can actually go past the dock

12  and you know, walk on the island until

13  we see, you know, perhaps where he

14  rests.   You know, where -- where he

15  lays his head.   Or is -- or is there

16  any guidance with regards to offenders

17  who own islands, you know?

18          And the response I got back

19  was that Epstein was unique in that

20  most offenders don't own islands.

21  However, they're -- they drew the

22  comparison to, let's say, an offender

23  lives in the Midwest, you know, where

24  there are, you know, mass amounts of

25  land.   You know, and the offender has



1   a gate, you know, and he owns

2   probably, you know, 20-something ares

3   of land.

4           If his home is within the

5   middle of that, he can argue that his

6   fence is his front door.  So, you

7   know, that was the comparison that was

8   -- that was drawn to Epstein.

9       Q.  And did they give you that

10  comparison as a means of saying, and

11  we think the dock is the same?

12          ATTORNEY ACKERMAN:  Object to

13      form.

14          THE WITNESS:  Pretty much, you

15      know, they said that they were not

16      sure.  But, you know, they drew

17      that comparison to show that --

18      that essentially, you know, that

19      was how another juris- -- another

20      state had to deal with -- -- with

21      their offender.  So yeah, you

22      know, it's -- it's their

23      property.

24          (BY ATTORNEY O'LAUGHLIN):

25      Q.  Do you know what Lori



1   what was said in Brisson's E-mail.

2        Q.  What year was that E-mail that

3   you escalated?

4        A.  Oh, I don't recall, but I do

5   remember reviewing that document with

6   Attorney Ackerman.

7        Q.  Okay.  Aside from that one

8   escalation, there were no other

9   escalations by DoJ regarding Epstein;

10  correct?

11       A.  Correct.  No other, no.

12       Q.  Okay.  You said that in 2017,

13  your role expanded to include looking

14  at the budget for DoJ; correct?

15       A.  Uh-huh.

16       Q.  And for the sex offender

17  monitoring group specifically,

18  correct?

19       A.  And for the sex -- oh,

20  overseeing the other employees, yes.

21       Q.  How is the sex offender

22  monitoring program funded?

23       A.  It's a Federally funded

24  program from VI -- from US DoJ and Sex

25  Offender Registry Notification Act.



1   You know, so by -- by enhancing our

2   laws in 2012, that made us eligible to

3   -- us being the Virgin Islands --

4   eligible to receive funding for

5   employees to -- to monitor offenders

6   in the Virgin Islands.

7        Q.  Was that funding adequate to

8   do the job that you guys had to do?

9            ATTORNEY ACKERMAN:  Object to

10           form, scope.

11           THE WITNESS:  If it was the

12           pos- -- that funding was used for

13           salaries.  Other -- and funding

14           was also received from US Marshals

15           Services as well too, you know, to

16           purchase like iPads, you know, for

17           us to use to be able to monitor

18           offenders outside of the office.

19           You know, to be able to update the

20           registry, the online registry

21           outside the office as well too.

22               So from -- from V- -- from US

23           DoJ, that funding was used for

24           salaries, the salaries being, you

25           know, for the three positions.



1          to form, scope to the extent it's

2          outside the sex offender registry

3          topic.

4               THE WITNESS:  To my knowledge,

5          no.

6               (BY ATTORNEY O'LAUGHLIN):

7          Q.  Do you know if First Lady

8   Cecile de Jongh ever interacted with

9   DoJ regarding Epstein?

10         A.  I cannot say that I was aware

11  of that during my -- during my time.

12  So no.

13         Q.  Do you know if Governor de

14  Jongh ever interacted with VI DoJ on

15  behalf of Epstein?

16         A.  I --

17              ATTORNEY ACKERMAN:  I'm just

18         going to object on scope to this

19         line of questioning.  And you can

20         go ahead.

21              THE WITNESS:  To my knowledge,

22         no.

