# **<u>FILED UNDER SEAL</u>**

# **EXHIBIT 287**

1              IN THE UNITED STATES DISTRICT COURT

2              IN THE SOUTHERN DISTRICT OF NEW YORK

3

4    GOVERNMENT OF THE UNITED STATES
     VIRGIN ISLANDS,
5
                    Plaintiff
6
         vs.                           No. 22-cv-10904-JSR
7
     JPMORGAN CHASE BANK, N.A.,
8
                    Defendant.
9    _____

10   JPMORGAN CHASE BANK, N.A.,

11        Third-Party Plaintiff,

12   v.

13   JAMES EDWARD STALEY,
     Third-Party Defendant.
14   _____

15        THE ORAL DEPOSITION OF MARGARITA BENJAMIN was

16   taken on the 26th day of May, 2023 at the Ritz-Carlton

17   Hotel, 6900 Great Bay, Nazareth, St. Thomas, U.S.

18   Virgin Islands, between the hours of 3:50 p.m. and 9:22

19   p.m. pursuant to Notice and Federal Rules of Civil

20   Procedure.

21                    _____

                         Reported by:
22
                      DESIREE D. HILL
23               Registered Merit Reporter
                 Hill's Reporting Services
24                  P.O. Box 307501
                 St. Thomas, Virgin Islands
25                  (340) 777-6466

1          Q.     And how did you inform yourself?

2          A.     That the benefits that were received by

3    Financial Trust, Inc. and Southern Trust, Inc. is

4    what's under request for rebate or claim.

5          Q.     So it includes both the benefits to

6    Financial Trust and to Southern Trust Company?

7          A.     Yes, sir.

8          Q.     And it does not include benefits extended

9    to AYH, correct?

10         A.     That is correct, yes.

11         Q.     And are there date restrictions on those

12   benefits?  For example, is it only a portion of

13   benefits to Southern Trust, or only a portion of the

14   benefits to Financial Trust, or is it all the

15   benefits?

16         A.     If there is an issue with the client, it

17   would be all of the benefits.

18         Q.     What group of individuals within EDA are

19   responsible for extending benefits to beneficiaries?

20              MR. ACKERMAN:  Object to form.

21              THE WITNESS:  At the time, based on

22         which time, the prior period, the board would

23         make recommendations to the Governor and the

24         Governor had the final decision.

25         Q.     (By Mr. O'Laughlin:)  During what date

1    ranges was that, the arrangement?

2         A.    That would be from 1998 to 2013,

3    thereabouts.

4         Q.    And then after the change, who was

5    responsible for extending benefits?

6         A.    The beard of directors of the Economic

7    Development Authority Commission.

8         Q.    And the change was they no longer required

9    the approval of the Governor?

10        A.    That is correct.

11        Q.    Why was that change made?

12             MR. ACKERMAN:  Object to form.  Scope.

13             You can answer.

14             THE WITNESS:  Okay.  Based on the --

15             based on the changes in the law was to

16             facilitate the process of applicants that were

17             stuck in the pipeline for some time.  That's

18             my exposure to discussions when the

19             legislative amendments went down.

20        Q.    (By Mr. O'Laughlin:)  So there was

21   essentially a backlog in the governor's office.  And

22   so to clear that backlog, it was deemed that the

23   Governor would no longer be the final sign-off so that

24   they could expedite those.  Is that right?

25             MR. ACKERMAN:  Object to form.  Scope.

1          Q.    (By Mr. O'Laughlin:) And where are the

2     unique situations or the qualitative conditions that

3     would be different?

4               MR. ACKERMAN:  Let me just do this in

5          order to avoid interrupting each time.  I'm

6          just gonna have a standing objection to scope

7          on this sort of general line of questioning,

8          but I'm not instructing the witness not to

9          answer.

