# FILED UNDER SEAL

# EXHIBIT 291

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4    GOVERNMENT OF THE UNITED STATES
      VIRGIN ISLANDS,
 5
                   Plaintiff,
 6
      v,                                    No. 22-cv-10904-JSR
 7
      JPMORGAN BANK, N.A.,
 8
                   Defendant.
 9    _____
      JPMORGAN CHASE BANK, N.A.,
10              Third-Party Plaintiff

11    v.

12    JAMES EDWARD STALEY,
      Third-Party Defendant.
13    _____

14          THE ORAL DEPOSITION OF ALBERT BRYAN, JR. was

15    taken on the 6th day of June, 2023, at the Law Offices

16    of Joel Holt, 2132 Company Street, Christiansted, St.

17    Croix, U.S. Virgin Islands, between the hours of 8:42

18    a.m. and 3:47 p.m. pursuant to Notice and Federal Rules

19    of Civil Procedure.

20                        _____
                               Reported by:
21
                             DESIREE D. HILL
22                       Registered Merit Reporter
                         Hill's Reporting Services
23                           P.O. Box 307501
                         St. Thomas, Virgin Islands
24                           (340) 777-6466

25
```

1      A.   I may -- from what I've read, I may have
2  had one phone conversation with him in terms of
3  availability for the meeting --
4      Q.   Okay.
5      A.   -- at Kellerhals Ferguson.
6      Q.   Tell me about that.
7           MR. ACKERMAN: Object to form.
8           THE WITNESS: It was -- about a
9      phone call?
10     Q.   (By Mr. Neiman.) Yeah.
11     A.   It was, Are you available on Friday, yeah.
12 Thursday, no.  Wednesday, yeah.  And then we agreed
13 on a date.
14     Q.   Just pure scheduling call?
15     A.   Yes.
16     Q.   So other than the three face-to-face
17 interactions and that one scheduling call, anything
18 else that you can remember in terms of the interaction
19 with Mr. Epstein?
20     A.   No.
21     Q.   Okay.  Were there any people working for
22 Mr. Epstein that you had interactions with.
23          MR. ACKERMAN: Object to form.
24          THE WITNESS: Yes.
25     Q.   (By Mr. Neiman:) Who?

1       A.   Ms. DeJongh.

2       Q.   Tell me what you remember about your

3  interactions with Ms. DeJongh?

4       A.   That's a very broad -- of course, she's

5  the First Lady, so, or was.

6       Q.   I'll break that down a little bit.  Putting

7  aside interactions that you had with her that didn't

8  relate to her work for Mr. Epstein.  So, let's just

9  focus on interactions that you had with her that

10  related to her work for Mr. Epstein.  What do you

11  recall about that?

12            MR. ACKERMAN:  Objection, vague.

13       Q.   (By Mr. Neiman:)  You can answer.

14       A.   So I worked with her -- I was the

15  executive director of a non-profit, and so the only

16  real interaction I had is any contributions that were

17  given to the non-profit.

18       Q.   So this was the job that you held between

19  the time that you were head of the EDC and the time

20  that you became governor?

21       A.   This is correct.

22       Q.   Non-profit was what?

23       A.   Junior Achievement.

24       Q.   I see.  And what kind of interactions did

25  you have with Mrs. deJongh related to Junior

1   compliance.  Am I understanding you correctly?
2           MR. ACKERMAN:  Objection to form.
3           THE WITNESS:  That didn't happen.
4       The EDC compliance team still did the
5       tax audit.
6       Q.   All right.  So, let's take a look, sir, if
7   we could, at some materials, and I'm going to start --
8   let's take a look, if we could, first at Exhibit 12 --
9   tab 12, which we will mark as Exhibit 1.
10          (Deposition Exhibit No. 1 was
11              for identification.)
12      Q.   Governor Bryan, I placed in front of you
13  the document marked as Exhibit 1, which is a
14  transcript of a meeting of the Economic Development
15  Commission in February of 2009.  Okay.  You see that?
16      A.   Yes.
17      Q.   And the transcript indicates this was a
18  meeting that you were present for on the left hand
19  corner.  You see that?
20      A.   Yes, sir.
21      Q.   If you could turn to what's marked as page
22  173 of the transcript, you'll see that there's some
23  discussion, this is Mr. Indyke talking.  He's
24  describing himself as the president and the director
25  of this company, FTC.  And he's talking about how in

1    always complained about not having cost benefit
2    analysis module.  So we actually created an economic
3    model that would spit out what the cost benefit
4    analysis was.
5         Q.   And what was the purpose of that economic
6    model?
7         A.   Just to see what it means to the Virgin
8    Islands in terms of the cost benefit.
9         Q.   Do you have any goals or targets in mind
10   for what would be a good return on investment from the
11   tax benefits that you were given?
12        A.   Definitely at least one and a half, two,
13   would be good.
14        Q.   One and a half, what does that mean?
15        A.   One and a half, for every dollar that we
16   make from them, they make a dollar and a half from
17   the investment.
18        Q.   For every dollar of tax exemption, you hope
19   to get a dollar and a half back?
