# EXHIBIT 297

1                  IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF NEW YORK

3     GOVERNMENT OF THE UNITED STATES
      VIRGIN ISLANDS,
4
                       Plaintiff,
5
              vs.                              No. 22-cv-10904-JSR
6
      JPMORGAN CHASE BANK, N.A.,
7
                       Defendant.
8     _____

9     JPMORGAN CHASE BANK, N.A.,

10              Third-Party Plaintiff,

11    v.

12    JAMES EDWARD STALEY,
      Third-Party Defendant.
13    _____

14

15              THE ORAL DEPOSITION OF CECILE DE JONGH was

16    taken on the 29th day of May, 2021 at the Ritz-Carlton

17    Hotel, 6900 Great Bay, Nazareth, St. Thomas, U.S. Virgin

18    Islands, between the hours of 9:02 a.m. and 2:22 p.m.

19    pursuant to Notice and Federal Rules of Civil Procedure.

20                    _____
                           Reported by:
21

22                      DESIREE D. HILL
                     Registered Merit Reporter
23                   Hill's Reporting Services
                        P.O. Box 307501
24                   St. Thomas, Virgin Islands
                        (340) 714-0269
25

1    had an issue, who should I talk to to get something

2    done.

3         Q.    Okay.  All right.  And did your husband

4    have any process for recusing himself from issues that

5    related to the company you worked for?

6         A.    I don't know if he had any process.

7         Q.    Okay.  You're not aware of any?

8         A.    I said I don't know.

9         Q.    Okay.  You're not aware of him recusing

10   himself from any issue regarding Mr. Epstein?

11        A.    I'm not aware of that, no.

12        Q.    Okay.  All right.  Now, when your husband

13   became the governor, did you sort of get a second job

14   result of that as the first lady of the Virgin

15   Islands?

16        A.    Yes.

17        Q.    And what did that job entail?

18        A.    Giving a lot of speeches.  I mean, he ran

19   twice.  So he ran in 2002 and lost.  I was not very

20   involved in that campaign.  And between 2002 and

21   2006, you know, right after 2002, we discovered that

22   our youngest son had some serious health issues.

23              So I was very focused on that.  We both

24   were.  And then he subsequently decided to run in

25   2006, and I was very involved in making sure that our

1    son was okay.

2              I also had my great aunt who was in

3    failing health.  She had had breast cancer.  And so

4    part of that -- I mean, he actually made me a promise

5    that I would never have to give a speech, and that

6    was not true.

7              And he asked me to head up -- well, he

8    and his team asked me to head up the Women For de

9    Jongh- Francis at the time, and -- which I did.  And

10   so we did -- you know -- so during the campaign part,

11   we did things like, you know, gatherings for

12   children, walking -- you know, doing walks and just

13   sort of -- and food sales and things like that.

14             And I tried to do as many things as I

15   could that wouldn't take away time from either work

16   or from my children.

17             And then once he won, it became very

18   overwhelming because my aunt passed away within two

19   months of my husband becoming governor.  I had to

20   settle her affairs, and my mother was diagnosed with

21   Alzheimer's, and my sister, who was bipolar --

22        Q.   I'm sorry.  I saw in the emails about your

23   sister -- you don't have to talk about that if you

24   prefer not to.

25        A.   She had a very public breakdown which was

1    newsworthy at the time.  So there was just a lot on

2    my plate.

3                 And then I was also very involved in the

4    National Governors Association.

5                 THE REPORTER:  I'm sorry.

6                 THE WITNESS:  The National Governors

7          Association, because a lot of the first ladies

8          were involved in mostly of children's

9          activities.

10                And the thing that I chose to do was to --

11         to focus on literacy, because there are many

12         children in the Virgin Islands that didn't

13         have -- when we would do door-to-door, during

14         the campaign, one of the things I discovered

15         that a lot of the household didn't have books in

16         them.

