# IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS, <br><br> Plaintiff, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A., <br><br> Defendant/Third-Party Plaintiff. <br> ——————————————— <br> JPMORGAN CHASE BANK, N.A., <br><br> Third-Party Plaintiff, <br><br> v. <br><br> JAMES EDWARD STALEY, <br><br> Third-Party Defendant. | Case No. 22-cv-10904 (JSR) |

**JPMORGAN CHASE BANK, N.A.'S MEMORANDUM OF LAW
IN OPPOSITION TO THE GOVERNMENT OF THE UNITED STATES VIRGIN
ISLANDS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...........................................................................................................................2

I.     DISPUTED ISSUES OF MATERIAL FACTS PRECLUDE SUMMARY JUDGMENT ON USVI'S 1591(a) CLAIM ...............................................................................3

     A.     JPMC Did Not Know Of Or Recklessly Disregard An Epstein's Sex-Trafficking Venture .............................................................................................3

     B.     JPMC Did Not "Participate" In Any Epstein Sex-Trafficking Venture ...............10

     C.     JPMC Did Not Benefit From A Sex-Trafficking Venture....................................22

II.    USVI IS NOT ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR ON ITS OBSTRUCTION CLAIM .........................................................................................25

III.   USVI CANNOT JUSTIFY INJUCTIVE RELIEF ........................................................27

IV.   JPMC'S AFFIRMATIVE DEFENSES APPLY TO USVI AND CANNOT BE RESOLVED ON SUMMARY JUDGMENT...................................................................29

     A.     USVI Officials Took Epstein's Cash.................................................................29

     B.     Epstein's Cash Bought Influence And Access To USVI DOJ .............................30

     C.     Epstein's Cash Bought Waivers And Special Treatment .....................................32

     D.     Epstein's Cash Bought $300 Million In Government Subsidies For His Businesses ...................................................................................................34

     E.     Epstein's Cash Bought Visas And Other Benefits................................................35

     F.     Epstein's Cash Bought Immunity .......................................................................37

CONCLUSION.......................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)...........................................................................................................1

*United States v. Afyare*,
632 F. App'x 272 (6th Cir. 2016) .................................................................................14

*Agence Fr. Presse v. Morel*,
934 F. Supp. 2d 547 (S.D.N.Y. 2013)........................................................................30

*Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*,
458 U.S. 592 (1982).........................................................................................................28

*Anora v. Oasia Pro. Mgmt. Grp., Ltd.*,
2021 WL 11114539 (S.D.N.Y. Aug. 31, 2021)........................................................23

*Aquino by Convergent Distribs. of Tex., LLC v. Alexander Cap., LP*,
642 B.R. 106 (S.D.N.Y. 2022)........................................................................................1

*Boyle v. United States*,
556 U.S. 938 (2009)............................................................................................................3

*Compass Aerospace Corp. v. Alinabal Holdings Corp.*,
2000 WL 572472 (S.D.N.Y. May 9, 2000) ...........................................................4, 9

*Doe #1 v. Red Roof Inns, Inc.*,
21 F.4th 714 (11th Cir. 2021) .......................................................................................22

*Does 1-6 v. Reddit, Inc.*,
51 F.4th 1137 (9th Cir. 2022) .......................................................................................14

*English v. Lattanzi*,
2015 WL 5038315 (E.D.N.Y. Aug. 26, 2015)..........................................................30

*Geiss v. Weinstein Co. Holdings LLC*,
383 F. Supp. 3d 156 (S.D.N.Y. 2019)...........................................................10, 11, 22

*United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*,
318 F. Supp. 3d 680 (S.D.N.Y. 2018)...........................................................................6

*United States v. Hansen*,
143 S. Ct. 1932 (2023)....................................................................................................10

*Jasco Tools, Inc. v. Dana Corp.*,
    574 F.3d 129 (2d Cir. 2009)................................................................39

*Lawson v. Rubin*,
    2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018) ...........................................13

*Nagelberg v. Meli*,
    2022 WL 2078010 (S.D.N.Y. June 9, 2022) ............................................4

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)................................................................28

*Noble v. Weinstein*,
    335 F. Supp. 3d 504 (S.D.N.Y. 2018)...............................................10, 11

*S.J. v. Choice Hotels Int'l, Inc.*,
    473 F. Supp. 3d 147 (E.D.N.Y. 2020) .................................................6, 14

*Twitter, Inc. v. Taamneh*,
    143 S. Ct. 1206 (2023) ...........................................................10, 11, 14

*Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*,
    238 F. Supp. 3d 314 (N.D.N.Y. 2017)...................................................33

*Waran v. Christie's Inc.*,
    315 F. Supp. 3d 713 (S.D.N.Y. 2018)....................................................4

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000)..................................................................9

*Woodhull Freedom Found. v. United States*,
    72 F. 4th 1286 (D.C. Cir. 2023) .........................................................10

*Zurich Am. Life Ins. Co. v. Nagel*,
    590 F. Supp. 3d 702 (S.D.N.Y. 2002)....................................................1

**State Cases**

*Christopher S. v. Douglaston Club*,
    713 N.Y.S.2d 542 (App. Div. 2000)........................................................9

*Juiditta v. Bethlehem Steel Corp.*,
    428 N.Y.S.2d 535 (App. Div. 1980) ......................................................9

*Montalvo v. Episcopal Health Servs., Inc.*,
    102 N.Y.S.3d 74 (App. Div. 2019) ......................................................9

*Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*,
    56 Cal. Rptr. 2d 756 (Ct. App. 1996).....................................................7

**Federal Statutes**

18 U.S.C. § 1591 ...................................................................................................23

18 U.S.C. § 1591(a)(2) ..............................................................................3, 11, 14, 16

18 U.S.C. § 1591(e)(3) ...............................................................................................4

18 U.S.C. § 1591(e)(4) .............................................................................................10

18 U.S.C. § 1591(e)(6) ...............................................................................................3

18 U.S.C. § 1595(d) ...................................................................................................3

18 U.S.C. § 1961(4) ...................................................................................................3

**Regulations**

12 C.F.R. § 21.11(c) .................................................................................................18

## PRELIMINARY STATEMENT

USVI makes no serious effort to meet the summary judgment standard. Rule 56 is designed for resolving pure legal issues about which there are *no* reasonable disagreements as to fact. USVI disregards the rule's standards and purpose with a list of 470 highly editorialized and mischaracterized "facts" which do nothing more than provide 470 reasons why summary judgment cannot enter on USVI's claims. As a plaintiff with the burden of proof, USVI carries the well-established burden to prove that there is *not one disputed fact* as to whether JPMC violated the TVPA. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). And USVI must shoulder that burden with all of JPMC's "'evidence … believed, and all justifiable inferences … drawn in [JPMC's] favor.'" *Zurich Am. Life Ins. Co. v. Nagel*, 590 F. Supp. 3d 702, 717 (S.D.N.Y. 2002); *Aquino by Convergent Distribs. of Tex., LLC v. Alexander Cap., LP*, 642 B.R. 106, 113-114 (S.D.N.Y. 2022) ("The court is barred at summary judgment from weighing conflicting evidence, making credibility findings, or attempting to determine the truth.").

USVI comes nowhere close to meeting that burden. As JPMC explains below and in its response to USVI's "SUMF," USVI's summary judgment papers are rife with disputed characterizations of cherry-picked evidence stripped of context and laden with counsel's argumentation. Its filing is a proposed findings of fact, not a motion for summary judgment, and it should be denied in its entirety for that reason alone.

Moreover, USVI's motion does nothing to address the glaring deficiency in its case, namely that it lacks standing to seek any form of relief beyond prospective injunctive relief—as highlighted by JPMC's own motion for summary judgment. And as to injunctive relief, USVI has not posited a single fact establishing that USVI or its residents are at any risk of *future* injury from JPMC's banking services, especially with respect to a TVPA violation.

Finally, as JPMC explains at length in the final section of this brief, it is USVI that enabled Epstein, not JPMC.  The USVI Attorney General who filed this lawsuit testified under oath to ███████████████████████████████.  For years, that same government bent its laws and favor to Epstein's wishes—including granting him $300 million in tax benefits—and it did so for money in return.  USVI does not seek justice for any victim.  It seeks an escape from having to try its case and the accountability that trial will bring.  The Court should not entertain the gambit. The motion should be denied.

## ARGUMENT

After narrating twenty-six pages of its view of contested facts, USVI asks for summary judgment only as to its demands for (1) civil penalties, (2) declaratory relief, and (3) injunctive relief.  As to the first category, JPMC's motion for summary judgment (Dkt. 228) already explains why USVI has no authority to seek "civil penalties"—or the "disgorgement" and "damages" that USVI "defers … until trial."  In short, USVI has no authority—and is not here proceeding—to act as an enforcement agency like the NYSDFS whose statutorily-authorized fines against Deutsche Bank USVI repeatedly cites.  It is a civil plaintiff seeking a civil remedy, nothing more.

