# EXHIBIT 60
# FILED UNDER SEAL

CONFIDENTIAL –

| | |
|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS,<br><br>　　　　Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>　　　　Defendant/Third-Party Plaintiff.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>　　　　Third-Party Plaintiff,<br><br>v.<br><br>JAMES EDWARD STALEY,<br><br>　　　　Third-Party Defendant. | UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK<br><br>Case No. 22-cv-10904-JSR |

# EXPERT REPORT OF TERESA A. PESCE
## ON BEHALF OF
# JPMORGAN CHASE BANK, N.A.

JUNE 23, 2023

CONFIDENTIAL –

19. JPMC reviewed Epstein's cash transactions. When the Bank inquired, a reasonable explanation for the activity was provided; indeed, large cash transactions were listed on Epstein-related Know Your Customer (KYC) forms as anticipated activity.[6] Rather than conceal Epstein's cash activity as alleged by the USVI, between 2002 and 2013, JPMC filed approximately 150 Currency Transaction Reports (CTRs) with the government on his large cash transactions consistent with its obligations.[7] CTRs, which must be filed on all currency transactions over $10,000, are a tool used by law enforcement in investigations.

20. The USVI alleges that Epstein structured cash transactions.[8] Structuring consists of conducting a transaction or series of transactions just below the CTR threshold to avoid the filing of a CTR. . JPMC filed numerous CTRs in connection with the activity in Epstein's accounts.

21. .

C. *The USVI's Claims Relate to a Small Portion of Epstein's Activity*

22. The USVI claims that JPMC should have known Epstein was engaged in illegal conduct because the vast majority of his account activity consisted of payments to women and cash withdrawals.[10] This oversimplifies Epstein's transactional activity. The overall Epstein relationship was complex. For example, a review of Epstein's activity shows that

---

[6] *See, e.g., Due Diligence Report for Hyperion Air*, JPM-SDNYLIT-00036300 at 00036306 (expected cash withdrawals at $10,000 to $50,000 per month and checks paid at $10,000 to $50,000 per month).
[7] CTRs, like SARs, are filed with FinCEN, the Financial Criminal Enforcement Network, which is an agency within the US Treasury Department.
[8] USVI Complaint, ¶ 67.
[9] 
[10] USVI Complaint, ¶ 69.

6

transactions through his accounts exceeded $445 million between 2011 and the close of the relationship.[11]  Of that, approximately $2.9 million, or 0.7% of Epstein's transactional activity, involved payments to individuals, 47% of which were to individuals with names traditionally recognized as male.[12]  Payments to individuals with names traditionally recognized as female made up a very small fraction of Epstein's complex transactional history.[13]  Cash withdrawals totaled approximately $900,000—only 0.2% of the overall activity.[14]  These percentages are consistent with Epstein's earlier activity.  Based on available transactional data,[15] Epstein's overall activity from September 2007 through January 2011 exceeded $450 million.[16]  Approximately $3.5 million or 0.8% of these transactions were made up of payments to individuals—65% to individuals with names traditionally recognized as male—while approximately $1.2 million or 0.3% were in cash.[17]

23. The USVI further claims that JPMC should have known that Epstein was engaged in illegal conduct because Epstein's account activity included payments to women with Eastern European surnames.  JPMC would not have been alerted to Epstein's payments to women with Eastern European surnames in the ordinary course of transaction monitoring.  Consistent with industry standards, and in compliance with their obligations under the BSA, JPMC deployed automated transaction monitoring systems to review transactions.  These systems were programmed with predefined scenarios or typologies potentially indicative of money laundering activity.  Neither the ethnicity of a payee (even if that were discernable by a surname) nor the gender of a payee would ever be such a scenario.  In addition to types of activity, scenarios included dollar thresholds.  The system would

---

[11] *See* Appendix D at D-1.
[12] *See id.* at D-1, D-2.
[13] *Id.* at D-1, D-3.
[14] *Id.* at D-1, D-3.
[15] I understand that due to data retention policies, available transactional records are limited for earlier periods.  However, analysts were able to extract transactional data from multiple sources including account statements.  As a result, we analyzed transactional data produced in this matter from September 2007 (the first period with complete transactional data for Epstein's DDA account ending in x0438) through December 2013 (the year JPMC exited Epstein).  In addition, we analyzed bank statements and wire transfer detail produced in this matter when information regarding the beneficiary of checks and wires was not present in the transactional data produced in this matter.
[16] *See* Appendix E at E-1.
[17] *See id.* at E-1, E-2, E-3.

generate an alert for review only if a transaction both matched the scenario and exceeded the designated dollar threshold.

