# EXHIBIT 61
# FILED UNDER SEAL

```
 1   UNITED STATES DISTRICT COURT FOR THE

 2   SOUTHERN DISTRICT OF NEW YORK

 3   ----------------------------------------X

 4   Jane Doe 1, individually and on behalf of

     all others similarly situated,

 5

 6                  Plaintiff,          Case No.

                                        1:22-cv-10019 (JSR)

 7        v.

 8   JPMorgan Chase Bank, N.A.,

                    Defendant.

 9   ----------------------------------------

10   GOVERNMENT OF THE UNITED STATES

     VIRGIN ISLANDS,

11                                      Case No.

                                        1:22-cv-10904 (JSR)

12                  Plaintiff,

13        v.

14   JPMORGAN CHASE BANK, N.A.,

15                  Defendant

16   ----------------------------------------

17     ** CONFIDENTIAL PORTION UNDER SEPARATE COVER **

18            ** DEPOSITION OF MARY ERDOES **

19              Wednesday, March 15, 2023

20

21

22

23   Reported by:

24   Angela M. Shaw-Crockett, CCR, CRR, RMR
```

```
 1        A.    No.

 2        Q.    It's not something that you would ever

 3   hope anyone at the bank would condone, right?

 4        A.    Correct.

 5        Q.    And if the bank was aware or became aware

 6   that Jeffrey Epstein was abusing young girls or

 7   women, you would recommend that he be terminated as

 8   a client at the bank, correct?

 9        A.    I wasn't -- I wasn't part of those

10   conversations, and there's -- those conversations

11   have lots of facts and circumstances around them.

12   So it would just -- it would depend.

13        Q.    I must have asked a bad question.  So my

14   question is hypothetically, if you were to learn and

15   believe that Jeffrey Epstein was sexually abusing

16   children and young women, would it be your position

17   that Jeffrey Epstein should be terminated as a

18   client at the bank?

19        A.    If I learned and believed that he was

20   sexually abusing young children, yes, he would be --

21   I would ask to have him exited from the bank.

22        Q.    And if you hypothetically learned that

23   Jeffrey Epstein was running a particular type of

24   sexual abuse scheme where he was inviting young
```

 1   hush payments to victims and recruiters and things

 2   of that nature, correct?

 3       A.   Those two things, unfortunately, never

 4   came together in my mind.

 5       Q.   Okay.  It's not until right now that we're

 6   having this discussion that things are kind of

 7   starting to -- the puzzle is coming together?

 8            MR. JOHNSON:  Objection.

 9            You can answer.

10       A.   At the time, the concern was the cash

11   payments, and at the time, the cash payments were

12   related to airplane usage.

13            And never at the time was that something

14   that I was connecting in my mind with anything to do

15   with any of the allegations of what he may or may

16   not have done, and I wasn't aware of any ongoing

17   things that Mr. Epstein was doing, and the two

18   things never -- they never came to my mind to

19   connect them.

20   BY MR. EDWARDS:

21       Q.   With respect to the cash payments, if you

22   believed that he was withdrawing cash because that's

23   the way -- that's the way it was necessary to make

24   payments for jet fuel, that's not somebody that you

 1   would terminate from the bank if you believed that

 2   story, right?

 3        A.   Correct.

 4        Q.   So he gave an explanation as to why these

 5   massive amounts of cash were being withdrawn from

 6   the bank, but fair to say it was not a believable

 7   explanation, correct?

 8        A.   I thought the explanation was an outsized

 9   amount of cash, and even though that was his

10   explanation for where the cash was being used, that

11   in conjunction with the culmination of everything

12   else and the fact that I didn't know or like

13   Mr. Epstein, I had no reason to vouch for

14   Mr. Epstein to be a client of the bank, and I

15   recommended exit and we exited.

16        Q.   Do you believe that just with the analysis

17   that you did in 2013 that you made the right

18   decision, the responsible decision on behalf of the

19   bank, to exit Mr. Epstein as a client?

20        A.   I am glad I exited Mr. Epstein from the

21   bank.

