# EXHIBIT 77
# FILED UNDER SEAL

```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF NEW YORK

          GOVERNMENT OF THE           :
          UNITED STATES VIRGIN        :
          ISLANDS,                    :   CASE NO.
                                      :   1:22-CV-10904
              Plaintiff,              :   -JSR
                                      :
                  v.                  :
                                      :
          JPMORGAN CHASE BANK,        :
          N.A.,                       :
                                      :
          Defendant/Third Party       :
          Plaintiff.                  :
          _____    :
          JPMORGAN CHASE BANK,        :
          N.A.,                       :
                                      :
          Third Party Plaintiff,      :
                                      :
                  v.                  :
                                      :
          JAMES EDWARD STALEY,        :
                                      :
          Third Party Defendant.      :
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

July 13, 2023

- - -

Videotaped deposition of JOHN R. DUFFY, taken pursuant to notice, was held at Wilmer Hale, Seven World Trade Center, New York, New York, beginning at 9:17 a.m., on the above date, before Michelle L. Gray, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public.

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential Pursuant to Protective Order

1  A. Rephrase that, please.
2  Q. At the end of your
3  conversation with Mr. Staley, you still
4  thought Mr. Epstein should be exited.
5  A. I was of the opinion his
6  reputational risk was not worth having
7  him as an account, that's correct.
8  Q. And, nevertheless, you
9  signed the DDR allowing him to remain.
10  A. I did.
11  Q. And if you had declined to
12  sign that, a widening of the circle would
13  have occurred, at which more people would
14  have discussed what to do with this
15  business, right?
16  A. The -- I felt like that had
17  already happened.
18  Q. Did you involve the CEO of
19  the entire Private Bank in that
20  conversation?
21  A. I don't recall.
22  Q. Did you involve Phil
23  Di Iorio in that conversation?
24  A. They are one and the same.

Confidential Pursuant to Protective Order

```
 1          A F T E R N O O N   S E S S I O N
 2                      - - -
 3              THE VIDEOGRAPHER:  The time
 4       right now is 12:37 p.m.  We're
 5       back on the record.
 6                      - - -
 7              CONTINUED EXAMINATION
 8                      - - -
 9   BY MR. SCHIFFMANN:
10       Q.   Mr. Duffy, at any point
11   during your time as CEO of the U.S.
12   Private Bank, did you become concerned by
13   Mr. Epstein's use of cash from his
14   JPMorgan accounts?
15       A.   I wasn't concerned about his
16   use of cash.  Large clients use cash in
17   different ways.  They are different than,
18   you know, the average person on Main
19   Street.
20              But I did speak with
21   Mr. Epstein about his use of cash and
22   what it was for and made suggestions to
23   him as it related to his response, which
24   was for aviation fuel, to use his
```

1  aviation account.

2       Q.   So your answer is no, you
3  were not concerned about his use of cash?

4       A.   It wasn't -- it wasn't
5  outsized in relation to what clients of
6  Mr. Epstein's net worth or asset base
7  has.  And it wasn't unusual, as it
8  related to what was expected in that
9  account, and he was pretty consistent in
10 the use of that.

11           So we are always concerned
12 about people who use cash and might be
13 carrying cash around, because it's a
14 liability for them.

15      Q.   So other than the size of --
16 well, strike that.

17           So you've just testified
18 that you weren't concerned about the size
19 of the withdrawals.  Did anything else
20 about the cash withdrawals concern you
21 while you were CEO of the U.S. Private
22 Bank?

23           MR. JOHNSON:  Objection.

24           THE WITNESS:  We -- clients

1          who take out cash regularly, we
2          look for it to be consistent with
3          what was expected for that
4          account.  And the DDR is the
5          mechanism for setting the
6          expectation of activity in an
7          account.  And Mr. Epstein's cash
8          withdrawals were consistent with
9          the expectations as set by his
10         DDR.
11   BY MR. SCHIFFMANN:
12         Q.   So to answer my question,
13   you did not -- you were not concerned
14   about any aspect of his cash usage while
15   you were CEO of the U.S. Private Bank?
16         A.   I was curious about it.  I
17   asked him about it.
18         Q.   But you were not concerned
19   about it?
20         A.   No.  We spoke about it.  He
21   gave me an answer, which was it was for
22   jet fuel.  I took him at his word and
23   felt like I covered that with him.
