# EXHIBIT 79
# FILED UNDER SEAL

```
 1      UNITED STATES DISTRICT COURT FOR THE
             SOUTHERN DISTRICT OF NEW YORK
 2                       - - -

 3   GOVERNMENT OF THE UNITED        : Case Number:
     STATES VIRGIN ISLANDS           : 1:22-cv-
 4        Plaintiff,                 : 10904-JSR
          v.                         :
 5   JPMORGAN CHASE BANK, N.A.       :
          Defendant/Third-Party      :
 6        Plaintiff.                 :
     _____
 7   JPMORGAN CHASE BANK, N.A.       :
          Third-Party Plaintiff,     :
 8        v.                         :
     JAMES EDWARD STALEY             :
 9        Third-Party Defendant.     :

10
                          - - -
11                   MAY 24, 2023
                 HIGHLY CONFIDENTIAL
12                        - - -

13           Videotaped deposition of

14   STEPHEN CUTLER, taken pursuant to notice,

15   was held at the law offices of Boies

16   Schiller Flexner LLP, 55 Hudson Yards,

17   New York, New York, commencing at

18   9:40 a.m., on the above date, before

19   Amanda Dee Maslynsky-Miller, a Certified

20   Realtime Reporter and Notary Public in

21   and for the State of New York.

22                        - - -
          GOLKOW LITIGATION SERVICES, INC.
23      877.370.3377 ph| 917.591.5672 fax
                deps@golkow.com
24
```

BY MS. LIU:

Q. But you do remember and you reviewed documents that reminded you, or refreshed your recollection, Mr. Cutler, correct, that on multiple occasions, as the top lawyer at the company, you said to business, I do not want this person, Jeffrey Epstein, as a client of the bank, correct?

A. I know that I said that in 2011. I do.

Q. But he remained a client of the bank until August of 2013, correct?

A. Or thereabouts, yes.

Q. Who overruled you?

MR. GAIL: Objection.

BY MS. LIU:

Q. Mr. Cutler --

A. I don't know if it was a

1  matter of being overruled, but I believe
2  that Mr. Staley and -- and others in the
3  business decided that we should retain
4  Mr. Epstein as a client, notwithstanding
5  my concerns that his continuing to have
6  an account at JPMorgan created a
7  reputational risk for the firm.
8      Q.   And who are the others that
9  you mentioned?
10     A.   Well, I don't think that an
11 account for a private bank customer gets
12 retained unless the private bank wants to
13 retain the account and the head of asset
14 management, to whom the private bank
15 reports, wants to retain that account.
16          And then I know in this case
17 Mr. Staley remained involved, given that
18 he was a primary relationship with the
19 account.
20     Q.   The head of asset management
21 at the time was Mary Erdoes, correct?
22     A.   Correct.  Sorry, in 2011,
23 we're talking about, yeah.
24          MS. LIU:  It's 1 o'clock.

1          consistent, yes.

2    BY MS. LIU:

3          Q.   And it's also consistent

4    that JPMorgan retained Jeffrey Epstein as

5    a client to deal with the Bear Stearns

6    litigation that Jeffrey Epstein had,

7    correct?

8          A.   I don't know that.

9          Q.   Because then she writes, I

10   reminded him that we have the other

11   matter outstanding.

12              Do you see that?

13         A.   I do.

14         Q.   So we had the one, it's been

15   approved, settlement is done.  But Steve,

16   from Nina, we've got that other

17   litigation with Jeffrey Epstein.

18              Do you recall that?

19         A.   I don't.

20         Q.   Do you recall the Zwirn

21   Highbridge Dubin litigation?

22         A.   I've now seen documents that

23   remind me there was -- there was another

24   claim that Epstein had.

