# EXHIBIT 108

# FILED UNDER SEAL

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
2

3    GOVERNMENT OF THE           :
     UNITED STATES VIRGIN        :
     ISLANDS,                    :   CASE NO.
4                                :   1:22-CV-10904
     Plaintiff,                  :   -JSR
5                                :
                                 :
6          v.                    :
                                 :
7    JPMORGAN CHASE BANK,        :
     N.A.,                       :
                                 :
8    Defendant/Third Party       :
     Plaintiff.                  :
9    _____ :
     JPMORGAN CHASE BANK,        :
10   N.A.,                       :
                                 :
11   Third Party Plaintiff,      :
                                 :
12         v.                    :
                                 :
13   JAMES EDWARD STALEY,        :
                                 :
14   Third Party Defendant. :

15    CONFIDENTIAL - ATTORNEYS' EYES ONLY
                  -  -  -
16              May 3, 2023
                  -  -  -
17

18              Videotaped deposition
     of WILLIAM D. LANGFORD, taken pursuant to
     notice, was held at the law offices of
19   Boies Schiller Flexner LLP, 55 Hudson
     Yards, New York, New York, and remotely,
20   beginning at 9:37 a.m., on the above
     date, before Michelle L. Gray, a
21   Registered Professional Reporter,
     Certified Shorthand Reporter, Certified
22   Realtime Reporter, and Notary Public.

23          GOLKOW LITIGATION SERVICES
        877.370.3377 ph| 917.591.5672
24              deps@golkow.com

1    that -- that is a fair characterization

2    of the initiative?

3         A.    Yes.

4         Q.    Okay.  Okay.  You can put

5    that aside.

6              In looking at the

7    transactional activity associated with

8    human trafficking.  Would you agree that

9    cash is an important red flag of

10   potential trafficking?

11             MR. KRAUSE:  Objection.

12             THE WITNESS:  So, again, I

13        need to go back to what we were

14        looking at.  The cash components

15        of it, we were focused,

16        appropriately so, on the business

17        of trafficking.  That is, people

18        who set up the criminal enterprise

19        to capture, imprison, move, and

20        sell the services, right, and

21        generate the criminal proceeds,

22        just like drug trafficking.

23             So what we -- what we

24        focused on, you know, it wasn't --

1          the cash usage actually wasn't all

2          that helpful, but it was, rather,

3          other indicia that we actually

4          found where you could start to

5          link it to people who were

6          promoting the trafficking, the

7          prostitution for example, using

8          otherwise benign retail accounts.

9          That was really the focus -- ended

10         up finding, I should say.

11    BY MS. SINGER:

12         Q.    Okay.  And so, again, I want

13    to focus not just on what you were doing,

14    what you were implementing at JPMorgan in

15    the human trafficking initiative, but

16    kind of the learnings that cash is

17    specifically suggestive of human

18    trafficking.

19              Do you agree with that

20    statement?

21              MR. KRAUSE:  Objection.

22              THE WITNESS:  So again,

23         partially.  What we were looking

24         for, what I really wanted to find,

1   derogatory information and identifiable

2   activity, this was identifiable activity

3   related to the information that was

4   available on Jeffrey Epstein's conduct,

5   correct?

6           MR. GAIL:  Objection.

7           THE WITNESS:  Yeah, so I

8       have to say, I've not seen an

9       instance where, in response to

10      negative media, we would have

11      pulled an affidavit like this.

12      Doesn't mean it doesn't happen.

13      I'm saying that's not typically

14      what I would have done as an

15      investigator, but I've never been

16      an investigator.  So I've not seen

17      it in the context of the

18      investigations done.

19          Is it relevant.  Everything

20      is relevant when you're assessing

21      conduct.  But at the end of the

22      day, the question of using the

23      bank to conduct the activity,

24      spending money, sure, I'd like to

1    know.

2            But at the end of the day,

3    withdrawal of cash is a withdrawal

4    of cash.  And so especially small

5    dollars, wealthy people withdraw

6    cash.  They do a lot of different

7    things.

8            So it's in contrast,

9    perhaps, to the receipt of

10   information, the criminal

11   enterprise like we talked about.

