**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 1:22-cv-10904-JSR |
| | ) | |
| JPMORGAN CHASE BANK, N.A. | ) | |
| | ) | |
| Defendant/Third-Party Plaintiff. | ) | |
| _____ | ) | |
| | ) | |
| JPMORGAN CHASE BANK, N.A. | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES EDWARD STALEY | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| _____ | ) | |

**GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS'
MEMORANDUM OF LAW IN OPPOSITION TO JPMORGAN
<u>CHASE BANK N.A.'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.   THE GOVERNMENT SEEKS APPROPRIATE AND AVAILABLE MONETARY
     RELIEF ............................................................................................................... 2

     A.   Section 1595(d) Broadly Authorizes the Government to Obtain Monetary Relief for
          Past Violations of the TVPA ............................................................................ 2

     B.   The Government's Decision to Withdraw Its Request for Proprietary Damages Does
          Not Impact Its Quasi-Sovereign Interest ........................................................... 5

     C.   Congress Authorized States, as *Parens Patriae*, to Seek Victim Damages ................. 5

     D.   The Putative Doe Settlements Do Not *A Priori* Impact the Government's Authority to
          Seek Victim Damages ..................................................................................... 7

     E.   Punitive Damages for Victim Harms Are Appropriate ............................................ 8

     F.   Section 1595(d) Permits Civil Penalties ............................................................ 11

     G.   Section 1595(d) Permits Disgorgement or Restitution ............................................ 13

II.  THE GOVERNMENT CAN PREVAIL ON ITS OBSTRUCTION CLAIM ................. 14

     A.   The Government Has *Parens Patriae* Authority to Pursue Its TVPA Claims Including
          Its Section 1591(d) Obstruction Claim ............................................................. 14

     B.   The Government Meets the Elements of Its Obstruction Claim ............................... 16

III. THERE IS NO IMPERMISSIBLY RETROACTIVE APPLICATION OF
     OBSTRUCTION OR RECKLESS DISREGARD PRE-2008 ......................................... 23

     A.   Obstruction (Count V) Applies to JPMorgan's Pre-2008 Conduct ........................... 23

     B.   Similarly, "Reckless Disregard" Applies to JPMorgan's Pre-2008 Conduct ............. 24

CONCLUSION .............................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**

*4 Pillar Dynasty LLC v. New York & Co., Inc.*,
  933 F.3d 202 (2d Cir. 2019) ................................................................................. 14

*A.B. v. Marriott Int'l, Inc.*,
  455 F. Supp. 3d 171 (E.D. Pa. 2020) ...................................................................... 3

*Aponte v. Perez*,
  ___ F.4th ___, 2023 WL 4630502 (2d Cir. July 20, 2023) ................................. 9, 10

*California v. Frito-Lay, Inc.*,
  474 F.2d 774 (9th Cir. 1972) ................................................................................. 5

*Canosa v. Ziff*,
  No. 18 Civ. 4115, 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) .............................. 3

*David v. Signal Int'l, LLC*,
  2015 WL 5254625 (E.D. La. Sept. 9, 2015) ........................................................... 9

*Ditullio v. Boehm*,
  662 F.3d 1091 (9th Cir. 2011) ........................................................................... 8, 10

*Erlenbaugh v. U.S.*,
  409 U.S. 239 (1972) ......................................................................................... 6, 11

*Hudson v. U.S.*,
  522 U.S. 93 (1997) ............................................................................................... 13

*Illinois v. AU Optronics Corp.*,
  794 F. Supp. 2d 845 (N.D. Ill. 2011) ................................................................... 12

*In re Am. Investors Life Ins. Co. Annuity Mktg. and Sales Practs. Litig.*,
  263 F.R.D. 226 (E.D. Pa. 2009) ............................................................................. 8

*In re Fairfield Sentry Ltd.*,
  714 F.3d 127 (2d Cir. 2013) ................................................................................... 4

*King v. Macri*,
  993 F.2d 294 (2d Cir. 1993) ................................................................................... 9

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ............................................................................................. 25

*Lee v. Edwards*,
  101 F.3d 805 (2d Cir. 1996) ................................................................................... 9

*Liu v. SEC*,
  140 S. Ct. 1936 (2020) ......................................................................................... 14

*Morrisette v. U.S.*,
  342 U.S. 246 (1952) ............................................................................................. 25

*New Mexico ex rel. Balderas v. Real Estate Law Ctr. PC*,
 430 F. Supp. 3d 761 (D.N.M. 2019) ............................................................ 12, 13

*New York by Abrams v. 11 Cornwall Co.*,
 695 F.2d 34 (2d Cir. 1982) ................................................................................. 5

*New York by Abrams v. Seneci*,
 817 F.2d 1015 (2d Cir. 1987) ......................................................................... 5, 14

*New York by Underwood v. LaRose Indus. LLC*,
 386 F. Supp. 3d 214 (N.D.N.Y. 2019) ............................................................. 12

*New York by Vacco v. Operation Rescue Nat'l*,
 80 F.3d 64 (2d Cir. 1996) ............................................................................... 5, 12

*New York v. Permanent Mission of India to United Nations*,
 618 F.3d 172 (2d Cir. 2010) .............................................................................. 4

*Noble v. Weinstein*,
 335 F. Supp. 3d 504 (S.D.N.Y. 2018) ............................................................... 3

*Payne v. Jones*,
 711 F.3d 85 (2d Cir. 2013) ............................................................................... 10

*Purdue Pharma L.P. v. Kentucky*,
 704 F.3d 208 (2d Cir. 2013) ........................................................................ 12, 14

*United States v. Jennings*,
 496 F.3d 344, 353 (4th Cir.2007) ..................................................................... 25

*United States v. Priv. San. Indus. Ass'n of Nassau/Suffolk, Inc.*,
 793 F. Supp. 1114 (E.D.N.Y. 1992) ................................................................. 10

*United States v. Ursery*,
 518 U.S. 267 (1996) .................................................................................... 10, 13

*Virgilio v. City of New York*,
 407 F.3d 105 (2d Cir. 2005) .............................................................................. 9

*West Virginia ex rel. McGraw v. JPMorgan Chase & Co.*,
 842 F. Supp. 2d 984 (S.D. W. Va. 2012) ......................................................... 14

**Statutes**

12 U.S.C. § 5538(b)(1)(C) ...................................................................................... 13

15 U.S.C. § 45c(c)(1)(C) ........................................................................................ 13

15 U.S.C. § 6103(a) ................................................................................................ 13

15 U.S.C. § 6309(c)(3) ............................................................................................ 13

15 U.S.C. § 6504(a)(1) .......................................................................................... 5, 13

15 U.S.C. § 7706(f)(1) .............................................................................................. 6

18 U.S.C. § 1510 ..................................................................................................... 24

