# EXHIBIT 208

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF NEW YORK

3    GOVERNMENT OF THE UNITED STATES
     VIRGIN ISLANDS,
4
                    Plaintiff,
5
          vs.                            No. 22-cv-10904-JSR
6
     JPMORGAN CHASE BANK, N.A.,
7
                    Defendant.
8    _____

9    JPMORGAN CHASE BANK, N.A.,

10          Third-Party Plaintiff,

11   v.

12   JAMES EDWARD STALEY,
     Third-Party Defendant.
13   _____

14

15          THE ORAL DEPOSITION OF CECILE DE JONGH was

16   taken on the 29th day of May, 2021 at the Ritz-Carlton

17   Hotel, 6900 Great Bay, Nazareth, St. Thomas, U.S. Virgin

18   Islands, between the hours of 9:02 a.m. and 2:22 p.m.

19   pursuant to Notice and Federal Rules of Civil Procedure.

20                    _____
                      Reported by:
21

22              DESIREE D. HILL
              Registered Merit Reporter
23            Hill's Reporting Services
                P.O. Box 307501
24           St. Thomas, Virgin Islands
                (340) 714-0269
25

1    government agencies as part of your job?

2         A.    Yes.

3         Q.    How about Port Authority?  Was that one of

4    them?

5         A.    I did interact with the Port Authority

6    more so on the latter part because Mr. Epstein wanted

7    a hangar for his helicopter.  And -- so, I negotiated

8    the lease with the Port Authority.

9         Q.    Okay.  Now, there came a time when your

10   husband became governor.

11        A.    Yes.

12        Q.    That was 2007?

13        A.    Yes.

14        Q.    And he served two terms?

15        A.    Correct.

16        Q.    Okay.  Did that create any issues given

17   your government-facing role for Mr. Epstein?

18        A.    I don't understand the question.

19        Q.    Okay.  Well, let me ask it to you this way:

20   Did you change how you interacted with the government

21   in any way after you had -- after your husband became

22   governor?

23        A.    I don't think so.  With the exception of

24   the fact that I would occasionally ask him for

25   direction as to who I should go to.  You know, if I

1   had an issue, who should I talk to to get something

2   done.

3        Q.    Okay.  All right.  And did your husband

4   have any process for recusing himself from issues that

5   related to the company you worked for?

6        A.    I don't know if he had any process.

7        Q.    Okay.  You're not aware of any?

8        A.    I said I don't know.

9        Q.    Okay.  You're not aware of him recusing

10  himself from any issue regarding Mr. Epstein?

11       A.    I'm not aware of that, no.

12       Q.    Okay.  All right.  Now, when your husband

13  became the governor, did you sort of get a second job

14  result of that as the first lady of the Virgin

15  Islands?

16       A.    Yes.

17       Q.    And what did that job entail?

18       A.    Giving a lot of speeches.  I mean, he ran

19  twice.  So he ran in 2002 and lost.  I was not very

20  involved in that campaign.  And between 2002 and

21  2006, you know, right after 2002, we discovered that

22  our youngest son had some serious health issues.

23            So I was very focused on that.  We both

24  were.  And then he subsequently decided to run in

25  2006, and I was very involved in making sure that our

1     newsworthy at the time.  So there was just a lot on

2     my plate.

3                    And then I was also very involved in the

4     National Governors Association.

5                    THE REPORTER:  I'm sorry.

6                    THE WITNESS:  The National Governors

7          Association, because a lot of the first ladies

8          were involved in mostly of children's

9          activities.

10                   And the thing that I chose to do was to --

11         to focus on literacy, because there are many

12         children in the Virgin Islands that didn't

13         have -- when we would do door-to-door, during

14         the campaign, one of the things I discovered

15         that a lot of the household didn't have books in

16         them.

17                   So my big project every year was to find

18    a local author and have them write a book and give

19    the books away for free because I didn't want to give

20    toys and I didn't want to give candy.

21                   And so we'd have holiday parties and

22    give away the books.  So I would raise money during

23    the year for that.  And which, you know, took up a

24    lot of time.  But I also got a lot of requests for --

25    just give a lot of speeches.

1      Q.    And did you have an office as first lady?

2      A.    No.

3      Q.    Did you have, like, an office address?

4      A.    No.

5      Q.    Do you have, like, an official Twitter

6  feed?

7      A.    Somebody set up a, I think a FaceBook

8  something for me.  I'm -- I'm not on -- I'm not on

9  Twitter.  I actually don't know how Twitter works.

10          And I know that I had -- I had an email

11 that was set up for me that I never really used

12 because I had to go into the government system and

13 then do something else and something else to get into

14 it.  And so I just asked the head of protocol, Raul

15 Carrillo, I said if anything comes in, because it was

16 -- it was the email address that they would give out

17 to people saying, you know, if you want the First

18 Lady to, you know, give a speech or show up

19 somewhere, you know, email her at this email address.

20          And so that was what was done. so I said

21 can you just monitor it and if -- you know, just send

22 me whatever and I'll see whether it fits into my

23 schedule and I would either do it or not do it.

24     Q.    Okay.  And did you have any staff that

25 helped you in your role as First Lady?

1     A.    Well, I had the chief of protocol.  But

2    everybody -- all those people worked for Government

3    House.  So it was the expectation that if there was a

4    social event -- if there was a social event, I was

5    responsible for it.  I found it sometimes very

6    misogynistic.

7     Q.    Sure.

8     A.    But it was what it was.  That if -- you

9    know, if there was going to be sort of an event after

10   the State of the Territory, that I should be pick the

11   caterer, I should do this, you know.

12         And so the chief of protocol had one or

13   two staff members, and so I would have -- you know, I

14   would run over to Government House and say, okay,

15   what are we doing?  You know, who are we inviting?

16   And they would sort of handle everything.

17         But they worked for -- they didn't

18   exclusively work for me.  They worked for Government

19   House.

20    Q.    Got it.  All right.  Let's look at

21   Exhibit 3.

22         MS. WARREN:  Tab 3, Exhibit 1.

23         MR. NEIMAN:  Yeah, Tab 3.  I will ask

24         the reporter to mark as Exhibit 1 a one-page

25         document.

1                      (Deposition Exhibit No. 1 was

2                      marked for identification.)

3          Q.    (By Mr. Neiman:)  All right.  Ms. de Jongh,

4     I handed you a one-page document, which is the Twitter

5     printout for ceciledeJongh@firstlady.vi.  Do you see

6     that?

7          A.    Yes.

8          Q.    You recognize that?

9          A.    This is a Twitter account?

10         Q.    It is.

11         A.    Okay.  But I never -- these aren't -- this

12    is not something that I typed up.

13         Q.    All right.  So you can see in the -- at the

14    sort of top half of the page there's a picture; right?

15         A.    Yes.

16         Q.    That's you?

17         A.    That is me.

18         Q.    Okay.  And it says under that that it's the

19    official Twitter account of U.S. Virgin Islands' First

20    Lady, Cecile de Jongh.  Do you see that?

21         A.    Em-hmm.

22         Q.    And then it indicates that it was joined in

23    September of 2012?  You see that?

24         A.    Yeah.

25         Q.    And that was during the time when you were

1    the first lady?

2         A.    Correct.

3         Q.    And then there's a bunch of Tweets?

4         A.    Right.

5         Q.    Do you know who wrote them?

6         A.    I don't.

7         Q.    Would it had been somebody working for the

8    government?

9         A.    It might have been somebody working for

10   the government, yeah.

11        Q.    Okay.  You didn't hire someone separate

12   from the government to manage this?

13        A.    I didn't have money to do that.

14        Q.    Sure.  Sure.  Okay.

15        A.    Just -- I mean, there's no office of the

16   first lady with a budget.  There was -- there was

17   nothing.

18        Q.    Okay.  So let's take a look at -- I show

19   you another document which we will mark as Exhibit 2.

20             MR. SCHIFFMAN:  Is it possible to share

21        these through chat at the same they're being

22        introduced so that we could -- I'll look at

23        them as well online.

