# EXHIBIT 223

1                UNITED STATES DISTRICT COURT FOR THE
                    SOUTHERN DISTRICT OF NEW YORK
2
                        CASE NO. 22-cv-10904
3

4    GOVERNMENT OF THE UNITED
     STATES VIRGIN ISLANDS,
5
             Plaintiff,
6
     v.
7
     JP MORGAN CHASE BANK, N.A.,
8
             Defendant.
9    _____/

10

11                      *CONFIDENTIAL*

12                  VIDEO DEPOSITION OF

13              FORMER GOV. KENNETH E. MAPP

14

15               Wednesday, May 24, 2023

16               9:48 a.m. - 5:03 p.m.

17

18                     Conducted at
                       Losey, PLLC
19                  1420 Edgewater Drive
                   Orlando, Florida 32804
20

21

22   Reported by:

23   Janet Hamilton, RPR, CRC, FPR
     Job No.:  J9718146
24
     AUSTIN REDCAY, Videographer
25   LOUWHAN WELCH, Exhibit Technician (via Zoom)



```
 1   BY MS. ELLSWORTH:
 2        Q.   Gov. Mapp, we were, just before we broke,
 3   talking about the lunch that you had on Mr. Epstein's
 4   island.  And, again, that was at some point between
 5   2015 and 2019.  Correct?
 6        A.   Yeah.  Yes.  It may -- maybe sometime in
 7   2016.
 8        Q.   What was the purpose of that lunch?
 9        A.   Well, he -- I believe at that time we were
10   attempting to do, float municipal bonds.  And he had
11   been trying to assist me.  I actually asked for his
12   help; as an investment person and a person that I
13   believed to, you know, be very connected to the
14   market.
15        We were having tremendous difficulty with
16   the issuance of the bonds.  Because at that time on
17   the national stage Congress was really involved in the
18   debt crisis in Puerto Rico.  So there was a bill that
19   was constructed, generally known as PROMESA, which
20   stands for some long label of words.  But it was
21   dealing with what would happen, how it would sort of
22   protect the bondholders, the persons holding notes in
23   Puerto Rico, and how Puerto Rico would have to manage
24   what was expected to be a default on its debt.
25        MR. DUNN:  Excuse me.  Sorry to interrupt,
```



```
 1        but the witness is muted.  We can't hear
 2        anything on the Zoom.
 3             VIDEOGRAPHER:  I apologize.  I must have
 4        muted that.
 5             MS. ELLSWORTH:  Sorry.
 6             Sorry, Jonathan.  You're unmuted now.
 7        A.   And while the PROMESA conversations were
 8   taking place between the House and the US Senate, it
 9   was driving a lot of consternation in the market about
10   the debt of the territories.  And so we were trying to
11   keep territories out of the PROMESA language and keep
12   the PROMESA discussion and language specifically
13   directed to Puerto Rico and Puerto Rico's financial
14   issues.
15             And there was literally a collaboration
16   that all of the territories should be -- PROMESA
17   shouldn't be Puerto Rico specific.  It should be all
18   of the territories.
19             And so the territories, we were concerned
20   about that.  But more specifically I was concerned.
21   Because I'm now going into the market trying to get, I
22   believe, $200-something-million for varying financial
23   needs.  And so we were dealing with that and trying to
24   see how we would structure this bond deal.  And one of
25   the options that were on the table was that, if a
```



