# EXHIBIT 224

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3    GOVERNMENT OF THE
     VIRGIN ISLANDS,
4
                     Plaintiff,
5
     v.                            No. 22-cv-10904-JSR
6
     JP MORGAN CHASE BANK, N.A.,
7
                     Defendant.
8    _____
     JPMORGAN CHASE BANK, N.A.,
9

10             Third-Party Plaintiff,

11   v.

12   JAMES EDWARD STALEY,
     Third-Party Defendant.
13   _____

14

15          THE ORAL DEPOSITION OF JOHN P. DE JONGH, JR.

16   was taken on the 30th day of May, 2023 at the Law

17   Offices of JOEL HOLT, 2132 Company Street,

18   Christiansted, St. Croix U.S. Virgin Islands, between

19   the hours of 9:02 a.m. and 4:46 p.m. pursuant to Notice

20   and Federal Rules of Civil Procedure.

21                    _____
                         Reported by:
22
                        DESIREE D. HILL
23                   Registered Merit Reporter
                     Hill's Reporting Services
24                       P.O. Box 307501
                     St. Thomas, Virgin Islands
25                       (340) 777-6466

1        A.    Not that I recall, no.

2        Q.    You don't recall a single phone

3   conversation with Jeffrey Epstein ever?

4        A.    No.

5        Q.    What about emails?

6        A.    No.

7        Q.    You don't recall a single email with

8   Epstein, ever?

9        A.    From Epstein to me?

10       Q.    Any kind of email contact.

11       A.    Just the one that I mentioned to you.

12       Q.    What year was that?

13       A.    That would have been late '15 or '16 --

14   early '16.

15       Q.    And what was the substance of that email

16   communication?

17       A.    Nothing of substance.  Just thank you.

18       Q.    Thank you for what?

19       A.    He had made an offer to Cecile to lend us

20   some money after the arrest that took place in order

21   to settle with the government.

22       Q.    And that's the only email communication

23   that you've ever had with Epstein?

24       A.    That I recall, yes.

25       Q.    How long did the First Lady work for

1   Jeffrey Epstein?

2        A.    I think she started in about 2000 and up

3   until she left like '18 or '19.

4        Q.    So approximately 18 or 19 years?

5        A.    Yeah -- yes.

6        Q.    And which specific entities of his did she

7   work for?

8        A.    Financial Trust Company and Southern Trust

9   Company.

10        Q.    In what capacity did she work for him?

11        A.    Office manager.

12        Q.    What did she do in that role?

13             MR. TEAGUE:  Objection, form.  You

14        can answer if you know.

15             THE WITNESS:  I don't know the

16        full scale, but just, you know, she

17        would tell me at times that she was

18        working on payroll, sending out letters

19        to government agencies, things -- that's

20        it.  But I don't know the full range of

21        her responsibilities.

22        Q.    (By Mr. O'Laughlin:) Other than the

23   in-person meetings that we discussed, the email

24   communications, the phone calls, have you had any

25   other means of contact with Jeffrey Epstein?

1          objection.

2                 MR. TEAGUE:  It is, because it's a

3          mischaracterization of his testimony on

4          the record.  Under that objection, you

5          can answer.

6                 THE WITNESS:  Was I aware of --

7          Q.    (By Mr. O'Laughlin:) Payments made by

8   Epstein separate and apart from campaign

9   contributions.

10         A.    What do you mean --

11                MR. TEAGUE:  Same objection.

12                THE WITNESS:  What do you mean by

13         "payments"?

14         Q.    (By Mr. O'Laughlin:) What do you understand

15   the word "payments" to mean?

16         A.    It can encompass everything.  I think I've

17   mentioned to you that he loaned us 200,000.  Is that

18   what you mean by payment?

19         Q.    What is your understanding of the word

20   "payments"?

21                MR. TEAGUE:  Same objection,

22         Counsel.  You had asked him at the

23         beginning of this if he didn't

24         understand the question to let you know.

25

```
 1              2023, we're on the record.
 2                   MR. O'LAUGHLIN:  Turn to tab 2 as
 3              the next exhibit.
 4                   (Deposition Exhibit No. 5 was
 5                    marked for identification.)
 6              Q.   (By Mr. O'Laughlin:)  So this is a January
 7    24th, 2014 email from ceciledejongh@yahoo.com, and it
 8    says, "Hi, Jeffrey, I have been fundraising for John's
 9    final State of the Territory reception on Monday
10    night.  I have raised $15K of the total $30K budget.
11    Would you be willing to match that?  John and I will
12    cover the balance."
13                   Did I read that correctly?
14              A.   You did.
15              Q.   What is a State of the Territory reception?
16              A.   Annually, the governor is required to give
17    a state of the territory speech for the previous
18    year.  Usually after the State of the Territory,
19    there is a reception that's held by the governor and
20    the staff.
21              Q.   And that reception is funded not by
22    government funds?
23              A.   It was not funded by government funds
24    under our administration.  I can't tell you what
25    others have done.
```

1      Q.    And you solicited $15,000 from Epstein to

2    fund it?

3            MR. TEAGUE:  Objection, form.  You

4      can answer.

5            THE WITNESS:  Cecile solicited

6      15,000.

7      Q.    (By Mr. O'Laughlin:)  Did she do this at

8    your direction?

9      A.    No.  As I mentioned to you earlier, what I

10   would usually do is sign letters asking for

11   contributions for various affairs.  I probably signed

12   a letter to him, but I didn't specifically ask her to

13   go to Mr. Epstein.

14     Q.    But you would have signed the letter to

15   Epstein requesting the funds?

16     A.    Yes.

17           MR. TEAGUE:  Objection, form.

18           THE WITNESS:  Possibly.  Like I

19     said, I'm not sure who the letters were

20     sent to, but it wouldn't surprise me if

21     he wasn't one of them.

22     Q.    (By Mr. O'Laughlin:)  If you look at the

23   top email in this thread, Ms. de Jongh asks, "Do you

24   want this to go through your personal account or STC?"

25   Do you see that?

1          A.    I do.

2          Q.    Are you aware that money was routed from

3     both Epstein and STC.

4               MS. BOGGS:  Objection, form.

5          Mischaracterizes testimony.

6               MR. TEAGUE:  Same objection.  You

7          can answer if you know.

8               THE WITNESS:  No.

9          Q.    (By Mr. O'Laughlin:)  Do you know why the

10    First Lady was asking Epstein which way to route the

11    money?

12               MR. TEAGUE:  Objection, calls for

13          speculation.  You can answer.

14               MS. BOGGS:  Same.

15               THE WITNESS:  No.

16         Q.    (By Mr. O'Laughlin:)  Are you aware of any

17    payments from Epstein that were routed through STC?

18         A.    No.

19         Q.    Are you aware of any payments from Epstein

20    that were routed through any of his business entities?

21         A.    No.

22               MR. O'LAUGHLIN:  Turn to tab 4 as

23          the next exhibit.

24

25

1     But definitely not this list because highlighted is

2     Kenneth Mapp.  So no.  I can't believe she supported

3     him either.

4         Q.    She says, quote, "I highlighted in yellow

5     those persons whom we supported."

6         A.    I'm hoping in this "we " she meant that

7     the company supported -- Epstein supported.

8         Q.    You don't think that it refers to her?

9         A.    I find it --

10            MS. BOGGS:  Objection.  Asked and

11        answered.

12            MR. TEAGUE:  Objection.

13        Speculation as well.

14            THE WITNESS:  I find it hard that

15        she supported Kenneth Mapp, that's all.

16        Q.    (By Mr. O'Laughlin:)  Do you have any

17    reason other than that to know who she meant by "we"?

18        A.    No.

19            MR. O'LAUGHLIN:  Turn to tab 10 as

20        the next exhibit.

21            (Deposition Exhibit No. 11 was

22             marked for identification.)

