# EXHIBIT 253

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3   GOVERNMENT OF THE UNITED STATES
     VIRGIN ISLANDS,                        No. 22-cv-10904-JSR
 4
                     Plaintiff,
 5
     v.
 6
     JPMORGAN CHASE BANK, N.A.,
 7
                     Defendant.
 8   _____
     JPMORGAN CHASE BANK, N.A.,
 9            Third-Party Plaintiff,

10   v.

11   JAMES EDWARD STALEY,
     Third-Party Defendant.
12   _____

13

14           THE ORAL DEPOSITION OF INAIS BORQUE was taken

15   on the 26th day of May, 2023 at the Ritz-Carlton Hotel,

16   6900 Great Bay, Nazareth, St. Thomas, U.S. Virgin

17   Islands, between the hours of 9:07 a.m. and 3:33 p.m.

18   pursuant to Notice and Federal Rules of Civil Procedure.

19                   _____
                         Reported by:
20

21

22                      DESIREE D. HILL
                    Registered Merit Reporter
23                  Hill's Reporting Services
                       P.O. Box 307501
24                  St. Thomas, Virgin Islands
                       (340) 777-6466
25
```

```
 1            A.    Yes.

 2            Q.    Is that monitoring a responsibility the

 3     USVI took seriously?

 4                  MR. ACKERMAN:  Object to form.

 5                  THE WITNESS:  Yes.

 6            Q.    (By Mr. O'Laughlin:) What measures did it

 7     take to monitor Jeffrey Epstein once he registered

 8     there?

 9            A.    I mean, at that time, I'm not sure how

10     they handled the registry, honestly.

11            Q.    So you're designated as the corporate

12     designee on sex offender monitoring, but you're not

13     aware of how he was monitored in 2010, correct?

14                  MR. ACKERMAN:  Objection, form.

15                  THE WITNESS:  Yes.  I mean, it

16         changes.  So I'm not sure who was in

17         charge at that time.  I don't know

18         how -- to what extent they monitored the

19         registry at that time.

20            Q.    (By Mr. O'Laughlin:) And did you do any

21     investigation to prepare yourself to testify regarding

22     that early monitoring period?

23            A.    No.

24            Q.    Okay.  If you go to page 11 in this same

25     exhibit, this is a news article from the Daily Beast
```

1    with the title "Billionaire Pedophile Goes Free."  And

2    it has the same fax transmission information as the

3    other document we looked at, that same fax number from

4    Florida, and the July 22nd, 2010 transmission date.

5    Do you see that?

6         A.    Yes.

7         Q.    And the date of the article is July 20th,

8    2010.  Do you see that?

9         A.    Yes.

10        Q.    So the Florida form that we just looked at

11   showed the established -- Epstein established

12   residence in USVI as of July 19th, 2010.  The next

13   day, July 20th, this article came out.  And then two

14   days later, Florida faxed this article to the USVI

15   DOJ, correct?

16        A.    Yes, from what I'm looking at.

17        Q.    And then this article was placed in

18   Epstein's official sex offender monitoring file,

19   correct?

20        A.    Not that I'm aware of.

21        Q.    You testified earlier that this document is

22   the 2010 documents from Epstein's registration file

23   and this article is in this document.

24        A.    Yeah, because of the dates.

25        Q.    What did you say?

1          A.    I said, yes, because of the dates.

2          Q.    So the fact that this is in here means it

3     was in his official file, correct?

4          A.    Yes.  And I probably bypassed it.

5          Q.    Okay.  So DOJ was aware of the contents its

6     sex offender monitoring file, correct?

7          A.    Repeat that.

8               MR. ACKERMAN:  Objection.  Form.

9          Q.    (By Mr. O'Laughlin:) USVI DOJ was aware of

10    the contents of its own sex offender monitoring file

11    for Jeffrey Epstein, correct?

12              MR. ACKERMAN:  Objection.  Form.

13              THE WITNESS:  To my knowledge,

14         they should.

15         Q.    (By Mr. O'Laughlin:) They should be aware?

16         A.    Yes.

17         Q.    So it was aware of the contents of this

18    article, correct?

19              MR. ACKERMAN:  Objection, form.

20         Scope.

21              THE WITNESS:  Yes.

22         Q.    (By Mr. O'Laughlin:) So if you look at the

23    first bullet in the article, it says, "Palm Beach's

24    police chief objected to Epstein's special treatment

25    and gave the Daily Beast an exclusive look at his

1          A.    Just to confirm that that's where they

2     live.

3          Q.    How frequent are they?

4          A.    It's random times.  It's not really --

5     it's frequent, but it's just random times.  Not a

6     specific time.

7          Q.    Are there any requirements for how often a

8     check needs to be conducted?

9          A.    No.

10         Q.    Can you estimate how many checks are done

11    per an offender?  Like is it once a year, once a

12    month, once a week?

13              MR. ACKERMAN:  Objection, form.

14         Scope.

15              THE WITNESS:  Usually once a week.

16         But then annually we do hold our annual

17         operation where we take a week in

18         St. Croix and a week in St. Thomas and

19         St. John to hit all offenders in that

20         one week.

21         Q.    (By Mr. O'Laughlin:)  Okay.  So offenders

22    are generally checked once a week, but then once a

23    year, there's a week where you check all offenders,

24    correct?

25         A.    Yes.

