# EXHIBIT 14

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
        GOVERNMENT OF THE           :
 3      UNITED STATES VIRGIN        :
        ISLANDS,                    :   CASE NO.
 4                                  :   1:22-CV-10904
            Plaintiff,              :   -JSR
 5                                  :
                v.                  :
 6                                  :
        JPMORGAN CHASE BANK,        :
 7      N.A.,                       :
                                    :
 8      Defendant/Third Party       :
        Plaintiff.                  :
 9      _____ :
        JPMORGAN CHASE BANK,        :
10      N.A.,                       :
                                    :
11      Third Party Plaintiff,      :
                                    :
12              v.                  :
                                    :
13      JAMES EDWARD STALEY,        :
                                    :
14      Third Party Defendant.      :

15         CONFIDENTIAL - ATTORNEYS' EYES ONLY
                        -  -  -
16                     May 3, 2023
                        -  -  -
17
                           Videotaped deposition
18      of WILLIAM D. LANGFORD, taken pursuant to
        notice, was held at the law offices of
19      Boies Schiller Flexner LLP, 55 Hudson
        Yards, New York, New York, and remotely,
20      beginning at 9:37 a.m., on the above
        date, before Michelle L. Gray, a
21      Registered Professional Reporter,
        Certified Shorthand Reporter, Certified
22      Realtime Reporter, and Notary Public.

23              GOLKOW LITIGATION SERVICES
             877.370.3377 ph| 917.591.5672
24                   deps@golkow.com
```

1          So this one is "AML Global
2   Best Practices" -- or maybe that's -- I'm
3   sorry.  "AML Laws and Regulations & The
4   JPMC Global Anti-Money Laundering
5   Program."
6              (Document marked for
7          identification as Exhibit
8          Langford-5.)
9   BY MS. SINGER:
10       Q.   So this is going to be
11  Exhibit 5.  Fortunately, this one has
12  Bates numbers, so it's going to be easier
13  for everybody to follow along.
14              Take your time.  I just want
15  to introduce it.
16              So this is a presentation
17  that also has your name on it, correct?
18       A.   Yes, it does have my name.
19       Q.   And as well as the JPMorgan
20  Chase logo at the bottom left?
21       A.   Yes.
22       Q.   And this one is dated
23  June 25, 2009, correct?
24       A.   Yes.

1  Q. Okay. And is this a
2  presentation that you recall?
3  A. I don't recall it
4  specifically, but I'm sure it is.
5  Q. Okay. Now, who is Barry
6  Koch?
7  A. Barry Koch was our lawyer,
8  FinCEN lawyer at the time.
9  Q. Okay. Okay. So we're just
10 going to turn to Slide 4, which is Bates
11 number -- it has a number on it. So this
12 is "AML Basics - Other Key Terms."
13         Do you see the bullet point
14 "Willful Blindness"?
15 A. Yes.
16 Q. "Individuals and companies
17 can be found guilty of criminal money
18 laundering if they 'turn a blind eye' to
19 money laundering by others (including
20 failing to report potentially suspicious
21 activity) or if they consciously avoid
22 the truth."
23         Have I read that correctly?
24 A. Yes.

1   Q.   Why did you include willful
2  blindness in this presentation?
3   A.   It's part of the Bank
4  Secrecy Act.
5   Q.   It's part of the Bank --
6   A.   It's part of the Bank
7  Secrecy Act, yeah.
8   Q.   Okay.  And was there a
9  reason that you wanted to convey this
10 concept to people who might be listening
11 to this presentation?
12  A.   It's part of the
13 requirements.  Can't be wilfully blind.
14  Q.   Okay.
15  A.   And, again, I don't remember
16 this, but I would have wanted to include
17 it generally if I'm talking about the
18 background.
19  Q.   Okay. All right. And let's
20 turn to Bates number 765.  When I say
21 Bates number, that's the stamped number
22 in the bottom right, the one that ends
23 765.
24       It's titled "Corporate

1  ███████████████████████████████

2  ███████████████████████████████

3  ███████████████████████████████

4  ███████████████████████████████

5  ███████████████████████████████

6  BY MS. SINGER:

7       Q.   Okay.  And absent an
8  explanation, a legitimate explanation --
9  I'm sorry, an explanation of the
10 legitimate use of that cash, what would
11 your opinion be about the nature of that
12 activity?
13            MR. KRAUSE:  Objection.
14            THE WITNESS:  It would be
15       pure speculation without all the
16       facts and circumstances.  If there
17       was no explanation, you know, I
18       would consider reporting it.
19 BY MS. SINGER:
20       Q.   I want to show you an
21 exhibit that we put together with Jeffrey
22 Epstein's cash transactions.  And this is
23 drawn from CTRs, currency transaction
24 reports, produced to us in discovery.

