# EXHIBIT 16

Confidential - Pursuant to Protective Order

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
 2

     GOVERNMENT OF THE UNITED      )
 3   STATES VIRGIN ISLANDS         )
                                   )
 4        Plaintiff,               )
                                   )
 5   vs.                           ) 1:22-cv-10904-JSR
                                   )
 6   JPMORGAN CHASE BANK, N.A.,    )
                                   )
 7        Defendant/Third-         )
          Party Plaintiff.         )
 8   _____)
     JPMORGAN CHASE BANK, N.A.     )
 9                                 )
          Third-Party              )
10        Plaintiff,               )
                                   )
11   vs.                           )
                                   )
12   JAMES EDWARD STALEY,          )
                                   )
13        Third-Party              )
          Defendant.               )
14
                 FRIDAY, JULY 14, 2023
15
       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16                      - - -
17           Remote videotaped deposition of
     Jonathan Schwartz, held remotely at the
18   location of the witness in New York, New
     York, commencing at 9:34 a.m. Eastern Time,
19   on the above date, before Carrie A. Campbell,
     Registered Diplomate Reporter and Certified
20   Realtime Reporter.
21
22                      - - -
23           GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
25
```

Golkow Litigation Services                                Page 1

```
 1   out of law school?
 2          A.    My first job was as a law clerk
 3   to Judge Harry T. Edwards on the US Court of
 4   Appeals in DC.
 5          Q.    Did you have another clerkship
 6   after that?
 7          A.    I did.  I clerked for Thurgood
 8   Marshall on the US Supreme Court.
 9          Q.    Okay.  And what did you do
10   after you clerked for Justice Marshall?
11          A.    I joined the law firm of Jones
12   Day in its New York office.
13          Q.    How long were you at -- I'm
14   sorry, sir.
15                Go ahead.
16          A.    It was approximately 18 months.
17                And I next went to the
18   US Attorney's Office for the Southern
19   District of New York.  I was an assistant
20   US Attorney in the criminal division.
21          Q.    That's a prosecutor's office?
22          A.    Correct.  They do civil cases,
23   too, but I was on the criminal side.
24          Q.    And after you left the
25   US Attorney's Office for the Southern
```

1    District of New York, what was your next job?
2        A.    I was detailed, as they called
3    it at the Department of Justice, to main
4    justice in Washington, DC, and I joined the
5    Office of the Deputy Attorney General.  And I
6    spent -- that detail lasted for six years.  I
7    was a main justice in the deputy's office.
8        Q.    Did you work directly with the
9    Attorney General during that time period?
10       A.    There were times when I did,
11   yes.
12       Q.    Okay.  Who was the Attorney
13   General at that time?
14       A.    Janet Reno.
15       Q.    After you left that role, what
16   was your next job?
17       A.    My first general counsel job
18   came then.  I became the general counsel of
19   Napster in, I believe, the spring of 2001.
20       Q.    And how long were you at
21   Napster?
22       A.    Until the summer of 2002.
23       Q.    Okay.  And then did you take
24   another job after that?
25       A.    I did.

```
 1   recollection of there being a rash of
 2   stories, you know, that did involve Prince
 3   Andrew.  Now I see President Clinton at that
 4   time frame.  And the sort of flavor of those
 5   tabloid stories, in part, was prominent
 6   people hanging out with somebody like Jeffrey
 7   Epstein who had engaged in bad conduct.
 8               So I think that's a long way of
 9   I think saying yes to your question.
10        Q.    Thanks.
11               All right.  In the very top
12   e-mail in TX161, you refer to Jay Lefkowitz,
13   but then you also say, "Another possible call
14   is to Willy Ferrer, the US Attorney in
15   Southern District of Florida.  Used to be one
16   of Reno's special assistants, and very nice
17   person."
18               Do you see that?
19        A.    I see it, yes.
20        Q.    Did you ever call Mr. Ferrer?
21        A.    I don't have a recollection of
22   speaking to him.  I know there's later
23   e-mails in which I'm reporting that I did,
24   but I -- even having seen that -- those
25   e-mails saying I spoke to him, I don't recall
```

1  speaking to him.
2      Q.    Do you believe it's likely that
3  your connections in the Department of Justice
4  is one of the reasons that you were asked to
5  get involved in the Epstein issues at
6  JPMorgan?
7            MR. GAIL:  Objection.
8            THE WITNESS:  I don't -- I
9        don't believe so.  I don't have any
10       specific -- I don't have any
11       recollection to suggest that that's
12       the case.
13 QUESTIONS BY MR. WOHLGEMUTH:
14     Q.    You don't dispute, though, that
15 here is an e-mail in which you are referring
16 to someone that you knew from your time at
17 the Department of Justice, correct?
18     A.    I am doing that in this e-mail,
19 yes.
20     Q.    And Mr. Lefkowitz is -- did you
21 also know Mr. Lefkowitz from your time in
22 government?
23     A.    No.  No, I knew -- I think I
24 testified earlier I met Jes -- excuse me.  I
25 met Jay Lefkowitz in the 1980s through mutual