██████████████████████████████████        ████████████████████████

**JPMC Response**: Undisputed that the cited document contains the quoted text.  USVI Ex. 190 at -710.  Disputed as to the inference that Epstein referred Brin.  *See* JPMC Ex. 62 at Resp. 18; JPMC Ex. 71 at 53:3-18.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

332.   *Brin and the CEO, CFO, and CIO of his family office, Bayshore Global, met with Mary*

*Erdoes, Kelly Coffey, John Duffy and other JPMorgan regional executives.  Ex. 190 at -709.*

**JPMC Response**: Undisputed that the cited document states, "Sergey, as well as members of his family office: CEO, CFO and CIO have met with Mary Erdoes, Kelly Coffey, John Duffy and other regional executives."  USVI Ex. 190 at -709.  Disputed as to the inference that Epstein referred Brin.  *See* JPMC Ex. 62 at Resp. 18; JPMC Ex. 71 at 53:3-18.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

333.   █████████████████████████████████████████████████████████

███████████████████████.  *Ex. 61 at -033.*

**JPMC Response**:  ████████████████████████████████████████
██████████████████████████████████████████████████  **USVI**
Ex. 61 at -033.  Disputed as to materiality in light of the fact that Epstein did not refer Sultan Ahmed Bin Sulayem as a client to JPMorgan.  *See* JPMC Ex. 62 at Resp. 26

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

334.   █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████  *Ex. 61 at -033.*

**JPMC Response**:  ███████████████████████████████████  **USVI**
Ex. 61 at -033.  Disputed as to materiality in light of the fact that Epstein did not refer Sultan Ahmed Bin Sulayem as a client to JPMorgan.  *See* JPMC Ex. 62 at Resp. 26.



Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

335.                                                                                          *Ex. 206 at -037; Ex. 207 at 1.*

*Ex. 206 at -037.*

> **JPMC Response**:  Disputed to the extent USVI omits text from the cited quote. *See* USVI Ex. 206 at -037.  Otherwise, undisputed.  Disputed as to materiality in light of the fact that Epstein did not refer Sultan Ahmed Bin Sulayem as a client to JPMorgan. *See* JPMC Ex. 62 at Resp. 26.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

336.   *Sultan Ahmed bin Sulayem, was a senior United Arab Emirates official involved in ownership of the Dubai Ports.  Ex. 144 at -009.*

> **JPMC Response**: Undisputed that the cited document states, "Sultan Ahmed bin Sulayem . . . is a senior UAE official involved in ownership of the Dubai Ports."  USVI Ex. 144 at -009.  Disputed as to materiality in light of the fact that Epstein did not refer Sultan Ahmed Bin Sulayem as a client to JPMorgan. *See* JPMC Ex. 62 at Resp. 26.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

337.   *On December 7, 2009, Epstein wrote to Staley, "if you can have a one on one off the record with sultan , [sic] he will meet you." Ex. 208 at -724; Ex. 144 at -012; Ex. 175 at 7.*

> **JPMC Response**: Undisputed that the cited documents contain the quoted text.  USVI Ex. 208 at -724; USVI Ex. 144 at -012; USVI Ex. 175 at 7.  Disputed as to materiality in

light of the fact that Epstein did not refer Sultan Ahmed Bin Sulayem as a client to JPMorgan. *See* JPMC Ex. 62 at Resp. 26.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

338. *On December 8, 2009, Epstein wrote to Staley, "no to china /ports yet.. [sic] sultan will meet you privately to give you guidance. . . ." Ex. 209 at -897; Ex. 144 at -012; Ex. 175 at 7.*

> **JPMC Response**: Undisputed that the cited documents contain the quoted text. USVI Ex. 209 at -897; USVI Ex. 144 at -012; USVI Ex 175 at 7. Disputed as to materiality in light of the fact that Epstein did not refer Sultan Ahmed Bin Sulayem as a client to JPMorgan. *See* JPMC Ex. 62 at Resp. 26.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

339. *On December 8, 2009, Epstein wrote to Sultan bin Sulayem, copying Staley, "sultan , [sic] jes is free thurs,, [sic] from 5-10 p.m. where and when,, [sic] only the two of you please." Ex. 210 at -727; Ex. 144 at -012; Ex. 175 at 7.*

> **JPMC Response**: Undisputed that the cited documents contain the quoted text. USVI Ex. 210 at -727; USVI Ex. 144 at -012; USVI Ex. 175 at 7. Disputed as to materiality in light of the fact that Epstein did not refer Sultan Ahmed Bin Sulayem as a client to JPMorgan. *See* JPMC Ex. 62 at Resp. 26.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

340. *On December 9, 2009, Epstein wrote to Staley, "sultan is laying the groundwork for you to establish a serious presence.. [sic] jpm reputation in the region is poor." Ex. 211 at -729; Ex. 144 at -012; Ex. 175 at 7.*

> **JPMC Response**: Undisputed that the cited documents contain the quoted text. USVI Ex. 144 at -012; USVI Ex. 175 at 7. Disputed as to materiality in light of the fact that Epstein did not refer Sultan Ahmed Bin Sulayem as a client to JPMorgan. *See* JPMC Ex. 62 at Resp. 26.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

341.    *Epstein's client, Leon Black, was a customer of JPMorgan Private Bank.  Ex. 39 at Resp.*

*192.; Ex. 212 at -010; Ex. 160 at 38:4-41:13.*

> **JPMC Response**: Undisputed that Leon Black was a customer of the Private Bank. Disputed as to materiality in light of the fact that Epstein did not refer Leon Black as a client to JPMorgan.  *See* USVI Ex. 39 at Resp. 11.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

342.    *One of Epstein's JPMorgan Bankers testified, "Leon Black had a very significant net worth*

*and he was a CEO of a large investment firm, and I looked at him as a priority prospect."  Ex.*

*160 at 53:15-54:2.*

> **JPMC Response**:  Undisputed that Morris testified to the cited information.  USVI Ex. 160 at 53:15-54:2.  Disputed as to materiality in light of the fact that Epstein did not refer Leon Black as a client to JPMorgan.  *See* USVI Ex. 39 at Resp. 11.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

343.    *Epstein occasionally brought opportunities to JPMorgan for them to "deepen" their*

*relationship with Leon Black.  Ex. 171 at 46:9-15.*

> **JPMC Response**:  Undisputed that Nelson testified to the cited information.  USVI Ex. 171 at 46:9-15.  Disputed as to materiality in light of the fact that Epstein did not refer Leon Black as a client to JPMorgan.  *See* USVI Ex. 39 at Resp. 11.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

344.    *In July 2012, Epstein sought a loan through JPMorgan on behalf of Leon Black for an art*

*purchase.  Ex. 213 at -569; Ex. 160 at 173:8-21.*

**JPMC Response**: Undisputed that the cited email from Duffy to Erdoes discusses a loan "Jeffrey is pursuing […] on Leon's behalf," USVI Ex. 213 at -569, and that Morris testified that Epstein wanted to bring him on an art loan for Leon Black, USVI Ex. 160 at 173:8-21. Disputed as to materiality in light of the fact that Epstein did not refer Leon Black as a client to JPMorgan. *See* USVI Ex. 39 at Resp. 11.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

345.

*Ex. 214 at -112.*

**JPMC Response**:



USVI Ex. 214 at -112.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

346.

*Ex. 215 at -892.*

**JPMC Response**: Undisputed that the cited document contains the quoted text. USVI Ex. 215 at -892. Disputed as to materiality in light of the fact that Epstein did not refer Leon Black as a client to JPMorgan. *See* USVI Ex. 39 at Resp. 11.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.



*Ex. 216 at -912.*

**JPMC Response**: Undisputed that the cited document contains the quoted text. USVI Ex. 216 at -912. Disputed as to materiality in light of the fact that Epstein did not refer Leon Black as a client to JPMorgan. *See* USVI Ex. 39 at Resp. 11.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

*Ex. 217 at -423.*

**JPMC Response**: Disputed to the extent USVI omits text from the cited quote.

SVI Ex. 217 at -423. Otherwise, undisputed.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

*Ex. 218 at -646.*

**JPMC Response**: Undisputed that the cited document contains the quoted text. USVI Ex. 218 at -646.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

████████████████████████████████████████

350.   *On March 23, 2011, Roy Navon wrote Jacob Frenkel and Staley, "Against all odds, we*

*have been granted a meeting with Prime Minister Netanyahu." Staley forwarded the email from*

*Navon to Epstein and said, "Thanks." Epstein responded to Staley, "surprisee [sic] surprise."*

*Ex. 219 at -841; Ex. 144 at -008; Ex. 175 at 6.*

> **JPMC Response**: Disputed to the extent USVI misstates the cited documents. Epstein's
> response to Staley states, "surprisee [sic] suprise [sic]." USVI Ex. 219 at -841.
> Otherwise, undisputed.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan
> benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶
> 170-175.

351.   *On April 10, 2011, Epstein wrote to Staley, "I will be back tomorow. [sic] Karim Wade*

*son of the senegalese president and one of the most important players in africa, will be at the house*

*this week, i think you will enjoy him." Ex. 220 at -260; Ex. 144 at -008; Ex. 175 at 6.*

> **JPMC Response**: Undisputed that the cited documents contain the quoted text. USVI
> Ex. 220 at -260; USVI Ex. 144 at -008; USVI Ex. 175 at 6.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan
> benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶
> 170-175.

352.   *On September 16, 2011, Epstein wrote to Staley, "co founder of facebook , [sic] and*

*founder of spotify, sean parker , [sic] will be at the house for dinner on sunday —come." Ex. 221*

*at -368; Ex. 144 at -009; Ex. 175 at 6.*

> **JPMC Response**: Undisputed that the cited documents contain the quoted text. USVI
> Ex. 221 at -368; USVI Ex. 144 at -009; USVI Ex. 175 at 6.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan
> benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶
> 170-175.

353.   ████████████████████████████████████████████████████████

████████████████████████████. *Ex. 222 at Resp. 5.*

███████████████████████████████        ████████████████████

**JPMC Response**: ███████████████████████████████████████████
████████████████████████████████████████

USVI Ex. 222 at Resp. 5.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

354.   *In August 2013, after JPMorgan informed Epstein of the decision to exit him from the bank,*

*Duffy and Erdoes decided it was okay to continue working with Epstein as long as it was through*

*his client accounts.  Ex. 212 at -010; Ex. 171 at 174:19-175:23.*

**JPMC Response**:  Disputed.  Erdoes and Duffy selectively permitted further engagement where the client directed that JPMC interact with Epstein, but Epstein could not have decision making authority over the accounts.  *See* JPMC Ex. 75.  *See also* JPMC Ex. 61 at 302:19-303:11  ("[W]e can't stop someone from being affiliated with somebody else. But we wouldn't be taking direction from [Epstein] . . . ."); *see also* JPMC Ex. 76 at 175:2-177:11; JPMC Ex. 77 at 382:23-383:9.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

355.   *JPMorgan continued to work with Epstein on accounts for Leon Black, CEO of Apollo, a*

*private equity group.  Ex. 223 at -344; Ex. 224 at -434-35; Ex. 225 at -511; Ex. 226 at -218-19;*

*Ex. 171 at 45:8-13.*

**JPMC Response**: Disputed to the extent the USVI mischaracterizes JPMorgan as "work[ing] with Epstein on accounts for Leon Black."  Disputed to the extent the cited documents do not support the assertion that JPMorgan "continued to work with Epstein on accounts for Leon Black."  In the cited deposition testimony, Nelson is asked, "[w]as there ever a point in time where Jeffrey Epstein was communicating with you on behalf of Leon Black related to any investment vehicles?"  Justin Nelson replies, "I don't remember."  USVI Ex. 171 at 45:4-8.  *See also* JPMC Response to ¶ 354, *supra*.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

356.   *Duffy gave Epstein's JPMorgan Banker (Nelson) permission to continue a relationship*

*with Epstein as a potential source of referrals.  Ex. 171 at 172:2-175:9.*

**JPMC Response**: Undisputed that during his deposition, Justin Nelson responded, "yes" when asked if, after Jeffrey Epstein had been terminated, Nelson got "the permission of John Duffy to continue a relationship with Jeffrey Epstein where he will be a potential source of future referrals?" USVI Ex. 171 at 172:2-175:9. Disputed as to the scope of the relationship implied by USVI's proposition. *See* JPMC Response to ¶ 354.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

357.  *Nelson maintained a relationship with Epstein after he was terminated as a client.  Ex. 171*

*at 43:6-24.*

**JPMC Response**:  Undisputed as to the cited deposition testimony.  USVI Ex. 171 at 43:6-24.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

358.  *Nelson met with Epstein 8 to10 times after Epstein was terminated.  Ex. 171 at 177:12-18.*

**JPMC Response**:  Undisputed as to the cited deposition testimony.  USVI Ex. 171 at 177:12-18.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

359.  *JPMorgan admits that Mary Casey met with Epstein at his Manhattan townhouse two or*

*three times between 2000 and before Epstein's arrest in 2006. JPMorgan admits that Mary Casey*

*also met with Epstein at his Manhattan townhouse once in 2011 and once in the summer of 2013.*

*Ex. 227 at Resp. 21.*

**JPMC Response**: Disputed to the extent the USVI misstates the cited document. Response 21 states that Erdoes, not Casey, "met with Epstein twice at his Manhattan townhouse in 2011 and in the Summer of 2013." USVI Ex. 227 at Resp. 21.  Undisputed that the cited document states that Mary Casey met with Epstein "at his Manhattan townhouse on two or three occasions between 2000 and prior to [Epstein's] arrest in 2006." *Id.*



Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

360. 

*Ex. 228 at -644.*

**JPMC Response**: Undisputed that the cited document contains the quoted text. Disputed as to materiality in light of the fact that Epstein did not refer Leon Black as a client to JPMorgan. *See* USVI Ex. 39 at Resp. 11.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

361. 

*Ex. 229 at -300.*

**JPMC Response**: Undisputed that cited document contains quoted text. USVI Ex. 229 at -300.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

362. 

