UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS<br><br>Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A.<br><br>Defendant/Third-Party Plaintiff.<br><br>JPMORGAN CHASE BANK, N.A.<br><br>Third-Party Plaintiff,<br><br>v.<br><br>JAMES EDWARD STALEY<br><br>Third-Party Defendant. | Case Number: 1:22-cv-10904-JSR |

**GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS'
REPLY MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

**ARGUMENT** ............................................................................................................................... 1

A.   The Government Is Entitled to Summary Judgment on Its TVPA Claims ......................... 1

    1.   Epstein engaged in a sex-trafficking "venture" in the USVI ................................. 1

    2.   JPMorgan knew/recklessly disregarded Epstein's sex-trafficking venture ........... 2

    3.   JPMorgan actively participated in Epstein's sex-trafficking venture ..................... 6

    4.   JPMorgan benefited from participation in Epstein's sex-trafficking venture......... 9

    5.   JPMorgan obstructed enforcement of the TVPA ................................................. 10

    6.   The Government is entitled to injunctive relief ................................................... 10

B.   The Government Is Entitled to Summary Judgment on JPMorgan's Defenses 5-8 ......... 11

    1.   JPMorgan concedes its equitable/fault-shifting defenses have no legal basis ...... 11

    2.   JPMorgan relies on immaterial and mischaracterized facts ................................. 12

        a.   Evidence of political contributions does not establish a conspiracy......... 13

        b.   JPMorgan offers no evidence of improper "influence and access" .......... 13

        c.   There is no evidence Epstein "bought" special treatment or "immunity"  14

        d.   Cecile de Jongh's actions do not support any affirmative defense ........... 15

## TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982) .................................................................................................... 11

*City of N.Y. v. FedEx Ground Package Sys., Inc.*,
  314 F.R.D. 348 (S.D.N.Y. 2016) .................................................................................. 11

*G.G. v. Salesforce.com, Inc.*,
  2023 WL 4944015 (7th Cir. Aug. 3, 2023) ............................................................. 9, 10

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015) .............................................................................. 6

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*,
  13 F. 4th 247 (2d Cir. 2021) ........................................................................................ 12

*Muller v. Twentieth Century Fox Film Corp.*,
  794 F. Supp. 2d 429 (S.D.N.Y. 2011) .......................................................................... 13

*New York v. United Parcel Serv., Inc.*,
  160 F. Supp. 3d 629 (S.D.N.Y. 2016) ............................................................... 11, 14, 15

*SEC v. Sayid*,
  860 Fed. Appx. 18 (2d Cir. Sept. 28, 2021) ................................................................... 2

*Specialty Minerals, Inc. v. Pluess-Staufer AG*,
  395 F. Supp. 2d 109 (S.D.N.Y. 2005) .......................................................................... 12

*United States v. Angell*,
  292 F.3d 333 (2d Cir. 2002) ......................................................................................... 11

*United States v. Philip Morris Inc.*,
  300 F. Supp. 2d 61 (D.D.C. 2004) ............................................................................... 11

# ARGUMENT

## A. The Government Is Entitled to Summary Judgment on Its TVPA Claims

### 1. Epstein engaged in a sex-trafficking "venture" in the USVI

JPMorgan argues the Government has not shown a "venture" with a USVI "nexus" (Dkt. 254 at 3-4). JPMorgan acknowledged *in this litigation* that Epstein "engaged in a longtime trafficking venture[.]" Resp. SUF (Dkt. 255) ¶1. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (at 21). There is no dispute Epstein was arrested in 2019 on federal charges including *conspiracy* to commit sex-trafficking; Maxwell was convicted in 2022 for *conspiring* with Epstein; Epstein ran a "sex-trafficking *ring*"; and JPMorgan ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ JPMorgan SUMF (Dkt. 229) ¶22; Resp. SUF ¶3-6, 8. A federal court found "*Epstein and his coconspirators* … committed violations of … federal law," and "*Epstein worked in concert with others*." *Id.* ¶15. The NPA named multiple co-conspirators of Epstein. *Id.* ¶120-21.

