# EXHIBIT 305

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4    GOVERNMENT OF THE UNITED STATES
      VIRGIN ISLANDS,
 5
                   Plaintiff,
 6
      v,                                   No. 22-cv-10904-JSR
 7
      JPMORGAN BANK, N.A.,
 8
                   Defendant.
 9    _____
      JPMORGAN CHASE BANK, N.A.,
10             Third-Party Plaintiff

11    v.

12    JAMES EDWARD STALEY,
      Third-Party Defendant.
13    _____

14          THE ORAL DEPOSITION OF ALBERT BRYAN, JR. was

15    taken on the 6th day of June, 2023, at the Law Offices

16    of Joel Holt, 2132 Company Street, Christiansted, St.

17    Croix, U.S. Virgin Islands, between the hours of 8:42

18    a.m. and 3:47 p.m. pursuant to Notice and Federal Rules

19    of Civil Procedure.

20                         _____
                                Reported by:
21
                            DESIREE D. HILL
22                      Registered Merit Reporter
                        Hill's Reporting Services
23                         P.O. Box 307501
                        St. Thomas, Virgin Islands
24                          (340) 777-6466

25
```

1    Q.   What did Mr. Epstein say to you and what
2    did you say to him as best that you recall?
3    A.   Well, he was just concerned about, you
4    know, what we were doing if elected, you know, what
5    my approach would be towards the island and towards
6    permitting, my views on having certain things.  Like,
7    he had several docks on the island.  He had problem
8    getting those through DPNR as well.
9    Q.   What did you tell him?
10   A.   I said, you know, I'm a very strong
11   business guy.  I'm not so strong on the environmental
12   side.  Consequently, I ended up hiring JP Oriol, the
13   commissioner of DPNR, because he is the
14   counterbalance to me.
15   Q.   Okay.  And anything else you can remember
16   about that first meeting with Mr. Epstein?
17        MR. ACKERMAN:  Object to form.
18   Q.   (By Mr. Neiman:)  You could answer.
19   A.   No, I don't remember anything else.
20   Q.   Any discussions with Mr. Epstein or his
21   lawyer in connection with that meeting about him or
22   people close to him contributing to your campaign?
23   A.   No.
24   Q.   Did you ever talk to him about money?
25   A.   No.

1      A.    Ms. DeJongh.

2      Q.    Tell me what you remember about your
3  interactions with Ms. DeJongh?

4      A.    That's a very broad -- of course, she's
5  the First Lady, so, or was.

6      Q.    I'll break that down a little bit.  Putting
7  aside interactions that you had with her that didn't
8  relate to her work for Mr. Epstein.  So, let's just
9  focus on interactions that you had with her that
10 related to her work for Mr. Epstein.  What do you
11 recall about that?

12           MR. ACKERMAN:  Objection, vague.

13     Q.    (By Mr. Neiman:)  You can answer.

14     A.    So I worked with her -- I was the
15 executive director of a non-profit, and so the only
16 real interaction I had is any contributions that were
17 given to the non-profit.

18     Q.    So this was the job that you held between
19 the time that you were head of the EDC and the time
20 that you became governor?

21     A.    This is correct.

22     Q.    Non-profit was what?

23     A.    Junior Achievement.

24     Q.    I see.  And what kind of interactions did
25 you have with Mrs. deJongh related to Junior

1   Achievement?
2           MR. ACKERMAN:  Objection.
3           THE WITNESS:  We always had
4       problems satisfying their educational
5       requirement of the certificate.  So I
6       would agree and recommend different
7       places where she could donate the money
8       that was required by their certificate.
9       Q.   (By Mr. Neiman:)  Okay.  And this is during
10  the time period when you were running Junior
11  Achievement?
12      A.   Yes.  That's correct.
13      Q.   How about -- anything else that you can
14  recall interacting with Mrs. de Jongh related to
15  Mr. Epstein?
16      A.   No.
17      Q.   How about when you became governor, did you
18  continue to interact with her related to Mr. Epstein?
