# EXHIBIT 308

```
 1            UNITED STATES DISTRICT COURT FOR THE
                 SOUTHERN DISTRICT OF NEW YORK
 2
                   CASE NO. 22-cv-10904
 3

 4   GOVERNMENT OF THE UNITED
     STATES VIRGIN ISLANDS,
 5
             Plaintiff,
 6
     v.
 7
     JP MORGAN CHASE BANK, N.A.,
 8
             Defendant.
 9   _____/

10

11                     *CONFIDENTIAL*

12                  VIDEO DEPOSITION OF

13            FORMER GOV. KENNETH E. MAPP

14

15              Wednesday, May 24, 2023

16                9:48 a.m. - 5:03 p.m.

17

18                    Conducted at
                      Losey, PLLC
19                1420 Edgewater Drive
                  Orlando, Florida 32804
20

21

22   Reported by:

23   Janet Hamilton, RPR, CRC, FPR
     Job No.:  J9718146
24
     AUSTIN REDCAY, Videographer
25   LOUWHAN WELCH, Exhibit Technician (via Zoom)
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1  Virgin Islands.
 2          Q.   And then as the program evolved, you
 3  mentioned the pre-financial age in your prior
 4  testimony?
 5          A.   Yes.
 6          Q.   Can you explain what you mean by that?
 7          A.   Well, it was generally created starting as
 8  a manufacturing operation.  And then, you know, I
 9  guess as the sophistication of artificial intelligence
10  and technology took place and financial work and
11  investment took place from a global nature, the law
12  was amended; the Congressional act, I believe, as well
13  as the local statute was amended to create management
14  of varying things.  Like financial certainly was one
15  of them.
16               And so we began to see folks who were
17  involved in financial management.  Small -- well,
18  large companies that were doing small, unsecured loans
19  and things of that nature, moving their operations
20  into the territory.
21               At one point we saw -- we were successful
22  in getting the parent entity for the Cancer Treatment
23  Centers of America to put its corporate sort of
24  operations there to manage its health facilities
25  throughout the country.  And that generated, you know,
```



1   high-level, high-quality folks that had to have a
2   really diverse and high education for that level of
3   work in and out the Virgin Islands in the
4   Virgin Islands.
5           Q.    And that leads into my next question, which
6   is:  What is the -- what are the benefits that the
7   Virgin Islands received from having financial
8   companies participate in this EDA program?
9           A.    Well, you got -- you got the high-worth
10  employment.  You got high-worth individuals.  Because,
11  ultimately, when a person -- when an entity moves in
12  and -- let's say a financial adviser, an investment
13  adviser gets a -- comes in as an EDC entity, not only
14  they get the benefit of the tax exemptions on what
15  they're doing from their management operations in the
16  Virgin Islands, the owners or partners of those
17  entities who are now residents of the
18  Virgin Islands -- and Congress enacted what defined as
19  a resident of the Virgin Islands -- their total income
20  became subject to now Virgin Islands' tax law.  Which
21  Virgin Islands' tax law for all the purposes of this
22  conversation is a mirror of the Internal Revenue Code.
23  The Virgin Islands doesn't have any independent income
24  tax statute.  Pursuant to the Revised Organic Act, we
25  mirror the Internal Revenue Codes and all of the



```
 1   operations of the Internal Revenue -- the Bureau of
 2   Internal Revenue mirrors the activities of the
 3   Internal Revenue Service and is literally subject to
 4   supervision of the Internal Revenue Service over the
 5   operations of the Bureau of Internal Revenue.
 6             And so that entity, that person who may
 7   have -- let's say had 100% of the shares or a majority
 8   of the shares who are now residents of the
 9   Virgin Islands, they would have to file their taxes in
10   the Virgin Islands pursuant to all of their income.
11             And so for those portions of the income
12   that were not benefiting from the tax exempt status,
13   taxes applied to them would be collected and put,
14   deposited into the treasury of the government of the
15   Virgin Islands.
16             So the EDC program, the IDC program, as we
17   envisioned it and put it together with the blessing of
18   the US Congress, was generally created to drive jobs.
