# EXHIBIT 309

```
                    IN THE UNITED STATES DISTRICT COURT

                   FOR THE SOUTHERN DISTRICT OF NEW YORK

       GOVERNMENT OF THE
       VIRGIN ISLANDS,

                      Plaintiff,

       v.                              No. 22-cv-10904-JSR

       JP MORGAN CHASE BANK, N.A.,

                      Defendant.
       _____
       JPMORGAN CHASE BANK, N.A.,


                  Third-Party Plaintiff,

       v.

       JAMES EDWARD STALEY,
       Third-Party Defendant.
       _____



              THE ORAL DEPOSITION OF JOHN P. DE JONGH, JR.

       was taken on the 30th day of May, 2023 at the Law

       Offices of JOEL HOLT, 2132 Company Street,

       Christiansted, St. Croix U.S. Virgin Islands, between

       the hours of 9:02 a.m. and 4:46 p.m. pursuant to Notice

       and Federal Rules of Civil Procedure.

                              _____
                              Reported by:

                              DESIREE D. HILL
                           Registered Merit Reporter
                           Hill's Reporting Services
                              P.O. Box 307501
                           St. Thomas, Virgin Islands
                              (340) 777-6466
```

1   Q.   What is your professional background,
2   starting from now and then moving backwards.
3   A.   Starting from now?
4   Q.   Yeah.
5   A.   Yes.  When I left office in 2015, I
6   reestablished a consulting firm I had called Chilmark
7   Advisory, LLC.
8           THE REPORTER:  Chilmark?
9           THE WITNESS:  Chilmark Advisory,
10      LLC, C-H-I-L-M-A-R-K, LLC.  We used to
11      go to vacation in Martha's Vineyard and
12      I liked Chilmark General Stores.  I
13      named my company after that.  I've been
14      doing that for the last, well, since
15      January, February of 2015.
16          Prior to that I was governor of the Virgin
17      Islands from January 1, 2007 to January 5th,
18      2015.
19          Prior to that, I was unemployed.  I ran
20      for governor in 2002.  I lost.  That's when I
21      established the first version of Chilmark with a
22      friend of mine out of St. Lucia.  So I did
23      consulting work in the Caribbean from 2003 until
24      about 2006, up until when I won.
25          Prior to that, I was president and chief

1      operating officer of the Lockhart Companies,
2      which was a local real estate company that we
3      expanded into insurance.
4           I did that until I ran for governor in
5      2002.  Prior to that, I was employed with Public
6      Financial Management out of Philadelphia.  But
7      when I came back to St. Thomas was after the
8      hurricane of 1995, which was Hurricane Marilyn.
9           And once I did that they recruited me
10     back.  What I found attractive about that, quite
11     frankly, is that not only did I have the job in
12     something that was new, but I got stock within
13     the company.  I got a board seat, and they also
14     agreed to pay for my kids' tuition, 50 percent
15     of my kids' tuition at school.  So that was
16     attractive.
17          And then prior to working -- before I
18     worked with Public Financial Management, I was
19     commissioner -- I worked for the governor of the
20     Virgin Islands then, Alexander Farrelly, as
21     executive assistant.  And before that I was
22     Chase Manhattan Bank.  I was commissioner of
23     finance, and then I worked at Chase Manhattan
24     Bank.
25          Just before that I was in charge of all

1        their consumer financing in the USVI, BVI and
2        St. Martin.
3        Q.   Focusing on the Chilmark work, you said you
4   worked with a friend.  Who is that friend?
5        A.   His name is -- was Desmond Skeete,
6   S-K-E-E-T-E.
7        Q.   And who else do you work with in the
8   Chilmark, the current version Chilmark?
9        A.   When you say work with, what do you mean?
10       Q.   Are there any associates with you in that
11  consulting company?
12       A.   No, sir.
13       Q.   It's just a sole operation?
14       A.   Correct.
15       Q.   So the only person who has been associated
16  with Chilmark was in the early iteration?
17       A.   That is correct.
18       Q.   What is your wife's name?
19       A.   Cecile Rene de Jongh.
20       Q.   And when did you meet?
21       A.   Now you're testing my knowledge.  We
22  met -- we met at Chase Manhattan Bank.  We met around
23  1984, '85.  '84.
24       Q.   When did you get married?
25       A.   November of 1986.  November 29th, 1986.

