# EXHIBIT 310

```
 1             UNITED STATES DISTRICT COURT FOR THE

 2                  SOUTHERN DISTRICT OF NEW YORK

 3               CASE NUMBER:  22-CV-10904-JSR

 4                       ACTION FOR DAMAGES

 5
     GOVERNMENT OF THE UNITED STATES          )
 6   VIRGIN ISLANDS,                          )
                                              )
 7                            Plaintiff,      )
                                              )
 8   VS.                                      )
                                              )
 9   JP MORGAN CHASE BANK, N.A.,              )
                                              )
10                            Defendant.      )
                                              )
11   ---------------------------------------

12

13

14

15              VIDEO RECORDED DEPOSITION OF

16                      SHANI A. PINNEY

17                      30(B)(6) WITNESS

18                  TUESDAY, JULY 18, 2023

19

20

21   REPORTED BY:

22   DENISE D. HARPER-FORDE
     Certified Shorthand Reporter (CSR)
23   Certified RealTime Reporter (CRR)
     Certified LiveNote Reporter (CLR)
24   Registered Professional Reporter (RPR)
     Notary Public (FLORIDA)
25
```



```
 1              THE WITNESS:  About the
 2         tuition being paid?
 3              (BY ATTORNEY O'LAUGHLIN):
 4         Q.  About the relationship between
 5   Governor John de Jongh, the First Lady
 6   and Epstein.
 7              ATTORNEY ACKERMAN:  Objection
 8         to form, scope.
 9              THE WITNESS:  I cannot recall
10         when I was first -- when I became
11         aware of these -- the relationship
12         between Epstein and the former
13         Governor.
14              (BY ATTORNEY O'LAUGHLIN):
15         Q.  Did the relationship between
16   Epstein and the de Jongh family ever
17   play any role in DoJ's monitoring of
18   Epstein as a sex offender?
19         A.  No.
20         Q.  Did either Cecile de Jongh or
21   John de Jongh ever reach out to anyone
22   involved in sex offender monitoring at
23   DoJ regarding Epstein?
24         A.  To my knowledge, no.
25              ATTORNEY O'LAUGHLIN:  Let's
```



```
 1  an online media search.
 2              (BY ATTORNEY O'LAUGHLIN):
 3       Q.  And did DoJ at any time take
 4  steps to do this kind of search into
 5  Epstein?
 6              ATTORNEY ACKERMAN:  Object to
 7  form, vague, scope to the extent it's
 8  outside sex offender registration and
 9  monitoring.
10              THE WITNESS:  In my position,
11  you know, with the registry, we kept
12  our focus primarily on what he was
13  convicted of and assuring that he was
14  fulfilling those obligations to
15  register as a sex offender in the
16  VIrgin Islands.
17              I didn't have the time to do
18  these -- to do searches of this
19  nature, because I was also monitoring
20  about 70-something other offenders who
21  had real allegations against them, you
22  know, filed with the US DoJ -- with VI
23  DoJ.  I'm sorry.
24              (BY ATTORNEY O'LAUGHLIN):
25       Q.  So these allegations against
```



```
 1   Epstein weren't real?
 2              ATTORNEY ACKERMAN:  Object to
 3   form.
 4              THE WITNESS:  You're asking me
 5   if they were real?
 6              (BY ATTORNEY O'LAUGHLIN):
 7        Q.   Well, you said you were
 8   focused on the offenders with real
 9   allegations.  So now --
10        A.   Okay.  When I say "real," I
11   mean that they were actually
12   complaints filed with VI DoJ against
13   offenders here in the Virgin Islands
14   who were currently committing other
15   sexual offenses here in the Virgin
16   Islands.
17             So we actually had you know,
18   real complaints you know, filed from
19   you know from real victims from you
20   know, that weren't rumors.  They
21   actually were coming in and saying,
22   Hey, this guy is on your registry, but
23   he's still raping his 15-year-old
24   daughter who's now pregnant.
25             So, you know, in addition, I'm
```



```
 1  saying that I didn't have time to sit
 2  down and you know, and do Google
 3  searches because I was working on --
 4  working with the investigators on you
 5  know, not only monitoring about
 6  70-something other offenders, but also
 7  working on cases for offenders who
 8  were absconding also who were also in
 9  -- who we received -- you know, filed
10  allegations about them conducting
11  other sexual offenses in the Virgin
12  Islands.
13          Q.  So the answer to the question
14  that I posed, which was:  Did anyone
15  at DoJ ever take any steps to do this
16  kind of news report investigation, the
17  answer is "no," correct?
18              ATTORNEY ACKERMAN:  Objection
19  to form, misstates prior testimony.
20  The answer is reflected in the
21  record.
22              THE WITNESS:  No.
23              ATTORNEY O'LAUGHLIN:  Okay.
24  Let's go off the record.
25              VIDEOGRAPHER:  Off the record.
```



1  they fall into a Tier 3 as well too.
2              And then you would see, you
3  know -- if we want to say more serious
4  in terms, you know, to first degree
5  would actually be enforceable rape.
