# EXHIBIT 311

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

GOVERNMENT OF THE UNITED STATES
VIRGIN ISLANDS,

Plaintiff,

vs. No. 22-cv-10904-JSR

JPMORGAN CHASE BANK, N.A.,

Defendant.

_______________________________

JPMORGAN CHASE BANK, N.A.,

Third-Party Plaintiff,

v.

JAMES EDWARD STALEY,
Third-Party Defendant.

__________________________________

THE ORAL DEPOSITION OF CECILE DE JONGH was taken on the 29th day of May, 2021 at the Ritz-Carlton Hotel, 6900 Great Bay, Nazareth, St. Thomas, U.S. Virgin Islands, between the hours of 9:02 a.m. and 2:22 p.m. pursuant to Notice and Federal Rules of Civil Procedure.

____________________
Reported by:

DESIREE D. HILL
Registered Merit Reporter
Hill's Reporting Services
P.O. Box 307501
St. Thomas, Virgin Islands
(340) 714-0269

A. No.

Q. Do you remember a person named [redacted]?

A. The name I do recognize, yeah.

Q. What do you remember about this person, [redacted]?

A. The thing I remember correctly is there was a [redacted] who was, when I was out getting my knee replacement in 2017, I was gone for a while, and I came back, and I think Jeanne told me that there was a [redacted] who was going to be working with us. And I said, who? And then -- who -- who worked with us. And by the time I came back, she was off and on the payroll.

Q. You mean she had gone on the payroll and then off the payroll?

A. Yeah.

Q. And you were in New York for, like, two weeks?

A. No. I was gone for about a month.

Q. About a month.

A. Yeah.

Q. And am I correct that you stayed in an apartment provided by Mr. Epstein in New York?

A. Correct.

Q. Did you know anything about the other

tenants in the building of the apartment you were staying in?

A. No. I mean, I confined myself to -- I mean, I had the surgery. I had two surgeries. One in July and one in September. So one before Hurricane Irma and one after. And the reason why I had the surgery up there was because they couldn't do the surgery here because of some Medicare issues.

So I asked Mr. Epstein if I could stay there because I had to stay there for my initial rehab and my post-op. And he said to deal with Lesley Groff, and which I did.

And I could have stayed with my daughter, but she was in a fifth floor walk-up. When I talked to my doctor, he said that was not going to work. I needed some place with an elevator. And also the apartment was, like, six blocks from the hospital for surgery. So I flew up. First time stayed with my daughter, did my pre-op. Then went to the apartment, had my surgery and stayed there.

I had had some heart complications. So I was there a little bit longer than normal.

MR. NEIMAN: Okay. Ask the reporter to mark Exhibit 6, another photograph.

would know. And you followed up with Kenn Hobson?

A. Correct.

Q. And Kenn Hobson was running the Port Authority at the time?

A. Correct.

Q. And the Port Authority would have interactions with Customs?

A. I would assume, yeah, they would.

Q. Right. And in fact, Mr. -- when you -- withdrawn.

When you spoke to Mr. Hobson, he told you who was running customs in the Virgin Islands, this Mr. Harrigan, right?

A. Yes.

Q. And then you forwarded that information on to Mr. Epstein. Do you see that?

A. Yes.

Q. And do you know anything about what the nature of Mr. Epstein's relationship was with Mr. Harrigan?

A. I do not.

Q. Do you know whether Mr. Epstein gave gifts to the folks at Customs?

A. I am not aware. I was not involved. I know that -- I think he asked me once about my

thoughts of giving turkeys or something, but other than that.

Q. Okay. You remember Mr. Epstein asked you if you thought it was okay for him to give a turkey to all the people who work at Customs at the airport --

A. I vaguely remember that.

Q. -- people who would see who was on his airplane?

A. Yeah. I vaguely remember that, yes.

Q. And you said that was okay?

A. Yeah. I mean --

Q. Did you check with anyone first before you gave that advice?

A. Well, down here, people usually give gifts to people at Department of Finance, they give, you know, they give gifts to people who they normally interact with on a regular basis.

You know, it's similar to, you know, when, you know, my brother-in-law lives in a building where everybody gives a gift to the doorman, you know. So that's where I was thinking, I had no reason to think anything untoward was happening.

Q. Sure. But you would recognize that Customs officials are not like the doorman in your building. They are law enforcement officers, right?

kind of normal in your experience to --

A. Yeah.

Q. Let me just finish the question. I'm sorry.

A. I'm sorry.

Q. I know I paused there, so that was -- that was my fault, not yours, but let me just finish the question.

Just in your experience in the way the government works in the Virgin Islands, would it be normal, the need to hire a consultant or a lobbyist to get a dental license approved?

