# EXHIBIT 317

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN THE SOUTHERN DISTRICT OF NEW YORK

 3

 4    GOVERNMENT OF THE UNITED STATES
      VIRGIN ISLANDS,
 5
                   Plaintiff
 6
           vs.                              No. 22-cv-10904-JSR
 7
      JPMORGAN CHASE BANK, N.A.,
 8
                   Defendant.
 9    _____

10    JPMORGAN CHASE BANK, N.A.,

11           Third-Party Plaintiff,

12    v.

13    JAMES EDWARD STALEY,
      Third-Party Defendant.
14    _____

15            THE ORAL DEPOSITION OF MARGARITA BENJAMIN was

16    taken on the 26th day of May, 2023 at the Ritz-Carlton

17    Hotel, 6900 Great Bay, Nazareth, St. Thomas, U.S.

18    Virgin Islands, between the hours of 3:50 p.m. and 9:22

19    p.m. pursuant to Notice and Federal Rules of Civil

20    Procedure.

21                         _____
                           Reported by:
22
                            DESIREE D. HILL
23                       Registered Merit Reporter
                         Hill's Reporting Services
24                          P.O. Box 307501
                         St. Thomas, Virgin Islands
25                           (340) 777-6466
```

```
1    report?
2         A.   This compliance report would have been
3    prepared -- let's see which this was.  Most likely
4    Sandra Bess and I would have reviewed the report.
5              Yes, by Sandra Bess.  It was prepared by
6    Ms. Sandra Bess and reviewed by myself.
7         Q.   And it was sent to Ms. Cecile de Jongh,
8    correct?
9         A.   That is correct.
10        Q.   Who is Ms. Cecile de Jongh?
11        A.   She was an employee of Financial Trust and
12   our compliance contact person.
13        Q.   Did she have any other notable positions?
14        A.   Where?
15        Q.   Within the USVI government.
16        A.   Not that I'm aware of besides being First
17   Lady.
18        Q.   Okay.  So she was the First Lady?
19        A.   Yes.
20        Q.   Okay.  If you scroll down, this is an
21   April 17, 2008 report.  If you go to page 17, there's
22   a heading that says "Financial Analysis Review."  Do
23   you see that?
24        A.   One minute.  Getting there.  Yes.
25        Q.   And it says, "Cost benefit analysis
```

```
 1                John P. de Jongh.
 2        Q.   And if you scroll down to the very bottom
 3   of the document, there's a signature and an approval
 4   date of May 31, 2013.  Who is on that signature line?
 5        A.   Approved, John P. de Jongh, Jr., Governor.
 6        Q.   So the approval here was by Governor
 7   John de Jongh, correct?
 8        A.   Correct.
 9        Q.   And Southern Trust employed
10   Cecile de Jongh, correct?
11        A.   Correct.
12        Q.   What's the relationship between
13   Cecile de Jongh and Governor John de Jongh?
14        A.   It's publicly known that it is his wife.
15        Q.   And was there any concern by EDC that
16   Governor John de Jongh was signing off on benefits
17   extended to the company managed by his wife?
18             MR. ACKERMAN:  Object to form.
19             THE WITNESS:  I cannot speak for the
20        Board members, but I did not hear any
21        discussion as such.
22        Q.   (By Mr. O'Laughlin:)  So you are designated
23   as a corporate designee on the benefits extended to
24   Southern Trust.  You're also designated on
25   investigations into Epstein and his business entities.
```

```
1          A.    The year before or so that he was -- had
2    served his sentence in the Florida case.
3          Q.    And that was what prompted the inquiry?
4                MR. ACKERMAN:  Object to form.
5                THE WITNESS:  Yes.
6          Q.    (By Mr. O'Laughlin:)  And what was the
7    nature of the Florida conviction?
8          A.    Sexual -- if I recall, with an underage
9    female and prostitution.
10         Q.    So EDC was aware of those charges in 2011?
11         A.    Yes.
12         Q.    And they were aware that Epstein pled
13   guilty to those charges?
14         A.    Yes.
15         Q.    How was that fact evaluated by EDC?
16         A.    There was no evaluation as it relates to
17   the specific business operation that was approved for
18   benefits.
19         Q.    So Epstein's conviction for procuring a
20   minor for sex had no bearing on the EDC's analysis of
21   extending him tax benefits?
22         A.    No.  It was not based on our law connected
23   to the business activity.  We had no findings of
24   that.
25         Q.    But EDC was aware that he had pled guilty
```

