# ATTACHMENT B

# PART 4

432.   *The Virgin Islands Department of Justice performed address verification checks (also*

*called "sweeps") roughly annually in conjunction with U.S. Marshalls.  Ex. 280 at 52:1-54:12,*

*105:20-106:3, 398:18-400:12.*

> **JPMC Response**: Undisputed that Pinney testified that that sweeps with the U.S.
> Marshals Service occurred "perhaps once a year depending on funding" that the U.S.
> Marshals received "to conduct the operational sweeps."  USVI Ex. 280 at 400:11-17.
> Disputed to the extent USVI suggests that the "roughly annual[]" checks were the only
> checks required by USVI DOJ's policy.  According to one of USVI's 30(b)(6) designees,
> USVI DOJ's policy is to perform random checks on offenders weekly, as well as an
> annual "sweep" once a year.  *See* CSMF ¶ 307.  Pinney also testified that "during the
> year, we would also verify the addresses of offenders . . . if they relocated, if they had a
> new address.  Within that time, I think it's seven days, that we would also go out to verify
> their addresses."  USVI Ex. 280 at 410:16-23.

433.   *The address checks are not warrants; government officials do not possess the ability to*

*enter a sex offender's property or conduct a search.  Ex. 280 at 49:21-50:25; 440:1-441:3.*

> **JPMC Response**: Undisputed that Pinney testified to the substance of the paragraph.
> Disputed insofar as USVI suggests that the cited testimony establishes the proposition as
> a legal conclusion.  USVI Ex. 280 at 49:21-50:25; 440:1-441:3.

434.   *In certain years, the U.S. Marshalls and Virgin Islands officials did not proceed beyond*

*Epstein's dock. If an offender refused entry, the government officials performing the check did not*

*possess authorization to enter.  Ex. 280 at 43:7-46:24, 47:12-48:11, 49:4-50:25.*

> **JPMC Response**: Undisputed that Pinney testified to the substance of the paragraph.
> USVI Ex. 280 at 43:7-46:24, 47:12-48:11, 49:4-50:25.  Disputed insofar as USVI
> suggests that the cited testimony establishes the proposition as a legal conclusion.

435.   *Ms. Pinney testified that she conferred with the federal government concerning this*

*practice and was told that it was similar to a situation where a landowner has placed a gate at the*

*border to his property.  The officials were not permitted to proceed beyond that gate without a*

*warrant.  Ex. 280 at 108:5-110:23.*

> **JPMC Response**: Undisputed that Pinney testified to the substance of the paragraph.
> USVI Ex. 108:5-110:23.  Disputed insofar as USVI suggests that the cited testimony
> establishes the proposition as a legal conclusion.  Further disputed that Pinney's full

testimony shows ambiguity as to whether the federal government confirmed that this analogy applied to Epstein's dock. *See* USVI Ex. 280 at 46:5-47:5, 124:9-23.

436.  *It was not improper or unusual for the Government to confirm addresses at a sex offender's place of employment, as was done one year with Epstein.  Ex. 280 at 409:7-410:4; 438:15-439:20.*

> **JPMC Response**: Undisputed that Pinney testified that there was an instance where Epstein's verification was conducted at his office.  USVI Ex. 280 at 438:15-18.  Also undisputed that Pinney testified that she verified other sex offenders in the USVI at their employer's address.  *Id.* at 439:17-20.  Disputed to the extent USVI suggests that such testimony establishes that this conduct was not "improper or unusual" as unsupported and disputed by other testimony in the record.   *See* CSMF ¶ 313.

437.  *In 2012, the Virgin Islands Legislature amended its sex offender laws, in part to obtain federal funding for its sex offender unit.  Ex. 278 at 79:12-80:10, 119:9-121:12; Ex. 280 at 125:21-126:6.*

> **JPMC Response**: Undisputed that USVI amended its sex offender laws in 2012 and that Pinney testified that by enhancing USVI's laws in 2012, "that made us eligible to – us being the Virgin Islands – eligible to receive funding for employees to – to monitor offenders in the Virgin Islands."  USVI Ex. 280 at 125:21-126:6.

438.  *The U.S. Government approved all changes to the Virgin Islands sex offender laws in advance.  Ex. 278 at 122:1-9; Ex. 280 at 306:22-307:12, 452:21-453:4.*

> **JPMC Response**: Undisputed that the cited testimony supports that the United States Department of Justice had to approve the amendment to USVI's sex offender laws in order for USVI to receive the funding.  USVI Ex. 278 at 122:1-9; USVI Ex. 280 at 307:2-12.

439.  *Although Epstein's attorneys sought to coordinate with legislators concerning proposed changes to the Virgin Islands laws, the Legislature ultimately rejected Epstein's proposed changes.  Ex. 278 at 160:12-165:1; 262:10-264:4.*

> **JPMC Response**: Disputed.  *See* CSMF ¶¶ 284-85.

440.   *Epstein applied for and received a waiver in 2012 of his travel notification requirements pursuant to these statutory provisions.  Ex. 278 at 11:13-13:23, 187:16-188:15, 189:18-190:24, 192:4-10, 193:14-24; Ex. 279 at 12480-12491.*

> **JPMC Response**: Disputed.  The USVI's sex offender law states, "the Attorney General may at his discretion reduce this twenty-one (21) day notice requirement if a sex offender requests such a reduction and ***provides information in support of the request***."  JPMC Ex. 84 (emphasis added).  Attorney Frazer testified that Epstein's attorneys provided "correspondence and information" concerning Epstein's need to travel, USVI Ex. 278 at 12:9-13:7, ████████████████████████████████████ JPMC Ex. 85 at -12502; *see also* CSMF ¶¶ 292, 294-95.  Accordingly, it remains disputed whether Epstein applied for and receive approval for relaxation of his notification requirements "pursuant to these statutory provisions."

441.   *Then-Attorney General Vincent Frazer testified that he relied on representations of Epstein's counsel in forming his decision, because he "was satisfied with the representations," which were "satisfactory to conclude that there was not an undue risk to the community" that would arise from the waiver.  Ex. 278 at 190:8-24, 191:3-12, 193:14-24, 250:11-255:13; Ex. 281 at 12246-12250, 12263-65.*

> **JPMC Response**: Undisputed that Attorney Frazer testified that he relied on representations of Epstein's counsel with respect to Epstein's need to travel for business activities and how Epstein provided notice of his travel via email to Florida, New Mexico, and New York authorities.  USVI Ex. 278 at 190:8-191:12.  Disputed as to the whether the cited representations are accurate as a legal or factual matter.  Further disputed to the extent USVI suggests this testimony supports an inference that the waivers were legitimately granted and appropriate.  *See* CSMF ¶¶ 288, 292, 294-95, 298-99.

442.   *Epstein's lawyers themselves represented to Attorney Frazer that other states, including Florida and New Mexico, permitted Epstein to provide email notification of his travels and that "there is no public safety necessity in requiring Mr. Epstein to notify the Department in person each time he travels to or from the jurisdiction."  Ex. 278 at 251:16-255:13; Ex. 281 at 12246-12250, 12270.*

**JPMC Response**: Undisputed that Epstein's lawyers made such representations to Attorney Frazer. USVI Ex. 278 at 251:16-255:13; USVI Ex. 281 at -246, -250, -270. Disputed as to the whether the cited representations are accurate as a legal or factual matter or that Epstein's lawyers were the appropriate individuals to determine what public safety requires. Further disputed to the extent USVI suggests this testimony supports an inference that the waivers were legitimately granted and appropriate. *See* CSMF ¶¶ 288, 292, 294-95, 298-99 .

443.   *As Ms. Pinney explained, and as the statute provides, the travel notification statute only required notification of travel outside the United States. While the Government had a "policy in place" to require notification of travel outside of the Territory but within the United States, nothing in the Virgin Islands statute required such notification. Ex. 280 at 363:3-365:12.*

**JPMC Response**: Disputed as to "and as the statute provides" as unsupported by the cited evidence. Undisputed that Pinney testified that "I'm remembering now that within the statute, it spoke about notifying VI DOJ if any offender has notified any – of any travel outside of the United States" and that "we got a policy in place where we wanted the offenders to notify us of, you know, any travel to include outside the territory." USVI Ex. 280 at 364:9-12; 364:22-365:1.

444.   *Travel notifications are not authorizations or requests; the Government had no ability to restrict Epstein's travel. Ex. 278 at 135:6-17, 200:14-201:4.*

**JPMC Response**: Undisputed that Attorney Frazer testified that his "understanding of the SONAR law, purpose was not to restrict a person's movement. It was to follow, to monitor the movement." USVI Ex. 278 at 135:13-16. Disputed insofar as USVI attempts to use Frazer's understanding of the law to establish a legal conclusion on the USVI's authority.

445.   *Entry into the Virgin Islands from overseas is controlled by federal authorities, not the Virgin Islands Government. Ex. 278 at 209:23-210:5, 265:13-268:8.*

**JPMC Response**: Undisputed that Attorney Frazer testified that custom checks are controlled by the Federal United States Custom and Border Protection agency. USVI Ex. 278 at 266:2-6. Disputed to the extent the USVI contends it has no role or ability to monitor entry into the Virgin Islands from overseas. *See id.* at 210:6-15 ("Q: As the Attorney General of the Virgin Islands, did you have the ability, if you had a law enforcement reason, to find out who was traveling on a particular plane that entered the Virgin Islands . . . . A: Yes, I imagine I could."); JPMC Ex. 86 at 63, Ex. 3 (describing policies to establish patrol coverage for the airport and role of patrol in monitoring security check points).

**Facts Concerning Tax Benefits Granted to Epstein's Companies**

446.    *The EDC granted tax incentives to two of Epstein's companies: Financial Trust Company and Southern Trust Company. Ex. 283 at 29:10-19, 34:2-10, 42:3-21; Exs. 284-286.*

> **JPMC Response**: Undisputed that Financial Trust Company and Southern Trust Company were granted tax incentives.  USVI Ex. 284; USVI Ex. 285; USVI Ex. 286. Disputed to the extent USVI suggests these were the only Epstein-entities that received benefits from USVI. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *ee* JPMC Ex. 87 at -6475, -6482; JPMC Ex. 88; JPMC Ex. 89.

447.    *The first grant of benefits to an Epstein-owned company occurred in 1999 to Financial Trust Company.  Ex. 283 at 29:10-19; Ex. 284.*

> **JPMC Response**: Undisputed that the first grant of EDC benefits to an Epstein-owned company occurred in 1999 to Financial Trust Company.  USVI Ex. 284.

448.    *In 2009, Financial Trust applied for and received an extension of benefits. Ex. 283 at 34:2-10; Ex. 285.*

> **JPMC Response**: Undisputed that in 2009, Financial Trust applied for and received an extension of EDC benefits.  USVI Ex. 285.

449.    *Epstein formed a new company—Southern Trust—which applied for and received tax benefits in 2012. Ex. 283 at 42:3-21; Ex. 286.*

> **JPMC Response**: Undisputed that Southern Trust applied for EDC tax benefits in 2012. Disputed that Southern Trust Company received tax benefits in 2012.  USVI Ex. 286 at -011.

450.    *Each time that Financial Trust or Southern Trust sought benefits, the companies submitted applications for the benefits.  Ex. 287 at 42:3-21; Exs. 288-289.*

> **JPMC Response**: Undisputed that each time Financial Trust or Southern Trust sought EDC benefits, someone submitted an application for benefits on behalf of the company. USVI Ex. 288; USVI Ex. 289.

451.    *Each time that Financial Trust or Southern Trust sought benefits, EDC held public hearings during which the benefits were discussed and the applicants were provided the*

*Co███████████████████████████████████*

*opportunity to present their case and answer questions.  Ex. 287 at 42:3-21, 67:15-69:7, 169:21-*

*170:2; Ex. 288-290; Ex. 291 at 29:12-20; Ex. 292.*

> **JPMC Response**: Undisputed that the EDC held public hearings regarding Financial
> Trust's original application for benefits, Financial Trust's application for modification of
> benefits, and Southern Trust Company's original application for benefits.  USVI Ex. 289.
> Disputed to the extent USVI suggests Epstein was in attendance at each of these
> meetings.  *See* JPMC Ex. 90 ¶ 69 ███████████████████████████████
> ███████████████████████████████████████████ JPMC lacks
> knowledge as to whether the EDC held public hearings during which benefits were
> discussed and applications were provided the opportunity to present their case and answer
> questions each time that Financial Trust or Southern Trust sought benefits.

452.   *Each time that Financial Trust or Southern Trust sought benefits, the EDC then held*

*decision meetings where the board considered the applications and rendered decisions.  Ex. 287*

*at 22:18-23:10, 42:3-21; Exs. 288-289.*

> **JPMC Response**: Undisputed that the EDC held decision meetings regarding Financial
> Trust's original application for benefits, Financial Trust's application for modification of
> benefits, and Southern Trust Company's original application for benefits.  USVI Ex. 289.
> JPMC lacks knowledge as to whether the EDC held decision meetings each time
> Financial Trust or Southern Trust sought benefits.  Disputed that the board rendered
> decisions at each decision meeting.  *Id.*

453.   *Epstein's Florida conviction was not a sufficient basis for revocation of benefits at that*

*time because there was no evidence available to the EDC that Epstein's solicitation of a minor for*

*prostitution in Florida was "connected with the operation" of Epstein's USVI businesses.  Ex. 287*

*at 157:6-24, 159:10-15, 170:3-172:3.*

> **JPMC Response**: Undisputed that Benjamin testified that "the type of charge . . . was not
> connected to the business operations."  USVI Ex. 287 at 171:24-172:1.  Disputed that
> Epstein's Florida conviction was not a sufficient basis for revocation of benefits because
> there was no evidence available to the EDC that Epstein's solicitation of a minor for
> prostitution in Florida was connected with the operation of Epstein's USVI businesses.
> *See, e.g.*, CSMF ¶¶ 382-388.

454.   *The EDC did not have access to Epstein's companies' daily financial transactions, and*

*was not aware of any connection between his conduct and the operations of his business.  Ex. 287*

*at 61:4-24, 148:11-149:7, 157:6-24, 159:10-15, 170:3-172:3; Ex. 283 at 53:22-54:4, 55:9-21; Ex.*

*291 at 295:25-297:18.*

> **JPMC Response**: Disputed that the EDC was not aware of any connection between
> Epstein's conduct and the operations of his business. *See* CSMF ¶¶ 383-84.  Disputed
> that the EDC could not request access to Epstein's companies' transactions. *See* JPMC
> Ex. 88 at -028 ███████████

455.    *Indeed, the EDC reached out to Epstein's attorney in January 2015 to inquire whether*

*media reporting regarding allegations of misconduct had any connection to the business of*

*Epstein's Southern Trust Company.  His attorney responded to confirm "[w]e do not believe that*

*these media discussions will have any impact on the business activities of STC."  Ex. 287 at*

*172:17-174:10; Exs. 293-294.*

> **JPMC Response**: Undisputed that the EDC corresponded with Epstein's attorney in
> January 2015 to inquire whether media reporting regarding allegations of misconduct had
> any connection to the business of Epstein's Southern Trust Company.  USVI Ex. 287 at
> 172:17-174:10; USVI Ex. 293 at -432; USVI Ex. 294 at -186.  Undisputed that Epstein's
> attorney responded with the quoted language.  USVI Ex. 294 at -186.  Disputed to the
> extent USVI contends that this testimony establishes as a legal matter that the cited
> outreach discharged EDC's obligations to follow up on allegations of wrongdoing.

456.    *Margarita Benjamin, a witness with more than 30 years' experience at the EDC, testified*

*that the cost-benefit ratios provided to board members cannot be analyzed in isolation because*

*the ratio "doesn't give the full picture to anyone" and "can be misleading."  Ex. 287 at 78:25-*

*79:21, 80:23-81:13.  Governor Albert Bryan testified that the ratios were not intended for "smaller*

*financial firms" like Epstein's companies.  Ex. 291 at 47:22-49:6.*

> **JPMC Response**: Disputed that Benjamin testified that the cost-benefit ratios provided
> to board members cannot be analyzed in isolation because the ratio "doesn't give the full
> picture to anyone" and "can be misleading."  Benjamin testified that in the context of a
> specific email between herself, Paul Fleming, and Stacey Plaskett, she was "summarizing
> that just given the unfavorable ratios itself without the other part doesn't give the full
> picture to anyone, so it can be misleading, and that's in the summary of what I was trying
> to say."  USVI Ex. 287 at 79:5-14.  Disputed that Governor Albert Bryan testified that the
> ratios were not intended for "smaller financial firms" like Epstein's companies.  He

testified that "[f]or these smaller financial firms, we were really interested in making sure that we have viable firms that come here and tax residents that have a high net worth." USVI Ex. 291 at 48:24-49:1-2. Disputed as to the underlying suggestion that the cost-benefit ratios were not relevant to the EDC's considerations. *See* JPMC Ex. 90 ¶¶ 59-66.

