# EXHIBIT 261

```
 1            UNITED STATES DISTRICT COURT FOR THE

 2               SOUTHERN DISTRICT OF NEW YORK

 3               CASE NUMBER:  22-CV-10904-JSR

 4                    ACTION FOR DAMAGES

 5
    GOVERNMENT OF THE UNITED STATES      )
 6  VIRGIN ISLANDS,                      )
                                         )
 7                           Plaintiff,  )
                                         )
 8  VS.                                  )
                                         )
 9  JP MORGAN CHASE BANK, N.A.,          )
                                         )
10                           Defendant.  )
                                         )
11  -------------------------------------

12

13

14

15           VIDEO RECORDED DEPOSITION OF

16                  SHANI A. PINNEY

17                 30(B)(6) WITNESS

18              TUESDAY, JULY 18, 2023

19

20

21  REPORTED BY:

22  DENISE D. HARPER-FORDE
    Certified Shorthand Reporter (CSR)
23  Certified RealTime Reporter (CRR)
    Certified LiveNote Reporter (CLR)
24  Registered Professional Reporter (RPR)
    Notary Public (FLORIDA)
25
```



```
 1              door."  Did we want to do it that
 2              way?  No.
 3                  You know, we would have loved
 4              to.  And it was actually, you know
 5              -- like I said, we would love to
 6              be able to go into the home of
 7              every offender, including Epstein,
 8              when -- when he was registering.
 9                  But we came to the -- you
10              know, the decision that his dock
11              had to essentially be considered
12              as his -- as his front door.
13                  (BY ATTORNEY O'LAUGHLIN):
14              Q.  Why weren't you on the Friday
15      call with Ms. Carbon?
16              A.  Oh, I've been on family
17      vacation.  I just came back yesterday
18      evening.  I've been gone since July
19      5th.  So I wasn't available for the
20      call on Friday.  Actually Ms. -- the
21      E-mail invite for -- for that
22      meeting.
23              Q.  Okay.  So you were invited to
24      the meeting by your counsel, but you
25      didn't see the invite, and so didn't
```



 1  attend?

 2       A.  I wasn't able to -- I didn't

 3  see the invite.  So I wasn't able to

 4  attend.

 5       Q.  Okay.  And so your counsel

 6  took notes of the meeting and provided

 7  them to you?

 8       A.  I guess this goes back to who

 9  actually prepared this document.  I'm

10  not sure.  But this was provided to me

11  Attorney Ackerman.

12          And it was a -- and it is a

13  brief write-up of the meeting on

14  Friday with -- with Attorney Carbon.

15       Q.  How much time did you spend

16  going over this document, prior to the

17  deposition this morning?

18       A.  We met for about a half hour

19  yesterday, and then I received the

20  document afterwards.  Had a long day

21  of traveling.  I reviewed for about

22  five, ten minutes yesterday evening

23  after -- after our meeting last

24  night.