23              (BY ATTORNEY O'LAUGHLIN):

24         Q.  What about Governor Bryan?

25         A.  To my knowledge, no.



```
 1              THE WITNESS:  About the

 2         tuition being paid?

 3              (BY ATTORNEY O'LAUGHLIN):

 4         Q.  About the relationship between

 5    Governor John de Jongh, the First Lady

 6    and Epstein.

 7              ATTORNEY ACKERMAN:  Objection

 8         to form, scope.

 9              THE WITNESS:  I cannot recall

10         when I was first -- when I became

11         aware of these -- the relationship

12         between Epstein and the former

13         Governor.

14              (BY ATTORNEY O'LAUGHLIN):

15         Q.  Did the relationship between

16    Epstein and the de Jongh family ever

17    play any role in DoJ's monitoring of

18    Epstein as a sex offender?

19         A.  No.

20         Q.  Did either Cecile de Jongh or

21    John de Jongh ever reach out to anyone

22    involved in sex offender monitoring at

23    DoJ regarding Epstein?

24         A.  To my knowledge, no.

25              ATTORNEY O'LAUGHLIN:  Let's
```



1        A.   Uh-huh.

2             ATTORNEY ACKERMAN:   Same

3        objection, speculation.

4             THE WITNESS:   No.

5             (BY ATTORNEY O'LAUGHLIN):

6        Q.   Do you agree with the

7    statement that there was no

8    information available to the USVI to

9    trigger an investigation?

10            ATTORNEY ACKERMAN:   Objection,

11       scope.

12            THE WITNESS:   You're talking

13       about the Attorney General

14       George's statements?

15            (BY ATTORNEY O'LAUGHLIN):

16       Q.   Yes.

17       A.   Yes, I agree with that.

18       Q.   Isn't all of the information

19   that we just looked at information

20   about complaints of criminal activity

21   by Epstein on Little St. James?

22            ATTORNEY ACKERMAN:   Objection

23       to form, scope.

24            THE WITNESS:   So like what

25       Denise George says here, an



1        investigation can only be launched

2        if someone launches -- if someone

3        files a criminal Complaint.  I'm

4        understanding that to be a

5        Complaint being filed locally, you

6        know, with VI DoJ or you know,

7        with VIPD.

8            (BY ATTORNEY O'LAUGHLIN):

9        Q.  Why does it need to be a

10   locally filed Complaint?

11       A.  I'm saying that's what I

12   understand and --

13           ATTORNEY ACKERMAN:  Hold on.

14       Objection, scope.  You can go

15       ahead.

16           THE WITNESS:  Yes.  I'm saying

17       that's what I understand, you

18       know, the AG's meaning to be here

19       in this sentence.  Nothing was

20       ever filed directly with VI DoJ or

21       VIPD to launch an investigation.

22           (BY ATTORNEY O'LAUGHLIN):

23       Q.  And DoJ's position is that

24   unless something was filed directly

25   with them, there was no need to do any



1   kind of investigation into Epstein?

2              ATTORNEY ACKERMAN:  Objection

3         to form, scope.

4              THE WITNESS:  Yeah.  You know,

5         it cannot be a -- no hearsay.  It

6         cannot be rumors, whispers.  It

7         has to actually be someone

8         actually filing a Complaint.

9              That would have been the

10        means, you know, for any sexual

11        offender to start spark an

12        investigation or you know, if

13        information was shared directly,

14        you know, with the victim you know

15        to VI DoJ.  It would have to have

16        been dir- -- it would have had to

17        have been direct communication.

18             (BY ATTORNEY O'LAUGHLIN):

19        Q.  Did anyone within DoJ ever

20   push for more to be done with respect

21   to investigating Epstein?

22             ATTORNEY ACKERMAN:  Objection

23        to form, scope.