10              THE WITNESS:  Okay.  So we have hotels;

11         we have manufacturers; we have service

12         industries.  And it may be based on what that

13         particular product is or service that they're

14         bringing to the industry, whether it's new,

15         whether we have skill sets here in the

16         territory.  We dictate some of those things,

17         whether the company is bringing in needed

18         services.  So if we had a manufacturer of, for

19         example, renewable energy products, which is

20         we're looking towards moving in that direction

21         in the economy, they weight it in terms of the

22         qualitative impact may be different from,

23         based on each company and what they bring to

24         the table.

25         Q.    (By Mr. O'Laughlin:) And who are the

```
 1    individuals involved in making the decisions about
 2    which entities are extending benefits?
 3              MR. ACKERMAN:  Object to form.
 4              THE WITNESS:  The board of directors
 5         currently has the final decision.  Prior, the
 6         governor had the final decision.
 7         Q.    (By Mr. O'Laughlin:) Who were the board of
 8    directors involved in the grant of benefits to
 9    Southern Trust Company?
10         A.    I can't remember exactly who all was
11    sitting at each time, but there were different board
12    members at different times.  I would have to go back
13    to the transcript.
14         Q.    Are there some you could remember?
15              MR. ACKERMAN:  I'm sorry, you spoke over
16         each other there.  Can you repeat that
17         question, please?
18              THE WITNESS:  No.  I said I would have
19         to go back to the transcript, which would have
20         the names of those board members on the
21         transcript.
22         Q.    (By Mr. O'Laughlin:)  Okay.  You can't
23    remember a single board member?
24         A.    I can remember board members over the
25    years.  Jose Penn was one of our board members that
```

1    companies over an extended period of time.

2         Q.    But the answer says only one company.  It

3    says, "The entity is Southern Trust Company."

4    Correct.

5              MR. ACKERMAN:  Object to form.

6         Argumentative.

7              THE WITNESS:  First, the business was

8         known as Financial Trust.  So I'm assuming

9         that it's also inclusive of Financial Trust.

10        Q.    (By Mr. O'Laughlin:) So the benefits that

11   form the basis of the government's claim for damages

12   in this action are not limited to just Southern Trust

13   Company?  They include both Southern Trust Company and

14   Financial Trust Company?

15        A.    That is my understanding, sir.

16        Q.    Okay.  And why is the total 80.5 million if

17   it's across both companies?

18             MR. ACKERMAN:  Object to form.  And this

19        is -- this is not a topic, Andy.  You're

20        asking her why something says something in an

21        interrogatory response?  That's privileged.

22             MR. O'LAUGHLIN:  This is the core of the

23        topic.

24             MR. ACKERMAN:  No.

25             MR. O'LAUGHLIN:  I think we need to

1    approved in these certificate of tax incentives.

2              MR. ACKERMAN:  Be sure to keep your

3         voice up.

4         Q.    (By Mr. O'Laughlin:)  And is part of the

5    compliance function and the application function

6    within EDC to verify that Financial Trust Company

7    actually did what it claimed to be doing in this

8    paragraph?

9         A.    If it's a startup company, we would go

10   based on what historical information we would have

11   gotten on the background.

12             If the company was in prior operation or

13   the owner had experience in the particular market or

14   field, and so that's where, from the application

15   standpoint.  Once they're in operation, as part of

16   the site visit, the compliance officers would review

17   records or contracts to see that they were engaged in

18   similar-type activities.

19        Q.    Okay.  And what sorts of contracts were

20   reviewed to verify the Financial Trust Company was

21   actually engaged in this business?

22        A.    The compliance officer assigned would have

23   the specifics, but usually it would be engagements

24   between the client and the beneficiary.

25        Q.    And what were the actual specific documents

1        modification.  They also committed to contribute

2        the salary of that person to the work force

3        development fund.

4        Q.    (By Mr. O'Laughlin:) A salary of what

5   person?

6        A.    The reduction from 11 to 10 employees.

7        Q.    And what did the reduction from 11 to 10

8   employees have to do with the company's extension

9   application?

10        A.    It included a modification of its

11   employment numbers.  And so in order to ensure that

12   there was no loss in commitments, there was an

13   agreement that they would contribute the salary to

14   the Workforce Development Fund.