20        A.   At least, yeah.
21        Q.   And then you can see in this first sentence
22   the cost benefit analysis under the section Projected.
23   It talks about how when the application was submitted.
24   It approves a value added ratio of .35 percent.  You
25   see that?  Can you explain to me what a value added

1    ratio of .35 percent means?
2         A.   That means it cost us money.
3         Q.   That's meaning that for every dollar of tax
4    exemption you gave out, you're getting about 35-cents?
5         A.   Correct.
6         Q.   And that's in the projected.  And then if
7    you look down, there's the Actual section.  Do you see
8    that below that?
9         A.   Yes.
10        Q.   And the Actual section says, "When the
11   projected financial information was compared with the
12   actual provided by compliance, the analysis provided a
13   value added ratio of .6 percent."  You see that?
14        A.   Yes.
15        Q.   So that would mean that for every dollar in
16   tax exemptions, you were getting back 60-cents.
17        A.   Yes.
18        Q.   That's worse than your goal.  Fair to say?
19             MR. ACKERMAN:  Objection.
20        A.   It is fair to say, but the cost benefit
21   analysis is really designed for larger corporations
22   and hotels where you're going to get 200, 300
23   employees.  You are going to get construction cost
24   and everything.  For these smaller financial firms,
25   we were really interested in making sure that we have

1    viable firms that come here and tax residents that

2    have a high net worth.

3            So while this may seem like we're giving

4    up a lot, what we're looking for is the ability of

5    those people to reinvest in the Virgin Islands as

6    well as attract more people like themselves.

7        Q.   Okay.  If you look at the next page, talk

8    about what was given up, you'll see that the analysis

9    reports that the government gave up approximately

10   $133 million in tax revenues during the ten-year

11   period, right?

12       A.   Eh-hmm.

13       Q.   Is that right?

14       A.   That's what it says.

15       Q.   You have any reason to question that?

16       A.   Well, the government didn't give up

17   anything because the government didn't have anything

18   to give up.

19       Q.   From your point of view, any dollar that

20   you got from this company was a dollar you wouldn't

21   have gotten without giving them the giant tax benefit.

22       A.   From any of our beneficiaries, half of

23   some is better than all of none.

24           MR. ACKERMAN:  Objection to the

25       last question.

1            THE REPORTER:  Can you repeat
2       that?
3            THE WITNESS:  Half of some is
4       better than all of none.
5       Q.    (By Mr. Neiman:)  Okay.  Right.  So from
6   your point of view, you're giving the guy a hundred
7   million dollars in tax exemptions and you're getting a
8   million dollars that you wouldn't have otherwise have.
9   That's better than not having -- better than nothing?
10           MR. ACKERMAN:  Objection to form.
11      Argumentative.
12           THE WITNESS:  I wouldn't be that
13      absolute and extreme that I would make a
14      statement like that because there are
15      other variables that count.
16      Q.    (By Mr. Neiman:)  Like what?
17      A.    Like what are they investing in, their
18  reinvestment in the Virgin Islands.  A lot of our
19  beneficiaries, we have clients who have done
20  remarkable things for the schools, created new
21  playgrounds, build gyms.  We have people who built
22  entire canine centers for our police officers.  So
23  it's not just the face value of the investment of the
24  company.
25           During this period, I would say, again,

1      between 2007 and 2014, we lost private schools
2      because our economy collapsed.  The ability to have
3      wealthy clients is important to contributions made to
4      those private schools because if they don't have
5      those schools, then we can't attract more people.  So
6      there's a lot of other ways.
7               Antilles School has like the top ten
8      sailing team in the United States as a result of EDC
9      clients contributing, having their kids going there,
10     pouring money into the program their kids are
11     interested in.
12              There's a lot of different benefits
13     other than just what you see on the face value.
14         Q.   Sure.  So fair to say in this time of
15     financial stress that the island was going through,
16     from your point of view was important to do things to
17     try to attract financial high net worth people to come
18     and live here?
19         A.   It's still important to attract high end
20     people to come here.
21         Q.   In fact, that's been a priority of your
22     administration as governor too?
23              MR. ACKERMAN:  Objection to form.
24              THE WITNESS:  Yes.
25         Q.   (By Mr. Neiman:)  And that was part of what

1  to happen.  Especially my previous governor had a lot
2  of volatile relationships.
3      Q.   Were you providing special treatment to
4  Mr. Epstein by meeting with him in person regarding