17                So my big project every year was to find

18   a local author and have them write a book and give

19   the books away for free because I didn't want to give

20   toys and I didn't want to give candy.

21                And so we'd have holiday parties and

22   give away the books.  So I would raise money during

23   the year for that.  And which, you know, took up a

24   lot of time.  But I also got a lot of requests for --

25   just give a lot of speeches.

1      Q.    And did you have an office as first lady?

2      A.    No.

3      Q.    Did you have, like, an office address?

4      A.    No.

5      Q.    Do you have, like, an official Twitter

6    feed?

7      A.    Somebody set up a, I think a FaceBook

8    something for me.  I'm -- I'm not on -- I'm not on

9    Twitter.  I actually don't know how Twitter works.

10          And I know that I had -- I had an email

11   that was set up for me that I never really used

12   because I had to go into the government system and

13   then do something else and something else to get into

14   it.  And so I just asked the head of protocol, Raul

15   Carrillo, I said if anything comes in, because it was

16   -- it was the email address that they would give out

17   to people saying, you know, if you want the First

18   Lady to, you know, give a speech or show up

19   somewhere, you know, email her at this email address.

20          And so that was what was done. so I said

21   can you just monitor it and if -- you know, just send

22   me whatever and I'll see whether it fits into my

23   schedule and I would either do it or not do it.

24     Q.    Okay.  And did you have any staff that

25   helped you in your role as First Lady?

1      A.    Well, I had the chief of protocol.  But

2    everybody -- all those people worked for Government

3    House.  So it was the expectation that if there was a

4    social event -- if there was a social event, I was

5    responsible for it.  I found it sometimes very

6    misogynistic.

7      Q.    Sure.

8      A.    But it was what it was.  That if -- you

9    know, if there was going to be sort of an event after

10   the State of the Territory, that I should be pick the

11   caterer, I should do this, you know.

12           And so the chief of protocol had one or

13   two staff members, and so I would have -- you know, I

14   would run over to Government House and say, okay,

15   what are we doing?  You know, who are we inviting?

16   And they would sort of handle everything.

17           But they worked for -- they didn't

18   exclusively work for me.  They worked for Government

19   House.

20     Q.    Got it.  All right.  Let's look at

21   Exhibit 3.

22           MS. WARREN:  Tab 3, Exhibit 1.

23           MR. NEIMAN:  Yeah, Tab 3.  I will ask

24       the reporter to mark as Exhibit 1 a one-page

25       document.

1    with them to inspect it.

2              So, here's your R.O. plant, here's the

3    generator.  So I did that, and I think they came over

4    like three different times for that.

5         Q.   Okay.

6         A.   One for the R.O. plant, and I think twice

7    for the generator because I think, if I remember

8    correctly, something, they needed something for the

9    spill kit, wasn't there.  So he come back and make

10   sure whatever needed to be in the spill kit was

11   there.

12        Q.   Okay.  Is that all the meetings that you

13   remember -- withdrawn.

14             All the times that you remember going to

15   Little St. James?

16        A.   Little St. James, yes.

17        Q.   Okay.  Did there come a time when you

18   learned that Mr. Epstein had been arrested in Florida?

19        A.   Yes.

20        Q.   When was that?

21        A.   I think that was in 2006.

22        Q.   Okay.  How did you learn about it?

23        A.   In the news.

24             THE REPORTER:  I'm sorry.

25             THE WITNESS:  In the news.

1          Q.    (By Mr. Neiman)  What do you remember

2     learning about it?

3          A.    That he was arrested for soliciting an

4     underage -- soliciting a minor.

5          Q.    Okay.  Did you ever talk to Mr. Epstein

6     about that?

7          A.    I did.

8          Q.    Tell me about that conversation.

9          A.    I basically asked him what was going on

10    and like -- I don't want to swear, but --

11         Q.    Go ahead.

12         A.    Sort of, like, what the hell is going on.

13    And he said, I -- it was an error in judgment.  And I

14    said, so, that's it, you approached somebody who you

15    thought was older?  And he said, yes.