Nor does the record permit summary judgment on USVI's remaining demands.  As to declaratory relief, the record is hotly disputed as to whether USVI can satisfy *any* of the elements of its § 1591(a) Claim (*see* Part I), and no reasonable juror could credit its obstruction claim (*see* Part II).  Disputed facts also preclude entry of an injunction—a demand that fails for the independent reason that USVI has marshalled *no* facts that it or its residents are at any future risk of harm from anyone, let alone a future violation of the TVPA by JPMC (*see* Part III).

Finally, the Court should disregard USVI's cramped reading of the caselaw governing JPMC's affirmative defenses and the strong factual bases in the record—indeed, USVI's complicity has only grown more apparent after it filed the motion to strike this Court recently

denied.  *See* Part IV.  USVI should not be heard to claim it was merely exercising its governing discretion or respecting Epstein's constitutional rights when its officials were facilitating his crimes.  Here too the record is disputed and summary judgment inappropriate.

## I.  DISPUTED ISSUES OF MATERIAL FACTS PRECLUDE SUMMARY JUDGMENT ON USVI'S 1591(a) CLAIM

To obtain summary judgment, USVI must prove—with all inferences drawn in JPMC's favor—that there is no dispute of material fact as to whether Epstein led a sex-trafficking venture as defined by the TVPA and that JPMC (1) knew of or recklessly disregarded an Epstein sex-trafficking venture; (2) participated in that venture; and (3) benefitted from that participation.  18 U.S.C. § 1591(a)(2).  USVI comes nowhere close to satisfying that burden.[1]

### A.  JPMC Did Not Know Of Or Recklessly Disregard An Epstein's Sex-Trafficking Venture

As a threshold matter, USVI carries the burden of demonstrating that Jeffrey Epstein led a sex-trafficking venture, as defined by the TVPA.  And, as *parens patriae*, it must prove a sex-trafficking venture that "threatened or adversely affected" the "interests of the residents" of USVI. 18 U.S.C. § 1595(d).  After positing the conclusion that "Epstein was engaged in sex-trafficking," and nothing else, USVI asks for summary judgment on this element.  But a sex-trafficking venture under the TVPA requires more than just sex-trafficking by an individual.  Rather, the TVPA defines "venture" to be "any group of two or more individuals associated in fact," the same way that RICO defines an "enterprise."  18 U.S.C. § 1591(e)(6); 18 U.S.C. § 1961(4).  In that context, the Supreme Court has explained that an "enterprise" encompasses a "group of persons associated together for a common purpose of engaging in a course of conduct."  *Boyle v. United States*, 556

---

[1]  Throughout this memorandum, "CSMF" refers to JPMC's Counterstatement of Additional Facts filed herewith.  "USVI SUMF" refers to USVI's statement of undisputed facts filed in support of its motion for summary judgment.

U.S. 938, 944 (2009).  By ignoring its burden to prove a TVPA-defined sex-trafficking venture, USVI has failed to meet it, including by failing to prove the scope and contours and timeline of the alleged venture, its "common purpose," who the victims of Epstein's sex-trafficking venture were (as distinguished from the victims of Epstein's individual conduct), and any nexus to USVI or any way in which the specific Epstein sex-trafficking venture affected the interests of USVI residents.  As the very least, these fact questions are insusceptible to summary judgment.[2]

As to JPMC's alleged liability, the first category of disputed material facts pertains to whether JPMC acted with "actual knowledge" or "reckless disregard" of Epstein's crimes.   But scienter is only appropriate for resolution at summary judgment in the most extraordinary case. *See Nagelberg v. Meli*, 2022 WL 2078010, at *4 (S.D.N.Y. June 9, 2022) (the question of whether someone "had scienter, the knowledge of what was going on … is a 'question for the jury'" because "juries are particularly skillful in determining such matters of interest, motive, and the like"); *Waran v. Christie's Inc.*, 315 F. Supp. 3d 713, 719 (S.D.N.Y. 2018) (same); *see also, e.g.*, *Compass Aerospace Corp. v. Alinabal Holdings Corp.*, 2000 WL 572472, at *3 (S.D.N.Y. May 9,

---

[2] USVI tries to make them seem so by citing victims' stories of abuse by Epstein told outside this litigation.  *See* USVI SUMF ¶¶ 12-24.  But USVI has made no attempt to show it has the right or ability to tell their stories at trial or on this motion.  *See* Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2).  Additionally, even if admissible, USVI demonstrates neither how these experiences satisfy the legal elements of USVI's TVPA claim nor how USVI, rather than these women, is entitled to money for any damages they sustained.  For instance, some of their experiences have no connection whatsoever to USVI.  *See, e.g.*, USVI SUMF ¶ 24(a), (b).  Others, based on the allegations, recount monstrous crimes but may not meet USVI's burden to demonstrate a commercial element.  *See, e.g.*, USVI SUMF ¶ 17; 18 U.S.C. § 1591(e)(3).  And some others are subject to genuine issues of material fact as to whether they amount to trafficking.  For example, USVI relies on hearsay statements (made to one of its experts in an unsworn, unrecorded conversation) about the individual experience of an unindicted co-conspirator named in Epstein's 2008 non-prosecution agreement.  *See, e.g.*, USVI SUMF ¶ 14.  Finally, regardless of how any specific victim's experience aligns with the legal elements of § 1591(a)(1), USVI has failed to explain how all these individual stories can be used by USVI to prove a venture with a common purpose that threatened the interests of its residents.

2000) (Rakoff, J.) (finding scienter a "genuinely disputed factual question[] unsuited for determination as a matter of law" in the case). USVI does not cite a single case in which questions of scienter were decided on summary judgment, let alone a case in the TVPA context. The record in this case will not permit it to be the first. USVI's allegations as to JPMC's scienter can be grouped into five buckets—each disputed, each unfit for resolution at summary judgment.

**_Epstein's 2008 Conviction._** JPMC disputes that Epstein's 2008 guilty plea for solicitation in Florida state court gave JPMC actual knowledge of an Epstein-related sex trafficking venture. Even if Epstein had been convicted of a violation of the TVPA (and he of course was not), it still would not satisfy USVI's burden. As the Court itself recognized, there is a difference between "classic" localized state-law sex crimes and the TVPA, which "requires [] additional elements" including an interstate nexus. MTD Order 36 ("MTD Order"), Dkt. 130. And if anything, the most salient fact to come out of Epstein's 2008 plea for purposes of JPMC's knowledge is that the federal government elected _not_ to charge Epstein for violating the TVPA, and thus provided JPMC no reason to believe Epstein was in fact doing so (let alone doing so after serving the sentence deemed appropriate by the courts at that time). CSMF ¶ 5.

The relevant inquiry is what JPMC believed. The jury will decide that question. They will hear evidence that JPMC did not consider those past crimes to constitute sex-trafficking under the TVPA. CSMF ¶¶ 4-15. They will hear that JPMC relied upon Staley's representations that Epstein had "turned the page" on his past conduct, had "paid his debt to society," and that JPMC's general counsel "absolutely" "rel[ied] on [Staley's] views" regarding Epstein's change in conduct because Staley "knew this client" and was a "respected member of operating committee." CSMF ¶¶ 106-107. They will hear Staley's testimony denying knowledge of any sex-trafficking activity led by Epstein. CSMF ¶ 69. And they will hear uniform testimony from JPMC witnesses disclaiming

knowledge of any sex trafficking.  Assessing that knowledge will depend on the fact finder's weighing this (among other) testimony and cannot be resolved now.

***News Articles and Lawsuits.***  USVI next turns to allegations against Epstein in civil lawsuits and media reports, including a 2003 *Vanity Fair* profile (at 7), which cited no illegal behavior, and a 2007 *New York Post* article (at 11-12).  But "'mere awareness of allegations concerning [a defendant's misconduct] is different from knowledge of actual [misconduct].'" *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 701 (S.D.N.Y. 2018) (Rakoff, J.) (alteration in the original).  Such general allegations of wrongdoing do not come close to satisfying "the knowledge element as to a *particular* sex trafficking venture." *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020).[3]  USVI itself argues, when defending its complicity in Epstein's crimes, that "news reports were not a sufficient basis to initiate an investigation because they did not contain requisite 'concrete allegations' of wrongdoing," USVI SUMF ¶ 428, and that USVI could not "rely on 'news reports, rumor,' or 'innuendo' to initiate an investigation into Epstein," USVI SUMF ¶ 429.  The jury will further hear how JPMC understood media allegations to be just that—allegations.  *See, e.g.*, CSMF ¶¶ 11-15.

The jury will also hear that JPMC did not ignore the media reports but investigated them. *E.g.*, CSMF ¶¶ 1-17, 108.  Take just one example:  In 2011, there were media reports that Epstein may have been under federal investigation for trafficking.  CSMF ¶¶ 10, 110.  JPMC personnel conducted a review of his account activity and took steps to determine whether there was any merit to the claim.  CSMF ¶¶ 14, 20-23, 44, 47, 50, 53-58.  JPMC reached out to Epstein's attorneys.

---

[3] JPMC preserves its argument that USVI must further prove that JPMC had knowledge as to the sex-trafficking *of a specific victim*.  Dkt. 39, at 10-11.