24. Systems were not generally tuned to alert on small dollar transactions.[18] A bank such as JPMC can process trillions of dollars' worth of transactions in a single day.[19] The number of alerts that would be generated at low dollar thresholds would inundate banks with useless information. Systems were tuned to minimize false-positive alerts. Even well-tuned transaction monitoring systems produced far more unproductive alerts than those eventually leading to investigation and SAR filing. Most of Epstein's payments to women were in small dollar amounts. They would not have generated alerts, and thus analysts would not have reviewed this activity.

25. Alerts were not reviewed at the time a payment was processed. Batches of alerts are generated for analysts to review sometime after the underlying transactions are completed. They then undergo review and investigation before a bank decides whether to file a SAR. Banks do not ordinarily stop transactions for suspicious activity, nor do they provide real-time information to law enforcement.

### D. *Banks were Not Monitoring Transactions for Human Trafficking*

26. Consistent with contemporaneous regulatory requirements and expectations, banks monitored transactions for money laundering and terrorist financing.[20] Epstein's transactions were not indicative of either. SAR forms in effect during most of the Epstein relationship contained a small number of check boxes for the type of activity reported. Boxes covered money laundering, terrorist financing, and several fraud-related offenses. When FinCEN amended the SAR form in 2012, a much longer list of offenses was added; human trafficking was not among them. FinCEN annually publishes a report on the number of, and trends in types of, SARs filed in a given calendar year. Based on

---

[18] An exception would be monitoring for structured cash activity.
[19] See JP Morgan, *Every Transaction Speaks Volumes*, https://www.jpmorgan.com/payments#:~:text=And%20offering%20seamless%20ways%20to,170%20countries%20and%20120%20currencies.
[20] As noted above, banks separately monitor for fraud. Fraud, like money laundering, is a financial crime.

CONFIDENTIAL –

Bank for decades. He was well-established as a financial and tax advisor to wealthy clients.[143] His wealth was publicly reported. During the life of the relationship, there was no credible evidence that his funds were the proceeds of illegal activity and thus that he was laundering money.[144] Importantly, there are no, nor were there ever, allegations that Epstein's source of funds or source of wealth was the proceeds of human trafficking.[145] In general, banks were not focused on outflows of lawfully obtained money unless payments were indicative of terrorist financing.[146]

87. Several of Epstein's transactions in fact generated alerts in SONAR, triggering on different scenarios, including significant variance in activity, sudden activity, flow through activity, and transactions with high-risk jurisdictions.[147] Per standard procedure, each alert was reviewed and investigated to determine whether there was a reasonable explanation for the transaction or whether the transaction was suspicious and required escalation.[148] A review of the explanations provided to close the alerts reveals that the transactions at issue represented normal and expected business or personal activity.[149] In each case the analyst documented an explanation for the transaction and was able to close the alert without further action.[150]

88. There were cases in which Bank employees questioned Epstein's need for large amounts of cash. Epstein provided what was, at the time, a reasonable explanation for someone

---

[143] For example, Epstein held power of attorney and was financial advisor to Leslie Wexner, the founder of Limited Brands, from the 1980's until 2008.
[144] Epstein's source of wealth is irrelevant to the questions under review. There is no allegation that his wealth was derived from human trafficking.
[145] As noted by Langford, the question for the Bank was not whether Epstein engaged in particular activity but whether he used the Bank to conduct the activity. Langford Dep. at 194.
[146] While conceding that Epstein was a "wealthy client" of JPMC, Rusch questions Epstein's sources of wealth noting that only two of Epstein's clients were ever publicly reported. Rusch Rep. at ¶ 5.11. Wealth advisors do not publish their client lists as such information is sensitive and expected to be kept confidential. More importantly, JPMC was not required to request Epstein's client list to substantiate his source of wealth. Banks are not required to know their customer's customers. See FFIEC Manual (2006) at 57-58 (setting forth suggested due diligence requirements for high-risk customers; list does not include obtaining information on your customer's customer), https://www.ffiec.gov/pdf/bsa_aml_examination_manual2006.pdf.
[147] See JPM-SDNYLIT-W-00026257.
[148] See May 2010 Policy.
[149] See JPM-SDNYLIT-W-00026257.
[150] See id. A                                                                    . Ryan Dep. at 133, 208-09, 216.