22        Q.   And when he was exited from the bank, did

23   you learn immediately that he was going to set up

24   new accounts at Deutsche Bank?

```
 1      Q.   Do you know what that zone was?
 2      A.   I don't.  I just don't.
 3      Q.   Do you agree each client's AML risk should
 4  be reassessed if material new information or
 5  unexpected account activity is identified?
 6      A.   I believe that generally happens.
 7      Q.   And do you believe financial institutions
 8  must establish criteria for determining when a
 9  client relationship poses too high a risk and
10  therefore must be terminated?
11      A.   I don't know what -- generally, what you
12  said, yes.
13      Q.   With respect to the news articles that
14  were presented to you over the time that you were at
15  JPMorgan, do you remember that allegations against
16  Jeffrey Epstein began as early as March 2005 with an
17  accusation that he paid a 14-year-old girl for a
18  massage?
19      A.   I don't remember the specific allegations.
20      Q.   Do you remember allegations that the
21  Palm Beach police uncovered dozens of underage
22  victims of sexual abuse?
23      A.   I don't -- I don't remember the -- aside
24  from what we just saw earlier, I don't remember what
```

1   the specifics were.

2       Q.   When you were hearing the allegations over
3   time, let's say -- do you remember when
4   Jeffrey Epstein was first arrested in 2006?

5       A.   Yes.

6       Q.   And because of the nature of the charges,
7   that it's allegedly sex with minors, that's a big
8   deal, right, for a client?

9       A.   Any allegation is taken very seriously.

10      Q.   But if it's an allegation of trespassing,
11  it's taken less seriously than sex with a minor?

12      A.   I can't judge the seriousness with which
13  they take it.

14      Q.   Okay.  Did you speak with Jes Staley in
15  the 2006 time period about the fact that
16  Jeffrey Epstein had been arrested?

17      A.   I remember Jes discussing that -- I sort
18  of don't know where or when -- that his
19  characterization of Jeffrey was very different than
20  the press situation.  And -- yeah, that's what I
21  remember.

22      Q.   Did you know that Jes was going to visit
23  Jeffrey at various houses of his?

24      A.   So I remember the email that I think we

```
 1   BY MR. NARWOLD:
 2        Q.   This is a series of emails between you and
 3   Mr. Duffy, and this is just about the time you were
 4   exiting Mr. Epstein, correct?
 5        A.   Yes.  Sorry.  I'm just reading through it
 6   first here.
 7        Q.   Yep.
 8        A.   Okay.
 9        Q.   If you look at the bottom email on the
10   first page, it's from Mr. Duffy to you.  It says "Re
11   JE."
12             And can you tell, from the content of this
13   email, this is Mr. Epstein?
14        A.   It was around the time that we were
15   exiting Mr. Epstein, so might be, yes.
16        Q.   You see the sentence talking about the
17   impact of his cash activities?
18        A.   Yes.
19        Q.   The second paragraph says:
20             "Separately he maintains he will be
21             ███ primary advisor and there will be
22             other client assignments in the future.  I
23             told him we would work with him as long as
24             it was through the client accounts, JE
```

 1             entities would not be acceptable."
 2             And you respond with a "Y."  Does that
 3      mean yes?
 4      A.   Probably, yes.
 5      Q.   Was it your understanding at this time
 6   that it was okay for the bank to deal with
 7   Mr. Epstein so long as it wasn't in his own
 8   accounts?
 9      A.   So we can't stop someone from being
10   affiliated with somebody else.  But we wouldn't be
11   taking direction from him is how I read this.
12           MR. NARWOLD:  I'm going to show you what
13      I've marked as 50 and 51.  I believe they go
14      together.
15           (Erdoes Exhibit 50 was received and marked
16      for identification, as of this date.)
17           (Erdoes Exhibit 51 was received and marked
18      for identification, as of this date.)
19   BY MR. NARWOLD:
20      Q.   That's 50 and that's 51.
21      A.   Okay.
22      Q.   This is an email and an attachment dated
23   July 16, 2013.  Looks like it's anticipation of a
24   meeting on the following day, the 17th.