24         Q.   And when he told you that,

Confidential Pursuant to Protective Order

1  you believed him?
2       A.   I did.
3       Q.   Did you ever think he was
4  being dishonest with you?
5       A.   No, I did not.
6       Q.   So did you always take
7  Mr. Epstein at his word?
8       A.   We didn't talk that often.
9  But on that -- on that matter in
10 particular, yes.
11      Q.   Do you remember ever not
12 taking him at his word during any of your
13 conversations?
14      A.   They were limited, so no.
15      Q.   Did you ever discuss your
16 concerns -- well, withdrawn.
17           Did you ever discuss
18 Mr. Epstein's use of cash with Mary
19 Erdoes?
20      A.   Yes.
21      Q.   And what do you remember
22 about -- well, when was that
23 conversation?
24      A.   I don't recall.

Confidential Pursuant to Protective Order

1  didn't think that it was appropriate?
2         A.    If I thought there was
3  something inappropriate that Mr. Epstein
4  was doing, then I wouldn't have approved
5  it.
6         Q.    If it was your
7  responsibility to continue the
8  relationship, why did you initially
9  decline to approve the account?
10        A.    In this review?
11        Q.    Yes.
12        A.    More information, from my
13 perspective, since we had -- I had a
14 discussion with Mr. Epstein about his use
15 of cash to pay for fuel out of a Hyperion
16 account.  I was looking for consistency.
17        Q.    And if you found out more
18 information that made you think that
19 approving Mr. Epstein's account was
20 inappropriate, you would have declined to
21 approve it, right?
22        A.    If I thought there was
23 anything he was doing that was wrong, a
24 crime, illicit, I would not have approved

1  e-mail, do you remember between --
2  whether between 6:03 p.m. on March 27th
3  and 6:25 p.m. on March 27th you had a
4  conversation with Mr. Epstein about this
5  particular cash withdrawal?
6           MR. JOHNSON:  Objection.
7           THE WITNESS:  I did not have
8      a conversation with him that I
9      recall on that day.
10 BY MR. SCHIFFMANN:
11      Q.   So it stands to reason that
12 when you wrote, "I previously spoke with
13 Jeffrey Epstein about this activity,"
14 what you're referring to is his overall
15 pattern of cash withdrawals, not this
16 particular cash withdrawal?
17      A.   I don't -- I had a
18 conversation with him about his cash
19 withdrawals and aviation fuel.  That's
20 what I'm referring to there.
21      Q.   Do you remember ever
22 speaking with him specifically about the
23 August 1st -- sorry, about the one
24 payment that Ms. Perry references?

Confidential - Pursuant to Protective Order

1        A.    It was.
2        Q.    And, obviously, it was
3  before this -- these events transpired,
4  right?
5        A.    It would -- it would have.
6  Yes.
7        Q.    Did you -- do you remember
8  if it was a long time before or had you
9  just had that conversation?
10       A.    I don't recall.
11       Q.    What prompted you to speak
12 to Mr. Epstein about his cash usage?
13       A.    Cash is a funny asset.  It
14 brings liability to clients when they
15 carry it around.  Large clients often
16 take large cash at different times of the
17 year.  Sometimes it's for household
18 staff.  Sometimes it's for holiday gifts.
19 Sometimes it's for building personnel.
20             So it's not uncommon to talk
21 to a client about their cash.
22             And with Mr. Epstein, as
23 I've said to you previously, in gaining a
24 broader picture of his account, I asked

Confidential - Pursuant to Protective Order

1  him about his cash and its usage, and he
2  mentioned aviation fuel, particularly in
3  parts of the world that can be a little
4  bit more difficult to travel through.
5  And where a U.S. bank card would
6  typically not be accepted for payment,
7  hence the OFAC.
8              And as I previously
9  mentioned, I took him at his word for
10 that.
11     Q.   So after this deep dive by
12 Ms. Perry, why did you think you needed
13 to speak to him again about the cash
14 withdrawals?
15     A.   I don't recall.  And I don't
16 think we did.  That's my recollection.
17     Q.   The last long sentence in
18 this e-mail is, "Perhaps the best next
19 step is for us to speak with Harry, who
20 we know, and ask Harry about the cash
21 withdrawals."