1  Epstein's suggestion, to make this
2  elaborate presentation about the world's
3  largest donor-advised fund, correct?
4       A.    If you're asking me if I
5  think we kept Mr. Epstein as a client
6  because of some dealings with the Gates
7  Foundation, I don't think so.  But -- I'm
8  sure we'll get to that, but I don't think
9  so.
10      Q.    So you have no reason to
11 disagree that the other matter
12 outstanding was the Highbridge litigation
13 by Jeffrey Epstein, correct?
14      A.    I just don't know what --
15 what Ms. Shenker was talking about in
16 this e-mail to Ms. Erdoes.
17      Q.    And what was the Jeffrey
18 Epstein Highbridge litigation that was
19 still outstanding at this time that you
20 were not off-boarding Jeffrey Epstein?
21           MR. GAIL:  Objection.
22           THE WITNESS:  I don't -- I
23      don't remember what the -- that
24      litigation, again, assuming that

Stephen Cutler - Highly Confidential

1               it was litigation, was about.
2               I also don't know that we
3          were not off-boarding Mr. Epstein
4          because of that litigation or
5          litigation claim.
6     BY MS. LIU:
7          Q.   So why were you retaining
8     Jeffrey Epstein at this time?
9               MR. GAIL:  Objection.
10              THE WITNESS:  Why was
11         JPMorgan?  I don't know all the
12         reasons.
13    BY MS. LIU:
14         Q.   Do you know any of the
15    reasons, Mr. Cutler?
16         A.   Well, I know that at least
17    Mr. Staley felt very strongly that
18    Mr. Epstein had paid his debt to society,
19    had served his time, and was someone that
20    a lot of other people trusted.  I think
21    Mr. Staley didn't agree with the notion
22    that we shouldn't have him as a client.
23         Q.   But, yet, Nina Shenker is
24    e-mailing Mary Erdoes.

1              You wrote that, correct?

2         A.   Yes.

3         Q.   Why did you write "it's

4    another to be paying him"?  What did you

5    mean by that?

6         A.   I'll reiterate what I said

7    before.  I think that, essentially, would

8    make Mr. Epstein our business partner,

9    and I didn't think, given the

10   reputational issues, that JPMorgan ought

11   to be business partners with Mr. Epstein.

12        Q.   Do you recall that that

13   Gates Foundation project that Mary

14   Erdoes, Jes Staley and with which you

15   were at least partially involved with

16   Jeffrey Epstein, ultimately didn't go

17   through?

18        A.   Again, that's my

19   recollection, that we did not do --

20   JPMorgan did not do a Gates Foundation

21   project.

22                    - - -

23             (Whereupon, Exhibit

24        Cutler-26, JPM-SDNYLIT-00136260,

1   Schwartz.

2       Q.   And do you recall what he
3   said to you or what you -- what you
4   remember about any conversations that
5   happened between someone at JPMorgan and
6   Ken Starr related to Jeffrey Epstein?

7       A.   My best recollection is we
8   were trying to ascertain whether there
9   was, in fact, an ongoing investigation,
10  that is, an investigation of, you know,
11  current conduct, or call it
12  post-conviction conduct.

13           And I don't remember the
14  result of the call with Starr, other than
15  we certainly didn't glean from that
16  communication that he thought there was
17  such an investigation.

18      Q.   Why was that the question
19  you were asking?

20      A.   I don't know if that was the
21  only question.  It may have been a
22  character reference kind of thing.

23           But at that time, I think we
24  were looking at the account again.  There

1  ongoing human trafficking through Jeffrey
2  Epstein?
3        A.   Here is what I was
4  interested in:  If Mr. Epstein was
5  continuing to engage in unlawful
6  activity, we didn't want him as a client.
7             We understood that he had
8  engaged in unlawful activity in the past.
9  That, itself, raised issues.  But we were
10 continuing to serve as his bank and
11 maintain his accounts.
12            If he was involved in --
13 in -- if he continued to be involved in
14 criminal activity, we did not want to
15 maintain those accounts.
16       Q.   And what did you do to
17 determine whether or not Jeffrey Epstein
18 was continuing to be involved in criminal
19 activity, namely human trafficking?
20       A.   Right.  I -- again, I would
21 not have personally been involved in
22 that.  But we had a compliance department
23 and an anti-money laundering function
24 with well-regarded people.  And I trusted