12   So it presents more of a

13   challenge.

14           MS. SINGER:  So move to

15   strike that answer.

16   BY MS. SINGER:

17       Q.    I appreciate it.  But I

18   think it was different than my question.

19           And I want to ask the

20   question again, which is, the fact that

21   Jeffrey Epstein, from whatever source,

22   right, The New York Times article, the

23   supporting documents, was known to pay

24   cash to girls who he was sexually abusing

1  customer, shortly before the break.

2            So if corporate compliance

3  or AML Ops wanted -- wanted Epstein

4  terminated, and the Private Bank

5  disagreed, what would happen?

6       A.    So to answer that question,

7  we need to distinguish.

8            In the context of a question

9  of reputational risk, I -- my view is,

10  and doctrine, I would have a vote but

11  would not be a decisive vote.

12            To the extent it involved

13  active ongoing violations of law and

14  someone disagreed with me, then I would

15  escalate above that line of business up

16  to CEO, up to board of directors, up to

17  and including resignation, if it didn't

18  resolve as I thought it should.

19       Q.    Okay.  And by CEO, you mean

20  CEO of JPMorgan, Jamie Dimon?

21       A.    If that were the case, yes.

22       Q.    Okay.  And who would -- what

23  would be the chain of escalating?  So

24  before you got to Jamie Dimon, who would

1   you go to?

2       A.    So, again, that wasn't this

3   case.

4       Q.    Yep.

5       A.    But if I ever had a

6   situation where I had said it's time to

7   exit, the line of business said no, I

8   would first go to Steve Cutler, who would

9   have been my boss at the time.  If Steve

10  Cutler disagreed and didn't convince me

11  otherwise, then I would push it up

12  further, probably to Jamie at that point.

13  And then if I still felt like I wasn't

14  getting heard and it was an active

15  ongoing issue, then I would go to the

16  board.

17

18

19

20

21

22

23

24

1  there was such a meeting, that there

2  would be documents about it, correct?

3        A.    I would expect there would

4  be documents, yeah.

5        Q.    Okay.  All right.  So the

6  conclusion reports, "Further meetings

7  held with Jes Staley to discuss LOB

8  decision for re-approval."

9              Do you know what Jes

10 Staley's position was within JP -- within

11 JPMorgan as of January 7, 2011?

12       A.    Yes.

13       Q.    What was his position?

14       A.    He was the head of the

15 investment bank.

16       Q.    So why was Jes Staley being

17 consulted about Jeffrey Epstein when Jes

18 Staley was the head of the investment

19 bank?

20       A.    I can only say what I

21 understood and was told.  I was told, as

22 I mentioned, that Epstein was Jes

23 Staley's client.

24       Q.    And it says, "Banker Paul

1       Q.     In any other context had

2   anyone explained it to you?

3       A.     Not -- in terms of why we

4   didn't terminate?

5       Q.     That's right.

6       A.     Well, here, it was to refer

7   to Jes, to have that discussion.

8   Speaking with Jes at the later time

9   was -- Jes's view was he didn't do it,

10  shouldn't have pled guilty, et cetera,

11  wasn't responsible for it.  So that's --

12  that's what I was told, in the context of

13  the retention or decision not to

14  terminate, I should say.

15      Q.     Okay.  So in -- prior to

16  this meeting on January 7th, because the

17  conversation, I think, with Jes Staley

18  and Epstein was after this meeting.

19  Prior to this meeting, did you have an

20  understanding why Private Bank didn't

21  want to exit or hadn't exited Jeffrey

22  Epstein?

23      A.     I don't -- I don't recall

24  specifically, no.

1    transactions enlightening as compared to

2    countless stories related to his

3    escapades.  Lots of salon, lingerie

4    shops, drug stores, NY, Palm Beach, and

5    in St. Thomas (his place of residence).

6    Plus lots of videos like Girls Gone Wild

7    and some other shops not fit for my good

8    Catholic upbringing.  The transactions

9    are old, '05 to '08.  Besides frequent,

10   frequent spa like charges it has died

11   down.  Surprised she was never

12   subpoenaed."