18 U.S.C. § 1512 ..................................................................................................... 24

18 U.S.C. § 1591(b) ............................................................................................ 13

18 U.S.C. § 1591(d) ...................................................................................... 13, 15

18 U.S.C. § 1593(a) ...................................................................................... 11, 13

18 U.S.C. § 1593(b) ............................................................................................ 13

18 U.S.C. § 1595 ................................................................................................ 13

18 U.S.C. § 1595(a) ...................................................................................... 10, 13

18 U.S.C. § 1595(d) .................................................................................. 3, 11, 14

18 U.S.C. § 1595A .............................................................................................. 11

18 U.S.C. § 2241 ................................................................................................ 24

18 U.S.C. § 2243 ................................................................................................ 24

18 U.S.C. § 248(c)(3) ........................................................................................... 6

31 U.S.C. § 5322(a) ...................................................................................... 24, 25

**Other Authorities**

154 Cong. Rec. H10888-01,
    2008 WL 5169865 ...................................................................................... 24

164 Cong. Rec. H1290-02,
    2018 WL 1073890 (Feb. 27, 2018) ............................................................. 6

164 Cong. Rec. S1849-08,
    2018 WL 1415014 ........................................................................................ 4

## INTRODUCTION

For more than a decade, Defendant JPMorgan Chase Bank, N.A. ("JPMorgan")—self-described as Epstein's "#1 bank" at the time—handled virtually every financial transaction Epstein needed to operate his sex-trafficking venture, from the millions in cash withdrawals and payments to co-conspirators, recruiters, and victims, to the millions in payments to Epstein's high-powered lawyers and publicists for the ongoing cover up that let Epstein evade federal sex-trafficking charges and continue for years to traffic and sexually abuse girls and young women. JPMorgan had virtually every financial detail of Epstein's venture—from wire payments to young women in Lithuania and Russia, to transfers for the purchase of a helicopter by Ghislaine Maxwell, to underwriting MC2 modeling agency and Jean-Luc Brunel, later charged with rape of minors, to every credit card transaction for Epstein's accomplices and victims—in real-time. Yet JPMorgan ███████████████████████████████████████████████ but instead continued to actively participate—right up until Epstein's arrest in 2019—in what they referred to inside the Bank as ██████████████████ *See generally* Gov't Mem. Supp. Partial Summ. J. (Dkt. 218) ("Government Motion").

Congress included section 1595(d) of the Trafficking Victims Protection Act (TVPA) so that State Attorneys General, as here, could civilly prosecute entities—like JPMorgan—that facilitate the heinous and growing crime of child sex-trafficking.  JPMorgan's argument that the Government cannot pursue any monetary relief for JPMorgan's past violations of the law would strip section 1595(d) of any teeth and is contrary to the Act's language and purpose. In addition, JPMorgan obstructed federal law enforcement efforts to enforce the TVPA against Epstein for more than a decade—between 2006 when he was arrested on state sex-crime charges until 2019 when he was arrested on federal sex-trafficking charges. ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

"[buy] his way to a lesser sentencing," and "[p]ay a whole series of girls to stay quiet." Gov't Mot. at 10-11, 18. There is no impermissible retroactivity as JPMorgan argues. JPMorgan has always been subject to a reckless disregard or willful blindness standard for ██████████████████

██████████████████████████████████████████ thereby obstructing law enforcement and allowing JPMorgan to profit handsomely from Epstein's wealth and wealth of connections to the world's dignitaries and ultra-rich.

JPMorgan's attempts to tar the Government with misleading accusations of "knowing" misconduct amount to little more than a desperate attempt to distract from its years-long violations of the TVPA. Moreover, the fact that the vast majority of JPMorgan's accusations against the Government are not relied on in its motion for summary judgment, *see* Gov't Resp. JPMorgan Local 56.1 Statement Undisputed Material Facts ("Government Response JPMorgan SUMF") (filed concurrently with this brief), makes clear this case is not about comparing JPMorgan's violations of federal sex-trafficking laws with the Government's alleged actions. The law is clear that such defenses are not cognizable in a civil law enforcement matter. *See* Gov't Mot. at 27-39.

## ARGUMENT

## I.   THE GOVERNMENT SEEKS APPROPRIATE AND AVAILABLE MONETARY RELIEF

### A.   Section 1595(d) Broadly Authorizes the Government to Obtain Monetary Relief for Past Violations of the TVPA

JPMorgan argues that the Government cannot seek *any* compensatory or punitive monetary relief under section 1595(d). JPMorgan's Mem. Supp. Partial Summ. J (Dkt. 228) at 3-14 ("JPMorgan's Motion"). JPMorgan is wrong. The Court held in denying JPMorgan's motion to

dismiss that the Government has a quasi-sovereign interest in "assuring its residents it will act to protect them from the harmful effects of criminal sex-trafficking enterprises flourishing in the Islands that are their home" and thus *parens patriae* standing. Op. and Order (Dkt. 130) at 18 ("Order"). As "parens patriae," Section 1595(d) provides that the Government may bring a civil action to obtain "appropriate relief." "Appropriate relief" is not subject to any specific limitation, and Congress said the Government can seek relief for past violations. 18 U.S.C. § 1595(d) (authorizing action where "an interest of the residents of that State has been … threatened or adversely affected" by person who violates the act). Such relief for past harm includes both compensatory and punitive monetary relief for violations of the law the Court stated:

> … [T]he residents – have suffered from sex trafficking in the past … I don't read the statute as I think you're trying to suggest, that that precludes bringing an action because the harm is over … because this statute very clearly, as a classic hybrid statute – civil/criminal – has both the general deterrent aspects as well as more immediate compensatory aspects, so they're entitled to get back monies that should have been paid because of sex trafficking in the past and – for example, I think these cases often involve punitive damages – to deter others from using the Virgin Islands as a headquarters for sex trafficking.

Mot. Dismiss Hr'g Tr. 31:25-34:1 (Mar. 16, 2023) (Dkt. 96).

Section 1595 is a "remedial provision" which "requires broad interpretation." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018); *see also Canosa v. Ziff*, No. 18 Civ. 4115, 2019 WL 498865, at *23 (S.D.N.Y. Jan. 28, 2019) (same); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 189 (E.D. Pa. 2020) ("Section 1595 allows for civil liability against facilitators who benefit from what they knew or should have known is a sex trafficking venture. As a remedial statute, we construe the act liberally."). "Section 1595 amended the TVPA for the remedial purpose of 'enhancing … protections of trafficking victims.'" *Noble*, 335 F. Supp. 3d at 515 (citing 18 U.S.C. § 1595, Pub. L. 108-193, Dec. 19, 2003, 117 Stat. 2878, § 4).