24             MR. NEIMAN:  Sure.  Okay.

25

```
 1              (Deposition Exhibit No. 2 was

 2               marked for identification.)

 3       Q.    (By Mr. Neiman:)  Okay.  I placed in front

 4   of you, Ms. de Jongh, Exhibit 2, which is a printout

 5   from the archives of the internet of the official

 6   website of the Governor of the U.S. Virgin Islands.

 7   Do you see that?

 8       A.    Yes.  Eh-hmm.

 9       Q.    And this announces that you had your own

10   website.  Do you see that?

11       A.    Eh-hmm.

12       Q.    Do you recall that?

13       A.    I recall that, yeah.

14            MR. SCHIFFMAN:  I'm sorry, counsel, was

15       there an answer to that question as to whether

16       documents are going to be shared in the chat?

17            MR. NEIMAN:  Yeah.  The answer was yes.

18            MR. SCHIFFMAN:  Okay.  I'm sorry.  I

19       just missed it.

20            MR. NEIMAN:  And it's in the chat now.

21       Q.    (By Mr. Neiman:)  Okay.  Sorry to

22   interrupt.  We were talking about the website.  Tell

23   us about the first lady website that was set up.

24       A.    That was something I think the P.R., that

25   the governor's P.R. department, John Greaux and his
```

1    staff put up because I was, you know, I was doing

2    things.  So they wanted to put it out there.

3         Q.    Right.  And you mentioned that you had to

4    give a lot of speeches in this -- in this job.  Did

5    you have someone who could write the speeches for you?

6         A.    Yeah.  Julia, I can't remember her

7    last name, worked in the P.R. department.  So a lot

8    of times I would draft something and I would send it

9    to her and say, you know, what are your thoughts.

10   And she would clean it up and send it to me, and

11   that's how it was done.

12        Q.    Okay.  And Julia was an employee of the

13   government?

14        A.    Correct.

15        Q.    Okay.  And if you look at this little

16   printout, you could see it says, "First Lady Launches

17   Website."

18        A.    Eh-hmm.

19        Q.    And then in the second paragraph, there's a

20   little quote attributed to you.  Do you see that?

21        A.    Yes.

22        Q.    And it says at the bottom, that "It's

23   important that residents and other interested

24   individuals have access to the ongoing work of the

25   first lady on behalf of all Virgin Islanders."

```
 1                  Do you see that?
 2        A.    Yes.
 3        Q.    Is that sort of how you saw your role as
 4   working on behalf of all the Virgin Islanders?
 5        A.    Yes.
 6        Q.    Okay.  All right.  And you can see that to
 7   the left there there's a little box that says "Office
 8   of the First Lady."
 9        A.    Eh-hmm.
10        Q.    Do you see that?
11              And then there's a phone number and a --
12        A.    I'm sorry, yes.
13        Q.    Yeah, she can't write it down unless you
14   say it.
15        A.    Yes.  I know, yes.
16        Q.    Let me just say one other thing, very
17   normal in regular conversation for us to kind of both
18   be talking at the same time?
19        A.    I apologize.
20        Q.    Super hard for her.
21        A.    Yeah.
22        Q.    So I will try not to --
23        A.    And I will try as well.
24        Q.    Great.  So you can see in this box it says
25   "Office of the First Lady," and then there's an
```

```
 1    address listed.  Do you see that?

 2         A.    Eh-hmm.  Yes.

 3         Q.    And that's the address where the governor's

 4    office is?

 5         A.    Correct.

 6         Q.    Okay.  And there's a phone number and a fax

 7    number there as well.  Do you see that?

 8         A.    Yes.

 9         Q.    And who would answer if that phone number

10    was called?

11         A.    That's -- that's the same number as

12    Government House.

13         Q.    Okay.  That's the general switchboard

14    number for Government House?

15         A.    Yes.

16         Q.    Okay.  And would that call find its way to

17    you, eventually?

18         A.    Yes.  I didn't work at Government House.

19               THE REPORTER:  I'm sorry.

20               THE WITNESS:  I didn't work at

21         Government House.

22         Q.    (By Mr. Neiman:)  Okay.  So if someone

23    called the number that the website is saying is the

24    number for the office of First Lady, what happens?

25         A.    They would probably get Raul Carrillo or
```

1        A.    No.

2        Q.    Do you remember a person named ███████?

3        A.    The name I do recognize, yeah.

4        Q.    What do you remember about this person,

5   ██████?

6        A.    The thing I remember correctly is there

7   was a ███████ who was, when I was out getting my knee

8   replacement in 2017, I was gone for a while, and I

9   came back, and I think Jeanne told me that there was

10  a ███████ who was going to be working with us.  And I

11  said, who?  And then -- who -- who worked with us.

12  And by the time I came back, she was off and on the

13  payroll.

14       Q.    You mean she had gone on the payroll and

15  then off the payroll?

16       A.    Yeah.

17       Q.    And you were in New York for, like, two

18  weeks?

19       A.    No.  I was gone for about a month.

20       Q.    About a month.

21       A.    Yeah.

22       Q.    And am I correct that you stayed in an

23  apartment provided by Mr. Epstein in New York?

24       A.    Correct.

25       Q.    Did you know anything about the other

```
1                    THE WITNESS:  Yes.
2          Q.    (By Mr. Neiman:)  I know it's hard.  At the
3    top, there's an email from you to Mr. Epstein and
4    copied to Mr. Kahn, correct?
5          A.    Yes.
6          Q.    Okay.  And you will see at the bottom
7    Mr. Epstein is asking you something about whether
8    there's an CB5 visa regional center in the V.I.  Also,
9    tuition is approved.  Do you see that?
10         A.    Eh-hmm.  Yes.
11         Q.    Okay.  So what is that -- what is he
12   talking about there, first, with the CB5 visa regional
13   center?
14         A.    As I sit here now, I don't know.
15         Q.    Okay.  And then you will see it also says
16   "Also tuition is approved."
17               Do you see that?
18         A.    Yes.
19         Q.    What's that talking about?
20         A.    That's probably tuition for our kids.
21         Q.    And am I correct that Mr. Epstein paid the
22   college tuition of your children.
23         A.    Of mine and everybody else who had kids at
24   Financial Trust, yes.
25         Q.    Who else's tuitions did he pay other than
```

1    really can't do anything to influence -- can't do

2    anything or influence Hancock since this the private

3    sector issue.  Do you see that?

4         A.    Yes.

5         Q.    Who is Kenn Hobson?

6         A.    I think was the head of VIPA at the time.

7         Q.    Got it.  And you say, "This is why Kenn

8    gave us a possible alternative."

9               Do you see that?

10        A.    Eh-hmm.  Yes.

11        Q.    What are you referring to there?

12        A.    Well, I think that's referring to --

13        Q.    To item 2 in the previous email?

14        A.    Yeah.

15        Q.    Okay.  And then you go and say, in the next

16   paragraph of your email, in Exhibit 9, that, "John has

17   said if you get the fuel prices together to show how

18   Hancock is gouging, he can take it to VIPA board.

19   Thoughts on this."

20              Do you see that?

21        A.    Yes.

22        Q.    So you're bringing up, again, the point you

23   made in the prior email that one way to deal with this

24   issue was to have your husband, the governor, take it

25   to the VIPA board, right?

1          anybody about getting it approved.

2               It was presented, I think, by Mr. Epstein

3          and Erika Kellerhals at the time.

4          Q.   (By Mr. Neiman:) Okay.  I think my question

5     to you was did you stay out of it entirely?

6          A.   I did.  I did stay -- well, yes.  The

7     answer is yes, I stayed out of it.

8          Q.   All right.  Let me show you a document

9     marked -- I will have the reporter mark as Exhibit 14.

10              (Deposition Exhibit No. 14 was

11               marked for identification.)

12         Q.   (By Mr. Neiman:) And you will see that

13    Exhibit 14 is an email exchange involving Carol

14    Chapman, Percival Clouden and Jennifer Nugent-Hill.

15    Do you see that?

16         A.   Yes.

17         Q.   And Carol Chapman worked for the Economic

18    Development Authority, correct?

19         A.   I don't know her.

20         Q.   You don't know her.  You know Percival

21    Clouden, though?

22         A.   I do.

23         Q.   He was who?

24         A.   I think he was the executive director, I

25    think is the right term.  Right.  Yeah.  I think it's

1    the right title.

2          Q.    He was the executive director of the

3    Economic Development --

4          A.    Yes.

5          Q.    -- Agency?

6          A.    Yes.  I believe so, at the time.

7          Q.    Okay.  And Jennifer Nugent-Hill?

8          A.    Honestly, I don't know what her title was.

9          Q.    She also had a role with the Economic

10   Development?

11         A.    But she worked there, yes.

12         Q.    Okay.  And let's take a look at

13   Ms. Chapman's email to Ms. Hill.  In the middle of the

14   page she writes, "Hope you had a great Christmas and

15   birthday.  The CEO called a few moments ago and asked

16   me to give you his best regards."

17               Do you remember who the CEO was?

18         A.    No, I don't.

19         Q.    Okay.  All right.  You certainly would have

20   known at the time who the CEO of the EDC was.