 1   natural issuance of bonds were going to run into --
 2   was going to be hampered by the PROMESA debate and
 3   activity, what opportunities would we have for what is
 4   known as a private placement of the bonds?  Because at
 5   the end of the day, the amount was $200-something-
 6   million.  And, again, the interest earnings on
 7   Virgin Islands debt is about 90% tax exempt, if not
 8   all exempt.  We didn't believe we had a problem
 9   establishing our ability to pay the debt.  Because
10   we've never had any issue in paying Virgin Islands
11   debt, given the structure that we use.
12            And so I think in that collaboration, I
13   asked for Jeffrey Epstein -- I was seeking
14   Jeffrey Epstein's advice.  I was seeking
15   Warren Mosler's advice, another EDC entity who does
16   investment banking.  And I believe Dave Johnson from
17   capital markets.  Who also do financial management.  I
18   was seeking their input and advice in terms of how to
19   get -- how to be successful in issuing what was some
20   really critically-needed bonds for financing some
21   critical financing needs of the territory.
22        Q.    (By Ms. Ellsworth) And at the lunch meeting
23   that you had with Mr. Epstein, was the subject of
24   discussion focused on this bond issuance issue?
25        A.    It was focused on that.  But Mr. Epstein



```
 1          A.    What --
 2          Q.    What interactions did you have with
 3   Ms. Kellahar when she was acting on behalf of
 4   Mr. Epstein or his entities while you were governor,
 5   from 2015 to 2019?
 6          A.    She was involved in the meeting and
 7   conversations having to do with the DPNR issues.
 8          Q.    Anything other than the DPNR issues that
 9   you recall discussing with Ms. Kellahar when she was
10   acting on behalf of Mr. Epstein or his entities?
11          A.    Not that I recall.
12          Q.    And what about William Blum?  Who is
13   William Blum?
14          A.    Well, I know William Blum well.
15   William Blum was the chief counselor to, counsel to
16   Gov. Juan Luis.  When he served, I -- I served as
17   Gov. Juan Luis' security as a young guy and ended up
18   serving in his cabinet by the end of his term.  So
19   Bill Blum was Gov. Luis' chief counsel.
20          Now the issue -- well, how I came to know
21   Bill Blum.
22          The EDC program in the Virgin Islands has a
23   unique twist.  And that unique twist is that the
24   revenue benefits that -- the revenues that receive the
25   tax exempt benefits in the Virgin Islands by the major
```



```
 1  companies, the varying companies, are subject to being
 2  domesticated or remaining sort of in the
 3  Virgin Islands.  So that if you -- if an entity has an
 4  operation going in the Virgin Islands and is based and
 5  has, as I say, a parent entity on the US mainland, and
 6  there's a level of revenues that receive a tax break,
 7  if I'm describing this accurately.  And I'm subject to
 8  being corrected.  If you repatriate those dollars for
 9  which you receive the tax benefits on, then they're
10  subject to additional taxation once the dollars hit
11  the US mainland.
12          I don't want to say sort of like if you're
13  a US entity operating in a foreign jurisdiction and
14  you get whatever tax structure you have in that
15  jurisdiction, those dollars may not be sort of subject
16  to US taxations, depending on how you do your income
17  tax.  But if you seek to repatriate the dollars back
18  home to the US, then they become subject to some level
19  of tax obligation.
20          And so under the EDC program of the
21  Virgin Islands, when you receive your tax exemption
22  and you remember now in order to get the benefit you
23  have to sort of -- the entity has to be a resident,
24  and generally the owner of the entity is a resident in
25  the Virgin Islands.  If you repatriate the money, then
```



```
1    you sort of lose the tax benefit.  And then you owe

2    the obligation to the IRS on the repatriation.

3            We wanted to find an avenue to make the

4    Virgin Islands EDC program more lucrative and to drive

5    in more companies and more owners of companies to take

6    residence in the territory.  And I already in our

7    earlier conversation described what those benefits

8    were to the Virgin Islands.

9            We wanted to see if we could fashion

10   language which would have to ultimately be sanctioned

11   by the US Congress.  Because the Virgin Islands

12   government has no jurisdiction outside the

13   Virgin Islands.  We wanted to try to fashion language

14   that would allow repatriation either at some level, or

15   repatriation after the dollars remained in the

16   Virgin Islands for a specific period of time.  So

17   that the -- we knew that Congress would not -- it

18   wouldn't be representative of any state's interest to

19   allow immediate repatriation of the dollars.  Because

20   then why would you pay state taxes if you could just,