23        Q.    (By Mr. O'Laughlin:)  This is a

24    December 24th, 2018 email from the First Lady to

25    Epstein.  She writes, "Happy holidays, Jeffrey.  John

```
 1    wanted to know whether you would support Carlton

 2    Dowe's bid to go back to VIPA?"

 3                Who is Carlton Dowe?

 4         A.   Carlton Dowe is a senator during my terms

 5    in office, even before I was governor, and he was a

 6    good supporter, not of just my campaigns but also a

 7    good supporter of my initiatives in government.

 8         Q.   What do you mean good supporter?

 9         A.   He supported some of the legislation that

10    I wanted to put through, and he didn't support some.

11    He is someone that I could talk to.

12         Q.   What would you talk to him about?

13         A.   Whatever legislation or initiative I may

14    have in process.

15         Q.   The statement, "John wanted to know," is

16    that a reference to you?

17                MR. TEAGUE:  Objection.  Calls for

18           speculation.  You could answer.

19                THE WITNESS:  I'm going to assume

20           it's me, yes.

21         Q.   (By Mr. O'Laughlin:) Why did you want to

22    know whether Epstein would support Carlton Dowe's bid

23    to go back to VIPA?

24                MR. TEAGUE:  Objection,

25           foundation.  You could answer.
```

```
1              THE WITNESS:  I just wanted to

2        gain as such support as I could for his

3        efforts to go back to VIPA, to the

4        Virgin Islands Port Authority.

5        Q.    (By Mr. O'Laughlin:) Why?

6        A.    Because I thought he would be very good at

7    the job.  In 2012, when he left as a senator, I

8    appointed him to be executive director of the Virgin

9    Islands Port Authority, with the support of the

10   board, and I thought he did a good job, and I thought

11   he could do a good job again.

12       Q.    And why did you want to know specifically

13   whether Epstein would support the bid or not?

14             MR. TEAGUE:  Objection,

15       foundation.  You can answer.

16             THE WITNESS:  Nothing was specific

17       to Epstein.  I was trying -- I was

18       talking to a number of people and

19       inquiring as to whether they would

20       support Carlton's bid to go back to the

21       Port Authority.

22             So Cecile saying that to him was nothing

23       unusual.

24       Q.    (By Mr. O'Laughlin:)  What does VIPA do?

25       A.    The Virgin Islands Port Authority oversees
```

1    all the airports and the seaports in the Virgin

2    Islands.

3         Q.    So they would have been overseeing the

4    comings and goings of people entering and exiting the

5    island?

6              MS. BOGGS:  Objection, form.

7              MR. TEAGUE:  Same objection.

8              THE WITNESS:  No.  I think that's

9         more the federal government.  They're in

10        charge of the facilities, the hard

11        assets.

12        Q.    (By Mr. O'Laughlin:)  Like security?

13        A.    Within the airport, yes.

14        Q.    So VIPA oversees security within the USVI

15   airport?

16        A.    Within the airport.

17        Q.    And is there any sort of Customs check

18   within the airport?

19        A.    When you're going through, yes.

20        Q.    Is that overseen by VIPA?

21        A.    That's overseen by the federal government.

22        Q.    And would security officers employed by --

23   were they employed by VIPA directly?

24              MS. BOGGS:  Objection, form.

25              MR. TEAGUE:  Same objection.

```
 1                    THE WITNESS:  That I can't answer.
 2           Q.    (By Mr. O'Laughlin:) But they oversaw them?
 3           A.    Yes.
 4                    MS. BOGGS:  Objection, form.
 5                    MR. TEAGUE:  Objection, form.
 6           Q.    (By Mr. O'Laughlin:)  Are you aware of
 7      allegations that Epstein was bringing women in and out
 8      through the USVI airport?
 9                    MS. BOGGS:  Objection, form.
10                    THE WITNESS:  Are we talking in
11           2014 during my term or are we talking
12           2018 and '19?
13           Q.    (By Mr. O'Laughlin:)  Let's answer both.
14      What about in 2014?
15           A.    No.
16           Q.    What about in 2018?
17           A.    Yes.
18           Q.    So in 2018, you were aware of allegations
19      that Epstein was bringing women in and out through the
20      V.I. airport?
21                    MS. BOGGS:  Objection, form.
22                    MR. TEAGUE:  Same objection.
23                    THE WITNESS:  When you say
24           "airport," I am presuming you mean the
25           building.  Mr. Epstein had a private
```

1    whether it was salary or bonus.  I wouldn't do that.

2    I just can't recall that detail.

3        Q.   Were there any benefits in addition to

4    salary that the First Lady received from Epstein?

5        A.   Similar to other employees in the office,

6    we had educational benefits for our children.  I

7    think in the beginning at least, I think it

8    continued -- I think it was 32 hours of work instead

9    of 40.  So I think those were the other two benefits.

10       Q.   What do you mean by educational benefits?

11       A.   Part of the package that she received was

12   to have our tuition paid for our children if they

13   went to a private school, which was similar to what

14   was negotiated for the other employees in the office.

15       Q.   Did that apply to a primary school tuition?

16       A.   If they went to a private school.

17       Q.   Did it apply to high school tuition?

18       A.   Yes.

19       Q.   Did it apply to college tuition?

20       A.   Yes.

21       Q.   How much?

22       A.   I don't know the dollar amount.

23            MR. O'LAUGHLIN:  Let's enter tabs

24   12 and 11 as the next exhibit.

25

1              (Deposition Exhibit No. 13 was

2              marked for identification.)

3         Q.    (By Mr. O'Laughlin:) This is a

4    January 10th, 2000 email from Epstein to First Lady

5    and Richard Kahn, and it has a summary of attachments

6    that sets out amounts of payment.  It has an entry for

7    "Michelle at Wake Forest, $19,551; Rene, Skidmore

8    College, $20,210; Thomas, Elon University, $12,744;

9    and JP, American University, $17,561."

10             Did I read notes correctly?

11        A.    Yes.

12        Q.    Is JP a reference to your son?

13             MS. BOGGS:  Objection.  Calls for

14        speculation.  Lack of foundation.

15             MR. TEAGUE:  Same objection.  You

16        can answer.

17             THE WITNESS:  I believe so, yes.

18        Q.    (By Mr. O'Laughlin:)  Is Renee a reference

19    to your daughter?

20             MS. BOGGS:  Same objections.

21             MR. TEAGUE:  Same objections.  She

22        can answer.

23             THE WITNESS:  Yes.

24        Q.    (By Mr. O'Laughlin:)  Is Thomas a reference

25    to Jean Brennan's son?

```
 1              MS. BOGGS:  Same objections?

 2              MR. TEAGUE:  Join.

 3              THE WITNESS:  I'm going to presume

 4         so, yes.

 5         Q.    (By Mr. O'Laughlin:)  Is Michelle a

 6    reference to Jean Brennan's daughter?

 7              MS. BOGGS:  Same objections.

 8              MR. TEAGUE:  Join that objection.

 9              THE WITNESS:  I presume, yes.

10         Q.    (By Mr. O'Laughlin:)  So this is a summary

11    of tuition payments that were being made by Epstein to

12    pay for the tuition of those four children.

13              MS. BOGGS:  Same objections.

14              MR. TEAGUE:  Objection.  Calls for

15         speculation.  You can answer.

16              THE WITNESS:  I presume so, yes.

17         Q.    (By Mr. O'Laughlin:) And Jean Brennan was

18    the -- what was her position with your campaign?

19         A.    Accountant.

20         Q.    So this is for 2009.  So if you sum

21    together the amount for JP and Renee, you received

22    $37,771 in the form of tuition payments from Epstein?

23              MR. TEAGUE:  Same objection.

24              MS. BOGGS:  Objection.  Calls for

25         speculation, form, lack of foundation.
```

 1              THE WITNESS:  I can't answer that.

 2       I haven't done the math.  I haven't.

 3       Q.    (By Mr. O'Laughlin:)  But if you add the

 4  17,561 here with the 20,210.

 5       A.    Yes.

 6              MS. BOGGS:  Same objection.

 7              MR. O'LAUGHLIN:  Okay.  Let's

 8       enter tab 18 as the next exhibit.

 9              MS. BOGGS:  Will this be Exhibit

10       14?

11              (Deposition Exhibit No. 14 was

12                marked for identification.)

13       Q.    (By Mr. O'Laughlin:)  So this is an email

14  thread between the First Lady and Epstein on

15  September 21, 2010.  She writes, "I have not received

16  an answer or indication from you on this subject, so I

17  have to assume that it is no.  If that is the case, I

18  will need to negotiate a raise so that I can afford to

19  pay for my children's tuition at college.  John and I

20  have put money into the campaign based on what we

21  thought was going to happen with the tuition

22  payments."  Did I read that correctly?

23              MR. TEAGUE:  You were reading from

24       the second page.  He was on the first.

25              THE WITNESS:  I didn't see -- I

1      didn't know you did the back and front.

2           Yes.

3      Q.    (By Mr. O'Laughlin:)  How much money did

4   you put into your campaign based on expectations that

5   Epstein would pay for your children's tuition?

6           MR. TEAGUE:  Objection,

7      foundation.  You can answer.

8           THE WITNESS:  I don't recall off

9      the top of my head, but it was quite a

10     bit.

11     Q.    (By Mr. O'Laughlin:)  Was it equal to the

12  amount of the tuition payments that you were getting?

13          MS. BOGGS:  Objection, form.

14          MR. TEAGUE:  Same objection.

15          THE WITNESS:  It was substantial.

16     Q.    (By Mr. O'Laughlin:)  What you mean by

17  quite a bit?

18     A.    We paid for various items during the

19  campaign, t-shirts, some literature, things like

20  that.

21     Q.    Can you estimate?

22     A.    T-shirts alone, for example, could be

23  $7,000; literature could come in anywhere around, you

24  know, 10 to 6,000.

25     Q.    Was the First Lady taking tuition payments

1          substance, no.

2          Q.    (By Mr. O'Laughlin:)  And she continued

3     accepting the tuition payments?