```
 1          Q.    So every offender should be checked at

 2    least once a year as part of that week, correct?

 3          A.    As part of the week, yes.

 4          Q.    But the average offender would be checked

 5    like 50 times in a year because there's 52 weeks in

 6    the year?

 7          A.    Could be possible, yes.

 8          Q.    Okay.  Do you know how frequently Epstein

 9    was checked?

10          A.    I don't know.

11          Q.    Would all of the compliance checks for

12    Epstein be in his compliance check file?

13          A.    It should be, yes.

14          Q.    So the maximum amount roughly that

15    compliance checks would happen would be, like, 50

16    times in a year, correct?

17          A.    Repeat that question.

18          Q.    The maximum number of checks in a year

19    would be approximately 50 based on the usual practice?

20          A.    Yeah.  There's not really a max.

21          Q.    But that would be the average because

22    they're checked weekly.

23          A.    Correct.

24          Q.    And so this file, who decides when checks

25    are made?
```

1            and monitor the offender.

2            Q.    (By Mr. O'Laughlin:) And why specifically?

3                  MR. ACKERMAN:  Objection.

4                  THE WITNESS:  Excuse me?

5            Q.    (By Mr. O'Laughlin:)  Why specifically is

6      it an important part of monitoring?

7                  MR. ACKERMAN:  Objection.  Asked

8            and answered.

9                  THE WITNESS:  To make sure we know

10           where they are at all times.

11           Q.    (By Mr. O'Laughlin:)  And is part of the

12     reason for doing compliance checks that if someone --

13     if the investigator is there and sees something

14     suspicious, they can report it?

15           A.    Yes.

16           Q.    So -- and is the frequency of checks

17     related to the investigator's ability to see

18     suspicious activity?

19                 MR. ACKERMAN:  Objection to form.

20                 THE WITNESS:  Repeat that

21           question.

22           Q.    (By Mr. O'Laughlin:)  Is the frequency at

23     which checks are conducted important to be able to

24     determine whether there is suspicious activity

25     occurring for a registered offender?

```
1              would be less likely if they're

2              frequently.

3              Q.    (By Mr. O'Laughlin:)  You're saying if

4       they're checked frequently, it's less likely that that

5       activity would be detected?

6              A.    Yes.

7                    MR. ACKERMAN:  Objection.

8              Q.    (By Mr. O'Laughlin:)  How so?

9                    MR. ACKERMAN:  Objection.

10                   THE WITNESS:  So what -- I mean,

11             they know they're being checked on.  So

12             they're going to make sure that they

13             don't have anything around or they don't

14             do anything that's not in compliance.

15             Q.    (By Mr. O'Laughlin:)  I see what you're

16      saying.  So if they're checked frequently, they're

17      less likely to have any criminal conduct generally,

18      because they are being checked on frequently, correct?

19             A.    Yes.

20             Q.    Got it.  And if they're checked only once,

21      then they're more likely to have criminal conduct,

22      correct?

23             A.    Right, because they won't know when we're

24      coming.

25                   THE REPORTER:  I'm sorry, repeat
```

1          accident.

2          Q.    (By Mr. O'Laughlin:)  Are you actually

3    aware of a reason, or have any reason to think

4    compliance checks were lost for Epstein, or you're

5    just speculating?

6          A.    I'm just guessing.  I don't know

7    specifically for him what happened.

8          Q.    Okay.  To the best of your knowledge as a

9    30(b)(6) designee, there were no checks in 2017

10   because there's nothing in the file, correct?

11              MR. ACKERMAN:  Objection.  Asked

12         and answered.

13              THE WITNESS:  Not that I know of.

14         I don't know.

15         Q.    (By Mr. O'Laughlin:)  And then in 2018 is

16   the next one.

17         A.    Okay.

18         Q.    Here the household occupants are

19   identified, correct?

20              MR. ACKERMAN:  Ms. Borque, are you

21         okay?

22              THE WITNESS:  Yeah, I'm good.  My

23         eyes just burns a little bit.  I'm fine.

24              MR. ACKERMAN:  I'm sorry.  Andy,

25         go ahead and ask that question again.  I

```
1      of St. Thomas, right?