```
 1                  Now, I take it you're
 2   familiar with the term "currency
 3   transaction report" or "CTR"?
 4          A.     Oh, yes.
 5          Q.     What is it?
 6          A.     Any cash transaction in or
 7   out, cash, cash equivalent to $10,000 and
 8   up has to be reported as a transaction
 9   that goes into the database maintained, I
10   think, by the IRS but available to FinCEN
11   and law enforcement.
12          Q.     Okay.  And that transaction
13   report is called a currency transaction
14   report, or CTR, correct?
15          A.     Yes.  Yep.
16          Q.     Okay.  So this is
17   Exhibit 17.  Cash Transactions From CTRs.
18                 (Document marked for
19                 identification as Exhibit
20                 Langford-17.)
21   BY MS. SINGER:
22          Q.     And, again, this is a
23   document we prepared.
24                 You can see that, based on
```

1  this, Jeffrey Epstein moved $840,000 in
2  cash from his account, the title is in
3  the -- the total is in the top row for
4  the year.  $840,000 in 2004.
5              Is that what this document
6  reflects?
7         A.   That's what it says.
8              MR. GAIL:  Objection.
9  BY MS. SINGER:
10        Q.   And in 2005, $904,000 and a
11 little bit, correct?
12        A.   That's what it says.  I
13 didn't add up the numbers.
14        Q.   Okay.  And in 2006 it was
15 $938,265, as represented here?
16        A.   As represented, yep.
17        Q.   Okay.  So that adds up,
18 roughly, and I won't do math either, but
19 to roughly $2.7 million, correct?
20        A.   I -- without a calculator, I
21 apologize.  Math major, but I don't do
22 that well.
23        Q.   That's why we're all
24 lawyers.

1             Do you believe that this
2    information on cash transaction from
3    Jeffrey Epstein's reports would have been
4    relevant and useful to law enforcement
5    investigating Jeffrey Epstein's conduct
6    between 2004 and 2006?
7             MR. GAIL:  Objection.
8             THE WITNESS:  So I'm not
9        sure how I know what's relevant or
10       not to law enforcement without
11       talking to them about it, I would
12       say, Number 1.
13            Number 2, that this is
14       available to them, right.  That's
15       a CTR.
16            Again, our focus on cash is
17       typically when somebody tries to
18       avoid the currency transaction
19       report requirement, so it then
20       becomes harder to track.
21   BY MS. SINGER:
22       Q.    Now, but filing a CTR
23   doesn't relieve a bank of the
24   responsibility to file a suspicious

1  activity report, correct?

2       A.   If the SAR is required, a
3  SAR is required, independent of a CTR.

4       Q.   Okay.  And the SAR report,
5  as we've discussed, has significance
6  independent of any other information that
7  may be conveyed to law enforcement,
8  correct?

9            MR. KRAUSE:  Objection.

10           MR. GAIL:  Objection.

11           THE WITNESS:  I mean, it's
12       different, right.  It conveys the
13       suspicion, whereas, a CTR does not
14       convey suspicion.  It's a raw fact
15       of a transaction.

16  BY MS. SINGER:

17       Q.   And a SAR would also put
18  that information in the context of the
19  bank's assessment and any other facts or
20  information it may have, correct?

21           MR. KRAUSE:  Objection.

22           THE WITNESS:  To the extent
23       that's relevant, yes.

24  BY MS. SINGER:

1                   pursuant to our procedures and
2                   standards, yes.
3          BY MS. SINGER:
4                   Q.    All right.  The next e-mail
5          is JPM-SDNYLIT-00152833, and we'll mark
6          this as Exhibit 40.
7                         (Document marked for
8                   identification as Exhibit
9                   Langford-40.)
10         BY MS. SINGER:
11                  Q.    And this is an e-mail
12         between you and Steven Cutler dated
13         January 21, 2011, correct?
14                  A.    Yes, it is.
15                  Q.    Okay.  And it provides you
16         with a telephone number for Ken Starr,
17         correct?
18                  A.    It appears that way, yes.
19                  Q.    And this meeting was a week
20         after your meeting with Jes Staley and
21         Catherine Keating, correct?
22                  A.    Yes.
23                  Q.    And were you talking to Ken
24         Starr pursuant to Jes Staley's request