*Ex. 230 at -592.*

**JPMC Response**: Undisputed that cited document contains quoted text. USVI Ex. 230 at -592.

[REDACTED]

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

363. [REDACTED]

[REDACTED]

[REDACTED]

*Ex. 231 at -975.*

> **JPMC Response**:  Undisputed that cited document contains quoted text.  USVI Ex. 231 at -975.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

364. [REDACTED]

[REDACTED]

[REDACTED] . *Ex. 232 at -177.*

> **JPMC Response**: [REDACTED]
>
> [REDACTED]
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

365. [REDACTED]

[REDACTED] *Ex 233 at -618.*

> **JPMC Response**: Undisputed that the cited document contains the quoted text.  USVI Ex. 233 at -618.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

[REDACTED]

366.    *JPMorgan admits Epstein was involved in the establishment of a customer relationship*

*with Kathryn Ruemmler.  Ex. 234 at Resp. 3.*

> **JPMC Response**: Undisputed that the cited document states that "Mr. Epstein had some
> involvement in the establishment of customer relationships between JPMC's private bank
> and Ghislaine Maxwell and Kathryn Ruemmler."  USVI Ex. 234 at Resp. 3.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan
> benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶
> 170-175.

367.    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] *Ex. 235 at -394.*

> **JPMC Response**: [REDACTED] USVI Ex. 235 at -394. [REDACTED]
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan
> benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶
> 170-175.

368.    [REDACTED]

[REDACTED]

[REDACTED]

> **JPMC Response**: [REDACTED]. *See*
> USVI Ex. 236 at -392. [REDACTED] *Id.*
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan
> benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶
> 170-175.

369. ████████████████████████████████████████████

████████ *Ex. 237 at 467.*

**JPMC Response**: ████████████████████████████
████████████████████████████████████████
██████████████████████ USVI Ex. 237 at -467.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

370. ████████████████████████████████████████████

████████████████████████████████████████████

████████ *Ex. 238 at -063.*

**JPMC Response**: ████████████████████████████
████████████████████████████████████████
██████████████████████ USVI Ex. 238 at -063.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

371. *Epstein was close friends with Glenn Dubin, the billionaire co-founder of Highbridge, and godfather to one of Dubin's children. Ex. 239 ¶ 3; Ex. 240 at -164; Ex. 123 at 173:19-74:1.*

**JPMC Response**: Disputed to the extent the USVI inserts the word "close" to describe the relationship. Undisputed that in the cited deposition testimony, Erdoes states, "I understood Mr. Epstein to be -- to have had a past relationship with Mr. Dubin's wife. And I understood that Mr. Epstein was the godfather of one of the Dubin -- the oldest of the Dubin children. That was my understanding." USVI Ex. 123 at 73:19-74:1.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

372. *Epstein advised JPMorgan regarding the acquisition. Ex. 241 at 590; Ex. 242 at -149-50.*

**JPMC Response**: Disputed to the extent the USVI mischaracterizes Epstein's role regarding the acquisition. On June 16, 2004, von Moltke emails Staley and Brigstocke, copying other JPMC employees. The email summarizes observations from a meeting the

previous day with Highbridge.  One of the items under "Next steps" states, "We continue to be concerned about the role Jeffrey Epstein is or is not playing.  One concern that we have is that Jeffrey has been educating Glenn & Henry about our structure and valuation thoughts behind our backs such that their expectations for yesterday's were higher.  This is clearly not in our interest."  USVI Ex. 242 at -150.  This information does not support the proposition that Epstein "advised" JPMC.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

373.   *Epstein also advised Highbridge regarding the acquisition.  Ex. 241 at -590; Ex. 242 at -149-50*

**JPMC Response**: Undisputed that the February 15, 2005 email sent from Shepherd to Staley and Brigstocke, copying Cook, sets out a "strawman proposal [sic] for the economics of a consulting arrangement at Highbridge for Jeff Epstein."  USVI Ex. 241 at -590.  Disputed as to the extent the USVI characterizes this proposal as representative of any final advising arrangement between Highbridge and Epstein or Epstein and JPMC.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

374.   *On June 16, 2004, James Von Moltke emailed Jes Staley and David Brigstocke with the subject line, "Thoughts on the 6/15/04 meeting with Highbridge," stating, "The good news is that we did not leave any money on the table and that, based on the 9-11x multiple range we discussed with Dimon et al . . . They should be encouraged to go ahead with the Dimon and Coulter lunch. . . . This would be a good part of a follow-up discussion, ideally with you and prior to the Dimon/Coulter meeting.  We continue to be concerned about the role Jeffrey Epstein is or is not playing. One concern that we have is that Jeffrey has been educating Glenn & Henry about our structure and valuation thoughts.  " Ex. 242 at -149-50.*

**JPMC Response**: Undisputed that the cited document contains the quoted text although the underlying document is formatted as a series of distinct bullet points and not as continuous text, as this paragraph presents it.  USVI Ex. 242 at -149-50.  Disputed to the extent the cited document is selectively quoted and without appropriate context.  For instance, the language that USVI quotes suggests Highbridge "should be encouraged to

[BLACK REDACTION BAR]

go ahead with the Dimon and Coulter lunch" *because of* the "9-11x multiple range we discussed with Dimon et al." These statements, however, appear in different, unrelated sections of von Moltke's email. USVI Ex. 249 at -50 (emphasis added).

Further disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

375.    *On January 14, 2004, the New York Times reported that JPMorgan had agreed to acquire*

*Bank One and stated:  "The combined company will be headed by William B. Harrison, 60, who*

*is currently the chairman and chief executive of J.P. Morgan Chase. James Dimon, 47, the*

*chairman and chief executive of Bank One, will become president and chief operating officer of*

*the combined company. He is to succeed Mr. Harrison as chief executive in 2006, although Mr.*

*Harrison will remain as chairman."  Ex. 243 at 1.*

**JPMC Response**: Undisputed that the cited document contains the quoted text.  USVI Ex. 243 at 1.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.  Further contended that the cited material cannot be presented at trial in admissible form.

376.    [BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR].

*Ex. 244 at -985, -987, -996, -998.*

**JPMC Response**: [BLACK REDACTION BAR]

[BLACK REDACTION BAR]. USVI Ex. 244 at -985, -987, -996, -998.



Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

377.

*Ex. 245 at -780.*

**JPMC Response**:

USVI Ex. 245 at -780.

"

USVI Ex. 245 at 780.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

378.   *JPMorgan admits that Dubin & Swieca Holdings, Inc. paid Financial Trust Company, Inc.*

*a fee related to JPMorgan's acquisition of a majority interest in Highbridge Capital Management*

*in 2004.  Ex. 39 at Resp. 9.*

**JPMC Response**: Undisputed that Dubin & Swieca Holdings, Inc. paid Financial Trust Company, Inc. a fee related to JPMorgan's acquisition of a majority interest in Highbridge Capital Management in 2004.  USVI Ex. 39 at Resp. 9.

████████████████████████████████████████████████████

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

379.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Ex. 246 at -246-47.*

> **JPMC Response**: ████████████████████████████████
> ████████████████████████████████████████████████
> ████████████████████████████ USVI Ex. 246 at -246-47.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

380.  *Highbridge managed $7 billion in assets at the time JPMorgan acquired the majority interest.  Ex. 247 at 1.*

> **JPMC Response**: Undisputed that the cited document, a New York Times article dated September 28, 2004, states that "Highbridge manages $7 billion in assets."  USVI Ex. 247 at 1.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

381.  *On June 11, 2009, JPMorgan completed its purchase of Highbridge and touted it as "one of the largest and most significant strategic alliances in the hedge fund industry."  Ex. 248 at 1.*

> **JPMC Response**: Disputed as to USVI's characterization that the cited document "touted" anything.  Undisputed that the cited document, dated June 11, 2009, contains the quoted text.  USVI Ex. 248 at 1.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

██████████████████████████████████████

382.    *At the October 2006 Rapid Response meeting, the Private Bank imposed a condition on*

*Epstein's accounts—he could remain a "banking" but not an investment client. Ex. 76 at -953.*

> **JPMC Response**: Disputed.  USVI misstates the conclusion of the meeting and the cited
> document.  The cited document does not support the conclusion that the Private Bank
> imposed a condition that Epstein could not remain an investment client.  The cited Rapid
> Response Team memorandum states that "it was decided that we will keep Mr. Epstein
> solely as a banking client and on a 'reactive', client service basis.  We will not
> proactively solicit new investment business from him."  USVI Ex. 76 at -953.  JPMC
> decided that it would not "proactively solicit new investment business" from Epstein, not
> that Epstein could not be an investment client.  *Id.*; *see also* JPMC Ex. 71 at 66:17-67:12

████████████████████████████████████████████

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan
> benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶
> 170-175.

383.    *At the time, Epstein's brokerage business was at Bear Stearns, not JPMorgan.  Ex. 124 at*

*- 175; Ex. 249 at -787.*

> **JPMC Response**: Undisputed that the cited documents support that Epstein had a
> brokerage relationship with Bear Stearns.  USVI Ex. 124 at -175; USVI Ex. 249 at -787.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan or
> Bearn Stearns benefited from participating in Epstein's alleged sex-trafficking venture.
> *See* CSMF ¶¶ 170-175.

384.    *JPMorgan considered him "problematic" from an investment standpoint.  Ex. 250 at -254;*

*Ex. 32 at 97:3-100:1.*

> **JPMC Response**: Undisputed that the cited document and testimony support that JPMC
> considered Epstein "problematic" from an investment standpoint.  USVI Ex. 250 at -254;
> USVI Ex. 32 at 97:30-100:1.  Disputed that this fact is at all material to the issues of this
> case.  The cited email shows that JPMC employees are discussing Epstein's
> "problematic" behavior in the context of his failure to pay fees and because "every
> transaction becomes problematic."  USVI Ex. 250 at -254.  This discussion has nothing to
> do with Epstein's arrest in 2006.  Ms. Casey testified that the cited email related to "the
> challenges of covering Jeffrey because he was a difficult investment client" and that the
> reference to Epstein being "problematic" was in connection with "an investment-related
> concern."  USVI Ex. 32 at 98:16-23.

██████████████████████████████████████  ████████████

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

385.   ███████████████████████████. *Ex. 167 at -654. By 2011, Epstein was the Private Bank's investment arm's "biggest revenue producer."  Ex. 168 at -977.*



**JPMC Response**: Disputed. ████████████████████████████████████
████████████████████████████████  USVI Ex. 76 at -953. ███████████  *Id.*
█████████████████████████████████████████████████████████████
██████████████████████████  *See* USVI Ex. 167 at -654. █████████████
██████████████████  *See* JPMC Ex. 78 at -968; USVI Ex. 168 at -977. ████████
██████████████████████

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

386.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████   *Ex. 251 at -223.*

**JPMC Response**: █████████████████████████████████████████
██████████████████████  USVI Ex. 251 at -223. ████████████████
██████████████████████████████  *Id.*
██████████████████████████████████  *See*
JPMC Response to ¶ 138, *supra*.

██████████████████████████████     ████████████

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

387. *On March 16, 2008, JPMorgan purchased Bear Stearns. Ex. 122 at 1.*

**JPMC Response**: Undisputed that on March 16, 2008, JPMorgan Chase and Co. purchased Bear Stearns.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan or Bear Stearns benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

388. *The purchase kept Bear Stearns, which was heavily in mortgage-backed securities investments, from bankruptcy following the housing market crash that led to the 2008 Great Recession. Ex. 122 at 1.*

**JPMC Response**: Undisputed that the cited document provides the cited information. USVI Ex. 122 at 1. Disputed that the cited document is competent evidence on the impact of the purchase of Bear Stearns or what led to Bear Stearns' bankruptcy.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan or Bear Stearns benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

389. ████████████████████████████████████████████████████

████████████████████████████████. *Ex. 252 at 1-2.*

**JPMC Response**: ██████████████████████████████████████████
████████████████████████████████████████. USVI Ex. 252 at 1-2. ██████████████████████████████████████████████████.
*See* JPMC Ex. 79 at 272:3-8 (Q: "And it's also consistent that JPMorgan retained Jeffrey Epstein as a client to deal with the Bear Stearns litigation that Jeffrey Epstein had, correct?" A: "I don't know that."); *id.* at 275:7-22 (explaining reasons JPMC retained Epstein around this time as "Mr. Staley felt very strongly that Mr. Epstein had paid his debt to society, had served his time, and was someone that a lot of other people trusted. I think Mr. Staley didn't agree with the notion that we shouldn't have him as a client.").

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan or Bear Stearns benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175. Further contended that the cited material cannot be presented at trial in admissible form.

390.    *In August 2009, Epstein sued Bear Stearns for "fraudulently overstat[ing] the value of Bear Stearns' mortgages, mortgage-backed and asset-backed securities and other derivative financial instruments, the adequacy of its liquidity and capital reserves, and the quality of Bear Stearns' risk management." Ex. 253 ¶ 15.*

> **JPMC Response**: Undisputed that on August 5, 2009, Epstein's entity, Financial Trust Company, Inc., filed a complaint against The Bear Stearns Companies Inc. and the complaint contains the quoted language.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan or Bear Stearns benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.  Further contended that the cited material cannot be presented at trial in admissible form.

391.    *On July 19, 2011, JPMorgan offered Epstein a proposal to settle his High Grade Fund and Bear Stearns claims together for $21 million. Ex. 254 at -561. The following day, Cutler responded, "This is not an honorable person in any way. He should not be a client." Id.*

> **JPMC Response**: Disputed.  USVI misstates the cited document.  The document does not support the contention that "JPMorgan offered Epstein a proposal to settle" his claims for $21 million.  Rather, the cited document shows that JPMC responded *to Epstein's proposal* to settle his claims for $21 million.  *See* USVI Ex. 254 at -561.  On July 19, 2011, James Condren wrote to Staley, Erdoes, Cutler, and Shenker, "I just conveyed to Mr. Epstein *our response to his proposal* to settle his High Grade Fund and Bear Stock claims together for $21 million." *Id.* (emphasis added).  Undisputed that on July 20, 2011, Cutler responded to Condren's email and Cutler's response contains the quoted text.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.

392.    *On July 21, 2011, Cutler wrote to Erdoes regarding a settlement offer to Epstein, "I would like to put it and HIM behind us. Not a person we should do business with - period." Ex. 255 at -958_R.*

> **JPMC Response**:  Undisputed that Cutler emailed Erdoes on July 21, 2011 and that email contains the quoted text.  USVI Ex. 255 at -958_R.  Disputed to the extent USVI contends that this fact supports an inference this litigation had any relevance to JPMC's

retention or exit decisions with respect to Epstein. *See* JPMC Ex. 79 at 272:3-8 (Q: "And it's also consistent that JPMorgan retained Jeffrey Epstein as a client to deal with the Bear Stearns litigation that Jeffrey Epstein had, correct?" A: "I don't know that."); *id.* at 275:7-22 (explaining reasons JPMC retained Epstein around this time as "Mr. Staley felt very strongly that Mr. Epstein had paid his debt to society, had served his time, and was someone that a lot of other people trusted.  I think Mr. Staley didn't agree with the notion that we shouldn't have him as a client.").