JPMorgan also does not dispute the *substance* of victim accounts of sex-trafficking by Epstein in the USVI. *Id.* ¶13-16, 19-24(c), (d); JPMorgan SUMF ¶12, 20 (Jane Doe complaints of abuse in USVI). JPMorgan alleges the "USVI had knowledge of *Epstein's crimes*," and facilitated "*his crimes*" and "*his transport of victims*" in the USVI, CSMF (Dkt. 255) Part III.C-E, which *a priori* means it does not dispute Epstein committed those sex-trafficking crimes in the USVI. JPMorgan states many girls on the available flight manifests to late 2018 were "Epstein's victims" in the USVI. *Id.* ¶344; Resp. SUF ¶26-31 (lists same names on flights). JPMorgan unavoidably admitted the victims "suffered unimaginable abuse at the hands of this man." *Id.* ¶2.[1]

---

[1] JPMorgan baselessly argues the victims cannot "tell their stories at trial" (at 4 n.2). The Government intends to call victims, including ▓▓▓▓▓▓▓. Professor Carr will also testify about

## 2. JPMorgan knew/recklessly disregarded Epstein's sex-trafficking venture

Scienter can be established on summary judgment, particularly here where JPMorgan admits it at least recklessly disregarded Epstein's venture beginning in July 2006. *SEC v. Sayid*, 860 Fed. Appx. 18, 19 (2d Cir. Sept. 28, 2021). JPMorgan does not dispute it knew of Epstein's arrest and related news reports that Epstein paid minors for sex and police thought there was probable cause to charge Epstein with sex acts with minors. Resp. SUF ¶33, 41-46. JPMorgan concedes that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (at 21 (citing FFIEC guidance)). There is no dispute JPMorgan had significant corroborating evidence of Epstein's reported sex crimes by July 2006 and knowledge of ongoing conduct. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (at 21, 20). "No reasonable juror" could find JPMorgan "failed to show a reckless disregard" for Epstein's sex trafficking venture from 2006 to 2019. *Sayid*, 860 Fed. Appx. at 19; Order (Dkt. 130) at 28 ("sufficient" that "JPMorgan was aware of Epstein's convictions for sex crimes and ignored numerous red flags … with Epstein's accounts").

That JPMorgan employees were, after his 2008 felony conviction, only reviewing Epstein for "reputational risk" not "continued illegal activity" (at 8), also proves at least reckless disregard. JPMorgan ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, knew it was Epstein's "#1 bank" at the time, knew Bear Stearns received a subpoena tying Epstein's financial transactions to

---

the victim stories. JPMorgan failed to seek or take ▆▆▆▆▆▆'s deposition during the discovery period, and it is pure speculation she will take the Fifth at trial. Resp. SUF ¶14.

federal trafficking and was surprised it did not receive a subpoena, Resp. SUF ¶97, 174, yet was only concerned with risk to its reputation, not victims' safety or other illegal activity (at 8).

The Government also proves JPMorgan *knew* Epstein was engaged in child sex-trafficking in 2006. The July 2006 news reports based on police documents discussed victims as young as 14. Resp. SUF ¶43. Other reports discussed arrests on multiple counts of unlawful sexual activity with minors and a statement given to police by one victim that "Epstein asked for her real age, [and she] stated she was 16. Epstein advised her not to tell anyone her real age." *Id.* ¶49-50. Epstein confessed to JPMorgan that, as the reports said, he engaged in sex with young women for money, denying only the ages. *Id.* ¶53,[2] 54. But JPMorgan's own due diligence included reports that Epstein's lawyers—to whom JPMorgan was making millions of dollars in payments at the time—had been discrediting "the 14- to 17-year-old girls." *Id.* ¶108, 127, 238-39. By September 2007, JPMorgan knew Epstein had made a deal to plead guilty to "soliciting [minors] for sex." Resp. JPMorgan SUMF (Dkt. 262) ¶7-j. JPMorgan ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Resp. SUF ¶3-4, 148. There is thus *zero* dispute JPMorgan "consider[ed] those past crimes to constitute sex-trafficking under the TVPA" (at 5).