19      A.   Yes.  Mrs. de Jongh was instrumental in
20  scheduling as well.
21      Q.   Okay.  So you talked to her about
22  scheduling what?
23      A.   The same meeting that we had.
24      Q.   Okay.  Other than talking to Mrs. de Jongh
25  about scheduling, anything else you can recall talking

1        was treated and the sentence that he was

2        put to serve, I didn't think more of it.

3        Q.    (By Mr. Neiman:)  He went to jail, right?

4        A.    Right.

5        Q.    For more than a year?

6        A.    Right.

7        Q.    Did that strike you as not serious?

8        A.    Well, solicitation is a serious crime, and

9   solicitation with a minor is a serious crime.

10       Q.    What, if anything -- we've talked about a

11  report and the absence of a report.  Is there anything

12  else that you know of that was done by the EDC to look

13  into the seriousness of the conduct that had led to

14  this criminal conviction?

15            MR. ACKERMAN:  Objection.

16       Foundation, vague.

17            THE WITNESS:  Once it was not

18       effectively connected to the business

19       and it wasn't in the jurisdiction of the

20       Virgin Islands and he went to jail for

21       it, whatever he settled with Florida was

22       good for us.

23       Q.    (By Mr. Neiman:)  All right.  Now, how when

24  you were the head of the EDC did you evaluate whether

25  you were getting enough back in benefits from a

1          A.    Kind of.
2          Q.    Explain.
3          A.    Well, that's what everybody wanted.
4    That's not what we wanted individually.
5          Q.    Okay.  Did you end up joining forces?
6          A.    No.
7          Q.    All right.  But that was sort of the
8    political scuttlebutt at the time?
9          A.    Right.  But we had five Democratic teams
10   and no one believed any one team was strong enough to
11   win outright.  So they wanted to combine the forces.
12         Q.    I see.  And then you'll see in the fourth
13   full paragraph, Mrs. de Jongh is advising Mr. Epstein,
14   "Your best bet is to give wide but nominal support in
15   the primary to solidify relationships, and then
16   strongly support the winner of the primary going into
17   the general election."  Do you see that?
18         A.    Yes.
19         Q.    Do you know whether you got support from
20   Mr. Epstein in the primary?
21         A.    Yes, I do know.  We got none.  No one
22   supported us.  Nobody thought we would win.
23         Q.    Did you get any contributions from anybody
24   associated with Mr. Epstein for the primary.
25               MR. ACKERMAN:  Objection to form.

1    Q.   (By Ms. Neiman:)  But this is a charity
2    that you particularly invested in, right?
3    A.   If you're asking if it bought favor
4    because he invested in Junior Achievement?  Not
5    particularly.
6    Q.   I didn't ask you that.  I asked you --
7    A.   I felt like I was helping them out more
8    than they were helping me out.
9    Q.   Sure.  But you were helping them out by
10   suggesting that they contribute to a charity that you
11   were quite close to, right?
12   A.   Right.  I think in the documents I was
13   shown, though, I said it would be self-serving for me
14   to recommend Junior Achievement.  So I didn't want to
15   do that, you know.  Because, I mean, those are my
16   people.
17   Q.   But then you actually suggest Junior
18   Achievement?
19   A.   Yeah, but I said it will be self-serving
20   for me to do so.
21   Q.   So you suggested that it will be
22   self-serving?
23   A.   Yeah.
24   Q.   And then they decided to give to Junior
25   Achievement, right?

1        A.    I don't know.
2        Q.    Fair enough.  All right.  Let's take a look
3   at -- well, this time I'm showing you Exhibit 20.
4   This is another email exchange to Mrs. de Jongh and
5   Epstein in December of 2018.  Between the time when
6   you were elected and began to serve as Governor,
7   correct?
8              (Deposition Exhibit No. 20 was
9               marked for identification.)
10       A.    Eh-hmm.