19   Expand the economy.  You create high-worth individuals
20   who are now investing, living in the Virgin Islands,
21   building homes, having those homes needing to be
22   serviced, creating employment in their varying
23   activities.  Manufacturing.  Industrial operations.
24   Now financial management.  Then generating a community
25   that have the ability and is required pursuant to
```



```
 1  their EDC certificates to make a significant level of
 2  charitable contributions to stated charities in the US
 3  Virgin Islands.
 4       Q.   And during the time that you were governor,
 5  from 2015 to 2019, Mr. Epstein's financial trust
 6  company was a participant in the EDC program?
 7       A.   Yes.
 8       Q.   And was their oversight by the government
 9  of the Virgin Islands during your tenure as
10  government -- excuse me -- governor from 2015 through
11  2019 over the participants in the EDC program?
12            MR. ACKERMAN:  Object to form.
13       A.   Generally, yes; by the Economic
14  Development Authority.  Because prior -- and I'm
15  searching, just to make sure I'm kind of accurate in
16  the years.  I can't give the months.  But certainly
17  during the tenure of Gov. Turnbull a number of members
18  of Congress raised some serious exception.  Because
19  high-worth operations within the varying states were
20  relocating their corporate activities and operations
21  within the US Virgin Islands.  And so it was depleting
22  revenues from some of the state and city and county
23  governments where they were operating.  And there were
24  some operations, that the Economic Development
25  Authority was giving tax exemptions to certain
```

```
 1          Q.   Sorry.  Let me reask the question.
 2               In 2014, do you know how much Mr. Epstein
 3   or one of his entities contributed to your campaign
 4   fund?
 5          A.   If he contributed to the campaign, he would
 6   have been limited to contributing $1,000.  Now there
 7   were PACs out there were giving support to the
 8   campaign.  And, you know, the PACs don't have
 9   limitations in terms of the contributions.  And so I
10   can't speculate beyond that.
11               But, generally, when you go meet some
12   entity, some businessperson, generally you will get
13   some contribution to the campaign.  But that's, again,
14   limited to the $1,000 mark.
15          Q.   Do you know whether Mr. Epstein contributed
16   to a PAC that was sporting you in the 2014
17   gubernatorial campaign?
18          A.   I don't know, but I would say I believe so.
19          Q.   And then you mentioned the inaugural
20   committee and your understanding or belief that
21   Mr. Epstein or one of his companies contributed to the
22   inaugural committee.  Do you know how much was
23   contributed to that?
24          A.   No, I do not.
25          Q.   After you became governor, did you receive
```



```
 1  BY MS. ELLSWORTH:
 2       Q.   Gov. Mapp, we were, just before we broke,
 3  talking about the lunch that you had on Mr. Epstein's
 4  island.  And, again, that was at some point between
 5  2015 and 2019.  Correct?
 6       A.   Yeah.  Yes.  It may -- maybe sometime in
 7  2016.
 8       Q.   What was the purpose of that lunch?
 9       A.   Well, he -- I believe at that time we were
10  attempting to do, float municipal bonds.  And he had
11  been trying to assist me.  I actually asked for his
12  help; as an investment person and a person that I
13  believed to, you know, be very connected to the
14  market.
15            We were having tremendous difficulty with
16  the issuance of the bonds.  Because at that time on
17  the national stage Congress was really involved in the
18  debt crisis in Puerto Rico.  So there was a bill that
19  was constructed, generally known as PROMESA, which
20  stands for some long label of words.  But it was
21  dealing with what would happen, how it would sort of
22  protect the bondholders, the persons holding notes in
23  Puerto Rico, and how Puerto Rico would have to manage
24  what was expected to be a default on its debt.
25                 MR. DUNN:  Excuse me.  Sorry to interrupt,
```



1        but the witness is muted.  We can't hear
2        anything on the Zoom.
3              VIDEOGRAPHER:  I apologize.  I must have
4        muted that.
5              MS. ELLSWORTH:  Sorry.
6              Sorry, Jonathan.  You're unmuted now.
7        A.    And while the PROMESA conversations were
8   taking place between the House and the US Senate, it
9   was driving a lot of consternation in the market about
10  the debt of the territories.  And so we were trying to
11  keep territories out of the PROMESA language and keep
12  the PROMESA discussion and language specifically
13  directed to Puerto Rico and Puerto Rico's financial
14  issues.