1        A.    No.
2              MS. BOGGS:  Objection to form.
3              MR. TEAGUE:  Objection, form.
4              THE WITNESS:  No, I did not.
5        Q.    (By Mr. O'Laughlin:) Were you ever
6   concerned about the fact that you may have been
7   getting campaign contributions from Epstein?
8              MS. BOGGS:  Objection, form.
9              THE WITNESS:  Was I concerned?  My
10        campaigns were in -- no, I was not.
11        2006, 2010, 2002 -- no.  And any
12        campaign contributions that were done
13        would have been within the legal limit
14        that's acceptable.
15       Q.    (By Mr. O'Laughlin:) What is the legal
16  limit?
17       A.    $1,000 per election cycle.
18       Q.    Did you ever become aware of USVI or other
19  politicians returning contributions they received from
20  Epstein?
21       A.    Yes.
22       Q.    Which instances are you aware of?
23       A.    Some local politicians, I believe,
24  returned some contributions.
25       Q.    Who?

1        A.    No.
2        Q.    How do you know he had ownership interest?
3        A.    I was told that by Andrew Farkas.
4        Q.    When were you told that?
5        A.    In 2007.
6        Q.    Is the governor's office involved in
7    granting EDA benefits?
8        A.    It's involved -- it affirms the decision
9    of the EDA board that grants the benefits, yes.
10       Q.    And what is the process surrounding that?
11       A.    The process surrounding the governor's
12   involvement?
13       Q.    Yeah.
14       A.    The beneficiary will submit the
15   application to the Economic Development Authority,
16   which is then reviewed by their staff.  They will go
17   through the process, according to their rules and
18   regulations as to whether it fits under the
19   requirements.
20             It will then be presented by the staff
21   to the board of the EDA, either with a recommendation
22   to approve or disapprove.
23             The board will then make its
24   determination as to which way they're going.
25             If it's approved, it is then sent up to

1   governor's office and sent to legal counsel.  Legal
2   counsel does its review of it, and then at that
3   point, it will come to the governor for signature.
4   That was at least the process that we followed.
5       Q.   And so focusing on the portion that
6   involves the governor's office, what exactly does that
7   review entail?
8            MR. TEAGUE:  Objection, asked and
9       answered.  You can answer it.
10           THE WITNESS:  It involves their
11      basically reviewing the decision that
12      the board made to make sure they
13      complied with the Economic Development
14      Authority rules and regulations.
15      Q.   (By Mr. O'Laughlin:) And -- so they take
16  the regulations from the EDA and they look at the
17  application and they compare the two?
18      A.   The regulations are codified, our rules
19  and regs.  They would then look at the application,
20  review the application, and then make a
21  recommendation.
22      Q.   And the -- what is the thing they're
23  evaluating for?  Just compliance with the EDA regs?
24      A.   And to see how the board approved it,
25  right.  And the type of business activity that would

1   be within the Virgin Islands.
2        Q.   And so they're evaluating the underlying
3   business activity of the beneficiary?
4        A.   As to whether they complied to the
5   sourcing rules of income, the number of individuals
6   that are employed in the V.I., making sure they fit
7   the rules and regulation, making sure that they were
8   comfortable.
9        Q.   And is there an analysis of the underlying
10  business of the beneficiary?
11            MS. BOGGS:  Objection, form.
12            THE WITNESS:  I'm going to presume
13       that there is.
14       Q.   (By Mr. O'Laughlin:) By the governor's
15  office?
16       A.   In terms of jobs, I think.  In terms of
17  jobs, business activity, yes.
18       Q.   What does that investigation look like?
19            MS. BOGGS:  Objection.
20       Mischaracterization.  Form.
21            THE WITNESS:  Just an analysis by
22       the board.
23            MR. TEAGUE:  Objection.
24       Foundation as well.  You can answer.
25            THE WITNESS:  Again, I'm not sure

1      to what extent.  They may call the EDA
2      to find out more on the activity.
3      They'll look at the rules and
4      regulations.
5          Q.    (By Mr. O'Laughlin:)  And is a
6   recommendation made to you personally?
7          A.    It's made to me, yes.  Was made to me,
8   yes.
9          Q.    And then you review it?
10         A.    I review the cover memorandum, usually, of
11  what was provided to me by my legal counsel.  I may
12  get a little bit more into the activities and
13  understand the type of business it is.
14         Q.    What do you do to get a little more into
15  the underlying business?
16         A.    Just look if -- the overview would provide
17  the business, the type of activity.  I may or may not
18  look at the application just to understand if it was
19  an unusual business.
20         Q.    Would you ever reach out to the person who
21  is applying to ask them questions?
22         A.    No.
23         Q.    Would you look at the financial projections
24  that they submitted?
25         A.    No.