6  You will see the more serious offenses
7  in Tier 3 compared to Tier 1.
8       Q.  Okay.  And then as a result of
9  being put into a higher tier, are
10 there differences in the monitoring
11 requirements?
12      A.  The monitoring requirements --
13 the only difference was in regards to
14 the frequency of their appearance at
15 VI DoJ to register in-person.
16      Q.  How does it change between
17 tiers?
18      A.  So for Tier 1 it was once a
19 year.  And that I think it was 15
20 years.  Tier 2, was every six months I
21 believe for 25 years, and then Tier 3
22 was every three months for life.
23      Q.  And were there any other
24 monitoring differences associated with
25 the tiers other than the ones you just



```
 1  discussed?
 2       A.  No.  They were all monitored
 3  the same.
 4       Q.  Okay.  What tier -- we've
 5  discussed this.  But Epstein was
 6  classified as Tier 1, correct?
 7       A.  That's correct.
 8       Q.  Okay.  What was the basis for
 9  classifying Epstein as Tier 1?
10          ATTORNEY ACKERMAN:  Object to
11  form.  I think it's asked and
12  answered, but you can go ahead.
13          THE WITNESS:  Okay.  I
14  understood that once Epstein -- what
15  was received from Florida was
16  reviewed.  That that conviction, that
17  was what was used to determine his
18  placement into a Tier 1.
19          (BY ATTORNEY O'LAUGHLIN):
20       Q.  Okay.  The procuring a minor
21  for prosecution was a Tier 1 offense
22  according to USVI law?
23       A.  That determination was made by
24  an Attorney within DoJ, which I -- if
25  I remember correctly, was Attorney
```



1  dates where we can have this operation
2  to verify the addresses of sex
3  offenders in the Virgin Islands.
4        Q.   So the sweeps were run by
5  who?
6        A.   Nothing within the statute
7  speaks about sweeps having to occur.
8  So the only thing that is within the
9  statute, if I remember, speaks about
10 an offender moves to the territory
11 within a set amount of dates, VI DoJ
12 officials go out to verify that
13 address.
14            In regards to the sex offender
15 address compliance checks, that was an
16 effort from the US Marshals Services.
17 And if I remember correctly, a part of
18 US DoJ is that the US Marshals
19 Services, that they assist states, you
20 know in the offices who oversee the
21 sexual -- the sex offenders; that they
22 assist them with the operation to
23 include the address verifications.
24       Q.   How frequently do sweeps
25 occur?



```
 1        A.   How frequent the sweeps occur?
 2   There was no set-in-stone time for the
 3   frequency of the sweeps to occur.  It
 4   would be something where we were in
 5   constant communication with the US
 6   Marshals Services.  And they will let
 7   us know, Hey, you know, this will be
 8   the time for an upcoming sweep.
 9        Q.   Do you have an estimate of how
10   frequently they occurred?
11        A.   I would say perhaps once a
12   year depending on funding.
13        Q.   Okay.  Funding from where?
14        A.   Funding that the US Marshals
15   Services received.  So the US Marshals
16   is Federal funding to conduct the
17   operational sweeps.
18        Q.   Okay.  And during a sweep,
19   what was the objective?
20        A.   The objective was to verify
21   the address of the -- that the sex
22   offender had on record as their
23   permanent residence.
24        Q.   What does verify mean?
25        A.   Verify, verification process
```



```
 1  private chefs here on the island are
 2  tight, and we see and hear everything,
 3  especially what goes on in Little St.
 4  James Island.  We have pictures,
 5  audio, video of it all going on."
 6          Is this the E-mail that you
 7  were talking earlier about as the only
 8  time that you received a tip about
 9  Epstein?
10      A.  If you want to say a tip, you
11  know, when I actually received
12  anything, you know, about allegations
13  of what was going on with Epstein.
14      Q.  Was there any follow-up on the
15  report that this individual had audio
16  and video of what was going on on
17  Little St. James?
18      A.  He never provided audio or
19  visuals on what was going on on Little
20  St. James.  He never did.  Not to my
21  knowledge, he ever did.  He never
22  provided anything to me.
23      Q.  Was there ever any outreach to
24  him to obtain any audio/video?
25      A.  My response is here, and the
```



```
 1   tone of it is, you know, very
 2   threatening.  So I reminded him of his
 3   need to register as a sexual offender
 4   and also that we're not at liberty to
 5   discuss any registration status of any
 6   offender, the same how we would not
 7   discuss his act with any other
 8   offender either.
 9             He had all -- if he did have
10   any pictures, audio, video of Epstein
11   on Little St. James, they were never
12   provided to DoJ.  And if he really
13   wanted, you know, to provide
14   something, he never did.  He never
15   followed up and write anything to my
16   knowledge.
17         Q.  So that's not the question.
18   The question is:  Did USVI DoJ ever
19   follow up with him to obtain audio or
20   video?
21             ATTORNEY ACKERMAN:  Object to
22   form.
23             Go ahead.
24             THE WITNESS:  You're asking if
25   VI DoJ or if myself ever asked him for
```



```
 1  go off the record.