MS. BOGGS: Objection to form.

THE WITNESS: Here, yes.

Q. (By Mr. Neiman:) Okay. And why is that?

A. Because it takes a long time to get licensing through. I went to my doctor a month ago and said to her, my son has been trying to get in to see you and you're not taking any more patients. No one is taking more patients.

And she said, you know why? Because I can't get any of my nurses or P.A.'s through the board. And she said to me, "Do you have any contact? Can I get you to go?"

And I said, "I don't know." And I

literally went online while I was sitting there to see if I knew anybody on the board, not for pay, but just to help her out.

So I guess that would classify me as a lobbyist. And I said to her, Well, I know this person and I know this person, I could call. She goes, "Anything that you can do, because my last two P.A.'s came and they left because they waited months and months and months, and they couldn't practice and they needed to go back to States. And, therefore, I can't take any more patients."

So, yes, that's how things work here.

Q. Okay. I don't mind to be indelicate, but are people asking for bribes? Is that --

A. No, no. It's just -- they just don't -- they have to be together. You know, they have to meet, and sometimes there is not a full board, so they don't have a quorum. That's, you know, that's -- that was the same -- sometimes the same issue with the EDA where they wouldn't have a full quorum and they would announce that they're going to, you know, have all these applications. And then all of sudden they're canceled because they don't have a quorum.

It happens a lot on all these boards. So, no, it's not that anybody getting paid -- you

know, wants to get paid under the table. It's just can you meet to make decisions.

And this is a situation where I didn't know anybody on the board that I could call up and say, Hey, what's going on, this person took the board, they passed the board, what else do they need to do?

Q. Do you remember a time when there was public reports that Mr. Epstein had supposedly donated like a million dollars to your husband's campaign? Do you remember hearing about that?

A. Yeah, I remember those reports. Yeah.

Q. And so those were -- that's the kind of news that would find its way to you, right?

A. Yes.

Q. Was it true?

A. No.

Q. Okay. Do you remember where that was covered?

A. Where?

Q. Yeah.

A. I don't.

Q. Okay. Let me show you a document and see if this refreshes your recollection. Exhibit 20.

Q. Okay. And did you have any idea why it was that [redacted] was spending so much time on the island?

A. I just thought maybe she was working there.

Q. Did she work for FTC?

A. No, but he had another company at Little St. James.

Q. Okay. Did you -- well, did she work at Little St. James?

A. I don't know. I didn't interact with the staff at Little St. James.

Q. Did he have employees who didn't speak English --

MR. TEAGUE: Objection to form.

Q. (By Mr. Neiman) -- on Little St. James?

A. Yes, he did.

Q. Who?

A. People who were from Dominican Republic; people who were from Haiti.

Q. Did she have any young women from Eastern Europe who worked on Little St. James and didn't speak English?

A. I did not interact with people on Little -- people who worked on Little St. James. But I do know that he had -- he had housekeepers and people

who didn't speak English.

Q. Okay. Do you remember him asking you to set up English as a second language courses for three young women with Eastern European names?

A. I remember that he asked me to set up something, but I don't know that he gave me their names at UVI. I reached out to a contact. They got back to me, and then I think that was it. I don't even know if they ever enrolled.

Q. Okay.

A. I'm not sure.

Q. But you recall -- you recall they actually did give you the names of three young women, [redacted] [redacted]. Remember that?

MR. TEAGUE: Objection, form. You can answer.

THE WITNESS: Sitting here now, I don't.

Q. (By Mr. Neiman:) Okay. Let's look at 176.

A. I did nothing wrong.

Q. Let me ask you to take a look at a document we'll mark as Exhibit 25.

(Deposition Exhibit No. 25 was marked for identification.)

Q. (By Mr. Neiman:) Okay. Do you have Exhibit 25 in front of you?

Q. Second page of the document in response to your email.

A. Eh-hmm.

Q. Ms. Jackson writes back, right?

A. Yeah.

Q. And there's a little back and forth. And then on the first page, at the bottom of the page Ms. Jackson advises you that this ESL class isn't offered every semester. Do you see that?

A. Yes.

Q. And that what they do is they keep a list of names and when they get enough people, they offer the class. Do you see that?

A. Yes.

Q. And you passed that information on to Mr. Epstein, right?

A. Yes.

Q. And Mr. Epstein wrote back to you and said, "If it worked, both [redacted] would sign up." Do you see that?

A. Yes.

Q. So he's now telling you there are two women who could benefit from an English as a second class --

A. Okay.

Q. -- that he might want to arrange, right?