```
 1           hearing for board decision and the owner is
 2           Jeffrey Epstein, hence, the inquiries.
 3       Q.    (By Mr. O'Laughlin:)  Why would the fact
 4   that the owner was Jeffrey Epstein generate all this
 5   interest?
 6           MR. ACKERMAN:  Object to form, scope.
 7           Speculation.  Foundation.
 8           THE WITNESS:  I would not know
 9           specifically what the requesters were
10           thinking, but I know in some of the
11           communications, it was really around whether
12           or not he was eligible for exemptions, or
13           whether or not the fact that he was charged in
14           a criminal offense whether the company should
15           be eligible for exemptions.
16       Q.    (By Mr. O'Laughlin:)  And what was the
17   EDC's position on those questions?
18           MR. ACKERMAN:  Objection, form.  Scope.
19           THE WITNESS:  If the criminal activity
20           was not connected to the business activity,
21           then it was two different issues.  It's a
22           personal issue versus one related to the
23           business operation.
24       Q.    (By Mr. O'Laughlin:)  So EDC viewed
25   Mr. Epstein's criminal misconduct as strictly a
```

```
1      personal issue that didn't impact his business,
2      correct?
3              MR. ACKERMAN:  Object to form, scope.
4              THE WITNESS:  Title 29, Chapter 12,
5          Section 722 explains what happens if there is
6          a company that is found with any criminal
7          offenses, or an owner, and it must be
8          connected to the business activity.
9          Q.   (By Mr. O'Laughlin:)  And EDC's view is
10     that the criminal offenses of Mr. Epstein were not
11     connected to his business entities, correct?
12             MR. ACKERMAN:  Objection to form.
13             THE WITNESS:  As far as we knew at the
14         time.
15         Q.   (By Mr. O'Laughlin:)  And did EDC undertake
16     any investigation in light of all these media
17     inquiries to evaluate whether or not the criminal
18     activity was connected to the business entities?
19         A.   Not that I'm aware of.  There was no
20     reason to believe said was connected.
21         Q.   Why was there no reason to believe there
22     wasn't a connection?
23             MR. ACKERMAN:  Objection.
24             THE WITNESS:  Because of the type of
25         charge, that it was not connected to the
```

1          business operations.  There was no findings
2          that it was connected to the business
3          operations.
4      Q.    (By Mr. O'Laughlin:)  So there was no
5  reason to think that the charge of procuring a minor
6  for prostitution was linked to any of Mr. Epstein's
7  business activities, correct?
8            MR. ACKERMAN:  Objection to form.
9            THE WITNESS:  Correct.
10           MR. O'LAUGHLIN:  Let's enter Tab 58 as
11       the next exhibit.
12           MS. WARREN:  Tab 58 is in the chat as
13       Exhibit 32.
14           (Deposition Exhibit No. 32 was
15            marked for identification.)
16           THE WITNESS:  I've read.
17     Q.    (By Mr. O'Laughlin:)  So this is a
18  January 7th, 2015 letter sent via certified mail to
19  Mr. Epstein by Ms. Stephanie Berry, the director of
20  Compliance for EDA, correct?
21     A.    Yes.
22     Q.    And in the letter she writes, "Dear
23  Mr. Epstein:  Given the current media discussion
24  surrounding principal of Southern Trust Company, the
25  USVI Economic Development Authority requests that no

```
1    de Jongh's employment with an Epstein-related
2    organization?
3         A.    Yes, sir.
4         Q.    And what did you do to prepare to testify
5    on that topic?
6         A.    Nothing.
7         Q.    Why did you do nothing?
8         A.    Because it was clearly documented in our
9    records that she was an employee of the company.
10        Q.    So what was the government's knowledge of
11   Cecile de Jongh's employment with an Epstein-related
12   organization?
13        A.    I can't speak for outside of the Virgin
14   Islands Economic Development Authority.  I'm sure
15   from public relations that they did, maybe they were
16   aware, but for EDA, we had it on record that she was
17   an employee with the company.
18             MR. ACKERMAN:  Counsel, can I --
19             MR. O'LAUGHLIN:  So your lawyer is going
20        to want to speak to you on a break to instruct
21        you a little bit more about what exactly
22        you're designated to testify on.  So we'll go
23        on break and then we will come back.
24             MR. ACKERMAN:  Let's do that.
25             VIDEOGRAPHER:  Going back off the
```