457.  *Ms. Benjamin further explained that the cost-benefit ratios can be misleading because, unless the business was already operating in the Territory, the Government would not have received the tax revenue in the first place and has not "lost" anything. Ex. 287 at 81:14-83:2. Governor Bryan agreed testifying that "the government didn't give up anything" because "half of some is better than all of none." Ex. 290 at 49:7-23.*

> **JPMC Response**: Disputed that Benjamin testified that the cost-benefit ratios "can be misleading." Undisputed that Benjamin testified to the meaning of "not favorable ratios" can depend on whether the company was operating in the territory because "if a company was not existing in the territory, there was no tax dollars being paid to the territory. So where it says, taxes foregone, it is not realistically foregone because the company would not have been in the territory and be in a tax-paying company." USVI Ex. 287 at 81:14-82:9. Disputed that Governor Bryan "agreed" with Benjamin's testimony. Further disputed to the extent USVI has to support this statement with evidence from the record. The cited USVI Exhibit 290 does not contain the cited pages. Undisputed Governor Bryan stated the quoted text at an EDC public hearing in November 2012. Disputed as to the underlying suggestion that the cost-benefit ratios were not relevant to the EDC's considerations. *See* JPMC Ex. 90 ¶¶ 59-66 .

458.  *The ratio further ignores ancillary benefits that accrue to the Territory from the presence of high net-worth individuals, who engage in economic activity unrelated to their businesses that benefits the Territory. Ex. 290 at 48:18-49:6, 50:5-51:13, 297:23-298:17.*

> **JPMC Response**: Disputed to the extent statement consists of USVI's summary of USVI Ex. 290. Further disputed to the extent USVI has to support this statement with evidence from the record. The cited USVI Exhibit 290 does not contain the cited pages. The document speaks for itself. Disputed as to the underlying suggestion that the cost-benefit ratios were not relevant to the EDC's considerations. *See* JPMC Ex. 90 ¶¶ 59-66.

459.  *During a March 2009 public hearing, Epstein's attorney explained that a denial of an extension would likely cause "a responsible business person . . . to seriously consider relocating the business" if another territory offered similar benefits. Ex. 295 at 40:20-41:3; Ex. 296.*

**JPMC Response**: Undisputed that cited document USVI Ex. 296 contains the quoted text. Disputed that Epstein would have relocated if the benefits were not extended. *See* JPMC Ex. 91 at 135:8-136:18.

460. *Thus, the EDC could not assume that it would collect Epstein's tax revenue if the benefits were not extended. Ex. 290 at 49:7-23.*

**JPMC Response**: Disputed to the extent USVI has failed to support this statement with evidence from the record. The cited USVI Exhibit 290 does not contain a page 49. Further disputed that Epstein would have relocated if the benefits were not extended. *See* JPMC Ex. 91at 135:8-136:18.

461. *The EDC did not treat Epstein differently than any other beneficiary. Ex. 290 at 280:3-17.*

**JPMC Response**: Disputed. *See* JPMC Ex. 90 ¶¶ 66, 67, 90. Disputed to the extent statement consists of USVI's summary of USVI Ex. 290. Further disputed to the extent USVI has to support this statement with evidence from the record. The cited USVI Exhibit 290 does not contain the cited pages.

**Facts Concerning Cecile de Jongh's Employment with Epstein**

462. *Cecile de Jongh became First Lady when her husband was elected Governor. She testified that "there's no office of the first lady with a budget," and she did not have an office. First Lady was largely a ceremonial position that entailed giving speeches and attending social events. Ex. 297 at 17:12-21:19.*

**JPMC Response**: Undisputed that Cecile de Jongh became First Lady when her husband was elected Governor. USVI Ex. 297 at 17:12-16. Disputed that cited document contains quoted text. *See* USVI Ex. 297. Disputed that First Lady was largely a ceremonial position that entailed giving speeches and attending social events. *See* CSMF ¶¶ 394-403.

463. *During the time her husband was Governor, Ms. de Jongh was widely known and recognized to be employed by Epstein's businesses and acting on their behalf. Ex. 287 at 130:12-14; Ex. 298 at 6:12-9:11, 10:10-23, 11:21-13:3; Ex. 299 at 49:4-21.*

**JPMC Response**: Disputed that USVI Ex. 287 supports the statement. *See* USVI Ex. 287 at 130:12-14 ("Q. What's the relationship between Cecile de Jongh and Governor John de Jongh? A. It's publicly known that it is his wife."). Otherwise, undisputed.

464.   *Her employment with Epstein had been widely reported and numerous witnesses confirmed their familiarity with her employment.  Ex. 287 at 130:12-14; Ex. 298 at 6:12-9:11, 10:10-23, 11:21-13:3; Ex. 299 at 49:4-21; Ex. 291 at 14:21-15:17; Ex. 283 at 36:12-37:2.*

> **JPMC Response**: Disputed that USVI Ex. 287 supports the statement.  *See* USVI Ex. 287 at 130:12-14 ("Q. What's the relationship between Cecile de Jongh and Governor John de Jongh? A. It's publicly known that it is his wife.").  Otherwise, undisputed.

465.   *Ms. de Jongh had no contact with personnel at the Department of Justice responsible for sex offender registration and monitoring.  Ex. 280 at 158:7-12, 179:20-24.*

> **JPMC Response**: Disputed to the extent the cited testimony does not support the broad proposition.  Pinney testified, "during my time" she could not say that she was aware of whether Cecile de Jongh ever interacted with the USVI DOJ regarding Epstein.  USVI Ex. 280 at 158:7-12.

466.   *Decisions concerning whether or not to grant tax benefits were first made by the board members of the EDC.  Ex. 287 at 22:18-23:10, 27:25-28:6.*

> **JPMC Response**: Disputed.  Benjamin testified that "the board would make recommendations to the Governor and the Governor had the final decision."  USVI Ex. 287 at 22:21-24.  *See also* CSMF ¶¶ 356-61.

467.   *Although the Governor (her husband) signed the tax benefit certificates, that process was little more than a formality and could not happen without the EDC's recommendation in the first place.  Ex. 287 at 22:18-23:10, 27:25-28:6.*

> **JPMC Response**: Disputed.  The cited testimony does not support the proposition that the Governor's approval was "little more than a formality."  On the contrary, Benjamin testified that from 1998 – 2013, the Governor held the "final decision."  USVI Ex. 287 at 22:18- 23:3; 27:25-28:6. *See also* CSMF ¶¶ 356-61.  Undisputed that the cited testimony states that "after the change" the "beard [sic] of directors of the Economic Development Authority Commission" was responsible for extending benefits and "they no longer required the approval of the Governor." USVI Ex. 287 at 23:4-10.

468.   *Ms. de Jongh vigorously denied knowing about or facilitating Epstein's crimes in the Virgin Islands.  Ex. 297 at 33:17-39:8, 133:10-134:2, 212:24-213:18, 217:11-220:6.*

**JPMC Response**: Disputed that Cecile de Jongh "vigorously" denied knowing about or facilitating Epstein's crimes in the Virgin Islands.  Further disputed that Ms. De Jongh in fact did not know about or facilitate Epstein's crimes.  *See* CSMF ¶¶ 321-350.  Ms. de Jongh's cited testimony included statements, such as "if somebody is introduced as somebody's girlfriend, I took it as face value that that's their girlfriend," USVI Ex. 297 at 218:3-5, and "I looked him in the eye and asked him, you know 'What the hell is going on,' that I had a daughter and, you know, what's going on, and what he said was just a mistake.  Mistook somebody to be older than they were," *id.* at 213:4-9.  Ms. de Jongh further testified that she believed Epstein's explanation that it was "just a mistake." *Id.* at 213:4-21.

469.   *With respect to efforts to establish an English as a Second Language class, Ms. de Jongh*

*testified that she was not aware any of the women were potential trafficking victims.  Ex. 297 at*

*131:16-132:16, 136:10-137:1.*

**JPMC Response**: Undisputed that Cecile de Jongh testified as such.  Disputed as to the underlying fact that Cecile de Jongh was not aware any of the women were potential trafficking victims.  *See* CSMF ¶¶ 321-350.

470.   *The documents also make clear that the University merely agreed to offer an already-*

*existing class to individuals.  Ex. 297 at 129:11-14; Ex. 300.*

**JPMC Response**:  Disputed.  Cecile de Jongh wrote to Epstein that UVI was "structuring the class around the ladies."  *See* CSMF ¶ 340.

████████████████████████████████        ██████████████

## JPMORGAN CHASE BANK, N.A.'S LOCAL CIVIL RULE 56.1(B)
## COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS

**I.      SUMMARY JUDGMENT CANNOT ENTER ON USVI'S CLAIMS**

**A.      JPMC Did Not Know Of Or Recklessly Disregard Epstein's Alleged Sex-Trafficking Venture**

***Rapid Response Meetings***

1.      JPMC employees regularly held "rapid response meetings" in light of derogatory or notable information about a client.  JPMC Ex. 66 at 194:22-195:12; JPMC Ex. 92 at 53:21-54:4; JPMC Ex. 93.

2.      When allegations are made against a client, the employees responsible for the client relationship would be tasked with staying on "high alert" and monitoring how those allegations develop towards a formal resolution, such as a criminal conviction.  JPMC Ex. 94 at 95:22-96:20.

3.      Epstein was indicted in Florida state court for felony solicitation of prostitution on July 19, 2006.  JPMC Ex. 2; JPMC Ex. 3 at i.  USVI's law enforcement agencies did not open an investigation into Epstein.  JPMC Ex. 4 at 25:17-21.

4.      On October 17, 2006, following news of Epstein's arrest for felony solicitation of prostitution under Florida state law, JPMC documented a series of internal discussions about its relationship with Epstein into a "rapid response team" memorandum.  The memorandum states: "After internal discussions with Jes Staley, Mary Erdoes, Catherine Keating, John Duffy, and Mary Casey, it was decided that we will keep Mr. Epstein solely as a banking client and on a 'reactive,' client service basis.  We will not proactively solicit new investment business from him."  JPMC Ex. 95.

5.      ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



6.      Following media reports about Epstein's pending guilty plea, JPMC employees held another meeting in October 2007 to discuss the Bank's relationship with Epstein.  JPMC Ex. 96; JPMC Ex. 97.

7.      Epstein ███████████████████████████████████

███████████████████████████████████████████████████

██████████  JPMC Ex. 11.  ████████████████████████  JPMC Ex. 12 at VI-JPM-000012204.  USVI's law enforcement agencies did not open an investigation into Epstein.  JPMC Ex. 4 at 25:17-26:18, 32:16-35:21.

8.      After Epstein pleaded guilty to state charges for solicitation of prostitution and procurement of a minor for prostitution, JPMC held a rapid response meeting to discuss the Bank's relationship with Epstein on July 15, 2008.  JPMC Ex. 98.

9.      At the conclusion of the July 15, 2008 rapid response meeting, it was determined that then-CEO of the US Private Bank, Catherine Keating, would "go back to JES to tell him we are uncomfortable with Epstein and do not want to go to Cutler for approval."  JPMC Ex. 93 at -26008.

10.     In summer 2010 and early 2011, media reports suggested that there may have been a current investigation into Epstein.  JPMC Ex. 15; JPMC Ex. 31; JPMC Ex. 32; JPMC Ex. 99.

███████████████████████████████████████    ██████████████████████████████

11.     JPMC employees did not view these reports as a determination that Epstein was engaged in ongoing unlawful conduct.  JPMC Ex. 100 at JPM-SDNYLIT-00157092; JPMC Ex. 101; JPMC Ex. 102 at 52:19-53:8, 107:22-108:20.

12.     Kevin McCleerey testified that "My view was it was – the reputational risk of the firm was increasing with these allegations, if they were true.  We knew in previous news articles some of the information was not true.  So we needed to get the facts.  But until then, we should have a meeting to review the current allegations in the press.  That was my view." JPMC Ex. 103 at 234:12-23; *see also* JPMC Ex. 103 at 236:7-18, 238:9-239:1.

13.     JPMC employees did not view these reports as a determination that Epstein was in fact under federal investigation.  JPMC Ex. 99; JPMC Ex. 101.

14.     In response to the new negative media on Epstein, JPMC held another rapid response meeting on January 7, 2011.  JPMC Ex. 104; JPMC Ex. 105; JPMC Ex. 106.

15.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████  JPMC Ex. 102 at 92:13-16.

16.     On January 14, 2011, William Langford and Catherine Keating had a meeting with Jes Staley to discuss the status of Epstein's accounts.  JPMC Ex. 107; JPMC Ex. 108 at 370:10-17.

17.     On August 4, 2011, JPMC held a fourth rapid response meeting about the Bank's relationship with Epstein.  JPMC Ex. 109.

### *Epstein's Cash Usage*

18.     Between 2003 and 2013, ████████████████████████████████████████

████████████████████████████████████████████████  JPMC Ex. 110 at 24.

19.     These cash transactions and direct and indirect payments to women constituted 1% of the nearly $900 million of funds that flowed through Epstein's accounts between 2003 and 2013.  JPMC Ex. 110 at 15-16; JPMC Ex. 60 at ¶ 92.

20.     In 2011, Epstein informed Paul Morris, his private banker at the time, that his cash withdrawals were to pay for fuel expenses for his personal airplane when traveling to foreign countries.  JPMC Ex. 106.

21.     In August 2011, after becoming CEO of JPMC's Private Bank, John Duffy investigated Epstein's cash usage.  JPMC Ex. 111.

22.     In 2011 and 2013 Duffy spoke to Epstein about his cash withdrawals and business activities.  JPMC Ex. 112; JPMC Ex. 113; JPMC Ex. 114; JPMC Ex. 77 at 225:13-226:10.

23.     Epstein informed John Duffy that his cash withdrawals were for fuel expenses for his personal airplane when traveling to foreign countries.  JPMC Ex. 77 at 207:12-16, 212:11-20; JPMC Ex. 115.

24.     Duffy advised Epstein to conduct cash withdrawals for fuel expenses from his aviation account, after which Epstein began conducting cash withdrawals out of his Hyperion Air account.  JPMC Ex. 115.

25.     It is not uncommon to speak to a client about unusual cash activity.  JPMC Ex. 77 at 225:20-21; JPMC Ex. 116 at 105:7-22; JPMC Ex. 108 at 401:16-23.

26.     JPMC employees previously had advised Epstein to cease structuring cash withdrawals below the $10,000 reporting threshold.  JPMC Ex. 116 at 106:6-107:7.

27.     Duffy believed Epstein's explanation that he used the cash withdrawals to purchase aviation fuel.  JPMC Ex. 77 at 176:18-177:5, 345:23-346:7; JPMC Ex. 115.

████████████████████████████████████████████

28.     Bonnie Perry testified that Epstein's explanation that he used the cash withdrawals to purchase aviation fuel "seemed reasonable."  JPMC Ex. 92 at 187:2-21.

29.     Epstein's former accountant, Richard Kahn, testified that Epstein's pilots would request cash to pay for fuel in order to secure more favorable rates.  JPMC Ex. 117 at 75:3-19, 105:5-16, 109:5-110:2.

30.     Epstein's former pilot Lawrence Visoski submitted a sworn declaration that until at least 2003, cash was used to pay for fuel at John F. Kennedy International airport in order to take advantage of a significant cash discount.  JPMC Ex. 118.

31.     With respect to Epstein's cash withdrawals, Phil DeLuca testified that, ████████ ████████████████████████████████████ JPMC Ex. 119 at 298:24-299:1.

32.     Maryanne Ryan testified that ████████████████████████████ ████████████████████ JPMC Ex. 102 at 278:10-17.

33.     ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████ JPMC Ex. 102 at 133:22-134:10, 208:24-209:2.

34.     William Langford testified: "But at the end of the day, withdrawal of cash is a withdrawal of cash.  And so especially small dollars, wealthy people withdraw cash.  They do a lot of different things."  JPMC Ex. 108 at 221:2-7.

35.     John Duffy testified: "I wasn't concerned about [Epstein's] use of cash.  Large clients use cash in different ways.  They are different than, you know, than the average person on Main Street. . . . It wasn't – it wasn't outsized in relation to what clients of Mr. Epstein's net

worth or asset base has.  And it wasn't unusual, as it related to what was expected in that account, and he was pretty consistent in the use of that."  JPMC Ex. 77 at 174:15-175:10.