25       Q.  Did you ask any follow-up



```
 1    that he based that based on what was

 2    presented to him about Jeffrey

 3    Epstein.

 4            I want to think he never met

 5    with Epstein in regards to, you know,

 6    prior to making that decision.  I want

 7    to think that paperwork or documents

 8    were provided to him from Epstein's

 9    attorneys to show that he was a

10    business man, a financial advisor,

11    financial business man who had to

12    travel frequently.

13        Q.  So you said you want to think

14    that that's the answer.

15        A.  If I want to remember

16    correctly from that meeting, that is

17    what was discussed or that was what

18    was related from Attorney Frazer.

19        Q.  Okay.  So Attorney Frazer told

20    you that he was provided with

21    documents by Epstein's counsel --

22            ATTORNEY ACKERMAN:  Object.

23            (BY ATTORNEY O'LAUGHLIN):

24        Q.  -- and that's what he based

25    the determination that he was a
```



```
 1   business man on, which was then also
 2   the reason for granting the waiver; is
 3   that correct?
 4           ATTORNEY ACKERMAN:  Object to
 5        form.
 6           THE WITNESS:  Okay.  So he
 7        never -- I remember him saying
 8        that he never met with Epstein
 9        individually, but he did meet with
10        Epstein's attorneys.
11           I'm not sure if during those
12        meetings that they provided
13        documents.  But prior -- or after
14        his meeting with Epstein's
15        attorneys, he was satisfied
16        enough, you know, to conclude that
17        Epstein was a business man and he
18        granted him that permission.
19           (BY ATTORNEY O'LAUGHLIN):
20        Q.  Okay.  So he was satisfied
21   after a meeting with his attorneys,
22   but you don't actually know what he
23   was provided to support the business
24   man conclusion?
25        A.  I'm not 100 percent sure what
```



```
 1   he was providing.  No, I'm not.
 2         Q.  Okay.  And that didn't come up
 3   with your -- in your conversation with
 4   Mr. Frazer?
 5         A.  Overall what I remember is
 6   that he never met with Epstein.  But
 7   when he met with his attorneys and
 8   upon his review of Epstein and his
 9   businesses, he felt confidence that he
10   was a business man who had to travel
11   frequently.
12         Q.  What other topics were covered
13   in your meeting with Mr. Frazer?
14         A.  It was primarily that, you
15   know, since he was the AG who was
16   there when Epstein first began
17   registering and he was the first AG to
18   use his discretion, it was primarily
19   -- it was primarily based on that.
20         Q.  So it was primarily that.  But
21   what other topics were covered?
22             ATTORNEY ACKERMAN:  Object to
23         form, asked and answered.
24             THE WITNESS:  If I remember it
25         correctly, that was it.  Nothing
```



1    You know, so by -- by enhancing our

2    laws in 2012, that made us eligible to

3    -- us being the Virgin Islands --

4    eligible to receive funding for

5    employees to -- to monitor offenders

6    in the Virgin Islands.

7        Q.  Was that funding adequate to

8    do the job that you guys had to do?

9            ATTORNEY ACKERMAN:  Object to

10       form, scope.

11           THE WITNESS:  If it was the

12       pos- -- that funding was used for

13       salaries.  Other -- and funding

14       was also received from US Marshals

15       Services as well too, you know, to

16       purchase like iPads, you know, for

17       us to use to be able to monitor

18       offenders outside of the office.

19       You know, to be able to update the

20       registry, the online registry

21       outside the office as well too.

22           So from -- from V- -- from US

23       DoJ, that funding was used for

24       salaries, the salaries being, you

25       know, for the three positions.



1          And then VI DoJ also -- the

2          funding was also used to purchase

3          a SORNA vehicle as well too.

4               So, you know, that vehicle was

5          used to do com- -- was used to do

6          compliance checks, one for St.

7          Thomas and one for St. Croix.

8               So I would say yes, that that

9          funding was able to allow us to --

10         to allow DoJ to hire adequate

11         staff and then to also to purchase

12         vehicles to go out to do the

13         address verifications for the

14         offenders.

15              (BY ATTORNEY O'LAUGHLIN):

16    Q.   So US DoJ wasn't constrained

17   by resources in its monitoring of

18   offenders, correct?

19              ATTORNEY ACKERMAN:  Object to

20         form, scope, misstates prior

21         testimony.

22              THE WITNESS:  No.

23              (BY ATTORNEY O'LAUGHLIN):

24    Q.   No, it wasn't constrained or

25   no, you disagree?



1              ATTORNEY ACKERMAN:  Same

2        objection.

3              THE WITNESS:  Repeat the

4        question for me, please.  You're

5        saying if funding constraints VI

6        DoJ from perform -- from

7        adequately monitoring offenders in

8        the Virgin Islands?

9              ATTORNEY O'LAUGHLIN:  Yes.

10             THE WITNESS:  And to that

11        question, I would say no, that we

12        were able to monitor the offenders

13        that were here in the Virgin

14        Islands.

15             (BY ATTORNEY O'LAUGHLIN):

16        Q.  Okay.  So resource constraints

17   did not limit VI DoJ's ability to

18   monitor the individuals who were

19   registered with it?

20             ATTORNEY ACKERMAN:  Objection

21        to form.  Misstates prior

22        testimony, and scope.