24             THE WITNESS:  No.

25             (BY ATTORNEY O'LAUGHLIN):



```
 1              (BY ATTORNEY O'LAUGHLIN):
 2         Q.  No you don't know or you don't
 3    think they were?
 4         A.  If other offenders were
 5    granted this, I would have been aware,
 6    since I was registering the
 7    offenders.
 8         Q.  Okay.  And you're not aware of
 9    any other offenders that got these
10    sorts of waivers?
11         A.  No.
12         Q.  Okay.
13         A.  I do want to say though -- you
14    said if they -- if anyone ever made
15    requests.  We got complaints all the
16    time, you know.
17              So offenders, you know,
18    complain about the frequency,
19    everything all the time.  So it was --
20    just wasn't to the extent, you know,
21    of this.
22         Q.  What was the reason for the
23    original regime of having the 21-day
24    notice requirement?
25              ATTORNEY ACKERMAN:  Object to
```



1  form, scope.

2          THE WITNESS:  I am not sure.

3  I don't know.  I wasn't involved in

4  the -- in the creation of it.

5  Guidance was received from US DoJ.  So

6  that may have been perhaps what US DoJ

7  recommended.

8          However, in the end, even with

9  the changes, US DoJ still approved

10  this SORNA for us to receive the

11  funding for -- we had to receive the

12  funding.

13          (BY ATTORNEY O'LAUGHLIN):

14      Q.  Were -- was the 21-day

15  requirement part of what you described

16  as making the laws more strict

17  surrounding the sex offender

18  monitoring?

19      A.  I --

20          ATTORNEY ACKERMAN:  Object to

21  form.  You can answer.

22          THE WITNESS:  I assume so.

23  Yes.

24          (BY ATTORNEY O'LAUGHLIN):

25      Q.  Okay.  And was the requirement



 1  notify via E-mail.

 2              (BY ATTORNEY O'LAUGHLIN):

 3         Q.  Okay.  So between the period

 4  when Attorney General Vincent Frazer

 5  left office and then was replaced by

 6  Attorney General -- by acting Attorney

 7  General Thomas-Jacobs, you don't

 8  recall any particular incidents

 9  outside of the ones that you just

10  discussed?

11         A.  No, I do not.

12              ATTORNEY O'LAUGHLIN:  Okay.

13  So let's enter Tab 12 as Exhibit 20.

14              (Whereupon, Defendant's

15               Exhibit No. 20, 2019 MetaData

16               Documents, was marked for

17               identification)

18              THE WITNESS:  And I do also

19  want to add in there, you know, that

20  -- that when I remember more, I think

21  the statute speaks about traveling

22  outside of the United States.

23              So, you know, it was more so

24  like a policy that we have for

25  offenders to notify us of any travel



1   outside of the Virgin Islands.  But

2   the statute really clearly spoke about

3   outside of the United States.

4          And since we are a US

5   territory, you know, travel to Florida

6   or to Minnesota or to New York or New

7   Jersey would have still be considered

8   inside the United States.

9          So we got a policy in place

10  where we wanted the offenders to

11  notify us of, you know, any travel to

12  include outside the territory.

13          (BY ATTORNEY O'LAUGHLIN):

14      Q.  So let me see if I understand.

15  Was -- there a change -- was there a

16  change between whether international

17  travel required reporting versus

18  travel within the United States?

19      A.  Well, you know, now that we're

20  speaking, and I spoke specifically

21  about the travel to DR, to the

22  Dominican Republic.  I'm remembering

23  now that within the statute, it spoke

24  about notifying VI DoJ if any offender

25  has notified any -- of any travel



1  outside the United States.

2        Q.   Okay.

3        A.   However, we adopted, you know,

4  a policy, you know, within VI DoJ.  We

5  wanted offenders to notify us of any

6  travel outside of the territory as

7  well.  So not just outside the United

8  States.

9             So if they were going to

10  Puerto Rico, we wanted to know they

11  were going to Tortola, we wanted to

12  know that as well too.

13       Q.   Okay.  Was that different from

14  the regime that had been in place

15  before?  Like if they had gone to

16  Florida before, would they have needed

17  to notify?

18             ATTORNEY ACKERMAN:  Object to

19  form.

20             THE WITNESS:  When you say

21  different from before, what time

22  frame?  You mean prior to 2012.