15        Q.    Okay.  What was the reason FTC gave for

16   wanting another five years of benefit?

17             MR. ACKERMAN:  Objection, scope.  You

18        can answer.

19             THE WITNESS:  Any applicant doesn't have

20        to give a reason for wanting it.  The law

21        provided for an applicant to apply and the

22        board could look at the parameters to

23        determine whether the applicant met the

24        compliance with their previous contract, and

25        also in negotiating that extension what

1           additional commitments and benefits that the

2           territory may receive.

3           Q.    (By Mr. O'Laughlin:) Okay.  So FTC, to your

4    memory, didn't provide, like, a look, we're in this

5    kind of economic hardship or some other concrete

6    reason.  They just said we want to extend our

7    benefits, and the board said, well, we find them to be

8    in compliance, so they're eligible for extension.  Is

9    that right?

10          A.    It's not as cut and dried as such.  The

11   transcript would define all the specific discussions

12   that would have had on record.

13          Q.    And do you know what the date of that

14   transcript would be?

15          A.    It would be the date of the decision

16   meeting that's outlined in the document before you.

17          Q.    And is that a public transcript?

18          A.    I believe -- public hearings are public

19   transcripts.  Executive sessions are closed

20   transcripts.  But I believe the transcripts were

21   provided as part of the request for information.

22          Q.    But do you know whether -- so you think

23   they've been produced in this case, but you don't

24   whether they were public at the time?  Is that right?

25          A.    They would not have been -- the decision

1    made, once they go into executive session, is closed

2    meeting.  So they would just report out on the

3    decision in the open meeting section.

4              But for the public hearing where the

5    client represents and speak on the merit of their

6    application, that would be an open meeting and

7    available to the public at the time, yes.

8        Q.   Do you see the paragraph that starts with

9    "by letter dated April 4, 2012"?

10       A.   Yes.

11       Q.   And it goes on to say that Erika Kellerhals

12   notified the V.I. EDC that they will no longer take

13   benefits as of March 23, 2012, correct?

14       A.   Correct.

15       Q.   Who is Erika Kellerhals?

16       A.   She was the legal representative on record

17   for Financial Trust Company.

18       Q.   And why did Financial Trust Company no

19   longer take benefits as of March 23, 2012?

20            MR. ACKERMAN:  Objection, scope.

21            THE REPORTER:  As of March --

22            MR. O'LAUGHLIN:  23rd, 2021.

23            MR. ACKERMAN:  Objection.  Scope and

24       form?

25            THE WITNESS:  In the petition would

```
1          says we can keep going.  The defendant

2          attorney says we're nearing the time for a

3          break, but not necessarily.  We don't have to

4          break right now.

5                 THE WITNESS:  I'm good.

6                 VIDEOGRAPHER:  Ask the witness.

7                 THE WITNESS:  I'm good.

8                 VIDEOGRAPHER:  All right.

9                 MR. O'LAUGHLIN:  We'll keep going a

10         little longer.  I appreciate we're getting

11         later in the day, so folks should shout if

12         they need a bathroom break or food or whatever

13         it is.

14                MR. ACKERMAN:  We could check for other

15         reasons, also.

16                MR. O'LAUGHLIN:  Noted.

17                MR. ACKERMAN:  You are allowed to laugh

18         on the record.  All right.  Go ahead.

19         Q.    (By Mr. O'Laughlin:) Okay.  Let's enter Tab

20    48 as the next exhibit.

21                MS. WARREN:  Tab 48 is in the chat as

22         Exhibit 14.

23                (Deposition Exhibit No. 14 was

24                 marked for identification.)

25         Q.    (By Mr. O'Laughlin:) Do you recognize this
```

1    document?

2         A.    It's up.  I'm reading.

3               Thank you.  Yes.

4         Q.    What is it?

5         A.    It is communication between Mr. Paul

6    Fleming, Attorney Stacey Plaskett.  Copied on there

7    was Percival Clouden, the board chairman, and myself.