5  his complaints?
6      A.   No.
7      Q.   Did you ever provide Mr. Epstein any
8  special treatment?
9      A.   No.
10     Q.   Did you ever provide Mr. Epstein any
11 special treatment as a result of his association with
12 Ms. Kellerhals?
13     A.   No.
14     Q.   Did you ever provide Mr. Epstein any
15 special treatment as a result of his -- because Cecile
16 de Jongh worked for him?
17     A.   No.
18     Q.   How do Virgin Islands' residents go about
19 setting up a meeting with you?
20     A.   A lot of people go -- some people call
21 directly the 774-0001.  Some people go through my
22 assistant who schedule -- who does most of my
23 scheduling.  And most people use whoever they know
24 that was on my campaign, close to me.  My poor aunt,
25 who is inundated with calls, my family, everybody, to

1  Q. So were Mr. Epstein and his companies Ms.
2  Kellerhals only client?
3  A. No.
4  Q. In your role as EDC chair and in your
5  experience as a Virgin Islands' resident, did you have
6  the opportunity to observe whether EDC tax
7  beneficiaries paid school tuition for the children of
8  their employees?
9  A. Yes.
10 Q. And what is it that you observed?
11 A. So in order to get -- one of the concerns,
12 especially when you're bringing people back, Virgin
13 Islanders back from the states, or people in city,
14 high cost-of-living. So when people come, then they
15 -- even if they see the salary and they say, I'm
16 going to take a lump for -- I'm going to take another
17 10 for the sake of moving to the Virgin Islands or
18 because I want to do this job. Then once they see
19 what the school tuition is for their kids, what the
20 housing is, what food costs, then they kind of have a
21 change of heart. So to make it more attractive, the
22 EDC companies have taken on paying for tuition for
23 their students and -- for their employee students as
24 well as paying 100 percent of their health insurance.
25 Q. Sir, when you were on the EDC board, did

1    you have access to nonpublic information about
2    Mr. Epstein's financial situation?
3         A.   Yes.
4         Q.   What type of access did you have
5    information to?
6         A.   Well -- so, any of the projections or any
7    of the review of the earnings of any company for the
8    EDC would always be done in executive session in
9    order to preserve the confidentiality of that
10   company's finances.
11        Q.   Did you have access to general ledgers of
12   the company to show every transaction that the company
13   was making?
14        A.   No, sir, I did not.
15        Q.   Did you or the EDC know when and to whom
16   Mr. Epstein or his companies were making money
17   transfers?
18        A.   No.  We wouldn't know who he was making
19   with or who any other company was making money
20   transfers to.
21        Q.   Did you or the EDC have access to that
22   information?
23        A.   No, we did not.
24        Q.   Did you or the EDC know the amounts of
25   money transfers that Mr. Epstein or his companies were

1    making or receiving?
2         A.    No, we did not.
3         Q.    Did you or the EDC have access to that
4    information?
5         A.    No, we didn't have access to that
6    information.
7         Q.    Did you or the EDC know how often
8    Mr. Epstein withdrew cash from his accounts?
9         A.    Absolutely not.
10        Q.    Did you or the EDC have access to that
11   information?
12        A.    No, we did not have access.
13        Q.    Did you or the EDC know the amounts of cash
14   withdrawals that Mr. Epstein made from his accounts?
15        A.    No, we did not.
16        Q.    Did you or the EDC have access to that
17   information?
18        A.    No, we did not.
19        Q.    Sir, during all of your time at the EDC,
20   did you have any indication that Mr. Epstein was
21   engaged in sex trafficking in the Virgin Islands?
22        A.    No, I did not.
23        Q.    You talked about the importance of high
24   network individuals to the Virgin Islands.  Do you
25   recall that testimony?

1        A.   Yes, sir.
2        Q.   Okay.  Explain again why is it important to
3   attract high network individuals to the Virgin
4   Islands?
5        A.   Well, in the Virgin Islands, when you look
6   at the tax roll, it may be a little different now,
7   but historically, there's 33,000 tax filers.  89
8   people pay 66 percent of all of the income tax.  When
9   you look back in history before 2000 probably 9 and
10  8, that number was higher.  It was 120.  At one time
11  it was 140, but we keep losing those individuals.
12             Those individuals are very important to
13  our economy and contribute, you know, not only with
14  direct taxation, but those people have boats.  They
15  want to maintain them.  They have housing staff.
16  They do catering.  They have parties.  They buy
17  planes.  All of that contributes to our economy.
18       Q.   Were you ever willing to break the laws in
19  order to attract high net worth individuals to the
20  Virgin Islands?
21       A.   Absolutely not.
22       Q.   Are you ever willing to bend the rules in
23  order to attract high net worth individuals to the
24  Virgin Islands?
25       A.   When you say -- rules of the EDC and