16               And -- but she wasn't?  And he said, no.

17               And I said, "And so you -- that's what

18    you were arrested for?  That was it?"  And he said,

19    "Yes."

20               And I said -- so I said to him, I said,

21    so, this will never happen again?  And he goes,

22    absolutely not.  I've learned my lesson.

23               I said, well, yeah, I mean, you know,

24    seems like you're in big trouble.  And he says, yes.

25    And then when I learned, you know, that, you know,

1    that he would be -- well, that's, you know -- that's

2    the conversation that we had at this point.

3        Q.    All right.  And what happened from there on

4    at this time?

5             MS. BOGGS:  Objection.  Vague.

6        Q.    (By Mr. Neiman:)  You could answer.

7        A.    I'm sorry.

8        Q.    Just let me explain how this works.  The

9    lawyers sometimes have to say "objection," but unless

10   they tell you not to answer, you could go ahead and

11   answer.

12       A.    Okay.  And I do specifically remember when

13   I learned that he was going to be, because of that

14   one incident, that he said was one incident, that he

15   would have to be a registered sex offender.

16            I remember it because I went home to my

17   17-year-old son and I said, you know, this sex

18   offender thing is very serious and I want you to be

19   very careful, because he was about to go off to

20   college.

21            And I said and I -- don't make any

22   mistakes because this is the rest of your life you're

23   talking about.  So don't date anybody younger, don't

24   go out to bars and, you know, just, you know, and,

25   you know, be on your P's and Q's.

1          And he was, like, mom, and I said, I

2    just -- I'm nervous about this, you know, because I

3    have two boys, and my other son was nine years

4    younger, so it wasn't a conversation I would have

5    with him at the time.

6          But I just said, you know, you're going

7    off to college and I just -- you know, we've had --

8    we've had the black talk, and I wanted to have this

9    talk with him.  That this was very important that you

10   remember this because this is the rest of your life.

11   Q.   Okay.  Did you have further discussions

12   with Mr. Epstein about the events that led to his

13   arrest?

14   A.   No, I didn't.

15   Q.   Okay.  Did you have further discussions

16   with Mr. Epstein about the case he was facing in

17   Florida and what was going to happen to him?

18   A.   No, I did not.

19   Q.   Okay.  Other than that one conversation

20   that you've described where you asked him what the

21   hell is this about, and he gave you his story, did you

22   ever talk to him further about anything related to the

23   case against him in Florida?

24   A.   I never had a conversation with him about

25   it, no.

1        Q.    Okay.  Did you continue to see things in

2   the newspaper about him?

3        A.    I continued to see things in the newspaper

4   about, you know, that it was solicitation, and that

5   he was going to be a registered sex offender, which

6   lined up with what he said.

7        Q.    I mean, did you see articles indicating

8   that the investigated related to dozens of people?

9        A.    At that time, I don't recall seeing that

10  until much, much later.

11       Q.    Okay.  And how did you find out that he was

12  going to go to jail?

13       A.    I don't recall how I found out.  I

14  actually don't recall how I found out he was going to

15  jail.

16       Q.    Okay.  But at some point you did find out

17  that he was going to jail?

18       A.    Yeah.  Eh-hmm.

19       Q.    Did you ever talk to him about that?

20       A.    I think he talked to the whole office and

21  told the whole office --

22            THE REPORTER:  I'm sorry.

23            THE WITNESS:  He talked to the whole

24       office and told the office that he going to be

25       away.

1          Q.    (By Mr. Neiman:)  And what did he say?

2          A.    Just, I'm gonna be away for a while for a

3     stupid thing that I did.

4          Q.    And did it make sense to you his story,

5     that he was going to jail for one time, soliciting one

6     person who he didn't realize was underage?