CSMF ¶¶ 109, 112.  It reached out to the federal government.  CSMF ¶¶ 113, 114.  And it reviewed Epstein's JPMC account transactions related to any alleged victims or co-conspirators named in the article, but JPMC found "no smoking guns."  CSMF ¶ 47.  Again, these are the same news articles that USVI itself claims did *not* provide a "sufficient basis to initiate an investigation." USVI SUMF ¶ 428.  All inferences must be drawn in JPMC's favor, and the inferences to be drawn from these facts are that JPMC diligently investigated the media reports and found nothing concrete, not that JPMC had actual knowledge of sex trafficking.

    ***Financial Transactions.***  USVI next cites (at 7-12) wire payments and cash withdrawals from Epstein's accounts, including payments from Epstein to his own lawyers, as proof of actual knowledge of a sex trafficking venture.  As an initial matter, USVI cites no evidence that anyone at JPMC knew any Epstein-related transaction pertained to sex trafficking.  And while USVI may urge a jury to *infer* that essential fact (this Court must make the opposite inference), the record shows the opposite.  The jury will hear, for example, that in 2011 Epstein explained to his private banker Paul Morris and JPMC Private Bank CEO John Duffy that his large cash withdrawals were for air fuel expenses when Epstein travels to foreign countries— ██████████████████████ ██████████████████  CSMF ¶¶ 18-30.  That same jury will hear that JPMC believed that Epstein was a "sugar daddy" who "likes to spend his money on ladies" but that this fact alone did not "imply [unlawful] financial support in exchange for sexual favors," let alone sex trafficking. CSMF ¶¶ 53-54.  The jury will further hear that Epstein's cash use habits were consistent with high net-worth customers at JPMC's private bank—that these customers "use cash regularly" and so the fact that Epstein "took out cash with the kind of assets that he had in his accounts" was not, in and of itself, "unusual."  CSMF ¶ 33; *see also* CSMF ¶¶ 31-32, 34-36.  Nor was it indicative of someone operating a sex trafficking venture.  *See* CSMF ¶¶ 37-39; *see Software Design &*

*Application, Ltd. v. Hoefer & Arnett, Inc.,* 56 Cal. Rptr. 2d 756, 763 (Ct. App. 1996) ("Account activity, whether in large sums or small, whether frequent or infrequent, is the nature of the beast— far from being suspicious, it is expected, routine behavior.").  And the jury will hear how USVI mispresents the record, for example by claiming (at 8) JPMC opened an account for ███ ███████ without her "birthdate, confirmed SSN, or a Passport or Driver's License Number," when JPMC in fact had all that information from her credit card application.  CSMF ¶ 51.  In short, the record regarding JPMC's knowledge based on Epstein's transactions is disputed, making summary judgment inappropriate.

**Internal JPMC Deliberations.**  USVI next cites (at 14) internal JPMC deliberations as to the right time to exit Epstein as a client, revealing the view of some JPMC employees that Epstein should have been exited earlier.  Internal *deliberations* about whether and when to exit Epstein are hardly undisputed evidence proving JPMC's actual knowledge of sex trafficking.  To the contrary, the jury that will hear the evidence will understand that several of JPMC employees' concerns were "based on reputational risk associated with banking with Jeffrey Epstein"—and not because of a belief that Epstein "was engaging in continued illegal activity after his 2008 plea."  CSMF ¶¶ 59-66.  Indeed, the jury will hear that JPMC executives would have insisted on exiting Epstein from the bank if they had believed he was engaged in ongoing criminal activity.  CSMF ¶¶ 42, 59-60.  A concern for reputational risk is not akin to actual knowledge of ongoing sex trafficking, and summary judgment clearly cannot enter to the contrary.

**Jes Staley**.  Finally, USVI argues (at 15) that JPMC had "personal knowledge" of sex-trafficking through Jes Staley.  That fails for two independent reasons:

*First*, Staley squarely disputes having this knowledge. CSMF ¶¶ 69, 108.  If Staley himself did not have the relevant knowledge, there is nothing to impute to JPMC.  This is a classic question

of credibility for the jury to resolve.  That alone is reason to deny summary judgment.  *See, e.g.*, *Compass Aerospace Corp.*, 2000 WL 572472, at *3.

*Second*, even assuming Staley had knowledge of Epstein's conduct, imputation of that knowledge to JPMC as a matter of law is impossible on this record.  Under the so-called "adverse interest" exception of agency law, "management misconduct will not be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000).  The record here is replete with evidence that Staley abandoned the interests of JPMC and pursued exclusively personal ends.  For example, Staley and Epstein regularly exchanged emails about entirely personal matters, including their interest in women.  *See, e.g.*, CSMF ¶¶ 70-76.  In these emails, Staley and Epstein repeatedly refer to each other as "family," CSMF ¶¶ 77-83.  Epstein helped with Staley's ▇▇▇▇▇ graduate school admissions, CSMF ¶¶ 84-91.  Staley also took personal trips to Epstein's USVI residence, at Epstein's invitation.  CSMF ¶¶ 92-97.  There is even evidence that Staley ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇, CSMF ¶ 68, conduct that *per se* derives from "wholly personal motives," *see Montalvo v. Episcopal Health Servs., Inc.*, 102 N.Y.S.3d 74, 77 (App. Div. 2019).

Moreover, courts have found that the adverse interest exception applies when an employer attempts to hide misconduct from his employer.  *See Christopher S. v. Douglaston Club*, 713 N.Y.S.2d 542, 543 (App. Div. 2000); *Juiditta v. Bethlehem Steel Corp.*, 428 N.Y.S.2d 535 (App. Div. 1980).  And the fact that Staley regularly forwarded confidential information to Epstein, *e.g.*, CSMF ¶¶ 98-102, while simultaneously withholding material information from JPMC regarding Epstein, provides plenty for a juror to conclude that Staley was doing exactly that.  Indeed, this is

the very basis of JPMC's pending faithless servant and breach of fiduciary duty claims against Staley.

All told, a reasonable juror could either credit Staley's testimony—or not.  If not, the juror could find that Staley was acting solely to further personal interests—or not.  That makes summary judgment improper twice over.

**B.     JPMC Did Not "Participate" In Any Epstein Sex-Trafficking Venture**

Nor does USVI's motion come close to showing that an undisputed record proves that JPMC "participated" in any Epstein sex-trafficking venture.  The TVPA defines "participation in a venture" as "knowingly assisting, supporting, or facilitating" a violation of §1591(a)(1).  18 U.S.C. §1591(e)(4).  In other words, there must be "participation in the sex trafficking act itself" through "specific conduct that furthered the sex trafficking venture." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 523-524 (S.D.N.Y. 2018); *see also Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) ("The participation giving rise to the benefit must be participation in a sex-trafficking venture, not participation in other activities engaged in by the sex traffickers that do not further the sex-trafficking aspect of their venture.").  After all, as the Supreme Court recently confirmed, "'[c]ulpability of some sort is necessary to justify punishment of a secondary actor,' lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1222 (2023); *see Woodhull Freedom Found. v. United States*, 72 F. 4th 1286, 1297-1299 (D.C. Cir. 2023) (equating "participation in a venture" with the criminal-law concept of aiding-and-abetting); *United States v. Hansen*, 143 S. Ct. 1932, 1940 (2023) (cabining criminal-law concept of "aiding-and-abetting" to the "provision of assistance to a wrongdoer with the intent to further an offense's commission").

USVI's motion advances three theories as to how JPMC purportedly "participated" in Epstein's crimes.  First, USVI points to JPMC's processing of cash withdrawals and wire transactions out of Epstein's accounts and a $1 million standby letter of credit ("SBLC") provided to Epstein to backstop a loan to a modeling agency, MC2.  Second, USVI argues that JPMC helped Epstein "structure" his cash withdrawals to avoid scrutiny.  Finally, USVI claims that JPMC "███████████████████████████████████████████████."  But, as with scienter, each of USVI's arguments rests on disputed questions of material fact—both as to whether JPMC engaged in any of the conduct USVI claims, and whether any action establishes that JPMC "knowingly assisted, supported, or facilitated" any "sex trafficking act."  *Noble*, 335 F. Supp. 3d at 523-524.

*Transactions/SBLC.*  USVI argues that JPMC participated in an Epstein sex-trafficking venture by "handling payments" from Epstein to various individuals and "allow[ing] Epstein" to use his own accounts to transfer money or withdraw his own funds in cash.  As a threshold matter, a bank does not "knowingly assist, support, or facilitate" a sex trafficking act merely by passively processing the routine transactions of its customers.  *See Twitter*, 143 S. Ct. at 1222; *see also Geiss*, 383 F. Supp. 3d at 168 n.4 (involvement in "hush payments" to cover up sex trafficking was not "participation" under § 1591(a)(2)); *Noble*, 335 F. Supp. 3d at 524 (no participation in a sex-trafficking venture where defendant allegedly "'facilitated' [perpetrator's] travel by virtue of his job responsibilities").