36

CONFIDENTIAL –

with his lifestyle; he had a private jet and other aircraft and paid cash for fuel.[151] Based on the number and type of planes Epstein owned, the number of trips taken, and contemporaneous fuel costs, this explanation was plausible.[152] Whether that explanation was or was not true in hindsight is irrelevant for AML purposes. Importantly, the Bank expected Epstein-related entities to conduct large cash transactions. KYC records for Hyperion Air, an account controlled by Epstein relating to the operation of his private jet, note expected cash activity of $10,000 to $50,000 a month in withdrawals and $10,000 to $50,000 a month in checks paid.[153] Large cash transactions were consistent with Epstein's expected activity and were wholly consistent with his transaction patterns over the course of the relationship.[154] As noted by senior employees in the line of business and in the Bank's AML group, large cash transactions were not unusual for Private Bank customers.[155]

89. Rusch suggests that the Bank should have asked Epstein if he were filing Currency and Monetary Instrument Reports (CMIRs) in connection with his trips abroad.[156] Anyone traveling out of the country with currency or monetary instruments valued at more than $10,000 must file a CMIR with US Customs.[157] He further suggests that the Bank should have questioned whether Epstein was involved in bulk cash smuggling as regulators have identified bulk cash smuggling as a money laundering risk.[158] Both suggestions are flawed. First, using cash in connection with the purchase of fuel for travel abroad does

---

[151] *See* JPM-SDNYLIT-00755378 at 00755380; McCleerey Dep. at 255.
[152] *See* Appendix F; *Deposition of Richard Kahn in Jane Doe 1 v. JPMorgan Chase Bank, N.A.* Case No. 1:22-cv-10019-JSR (SDNY) (Kahn Dep.) at 75-76. Kahn further testified that Epstein kept cash in a safe for household expenses. *Id.* at 62-64. Rusch suggests that JPMC analysts should not have accepted fuel costs as an explanation without first conducting research by contacting JPMC's flight staff to ask if such transactions made sense. Rusch Rep. at ¶ 5.188. While this is an interesting concept in hindsight, it is simply out of line with the type of investigation an AML analyst would conduct to determine if a transaction was reasonable.
[153] Hyperion Air Due Diligence Report, JPM-SDNYLIT-00036300 at 00036306.
[154] JPMC filed CTRs for Epstein's large cash transactions dating back at least until 2002. *See,* FinCEN 00000406, FinCEN 00000147; *see also,* McCleerey Dep. at 376-77; Ryan Dep. at 184-85 ( ).
[155] *Deposition of Mary Casey in Government of the Virgin Islands v. JPMorgan Chase Bank, N.A.,* 1:22-cv-10904-JSR (SDNY) (Casey Dep.) at 364-65 (cash activity was consistent with that of high-net-worth clients); DeLuca Dep. at 298-300 (for a Private Bank customer, transactions of that size "wouldn't make me flinch."); Ryan Dep. at 134 ("Lots of private bank customers use cash regularly, so the fact that a Private Bank customer took out cash with the kind of assets that he had in his accounts, I did not think that was unusual.")
[156] Rusch Rep. at ¶ 5.188.
[157] 31 C.F.R. § 1010.340.
[158] Rusch Rep. at ¶ 5.188.

CONFIDENTIAL –

not necessarily indicate that the fuel will be purchased abroad. Even if that were the case, banks are not responsible for policing whether their clients file the proper forms with Customs. Second, the activity at issue here was not bulk cash smuggling and not the type of activity regulators identified as requiring additional scrutiny by banks. Bulk currency transactions, or the wholesale cash business, involves the transportation of large volumes of US or foreign banknotes made to or from banks.[159] Here, the Bank was neither receiving bulk cash nor shipping bulk cash on Epstein's behalf.