22          Do you see that?
23     A.   I do.
24     Q.   And this is Harry Beller?

1  received the cash for fuel explanation --
2  or you never looked into whether or not
3  that explanation made sense, given that
4  he had spent a considerable number of
5  years in jail and then on house arrest?
6             MR. JOHNSON:  Objection.
7             THE WITNESS:  Could you
8        repeat your question, please.
9             MS. LIU:  Can I have that
10        question read back.
11             (Whereupon, the court
12        reporter read back the requested
13        portions of the transcript.)
14             THE WITNESS:  That
15        explanation, to me, was taken at
16        face value and post the
17        conversation with Mr. Epstein.
18        Many of his cash activities, as
19        recommended to him for his
20        aviation fuel needs, were switched
21        to his aviation account, Hyperion.
22  BY MS. LIU:
23        Q.   Taken at face value, meaning
24  you didn't do any digging into whether or

Confidential - Pursuant to Protective Order

1  not that explanation made sense?  You
2  just took Mr. Epstein at his word,
3  correct?
4        A.    I took Mr. Epstein at his
5  word.  And then following that, his cash
6  activity for fuel came out of the
7  Hyperion account, and that made sense.
8        Q.    It came out of the Hyperion
9  account at your suggestion, correct?
10       A.    Well, it came -- if he is
11 using money, his money for aviation
12 purposes, it's common sense and good
13 advice to give a client advice to make
14 sure that money comes out of your
15 aviation account so that when you're
16 accounting for your aviation expenses,
17 they are well documented.
18       Q.    But you knew that the money
19 was simply being transferred into the
20 aviation account a few days before it was
21 then taken out of the aviation account,
22 correct, Mr. Duffy?  That's what the
23 documents in this case show?
24            MR. JOHNSON:  Objection.

```
 1   trafficking business?
 2           MR. JOHNSON:  Objection.
 3           THE WITNESS:  I had no
 4      reason to believe that
 5      Mr. Epstein -- and at no point in
 6      time did I believe Mr. Epstein was
 7      committing criminal acts through
 8      JPMorgan, such as sex trafficking.
 9   BY MS. LIU:
10      Q.   So, therefore, you didn't
11   look or have any of the people working
12   for you at the Private Bank look at his
13   transactions to see if any might have
14   matched up with the allegations of sex
15   trafficking; is that fair?
16      A.   No, that's not fair.  Our
17   risk and control teams monitor client
18   cash activity.  ███████████████████████
     ██████████████████████████████████████
20      Q.   All right. So let's pull up
21   Tab 12, please.
22           THE COURT REPORTER:  Is that
23      something you're putting in the
24      chat?
```

Confidential - Pursuant to Protective Order

1  about the Epstein link."
2         Do you see that?
3     A.   I do.
4     Q.   What did you understand that
5  to mean in February of 2014 when
6  Mr. Saghri said to you, "We all remain
7  very concerned about the Epstein link"?
8         MR. JOHNSON:  Objection.
9         THE WITNESS:  I do not have
10    a recollection of that.
11 BY MS. LIU:
12    Q.   So if you go up to the first
13 page of the e-mail chain, you'll see at
14 some point you -- second e-mail down on
15 the first page, you sent an e-mail to
16 Marcus Sheridan, Re: Leon, and you say,
17 "Sticky, Jeffrey cannot have POA."
18        Do you see that?
19    A.   I do.
20    Q.   And I assume POA means power
21 of attorney, correct?
22    A.   Yes, it does.
23    Q.   So at this point you thought
24 it was possible that Jeffrey Epstein

Confidential - Pursuant to Protective Order

1  would want to have power of attorney over
2  this relationship that you were building
3  with Leon Black and his family, correct?
4              MR. JOHNSON:  Objection.
5              THE WITNESS:  No.  I just
6         was -- wanted to be clear with a
7         colleague that we would not accept
8         Jeffrey as a power of attorney on
9         another client's account.
10 BY MS. LIU:
11       Q.   Why did you think it was
12 possible, at this time, that Jeffrey
13 Epstein might want to be power of
14 attorney on the Leon Black family
15 account?
16             MR. JOHNSON:  Objection.
17             THE WITNESS:  I don't know.
18        I just wanted to be clear with a
19        colleague that it wasn't a
20        possibility.
21             MS. LIU:  Thank you for your
22        time, Mr. Duffy.  I have no
23        further questions.
24             THE WITNESS:  Thank you.