13              Have I read that correctly?

14        A.    Yes.

15        Q.    Based on your understanding

16   of human trafficking and the knowledge

17   you had gained through the initiative,

18   you recognized those charges may not have

19   been escapades but, potentially, human

20   trafficking, correct?

21              MR. KRAUSE:  Objection.

22              THE WITNESS:  Yeah, well, in

23        many respects it's inconsistent

24        with the types of things that we

1          saw in human trafficking.  You

2          know, having her own account,

3          providing money, providing

4          documented expenses.

5              The human trafficking

6          enterprises that we were focused

7          on were designed to traffic the

8          individuals, keep them down, do --

9          do the business and keep it off

10          the radar.

11              This was different.  I mean,

12          it's -- it's pretty -- I don't

13          like the behavior.  But it's

14          different from the typology of

15          human trafficking that we had been

16          focused on.

17     BY MS. SINGER:

18          Q.    Right.  Those enterprises

19     that you were looking at on the retail

20     side, correct?

21          A.    No, no, no.  No.  The

22     accounts were on the retail side.  It was

23     the enterprise of criminal enterprise,

24     right.

William Langford     Confidential Attorneys' Eyes Only

1  BY MS. SINGER:

2        Q.    And you would -- you would

3  agree that his relationship with MC2 is

4  of concern, given Epstein's history of

5  sexual conduct with girls?

6              MR. KRAUSE:  Objection.

7              THE WITNESS:  Again, it's

8        hard.  Knowing what I know today,

9        sure.  Back then I don't know that

10       that necessarily -- it's negative

11       media.  It made the allegation.  I

12       would expect us to track it down,

13       pay attention to it, yeah.

14             How significant it is, it's

15       hard to say at this point, looking

16       back.

17  BY MS. SINGER:

18       Q.    Quite clearly significant

19  enough that Maryanne is raising it in her

20  e-mail?

21       A.    Sure.  She raised it

22  ostensibly because that's the allegation

23  in the media.

24       Q.    So it says in Maryanne's

1    e-mail that Jes would be deciding the

2    next steps, correct?

3         A.    Yes.

4         Q.    Was it your understanding

5    that Jes Staley was the decisionmaker as

6    to whether Jeff Epstein would be exited

7    from the bank?

8         A.    So, again, I was escalating

9    my -- my position, my view, we should

10   exit Epstein, and told that Jes owned the

11   client relationship.

12             So from that perspective, I

13   suppose he would be the one to help make

14   that decision or to make that decision.

15        Q.    Do you know whether anybody

16   else at the bank, John Duffy or Mary

17   Erdoes, whether any of them said that it

18   shouldn't be Jes Staley's decision?

19        A.    I'm not aware of anybody

20   saying that, no.

21        Q.    All right.  And then if we

22   turn to the front page of this e-mail.

23   This is the part of the chain from Phil

24   DeLuca to Nina Nichols, cc'ing you.  And

1                 MR. KRAUSE:  Objection.

2                 THE WITNESS:  I don't know

3          unusual.  But it would -- you

4          know, again, if you're looking

5          back and saying what are the

6          totality of facts, I would want to

7          understand them under the

8          circumstances, along with a lot of

9          other information.

10   BY MS. SINGER:

11        Q.    And so you would expect that

12   there would be some inquiry or

13   investigation into whether there was a

14   business or other legitimate reason for

15   these payments, correct?

16                MR. KRAUSE:  Objection.

17                THE WITNESS:  So, again,

18          looking back and deciding all

19          relevant facts versus what was

20          looked at at the time, you know,

21          I'd want to -- presented with this

22          today, sure, I'd want to know.

23   BY MS. SINGER:

24        Q.    And, again, this is all

1    to Phil DeLuca back on January 10th?

2         A.    To Phil, Nina, and Maryanne,

3    yeah.

4         Q.    Okay.  And just an

5    understanding what you meant here.  Is it

6    fair to say that you were -- that

7    modeling agencies was one piece of the

8    puzzle, but that you would want to know

9    more or -- tell me what you were saying.