With section 1595(d), Congress believed the existing civil remedy was inadequate to protect trafficking victims and thus "unleash[ed]" state law enforcement to vigorously enforce the law to prevent and punish sex trafficking including of children:

> We have begun to change this issue of resources to go after the perpetrators of these heinous crimes in a much better way by allowing State attorneys general and State district attorneys to actually prosecute these crimes, even though they are Federal crimes. We are doing something in the law that says: We need more prosecutors, we need more investigators, and we need more resources. Let's unleash those in the States to help us address this growing problem throughout our country.

164 Cong. Rec. S1849-08, 2018 WL 1415014, at *S1864. "Congress may elevate harms that exist in the real world before Congress recognized them to actionable legal status." Order at 17. A long line of Congressional enactments authorize State Attorneys General, as *parens patriae*, to seek damages, civil penalties, and restitution for violations of the law, including laws that protect children, as explained below. If Congress wanted to limit State Attorneys General to particular forms of relief, it could have done that. *See, e.g.*, *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 138 (2d Cir. 2013) ("The absence of a statutory definition for a term that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts presented, without prescription or limitation."); *New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 184 (2d Cir. 2010) (declining to apply principle of *ejusdem generis* where "doing so would risk reading judicial limits into a term Congress seems deliberately to have sought to leave open-ended . . . ."). Instead—in the context of the language of the statute authorizing state law enforcement to prosecute past violations, Congress's intent to unleash State law enforcement to pursue the "growing problem" of "these heinous crimes," and federal laws recognizing State Attorneys General, as *parens patriae*, to seek damages, civil penalties, and restitution— "appropriate relief" includes the compensatory and punitive monetary relief sought here.

4

### B. The Government's Decision to Withdraw Its Request for Proprietary Damages Does Not Impact Its Quasi-Sovereign Interest

JPMorgan argues that the only basis for the Court's holding that the Government had *parens patriae* standing to seek damages was the Government's request for "proprietary" damages to the Government, which it has since withdrawn. JPMorgan Mot. at 4-5. The Court said nothing of the sort and, in fact, JPMorgan's cited case, *New York by Abrams v. 11 Cornwall Co.*, 695 F.2d 34, 38-39 (2d Cir. 1982), JPMorgan Mot. at 6, explains that the Government's "proprietary" interests are "distinguish[ed]" from its "quasi-sovereign" interest.

### C. Congress Authorized States, as *Parens Patriae*, to Seek Victim Damages

JPMorgan argues that the Government's *parens patriae* authority does not extend to seeking damages for individual victims. JPMorgan Mot. at 4-8. JPMorgan's cited cases, *New York by Abrams v. Seneci*, 817 F.2d 1015 (2d Cir. 1987) and *New York by Vacco v. Operation Rescue Nat'l*, 80 F.3d 64 (2d Cir. 1996), which relies on *Seneci*, do not support its position here. *Seneci* did not involve—as here—a statutory grant of *parens patriae* authority to seek appropriate relief for past harm in the context of a remedial statute, including compensatory and punitive damages for victims of sex-trafficking. *California v. Frito-Lay, Inc.*, the lead case on which *Seneci* relies to hold the state lacks *parens patriae* standing to prosecute a suit "only … to recover money damages for injuries suffered by individuals," *Seneci¸* 817 F.2d at 1017, concludes a state could be "empowered to act" to seek damages on behalf of individuals, but "that authority must come through … legislation" and "cannot be founded on its common-law capacity as *parens patriae*." *Frito-Lay, Inc.¸* 474 F.2d 774, 776-77 (9th Cir. 1972).

Congress repeatedly has empowered State Attorneys General, as *parens patriae*, to seek damages to victims of unlawful practices, including for the protection of children. *See* 15 U.S.C. § 6504(a)(1) (State Attorney General's right of action, "as parens patriae," to redress harm or threat

to residents' interests from children's online privacy protection violations by obtaining, *inter alia*, "damage, restitution, or other compensation on behalf of residents of the State"); *see also* 15 U.S.C. § 7706(f)(1) (State Attorney General's right of action, "as parens patriae," to redress harm or threat to residents' interests from non-solicited pornography and marketing by obtaining, *inter alia*, "damages on behalf of residents of the State"); 18 U.S.C. § 248(c)(3) (State Attorney General's right of action, "as parens patriae," to redress harm or threat to residents' interests from obstruction to access to reproductive health services by obtaining, *inter alia*, "compensatory damages"). *See, e.g.*, *Erlenbaugh v. U.S.*, 409 U.S. 239, 244 (1972) ("The rule [of *in pari materia*] is but a logical extension of the principle that individual sections of a single statute should be construed together, for it necessarily assumes that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject[.]"). Further, section 1595(d) was added to the TVPA's "Civil remedy" section authorizing individual victims to seek damages and, the legislative history shows, intended to serve as "extra litigation leverage for individuals who are impacted in a devastating manner." 164 Cong. Rec. H1290-02, 2018 WL 1073890, at *H1303 (Feb. 27, 2018).

JPMorgan also contends without merit that the Government "can only sue to vindicate the interests of 'residents' … and here it has no proof that any victim was a resident of the USVI (rather than a person trafficked to or from the Islands)." JPMorgan Mot. at 5. The Court held that the Government has a quasi-sovereign interest in "assuring its residents it will act to protect them from the harmful effects of criminal sex-trafficking enterprises flourishing in the Islands that are their home" which "directly parallels the interest that Puerto Rico successfully asserted in *Snapp*, which was an interest in "assuring its residents that it will act to protect them from … the harmful effects of discrimination." Order at 18. With respect to victims trafficked to or from the Virgin

Islands, the Court previously considered the meaning of the term "residents" and said it did not require legal residency as JPMorgan argues:

> What is telling here is that Congress used the term 'residents.' They didn't say 'lawful residents'; they didn't say 'citizens'; they didn't use any of the other terms that they've used in other statutes. And the sort of common sense would be 'resident' is someone who is residing in that particular location, whether by choice or by force, or trafficking.

Mot. Dismiss Hr'g Tr. at 41:11-17. JPMorgan agreed, responding, "No, that's not what I'm saying" when the Court asked, "Are you saying that people, even though forced [to the USVI] and even though residing in some physical sense there, would not be residents?" *Id.* at 29:21-24.