21         A.    I don't recall.

22         Q.    Okay.  But I mean, you were a pretty senior

23   person --

24         A.    Yeah.

25         Q.    -- on the island with lots of contacts.

1   Did you know at the time, even if you can't remember

2   today who it was?

3       A.    I would probably know then, yes.

4       Q.    And you'll see that what Ms. Hill writes is

5   that, "The CEO called a few minutes ago, asked me to

6   give you his best regards."

7           And then it goes down to the next

8   paragraph, "He asked me to let you know he had a

9   call from the First Lady, and she has asked that

10  Epstein be on the board agenda at the public

11  hearing for the January 9th meeting."

12          Do you see that?

13      A.    Yes.

14      Q.    So, what Ms. Hill is relating is that you

15  had made a phone call to the CEO of the EDC, right?

16      A.    Yes.

17      Q.    Do you have any reason to dispute that?

18      A.    Nope.

19      Q.    Okay.  And the purpose of your call was to

20  get an issue related to Mr. Epstein's certificate in

21  front of the agency, right?

22          MS. BOGGS:  Objection.  Mischaracterizes

23      this document.

24          THE WITNESS:  The EDC was notoriously

25      always postponing, postponing, postponing.

1            And so I can only sitting here today assume

2            that either Erika Kellerhals or -- said, can

3            somebody please make a phone call to see if we

4            can get on somebody's agenda so we could get

5            this over with.

6       Q.    (By Mr. Neiman:) And you made the call?

7       A.    I made the call.

8            (Deposition Exhibit No. 15 was

9             marked for identification.)

10      Q.    (By Mr. Neiman:) All right.  Let's take a

11   look now at -- all right.  Ms. de Jongh, I'm handing

12   you a document marked Exhibit 15.

13            And Exhibit 15 is a 2010 email exchange

14   between you and Jeffrey Epstein.

15            Do you see that?

16      A.    Yes, I do.

17      Q.    And at the bottom of the page, Mr. Epstein

18   is asking you who is in charge of Customs in the

19   Virgin Islands.

20            Do you see that?

21      A.    Yes.

22      Q.    And am I correct that although the Virgin

23   Islands is part of the United States, it's not part of

24   the United States.  It's customs zone.

25      A.    Correct.

CECILE DE JONGH -- DIRECT                84

1       Q.    And that means that even if you're coming

2    from the United States and going back to the United

3    States, you have to clear Customs before you get on a

4    plane and go back to the United States.

5       A.    Correct.

6       Q.    And so if Mr. Epstein had guests with him

7    and they were flying on his plane back to the United

8    States, they'd have to go through Customs before they

9    left?

10      A.    Correct.

11      Q.    So Customs would see whoever was with

12   Mr. Epstein on his plane?

13           MR. TEAGUE:  Objection, form.  You could

14       answer.

15           THE WITNESS:  I would -- I guess I would

16       assume so.  I mean, I never been on his plane,

17       so I don't know.

18      Q.    (By Mr. Neiman:) Sure.  But according to

19   how the rules work, that's how it would work?

20      A.    I mean, whenever I leave here I have to go

21   through customs.

22      Q.    Okay.  And Mr. Epstein is writing to you

23   and asking you who was in charge of customs for the

24   Virgin Islands?

25      A.    Eh-hmm.

1          MR. TEAGUE:  You to answer out loud.

2          THE WITNESS:  I'm sorry, yes.

3     Q.   (By Mr. Neiman:)  Okay.  I'm sorry.  And

4     that's a federal official?

5     A.   Yes.

6     Q.   Okay.  And he writes, "I used to have great

7     relationship with Gloria Lambert, the airport

8     supervisor."

9          Do you know who Gloria Lambert is?

10    A.   No, I do not.

11    Q.   Okay.  And he writes, "I would like to know

12    who is now in her place or her boss with Kenn Hobson

13    now."  Do you see that?

14    A.   I see that.

15    Q.   "There is a Mr. Carpenter who has been

16    difficult lately; not sure why."

17         Do you know who Mr. Carpenter was?

18    A.   I do not.

19    Q.   Okay.  And then you write back on this

20    request from Mr. Epstein to find out whose running

21    Customs in the Virgin Islands.  You say, "I spoke to

22    Kenn."  Do you see that?

23    A.   Yes.

24    Q.   So Mr. Epstein had this question about who

25    is running Customs and wondered whether Kenn Hobson

1    would know.  And you followed up with Kenn Hobson?

2          A.    Correct.

3          Q.    And Kenn Hobson was running the Port

4    Authority at the time?

5          A.    Correct.

6          Q.    And the Port Authority would have

7    interactions with Customs?

8          A.    I would assume, yeah, they would.

9          Q.    Right.  And in fact, Mr. -- when you --

10   withdrawn.

11          When you spoke to Mr. Hobson, he told

12   you who was running customs in the Virgin Islands,

13   this Mr. Harrigan, right?

14          A.    Yes.

15          Q.    And then you forwarded that information on

16   to Mr. Epstein.  Do you see that?

17          A.    Yes.

18          Q.    And do you know anything about what the

19   nature of Mr. Epstein's relationship was with

20   Mr. Harrigan?

21          A.    I do not.

22          Q.    Do you know whether Mr. Epstein gave gifts

23   to the folks at Customs?

24          A.    I am not aware.  I was not involved.  I

25   know that -- I think he asked me once about my

1    thoughts of giving turkeys or something, but other

2    than that.

3         Q.    Okay.  You remember Mr. Epstein asked you

4    if you thought it was okay for him to give a turkey to

5    all the people who work at Customs at the airport --

6         A.    I vaguely remember that.

7         Q.    -- people who would see who was on his

8    airplane?

9         A.    Yeah.  I vaguely remember that, yes.

10        Q.    And you said that was okay?

11        A.    Yeah.  I mean --

12        Q.    Did you check with anyone first before you

13   gave that advice?

14        A.    Well, down here, people usually give gifts

15   to people at Department of Finance, they give,  you

16   know, they give gifts to people who they normally

17   interact with on a regular basis.

18              You know, it's similar to, you know,

19   when, you know, my brother-in-law lives in a building

20   where everybody gives a gift to the doorman, you

21   know.  So that's where I was thinking, I had no

22   reason to think anything untoward was happening.

23        Q.    Sure.  But you would recognize that Customs

24   officials are not like the doorman in your building.

25   They are law enforcement officers, right?

1          A.    Correct.  But --

2          Q.    And so my question to you was did you check

3    with anyone before you told Mr. Epstein it was okay to

4    give this gift to the Customs official who could see

5    who was on his plane?

6          A.    Well --

7                MR. TEAGUE:  Objection to form.  You can

8          answer.

9                THE WITNESS:  No, I didn't check with

10         anyone, but it doesn't matter whether I

11         checked with anybody or not.  It was his

12         decision whether he wanted to do that or not.

13         It wasn't my say-so.

14         Q.    (By Mr. Neiman:) Okay.  But you thought it

15   was okay?

16         A.    I just said, okay, if that's what you want

17   to do.

18         Q.    Did Mr. Epstein have relationships with

19   other governors besides your husband?

20               MS. BOGGS:  Objection, vague.

21               MR. TEAGUE:  Objection, form.

22         Mischaracterization.  You can answer.

23               THE WITNESS:  Yes.

24         Q.    (By Mr. Neiman:) Which other governors did

25   Mr. Epstein have relationships with?

1        A.     Governor Mapp and Governor Bryan.

2               THE REPORTER:  With who?

3               THE WITNESS:  Bryan.

4        Q.     (By Mr. Neiman:) What was the nature of

5    Mr. Epstein's relationship with Governor Mapp as you

6    perceived it?

7        A.     Well, Governor Mapp was not a friend of

8    mine.

9        Q.     Okay.

10        A.     And which reason I am pretty sure you are

11    aware.  But I was just aware of the fact that he

12    visited the island a few times, and that -- I think

13    that I was cc'd on a few emails of schedules of

14    meetings and things like that.  But I was never

15    involved in any meetings, never, you know,

16    participated in any of the meetings, and I never knew

17    whatever it is they talked about.

18               I do know that -- and I don't know the

19    dates.  I could only say that it's -- I think Mapp

20    got into office in 2015 and he was out in 2018.  That

21    Mr. Epstein visited him at Government House once, but

22    I don't know when.  So that's the nature.

23        Q.     Okay.  And you said that Governor Mapp was

24    not a friend and that I would know why.  What were you

25    referring to?

1      A.    Well, the fact that shortly after my

2   husband left office he had him arrested.

3            THE REPORTER:  I'm sorry.

4            THE WITNESS:  He had him arrested.

5      Q.    (By Mr. Neiman:)  For what?

6      A.    Because we decided not to live in

7   Catherineberg because it was mold infested and I

8   didn't want my children living there.  So we decided

9   to live in our own home.