21   you know, operate in the Virgin Islands and then just

22   next year send the money to your corporate entity in

23   whatever state you were in?

24           So we were really trying to find a nexus, a

25   link that we could resist the political opposition.
```



```
 1   And it could be seen as favorable to the expansion of
 2   the Virgin Islands' economy, and make the program more
 3   attractive if the repatriation of the dollars after it
 4   had a certain life in the Virgin Islands could occur.
 5   And if it could occur with some level of percentage
 6   being repatriated after some specific time.
 7            And I know part of our discussions, the
 8   conversation between Jeffrey Epstein and myself, I
 9   would -- you know.  I asked.  How would that -- how
10   could that benefit, say, his particular business?  And
11   I believe I asked Mr. Johnson, capital markets, the
12   same question.
13            And so I believe -- Epstein, I guess, knew
14   Will Blum.  Because I was surprised when he mentioned
15   his name.  Because I knew who Will Blum was.  And he,
16   I guess on his own, got in touch with Mr. Blum.  And
17   then -- Bill knew who I was and called.  And so he was
18   helping us on seeing what kind of construct of
19   language could be put together that could begin the
20   process of that discussion and hopefully try to make
21   that happen.
22        Q.   And did Mr. Blum provide some draft
23   language or a draft piece of legislation to you?
24        A.   He may have.  He may have.
25        Q.   And was it your understanding, when
```



```
 1   Mr. Blum provided a draft piece of legislation to you
 2   related to this repatriation that he was being paid by
 3   Mr. Epstein in connection with that work?
 4          A.   Well, he would have, had to be.  Because
 5   Mr. Epstein brought him to the table.
 6               I had my own counsel in Washington that --
 7   whatever legislations or drafts or whatever anybody
 8   presented to me would ultimately end up in my local
 9   counsel, my chief counsel in Government House.  But we
10   would generally send those things off to our counsels
11   in DC.  Because -- you know.  Obviously, they were
12   hired and always did our political advocacy.  And then
13   the draft of languages with varying staff at the
14   Congress in terms of what we thought we could get
15   through and what absolutely wasn't going to get
16   through.
17               So, you know, Bill would -- obviously was
18   put in contact with them.  And, you know, this is not
19   pejorative at all:  Lawyers will do what lawyers will
20   do.
21          Q.   Did you have a conversation with Mr. Blum
22   and Mr. Epstein about this repatriation legislation?
23          A.   Questions.  Yes.  Obviously.
24          Q.   And what do you recall about that
25   conversation?
```



```
 1        A.    Yes.
 2        Q.    Do you know what "Seb" refers to in this
 3   email?
 4              MR. ACKERMAN:  Object to form.
 5        A.    Sebastiano Paiewonsky Cassinelli?
 6        Q.    (By Ms. Ellsworth) I'm asking you if you
 7   have --
 8        A.    That's all I can think it is.
 9        Q.    Okay.  Do you recall ever discussing with
10   Ms. de Jongh your campaign either attacking or not
11   attacking former Gov. de Jongh?
12        A.    No.
13        Q.    And do you recall with Mr. Epstein your
14   campaign either attacking or not attacking
15   Gov. de Jongh?
16        A.    No.
17              MR. ACKERMAN:  Object to form.
18              MS. ELLSWORTH:  Tab 14, please.  Thank you.
19              I've marked as Exhibit 5 a document
20         Bates-labeled ESTATE_JPM015733.
21              (Exhibit 5 marked for identification.)
22              MS. ELLSWORTH:  Take a look and let me know
23         when you've had a chance to do so.
24              THE WITNESS:  Okay.
25        Q.    (By Ms. Ellsworth) This is an email from --
```



```
 1   at the top at least -- from Ms. de Jongh to
 2   Mr. Epstein dated December 18, 2014?
 3         A.    Uh-hum.
 4         Q.    And it is entitled "Inaugural Committee."
 5               You testified earlier that you believed
 6   Mr. Epstein had testified to your inaugural committee.
 7   Correct?
 8               MR. ACKERMAN:  Object to form.
 9         A.    That he had --
10         Q.    (By Ms. Ellsworth) -- contributed to your
11   inaugural committee?
12         A.    Yes.
13         Q.    Does this refresh your recollection as to
14   the amount that Mr. Epstein donated?
15               MR. ACKERMAN:  Object to form.
16         A.    This is the first time I am seeing an
17   amount.
18         Q.    (By Ms. Ellsworth) And my question is:
19   Does this refresh your recollection that
20   Jeffrey Epstein donated $10,000 to your Inaugural
21   Committee?
22               MR. ACKERMAN:  Objection.
23         A.    I had no knowledge of how much he donated,
24   but I believed he did donate to the Inaugural
25   Committee.
```