4              MS. BOGGS:  Objection.  Calls for

5          speculation, form.

6              MR. TEAGUE:  Objection.

7          Foundation as well.

8              THE WITNESS:  Make sure I

9          understand.  Did she get a salary

10         increase and receive tuition payments?

11         Q.    (By Mr. O'Laughlin:)  No, I'm just asking,

12    did she continue to receive tuition payments after

13    these 2010 emails.

14             MS. BOGGS:  Same objections.

15             THE WITNESS:  That I can't -- I

16         don't recall.

17         Q.    (By Mr. O'Laughlin:)  Weren't you involved

18    in the finances around paying for your children's

19    tuition?

20         A.    I was.  But I'm not sure what the numbers

21    were.

22         Q.    But you know whether you were paying the

23    tuition bill or Epstein was the paying tuition bill,

24    correct?

25             MS. BOGGS:  Objection.  Objection,

```
 1          argumentative.
 2               THE WITNESS:  I still pay tuition
 3          fees and various things for my kids when
 4          they were in college.  So I'm not sure
 5          how it worked out.
 6          Q.    (By Mr. O'Laughlin:)  Were the fees you
 7     were paying room and board?
 8          A.    Some was for room, particularly, with J.P.
 9          Q.    So who was paying the tuition, you or
10     Epstein?
11          A.    I would think Epstein was, yes.
12          Q.    Was that all the way through his school?
13          A.    That I don't recall.  There was a point
14     where, I think, we started paying, I believe.
15          Q.    Why did you start paying?
16          A.    I think Cecile may have renegotiated her
17     salary or it increased and she didn't want to pass it
18     on.
19          Q.    Do you know when that change would have
20     happened?
21          A.    No, that I don't recall.
22          Q.    So that's for John.  What about for Renee?
23          A.    No.  It was for John, JP.
24               MR. O'LAUGHLIN:  Look under tab
25          14.
```

```
 1              (Deposition Exhibit No. 15 was

 2                marked for identification.)

 3         Q.    (By Mr. O'Laughlin:) This is a

 4    December 2010 email to Epstein from the First Lady

 5    attaching tuition bills for the spring semester of

 6    American University and Skidmore College, and putting

 7    the amounts for each of those tuition bills at 18,090

 8    and 20,175.

 9              So in 2010, you and the First Lady

10    received approximately 38,000 from Epstein in the

11    form of tuition payments, correct?

12              MS. BOGGS:  Objection, calls for

13         speculation, lack of foundation, form.

14              MR. TEAGUE:  Same objections.  You

15         can answer.

16              THE WITNESS:  Yes, based on the

17         numbers on the Exhibit 13 I'm looking

18         at.

19         Q.    (By Mr. O'Laughlin:)  And did you declare

20    that as income in 2010?

21              MS. BOGGS:  Objection, form.

22              THE WITNESS:  Again, I'll have to

23         look at the taxes, but if we gave it to

24         the accountant, it was prepared.

25         Q.    (By Mr. O'Laughlin:)  You believe it was
```

1    declared as income?

2         A.    I believe.

3         Q.    Let's enter tabs 15 and 16 as the next

4    exhibit.

5              (Deposition Exhibit No. 16 was

6               marked for identification.)

7         Q.    (By Mr. O'Laughlin:)  This is an email with

8    the subject line:  "Please approve," sent from the

9    First Lady to Epstein, and an "Attachment:  Skidmore

10   Fall 2011."

11             And then the attachment contains a

12   statement of student account from the Skidmore

13   Bursar's office listing the amount due as

14   $24,955.50.

15             So was this amount paid by Epstein in

16   2011?

17             MR. TEAGUE:  Objection.  Form.

18             MS. BOGGS:  Objection.  Lack of

19        foundation.  Form.

20             THE WITNESS:  Again, I'm going by

21        the email.  I assume it was.

22        Q.    (By Mr. O'Laughlin:) And did you declare

23   that as income in 2011?

24             MS. BOGGS:  Objection.  Form.

25             THE WITNESS:  Again, based on my

```
 1            taxes.

 2                 MR. O'LAUGHLIN:  Let's do tab 20

 3            and 21.

 4                 (Deposition Exhibit No. 17 was

 5                  marked for identification.)

 6            Q.    (By Mr. O'Laughlin:) This is a

 7       December 9th, 2011 email from the First Lady to

 8       Epstein, attaching spring 2012 tuition bills for

 9       Skidmore College in the amount of 20,710, and asking

10       Epstein, "Please approve this payment so that Rich can

11       process it."

12                 And so if you take the fall 2011 amount

13       that we just looked at of 24,000, and then the

14       spring of 2012 that we looked at and combine them,

15       it shows that in the 2011 to 2012 school year, your

16       family received approximately 49,000 in tuition

17       payments for your children from Epstein, correct?

18                 MS. BOGGS:  Objection.  Lack of

19            foundation.  Calls for speculation.

20            Mischaracterization.

21                 MR. TEAGUE:  Object.  Join those

22            objections.  Also foundation.  You can

23            answer.

24                 THE WITNESS:  Based on the numbers

25            you've provided me.
```

1          Q.    (By Mr. O'Laughlin:)  And was that amount

2     declared as income in your 2011 returns and your 2012

3     returns?

4          A.    Should have been, yeah.

5          Q.    What is the EDA?

6          A.    What is the --

7          Q.    EDA?

8          A.    Virgin Islands Economic Development

9     Authority.

10          Q.    Actually, before I go there, are you

11     aware -- beyond the payments we've just looked at, are

12     you aware of any other tuition payments made by

13     Epstein to you?

14               MR. TEAGUE:  Objection, vague.

15               MS. BOGGS:  Objection, form.

16               THE WITNESS:  No.

17          Q.    (By Mr. O'Laughlin:)  But as far as you

18     know, he paid the tuition for your children all the

19     way through college, correct?

20               MS. BOGGS:  Objection, form.

21               MR. TEAGUE:  Objection, form.

22          Foundation.

23               THE WITNESS:  That I don't recall.

24          I think there was a point where he did

25          not directly.

1         A.    No.

2         Q.    How do you know he had ownership interest?

3         A.    I was told that by Andrew Farkas.

4         Q.    When were you told that?

5         A.    In 2007.

6         Q.    Is the governor's office involved in

7    granting EDA benefits?

8         A.    It's involved -- it affirms the decision

9    of the EDA board that grants the benefits, yes.

10        Q.    And what is the process surrounding that?

11        A.    The process surrounding the governor's

12   involvement?

13        Q.    Yeah.

14        A.    The beneficiary will submit the

15   application to the Economic Development Authority,

16   which is then reviewed by their staff.  They will go

17   through the process, according to their rules and

18   regulations as to whether it fits under the

19   requirements.

20             It will then be presented by the staff

21   to the board of the EDA, either with a recommendation

22   to approve or disapprove.

23             The board will then make its

24   determination as to which way they're going.

25             If it's approved, it is then sent up to

1    governor's office and sent to legal counsel.  Legal

2    counsel does its review of it, and then at that

3    point, it will come to the governor for signature.

4    That was at least the process that we followed.

5         Q.    And so focusing on the portion that

6    involves the governor's office, what exactly does that

7    review entail?

8              MR. TEAGUE:  Objection, asked and

9              answered.  You can answer it.

10             THE WITNESS:  It involves their

11             basically reviewing the decision that

12             the board made to make sure they

13             complied with the Economic Development

14             Authority rules and regulations.

15        Q.    (By Mr. O'Laughlin:) And -- so they take

16   the regulations from the EDA and they look at the

17   application and they compare the two?

18        A.    The regulations are codified, our rules

19   and regs.  They would then look at the application,

20   review the application, and then make a

21   recommendation.

22        Q.    And the -- what is the thing they're

23   evaluating for?  Just compliance with the EDA regs?

24        A.    And to see how the board approved it,

25   right.  And the type of business activity that would

1          to what extent.  They may call the EDA

2          to find out more on the activity.

3          They'll look at the rules and

4          regulations.

5          Q.    (By Mr. O'Laughlin:)  And is a

6    recommendation made to you personally?

7          A.    It's made to me, yes.  Was made to me,

8    yes.

9          Q.    And then you review it?

10         A.    I review the cover memorandum, usually, of

11   what was provided to me by my legal counsel.  I may

12   get a little bit more into the activities and

13   understand the type of business it is.

14         Q.    What do you do to get a little more into

15   the underlying business?

16         A.    Just look if -- the overview would provide

17   the business, the type of activity.  I may or may not

18   look at the application just to understand if it was

19   an unusual business.

20         Q.    Would you ever reach out to the person who

21   is applying to ask them questions?

22         A.    No.

23         Q.    Would you look at the financial projections

24   that they submitted?

25         A.    No.

1      Q.    Would you do any kind of diligence on the

2      business itself to see that they were doing what they

3      claimed to be doing?