2              A.    No, he didn't.

3              Q.    Where did Mr. Epstein live?

4              A.    From my knowledge, Little St. James.

5              Q.    Okay.  What was required of DOJ to perform

6      a checkup -- excuse me -- or a check-in of Mr. Epstein

7      on Little St. James?

8              A.    Well, from what I was informed, the

9      process of -- I mean, of course, he lives across the

10     water.  So they will have to go through DPNR to, I

11     guess, utilize their vessel to go over there.

12             Q.    Okay.  So the sex offender department or

13     group did not have a dedicated vessel -- I'm sorry,

14     strike that.  Let me ask the question differently.

15                   Is it your understanding -- what -- let

16     me form this question.

17                   Do you have an understanding as to

18     whether the sex offender group had a vessel, a

19     dedicated vessel for it to use in order to perform

20     a checkup on Mr. Epstein's island?

21             A.    To my understanding, no, not a designated.

22             Q.    And when you say no, does that mean that

23     they did not have a designated vessel?

24             A.    No, they did not.  They would have to go

25     through DPNR --
```

1        Q.    Okay.

2        A.    -- to use theirs.

3        Q.    Thank you.  Now, there was some questions

4    at the very beginning, way back this morning about

5    training, sex offender training.  When you joined the

6    Department of Justice, did you receive any training on

7    how to perform your job?

8        A.    Well, from who was over me, which was

9    Shani Pinney, of course informed me of all the

10   process and procedures of the sex offender unit.  We

11   would have virtual training on how to handle the

12   registry, and that's about it.

13       Q.    Okay.  Did those trainings include the

14   purpose of compliance checks?

15       A.    Not quite.

16       Q.    All right.  During the course of your

17   employment, have you -- are you aware of the purpose

18   of a compliance check?

19       A.    Yes.

20       Q.    And what is the purpose of a compliance

21   check?

22       A.    To track and monitor the offender, and

23   make sure they are doing what they're supposed to and

24   live where they say they live.

25       Q.    Are there limitations on what you or an

```
 1    offender.

 2         Q.   Do you consider Leon Brison a credible

 3    source?

 4         A.   As in?

 5         Q.   Let me ask this question:  Do you have

 6    experience with Leon Brison?

 7         A.   Somewhat.

 8         Q.   Okay.  What is your experience with Leon

 9    Brison?

10         A.   When me and the investigator from

11    St. Croix come over to St. Thomas and do random

12    checks as well.

13         Q.   Okay.  Are you aware of Leon Brison's

14    reputation within the sex offender group?

15         A.   Yes.

16         Q.   And what is Mr. Brison's reputation within

17    the sex offender group?

18         A.   Well, he's known for sending these kind of

19    threatening emails.  That's mostly what I know about

20    him.

21         Q.   Okay.  Did you discuss this email with

22    Ms. Pinney yesterday?

23         A.   Yes, I did.

24         Q.   Did Ms. Pinney tell you whether she

25    considered this email to be a credible complaint?
```

```
 1          A.    Yes.

 2          Q.    And what was -- what did she say?

 3          A.    From what I recall, she said that it was

 4    given to an investigator.  I can't remember who

 5    specifically.

 6          Q.    Okay.

 7                MR. O'LAUGHLIN:  Sorry, what was

 8          that answer?  I couldn't hear.

 9                THE WITNESS:  The email was

10          forwarded to an investigator, but I --

11          I'm not sure which investigator it was.

12          Q.    (By Mr. Ackerman:)  Okay.  Let's look at

13    Exhibit 16, but it's the one that's marked Tab 13.  If

14    you can pull that out.

15                If you could go to 194 of that document,

16    it's all the way to the end.

17                This document is entitled "Affidavit of

18    Diligent Search."

19                Do you see that?

20          A.    Yes.

21          Q.    Are you familiar with this form of

22    document?

23          A.    Yes, I am.

24          Q.    Is this a form of document that you have

25    used in the course of your employment at the
```