```
 1   that you talk to Jeffrey Epstein's
 2   lawyer?
 3          A.   Yes.
 4          Q.   Did you agree with the
 5   suggestion that talking to Ken Starr
 6   would be helpful to you?
 7               MR. GAIL:  Objection.
 8               THE WITNESS:  I was happy to
 9         accommodate it, but I didn't think
10         it was going to change my mind.
11   BY MS. SINGER:
12          Q.   All right.  So let's turn to
13   Estate_005175, which we'll mark as
14   Exhibit 41.
15               (Document marked for
16         identification as Exhibit
17         Langford-41.)
18   BY MS. SINGER:
19          Q.   And this is a February 17,
20   2011, e-mail chain between Kenneth Starr
21   and Jeffrey Epstein.  And it reports,
22   "Just off the phone.  Went well.  Almost
23   half an hour" -- I'm sorry.  "Almost a
24   half hour.  John Schwartz/William
```

1     Q.    And do you know why Steve
2  Cutler didn't join that call?
3     A.    I don't recall, no.
4     Q.    So it sounds like what Ken
5  Starr was representing was that Epstein
6  had acted inappropriately but not
7  criminally.  Is that consistent with your
8  recollection of the conversation?
9     A.    I think so.  Yeah, it's been
10 a while.  But it was words to that
11 effect.
12    Q.    And was it a conversation of
13 about half an hour?
14    A.    I don't recall the length.
15    Q.    Did you ask Ken Starr any
16 questions, or did John Schwartz ask Ken
17 Starr any questions?
18    A.    After we initiated the call
19 and introduced, I don't recall asking
20 questions.  I may have or John may have,
21 but it was mostly listening to Ken Starr.
22    Q.    And did Ken Starr say
23 anything about a plea being overturned
24 or -- yes?

```
 1         A.    Yes.
 2         Q.    And what did he say?
 3         A.    He said they were working to
 4   have the plea deal thrown out.
 5         Q.    Do you recall anything else
 6   about the conversation with you, John
 7   Schwartz, and Ken Starr?
 8         A.    No.  It's -- was sort of
 9   about what I expected for an attorney
10   representing Epstein.
11         Q.    And what do you mean by
12   that?
13         A.    I mean he was representing
14   Epstein.  Trying to suggest, you know,
15   again, that was not a crime.
16   Inappropriate, as he says here.  But
17   trying to convince us that it wasn't a
18   crime.
19         Q.    Okay. And that's what you
20   would have expected from Epstein's
21   criminal defense attorney, correct?
22         A.    Yes.
23         Q.    And do you recall this ▮
24   ▮ story?
```