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

393. *On August 4, 2011, JPMorgan met for a fourth Rapid Response Meeting regarding Epstein and concluded that "Duffy to reach out to Jes Staley and advise that we exit while things are a bit settled." Ex. 256 at 31.*

**JPMC Response**: Undisputed that a Rapid Response meeting was held on August 4, 2011 and the cited document contains the quoted text.  USVI Ex. 256 at 31.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

394. *On April 8, 2011, Nina Shenker emailed Kevin McCleerey with the subject, "Rapid Response." Shenker wrote, "[I]f you could break down between ddas, brokerage and fund holdings and others [sic] categories.  So that we can understand the process for offboarding the account." Ex. 257 at -025. Kevin McCleerey responded with the attachment, "Rapid Response Team – Jeffrey Espstein [ sic ] 3r Mtg – Jan 2011 – March 2011 update-doc.zip."  Employees were working to collect information to "understand the process for offboarding the account." Id. at -025.*

**JPMC Response**: Disputed.  USVI misstates the cited document.  Undisputed that on April 8, 2011, Shenker emails McCleerey and the email contains the quoted text. McCleerey does not, however, respond to Shenker with the cited attachment.  Rather, McCleerey forwards Shenker's email to James Dalessio, attaching the file titled "Rapid Response Team - Jeffrey Espstein [sic] 3r Mtg - Jan 2011 - March 2011 update-doc.zip," and states "Lets [sic] discuss her request."  USVI Ex. 257 at -025.

███████████████████████████████████████████

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

395.  *In July 2011, when Epstein approved the settlement, Nina Shenker, then GC to the Private Bank, wrote to Erdoes, "Steve [Cutler] at conclusion of JE approval [of Bear Stearns settlement], asked when we are offboarding JE.  I reminded him that we have the other matter outstanding."*
*Ex. 258 at -982; Ex. 99 at 268:12-272:24.*

> **JPMC Response**: Undisputed that Shenker emailed Erdoes on July 22, 2011 and that email contains the quoted language.  USVI Ex. 258 at -982.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

396.  ████████████████████████████████████████████████

████████████████████████████████████   *Ex. 259 at -106.*

> **JPMC Response**:  Undisputed that the cited document contains the quoted text.  USVI Ex. 259 at -106.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

397.  ████████████████████████████████████████████████

████████████████████████.   *Ex. 252 at 1-2; Ex. 260 at -610.*

> **JPMC Response**: ████████████████████████████
> ████████████████████████████████████████
> ████████████████████████████   *. See* Ex. JPMC Ex. 79 at 274:17-275:5 ("I also don't know that we were not off-boarding Mr. Epstein because of [the Highbridge] litigation or litigation claim."); *id.* at 273:1-15 ("We did not, also, offboard him once the Zwirn matter was resolved."); *id.* at 275:7-22 (explaining reasons JPMC retained Epstein around this time as "Mr. Staley felt very strongly that Mr. Epstein had paid his debt to society, had served his time, and was someone that a lot of other people trusted.  I think Mr. Staley didn't agree with the notion that we shouldn't have him as a client.").

███████████████████████████████████   ███████

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175. Further contended that the cited material cannot be presented at trial in admissible form.

398. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████   *Ex. 261 at -948_R.*

**JPMC Response**: Undisputed that the cited document contains the quoted text. USVI Ex. 261 at -948_R.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

399. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████   *Ex. 262 at -561.*

**JPMC Response**: Undisputed that the cited document contains the quoted text. USVI Ex. 262 at -561.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan or Bear Stearns benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

400. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

**JPMC Response**: Undisputed that the cited document contains the quoted text. USVI Ex. 262 at -560.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

401.    *"The Talented Mr. Epstein" states: "in his early 20s [Epstein] got a job teaching physics and math at Dalton, the elite Manhattan private school. While there he began tutoring the son of Bear Stearns chairman Ace Greenberg and was friendly with a daughter of Greenberg's. Soon he went to Bear Stearns, where, under the mentorship of both Greenberg and current Bear Stearns C.E.O. James Cayne, he did well enough to become a limited partner—a rung beneath full partner." Ex. 49 at 5.*

> **JPMC Response**: Undisputed that the cited document contains the quoted text.  USVI Ex. 49 at 6.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan or Bear Stearns benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.  Further contended that the cited material cannot be presented at trial in admissible form.

402.    *In August 2010, Alan "Ace" Greenberg, who was now at JPMorgan, wanted to continue to do business with Epstein so he went to Cutler for an exception to the felon policy.  Ex. 263 at 910-11.*

> **JPMC Response**: Undisputed that the cited email states that "Ace Greenberg wants to do business with [Epstein]" and Todd Cook asks, "Did Ace go to him for an exception to the felon policy," to which Melissa Getler states, "That's my understanding."  USVI Ex. 263 at -910-11.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

403.    *In his deposition, Jes Staley agreed that Greenberg was "a fairly important person" with "heft" at JPMorgan around 2010.  Ex. 46 at 173:13-24.*

> **JPMC Response**: Disputed to the extent USVI mischaracterizes Staley's testimony. *See* USVI Ex. 46 at 173:13-24.  Undisputed that Staley testified that "Greenberg was important." *Id.* at 173:23-24.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

████████████████████████████████████████

404.    *Beginning in 2011, Staley and Erdoes had "regular communication with Jeffrey Epstein relating to certain strategic initiatives and business proposals." Ex. 144 at -012; Ex. 175 at 1.*

> **JPMC Response**: Undisputed that the cited documents contain the quoted text.  USVI Ex. 144 at -012; USVI Ex. 175 at 1.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

405.    ████████████████████████████████████████

████████████████████████████.  *Ex. 302 at -555-56; Ex. 303 at -548-49.*

> **JPMC Response**: ████████████████████████████████
>
> ████████████████████████████████████.
>
> USVI Ex. 302 at -548-49; USVI Ex. 303. ████████████████
>
> ████████████████
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

406.    *JPMorgan admits that Epstein and JPMorgan personnel discussed a potential donor advised fund relating to The Bill and Melinda Gates Foundation and Bill Gates. Ex. 39 at Resp. 14.*

> **JPMC Response**: Undisputed that Epstein and JPMorgan personnel discussed a potential donor advised fund relating to The Bill and Melinda Gates Foundation and Bill Gates.  USVI Ex. 39 at Resp. 14.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

407.    *On February 6, 2011, Epstein wrote to Staley regarding a potential donor advised fund for The Bill and Melinda Gates Foundation, "you could tie it initially just to the gates program,, [sic] miinimum [sic] gift. 100 million. it could then be opend [sic] up later. IT will be the largest foundation in the world . . . . done right its [sic] 100 billion dollars in 2 years. . . . .Farming the*

████████████████████████████████████████
████████████████████

*investments to a highbridge is no brainer. . . .It will be the most sort [sic] after board in the*

*country." Ex. 264 at -591; Ex. 144 at -012; Ex. 175 at 7.*

> **JPMC Response**: Undisputed that the cited documents contain the quoted text.  USVI
> Ex. 264 at -591; USVI Ex. 144 at -012; USVI Ex. 175 at 7.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan
> benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶
> 170-175.

408.   *In August 2011, Epstein wrote to Staley and Erdoes regarding* ███  ██████████████

*noting it will be a "very HIGH profile" opportunity and recommending it require a minimum $100*

*million donation.  Ex. 265 at -652; Ex. 144 at -013; Ex. 175 at 7.*

> **JPMC Response**: Undisputed that Epstein emailed Staley and Erdoes on August 10,
> 2011 and wrote, "This will be very HIGH profile.  I propose a minimum of 100 million
> donation."  USVI Ex. 265 at -654.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan
> benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶
> 170-175.

409.   ████████████████████████████████████████

████████████████████████████████████████

████████████████████   *Ex. 266 at -924.*

> **JPMC Response**: Undisputed that the cited document contains the quoted text.  USVI
> Ex. 266 at -924.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan
> benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶
> 170-175.

410.   ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████   *Ex. 267 at -666.*

> **JPMC Response**: Undisputed that the cited document contains the quoted text.  USVI
> Ex. 267 at -666.

██████████████████████████████████████████   ████████

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

411.   ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████   *Ex. 268 at -028.*

**JPMC Response**: Undisputed that the cited document contains the quoted text. USVI Ex. 268 at -028.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

412.   *JPMorgan admits it had communication with Epstein about a fee for Epstein in connection with a proposed donor advised fund. Ex. 39 at Resp. 15.*

**JPMC Response**: Undisputed that JPMC had communication with Epstein about a fee for Epstein in connection with a proposed donor advised fund. Disputed as to materiality in light of the fact that, as provided in the full cited response, the donor advised fund was never established and JPMC did not pay Epstein any such fee. *See* USVI Ex. 39 at Resp. 15.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

413.   ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

[REDACTED]

*Ex. 269 at -931-32.*

**JPMC Response**: [REDACTED] USVI Ex. 269 at -931. [REDACTED]

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

414.    *On April 27, 2009, Epstein emailed Staley, "*[REDACTED]* can meet have dinner lunch a weekend [sic] with any of the following seth Lloyd mit quantum computing.. [sic] murray gell-man , santa-fe institute quarks ,, [sic] brian greene Columbia -string theory,, [sic] leonard Susskind ,, [sic] strings theory, lawrence Krause,, [sic] origins institute phoenix Arizona.. [sic] lee smolin perimeter institute, loop quantum gravity , [sic] she can see the large adron [sic] collider in switzerland. private tour." Ex. 270 at -844; Ex. 144 at -004; Ex. 175 at 4.*

**JPMC Response**: Disputed to the extent USVI misstates the document, the quoted text states, "[REDACTED] can meet have dinner lunch a weekend [sic] with any of the following seth lloyd mit quantum computing.. [sic] murray gell-man , santa- fe institute, quarks ,, [sic] brian greene columbia -string theory,, [sic] leonard susskind ,, [sic] strings theory, lawrence krause,, [sic] origins institute phoenix arizona.. [sic] lee smolin perimeter institute, loop quantum gravity , [sic] she can see the large hadron [sic] collider in switzerland. private tour." USVI Ex. 270 at -844. Otherwise, undisputed.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

415.    [REDACTED] *Ex. 144 at -004.*

**JPMC Response**: [REDACTED]

212

███████████████████████████████        ████████████████████████████

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.

416.   *On September 24, 2010, Staley forwarded an email chain between him,* ████████████████

*and Staley's wife,*████████████████████████ *regarding a professor at Columbia to Epstein,*

*"can u [sic] get to this professor at Columbia?" Ex. 271 at -121; Ex. 144 at -004; Ex. 175 at 4.*

*On September 25, 2010, Epstein responded, "in a snap." Id.*

> **JPMC Response**: Disputed to the extent USVI misstates the quoted document.  Staley's wife's ████████████████████ and the quoted email from Staley reads, "Can u get to this professor at Columbia?"  USVI Ex. 274 at -121.  Otherwise, undisputed.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

417.   *On December 12, 2008, Erdoes wrote to Staley regarding Bernie Madoff, ". . . glenn and*

*I have been going back and forth all night.  This is terrible.  Just terrible.* ████████ *has over 1b.*

*Nicole has another client with 1b.  We have HUNDREDS of clients with some.  The ny/palm beach*

*community will be in shock.  Can you call JE to get scoop from down there?" Ex. 272 at -627.*

> **JPMC Response**: Undisputed that the cited document contains the quoted text.  USVI Ex. 272 at -627.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

418.   *On April 7, 2023, in a CNN interview Jamie Dimon, in response to a question about*

*whether "JPMorgan should have acted more quickly after Epstein pleaded guilty to one of these*

*charges in 2008" said "Hindsight is a fabulous gift." Ex. 273 at 21.*

> **JPMC Response**: Undisputed that Dimon provided the quoted response.  USVI Ex. 273 at 21.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture.  *See* CSMF ¶¶ 170-175.

███████████████████████████████    ████████████████

419.    *In the same CNN interview, Jamie Dimon was asked, "[the U.S. Virgin Islands is] alleging that your bank helped facilitate payments to Epstein's victims and benefited from human trafficking while ignoring warnings. Do those allegations have merit?" Dimon responded, "[W]e have some of the best lawyers in the world—compliance, out of the DOJ, out of SEC important divisions who review all of these things and make decisions at the time based on what they know, as best as they know." Ex. 273 at 20.*

> **JPMC Response**: Undisputed that Dimon provided the quoted response.  USVI Ex. 273 at 20.
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan benefited from participating in Epstein's alleged sex-trafficking venture. *See* CSMF ¶¶ 170-175.

### JPMorgan Obstructed Enforcement of the TVPA

420.    *Shaun O'Neill, former Special Agent with the Federal Bureau of Investigations ("FBI"), states that "the FBI relies on financial institutions as a key partner to . . . obtain the information necessary to answer the questions of who, what, when, where, and why." Ex. 274 at 17. The information in JPMorgan's possession "warranted a constant stream of information from JPMC to the FBI about Epstein's* ████████████████████ *. . . Human trafficking is an ongoing crime, with harm incurred every day that the crime continues." Id. at 18. "It shocks the conscience that it was not until Epstein's death in prison that JPMC suddenly recognized Epstein's prior banking transactions as* ██████████ *Id. at 25. O'Neill further states that "When it became public that Jeffrey Epstein had been arrested and that he had used cash to commit his sexual crimes against children, JPMC's* ████████████████████ *impaired the government's ability to prosecute the crimes that it was investigating against Epstein." Id. Further,* ████████████████████
████████████████████████████████████—*"the sheer amount of cash being dispersed,"*



"more than $3 million was paid by Epstein to women, many of whom had Eastern European surnames," and Epstein's loan to modeling agency MC2—"Epstein would have been federally charged at a much earlier date." *Id.* at 18-25. "Had the FBI been notified of this ██████ banking activity all being related to Epstein . . . [Epstein] would not have been able to continue his criminal activity from 2008 onward." *Id.* at 20-21.

> **JPMC Response**: Disputed.  JPMC does not dispute that the quoted text is included in the report of USVI's proffered expert Shaun O'Neill.  However, JPMC disputes the underlying conclusions and O'Neill's misstatement of the record. ███████
>
> ██████ *ee* JPMC Exs. 42, 43, 44, 45, 46, 47, 48. ████
>
> ████ JPMC Ex. 80 at 59:8-60:10. ████████
>
> ████ *See* JPMC Ex. 81
> ¶ 15.

> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan obstructed enforcement of the TVPA.  *See* CSMF ¶¶ 176-179.  Further contended that the cited material cannot be presented at trial in admissible form.