Even though Epstein was charged under state law, not the TVPA (*id.*), JPMorgan knew Epstein's lawyers it was paying negotiated a deal to avoid TVPA charges. Resp. SUF ¶112. The TVPA covers soliciting a minor for prostitution, and JPMorgan was aware of a foreign and "interstate nexus" (at 5), including evidence supporting reports ▮▮▮▮▮▮ had been trafficked, and that ▮▮▮▮▮ and ▮▮▮ had credit cards through Epstein noting "travel[] through ... Europe, and US Virgin Islands and US monthly." Resp. SUF ¶48-50, 77, 86.

---

[2] JPMorgan agrees "Staley testified as to the quoted text" but says "a credibility determination" is required. This is not a proper dispute under Rule 56.1(d) which requires "admissible evidence." In any event, Staley's testimony is corroborated by his email. Resp. SUF ¶54.

JPMorgan argues it did not know or recklessly disregard that Epstein was *continuing* to engage in a sex-trafficking venture (at 5-6). Yet JPMorgan ███████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ Resp. SUF ¶4. There is also no dispute regarding the ███████████████████████ ███████████████████████████████████████████████████████ ████████, *infra* at 5, which show knowledge or reckless disregard of Epstein's ongoing venture.

JPMorgan argues news reports and lawsuits are mere "allegations" and thus insufficient (at 6), but FFIEC guidance and Private Bank policy required JPMorgan to rely on news reports and lawsuits in determining ███████████████████████████████████ Resp. SUF ¶38, 84, 66. Further, many reports were based on police documents. And the Government asserts the reports *plus* JPMorgan's undisputed information corroborating the allegations are sufficient, including: Epstein's confession of the July 2006 "allegations"; JPMorgan banked all the 2006 "alleged" recruiters and accomplices; significant payments to "alleged" accomplices; ongoing large cash withdrawals supporting the "alleged" amount of cash used to pay recruiters and victims; credit cards for "alleged" Epstein accomplices and victim noting travel monthly to Europe, the US, and the USVI; a "revoked" credit card for an "alleged" recruiter "alleged" to have spoken to police; payments to girls and women, many with Eastern European names or located in Eastern Europe, when Epstein was "alleged" to traffic girls from Eastern Europe; tens of millions of dollars in payments to "alleged" accomplice Maxwell; and a SBLC for Epstein to Brunel/MC2 when Epstein was "alleged" to be doing business with MC2 and using it to abuse girls. *See* Gov't Mot. Part B.

JPMorgan did not "diligently investigate[]" following 2010 news reports that Epstein was under federal investigation for sex-trafficking (at 6-7). ███████████████████████

4

██████████████████████████████████████████████████████████

████████████████████████████████. Instead, JPMorgan called Epstein's lawyers who it knew had engaged in a cover-up following Epstein's arrest, discrediting victims, tampering with police witnesses, and negotiating a deal to avoid federal charges, and to whom JPMorgan was continuing to pay *tens of millions of dollars*. Resp. SUF ¶108, 110, 112, 240. JPMorgan also called federal authorities who it knew could not "confirm or deny the existence of an investigation." Resp. JPMorgan SUMF ¶¶37-a, b, c, 38-a. JPMorgan argues Ryan reviewed some of Epstein's activity and found "no smoking guns," but leaves out ████████████████████████ Ellsworth Decl. (Dkt. 256) Ex. 124, and that AML compliance had already said to exit Epstein, Liu Decl. (Dkt. 225) Ex. 70. ████████████████████████████████████████

████████████████████

JPMorgan tied the cash and transactions it handled for Epstein to his sex-trafficking (at 7) time and time again: the 2006 Rapid Response meeting; the 2007 Private Bank review; █████ ████████████████████████████████████████████████████████████ Resp. SUF ¶¶90-93, 125-27, 96-97, 94. JPMorgan also repeatedly stated the cash was "excessive" and "unusual," particularly given Epstein's "personal history." *Infra* at 7. JPMorgan's argument that Duffy took Epstein's cash-for-fuel explanation "at his word" in 2011 (at 12, 7) is the height of reckless disregard if not knowledge. Epstein was a convicted felon. ████████████ ████████████████████████████████████████████████████ JPMorgan knew Epstein was in jail and on house arrest and thus not traveling when the Bank was noting large cash withdrawals. The explanation was not supported by any receipts or other documentation. Resp. SUF ¶100-06. Epstein's pilot (had the Bank contacted him) said the last time Epstein paid cash for fuel was in 2003. Ellsworth Decl. (Dkt. 256) Ex. 118. ████████████