11       Q.    It's a tough one for the court reporter.
12       A.    Yes.
13             MR. ACKERMAN:  Objection to form.
14        The last question, I think there were
15        two questions in there.
16             MR. NEIMAN:  Okay.
17       Q.    (By Mr. Neiman:)  Now, if you look at the
18  bottom of the page, you could see that Mrs. de Jongh
19  writes, Good afternoon Jeffrey, Albert suggested a
20  school for autistic children and Junior Achievement.
21  Do you see that?
22       A.    Yes.
23       Q.    Autism is another issue that's personally
24  important to you?
25       A.    Yes.

1    Q.   Okay.  And which she says here that you had
2  suggested this particular school and Junior
3  Achievement, is that accurate?
4    A.   Yes.
5    Q.   All right.  And then you see that there's a
6  dialogue up above about the gift, and Mr. Epstein
7  agreed to 10,000 to each, do you see that?
8    A.   Where is that?
9    Q.   If you look up above Ms. De Jongh's email,
10  Mr. Epstein writes 10K.  And then Mrs. de Jongh asked,
11  10K each?  And then Mr. Epstein writes, Yes.  Do you
12  see that?
13    A.   Yes.
14    Q.   Do you remember whether these two charities
15  actually received the donation?
16    A.   No.
17    Q.   Don't remember one way or the other?
18    A.   No.  I didn't follow-up.  Like I said, you
19  know, they have a problem meeting their public
20  education commitments.  So it was more of a favor to
21  them than to me.  Junior Achievement is pretty
22  well-funded.  We have a golf tournament every year
23  where we raised all the money for the year.  So
24  that's another place where I didn't really have to
25  solicit hard in order to find donations.

1              As a matter of fact, my board get on me
2     because I used to tell -- I used to stop raising
3     money and tell, give it to somebody else because
4     there's so many needing charities in the Virgin
5     Islands that don't have enough money, you know,
6     especially during this period.
7          Q.   But one of the charities that you chose to
8     suggest to Ms. De Jongh was Junior Achievement?
9          A.   Right.
10         Q.   Let's take a look now at tab --
11         A.   I just want to clarify, I didn't really
12    suggest Junior Achievement.  In what I read, I said,
13    I should suggest -- I would suggest Junior
14    Achievement but that would be self-serving.  So
15    technically I didn't recommend Junior Achievement.
16         Q.   When you're referring to what you read,
17    what are you talking about?
18         A.   A document that was in my package that was
19    sent to me to review.
20         Q.   Okay. And that was in -- was it
21    communication between who and who?
22         A.   Cecile and I, I think.  I think --
23    actually, no.  It wasn't in a document.  I read it
24    here.  And then I looked back and I think we shared
25    in a document to you.  When I looked back in my text

Case 1:22-cv-10904-JSR   Document 283-2   Filed 08/14/23   Page 12 of 18

ALBERT BRYAN, JR. -- DIRECT                           173

1    Q.   Will you agree that you described your
2    campaign as going out and raising money for your
3    inauguration?
4    A.   No, I just want -- when I'm reading this,
5    I'm just saying what this document says.
6    Q.   When you talked before, was there also fund
7    raising going on by your campaign for the
8    inauguration?
9    A.   The inaugural committee.
10   Q.   Not the campaign?
11   A.   I'm not sure.  I mean, remember this is
12   the island.  Like, this is the same people.  So I
13   can't say they were in the capacity of the campaign
14   or -- we don't have any recorded -- I don't think we
15   recorded any donations to the election roll for the
16   inaugural committee from the campaigns.  So if the
17   inaugural committee was raising money, they were
18   doing it under that guise -- not the campaign was
19   done.
20   Q.   Same people, different entity doing the
21   raising.
22   A.   Sort of the same people.  We had a lot
23   more people in the inaugural committee.
24   Q.   Sure.  Once you won, everybody wants to be
25   a part of --