15              And there was literally a collaboration
16  that all of the territories should be -- PROMESA
17  shouldn't be Puerto Rico specific.  It should be all
18  of the territories.
19              And so the territories, we were concerned
20  about that.  But more specifically I was concerned.
21  Because I'm now going into the market trying to get, I
22  believe, $200-something-million for varying financial
23  needs.  And so we were dealing with that and trying to
24  see how we would structure this bond deal.  And one of
25  the options that were on the table was that, if a

1  natural issuance of bonds were going to run into --
2  was going to be hampered by the PROMESA debate and
3  activity, what opportunities would we have for what is
4  known as a private placement of the bonds?  Because at
5  the end of the day, the amount was $200-something-
6  million.  And, again, the interest earnings on
7  Virgin Islands debt is about 90% tax exempt, if not
8  all exempt.  We didn't believe we had a problem
9  establishing our ability to pay the debt.  Because
10 we've never had any issue in paying Virgin Islands
11 debt, given the structure that we use.
12            And so I think in that collaboration, I
13 asked for Jeffrey Epstein -- I was seeking
14 Jeffrey Epstein's advice.  I was seeking
15 Warren Mosler's advice, another EDC entity who does
16 investment banking.  And I believe Dave Johnson from
17 capital markets.  Who also do financial management.  I
18 was seeking their input and advice in terms of how to
19 get -- how to be successful in issuing what was some
20 really critically-needed bonds for financing some
21 critical financing needs of the territory.
22       Q.   (By Ms. Ellsworth) And at the lunch meeting
23 that you had with Mr. Epstein, was the subject of
24 discussion focused on this bond issuance issue?
25       A.   It was focused on that.  But Mr. Epstein



```
 1   cables directly into Florida and into New York.  That
 2   could benefit such a business.
 3             So to the extent of making that well-known
 4   and looking for recommendations and spreading the word
 5   that the Virgin Islands had this unique attribute that
 6   it was pushing for business investment, that would be
 7   the extent of the conversations.
 8        Q.   (By Ms. Ellsworth) Is it fair to say that
 9   one of your campaign platforms when you ran for
10   governor was to increase business investment in the
11   Virgin Islands?
12        A.   Significantly.
13        Q.   And one of your key platforms as governor
14   was to increase business investment in the
15   Virgin Islands?
16        A.   Yes.
17        Q.   And you did discuss those platforms with
18   Mr. Epstein as a business owner on the Virgin Islands.
19   Correct?
20        A.   Yes.
21        Q.   Did you discuss Mr. Epstein's advice about
22   increasing government -- excuse me -- business
23   investment in the US Virgin Islands?
24        A.   Mr. Epstein.  Members of the Chamber of
25   Commerce.  Other members of the EDC Community.  Local
```



```
 1   businesses.  Members of Congress.  Members of the
 2   Senate.
 3            Any advice, any way that folks felt the
 4   Virgin Islands lacked in its approach to its messages
 5   about the Virgin Islands being open for business and
 6   how to help facilitate business investment.  And even,
 7   you know, a number of folks had a lot of
 8   recommendations about some of the failures within the
 9   Virgin Islands's public system in terms of
10   facilitating business growth and development in terms
11   of how we handle registering businesses, licensing
12   businesses.  Just the time involved and the
13   bureaucratic -- the bureaucracy, and how it impacted
14   and delayed and frustrated people.
15            You know.  I was just open to all of that.
16       Q.   And so the answer is yes, you did seek
17   Mr. Epstein's advice about how to increase business
18   investment in the Virgin Islands?
19       A.   Yes.  Yes.
20            MR. ACKERMAN:  Object to form.
21       Q.   (By Ms. Ellsworth) What advice do you
22   recall receiving from Mr. Epstein about how to
23   increase business investment in the Virgin Islands?
24       A.   Some of the bureaucracy issues.  Some of
25   the limitations that EDC businesses faced.  And I
```



```
1        A.   Uh-hum.
2        Q.   Are you familiar with the limitations on
3   contributions to multicandidate political committees
4   imposed by the Virgin Islands Code?