1  Q. Would you do any kind of diligence on the
2  business itself to see that they were doing what they
3  claimed to be doing?
4      MS. BOGGS: Objection, form.
5      MR. TEAGUE: Same objection.
6      Foundation as well. You can answer.
7      THE WITNESS: I presume that by
8      the time it came to me after the
9      analysis done by EDA staff and the board
10     and my legal counsel, that that was less
11     of an issue.
12     THE REPORTER: I'm sorry, that
13     was --
14     THE WITNESS: Less of an issue.
15 Q. (By Mr. O'Laughlin:) So what is
16 specifically the thing that you are reviewing for?
17 A. The legal opinion, making sure it is
18 consistent with the rules and regulations, looking at
19 the business activity, looking at the economic
20 development, diversification that was taking place in
21 the territory.
22 Q. What do you mean by looking at the business
23 activity?
24 A. If it was unusual. One year, we had
25 someone that applied that wanted to do manufacturing.

1   We don't have very many manufacturers in the Virgin
2   Islands, so I just looked at the application to make
3   sure I understood.
4          Some were looking at foreign
5   destinations to sell their products.  I wanted to
6   see, you know, what percentage of their business
7   activity they were looking at.  Was it -- did they
8   consider the U.S. foreign or where are they selling?
9   So I would look at things like that.
10       Q.   What would you do if the business -- the
11  underlying business activity did strike you as
12  unusual?
13       A.   I would, then, more than likely not call
14  the individual.  I'd probably call my attorney and
15  ask him to look into it.
16       Q.   And they would go and report back to you?
17       A.   Correct.
18       Q.   Did you review Financial Trust's
19  application?
20       A.   Yes.
21       Q.   Did you review Southern Trust's
22  application?
23       A.   No.
24       Q.   Okay.  Did you find any of their activity
25  unusual?

1    Q.   So the initial amount, the actual cost of
2    improvements was 181,000?
3    A.   No.  That was the value that the
4    government said I owed after the depreciated value
5    over eight years.
6    Q.   Okay.  And then the ultimate amount paid
7    was 381,000.  So they added 200,000 on to their
8    assessment of the value?
9    A.   That's correct.
10   Q.   Okay.  And of the 381,000, Epstein financed
11   200,000?
12   A.   He gave us a loan for 200,000.
13   Q.   What were the terms of the loan?
14   A.   That we had to pay it back -- we asked him
15   if we could have two years to pay it back.  He said,
16   no, a year.  So we paid it back early, mid '16, 2016,
17   and that was it.
18   Q.   Was there interest accrued on the loan?
19   A.   Yes, I don't recall the amount, but there
20   was interest on the loan.
21   Q.   Do you recall what the rate was?
22   A.   I do not.
23   Q.   How was the rate determined?
24   A.   I don't know.  I don't know how they
25   negotiated the rate.

1  Q. Did you ask the First Lady to relay this
2  information to Epstein?
3  A. I must of.
4  Q. Were you involved in any discussions of a
5  $50 million loan to the USVI government involving
6  Epstein?
7  A. When you say "discussions," please -- what
8  do you mean by discussions?
9  Q. What do you understand the word
10 "discussions" to mean?
11 A. Discussions, but with whom?
12 Q. Anyone.
13 A. I wasn't in any discussions, no.
14 Q. Did you have -- do you have any knowledge
15 of any $50 million loan to the USVI government?
16 A. I was asked some questions, of which I
17 responded to those questions, yes.
18 Q. What were the questions you were asked?
19 A. Just if the government wanted to borrow,
20 could they. Was there a revenue stream? Could it be
21 collateralized? But there was no discussions. There
22 were just some questions.
23 Q. Why were those questions coming to you?
24     MS. BOGGS: Objection,
25   speculation. Lack of foundation.

1              THE WITNESS:  I'm presuming just
2         based on my knowledge of government.
3         Q.    (By Mr. O'Laughlin:)  But this was after
4    you were out of office, correct?
5         A.    I believe so.
6         Q.    Okay.  Who was asking the questions?
7         A.    I'm not sure if it came from Cecile.  I
8    think it may have come from Cecile.
9         Q.    Okay.  On behalf of Epstein?
10        A.    I presume so.
11        Q.    Okay.  Do you know the approximate date of
12   these questions being asked to you?
13        A.    No, I don't.
14             MR. O'LAUGHLIN:  Let's enter tab
15        64.
16             (Deposition Exhibit No. 50 was
17              marked for identification.)
18        Q.    (By Mr. O'Laughlin:)  Exhibit 50.  This is
19   an email chain that starts February 5, 2017, and
20   Epstein writes to the First Lady, "The government
21   needs 40 to 50 million for year.  What does John think
22   would be the most viable collateral"?
23             Do you see that?
24        A.    I do.
25        Q.    Do you know where the government's need for