 2              VIDEOGRAPHER:  Off the record.
 3  The time is 6:31.
 4                  (Off the record)
 5                (Back on the record)
 6              VIDEOGRAPHER:  On the record
 7  at 6:42.
 8                   CROSS EXAMINATION
 9              (BY ATTORNEY ACKERMAN):
10         Q.   Okay.  Ms. Pinney, it has been
11  a long day.  We have met before.  My
12  name is David Ackerman with the law
13  firm of Motley Rice representing the
14  Government of the US Virgin Islands.
15  I just have a few questions --
16         A.   Uh-huh.
17         Q.   -- for you.  And I want to
18  start with the topic of address
19  verifications.  I think you said some
20  of this before, but I just want to
21  make sure that I have it clear.
22              Who selects the date that the
23  address verifications occur?
24         A.   US Marshal Services would have
25  sent, you know, different windows and
```



```
 1   asked which works best for us.  But it
 2   was the Marshals Service who would
 3   essentially, you know, decide which
 4   dates were best.
 5        Q.  Okay.  And by the way, are the
 6   address verifications the same thing
 7   as the sweeps that you described, that
 8   you -- it was a term you used
 9   earlier?
10        A.  Yes.  So the US Marshals
11   Services, they titled those.  They
12   called the operation as Operation
13   Island Sweep.
14        Q.  Okay.  And when -- what is the
15   purpose of the sweep or the address
16   verification?
17        A.  The purpose is to confirm that
18   what the offender has provided as
19   their permanent residence, and also
20   instances may also be their employer
21   address, that that is true and -- and
22   correct.
23        Q.  Okay.  When you performed or
24   when the DoJ performed sweeps to
25   verify Mr. Epstein's address, did DoJ
```



```
 1  already know where Mr. Epstein was
 2  living?
 3          A.   Yes, we did.
 4          Q.   Okay.  Was there any doubt in
 5  your mind or in the SORNA unit's mind
 6  as to whether Mr. Epstein had moved to
 7  a different address?
 8          A.   No, there was not.
 9          Q.   Why not?
10          A.   Well, for one, he did not
11  provide any notice of change.  We
12  received no tips saying that he was no
13  longer living on Little St. James and
14  living at another residence, and yeah.
15          Q.   Okay.  Was there an instance
16  where Mr. Epstein's verification was
17  conducted at his office?
18          A.   Yes, there was.
19          Q.   Okay.  Did you participate in
20  that verification?
21          A.   From my recollection, I did.
22          Q.   Okay.  And tell me what you
23  recall about that verification when
24  you met Mr. Epstein at his office.
25          A.   So we ended up -- when we went
```



```
 1  to his island, he wasn't there.  So at
 2  that point we decided that we can meet
 3  him at his -- at his office.
 4            When we went to the island,
 5  his staff was there, his employees
 6  were there.  They confirmed, you know,
 7  that this was Little St. James and
 8  that this was Jeffrey Epstein's, if
 9  you want to say his island, you know.
10            And just like how the decision
11  was made in other address checks for
12  other offenders, since he wasn't at
13  home, that was not determined to be
14  that he was in noncompliance.  We
15  simply just said, Okay.  We'll go to
16  his employer address.
17       Q.   Did you verify other sex
18  offenders in the Virgin Islands at
19  their employer's address?
20       A.   Yes, we did.
21       Q.   Okay.  Are the address
22  verifications or the sweeps required
23  by any Virgin Islands statute to your
24  knowledge?
25       A.   No.
```



1      Q.   When you performed the address
2  verifications or the sweeps, do you
3  have a warrant?
4      A.   No, we do not.
5      Q.   Do you have an understanding
6  as to whether there is any limit on
7  your ability to search or enter a
8  person's, a sex offender's property
9  during an address verification or
10 sweep?
11     A.   An address verification does
12 not constitute that VI DoJ has the
13 right to search an offender's home.
14 If we go to the address and we say,
15 Hi, we're here to conduct an address
16 verification, can we come inside, they
17 have the right to say no.
18          Them saying no does not put
19 them in noncompliance because it is
20 not a search warrant.  We don't have a
21 search warrant to search the home.
22          So in many instances, we have
23 conducted address -- checks in an
24 offender's yard, on their front porch,
25 and they were found to still be in



```
 1   compliance because a search of their
 2   home was not required to complete that
 3   address verification.
 4         Q.   Okay.  Thank you.
 5              You testified earlier one of
 6   the things you did in preparation for
 7   this deposition was to review the
 8   testimony of Inais Borque, right?
 9         A.   Yes.
10         Q.   Okay.  There was testimony in
11   Ms. Borque's deposition about
12   performing weekly checks of offenders.
13   Do you recall that testimony?
14         A.   I do recall reading that in
15   her -- in her deposition, yes.
16         Q.   Okay.  Was it the practice of
17   the Virgin Islands DoJ SORNA office to
18   conduct weekly checks of sex offenders
19   during the time period that you worked
20   in that office?
21         A.   No, it was not.
22         Q.   Thank you.
23              I want to go through a few
24   exhibits, and I'll try to just go
25   quickly.  But let's start with Exhibit
```