36.     Frank Pearn testified: "I have seen very large amounts of cash be taken out of the bank by Private Bank clients over my time at the bank."  JPMC Ex. 94 at 153:21-24.

37.     JPMC's human trafficking expert, Dr. Kimberly Mehlman-Orozco testified that "high-net-worth individuals making significant payments to their victims is atypical of trafficking."  JPMC Ex. 120 at 229:24-230:1.

38.     Dr. Mehlman-Orozco further testified: "If you could sort of give me a subset of what you're saying that it would have corroborated.  Because, for example, if you're asking me would victim payments in cash corroborate an allegation of trafficking, I would say, no, that's atypical or inconsistent with trafficking.  So you typically would not see that as a corroborating piece of evidence.  I would typically see that in something that would be used by the other side to show that they were not a victim."  JPMC Ex. 120 at 263:21-264:7.

39.     William Langford testified that large cash withdrawals were not the focus on the use of cash as part of JPMC's Human Trafficking Initiative, which was focused on "the business of trafficking. That is, people who set up the criminal enterprise to capture, imprison, move, and sell the services, right, and generate the criminal proceeds, just like drug trafficking."  JPMC Ex. 108 at 169:12-170:10.

40.     Paul Morris testified that it "never occurred" to him that Epstein was withdrawing cash "for the payment related to sexual abuse or sex trafficking" and he had "absolutely not, never heard" anyone at JPMC indicate a suspicion that Epstein's cash withdrawals were being used or could be used for sexual abuse or sex trafficking.  JPMC Ex. 121 at 337:20-338:4.

41.    John Duffy testified: "I had no reason to believe that Mr. Epstein—and at no point in time did I believe Mr. Epstein was committing criminal acts through JPMorgan, such as sex trafficking."  JPMC Ex. 77 at 365:3-8.

42.    Former Head of the Global Private Bank and current CEO of Asset and Wealth Management Mary Erdoes testified: "[T]he concern was the cash payments, and at the time, the cash payments were related to airplane usage.  And never at the time was that something that I was connecting in my mind with anything to do with any of the allegations of what he may or may not have done, and I wasn't aware of any ongoing things that Mr. Epstein was doing, and the two things never – they never came to my mind to connect them."  JPMC Ex. 61 at 182:10-19.  Erdoes further testified that if she had "learned and believed that [Epstein] was sexually abusing young children yes, he would be – I would ask to have him exited from the bank." JPMC Ex. 61 at 180:19-21.

### *Investigation of Other Epstein Account Activity*

43.    JPMC employees were aware of media reports in which the owner and president of MC2 Models Management denied receiving financial support from or having a working relationship with Epstein.  JPMC Ex. 122 at -36593, -36596.

44.    JPMC employees investigated Epstein's account activity, including his involvement with MC2 Models Management.  As part of that investigation, AML investigator Maryanne Ryan noted that MC2 "appear[ed] to be a legit modeling agency."  JPMC Ex. 123 at -25203.

45.    William Langford stated that the modeling agency "really tells us little" about any "possible linkages between the JPM accounts and bad activity."  JPMC Ex. 123 at -25201.

█████████████████████████████          ████████████████

46.     Langford testified that "[t]he modeling agency is just that it didn't tell us anything, and our ability as a bank to know what's really going on in a modeling agency is extremely limited."  JPMC Ex. 108 at 356:20-24.

47.     On January 13, 2011, Ryan emailed Langford and Phil DeLuca regarding her investigation into Epstein, in which she concluded that there were "no smoking guns."  JPMC Ex. 124 at -152809.

48.     In March 2011, JPMC informed Epstein that it was not going to renew the $1 million standby letter of credit ("SBLC") issued to Epstein to backstop a loan from Mellon to MC2 Models Management.  JPMC Ex. 105 at -274776; JPMC Ex. 93.

49.     Prior to the SBLC expiring, it had never been drawn on.  JPMC Ex. 102 at 221:5-222:15.

50.     Among the conclusions reached by Ryan in her investigation was that Epstein had sponsored the opening of accounts for two adult women, including one described as a "willing participant" in the "recaps of the escapades."  JPMC Ex. 124 at -152809.

51.     In opening accounts for ██████████████, JPMC had information regarding her date of birth, her social security number, driver's license number, and home address.  JPMC Ex. 58.

52.     

████████████████████          JPMC Ex. 102 at 139:7-18.

53.     Ryan also noted that Epstein "pa[id] other girls, many models no huge amounts" and described Epstein as a "Sugar Daddy."  JPMC Ex. 124 at -152809.

██████████████████████████████████████████   ████████████

54.     Ryan testified that she understood the term "sugar daddy" to mean "[s]omebody that likes to spend his money on ladies" but that she did not believe it "impl[ied] financial support in exchange for sexual favors."  JPMC Ex. 102 at 229:12-22.

55.     ████████████████████████████████████████████████████

████████████████████████████████████ JPMC Ex. 102 at 225:5-231:12.

56.     William Langford testified that this activity was "in many respects . . . inconsistent with the types of things that we saw in human trafficking.  You know, having her own account, providing money, providing documented expenses.  The human trafficking enterprises that we were focused on were designed to traffic the individuals, keep them down, do—do the business and keep it off the radar.  This was different.  I mean it's—it's pretty—I don't like the behavior.  But it's different from the typology of human trafficking that we had been focused on."  JPMC Ex. 108 at 325:15-326:16.

57.     William Langford testified that he did not believe that ████████████

████████████████████████████████████████████ JPMC Ex. 108 at 488:9-18.

58.     William Langford further testified that Maryanne Ryan's findings in her investigation of Epstein's account activity did not "establish a link between JPMorgan and the operation by Epstein of a sex trafficking ring through the bank, on its face, in my opinion." JPMC Ex. 108 at 492:19-493:1.

***Recommendations to Exit Were Based on Reputational Risk***

59.     William Langford testified that he recommended exiting Epstein as a client due to reputational risk concerns rather than legal concerns or concerns about Epstein's account activity.  JPMC Ex. 108 at 436:10-20, 488:5-489:10.  Langford further testified that he did not

█████████████████████████████████     ████████████████████

believe that Epstein "was engaging in continued illegal activity after his 2008 plea." JPMC Ex. 108 at 487:24-488:4. Langford also testified that if he believed there were ongoing violations of law and others disagreed over exiting a client, he would have escalated that decision to the board. JPMC Ex. 108 at 283:6-284:16.

60.     Stephen Cutler recommended exiting Epstein as a client and refraining from engaging in further business with him due to the reputational risk he created for the Bank.  JPMC Ex. 79 at 209:24-210:7, 299:6-11; JPMC Ex. 126 at 76:2-6.  Cutler further testified that, "If Mr. Epstein was continuing to engage in unlawful activity, we didn't want him as a client." JPMC Ex. 79 at 363:3-19.

61.     Maryanne Ryan testified that she and Phil DeLuca advocated exiting Epstein as a client because "[h]e was a reputational risk to the bank."  JPMC Ex. 102 at 70:24-71:17, 129:12-18.

62.     Epstein's former private banker, Mary Casey, "escalated concerns for reputational risk."  JPMC Ex. 66 at 34:10-14, 93:4-6.

63.     Phil DeLuca testified that AML Investigations' recommendation to exit Epstein was based on "reputational risk."  JPMC Ex. 119 at 85:6-10.

64.     With respect to Epstein's status as a client, John Duffy testified: "I was of the opinion his reputational risk was not worth having him as an account, that's correct."  JPMC Ex. 77 at 125:5-7.

65.     Kevin McCleerey testified that "Mr. Epstein represented a reputational risk to the firm."  JPMC Ex. 103 at 38:8-10.

66.     Justin Nelson testified that understood that Epstein was terminated as a client due to considerations of "reputational risk."  JPMC Ex. 76 8:6-9.

***Staley***

67. Former JPMC executive Jes Staley was the most senior and primary JPMC employee responsible for the Bank's relationship with Epstein. JPMC Ex. 126 at 13:14-20; JPMC Ex. 127 at 75:17-19; JPMC Ex. 108 at 309:20-23, 336:4-14.

68. Jane Doe 1 testified that JPMC Ex. 128 at 140:6-149:20.

69. Staley testified that he did not "observe anything that caused [him] to question whether Epstein was engaged in sex trafficking." JPMC Ex. 129 at 522:19-22.

Staley Exchanged Suggestive Emails with Epstein About Women

70. On August 30, 2009, Epstein emailed Staley, "how long London? Do you need anything there?" Staley responded, "Yep." JPMC Ex. 130.

71. On September 2, 2009, Epstein emailed "jes staley is staying at the berkeley hotel in London tonight." JPMC Ex. 131.

72. On December 5, 2009, Epstein emailed Staley, "you were with larry , [sic] and I had to put up with . . . ." and attached the following suggestive photograph of a young woman:



JPMC Ex. 132; JPMC Ex. 133.

73.    That same day, Staley responded to Epstein, writing "Don't tell me a French wine."  JPMC Ex. 132.

74.    On December 20, 2009, Epstein emailed Staley the following photograph of a young woman:



JPMC Ex. 134; JPMC Ex. 135).

75.     On June 16, 2010, Staley wrote to Epstein "is she free tonight?" Epstein responded, "call me." Staley replied, "I'm with A."  JPMC Ex. 136.

76.     On July 9, 2010, Staley e-mailed Epstein, "That was fun. Say hi to Snow White." Epstein responded, "what character would you like next." Staley replied, "Beauty and the Beast . . . ." Epstein responded, "well one side is available." JPMC Ex. 137.

<u>Staley Had a Close Personal Relationship with Epstein</u>

77.     On February 26, 2011, Staley emailed Epstein calling him "Family."  JPMC Ex. 138.

78.     On March 3, 2011, Epstein emailed Staley, writing, "Told you—family." Staley responded the same day, writing "family."  JPMC Ex. 139.

79.     On March 4, 2011, Staley emailed Epstein saying that he counted Epstein "as one of our deepest friends. And most honest of people."  JPMC Ex. 140.

80. On March 5, 2011, Epstein emails Staley in response, calling him "family." JPMC Ex. 140.

81. On March 7, 2011, Epstein emailed Staley saying "[I] forgot to say thanks . . Family." JPMC Ex. 141.

82. On March 10, 2011, Epstein emailed Staley, writing "yup family  dont [*sic*] worry."  JPMC Ex. 142.

83. On March 18, 2011, Epstein emailed Staley saying "Dear family member,, don't fret[.]" JPMC Ex. 143.

Epstein Provided Assistance with ▮▮▮▮▮ Graduate School Admissions

84. April 27, 2009, Epstein emailed Staley, writing ▮▮▮ can meet have dinner lunch a weekend with any of the following seth lloyd mit quantum computing.. murray gell-man , santa-fe institute quarks ,, brian greene Columbia -string theory,, leonard Susskind ,, strings theory, lawrence krause,, origins institute phoenix arizona.. lee smolin premiter institute, loop quantum gravity , she can see the large hadron collider in switzerland. private tour [sic]."  JPMC Ex. 144.

85. Staley forwarded the email to ▮▮▮▮▮, Alexa Staley, writing "This is from uncle Jeffrey. Add Lisa Randell at Harvard."  JPMC Ex. 144.

86. On October 24, 2009, Staley forwarded his ▮▮▮▮r feedback Epstein provided on a draft of her scholarship essay.  JPMC Ex. 145.

87. On January 11, 2010, ▮▮▮▮▮ forwarded to Staley an email exchange she had with Epstein, thanking him for inviting her to a physics conference in California.  JPMC Ex. 146.

██████████████████████████████████████████
██████████████████████████████████

88.     On September 23, 2010, Staley forwarded to Epstein an email from ████████████

about a professor at Columbia University and asking Epstein if he could "get to this professor at

Columbia." On September 24, 2010, Epstein responded, "in a snap." JPMC Ex. 147.

89.     On November 11, 2010, Epstein emailed Staley in response to an email chain

about ███████████ application to ███████████, writing "she can sit with Richard

Axel when I get back, he won the Novel prize .. he has guaranteed me." JPMC Ex. 148.

90.     On January 19, 2011, Staley forwarded to Epstein an email exchange between a

██████ professor and ███████ regarding her GRE scores "not seem[ing] to be a problem

according to my sources." JPMC Ex. 149.

91.     Also on January 19, 2011, Epstein emailed Staley, writing "████ is now 70-30

up from 45-55." JPMC Ex. 150.

### Staley Made Personal Visits/Vacations to Epstein Properties

92.     On December 31, 2008, while Epstein was incarcerated, Staley made plans to

visit Epstein in Palm Beach, Florida. JPMC Ex. 151.

93.     On October 23, 2009, Epstein emails ███████████, writing that "jes staley

and wife are going to be at the ranch next weekend,, please coordinate== they get to stay in blue

room. [sic]" JPMC Ex. 152.

94.     On October 30, 2009, Staley emailed Epstein asking if he could go to Santa Fe, to

which Epstein responded "not today." JPMC Ex. 153.

95.     On November 1, 2009, Staley emailed Epstein, writing "So when all hell breaks

lose [sic], and the world is crumbling, I will come here, and be at peace. Presently, I'm in the

hot tub with a glass of white wine. This is an amazing place. Truly amazing. Next time, we're

██████████████████████      ████████████████████

here together. I owe you much.  And I deeply appreciate our friendship.  I have few so

profound."  JPMC Ex. 154.

96.     On January 8, 2010, Epstein emailed Staley about a visit to his private island in

USVI, writing, "my car and driver, , former dea armed. will pick you up in st thomas we have all

the on field permits.. helicopter also availble for a tour around , ... remember I own the two big

marinas.. yacht haven grand, in st thomas and the marina at red hook... you can use my atv's jet

ski ,gym etc. , i will organize the harbor at Norman island if you like, in the bvil . as well as

lunch at guana.."  JPMC Ex. 155.

97.     On January 22, 2011, Staley emailed Epstein about a visit to Epstein's island in

USVI, writing "What a paradise.  When I retire, I'm going to put a mooring in front of your dock

for my boat[.]  Amazing place."  JPMC Ex. 156.

<div align="center">Staley Shared Confidential Information With Epstein</div>

98.     On multiple occasions, Staley shared with Epstein confidential information about

transactions the Bank was structuring or exploring.  JPMC Ex. 157; JPMC Ex. 158; JPMC Ex.

159; JPMC Ex. 160; JPMC Ex. 161; JPMC Ex. 162.

99.     Staley discussed the confidential status of other clients at the Bank with Epstein.

JPMC Ex. 163.

100.    Staley shared information protected by the attorney-client privilege about

Epstein's ongoing litigation against JPMC with Epstein.  JPMC Ex. 164.

101.    Staley solicited feedback from Epstein on confidential drafts of shareholder

letters.  JPMC Ex. 165.

102.    Staley kept Epstein informed about the status of the Bank's investigation into the

allegations against him.  JPMC Ex. 166; JPMC Ex. 167.

███████████████████████          ████████████████████

### Staley Vouched for Epstein

103.    Jes Staley vouched for Epstein on multiple occasions by telling other JPMC executives and employees that Epstein was not engaged in criminal conduct.  JPMC Ex. 126 at 169:7-12.

104.    Mary Erdoes testified that Jes Staley had a "very different" characterization of Epstein than the press reports following his arrest.  JPMC Ex. 61 at 213:17-21.

105.    William Langford, JPMC's former General Counsel for Global Compliance and Regulatory Management, testified that Jes Staley told him that, with respect to Epstein's conviction in 2008 on state charges for solicitation of prostitution and procurement of a minor for prostitution, Epstein "didn't do it, shouldn't have pled guilty, et cetera, wasn't responsible for it" and that Epstein's lawyers were working to get the guilty plea "thrown out."  JPMC Ex. 108 at 323:6-14, 370:10-17.

106.    JPMC's former General Counsel, Stephen Cutler, testified that Jes Staley told him that Epstein had "turned a page" "paid his debt to society" "turned a corner" and "was on the straight and narrow."  JPMC Ex. 126 at 58:23-60:4, 163:3-164:11.

107.    Stephen Cutler relied on Jes Staley's views in evaluating the Bank's relationship with Epstein because Staley was a "respected member of the operating committee" and knew Epstein.  JPMC Ex. 126 at 167:1-19.

### B.    JPMC Did Not "Participate" In Any Epstein Sex-Trafficking Venture

#### *Attempts to Verify Ongoing Investigation*

108.    Following the January 2011 rapid response meeting, employees within JPMC's Private Bank discussed the Epstein relationship with Staley, who spoke to Epstein about the media allegations, which Epstein "claimed were without merit."  JPMC Ex. 105 at -274776.