23             (BY ATTORNEY O'LAUGHLIN)

24        Q.  Correct?

25        A.  We were not limited, no.



```
 1          Q.   Okay.   In any way?
 2          A.   In any way.
 3               ATTORNEY ACKERMAN:   Same
 4          objection.
 5               (BY ATTORNEY O'LAUGHLIN):
 6          Q.   Okay.   When did DoJ first
 7    become aware of Jeffrey Epstein?
 8               ATTORNEY ACKERMAN:   Objection
 9          to form, scope.
10               THE WITNESS:   VI DoJ first
11          became aware of Epstein, that
12          would have been before I came on.
13          But like any offender, once they
14          notify DoJ that they -- that they
15          are moving here or working here.
16               So I will assume that -- and
17          also from the -- from the
18          documents that -- that they were
19          first notified of Epstein when he
20          was living here in the Virgin
21          Islands.
22               (BY ATTORNEY O'LAUGHLIN):
23          Q.   So was it when he was -- just
24    when he was living here or when he
25    registered as a sex offender?
```



```
 1            investigation can only be launched

 2            if someone launches -- if someone

 3            files a criminal Complaint.  I'm

 4            understanding that to be a

 5            Complaint being filed locally, you

 6            know, with VI DoJ or you know,

 7            with VIPD.

 8                (BY ATTORNEY O'LAUGHLIN):

 9            Q.  Why does it need to be a

10    locally filed Complaint?

11            A.  I'm saying that's what I

12    understand and --

13                ATTORNEY ACKERMAN:  Hold on.

14            Objection, scope.  You can go

15            ahead.

16                THE WITNESS:  Yes.  I'm saying

17            that's what I understand, you

18            know, the AG's meaning to be here

19            in this sentence.  Nothing was

20            ever filed directly with VI DoJ or

21            VIPD to launch an investigation.

22                (BY ATTORNEY O'LAUGHLIN):

23            Q.  And DoJ's position is that

24    unless something was filed directly

25    with them, there was no need to do any
```



```
 1   kind of investigation into Epstein?
 2              ATTORNEY ACKERMAN:  Objection
 3        to form, scope.
 4              THE WITNESS:  Yeah.  You know,
 5        it cannot be a -- no hearsay.  It
 6        cannot be rumors, whispers.  It
 7        has to actually be someone
 8        actually filing a Complaint.
 9              That would have been the
10        means, you know, for any sexual
11        offender to start spark an
12        investigation or you know, if
13        information was shared directly,
14        you know, with the victim you know
15        to VI DoJ.  It would have to have
16        been dir- -- it would have had to
17        have been direct communication.
18              (BY ATTORNEY O'LAUGHLIN):
19        Q.  Did anyone within DoJ ever
20   push for more to be done with respect
21   to investigating Epstein?
22              ATTORNEY ACKERMAN:  Objection
23        to form, scope.
24              THE WITNESS:  No.
25              (BY ATTORNEY O'LAUGHLIN):
```



```
 1   disposition, it wasn't easy for me to
 2   get information, to get that basic
 3   information.
 4            So I'm not sure if I had
 5   reached out for this sort of
 6   information, if it would have been,
 7   you know, granted to VI DoJ.  So I
 8   really cannot say.  I'm not sure what
 9   lengths EDA went to get this
10   information.  I'm not sure.
11            (BY ATTORNEY O'LAUGHLIN):
12       Q.  Okay.  There's -- if you keep
13   flipping, page 31 in the document,
14   there's a section of the investigation
15   that says "Online media search:
16   Jeffrey Epstein."
17       A.  Uh-huh.
18       Q.  And the summary says, "The
19   investigation revealed numerous online
20   negative references to Jeffrey Edward
21   Epstein, but the following two
22   negative online sources provided
23   current" substantive -- "substantive
24   overview of the nature of those
25   reports."
```



```
 1              Is there any reason that DoJ
 2     could not have run searches to look at
 3     public media reports?
 4              ATTORNEY ACKERMAN:  Objection
 5     to form, scope, foundation.
 6              THE WITNESS:  If there's any
 7     reason why VI DoJ could not have
 8     conducted this same search and got
 9     this same information?  Any one can do
10     a search.
11              (BY ATTORNEY O'LAUGHLIN):
12        Q.  Okay.
13        A.  If it's -- if it's leaning --
14        Q.  Oh, sorry.
15        A.  I'm sorry.
16        Q.  No.  I didn't --
17              ATTORNEY ACKERMAN:  Finish
18     your answer, please.
19              THE WITNESS:  I was going to
20     say if it's leaning into a Yahoo or a
21     Google search would have been enough
22     to trump an investigation, I still --
23     I can't say that would have been
24     enough.  I don't think that that would
25     have been enough.
```



1           Q.  And it's dated June 30th,

2     2008, correct?