23             (BY ATTORNEY O'LAUGHLIN):

24       Q.   The -- well, when do you think

25  the change -- if there was a change,



```
 1   her response was to that I cannot
 2   recall.
 3               (BY ATTORNEY O'LAUGHLIN):
 4        Q.   Okay.  So you don't remember
 5   what her view was about the previous
 6   grants?
 7               ATTORNEY ACKERMAN:  Object to
 8   form.
 9               THE WITNESS:  No.
10               (BY ATTORNEY O'LAUGHLIN):
11        Q.   Okay.  You don't know whether
12   she opposed the grants that Frazer had
13   put in place?
14               ATTORNEY ACKERMAN:  Object to
15   form.
16               THE WITNESS:  No.
17               (BY ATTORNEY O'LAUGHLIN):
18        Q.   Okay.  You talked about
19   sweeps.  What is a sweep?
20        A.   So the sweep was the name that
21   the US Marshals gave the -- the
22   operation.  It was called Operation
23   Island Sweep.  And that was when US
24   Marshals Services, they would come in.
25               They would let us know the
```



1  dates where we can have this operation

2  to verify the addresses of sex

3  offenders in the Virgin Islands.

4        Q.  So the sweeps were run by

5  who?

6        A.  Nothing within the statute

7  speaks about sweeps having to occur.

8  So the only thing that is within the

9  statute, if I remember, speaks about

10  an offender moves to the territory

11  within a set amount of dates, VI DoJ

12  officials go out to verify that

13  address.

14             In regards to the sex offender

15  address compliance checks, that was an

16  effort from the US Marshals Services.

17  And if I remember correctly, a part of

18  US DoJ is that the US Marshals

19  Services, that they assist states, you

20  know in the offices who oversee the

21  sexual -- the sex offenders; that they

22  assist them with the operation to

23  include the address verifications.

24        Q.  How frequently do sweeps

25  occur?



1        A.  How frequent the sweeps occur?

2   There was no set-in-stone time for the

3   frequency of the sweeps to occur.  It

4   would be something where we were in

5   constant communication with the US

6   Marshals Services.  And they will let

7   us know, Hey, you know, this will be

8   the time for an upcoming sweep.

9        Q.  Do you have an estimate of how

10  frequently they occurred?

11       A.  I would say perhaps once a

12  year depending on funding.

13       Q.  Okay.  Funding from where?

14       A.  Funding that the US Marshals

15  Services received.  So the US Marshals

16  is Federal funding to conduct the

17  operational sweeps.

18       Q.  Okay.  And during a sweep,

19  what was the objective?

20       A.  The objective was to verify

21  the address of the -- that the sex

22  offender had on record as their

23  permanent residence.

24       Q.  What does verify mean?

25       A.  Verify, verification process



1   confirm with Epstein to complete his

2   compliance check within that time

3   period, they would have tried.  But

4   once they went back, that was it.  You

5   know, the operation ended at that

6   point.

7        Q.  And there wouldn't have been

8   any further follow-up, correct?

9        A.  Further follow-up in regards

10  to verifying his address?

11       Q.  Yeah.

12       A.  Well, if we go there and

13  Epstein -- remember I said before

14  another person in the home can, you

15  know, confirm that the offender was

16  living there.  Ideally we do want to

17  see the offender in person.

18           However, an offender not being

19  at the address does not -- does not

20  immediately mean that they are in

21  noncompliance or, you know, it -- it

22  wouldn't immediately mean they were in

23  noncompliance if -- within the team if

24  it was agreed that, okay, you know,

25  he's off island right now or, you



1  know, we can meet him at his office,

2  then that would have been enough to,

3  you know, to -- at the time for, you

4  know, during the week of the checks.

5       Q.  You testified earlier that

6  USVI DoJ SOR unit purchased a car?

7       A.  Uh-huh.

8       Q.  Why?

9       A.  I testified earlier that the

10 vehicle was used to conduct the

11 verification checks --

12      Q.  So --

13      A.  -- the compliance checks.

14      Q.  So the car was only used

15 approximately once a year?

16      A.  No.  Remember I also said

17 that -- that during the year, we would

18 also verify the addresses of

19 offenders, you know, if they

20 relocated, if they had a new address.