8               And he was providing ratios that was taken

9    from the cost benefit model, the results of those

10   ratios.  I responded basically summarizing that just

11   given the unfavorable ratios itself without the other

12   part doesn't give the full picture to anyone, so it

13   can be misleading, and that's in the summary of what

14   I was trying to say.

15              And then she said that she would be

16   disseminating the information and will redact the

17   none for your required information.  So it may have

18   been as a result based on what she is saying, for

19   your, someone would have requested information from

20   the record.  And it does say the subject, press

21   inquiry.

22        Q.    And this is a June 28, 2011 email chain,

23   correct?

24        A.    Correct.

25        Q.    Who is Paul Fleming?

1       A.     He would have been the director of

2    Applications at that time.

3       Q.     And who is Stacey Plaskett?

4       A.     She would have been the legal counsel for

5    the Authority.

6       Q.     Who is Percival Clouden?

7       A.     The chief executive officer.

8       Q.     Who was Albert Bryan?

9       A.     The chairman of the board.

10      Q.     Well, you mentioned the cost benefit model,

11   what is that?

12      A.     For companies that apply for benefits,

13   they are required to file a five-year projection that

14   reflects their anticipated revenues and expenses over

15   the initial five years of 7benefits, and based on

16   that, we put it into our model so that we can see

17   what would be the outputs if they operated at that

18   level.  And so basically that's what the cost benefit

19   model is.

20           It also shows us based on what would have

21   been the taxes due, what the exemption value would

22   be.

23      Q.     And how does the cost benefit model bear on

24   the EDC's decision on whether or not to extend

25   benefits?

1          MR. ACKERMAN:  Objection, scope.  You
2      can answer.
3          THE WITNESS:  Yes.  It is part of their
4      model that we use but there are varying
5      factors and other additional factors that
6      would lead to a decision.  Just not solely on
7      the cost benefit analysis.
8      Q.   (By Mr. O'Laughlin:)  When you wrote these
9  ratios are not favorable, what did you mean?
10     A.    In and of itself, meaning that if someone
11  reads the ratios without having full context of the
12  information, that they would tend to interpret it
13  that their findings are all negative.
14     Q.   What would not favorable ratios mean?
15          MR. ACKERMAN:  Object to form.
16          THE WITNESS:  Not favorable ratios, for
17      most of -- for our cost benefit model, in
18      order for you to be able to get the taxes
19      foregone and taxes -- taxes received by the
20      beneficiary, it must have numbers in there.
21          However, some of the -- some of the
22      factors that would guide whether the cost
23      benefit is favorable or not favorable is whether
24      the company was even operating in the territory.
25          If the company was in operation and we

1        were removing them off of the tax roll, then the

2        projections would be more realistic in terms of

3        the cost benefit ratio.

4            But if a company was not existing in the

5        territory, there was no tax dollars being paid

6        to the territory.  So where it says, taxes

7        foregone, it is not realistically foregone

8        because the company would not have been in the

9        territory and be in a tax-paying company.

10       Q.   So what did you mean exactly when you said

11   the ratio is not favorable?

12           MR. ACKERMAN:  Objection.  Asked and

13       answered.  Scope.

14           THE WITNESS:  So, if one is the base

15       line and it's -- you said we're going to have

16       even numbers, it will be one-to-one, we will

17       start off first to say that -- what you're

18       giving and what you're receiving is equal.

19           So anything below one would be looked at

20       as not favorable.  But looking at just the cost

21       benefit ratio is not all because we have to also

22       look at value added to the gross territorial

23       product and other factors.

24           So just given the ratio does not explain

25       the whole analysis, and also does not include

1          other qualitative factors that we would consider

2          on an applicant.

3          Q.    So, just to be clear, when you say one to

4     one, that means for every dollar in tax incentive

5     given to the beneficiary, they are returning one

6     dollar back to the USVI economy.  That would be a

7     one-to-one ratio?

8          A.    Correct.

9          Q.    And so if the ratio was say two to one,

10    that means that for every dollar in incentive given,

11    they're actually returning two dollars back to the

12    USVI economy, correct?

13               MR. ACKERMAN:  Objection, scope.

14               THE WITNESS:  That would be the primary

15          basis for the interpretation of the ratios.