7               MS. BOGGS:  Objection, vague.

8               THE WITNESS:  It did at the time, you

9          know.  He was in Florida.  You know, that was

10         Florida law, and that's, you know, his -- you

11         know, those were all the stories that came out

12         in the newspaper, that this is what was going

13         to happen.  Nothing else came out that -- that

14         he was going away for anything else.

15         Q.    (By Mr. Neiman:)  Did you hear -- recall

16    hearing rumors at that time that he had been bringing

17    young women to Little St. John -- Little St. James,

18    rather?

19         A.    No.

20         Q.    When did you start hearing those rumors?

21              MR. TEAGUE:  Object to form.  You can

22         answer.

23         Q.    (By Mr. Neiman:) You can answer.

24              MR. TEAGUE:  You can answer.

25              THE WITNESS:  Not until like early '19,

1              2019 when I think the Miami Herald started

2              running stores about him.

3              Q.    (By Mr. Neiman:)  And did you talk to

4      Mr. Epstein when you saw those stories?

5              A.    No, I didn't.  I emailed Darren and said,

6      basically, is there any truth to any of this?

7              Q.    Eh-hmm.

8              A.    And he responded, no.

9              Q.    Had you ever seen young women around

10     Mr. Epstein?

11             A.    No. -- I mean, he had Sarah Kellen, who

12     was his assistant.

13             Q.    Eh-hmm.

14             A.    She was in her twenties.  And he had his

15     girlfriend, Karyna, who was in her twenties.

16             Q.    Eh-hmm.

17             A.    Those were the -- those were the young

18     women that I had seen.

19             Q.    Okay.  Do you remember a time when he asked

20     you to help him with some issues related to other

21     young women?

22             MS. BOGGS:  Objection, vague.

23             Q.    (By Mr. Neiman:)  You can answer.

24             A.    I think there was a time when he asked

25     about some young ladies going to UVI.

CECILE DE JONGH -- DIRECT                    129

1        Q.    Second page of the document in response to

2    your email.

3        A.    Eh-hmm.

4        Q.    Ms. Jackson writes back, right?

5        A.    Yeah.

6        Q.    And there's a little back and forth.  And

7    then on the first page, at the bottom of the page

8    Ms. Jackson advises you that this ESL class isn't

9    offered every semester.  Do you see that?

10       A.    Yes.

11       Q.    And that what they do is they keep a list

12   of names and when they get enough people, they offer

13   the class.  Do you see that?

14       A.    Yes.

15       Q.    And you passed that information on to

16   Mr. Epstein, right?

17       A.    Yes.

18       Q.    And Mr. Epstein wrote back to you and said,

19   "If it worked, both Julia and Renata would sign up."

20   Do you see that?

21       A.    Yes.

22       Q.    So he's now telling you there are two women

23   who could benefit from an English as a second class --

24       A.    Okay.

25       Q.    -- that he might want to arrange, right?

 1              (Deposition Exhibit No. 26 was

 2               marked for identification.)

 3        Q.    (By Mr. Neiman:)  Okay.  Let's take a look

 4   now at Exhibit 26.  You see at the bottom of the page,

 5   Mr. Epstein writes back to you, "I can enroll Julia,

 6   Renata, and Svet if that helps the school."  Do you

 7   see that?

 8        A.    Eh-hmm.

 9        Q.    So he's now identified a third person with

10   an Eastern European name who could benefit from

11   English as a second language classes, right?

12              MR. TEAGUE:  Objection, form.  You could

13         answer.

14              THE WITNESS:  Yes, those three names

15         were there.

16        Q.    (By Mr. Neiman:)  Okay.  Did it ever cross

17   your mind to wonder whether there was something wrong

18   with this convicted sex offender telling you I have

19   three women who I'd like to help learn to speak

20   English?

21              MS. BOGGS:  Objection, vague,

22         argumentative.

23              THE WITNESS:  This is -- this is a

24         person who had one offense, had to register as

25         a sex offender.  Didn't see him with any --

1       anybody underage, or anything.  And I'm

2       thinking he is just trying to be helpful to

3       people.