Regardless, far from there being no factual dispute as to Epstein's transactions, the jury will hear that cash transactions referenced by USVI were routine matters that did not stand out from the typical transactions of a wealthy Private Bank client.  *See* CSMF  ¶¶ 31 (with regard to Epstein's cash withdrawals, "████████████████████████████████████"); CSMF

¶ 33 (“███████████████████████████████████████████████████

████████████████████████████████████████████████████”);

CSMF ¶ 34 (“But at the end of the day, withdrawal of cash is a withdrawal of cash.  And so

especially small dollars, wealthy people withdraw cash.  They do a lot of different things.”); CSMF

¶ 35 (“I wasn't concerned about [Epstein's] use of cash.  Large client use cash in different ways.

They are different than, you know, than the average person on Main Street. … It wasn't—it wasn't

outsized in relation to what clients of Mr. Epstein's net worth or asset base [do].  And it wasn't

unusual, as it related to what was expected in that account, and he was pretty consistent in the use

of that.”); CSMF ¶ 36 (“I have seen very large amounts of cash be taken out of the bank by Private

Bank clients over my time at the bank.”).

USVI can point to no evidence that JPMC had any contemporaneous knowledge that a

given transaction was at all related to a sex-trafficking venture.  Epstein provided what was then

considered a plausible explanation for his cash withdrawals. *See* CSMF ¶ 40 (testifying that

Epstein's cash withdrawals were for jet fuel and nobody at JPMC suspected cash was used for sex

trafficking); CSMF ¶ 41 (“I took Mr. Epstein at his word.  And then following that, his activity for

fuel came out of the Hyperion account, and that made sense.”); CSMF ¶ 27 (Duffy email to Bonnie

Perry in performing annual KYC review of Epstein, writing “I did ask [Epstein] to withdraw this

cash from his aviation account for these payments.  Clearly he is doing this.”); CSMF ¶ 28 (it

“seemed reasonable”; “Epstein was using large cash withdrawals to pay for fuel expenses when

he travel[ed] to foreign countries”); CSMF ¶ 29 (Epstein's accountant testifying that ██████

████████████████████████████████████████████); CSMF ¶ 30.  Nor did

his payments to adult women give rise to suspicion of *crimes*.  CSMF ¶ 53 (describing Epstein as

a “sugar daddy”); CSMF ¶ 54 (explaining understanding of “sugar daddy” as “[s]omebody that

likes to spend his money on ladies," but does not "imply financial support in exchange for sexual favors"); CSMF ¶ 52 (explaining that filing a ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ "). And neither the provision of legal services (to which a criminal defendant is constitutionally entitled) nor the "handling" of payments for such legal services amounts to "knowing assistance, support, or facilitation" of a sex trafficking venture. *See Lawson v. Rubin*, 2018 WL 2012869, at *11 (E.D.N.Y. Apr. 29, 2018).

As to the "standby letter of credit" to the modeling agency MC2, again, the jury will hear that Epstein's actual involvement in MC2's business was disputed, even within the same articles on which USVI relies, CSMF ¶ 43 (noting owner of MC2 "denied receiving any payment from Epstein"); *see id.* ("MC2 president Jeffrey Fuller confirmed Brunel was a partner in the company, but denied any working relationship with either Epstein or Marie."). And the jury will hear that the SBLC—which represented *Epstein's* fully secured guarantee, *not* JPMC's, of a *separate* loan obligation owed by MC2 to a *different* financial institution—was never even drawn on. CSMF ¶ 49. Moreover, after the media reports alleging Epstein was under federal investigation for trafficking connected to MC2, *see* CSMF ¶¶ 10, 43, JPMC's anti-money laundering operations investigated the modeling agency but could not find any evidence of misconduct. CSMF ¶44 ("It appears to be a legit modeling agency. If girls were exploited [sic] via their contract or arrangement, it would be hard for us to tell."); CSMF ¶ 45 ("What do we have today with regard to possible linkages between the JPM accounts and bad activity? You noted below that he has ties to the modeling agency, but that really tells us little."). And regardless, in light of the increase in derogatory information, JPMC ultimately decided not to renew the SBLC in March 2011. CSMF ¶ 48.

Nor can USVI obtain any relief—let alone summary judgment—on a theory that JPMC merely failed to detect or stop Epstein's alleged sex-trafficking venture.  *See Choice Hotels*, 473 F. Supp. 3d at 154 (failure to adequately detect signs of sex trafficking not sufficient to state claim); *see also Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1145-1146 (9th Cir. 2022) (§ 1591(a)(2) "does not target those that merely 'turn a blind eye to the source of their [revenue]'" (cleaned up)), *cert. denied*, 2023 WL 3696135 (U.S. May 30, 2023); *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016) (same).  Banks are required to report suspicious activity; they are not obligated to investigate underlying crimes—"[i]nvestigation is the responsibility of law enforcement."  FFIEC, Bank Secrecy Act/Anti-Money Laundering Examination Manual: Suspicious Activity Reports - Overview at 67-68 (Feb. 27, 2015).  And while what Epstein may have chosen to do with his money is abhorrent, that does not mean that JPMC somehow "participated" in that conduct. *Twitter*, 143 S. Ct. at 1222 ("'[C]ulpability of some sort is necessary to justify punishment of a secondary actor,' lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions."); *see also Reddit*, 51 F.4th at 1145-1146 ("Mere association with sex traffickers is insufficient absent some knowing 'participation' in the form of assistance, support, or facilitation."); *Afyare*, 632 F. App'x at 286 (§ 1591(a)(2) requires "that a defendant actually participate and commit some 'overt act' that furthers the sex trafficking aspect of the venture").

At bottom, the jury will hear consistent testimony that JPMC employees did not know or have any reason to believe that Epstein's JPMC accounts were being used by Epstein for any unlawful purpose.  *See* CSMF ¶ 40 ("Absolutely not, never heard that."); CSMF ¶ 41 ("I had no reason to believe that Mr. Epstein—and at no point in time did I believe Mr. Epstein was committing criminal acts through JPMorgan, such as sex trafficking."); CSMF ¶ 42 ("[T]he

14

concern was the cash payments, and at the time, the cash payments were related to airplane usage. And never at the time was that something that I was connecting in my mind with anything to do with any of the allegations of what he may or may not have done, and I wasn't aware of any ongoing things that Mr. Epstein was doing, and the two things never – they never came to my mind to connect them."); CSMF ¶ 58 ("Again, she outlines what she finds, right. It doesn't establish a link between JPMorgan and the operation by Epstein of a sex trafficking ring through the bank, on its face, in my opinion.").[4] The record is clearly at minimum disputed and thus summary judgment is inappropriate.

**Structuring.** USVI next claims (at 19) that JPMC "structured" Epstein's cash withdrawals to "provide cover for Epstein's incredible and undocumented fuel explanation." But this misstates the record in several ways. As described above, Epstein's fuel explanation for his cash withdrawals was in fact believed by multiple JPMC employees and ultimately supported by statements made under oath. USVI cites to no evidence in the record to the contrary. Moreover, USVI's "structuring" allegation is based on a conversation that a Private Bank executive had with Epstein regarding the nature of his cash withdrawals. But there is nothing inappropriate about trying to understand the nature and purpose of client transactions. *See* CSMF ¶ 25 ("███████

███████████████████████████████████████████

███████████████████████████████████████████

---

[4] As USVI's own expert's analysis shows, ████████████████████████████████████
███████████████. CSMF ¶ 18. That is
████████████ CSMF ¶ 19. Indeed,
that ratio remained consistent for much of Epstein's time as a client of the Private Bank. CSMF ¶ 19 (noting that cash transactions and payments to individuals, almost half of which were men, combined represented less than 1% of transactions between February 2011 and 2013 and 1.1% of transactions between September 2007 and January 2011).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ ").  Indeed, that is exactly what is supposed to happen, and did happen, at various points while Epstein was a client of the Private Bank.  CSMF ¶ 22 (explaining need to speak to Epstein about cash usage for jet fuel); *id.* (documenting April 24, 2013, conversation between Duffy and Epstein "to discuss [Epstein's] current business activities and his related account activity" with JPMC as part of annual KYC review)]; CSMF ¶¶ 23-24, 27 (March 28, 2012 email from Perry to Duffy analyzing Epstein cash activity, noting cash was coming from account for Hyperion Air Inc., which held Epstein's private plane, and all other account activity "appear[ed] to be legitimately related to fees etc. associated to an aircraft"); CSMF ¶ 26 (████████████

██████████████████████████████████████████████████

████████████████████ ).  That JPMC executives, including Mary Erdoes, came to question that explanation at a later point in time, CSMF ¶ 162, in no way supports the inference that JPMC or its employees "structured" Epstein's cash withdrawals to avoid scrutiny.  At the very least, that is an inference a reasonable juror would be free to reject and which must be drawn in JPMC's favor in resolving USVI's motion for summary judgment.

███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████ ,



. CSMF ¶ 122

; CSMF ¶ 120

CSMF ¶ 123

CSMF ¶ 124

In short, Epstein was treated no differently.

. *See* CSMF ¶ 57

; CSMF ¶¶ 15, 33

CSMF ¶ 31

*See* CSMF ¶¶ 127-161.