90. Based on my analysis and experience, I believe that the explanations provided were reasonable in context, and that the reviewers were justified in closing the alerts. There is no incentive for an AML Analyst or Investigator to close an alert if the activity reviewed presents indicia of suspicion. To the contrary, alert and case assessments are subject to quality control and/or quality assurance reviews. Failures to escalate cases appropriately reflect poorly on such employees and are considered in performance reviews. JPMC Compliance employees made clear that the size of a customer relationship and/or the lines of business .[160]

   iii.   The USVI's Flawed Assumptions Regarding Monitoring Standards

91. The USVI asserts that the Bank knew Epstein was engaged in unlawful activity based on the recipients of wire transfers. Per the complaint, these include payments to co-conspirators[161]; women, including those with Eastern European surnames[162]; alleged

---

[159] See FFIEC Manual (2014) at 183, https://bsaaml.ffiec.gov/docs/manual/BSA_AML_Man_2014_v2_CDDBO.pdf. The buying and selling of banknotes is a distinct line of business maintained by some banks, not including JPMC.
[160] DeLuca Dep. at 331-32; Ryan Dep. at 27. . Report of Robert J. Jackson, Jr. in Government of the Virgin Islands v. JPMorgan Chase Bank, N.A., 1:22-cv-10904-JSR (Jackson Rep.) at ¶¶ 3, 14-15. . See supra ¶ 53.
[161] USVI Complaint, ¶¶ 105, 161.
[162] Id. at ¶ 66.

38

victims of trafficking[163]; and alleged recruiters.[164] The USVI created exhibits for use in the depositions of bankers Mary Casey and Mary Erdoes purportedly showing the value and volume of Epstein's payments to women.[165] Based on transaction monitoring standards over the course of the Epstein relationship, the vast majority of these payments would not have generated alerts and thus they would not have come to JPMC's attention for review. Most were in small dollar amounts, and monitoring systems did not monitor transactions based on a recipient's ethnicity or gender. Those in larger dollar amounts may not have alerted or alerts would have been disposed of if such payments were consistent with Epstein's prior or expected activity.[166]

92. Epstein maintained a highly complex relationship with the Bank. He held or controlled dozens of personal and business accounts at JPMC. While the USVI alleges that payments to women, and cash transactions made up the vast majority of Epstein's activity,[167] a review of his transactions reveals that this is simply not true. Between February 2011 and 2013, JPMC processed $445,040,042 worth of transactions through the Epstein accounts. Of that, only $2,907,056 or 0.7% of the total activity during that period constituted payments to individuals, 47% to individuals with names traditionally recognized as male.[168] Cash withdrawals make up an even smaller percentage of Epstein's overall activity. Such transactions were valued at $925,852, constituting 0.2% of total activity.[169] These percentages are consistent with Epstein's earlier activity. Based on available transactional data,[170] Epstein's overall activity from September 2007 through January 2011 was $451,579,599.[171] $3,534,434 or 0.8% of these transactions were made up of payments to individuals, while $1,150,493 or 0.3% were cash

---

[163] *Id.* at ¶¶ 42, 68.
[164] *Id.* at ¶ 42.
[165] Erdoes Dep. at Exhibit 7; Casey Dep. at Exhibit 6.
[166] Rusch suggests that Epstein's payments to attorneys were indicative of money laundering and that the Bank should have investigated this activity. Rusch Rep. at ¶¶ 5.154, 5.193. There is nothing inherently suspect about the transparent payment of legal fees, particularly for someone with Epstein's complex business and litigation needs.
[167] USVI Complaint, ¶ 69.
[168] *See* Appendix D at D-1, D-2.
[169] *See* Appendix D at D-1, D-3.
[170] Due to data retention policies, available transactional records are limited for earlier periods. However, analysts were able to extract transactional data from multiple sources including account statements. *See* fn. 15.
[171] *See* Appendix E at E-1.

CONFIDENTIAL –

withdrawals.[172] The Bank processed thousands of Epstein-related transactions which do not present indicia of sex trafficking. Under the BSA, banks are required to monitor transactions for the purpose of reporting suspicious activity. They are not required to review every transaction they process.[173]

93. The USVI asserts that the Bank should have known Epstein was engaged in criminal conduct based on his cash activity. It cites to large cash withdrawals,[174] alleged structured cash transactions,[175] and cash payments to victims and co-conspirators.[176] Per the USVI, cash transactions are evidence of crimes.