10        A.    You know, so to frame the

11   entire context, one, I didn't need any of

12   this to recommend kicking him out of our

13   bank, period.

14             What I was asking for, is

15   there anything else we can point to.  Are

16   there any other linkages to ongoing

17   activity that could make this decision

18   even easier, point to more potentially

19   suspicious activity, that sort of thing.

20             The modeling agency is just

21   that it didn't tell us anything, and our

22   ability as a bank to know what's really

23   going on in a modeling agency is

24   extremely limited.  Especially, he is a

1    when he -- when he responded.  I don't

2    recall anybody else articulating a view

3    on exit at that time.

4          Q.    Did Catherine Keating speak

5    at all?

6          A.    I don't remember her

7    speaking.

8          Q.    And you said Jes Staley

9    responded.  What did he say?

10         A.    So Jes's response was, with

11   regard to the conviction, no, that was

12   not accurate, his lawyers are working to

13   get the conviction thrown -- or excuse

14   me, the plea, the plea, get the plea

15   thrown out, he didn't actually do that,

16   and that we should be talking to his

17   lawyers.

18         Q.    And how were things left --

19   and did you respond to Jes Staley, by the

20   way, when he said that?

21         A.    I don't remember specific

22   responses, but the takeaways were that we

23   would go and speak with Mr. Epstein's

24   attorney.

1    Q.    Do you know, or did you

2  hear, that anybody had gone with Jes

3  Staley when this conversation took place?

4    A.    Again, no, I don't have any

5  information on it.

6    Q.    Is it surprising to you that

7  the report was that Jeffrey Epstein had

8  denied the allegations?

9    A.    No.

10    Q.    Do you think that a

11 conversation between Jes Staley and

12 Jeffrey Epstein was likely to yield

13 useful information about whether Jeffrey

14 Epstein was engaged in human trafficking?

15         MR. KRAUSE:  Objection.

16         THE WITNESS:  So, look, at

17     the time, Jes was the lead banker,

18     right.  That was his client, and

19     it would not surprise -- it would

20     not be unusual to have a banker to

21     have a conversation with the

22     client, even something as unsavory

23     as this.

24         So back then, versus what we

1    Page 13.  And do you see Jeffrey Epstein,

2    Row 21, at the top of Page 13?

3         A.    Yes.

4         Q.    Okay.  And that entry is

5    dated July 15, 2008, correct?

6         A.    Yes.

7         Q.    And it says here, "Catherine

8    will go back to Jes to tell him we are

9    uncomfortable with Epstein and do not

10   want to go to Cutler for approval."

11              Have I read that correctly?

12        A.    Yes.

13        Q.    Do you understand JES to be

14   the acronym for Jes Staley?

15        A.    That is what I think it

16   means, yes.

17        Q.    And Catherine is presumably

18   Catherine Keating?

19        A.    That would be my assumption.

20        Q.    Do you know that Catherine

21   Keating -- do you know if Catherine

22   Keating went to Jes Staley and told him

23   that Private Bank was uncomfortable with

24   Epstein and didn't want to seek Steve

1          reputational component, would

2          include this, but not as specific

3          as that was the discussion and

4          Steve said no change.  I don't --

5          I don't know that that was

6          accurate or right.  I can't -- I'm

7          not aware of that, put it that

8          way.

9     BY MS. SINGER:

10         Q.    Were any -- was the

11    conversation that you had with Steve

12    Cutler, the one that you recall, did that

13    include any piece that was about legal

14    advice, ████████████████████████████

██    ██████████████████████████████████

16    any of those issues, or was it -- was it

17    entirely on the reputational side?

18         A.    My recollection, it was

19    based on the reputational side, because

20    that's what my point was.

21         Q.    Did you ever reach out to

22    outside counsel about how to handle

23    Jeffrey Epstein's accounts?

24         A.    I don't believe I ever did,

1      Q.    Did anyone from JPMorgan's

2   Private Bank ever, at any time, try to

3   dissuade you from doing anything ████████

██  ████████████████████████████████████

5      A.    Sorry, do that one again.

6      Q.    Sure.

7            Did anyone from the Private

8   Bank ever, at any time, try to dissuade

9   you from doing anything ██████████████

██  ████████████████████████████

11     A.    No.  No.

12     Q.    Are you aware of any

13  instance where anyone from the Private

14  Bank tried to dissuade any of your

15  colleagues from doing anything ████

██  ██████████████████████████████████

17     A.    No.

18     Q.    Did anyone from any of

19  JPMorgan's businesses ever, at any time,

20  try to dissuade you from filing a SAR

21  related, in any way, to a customer?