### D.   The Putative Doe Settlements Do Not *A Priori* Impact the Government's Authority to Seek Victim Damages

The Court also should reject JPMorgan's argument that compensatory damages for victim harms is unavailable because "victims have *already* obtained damages in the two related cases." JPMorgan Mot. at 5 (emphasis in original). Whether some victims may obtain damages has no bearing on whether the Government has *parens patriae* standing to seek damages for individuals, which Congress already said it does. Even under common law *parens patriae*, the Second Circuit recognized, the state may seek damages for individuals if those individuals "could not obtain complete relief through a private suit." JPMorgan Mot. at 6 (citing *11 Cornwell Co.*, 695 F.2d at 40). Here, as explained, Congress thought private litigants may not be able to obtain complete relief and authorized State Attorney General actions as "a much better way" to go after "perpetrators of these heinous crimes." *Supra* at 4.

JPMorgan's argument is also premature because no one has obtained damages in the two related cases, where the class action settlement agreements have not received final court approval and remain subject to opt-outs that could undo the settlement, objections, and appeals. Even if the settlements were approved and enforced, they cannot release claims of the Government, which is

not a party to those settlements. *In re Am. Investors Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*, 263 F.R.D. 226, 241 (E.D. Pa. 2009) ("The attorneys' general law enforcement powers are not claims the [class action] plaintiffs have, and as such, the plaintiffs do not release any of these claims."). Moreover, the Government can provide recoveries for victims who opt out or do not come forward during the class award period and acts to protect absent victims, Gov't Resp. JPMorgan SUMF ¶54-a, all of which Congress contemplated in further enhancing protections to trafficking victims by authorizing state law enforcement to civilly prosecute these crimes.

JPMorgan also argues that any damages award must be offset by the Government's prior settlements against the Epstein Estate and ▮▮▮▮. JPMorgan Mot. at 13-14. Offset related to damages for victim harms is improper because, JPMorgan acknowledges, those settlements did not involve claims for damages to individual victims. JPMorgan SUMF (Dkt. 229) ¶30; *see also* Gov't Resp. JPMorgan SUMF ¶30-b. No funds from those settlements were earmarked for individual victims; instead, the settlements set aside funds for mental health, victims' services, and law enforcement. *See id.* ¶¶31-a, 31-b, 32-a.

In addition, the Estate and ▮▮▮ matters were under the Territory's CICO law, which authorizes civil penalties and proprietary damages to the Territory. *See id.* ¶30-a. The Court dismissed the CICO claim against JPMorgan. Order at 43-44. There is no offset—and JPMorgan's cited cases do not so hold—of civil penalties against JPMorgan for its violations of the TVPA by civil penalties sought against a different wrongdoer for violations of another (or the same) law.

### E.    Punitive Damages for Victim Harms Are Appropriate

JPMorgan does not dispute that punitive damages are an appropriate remedy under the TVPA. JPMorgan Mot. at 10; *see also Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011) ("punitive damages are available under 18 U.S.C. § 1595(a)"). Instead, it contends that punitive

damages are unavailable to the Government because it purportedly has no compensatory damages. JPMorgan Mot. at 9. As explained, the Government has a claim for compensatory damages against JPMorgan under section 1595(d). Even if it did not, a plaintiff's proof of intentional or willful violation of a federal civil rights statute supports an award of punitive damages as an appropriate remedy whether or not the plaintiff separately proves compensatory damages. *See Aponte v. Perez*, No. 20-2186, 2023 WL 4630502, at *5 (2d Cir. July 20, 2023); *King v. Macri*, 993 F.2d 294, 297 (2d Cir. 1993). The TVPA "'represents an effort to increase civil rights protections'" and thus is similar to civil rights statutes like § 1983 where the availability of compensatory damages is not a prerequisite to punitive damages. *David v. Signal Int'l, LLC*, No. 08-1220, 2015 WL 5254625, at *2 (E.D. La. Sept. 9, 2015) (quoting K. Kim & K. Hreshchyshyn, *Human Trafficking Private Right of Action: Civil Rights for Trafficked Persons in the United States*, 16 Hastings Women's L.J. 1, 4 (2014)). As explained, section 1595(d) was added because of the strong public interest in deterring "perpetrators of these heinous crimes" including through punitive damages and civil penalties.[1]

Also lacking merit is JPMorgan's related contention that the Government cannot recover punitive damages without compensatory damages because "exemplary damages must bear a reasonable relationship to compensatory damages." JPMorgan Mot. at 9 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996)). The Second Circuit has rejected this argument in § 1983 cases. *See Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996) ("In *Gore*, a 500 to 1 ratio was 'breathtaking.' However, in a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated while maintaining normal respiration."); *see also Payne v.*

---

[1] Since the Government's claims arise under federal law, JPMorgan's cite to *Virgilio v. City of New York*, 407 F.3d 105 (2d Cir. 2005), JPMorgan Mot. at 9, is inapposite. *Virgilio* held that "*under New York law* [punitive damages] cannot be invoked without some compensatory injury." 407 F.3d at 117 (emphasis added).

*Jones*, 711 F.3d 85, 102 (2d Cir. 2013) ("In such cases, the large size of the ratio has no necessary bearing on the appropriateness of the amount of punitive damages.").

JPMorgan's separate argument that punitive damages without compensatory damages would be a "criminal penalty in the guise of civil relief," JPMorgan Mot. at 9, is incorrect. In the case relied on by JPMorgan, *United States v. Priv. San. Indus. Ass'n of Nassau/Suffolk, Inc.*, the relief requested by the government "would amount to an order of forfeiture," a criminal penalty under the statute there. 793 F. Supp. 1114, 1151 (E.D.N.Y. 1992). Punitive damages under the TVPA are a civil remedy. *See Ditullio*, 662 F.3d at 1096 ("Because the TVPA civil remedy provision creates a cause of action that sounds in tort, we hold that punitive damages are available."). Further, punitive damages serve to deter future misconduct, *see, e.g., Aponte*, 2023 WL 4630502, at *5, a "purpose" that "may serve civil and criminal goals." *United States v. Ursery*, 518 U.S. 267, 292 (1996). There is no retroactivity or *Ex Post Facto* concern. "Civil remedy" section 1595(a) already allowed punitive damages against JPMorgan for violations of section 1591. *See* 18 U.S.C. § 1595(a).

Finally, JPMorgan's fact-based argument for summary judgment on punitive damages likewise fails. JPMorgan asserts without reference to evidence that "no reasonable juror could find that JPMC intended to benefit from participation in a sex trafficking venture[.]" JPMorgan Mot. at 10. To the contrary, the Government demonstrates that JPMorgan knowingly handled virtually every financial transaction Epstein needed to operate his sex-trafficking venture, from the millions in cash withdrawals and payments to co-conspirators, recruiters, and victims, to the millions in payments to lawyers and publicists for the ongoing cover up. JPMorgan had virtually every financial detail of Epstein's venture—from payments to young women in Lithuania and Russia, to transfers for the purchase of a helicopter by Maxwell, to a "revoked" credit card for an alleged

recruiter who talked to the police—in real-time and ████████████████████

███████████████████████. *See* Gov't Mot. Part I(B) and (C). And JPMorgan

benefited greatly right up to Epstein's 2019 arrest—from millions in revenues to introductions and

referrals to the world's dignitaries and ultra-wealthy. *See id.* Part I(D).