10           And they put up a security -- a little

11  security house and a fence, and got the funding

12  through -- they passed it through the legislature.

13  And for political reasons, people made hay of it.

14           And my husband, you know, three or four

15  years before he came out of office said, it's okay,

16  when we get out of office, I'll just pay everything

17  back, which we were in the process of doing, and

18  Governor Mapp decided that, I believe because he

19  never wanted my husband to ever run again decided to

20  arrest him.

21     Q.    What happened?

22     A.    And what happened was that they then said,

23  well, you don't want to go to jail, just pay all this

24  money, which was about a hundred and something

25  thousand dollars more than what we determined was the

1    depreciated value.  And we had a certain -- date

2    certain that we had to pay it back.

3          Q.    So what happened?

4          A.    We paid it back.

5          Q.    Where did you get the money to do that?

6          A.    We got some money from my mother's trust

7    and Mr. Epstein called me up and said, "Is everything

8    okay, what's happening?"  And I said this is the

9    position we're in, and we're going to refinance our

10   house for the rest of the money, but I don't think

11   that we're going to be able to do it in time.

12              So he offered to lend us the money,

13   which he did immediately.  I asked him if we could

14   pay it back within three years, and he said, "No, you

15   have to pay it back within a year, with interest."

16   And so he did that and we paid it back.

17         Q.    Okay.  So about how much money did

18   Mr. Epstein loan you at this time?

19         A.    200,000.

20         Q.    How did you pay it back?

21         A.    We refinanced our house.  We took out 150

22   -- we got -- we were able to get $150,000 out.  We

23   paid.  And then I for -- I had to forego any bonuses.

24   And then the rest of it, we paid out of pocket.

25         Q.    Okay.  So a portion of the repayment was

1    foregoing bonuses you might otherwise have earned from

2    your job?

3         A.    Well, it would be just give me the bonus

4    and I had to write a check and pay it back.

5         Q.    Okay.  About how much of the repayment came

6    from these bonuses?

7         A.    20,000.

8         Q.    All right.  How about Governor Bryan, what

9    was the relationship between Mr. Epstein and the

10   current governor?

11        A.    I sort of had less knowledge of what was

12   going on there.  Erika Kellerhals was close to

13   Governor Bryan.  I mean, I've known Governor Bryan,

14   obviously, because he was commissioner of Labor under

15   my husband, and he sat on a committee that I ran.

16              THE REPORTER:  That I --

17              THE WITNESS:  Pardon.

18              THE REPORTER:  It sat on a committee

19        that --

20              THE WITNESS:  That I ran.  Children's

21        Cabinet that I ran.

22              And -- but I knew that Erika Kellerhals

23        had arranged some meetings with him.

24        Q.    (By Mr. Neiman:)  Okay.  Some meetings

25   between Mr. Epstein and Mr. Bryan?

1          A.     Correct.

2          Q.     What is this Children's Cabinet that you're

3     referring to?

4          A.     It's something that other states had done

5     and we tried to replicate it here where we were --

6     you know, we have Department of Education, Department

7     of Labor, sort of heads of all the -- all the

8     departments -- not all departments, but departments

9     that deal with children.  Police department.  And we

10    would come together, like, every two months.  And so

11    they'd help me with my book drives.

12              We did things, like, I would go to

13    department of -- the police department and talk to

14    the police about ADD and ADHD and how that affected

15    especially young boys, and that their acting out

16    wasn't necessarily something that they needed to get

17    arrested for, go to juvie, but to sensitize the

18    police on how to treat children with that, especially

19    because, you know, it was more prevalent, especially

20    with ADHD, more prevalent in boys.

21              We worked with the NEEKC Foundation on

22    early childhood education, and got implemented that

23    all the early childhood centers, one of our goals was

24    to make sure that every child caretaker, at least,

25    had a high school degree, and that they worked

94

1    towards an associate degree because, you know, in the

2    Virgin Islands, at the time that we -- you know, that

3    John got into office, it was felt that people would

4    focus more on education in high school years, and

5    that really what we should focus on is, the most

6    important thing was zero to five.

7              And that if we had a solid zero to five,

8    then those kids could learn anything anywhere.  And

9    that we wanted to sort of flip the dynamic.  And in

10   order to do that, we had to get everybody on board

11   for that.

12             So we held quite a few symposiums on

13   that, and in acting with the NEEKC Foundation.  And

14   so those were some of our goals.

15   Q.   Okay.  And you were the chair of the

16   children's Cabinet?

17   A.   Yes.

18   Q.   And this was -- the other members of this

19   cabinet were senior government officials?

20   A.   Correct.

21   Q.   And then you ran it?

22   A.   Yes.

23   Q.   Okay.  And that Children's Cabinet helped

24   to implement the government's policy?

25   A.   Yes.  Well, we tried to make sure that we

1    were in sync with government's policy.

2              THE REPORTER:  I'm sorry, in sync?

3              THE WITNESS:  In sync with the

4       government's policy.

5       Q.   (By Mr. Neiman:) And as you were talking

6    sort of this focus on early childhood, that was an

7    example of kind of implementing what the government

8    wanted to do?

9       A.   Correct.

10      Q.   Okay.  So, do you recall Mr. Epstein being

11   influential in who the current governor appointed to

12   various positions?

13             MS. BOGGS:  Objection, form.

14             THE WITNESS:  Of him being influential?

15      Q.   (By Mr. Neiman:) Yeah.

16      A.   I would make some sort of recommendations

17   of, you know, who I thought would be good in terms

18   of -- because what he was -- seemed to be mainly

19   concerned about was being able to build whatever he

20   wanted to build on Little St. James.  That was always

21   a point of contention for me and for Erika because,

22   you know, we never went over there.  So he would

23   build whatever he would build.  Some with permits;

24   some without.

25             DPNR would find out.  They would get

1    upset.  We'd say, you know, here we are again.  He

2    would get fined, you know, we call it a NOVA, Notice

3    of Violation.

4              I think he was -- got a Notice of

5    Violation like three or four times under John's

6    administration.  I don't know about under Mapp's

7    administration.

8              The other thing that was very important

9    to him was being able to get a hangar down at the --

10   at the airport.

11             He -- as I told you earlier I worked out

12   a lease which took two long years to get -- for his

13   helicopter, and then he subsequently wanted to be

14   able to get a lease, or have a hangar built for his

15   plane.

16   Q.   Okay.  So he cared who was running the Port

17   Authority?

18   A.   Because he wanted to be able to build a

19   hangar.

20   Q.   All right.  And you remember enlisting

21   Mr. Epstein to support a particular candidate to

22   become the head of the Port Authority?

23   A.   Yes.

24   Q.   Tell me about that.

25   A.   Just, he seemed to have the ear of Albert

1    Bryan.

2         Q.    Who seemed to have the ear?

3         A.    Jeffrey Epstein.

4         Q.    Eh-hmm.

5         A.    And so I just said, you know, that Carlton

6    Dowe would probably be, you know, best for you in

7    terms of being able to get the hangar that you want.

8         Q.    Okay.  And you say that Jeffrey Epstein

9    seemed to have the work of -- the ear, right --

10   withdrawn.

11              Let me start again.

12              You said that Jeffrey Epstein seemed to

13   have the ear of Governor Bryan.  What did you mean

14   by that?

15        A.    Well, he -- I knew that -- I knew that

16   they spoke.  And when Governor Bryan was setting up

17   his cabinet, and I knew that -- I knew that Carlton

18   Dowe wanted -- I think he was there before, Mapp let

19   him go, and he wanted to go back.  And I thought he

20   did a brilliant job when he was there before, and he

21   would probably do a brilliant job again.  And that he

22   would probably -- you know, he seemed to be more

23   business friendly rather than status quo.

24              When he was there before, he'd, you

25   know, put in all these beautiful palm trees and

1    certainly made, you know, just made the place look

2    welcoming.

3              And, you know, right now he's, you know,

4    putting in new parking, it's -- you know, it's going

5    well.  And so I just thought, you know, this is

6    probably the guy that you would want to talk to to be

7    able to build a hangar.

8         Q.    And so you suggested to Mr. Epstein that he

9    talk to Governor Bryan about appointing Mr. Dowe?

10        A.    Yeah.

11        Q.    Because you thought that Mr. Epstein might

12   be able to be helpful in getting Mr. Dowe appointed?

13        A.    Yeah.  Yes.

14        Q.    Okay.  And Mr. Epstein agreed to do that?

15        A.    Yes.

16        Q.    And he spoke to the governor about it?

17        A.    That I don't know.  He didn't -- he -- he

18   rarely ever came back -- circled back to me and told

19   me what he spoke about.