1        Q.   (By Ms. Ellsworth) Okay.  Do you have any
2   reason to doubt that he donated $10,000?
3        A.   I have none.
4        Q.   The bottom of this email chain begins with
5   an email from Sebastiano Paiewonsky Cassinelli.
6   Correct?
7        A.   That's what it says.
8        Q.   Is that different than Filippo Cassinelli?
9        A.   That would be his brother.
10       Q.   Okay.  And did Sebastiano Cassinelli work
11  for your campaign?
12       A.   He supported the campaign.
13       Q.   Okay.  Was he involved in planning your
14  inaugural event?
15       A.   No.  I don't know -- other than the folks
16  that I have designated as the head of the inaugural
17  committee, I don't know who all was involved.  But I
18  know many businesses and folks got involved in the
19  inaugural event.
20       Q.   Do you recall who was the -- who were the
21  designated heads of your inaugural committee?
22       A.   Former First Lady Barbara Schneider and
23  Former First Lady Luz Luis.
24       Q.   Do you recall -- did you throw an inaugural
25  event?



1        A.    No.

2        Q.    The beginning of this email -- I'm sorry --

3    in that second paragraph, beginning with "Mapp would

4    like."

5        A.    Yes.

6        Q.    Ms. de Jongh references previous

7    discussions she has had with you with regards to

8    eCommerce?

9        A.    Uh-hum.

10       Q.    When do you recall first discussing

11   eCommerce issues with Mr. Epstein?

12       A.    It may have come up when I met with him as

13   part of my spiel in terms of what are some of the

14   priorities if I am successful at becoming Governor.

15   Because I -- that was one of the big issues for me.

16       Q.    Do you have any more specific recollection

17   about discussing eCommerce issues with Mr. Epstein?

18            MR. ACKERMAN:  Object to form.

19       A.    As I said, during the course of some of my

20   meetings.  Any ability he had from clientele and folks

21   in particularly in the investment market.  The money

22   market area.  The money industry.  That it became a

23   selling point for financial managers in the

24   Virgin Islands.  Because here we had a redundant

25   platform that was tied in by fiber-optic and undersea

1  cables directly into Florida and into New York.  That

2  could benefit such a business.

3          So to the extent of making that well-known

4  and looking for recommendations and spreading the word

5  that the Virgin Islands had this unique attribute that

6  it was pushing for business investment, that would be

7  the extent of the conversations.

8      Q.   (By Ms. Ellsworth) Is it fair to say that

9  one of your campaign platforms when you ran for

10  governor was to increase business investment in the

11  Virgin Islands?

12      A.   Significantly.

13      Q.   And one of your key platforms as governor

14  was to increase business investment in the

15  Virgin Islands?

16      A.   Yes.

17      Q.   And you did discuss those platforms with

18  Mr. Epstein as a business owner on the Virgin Islands.

19  Correct?

20      A.   Yes.

21      Q.   Did you discuss Mr. Epstein's advice about

22  increasing government -- excuse me -- business

23  investment in the US Virgin Islands?

24      A.   Mr. Epstein.  Members of the Chamber of

25  Commerce.  Other members of the EDC Community.  Local



```
 1    businesses.  Members of Congress.  Members of the
 2    Senate.
 3            Any advice, any way that folks felt the
 4    Virgin Islands lacked in its approach to its messages
 5    about the Virgin Islands being open for business and
 6    how to help facilitate business investment.  And even,
 7    you know, a number of folks had a lot of
 8    recommendations about some of the failures within the
 9    Virgin Islands's public system in terms of
10    facilitating business growth and development in terms
11    of how we handle registering businesses, licensing
12    businesses.  Just the time involved and the
13    bureaucratic -- the bureaucracy, and how it impacted
14    and delayed and frustrated people.
15            You know.  I was just open to all of that.
16       Q.   And so the answer is yes, you did seek
17    Mr. Epstein's advice about how to increase business
18    investment in the Virgin Islands?
19       A.   Yes.  Yes.
20            MR. ACKERMAN:  Object to form.
21       Q.   (By Ms. Ellsworth) What advice do you
22    recall receiving from Mr. Epstein about how to
23    increase business investment in the Virgin Islands?
24       A.   Some of the bureaucracy issues.  Some of
25    the limitations that EDC businesses faced.  And I
```



1   think we exhausted quite a bit of time talking about

2   the repatriation issues.  Certainly the limitation on

3   travel, as it affected everyone in the Virgin Islands.

4   But particularly members of the EDC community across

5   the board.  A number of EDC companies raised that

6   issue with me, with the regulation of Treasury.

7   Things of that nature.

8        Q.   After you became Governor -- well,

9   withdrawn.

10           You had a separate campaign fund as a part

11  of your campaign in 2014.  Correct?

12       A.   Well, when you say "separate campaign

13  fund" --

14       Q.   Let me start the question again.

15           You had a campaign fund as a part of your

16  2014 campaign?

17       A.   Yes.  Yes.

18       Q.   Okay.  Did you use that same fund in the

19  2018 campaign?

20       A.   I believe we did.  Yes.

21       Q.   Okay.  Did you also have a political action

22  committee or PAC that was associated with your

23  campaign?

24       A.   Well, there were -- there were PACs out

25  there of people who were supporting the campaign and