4            MS. BOGGS:  Objection, form.

5            MR. TEAGUE:  Same objection.

6      Foundation as well.  You can answer.

7            THE WITNESS:  I presume that by

8            the time it came to me after the

9            analysis done by EDA staff and the board

10           and my legal counsel, that that was less

11           of an issue.

12           THE REPORTER:  I'm sorry, that

13           was --

14           THE WITNESS:  Less of an issue.

15     Q.    (By Mr. O'Laughlin:)  So what is

16     specifically the thing that you are reviewing for?

17     A.    The legal opinion, making sure it is

18     consistent with the rules and regulations, looking at

19     the business activity, looking at the economic

20     development, diversification that was taking place in

21     the territory.

22     Q.    What do you mean by looking at the business

23     activity?

24     A.    If it was unusual.  One year, we had

25     someone that applied that wanted to do manufacturing.

```
 1    We don't have very many manufacturers in the Virgin

 2    Islands, so I just looked at the application to make

 3    sure I understood.

 4              Some were looking at foreign

 5    destinations to sell their products.  I wanted to

 6    see, you know, what percentage of their business

 7    activity they were looking at.  Was it -- did they

 8    consider the U.S. foreign or where are they selling?

 9    So I would look at things like that.

10        Q.   What would you do if the business -- the

11    underlying business activity did strike you as

12    unusual?

13        A.   I would, then, more than likely not call

14    the individual.  I'd probably call my attorney and

15    ask him to look into it.

16        Q.   And they would go and report back to you?

17        A.   Correct.

18        Q.   Did you review Financial Trust's

19    application?

20        A.   Yes.

21        Q.   Did you review Southern Trust's

22    application?

23        A.   No.

24        Q.   Okay.  Did you find any of their activity

25    unusual?
```

1          A.    No.

2          Q.    Did you ask anyone to do any further

3     investigation into them?

4          A.    No.

5          Q.    Did you consider the character and fitness

6     of applicants as part of your review?

7          A.    I went by the recommendation by my legal

8     counsel, usually.

9          Q.    Do you know if your legal counsel would

10    look into the character and fitness of applicants?

11         A.    I don't.

12         Q.    Do you know if they would do a background

13    check?

14         A.    Beyond what EDA and the work that they may

15    have done?  I'm not aware.

16         Q.    You're not aware of any background check?

17         A.    I'm not aware if they did, if they went

18    further.

19         Q.    Are you aware of any investigation of

20    public reporting surrounding beneficiaries?

21              MS. BOGGS:  Objection, form.

22              THE WITNESS:  I'm not quite sure I

23         understand.

24         Q.    (By Mr. O'Laughlin:)  Are you aware of any

25    investigation undertaken by your office into public

1    reporting surrounding the beneficiaries?

2         A.    No.

3              MS. BOGGS:  Same objection.

4         Q.    (By Mr. O'Laughlin:)  Did you consider

5    Epstein's past criminal conviction when you reviewed

6    the Financial Trust application?

7         A.    I went sole --

8              MS. BOGGS:  Objection, form.

9              MR. TEAGUE:  Same objection.

10    Foundation as well.

11              THE WITNESS:  I went solely on the

12              recommendations of the staff -- of my

13              legal counsel.

14         Q.    (By Mr. 4O'Laughlin:) So you didn't

15    independently consider his sex offender status?

16              MS. BOGGS:  Objection, form.

17              MR. TEAGUE:  Same objections.

18              THE WITNESS:  No.

19         Q.    (By Mr. O'Laughlin:)  And you didn't

20    independently consider his past criminal convictions?

21              MS. BOGGS:  Objection, form.

22              THE WITNESS:  No.

23              MR. TEAGUE:  Objection, form.

24         Mischaracterization.

25              THE REPORTER:  Hold on.

```
 1                 MR. TEAGUE:  Mischaracterization
 2         as well.
 3         Q.    (By Mr. O'Laughlin:)  And you didn't
 4    independently consider public reporting surrounding
 5    Epstein?
 6                 MS. BOGGS:  Objection, form.
 7                 THE WITNESS:  No.
 8         Q.    (By Mr. O'Laughlin:)  Did you reach out to
 9    the First Lady?
10         A.    No.
11                 MS. BOGGS:  Objection, form.  When
12         you say "First Lady," can you clarify
13         who you mean?
14         Q.    (By Mr. O'Laughlin:)  So throughout this
15    deposition if I refer to First Lady, do you understand
16    that I'm referring to First Lady, Cecile de Jongh,
17    your wife?
18         A.    Okay.
19         Q.    Okay.  Did you perceive any conflict of
20    interest in approving benefits to Epstein's company --
21                 MS. BOGGS:  Objection.
22         Q.    (By Mr. O'Laughlin:) -- companies given
23    that your wife worked for them?
24                 MS. BOGGS:  Objection, form.
25                 THE WITNESS:  No.
```

1      Q.    (By Mr. O'Laughlin)  Did you ask your

2   legal counsel to provide any opinion on any potential

3   conflict of interest?

4           MS. BOGGS:  Objection, form.  Also

5       privileged to the extent it reveals the

6       substance of any communications between

7       Governor de Jongh and his legal counsel.

8           MR. TEAGUE:  Same objection.  You

9       can answer.

10          THE WITNESS:  No.

11     Q.    (By Mr. O'Laughlin:) Did you ask for any

12  assessment of any kind of any potential conflict of

13  interest?

14          MS. BOGGS:  Same objections to the

15      extent we're talking about

16      communications between your attorney and

17      you.

18          MR. TEAGUE:  Same objection.

19          THE WITNESS:  No.

20     Q.    (By Mr. O'Laughlin:)  Are you aware that

21  any investigation of any kind was undertaken to assess

22  any potential conflicts of interest?

23          MS. BOGGS:  Same objections.

24          MR. TEAGUE:  Same.

25          THE WITNESS:  No, I'm not aware of

1          any investigations.

2          Q.    (By Mr. O'Laughlin:)  So you testified that

3     you didn't approve Southern Trust, correct?

4               MR. TEAGUE:  Objection,

5          mischaracterization.

6               THE WITNESS:  No.  I said I did

7          approve Southern Trust.

8          Q.    (By Mr. O'Laughlin:)  I thought you said

9     you did approve Financial Trust but not Southern

10    Trust.

11         A.    I believe I said approved Southern Trust.

12              MR. TEAGUE:  Objection.

13         Mischaracterization of prior testimony.

14         Q.    (By Mr. O'Laughlin:)  Okay.  So just to

15    clarify --

16              MR. TEAGUE:  You have to let me

17         finish my objection as well, Counsel.

18              Go ahead.

19         Q.    (By Mr. O'Laughlin:)  So just to clarify,

20    your belief is that you reviewed and approved both

21    Financial Trust and Southern Trust?

22         A.    I approved what the EDA board did, yes.

23         Q.    Okay.  With respect to both those entities?

24         A.    Based on their recommendations, yes.

25              MR. O'LAUGHLIN:  Okay.  Let's

1    analysis would have been stored in the government's

2    records?

3              MS. BOGGS:  Objection, form.

4              MR. TEAGUE:  Same objection.  And

5         objection to the extent of privilege,

6         but you can answer.

7              THE WITNESS:  No, I don't have any

8         knowledge.

9         Q.    (By Mr. O'Laughlin:)  So if you go to the

10   last page of the letter to you -- this letter, by the

11   way, is sent by Albert Bryan, then chairman of the

12   EDA.

13             Who is Albert Bryan?

14        A.    Chairman of the EDA and he was my

15   commissioner of Labor.

16        Q.    During what years?

17        A.    2007 to 2014.

18        Q.    And what does he do now?

19        A.    He's now the governor of the Virgin

20   Islands.

21        Q.    So at the time he was chairman of the EDA?

22        A.    Yes.

23        Q.    And he, in that capacity, signed off on

24   Epstein's tax benefits?

25        A.    Based on what you're showing me, yes.

1      Q.    And then he forwarded them to you for your

2    review?

3              MR. TEAGUE:  Objection, form.

4              THE WITNESS:  EDA forwarded it to

5        me, yes.

6      Q.    (By Mr. O'Laughlin:)  And then you signed

7    off on the tax benefits?

8      A.    That's correct.

9      Q.    Is that your signature on page 5?

10     A.    Yes, it is.

11     Q.    With an approval date of May 31st, 2013?

12     A.    Yes.

13     Q.    So the letter that you signed lays out the

14   benefits that Epstein was receiving through Southern

15   Trust under section B.

16             MS. BOGGS:  Objection, form.

17        Mischaracterization.

18     Q.    (By Mr. O'Laughlin:)  Sorry.  Under

19   Sections A through G.

20             MS. BOGGS:  Same objections.

21             MR. TEAGUE:  Also object to the

22        extent that the document speaks for

23        itself.

24     Q.    (By Mr. O'Laughlin:)  Do you see that?

25     A.    Yes.

1    fact as part of your consideration?