```
 1        A.    I do not.
 2        Q.    I'm sure it was a good one.
 3              Did you -- did you get any
 4   information from Ken Starr about why
 5   Jeffrey Epstein was taking so much cash
 6   from his accounts at JPMorgan?
 7        A.    No.
 8        Q.    Did you get any information
 9   from Ken Starr about Epstein's wire
10   transfers to Eastern European women?
11        A.    No.
12        Q.    Did you get any information
13   from Ken Starr about Jeffrey Epstein's
14   payment to ▓▓▓▓▓▓▓▓▓?
15        A.    No.
16        Q.    In your professional
17   experience, is it customary to assess a
18   banking client by talking to that banking
19   client's criminal defense attorney?
20              MR. KRAUSE:  Objection.
21              THE VIDEOGRAPHER:  Sorry,
22        your microphone.
23              MR. KRAUSE:  Sorry.  Hold
24        on.
```

```
 1                THE WITNESS:  This was the
 2         first and probably, I think, the
 3         only time I've been involved in
 4         talking to the defense attorney in
 5         connection with a client
 6         relationship.
 7   BY MS. SINGER:
 8         Q.    Do you know whether JPMorgan
 9   ever met with any of the women who
10   received wire transfers from Jeffrey
11   Epstein?
12         A.    I don't know.
13         Q.    Do you know whether the bank
14   ever met with ████████████ or ████
15   █████, who are the bank's customers
16   through Jeffrey Epstein?
17         A.    I don't know that.
18         Q.    Did you ever see that the
19   bank had any of those conversations?
20         A.    I have not seen any
21   indication that they have.
22         Q.    All right.  Let's turn to
23   JPM-SDNYLIT-0012641.
24                MS. SINGER:  And we're going
```

1               the lawyers.  We talked to the
2               lawyers.  I continued to press for
3               exit, and there was no exit.
4               That's what I know.
5                    Other than that, I didn't
6               have additional conversations with
7               Jes or anybody else.
8      BY MS. SINGER:
9           Q.   And I take it, by the way,
10    the conversation with Ken Starr didn't
11    change your view about exiting -- exiting
12    Jeffrey Epstein, correct?
13          A.   Correct.
14          Q.   And was there anybody -- did
15    anybody ever try to go around Jes Staley
16    to terminate Jeffrey Epstein as a client
17    of the bank?
18               MR. KRAUSE:  Objection.
19    BY MS. SINGER:
20          Q.   To your knowledge,
21    Mr. Langford.
22          A.   Yeah, I don't know.  Going
23    around, I'm not sure how that would work.
24    But I'm not aware of anybody trying to

```
 1        A.    I don't know.  I don't know
 2  if he was already head of Baylor or not.
 3        Q.    The president at -- at some
 4  point he becomes president --
 5        A.    I don't know if it was at
 6  that point or not.
 7        Q.    Before he became president
 8  of Baylor, am I correct that Mr. Starr
 9  also served as the solicitor general of
10  the United States?
11        A.    I don't know for sure.
12        Q.    Do you know whether he
13  served as a senate-confirmed judge on the
14  United States Court of Appeals?
15        A.    No, I don't know that.
16        Q.    Okay.  You testified that
17  you didn't discuss with Starr cash from
18  Epstein's accounts and wire transfers.
19  Do you recall that testimony?
20        A.    Yes.
21        Q.    Why not?
22        A.    We were meeting with Ken
23  Starr at the request of Jes, to have him
24  explain to us why it was that he thought
```

1  that Epstein's plea agreement would be
2  tossed out.
3          Q.    Couple more questions and
4  we'll be done.
5                On human trafficking, did
6  Jeffrey Epstein's account activity fit
7  within any of the typology developed as
8  part of the human trafficking project
9  that you helped launch?
10         A.    No.  We discussed earlier,
11 they didn't.  We were focused on the
12 business of trafficking versus
13 consumer -- the consumer of the
14 trafficked victim.
15         Q.    At any time while you were
16 in your roles at JPMorgan, did you
17 believe that Epstein was using his
18 JPMorgan accounts to run a human
19 trafficking scheme?
20               MS. SINGER:  Objection.
21               THE WITNESS:  No.
22 BY MR. GAIL:
23         Q.    If you had believed at any
24 time that Epstein was running a human