421. ████████████████

████████████████

████████████████

████ *Ex. 275 at -683.*

> **JPMC Response**: ████████████
>
> ████████████████



*. See* USVI Ex. 421 at -683

*Id.* (emphasis added)).

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan obstructed enforcement of the TVPA. *See* CSMF ¶¶ 176-179.  Further contended that the cited material cannot be presented at trial in admissible form.

422.



*Ex. 276 at -422.*

**JPMC Response**: Undisputed that the cited document contains the quoted language. USVI Ex. 276 at -422.

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan obstructed enforcement of the TVPA.  *See* CSMF ¶¶ 176-179.

423.  *In 2019, Brunel was arrested and charged with rape of minors and sexual harassment and*

*was under investigation for human trafficking.  Ex. 277.*

**JPMC Response**: Disputed.  Brunel was arrested in December 2020, not 2019.  See USVI Ex. 277; JPMC Ex. 82 ("Brunel was arrested at Paris Charles de Gaulle Airport in December 2020 on counts of "'rape and sexual assault, rape and sexual assault on a minor under 15, rape and sexual assault on a minor over 15, sexual harassment, criminal associations and human trafficking to the detriment of minor victims for the purposes of sexual exploitation.'").

Disputed insofar as USVI contends that this fact supports an inference that JPMorgan obstructed enforcement of the TVPA.  *See* CSMF ¶¶ 176-179.  Further contended that the cited material cannot be presented at trial in admissible form.

424.

216



*Ex. 69 at -545.*

> **JPMC Response**: USVI Ex. 69 at -545-550.
>
> *See* USVI Ex. 69 at -545; JPMC Ex. 83
>
> Disputed insofar as USVI contends that this fact supports an inference that JPMorgan obstructed enforcement of the TVPA.  *See* CSMF ¶¶ 176-179.

## Facts Concerning Epstein's Registration as a Sex Offender in the Virgin Islands

425.   *Shani Pinney, coordinator for the sex offender registry, and former Attorney General Vincent Frazer both testified that they were not responsible for and did not enable Epstein's crimes. Ex. 278 at 266:17-268:8; Ex. 280 at 12:9-21, 455:24-456:20.*

> **JPMC Response**:  Undisputed that Pinney and Frazer testified as such.  Disputed that such testimony establishes as a legal conclusion that they "were not responsible for and did not enable Epstein's crimes."  *See, e.g.*, CSMF ¶¶ 261-288, 290-320.

426.   *Epstein never failed to register as a sex offender. Ex. 280 at 85:2-87:2; 442:15-17.*

> **JPMC Response**:  Undisputed that Pinney testified that Epstein never failed to register in the USVI.  *See* USVI Ex. 280 at 442:15-17.

427.   *Shani Pinney, coordinator for the sexual offender registry, testified that news reports were not sufficient basis to initiate an investigation because they did not contain the requisite "concrete allegations" of wrongdoing. Ex. 280 at 12:9-21; 415:1-20; 446:5-447:9; 447:16-449:1.*

> **JPMC Response**: Undisputed that Pinney testified as such.  Disputed as to the underlying fact that news reports were not sufficient basis to initiate an investigation into Epstein.  *See* CSMF ¶¶ 252-255.

428.    *Former Attorney General Denise George similarly testified that she couldn't rely on "news reports," "rumor" or "innuendo" to initiate an investigation into Epstein.  Ex. 282 at 167:3-170:3.*

> **JPMC Response**: Undisputed that George testified as such.  USVI Ex. 282 at 167:3-170:30.  Disputed as to the underlying fact that news reports, rumor, or innuendo could not be used to initiate an investigation into Epstein.  *See* CSMF ¶¶ 252-55, 257-58.

429.    *As witnesses testified, absent an actual complaint from a victim or eyewitness evidence brought to the Department of Justice's attention, the Department could not initiate investigations. Ex. 280 at 415:1-20; 446:5-447:9; 447:16-449:1; Ex. 282 at 167:3-170:3.*

> **JPMC Response**: Undisputed that Pinney and George testified as such.  Disputed as to the underlying fact that absent an actual complaint from a victim or eyewitness evidence brought to the Department of Justice's attention, the Department could not initiate investigations.  *See* CSMF ¶¶ 255, 257-58.  Further disputed that the USVI lacked actual complaints from a victim or eyewitness.  *See* CSMF ¶¶ 244-48, 251, 315.

430.    *Ms. Pinney and Attorney George both confirmed they received no concrete complaints of misconduct by Epstein.  Ex. 280 at 206:6-208:17; Ex. 282 at 164:3-167:2.*

> **JPMC Response**: Undisputed that Pinney and George testified as such.  Disputed insofar as USVI contends that the cited testimony establishes that the USVI lacked sufficient evidence to investigate Epstein or that no information about Epstein's misconduct ever reached USVI officials.  *See* SUMF ¶¶ 24, 26; CSMF ¶¶ 244-55.

431.    *Upon assuming her role as Attorney General, Attorney George inquired of various agencies to confirm whether they had received any complaints regarding Epstein. She found no evidence that any complaints had been received. Ex. 282 at 164:3-167:2.*

> **JPMC Response**: Undisputed that George testified that she inquired with the local VIPD and the USVI Department of DOJ as part of a general "inquiry to find out do we have cases?  Do we have a record of . . .anyone complaining about seeing something that looked suspicious on Little St. James or – or with respect to Jeffrey Epstein in particular." USVI Ex. 282 at 164:16-165:5.  Disputed to the extent USVI suggests that George inquired about Epstein with any other agencies. *See id.* at 165:5-13 ("I didn't [inquire] with the federal authorities who were also there because they're – you know, they're not going to disclose if there's a pending investigation or anything like that."); s*ee also* CSMF ¶¶ 253, 257.

432.   *The Virgin Islands Department of Justice performed address verification checks (also called "sweeps") roughly annually in conjunction with U.S. Marshalls.   Ex. 280 at 52:1-54:12, 105:20-106:3, 398:18-400:12.*

> **JPMC Response**: Undisputed that Pinney testified that that sweeps with the U.S. Marshals Service occurred "perhaps once a year depending on funding" that the U.S. Marshals received "to conduct the operational sweeps." USVI Ex. 280 at 400:11-17. Disputed to the extent USVI suggests that the "roughly annual[]" checks were the only checks required by USVI DOJ's policy. According to one of USVI's 30(b)(6) designees, USVI DOJ's policy is to perform random checks on offenders weekly, as well as an annual "sweep" once a year. *See* CSMF ¶ 307. Pinney also testified that "during the year, we would also verify the addresses of offenders . . . if they relocated, if they had a new address. Within that time, I think it's seven days, that we would also go out to verify their addresses." USVI Ex. 280 at 410:16-23.

433.   *The address checks are not warrants; government officials do not possess the ability to enter a sex offender's property or conduct a search. Ex. 280 at 49:21-50:25; 440:1-441:3.*

> **JPMC Response**: Undisputed that Pinney testified to the substance of the paragraph. Disputed insofar as USVI suggests that the cited testimony establishes the proposition as a legal conclusion. USVI Ex. 280 at 49:21-50:25; 440:1-441:3.

434.   *In certain years, the U.S. Marshalls and Virgin Islands officials did not proceed beyond Epstein's dock. If an offender refused entry, the government officials performing the check did not possess authorization to enter. Ex. 280 at 43:7-46:24, 47:12-48:11, 49:4-50:25.*

> **JPMC Response**: Undisputed that Pinney testified to the substance of the paragraph. USVI Ex. 280 at 43:7-46:24, 47:12-48:11, 49:4-50:25. Disputed insofar as USVI suggests that the cited testimony establishes the proposition as a legal conclusion.

435.   *Ms. Pinney testified that she conferred with the federal government concerning this practice and was told that it was similar to a situation where a landowner has placed a gate at the border to his property. The officials were not permitted to proceed beyond that gate without a warrant. Ex. 280 at 108:5-110:23.*

> **JPMC Response**: Undisputed that Pinney testified to the substance of the paragraph. USVI Ex. 108:5-110:23. Disputed insofar as USVI suggests that the cited testimony establishes the proposition as a legal conclusion. Further disputed that Pinney's full

219

testimony shows ambiguity as to whether the federal government confirmed that this analogy applied to Epstein's dock. *See* USVI Ex. 280 at 46:5-47:5, 124:9-23.

436.   *It was not improper or unusual for the Government to confirm addresses at a sex offender's place of employment, as was done one year with Epstein.  Ex. 280 at 409:7-410:4; 438:15-439:20.*

> **JPMC Response**: Undisputed that Pinney testified that there was an instance where Epstein's verification was conducted at his office.  USVI Ex. 280 at 438:15-18.  Also undisputed that Pinney testified that she verified other sex offenders in the USVI at their employer's address.  *Id.* at 439:17-20.  Disputed to the extent USVI suggests that such testimony establishes that this conduct was not "improper or unusual" as unsupported and disputed by other testimony in the record.   *See* CSMF ¶ 313.

437.   *In 2012, the Virgin Islands Legislature amended its sex offender laws, in part to obtain federal funding for its sex offender unit.  Ex. 278 at 79:12-80:10, 119:9-121:12; Ex. 280 at 125:21-126:6.*

> **JPMC Response**: Undisputed that USVI amended its sex offender laws in 2012 and that Pinney testified that by enhancing USVI's laws in 2012, "that made us eligible to – us being the Virgin Islands – eligible to receive funding for employees to – to monitor offenders in the Virgin Islands."  USVI Ex. 280 at 125:21-126:6.

438.   *The U.S. Government approved all changes to the Virgin Islands sex offender laws in advance.  Ex. 278 at 122:1-9; Ex. 280 at 306:22-307:12, 452:21-453:4.*

> **JPMC Response**: Undisputed that the cited testimony supports that the United States Department of Justice had to approve the amendment to USVI's sex offender laws in order for USVI to receive the funding.  USVI Ex. 278 at 122:1-9; USVI Ex. 280 at 307:2-12.

439.   *Although Epstein's attorneys sought to coordinate with legislators concerning proposed changes to the Virgin Islands laws, the Legislature ultimately rejected Epstein's proposed changes.  Ex. 278 at 160:12-165:1; 262:10-264:4.*

> **JPMC Response**: Disputed.  *See* CSMF ¶¶ 284-85.

440.    *Epstein applied for and received a waiver in 2012 of his travel notification requirements*

*pursuant to these statutory provisions.  Ex. 278 at 11:13-13:23, 187:16-188:15, 189:18-190:24,*

*192:4-10, 193:14-24; Ex. 279 at 12480-12491.*

> **JPMC Response**: Disputed.  The USVI's sex offender law states, "the Attorney General
> may at his discretion reduce this twenty-one (21) day notice requirement if a sex offender
> requests such a reduction and ***provides information in support of the request***."  JPMC
> Ex. 84 (emphasis added).  Attorney Frazer testified that Epstein's attorneys provided
> "correspondence and information" concerning Epstein's need to travel, USVI Ex. 278 at
> 12:9-13:7, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
> ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉"  JPMC Ex. 85 at -12502; *see*
> *also* CSMF ¶¶ 292, 294-95.  Accordingly, it remains disputed whether Epstein applied
> for and receive approval for relaxation of his notification requirements "pursuant to these
> statutory provisions."

441.    *Then-Attorney General Vincent Frazer testified that he relied on representations of*

*Epstein's counsel in forming his decision, because he "was satisfied with the representations,"*

*which were "satisfactory to conclude that there was not an undue risk to the community" that*

*would arise from the waiver.  Ex. 278 at 190:8-24, 191:3-12, 193:14-24, 250:11-255:13; Ex. 281*

*at 12246-12250, 12263-65.*

> **JPMC Response**: Undisputed that Attorney Frazer testified that he relied on
> representations of Epstein's counsel with respect to Epstein's need to travel for business
> activities and how Epstein provided notice of his travel via email to Florida, New
> Mexico, and New York authorities.  USVI Ex. 278 at 190:8-191:12.  Disputed as to the
> whether the cited representations are accurate as a legal or factual matter.  Further
> disputed to the extent USVI suggests this testimony supports an inference that the
> waivers were legitimately granted and appropriate. *See* CSMF ¶¶ 288, 292, 294-95, 298-
> 99.

442.    *Epstein's lawyers themselves represented to Attorney Frazer that other states, including*

*Florida and New Mexico, permitted Epstein to provide email notification of his travels and that*

*"there is no public safety necessity in requiring Mr. Epstein to notify the Department in person*

*each time he travels to or from the jurisdiction."  Ex. 278 at 251:16-255:13; Ex. 281 at 12246-*

*12250, 12270.*

> **JPMC Response**: Undisputed that Epstein's lawyers made such representations to Attorney Frazer. USVI Ex. 278 at 251:16-255:13; USVI Ex. 281 at -246, -250, -270. Disputed as to the whether the cited representations are accurate as a legal or factual matter or that Epstein's lawyers were the appropriate individuals to determine what public safety requires. Further disputed to the extent USVI suggests this testimony supports an inference that the waivers were legitimately granted and appropriate. *See* CSMF ¶¶ 288, 292, 294-95, 298-99 .

443. *As Ms. Pinney explained, and as the statute provides, the travel notification statute only required notification of travel outside the United States. While the Government had a "policy in place" to require notification of travel outside of the Territory but within the United States, nothing in the Virgin Islands statute required such notification. Ex. 280 at 363:3-365:12.*

> **JPMC Response**: Disputed as to "and as the statute provides" as unsupported by the cited evidence. Undisputed that Pinney testified that "I'm remembering now that within the statute, it spoke about notifying VI DOJ if any offender has notified any – of any travel outside of the United States" and that "we got a policy in place where we wanted the offenders to notify us of, you know, any travel to include outside the territory." USVI Ex. 280 at 364:9-12; 364:22-365:1.

444. *Travel notifications are not authorizations or requests; the Government had no ability to restrict Epstein's travel. Ex. 278 at 135:6-17, 200:14-201:4.*

> **JPMC Response**: Undisputed that Attorney Frazer testified that his "understanding of the SONAR law, purpose was not to restrict a person's movement. It was to follow, to monitor the movement." USVI Ex. 278 at 135:13-16. Disputed insofar as USVI attempts to use Frazer's understanding of the law to establish a legal conclusion on the USVI's authority.