5

███████ Resp. SUF ¶103. JPMorgan does not dispute its diligence at the time cited reports that Epstein traveled to foreign countries to traffic young women, *id.* ¶107, so even if the cash were for fuel to travel to foreign countries, JPMorgan knew or recklessly disregarded it was connected to Epstein's sex-trafficking. Finally, JPMorgan does not dispute Brigstocke and Erdoes had knowledge of Epstein's sex-trafficking venture ("[r]eminded me of JE's house … except fewer nymphettes"). *Id.* at 190.[3]

### 3. JPMorgan actively participated in Epstein's sex-trafficking venture

JPMorgan does not dispute the payments to co-conspirators or girls or women but argues the payments were "passive" and "routine" business transactions (at 10-11). JPMorgan lost that fight. This Court held the type of transactions the Government proves on summary judgment—using accounts to send payments to co-conspirators, ████████████████████████████████, providing excessive and unusual amounts of cash to Epstein, and structuring cash withdrawals—go "well beyond" providing usual banking services. Order at 25-26. The NYSDFS also said the conduct the Government proves are not routine or ordinary banking services.[4] Gov't Mot. at 16.

JPMorgan also does not dispute the amount of the cash withdrawals (at 18-19), but argues the cash was "routine" (at 11-12). JPMorgan's own undisputed evidence contradicts its argument.

---

[3] Even though (1) Epstein confessed to Staley he paid young women for sex, and JPMorgan (2) ████████████████████████████████████████████████████ and (3) ████████████████████████████████, JPMorgan disputes Staley knew Epstein was engaged in sex-trafficking (at 8-9); CSMF ¶156. JPMorgan is wrong the "adverse interest" exception applies. JPMorgan *admits* Staley was "the senior person at JPMorgan with a *business relationship* with Epstein." Resp. SUF ¶191-92. JPMorgan only cites a handful of emails (out of 1200) to argue Staley's personal relationship with Epstein (at 9), which—even if they had nothing to do with continuing to maintain a business relationship with this ultra-connected, ultra-rich client—still do not prove Staley completely abandoned JPMorgan's interest and acted entirely in his own interest. Also, the alleged "personal" emails and conduct do not begin until 2009, CSMF ¶70, 84, thus any knowledge in the critical period prior to that is imputed even if the exception applied.

[4] The Court can take judicial notice of the NYSDFS consent order. *See, e.g.¸ In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 588 n.4 (S.D.N.Y. 2015).

In 2006 and 2007, JPMorgan identified Epstein's frequent cash withdrawals as notable in conjunction with his "felony charges of soliciting underage prostitutes." Resp. SUF ¶90-93; 125. ████████████████████████████████████████████████████████████████████████████████ ██████████████████████████. *Id.* ¶97, 103, Ellsworth Decl. (Dkt. 231) Ex. 46. There is no dispute AML compliance knew Epstein "never stopped the large cash withdrawals." Resp. SUF ¶98. It is also undisputed the draft "talking points for Epstein's exit conversation" in August 2013 cited "the intersection" of Epstein's "repetitive" cash transactions and his "personal history." *Id.* ¶99.

JPMorgan does not dispute from 2005 to 2011, JPMorgan extended a $1 million guarantee to Brunel/MC2. JPMorgan argues one employee's 2011 "investigation" showed MC2 "appears to be a legit modeling agency" (at 13). JPMorgan knew at the time of a 2007 report Epstein was covering up his relationship with MC2, hardly indication of its legitimacy, and 2010 reports reviewed by JPMorgan said Brunel/MC2 were the source of trafficked girls and being investigated for child sex-trafficking. JPMorgan's due diligence showed by 2011 MC2 had $593,789 in federal tax liens and a citation for operating "without a license." Resp. SUF ¶128-29, 136-39.