```
1                MR. ACKERMAN:  Objection.
2                THE WITNESS:  Absolutely.
3        Q.    (By Mr. Neiman:)  And what it says here
4    about how you were trying to raise the money privately
5    for inaugural events, that's inaccurate?
6                MR. ACKERMAN:  Objection to form.
7                THE WITNESS:  Yeah.  I wasn't
8           trying to raise any money.  The
9           inaugural committee was.
10       Q.    (By Mr. Neiman:)  Well, did you tell them
11   don't do this?
12               MR. ACKERMAN:  Objection to form.
13               THE WITNESS:  No.
14       Q.    (By Mr. Neiman:)  You could have told them
15   not to do it, right?
16               MR. ACKERMAN:  Objection to form.
17               THE WITNESS:  Yeah, I could have
18          told them not to do it.  I think the
19          whole inaugural activity thing is a
20          waste of money anyway.  So I didn't
21          really have any involvement in it.
22       Q.    (By Mr. Neiman:)  Well, you went to the
23   events?
24       A.    I didn't have a choice.
25       Q.    I mean, you could have told them I don't
```

1  to happen.  Especially my previous governor had a lot
2  of volatile relationships.
3       Q.   Were you providing special treatment to
4  Mr. Epstein by meeting with him in person regarding
5  his complaints?
6       A.   No.
7       Q.   Did you ever provide Mr. Epstein any
8  special treatment?
9       A.   No.
10      Q.   Did you ever provide Mr. Epstein any
11 special treatment as a result of his association with
12 Ms. Kellerhals?
13      A.   No.
14      Q.   Did you ever provide Mr. Epstein any
15 special treatment as a result of his -- because Cecile
16 de Jongh worked for him?
17      A.   No.
18      Q.   How do Virgin Islands' residents go about
19 setting up a meeting with you?
20      A.   A lot of people go -- some people call
21 directly the 774-0001.  Some people go through my
22 assistant who schedule -- who does most of my
23 scheduling.  And most people use whoever they know
24 that was on my campaign, close to me.  My poor aunt,
25 who is inundated with calls, my family, everybody, to

1 Virgin Islands?
2     A.   No.  We compete with Puerto Rico who has a
3 tax benefit program as well, and Puerto Rico and
4 Cayman?  I'm sorry, British Virgin Islands and
5 Cayman.  Under the current law, a lot of those
6 companies -- a lot of those foreign destinations are
7 still more way more advantageous than the Virgin
8 Islands.
9         The Virgin Islands also competes itself
10 because -- against itself because we also have the
11 research and technology park which offers the same
12 amount of benefits.
13     Q.   There were documents about the cost benefit
14 ratio.  Do you remember those?
15     A.   Yes.
16     Q.   In your experience, are there benefits to
17 the Virgin Islands from the tax benefit program beyond
18 those reflected in those cost benefit ratios?
19     A.   There are tremendous benefits to the
20 Virgin Islands beyond the finances in the cost
21 benefits program.
22     Q.   So what are those other benefits to the
23 Virgin Islands?
24     A.   The one thing is having our residents that
25 are able to donate heavily to charitable

1    organizations.  We have a lot of non-profits that
2    suffer in the Virgin Islands, especially during the
3    period of the Great Recession, the energy crisis and
4    the closing of Hovensa.  So those -- that money gets
5    the kids that the government doesn't -- hasn't been
6    able to get.  The things like Little League, Junior
7    Achievement, The Women's Coalition, The Men's
8    Coalition.  Just to name a few, those donors give to
9    them.  They also shore up our educational
10   infrastructure.
11              When we lost the refinery in 2012, it
12   shuddered -- we lost a whole school because the
13   refinery paid for all of the tuition for its
14   supervisory staff.  Those schools benefited from that
15   tuition.  When that benefit was taken away, those
16   kids stopped going there.  We had to combine schools.
17              EDC programs -- the refinery exist on an
18   EDC-type program.  The reason why the EDC program has
19   those -- we encourage those education benefits, you
20   have a whole generation of Virgin Islanders that
21   became lawyers and doctors as a result of Leon Hess
22   funding education in the Virgin Islands.
23              So we have companies like International
24   Capital Management in St. Thomas that not only funded
25   the tuition for those people's kids to go to school.

Case 1:22-cv-10904-JSR   Document 283-2   Filed 08/14/23   Page 17 of 18

ALBERT BRYAN -- CROSS                           289

1    They actually extended loan programs to their
2    employees where they would give low interest loans
3    for down payments.
4              Our sports benefit as well too.
5    Antilles School, as a result of EDC companies moving
6    here and kids of those students going to the school,
7    we have like one of the top ten sailing high schools
8    in the nation.  A lot of those kids end up going to
9    schools on sailing scholarships.
10             Same so with golf, basketball where EDC
11   beneficiaries fund kids' trips to go to Puerto Rico
12   and to the mainland to compete in tournaments.
13             So there's a lot of other ways.  The
14   biggest way financially that's never reflected is
15   while you pay, you get an income tax reduction on the
16   taxes that you get through the company any revenue
17   you get through the company but your worldwide income
18   is taxed fully, just like everybody else in a lot
19   more income comes into the Virgin Islands that way as
20   well, and that's never in the cost benefit analysis.
21        Q.   Do EDC beneficiaries or owners of EDC
22   beneficiaries invest in the community other than in --
23   by investing in educational?
24        A.   Absolutely.  We have opportunities -- the
25   way that we design the law, it allows for the owners

1      Q.   So were Mr. Epstein and his companies Ms.
2  Kellerhals only client?
3      A.   No.
4      Q.   In your role as EDC chair and in your
5  experience as a Virgin Islands' resident, did you have
6  the opportunity to observe whether EDC tax
7  beneficiaries paid school tuition for the children of
8  their employees?
9      A.   Yes.
10     Q.   And what is it that you observed?
11     A.   So in order to get -- one of the concerns,
12 especially when you're bringing people back, Virgin
13 Islanders back from the states, or people in city,
14 high cost-of-living.  So when people come, then they
15 -- even if they see the salary and they say, I'm
16 going to take a lump for -- I'm going to take another
17 10 for the sake of moving to the Virgin Islands or
18 because I want to do this job.  Then once they see
19 what the school tuition is for their kids, what the
20 housing is, what food costs, then they kind of have a
21 change of heart.  So to make it more attractive, the
22 EDC companies have taken on paying for tuition for
23 their students and -- for their employee students as
24 well as paying 100 percent of their health insurance.
25     Q.   Sir, when you were on the EDC board, did