5        A.   Well, I know that election committees, such
6   as my gubernatorial campaign, contributions I believe
7   are limited to $1,000.
8        Q.   Do you know anything about limitations for
9   donations to political action committees?
10       A.   They are not -- I do not believe political
11  action committees are covered by the same statute as a
12  campaign committee.
13       Q.   Do you have any familiarity with these
14  sections of the Virgin Islands Code?
15       A.   I do not.
16            MR. ACKERMAN:  Objection to form.
17       Q.   (By Ms. Ellsworth) Does this refresh your
18  recollection as to who Darren Indyke is?
19            MR. ACKERMAN:  Objection to form.
20       A.   No.  I do not know who Darren Indyke is.
21       Q.   (By Ms. Ellsworth) And you see that this
22  email, Mr. Indyke's email to Mr. Epstein was forwarded
23  to you.  Correct?
24       A.   Yes.
25       Q.   Do you recall receiving this email?
```



```
 1        Q.   Did you ask Mr. Epstein from time to time
 2   for advice on spurring investment interest in the
 3   USVI?
 4        A.   I go back to the original responses to this
 5   deposition.  And you asked me about why I was having
 6   conversations with Jeffrey Epstein.  And as I
 7   indicated, given his role in the financial market, his
 8   portrayal as an investment banker, the apparent
 9   success of his business operations; as I did with
10   other EDC beneficiaries, we wanted to grow the
11   program.  We wanted to expand the program.  We wanted
12   to enhance the benefits of the program.  And who best
13   to give you reactions and advice to doing that but the
14   people who were experiencing the program and using the
15   program to their benefit?
16             MS. ELLSWORTH:  Why don't we take a break?
17             MR. ACKERMAN:  Okay.
18             VIDEOGRAPHER:  Going off the record at
19        3:23.
20                  (Recess)
21             VIDEOGRAPHER:  We are back on the record at
22        3:43 p.m.
23             MR. ACKERMAN:  So the record is complete,
24        the Government is not going to claw back
25        Exhibit 22.
```



```
 1   afternoon.
 2                 The first question I have for you is this.
 3                 We have looked at emails with
 4   Mr. Epstein -- or between you and Mr. Epstein today.
 5                 You have testified about meetings that you
 6   had with Mr. Epstein.
 7                 In any of your contacts with Mr. Epstein
 8   did you have, ever have any indication that
 9   Mr. Epstein was engaged in sex trafficking or human
10   trafficking in the Virgin Islands?
11         A.    I had no knowledge that he was engaged in
12   human trafficking or sex trafficking anywhere.
13         Q.    (By Ms. Ellsworth) Did anything about your
14   communications or meetings with Mr. Epstein ever
15   suggest to you that he was engaged in sex trafficking
16   or human trafficking in the Virgin Islands?
17         A.    Nothing.
18         Q.    Did you as Governor provide any special
19   treatment to Mr. Epstein?
20                 MS. ELLSWORTH:  Object to the form.
21         A.    None.
22         Q.    (By Mr. Ackerman) Did you as Governor give
23   Mr. Epstein any favors or benefits that you would not
24   have afforded any other resident of the
25   Virgin Islands?
```



```
 1              MS. ELLSWORTH:  Object to the form.
 2         A.   None.
 3         Q.   (By Mr. Ackerman) Okay.  When you met with
 4   Mr. Epstein did you know where his money came from?
 5         A.   I did not.
 6         Q.   Okay.  When you met or conversed with
 7   Mr. Epstein did you know when and to whom he was
 8   making money transfers?
 9         A.   I did not.
10         Q.   Did you have any access to that
11   information?
12         A.   None.
13         Q.   When you met or conversed with Mr. Epstein
14   did you know the amounts of money transfers he was
15   making and receiving?
16         A.   No.
17              MS. ELLSWORTH:  Object to the form.
18         A.   None.
19         Q.   (By Mr. Ackerman) Did you have access to
20   that information?
21         A.   I did not.
22         Q.   When you met or conversed with Mr. Epstein
23   did you know how often he withdrew cash from his
24   accounts?
25              MS. ELLSWORTH:  Object to the form.
```