████████████████████████████████████   ██████████████

109.   ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

JPMC Ex. 33; JPMC Ex. 34 at -274529; JPMC Ex. 79 at 351:7-17; JPMC Ex. 168.

110.   On March 7, 2011, Stephen Cutler emailed Jonathan Schwartz asking if he spoke
to Staley about "Ken Starr's best friend?"  That same day, Jonathan Schwartz replied, "Yes and
didn't get anything back from him, so I just called him again.  He said he'll call Epstein and get
me a live name and number for a current lawyer.  The recent headlines (re FBI reopening its
investigation in Daily Mail and NY Post over the weekend, and guilt-by-being-friends stories
about Prince Andrew and former President Clinton) aint [sic] great.  Cc'ing William."  JPMC
Ex. 168.

111.   On March 9, 2011, Jonathan Schwartz discussed with Stephen Cutler, then-
General Counsel for JPMC, the need to determine where "there's actually a live federal
investigation" into Epstein.  JPMC Ex. 34 at JPM-SDNYLIT-00274529.

112.   On March 15, 2011, Jonathan Schwartz emailed Stephen Cutler that he contacted
Jay Lefkowitz, Epstein's attorney, to inquire whether there was any such investigation.  Mr.
Lefkowitz explained that he and Epstein had heard nothing to suggest that there was a current
FBI or other law enforcement agency investigation.  As to any suggestion in the media of an
ongoing investigation, "according to Jay, [they] don't seem to have any basis."  JPMC Ex. 34 at
JPM-SDNYLIT-00274528.

███████████████████████████████████  ██████████

113.    On or about March 22, 2011, Jonathan Schwartz spoke to the United States

Attorney for the Southern District of Florida, who did not disclose any investigation into Epstein.

JPMC Ex. 35; JPMC Ex. 36 at 18.

114.    JPMC also reached out to the FBI to ask for a contact at the agency who may

have been working on any ongoing investigation into Epstein.  The FBI never returned the phone

call.  JPMC Ex. 36 at 19; JPMC Ex. 37 at 151:19-152:24; 329:5-330:21.

### *Currency Transaction Reports Related to Epstein*

115.    Between 2002 and 2013, JPMC filed approximately 150 CTRs related to Epstein

and his accounts in which JPMC identified its relationship with Epstein, flagged his large cash

withdrawals.  JPMC Ex. 39 at ¶ 95; JPMC Ex. 41.

116.    Seventy-three of these CTRs were filed before Epstein was arrested in July 2006.

JPMC Ex. 41.

117.    Law enforcement never contacted JPMC in response to any CTR.  JPMC Ex. 38

at 136:23-137:11; JPMC Ex. 39 at ¶ 30 n.28.



████████████████████████████████

118.    ██████████████████████████████████████████████

███████████████████████  JPMC Ex. 108 at 353:2-9.

119.    ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████  JPMC Ex. 102 at 23:14-19.

120.    Maryanne Ryan testified: "The SAR decision lies solely with the investigations

department.  Could an employee under me have discussed it with another person within

investigations? Sure.  But they weren't going back to the business to discuss the merits of SAR

filing."  JPMC Ex. 102 at 27:10-16.

> 121.    In her expert report, Terry Pesce opined that,

> At times banks will conduct transaction reviews or "lookbacks."
> Banks may conduct lookbacks if they are looking for a particular
> kind of past activity or if they receive a request from law
> enforcement. This entails a much more granular and pointed
> review of historical activity. The bank would see activity it would
> not have reviewed in the ordinary course of monitoring, and
> notably, the bank would likely file SARs it would not have filed in
> fulfilling its day-to-day AML program obligations.

> JPMC was required to perform a transaction lookback in
> connection with the 2013 Consent Order. However regulators
> required the Bank to examine activity with non-bank financial
> institutions. There is nothing in the required lookback to suggest
> examiners were concerned that the bank failed properly to monitor
> high-risk Private Bank clients or to detect human trafficking.
> Moreover, it is unlikely that even a broader-scoped lookback
> would have uncovered Epstein's transactions with individuals. I
> have supervised numerous lookbacks. They require applying
> additional scenarios or more precise thresholds to past activity that
> might not have alerted under a bank's monitoring systems. They
> do not generally entail setting thresholds at the low dollar amounts
> at issue here.

> Importantly, lookbacks are conducted with information that might
> not have been available or meaningful when the underlying
> transactions occurred. Banks act with the information they have
> before them. The USVI created demonstrative exhibits for use in
> depositions that collect granular information now available. What
> may seem relevant in hindsight may not have been apparent at the
> time.

JPMC Ex. 60 at ¶¶ 121-23.

122.     William Langford testified that nobody from JPMC's business ever tried to dissuade him from filing a SAR related to a customer and that he was not aware of any instance in which an employee in JPMC's lines of business ever tried to dissuade a colleague from filing a SAR related to a customer.  JPMC Ex. 108 at 486:18-487:4.

123.     William Langford testified that he never decided against filing a SAR related to a customer that he believed was warranted "because the customer was particularly large or valuable" and that he was not aware of any instance in which any JPMC employee believed a SAR should be filed but failed to do so "because the client was particularly large or valuable." JPMC Ex. 108 at 487:5-11.

124.



JPMC Ex. 119 at 332:5-11.

125.

JPMC Ex. 108 at 486:7-17.

126.     Phil DeLuca testified that nobody from JPMC's Private Bank ever tried to dissuade him from filing ▮▮▮▮ "doing anything at all in connection with" Epstein and that he was not aware of any instance in which an employee in JPMC's Private Bank ever tried to dissuade a colleague from ▮▮▮▮ "doing anything in connection with" Epstein. JPMC Ex. 119 at 330:24-332:4.



127.

JPMC Ex. 39 at ¶¶ 19-21, 30.

128.

JPMC Ex. 42.

129.

JPMC Ex. 43.

130.

JPMC Ex. 44.

131.

JPMC Ex. 169; JPMC Ex. 170.

132.

JPMC Ex. 102 at 25:5-7.

███████████████████████████████████████████████
███████████████

133.   ████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████ JPMC Ex. 45.

████████████████████████

134.    On June 19, 2013, Phil DeLuca sent an email to Cynthia Armine describing the history of escalations of the Bank's relationship with Epstein. JPMC Ex. 171.

135.    On July 19, 2013, Maryanne Ryan sent an email to Kevin McCleerey, James Dalessio, and Phil DeLuca "to follow up on the Epstein withdrawals" and noted that she believed his explanation that the withdrawals for fuel "seem[ed] odd."  JPMC Ex. 172.

136.   ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████ JPMC Ex.

173.

137.   ████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████ JPMC Ex. 173.



138. ███████████████████████████████████████

█████████████████████ JPMC Ex. 173.

139. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ JPMC Ex. 102 at 202:21-203:4.

140. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████ JPMC Ex. 46 at JPM-SDNYLIT-W-00019086-

00019096.

141. ███████████████████████████████████

███████████████████████████████████████████ JPMC Ex.

174.

142. █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████ JPMC

Ex. 47 at JPM-SDNYLIT-W-00018180-00018196.

143. ████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████  ███████

███████████████████████████████████████████████

███████████████████  JPMC Ex. 48 at JPM-SDNYLIT-W-00002185-00002196.

144.  ██████████████████████████████████████

███  JPMC Ex. 38 at 136:23-137:11; JPMC Ex. 39 at ¶ 30 n.28.

145.  USVI's law enforcement expert, Shaun O'Neill ████████████████

████████████████  JPMC Ex. 80 at 11:4-13.

146.  Mr. O'Neill testified that ████████████████████████

██████████████████████████████████████████████

█████████████████  JPMC Ex. 80 at 58:13-59:2.

147.  Mr. O'Neill further testified that ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████  JPMC Ex. 80 at 59:8-60:2.

148.  On July 9, 2019, JPMC employees began an investigation into Epstein's banking

relationship with the Bank.  JPMC Ex. 175 at -37464.

149.  ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████  JPMC Ex. 176.

███████████████████████████████████████████████

150.   ███████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████  JPMC Ex. 177 at -17206.

151.   ██████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████  JPMC Ex. 178 at -8097.

152.   ███████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████



JPMC Ex. 335 at -8820.

153.

JPMC Ex. 179 at -21053, -21055.

154.

JPMC Ex. 180 at -207.

155.



JPMC Ex. 181 at -175.

156.

JPMC Ex. 182 at -223.

157.

PMC Ex. 183 at -548.

158.

JPMC Ex. 184 at -8121.



159.

JPMC Ex. 185 at -22630.

160.

JPMC Ex. 186 at -8142.

161.

JPMC Ex. 187 at -8162.

### ***JPMC Exited Epstein as a Client***

162.     Mary Erdoes testified that in 2013 she became concerned with Epstein's cash usage and "thought the explanation was an outsized amount of cash, and even though that was his explanation for where the cash was being used, that in conjunction with the culmination of

everything else and the fact that I didn't know or like Mr. Epstein, I had no reason to vouch for

Mr. Epstein to be a client of the bank, and I recommended exit and we exited."  JPMC Ex. 61 at

183:8-15.

163.    In explaining the factors that went into Epstein's exit in 2013, Frank Pearn

testified: "A number of factors, in no particular order.  There was continued negative media that

the line of business and the risk department continued to see.  There was continued cash and wire

activity in many of Epstein's accounts.  There was, I'll say, a long-time view of many of the

people in the line of business, in the risk and compliance organization, that Mr. Epstein should

be exited or should have been exited, as I'm sure we'll cover, and Jes Staley was no longer at the

bank.  And I'd say the last thing was at that time the industry, the regulatory environment, was—

had changed. JPMorgan had received AML consent orders earlier in 2013, along with a number

of other banks.  The regulatory view of bank's role in combating money laundering, terrorist

financing, was—had changed.  And as part of that, our institution was looking at our portfolio or

our book of high-risk clients and taking a fresh look at whether or not we should maintain those

relationships.  So a number of factors."  JPMC Ex. 94 at 116:15-117:19.

164.    On July 17, 2013, JPMC employees and executives, including John Duffy, Mary

Erdoes, Stephen Cutler, and Justin Nelson met to discuss the status of Epstein's relationship with

the Bank, and decided to terminate the relationship.  JPMC Ex. 188; JPMC Ex. 189.

165.    On July 19, 2013, John Duffy emailed Mary Erdoes a draft of talking points to

communicate the Bank's decision to exit Epstein as a client.  Duffy wrote: "1. The repetitive

nature of your cash transactions is a problem for us and our relationship with you. 2. The

regulatory standards in the banking industry continue to evolve with a very low tolerance for

cash activity when combined with your personal history. 3. So, given the intersection of these

████████████████████████████        ████████████

circumstances we are in a uniquely challenged situation. Remediation is required and we need to ask you – in an orderly manner – to find another bank for your needs." JPMC Ex. 190.

166.   On August 9, 2013, Mary Erdoes emailed several JPMC employees and executives, including Cynthia Armine, Stephen Cutler, Nina Shenker, Donna Dellosso, John Duffy, and Phil DiIorio, writing, "Re our client exit, the conversation went well and was very professional. I suspect the call last night might have helped. It will move in an orderly process. John did an excellent job." JPMC Ex. 191.

167.   On August 14, 2013, John Duffy emailed Justin Nelson, writing, "Thanks. He and I spoke as well about his advisory business and whether our [sic] not we would work with him. I said 'yes', as long as we were not transacting in JE accounts." JPMC Ex. 192.

168.   On September 13, 2013, John Duffy emailed Justin Nelson regarding a request from Epstein for "more credit," writing, "the answer needs to be 'no,' followed by this is a great opportunity to move forward with you [sic] new bank." JPMC Ex. 193.

169.   On September 20, 2013, John Duffy emailed Mary Erdoes about Epstein, writing, "Spoke with him. Good conversation. Told JE no on sole trustee or POA, yes for advisory role without discretion. Yes for custody in the client's name. Tough one he brought up regarding Gates – JE and JPM as co-trustee. While I expect that this would be hard to get through – its [sic] like co-branding with him. We should still discuss it – Let's talk. He understood." JPMC Ex. 75.

### C.   JPMC Did Not Knowingly Benefit From A Sex-Trafficking Venture

170.   Jamie Dimon testified that he did not "recall any involvement on [Epstein's] part" in JPMC's acquisition of Highbridge Capital Management, LLC and that he was not "informed

that Jeffrey Epstein received a $15 million fee for his work in connection with that transaction."
JPMC Ex. 55 at 57:6-58:16.

171.    Epstein's company, Financial Trust Company, Inc., had been retained as a
consultant by Highbridge Capital Management, LLC.  JPMC Ex. 194.

172.    Financial Trust Company, Inc. received a $15 million fee from Dubin & Swieca
Holdings, Inc. related to JPMC's acquisition of a majority interest in Highbridge Capital
Management in 2004.  JPMC Ex 194; JPMC Ex. 195; JPMC Ex. 116 at 164:17–20.

173.    Epstein did not receive a fee from JPMC in connection with JPMC's acquisition
of a majority interest in Highbridge Capital Management.  JPMC Ex. 116 at 164:10-16.

174.    By 2014, Leon Black was a "longstanding client of the private bank."  JPMC Ex.
196 at -902716.

175.    Frank Pearn testified: "As the founder and one of the senior leaders at Apollo
Global Management, the bank had a long established relationship with Apollo and with Mr.
Black.  My understanding is that Leon Black was one of Mr. Epstein's clients as a money
manager.  And as far as I've been able to determine, we don't see any—or I don't see any
introduction of Leon Black as a private bank client through Mr. Epstein."  JPMC Ex. 116 at
182:5–19; *see also* JPMC Ex. 70 at 386:14-17.

## II.    JPMC Did Not Obstruct Or Attempt To Obstruct An Effort To Enforce The TVPA

176.    On August 15, 2007, Bear Stearns received a Grand Jury Subpoena from the U.S.
District court for the Southern District of Florida seeking "all documents referring or relating to
Jeffrey Epstein."  JPMC Ex. 197 at -373075.

177.    On August 27, 2007, members of Bear Stearns AML and Litigation departments
spoke to Assistant U.S. Attorney Ann Marie Villafana "regarding the scope of the Grand Jury

Subpoena." "During the conversation, the AUSA stated that Bear Stearns was not a target of the investigation. Moreover, a member of the AML Group asked the AUSA if any of the activity concerning the Epstein investigation might have triggered a reporting requirement for the Firm. The AUSA answered that question in the negative." JPMC Ex. 197.

178.    On August 27, 2007 and September 6, 2007, Assistant U.S. Attorney Marie Villafana sent letters to Bear Stearns clarifying the scope of the Grand Jury Subpoena. JPMC Ex. 198.

179.    In response to the Grand Jury Subpoena, Bear Stearns reviewed transfers out of Epstein's accounts in the amounts of $1,000 or $100,000 and concluded that the "account(s) does not appear to be implicated in the alleged wrongdoing" and that the review "revealed no suspicious or unusual third party wire transfers consistent with those mentioned in the above-describe [sic] Probable Cause Affidavit or news articles. Based upon the available facts, this investigation is closed and nothing further is deemed necessary." JPMC Ex. 197 at -373076.

## III.    SUMMARY JUDGMENT CANNOT ENTER ON JPMC'S AFFIRMATIVE DEFENSES

### A.    Epstein Made Payments To USVI Officials And Entities

180.    On December 21, 2017, Epstein wrote to Dawn Henry of the USVI Department of Planning and Natural Resources ("DPNR") that he had given "25 k to the home for girls in st croix" and asked Henry for suggestions on where he could donate. JPMC Ex. 199.

181.    On December 27, 2017, Epstein directed Richard Kahn (Epstein's accountant) to write a $25,000 check from Southern Trust Company, Inc. ("STC") to the DPNR for a donation to a public library. JPMC Ex. 200.

182.    In connection with that donation, Dawn Henry wrote to Epstein on December 27, 2017, to suggest specific libraries to which Epstein could donate. She additionally wrote to

Epstein: "If you prefer to donate to school libraries I can connect you with the Commissioner for Education. Either way the Territory wins." JPMC Ex. 200.

183. The USVI government "review[ed] its corporate sponsorships after it emerged that Jeffrey Epstein, the convicted sex offender … gave gifts to school pupils and financed events for young children." JPMC Ex. 201.

184. Epstein provided funding for a science fair for children in grade school in the USVI run by the USVI Department of Education. He also specifically paid for travel and accommodations for prize-winning children to attend the science fair in St. Thomas. JPMC Ex. 201.

185. Epstein provided funding for a summer camp for children with intellectual disabilities through his USVI-based corporations. JPMC Ex. 201 at 1, 2.