3           A.  Yes.

4           Q.  So earlier when you testified

5     that USVI DoJ made a request to

6     Florida for certain information about

7     the underlying criminal case, was --

8     were these the documents that came

9     back?

10          A.  Yes.

11          Q.  Okay.  And what did you learn

12    from these documents?

13          A.  We learned what -- we learned

14    what he was found guilty of, the

15    crime.

16          Q.  And what crime was that?

17          A.  Procuring person under 18 for

18    prostitution.

19          Q.  Is that a serious crime?

20          A.  I would say all sexual

21    offenses are serious crimes regardless

22    of what tier they fall into.

23          Q.  Are some more serious than

24    others?

25                ATTORNEY ACKERMAN:  Object to



```
 1   form.
 2            THE WITNESS:  According to the
 3   statute, they determine which tier an
 4   offense falls into.  What I want to
 5   say, more serious because I think all
 6   offenses, all sexual offenses are all
 7   serious alike.
 8            But according to the victim's
 9   age, according to if it was forcible
10   rape or, you know, statutory rape,
11   that will determine what tier it falls
12   into.  So I don't want to say ser- --
13   I think, like I said before, all
14   offenses are serious.
15            But according to the details
16   of the case, the details of the
17   offense, you will see certain cases at
18   the higher tier levels.
19            (BY ATTORNEY O'LAUGHLIN):
20       Q.  Is this one of those cases?
21       A.  At a high --
22            ATTORNEY ACKERMAN:  Object to
23   form.
24            THE WITNESS:  Can you repeat
25   that, please?
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1        Q.  Do you know if Epstein was
 2   involved at all in the legislation in
 3   2012?
 4        A.  No.
 5             ATTORNEY ACKERMAN:  Object to
 6   form, scope.
 7             THE WITNESS:  Repeat the
 8   question, please.
 9             (BY ATTORNEY O'LAUGHLIN):
10        Q.  Do you know if Epstein was
11   involved at all in the passage of the
12   2012 legislation?
13             ATTORNEY ACKERMAN:  Object to
14   form, scope.  You can answer.
15             THE WITNESS:  No.
16             (BY ATTORNEY O'LAUGHLIN):
17        Q.  Do you know whether drafts of
18   the legislation were provided to
19   Epstein?
20             ATTORNEY ACKERMAN:  Same
21   objection.  You can answer.
22             THE WITNESS:  No.
23             (BY ATTORNEY O'LAUGHLIN):
24        Q.  Do you know whether he
25   commented or expressed a view on what
```



1  the legislation ought to contain?

2              ATTORNEY ACKERMAN:  Same

3  objection.  You can answer.

4              THE WITNESS:  No.

5              (BY ATTORNEY O'LAUGHLIN):

6      Q.  Would you be surprised if

7  drafts were shared with him?

8              ATTORNEY ACKERMAN:  Objection,

9  form, scope.

10             You can answer.

11             THE WITNESS:  If I would be

12  surprised?  Definitely.

13             (BY ATTORNEY O'LAUGHLIN):

14     Q.  Why?

15     A.  Because that was within DoJ.

16  That was something that we were

17  working on within DoJ.  If it was --

18  if it was shared with anyone outside

19  of DoJ, that would have been a

20  surprise to me.

21     Q.  Would it have been

22  problematic?

23             ATTORNEY ACKERMAN:  Object to

24  form, scope.

25             THE WITNESS:  If an offender



1  saw the draft that was being created

2  by VI DoJ for the sex offender

3  registration laws, if that would have

4  been problematic?  I would say -- I

5  would say anyone seeing that draft

6  would -- would have been a problem

7  definitely.

8           ATTORNEY ACKERMAN:  Good time

9  for a break?  Whenever you're ready.

10           ATTORNEY O'LAUGHLIN:  Sure.

11  Let's pause there.

12           ATTORNEY ACKERMAN:  Okay.

13           VIDEOGRAPHER:  Off the record

14  at 3:26.