21 Within that time, I think it's seven

22 days, that we would also go out to

23 verify their addresses.

24      Q.  Were there any other reasons a

25 car would be used?



1        Q.  The news articles that we went

2    over earlier today and the 2009

3    article that we looked at -- or sorry,

4    I think it was 2010, July 2010 Daily

5    Beast article with the allegations

6    against Epstein, did any of that

7    reporting cause USVI DoJ to initiate a

8    check on Epstein?

9            ATTORNEY ACKERMAN:  Object to

10   form.

11           THE WITNESS:  No.  Like I

12   stated before, there were no written

13   concrete allegations that were

14   submitted to VI DoJ to constitute, you

15   know, or to elevate for -- for an

16   investigation.

17           And the article was there.  I

18   saw the article from The Daily Beast,

19   and yeah, I mean, I remember seeing

20   that here with you, and yeah.

21           (BY ATTORNEY O'LAUGHLIN):

22       Q.  That's fine.  You don't need

23   to find it.

24       A.  I'm not sure how --

25       Q.  There was no follow-up here,



1   already know where Mr. Epstein was

2   living?

3        A.  Yes, we did.

4        Q.  Okay.  Was there any doubt in

5   your mind or in the SORNA unit's mind

6   as to whether Mr. Epstein had moved to

7   a different address?

8        A.  No, there was not.

9        Q.  Why not?

10       A.  Well, for one, he did not

11  provide any notice of change.  We

12  received no tips saying that he was no

13  longer living on Little St. James and

14  living at another residence, and yeah.

15       Q.  Okay.  Was there an instance

16  where Mr. Epstein's verification was

17  conducted at his office?

18       A.  Yes, there was.

19       Q.  Okay.  Did you participate in

20  that verification?

21       A.  From my recollection, I did.

22       Q.  Okay.  And tell me what you

23  recall about that verification when

24  you met Mr. Epstein at his office.

25       A.  So we ended up -- when we went



1    to his island, he wasn't there.  So at

2    that point we decided that we can meet

3    him at his -- at his office.

4              When we went to the island,

5    his staff was there, his employees

6    were there.  They confirmed, you know,

7    that this was Little St. James and

8    that this was Jeffrey Epstein's, if

9    you want to say his island, you know.

10             And just like how the decision

11   was made in other address checks for

12   other offenders, since he wasn't at

13   home, that was not determined to be

14   that he was in noncompliance.  We

15   simply just said, Okay.  We'll go to

16   his employer address.

17        Q.  Did you verify other sex

18   offenders in the Virgin Islands at

19   their employer's address?

20        A.  Yes, we did.

21        Q.  Okay.  Are the address

22   verifications or the sweeps required

23   by any Virgin Islands statute to your

24   knowledge?

25        A.  No.



1          Q.  When you performed the address

2     verifications or the sweeps, do you

3     have a warrant?

4          A.  No, we do not.

5          Q.  Do you have an understanding

6     as to whether there is any limit on

7     your ability to search or enter a

8     person's, a sex offender's property

9     during an address verification or

10    sweep?

11         A.  An address verification does

12    not constitute that VI DoJ has the

13    right to search an offender's home.

14    If we go to the address and we say,

15    Hi, we're here to conduct an address

16    verification, can we come inside, they

17    have the right to say no.

18              Them saying no does not put

19    them in noncompliance because it is

20    not a search warrant.  We don't have a

21    search warrant to search the home.

22              So in many instances, we have

23    conducted address -- checks in an

24    offender's yard, on their front porch,

25    and they were found to still be in



1  compliance because a search of their

2  home was not required to complete that

3  address verification.

4         Q.  Okay.  Thank you.

5              You testified earlier one of

6  the things you did in preparation for

7  this deposition was to review the

8  testimony of Inais Borque, right?

9         A.  Yes.

10        Q.  Okay.  There was testimony in

11 Ms. Borque's deposition about

12 performing weekly checks of offenders.

13 Do you recall that testimony?

14        A.  I do recall reading that in

15 her -- in her deposition, yes.