16               However, based on the circumstance, if the

17          company is not operating in the territory, the

18          dollar amount of taxes foregone will not be

19          realistic as that company was not paying and

20          that company is coming on to the program as a

21          non-taxpayer.

22          Q.    (By Mr. O'Laughlin)  So I understand that,

23    but that's not my question.  I'm just trying to

24    understand very basically --

25          A.    Okay.

```
1                John P. de Jongh.

2      Q.    And if you scroll down to the very bottom

3  of the document, there's a signature and an approval

4  date of May 31, 2013.  Who is on that signature line?

5      A.    Approved, John P. de Jongh, Jr., Governor.

6      Q.    So the approval here was by Governor

7  John de Jongh, correct?

8      A.    Correct.

9      Q.    And Southern Trust employed

10 Cecile de Jongh, correct?

11     A.    Correct.

12     Q.    What's the relationship between

13 Cecile de Jongh and Governor John de Jongh?

14     A.    It's publicly known that it is his wife.

15     Q.    And was there any concern by EDC that

16 Governor John de Jongh was signing off on benefits

17 extended to the company managed by his wife?

18         MR. ACKERMAN:  Object to form.

19         THE WITNESS:  I cannot speak for the

20     Board members, but I did not hear any

21     discussion as such.

22     Q.    (By Mr. O'Laughlin:)  So you are designated

23 as a corporate designee on the benefits extended to

24 Southern Trust.  You're also designated on

25 investigations into Epstein and his business entities.
```

1    companies for an 18-year period, if there was

2    something new, mathematician employees, presumably she

3    would be able to identify that, correct?

4              MR. ACKERMAN:  Object to form.

5              THE WITNESS:  I do not recall that there

6         was a specific job title of mathematician.

7         But yes, if there was a new title on the

8         employment report, she would have recognized

9         it because they would have to report any new

10        hires and identify them.

11   Q.    (By Mr. O'Laughlin)  So Southern Trust

12   passed the site visit to establish that it had

13   transitioned over to doing the DNA work, is that

14   right?

15   A.    Based on her records she saw that there

16   were servers and equipment that wasn't purchased

17   based on their financial reporting, and that she was

18   shown a program that they were developing or had

19   developed for the DNA sequencing that they were

20   doing.

21             THE REPORTER:  The DNA?

22             THE WITNESS:  Sequencing.

23             And if I may put a caveat, this is my

24        conversation with Sandra Bess after we were

25        doing our final report, as I 7was not the

1          director of Compliance at the time that she did

2          the site visit.

3          Q.    (By Mr. O'Laughlin:)  So there were no red

4    flags identified in the 2018 operations of Southern

5    trust as a DNA company by the EDC, correct?

6          A.    Not that was communicated to me or that I

7    saw in the records.

8               MR. O'LAUGHLIN:  Let's enter Tab 59 as

9          the next exhibit.

10              MS. WARREN:  Tab 59 is in the chat as

11         Exhibit 24.

12              THE WITNESS:  Tab 59 is downloaded.

13              (Deposition Exhibit No. 24 was

14               marked for identification.)

15         Q.    (By Mr. O'Laughlin:) So if you scroll to

16    the second page.

17         A.    Eh-hmm.

18         Q.    It's an email from Ms. Sandra Bess to First

19    Lady de Jongh saying she's in the process of

20    completing a compliance review of Southern Trust's tax

21    incentive certificate and would like to schedule a

22    visit.

23              And she says that, "At that site visit,

24    procurement and other documentation required to

25    properly complete the compliance record will be

1      A.    The year before or so that he was -- had

2  served his sentence in the Florida case.

3      Q.    And that was what prompted the inquiry?

4            MR. ACKERMAN:  Object to form.

5            THE WITNESS:  Yes.

6      Q.    (By Mr. O'Laughlin:)  And what was the

7  nature of the Florida conviction?

8      A.    Sexual -- if I recall, with an underage

9  female and prostitution.