4            Okay.  Just like he is helpful for people

5       in our office when somebody dies and, you know,

6       he helps them fly their, you know, their --

7       their parents wherever they need to get buried.

8       Whatever is asked, he would usually do it.

9            I would hear, you know, when somebody is

10      on the island, you know, somebody was from Haiti

11      and they needed to take supplies down to their

12      family, he flew them down to do that.

13           In that context, that's what I was

14      thinking, that's what he does.  So I had no

15      reason to believe that he was doing anything

16      untoward with these ladies.

17      Q.    (By Mr. Neiman:)  Eh-hmm.  And the fact

18      that he was doing something on behalf of Eastern

19      European women didn't raise a red flag in your mind?

20      A.    Well, how would I know based on the names

21      that they're necessarily Eastern European.

22      Q.    Well, Renata?

23      A.    Renata could be Italian.

24      Q.    Svetlana?

25      A.    Svetlana?  You know, Julia?

133

```
 1          Q.    Well, Svetlana?  Eastern European?

 2          A.    Just like --

 3                MS. BOGGS:  Objection, argumentative.

 4                MR. TEAGUE:  I mean, the spelling,

 5          Counsel, is S-V-E-T.  So you're telling me

 6          that's Svetlana?

 7                MR. NEIMAN:  Well, I can show you 20

 8          more documents here it's spelled Svetlana.

 9                MR. TEAGUE:  Then that's fine.

10                THE WITNESS:  Okay.  I would never do

11          anything to harm anyone, or to aid and abet

12          anyone in harming someone.

13          Q.    (By Mr. Neiman:)  Yeah.  So just staying on

14    top, let's just take a look at --

15          A.    No, no.

16          Q.    -- at 181.

17          A.    -- you're accusing me of something.

18                MR. TEAGUE:  Wait for the question.

19                THE WITNESS:  No, I have a daughter,

20          too.

21                MR. TEAGUE:  That's okay.  Wait for the

22          question to be asked.

23                THE WITNESS:  I have a daughter.  And I

24          wouldn't want anybody to do that to my

25          daughter.  And by the way, just as a joke, I
```

1        actually enrolled my daughter in ESL for camp

2        not knowing what it was.

3            Q.    (By Mr. Neiman:)  Okay.  Let's take a look

4    at --

5                 MR. TEAGUE:  Counsel, we are going to be

6        taking a break in about 15 minutes.  So just

7        to give you a head's up.

8            Q.    (By Mr. Neiman:)  Sure.  That's fine.

9                 MR. NEIMAN:  I ask the reporter to mark

10       Exhibit 27, a two-page document.

11                (Deposition Exhibit No. 27 was

12                 marked for identification.)

13           Q.    (By Mr. Neiman:)  All right.  You see that

14   Exhibit 27 is another email exchange on this topic of

15   the ESL course at the U.S. Virgin Islands -- excuse

16   me.  Withdrawn.  I'll start again.

17                Do you see that Exhibit 27 --

18           A.    Yes.

19           Q.    -- is another email exchange on this ESL

20   course at the University of the Virgin Islands topic?

21           A.    Yes.

22           Q.    Okay.  And you'll see at the second page of

23   the email, that a person named Ann Rodriquez at the

24   bottom of the first page, top of the second page, is

25   chiming in with some information about the last names

1    an email in June of 2013 from you to Mr. Epstein,

2    correct?

3         A.    Eh-hmm.

4         Q.    And it's, again, on this topic of the ESL

5    class?

6         A.    Right.

7         Q.    And you're asking Mr. Epstein if the ladies

8    still plan on taking the class this summer?

9         A.    Right.

10        Q.    Okay.  From your point of view, do you

11   think it's unfair to suggest that knowing that

12   Mr. Epstein was doing things for women with Eastern

13   European names is the same as a red flag for sex

14   trafficking?