These facts alone suffice to deny USVI's motion.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

First, as USVI concedes, a SAR must be filed only after a bank "detects any known or suspected Federal criminal violation" and "believes that it … was used to facilitate a criminal transaction."  12 C.F.R. § 21.11(c).  Whether a given transaction or series of transactions, such as Epstein's cash withdrawals, meets that standard "is an inherently subjective judgment," FFIEC, Bank Secrecy Act/Anti-Money Laundering Examination Manual: Suspicious Activity Reports - Overview at 68 (Feb. 27, 2015), and depends on the "totality of facts" and the circumstances surrounding both the client and the activity, CSMF ¶¶ 118, 119. ████████████████████████████

████████████████████████████████████████████████████

█████████████████████

       ██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ CSMF ¶ 131 ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ CSMF ¶ 132 ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ *See* CSMF ¶ 133.

███████████████████████████████████████████████████████

███████████████████   By that time, in light of Epstein's withdrawal of an "outsized amount

of cash," CSMF ¶ 162, compliance personnel were skeptical of Epstein's jet fuel explanation for

his cash withdrawals, CSMF ¶¶ 134-35, 163, and the regulatory environment and overall risk

tolerance within the Private Bank had changed, CSMF ¶ 163; *see also* CSMF ¶ 165 (email from

Duffy to Erdoes on talking points for Epstein exit, including "the regulatory standards in the

banking industry continue to evolve with a very low tolerance for cash activity when combined

with your personal history"). ██████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████   CSMF ¶ 137   ██████████████████████

███████████████████████████████████████████████████████

████████████   CSMF ¶ 139, ████████████████████████████████

███████████████████████████████████████████████████████

CSMF ¶¶ 137, 139.

███████████████████████████████████████████████████   SARs

███████████████ must be filed within 30 days "from the date of the initial detection of facts that may constitute a

basis for filing a SAR."  FFIEC, Bank Secrecy Act/Anti-Money Laundering Examination Manual:

Suspicious Activity Reports - Overview at 670 (Feb. 27, 2015). ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

19

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████ CSMF ¶¶ 142-143. ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ CSMF ¶ 141. ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████ CSMF ¶ 142. ███████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████ CSMF ¶ 143. ████████████████

████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[5] A "314(b)" request refers to a request to share information between financial institutions for the purpose of detecting potentially suspicious activity pursuant to Section 314(b) of the USA PATRIOT Act.



CSMF ¶ 148.

CSMF ¶ 121,

CSMF ¶ 150,

CSMF ¶ 155

CSMF ¶¶ 149, 151-54, 156-161.

In sum, USVI seeks summary judgment that JPMC actively "participated" in a sex trafficking venture by omitting JPMC's actual conduct—which included scrutinizing and reviewing Epstein's accounts and eventually exiting Epstein as a client.  A reasonable juror could obviously conclude that JPMC was not "assisting, supporting, or facilitating" any Epstein sex-trafficking venture by reporting his transaction activity to the federal government repeatedly through ███████████████████████████ the approximately 150 CTRs filed for cash transactions involving Epstein's accounts between 2003 and 2013.  *See* CSMF ¶¶ 115, 127.  A reasonable juror could also conclude that JPMC was not "assisting, supporting, or facilitating" any Epstein sex-trafficking venture by repeatedly holding meetings to evaluate Epstein's status as a client of the Bank, *see* CSMF ¶¶ 1-17, and investigating evidence of

potentially unlawful activity tied to his JPMC accounts, ¶¶ 20, 23, 43-58, 134-37, or of a potential

ongoing federal investigation into his conduct, CSMF ¶¶ 108-114.  And a reasonable juror could

readily conclude that JPMC was not "assisting, supporting, or facilitating" any Epstein sex-

trafficking venture by exiting Epstein as a client in August 2013.  CSMF ¶¶ 162-169.[6]  Given that

everyone involved has sworn under oath that they would never bank a sex trafficker, that they

asked the right questions when allegations arose, that they did the right work, and that they did not

know about Epstein's trafficking conduct, a reasonable juror could easily conclude that JPMC did

not participate in a sex-trafficking venture.

### C.    JPMC Did Not Benefit From A Sex-Trafficking Venture

Lastly, USVI does not show an undisputed record that JPMC "benefited" from a sex-

trafficking venture.  At trial, USVI must demonstrate a "causal relationship" between JPMC's

alleged "affirmative conduct furthering the sex-trafficking venture and [its] receipt of a benefit."

*Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019).  In other words,

JPMC must have received benefits *in return for* its support or facilitation of a particular sex-

trafficking venture and JPMC must have known this was the case.  *See id.* at 169-170; *Doe #1 v.*

*Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021); *Geiss*, 383 F. Supp. 3d at 169-170 (while

The Weinstein Company "undoubtedly benefited" because Harvey Weinstein's "movies and

influence generated revenue," plaintiffs failed to allege Weinstein provided those benefits *because*

the company facilitated his sexual misconduct).

---

[6] Elsewhere in its brief, USVI argues that JPMC continued to "benefit" from Epstein, as a source of referrals, following his exit from the bank.  But USVI does not even attempt to identify any facts that show that JPMC "participated" in any sex trafficking venture following Epstein's exit.  While select JPMC employees met with Epstein following his exit, this was in Epstein's capacity as an advisor to existing Private Bank clients (at the express request of those clients) concerning accounts over which Epstein had no control, management, or discretion.  *See* CSMF ¶¶ 167-169.

At the motion to dismiss stage, the Court noted it was not yet "convinced" that JPMC must receive benefits "in exchange for [its] furtherance of Epstein's sex-trafficking venture." MTD Order 31. JPMC maintains that this is the proper legal standard. But because there are genuine disputes of material fact regarding the very existence of any benefits—and whether any such benefits were connected in any way to Epstein's sex-trafficking venture—entry of summary judgment is improper under any possible causation standard.

USVI primarily points to three supposed benefits JPMC received from Epstein's sex-trafficking venture: (1) fees earned from Epstein's accounts; (2) economic benefits derived from JPMC's acquisition of Highbridge Capital, which Epstein purportedly facilitated; and (3) referrals Epstein provided to other sources of business. None suffices.

*First*, as already explained, mere banking fees are insufficient to establish a benefit *from* sex trafficking, and no jury could conclude otherwise. USVI must prove that JPMC benefited "*from* participation in a [sex-trafficking] venture," *i.e.*, that there is a causal connection between the "fees" and Epstein's specific sex-trafficking activity. 18 U.S.C. § 1591 (emphasis added). Otherwise, USVI would simply be asking the Court to hold TVPA liable for the provision of routine commercial services to a sex-trafficker. That is not the law. *See Anora v. Oasia Pro. Mgmt. Grp., Ltd.*, 2021 WL 11114539, at *2 (S.D.N.Y. Aug. 31, 2021) (finding lack of benefit in TVPA labor-trafficking case where defendant was not alleged to have "received any benefits other than routine payment for legal services"). Not only did JPMC not receive fees with any causal relationship to sex-trafficking, the record actually suggests the opposite. Once allegations of Epstein's sex-trafficking emerged, JPMC placed *restrictions* on his account to limit the scope of its business with Epstein. CSMF ¶ 4. Once he was convicted, JPMC designated Epstein as a high-

23

risk client that warranted supplemental diligence.  CSMF ¶¶ 8-9.[7]  A bank's limiting services to a criminal is not undisputed evidence of benefiting from criminal activity.  It is the opposite.[8]

*Second*, USVI claims (at 21-22) that "Epstein facilitated JPMorgan's acquisition" of the hedge fund Highbridge, a "game-changing acquisition for JPMorgan."  But USVI fails to explain why any benefit to JPMC from that acquisition constitutes a benefit from sex trafficking.  And regardless, it is a disputed question whether Epstein had meaningful involvement in that transaction.  JPMC Chief Executive Officer Jamie Dimon testified that he didn't recall "any involvement" by Epstein in the transaction at all.  CSMF ¶ 170.  And if anything, Epstein was an agent for the party across the table, Highbridge: Epstein received a consulting fee from Highbridge founder Glenn Dubin for "merger and acquisition advice," *see* CSMF ¶ 172, yet received nothing from JPMC, *see* CSMF ¶ 173.

*Third*, USVI argues (at 23-24) that Epstein "connect[ed] JPMorgan with the world's dignitaries and wealthiest people," bringing in "significant revenues to the Bank."  Once again, any benefit from these connections are not benefits *from* sex trafficking.  And many of these purported introductions never occurred.  USVI claims (at 1) that Epstein connected JPMC to a long list of wealthy individuals and dignitaries including the Sultan of Dubai, Prince Andrew, Ehud Barak, etc. to JPMC.  But the only evidence that shows that Epstein *referred business* from any of these individuals is the conclusory and self-serving testimony of Jes Staley.  *See, e.g.*, USVI SUMF

---

[7] USVI claims (at 22) that these "restrictions were ignored," but offers no support for that claim.  All USVI cites is an email indicating that Epstein remained an "investment professional/active trader w/GIO, $500 million NW."  USVI SUMF ¶ 385, Ex. 167 at -654.  But nothing about that is inconsistent with JPMC's imposition of the cited restrictions on Epstein's account.