94. Cash transactions may require additional scrutiny because they lack transparency. Banks may question large cash deposits because the source of funds is unknown. For example, if a client makes a cash deposit that is unusually large and out of line with expected activity, the deposit may generate an alert, and an investigator will research the source of the funds. Cash withdrawals, while potentially unusual, do not present the same concerns when the source of the funds is known. In Epstein's case, he was the source of funds, and his wealth supported sizable transactions. The Head of AML Compliance's Financial Intelligence Unit (FIU), the chief AML investigator for the Private Bank and a Private Banker commented that large cash transactions were not unusual for Private Bank clients.[177]

95. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[178] Subsequently, Epstein's cash transactions exceeded the reporting threshold. JPMC filed approximately 150 CTRs on Epstein's cash transactions over $10,000 dating back to 2002.[179] These large cash transactions would have been visible to FinCEN, and

---

[172] See id. at E-1, E-2, E-3.
[173] Ryan Dep. at 202-03 (investigators will not make assumptions with respect to how cash is used).
[174] USVI Complaint at ¶¶ 67, 161.
[175] Id. at ¶ 67.
[176] Id. at ¶¶ 67, 75, 104, 161.
[177] DeLuca Dep. at 298; Ryan Dep. at 134; Casey Dep. at 364-65.
[178] See supra fn. 9.
[179] See supra fn. 154.

40

**CONFIDENTIAL –** ■■■■

■■■■

121. At times banks will conduct transaction reviews or "lookbacks." Banks may conduct lookbacks if they are looking for a particular kind of past activity or if they receive a request from law enforcement. This entails a much more granular and pointed review of historical activity. ■■■■

122. JPMC was required to perform a transaction lookback in connection with the 2013 Consent Order.[227] However regulators required the Bank to examine activity with non-bank financial institutions.[228] There is nothing in the required lookback to suggest examiners were concerned that the bank failed properly to monitor high-risk Private Bank clients or to detect human trafficking. Moreover, it is unlikely that even a broader-scoped lookback would have uncovered Epstein's transactions with individuals. I have supervised numerous lookbacks. They require applying additional scenarios or more

---

[225] JPM-SDNYLIT-W-00025204 at 00025209.
[226] JPM-SDNYLIT-W-00019086 at 00019096.
[227] Consent Order at Article IX.
[228] *Id.*

50

CONFIDENTIAL –

precise thresholds to past activity that might not have alerted under a bank's monitoring systems. They do not generally entail setting thresholds at the low dollar amounts at issue here.

123. Importantly, lookbacks are conducted with information that might not have been available or meaningful when the underlying transactions occurred. Banks act with the information they have before them. The USVI created demonstrative exhibits for use in depositions that collect granular information now available. What may seem relevant in hindsight may not have been apparent at the time.

## CONCLUSION

124. In my opinion, JPMC's management of the Jeffrey Epstein relationship was consistent with contemporaneous regulatory expectations and industry standards under the BSA. They were not expected to police how wealthy clients spent their money. Epstein, a long-time client of the Bank, was a very wealthy man. The accounts he held at the Bank were funded with his own money. He was not laundering criminal proceeds and plainly not transacting in the proceeds of human trafficking.

125. As noted by numerous bank executives and employees, the risk Epstein presented to the Bank was reputational. His arrest in 2006 and ultimate conviction in 2008 for soliciting a prostitute under the age of eighteen raised questions about his character. In light of his conviction and of allegations in the press, the Bank repeatedly addressed whether it wanted to keep Epstein as a customer and be associated with someone with his reputation. Reasonably, however, Bank executives and compliance professionals alike did not believe the transactions he conducted through the bank were indicative of criminal activity.

51

**CONFIDENTIAL –**

134. Epstein did not need JPMC, or any bank, to engage in his unlawful activity. The Bank was not facilitating his activity or offering him special or non-routine products or services to further his behavior. Epstein cashed checks and trans▮ funds from traditional demand deposit accounts. Even these products were not integral to his unlawful behavior. His overall cash activity was small in relation to his assets. He could have kept cash in a safe for his personal use and still engaged in his brand of sex trafficking. JPMC's treatment of the Epstein relationship was consistent with regulatory expectation under the BSA regime; filing additional SARs would not have benefitted the USVI.

*Teresa A. Pesce*

Terry Pesce & Co. LLC
terrypesceco.com