22     A.    No.

23     Q.    Are you aware of any

24  instance where anyone from any of

```
1   JPMorgan's line of business tried to

2   dissuade any of your colleagues from

3   filing a SAR relating to a customer?

4        A.   No.

5        Q.   At any point during your

6   time at JPMorgan, did you ever come to

7   believe that a SAR should be filed in a

8   particular instance, but where you

9   decided not to do so because the customer

10  was particularly large or valuable?

11       A.   No.

12       Q.   Are you aware of any

13  instance where anyone at JPMorgan thought

14  a SAR should be filed but failed to do so

15  because the client was particularly large

16  or valuable?

17       A.   No.

18       Q.   You testified earlier that

19  you never discussed ███████████████████

    ██████████████████████ between, I think it

21  was, 2008 and then your departure from

22  the bank.  Do you recall that?

23       A.   Yes.

24       Q.   Do you believe that Epstein,
```

1    to use your words, should go, because you

2    believed he was engaging in continued

3    illegal activity after his 2008 plea?

4        A.    No.

19        Q.    Fair to say your focus was

20    on the reputational risk of keeping

21    Epstein

23    you'd have focused on that, had you

24    thought there was, yes?

1        A.      Yes.

2        Q.      ████████████████████

████████████████████████

████████████████████████

████████  why were you discussing

6  Epstein with others at JPMorgan?

7        A.      Because I believed he should

8  not be a client of the bank because of

9  his plea and his reputational risk,

10  period.

11        Q.      Okay.  We've seen work

12  relating to Epstein by Maryanne Ryan.

13  You did or did not develop a good

14  understanding of Maryanne Ryan's

15  temperament and skills during your time

16  at JPMorgan?

17        A.      I did.

18        Q.      How skilled was Maryanne as

19  an investigator?

20        A.      One of the best.

21        Q.      You did or did not develop a

22  good understanding of Maryanne Ryan's

23  temperament through your time working

24  with her at JPMorgan?

1  DeLuca, with the most recent e-mail dated

2  January 14, 2011.

3  Have I got that right?

4  A.  Yes.

5  Q.  Let's take a look at

6  Ms. Ryan's e-mail to you on January 13th,

7  I think in the beginning of the page.

8  Do any of Ms. Ryan's

9  findings indicate that JPMorgan is

10  participating in a sex trafficking ring?

11  MS. SINGER:  Objection.

12  THE WITNESS:  That JPMorgan

13  is?

14  BY MR. GAIL:

15  Q.  Yeah.

16  A.  No.

17  Q.  Why not?

18  MS. SINGER:  Objection.

19  THE WITNESS:  Again, she

20  outlines what she finds, right.

21  It doesn't establish a link

22  between JPMorgan and the operation

23  by Epstein of a sex trafficking

24  ring through the bank, on its

1          face, in my opinion.

2   BY MR. GAIL:

3          Q.    Do any of Ms. Ryan's

4   findings, as you see them there, indicate

5   that as of 2011 Epstein was using the

6   bank to perpetrate sex trafficking?

7                MS. SINGER:  Objection.

8                THE WITNESS:  So, again, the

9          findings that she cites are old.

10          In 2004, et cetera, she notes

11          that.  And notes, though, the

12          activity not continuing,

13          necessarily.

14  BY MR. GAIL:

15         Q.    You testified that you had a

16  call with Ken Starr following your

17  conversation with Jes Staley.  Do you

18  recall that?

19         A.    Yes.

20         Q.    Now, counsel for the U.S.

21  Virgin Islands referred to Epstein's

22  criminal defense attorney.  What was Ken

23  Starr's position at the time you were

24  speaking to him?