### F.        Section 1595(d) Permits Civil Penalties

JPMorgan argues that the TVPA says "nothing" about civil penalties. JPMorgan Mot. at

11. This is wrong. Since the TVPA's enactment in 2000, Congress has recognized the availability

of civil penalties in law enforcement actions against persons who violate the TVPA. *See* 18 U.S.C.

§ 1593(a) (authorizing restitution "in addition to any other civil or criminal penalties authorized

by law"). Against this prior law, Congress authorized State Attorneys General to obtain

"appropriate relief," without proscribing civil penalties. In addition, Congress explicitly authorized

state law enforcement to obtain relief for *past* violations of the law ("has been")—as opposed to,

for example, section 1595A which authorized federal law enforcement to seek a civil injunction

for ongoing or future harm ("is engaged or is about to engage"). The plain language of section

1595(d) thus contemplates civil penalties. Civil penalties are also consistent with the legislative

history—which explains that section 1595(d) was to "ensure more resources to go after the

perpetrators of these heinous crimes in a much better way" through State Attorney General actions.

Congress's intent may further be discerned by reference to the remedies it deemed

appropriate in other statutes providing for state *parens patriae* actions to protect residents'

interests. *See, e.g.*, *Erlenbaugh*, 409 U.S. at 244 (1972). Viewed in this light, the numerous

examples of *parens patriae* federal statutes JPMorgan references as expressly providing civil

penalty relief support exactly the opposite conclusion JPMorgan urges. JPMorgan Mot. at 10-11

(citing 18 U.S.C. § 248(c)(3); 12 U.S.C. § 5538, 15 U.S.C.§ 6309(c), 49 U.S.C. § 14711). These

statutes demonstrate that Congress considers civil penalties to be appropriate relief in *parens patriae* actions. JPMorgan argues that Congress "also knows how to withhold such authority," citing a case where Congress "specifically rejected an amendment that would have authorized" the relief. JPMorgan Mot. at 11 n.3. Here, Congress did not reject an amendment authorizing State Attorneys General to request civil penalties. To the contrary, as explained, the TVPA already recognized "civil … penalties" and broadly authorized States to obtain "appropriate relief" without proscribing civil penalties.

Courts have also consistently held that civil penalties are appropriate relief in *parens patriae* actions. *Operation Rescue*, relied on by JPMorgan, held that "New York has [*parens patriae*] standing to enforce compliance … by seeking *noncompensatory fines* …." 80 F.3d at 71 (emphasis added); *see also Illinois v. AU Optronics Corp.*, 794 F. Supp. 2d 845, 854-55 (N.D. Ill. 2011) ("Plaintiff has a quasi-sovereign interest in both its claims for injunctive relief and penalties and its damages claims, which seek recovery on behalf of a wide range of consumers and aim to deter future antitrust conduct by corporations in Illinois."); *New Mexico ex rel. Balderas v. Real Estate Law Ctr. PC*, 430 F. Supp. 3d 761, 875 and 899 (D.N.M. 2019) (awarding civil penalty to prevailing state attorney general in *parens patriae* action under 12 U.S.C. § 5538(b)(1)); *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 215 (2d Cir. 2013) (state attorney general's state-law *parens patriae* action seeking civil penalties); *New York by Underwood v. LaRose Indus. LLC*, 386 F. Supp. 3d 214, 218 (N.D.N.Y. 2019) ("New York argues that, 'when, as here, a State sues in its *parens patriae* capacity to enforce laws that protect its citizens and seeks civil penalties and injunctive relief to prevent future violations, the State is the real party in interest.'  The Court agrees.").

JPMorgan further argues that the Government cannot obtain civil penalties here due to retroactivity and *Ex Post Facto* limitations. JPMorgan Mot. at 12. This argument fails for two reasons. First, the *civil* penalty the Government seeks is civil relief. *See, e.g.*, 18 U.S.C. § 1593(a) (distinguishing between "civil" and "criminal" penalties); *compare* 18 U.S.C. § 1595 ("Civil remedy") *with* 18 U.S.C. §§ 1591(b) and (d) (authorizing criminal fines). The Supreme Court has recognized both that "all civil penalties have some deterrent effect[,]" *Hudson v. U.S.*, 522 U.S. 93, 102 (1997), and that "the purpose of deterrence . . . may serve civil as well as criminal goals." *Ursery*, 518 U.S. at 292. Second, there are no retroactivity or *Ex Post Facto* concerns. The prior "Civil remedy" section afforded punitive damages, 18 U.S.C. § 1595(a), and punitive damages are akin to civil penalties, *see* JPMorgan Mot. at 12, 9. Thus, JPMorgan acknowledges the Court held, section 1595(d) "merely gave a new set of plaintiffs the right to vindicate potential liabilities that already existed, *i.e.*, the 'civil liability' Congress created in 2003." *Id.* at 12 (citing Order at 23).[2]

## G. Section 1595(d) Permits Disgorgement or Restitution

Congress has expressly recognized restitution of ill-gotten gains as a criminal punishment under the TVPA. 18 U.S.C. § 1593(a)-(b). Congress also has repeatedly recognized restitution to be an appropriate civil remedy in *parens patriae* actions.[3] Courts have also recognized the availability of restitution and disgorgement in a *parens patriae* action. *See, e.g.*, *New Mexico*, 430 F. Supp. 3d at 875 (discussing New Mexico's authority to seek restitution, civil penalties, and

---

[2] Further, the prior law also afforded criminal penalties, so, even if, as JPMorgan argues, civil penalties were quasi-criminal sanctions, there is no increased liability, but merely "a new set of plaintiffs" pursuing such pre-existing liability.