20        Q.    Got it.  Okay.  So let's take a look at

21   what we will mark Exhibit 16.

22              (Deposition Exhibit No. 16 was

23               marked for identification.)

24        Q.    (By Mr. Neiman:)  Exhibit 16 is a 2018

25   email exchange between you and Jeffrey Epstein,

1      A.    Well, yeah, I know that Carlton had been

2   appointed.

3      Q.    Do you remember --

4      A.    I do recall that one of the reasons why it

5   was necessary to do -- well, we felt it was necessary

6   to do that is because Erika Kellerhals was,

7   obviously, Mr. Epstein's attorney, and Mr. Epstein

8   told me that she was dead set against Mr. Dowe

9   being -- going back to the Port Authority.  And so

10  that was why we -- you know, why I said, hey, if you

11  can give him a good word, give him a good word,

12  because I know that Erika Kellerhals was saying

13  something else.

14     Q.    Got it.  So this was a situation where it

15  was not a sure thing that Mr. Dowe would get this job?

16     A.    Yeah.

17     Q.    Correct?

18     A.    Correct.

19     Q.    And you thought Mr. Epstein could be

20  influential in getting him the job?

21     A.    Well, I knew that he listened a lot to

22  Erika.

23     Q.    Who listened a lot to Erika?

24     A.    Mr. Epstein.

25     Q.    I see.  So you were trying to persuade him

1    to back somebody that your thought Erika was trying to

2    persuade him not to back?

3         A.    Right.

4         Q.    I see.

5         A.    It's a small island.

6         Q.    Understood.  Okay.  Tell me who Celestino

7    White is?

8         A.    He's a former senator here.  I can't

9    remember how many terms.  Maybe ten terms here.

10        Q.    Okay.

11        A.    And he became a consultant.

12        Q.    Did he do work for Mr. Epstein?

13        A.    He did.

14        Q.    What was the nature of the work that

15   Celestino White did for Mr. Epstein?

16        A.    He started out doing work for -- actually,

17   for Andrew Farkas.  The second time that John -- that

18   my John ever met with Mr. Epstein was in 2014, I

19   think.

20              Mr. Farkas was very, very, very upset

21   and livid that when taxi drivers got picked up from

22   WICO dock, that they would completely bypass Yacht

23   Haven Grande and go straight to town.

24              And he had all these shops and every --

25   you know, invested all of this money.  And also that

```
 1    people.

 2         Q.    Okay.  And that -- but Celestino White was

 3    the specific recommendation of one person who might

 4    fit that role?

 5         A.    Yes.

 6         Q.    And that Mr. Farkas and Mr. Epstein,

 7    therefore -- thereafter, hired Mr. White?

 8         A.    Yes.

 9         Q.    Okay.  Do you know how much they paid him?

10         A.    No.  That -- no, I don't.

11         Q.    Does your husband have any kind of

12    financial relationship with Mr. White?

13         A.    No.

14         Q.    Do you have any kind of financial

15    relationship?

16         A.    No, I do not.

17         Q.    Okay.

18         A.    But may I complete my --

19         Q.    Sure.  Go ahead.

20         A.    So -- and then subsequent to that,

21    Mr. Epstein did hire Celestino White to -- he came up

22    with the idea that he wanted to change the name of

23    Little St. James to Little St. Jeff.

24               And he asked me, and I said I have no

25    clue how one would go about doing that.  And so he
```

107

1    called up Celestino White and went and did a contract

2    with him.  And Celestino presented something, and my

3    -- did my own --

4              THE REPORTER:  I'm sorry.

5              THE WITNESS:  Presented, did a -- did a

6         written proposal or something, and it kind of

7         died there.

8         Q.   (By Mr. Neiman:) Okay.  Did you ever

9    recommend Celestine White to Mr. Epstein?

10        A.   I think might I have recommended it for

11   the Little St. Jeff thing.

12        Q.   For anything else?

13        A.   Not that I can recall.

14        Q.   Okay.  Let's take a look at a couple of

15   documents.  First, let me show you what 281.

16             I'm going to ask the reporter to mark as

17   page 18, a one-page document.

18             (Deposition Exhibit No. 18 was

19              marked for identification.)

20        Q.   (By Mr. Neiman:)  All right.  And this is

21   an email from you to Mr. Epstein on February 11, 2015.

22   Do you see that?

23        A.   Yes.  This was Little St. Jeff.

24        Q.   Let me just ask the questions so I make

25   sure I got it.

1        A.    All right.

2        Q.    So this is in February of 2015?

3        A.    Yeah.

4        Q.    And you're recommending to Mr. Epstein that

5   he put Celestino on what you call a monthly retainer,

6   correct?

7        A.    Eh-hmm.

8        Q.    What did you mean by that?

9             MR. TEAGUE:  You have to answer out

10       loud.

11            THE WITNESS:  I'm sorry, yes.

12       Q.    (By Mr. Neiman:)  What did you mean by a

13  monthly retainer in this context?

14       A.    Because I knew Celestino wouldn't do

15  anything for cheap.

16       Q.    Okay.  What do you mean by that?

17       A.    I just knew he wouldn't, you know -- if

18  you paid him $2,000, he would be, like, he's not

19  going to do anything much, but, you know, that's --

20  and when he wanted to do Little St. Jeff, this is

21  probably the person that you -- and, you know, the

22  one thing that I knew, if you wanted to change a name

23  you have to go to the legislature to do that.

24            And I am just said, I'm not the person

25  to go down to the legislature to convince somebody to

1    change the name an island.

2        Q.    I got it.  And you write that after you say

3    you should consider putting Celestino on some sort of

4    monthly retainer, you write, "That will get you his

5    loyalty and access."  Do you see that?

6        A.    Eh-hmm.  Well, he is a consultant.

7        Q.    So what did you mean his loyalty and

8    access?

9        A.    Usually when you pay people -- you know, I

10   mean -- I don't know.  I don't know why I said that.

11   Just that he would -- he would be responsive to you.

12   He would -- he would, you know, make you a priority.

13       Q.    All right.  Do you remember Celestino doing

14   any other work besides the Little St. Jeff work?

15       A.    He may have, but I don't recall.

16       Q.    Okay.  Let me show you a document marked

17   Exhibit 19.

18            (Deposition Exhibit No. 19 was

19             marked for identification.)

20       Q.    (By Mr. Neiman:)  Do you recognize

21   Exhibit 19 as an email exchange between you and

22   Mr. Epstein in August of 2015?

23       A.    I don't even know what this is referring

24   to.

25       Q.    Well, you see that the subject is --

```
 1                   You see that?

 2        A.    Yes.

 3        Q.    That was true, right?

 4        A.    I was for a period of time, yes.

 5        Q.    And it also says he pays for the education

 6   of the governor's children at the exclusive Antilles

 7   School on St. Thomas.  That was true also?

 8        A.    He paid for my children and everybody

 9   else's children, yes.

10        Q.    Well, when you say everybody else's

11   children, you mean other employees of FTC?

12        A.    Correct.  And other EDC companies, that is

13   normal par for the course for other EDCs to pay for

14   their children.  It was normal and customary.

15        Q.    Okay.

16        A.    We were not special.

17        Q.    Okay.  And you see down at the bottom of

18   the page, and this is good classic New York Post

19   speak, it says in the last paragraph, "de Jongh's

20   flack didn't return our call."

21                   Do you see that?

22        A.    Eh-hmm.

23        Q.    Do you remember hearing that the New York

24   Post was covering this issue?

25        A.    I don't read the Post.  Sorry.
```

1                (Deposition Exhibit No. 26 was

2                  marked for identification.)

3        Q.    (By Mr. Neiman:)  Okay.  Let's take a look

4   now at Exhibit 26.  You see at the bottom of the page,

5   Mr. Epstein writes back to you, "I can enroll ████,

6   ██████████████████ if that helps the school."  Do you

7   see that?

8        A.    Eh-hmm.

9        Q.    So he's now identified a third person with

10  an Eastern European name who could benefit from

11  English as a second language classes, right?

12              MR. TEAGUE:  Objection, form.  You could

13         answer.

14              THE WITNESS:  Yes, those three names

15         were there.

16       Q.    (By Mr. Neiman:)  Okay.  Did it ever cross

17  your mind to wonder whether there was something wrong

18  with this convicted sex offender telling you I have

19  three women who I'd like to help learn to speak

20  English?

21              MS. BOGGS:  Objection, vague,

22         argumentative.

23              THE WITNESS:  This is -- this is a

24         person who had one offense, had to register as

25         a sex offender.  Didn't see him with any --

1          (Deposition Exhibit No. 35 was

2               marked for identification.)