2         A.    No, I don't recall the specifics of what

3    was provided to me back then.

4         Q.    Nothing stood out to you with respect to

5    Southern Trust Company in terms of the cost benefit

6    analysis being un-advantageous to the USVI?

7         A.    No, nothing stood out.

8              MS. BOGGS:  Objection, form.

9         Mischaracterization.

10             MR. TEAGUE:  Foundation as well.

11        Q.    (By Mr. O'Laughlin:)  So there were no red

12   flags based on the potential that Epstein was giving

13   only a few pennies and getting a whole dollar for each

14   dollar benefit, correct?

15             MS. BOGGS:  Objection, form.

16        Speculation.  Mischaracterization.

17             MR. TEAGUE:  Join.  I join the

18        objection.

19             THE WITNESS:  Dollars and pennies,

20        and I just have no knowledge of that.

21        Q.    (By Mr. O'Laughlin:)  Okay.  Under the

22   Special Conditions section of the letter, there's an

23   itemized list of the conditions that Southern Trust

24   has to comply with as part of receiving benefits.

25             Do you see that?

```
 1          A.    I do.

 2          Q.    Focusing on number 4, it says, "Southern

 3     Trust will provide its full-time employees and

 4     dependents with one hundred percent employer paid

 5     medical insurance coverage."

 6                Do you see that?

 7          A.    I do.

 8          Q.    Was an employee of Southern Trust the First

 9     Lady?

10          A.    She was.

11          Q.    Were you a dependent of the First Lady?

12          A.    No.

13          Q.    How not?

14          A.    I was covered under my government

15     insurance.

16          Q.    Okay.  So you didn't receive any benefits

17     pursuant to this.

18          A.    No.

19                MS. BOGGS:  Objection, form.

20          Q.    (By Mr. O'Laughlin)  Okay.

21          A.    No, I did not.

22          Q.    If you look at number 9, it says, "Southern

23     Trust will provide its employees tuition,

24     reimbursement, employee training and continuing

25     professional educational courses for programs related
```

1      to an employee's job function and approved by

2      management.  The maximum assistance to be provided to

3      an eligible employee during calendar year is $5000."

4                Did you see that?

5      A.    I do.

6      Q.    Is this the provision that provided for the

7      reimbursement tuition payments?

8                MS. BOGGS:  Objection, foundation,

9          form, speculation.

10               MR. TEAGUE:  Same objection.

11               THE WITNESS:  I can't answer that.

12         I don't know -- I don't know what the --

13         I don't know.  This is in 2013.

14         Southern Trust, I am not quite sure how

15         it's being applied.

16     Q.    (By Mr. O'Laughlin:)  So you don't know

17     whether the tuition payments were pursuant to this

18     particular special condition?

19     A.    I don't.

20               MS. BOGGS:  Objection.  Same

21         objections.

22               MR. TEAGUE:  Same.

23     Q.    (By Mr. O'Laughlin:) Were the tuition

24     payments that were made in excess of $5,000?

25     A.    Based on the list you gave me, yes.

```
 1                MR. O'LAUGHLIN:  Let's enter tab

 2         22 as the next exhibit.

 3                (Deposition Exhibit No. 19 was

 4                 marked for identification.)

 5                THE WITNESS:  Could I just make

 6         one statement?

 7         Q.    (By Mr. O'Laughlin:) Sure.

 8         A.    The tuition payments were in 2010 and '11,

 9    not '13.

10         Q.    Were you aware of a previous review of

11    Financial Trust Company?

12         A.    I'm sorry, what do you mean by that?

13         Q.    The granting of benefits to Financial Trust

14    Company?

15         A.    I believe I approved Financial Trust

16    Company when it came up for renewal, I believe.

17         Q.    Do you recall whether it would have had

18    this same or similar special conditions?

19                MS. BOGGS:  Objection, lack of

20         foundation, form.

21                MR. TEAGUE:  Right.  Real fast

22         before we go into this next exhibit.  I

23         apologize, I need to take a bathroom

24         break real fast.  That's on me.

25                VIDEOGRAPHER:  We are going off
```

 1    to anyone in the Governor's office on behalf of

 2    Epstein regarding this response?

 3            MS. BOGGS:  Objection, form.

 4            THE WITNESS:  No.

 5        Q.    (By Mr. O'Laughlin:)  So let's look at the

 6    underlying questions that were asked by the reporter.

 7    In section 1, He asks about the fact that you signed

 8    an approval letter for a five-year extension of EDC

 9    benefits to FTC and notes that the statute requires

10    the EDC director to examine the character of

11    applicants.

12            Do you see that?

13        A.    I do.

14        Q.    Do you know if that character analysis was

15    done?

16        A.    Again, like I mentioned to you earlier, I

17    went on the recommendation of the board, whatever

18    their analysis was, and I also then went on my legal

19    counsel's recommendation.  So what they did, I'm not

20    sure.

21        Q.    Did they make a recommendation to you that

22    Epstein was of the requisite character to receive the

23    benefits?

24        A.    They made a recommendation that FTC should

25    be approved for benefits.

1        Q.    And do you know whether that included a

2   recommendation that his character was --

3        A.    I don't recall.

4             MS. BOGGS:  Objection.

5        Mischaracterizes his testimony.

6        Q.    (By Mr. O'Laughlin:)  What is your personal

7   belief as whether his character merited receiving EDC

8   benefits?

9             MR. TEAGUE:  Objection, form.

10            MS. BOGGS:  Same objection.

11            THE WITNESS:  2012, I went on the

12       recommendation.  I didn't give it much

13       thought beyond that.

14       Q.    (By Mr. O'Laughlin:)  So you didn't say, I

15   don't think that his character is appropriate?

16       A.    I don't recall, no.

17       Q.    You just went with the recommendation?

18       A.    I went with the recommendation, yes.

19       Q.    The last question in section 1 from the

20   reporter is, "Do you believe registered sexual

21   offender, guilty of such violations, should be

22   receiving these benefits?"

23            Do you see that?

24       A.    I do.

25       Q.    What's your answer to that question?

```
 1              MS. BOGGS:  Objection, form.  Lack
 2         of foundation.
 3              THE WITNESS:  Again, I'm not --
 4         you know, I went on the recommendation
 5         of the board and on the recommendation
 6         of counsel.
 7         Q.    (By Mr. O'Laughlin:)  But what is your
 8    answer to that question?
 9              MS. BOGGS:  Same objection.
10              MR. TEAGUE:  Objection.  Asked and
11         answered.
12              THE WITNESS:  I went on the
13         recommendation of counsel and the board,
14         and I approved the benefits.
15         Q.    (By Mr. O'Laughlin:)  So you approved the
16    benefits because you thought he should be receiving
17    them?
18              MR. TEAGUE:  Objection.
19              MS. BOGGS:  Objection,
20         mischaracterizes testimony, lack of
21         foundation, form.
22              MR. TEAGUE:  And asked and
23         answered.  I join in those objections as
24         well.
25              THE WITNESS:  I approved the
```

1        terms of someone bringing it to my

2        attention?

3        Q.    (By Mr. O'Laughlin:)  Did the First Lady

4   ever try to avoid things coming to your desk that

5   would impact Epstein?

6             MS. BOGGS:  Objection.

7             MR. TEAGUE:  Objection, calls for

8        speculation, form, lack of foundation.

9             MS. BOGGS:  Same objection.

10            THE WITNESS:  I don't know for

11       certain but I'm assuming she did.

12            MR. O'LAUGHLIN:  Let's look at tab

13       30.

14            (Deposition Exhibit No. 26 was

15             marked for identification.)

16       Q.    (By Mr. O'Laughlin:)  This is an

17   August 5th, 2013 email from the First Lady to Epstein

18   commenting on an apparent dispute, First Resort versus

19   LSJ, LLC, and she writes, "Additionally, this will end

20   up on John's desk and he would just as soon avoid

21   that."

22            Do you see that?

23       A.    I do.

24       Q.    Do you know what this dispute involved?

25            MS. BOGGS:  Objection, lack of

 1    probationers."  Do you see that, the first -- the

 2    second sentence?

 3         A.    The email from Jeffrey Epstein to Cecile?

 4         Q.    No.  The -- yes, yes.

 5         A.    Right.  I'm not copied on that.

 6         Q.    Right.  But do you see that sentence?

 7         A.    Yes.

 8         Q.    So it's about transferring parole --

 9               MS. BOGGS:  Objection.

10         Q.    (By Mr. O'Laughlin) -- given the reference

11    to probationers?

12               MS. BOGGS:  Objection, lack of

13         foundation, calls for speculation.

14               THE WITNESS:  Yes.

15         Q.    (By Mr. O'Laughlin:)  Were there

16    discussions of transferring Epstein's house arrest to

17    the USVI at any point?

18         A.    Not with me.

19         Q.    You're not aware of any conversations at

20    any point regarding transferring Epstein's house

21    arrest from the USVI -- from Florida to the USVI?