445. *Entry into the Virgin Islands from overseas is controlled by federal authorities, not the Virgin Islands Government. Ex. 278 at 209:23-210:5, 265:13-268:8.*

> **JPMC Response**: Undisputed that Attorney Frazer testified that custom checks are controlled by the Federal United States Custom and Border Protection agency. USVI Ex. 278 at 266:2-6. Disputed to the extent the USVI contends it has no role or ability to monitor entry into the Virgin Islands from overseas. *See id.* at 210:6-15 ("Q: As the Attorney General of the Virgin Islands, did you have the ability, if you had a law enforcement reason, to find out who was traveling on a particular plane that entered the Virgin Islands . . . . A: Yes, I imagine I could."); JPMC Ex. 86 at 63, Ex. 3 (describing policies to establish patrol coverage for the airport and role of patrol in monitoring security check points).

██████████████████████████████      ████████████████████

**Facts Concerning Tax Benefits Granted to Epstein's Companies**

446.    *The EDC granted tax incentives to two of Epstein's companies: Financial Trust Company*

*and Southern Trust Company. Ex. 283 at 29:10-19, 34:2-10, 42:3-21; Exs. 284-286.*

>    **JPMC Response**: Undisputed that Financial Trust Company and Southern Trust
>    Company were granted tax incentives.  USVI Ex. 284; USVI Ex. 285; USVI Ex. 286.
>    Disputed to the extent USVI suggests these were the only Epstein-entities that received
>    benefits from USVI. ████████████████████████████████████████████████████
>    ████████████████████████████████████████████████████████████████████████
>    █████████████████████ *See* JPMC Ex. 87 at -6475, -6482; JPMC Ex. 88; JPMC Ex. 89.

447.    *The first grant of benefits to an Epstein-owned company occurred in 1999 to Financial*

*Trust Company.  Ex. 283 at 29:10-19; Ex. 284.*

>    **JPMC Response**: Undisputed that the first grant of EDC benefits to an Epstein-owned
>    company occurred in 1999 to Financial Trust Company.  USVI Ex. 284.

448.    *In 2009, Financial Trust applied for and received an extension of benefits. Ex. 283 at 34:2-*

*10; Ex. 285.*

>    **JPMC Response**: Undisputed that in 2009, Financial Trust applied for and received an
>    extension of EDC benefits.  USVI Ex. 285.

449.    *Epstein formed a new company—Southern Trust—which applied for and received tax*

*benefits in 2012. Ex. 283 at 42:3-21; Ex. 286.*

>    **JPMC Response**: Undisputed that Southern Trust applied for EDC tax benefits in 2012.
>    Disputed that Southern Trust Company received tax benefits in 2012.  USVI Ex. 286 at -
>    011.

450.    *Each time that Financial Trust or Southern Trust sought benefits, the companies submitted*

*applications for the benefits.  Ex. 287 at 42:3-21; Exs. 288-289.*

>    **JPMC Response**: Undisputed that each time Financial Trust or Southern Trust sought
>    EDC benefits, someone submitted an application for benefits on behalf of the company.
>    USVI Ex. 288; USVI Ex. 289.

451.    *Each time that Financial Trust or Southern Trust sought benefits, EDC held public*

*hearings during which the benefits were discussed and the applicants were provided the*

[redacted]

*opportunity to present their case and answer questions.  Ex. 287 at 42:3-21, 67:15-69:7, 169:21-170:2; Ex. 288-290; Ex. 291 at 29:12-20; Ex. 292.*

> **JPMC Response**: Undisputed that the EDC held public hearings regarding Financial Trust's original application for benefits, Financial Trust's application for modification of benefits, and Southern Trust Company's original application for benefits.  USVI Ex. 289. Disputed to the extent USVI suggests Epstein was in attendance at each of these meetings.  *See* JPMC Ex. 90 ¶ 69 [redacted]
>
> [redacted] ).  JPMC lacks knowledge as to whether the EDC held public hearings during which benefits were discussed and applications were provided the opportunity to present their case and answer questions each time that Financial Trust or Southern Trust sought benefits.

452.   *Each time that Financial Trust or Southern Trust sought benefits, the EDC then held decision meetings where the board considered the applications and rendered decisions.  Ex. 287 at 22:18-23:10, 42:3-21; Exs. 288-289.*

> **JPMC Response**: Undisputed that the EDC held decision meetings regarding Financial Trust's original application for benefits, Financial Trust's application for modification of benefits, and Southern Trust Company's original application for benefits.  USVI Ex. 289. JPMC lacks knowledge as to whether the EDC held decision meetings each time Financial Trust or Southern Trust sought benefits.  Disputed that the board rendered decisions at each decision meeting.  *Id.*

453.   *Epstein's Florida conviction was not a sufficient basis for revocation of benefits at that time because there was no evidence available to the EDC that Epstein's solicitation of a minor for prostitution in Florida was "connected with the operation" of Epstein's USVI businesses.  Ex. 287 at 157:6-24, 159:10-15, 170:3-172:3.*

> **JPMC Response**: Undisputed that Benjamin testified that "the type of charge . . . was not connected to the business operations."  USVI Ex. 287 at 171:24-172:1.  Disputed that Epstein's Florida conviction was not a sufficient basis for revocation of benefits because there was no evidence available to the EDC that Epstein's solicitation of a minor for prostitution in Florida was connected with the operation of Epstein's USVI businesses. *See, e.g.*, CSMF ¶¶ 382-388.

454.   *The EDC did not have access to Epstein's companies' daily financial transactions, and was not aware of any connection between his conduct and the operations of his business.  Ex. 287*

*at 61:4-24, 148:11-149:7, 157:6-24, 159:10-15, 170:3-172:3; Ex. 283 at 53:22-54:4, 55:9-21; Ex.*

*291 at 295:25-297:18.*

> **JPMC Response**: Disputed that the EDC was not aware of any connection between
> Epstein's conduct and the operations of his business. *See* CSMF ¶¶ 383-84.   Disputed
> that the EDC could not request access to Epstein's companies' transactions. *See* JPMC
> Ex. 88 at -028

455.    *Indeed, the EDC reached out to Epstein's attorney in January 2015 to inquire whether*

*media reporting regarding allegations of misconduct had any connection to the business of*

*Epstein's Southern Trust Company.  His attorney responded to confirm "[w]e do not believe that*

*these media discussions will have any impact on the business activities of STC."   Ex. 287 at*

*172:17-174:10; Exs. 293-294.*

> **JPMC Response**: Undisputed that the EDC corresponded with Epstein's attorney in
> January 2015 to inquire whether media reporting regarding allegations of misconduct had
> any connection to the business of Epstein's Southern Trust Company.  USVI Ex. 287 at
> 172:17-174:10; USVI Ex. 293 at -432; USVI Ex. 294 at -186.  Undisputed that Epstein's
> attorney responded with the quoted language.  USVI Ex. 294 at -186.  Disputed to the
> extent USVI contends that this testimony establishes as a legal matter that the cited
> outreach discharged EDC's obligations to follow up on allegations of wrongdoing.

456.    *Margarita Benjamin, a witness with more than 30 years' experience at the EDC, testified*

*that the cost-benefit ratios provided to board members cannot be analyzed in isolation because*

*the ratio "doesn't give the full picture to anyone" and "can be misleading."  Ex. 287 at 78:25-*

*79:21, 80:23-81:13.  Governor Albert Bryan testified that the ratios were not intended for "smaller*

*financial firms" like Epstein's companies.  Ex. 291 at 47:22-49:6.*

> **JPMC Response**: Disputed that Benjamin testified that the cost-benefit ratios provided
> to board members cannot be analyzed in isolation because the ratio "doesn't give the full
> picture to anyone" and "can be misleading."  Benjamin testified that in the context of a
> specific email between herself, Paul Fleming, and Stacey Plaskett, she was "summarizing
> that just given the unfavorable ratios itself without the other part doesn't give the full
> picture to anyone, so it can be misleading, and that's in the summary of what I was trying
> to say."  USVI Ex. 287 at 79:5-14.  Disputed that Governor Albert Bryan testified that the
> ratios were not intended for "smaller financial firms" like Epstein's companies.  He

testified that "[f]or these smaller financial firms, we were really interested in making sure that we have viable firms that come here and tax residents that have a high net worth." USVI Ex. 291 at 48:24-49:1-2. Disputed as to the underlying suggestion that the cost-benefit ratios were not relevant to the EDC's considerations. *See* JPMC Ex. 90 ¶¶ 59-66.

457.    *Ms. Benjamin further explained that the cost-benefit ratios can be misleading because, unless the business was already operating in the Territory, the Government would not have received the tax revenue in the first place and has not "lost" anything. Ex. 287 at 81:14-83:2. Governor Bryan agreed testifying that "the government didn't give up anything" because "half of some is better than all of none." Ex. 290 at 49:7-23.*

> **JPMC Response**: Disputed that Benjamin testified that the cost-benefit ratios "can be misleading." Undisputed that Benjamin testified to the meaning of "not favorable ratios" can depend on whether the company was operating in the territory because "if a company was not existing in the territory, there was no tax dollars being paid to the territory. So where it says, taxes foregone, it is not realistically foregone because the company would not have been in the territory and be in a tax-paying company." USVI Ex. 287 at 81:14-82:9. Disputed that Governor Bryan "agreed" with Benjamin's testimony. Further disputed to the extent USVI has to support this statement with evidence from the record. The cited USVI Exhibit 290 does not contain the cited pages. Undisputed Governor Bryan stated the quoted text at an EDC public hearing in November 2012. Disputed as to the underlying suggestion that the cost-benefit ratios were not relevant to the EDC's considerations. *See* JPMC Ex. 90 ¶¶ 59-66 .

458.    *The ratio further ignores ancillary benefits that accrue to the Territory from the presence of high net-worth individuals, who engage in economic activity unrelated to their businesses that benefits the Territory. Ex. 290 at 48:18-49:6, 50:5-51:13, 297:23-298:17.*

> **JPMC Response**: Disputed to the extent statement consists of USVI's summary of USVI Ex. 290. Further disputed to the extent USVI has to support this statement with evidence from the record. The cited USVI Exhibit 290 does not contain the cited pages. The document speaks for itself. Disputed as to the underlying suggestion that the cost-benefit ratios were not relevant to the EDC's considerations. *See* JPMC Ex. 90 ¶¶ 59-66.

459.    *During a March 2009 public hearing, Epstein's attorney explained that a denial of an extension would likely cause "a responsible business person . . . to seriously consider relocating the business" if another territory offered similar benefits. Ex. 295 at 40:20-41:3; Ex. 296.*

226

**JPMC Response**: Undisputed that cited document USVI Ex. 296 contains the quoted text.  Disputed that Epstein would have relocated if the benefits were not extended.  *See* JPMC Ex. 91 at 135:8-136:18.

460.  *Thus, the EDC could not assume that it would collect Epstein's tax revenue if the benefits were not extended.  Ex. 290 at 49:7-23.*

**JPMC Response**: Disputed to the extent USVI has failed to support this statement with evidence from the record. The cited USVI Exhibit 290 does not contain a page 49. Further disputed that Epstein would have relocated if the benefits were not extended.  *See* JPMC Ex. 91 at 135:8-136:18.

461.  *The EDC did not treat Epstein differently than any other beneficiary.  Ex. 290 at 280:3-17.*

**JPMC Response**: Disputed.  *See* JPMC Ex. 90 ¶¶ 66, 67, 90.  Disputed to the extent statement consists of USVI's summary of USVI Ex. 290.  Further disputed to the extent USVI has to support this statement with evidence from the record.  The cited USVI Exhibit 290 does not contain the cited pages.

**Facts Concerning Cecile de Jongh's Employment with Epstein**

462.  *Cecile de Jongh became First Lady when her husband was elected Governor.  She testified that "there's no office of the first lady with a budget," and she did not have an office.  First Lady was largely a ceremonial position that entailed giving speeches and attending social events.  Ex. 297 at 17:12-21:19.*

**JPMC Response**: Undisputed that Cecile de Jongh became First Lady when her husband was elected Governor.  USVI Ex. 297 at 17:12-16.  Disputed that cited document contains quoted text.  *See* USVI Ex. 297.  Disputed that First Lady was largely a ceremonial position that entailed giving speeches and attending social events.  *See* CSMF ¶¶ 394-403.

463.  *During the time her husband was Governor, Ms. de Jongh was widely known and recognized to be employed by Epstein's businesses and acting on their behalf.  Ex. 287 at 130:12-14; Ex. 298 at 6:12-9:11, 10:10-23, 11:21-13:3; Ex. 299 at 49:4-21.*

**JPMC Response**: Disputed that USVI Ex. 287 supports the statement.  *See* USVI Ex. 287 at 130:12-14 ("Q. What's the relationship between Cecile de Jongh and Governor John de Jongh? A. It's publicly known that it is his wife.").  Otherwise, undisputed.

227

464.    *Her employment with Epstein had been widely reported and numerous witnesses confirmed their familiarity with her employment.  Ex. 287 at 130:12-14; Ex. 298 at 6:12-9:11, 10:10-23, 11:21-13:3; Ex. 299 at 49:4-21; Ex. 291 at 14:21-15:17; Ex. 283 at 36:12-37:2.*

> **JPMC Response**: Disputed that USVI Ex. 287 supports the statement. *See* USVI Ex. 287 at 130:12-14 ("Q. What's the relationship between Cecile de Jongh and Governor John de Jongh? A. It's publicly known that it is his wife."). Otherwise, undisputed.

465.    *Ms. de Jongh had no contact with personnel at the Department of Justice responsible for sex offender registration and monitoring.  Ex. 280 at 158:7-12, 179:20-24.*

> **JPMC Response**: Disputed to the extent the cited testimony does not support the broad proposition. Pinney testified, "during my time" she could not say that she was aware of whether Cecile de Jongh ever interacted with the USVI DOJ regarding Epstein. USVI Ex. 280 at 158:7-12.

466.    *Decisions concerning whether or not to grant tax benefits were first made by the board members of the EDC.  Ex. 287 at 22:18-23:10, 27:25-28:6.*

> **JPMC Response**: Disputed. Benjamin testified that "the board would make recommendations to the Governor and the Governor had the final decision." USVI Ex. 287 at 22:21-24. *See also* CSMF ¶¶ 356-61.

467.    *Although the Governor (her husband) signed the tax benefit certificates, that process was little more than a formality and could not happen without the EDC's recommendation in the first place.  Ex. 287 at 22:18-23:10, 27:25-28:6.*

> **JPMC Response**: Disputed. The cited testimony does not support the proposition that the Governor's approval was "little more than a formality." On the contrary, Benjamin testified that from 1998 – 2013, the Governor held the "final decision." USVI Ex. 287 at 22:18- 23:3; 27:25-28:6. *See also* CSMF ¶¶ 356-61. Undisputed that the cited testimony states that "after the change" the "beard [sic] of directors of the Economic Development Authority Commission" was responsible for extending benefits and "they no longer required the approval of the Governor." USVI Ex. 287 at 23:4-10.