JPMorgan disputes structuring of cash withdrawals (at 15). JPMorgan's argument that it supposedly "believed" the cash-for-fuel explanation is irrelevant. *Supra* at 5. And there is no dispute Duffy told Epstein "to withdraw this cash from his aviation account" to fit Epstein's explanation in 2011. Resp. SUF ¶101. While JPMorgan claims there is "nothing inappropriate about this" (at 15), it begs the question that can be resolved on summary judgment why JPMorgan ████████████████████████. Gov't Mot. at 19; Resp. SUF ¶103.

JPMorgan argues ████████████████████████████████ (at 16-22). JPMorgan does not genuinely dispute any facts, but argues the Government cannot prove JPMorgan ████████ ████████████████████████. *Id.* at 16, 17. Even if that were true despite the business' interest in

7

continuing its relationship with Epstein and his vast network, the standard for filing a SAR is reckless disregard/willful blindness. Gov't Opp'n (Dkt. 261) at 25. JPMorgan also argues ▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓ (at 17). *That is the problem.* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓:

- In 2013, AML compliance emailed that Epstein "never stopped the large cash withdrawals" and asked: *"Shouldn't the business have been telling us this?"* Resp. SUF ¶98
- In 2006 and 2007, the business repeatedly identified Epstein's cash withdrawals as notable together with his "felony charges of soliciting underage prostitutes" ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id.* ¶90-93; 125, 96
- AML compliance was "skeptical of Epstein's jet fuel explanation" in July 2013 ▓▓▓▓▓▓▓▓▓▓; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (at 19); CSMF ¶135; Resp. SUF ¶101
- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Resp. JPMorgan SUMF ¶49a-d, f; Resp. SUF ¶125-26. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (at 20).
- The business did not tell compliance about the *2005* SBLC to MC2 until *2011*. Ellsworth Decl. (Dkt. 256) Ex. 123.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ it is undisputed AML compliance had enough to know Epstein should be terminated. The business, including Erdoes, decided otherwise. Gov't Mot. at 14. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (at 18), ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

The nail in the coffin is the undisputed fact that JPMorgan ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (at 21). There were no "new facts"—the conduct alleged was the same conduct JPMorgan reviewed in the news in 2006. *Sealed Indictment*, *US v. Epstein*, 19-cr-490 (S.D.N.Y July 2, 2019). The *only* difference between 2006 and 2019 was JPMorgan could no longer benefit from Epstein.

8

### 4. JPMorgan benefited from participation in Epstein's sex-trafficking venture

And between 2006 and 2019, JPMorgan did benefit. JPMorgan, relying on *Geiss v. Weinstein Co.*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019), argues there must be a "causal relationship" between JPMorgan's "affirmative conduct furthering the sex-trafficking venture and [its] receipt of a benefit" (at 22). The Court was "not convinced[.]" Order at 31. Neither is the Seventh Circuit:

> [A] plaintiff can allege that the defendant "knowingly benefitted by alleging only that the defendant was aware that it was benefitting in some way from its participation in the venture. That's it …. The statutory text clearly dictates, where the defendant is simply aware that it is benefiting, that is enough.

*G.G. v. Salesforce.com, Inc.*, 2023 WL 4944015, at *15-16 (7th Cir. Aug. 3, 2023).[5] Though many of JPMorgan's disputes misstate the evidence,[6] or argue JPMorgan only "met [certain] clients" through Epstein as opposed to got an actual "referral," Resp. SUF ¶279-86, 289-90, there is still no genuine dispute JPMorgan benefited from revenues; referrals; introductions; facilitation of meetings; connections to Epstein clients; settlements of Epstein's lawsuits; "business advice and consulting" (Highbridge, Gates DAF); and personal help from the early 2000s until 2019. *Id.* ¶252, 257-58, 267-69, 271-77, 293-304, 306-16, 333-44, 346-54, 356-58, 360-68, 370-71, 373-81, 383, 385, 386-92, 395-404, 406-417; CSMF ¶171-72. JPMorgan does not dispute Duffy "approved the opening of four new business accounts" for Epstein shortly before he was exited, or that Duffy and Erdoes approved ongoing referrals from Epstein after he was exited. *Id.* ¶386, 353-54, 356-58, 360-68. There is no genuine dispute Epstein facilitated JPMorgan's relationship with Black and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id.* ¶343-44, 346-49, 360-65. Weeks before his 2019 arrest, Friedman

---

[5] JPMorgan miscites *Doe #1 v. Red Roof Inns*, 21 F.4th 714, 723-24 (11th Cir. 2021) (at 22), which holds the same as the Seventh Circuit and does *not* require a causal connection.