186. Epstein funded a prize for the winners of a school essay-writing competition. JPMC Ex. 201 at 2.

187. Epstein paid for computers to be given to two 14-year-old students attending high school in the USVI. JPMC Ex. 201 at 2.

188. Epstein purchased Kindle e-readers for use by a school library. JPMC Ex. 201 at 2.

189. Epstein purchased over 100 Microsoft Surface tablets for use by children in USVI schools. JPMC Ex. 201 at 2.

190. Epstein provided funding through his USVI businesses for a basketball tournament in the USVI, which included children as young as six. JPMC Ex. 201 at 2.

███████████████████████                    ███████████████

191.    On December 16, 2018, Cecile de Jongh wrote to Epstein that Governor Albert Bryan had suggested two schools, Coral Reef Academy and Junior Achievement, to which Epstein could make a $50,000 donation.  JPMC Ex. 202; JPMC Ex. 203 at 162:20-167:1.

192.    On December 20, 2018, Cecile de Jongh wrote to Epstein that Governor Albert Bryan had requested that Epstein donate $30,000 to the USVI Little League.  JPMC Ex. 204.

193.    In 2010, one of Epstein's USVI-based businesses, Financial Trust Company, Inc. ("FTC") donated $3,500 to the Virgin Islands Police Department.  JPMC Ex. 205 at -6070.

194.    In August 2012, Epstein was asked to provide funding for two USVI police officers to attend a homicide investigation training program in New York.  He wrote to Cecile de Jongh that he "always would like to support these things" but that "in the past" it had been "looked upon with suspicioun [sic]."  Cecile de Jongh responded: "Suspicion locally?  My thought was that this would be ok because it is specifically homicide training."  Epstein responded "face to face."  JPMC Ex. 206.

195.    Over multiple election cycles, Epstein donated $5,400, the maximum amount allowed, to the campaign of Congresswoman Stacey Plaskett, the Delegate to the United States House of Representatives from the USVI.  JPMC Ex. 207 at 148:8-17; JPMC Ex. 244.

196.    Congresswoman Plaskett previously worked for the USVI Economic Development Authority ("EDA") and for a law firm that represented Epstein related to his USVI businesses.  JPMC Ex. 207 at 14:24-15:5; 86:4-24; JPMC Ex. 208 at 101:4-13.

197.    Cecile de Jongh asked Epstein to donate money to Congresswoman Stacey Plasket.  JPMC Ex. 208 at 189:4-12.

198.    Cecile de Jongh asked Epstein to donate $13,000 to the Democratic Party on behalf of Congresswoman Stacey Plaskett.  JPMC Ex. 208 at 195:2-8.

199.     Congresswoman Plaskett also asked Epstein to donate the maximum amount to the Democratic Congressional Campaign Committee ("DCCC"), which was approximately $30,000.  JPMC Ex. 207 at 219:7-221:13.

200.     Epstein attempted to donate $30,000 to the DCCC, but the donation was returned after Epstein failed to meet the DCCC's vetting requirements.  JPMC Ex. 207 at 226:10-227:12; JPMC Ex. 208 at 195:17-197:9.

201.     Epstein requested that Congresswoman Plaskett's campaign keep his donations anonymous.  JPMC Ex. 209.

202.     On June 19, 2014, Cecile de Jongh emailed Epstein that his "help [was] needed" because "[w]e are trying to get Stacey Plaskett elected to Congress."  She further stated that "we would have a friend in Stacey" and asked Epstein if "any of [his] friends would give to her campaign."  JPMC Ex. 210.

203.     Epstein requested, through Cecile de Jongh, that his employees and other individuals donate to Congresswoman's Plaskett's campaign.  JPMC Ex. 210; JPMC Ex. 208 at 191:1-20, 194:2-195:1.

204.     Epstein and his employees donated over $30,000 to Congresswoman Plaskett's campaigns across three congressional election cycles.  JPMC Ex. 207 at 303:17-305:20.

205.     On June 23, 2014, Erika Kellerhals emailed Cecile de Jongh with the subject "help!!" "I need to raise $20k by Wednesday for Stacey.  Think I can ask JEE?  Anyone else you can think of?"  Cecile de Jongh replied "I asked him already."  JPMC Ex. 211.

206.     On October 24, 2014, Cecile de Jongh wrote to Epstein to confirm "that STC will send $13k to the Democratic Party for the benefit of Stacey Plaskett."  JPMC Ex. 212.

207.    On October 17, 2014, Cecile de Jongh and Epstein exchanged emails regarding a $15,000 donation from Epstein's personal account to the St. Croix District Democratic Party. JPMC Ex. 213; JPMC Ex. 208 at 187:18-189:3.

208.    As part of that email thread, on October 16, 2014, Cecile de Jongh wrote that "[future Governor] Kenn Mapp and [Senator] Celestino White would like to see you."  JPMC Ex. 213.

209.    On November 10, 2016, Epstein emailed Cecile de Jongh to ask "how did our candidates do?"  Cecile de Jongh responded that "[t]en of the twelve candidates that we gave contributions to won" and that she "personally raised funds for two candidates … whom STC did not contribute to and they won as well."  She also attached a list of candidates and stated that "the names in **bold** and above the line the line [sic] are the winners."  JPMC Ex. 214; JPMC Ex. 215.

210.    On February 16, 2018, Cecile de Jongh emailed Epstein regarding upcoming elections and candidates and stated that his "best bet is to give wide but nominal support in the primary to solidify relationships and then strongly support the winner of the primary going into the general election."  JPMC Ex. 216.

211.    On October 2, 2018, Cecile de Jongh emailed Richard Kahn that she "discussed the political contributions with him.  I asked about writing checks from STC and he said to talk to you but his guess is yes" and includes a list of four candidates:  Alicia Barnes, Donna Frett-Gregory, Stedmann Hodge Jr., and Athneil Bobby Thomas.  Kahn replies that he "spoke with jee yesterday and ok to cut all checks (4) from STC."  Ms. de Jongh forwards that email to Una Pascal and asks her to "cut the checks ($1,000 each) indicated below."  JPMC Ex. 217.

████████████████████████████   ██████████████

212.     Cecile de Jongh agreed to list her telephone number on the DCCC website as the contact information for donations from Jeffrey Epstein.  JPMC Ex. 218.

213.     On November 9, 2018, Ms. de Jongh emailed Jeanne Brennan copying Richard Kahn with the subject "PAC Check."  She asks Ms. Brennan to "[p]lease prepare a check in the amount of $25,000 to the below entity from STC as per JE . . . From Adriane Dudley:  The Pac is Islands Engaged, Inc. ██████████████████████████████"  JPMC Ex. 219.

214.     On November 10, 2014, Cecile de Jongh wrote to Epstein that the "Mapp campaign is going to take the $ that you gave to attack John" and asked: "Can we stop payment on the check to send a message?"  JPMC Ex. 220.

215.     On September 1, 2016, Epstein asked to prepare a check to donate $75,000 to a super PAC associated with Governor Kenneth Mapp.  JPMC Ex. 221; JPMC Ex. 208 at 197:17-198:20.

216.     On December 18, 2014, Sebastiano Palewonsky Cassinelli wrote to Cecile de Jongh "[r]egarding a contribution to the Mapp-Potter Inaugural Committee" and stated the Committee "would welcome any donation that Mr. Epstein would be so inclined to make."  Cecile de Jongh then wrote to Epstein to confirm that he wanted "to donate $10,000 to the Mapp-Potter Inaugural committee and that it should come from Southern Trust."  JPMC Ex. 222; JPMC Ex. 223 at 101:25-103:3.

217.     On December 20, 2018, Cecile de Jongh wrote to Epstein regarding a request from the Bryan/Roach Inaugural Committee for a $25,000 donation from Epstein for inaugural events.  JPMC Ex. 315; JPMC Ex. 203 at 172:11-176:5.

218.    On August 29, 2016, Ms. Una Pascal emailed Ms. Cecile de Jongh that "[Epstein] added three more Senators to the list" after "he met with the Governor last week in St. Croix." JPMC Ex. 225.

219.    In January 2014, at the request of Cecile de Jongh, Epstein donated $15,000 to the Special Events Fund for Governor John de Jongh related to Governor de Jongh's State of the Territory reception.  JPMC Ex. 226; JPMC Ex. 208 at 186:3-187:17; JPMC Ex. 224 at 101:6-103:21.

220.    Epstein paid $10,000 to USVI Senator Celestino White to consult on changing the name of one of Epstein's islands.  JPMC Ex. 228; JPMC Ex. 208 at 102:6-13, 106:20-107:13; JPMC Ex. 229.

221.    From January 2007 to January 2015, Cecile de Jongh was the First Lady of the USVI.  JPMC Ex. 208 at 16:9-17:16.

222.    Cecile de Jongh was the manager for two of Epstein's USVI-based businesses, FTC and STC.  JPMC Ex. 224 at 39:25-40:11.

223.    In 2007, Cecile de Jongh was paid $200,904 in salary, bonuses, and other benefits for her work as a manager for one of Epstein's USVI-based businesses.  JPMC Ex. 230.

224.    Between 2000 and 2014, Epstein paid over $325,000 in tuition payments for John and Cecile de Jongh's children to attend the Antilles school, and more than $300,000 for their children to attend Skidmore and American universities.  JPMC Ex. 231; JPMC Ex. 230; JPMC Ex.233; JPMC Ex. 234; JPMC Ex. 224 at 142:3-144:5.

225.    On September 21, 2010, Cecile de Jongh wrote to Epstein that she and Governor John de Jongh "have put money into the campaign based on what [they] thought was going to happen with the tuition payments."  JPMC Ex. 235; JPMC Ex. 224 at 144:13-145:24.

226.    On September 25, 2015, Epstein wrote to Cecile de Jongh to offer to lend money to Governor John de Jongh "so he immediatly has it [sic]" in connection with a criminal case brought against Governor de Jongh. Epstein stated he would "play any role in this you guys like" and stated he would "gladly be on thephone (anonymouse) with john quinn and the prosecutor offering suggestions. [sic]" JPMC Ex. 236; JPMC Ex. 208 at 159:3-160:25.

227.    On December 27, 2015, Governor John de Jongh wrote to Epstein to state that he was "near to an agreement on the [USVI Department of Justice's] acceptance of $380k" and that Governor de Jongh "would like to take [Epstein] up on [his] offer and request to borrow $215k." JPMC Ex. 237.

228.    Epstein loaned Cecile de Jongh and John de Jongh $200,000 related to a criminal case brought against Governor John de Jongh. JPMC Ex. 208 at 89:23-92:7; JPMC Ex. 224 at 39:15-21; 82:7-18; 292:22-298:24.

229.    On June 27, 2017, Governor John de Jongh wrote to Epstein to "again express my appreciation and thank you for the assistance at a very difficult time, it made matters much easier." JPMC Ex. 238.

230.    After Epstein's death, Cecile de Jongh was provided a lump sum payment of $305,763.89 in severance payments for her termination from Southern Trust Company. JPMC Ex. 239.

231.    On November 19, 2019, Cecile de Jongh emailed Jeanne Brennan with the subject "Talking Points." The attachment, "11.19.19 Talking Points," contains talking points for requested severance, and states that "all the employees were loyal to Jeffrey Epstein"; that "we are put a[t] further disadvantage to the loyalty that was exhibited"; and that "[t]he requested severance is not a pay-off but an acknowledgement of our tenure with the company and its early

████████████████████████████████                    ████████

dissolution while we transition to other employment.  (Cannot be seen as a pay-off as we were

not complicit in any acts.)."  JPMC Ex. 240; JPMC Ex. 241.

232.     On February 5, 2015, Cecile de Jongh emailed Lesley Groff to ask her to

"[p]lease include on JE's schedule a meeting with former Senator Celestino White on Tuesday,

February 10th at 2 PM at the STC Office.  The POC will be me."  JPMC Ex. 242.  On February

11, 2015, Cecile de Jongh wrote to Epstein stating he "might want to consider putting [USVI

Senator] Celestino [White] on some sort of monthly retainer" because it would "get [Epstein] his

loyalty and access."  JPMC Ex. 243; JPMC Ex. 208 at 107:20-109:12.

233.     From 2002 through 2006, Financial Trust Company "spent more than $5.4 million

into the local economy."  JPMC Ex. 245 at VI-JPM-000021922.

234.     On January 12, 2017, Sharon McCollum, the Commissioner of the USVI

Department of Education wrote to Everett Barnes, who worked for RMC Research Corporation,

and Cecile de Jongh, "I have asked Mrs. deJongh to include her employer, Jeffery Epistien [sic],

in reviewing a list of potential donors to see if he is familiar with individuals to facilitate 'inside'

contacts.  RMC will supply a list of possible contacts for review.  We are planning a meeting,

February 19, 2017, to bring to the table all parties that can assist DOE with making this vision a

reality."  JPMC Ex. 247.

235.     On January 17, 2017, Everett Barnes wrote to Cecile de Jongh copying Sharon

McCollum, the Commissioner of the USVI Department of Education, with the subject

"Introduction; DOE Public Private Partnerships."  He writes:  "We will need 'influencers,' like

Mr. Epstien [sic] and others, who can open the doors and get the Commissioner an audience . . . .

It would be wonderful if we could build a small core group of 'influencers' who have a personal

commitment to the VI and who would be willing to provide some resources to get some

initiatives off the ground without all the politics and bureaucracy associated with govt or foundation funding." JPMC Ex. 247; JPMC Ex. 248.

236.    On February 27, 2017, Ms. Karen Pulliam Turnbull, of the Office of the Commissioner for the USVI Department of Education, wrote to Ms. Cecile de Jongh "Commissioner McCollum requested that I contact you relative to your assurance to speak with Mr. Jeffrey Epstein regarding other individuals who the Department of Education can possibly contact for funding." JPMC Ex. 249.

**B.    Epstein Gave USVI Government Officials And Entities Non-Monetary Benefits**

237.    Cecile de Jongh stayed at Epstein's apartment in New York for about a month in 2017. JPMC Ex. 250; JPMC Ex. 208 at 42:17-24.

238.    In February 2017, Epstein wrote Cecile de Jongh to state that "the vi govt is desperate for cash" and asked if former Governor John de Jongh knew of USVI government properties that could serve as collateral for a $50 million dollar loan from Epstein. Cecile de Jongh stated that she would "get a list of GOVI properties." JPMC Ex. 251; JPMC Ex. 208 at 202:23-206:2; JPMC Ex. 224 at 342:14-346:19.

239.    Governor Kenneth Mapp testified that he discussed eCommerce issues with Epstein and asked him for assistance in "spreading the word that the Virgin Islands had" a "unique attribute that it was pushing for business investment" regarding "a redundant platform that was tied in by fiber-optic and undersea cables into Florida and into New York" that could benefit businesses. JPMC Ex. 223 at 119:2-120:7.

240.    Governor Mapp testified that he sought "Epstein's advice about how to increase business investment in the Virgin Islands." JPMC Ex. 223 at 120:21-122:7.

241.     Governor Mapp testified that he sought Epstein's advice on "how to be successful in issuing what was some really critically-needed bonds for financing some critical financing needs of the territory." JPMC Ex. 223 at 40:2-42:21.

242.     Governor Mapp testified that he sought Epstein's assistance in legislative efforts to allow EDC beneficiaries to repatriate their income to make USVI's EDC program more attractive. He further testified that William Blum, one of Epstein's attorneys, helped draft legislation regarding these repatriation efforts. JPMC Ex. 223 at 61:22-65:23.

243.     On December 20, 2019, Celina D. Morris emailed Ms. Cecile de Jongh with the subject "Introduction to the VIEDA Business Ambassador." She attached a "letter from VIEDA CEO, Kamal Latham, requesting your company's assistance with promoting the VIEDC tax incentive program, as well as introducing you to our Business Ambassador, Yolanda Bryan. Ms. Bryan is available to assist you with any challenges you may encounter as you do business in the U.S. Virgin Islands. She will be contacting you to schedule a meeting in the new year." JPMC Ex. 246.

### C.     USVI Had Knowledge Of Epstein's Crimes

244.     In October 2007, Page Six published an article titled "Epstein's Tropic Isle of Babes," which stated that the "sordid sex scandals surrounding Jeffrey Epstein are making waves in the Caribbean, where the billionaire owns a private 900-acre getaway and has deep financial ties to the governor of the U.S. Virgin Islands." The article further stated that Epstein "regularly ferried boatloads of young women there." JPMC Ex. 252.