15              (Off the record)

16              (Back on the record)

17           VIDEOGRAPHER:  On the record.

18  The time is 3:43 P.M.

19           (BY ATTORNEY O'LAUGHLIN):

20      Q.  So we were looking at Exhibit

21  12 before we took a break.  And I'd

22  like to refer you Bates 12263 within

23  Exhibit 12.

24           This is a letter dated July

25  25th, 2012, from Attorney General



```
 1              (BY ATTORNEY O'LAUGHLIN):
 2         Q.  No you don't know or you don't
 3   think they were?
 4         A.  If other offenders were
 5   granted this, I would have been aware,
 6   since I was registering the
 7   offenders.
 8         Q.  Okay.  And you're not aware of
 9   any other offenders that got these
10   sorts of waivers?
11         A.  No.
12         Q.  Okay.
13         A.  I do want to say though -- you
14   said if they -- if anyone ever made
15   requests.  We got complaints all the
16   time, you know.
17              So offenders, you know,
18   complain about the frequency,
19   everything all the time.  So it was --
20   just wasn't to the extent, you know,
21   of this.
22         Q.  What was the reason for the
23   original regime of having the 21-day
24   notice requirement?
25              ATTORNEY ACKERMAN:  Object to
```



 1   offense, correct?

 2        A.  I don't agree with the last

 3   part.  Because I cannot say what it

 4   was classified as, because it simply

 5   wasn't just looking at the crime, the

 6   title of the crime was also -- I

 7   remember it was also looking at the

 8   breakdown of the statute as well too,

 9   where it detailed, you know, exactly,

10   you know, what that crime entailed.

11        Q.  So who within the USVI

12   Government knows the answer to the

13   question of why Jeffrey Epstein was

14   classified as a Tier 1 offender?

15             ATTORNEY ACKERMAN:  Object to

16   form.

17             THE WITNESS:  Who would know

18   why?

19             (BY ATTORNEY O'LAUGHLIN):

20        Q.  Yes.

21        A.  I am not sure.  I remember

22   that we passed them on to attorneys,

23   namely Attorney Carbon.  That --

24   that's who we passed them on.  I'm not

25   sure if she had an assistant who



```
 1   assisted her in regards to the

 2   classifications, another attorney who

 3   assisted her.

 4        Q.  So you're not aware of any

 5   person who would know the answer to

 6   why the USVI Government classified

 7   Epstein as Tier 1?

 8             ATTORNEY ACKERMAN:  Object to

 9   form.

10             THE WITNESS:  No.

11             (BY ATTORNEY O'LAUGHLIN):

12        Q.  Okay.  Let's look at Bates

13   12283 within Exhibit 12.

14        A.  Exhibit 12.  Can you repeat

15   the page number, please?

16        Q.  Yeah.  It's 12283.

17             So this is a legal memorandum

18   to you from Darren Indyke, Epstein's

19   attorney, copying Monica Carbon, dated

20   September 6, 2012.  And the subject is

21   "Jeffrey Epstein's qualification as a

22   Tier 1 sex offender."

23             Do you see that?

24        A.  Yes, I do.

25        Q.  If you look at the last
```



 1  do not recall or having to request a

 2  memorandum explaining why Epstein

 3  would have been a Tier 1 offender,

 4  according to his review.

 5        Q.  So your testimony today is

 6  that -- do you recall asking for the

 7  passports, the copies of the

 8  passports?

 9        A.  I would have quicker asked for

10  that.  That sounds more practical, you

11  know, because we needed to collect

12  from offenders all of their -- all of

13  their official IDs, you know.

14           So that was a part of what we

15  did for all offenders.  I would have

16  needed his two passports.

17        Q.  And so your testimony sitting

18  here today is that what you likely

19  requested from Mr. Epstein was copies

20  of the U.S. passports, and then they,

21  his counsel, voluntarily  submitted a

22  memorandum regarding Mr. Epstein's

23  qualification as a Tier 1 offender?

24        A.  They were very proactive.  So

25  I'm saying that to say with all the



1   E-mails that, you know, is included,

2   yeah.  I think they probably took it

3   upon themselves to review their -- the

4   laws on their own, and then to

5   determine on their own what they felt

6   Epstein's classification should have

7   been.