16        Q.  Okay.  Was it the practice of

17 the Virgin Islands DoJ SORNA office to

18 conduct weekly checks of sex offenders

19 during the time period that you worked

20 in that office?

21        A.  No, it was not.

22        Q.  Thank you.

23              I want to go through a few

24 exhibits, and I'll try to just go

25 quickly.  But let's start with Exhibit



1  25, if you would.  Do you have Exhibit

2  25 in front of you?

3          A.  Yes, I do.

4          Q.  Okay.  And this is the Virgin

5  Islands daily news article from April

6  3rd, 2018.  Do you see that?

7          A.  Yes.

8          Q.  Okay.  And counsel read you a

9  quote that said, "We're not a lenient

10  jurisdiction because we know

11  registration reduces the frequencies

12  of sex offenses against new victims."

13          Did I read that correctly?

14          A.  Yes.

15          Q.  Did Mr. Epstein ever fail to

16  register in the Virgin Islands?

17          A.  No.

18          Q.  Okay.  We can put that aside.

19          Let's look quickly at Exhibit

20  22.  Do you have Exhibit 22 in front

21  of you?

22          A.  Yes.

23          Q.  Okay.  And Exhibit 22 is the

24  E-mail chain with a sex offender.  His

25  name is redacted on this document.



1    had to be creditable, it had to have

2    been a clear indication that the

3    offender was in noncompliance.

4            (BY ATTORNEY ACKERMAN):

5        Q.  In your exper- -- given your

6    experience, do you believe news

7    reports would have been sufficient to

8    obtain a warrant to search

9    Mr. Epstein's property?

10           ATTORNEY O'LAUGHLIN:

11   Objection.

12           THE WITNESS:  No.

13           (BY ATTORNEY ACKERMAN):

14       Q.  Why not?

15       A.  The media has a way of

16   sensationalizing a lot of things.

17   That's for one.  And it would have to

18   be something that is concrete, that

19   has evidence.

20           It would have to be a victim

21   actually coming forward or a witness

22   actually coming forward and saying,

23   putting it, you know, on record and,

24   you know, a full statement to VI DoJ

25   would have been needed from -- that's



1   what I think would have been needed to

2   move forward with an investigation

3   against Epstein from VI DoJ.

4            I don't think that a media

5   source of allegations would have been

6   enough for us to go forward to a judge

7   to request an investigation or a

8   warrant to search -- to search the

9   island.

10           Q.   During your tenure at the

11  SORNA unit, are you aware of any of

12  Epstein's victims or any witness to

13  Epstein's crimes coming forward to DoJ

14  prior to his arrest?

15           A.   No.

16           Q.   I want to give you the

17  opportunity to, I think, explain

18  something.  You earlier in this

19  deposition used the term real

20  complaints and real victims.  Do you

21  recall that phrase?

22           A.   I think I was explaining about

23  what -- if allegations were reported

24  to VI DoJ about offenders.  Yes, I

25  do.



1        Q.   Yes.   Were you meaning to

2    suggest that the victims of

3    Mr. Epstein weren't real?

4         A.   Oh, of course not, no.   That's

5    not what I meant at all.   I was trying

6    to just draw the comparison to show

7    how, you know, a news report of

8    allegations from victims, that was not

9    going -- that was not going to be

10   considered as something concrete.

11           In comparison to other

12   offenders we've had where there have

13   been written allegations, you know,

14   victims coming forward saying that,

15   you know, for example, John Doe on the

16   registry is still committing sexual

17   offenses against children, for

18   example.

19           And with that, that would have

20   been enough proof for us to do an

21   investigation, to contact human

22   services, to contact VIPD as well in

23   those instances.   But it was not to

24   say in any way that -- that the

25   allegations from any of those victims,



1   you know, that they were not real.

2          Q.   Thank you.

3               You described earlier a

4   discussion with Denise George

5   concerning Mr. Epstein.  Do you recall

6   that testimony?

7          A.   Yes.

8          Q.   Was that discussion specific

9   to Mr. Epstein or did Mr. Epstein come

10  up in the context of a discussion of

11  sex offenders generally?