10     Q.    So EDC was aware of those charges in 2011?

11     A.    Yes.

12     Q.    And they were aware that Epstein pled

13  guilty to those charges?

14     A.    Yes.

15     Q.    How was that fact evaluated by EDC?

16     A.    There was no evaluation as it relates to

17  the specific business operation that was approved for

18  benefits.

19     Q.    So Epstein's conviction for procuring a

20  minor for sex had no bearing on the EDC's analysis of

21  extending him tax benefits?

22     A.    No.  It was not based on our law connected

23  to the business activity.  We had no findings of

24  that.

25     Q.    But EDC was aware that he had pled guilty

1          that once we receive request for information,

2          that we notify the client.

3          Q.    (By Mr. O'Laughlin:)  Were there any

4     concerns by EDC based on this average from Newsweek?

5               MR. ACKERMAN:  Object to form, scope.

6               THE WITNESS:  No, not that I'm aware of.

7          Q.    (By Mr. O'Laughlin:) And was any

8     investigation undertaken in response to this request?

9          A.    Could you repeat that?

10         Q.    Was there any investigation into Epstein

11    undertaken in response to this inquiry?

12         A.    No.  All the inquiries was relative to the

13    application.  We tied into his conviction which did

14    not have anything directly to do with the business

15    operation.

16              MR. O'LAUGHLIN:  Let's enter Tab 39 as

17         the next exhibit.

18              MS. WARREN:  Tab 39 is in the chat as

19         Exhibit 28.

20              (Deposition Exhibit No. 28 was

21               marked for identification.)

22              MR. ACKERMAN:  Counsel, are you asking

23         questions about the top part of this email?

24              MR. O'LAUGHLIN:  No, I am going to focus

25         on the bottom.

1          MS. WARREN:  Tab 43 is in the chat as

2     Exhibit 31.

3          (Deposition Exhibit No. 31 was

4           marked for identification.)

5          MR. ACKERMAN:  Objection to the scope on

6     this line of questioning.

7     Q.    (By Mr. O'Laughlin:)  So the bottom email

8     in this chain is a January 27, 2016 email from Semele

9     George to Jennifer Nugent-Hill and Tracy Lynch Bhola,

10    with the importance designated as high, and sending

11    immediate inquiry received from reporter from the

12    Guardian inquiring about Southern Trust Company and

13    seeking information regarding a decision meeting held

14    on January 23rd, 2014.

15         Do you recall in your function with any

16    EDC receiving notice of this inquiry?

17    A.    There were several inquiries from

18    different medias that I was copied on, and this one I

19    was copied on the response going from the assistant

20    CEO to Ms. Sydney George.

21    Q.    What was your understanding of why EDC was

22    getting all of these inquiries?

23         MR. ACKERMAN:  Object to form, scope.

24         THE WITNESS:  The application for

25    Southern Trust, of course, went to public

1          hearing for board decision and the owner is

2          Jeffrey Epstein, hence, the inquiries.

3          Q.    (By Mr. O'Laughlin:)  Why would the fact

4     that the owner was Jeffrey Epstein generate all this

5     interest?

6               MR. ACKERMAN:  Object to form, scope.

7          Speculation.  Foundation.

8               THE WITNESS:  I would not know

9          specifically what the requesters were

10          thinking, but I know in some of the

11          communications, it was really around whether

12          or not he was eligible for exemptions, or

13          whether or not the fact that he was charged in

14          a criminal offense whether the company should

15          be eligible for exemptions.

16          Q.    (By Mr. O'Laughlin:)  And what was the

17     EDC's position on those questions?

18               MR. ACKERMAN:  Objection, form.  Scope.

19               THE WITNESS:  If the criminal activity

20          was not connected to the business activity,

21          then it was two different issues.  It's a

22          personal issue versus one related to the

23          business operation.

24          Q.    (By Mr. O'Laughlin:)  So EDC viewed

25     Mr. Epstein's criminal misconduct as strictly a

1  personal issue that didn't impact his business,

2  correct?