15             MS. BOGGS:  Objection, argumentative.

16             MR. TEAGUE:  Objection.

17        Q.    (By Mr. Neiman:)  From your point of view.

18             MR. TEAGUE:  Objection to form.

19             THE WITNESS:  From hindsight, from where

20        I sit now?

21        Q.    (By Mr. Neiman:) No.  Well, from where you

22   sat then?

23        A.    Where I sat then?  I didn't know -- didn't

24   know anything about sex trafficking then.  He had

25   one -- one charge for solicitation.  Didn't know

1    anything about sex trafficking.

2          Q.    (By Mr. Neiman:)  Right.  And so --

3          MS. BOGGS:  Since we're talking about

4    victims of sex trafficking, let's designate

5    the entire transcript as confidential.

6          MR. NEIMAN:  Sure.

7          MS. BOGGS:  And then we can de-designate

8    as determined by the practice of the parties.

9          MR. NEIMAN:  Of course.

10         THE REPORTER:  Determining by --

11         MS. BOGGS:  By the practice of the

12    parties.

13         Q.    (By Mr. Neiman:)  Okay.  Let me just ask

14    you the question from your point of view knowing what

15    you knew at the time.

16         A.    I'm sorry.

17         Q.    From your point of view --

18         A.    Eh-hmm.

19         Q.    -- knowing what you knew at the time, do

20    you think it would be unfair to infer from evidence

21    that Mr. Epstein was doing something to benefit women

22    from Eastern Europe that he was engaged in sex

23    trafficking.

24         MS. BOGGS:  Objection.

25         MR. TEAGUE:  Objection, form.

1              So I thought he was an architect, and

2     then somebody said, no, I think he's a talent agent

3     or something.

4          Q.    Okay.  That was Mr. Brunel?

5              THE REPORTER:  That was Mr. --

6              MR. NEIMAN:  Mr. Brunel.

7              THE WITNESS:  I subsequently, like -- I

8          think when he -- when I read that he committed

9          suicide, that I figured out that that's who

10         that was.

11         Q.    (By Mr. Neiman:)  I got it.  Anything else

12    that you can recall learning about allegation related

13    to Mr. Epstein from your Googling from say 2006 to

14    2018?

15         A.    Now, and -- I mean, it wasn't something --

16    I didn't Google a lot.  I mean, I had a lot on my

17    plate.

18         Q.    Sure.

19         A.    And I did a lot of traveling with being

20    First Lady, but also, you know, taking my kids for

21    medical things and, you know, a lot of this job had

22    to do with me trying to spend a lot of time focusing

23    on my kids.

24         Q.    Understood.  Fair to say that you didn't

25    kind of do your own investigation to make sure you

1    were comfortable with Mr. Epstein?

2            MS. BOGGS:  Objection, vague.  You could

3        answer.

4            THE WITNESS:  Well, I looked him in the

5        eye and asked him, you know "What the hell is

6        going on," that I had a family, that I had a

7        daughter and, you know, what's going on, and

8        what he said was just a mistake.  Mistook

9        somebody to be older than they were.

10           And, you know -- and he got caught and had

11       to go to jail and register as a sex offender.

12       And I think I told you that I went home to my

13       17-year-old son and explained to him that this

14       is real life.

15           And I guess at that point, I just thought

16       that if I could look someone in the eye, I like

17       to tell the truth, and I figured that he was

18       going to tell me the truth.

19       Q.    (By Mr. Neiman:) You found him convincing

20   when he responded to you?

21       A.    Yes.

22       Q.    All right.  How did you learn that

23   Mr. Epstein's second arrest?

24       A.    I was with my family, and my son was

25   going -- my youngest son was going to school at

1    know, like ten people and scour the island to make

2    sure that, you know, things were on the up and up.