[8] USVI repeatedly relies on the size of Epstein's account—which is neither relevant nor accurate.  Whether his accounts were large or small, there is still no record evidence of JPMC benefiting *from* a sex trafficking venture.  USVI also exaggerates the relative size of Epstein's assets vis-à-vis the bank's portfolio.  Regardless of relevance, this again is a question of fact.

¶¶ 282, 283, 284, 285, 286, 289, 291.  Even Staley's testimony is inconsistent: In the very same deposition, Staley testified that Epstein was *not* "making a referral" to the bank through any introduction.  CSMF ¶ 175.  In fact, several of these individuals—including Barak, Sultan Ahmed Bin Sulayem, Robert Lee Burch III, Prince Andrew, and David Gergen—are not and have never been JPMC private bank clients.  And, contrary to Staley's testimony, Epstein also had nothing to do with JPMC's relationship with Leon Black, CEO of Apollo Global Management.  Black was already a "client of the private bank."  CSMF ¶¶ 174, 175.  Given his own role in this litigation, suffice it to say that a jury could conclude that Staley is not a credible witness as to facts going to the ultimate issue of JPMC's liability.  Summary judgment is thus improper.

## II.   USVI IS NOT ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR ON ITS OBSTRUCTION CLAIM

It is JPMC, not USVI, that is entitled to summary judgment on USVI's obstruction claim.  As JPMC explains in its own motion, no reasonable juror could find that JPMC "(1) kn[e]w of an effort to enforce the TVPA and (2) intentionally obstruct[ed] or attempt[ed] to obstruct that enforcement effort."  MTD Order 32-33 (quoting *United States v. Farah*, 766 F.3d 599, 612 (6th Cir. 2014)).  USVI's motion only underscores its absence of proof for either element.

USVI's motion cites no supporting facts in the mountain of discovery it has received to support the claim that JPMC knew of a federal TVPA investigation *after* the federal *non-*prosecution agreement was executed and unsealed.  It points (at 10, 14, and 25) only to tabloid articles in 2006 and 2007[9] and media allegations in 2010, none of which proves the existence of

---

[9] As JPMC explained in its own motion for summary judgment, USVI cannot base its obstruction claim on conduct that took place before § 1591(d) was added to the TVPA in December 2008.  Prior to December 2008, the TVPA did not provide for either civil or criminal liability for "obstruction," and holding JPMC liable for obstruction for conduct predating the enactment of § 1591(d) would result in an impermissible retroactive application of the statute.  Dkt. 228, at 21.

anything. No reasonable juror could conclude such evidence constitutes proof of JPMC's actual knowledge of a TVPA investigation. It further points (at 14-15) to a subpoena the United States Attorney's Office for the Southern District of Florida issued to Bear Stearns in *August 2007* regarding transactions out of Epstein's accounts in the amounts of either $1,000 or $100,000. But that subpoena was served prior to JPMC's acquisition of Bear Stearns, and by the time JPMC acquired that firm, that same prosecutor's office had entered a non-prosecution agreement with Epstein. CSMF ¶ 5. What is more, the undisputed evidence shows that federal law enforcement did not view these transactions as "█████████," and, when asked by Bear Stearns' AML group whether "████████████████████████████████████████ █████████," the assistant United States Attorney handling the case "answered that question in the negative." CSMF ¶ 117. All of which says nothing of the fact that JPMC never received a subpoena from the federal government and actively tried to determine whether there was a federal TVPA investigation, only to have the inquiry either denied or ignored. *See* Dkt. 228. Put simply, USVI's motion confirms the record is barren of any proof of the first essential element of its obstruction claim, and summary judgment must enter for JPMC.

Similarly, USVI's motion confirms that it has no proof that JPMC "intentionally obstructed" the federal TVPA investigation it did not know existed.[10] The entirety of USVI's theory on this point is an alleged failure to report Epstein to the federal government—a theory thoroughly refuted for the same reasons that █████████████████████ does not constitute

---

[10] USVI misleadingly claims (at 26) that members of law enforcement said JPMC possessed information that would have been "extremely useful" in prosecuting Epstein. USVI SUF ¶ 421. What USVI omits, however, is that the special agent who made that statement was referring to a journal kept by Epstein's former employee about his activities, who tried to sell its content to law enforcement. *See* JPMC Resp. USVI SUMF at ¶ 421. USVI cites no evidence from any law enforcement source that any information in JPMC's possession was at all material to any investigation against Epstein.

"participation" in a sex-trafficking venture.  As JPMC has already explained at length, it did in

fact report Epstein to the federal government on numerous occasions and via numerous vehicles—

and the federal government did nothing with those reports or the other extensive evidence it already

had to prosecute Epstein.  Dkt. 228, at 17-20.[11]  The critical point is that even if USVI is correct

that yet ████████████ or *another* CTR would have spurred a federal investigation, there is no

proof—none—that JPMC *intentionally* withheld that ██████ CTR for the purposes of thwarting

the DOJ.  Even according the greatest weight possible to USVI's arguments and assuming (without

basis) that more frequent reporting by JPMC would have led the DOJ to indict Epstein sooner,

USVI's claims still fail.  The question is whether obstruction was JPMC's goal and there is no

evidence to that effect.  JPMC's actual reporting to the government is to the contrary.  Summary

judgment should therefore enter in JPMC's favor.

## III.   USVI CANNOT JUSTIFY INJUNCTIVE RELIEF

JPMC's motion for summary judgment already explains that, as a matter of law, USVI

cannot obtain the various categories of monetary relief it demands.  USVI's motion papers

separately show it cannot carry its burden for injunctive relief either—not at trial and certainly not

at summary judgment.  In a single sentence (at 27) that belies any serious intention to meet the

requirements for permanent injunctive relief, USVI asks this Court to enjoin "JPMorgan from

participating in trafficking ventures in the future and obstructing efforts to stop such ventures in

---

[11] For example, law enforcement took no action ████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████████ Indeed, USVI's own law
enforcement expert, who spent his entire 23-year career in Miami and West Palm Beach, Florida,
even conceded that ████████████████████████████████████████████████████
████████████████████████████████████████████████
CSMF ¶ 147.

violation of the TVPA."  Obviously JPMC has no intention of doing either.  And as explained throughout this brief, genuine disputes of material fact preclude a finding of liability at this time, precluding entry of any final remedy.  But USVI's request for injunctive relief suffers additional, independent flaws.

*First*, "[a]lthough past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016).  But nowhere scattered in USVI's 470 "undisputed facts" or forty pages of briefing will the Court find any fact establishing that USVI or its residents are at any risk of *future* injury from JPMC's banking services, especially with respect to a TVPA violation.  In *Snapp*, Puerto Rico (like the sovereigns in every successful *parens patriae* case cited in that opinion) sought to enjoin ongoing or imminent harm posed by the defendants they sued.  *See Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 598-599, 600-603 (1982).  But here, USVI's allegations and evidence concern long past behavior.  USVI has not introduced evidence of any current sex-trafficking activity in its territory, let alone a sex-trafficking venture through which JPMC is knowingly benefitting via the provision of banking services.  The focus of this lawsuit is, instead, on JPMC's relationship with a client that JPMC exited over a decade ago who is now deceased, in a regulatory environment and AML program vastly different than that in place today.  In short, there is nothing for the Court to enjoin.

*Second*, as explained below, USVI is a civil plaintiff with "unclean hands" proceeding pursuant to the TVPA's "civil remedy."  It is accordingly subject to JPMC's equitable defenses which would foreclose any possible relief.  Dkt. 157 (collecting cases).  There remain fact

28

questions regarding the nature and scope of USVI's own wrongdoing and thus whether USVI has recourse to this Court's equitable jurisdiction at all. *See infra.*

## IV. JPMC'S AFFIRMATIVE DEFENSES APPLY TO USVI AND CANNOT BE RESOLVED ON SUMMARY JUDGMENT

USVI's request for summary judgment on JPMC's affirmative defenses is a misguided attempt to re-litigate their motion to strike argument that those defenses are unavailable against the government as a matter of law. *Compare* Dkt. 139, at 7 ("JPMorgan's equitable defenses are not cognizable as a matter of law"), *with* Dkt. 218, at 29 (same). The Court has already rejected that legal argument. Dkt. 215. What remains is the factual question of whether USVI officials were complicit in Epstein's crimes. Answering this question requires credibility determinations, weighing of competing testimony, and drawing inferences about the motive underlying the actions of government officials. Such determinations are the exclusive province of the factfinder and preclude summary judgment.

The record shows that Epstein gave payments, advice, and other benefits to the highest USVI government officials. In exchange, he received (1) influence over the very laws that were supposed to constrain him; (2) waivers of sex offender monitoring requirements; (3) $300 million dollars in subsidies to the allegedly sham companies he used for sex trafficking; (4) facilitation of visas, licenses, and other forms of government assistance that enabled his criminal conduct; and (5) immunity from investigation and scrutiny.