[3] *See, e.g.*, 12 U.S.C. § 5538(b)(1)(C) ("[T]he State, as parens patriae, may bring a civil action on behalf of its residents . . . to obtain damages, restitution, or other compensation on behalf of the residents of the State[.]"); 15 U.S.C. § 45c(c)(1)(C) (same); 15 U.S.C. § 6103(a) (same); 15 U.S.C. § 6504(a)(1) (same); 15 U.S.C. § 6309(c)(3) ("[T]he State, as parens patriae, may bring a civil action on behalf of its residents . . . to obtain . . . appropriate restitution[.]").

disgorgement under 12 U.S.C. § 5538(b)(1)). In *Seneci*, on which JPMorgan relies, the state court "directed the payment of full restitution to all consumers injured by the defendants' conduct" in New York's *parens patriae* action. 817 F.2d at 1017. In another case cited by JPMorgan, the court held "A state may have a quasi-sovereign interest in bringing an action to enforce its laws [and] disgorge the proceeds of ill-gotten gain." *West Virginia ex rel. McGraw v. JPMorgan Chase & Co.*, 842 F. Supp. 2d 984, 998 (S.D. W. Va. 2012).[4] A disgorgement of ill-gotten gains remedy is consistent with deterrence objectives of *parens patriae* actions. *See Purdue Pharma L.P.*, 704 F.3d at 220 n.11 ("[W]e conclude that this action is a *parens patriae* action based on the State's deterrence and consumer protection interests . . . .") (cleaned up); *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 213 (2d Cir. 2019) ("[t]ethering the power of district courts to require a defendant's disgorgement of profits to a plaintiff's showing of actual consumer confusion would hamper courts' ability to deter willful misconduct.").[5] Again, against this backdrop, Congress explicitly authorized State Attorneys General, as *parens patriae*, to seek "appropriate relief" without limitation of disgorgement or restitution.

## II.     THE GOVERNMENT CAN PREVAIL ON ITS OBSTRUCTION CLAIM

### A.     The Government Has *Parens Patriae* Authority to Pursue Its TVPA Claims Including Its Section 1591(d) Obstruction Claim

JPMorgan argues the Government does not have standing to pursue its obstruction claim and that only the federal government can bring an obstruction claim. JPMorgan Mot. at 15-16.

---

[4] JPMorgan seeks to distinguish the Government's case by arguing "a government may only seek 'disgorgement' when imposing their own law." JPMorgan at 12 n.4 (citing *McGraw*). In section 1595(d) Congress has explicitly authorized States to enforce the TVPA, and the Court has already found the Government has quasi-sovereign interests here.

[5] In *Liu v. SEC*, relied on by JPMorgan, JPMorgan Mot. at 12 n.4, the Supreme Court said disgorgement, as "equitable relief" under § 78u(d)(5), as opposed to punitive, is limited to compensating victims. 140 S. Ct. 1936, 1946 (2020).

JPMorgan again improperly seeks to re-litigate decided issues. As explained above, the Court previously held that the Government has *parens patriae* standing to bring its TVPA claims based on its quasi-sovereign interest in "assuring its residents it will act to protect them from the harmful effects of criminal sex-trafficking enterprises flourishing in the Islands that are their home." Order at 18. "Since the interest asserted by the USVI here is directly analogous to the interest that provided *parens patriae* standing in *Snapp*, the USVI has Article III standing." *Id.* at 19.

The Court also held that "the statute cannot be read in this cramped fashion" to say that only the federal government can bring an obstruction claim. *Id.* at 33. "[T]he 'victims' of one who obstructs the enforcement of the TVPA include not just the government, but also include those who suffered harm because the government's enforcement efforts were hindered," *id.* at 34, which would clearly include the residents the Government, exercising its *parens patriae* authority, seeks to assure it will act to protect from the harmful effects of criminal sex-trafficking. Further, even if "victims" somehow meant only the federal government, section 1595(d) does not apply to "victims" but is wrongdoer facing and gives State Attorneys General authority to pursue "any person who violates section 1591."

JPMorgan's argument that the USVI "could seek relief against obstruction" of a USVI investigation into Epstein makes no sense. JPMorgan Mot. at 16. The anti-obstruction provision of the TVPA applies only to obstruction of a federal law enforcement investigation of the TVPA, 18 U.S.C. § 1591(d), as JPMorgan itself acknowledges, JPMorgan Mot. at 10 ("federal government alone" can prosecute "federal crime" under TVPA); *id.* at 15 n.5 ("the federal government [is] the entity 'enforcing' the criminal penalties" under § 1591(d)). JPMorgan improperly advances this frivolous legal argument to advance misleading factual allegations against the USVI to distract

from its 13-year active participation in Epstein's sex-trafficking venture. *See* Gov't Resp. JPMorgan SUMF ¶¶25, 25a-c; 26; 26a-b.

**B.      The Government Meets the Elements of Its Obstruction Claim**

As explained in detail in the Government's motion for summary judgment on its obstruction claim (Count V), by 2007, JPMorgan knew of efforts to enforce the TVPA and intentionally obstructed or attempted to obstruct those enforcement efforts.  Gov't Mot. at 24-27; *see also id.* 19-21. In 2006 and 2007, JPMorgan reviewed reports that federal prosecutors were looking to bring child sex-trafficking charges against Epstein and that his lawyers were "negotiating a deal" to avoid those charges. *Id.* at 10-11. By this point, Epstein had confessed to Staley (which Staley reported to Erdoes) that he had engaged in sex with multiple young women for money, denying only their ages. JPMorgan ███████████████████████████████████████ and, instead helped cover up Epstein's conduct by actively handling over $4 million in payments to Epstein's lawyers who it knew from reports were discrediting the victims and hiring private investigators to target witnesses before they talked to the police and pose as police officers. *See id.* at 24-25; Gov't SUF (Dkt. 219) ¶110 (August 2006 news report: "Detectives received complaints that private eyes were posing as police officers … the [private] investigators worked for Roy Black"). Further, before Epstein signed the federal non-prosecution agreement ("NPA") at the end of September 2007, which gave him immunity from federal TVPA charges, JPMorgan knew, ███ ██████████████—as Epstein's "#1 bank" at the time, Gov't SUF ¶174—reams of financial and other information related to Epstein, including:

- Epstein had made over $25 million in payments dating back to 1999 to Ghislaine Maxwell (who was not named as a co-conspirator in the NPA), Gov't SUF ¶221

- Epstein had made nearly $250,000 in payments to ████████ and ████████████ Gov't SUF ¶¶215, 80, 218 (Figure 9.2)

16

- credit cards (though Epstein's NES LLC account) for █████ and █████████ and for a number of other women including █████████ for "travel[] through Paris, Europe and US Virgin Islands and US monthly" and "█████████," Gov't SUF ¶86; Liu Decl. Ex. 73 (Dkt. 225-73); Gov't Resp. JPMorgan SUMF ¶7-k.