3     Q.     (By Mr. Neiman:) Ms. de Jongh, this is an

4     email exchange between you and Jeffrey Epstein in

5     September of 2015.  Do you see that?

6     A.     Yes.

7     Q.     All right.  Looking at the email at the

8     bottom of the page from Mr. Epstein to you, he writes,

9     "I will play any role in this you guys like.  I could

10    lend John the money so he immediately has it.  I would

11    gladly be on the phone (anonymous) with John Quinn and

12    the prosecutor offering suggestions.  25 a year for 20

13    yours, 490 now, with an income tax for the full

14    amount.  250 now and 250 in 15 years, et cetera."

15         What's going on here?

16    A.     That's the note that I told you about when

17    John got arrested, with Mapp.

18    Q.     Ah.

19    A.     So it is not John Quinn.  It is John and

20    Quinn.  It's Mike Quinn, John's attorney.

21    Q.     Ah.

22    A.     So he just didn't put a comma, I guess.

23    Q.     Got it.  And this reference to 25 a year

24    for 20 years, 490 now with an income tax credit for

25    the full amount, 250 now and 250 in 15 years, what's

1    that talking about?

2         A.    I actually never knew what he meant by

3    that because it was just, you know, we needed like

4    400,000, or a little shy of 400,000.

5              So I just said I would, you know,

6    discuss it with John.  You know, he wanted, you know,

7    to see if we wanted him -- if we wanted him to pay

8    for our legal fees, and we said, no, we got that

9    covered.

10             It was just the issue of the Mapp

11   administration at the time trying to squeeze us to

12   pay immediately or go to jail, which we thought

13   seemed, you know, if it's a criminal offense, why ask

14   us for money, you know.  So --

15        Q.    And Mr. Epstein was giving some advice

16   about how to handle this criminal problem?

17        A.    His advice was, don't go to court, just

18   pay the money.

19        Q.    Okay.  And -- but he is offering here some

20   various proposed structures for how to pay.  Is that

21   fair?

22        A.    That's fair.

23        Q.    And one of them was to pay 490,000 now, but

24   get an income tax credit for the full amount?

25        A.    Yeah.

1        Q.    And to do that as a convicted felon, he

2   needed to get his supervision moved from Florida to

3   the Virgin Islands, right?

4        A.    Correct.

5        Q.    And you were passing on information related

6   to that to the governor and the attorney general of

7   the Virgin Islands.

8        A.    About how to go about -- how one would go

9   about doing that.

10       Q.    Right.  And then you spoke to your husband

11  about it?

12       A.    Yes.

13       Q.    And got some advice about what the best way

14  it was to proceed, right?

15       A.    Yes.  Like who -- who would you talk to to

16  get this done.

17       Q.    Did you also talk to the attorney general

18  about it?

19       A.    I didn't speak directly to Vincent.

20             THE REPORTER:  Sorry, I couldn't --

21             THE WITNESS:  I don't -- I don't believe

22  I talked directly to Vincent about it.

23       Q.    (By Mr. Neiman:)  So your husband talked to

24  the attorney general?

25       A.    I think he did.

1      Q.    And then relayed to you this information

2    that you've set out in your email to Mr. Epstein?

3      A.    Yeah.  What he needed to do in order to

4    get transferred here.

5      Q.    So you, the attorney general, and the

6    governor are together helping Mr. Epstein sort through

7    how he can transfer supervision from Florida to the

8    Virgin Islands?

9      A.    How to legally get transferred here, yes.

10     Q.    Okay.  All right.

11     A.    You mentioned that he was in jail at this

12   time?

13     Q.    Eh-hmm.

14     A.    I don't -- I think he was on work release.

15   He was -- I never spoke to him once he was in jail.

16     Q.    Okay.  But he was -- withdrawn.  Do you

17   remember him being on work release in the daytime and

18   then going to jail at night?

19     A.    I didn't -- I never knew his schedule.

20     Q.    Okay.

21     A.    I just know that I hadn't spoken to him

22   the whole time that he was incarcerated or in -- even

23   on work release.

24     Q.    Okay.  But at some point in 2009 you were

25   speaking to him about getting his future supervision

1    transferred?

2         A.    Emailing, yeah.

3         Q.    Well, emailing, but he says at the

4    beginning of the email, "Call me when you get a

5    chance," right?

6         A.    Right.  And usually I would call, like,

7    Lesley Groth and she would --

8              THE REPORTER:  Who?

9              THE WITNESS:  Lesley Groff.  Because

10             tens out of -- ten times out of ten I wouldn't

11             have a number for him.

12        Q.    (By Mr. Neiman:)  So you would call Lesley

13   and she could reach him?

14        A.    And she would patch me in to him.

15        Q.    Got it.  Okay.  All right.  Let's talk

16   about a topic we touched on earlier today which is the

17   sex offender registry.

18        A.    Eh-hmm.

19        Q.    Do you recall discussing the topic of the

20   sex offender registry as it related to Mr. Epstein

21   with your husband?

22        A.    Yes.

23        Q.    Who else did you talk about that topic

24   besides the governor?

25        A.    Just the governor.

1      Q.    You never talked to the attorney general

2   about that topic?

3      A.    No, he talked to the attorney general

4   about the topic.

5      Q.    Okay.  Tell me what he told you about his

6   conversations with the attorney general on that topic?

7      A.    Just that -- I asked him -- let me start

8   backwards?

9      Q.    Sure.

10      A.    Darren and Erika alerted me that, you

11   know, all the states and the territories had to come

12   up with their own SORNA laws, and there was money

13   attached to it and this was coming down the pike for

14   the Virgin Islands.

15            Darren then said, you know, hey, I read

16   through everything, and this particular portion is

17   going to work for Mr. Epstein because he's got a, you

18   know, private plane, whatever, and he would like the

19   notice to be shorter.  How do we go about doing that?

20            I talked to John about that.  He says,

21   well, have whoever -- whoever Epstein's lawyer is

22   talk to the attorney general.  And I believe at the

23   time they asked Maria Hodge to do that in conjunction

24   with Darren and also Erika Kellerhals.

25      Q.    Okay.  And there was kind of a back and

1          A.     Through his attorney, Maria Hodge, yes.

2          Q.     And they've reached agreement with his

3    attorneys on what that legislation should look like,

4    correct?

5          A.     Eh-hmm.

6          Q.     Yes?

7          A.     Yes.

8                 MS. BOGGS:  Objection, form.

9          Q.     (By Mr. Neiman:) And the attorney general

10   endorsed the version that reflected the input of

11   Mr. Epstein and his lawyers, correct?

12                MS. BOGGS:  Objection to form.

13                THE WITNESS:  It appears so, yes.

14         Q.     (By Mr. Neiman:) And then there was a state

15   senator who needed to weigh in, correct?

16         A.     Correct.

17         Q.     That's Mr. Russell?

18         A.     Correct.

19         Q.     Is that a first name or last name?

20         A.     Senator Russell.

21         Q.     Senator Russell.  He's the senate

22   president?

23         A.     I think he was the senate president at the

24   time, yes.

25         Q.     Yeah.  And you report in your email that

1    Senator Russell said this morning that he would accept

2    the amendments and introduce them tomorrow.  Do you

3    see that?

4         A.    Yes.

5         Q.    How did you know that?

6         A.    I think I called him and I asked him if he

7    got everything -- if he got this, and he said, yeah,

8    yeah.  And now I can't remember whether I called him

9    or I saw him at the seaplane shuttle or something,

10   and I brought it up and he said, oh, yeah, I saw

11   everything and it's fine with me.

12        Q.    Got it.  So you had a conversation, a

13   direct one-on-one conversation with Senator Russell

14   where he confirmed that he was okay with the version

15   that had been worked out between the attorney

16   general's office and Mr. Epstein's lawyers?

17        A.    Yeah.  I told him that Maria Hodge wrote

18   something that was amending it, and that -- and he

19   said as long as the AG was fine with it.  I said, it

20   appears that he is, and he said, okay, well, let's

21   bring it to the senate floor.

22        Q.    And there came a time when Senator Russell

23   changed his mind?

24        A.    Yeah.  He had no intention of making any

25   changes.

1          Q.    Or he did something that was different from

2    what he told you, is that fair?

3          A.    It was par for his course.

4          Q.    Okay.  But am I correct that he told you

5    one thing and then did something else?

6          A.    Correct.

7          Q.    And what he told you was he was okay with

8    what had been worked out between the attorney general

9    and Mr. Epstein, correct?