22         A.    I always recommended that Cecile and her

23    attorneys talk directly to Vincent.  So substantive

24    -- substance of those discussions, no, I'm not aware

25    of.

```
 1        Q.    So you've testified that you didn't receive
 2   the underlying document, correct?
 3              MS. BOGGS:  Objection,
 4         mischaracterizes testimony.
 5              THE WITNESS:  When you refer to
 6         the "underlying document," are you
 7         talking about the document that was
 8         corrupted?
 9        Q.    (By Mr. O'Laughlin:)  Yes.
10        A.    I guess I received the document.  I
11   couldn't open it.
12        Q.    Okay.  On Thursday, April 9th at 9:18 a.m.,
13   which is about 20 minutes after the earlier email
14   where the First Lady asks for the document to be
15   resent, she says to Epstein, "Thanks.  Sending again
16   to John."
17              Do you see that?
18        A.    Yes.
19        Q.    Do you receive -- do you recall receiving
20   that document in that follow-up transmission?
21        A.    I don't recall, but if I did, I would have
22   sent it straight to Vincent.
23        Q.    And she -- in fact, she says, the First
24   Lady says, "John will email to Vincent," correct?
25        A.    Correct.
```

```
 1        Q.    Did you email the document to Vincent

 2   Frazer?

 3              MR. TEAGUE:  Objection.

 4              MS. BOGGS:  Objection, asked and

 5        answered, lack of foundation.

 6              THE WITNESS:  I believe I did,

 7        yes.

 8        Q.    (By Mr. O'Laughlin:)  And do you know what

 9   was in the document?

10        A.    No.

11        Q.    So you forwarded a document without knowing

12   what was in it?

13              MS. BOGGS:  Objection, lack of

14        foundation, argumentative.

15              THE WITNESS:  Not very unusual in

16        terms of the substance of the document.

17        Q.    (By Mr. O'Laughlin:)  So it's not unusual

18   for you to have received a document with a subject

19   line, "Confidential" from Epstein and forwarded to the

20   attorney general without looking at it?

21              MS. BOGGS:  Objection, lack of

22        foundation, calls for speculation, form.

23              THE WITNESS:  It's not unusual for

24        me to receive documents that post the

25        subject line.  I may not go into the
```

1         being sent to you from me and I'm giving

2         it for his review.  There's no substance

3         to our discussions at all.

4         Q.   (By Mr. O'Laughlin:)   sorry, who --

5    something is being sent from who to who?

6         A.    From the attorney -- from myself to the

7    attorney general, there were no discussions on the

8    substance of it.

9         Q.   What was sent from you to the attorney

10   general?

11        A.    What Cecile sent me that you -- that I

12   could not open.

13        Q.   So just to be clear, there's two different

14   time periods.  In 2009, there was that document that

15   was sent to you that you couldn't open --

16        A.    Eh-hmm.

17        Q.   -- regarding the transfer of parole from

18   Florida to USVI, correct?

19        A.    Correct.

20        Q.   And then in 2012, three years later, there

21   was a separate legislation regarding SORNA, correct?

22        A.    Correct.

23             MR. TEAGUE:  Objection,

24        foundation.

25        Q.   (By Mr. O'Laughlin:)  And so were there --

1    did you have any involvement in the 2011, 2012 period

2    regarding the SORNA legislation?

3              MS. BOGGS:  Objection, lack of

4         foundation.

5              THE WITNESS:  Not in terms of

6         substantive discussions with the

7         attorney general.

8         Q.    (By Mr. O'Laughlin:)  What -- when you say

9    substantive discussions, what do you mean?

10             MS. BOGGS:  Objection.  I'm going

11        to instruct the witness not to answer if

12        it involves legal advice or seeking

13        legal advice or seeking legal advice

14        from the attorney general.

15             THE WITNESS:  Other than to review

16        what you're looking at, that's it.  The

17        attorney general and I did not have a

18        discussion about Mr. Epstein or any

19        others on the sexual offender list at

20        all.

21        Q.    (By Mr. O'Laughlin:)  So what discussions

22   were there regarding SORNA?

23             MS. BOGGS:  Objection.  Again, I

24        am going to instruct the witness not to

25        answer in regard to any legal advice or

1          seeking legal advice from the attorney

2          general.

3               THE WITNESS:  Again, I don't

4          recall anything of substance.  Something

5          along that nature, I would pass on to

6          the attorney general and be guided by

7          what came back to me.

8          Q.   (By Mr. O'Laughlin:)  Were you ultimately

9     the one who signed off on the legislation as the

10    executive?

11         A.   Once it was approved by the legislature, I

12    must have been.

13         Q.   And so what was your involvement in

14    considering the changes to the legislation?

15         A.   Any of the recommendations that the AG may

16    have proposed.

17              MS. BOGGS:  Objection.  Again, I'm

18         going to instruct the witness not to

19         reveal any communications with the AG

20         regarding legal advice or seeking legal

21         advice.

22              THE WITNESS:  And my policy to

23         him, have the team look at.  I probably

24         did sign the legislation -- I'm

25         presuming I signed it.

 1          Q.    (By Mr. O'Laughlin:)  Do you recall what

 2     the policy team's position was on the legislation?

 3          A.    No, but I presume it was to sign it.

 4          Q.    Do you recall what the nature of the

 5     amendments was?

 6          A.    No, not at all.

 7          Q.    Do you recall what the substance of the

 8     discussions in the legislature were surrounding SORNA?

 9          A.    No.

10          Q.    Did you discuss the bill with the First

11     Lady?

12          A.    I did not.

13          Q.    Did you discuss the bill with Epstein?

14                MS. BOGGS:  Objection, form.

15                THE WITNESS:  Of course not.

16          Q.    (By Mr. O'Laughlin:)  Did you discuss the

17     bill with any of Epstein's associates?

18                MS. BOGGS:  Objection, form.

19                THE WITNESS:  Of course not.

20          Q.    (By Mr. O'Laughlin:)  Did you advocate for

21     changes to the legislation?

22                MS. BOGGS:  Objection, form.

23                THE WITNESS:  I did not.

24          Q.    (By Mr. O'Laughlin:)  So Epstein had no

25     input of any kind into your consideration of the SORNA

1    entirely sure.  I think perhaps he finally focused

2    on the issue at hand and decided that he personally

3    did not like the language.  John is going to speak

4    to him when he gets back."

5              Did I read that correctly?

6        A.    Yes.

7        Q.    Is the John referred to in this email you?

8              MS. BOGGS:  Objection, calls for

9         speculation, lack of foundation.

10             THE WITNESS:  I'm going to presume

11        it is.

12        Q.    (By Mr. O'Laughlin:)  What was the bad ball

13   that Vincent started rolling?

14             MS. BOGGS:  Objection, lack of

15        foundation, calls for speculation.

16             THE WITNESS:  I have no idea.

17        Q.    (By Mr. O'Laughlin:)  When the First Lady

18   writes that you were going to speak with the AG when

19   he gets back, what is that referring to?

20             MS. BOGGS:  Objection, lack of

21        foundation, calls for speculation,

22        mischaracterization.

23             THE WITNESS:  I do not recall, but

24        if -- any discussion I would have had

25        with the AG on this matter, it would

1          have been the same I had with a lot of

2          my commissioners, which is --

3              MS. BOGGS:  Objection to the -- I

4          instruct you not to answer to the extent

5          it involves legal information or seeking

6          legal advice with the attorney general.

7              MR. TEAGUE:  You can answer.

8              THE WITNESS:  Which is you can't

9          change your mind and say nothing to

10         someone.

11     Q.    (By Mr. O'Laughlin:)  What do you mean by

12     that?

13     A.    If you disagree with a position, then tell

14     them you disagree with the position.  You just can't

15     change your mind and not say a word.  So any

16     discussion I had with Vincent or any one of my

17     commissioners would not be the substance of the bad

18     ball rolling.  It would be if you don't agree and you

19     change your mind, then discuss it with them.

20     Q.    What was the change of position that you

21     discussed with Attorney General Frazer?

22     A.    I have no idea.

23             MS. BOGGS:  Objection, lack of

24         foundation, calls for speculation.

25             THE WITNESS:  I do not recall.

1          But clearly he made a decision he felt

2          comfortable with.  I'm not going to try

3          to get him to change it.  I'm going to

4          tell him, just communicate it.

5          Q.    (By Mr. O'Laughlin:) You're going to tell

6    him what?

7          A.    To communicate it.

8          Q.    What do you mean by "to communicate it"?

9          A.    Well, in the letter, what it says is that

10   that -- that he basically, he changed his mind and

11   said nothing.  My position would be, you got to say

12   something.  If you disagree with that position, say

13   you disagree with that position.

14         Q.    So just to be clear, are you testifying

15   about an actual conversation that you had with the

16   attorney general?