468.    *Ms. de Jongh vigorously denied knowing about or facilitating Epstein's crimes in the Virgin Islands.  Ex. 297 at 33:17-39:8, 133:10-134:2, 212:24-213:18, 217:11-220:6.*

**JPMC Response**: Disputed that Cecile de Jongh "vigorously" denied knowing about or facilitating Epstein's crimes in the Virgin Islands. Further disputed that Ms. De Jongh in fact did not know about or facilitate Epstein's crimes. *See* CSMF ¶¶ 321-350. Ms. de Jongh's cited testimony included statements, such as "if somebody is introduced as somebody's girlfriend, I took it as face value that that's their girlfriend," USVI Ex. 297 at 218:3-5, and "I looked him in the eye and asked him, you know 'What the hell is going on,' that I had a daughter and, you know, what's going on, and what he said was just a mistake. Mistook somebody to be older than they were," *id.* at 213:4-9. Ms. de Jongh further testified that she believed Epstein's explanation that it was "just a mistake." *Id.* at 213:4-21.

469. *With respect to efforts to establish an English as a Second Language class, Ms. de Jongh testified that she was not aware any of the women were potential trafficking victims. Ex. 297 at 131:16-132:16, 136:10-137:1.*

**JPMC Response**: Undisputed that Cecile de Jongh testified as such. Disputed as to the underlying fact that Cecile de Jongh was not aware any of the women were potential trafficking victims. *See* CSMF ¶¶ 321-350.

470. *The documents also make clear that the University merely agreed to offer an already-existing class to individuals. Ex. 297 at 129:11-14; Ex. 300.*

**JPMC Response**: Disputed. Cecile de Jongh wrote to Epstein that UVI was "structuring the class around the ladies." *See* CSMF ¶ 340.

████████████████████████████         ████████████████████

## JPMORGAN CHASE BANK, N.A.'S LOCAL CIVIL RULE 56.1(B) COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS

## I.   SUMMARY JUDGMENT CANNOT ENTER ON USVI'S CLAIMS

### A.   JPMC Did Not Know Of Or Recklessly Disregard Epstein's Alleged Sex-Trafficking Venture

***Rapid Response Meetings***

1.     JPMC employees regularly held "rapid response meetings" in light of derogatory or notable information about a client.  JPMC Ex. 66 at 194:22-195:12; JPMC Ex. 92 at 53:21-54:4; JPMC Ex. 93.

2.     When allegations are made against a client, the employees responsible for the client relationship would be tasked with staying on "high alert" and monitoring how those allegations develop towards a formal resolution, such as a criminal conviction.  JPMC Ex. 94 at 95:22-96:20.

3.     Epstein was indicted in Florida state court for felony solicitation of prostitution on July 19, 2006.  JPMC Ex. 2; JPMC Ex. 3 at i.  USVI's law enforcement agencies did not open an investigation into Epstein.  JPMC Ex. 4 at 25:17-21.

4.     On October 17, 2006, following news of Epstein's arrest for felony solicitation of prostitution under Florida state law, JPMC documented a series of internal discussions about its relationship with Epstein into a "rapid response team" memorandum.  The memorandum states: "After internal discussions with Jes Staley, Mary Erdoes, Catherine Keating, John Duffy, and Mary Casey, it was decided that we will keep Mr. Epstein solely as a banking client and on a 'reactive,' client service basis.  We will not proactively solicit new investment business from him."  JPMC Ex. 95.

5.     █████████████████████████████████████

███████████████████████████████████████████



6.      Following media reports about Epstein's pending guilty plea, JPMC employees held another meeting in October 2007 to discuss the Bank's relationship with Epstein.  JPMC Ex. 96; JPMC Ex. 97.

7.      Epstein ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████    JPMC Ex. 11.  ███████████████████████████  JPMC Ex. 12 at VI-JPM-000012204.  USVI's law enforcement agencies did not open an investigation into Epstein.  JPMC Ex. 4 at 25:17-26:18, 32:16-35:21.

8.      After Epstein pleaded guilty to state charges for solicitation of prostitution and procurement of a minor for prostitution, JPMC held a rapid response meeting to discuss the Bank's relationship with Epstein on July 15, 2008.  JPMC Ex. 98.

9.      At the conclusion of the July 15, 2008 rapid response meeting, it was determined that then-CEO of the US Private Bank, Catherine Keating, would "go back to JES to tell him we are uncomfortable with Epstein and do not want to go to Cutler for approval."  JPMC Ex. 93 at -26008.

10.     In summer 2010 and early 2011, media reports suggested that there may have been a current investigation into Epstein.  JPMC Ex. 15; JPMC Ex. 31; JPMC Ex. 32; JPMC Ex. 99.

███████████████████████████████████    █████████████████████████

11.     JPMC employees did not view these reports as a determination that Epstein was engaged in ongoing unlawful conduct.  JPMC Ex. 100 at JPM-SDNYLIT-00157092; JPMC Ex. 101; JPMC Ex. 102 at 52:19-53:8, 107:22-108:20.

12.     Kevin McCleerey testified that "My view was it was – the reputational risk of the firm was increasing with these allegations, if they were true.  We knew in previous news articles some of the information was not true.  So we needed to get the facts.  But until then, we should have a meeting to review the current allegations in the press.  That was my view." JPMC Ex. 103 at 234:12-23; *see also* JPMC Ex. 103 at 236:7-18, 238:9-239:1.

13.     JPMC employees did not view these reports as a determination that Epstein was in fact under federal investigation.  JPMC Ex. 99; JPMC Ex. 101.

14.     In response to the new negative media on Epstein, JPMC held another rapid response meeting on January 7, 2011.  JPMC Ex. 104; JPMC Ex. 105; JPMC Ex. 106.

15.     █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████  JPMC Ex. 102 at 92:13-16.

16.     On January 14, 2011, William Langford and Catherine Keating had a meeting with Jes Staley to discuss the status of Epstein's accounts.  JPMC Ex. 107; JPMC Ex. 108 at 370:10-17.

17.     On August 4, 2011, JPMC held a fourth rapid response meeting about the Bank's relationship with Epstein.  JPMC Ex. 109.

***Epstein's Cash Usage***

18.     Between 2003 and 2013, ███████████████████████████████████

███████████████████████████████████████████████  JPMC Ex. 110 at 24.

19.    These cash transactions and direct and indirect payments to women constituted 1% of the nearly $900 million of funds that flowed through Epstein's accounts between 2003 and 2013.  JPMC Ex. 110 at 15-16; JPMC Ex. 60 at ¶ 92.

20.    In 2011, Epstein informed Paul Morris, his private banker at the time, that his cash withdrawals were to pay for fuel expenses for his personal airplane when traveling to foreign countries.  JPMC Ex. 106.

21.    In August 2011, after becoming CEO of JPMC's Private Bank, John Duffy investigated Epstein's cash usage.  JPMC Ex. 111.

22.    In 2011 and 2013 Duffy spoke to Epstein about his cash withdrawals and business activities.  JPMC Ex. 112; JPMC Ex. 113; JPMC Ex. 114; JPMC Ex. 77 at 225:13-226:10.

23.    Epstein informed John Duffy that his cash withdrawals were for fuel expenses for his personal airplane when traveling to foreign countries.  JPMC Ex. 77 at 207:12-16, 212:11-20; JPMC Ex. 115.

24.    Duffy advised Epstein to conduct cash withdrawals for fuel expenses from his aviation account, after which Epstein began conducting cash withdrawals out of his Hyperion Air account.  JPMC Ex. 115.

25.    It is not uncommon to speak to a client about unusual cash activity.  JPMC Ex. 77 at 225:20-21; JPMC Ex. 116 at 105:7-22; JPMC Ex. 108 at 401:16-23.

26.    JPMC employees previously had advised Epstein to cease structuring cash withdrawals below the $10,000 reporting threshold.  JPMC Ex. 116 at 106:6-107:7.

27.    Duffy believed Epstein's explanation that he used the cash withdrawals to purchase aviation fuel.  JPMC Ex. 77 at 176:18-177:5, 345:23-346:7; JPMC Ex. 115.

████████████████████████████████████████

28.     Bonnie Perry testified that Epstein's explanation that he used the cash withdrawals to purchase aviation fuel "seemed reasonable."  JPMC Ex. 92 at 187:2-21.

29.     Epstein's former accountant, Richard Kahn, testified that ███████████ ████████████████████████████████████  JPMC Ex. 117 at 75:3-19, 105:5-16, 109:5-110:2.

30.     Epstein's former pilot Lawrence Visoski submitted a sworn declaration that until at least 2003, cash was used to pay for fuel at John F. Kennedy International airport in order to take advantage of a significant cash discount.  JPMC Ex. 118.

31.     With respect to Epstein's cash withdrawals, Phil DeLuca testified that, █████ ████████████████████████████████  JPMC Ex. 119 at 298:24-299:1.

32.     Maryanne Ryan testified that ████████████████████████ ████████████████  JPMC Ex. 102 at 278:10-17.

33.     ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████  JPMC Ex. 102 at 133:22-134:10, 208:24-209:2.

34.     William Langford testified: "But at the end of the day, withdrawal of cash is a withdrawal of cash.  And so especially small dollars, wealthy people withdraw cash.  They do a lot of different things."  JPMC Ex. 108 at 221:2-7.

35.     John Duffy testified: "I wasn't concerned about [Epstein's] use of cash.  Large clients use cash in different ways.  They are different than, you know, than the average person on Main Street. . . . It wasn't – it wasn't outsized in relation to what clients of Mr. Epstein's net

worth or asset base has.  And it wasn't unusual, as it related to what was expected in that account, and he was pretty consistent in the use of that."  JPMC Ex. 77 at 174:15-175:10.

36.     Frank Pearn testified: "I have seen very large amounts of cash be taken out of the bank by Private Bank clients over my time at the bank."  JPMC Ex. 94 at 153:21-24.

37.     JPMC's human trafficking expert, Dr. Kimberly Mehlman-Orozco testified that "high-net-worth individuals making significant payments to their victims is atypical of trafficking."  JPMC Ex. 120 at 229:24-230:1.

38.     Dr. Mehlman-Orozco further testified: "If you could sort of give me a subset of what you're saying that it would have corroborated.  Because, for example, if you're asking me would victim payments in cash corroborate an allegation of trafficking, I would say, no, that's atypical or inconsistent with trafficking.  So you typically would not see that as a corroborating piece of evidence.  I would typically see that in something that would be used by the other side to show that they were not a victim."  JPMC Ex. 120 at 263:21-264:7.

39.     William Langford testified that large cash withdrawals were not the focus on the use of cash as part of JPMC's Human Trafficking Initiative, which was focused on "the business of trafficking. That is, people who set up the criminal enterprise to capture, imprison, move, and sell the services, right, and generate the criminal proceeds, just like drug trafficking."  JPMC Ex. 108 at 169:12-170:10.

40.     Paul Morris testified that it "never occurred" to him that Epstein was withdrawing cash "for the payment related to sexual abuse or sex trafficking" and he had "absolutely not, never heard" anyone at JPMC indicate a suspicion that Epstein's cash withdrawals were being used or could be used for sexual abuse or sex trafficking.  JPMC Ex. 121 at 337:20-338:4.

████████████████████████        █████████████

41.     John Duffy testified: "I had no reason to believe that Mr. Epstein—and at no point in time did I believe Mr. Epstein was committing criminal acts through JPMorgan, such as sex trafficking."  JPMC Ex. 77 at 365:3-8.

42.     Former Head of the Global Private Bank and current CEO of Asset and Wealth Management Mary Erdoes testified: "[T]he concern was the cash payments, and at the time, the cash payments were related to airplane usage.  And never at the time was that something that I was connecting in my mind with anything to do with any of the allegations of what he may or may not have done, and I wasn't aware of any ongoing things that Mr. Epstein was doing, and the two things never – they never came to my mind to connect them."  JPMC Ex. 61 at 182:10-19.  Erdoes further testified that if she had "learned and believed that [Epstein] was sexually abusing young children yes, he would be – I would ask to have him exited from the bank." JPMC Ex. 61 at 180:19-21.

### *Investigation of Other Epstein Account Activity*

43.     JPMC employees were aware of media reports in which the owner and president of MC2 Models Management denied receiving financial support from or having a working relationship with Epstein.  JPMC Ex. 122 at -36593, -36596.

44.     JPMC employees investigated Epstein's account activity, including his involvement with MC2 Models Management.  As part of that investigation, AML investigator Maryanne Ryan noted that MC2 "appear[ed] to be a legit modeling agency."  JPMC Ex. 123 at -25203.

45.     William Langford stated that the modeling agency "really tells us little" about any "possible linkages between the JPM accounts and bad activity."  JPMC Ex. 123 at -25201.

46.     Langford testified that "[t]he modeling agency is just that it didn't tell us anything, and our ability as a bank to know what's really going on in a modeling agency is extremely limited."  JPMC Ex. 108 at 356:20-24.

47.     On January 13, 2011, Ryan emailed Langford and Phil DeLuca regarding her investigation into Epstein, in which she concluded that there were "no smoking guns."  JPMC Ex. 124 at -152809.

48.     In March 2011, JPMC informed Epstein that it was not going to renew the $1 million standby letter of credit ("SBLC") issued to Epstein to backstop a loan from Mellon to MC2 Models Management.  JPMC Ex. 105 at -274776; JPMC Ex. 93.

49.     Prior to the SBLC expiring, it had never been drawn on.  JPMC Ex. 102 at 221:5-222:15.

50.     Among the conclusions reached by Ryan in her investigation was that Epstein had sponsored the opening of accounts for two adult women, including one described as a "willing participant" in the "recaps of the escapades."  JPMC Ex. 124 at -152809.

51.     In opening accounts for ▮▮▮▮▮▮▮▮▮▮▮, JPMC had information regarding her date of birth, her social security number, driver's license number, and home address.  JPMC Ex. 58.

52.     

▮▮▮▮▮▮▮▮▮  JPMC Ex. 102 at 139:7-18.

53.     Ryan also noted that Epstein "pa[id] other girls, many models no huge amounts" and described Epstein as a "Sugar Daddy."  JPMC Ex. 124 at -152809.

██████████████████████████████████████████    ████████████████

54.     Ryan testified that she understood the term "sugar daddy" to mean "[s]omebody that likes to spend his money on ladies" but that she did not believe it "impl[ied] financial support in exchange for sexual favors." JPMC Ex. 102 at 229:12-22.