[6] *E.g.*, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Resp. SUF ¶314, when its due diligence summary for Brin acknowledges the meeting occurred, Liu Decl. Ex. 190 at -710. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* Ex. 188 at -003. JPMorgan also disputes Epstein "worked" with Dimon on the Highbridge acquisition even though they were both part of the Highbridge "*Working*" group." Resp. SUF ¶376.

9

(GC) and Erdoes (Head AWM), excitedly accepted a referral of, in Friedman's words, "a rock star[] litigator … she would be a great client," from Epstein. *Id.* ¶368. Such a "continuous business relationship" shows JPMorgan "participated in [Epstein's] venture and knowingly benefitted from it." *G.G.*, 2023 WL 4944015, at *16.

Even under JPMorgan's reading of the statute, there is no genuine dispute the Bank received revenue from Epstein *in exchange for* its furtherance of Epstein's sex-trafficking venture. Epstein's business with its "#1 bank" was trafficking; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ After Epstein's 2006 arrest for conduct constituting child sex-trafficking, JPMorgan continued for years to handle virtually every financial aspect of Epstein's business in exchange for the above undisputed and extensive benefits. Gov't Mot. at 21-24.

### 5. JPMorgan obstructed enforcement of the TVPA

By 2007, JPMorgan knew of an effort to enforce the TVPA and intentionally obstructed or attempted to obstruct that enforcement effort until after Epstein's arrest and death in 2019, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Gov't Mot. at 24-27; Gov't Opp'n at 16-23.

### 6. The Government is entitled to injunctive relief

The Government has a quasi-sovereign interest in "assuring its residents it will act to protect them from the harmful effects of criminal sex-trafficking enterprises flourishing in the Islands that are their home":

> Like the discrimination that was at stake in *Snapp*, sex-trafficking is a problem that might well re-occur, especially in a remote and isolated territory such as the USVI. Additionally, sex-trafficking is a problem that the USVI would, if it could, "likely attempt to address through its sovereign lawmaking powers."

10

Order at 18-19. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 597-99 (1982) involved the 1978 apple harvest, but was filed in 1979 after the conduct occurred, and sought injunctive relief—not to enjoin specific ongoing conduct—but to require defendants "to conform to the relevant federal statutes and regulations in the future." JPMorgan did not cut ties with Epstein over a decade ago and change its ways (at 28); JPMorgan continued to accept benefits from Epstein up until his 2019 arrest and ██████████████████████████████████████ until there were no more benefits to be had by facilitating his sex-trafficking venture. "Obviously JPMC has no intention" of complying with trafficking laws unless ordered (*id.*). Even if JPMorgan could prove unclean hands, *infra* Part B, JPMorgan's equitable defenses are not available against the Government acting in the public interest seeking an injunction (at 28), *infra* n.7

**B.   The Government Is Entitled to Summary Judgment on JPMorgan's Defenses 5-8**

**1.   JPMorgan concedes its equitable/fault-shifting defenses have no legal basis**

JPMorgan does not address the substantial authority precluding its equitable defenses of *in pari delicto*, unclean hands, and laches, and its fault-shifting defense (Defenses 5-8) in this public enforcement action.[7] It argues only that the Court implicitly rejected this authority (including Second Circuit precedent) when it denied the Motion to Strike (at 29). Not so. The Court confirmed it "is skeptical that some or all of the defenses will survive summary judgment (let alone prevail at trial)," but "satisfied they should not be stricken as a matter of pleading." Order (Dkt. 215). *UPS* makes clear "[d]enial of [a motion to strike] with regard to any defense does not necessarily mean