245.     USVI's 2010 sex offender file on Epstein contained a copy of a Daily Beast article titled "Billionaire Pedophile Goes Free" that Florida law enforcement faxed to USVI DOJ in July 2010. JPMC Ex. 253 at 74:24-75:16; JPMC Ex. 254 at 12215. Among other things, it

█████████████████████████████████████     ████████████████████████

stated that Epstein had a "private Caribbean island," that victims made allegations about trips

"out of state and abroad on Epstein's private jets" that would have been evidence of sex

trafficking, that the FBI's investigation reached as far back as 2001, and that the FBI had

identified roughly 40 victims.   JPMC Ex. 253 at 75:16-76:21; JPMC Ex. 254 at 12215.

246.    The Government's 30(b)(6) witness on sex offender monitoring, Ms. Inais

Borque, testified that the Government was aware of the contents of Epstein's sex offender files,

including the Daily Beast article.   JPMC Ex. 253 at 75:17-76:21.

247.    On May 1, 2009, Jane Doe No. 102 filed a lawsuit in the Southern District of

Florida alleging that Epstein was transporting victims to the USVI.   JPMC Ex. 255.

248.    On January 13, 2015, the Guardian published an article titled "Jeffrey Epstein's

Donations to Young Pupils Prompts US Virgin Islands Review."  It stated that the USVI was

going to "review its corporate sponsorships after it emerged that Jeffrey Epstein, the convicted

sex offender and friend to Prince Andrew, gave gifts to school pupils and financed events for

young children."  The article further stated that a woman had alleged that she was "made to

engage sexually with Andrew at Epstein's Virgin Islands property."  JPMC Ex. 201 at 1, 2.

249.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████   JPMC Ex. 256, JPMC Ex. 257; JPMC Ex. 258 at

42:10-44:02.

250.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ JPMC Ex. 259 at 61109. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ JPMC Ex. 259 at 61132-61144.

251.    On January 26, 2017, Jane Doe 43 filed a lawsuit in the Southern District of New York against Epstein and others alleging that she was required to perform sexual acts on Epstein in the USVI and that on one occasion after suffering verbal abuse and threats by Epstein and others she attempted to escape from his private island only for a search party to locate her and physically return her to the main house on the island.  JPMC Ex. 260 ¶¶ 42, 46.

252.    Ms. Pinney testified that anyone, including USVI DOJ, could have run a search for online media articles on Epstein.  JPMC Ex. 261 at 222:18-223:12.

253.    Former Attorney General Denise George testified that she reviewed civil complaints against Epstein when she became the Attorney General.  JPMC Ex. 262 at 74:19-76:25.

254.    Former Attorney General Carol Thomas-Jacobs testified that she is "sure the Virgin Islands would be aware of any national press accounts."  JPMC Ex. 263 at 127:13-17.

255.    Attorney General Carol Thomas-Jacobs further testified that if the USVI knew of allegations in civil lawsuits they had a "responsibility to follow up" on the allegations.  JPMC Ex. 263 at 131:3-132:4.

**D.    USVI's Lax Sex Offender Monitoring Of Epstein Facilitated His Crimes**

256.    USVI's 30(b)(6) witness on sex offender monitoring, Ms. Shani Pinney, testified that there was never any investigation by USVI DOJ into Epstein.  JPMC Ex. 261 at 207:9-208:24.

███████████████████████████████        ██████████

257.   Ms. George testified that when she became AG in April 2019, there was a lot of information "swirling around the media" with respect to what had been occurring on LSJ, and USVI DOJ was receiving a lot of media inquiries on the subject.  JPMC Ex. 264 at 159:9-162:2, 164:3-171:17; JPMC Ex. 262 at 75:2-76:25.

258.   She "want[ed] to find out what happened because . . . this thing went by for so many years" which was "mind-boggling."   JPMC Ex. 264 at 163:07-16.  She started to make "inquir[ies]" into the allegations, including inquiring with USVI DOJ, and the USVI Police Department to find out if there were any complaints about Epstein.  During the same period, she started keeping up with media reports and civil lawsuits involving Epstein.  JPMC Ex. 264 at 164:3-171:17; JPMC Ex. 262 at 75:2-76:25.

259.   Ms. George testified that USVI DOJ did not have the resources it needed to investigate Epstein.  JPMC Ex. 264 at 164:3-170:3.

260.   The USVI's 30(b)(6) witness, Ms. Shani Pinney, testified that budget constraints did not "in any way" impact USVI's ability to monitor Epstein.  JPMC Ex. 261 at 126:7-129:2.

261.   In April 2009, First Lady Cecile de Jongh wrote to Epstein about transferring his parole from Florida to USVI.  Ms. de Jongh wrote that she "forwarded the document [he] sent [her] last week to John and he tried to send it to Vincent" but it was "corrupted – Vincent can't open either."  Later in the email chain, Epstein resends the attachment and she writes, back "Thanks – sending again to John . . . John will email to Vincent."  JPMC Ex. 265.

262.   Governor John de Jongh testified that he emailed the parole request to the Attorney General and told the First Lady to speak directly to the Attorney General about it.  JPMC Ex. 224 at 227:19-25, 228:12-229:7.

263.   First Lady Cecile de Jongh testified that she never spoke to the Attorney General about it but that the Governor did and relayed to her how Epstein should proceed as to the parole request.  JPMC Ex. 208 at 163:1-164:9.

264.   The Attorney General claimed he had no memory of the outreach by either of the de Jonghs regarding transferring Epstein's parole to the USVI.  JPMC Ex. 266 at 39:20-40:16.

265.   On May 15, 2011, Ms. de Jongh forwarded an email to Epstein with "suggested language" for USVI's Sex Offender Registration and Notification Act (SORNA) legislation. The original sender information is cutoff, but the author writes:  "I considered the language you shared with me.  I believe this language may be best.  We need to be able to know whether a person is at the address or not.  To waive the notice requirement all together will not be acceptable to the federal DOJ program managers.  Remember they must review and determine if we are in compliance.  This is the suggested language; will it work for you?"  JPMC Ex. 267 at 024493.  Epstein replied that "we should add out of country for more than 7 days, otherwise I could not go for a day trip to Tortola ,at the last minute."  JPMC Ex. 267.  Ms. de Jongh replies that "This needs to be settled by Thursday because J goes away for a week and AG needs to submit by June 1.  Don't want to email back and forth."  JPMC Ex. 267.

266.   On May 18, 2011, Ms. de Jongh emailed Epstein "If you could only change one thing in the bill, what would it be?  The question of your 'top priority' came up."  Epstein replies that "I would add that the attorney general can waive the notice requirement if the offenders vocation requires more than three intl trips per year."  JPMC Ex. 268.

267.   On June 19, 2012, Ms. Maria Hodge, Epstein's attorney, emailed Attorney Ayala, the legal counsel to the USVI legislature, the following:  "As promised, I attach a copy of my

notes on the amendments to the bill I understand Senator Russell has agreed to support . . . ."
JPMC Ex. 269; JPMC Ex. 270; JPMC Ex. 271; JPMC Ex. 266 at 9:8-22.

268.     On June 22, 2012, Ms. Hodge emailed Wayne Anderson, a USVI DOJ legal counsel, and Monica Carbon, legal counsel to the Attorney General.  Ms. Hodge writes that "in a phone call I received from the AG today . . . we had discussed communicating with Attorney Carbon about" the legislation.   Ms. Carbon responds with USVI's "counterproposal" to the legislation that Attorney Carbon had requested.  JPMC Ex. 272.

269.     On June 25, 2011, Ms. Hodge emailed USVI Senator Ronald Russell, blind copying Epstein, that she believes that Attorney Carbon's "counter-proposal" still has "a number of problems."  She states that she sent the "attached compromise proposal to Attorney Carbon" and that it was specifically prepared to cover the "DOJ concern that there be no off island travel without some notice, even in emergency situations, but to allow notice by expedited means in those cases, and also to adopt some reasonable criteria for frequent travelers."  She states that she hopes he will "offer this language rather than the draft the DOJ prepared."  JPMC Ex. 227; JPMC Ex. 273.

270.     Ms. Hodge's counterproposal requests the following exceptions to the 21-day requirement:  "provided, however, that a sex offender who provides reasonable and reliable proof satisfactory to the Department of Justice, that he travels outside the United States frequently for work or other legitimate purposes, and a sex offender who travels outside the United States for emergency situations, shall notify the [DOJ] prior to departure, by telephone or in writing, of travel outside the United States for periods of forty-eight (48) hours or less, and shall notify the [DOJ] in writing at least twenty four (24) hours before traveling outside of the United States for periods of more than forty-eight (48) hours, and, in any such case, shall notify

████████████████████████████          ████████████

the [DOJ] in writing upon the sex offender's return to this jurisdiction; and provided further, that

the Attorney General may at his discretion reduce the twenty-one (21) day notice requirement if

a sex offender requests such a reduction and provides information in support of the request,

satisfactory to the [DOJ][.]"  JPMC Ex. 273.

271.    Ms. Hodge's counterproposal also requests the following language concerning

information the sex offender must provide:  "Within twenty-one (21) days prior to travel away

from the Virgin Islands, the sex offender shall provide the information set forth below in writing

to the Department of Justice, provided, however, that a sex offender who provides reasonable

and reliable proof satisfactory to the Department of Justice that he travels frequently for work or

other legitimate purposes, and a sex offender who travels for emergency situations, shall provide

such information to the Department of Justice prior to departure by telephone or in writing, for

travel away from the Virgin Islands for periods of forty-eight (48) hours or less, and shall

provide such information in writing to the Department of Justice in writing . . . at least twenty

four (24) hours before traveling away from the Virgin Islands for periods of more than forty []

eight (48) hours; and provided further, however, that the Attorney General may at his discretion

reduce this twenty-one (21) day notice requirement if a sex offender requests such a reduction

and provides information in support of the request:  (i) identifying information of the temporary

lodging locations, including addresses and names, or, in the case of a sex offender who provides

reasonable and reliable proof to the [DOJ] that he travels frequently for work or other legitimate

purposes, reliable information regarding general travel locations and areas of work in lieu of

specific addresses, and contact telephone information at which the sex offender can be contacted

without unreasonable delay at all times while traveling from the Virgin Islands, and (ii) the dates

████████████████████████

the sex offender will be staying at each temporary lodging location, or in such general locations and areas of work." JPMC Ex. 273.

272. Ms. Monica Carbon, legal counsel to the Attorney General, stated that at the time she was not concerned about receiving input from Ms. Hodge on the sex offender legislation because she "knew that anything submitted had to be approved by US DOJ." JPMC Ex. 274; JPMC Ex. 261 at 54:14-55:14.

273. Ms. Pinney testified that "anyone seeing that draft [sex offender legislation outside of DOJ] would . . . have been a problem definitely" and that she "definitely" would have been "surprised" to hear that it had been shared with Epstein. JPMC Ex. 261 at 294:10-296:7.

274. First Lady de Jongh testified that she spoke to her husband, Governor de Jongh, about Epstein's preferences for the SORNA legislation. JPMC Ex. 208 at 165:19-166:24. She testified that she never spoke with the Attorney General about Epstein in relation to the legislation, but her husband did. JPMC Ex. 208 at 165:19-166:24.

275. Governor de Jongh initially testified that he never spoke to the First Lady or the Attorney General regarding Epstein and the proposed legislation. JPMC Ex. 224 at 245:10-12, 242:25-244:07. After being confronted with documents, he acknowledged speaking to both Ms. de Jongh and the Attorney General regarding Epstein and the proposed legislation. JPMC Ex. 224 at 270:17-278:7.

276. Attorney General Frazer claimed not to recall any interactions with the Governor or First Lady regarding the sex offender legislation. JPMC Ex. 266 at 178:6-179:2.

277. Attorney General Frazer testified that he believes that at some point a compromise was worked out between Epstein's team and USVI DOJ on the language of the amendments. JPMC Ex. 266 at 173:5-25.

278.    Ms. de Jongh testified that Epstein's team and USVI DOJ reached an agreement

on the language of the amendments, but that Senator Russell changed his mind, and also that

Attorney General Frazer did not push hard enough for the agreed language.  JPMC Ex. 208 at

177:2-180:11.

279.    On June 28, 2012, the legislature of the USVI passed Act No. 7372, an act

amending chapter 86 of title 14 of the Virgin Islands Code, which contains the laws of the USVI

regarding the monitoring and tracking of sex offenders within USVI.  JPMC Ex. 275 at 65.

Governor de Jongh approved the bill on July 18, 2012.  *Id.* at 66.

280.    The Act deleted and replaced subsection 1724(b)(4) with the following language:

"All sex offenders required to register in this jurisdiction shall appear in person at the [DOJ] at

least twenty one (21) calendar days prior to any intended travel outside of the United States and

provide information about their intended travel as may be required by the Attorney General;

provided, however, that the Attorney General may at his discretion reduce this twenty-one (21)

day notice requirement if a sex offender requests such a reduction and provides information in

support of the request." JPMC Ex. 275 at 37.

281.    It also deleted and replaced subsection 1726(2)(b)(16) with the following

language:  "Within twenty-one (21) days prior to Travel for 7 days or more, the sex offender

shall provide the following information; provided, however, that the Attorney General may at his

discretion reduce this twenty-one [(]21) day notice requirement if a sex offender requests such a

reduction and provides information in support of the request.  (i) identifying information of the

temporary lodging locations including addresses and names, and (ii) the dates the sex offender

will be staying at each temporary lodging location. (iii) the Attorney General at his discretion

may require other information in lieu of the above information upon the request of a sex offender." JPMC Ex. 275 at 49.

282.    On July 1, 2012, Ms. de Jongh sent Epstein an email with the subject line "Next steps." She stated: "I know this was a horrible week and I am really sorry about how things panned out . . . However, all is not lost and [] we will figure something out by coming up with a game plan to get around these obstacles . . . We will need to work through Dowe and White to get this accomplished. In the mean time, we will work with Vincent to give the discretion for status quo for you – that's the least he can do." JPMC Ex. 276.

283.    On July 30, 2012, Epstein wrote to Ms. de Jongh: "I appreciate you keeping[] a close watch on the [V]incent issue. We will have to go for an amendment soon, I do not want to alienate him so he whispers in russells ear." JPMC Ex. 277.

284.    On December 14, 2012, another amendment to chapter 86 of title 14 passed, amending section 1724(b) as follows: "striking in paragraph (4) 'may be required by the Attorney General' and inserting 'provided in § 1726; however, a sex offender who provides reasonable and reliable proof satisfactory to the Department of Justice, that he travels frequently outside the United States for work or other legitimate purposes, or a sex offender who travels outside the United States for emergency situations, shall notify the Department of Justice prior to departure, by telephone or in writing, of travel outside the United States for periods of 48 hours or less, and shall notify the Department of Justice in writing at least 24 hours before traveling outside of the United States for periods of more than 48 hours, and, in any such case, shall notify the Department of Justice in writing upon the sex offender's return to this jurisdiction.'" JPMC Ex. 278 at 2.

285.    It also amended 1726(b) by "striking the language in (16) in its entirety and inserting new language that read as follows:  'A sex offender who provides reasonable and reliable proof satisfactory to the Department of Justice, that he travels frequently outside the United States for work or other legitimate purposes, and a sex offender who travels outside the United States for emergency situations, shall notify the Department of Justice prior to departure, by telephone or in writing, of travel outside the United States for periods of 48 hours or less, and shall notify the Department of Justice in writing at least (24) hours before traveling outside of the United States for periods of more than (48) hours, and, in any such case, shall notify the Department of Justice in writing upon the sex offender's return to this jurisdiction; however, the Attorney General may, at his discretion, reduce the 21-day notice requirement, if a sex offender requests such a reduction and provides information in support of the request, satisfactory to the Department of Justice. The information must include: identifying information of the temporary lodging locations, including addresses and names, or, in the case of a sex offender who provides reasonable and reliable proof satisfactory to the Department of Justice, that he travels for work or other legitimate purposes frequently, reliable information regarding general travel locations and areas of work in lieu of specific addresses, and contact telephone information at which the sex offender can be contacted without unreasonable delay at all times while traveling away from the Virgin Islands; and (ii) The dates the sex offender will be staying at each temporary lodging location, or in such general locations and areas of work. . . .'"  JPMC Ex. 278 at 2.

286.    In a July 25, 2012 letter, Attorney General Frazer informed Ms. Maria Hodge that he was granting Epstein a waiver of the 21-day notice requirement when he traveled outside of USVI.  The letter states that notice must be given to the DOJ no less than 72 hours before travel

███████████████████████████     █████████████████████████

and that it may be given in person, by facsimile correspondence which is signed by him, or by e-mail with an electronic signature.  JPMC Ex. 279 at -12263.