8        Q.  So USVI DoJ never requested a

9   memorandum from Epstein's attorneys

10  regarding his classification as a Tier

11  1 offender?

12       A.  I never did.  And I don't

13  think anyone else from U.S. -- from VI

14  DoJ requested that from Epstein's

15  attorneys.

16       Q.  Do you know if the memorandum

17  sent on September 6, 2012, was

18  considered by USVI DoJ as part of its

19  determination of what tier to assign

20  to Jeffrey Epstein?

21       A.  What page is that again,

22  please?  I'm shuffling back and forth.

23       Q.  12283.

24       A.  12283.  So backwards now.  All

25  right.



1        A.   I think they did that outside
2   of this memorandum from Indyke.
3        Q.   Even though the E-mail says,
4   Here's the memo you requested?
5             ATTORNEY ACKERMAN:   Object to
6   form, misstates prior testimony.
7             THE WITNESS:   To me, the
8   E-mail says, As requested, the two
9   U.S. passports.   English is a very
10  funny language.   I think that he just
11  threw that part in there.   Not saying
12  that I requested a memorandum.
13            (BY ATTORNEY O'LAUGHLIN):
14       Q.   Okay.   And that's your
15  testimony here today?
16            ATTORNEY ACKERMAN:   Objection.
17  Of course it's her testimony.   I mean
18  --
19            ATTORNEY O'LAUGHLIN:   That's
20  not an objection.
21            ATTORNEY ACKERMAN:   Okay.
22  Fine.   Objection to form, improper
23  question.
24            THE WITNESS:   Oh, yes, that's
25  a yes.



```
1          A.  How frequent the sweeps occur?
2    There was no set-in-stone time for the
3    frequency of the sweeps to occur.  It
4    would be something where we were in
5    constant communication with the US
6    Marshals Services.  And they will let
7    us know, Hey, you know, this will be
8    the time for an upcoming sweep.
9          Q.  Do you have an estimate of how
10   frequently they occurred?
11         A.  I would say perhaps once a
12   year depending on funding.
13         Q.  Okay.  Funding from where?
14         A.  Funding that the US Marshals
15   Services received.  So the US Marshals
16   is Federal funding to conduct the
17   operational sweeps.
18         Q.  Okay.  And during a sweep,
19   what was the objective?
20         A.  The objective was to verify
21   the address of the -- that the sex
22   offender had on record as their
23   permanent residence.
24         Q.  What does verify mean?
25         A.  Verify, verification process
```



```
 1  follow-up.  We would have -- we might
 2  have circled back.  Remember, so we
 3  went from Sunday to Sunday.  If during
 4  that -- if we went on Monday and we
 5  weren't able to verify, we might
 6  circle back because again, you know,
 7  sometime during the days of the rest
 8  of the week, yes, we would have.
 9        Q.  Okay.  And if you weren't able
10  to make contact  during the sweep
11  week, would there be further
12  follow-up?
13        A.  There would be further
14  follow-up.
15            ATTORNEY ACKERMAN:  Object to
16  form, scope.
17            You can answer.
18            THE WITNESS:  Okay.  So after
19  the -- so yes, we -- efforts would
20  have been made to follow up again.  If
21  you are speaking pertaining to Jeffrey
22  Epstein, that's a different scenario
23  because VI DoJ does not own a vessel.
24            And to confirm the address for
25  Epstein, US Marshals Services, they
```