12         A.   If I recall, he came up in a

13  conversation of sexual -- of sex

14  offenders generally.  He came up

15  within the discussion.

16         Q.   Thank you.

17              Are you aware whether the

18  Attorney General is involved in

19  monitoring sex -- or strike that.  Let

20  me ask the question differently.

21              During your tenure -- tenure

22  at the SORNA unit, was the Attorney

23  General involved directly in

24  monitoring sex offenders?

25              ATTORNEY O'LAUGHLIN:



1           ATTORNEY O'LAUGHLIN:

2     Objection.

3           THE WITNESS:  I'm not sure,

4     but I can say that every jurisdiction

5     has their own set of statutes that

6     they use to determine how frequently

7     or the -- or the duration of time that

8     offenders must appear or how long they

9     have to register.

10          (BY ATTORNEY ACKERMAN):

11     Q.   Okay.  There was some

12     discussion about the 2012 changes in

13     legislation, the changes in the SORNA

14     legislation, correct?

15     A.   Yes.

16     Q.   And do you recall testimony

17     about whether drafts of that

18     legislation were shared with

19     Mr. Epstein or his lawyers?

20     A.   Yes.

21     Q.   Are you aware whether any

22     proposed legislation required approval

23     from the US DoJ?

24     A.   It would have had to have been

25     approved by US DoJ.  So it was



1   approved prior to the amendment.

2   After the amendment, it was still

3   approved by VI -- by US DoJ to be in

4   compliance with SORNA.

5       Q.  Okay.  The proposed

6   legislation, what role did the

7   legislature play in --

8       A.  The legis- --

9       Q.  -- that process?

10          ATTORNEY O'LAUGHLIN:

11   Objection.

12          THE WITNESS:  The role that

13   the legislature played in the -- in

14   the proposed -- the legislature, they

15   had to pass it; you know, they enacted

16   it.

17          (BY ATTORNEY ACKERMAN):

18       Q.  Could DoJ have put that

19   legislation in effect by itself?

20       A.  No.

21       Q.  I want to, if you would, pull

22   out Exhibit 14.  Let me know when you

23   have that --

24       A.  Okay.  I have it.

25       Q.  -- in front of you.



```
 1              A.  No.
 2              Q.  Did the Virgin Department of
 3     Justice have access to how often he
 4     withdrew cash from his accounts?
 5              A.  No.
 6              Q.  Did the Virgin Islands have --
 7     Department of Justice have access to
 8     the amounts of cash withdrawals that
 9     Mr. Epstein made from his accounts?
10              A.  No.
11              Q.  The Department of Justice
12     couldn't get that information without
13     a -- unless it had a warrant, right?
14              A.  I assume that would have --
15     that would be what would have been
16     needed.  So yes.
17                  ATTORNEY O'LAUGHLIN:
18     Objection.
19                  (BY ATTORNEY ACKERMAN):
20              Q.  None of that materi- -- none
21     of what I just mentioned is listed on
22     this checklist, is it?
23              A.  No.
24              Q.  Okay.  Ms. Pinney, you were at
25     the SORNA unit for close to ten years;
```



1   is that right?

2          A.  Yes.

3          Q.  Did you do everything in your

4   power to appropriately monitor

5   Mr. Epstein?

6          A.  Absolutely, yes.

7          Q.  Do you believe that the SORNA

8   unit is responsible for Mr. Epstein's

9   crimes?

10         A.  No.

11         Q.  If you had any information

12  that Mr. Epstein was committing crimes

13  on his island, what would you have

14  done?

15         A.  I would have reported that

16  information to our  investigator,

17  VIPD, criminal, the AG.

18         Q.  Did you ever participate in a

19  cover-up of Mr. Epstein's crimes?

20         A.  Absolutely not.  No.

21             MR. ACKERMAN:  I have nothing

22  further.

23                 REDIRECT EXAMINATION

24         (BY ATTORNEY O'LAUGHLIN):

25         Q.  Ms. Pinney, counsel for USVI