3            MR. ACKERMAN:  Object to form, scope.

4            THE WITNESS:  Title 29, Chapter 12,

5       Section 722 explains what happens if there is

6       a company that is found with any criminal

7       offenses, or an owner, and it must be

8       connected to the business activity.

9       Q.    (By Mr. O'Laughlin)  And EDC's view is

10  that the criminal offenses of Mr. Epstein were not

11  connected to his business entities, correct?

12            MR. ACKERMAN:  Objection to form.

13            THE WITNESS:  As far as we knew at the

14       time.

15       Q.    (By Mr. O'Laughlin)  And did EDC undertake

16  any investigation in light of all these media

17  inquiries to evaluate whether or not the criminal

18  activity was connected to the business entities?

19       A.    Not that I'm aware of.  There was no

20  reason to believe said was connected.

21       Q.    Why was there no reason to believe there

22  wasn't a connection?

23            MR. ACKERMAN:  Objection.

24            THE WITNESS:  Because of the type of

25       charge, that it was not connected to the

1          business operations.  There was no findings

2          that it was connected to the business

3          operations.

4          Q.    (By Mr. O'Laughlin:)  So there was no

5     reason to think that the charge of procuring a minor

6     for prostitution was linked to any of Mr. Epstein's

7     business activities, correct?

8               MR. ACKERMAN:  Objection to form.

9               THE WITNESS:  Correct.

10              MR. O'LAUGHLIN:  Let's enter Tab 58 as

11         the next exhibit.

12              MS. WARREN:  Tab 58 is in the chat as

13         Exhibit 32.

14              (Deposition Exhibit No. 32 was

15               marked for identification.)

16              THE WITNESS:  I've read.

17         Q.    (By Mr. O'Laughlin:)  So this is a

18    January 7th, 2015 letter sent via certified mail to

19    Mr. Epstein by Ms. Stephanie Berry, the director of

20    Compliance for EDA, correct?

21         A.    Yes.

22         Q.    And in the letter she writes, "Dear

23    Mr. Epstein:  Given the current media discussion

24    surrounding principal of Southern Trust Company, the

25    USVI Economic Development Authority requests that no

1    later than January 9, 2015 an assessment of the

2    potential impact, if any, on the business activities

3    of Southern Trust Company as approved by the USVI

4    Economic Development Commission be provided to the VI

5    EDA."

6              Did I read that correctly?

7         A.   Yes.

8         Q.   What were the current media discussions

9    that are referenced in this letter?

10        A.   I cannot speak to what specific ones she

11   was, but around that time, again, it was all about

12   Jeffrey Epstein being the owner for Southern Trust

13   Company, which was the recipient of EDC tax

14   incentives.

15        Q.   So the reference here to a principal of

16   Southern Trust Company is a reference to Mr. Epstein,

17   correct?

18        A.   Yes.

19        Q.   And USVI EDA is requesting an assessment of

20   the impacts of these media discussions on business

21   activities of Southern Trust, correct?

22        A.   Yes.

23        Q.   Did it receive such an assessment?

24        A.   It would have received a response.  I was

25   not, at the time, specifically involved in the

1    compliance unit, but the record should have received

2    a response.

3            Q.    And do you recall what the response was?

4            A.    If I recall, the response would have been

5    from their legal counsel.

6            Q.    Would have been, sorry, from who?

7            A.    Their legal counsel.

8            Q.    But do you recall what the substance of the

9    response was?

10           A.    That there was no impact.

11           Q.    And did EDA agree with that response and

12   find it satisfactory?

13           A.    I cannot speak to EDA at that time as I am

14   only seeing these documents -- that particular

15   document now in reviewing for this.  I have -- I was

16   not privy to that specific conversation around the

17   response back then.

18           Q.    But this is an investigation by EDA into

19   Southern Trust based on the media reviews, correct?

20               MR. ACKERMAN:  Object to form.

21               THE WITNESS:  It is a request for

22           information from the director of compliance,

23           Ms. Stephanie Berry.

24           Q.    (By Mr. O'Laughlin:) And you are designated

25   to give testimony on investigations into Epstein and