3              I'm sorry, what was the question?

4         Q.   My question was whether anybody from the

5    Virgin Islands law enforcement ever contacted you

6    about Mr. Epstein up to the time that he was arrested

7    for the second time in New York?

8         A.   Up until?

9         Q.   Up until that time.

10        A.   No.

11        Q.   Okay.  Looking back, you know, obviously

12   hindsight is much clearer sometimes than what we

13   experience in realtime.

14             Is there anything that you saw that

15   looks different today than it did to you at the

16   time?

17        A.   What I didn't see, and I guess what I

18   would have looked for were underage girls.

19        Q.   Eh-hmm.

20        A.   And I didn't -- I didn't see that.  Maybe

21   that was -- and in hindsight now, you know, I didn't

22   have -- I didn't have an understanding about sex

23   trafficking.

24             You know, that somebody could be 30

25   years old and be sex trafficked.  I didn't -- and

1    maybe -- maybe I've led a sheltered life, but I

2    didn't understand that.

3              And that, you know, if somebody is

4    introduced as somebody's girlfriend, I took it as

5    face value that that's their girlfriend.

6              So, in hindsight, you know, maybe some

7    alarm bells would have gone off with what I know

8    today, yes.

9        Q.   Did any of the women that you met

10   associated with Mr. Epstein ever look distressed to

11   you at the time?

12       A.   No.  And I guess that's the reason why,

13   you know, the few times that they would come into the

14   office, they would ask, you know, ask somebody where

15   can we go to buy ice cream, or where -- you know,

16   they would go off on their own.

17       Q.   Eh-hmm.

18       A.   And I guess my naive idea about being

19   controlled and being, you know, is that, somebody's

20   got you, sort of tethered, and they, from my

21   understanding would fly down on their own, they'd fly

22   back on their own.

23              They would -- so, I just thought that

24   they were, you know girlfriends.  And that they were

25   -- that they were doing all of this under their free

1     will.

2                 Hindsight is 20/20, and sure, if I knew

3     then what I knew now, you know, but there is never a

4     time where I saw somebody under distress and would go

5     to him and say, "Are you okay, can I take you

6     somewhere?"

7                 I mean, my security was my security for

8     eight years as female, and she was head of sexual

9     assault.  And she would have been the first person

10    that I would have taken them to.

11                But it was not something that, you know,

12    that ever rang any bells, and I guess in my thoughts

13    he was deemed a sexual offender, and so he needs to

14    be monitored, you know, everything that he did.  And

15    I had a lecture by -- we all did by Darren about,

16    hey, Jeffrey can't have -- he said this, you know,

17    Mr. Epstein can't have any new emails.  All his cars

18    have to be registered.  He can't have any new

19    addresses.  So don't anybody go set up any -- any new

20    -- anything online for him.  Don't, you know --

21    everything, everything about his life is monitored,

22    and that's what we were told, that every single thing

23    is monitored.  Who he brings in, who he takes out,

24    everything is monitored.

25                And that he would keep track of his days

1    coming in and coming out, he and Erika, that we were

2    not to worry about that.  But that we needed to make

3    sure that, you know, if asked, not to set up a new,

4    you know, Jeffrey St. Thomas email address him

5    because he could get in trouble.  And so we

6    understood that.

7         Q.   Okay.  I notice you have your own counsel

8    here at the deposition today.  Who is paying counsel's

9    bills?

10        A.   I am.

11        Q.   What did you do to prepare for today's

12   meeting?

13        A.   I met with counsel on Saturday for about

14   six hours.

15        Q.   And what did you do in that meeting?

16        A.   I'm sorry.

17        Q.   What did you do at that meeting?

18        MR. TEAGUE:  I would object to anything

19        about conversations with counsel that fall

20        under attorney/client privilege.  If you want

21        to ask how long she met with counsel and what

22        documents she may or may not have reviewed,

23        you may do so.

24        MR. NEIMAN:  Sure.

25        Q.   (By Mr. Neiman:)  You said the meeting was