### A. USVI Officials Took Epstein's Cash

USVI's summary judgment motion ignores the foundational element of its quid-pro-quo arrangement with Epstein—the hundreds of thousands of dollars in payments Epstein made to USVI government entities and officials over two decades. *See* Dkt. 194 at 2-5; CSMF ¶¶ 180-236 (detailing payments). These included paying ███████ in school tuition for Governor de Jongh's

children, CSMF ¶ 224, and ███████████████████ following the Governor's arrest

for embezzling public funds, CSMF ¶ 228.  Epstein's payments to politicians were advised and

directed by USVI's First Lady, *see* CSMF ¶¶ 202, 209-10, 214, and bought Epstein "loyalty and

access" among USVI politicians, CSMF ¶ 232.[12]  These payments provide the backdrop to JPMC's

defenses by establishing that key officials within the USVI government had a compelling motive

to give him special treatment and facilitate his crimes: He was paying them.[13]

Whether these payments were legitimate, or part of an illicit quid-pro-quo exchange, is a

disputed fact question that precludes summary judgment.  *See English v. Lattanzi*, 2015 WL

5038315, at *7 (E.D.N.Y. Aug. 26, 2015) (denying summary judgment on conversion claim based

on factual disputes of whether wire transfers were "legitimate salary payments" or stolen money).

USVI's failure to address them is telling.  *See Agence Fr. Presse v. Morel*, 934 F. Supp. 2d 547,

562-564 (S.D.N.Y. 2013) (denying summary judgment where plaintiff "wholly ignore[d]" facts

"that are directly contrary to its position").

### B.     Epstein's Cash Bought Influence And Access To USVI DOJ

---

[12] Even after Epstein's death, Cecile De Jongh ███████████████████████████████
from the entity USVI alleges was a front for sex-trafficking.  CSMF ¶ 230.
████████████████████████ CSMF ¶ 231.

[13] USVI also ignores the many ways in which Epstein provided government officials with
non-monetary benefits. Cecile de Jongh ████████████████████ CSMF ¶ 237.
Kenneth Mapp, USVI's Governor from 2015 to 2019, sought Epstein's counsel on how to increase
USVI's business investments and deal with USVI's structural fiscal imbalance.  CSMF ¶ 240.  He
asked Epstein to "spread[] the word" that USVI was pushing for business investment and requested
Epstein's input on issuing "critically needed bonds" to finance USVI's operations.  CSMF ¶ 239-
241.  He later asked Epstein for help with coming up with a way for EDC beneficiaries to repatriate
their income to make USVI's EDC program more attractive, and one of Epstein's lawyers drafted
proposed legislation for the Governor.  CSMF ¶ 242.  In 2017, as now, "the vi govt [was] desperate
for cash." CSMF ¶ 238.  Epstein worked with both a sitting and former USVI Governor on a plan
to get them their cash through by extending them a $50 million loan collateralized by USVI's
islands.  CSMF ¶ 238.

Evidence also reveals *why* Epstein paid USVI officials.  For example, ████████, the First Lady suggested that Epstein's business associates "███████████████████████████ ███████████████████████████████████████ CMSF ¶ 345. ███████████████ ███████████████████████████████████████" and explained that ███████ ██████████████ CSMF ¶ 345.  Celestino White is the same USVI Senator that the First Lady suggested Epstein put on "some sort of monthly retainer" because it would "get [Epstein] his loyalty and access."  CSMF ¶ 232.  He is also the same USVI senator who ████████████████ ████████████████████████████████ CSMF ¶ 348.

Email correspondence shows that as early as 2009, Epstein worked through the USVI First Lady and Governor to reach the Attorney General ████████████████████████████████ ████████████ CSMF ¶ 261.[14]  The reason why has become clear:  In USVI, he could guard the guards.  In 2011, the USVI First Lady solicited Epstein's input on USVI's pending sex offender monitoring legislation and shared draft language from DOJ with Epstein writing: "This is the suggested language; *will it work for you*?"  CSMF ¶ 265 (emphasis added).  Epstein responded with directions on how to loosen the restrictions.  The First Lady responded that she did not "want to email back and forth" and that "[t]his needs to be settled by Thursday because J [Governor John de Jongh] goes away for a week and AG [Vincent Frazer] needs to submit by June 1."  CSMF ¶ 265.  Epstein and his lawyers continued to stay in touch with USVI DOJ and various senators in order to influence the text of the bill.  CSMF ¶¶ 266-271.  Here, too, the witnesses and documents

---

[14] When confronted with these emails, USVI witnesses gave conflicting accounts, again requiring credibility determinations.  The Governor said he emailed the request to the Attorney General and told the First Lady to speak directly to the Attorney General; the First Lady testified that she never spoke to the Attorney General but that the Governor did and relayed to her how Epstein should proceed; and the Attorney General claimed ████████████████████████████████ CSMF ¶¶ 262-264.

present conflicting accounts of what happened that only a jury can resolve. While USVI attempts to minimize the impropriety of Epstein's influence over the sex offender legislation, USVI's 30(b)(6) witness testified that ██████████████████████████████████████████████ ██████████ CSMF ¶ 273.

**C.     Epstein's Cash Bought Waivers And Special Treatment**

It did not stop there. When Epstein's preferred language did not make it into law, the First Lady wrote to Epstein to reassure him that although it had not included everything he wanted, all was not "lost" and "we will figure something out by coming up with a game plan to get around these obstacles." CSMF ¶ 282. She assured him that: "We will need to work through [then-USVI Senator Carlton] Dowe and [then-USVI Senator Celestino] White to get this accomplished. In the meantime, we will work with [then-USVI Attorney General] Vincent [Frazer] to give the discretion for status quo for you - that's the least he can do." CSMF ¶ 282.

After passage of the legislation, USVI Attorney General Vincent Frazer promptly provided a waiver of "the 21 day prior notice requirement to the [USVI DOJ] for Mr. Epstein, when travelling out of the Virgin Islands." CSMF ¶ 286. When Epstein's attorneys complained that this accommodation was still too restrictive, Attorney General Frazer loosened it further, offering that Epstein be allowed to "notify the [USVI DOJ] of his intention to travel out of the [USVI] twenty-four (24) hours prior to his departure." CSMF ¶ 287.[15]

USVI recycles its prior argument that the Attorney General's granting a travel waiver to Epstein is a discretionary action that cannot support an affirmative defense. This misses the point. JPMC is not second guessing whether the waiver should have been granted as an objective matter.

---

[15] In addition to obtaining waivers, Epstein obtained ███████████████████████████████ ████████████████████████████████████████████████ *nearly identical* to language Epstein's lawyer had proposed for the July 2012 bill. CSMF ¶¶ 266-285.

Rather, it is pointing to record evidence suggesting that the waivers were part of an improper quid-pro-quo exchange involving DOJ and USVI politicians with close ties to Epstein.   Former Attorneys General Thomas-Jacobs and George both testified that ██████████████████ ████████████████████████████████████████████████████ ██████   CSMF ¶¶ 294, 295.   And Attorney General Frazer himself ██████████████████ ████████████████████████████████████████████████

CSMF ¶¶ 291, 292.   A jury is entitled to hear this evidence and draw inferences regarding the connection between Epstein's special treatment and his payments to USVI officials.

Epstein's ██████████████████████ provides further evidence he benefited from improper political influence.   USVI witnesses testified that ████████████████████████ ████████████████████   CSMF ¶ 303.   Under that regime, Epstein should have been ██████████████████.   CSMF ¶ 304.   Yet he was ████████████.   CSMF ¶ 306.   No witness within the USVI government was able to ████████████████ ████████████.   CSMF ¶ 306.   The best evidence of how the classification came about is ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████   CSMF ¶ 302.   Yet the USVI witness who ████████████████████████████████████.   CSMF ¶ 301.   This conflict between the documentary and testimonial record is a quintessential fact dispute.   *See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 238 F. Supp. 3d 314, 346-347 (N.D.N.Y. 2017) (denying plaintiff summary judgment on defendant's defense based in part on the fact that deposition testimony was "contradicted by several documents").



33

Any remaining doubt as to whether there are disputed facts underlying JPMC's affirmative

defenses is removed by former USVI's Attorney General Denise George's testimony that, ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ CSMF ¶ 296-98.[16]  George

testified that ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ CSMF ¶ 298.  To repeat: the USVI Attorney General

who filed this lawsuit testified under oath that ██████████████████████████

██████████████████████.  That alone suffices to preclude summary judgment.

### D.   Epstein's Cash Bought $300 Million In Government Subsidies For His Businesses

USVI's complaint alleges that Epstein's two USVI-based companies were fronts for his

sex trafficking enterprise.  Second Am. Compl. ¶¶ 24-28, Dkt. 119.  For twenty years, USVI

subsidized the operation of these two companies and ensured they kept their operations in USVI

by granting them (and by extension Epstein) between 100% and 90% reductions in income taxes.

CSMF ¶¶ 367, 369.  Both before and after his conviction, USVI officials took sworn testimony

regarding Epstein's operations and then voted to allow him and his companies to avoid paying

taxes.  CSMF ¶ 390.  These tax breaks amounted to $300 million in direct benefits to Epstein.