- credit cards (though Epstein's NES LLC account) for █████████, Larry Visoski and David Rodgers, Gov't SUF ¶87

- debit transactions for █████████ consistent with upscale sex-trafficking operations and other information related to teenager (and victim) █████████, Gov't SUF ¶¶81-82, 73-74, 76-79

- information related to another teenager (and victim) █████████ Gov't SUF ¶¶74-75, 224

- "cash withdrawals of $40,000 to $80,000 several times a month, which total over $750,000 year to date [October 2006]," Gov't SUF ¶93; cash withdrawals of $840,000 and $904,337 in 2004, and 2005, respectively, Gov't SUF ¶242 (Figure 8)

- More than two dozen $100,000 payments, which amount was highlighted as suspicious in a news report JPMorgan reviewed in August 2006, Liu Decl. Ex. 45 (Dkt. 225-45), Gov't Resp. JPMorgan SUMF ¶7-l, ████████████████████████████████████ ████████████████████████████ Gov't SUF ¶177

- Epstein's financial ties to Jean-Luc Brunel and MC2 modeling agency, Gov't SUF ¶¶129-31

- ████████████████████████████████████████ ████████████████████, Gov't SUF ¶225.

There is no genuine dispute that—at a minimum—████████████████████ ████████████████████████████████████████████ ████████████████. Gov't SUF ¶250.

In 2010 and 2011, JPMorgan acknowledges, reports of new federal child sex-trafficking investigations "were discussed internally at JPMC." JPMorgan Mot. at 17. On July 31, 2010, Erdoes writes Staley, largely quoting a NY Post Article published that same day, "The feds may not be quite done with (JE).  Having just completed 13 months in a fl jail for solicing [sic] prost [sic] from a minor, he now might be under investig [sic] for other possible crimes, including [sic]

whether there's any evidence of child trafficking …. The us AG in fl wouldn't comment. E's lawyer, jack Goldberger, say he know nothing of any probe, and 'they are not and should not be any pending criminal investigations." Gov't SUF ¶134. The NY Post article quoted by Erdoes cites to a July 29, 2010 Daily Beast article which stated, "The Justice Department is investigating Jeffrey Epstein for child trafficking … and has widened the scope of its probe to include a famous modeling agency." "The FBI is also investigating Epstein's friend Jean Luc Brunel, whose MC2 modeling agency appears to have been a source of girls from overseas who ended up on Epstein's private jet." Gov't SUF ¶¶135-36.

But, JPMorgan argues, "there are no … facts" that "allow a jury to conclude that JPMC actually 'knew' of a federal TVPA investigation." JPMorgan Mot. at 17. That is not true. First, JPMorgan itself found the news reports credible. In March 2011, JPMorgan's General Counsel, Steve Cutler, wrote to Jonathan Schwartz (General Counsel Investment Bank) that the news reports "seem to be pretty definitive about the existence of a current investigation." Gov't Resp. JPMorgan SUMF ¶36-b. After the reports came out, General Counsel of AWM (Shenker) was gathering information to "understand the process for offboarding the [Epstein] account." Gov't SUF ¶394. The AUSA and the FBI did not tell the Bank there was no investigation, JPMorgan Mot. at 18, and JPMorgan knew from the reports that "it is against [DOJ] policy to confirm or deny the existence of an investigation." Gov't Resp. JPMorgan SUMF ¶37-b; *see also id.* ¶38-a. JPMorgan knew that at the time of the 2010 and 2011 news it was handling payments of ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ Gov't SUF ¶240 ██████████████

████████████████████████████████████

JPMorgan knew that at the time of his arrest, Epstein's lawyers had engaged in a cover-up, discrediting victims when Epstein confessed to the Bank, and paying private investigators to target witnesses and pose as police. Gov't Mot. at 10-11. JPMorgan knew that Epstein's other representative, Howard Rubenstein, had also lied for Epstein, claiming Epstein had no relationship with Brunel and MC2 modeling agency when JPMorgan had for years extended a $1 million letter of credit for Epstein to MC2. *Id.* at 11-12, 18. Yet, unbelievably, JPMorgan argues that "[i]t is the opposite" of obstruction that JPMorgan "affirmatively reach[ed] out to the potential target of a federal investigation" through his lawyers and representatives. JPMorgan Mot. at 18. Equally incredible is JPMorgan's argument that it did not obstruct a federal investigation because it reached out to the federal government to ask if there was an investigation. *Id.* ████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████ Gov't Mot. at 24-27. *That* would be "the opposite" of obstruction. *Id.*

JPMorgan's argument that it ███████████████████████████████████████

██████████████ is without merit. █████████████████████████████████

██████████████████████████ Gov't Resp. JPMorgan SUMF ¶¶40-a. "The CTR is merely a record of cash transactions above the 10,000 threshold. The suspicious activity report … is when the bank believes that there is potentially suspicious activity involving a transaction or a series of transactions." *Id.* ¶40-b. CTRs do not reflect potential structuring. *Id.* ¶¶40-b, 40-c ("Structuring is not involved in CTRs."). Further, ████████████████████

████████████████████████████ *Id.* ¶40-d.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████ *See* Gov't Mot

at 19-21, 24-27. ███████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

Gov't Resp. JPMorgan SUMF ¶¶44-a, 45-a, 46-e. █████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████ *See supra* at 16-17.

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Gov't Resp. JPMorgan

SUMF ¶47-a; Gov't Mot. at 25. ██████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

*See* Gov't Mot. at 24-27, 19-21; *supra* at 16-17; Gov't Resp. JPMorgan SUMF ¶¶47a-d.



*See* Gov't Mot. at 24-27, 19-21.

*Id.* at 14-15; 18, 26.

*Id.* at 20-21; Gov't Resp. JPMorgan SUMF ¶¶48, 48a-e.

Gov't Mot. at 26.

Gov't Resp. JPMorgan SUMF ¶¶49a-d.

*Id.* ¶49-f.

*Id.* ¶49-e.

21



████████████████████████████████████████████████ Gov't

Resp. JPMorgan SUMF ¶49-g. ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████ Gov't Mot. at 21.

JPMorgan's final argument—████████████████████████████

███████████████████████████ JPMorgan Mot. at 19-20—mirrors the same

cavalier attitude about the law that it displayed in banking Epstein for more than a decade and

participating at every turn in Epstein's sex-trafficking venture. Gov't Mot. 16-21. ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ Gov't  Resp.  JPMorgan  SUMF  ¶7-h. ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████ *Id.* ¶7-b; *see also* ¶7-c. ██████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ *Id.* ¶7-d (emphasis in original).