10         A.    In retrospect at the time, I realized that

11   he probably read anything.  He was just like, yeah,

12   yeah, yeah.  And then when it came down to the senate

13   and he did read it, he was he just wanted to go back

14   to the way it was before.

15         Q.    Which --

16         A.    And also I don't think the AG really

17   pushed it either.

18         Q.    Do you know that or you're guessing?

19         A.    No.  I'm pretty sure that the AG did not

20   push it either.

21         Q.    How do you know that?

22         A.    I just remember that, that he was not --

23   you know, he was fine either way, that if -- if -- if

24   it went as original, he was fine with it.

25         Q.    Got it.

180

1       A.    That we shouldn't make -- necessarily make

2   any special arrangements for anyone.

3       Q.    So there was a process of working out a

4   deal with the attorney general's office that the

5   attorney general signed off on, correct?

6       A.    Eh-hmm.

7       Q.    Yes?

8       A.    Yes.

9       Q.    But he didn't push for it with the

10  legislature.  Is that what you're saying?

11      A.    Correct.

12      Q.    Okay.  And then you write, you send all

13  this news to Mr. Epstein and say, "Please call me when

14  you have a moment."  Do you see that?

15      A.    Yes.

16      Q.    Did you talk to Mr. Epstein about it?

17      A.    I probably did and just told him what

18  happened.

19      Q.    Okay.  Let's take a look at -- do you

20  remember what his reaction was?

21      A.    To this?

22      Q.    Yeah.

23      A.    I don't recall what his reaction was, no.

24      Q.    Okay.  Let's take a look at another

25  document which may help.  42.

1    off the improvements on the house, right?

2         A.   Yes.

3         Q.   Okay.  So that's one example.  Didn't you

4    also ask him to contribute to a reception for --

5         A.   Yes.

6         Q.   -- your husband?

7         A.   Yes.  You.  You said campaign.

8         Q.   Okay.  I'm just asking the question.

9         A.   I know.  And I'm just answering the

10   question specifically what you're asking me.

11        Q.   Well, you did ask him to raise money for a

12   political event, State of the Territory reception?

13        A.   Yes.

14        Q.   Okay.  And Mr. Epstein contributed to that

15   event?

16        A.   He did.

17        Q.   How much did he give?

18        A.   I do not recall.

19        Q.   Okay.  Let's take a look.  131.

20             (Deposition Exhibit No. 44 was

21              marked for identification.)

22        Q.   (By Mr. Neiman:)  131 is an email exchange

23   between you and Mr. Epstein, Subject:  Fundraising

24   Question.  You see that?

25        A.   Yes.

1     Q.   And you indicate in your email to

2  Mr. Epstein at 10:51 a.m. on January 24th, 2014, that

3  you are fund raising for the governor's final State of

4  the Territory reception, correct?

5     A.   Correct.

6     Q.   That's a political event.

7     A.   Yes.

8     Q.   And you needed $35,000 to fund that event?

9     A.   Well, yeah, I needed 35,000, we had raised

10  15, and we wanted to match the other 15.

11     Q.   All right.  So you're asking him if he

12  would contribute $15,000 to this political event?

13     A.   Correct.

14     Q.   For the benefit of your husband?

15     A.   Yes.

16     Q.   And Mr. Epstein agreed to do that?

17     A.   Yes.

18     Q.   Okay.  And then let me show you next -- do

19  you recall asking Mr. Epstein to contribute to the

20  Democratic Party?

21     A.   I may have.  I don't -- you'd have to jog

22  my memory.

23     Q.   Your husband was a Democrat, correct?

24     A.   Yes.

25     Q.   Okay.  So he would benefit by raising more

```
 1    funds for the Democratic Party, true?

 2         A.   Didn't seem to help him at the time, but,

 3    yes.

 4         Q.   Okay.  I'll ask the court reporter to mark

 5    the next document, Exhibit 45.

 6              (Deposition Exhibit No. 45 was

 7               marked for identification.)

 8         Q.   (By Mr. Neiman:)  Exhibit 45 is another

 9    email exchange with Jeffrey Epstein, this one in

10    October 2014, correct?

11         A.   Eh-hmm.

12         Q.   And you asked Mr. Epstein in the middle of

13    the page, "How much would you like to give to the

14    St. Croix District Democratic Party?"  Do you see

15    that?

16         A.   Eh-hmm.

17         Q.   And he says, "15K."

18         A.   Yeah.

19         Q.   Do you recall any other donations that

20    Mr. Epstein made to the Democratic party?

21         A.   This one is not on behalf of John.

22         Q.   Okay.

23         A.   This is not solicited on behalf of John.

24         Q.   Well, it's -- do you recall any other

25    contributions to the Democratic party that you asked
```

1    Mr. Epstein to make other than this one?

2         A.    You'd have to refresh my memory.  I'm sure

3    you have other emails, so refresh my memory.

4         Q.    Do you recall asking him to contribute to

5    particular Democratic candidates?

6         A.    Yeah, I always did.

7         Q.    And how about Stacey Plaskett in

8    particular?  Do you remember asking Mr. Epstein to

9    contribute to her campaign?

10        A.    Yeah, I did.

11        Q.    Why did you do that?

12        A.    I liked her.

13        Q.    All right.  I'll show you another document

14   I'll ask the court reporter to mark Exhibit 46.

15             (Deposition Exhibit No. 46 was

16              marked for identification.)

17        Q.    (By Mr. Neiman:)  All right.  This is an

18   email exchange between you and Jeffrey Epstein on June

19   19th, 2014, correct?

20        A.    Yes.

21        Q.    All right.  And you told Mr. Epstein that

22   his help was needed to try to get Stacey Plaskett

23   elected to congress.  Do you see that?

24        A.    Eh-hmm.

25        Q.    And you note that Shawn Malone, the current

1          Q.    All right.  And so you told Mr. Epstein

2    that Shawn needed to be defeated and that Stacey was a

3    friend, and asked if any of his friends would give to

4    her campaign.

5                Do you see that?

6          A.    Eh-hmm.

7          Q.    Why were you asking for contributions from

8    the friends instead of from Mr. Epstein personally?

9          A.    Don't I ask him for it, too?

10               THE REPORTER:  I'm sorry.

11               THE WITNESS:  I said am I -- aren't I

12         asking him in this for him, too, to give?

13         Q.    (By Mr. Neiman:)  Do you read the sentence,

14   "Do you think any of your friends would give to her

15   campaign," as a request for Mr. Epstein to give?

16         A.    I'm reading this as you, your friends.

17   That's how I'm reading this.

18         Q.    So, you thought you were asking Mr. Epstein

19   in his email whether he or any of his friends --

20         A.    Or any of his friends, yeah.

21         Q.    Okay.  Why were you asking him to give to

22   Ms. Plaskett if you didn't ask him to give to your

23   husband's campaign?

24         A.    I just never -- I'm -- I was notoriously

25   bad about asking anybody for John's campaign.

1    against.

2        Q.    Got it.  And then Mr. Epstein writes back

3    to you, "I'm sure darren rich bella ana would."

4            Do you see that?

5        A.    Yes.

6        Q.    So he's identifying four employees of his

7    who he thought could give to the campaign, correct?

8        A.    Yes.

9        Q.    And you say, "Ok, should I ask them?"  And

10   he said, "Yes, individually."  Do you see that?

11       A.    Yes.

12       Q.    And did you go ask -- out and ask each of

13   them?

14       A.    I think more than likely I did, yes.

15       Q.    And when you did that, did you let them

16   know that, you know, Mr. Epstein wanted them to give?

17       A.    Yeah.

18       Q.    And that was, I take it -- you had to let

19   them know that so that they would do it.

20       A.    I didn't want them to think it was me.  It

21   is not something I am comfortable with, so it was

22   easier for me to say Mr. Epstein said.

23       Q.    Understood.  And were they all willing to

24   give once they heard that this is what Mr. Epstein

25   wanted?

```
 1        A.    Yeah.
 2        Q.    All right.  Do you remember also asking
 3   Mr. Epstein to give $13,000 to the Democratic Party
 4   for Ms. Plaskett's benefit?
 5        A.    Yes.  I think that was on behalf of Erika
 6   as well.
 7        Q.    Did he agree to do that?
 8        A.    I don't recall.
 9        Q.    All right.
10        A.    What year was that?
11        Q.    Do you recall in 2014 making that request?
12        A.    No, I don't.
13        Q.    All right.  How about --
14        A.    Oh, go ahead.
15        Q.    I'm sorry, I didn't mean to cut you off.
16        A.    That's fine.
17        Q.    What were you going to say?
18        A.    No, I just said I know that there was a
19   donation later than that that he made that was
20   rejected by the Democratic Party.
21        Q.    When -- okay.  I'm sorry.
22              THE WITNESS:  Did you hear what he said?
23              THE REPORTER:  Yes.
24        Q.    (By Mr. Neiman:)  Yeah.  Okay.  When did
25   you hear that?
```

1        A.    I think that was -- trying to think of the

2    years that she ran.  So she runs every two-years, so

3    it might have been 2018.