17         A.    I believe so.

18         Q.    Okay.  And what was that conversation?

19         A.    Just --

20         MS. BOGGS:  Objection.  Again, I

21         am going to instruct the witness not to

22         reveal any communications with the

23         attorney general seeking or obtaining

24         legal advice.

25         MR. TEAGUE:  You can answer.

1              THE WITNESS:  To discuss it with

2          his attorney, to discuss with them

3          exactly why you changed your position.

4          But he did not discuss with me any

5          substance.

6          Q.    (By Mr. O'Laughlin:)  Changed his position

7     on what?

8          A.    I have no idea.  I'm going strictly by

9     this email.

10         Q.    I'm asking if you have a recollection of a

11    conversation with the attorney general.  Do you?

12         A.    I recall a conversation with the attorney

13    general where he changed his position and he did not

14    communicate it to them.  I told him to communicate to

15    them, them, meaning their lawyers, exactly why he

16    changed his position.

17              We had no discussion on the substance of

18    why he changed his position.  Just that he needed to

19    be forthright and tell them the basis on the position

20    that he took.

21         Q.    But the discussion you had with the

22    attorney general was about the SORNA legislation?

23         A.    It was about his --

24              MS. BOGGS:  Objection, calls for

25          speculation, lack of foundation.  Also,

```
 1          again, I'm going to instruct the witness

 2          not to reveal the content of any

 3          communications with the attorney general

 4          involving legal advice.

 5                  THE WITNESS:  Strictly based on

 6          the position he took, why did he change

 7          his position.  Just communicate it to

 8          them.  There was no substance on the

 9          discussion.

10          Q.   (By Mr. O'Laughlin:)  Was there anyone else

11     involved in this discussion?

12          A.   Meaning, was there someone else in the

13     room with me?

14          Q.   Yes.

15          A.   No.

16          Q.   Was it an in-person discussion?

17          A.   No.

18          Q.   Was it over the phone?

19          A.   I recall, yes.

20          Q.   Were there notes made of this discussion?

21          A.   No.

22          Q.   What was your reason for reaching out to

23     the attorney general to have this discussion?

24                  MS. BOGGS:  Objection, lack of

25          foundation.
```

```
1              THE WITNESS:  Because if he agreed
2         on one issue and they thought he was
3         going to do something, to at least
4         correct it.
5         Q.    (By Mr. O'Laughlin:)  How did you know that
6    he had changed his position?
7         A.    It had been mentioned.
8         Q.    By who?
9         A.    Cecile.
10        Q.    So the First Lady mentioned to you that the
11   attorney general had changed his position on the SORNA
12   legislation, and then you followed up with a call to
13   the attorney general, correct?
14             MS. BOGGS:  Objection, form.
15             THE WITNESS:  She mentioned to me
16        that he had changed his position,
17        particularly on the issue, which I did
18        not go into with her.  Just that he
19        changed his position.
20             And my position always has been if you're
21        going to change your position on the stance, you
22        have to notify the individuals you're dealing
23        with.  You just can't change your position.
24        Q.    (By Mr. O'Laughlin:)  So the First Lady
25   came to you with the concern that he changed his
```

1    position, and you followed up by having a conversation

2    with the attorney general?

3                MR. TEAGUE:  Objection, form.

4                THE WITNESS:  Correct.  Correct.

5         Q.    (By Mr. O'Laughlin:)  And telling him that

6    if he was going to change his position on the SORNA

7    legislation, he should relay that to the First Lady?

8         A.    I don't know if it was a change on the

9    SORNA legislation or some aspect, but, yes, that he

10   should convey it to their counsel, yes.

11        Q.    Do you know if the attorney general in

12   response to your call did have a follow-up

13   conversation?

14        A.    I don't know.

15                MS. BOGGS:  Objection, lack of

16           foundation, speculation.

17                   (Discussion off the record.)

18        Q.    (By Mr. O'Laughlin:)  What was the attorney

19   general's response to your message to him that he

20   should convey any changes in his position?

21                MS. BOGGS:  Objection.  Again, I'm

22           going to instruct the witness not to

23           reveal any communications with the

24           attorney general that would involve

25           local advice.

1           THE WITNESS:  I don't recall

2      specifically what he said.

3      Q.    (By Mr. O'Laughlin:)  Do you recall

4   generally?

5           MS. BOGGS:  Same instruction.

6           THE WITNESS:  It was a very short

7      conversation.

8      Q.    (By Mr. O'Laughlin:)  Did he agree with

9   you?

10          MS. BOGGS:  Same instruction.

11          THE WITNESS:  I don't recall.

12     Q.    (By Mr. O'Laughlin:)  You don't recall

13   whether he agreed with you or not?

14          MS. BOGGS:  Same instruction.

15          THE WITNESS:  Well, he did --

16          MS. BOGGS:  Same instruction.

17          THE WITNESS:  I don't recall

18     whether he said, Yes, I'll pick the

19     phone and call them, or that he said, He

20     would.  It was just my telling him what

21     I thought he needed to do.

22     Q.    (By Mr. O'Laughlin:)  And what is it that

23   you thought he needed to do specifically?

24          MR. TEAGUE:  Objection.  Asked and

25     answered multiple times.  You can answer

```
 1            again.
 2                  THE WITNESS:  Be very clear in his
 3            position.
 4            Q.    (By Mr. O'Laughlin:)  With who?
 5            A.    With their attorneys.
 6            Q.    Their attorneys being Epstein's attorneys?
 7            A.    Yes.
 8            Q.    Do you know if the First Lady was unhappy
 9      with the outcome of the SORNA legislation?
10                  MS. BOGGS:  Objection, calls for
11            speculation, lack of foundation.
12                  THE WITNESS:  I do not.
13            Q.    (By Mr. O'Laughlin:)  Do you know if
14      Epstein was unhappy with the outcome of the SORNA
15      legislation?
16                  MS. BOGGS:  Objection, calls for
17            speculation, lack of foundation.
18                  MR. TEAGUE:  You can answer.  Go
19            ahead.
20                  THE WITNESS:  I don't.  I don't
21            know what his position was.
22            Q.    (By Mr. O'Laughlin:)  Were you involved in
23      any way with the follow-up by Epstein or his
24      associates following the sex offender legislation?
25                  MS. BOGGS:  Objection.
```

1    not want to do it via email or phone," correct?

2         A.    That is correct.

3         Q.    Do you have any knowledge as to why she

4    wouldn't want to put these discussions in email?

5              MS. BOGGS:  Objection, calls for

6         speculation, lack of foundation.

7              THE WITNESS:  No.

8              MR. O'LAUGHLIN:  What time do you

9         want to stop?

10             MR. TEAGUE:  Actually, if you're

11        starting a new topic, this would be a

12        good time.

13             MR. O'LAUGHLIN:  Yeah.  Okay.

14             VIDEOGRAPHER:  Okay.  We're going

15        off the record.  The time is 2:16 p.m.,

16        Tuesday, May 30th, 2023.  We're off the

17        record.

18                  (Break taken.)

19             VIDEOGRAPHER:  We are back on the

20        record, the time is 2:26 p.m., Tuesday,

21        May 30th, 2023.  We're on the record.

22        Q.    (By Mr. O'Laughlin:)  Earlier you testified

23   that you were arrested in connection with a corruption

24   case against you, correct?

25        A.    That is correct.

JOHN P. D JONGH, JR. -- DIRECT                293

1          Q.    What was the nature of the case?

2          A.    It was an action brought against me by the

3    government of the V.I. because they thought I

4    illegally used government funds for security measures

5    at my house.

6                When I was elected governor in 2006, one

7    of the last items I had to think about, that I

8    thought that I did have to think about, was security.

9    But we made the decision to live in our home because

10   there's truly no government residence.

11               And where the previous governors had

12   lived was not an accommodation to fit my family.  I

13   had three young children, an aunt we were taking care

14   of.

15               And to refurbish the place it would have

16   taken -- we had estimated at three and half -- two

17   and half to three million.  So I thought it would be

18   better to live at home.

19               I had an AG's opinion, an acting

20   attorney general's opinions from Department of

21   Justice --

22               MS. BOGGS:  Objection.  I'm going

23          to instruct the witness not to testify

24          regarding any legal -- sorry -- legal

25          advice given to you by the attorney

1              general.

2                        MR. TEAGUE:  You can continue.

3                        THE WITNESS:  I'll continue, yes.

4              That it was okay to do it.  So I went

5              through a process where we -- we did

6              procurement for government contracts

7              that involved working through the

8              Department of Property and Procurement,

9              got their approval, working through the

10             Department of Justice, and got their

11             legal sufficiency.

12                        After it was done, after I was out of

13             office, the then sitting governor decided that

14             it was illegal.  Had me arrested.

15             Q.    (By Mr. O'Laughlin:)  Who was the-then

16     sitting governor?

17             A.    Kenneth Mapp.

18             Q.    Does he have that authority as the governor

19     or would it have to go through the attorney general's

20     office?