55.     ███████████████████████████████████████████████

████████████████████████████    JPMC Ex. 102 at 225:5-231:12.

56.     William Langford testified that this activity was "in many respects . . . inconsistent with the types of things that we saw in human trafficking. You know, having her own account, providing money, providing documented expenses. The human trafficking enterprises that we were focused on were designed to traffic the individuals, keep them down, do—do the business and keep it off the radar. This was different. I mean it's—it's pretty—I don't like the behavior. But it's different from the typology of human trafficking that we had been focused on." JPMC Ex. 108 at 325:15-326:16.

57.     William Langford testified that he did not believe that ████████████████

██████████████████████████████████████████    JPMC Ex. 108 at 488:9-18.

58.     William Langford further testified that Maryanne Ryan's findings in her investigation of Epstein's account activity did not "establish a link between JPMorgan and the operation by Epstein of a sex trafficking ring through the bank, on its face, in my opinion." JPMC Ex. 108 at 492:19-493:1.

### *Recommendations to Exit Were Based on Reputational Risk*

59.     William Langford testified that he recommended exiting Epstein as a client due to reputational risk concerns rather than legal concerns or concerns about Epstein's account activity. JPMC Ex. 108 at 436:10-20, 488:5-489:10. Langford further testified that he did not

believe that Epstein "was engaging in continued illegal activity after his 2008 plea." JPMC Ex. 108 at 487:24-488:4.  Langford also testified that if he believed there were ongoing violations of law and others disagreed over exiting a client, he would have escalated that decision to the board. JPMC Ex. 108 at 283:6-284:16.

60. Stephen Cutler recommended exiting Epstein as a client and refraining from engaging in further business with him due to the reputational risk he created for the Bank.  JPMC Ex. 79 at 209:24-210:7, 299:6-11; JPMC Ex. 126 at 76:2-6.  Cutler further testified that, "If Mr. Epstein was continuing to engage in unlawful activity, we didn't want him as a client."  JPMC Ex. 79 at 363:3-19.

61. Maryanne Ryan testified that she and Phil DeLuca advocated exiting Epstein as a client because "[h]e was a reputational risk to the bank."  JPMC Ex. 102 at 70:24-71:17, 129:12-18.

62. Epstein's former private banker, Mary Casey, "escalated concerns for reputational risk."  JPMC Ex. 66 at 34:10-14, 93:4-6.

63. Phil DeLuca testified that AML Investigations' recommendation to exit Epstein was based on "reputational risk."  JPMC Ex. 119 at 85:6-10.

64. With respect to Epstein's status as a client, John Duffy testified: "I was of the opinion his reputational risk was not worth having him as an account, that's correct."  JPMC Ex. 77 at 125:5-7.

65. Kevin McCleerey testified that "Mr. Epstein represented a reputational risk to the firm."  JPMC Ex. 103 at 38:8-10.

66. Justin Nelson testified that understood that Epstein was terminated as a client due to considerations of "reputational risk."  JPMC Ex. 76 8:6-9.

239

███████████████████████████████       ███████████████████████

**_Staley_**

67.     Former JPMC executive Jes Staley was the most senior and primary JPMC employee responsible for the Bank's relationship with Epstein.  JPMC Ex. 126 at 13:14-20; JPMC Ex. 127 at 75:17-19; JPMC Ex. 108 at 309:20-23, 336:4-14.

68.     Jane Doe 1 testified that ████████████████████████████████████

█████████   JPMC Ex. 128 at 140:6-149:20.

69.     Staley testified that he did not "observe anything that caused [him] to question whether Epstein was engaged in sex trafficking."  JPMC Ex. 129 at 522:19-22.

Staley Exchanged Suggestive Emails with Epstein About Women

70.     On August 30, 2009, Epstein emailed Staley, "how long London? Do you need anything there?"  Staley responded, "Yep." JPMC Ex. 130.

71.     ████████████████████████████████████████████████████

████████████████████████████████   JPMC Ex. 131.

72.     On December 5, 2009, Epstein emailed Staley, "you were with larry , [sic] and I had to put up with . . . ." and attached the following suggestive photograph of a young woman:



JPMC Ex. 132; JPMC Ex. 133.

73.     That same day, Staley responded to Epstein, writing "Don't tell me a French wine."  JPMC Ex. 132.

74.     On December 20, 2009, Epstein emailed Staley the following photograph of a young woman:



JPMC Ex. 134; JPMC Ex. 135).

75.     On June 16, 2010, Staley wrote to Epstein "is she free tonight?" Epstein

responded, "call me." Staley replied, "I'm with A."  JPMC Ex. 136.

76.     On July 9, 2010, Staley e-mailed Epstein, "That was fun. Say hi to Snow White."

Epstein responded, "what character would you like next." Staley replied, "Beauty and the Beast .

. . ." Epstein responded, "well one side is available." JPMC Ex. 137.

<u>Staley Had a Close Personal Relationship with Epstein</u>

77.     On February 26, 2011, Staley emailed Epstein calling him "Family."  JPMC Ex.

138.

78.     On March 3, 2011, Epstein emailed Staley, writing, "Told you—family." Staley

responded the same day, writing "family."  JPMC Ex. 139.

79.     On March 4, 2011, Staley emailed Epstein saying that he counted Epstein "as one

of our deepest friends. And most honest of people."  JPMC Ex. 140.

████████████████████████████████     ████████████████████

80.    On March 5, 2011, Epstein emails Staley in response, calling him "family." JPMC Ex. 140.

81.    On March 7, 2011, Epstein emailed Staley saying "[I] forgot to say thanks . . Family."  JPMC Ex. 141.

82.    On March 10, 2011, Epstein emailed Staley, writing "yup family  dont [*sic*] worry."  JPMC Ex. 142.

83.    On March 18, 2011, Epstein emailed Staley saying "Dear family member,, don't fret[.]"  JPMC Ex. 143.

<u>Epstein Provided Assistance with ████████ Graduate School Admissions</u>

84.    April 27, 2009, Epstein emailed Staley, writing "████ can meet have dinner lunch a weekend with any of the following seth lloyd mit quantum computing.. murray gell-man , santa-fe institute quarks ,, brian greene Columbia -string theory,, leonard Susskind ,, strings theory, lawrence krause,, origins institute phoenix arizona.. lee smolin premiter institute, loop quantum gravity , she can see the large hadron collider in switzerland. private tour [sic]."  JPMC Ex. 144.

85.    Staley forwarded the email to ████████████, writing "This is from uncle Jeffrey. Add Lisa Randell at Harvard."  JPMC Ex. 144.

86.    On October 24, 2009, Staley forwarded ████████ feedback Epstein provided on a draft of her scholarship essay.  JPMC Ex. 145.

87.    On January 11, 2010, ████████ forwarded to Staley an email exchange she had with Epstein, thanking him for inviting her to a physics conference in California.  JPMC Ex. 146.

███████████████████████████████████████████

88.     On September 23, 2010, Staley forwarded to Epstein an email from ██████████
about a professor at Columbia University and asking Epstein if he could "get to this professor at
Columbia."  On September 24, 2010, Epstein responded, "in a snap."  JPMC Ex. 147.

89.     On November 11, 2010, Epstein emailed Staley in response to an email chain
about ████████████████ application to ████████████, writing "she can sit with Richard
Axel when I get back, he won the Novel prize .. he has guaranteed me."  JPMC Ex. 148.

90.     On January 19, 2011, Staley forwarded to Epstein an email exchange between a
████████ professor and ████████ regarding her GRE scores "not seem[ing] to be a problem
according to my sources."  JPMC Ex. 149.

91.     Also on January 19, 2011, Epstein emailed Staley, writing "████ is now 70-30
up from 45-55."  JPMC Ex. 150.

<u>Staley Made Personal Visits/Vacations to Epstein Properties</u>

92.     On December 31, 2008, while Epstein was incarcerated, Staley made plans to
visit Epstein in Palm Beach, Florida.  JPMC Ex. 151.

93.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████  JPMC Ex. 152.

94.     On October 30, 2009, Staley emailed Epstein asking if he could go to Santa Fe, to
which Epstein responded "not today."  JPMC Ex. 153.

95.     On November 1, 2009, Staley emailed Epstein, writing "So when all hell breaks
lose [sic], and the world is crumbling, I will come here, and be at peace.  Presently, I'm in the
hot tub with a glass of white wine.  This is an amazing place.  Truly amazing.  Next time, we're

██████████████████████████████     ████████████████████████

here together. I owe you much.  And I deeply appreciate our friendship.  I have few so

profound."  JPMC Ex. 154.

96.     On January 8, 2010, Epstein emailed Staley about a visit to his private island in

USVI, writing, "my car and driver, , former dea armed. will pick you up in st thomas we have all

the on field permits.. helicopter also availble for a tour around , ... remember I own the two big

marinas.. yacht haven grand, in st thomas and the marina at red hook... you can use my atv's jet

ski ,gym etc. , i will organize the harbor at Norman island if you like, in the bvil . as well as

lunch at guana.."  JPMC Ex. 155.

97.     On January 22, 2011, Staley emailed Epstein about a visit to Epstein's island in

USVI, writing "What a paradise.  When I retire, I'm going to put a mooring in front of your dock

for my boat[.]  Amazing place."  JPMC Ex. 156.

Staley Shared Confidential Information With Epstein

98.     On multiple occasions, Staley shared with Epstein confidential information about

transactions the Bank was structuring or exploring.  JPMC Ex. 157; JPMC Ex. 158; JPMC Ex.

159; JPMC Ex. 160; JPMC Ex. 161; JPMC Ex. 162.

99.     Staley discussed the confidential status of other clients at the Bank with Epstein.

JPMC Ex. 163.

100.    Staley shared information protected by the attorney-client privilege about

Epstein's ongoing litigation against JPMC with Epstein.  JPMC Ex. 164.

101.    ████████████████████████████████████████████████████

████    JPMC Ex. 165.

102.    Staley kept Epstein informed about the status of the Bank's investigation into the

allegations against him.  JPMC Ex. 166; JPMC Ex. 167.

██████████████████████    ███████████████

### Staley Vouched for Epstein

103.    Jes Staley vouched for Epstein on multiple occasions by telling other JPMC executives and employees that Epstein was not engaged in criminal conduct.  JPMC Ex. 126 at 169:7-12.

104.    Mary Erdoes testified that Jes Staley had a "very different" characterization of Epstein than the press reports following his arrest.  JPMC Ex. 61 at 213:17-21.

105.    William Langford, JPMC's former General Counsel for Global Compliance and Regulatory Management, testified that Jes Staley told him that, with respect to Epstein's conviction in 2008 on state charges for solicitation of prostitution and procurement of a minor for prostitution, Epstein "didn't do it, shouldn't have pled guilty, et cetera, wasn't responsible for it" and that Epstein's lawyers were working to get the guilty plea "thrown out."  JPMC Ex. 108 at 323:6-14, 370:10-17.

106.    JPMC's former General Counsel, Stephen Cutler, testified that Jes Staley told him that Epstein had "turned a page" "paid his debt to society" "turned a corner" and "was on the straight and narrow."  JPMC Ex. 126 at 58:23-60:4, 163:3-164:11.

107.    Stephen Cutler relied on Jes Staley's views in evaluating the Bank's relationship with Epstein because Staley was a "respected member of the operating committee" and knew Epstein.  JPMC Ex. 126 at 167:1-19.

### B.    JPMC Did Not "Participate" In Any Epstein Sex-Trafficking Venture

#### *Attempts to Verify Ongoing Investigation*

108.    Following the January 2011 rapid response meeting, employees within JPMC's Private Bank discussed the Epstein relationship with Staley, who spoke to Epstein about the media allegations, which Epstein "claimed were without merit."  JPMC Ex. 105 at -274776.

███████████████████████████      ██████████████

109.    ████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

JPMC Ex. 33; JPMC Ex. 34 at -274529; JPMC Ex. 79 at 351:7-17; JPMC Ex. 168.

110.    On March 7, 2011, Stephen Cutler emailed Jonathan Schwartz asking if he spoke to Staley about "Ken Starr's best friend?"  That same day, Jonathan Schwartz replied, "Yes and didn't get anything back from him, so I just called him again.  He said he'll call Epstein and get me a live name and number for a current lawyer.  The recent headlines (re FBI reopening its investigation in Daily Mail and NY Post over the weekend, and guilt-by-being-friends stories about Prince Andrew and former President Clinton) aint [sic] great.  Cc'ing William."  JPMC Ex. 168.

111.    On March 9, 2011, Jonathan Schwartz discussed with Stephen Cutler, then-General Counsel for JPMC, the need to determine where "there's actually a live federal investigation" into Epstein.  JPMC Ex. 34 at JPM-SDNYLIT-00274529.

112.    On March 15, 2011, Jonathan Schwartz emailed Stephen Cutler that he contacted Jay Lefkowitz, Epstein's attorney, to inquire whether there was any such investigation.  Mr. Lefkowitz explained that he and Epstein had heard nothing to suggest that there was a current FBI or other law enforcement agency investigation.  As to any suggestion in the media of an ongoing investigation, "according to Jay, [they] don't seem to have any basis."  JPMC Ex. 34 at JPM-SDNYLIT-00274528.

███████████████████████████████████████

113.    On or about March 22, 2011, Jonathan Schwartz spoke to the United States

Attorney for the Southern District of Florida, who did not disclose any investigation into Epstein.

JPMC Ex. 35; JPMC Ex. 36 at 18.

114.    JPMC also reached out to the FBI to ask for a contact at the agency who may

have been working on any ongoing investigation into Epstein.  The FBI never returned the phone

call.  JPMC Ex. 36 at 19; JPMC Ex. 37 at 151:19-152:24; 329:5-330:21.

***Currency Transaction Reports Related to Epstein***

115.    Between 2002 and 2013, JPMC filed approximately 150 CTRs related to Epstein

and his accounts in which JPMC identified its relationship with Epstein, flagged his large cash

withdrawals.  JPMC Ex. 39 at ¶ 95; JPMC Ex. 41.

116.    Seventy-three of these CTRs were filed before Epstein was arrested in July 2006.

JPMC Ex. 41.

117.    Law enforcement never contacted JPMC in response to any CTR.  JPMC Ex. 38

at 136:23-137:11; JPMC Ex. 39 at ¶ 30 n.28.



118.    ████████████████████████████████████████████

████████████████████  JPMC Ex. 108 at 353:2-9.

119.    ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████  JPMC Ex. 102 at 23:14-19.