---

[7] *See, e.g., United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002) (laches); *New York v. United Parcel Serv., Inc.*, 160 F. Supp. 3d 629, 647-48 (S.D.N.Y. 2016) ("UPS") (unclean hands, *in pari delicto*, laches) (seeking injunction); *City of N.Y. v. FedEx Ground Package Sys., Inc.*, 314 F.R.D. 348, 357-58 (S.D.N.Y. 2016) (same); *id.* at 359 (fault-shifting) (seeking injunction); *United States v. Philip Morris Inc.*, 300 F. Supp. 2d 61, 76 (D.D.C. 2004) (unclean hands, *in pari delicto*, laches) (seeking injunction).

that the Court will ultimately find such defense appropriate or applicable" and does not preclude the Court from "later determin[ing] that such defense may not, as a matter of law or fact, be available." 160 F. Supp. 3d at 638. The heightened standard for striking affirmative defenses—"no substantial question of law that *might* allow the defense to succeed" and "the plaintiff must be prejudiced by the inclusion of the defense," *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 111 (S.D.N.Y. 2005) (emphasis added)—no longer applies. On summary judgment, JPMorgan must establish the legal bases for its defenses. It fails to do so.

That JPMorgan chose not to present *any* legal argument is telling. The authority cited in the Government's Motion bars these affirmative defenses from going forward *as a matter of law*. JPMorgan's opposition addresses only purportedly disputed issues of *fact* in response. But "facts [are] material" only "if [they] 'might affect the outcome of the suit under the governing law.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, 13 F. 4th 247, 259 (2d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Because the governing law precludes these affirmative defenses, the Court need not consider JPMorgan's "factual" recitations. Moreover, JPMorgan's claimed "disputed issues" fail to support its defenses in any event.

### 2. JPMorgan relies on immaterial and mischaracterized facts

With no legal leg to stand on, JPMorgan pieces together a conspiratorial fantasy in which Government officials "actively facilitated" Epstein's sex-trafficking crimes (at 39). JPMorgan focuses on facts not law because it seeks to defend this lawsuit by smearing the Government. But JPMorgan's rhetoric cannot escape its most fundamental flaw—there is no evidence that any Government official or employee had *knowledge* of what was occurring on Epstein's private island (unlike JPMorgan, which had real-time knowledge of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Having failed to develop such evidence in extensive discovery of the

12

Government, JPMorgan instead misconstrues the Government's statutorily-authorized governmental decisions to support its arguments. JPMorgan's claims are "based on speculation and conjecture rather than concrete evidence" and do not establish a genuine issue of material fact. *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 442 (S.D.N.Y. 2011).

### a. Evidence of political contributions does not establish a conspiracy

JPMorgan argues a disputed fact exists over whether political contributions to candidates and certain payments to the de Jonghs "were legitimate," but no evidence even suggests these payments were improper. The USVI permits campaign contributions up to $1,000 per person, and there is *no evidence* that Epstein's payments exceeded that lawful amount. Resp. CSMF ¶4 (filed concurrently). JPMorgan's citations to contributions to candidates for federal office who are not USVI Government employees also prove nothing. *Id.* ¶1-4. There is no evidence that political contributions prompted improper, preferential treatment. JPMorgan cites a $200,000 loan to the de Jonghs but leaves out the loan was made *after* the former Governor left office. *Id.* ¶6. JPMorgan does not even attempt to explain how such "payments" affected the actions of other office holders. And although Epstein paid tuition for the de Jonghs' children, testimony from numerous witnesses establishes that such payments are commonly provided by employers in the USVI. *Id.* Nothing about any of these payments supports a claim that the Government was engaged in illicit activity, let alone somehow at fault for Epstein's crimes.

### b. JPMorgan offers no evidence of improper "influence and access"

JPMorgan's purported examples of "influence and access" are similarly immaterial and overblown (at 31). JPMorgan cites a contract with Mr. White who was a "former Senator" at the time. CSMF ¶232. JPMorgan's references to a transfer of Epstein's parole and proposed input on sex offender legislation prove nothing; there is no evidence that Epstein's parole was ever

transferred to the USVI, and testimony establishes that the legislature rejected Epstein's proposed legislative changes at the time. CSMF ¶278; Resp. CSMF ¶17, 18.