287.    In an August 14, 2012 letter, Attorney General Frazer informed Ms. Hodge that "[a]fter careful review of your letter giving additional information to support . . . Jeffrey Epstein's request" he was allowing Epstein to notify the DOJ of his intention to travel out of USVI within 24 hours prior to departure; to notify when he was staying in one of his stateside homes and to provide a current list and addresses of each of his stateside homes; when staying in a non-private lodging, to provide the specifics of the name, city and address of the establishment; and when he was staying in the home of an associate, to notify the department of the city and state or country in which he is temporarily staying and his period of stay in the jurisdiction. JPMC Ex. 279 at -12275.

288.    Ms. Pinney testified that she was not aware of any other sex offender who received or requested a more permanent waiver similar to what Epstein requested.  JPMC Ex. 261 at 306:8-21; 450:14-19.  She further testified that "I do want to say though – you said if they – if anyone ever made requests.  We got complaints all the time, you know.  So offenders, you know, complain about the frequency, everything all the time."  JPMC Ex. 261 at 306:8-21.

289.    Mr. Frazer testified that during his tenure as Attorney General he never granted special treatment to Epstein because of Mr. or Mrs. de Jongh.  JPMC Ex. 266 at 247:12-248:3.

290.    He considered (and continues to consider) Mr. de Jongh his friend.  JPMC Ex. 266 at 43:19-20; 243:11-13.

291.    Mr. Frazer testified that he gave Epstein the waiver based on the representations of Epstein's lawyers that he was a businessman, and online research Mr. Frazer's staff did for him.  JPMC Ex. 266 at 199:3-14; 252:23-253:18.

292.    Ms. Carbon does not recall "doing any research or work on this request for a waiver." JPMC Ex. 274. Ms. Pinney testified she does not know what was provided to Mr. Frazer in support of the waiver. JPMC Ex. 261 at 61:19-63:11.

293.    In a March 14, 2019 letter, Former Attorney General Thomas-Jacobs wrote to Epstein that "while provisions were granted in the past" USVI DOJ was now requiring notification of any travel outside of the U.S. Virgin Islands in person at USVI DOJ when Epstein was in USVI at least 21 calendar days prior to the travel. JPMC Ex. 280 at -12328; JPMC Ex. 263 at 39:23-40:15.

294.    Former Attorney General Thomas-Jacobs testified that she was "surprised" and "concerned" to see the waivers that had been granted to Epstein in the past. JPMC Ex. 263 at 39:3-20; 40:17-23. She testified that she "did not see anything in [his] file to support the waiver" and that the "better course" would have been to have him adhere closely to the statute. JPMC Ex. 263 at 23:21-24:2; 40:22-41:6.

295.    Ms. George testified that she reviewed Epstein's file and never saw proof of a legitimate reason for frequent travel and that that made her think that maybe Epstein did not have any. JPMC Ex. 262 at 214:14-216:4.

296.    A couple of weeks after Ms. George became Attorney General in April 2019, Governor Bryan approached her (either by phone or in person, she could not recall) to let her know that Epstein was planning to ask her to reinstate the notification requirements that had applied to him under Former Attorney General Frazer. He "expressed [a] position" on the request, and "encouraged" her to meet with Epstein's attorneys to discuss the request. JPMC Ex. 264 at 104:7-16; JPMC Ex. 262 at 173:19-174:13.

█████████████████████████████████     ███████████████████

297. After Ms. George had received the request, Governor Bryan texted her to remind her to make a decision on the request. JPMC Ex. 262 at 223:1-10.

298. Ms. George testified that she believes that such outreach was "improper" because the Governor should not have been involved in a law enforcement matter. JPMC Ex. 262 at 221:19- 222:14. She testified that it indicated to her that Epstein was "flexing his political influence over or with the Governor in an effort to get a favorable result in . . . a law enforcement issue" which was a "red flag"; that the "fact that the request was made on behalf of" a "convicted child . . . molester, [] predator" through "the Governor instead of the regular channels was . . . concerning"; and that it showed that it was the "Governor's priority" for "some reason" and that there "exist[ed] some degree of political influence" by Epstein over Governor Bryan. JPMC Ex. 262 at 219:21-221:24; 222:2-13; 232:05-235:13.

299. After denying Epstein's request, she sent an email to Governor Bryan explaining the reasons for her decision and explaining that the statute was there to "protect the community." She did so because she felt that Governor Bryan "needed an understanding as to the importance and the magnitude of the [notification] requirement." JPMC Ex. 262 at 229:06-230:11.

300. She testified that her refusal to reinstate the notification requirements "likely" impacted her standing with Governor Bryan, because she was "doing [her] job without respect to any political interference," and irrespective of what "political influence" Epstein may have had, and that that may have been the first time that Governor Bryan was faced with that. JPMC Ex. 262 at 236:23-238:9.

301. Ms. Pinney testified that USVI DOJ never asked for Epstein's lawyers input into what Tier he should be classified as. JPMC Ex. 261 at 329:17-330:15; 333:7-12.

302.    On September 6, 2012, Darren Indyke wrote to Ms. Shani Pinney stating "As you requested when Mr. Epstein appeared at the Department of Justice on Tuesday, I have attached copies of Mr. Epstein's two U.S. Passports and a Memorandum explaining why Mr. Epstein qualifies as a tier 1 offender." JPMC Ex. 279 at -12286.

303.    Ms. Pinney testified that, although she thinks all sexual offenses are "serious alike," the statute classifies certain crimes at higher tier levels depending on the "details of the case." JPMC Ex. 261 at 230:23-231:18.

304.    Epstein served a 13-month sentence and was convicted of solicitation of a minor. JPMC Ex. 11; JPMC Ex. 12.  Under USVI's Sex Offender Legislation, a "Tier 1" offense includes any sex offense that is not a "Tier 2" or "Tier 3" offense.  JPMC Ex. 281, § 1721B(a)(1).  And a Tier 2 offense includes any sex offense against a minor that involves "the use of minors in prostitution, including solicitations."  *Id.* § 1721B(b)(2).

305.    A summary of a meeting with Ms. Carbon indicates that Ms. Carbon "want[ed] him to be classified higher but . . .  believed they weren't able to put him as a level 3."  JPMC Ex. 274.  It also states that Ms. Carbon "can't recall whether she considered [his] 13 month sentence when looking at the tier assignment for Epstein" and "can't recall" her analysis about the fact that solicitation of minors is designated as a Tier 2 offense under the statute.  JPMC Ex. 274.  It further states that she "can't recall the process to which a tier was assigned" nor "who made the determination but believed it was likely her."  JPMC Ex. 274.

306.    Ms. Pinney, USVI's 30(b)(6) designee on sex offender monitoring of Epstein, testified that she did not know why Epstein was classified as a Tier I offender and did not know anyone else in the USVI government who would know or could explain what the basis for classifying Epstein as a Tier I was.  JPMC Ex. 261 at 324:11-325:10.

307.    Ms. Borque testified that sex offenders are "usually" checked "once a week," in addition to an "annual operation" that performs compliance checks for all of the offenders in that week.  Thus, she estimated that it was possible that "the average offender would be checked [] 50 times in a year because there's [sic] 52 weeks in the year."  JPMC Ex. 253 at 199:10-200:23.

308.    Ms. Pinney testified that there are no weekly checks; only the annual operation. JPMC Ex. 261 at 400:1-12; 441:10-21.

309.    Ms. Borque testified that "part of the reason for doing compliance checks" is so that "if an investigator is there and sees something suspicious, they can report it" and that more frequent checks make it less likely that offenders will engage in criminal activity because "they know they're being checked on."  JPMC Ex. 253 at 202:11-15; 205:3-14.

310.    Ms. Pinney testified that the purpose is to "confirm that what the offender has provided as their permanent residence, and also . . . their employer address . . . is true and [] correct."  JPMC Ex. 261 at 437:14-22.

311.    USVI DOJ performed a total of five compliance checks on Epstein.  JPMC Ex. 282; JPMC Ex. 253 at 220:2-7 (does not know of any compliance checks being lost for Epstein). Of those five checks, he was present on the island only once.  JPMC Ex. 282 at -12619-12620.

312.    None of the compliance boxes were checked "Needs Investigation" or "Not in Compliance".  JPMC Ex. 282.

313.    Ms. Thomas-Jacobs testified that investigators should have followed up after the issues with Epstein's compliance checks.  JPMC Ex. 262 at 114:11-115:21.  Mr. Frazer testified that he might have filed charges or a complaint in court had he known that Epstein was denying the investigators access to LSJ.  JPMC Ex. 266 at 217:15-218:21.

██████████████████████████████        ██████████████████████

314.    Ms. Pinney testified that even when an offender is not present they are not in

noncompliance, and that even though the policy was to follow up and check on an offender when

he wasn't there, USVI DOJ lacked access to a boat so it could not do so for Epstein.   JPMC Ex.

261 at 407:9-410:4.

315.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

JPMC Ex. 304.

316.    ██████████████████████████████████████████████

██████████████████████████████████████   JPMC Ex. 261 at 419:07-

420:10; JPMC Ex. 283.

317.    Ms. Pinney is not aware of any follow-up actions that were taken to respond to the

tip about Epstein's criminal activity.  JPMC Ex. 261 at 420:11-421:3; JPMC Ex. 258 at 51:5-

52:14.

318.    When asked if she found the complaint credible, she testified that she "made the

decision to forward it on;" and that it "may have been" credible but also that the offender was

"very questionable."  JPMC Ex. 261 at 443:14-444:07.

319.    Ms. Borque testified that this sex offender is "known for sending these kind of

threatening emails."  JPMC Ex. 253 at 233:16-234:05.

320.    Ms. Thomas-Jacobs agreed that the USVI "should have" followed up on the

private chef's email and that "audio and video of what was going on on Little St. James would be

of interest if there were interest in finding out whether Mr. Epstein was engaged in any sexual

misconduct."  JPMC Ex. 263 Jacobs Tr. at 125:23-126:16.

███████████████████████████████████████████

**E.     Government-Affiliated Officials Gave Epstein Influence And Access In Ways That Facilitated His Crimes And His Transport of Victims**

321.    Epstein leased hangar space from the Virgin Islands Port Authority ("VIPA") for his aircrafts.  JPMC Ex. 284.

322.    Cecile de Jongh negotiated a lease with VIPA for a hangar for Epstein's aircrafts. JPMC Ex. 208 at 16:3-8.

323.    VIPA granted one of Epstein's employees a VIPA badge, allowing ramp access at a USVI airport with a VIPA escort.  JPMC Ex. 285.

324.    An Epstein employee was granted a U.S. Customs and Border Protection Security Seal.  That seal allowed the employee to "escort passengers through U.S. Customs & Border Protection."  JPMC Ex. 286 at -44492.

325.    Cecile de Jongh and Governor John de Jongh enlisted Epstein's support in having Carlton Dowe appointed as the Executive Director of VIPA.  JPMC Ex. 287; JPMC Ex. 208 at 96:8-98:15; JPMC Ex. 224 at 127:23-129:11.

326.    On several occasions, Epstein had meetings with Executive Director Dowe. JPMC Ex. 288.

327.    Governor de Jongh testified that VIPA "over[saw] all the airports and the seaports in the Virgin Islands," was responsible for security within USVI's airports, and oversaw the airport's security officers.  JPMC Ex. 224 at 129:24-131:3.

328.    USVI's expert Bridgette Carr ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████  JPMC Ex. 289  at ¶¶ 222-24.

329.    On June 22, 2010, Epstein wrote to Cecile de Jongh to ask "who is [in] charge of customs in the v.i." and stated that he "used to have a great relationship with gloria Lambert the airport supervisor."  He additionally stated: "there is a mr carpenter ,who has been difficult lately."  Cecile de Jongh responded that she "spoke to Kenn" who would call the head of customs, Louis Harrigan, to find out who Mr. Carpenter was and discuss with Epstein later. JPMC Ex. 290; JPMC Ex. 208 at 84:1-86:21.

330.    Kenn Hobson was the "head of VIPA" at one point in time.  JPMC Ex. 208 at 60:5-6.

331.    Epstein sought Cecile de Jongh's assistance to gift the 78 customs employees in the St. Thomas Customs and Border Protection office a turkey for Thanksgiving.  JPMC Ex. 291.

332.    Cecile de Jongh said that it would be "ok" for Epstein to give that gift to the customs officers.  JPMC Ex. 291; JPMC Ex. 208 at 86:22-87:11.

333.    Cecile de Jongh did not check with anyone before stating it would be "ok" for Epstein to gift turkeys to customs officers in the USVI.  JPMC Ex. 208 at 87:12-88:17.

334.    On January 24-25, 2011, Epstein wrote to Cecile de Jongh and Richard Kahn to ask if there was an EB5 visa regional center in the USVI.  Cecile de Jongh responded that she was "trying to find out from someone at Immigration (Hillary Hodge, Special Agent in Charge)." JPMC Ex. 292.

335.    On March 6, 2012, Cecile de Jongh wrote to Epstein that she had spoken to an attorney, Vince Fuller, "pertaining to the immigration matter" for a female individual employed by Epstein.  JPMC Ex. 293.

336.     Cecile de Jongh assisted Epstein in enrolling three women in English as a Second Language ("ESL") courses with the University of the Virgin Islands ("UVI").  JPMC Ex. 294; JPMC Ex. 295; JPMC Ex. 296; Ex. 208 at 131:3-15.

337.     Cecile de Jongh worked with Dionne Jackson, the Vice President for Institutional Advancement at the UVI, to help enroll three women in ESL classes with the UVI.  JPMC Ex. 296 at 20207-20209.

338.     As part of the process for enrolling the young women in ESL courses, Cecile de Jongh wrote to Epstein on May 29, 2013 to ask: "What kind of visas do these ladies currently have?"  She additionally suggested that the women could enroll in the UVI to acquire an I-20 form for a student visa if required.  Epstein responded that Renata had an F-1 visa and Julia had a B-1 visa.  JPMC Ex. 296.

339.     An I-20 form is required for a citizen of a foreign country to obtain a student (F or M) visa. The form must be "present[ed] … to the consular officer when [a person] attend[s] [their] visa interview."  JPMC Ex. 297.

340.     On June 27, 2013, Cecile de Jongh wrote to Epstein to state that UVI was "structuring the class around the ladies" in regard to the ESL classes in which she helped Epstein enroll three women.  JPMC Ex. 298.

341.     On November 22, 2013, Ms. Jeanne Brennan emailed Ms. Cecile de Jongh "The 2 five thousand $ checks we wrote to UVI are still outstanding.  Do you think we should follow up. They were written in August."  JPMC Ex. 299.

342.     On February 10, 2015, Cecile de Jongh emailed Epstein information on how an individual could obtain an I-20 form through the UVI for a student visa.  JPMC Ex. 300.

███████████████████████████████████     ████████████████

343.    On May 11, 2015, Cecile de Jongh wrote to Carlton Dowe in connection with a

letter of support for an O-1 visa application for a woman named ████████.  She provided him

"████████ resume and the visa guidelines" and asked him to "[p]lease let me if you are willing

to do this and then we can talk about sample letters."  JPMC Ex. 301.

344.    On June 21, 2016, Cecile de Jongh was copied on an email with the subject

"Jeffrey has given me Schedule!"  in which Lesley Groff emails that Jeffrey "will go to the

island on Monday June 27th" and states "████ I know you will be on holiday June 24-July 1.

Will all be ok?"  Ms. ████████████ replies "I might just drop off the girls and come back to

STT."  Copied on the email are several of Epstein's victims, including ████████████████,

████████████, ████████████████ and ████████████.  JPMC Ex. 302.

345.    On February 13, 2014, Cecile de Jongh emailed Thomas Mukamal, the CEO of

Island Global Yachting Facilities Ltd., which owned American Yacht Harbor, ████████████

████████, with the subject "AYH P dock" that "I have been giving this subject some thought

and I think you should consider having Celestino White go with you and Jamie to the hearing.  I

do not think the members of the CZM Commission will go against Celestino.  Just a thought."

Mr. Mukamal writes back "I had already discussed the matter with Celestino and asked for his

advice as it was developing – I will see if he is available."   Ms. de Jongh replies "Ok. Great.  I

think he can be very helpful."   JPMC Ex. 303; JPMC Ex. 87 at -6475, -6482.

346.    In April 2014, Epstein and Cecile de Jongh discussed "a new practice act"

regarding dental licenses that would have "significant changes and allowances for reciprocity"

with Deborah Richardson-Peter, the Director for the Office of Professional Licensure and Health

Planning at the USVI Department of Health.  Richardson-Peter discussed the issue during a

phone call with Epstein and conferred with the dental licensing board for additional information

for Epstein. She wrote that the new act was "slated to go before the Senate Committee on health on May 9th, once that process is vetted the board will have a clearer idea on what her options are moving forward." JPMC Ex. 305.