 1  would go about setting up, you know,
 2  the necessary accommodations that --
 3  that would have been needed to go out
 4  to Epstein's island.
 5          So if there was an incident
 6  where we attempted to complete a
 7  compliance check with Epstein and he
 8  was not on the island or he was not at
 9  work.  Let's say he was off island,
10  and that incident did happen at one
11  time.
12          It wouldn't have -- it would
13  have not been easy to just simply get
14  another boat, you know, two days later
15  to go back to verify his address.
16      Q.  Did you try?
17      A.  Did we try?  The US Marshals
18  Services, it was -- it was their
19  efforts.  So if they tried afterwards,
20  US Marshals Services, they were --
21  they were typically employed -- their
22  team came from Florida and from the
23  southern US.  So they were here at a
24  time within a time frame.
25          So if they weren't able to



```
 1  confirm with Epstein to complete his
 2  compliance check within that time
 3  period, they would have tried.  But
 4  once they went back, that was it.  You
 5  know, the operation ended at that
 6  point.
 7        Q.  And there wouldn't have been
 8  any further follow-up, correct?
 9        A.  Further follow-up in regards
10  to verifying his address?
11        Q.  Yeah.
12        A.  Well, if we go there and
13  Epstein -- remember I said before
14  another person in the home can, you
15  know, confirm that the offender was
16  living there.  Ideally we do want to
17  see the offender in person.
18           However, an offender not being
19  at the address does not -- does not
20  immediately mean that they are in
21  noncompliance or, you know, it -- it
22  wouldn't immediately mean they were in
23  noncompliance if -- within the team if
24  it was agreed that, okay, you know,
25  he's off island right now or, you
```



```
 1    know, we can meet him at his office,
 2    then that would have been enough to,
 3    you know, to -- at the time for, you
 4    know, during the week of the checks.
 5            Q.  You testified earlier that
 6    USVI DoJ SOR unit purchased a car?
 7            A.  Uh-huh.
 8            Q.  Why?
 9            A.  I testified earlier that the
10    vehicle was used to conduct the
11    verification checks --
12            Q.  So --
13            A.  -- the compliance checks.
14            Q.  So the car was only used
15    approximately once a year?
16            A.  No.  Remember I also said
17    that -- that during the year, we would
18    also verify the addresses of
19    offenders, you know, if they
20    relocated, if they had a new address.
21    Within that time, I think it's seven
22    days, that we would also go out to
23    verify their addresses.
24            Q.  Were there any other reasons a
25    car would be used?
```



1   this -- these pictures or evidence.

2            ATTORNEY O'LAUGHLIN:  Yes.

3            THE WITNESS:  I never did, but

4   I did share this

5   E-mail with investigators and also

6   with the criminal defense attorney.

7            ATTORNEY O'LAUGHLIN:  Let's

8   enter Tab 23 as Exhibit 23.

9            (Whereupon, Defendant's

10            Exhibit No. 23, E-mail, dated

11            February 25, 2019, was marked

12            for identification)

13            (BY ATTORNEY O'LAUGHLIN):

14       Q.  This is an E-mail from you,

15   and it's a forward of the E-mail we

16   were just looking at to an Anola

17   Duncan, Quincy McRae, Carol Jacobs,

18   copying Kevin Augustin; correct?

19       A.  Correct.

20       Q.  Was this what you were just

21   talking about as -- when you passed

22   this information along?

23       A.  Yes.

24       Q.  Who are you to the people on

25   this distribution list?



1        A.   Anola Duncan was the AG's

2   secretary.  Quincy McRae was the

3   criminal -- the chief over the

4   criminal division.  Carol Jacobs --

5   Carol Jacobs, she -- I don't see

6   Denise in here.

7              So Carol must have been the

8   acting AG, and Kevin Augustin was the

9   -- Kevin Augustin was the investigator

10  for SORNA.

11       Q.   Do you know what, if any,

12  follow-up they did in response to you

13  passing this information along?

14              ATTORNEY ACKERMAN:  Object to

15  form.

16              THE WITNESS:  I am not sure if

17  anything was done, followed up.  I'm

18  not sure if anything was done.  It --

19  I wasn't aware of it.

20              (BY ATTORNEY O'LAUGHLIN):

21       Q.   Okay.  So as far as you know,

22  you E-mailed it, but there was no

23  further follow-up?

24              ATTORNEY ACKERMAN:  Object to

25  form.



```
 1               THE WITNESS:  As far as I
 2   know, nothing else was relayed back to
 3   me about a follow-up to this E-mail.
 4               (BY ATTORNEY O'LAUGHLIN):
 5       Q.  Okay.  And did you follow up
 6   with any of them to be like, Hey, what
 7   happened with this?
 8               ATTORNEY ACKERMAN:  Object to
 9   form.
10               THE WITNESS:  There were other
11   follow-ups, but it was -- it was
12   pertaining to the same offender
13   sending threatening E-mails as well
14   too, referring to me as a monkey,
15   referring, you know -- you know, to us
16   being -- you know, very harsh
17   explicatives, you know, within the
18   E-mail.
19               So within this -- within this
20   -- this offender's file, there are
21   several other E-mails that he -- he
22   would send E-mails 3:00, 4:00 in the
23   morning.  But, you know, nonetheless,
24   I still forwarded this E-mail on
25   because he spoke about him having
```



 1   asked which works best for us.  But it

 2   was the Marshals Service who would

 3   essentially, you know, decide which

 4   dates were best.