CSMF ¶ 370.   JPMC's experts analyzed the tax breaks and concluded that there was no valid

---

[16] ██████████████████████ was a "business ambassador" for the same government entity
that extended the $300 million in tax breaks to Epstein's companies.  CSMF ¶ 243. A letter to
Cecile De Jongh states: ██████████████████████████████
██████████████████████████████████████" *Id.*

economic rationale to support them.  CSMF ¶ 371.[17]  By their own count, the USVI officials who

extended these benefits received ████████████████████████████████████████████

████████████████████████████████████ ‘████████████████████████████████████

███████.”  CSMF ¶ 392.  Yet, in 20 years of doing business with him, ████████████████

██████████████████████████████  CSMF ¶ 392.

USVI attempts to distance itself from the EDC by claiming its actions are not attributable

to the government.  In fact, the EDC's board is under the "general supervision and direction of the

Governor."  29 V.I.C. § 1101(b).  The Government's own 30(b)(6) witness regarding the EDC

testified that ████████████████████████████████████████████  CSMF ¶ 352.   And

the ultimate decision on whether or not to approve recommended tax incentives was made by the

Governor.  CSMF ¶ 353.   Assessing the USVI's motivations behind these tax breaks, the

knowledge USVI officials had about Epstein's operations, their involvement in those operations,

and whether or not incentives were improperly granted as part of a quid-pro-quo exchange requires

weighing competing evidence, a job for the jury.[18]

E.      **Epstein's Cash Bought Visas And Other Benefits**

USVI waves away (at 38) the influence of First Lady de Jongh, claiming her position was

merely "ceremonial."   But the facts show she was an active player in position to influence

---

[17] Emails show that Epstein's Southern Trust employees also served him in an individual

capacity—with the First Lady overseeing both.  In one email ██████████████████████

███████████████████████████████   CSMF ¶ 389.

[18] For example, a long-time employee of the EDC, and USVI's 30(b)(6) designee regarding

its grants to Epstein, provided sworn testimony that at no point did the EDC do any kind of

investigation into Epstein.  CSMF ¶ 382.  Yet, a 37-page document produced in discovery dated

June 4, 2018, █████████████████████████████████████████████████████████████

█████████████████████████████   .  CSMF ¶¶ 250, 384.

legislation and secure government benefits for Epstein.   CSMF ¶¶ 394-401 (listing facts demonstrating First Lady acted as a government official); CSMF ¶¶ 232, 261, 265-66, 274, 282, 329, 334-43, 402-03 (showing how the First Lady used her position to benefit Epstein).   USVI's claim (at 39) that the First Lady had "no contact" with individuals in a position to influence Epstein's sex offender monitoring is also disputed.   CSMF ¶¶ 261-262, 265-266, 274.   As is USVI's claim that the Governor's review of Epstein's application for tax benefits was merely "a formality."   CSMF ¶¶ 356-61.   USVI's perfunctory treatment of Epstein's relationship with the First Lady ignores the many ways in which she, and other government affiliated individuals, actively facilitated Epstein's crimes.  *See, e.g.*, CSMF ¶¶ 321-323, 334, 343, 347-350.

For example, the First Lady facilitated gifts from Epstein to airport personnel and 78 customs employees.  CSMF ¶ 331.  And there is evidence that Epstein traveled openly through USVI airports accompanied by young women.  CSMF ¶¶ 323-324, 328.  Indeed, ████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████. CSMF ¶¶ 323-324.

Further, Epstein corresponded with First Lady de Jongh and other high-level government officials about securing visas and setting up ESL classes for his alleged victims in USVI.  CSMF ¶¶ 336-38.  Specifically, Ms. de Jongh was aware that at least one of his young female associates had only a B-1 temporary business visitor visa (Ms. ██████████).  CSMF ¶ 338.  She coordinated with Epstein on how an individual could obtain an I-20 through the University of the Virgin Islands.  CSMF ¶ 342.  The First Lady also assisted with other immigration matters related to Epstein's foreign, female associates, including by speaking with immigration attorneys on Epstein's behalf.  CSMF ¶ 335.  And she assisted in gathering materials to be provided in support

of another young woman's O-1 visa application by coordinating with members of the USVI government for letters of support. CSMF ¶ 343. She also assisted with setting up a special session of an ESL class specifically for three young women. CSMF ¶ 336-37. She worked directly with the Vice-President for Institutional Advancement at the University of the Virgin Islands on St. Thomas in order to do so. CSMF ¶ 337. In ███████, Cecile de Jongh was included on an email that ███████████████████████████████. CSMF ¶ 344. Ms. Ann Rodriguez writes about plans for ████████████████████████████████████████ *Id.* None of this is ceremonial. It is evidence of active facilitation of Epstein's crimes that at the very least requires the taking and evaluation of conflicting evidence by a jury.

## F.   Epstein's Cash Bought Immunity

USVI concedes it never investigated Epstein. What remains disputed is why. USVI claims (at 31) it is an *undisputed* fact that the Government lacked sufficient evidence to investigate Epstein. Not so. USVI witnesses acknowledged that when Florida law enforcement faxed Epstein's registration information to USVI DOJ officials in July 2010, they included a news article. CSMF ¶ 245. Based on this article, the Government's 30(b)(6) designee acknowledged that ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ CSMF ¶ 246. USVI DOJ kept this article in Epstein's official sex offender registry file. CSMF ¶ 245. USVI witnesses further confirmed that ██████████████████████████████████. CSMF ¶ 253. And that ████████████████████████████████████████████████████

██████████████████████████ CSMF 253, 258. A former Attorney General of USVI confirmed ████████████████████████████████████████████████████

████████████████████████████████████████████ CSMF ¶¶ 254, 255. And

although Attorney General George claims that ███████████████████████

████████ Epstein, USVI's 30(b)(6) witness flatly contradicts this claim, testifying that ███████

█████████████████████████████████. CSMF ¶¶ 259, 260.

What is more, although USVI argues it never received evidence to trigger an investigation,

witnesses testified that █████████████████████████████████████

█████████████████████████████████████████████████████

██████ CSMF ¶ 315.[19]

Were this not enough, ████████████████████████████████

████████████████. CSMF ¶ 307.[20]  The government's 30(b)(6) witness on

sex offender monitoring testified that ████████████████████████████

██████████████████████████████████████████████████

████████████████████████. CSMF ¶¶ 309, 314.  If Epstein had been checked

weekly over a period of ten years, there would be records of approximately 500 checks.  Yet

Epstein ███████████████████. CSMF ¶ 311. ████████████████████

█████████████ CSMF ¶ 311.  Across ██████████████████████████

███████████████████████  ██████████████████████ CSMF ¶¶ 312, 314.

Though USVI claims ████████████████, former Attorneys General testified that ████

███████████████████████ and that ███████████████████████

████████████████████████████. CSMF ¶ 313.

---

[19] Although some USVI witnesses testified ██████████████████████, others

████████████████. CSMF ¶¶ 318-319. And the head of USVI's sex offender monitoring

██████████████████████████████████████████████████ CSMF ¶ 316.

[20] Other USVI witnesses disputed █████████████████████████████

████████████████. CSMF ¶ 308.  This conflicting evidence creates a fact dispute.

At bottom, JPMC's affirmative defenses turn on hotly disputed questions as to whether USVI's preferential treatment of Epstein, and the benefits it derived from its relationship with him, can all be attributed to mere incompetence and bad judgment or whether the government's actions actively facilitated Epstein's crimes and misconduct.  At this stage, all inferences must be drawn in favor of JPMC.  *See Jasco Tools, Inc. v. Dana Corp.*, 574 F.3d 129, 156 (2d Cir. 2009) (the court's role in deciding a motion for summary judgment "is to identify factual issues, not to resolve them").  The disputed record requires jury resolution.

## CONCLUSION

For these reasons, the Court should not enter summary judgment in USVI's favor on any claim or any issue.


Dated: August 7, 2023                               Respectfully submitted,

**MASSEY & GAIL LLP**                        **WILMER CUTLER PICKERING**
                                                                  **HALE AND DORR LLP**


/s/ *Leonard A. Gail*                               /s/ *Felicia H. Ellsworth*
Leonard A. Gail (*pro hac vice*)              Felicia H. Ellsworth
Rachel Morse (*pro hac vice*)                 John J. Butts
50 East Washington Street, Suite 400     Andrés O'Laughlin
Chicago, IL 60602                                  60 State Street
(t) (312) 283-1590                                 Boston, MA 02109
lgail@masseygail.com                           (t) (617) 526-6000
rmorse@masseygail.com                       (f) (617) 526-5000
                                                            felicia.ellsworth@wilmerhale.com
                                                            john.butts@wilmerhale.com
                                                            andy.olaughlin@wilmerhale.com

                                                            Boyd M. Johnson III
                                                            Robert L. Boone
                                                            Alan E. Schoenfeld
                                                            Christopher Bouchoux
                                                            7 World Trade Center
                                                            250 Greenwich Street
                                                            New York, NY 10007
                                                            (t) (212) 230-8800

(f) (212) 230-8888
boyd.johnson@wilmerhale.com
robert.boone@wilmerhale.com
alan.schoenfeld@wilmerhale.com
christopher.bouchoux@wilmerhale.com

*Attorneys for JPMorgan Chase Bank, N.A.*