JPMorgan's own due diligence on Epstein shows it knew that "names and contact

information of material witnesses and additional victims" would have been "extremely useful in

investigations and prosecuting the [federal] case." Gov't Mot. at 26; Gov't Resp. JPMorgan SUMF

¶7-a. In addition to the ████████ millions of dollars in cash usage and the ████████ millions of

22

dollars in payments to girls or women, JPMorgan had the names and information for dozens of accomplices, victims, and other material witnesses—including his pilots, his assistants, and his accountant, ████████████████████████████████████████████████████████ ██████████████████████████████████████████ as well as the long list of dignitaries and ultra-wealthy men Epstein referred or connected to the Bank. *Id.*

JPMorgan argues that the Government's own federal law enforcement expert acknowledged the federal authorities could have charged Epstein in 2008 with child sex-trafficking. *See* Gov't Resp. JPMorgan SUMF ¶9 ("victimizing horrendously a 14-year-old and paying them cash is indeed human trafficking"). But, the Government demonstrates, JPMorgan obstructed those efforts by actively handling the millions of dollars in payments to Epstein's lawyers which allowed him to escape more serious charges including federal sex-trafficking charges. JPMorgan acknowledged reports that Epstein "supposedly bought his way to a lesser sentencing." JPMorgan made the payments to make that happen—and then ████████████████ ████████████████████████████████████████████████████████████████ ████████████████, suggesting ongoing investigations. Gov't Mot. at 10-11, 24-25, 18.

## III. THERE IS NO IMPERMISSIBLY RETROACTIVE APPLICATION OF OBSTRUCTION OR RECKLESS DISREGARD PRE-2008

### A. Obstruction (Count V) Applies to JPMorgan's Pre-2008 Conduct

JPMorgan incorrectly argues that § 1591(d) does not apply to JPMorgan's pre-2008 ████ ████████████████████████████████████████████████ Congress did not "create[e] … a brand new category of actionable conduct." JPMorgan Mot. at 21. Instead, the 2008 amendment merely "conform[ed] the various crimes" in Title 18, USC, Chapter 77 (Peonage, Slavery, and Trafficking in Person) "by extending the obstruction provisions of the Peonage statute (section 1581) to the other substantive servitude offenses." 154 Cong. Rec. H10888-01, 2008 WL 5169865,

at *H10904. In other words, Congress clarified in 2008 that the same anti-obstruction provision in the original servitude offense (Peonage) applied to the later-added servitude offenses (including Trafficking).

Further, Congress explained: "None of the provisions are intended to foreclose the use of corresponding sections of the criminal code, where appropriate." *Id.* The criminal code has long prohibited obstruction, including, for example, obstruction of criminal investigations and tampering with a witness, victim or informant. 18 U.S.C. §§ 1510 and 1512. In addition, ███ ████████████████████████████████████████████—which largely undergird the Government's obstruction claim—were subject to criminal penalties prior to the 2008 amendment. 31 U.S.C. § 5322(a). Applying § 1591(d) to JPMorgan's pre-2008 conduct thus meets "familiar considerations of fair notice, reasonable reliance, and settled expectations," Order at 21 (citing *Martin v. Hadix*, 526 U.S. 343, 345 (1999)), and is not impermissibly retroactive.

### B.   Similarly, "Reckless Disregard" Applies to JPMorgan's Pre-2008 Conduct

On summary judgment, the Government also explained that as early as 2006, JPMorgan knew or recklessly disregarded that "the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." *See generally* Gov't Mot. Part I.B. JPMorgan wrongly asserts that "reckless disregard" too does not apply to JPMorgan's pre-2008 conduct. As with obstruction, the 2008 "reckless disregard" amendment did not impact JPMorgan's fair notice, reasonable reliance, and settled expectations. "Such an approach is well-established in other federal criminal statutes, and would have the advantage of reaching those who turn a willfully blind eye toward a person in commercial sexual activity who is being physically abused or is underage." 154 Cong. Rec. H10888-01, at *H10904. For example, in 18 U.S.C. § 2241 and § 2243, two provisions that punish sexual abuse of children, there is no *mens rea* requirement with respect

24

to the victim's age. *United States v. Jennings,* 496 F.3d 344, 353 (4th Cir.2007). At common law, sex crimes against minors have long been held to be an exception to the requirement of criminal intent: "Exceptions came to include sex offenses, such as rape, in which the victim's actual age was determinative despite defendant's reasonable belief that the girl had reached age of consent." *Morrisette v. U.S.¸* 342 U.S. 246, 251 & n.8 (1952).

In addition, JPMorgan was always subject to criminal penalties for █████████████████ ████████████████████████████████████████, including child sex-trafficking, under a reckless disregard/willful blindness standard. 31 U.S.C. § 5322(a). ████████████████████ █████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ Gov't Resp. JPMorgan SUMF ¶7-g. ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████ ██████████ *Id.* ¶7-i. The reckless disregard amendment thus did not "unfair[ly] … impos[e] new burdens" on JPMorgan and the presumption against retroactivity thus does not apply. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994).

In any event, JPMorgan knew that Epstein was engaged in child sex-trafficking prior to the 2008 amendment. As demonstrated on summary judgment, *see* Gov't Mot. Part I.B., in July 2006, the news reports—based on police documents—explained that "police thought there was probable cause to charge Epstein with unlawful sex acts with a minor" and discussed victims as young as 14. Gov't SUF ¶43. Other reports discussed arrests on multiple counts of unlawful sexual activity



with minors including a victim under 16, and a statement given to police by one victim that "Epstein asked for her real age, [and she] stated she was 16. Epstein advised her not to tell anyone her real age." Gov't SUF ¶¶49-50. Epstein confessed to JPMorgan that he engaged in sex with young women for money, denying only the ages, Gov't SUF ¶53-54, but JPMorgan's own due diligence included reports that Epstein's lawyers—to whom JPMorgan was making millions of dollars in payments at the time—had been discrediting "the 14- to 17-year-old girls." Gov't SUF ¶108. By September 2007, JPMorgan knew that Epstein had made a deal and would plead guilty to "soliciting underage teenage girls for sex." Gov't Resp. JPMorgan SUMF ¶7-j. JPMorgan acknowledged ███████████████████████████████████████████████████

████████████ Gov't SUF ¶¶3-4.

## CONCLUSION

For the foregoing reasons, the Court should deny JPMorgan's motion for partial summary judgment.

Dated: August 7, 2023

**ARIEL SMITH, ESQ.**
**ATTORNEY GENERAL**

/s/ *Mimi Liu*
**MIMI LIU**
Admitted *Pro Hac Vice*
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
mliu@motleyrice.com

**VENETIA VELAZQUEZ**
Admitted *Pro Hac Vice*
Acting Chief, Civil Division
Virgin Islands Department of Justice
Office of the Attorney General
213 Estate La Reine, RR1 Box 6151
Kingshill, St. Croix
U.S. Virgin Islands 00850
Tel: (340) 773-0295 ext. 202481
venetia.velazquez@doj.vi.gov

**LINDA SINGER** (Admitted *Pro Hac Vice*)
**DAVID I. ACKERMAN**
**PAIGE BOGGS** (Admitted *Pro Hac Vice*)
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
lsinger@motleyrice.com
dackerman@motleyrice.com
pboggs@motleyrice.com

*Attorneys for Plaintiff Government of the*
*United States Virgin Islands*