4        Q.    Okay.

5        A.    And --

6        Q.    What did you hear?

7        A.    I didn't know.  I didn't know anything

8    about the payment, but then I heard in the office, it

9    was sort of a hubbub and Richard called down and was

10   like they're returning his money and then I think it

11   became a story.

12            And Rich said he got yelled at by

13   Jeffrey about, you know, why this money was sent, and

14   Jeanne Brennan, who worked in the office, said, you

15   know, Cecile, the instructions were explicitly said

16   to send the money to, you know, to this, so why is

17   everybody upset at me?

18       Q.    Right.

19       A.    And I said, I don't know.  Sorry about

20   that, but, you know, they returned the money and that

21   was the end of it.

22            THE REPORTER:  They were --

23            THE WITNESS:  They returned the money

24       and that was the end of it.

25       Q.    (By Mr. Neiman:)  Did you have any

1    understanding as to why the Democratic party --

2         A.    Yeah, because --

3         Q.    I'm sorry, just let me finish the question.

4    Just so that she can do her job.  That's all.  I know

5    you anticipate what I'm asking you.

6              Did you have any understanding of what

7    the Democratic Party decided not to accept the

8    money from Mr. Epstein?

9         A.    Because he was a registered sex offender.

10        Q.    Did the fact that the Democratic Party

11   wouldn't take his money give you any concern about

12   whether you should continue?

13        A.    Yes, I was concerned that they were

14   concerned, yeah.

15        Q.    Did you do anything about it?

16        A.    No, I didn't do anything about it.

17        Q.    Do you remember Mr. Epstein donation

18   $75,000 to a Super PAC for Mr. Mapp?

19        A.    No -- yeah.

20        Q.    Yeah?

21        A.    I don't recall that.

22        Q.    Okay.  Let me show you a document which I

23   shall ask the reporter the mark as Exhibit 47.

24

25

1            (Deposition Exhibit No. 47 was

2               marked for identification.)

3        Q.    (By Mr. Neiman:)  All right.  You see there

4   an email from Mr. Epstein to you in September of 2016

5   asking the check be prepared for Mr. Mapp's Super PAC

6   for $75,000?

7        A.    Yeah.

8        Q.    You see that?

9        A.    Eh-hmm.

10       Q.    Do you remember what this Super PAC was?

11       A.    I don't -- because I don't -- I don't cut

12   checks.

13       Q.    Eh-hmm.

14       A.    I think he -- I see Rich is on here.  He's

15   got Governor Mapp on here.  So Rich would have been

16   the one to cut the check.

17       Q.    Got it.  And so you're not sure who it was?

18       A.    No, I wouldn't.  I, in all honesty, wanted

19   to know as little as possible about Mapp as possible.

20       Q.    Understood.

21            MR. TEAGUE:  Could we take a break in

22        about five minutes?  I need to take a restroom

23        break, too.

24            MR. NEIMAN:  Absolutely.

25            Ask the reporter to mark this three-page

1    Internal Revenue, they would deem it as like a hotel

2    because he had so many buildings.

3         Q.    Eh-hmm.

4         A.    Separate buildings, and we had to convince

5    them that it wasn't -- it wasn't a hotel.  And he --

6    and also he would bring in so many, like, tons of

7    furniture.  Just a lot of supplies.

8         Q.    Eh-hmm.

9         A.    And so through Customs and excise or

10   whatever.  And so they just kept saying, oh, this has

11   got to be a hotel, or a small boutique hotel.  So

12   we'd always have to -- you know, Darren or Erika

13   would have to write a letter saying this not a hotel,

14   it's a home.

15        Q.    Okay.  Was part of what was raising all

16   those questions the number of people who were coming

17   to the island?

18        A.    No.  It had more to do with the fact that

19   why are you bringing in all this -- all this stuff

20   that comes through Tropical and has to be cleared

21   through Customs, all his trees, all his -- all

22   construction supply -- materials.

23        Q.    Okay.  Do you remember there being times

24   when the government of the Virgin Islands itself

25   turned to Mr. Epstein as a potential source of cash?

1        A.     I vaguely remember him asking about

2    collateralization or something, but --

3        Q.     What do you remember about that?

4        A.     Just him asking if I could ask John about

5    how one goes about collateralizing a loan to the

6    government.

7        Q.     So the idea was that Mr. Epstein could loan

8    the government of the Virgin Islands cash in exchange

9    for the government posting properties as security?

10       A.     Yes.  That's the gist of it, yes.

11              Are we done with this?

12       Q.     Yeah.  All right.  So take a quick look at

13   this document, which we'll have the court reporter

14   mark as Exhibit 50.

15              (Deposition Exhibit No. 50 was

16               marked for identification.)

17       Q.     (By Mr. Neiman:)  So you'll see at the

18   bottom of the first page of Exhibit 50, there's an

19   email from Mr. Epstein to you that says the

20   government -- "The vi government is desperate for

21   cash."  Do you see that?

22       A.     Yes.

23       Q.     And then he asks, "Does John know of any

24   asset they might have that I can use as collateral.

25   Islands, etc."  Do you see that?

1     A.    Yes.

2     Q.    Where did Mr. Epstein get the idea that

3     Virgin Islands government was desperate for the cash?

4     A.    It wasn't from my husband because my

5     husband was not governor at the time.

6     Q.    Ah, this is after your husband left.  Do --

7     do you have any idea where he got the idea that the

8     government was desperate for cash?

9     A.    Well, do you want me to make an

10    assumption?

11    Q.    Tell me what you think?

12    A.    What I think is that he was probably

13    speaking to Governor Mapp, and Governor Mapp probably

14    said we only have X amount of money left in the

15    coffers to pay, you know, payroll, et cetera, and I

16    need -- we need cash. And --

17          MR. TEAGUE:  I just want to object to

18          the extent that this calls for speculation.

19          But you can continue to answer.

20    Q.    (By Mr. Neiman:) You can continue.

21    A.    And, you know, he turned to Mr. Epstein

22    and said, you're a finance guy, you know, could you

23    help me out?

24    Q.    The idea being maybe you, Mr. Epstein,

25    could loan me some money?

```
 1              MR. TEAGUE:  Same objection.

 2              THE WITNESS:  Sorry, I didn't mean to

 3         shake my head.  I am making that assumption,

 4         yes.

 5         Q.   (By Mr. Neiman:)  That's what you

 6    understood from this email exchange you had with

 7    Mr. Epstein?

 8         A.   Yes.  Well, I didn't think that he'd want

 9    to take property for $50 million just for nothing.

10              THE REPORTER:  He wouldn't --

11              THE WITNESS:  He wouldn't want to

12         take -- wouldn't want to take property as

13         collateralization just for nothing.  And he

14         starts out the email by saying the V.I.

15         government is desperate for cash.

16         Q.   (By Mr. Neiman:)  Right.  So as you

17    understood it from your communications with

18    Mr. Epstein, the problem was that the government was

19    desperate for cash, correct?

20         A.   Correct.

21              MS. BOGGS:  Objection.  Calls for

22         speculation.

23         Q.   (By Mr. Neiman:) And as you understood from

24    your discussions with Mr. Epstein, the potential

25    solution was for Mr. Epstein to provide some cash in
```

1    exchange for islands as collateral?

2         A.    Or land as collateral, yes.

3         Q.    Okay.  And being short of cash is kind of a

4    perpetual problem for the Virgin Islands government,

5    fair?

6              MS. BOGGS:  Objection, speculation.

7              MR. TEAGUE:  Same objection, form.

8              THE WITNESS:  It was until about three

9         or four years ago, yes.

10        Q.    (By Mr. Neiman:) What happened three or

11   four years ago?

12        A.    COVID.

13        Q.    Ah.  And that was good for the Virgin

14   Islands?

15        A.    Very good.

16             MR. TEAGUE:  Objection, form.

17             THE WITNESS:  Oh.

18             MR. TEAGUE:  You can answer.

19        Q.    (By Mr. Neiman:) You can answer.

20        A.    Yes.  Seemed very good, yes.

21        Q.    Okay.  Prior to COVID, for a long time the

22   Virgin Islands had been strapped for cash?

23        A.    Well, since the --

24             MS. BOGGS:  Objection.  Speculation.

25             THE WITNESS:  Since the financial crash