21             A.    Went through the attorney general's

22     office, an acting attorney general.

23             Q.    Was Epstein involved at all in your

24     response to that lawsuit?

25                        MS. BOGGS:  Objection.  Objection,

```
 1              form.
 2                      THE WITNESS:  I'm sorry, can you
 3              be a little bit more specific?
 4              Q.    (By Mr. O'Laughlin:)  Was Epstein involved
 5       in your defense of the lawsuit?
 6              A.    Oh, in my defense?  No.  Not at all.
 7              Q.    Did he provide advice?
 8              A.    No.
 9              Q.    Did he provide any financial assistance in
10       connection with the lawsuit?
11              A.    With the action itself or --
12              Q.    Let's answer both.  So in regards to the
13       action, the defense of the action itself, did he
14       provide assistance?
15              A.    No, he didn't.
16              Q.    Who paid for the defense of the case?
17              A.    Cecile and myself.
18              Q.    Personally?
19              A.    Personally.
20              Q.    And did funds come from any other source?
21              A.    Came -- it came from my account.
22              Q.    Okay.  And then did he provide any other
23       type of financial assistance beyond defense of the
24       lawsuit?
25              A.    Yes, he did.
```

1      Q.    And what financial assistance did he

2  provide?

3      A.    In order to settle the case, the

4  government -- I had paid the government -- we had an

5  appraisal done on the security enhancements that we

6  did.

7            And based on those appraisals, the

8  government decided without my input, that I needed to

9  pay them a certain amount, 181,000, which I did.  The

10  government -- I gave them a check.

11            They then returned the check to me at

12  7:30 at night, and then the next day held a press

13  conference saying that I did not meet the obligations

14  of what I had agreed to do, and then had me arrested

15  a couple months later.

16            We then entered into negotiations as to

17  what it would take to drop the case and essentially

18  said you have to pay more.

19            So we came up and agreed on a number.

20  Once we agreed on that number, Mr. Epstein,

21  unsolicited by me, spoke to Cecile and said, how can

22  I help.  And that's how he provided $200,000.

23      Q.    What was the total amount that was paid to

24  resolve the case?

25      A.    About 381,000.

1      Q.   So the initial amount, the actual cost of

2  improvements was 181,000?

3      A.   No.  That was the value that the

4  government said I owed after the depreciated value

5  over eight years.

6      Q.   Okay.  And then the ultimate amount paid

7  was 381,000.  So they added 200,000 on to their

8  assessment of the value?

9      A.   That's correct.

10     Q.   Okay.  And of the 381,000, Epstein financed

11 200,000?

12     A.   He gave us a loan for 200,000.

13     Q.   What were the terms of the loan?

14     A.   That we had to pay it back -- we asked him

15 if we could have two years to pay it back.  He said,

16 no, a year.  So we paid it back early, mid '16, 2016,

17 and that was it.

18     Q.   Was there interest accrued on the loan?

19     A.   Yes, I don't recall the amount, but there

20 was interest on the loan.

21     Q.   Do you recall what the rate was?

22     A.   I do not.

23     Q.   How was the rate determined?

24     A.   I don't know.  I don't know how they

25 negotiated the rate.

1          Q.    Who negotiated the rate?

2          A.    It would have been between Epstein's

3     office or Epstein and Cecile.

4          Q.    And were you involved in those negotiations

5     at all?

6          A.    I was not.

7          Q.    How did Epstein first learn that you might

8     be in need of that financial assistance?

9               MS. BOGGS:  Objection, foundation,

10              speculation.

11              THE WITNESS:  I gather that he

12              kept abreast with Cecile about what was

13              happening with the case.

14         Q.    (By Mr. O'Laughlin:)  So the First Lady

15     relayed to him what was going on with the case and

16     then he volunteered to finance $200,000 worth of the

17     ultimate amount?

18              MS. BOGGS:  Objection, form.

19              MR. TEAGUE:  Objection,

20              foundation.  You can answer.

21              THE WITNESS:  Yes.

22         Q.    (By Mr. O'Laughlin:)  Was he involved in

23     any other way in the case?

24         A.    No.

25         Q.    Did his team review legal filings in the

1          Q.    Did you ask the First Lady to relay this

2    information to Epstein?

3          A.    I must of.

4          Q.    Were you involved in any discussions of a

5    $50 million loan to the USVI government involving

6    Epstein?

7          A.    When you say "discussions," please -- what

8    do you mean by discussions?

9          Q.    What do you understand the word

10   "discussions" to mean?

11         A.    Discussions, but with whom?

12         Q.    Anyone.

13         A.    I wasn't in any discussions, no.

14         Q.    Did you have -- do you have any knowledge

15   of any $50 million loan to the USVI government?

16         A.    I was asked some questions, of which I

17   responded to those questions, yes.

18         Q.    What were the questions you were asked?

19         A.    Just if the government wanted to borrow,

20   could they.  Was there a revenue stream?  Could it be

21   collateralized?  But there was no discussions.  There

22   were just some questions.

23         Q.    Why were those questions coming to you?

24              MS. BOGGS:  Objection,

25         speculation.  Lack of foundation.

```
1              THE WITNESS:  I'm presuming just
2         based on my knowledge of government.
3         Q.   (By Mr. O'Laughlin:)  But this was after
4    you were out of office, correct?
5         A.   I believe so.
6         Q.   Okay.  Who was asking the questions?
7         A.   I'm not sure if it came from Cecile.  I
8    think it may have come from Cecile.
9         Q.   Okay.  On behalf of Epstein?
10        A.   I presume so.
11        Q.   Okay.  Do you know the approximate date of
12   these questions being asked to you?
13        A.   No, I don't.
14             MR. O'LAUGHLIN:  Let's enter tab
15        64.
16             (Deposition Exhibit No. 50 was
17              marked for identification.)
18        Q.   (By Mr. O'Laughlin:)  Exhibit 50.  This is
19   an email chain that starts February 5, 2017, and
20   Epstein writes to the First Lady, "The government
21   needs 40 to 50 million for year.  What does John think
22   would be the most viable collateral"?
23             Do you see that?
24        A.   I do.
25        Q.   Do you know where the government's need for
```

1    40 to $50 million a year was coming from?

2         A.   I do not.

3         Q.   Did you ask?

4         A.   I did not.

5         Q.   And you said that you think this request

6    came to you because you had some particular expertise

7    in it?

8         A.   I couldn't imagine any other reason.

9         Q.   What was the expertise you had?

10        A.   Well, not expertise.  Knowledge.

11        Q.   What was the knowledge you had?

12        A.   Just what -- what could the government

13   provide as collateral.  That's it.

14        Q.   Did you take any steps in response to this

15   request?

16        A.   No, I did not.

17        Q.   So on February 6, 2017, the First Lady

18   writes, "I sent it to John for his response.  He did

19   mention that the government has revenue generating

20   property in the Subbase area.  He has asked a former

21   Property and Procurement employee for a list of

22   properties."

23             Is that right?

24        A.   Right in terms of what you read or right

25   in terms of what I did?

1        Q.    Right in terms of what I read.

2        A.    Yes, it is.

3        Q.    Is it right in terms of what you did?

4        A.    No.

5              MS. BOGGS:  Objection.

6        Q.    (By Mr. O'Laughlin:)  So the First Lady is

7   reporting back to Epstein's action that you took that

8   are not accurate?

9        A.    No.

10             MS. BOGGS:  Objection, form.

11             THE WITNESS:  No.  Not at all.  I

12             did mention that the government has

13             revenue generating property, some in the

14             Subbase area.  But I never went to a

15             former employee to ask because a list of

16             government properties is located online,

17             and also is in their budget.  So I

18             didn't have to go to another employee to

19             ask.

20        Q.    (By Mr. O'Laughlin:)  So you never got a

21   list of government properties from anyone?

22             MR. TEAGUE:  Objection, form.

23             THE WITNESS:  I never got a list

24             that I shared with anyone, correct.

25        Q.    (By Mr. O'Laughlin:)   But did you obtain a

 1    list?

 2         A.    Yes.

 3         Q.    You obtained a list and then you didn't

 4    share it?

 5         A.    I didn't share it.

 6         Q.    Why did you obtain a list if you weren't

 7    planning on sharing it?

 8         A.    Because the amount of time that it took

 9    for me to get the list by going online, which is too

10    long.  So I just never did anything with it, other

11    than tell them look at properties that the government

12    owns, which you could find that online.

13         Q.    Did you provide any sort of response to

14    Epstein about what items might be available to secure

15    a $50 million loan?

16         A.    When you say "items," you mean properties?

17    Specific properties?

18         Q.    Yes.

19         A.    No, I did not.

20               MR. O'LAUGHLIN:  Let's enter tab

21         65.

22               (Deposition Exhibit No. 51 was

23                marked for identification.)

24         Q.    (By Mr. O'Laughlin:)  This is a February 6,

25    2017 email from you where you write, "I don't believe