120.    Maryanne Ryan testified: "The SAR decision lies solely with the investigations

department.  Could an employee under me have discussed it with another person within

█████████████████████████████████    ███████████

investigations? Sure.  But they weren't going back to the business to discuss the merits of SAR

filing."  JPMC Ex. 102 at 27:10-16.

      121.    In her expert report, Terry Pesce opined that,

> At times banks will conduct transaction reviews or "lookbacks."
> Banks may conduct lookbacks if they are looking for a particular
> kind of past activity or if they receive a request from law
> enforcement. This entails a much more granular and pointed
> review of historical activity. The bank would see activity it would
> not have reviewed in the ordinary course of monitoring, and
> notably, the bank would likely file SARs it would not have filed in
> fulfilling its day-to-day AML program obligations.

> JPMC was required to perform a transaction lookback in
> connection with the 2013 Consent Order. However regulators
> required the Bank to examine activity with non-bank financial
> institutions. There is nothing in the required lookback to suggest
> examiners were concerned that the bank failed properly to monitor
> high-risk Private Bank clients or to detect human trafficking.
> Moreover, it is unlikely that even a broader-scoped lookback
> would have uncovered Epstein's transactions with individuals. I
> have supervised numerous lookbacks. They require applying
> additional scenarios or more precise thresholds to past activity that
> might not have alerted under a bank's monitoring systems. They
> do not generally entail setting thresholds at the low dollar amounts
> at issue here. ███████████████████████
> ██████████████████

> Importantly, lookbacks are conducted with information that might
> not have been available or meaningful when the underlying
> transactions occurred. Banks act with the information they have
> before them. The USVI created demonstrative exhibits for use in
> depositions that collect granular information now available. What
> may seem relevant in hindsight may not have been apparent at the
> time. ██████████████████████████████
> ██████████████████████████████████
> █████████████████████████

JPMC Ex. 60 at ¶¶ 121-23.

██████████████████████████████████████

122.    William Langford testified that nobody from JPMC's business ever tried to dissuade him from filing a SAR related to a customer and that he was not aware of any instance in which an employee in JPMC's lines of business ever tried to dissuade a colleague from filing a SAR related to a customer.  JPMC Ex. 108 at 486:18-487:4.

123.    William Langford testified that he never decided against filing a SAR related to a customer that he believed was warranted "because the customer was particularly large or valuable" and that he was not aware of any instance in which any JPMC employee believed a SAR should be filed but failed to do so "because the client was particularly large or valuable." JPMC Ex. 108 at 487:5-11.

124.   

JPMC Ex. 119 at 332:5-11.

125.

JPMC Ex. 108 at 486:7-17.

126.    Phil DeLuca testified that nobody from JPMC's Private Bank ever tried to dissuade him from ████████████ "doing anything at all in connection with" Epstein and that he was not aware of any instance in which an employee in JPMC's Private Bank ever tried to dissuade a colleague from ████████████ "doing anything in connection with" Epstein. JPMC Ex. 119 at 330:24-332:4.



127. ███████████████████████████████████

███████████████████████ JPMC Ex. 39 at ¶¶ 19-21, 30.

128. ████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████ JPMC Ex. 42.

129. ████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████ JPMC Ex. 43.

130. ████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████ JPMC Ex. 44.

131. ████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

██████ JPMC Ex. 169; JPMC Ex. 170.

132. ████████████████████████████████

██████████████████████████ JPMC Ex. 102 at 25:5-7.



133.

JPMC Ex. 45.

134.    On June 19, 2013, Phil DeLuca sent an email to Cynthia Armine describing the history of escalations of the Bank's relationship with Epstein. JPMC Ex. 171.

135.    On July 19, 2013, Maryanne Ryan sent an email to Kevin McCleery, James Dalessio, and Phil DeLuca "to follow up on the Epstein withdrawals" and noted that she believed his explanation that the withdrawals for fuel "seem[ed] odd."  JPMC Ex. 172.

136.

JPMC Ex. 173.

137.

JPMC Ex. 173.

138. ██████████████████████████████████

████████████████ JPMC Ex. 173.

139. ██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████ JPMC Ex. 102 at 202:21-203:4.

140. ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

█████████████████████████ JPMC Ex. 46 at JPM-SDNYLIT-W-00019086-

00019096.

141. ██████████████████████████████████

████████████████████████████████████████████ JPMC Ex.

174.

142. ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████ JPMC

Ex. 47 at JPM-SDNYLIT-W-00018180-00018196.

143. ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████ JPMC Ex. 48 at JPM-SDNYLIT-W-00002185-00002196.

144.   ████████████████████████████████████

████ JPMC Ex. 38 at 136:23-137:11; JPMC Ex. 39 at ¶ 30 n.28.

145.   USVI's law enforcement expert, Shaun O'Neill ███████████████

███████████████████ JPMC Ex. 80 at 11:4-13.

146.   Mr. O'Neill testified that ███████████████████████████

███████████████████████████████████████████████

███████████████████ JPMC Ex. 80 at 58:13-59:2.

147.   Mr. O'Neill further testified that ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████ JPMC Ex. 80 at 59:8-60:2.

148.   On July 9, 2019, JPMC employees began an investigation into Epstein's banking relationship with the Bank.  JPMC Ex. 175 at -37464.

149.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ JPMC Ex. 176.

150.

JPMC Ex. 177 at -17206.

151.

JPMC Ex. 178 at -8097.

152.



JPMC Ex. 335 at -8820.

153.

JPMC Ex. 179 at -21053, -21055.

154.

JPMC Ex. 180 at -207.

155.



JPMC Ex. 181 at -175.

156.

JPMC Ex. 182 at -223.

157.

JPMC Ex. 183 at -548.

158.

JPMC Ex. 184 at -8121.

159.

JPMC Ex. 185 at -22630.

160.

JPMC Ex. 186 at -8142.

161.

JPMC Ex. 187 at -8162.

***JPMC Exited Epstein as a Client***

162.    Mary Erdoes testified that in 2013 she became concerned with Epstein's cash usage and "thought the explanation was an outsized amount of cash, and even though that was his explanation for where the cash was being used, that in conjunction with the culmination of

everything else and the fact that I didn't know or like Mr. Epstein, I had no reason to vouch for

Mr. Epstein to be a client of the bank, and I recommended exit and we exited." JPMC Ex. 61 at

183:8-15.

163.    In explaining the factors that went into Epstein's exit in 2013, Frank Pearn

testified: "A number of factors, in no particular order. There was continued negative media that

the line of business and the risk department continued to see. There was continued cash and wire

activity in many of Epstein's accounts. There was, I'll say, a long-time view of many of the

people in the line of business, in the risk and compliance organization, that Mr. Epstein should

be exited or should have been exited, as I'm sure we'll cover, and Jes Staley was no longer at the

bank. And I'd say the last thing was at that time the industry, the regulatory environment, was—

had changed. JPMorgan had received AML consent orders earlier in 2013, along with a number

of other banks. The regulatory view of bank's role in combating money laundering, terrorist

financing, was—had changed. And as part of that, our institution was looking at our portfolio or

our book of high-risk clients and taking a fresh look at whether or not we should maintain those

relationships. So a number of factors." JPMC Ex. 94 at 116:15-117:19.

164.    On July 17, 2013, JPMC employees and executives, including John Duffy, Mary

Erdoes, Stephen Cutler, and Justin Nelson met to discuss the status of Epstein's relationship with

the Bank, and decided to terminate the relationship. JPMC Ex. 188; JPMC Ex. 189.

165.    On July 19, 2013, John Duffy emailed Mary Erdoes a draft of talking points to

communicate the Bank's decision to exit Epstein as a client. Duffy wrote: "1. The repetitive

nature of your cash transactions is a problem for us and our relationship with you. 2. The

regulatory standards in the banking industry continue to evolve with a very low tolerance for

cash activity when combined with your personal history. 3. So, given the intersection of these

███████████████████████████         █████████████████

circumstances we are in a uniquely challenged situation. Remediation is required and we need to ask you – in an orderly manner – to find another bank for your needs."  JPMC Ex. 190.

166.    On August 9, 2013, Mary Erdoes emailed several JPMC employees and executives, including Cynthia Armine, Stephen Cutler, Nina Shenker, Donna Dellosso, John Duffy, and Phil DiIorio, writing, "Re our client exit, the conversation went well and was very professional.  I suspect the call last night might have helped.  It will move in an orderly process.  John did an excellent job."  JPMC Ex. 191.

167.    On August 14, 2013, John Duffy emailed Justin Nelson, writing, "Thanks. He and I spoke as well about his advisory business and whether our [sic] not we would work with him.  I said 'yes', as long as we were not transacting in JE accounts."  JPMC Ex. 192.

168.    On September 13, 2013, John Duffy emailed Justin Nelson regarding a request from Epstein for "more credit," writing, "the answer needs to be 'no,' followed by this is a great opportunity to move forward with you [sic] new bank."  JPMC Ex. 193.

169.    On September 20, 2013, John Duffy emailed Mary Erdoes about Epstein, writing, "Spoke with him.  Good conversation.  Told JE no on sole trustee or POA, yes for advisory role without discretion.  Yes for custody in the client's name.  Tough one he brought up regarding Gates – JE and JPM as co-trustee.  While I expect that this would be hard to get through – its [sic] like co-branding with him.  We should still discuss it – Let's talk. He understood."  JPMC Ex. 75.

### C.    JPMC Did Not Knowingly Benefit From A Sex-Trafficking Venture

170.    Jamie Dimon testified that he did not "recall any involvement on [Epstein's] part" in JPMC's acquisition of Highbridge Capital Management, LLC and that he was not "informed

████████████████████████                    ████████████████

that Jeffrey Epstein received a $15 million fee for his work in connection with that transaction."
JPMC Ex. 55 at 57:6-58:16.

171.    Epstein's company, Financial Trust Company, Inc., had been retained as a
consultant by Highbridge Capital Management, LLC.  JPMC Ex. 194.

172.    Financial Trust Company, Inc. received a $15 million fee from Dubin & Swieca
Holdings, Inc. related to JPMC's acquisition of a majority interest in Highbridge Capital
Management in 2004.  JPMC Ex 194; JPMC Ex. 195; JPMC Ex. 116 at 164:17–20.

173.    Epstein did not receive a fee from JPMC in connection with JPMC's acquisition
of a majority interest in Highbridge Capital Management.  JPMC Ex. 116 at 164:10-16.

174.    By 2014, Leon Black was a "longstanding client of the private bank."  JPMC Ex.
196 at -902716.

175.    Frank Pearn testified: "As the founder and one of the senior leaders at Apollo
Global Management, the bank had a long established relationship with Apollo and with Mr.
Black.  My understanding is that Leon Black was one of Mr. Epstein's clients as a money
manager.  And as far as I've been able to determine, we don't see any—or I don't see any
introduction of Leon Black as a private bank client through Mr. Epstein."  JPMC Ex. 116 at
182:5–19; *see also* JPMC Ex. 70 at 386:14-17.

**II.    JPMC Did Not Obstruct Or Attempt To Obstruct An Effort To Enforce The TVPA**

176.    On August 15, 2007, Bear Stearns received a Grand Jury Subpoena from the U.S.
District court for the Southern District of Florida seeking "all documents referring or relating to
Jeffrey Epstein."  JPMC Ex. 197 at -373075.

177.    On August 27, 2007, members of Bear Stearns AML and Litigation departments
spoke to Assistant U.S. Attorney Ann Marie Villafana "regarding the scope of the Grand Jury

Subpoena." "During the conversation, the AUSA stated that Bear Stearns was not a target of the investigation.  Moreover, a member of the AML Group asked the AUSA if any of the activity concerning the Epstein investigation might have triggered a reporting requirement for the Firm. The AUSA answered that question in the negative."  JPMC Ex. 197.

178.    On August 27, 2007 and September 6, 2007, Assistant U.S. Attorney Marie Villafana sent letters to Bear Stearns clarifying the scope of the Grand Jury Subpoena.  JPMC Ex. 198.

179.    In response to the Grand Jury Subpoena, Bear Stearns reviewed transfers out of Epstein's accounts in the amounts of $1,000 or $100,000 and concluded that the "account(s) does not appear to be implicated in the alleged wrongdoing" and that the review "revealed no suspicious or unusual third party wire transfers consistent with those mentioned in the above-describe [sic] Probable Cause Affidavit or news articles. Based upon the available facts, this investigation is closed and nothing further is deemed necessary."  JPMC Ex. 197 at -373076.

## III.    SUMMARY JUDGMENT CANNOT ENTER ON JPMC'S AFFIRMATIVE DEFENSES

### A.    Epstein Made Payments To USVI Officials And Entities

180.    On December 21, 2017, Epstein wrote to Dawn Henry of the USVI Department of Planning and Natural Resources ("DPNR") that he had given "25 k to the home for girls in st croix" and asked Henry for suggestions on where he could donate.  JPMC Ex. 199.

181.    On December 27, 2017, Epstein directed Richard Kahn (Epstein's accountant) to write a $25,000 check from Southern Trust Company, Inc. ("STC") to the DPNR for a donation to a public library.  JPMC Ex. 200.

182.    In connection with that donation, Dawn Henry wrote to Epstein on December 27, 2017, to suggest specific libraries to which Epstein could donate.  She additionally wrote to

███████████████████████████████████████

Epstein: "If you prefer to donate to school libraries I can connect you with the Commissioner for Education. Either way the Territory wins." JPMC Ex. 200.

183.    The USVI government "review[ed] its corporate sponsorships after it emerged that Jeffrey Epstein, the convicted sex offender … gave gifts to school pupils and financed events for young children." JPMC Ex. 201.

184.    Epstein provided funding for a science fair for children in grade school in the USVI run by the USVI Department of Education. He also specifically paid for travel and accommodations for prize-winning children to attend the science fair in St. Thomas. JPMC Ex. 201.

185.    Epstein provided funding for a summer camp for children with intellectual disabilities through his USVI-based corporations. JPMC Ex. 201 at 1, 2.

186.    Epstein funded a prize for the winners of a school essay-writing competition. JPMC Ex. 201 at 2.

187.    Epstein paid for computers to be given to two 14-year-old students attending high school in the USVI. JPMC Ex. 201 at 2.

188.    Epstein purchased Kindle e-readers for use by a school library. JPMC Ex. 201 at 2.

189.    Epstein purchased over 100 Microsoft Surface tablets for use by children in USVI schools. JPMC Ex. 201 at 2.

190.    Epstein provided funding through his USVI businesses for a basketball tournament in the USVI, which included children as young as six. JPMC Ex. 201 at 2.