### c. There is no evidence Epstein "bought" special treatment or "immunity"

JPMorgan's remaining argument is that Epstein "bought" preferential treatment from the Government (at 32). There is *no* evidence from which a jury may infer that Epstein's supposed financial inducements resulted in the acts described. The Government programs Epstein qualified for and his misconduct are entirely independent. JPMorgan offers no evidence that the federally-authorized Economic Development Commission benefits were the result of financial payments. It does not credibly dispute that Epstein's misconduct was not, to the Government's knowledge, "connected with the operation" of his business such that the Government had the legal right to terminate benefits, as required by statute. Resp. SUF ¶453. Decisions regarding "whether to collect taxes from third parties constitute[] a protected policy choice" that "falls in the heartland of a State's broad discretion in the area of law enforcement decision making," and "these defenses are never cognizable as a matter of law to any claim." *UPS*, 160 F. Supp. 3d at 644-645.

JPMorgan's salacious claim that Epstein enjoyed "immunity" from investigation or prosecution faces similar obstacles. There was no such "immunity." Moreover, "[i]t is well-established … that government actors have broad discretion in law enforcement decisions," which include both "the decision not to take action, as well as the decision to take action." *Id.* at 639. JPMorgan ignores this authority and the caselaw cited in the Motion establishing that news articles and anonymous court filings, while triggering the Bank's due diligence obligation, *supra* at 4, are insufficient to establish probable cause to obtain a warrant.[8]

---

[8] There is no requirement to make weekly checks as JPMorgan claims, and the Government did not begin performing weekly checks of offenders until 2019. Resp. CSMF ¶24.

Nor can the waiver of notice of international travel form the basis of an affirmative defense. JPMorgan ignores governing law regarding that discretionary decision, except to assert it is contending the waiver was "part of an improper" arrangement without "second guessing whether the waiver should have been granted" (at 32-33). But JPMorgan's affirmative defenses require wrongful conduct. *See, e.g.*, *UPS*, 160 F. Supp. 3d at 646 ("*in pari delicto*" defense requires comparison "among wrongdoers").[9] None has been established here.

JPMorgan also misconstrues former Attorney General George's testimony. While she believed Epstein was seeking to exert political influence in *2019*, she confirms that his attempts were unsuccessful as she denied Epstein's request. She also confirmed the Governor did not pressure her for a different result, but thanked her for her work on the issue. Resp. CSMF ¶22.

### d. Cecile de Jongh's actions do not support any affirmative defense

JPMorgan's focus on Cecile de Jongh's emails and activities also does not survive summary judgment. JPMorgan does not and cannot contest the federal government controls entry in and out of the Territory, not the Government. Resp. SUF ¶445; Resp. CSMF ¶26. Nor does the Government issue visas or otherwise have responsibility for immigration-related matters. *Id.* Ms. de Jongh testified she had no knowledge of Epstein's misconduct. JPMorgan again cannot rebut this testimony, except to state that it disagrees. Resp. SUF ¶468. JPMorgan's failure to adduce evidence of knowledge of Epstein's activities is fatal to its defenses.

---

[9] JPMorgan fails to explain how any "factual dispute" concerning Epstein's tier classification is material to its affirmative defenses. Under USVI law, a tier classification governed only how frequently an offender has to appear in person to register and did not affect the level of monitoring or other travel notification requirements. Resp. CSMF ¶23.

15

Dated: August 14, 2023               **ARIEL SMITH, ESQ.**
                                                  **ATTORNEY GENERAL**

/s/ *Mimi Liu*
**MIMI LIU**
Admitted *Pro Hac Vice*
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
mliu@motleyrice.com

**VENETIA VELAZQUEZ**
Admitted *Pro Hac Vice*
Acting Chief, Civil Division
Virgin Islands Department of Justice
Office of the Attorney General
213 Estate La Reine, RR1 Box 6151
Kingshill, St. Croix
U.S. Virgin Islands 00850
Tel: (340) 773-0295 ext. 202481
venetia.velazquez@doj.vi.gov

**LINDA SINGER** (Admitted *Pro Hac Vice*)
**DAVID I. ACKERMAN**
**PAIGE BOGGS** (Admitted *Pro Hac Vice*)
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
lsinger@motleyrice.com
dackerman@motleyrice.com
pboggs@motleyrice.com

*Attorneys for Plaintiff Government of the United States Virgin Islands*