347.    On May 27, 2015, Cecile de Jongh wrote to Epstein: "Bad news re the dental licensure rules and regs – the AG's office does not have them" and stated she would "let Donald know via text and await his response." She additionally stated that the "Acting Solicitor General is a good friend of mine, Mac Davis" and that once she received a response from Donald, she would "alert Mac and try to get it fast tracked." JPMC Ex. 306.

348.    On August 5, 2015, Cecile de Jongh wrote to Epstein that Celestino White "is going to work on" ▮▮▮▮▮▮ dental licensing issue and that she "sent him some of ▮▮▮▮ s info." She additionally wrote that White had stated "that it would be easier for him to look into and resolve these things for you if he had a contract with a retainer so that he could state to whomever that he has your permission to have info released to him." JPMC Ex. 307.

349.    Between September 30, 2015 and October 1, 2015, Epstein and Cecile de Jongh exchanged emails regarding the dental license application for ▮▮▮▮▮▮. Epstein asked if he should call Randy Knight, the Governor's Chief of Staff, regarding the application. Cecile de Jongh suggested that he should not because "Randy is not exactly a light touch or diplomatic and I don't want the board members to feel that they are threatened into approving ▮▮ a." She stated that she had reached out to Deborah Richardson-Peter and would "call every day" and would "call Donald as well" regarding ▮▮▮▮ application. JPMC Ex. 308.

350.    ▮▮▮▮▮▮ USVI dental license was approved in November 2015. JPMC Ex. 309.

F.    **USVI Funded The Businesses It Claims Were Fronts For Sex Trafficking By Granting Them $300M In Tax Incentives**

351.    The USVI has alleged that "Epstein formed an association in fact with both companies and non-profit organizations he owned and operated" to aid his criminal efforts.  The USVI has specifically alleged that one of these companies was STC, which received economic benefits from the USVI Economic Development Commission ("EDC"), and acted "as a conduit for payment to foreign women, credit cards, airplanes, and other instrumentalities."  JPMC Ex. 310 ¶¶ 24-28.

352.    Margarita Benjamin testified on behalf of the USVI government that the USVI Economic Development Authority ("EDA") is a "semiautonomous entity under the Government of the U.S. Virgin Islands."  JPMC Ex. 311 at 24:9-24:14.

353.    Benefits awarded by the EDA must be approved by the Governor of the USVI. JPMC Ex. 224 at 154:6-155:4.

354.    Governor John de Jongh approved the award of EDC benefits to STC in 2012. JPMC Ex. 224 at 167:9-168:12.

355.    Governor John de Jongh approved a renewal of benefits to FTC.  JPMC Ex. 224 at 176:10-16.

356.    Governor John de Jongh testified that the governor's office's review of EDC benefits applications for approval involved "reviewing the decision that the board made to make sure they complied with Economic Development Authority rules and regulations."  JPMC Ex. 224 at 155:5-14.

357.    Governor John de Jongh testified that, when considering EDC benefit applications, he would "review the cover memorandum … of what was provided" by legal counsel and "may get a little bit more into the activities and understand the type of business" that was applying.  JPMC Ex. 224 at 157:5-13.

358.    Governor John de Jongh testified that, when reviewing applications, he would not "reach out to the person who is applying to ask them questions" and would not "look at the financial projections that they submitted."  JPMC Ex. 224 at 157:20-25.

359.    Governor John de Jongh testified that he would "look if – the overview would provide the business, the type of activity.  I may or may not look at the application just to understand if it was an unusual business" and that he would review "[t]he legal opinion, making sure it is consistent with the rules and regulations, looking at the business activity, looking at the economic development, diversification that was taking place in the territory."  JPMC Ex. 224 at 157:14-19; 158:15-21.

360.    Governor de Jongh testified that if the underlying business activity struck him as "unusual," "I would, then, more than likely not call the individual.  I'd probably call my attorney and ask him to look into it" and they would "report back" to Governor de Jongh.  JPMC Ex. 224 at 159:10-17.

361.    Governor John de Jongh testified that he was looking to see if the business activity "was unusual" and that, as an example, one year they had "someone that applied that wanted to do manufacturing.  We don't have very many manufacturers in the Virgin Islands, so I just looked at the application to make sure I understood.  Some were looking at foreign destinations to sell their products.  I wanted to see, you know, what percentage of their business activity they were looking at.  Was it – did they consider the U.S. foreign or where are they selling?  So I would look at things like that."  JPMC Ex. 224 at 158:22-159:12.

362.    When approving benefits for Financial Trust, including considering Epstein's criminal conviction in conjunction with those benefits, Governor John de Jongh testified that he

"went solely on the recommendations of the [Governor's] staff – of my legal counsel." JPMC Ex. 224 at 161:4-13.

363. When considering the EDC applications for FTC and STC, Governor John de Jongh testified that he did not "find any of their activity unusual" and did not "ask anyone to do any further investigation into them." JPMC Ex. 224 at 159:18-160:4.

364. Governor de Jongh testified that he "didn't give … much thought beyond" the recommendation of the EDC and his legal counsel to Epstein's character when approving EDC benefits for FTC. JPMC Ex. 224 at 188:14-190:14.

365. Governor Albert Bryan was the Chairman of the EDC when FTC's application for a renewal of benefits was approved in 2012. JPMC Ex. 312 at 17987.

366. Governor Albert Bryan was the Chairman of the EDC when STC's application for benefits was approved in 2014. JPMC Ex. 313 at -18010.

367. The original benefits granted to FTC by the EDC in 1999 awarded FTC a 100% reduction in income taxes. JPMC Ex. 314.

368. When FTC's benefits were extended, FTC was granted an 81% reduction in income taxes by the EDC. JPMC Ex. 314 at -19064; JPMC Ex. 312 at -17988.

369. In 2013, the EDC awarded a certificate to STC granting a 90% reduction in income taxes. JPMC Ex. 314 at 19065; JPMC Ex. 313 at 18011.

370. Through the EDC program, the EDC granted over $300 million in tax breaks to FTC and STC. JPMC Ex. 90 ¶ 60, Exhibit 1.

371. JPMC's expert Carlyn Irwin has opined that "from 1999 to 2018, neither Financial Trust nor Southern Trust came close to generating sufficient benefits to USVI to offset

the tax incentives granted to Mr. Epstein and these companies let alone reach the thresholds the

EDC considered      .'"  JPMC Ex. 90 ¶¶ 59-66.

     372.    When Governor de Jongh approved the award of EDC benefits to STC, his wife

Cecile de Jongh was an employee of EDC.  JPMC Ex. 224 at 174:8-10.

     373.    The Special Conditions for STC as part of its EDC benefits that were approved by

Governor de Jongh mandated that STC "provide its full-time employees and dependents with

one hundred percent employer paid medical insurance coverage" as well as other benefits,

including tuition reimbursement.  JPMC Ex. 224 at 173:21-175:25.

     374.    On June 30, 2009, while Epstein was incarcerated in Florida, Cecile de Jongh

signed a certification related to FTC's benefits received from the EDC stating that Epstein was a

bona-fide resident of the USVI.  JPMC Ex. 316 at -13521-13522.

     375.    On several occasions, official correspondence from the EDA and EDC related to

benefits awarded to Epstein's companies was addressed to Cecile de Jongh.  JPMC Ex. 317;

JPMC Ex. 318; JPMC Ex. 319; JPMC Ex. 232.

     376.    Sandra Bess, the EDA Program Compliance Officer who oversaw the compliance

reports for FTC and STC, testified that the person she "dealt with" was Cecile de Jongh as the

office manager for FTC and STC.  Those interactions included during unannounced visits when

she would "ask to see the compliance person" and would speak with de Jongh.  JPMC Ex. 320 at

36:1-17.

     377.    On April 10, 2012, in response to a media request received by Governor John de

Jongh regarding Cecile de Jongh's employment with FTC while it was EDC benefits, Cecile de

Jongh suggested to Epstein that the response be: "Cecile de Jongh currently works for Financial

Trust Company in the capacity of office manager.  She had nothing to do with Financial Trust

███████████████████████████████

Company receiving EDC Tax benefits." Epstein responded that "he would simply state that [Cecile de Jongh is] an office manager," to which Cecile de Jongh responded: "That's what John went with." JPMC Ex. 321.

378.   Governor de Jongh did not "perceive any conflict of interest in approving benefits" for Epstein's companies for which his wife, Cecile de Jongh, was an employee. JPMC Ex. 224 at 162:19-25.

379.   Governor de Jongh did not request that legal counsel provide an opinion on any potential conflict of interest related to his approval of benefits for companies for which his wife was an employee. JPMC Ex. 224 at 163:1-10.

380.   Governor de Jongh testified that he was not aware of any investigation undertaken to assess any potential conflict of interest related to his approval of benefits for companies for which his wife was an employee.  JPMC Ex. 224 at 163:20-164:1.

381.   Governor de Jongh did not request any assessment of any potential conflict of interest related to his approval of benefits for companies for which his wife was an employee. JPMC Ex. 224 at 163:11-19.

382.   Margarita Benjamin, testifying on behalf of the USVI government, testified that no investigations into Epstein and his companies were undertaken by the EDC other than normal compliance audits.  JPMC Ex. 311 at 56:22-57:22.

383.   On January 7, 2015, USVI EDA Director of Compliance Stephanie Berry wrote a letter to Epstein stating that, "[g]iven the current media discussions surrounding a principal of" STC, the EDA was requesting "an assessment of the potential impact, if any, on the business activities" of STC "as approved by the" EDC.  JPMC Ex. 322.

████████████████████████████████████   ████████████

384.   ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████   JPMC Ex. 259 at 61108-61109.

385.   Sandra Bess testified that compliance reports for EDC beneficiaries "should be done annually."  JPMC Ex. 320 at 15:9-13.

386.   The first compliance review of FTC was completed on April 17, 2008, covering "the period of April 1, 1999 to December 31, 2006."  JPMC Ex. 323.

387.   Sandra Bess testified that the compliance process for EDC benefits relied on "information provided by the certificate holder" and sought to confirm that numbers provided "in the cover sheet of the annual report matche[d] what the company ha[d] provided … in the support behind the cover sheet." JPMC Ex. 320 at 22:2-23:8.

388.   The compliance officer was not tasked with "reviewing the character of the people who are the owners of the companies receiving tax benefits."  JPMC Ex. 320 at 23:9-13.

389.   On January 24, 2019, Carlos Rodriguez emailed Ms. Cecile de Jongh with the subject "Carlos work obligations."  He stated the following:  "Greetings Cecile, her is a list of things Im doing for LSJ/GSJ and STC . . . Take care of STC vehicles and vehicles and vehicles at hangar, keep them fueled and clean.  Every time JE visits all his vehicles are washed and detailed, also hangar vehicles are washed and detailed.  Go on JE Denali to airport on his arrival to ensure there is a spare vehicle in case heli has issues , help with luggage and bring to red hook for pik up.  Keep hangar bedroom sheets always fresh laundered.  I bring them to lsj for washing and ironing . . . also been doing most shopping for LSJ/GSJ for most departments.  Some of my other obligations include, picking up guests and contractors from airport and bring them to and from to hotels and LSJ, some early morning some late at night.  I've been dealing with boat

██████████████████████████              ██████████████

repair contractors in Tortola to help Randy and Patrick.  I do all boat registrations, some pickups at tropical and anything requested from me."  JPMC Ex. 324.

390.    The public hearings of the EDC related to awarding benefits to EDC reflect that the Commissioners did not ask questions regarding Epstein's criminal history when considering an award of benefits to STC.  JPMC Ex. 325; JPMC Ex. 326; JPMC Ex. 327; JPMC Ex. 328; JPMC Ex. 329; JPMC Ex. 330.

391.    On October 2, 2019, Margarita Benjamin, the Managing Director of the EDA, wrote to EDA employees Joy Penn and Sandra Bess that questions regarding Epstein's receipt of benefits from the EDC "are opening us up to public scrutiny."  JPMC Ex. 331.

392.    A "Draft Report on USVIEDA Responses to Media Inquiries about Jeffrey Epstein and his businesses under the VI Economic Development Commission Tax Incentive Program" dated December 5, 2019 states that the USVI Economic Development Authority received 55 total inquiries from 8 publications, 1 television station, and 14 reporters and investigative journalists, "in relation to Jeffrey Epstein and his EDC businesses."   "Three (3) interviews were [also] conducted for the New York Times."   USVIEDA never reached out to law enforcement in connection with these inquiries.  JPMC Ex. 311 at 185:19-188:19; JPMC Ex. 332 at -22697.

393.    The EDC and EDA terminated STC's benefits early, effective December 31, 2019, at STC's request.  JPMC Ex. 333.

G.    **Cecile de Jongh Had Official Responsibilities Within the Government As First Lady**

394.    As First Lady of the USVI, Cecile de Jongh was the chair of the Children's Cabinet, which also included "senior government officials" from the Department of Education,

the Department of Labor, and the USVI police department.  The Children's Cabinet worked to implement government policy regarding children's issues.  JPMC Ex. 208 at 92:8-95:9.

395.    One of the initiatives of the Children's Cabinet chaired by Cecile de Jongh was to "make sure that every child caretaker, at least, had a high school degree, and that they worked towards an associate degree[.]"  JPMC Ex. 208 at 93:21-94:14.

396.    Cecile de Jongh testified that, as first lady, she was "very involved in the National Governors Association."  JPMC Ex. 208 at 19:3-19:9.

397.    Cecile de Jongh testified that, as First Lady, she had a Twitter account that was named "the official Twitter account of U.S. Virgin Islands' First Lady, Cecile de Jongh."  She further testified that she "didn't hire someone separate from the government to manage" the account and that it was likely managed by a government employee.  JPMC Ex. 208 at 22:3-23:17.

398.    Cecile de Jongh testified that she had a website as First Lady of the USVI that was set up by the public relations department for the Governor of the USVI.  JPMC Ex. 208 at 23:3-25:2.

399.    The website for First Lady Cecile de Jongh listed the address for the "Office of the First Lady" as the governor's office and the phone number for the general switchboard at the Government House.  JPMC Ex. 208 at 26:6-27:15.

400.    Cecile de Jongh testified that, as First Lady, she worked with protocol officials for the USVI Government House regarding social events related to her duties as First Lady.  JPMC Ex. 208 at 20:24-21:19.

401.    Cecile de Jongh testified that, as First Lady, she saw her role as "working on behalf of all the Virgin Islanders."  JPMC Ex. 208 at 26:3-26:5.

402.    On December 27, 2012, Carole Chapman, the Executive Assistant to the CEO of

the USVI EDA, emailed Jennifer Nugent-Hill and Percival Clouden of the EDA that the CEO

"had a call from the First Lady and she has asked that Epstein be on the Board agenda (public

hearing) for the January 9th meeting."  Cecile de Jongh testified that she called the CEO of the

EDA regarding placing Epstein's issue on the board agenda.  JPMC Ex. 334; JPMC Ex. 208 at

80:12-83:7.

403.    Governor John de Jongh testified that he "assum[ed]" that Cecile de Jongh

"tr[ied] to avoid things coming to [Governor de Jongh's] desk that would impact Epstein[.]"

JPMC Ex. 224 at 212:3-11.


Dated: August 7, 2023                              Respectfully submitted,

**MASSEY & GAIL LLP**                              **WILMER CUTLER PICKERING**
                                                   **HALE AND DORR LLP**

*/s/ Leonard A. Gail*                              */s/ Felicia H. Ellsworth*
Leonard A. Gail (pro hac vice)                     Felicia H. Ellsworth
Rachel Morse (pro hac vice)                        John J. Butts
50 East Washington Street, Suite 400               Andrés O'Laughlin
Chicago, IL 60602                                  60 State Street
(t) (312) 283-1590                                 Boston, MA 02109
lgail@masseygail.com                               (t) (617) 526-6000
rmorse@masseygail.com                              (f) (617) 526-5000
                                                   felicia.ellsworth@wilmerhale.com
*Attorneys for JPMorgan Chase Bank, N.A.*          john.butts@wilmerhale.com
                                                   andy.olaughlin@wilmerhale.com

                                                   Boyd M. Johnson III
                                                   Robert L. Boone
                                                   Alan E. Schoenfeld
                                                   Christopher Bouchoux
                                                   7 World Trade Center
                                                   250 Greenwich Street
                                                   New York, NY 10007
                                                   (t) (212) 230-8800
                                                   (f) (212) 230-8888
                                                   boyd.johnson@wilmerhale.com

robert.boone@wilmerhale.com
alan.schoenfeld@wilmerhale.com
christopher.bouchoux@wilmerhale.com

*Attorneys for JPMorgan Chase Bank, N.A.*