 5          Q.  Okay.  And by the way, are the

 6   address verifications the same thing

 7   as the sweeps that you described, that

 8   you -- it was a term you used

 9   earlier?

10          A.  Yes.  So the US Marshals

11   Services, they titled those.  They

12   called the operation as Operation

13   Island Sweep.

14          Q.  Okay.  And when -- what is the

15   purpose of the sweep or the address

16   verification?

17          A.  The purpose is to confirm that

18   what the offender has provided as

19   their permanent residence, and also

20   instances may also be their employer

21   address, that that is true and -- and

22   correct.

23          Q.  Okay.  When you performed or

24   when the DoJ performed sweeps to

25   verify Mr. Epstein's address, did DoJ



 1  compliance because a search of their

 2  home was not required to complete that

 3  address verification.

 4        Q.  Okay.  Thank you.

 5            You testified earlier one of

 6  the things you did in preparation for

 7  this deposition was to review the

 8  testimony of Inais Borque, right?

 9        A.  Yes.

10        Q.  Okay.  There was testimony in

11  Ms. Borque's deposition about

12  performing weekly checks of offenders.

13  Do you recall that testimony?

14        A.  I do recall reading that in

15  her -- in her deposition, yes.

16        Q.  Okay.  Was it the practice of

17  the Virgin Islands DoJ SORNA office to

18  conduct weekly checks of sex offenders

19  during the time period that you worked

20  in that office?

21        A.  No, it was not.

22        Q.  Thank you.

23            I want to go through a few

24  exhibits, and I'll try to just go

25  quickly.  But let's start with Exhibit



 1   But do you know who the sex offender

 2   is?

 3        A.  Yes.

 4        Q.  Okay.  First let's look at the

 5   bottom E-mail.  What was the sex

 6   offender demand -- or was the sex

 7   offender demanding something from the

 8   DoJ SORNA office?

 9        A.  He was demanding to be removed

10   from the registry.

11        Q.  Okay.  Was this a frequent

12   demand from this individual?

13        A.  Yes.

14        Q.  Did you consider this

15   individual's statements regarding

16   claiming to have audio and video of

17   things going on on Little St. James

18   credible?

19        A.  I personally made the decision

20   to forward it on.  If it was

21   creditable, it may have been, but the

22   offender was very questionable.  He

23   was an habitual drug user, you know.

24   And a lot of his other E-mails would

25   come 3:00, 4:00, 2:00, 5:00 o'clock in



1   the morning, and very belligerent, you

2   know, very broken up, very cut-up

3   language, you know.  So anything can

4   be creditable.  That's why I forwarded

5   it on, you know.  But his -- as

6   an individual, he was very

7   questionable.

8        Q.  Okay.  Thank you.  You can put

9   that aside.

10        There was a lot of discussion,

11   or there was some discussion today

12   about warrants.  And I want to ask, in

13   your capacity in your work for the

14   SORNA unit, were you involved in

15   attempting to obtain warrants from

16   magistrate judges in the Virgin

17   Islands?

18        A.  Yes.

19        Q.  Describe just generally what

20   the nature of your involvement was.

21        A.  It wasn't always easy to get

22   those warrants.  That is why we

23   created that notification need to

24   register so it can be a clear document

25   that we attach along with the

Objection.
THE WITNESS: Directly, no. The AG entrusted that the SORNA -- that the SORNA employees and the investigators, that we were doing that. And of course, you know, we will meet with her if need be.
(BY ATTORNEY ACKERMAN):
Q. Okay. A lot of discussion today about waiver of travel requirements. Do you recall that, all that testimony?
A. Yes.
Q. Are you aware of any other sex offender in the Virgin Islands who requested a more permanent waiver similar to what Mr. Epstein requested?
A. To my knowledge, no.
Q. There was discussion about the tiering, the tier classification of Mr. Epstein, correct?
A. Yes.
Q. Okay. Does the tier class -- under Virgin Islands law, does the

