# EXHIBIT 262

1          UNITED STATES DISTRICT COURT FOR THE

2             SOUTHERN DISTRICT OF NEW YORK

3             CASE NUMBER:  22-CV-10904-JSR

4                   ACTION FOR DAMAGES

5

    GOVERNMENT OF THE UNITED STATES        )
6   VIRGIN ISLANDS,                        )
                                           )
7                          Plaintiff,  )
                                           )
8   VS.                                    )
                                           )
9   JP MORGAN CHASE BANK, N.A.,            )
                                           )
10                         Defendant.  )
                                           )
11  -------------------------------------

12

13

14

15           VIDEO RECORDED DEPOSITION OF

16                    DENISE GEORGE

17                     VOLUME II

18            THURSDAY, JULY 20, 2023

19

20

21  REPORTED BY:

22  DENISE D. HARPER-FORDE
    Certified Shorthand Reporter (CSR)
23  Certified RealTime Reporter (CRR)
    Certified LiveNote Reporter (CLR)
24  Registered Professional Reporter (RPR)
    Notary Public (FLORIDA)

25



```
 1   anything.  Any other types of contact
 2   that would not have anything to do
 3   with the litigation and the -- you
 4   know the enforcement action against
 5   him or against the Estate.
 6        Q.  Okay.  So have you ever spoken
 7   with former Attorney General Frazer
 8   about Epstein?
 9        A.  No.
10        Q.  Okay.  Have you ever spoken
11   with Governor -- former Governor Mapp
12   about Epstein?
13        A.  No.
14        Q.  And we have already talked
15   about you have spoken of course with
16   Governor Bryan.  We talked about that
17   on Monday, correct?
18        A.  Yes.
19        Q.  Okay.  You mentioned that as
20   part of the process that you undertook
21   when you assumed the position of AG
22   was you were curious and you went
23   looking for articles and information
24   about Epstein, correct?
25             ATTORNEY ACKERMAN:  Object to
```



```
 1   form.
 2             THE WITNESS:  What I -- that
 3   is not entirely what I said, as I
 4   indicated.  I didn't just start
 5   looking for articles on Epstein.
 6             Once I came on board as
 7   Attorney General in April, there was a
 8   lot of media allegations or reports
 9   and everything from the media.
10             Even inquiries from the media
11   with respect to allegations and
12   reports of misconduct, sex trafficking
13   and those things by Mr. Epstein on
14   Little St. James island.
15             And that allegations had been
16   going on for many years and a lot of
17   victims of this sex trafficking and
18   it's sex -- sexual exploitation.
19             These are reports that were
20   coming from the media, even members of
21   the media would be -- would have been
22   calling, and even before I got there.
23   And I was advised when I got there
24   that this was -- that there had been a
25   lot of inquiries with respect to that
```



 1  issue about, you know, Epstein's

 2  misconduct in the sex trafficking

 3  operation occurring on Little St.

 4  James.

 5          So having heard all of that --

 6  of course it was all what I consider

 7  hearsay, because you know it comes

 8  from just  reports from the media and

 9  everything.  I was of course

10  interested in looking because the

11  allegations were really horrific.

12          So I then started to really

13  not only inquire about whether we have

14  solid complaints.  But I started to

15  really -- you know just research, read

16  the news -- read the news articles,

17  media.  As well as reports from

18  regarding Courts and Court documents

19  that were available just to study and

20  to get a background.  And get a gist

21  of you know just whether or not you

22  know there's anything credible or

23  anything that occurred with respect to

24  this, to actually understand what went

25  on.



```
 1   E-mail, and then the second is the
 2   attachment to it.
 3        A.   Oh, okay.
 4             ATTORNEY O'LAUGHLIN:  In fact,
 5   Madam Court Reporter, if we could
 6   enter it as a single exhibit, that
 7   might be better, but defer to -- defer
 8   to you.
 9             THE WITNESS:  Okay.
10             (BY ATTORNEY O'LAUGHLIN):
11        Q.   Do you know who Jason Marsh
12   is?
13        A.   Yes.  Jason Marsh is a law
14   enforcement officer.  I think when I
15   became Attorney General in 2019, he
16   may have been acting police
17   commissioner at the time before
18   Governor Bryan appointed a police
19   commissioner.
20        Q.   Okay.  So Jason Marsh is
21   sending a PDF scan he's made of the
22   Virgin Islands Daily News source with
23   the title "Lawmakers issue call for
24   investigation of Epstein deal."
25             Do you see that?
```



```
 1              ATTORNEY ACKERMAN:  Object to
 2    form, foundation.
 3              THE WITNESS:  Give me a
 4    second.  Okay.  I see the second --
 5    page 2?
 6              ATTORNEY O'LAUGHLIN:  Yeah.
 7              THE WITNESS:  I'm looking at
 8    page 2 in 9.  That's -- that's dated
 9    Saturday, December 8th, 2019.
10              ATTORNEY O'LAUGHLIN:  Yes.
11    THE WITNESS:  I mean 2018.
12              THE WITNESS:  Okay.  Yes, I'm
13    seeing it.
14              (BY ATTORNEY O'LAUGHLIN):
15         Q.  And there's a paragraph that's
16    in the fourth column in from the left
17    that starts with the words "The
18    Herald's examination"?
19         A.  Okay.  It says, "The Herald's
20    examination," yes.
21         Q.  So it says, "The Herald's
22    examination of thousands of court
23    records, E-mails and FBI records also
24    showed that after the deal was struck,
25    it effectively shut down an ongoing
```



```
 1   is, but I don't know her.  I didn't
 2   even know her at this time.
 3        Q.  Okay.  So this is the first --
 4   this letter that you received is the
 5   first time you had interacted with
 6   her?
 7        A.  Yes.  I believe though that I
 8   may have been introduced to her a
 9   couple of years ago, before I was even
10   an AG at the -- but I'm not -- I'm not
11   sure.  I think she was in a group of
12   people.  But other than that, I've
13   never had any contact with her or
14   anything.
15        Q.  Okay.  And what was the reason
16   for the outreach?
17        A.  The reason for this?
18        Q.  Uh-huh.
19        A.  Well, as per Governor Bryan
20   telling me that you know Jeffrey
21   Epstein wants to have this waiver of
22   the travel requirements, and that he
23   said that his attorneys will be
24   contacting me, and encouraged me to
25   meet with the attorneys to consider
```



1   it.

2         I -- this must be the

3   follow-up letter.  In this letter in

4   their is a letter where she is

5   requesting on behalf of Jeffrey

6   Epstein for a waiver and for -- as she

7   indicated, a reinstatement of the

8   waiver that Attorney Vincent Frazer

9   had entered years ago, years before.

10  And I suppose a revocation of what

11  Thomas-Jacobs did.  So she went

12  through that whole thing about what

13  was done.

14      Q.  Were you aware of what the

15  previous conditions granted by

16  Attorney Frazer were?

17      A.  At this point I was, because

18  in anticipation of -- you know after

19  speaking with the Governor, I had

20  gotten -- as I indicated, I went to

21  the Deputy Attorney General, Attorney

22  Jacobs, to get that briefing, the

23  background.

24          And it was in getting that

25  from Attorney Jacobs, that yes, that



```
 1   answer.
 2        A.  Oh, okay.  I said that I'm not
 3   looking for any specific documents
 4   because I'm not.  I don't know what to
 5   look for.  You need to know what the
 6   proof is.  You know, because I looked
 7   at this, and it seems sort of silly to
 8   me because, you know, it's like you're
 9   making a motion -- it's like making a
10   motion before the court and then
11   asking the judge, Can you tell me,
12   judge, what I need to produce in order
13   to prove this so you can grant it.
14            I mean, it's -- whatever is
15   the proof that they have, only they
16   can have it.  I don't have it.  But if
17   they can't find proof that he has
18   engaged, or he has to be engaged in
19   legitimate business, or for legitimate
20   business purposes internationally to
21   the -- to the level that he is going
22   to need a waiver of the travel
23   requirements.  It's only for them to
24   know what that is.
25            And if they don't have it,
```



```
 1   then they don't have it.  But I just
 2   wanted to make it clear that that's
 3   the only way that I'm going to
 4   consider a  request if they submit
 5   that proof.  And if you don't know
 6   what that -- those documents are to
 7   prove that, that's -- it seemed to me
 8   that, well, maybe you don't have it.
 9             But I'm not going to answer
10   that question like what specific
11   things that you need when I don't
12   know.  That's for her to do.  That's
13   for the -- for Jeffrey Epstein to
14   do --
15        Q.  And --
16        A.  -- submit that proof.
17        Q.  And prior to receiving this
18   E-mail, you had looked through
19   Epstein's sex offender registration
20   file to see if there was any
21   reasonable and reliable proof;
22   correct?
23        A.  Based on what was in there.
24   Based on what was in there, I saw
25   nothing that convinced me that there
```



 1  was any reasonable or reliable proof.
 2  You know, nothing satisfied me with
 3  respect to that that would have
 4  warranted or justified any waiver.
 5          So as it was, that's why my
 6  decision was no, that I would not do
 7  it unless proof is shown.  But nothing
 8  was shown there.  And I just had to
 9  make it clear that unless they show
10  that, show proof and submit proof, I'm
11  not going to even consider it much
12  less act favorably on the request
13  irrespective -- and I said I realized
14  there was some political maneuvering
15  that he was doing.  Just the fact that
16  he as a sex offender got the Governor
17  to come to me for that request, which
18  is unusual.  Which I imagine is
19  unusual because a sex offender just
20  goes and applies to the Attorney
21  General directly if they want some
22  kind of a waiver.
23          So I know that was in play,
24  and I just wanted to again let them
25  know and reiterate that the only thing



```
 1    it is not so much a problem.  Using
 2    his political influence is what it
 3    appeared to me that Jeffrey Epstein
 4    was doing, was trying to use political
 5    influence that he may have had with
 6    the Governor in order to boost or help
 7    me to rule favorably.  And that's what
 8    I was thinking at the time.
 9              And so it just -- my position
10    was just to make sure that he knows
11    that is not happening.  I would not be
12    a part of that, and to let him know
13    what he'll need to submit.
14              (BY ATTORNEY O'LAUGHLIN):
15       Q.  What led you to think that
16    Epstein was exerting political
17    influence?
18       A.  Well, I think --
19              ATTORNEY ACKERMAN:  Object to
20    form.
21              THE WITNESS:  Well, for me
22    what -- what led me to think that is
23    just the fact that the Governor
24    approached me on behalf of him
25    requesting -- about this request
```



 1  saying that he requested it, that --

 2  that alone.  Because not every sexual

 3  offender or any person, you know, are

 4  in the position to have the Governor

 5  make the request to the Attorney

 6  General rather than just coming and

 7  making it on their own directly to the

 8  Attorney General.

 9           That by itself indicated to me

10  that he was flexing his political

11  influence over or with the Governor in

12  an effort to get a favorable result in

13  what I considered to be definitely a

14  law enforcement issue by the Attorney

15  General.

16           And so that's what --

17  certainly just that alone raised that

18  red flag.  And then the subsequent

19  reminder coming from the Governor, not

20  by Attorney Kellerhals and not by

21  Jeffrey Epstein.  But coming from the

22  Governor to remind me that I have to

23  make or I need to make a decision on

24  Epstein, that also indicated to me

25  definitely that they're using that



1   political influence or that there --

2   that there is or there exists some

3   degree of political influence that

4   Epstein is willing to use through the

5   Governor.

6            Because even then, you know,

7   the question is why is this a

8   priority?  Well, maybe to show that

9   this is the Governor's priority or

10  some -- for some reason.

11           But to answer your questions,

12  those are what was in my mind that

13  made it clear to me that he is

14  exercising some kind of political

15  power in order to get a certain result

16  from me with respect to applying the

17  laws here.

18           (BY ATTORNEY O'LAUGHLIN):

19       Q.  Did you think that the

20  outreach by the Governor on behalf of

21  Epstein was improper?

22           ATTORNEY ACKERMAN:  Object to

23  form.

24           THE WITNESS:  I do.

25           (BY ATTORNEY O'LAUGHLIN):



```
 1        Q.  Why?
 2        A.  My thoughts about that even
 3   then, in particular then, it did not
 4   sit right with me.  Because my thing
 5   is, first of all, why is the Governor,
 6   you know, getting involved in this
 7   matter that is a law enforcement
 8   matter.  Or only the Attorney General
 9   to make based on law, and that he was
10   doing so on behalf of a convicted sex
11   offender, a sexual offender, child
12   predator, this person, Jeffrey --
13   Jeffrey Epstein.
14           That was troubling to me.  I
15   didn't go much further than that, but
16   that was definitely troubling to me --
17        Q.  Were there --
18        A.  -- that he made -- he said it
19   will come in, and I would --
20   definitely the request came in, and
21   then I did just as any request would
22   come.  I waited until the request came
23   from the attorney, and then I
24   responded once that -- a request came,
25   properly came.
```



1      Q.   You testified on Monday that

2   there were several other outreaches by

3   the Government -- by the Governor

4   involving Epstein, correct?

5      A.   Pre-litigation there was just

6   that additional reminder on May 14th

7   that was a text reminder regarding the

8   sex offender registry where he said

9   you must -- you need to make a

10   decision on Epstein.

11      Q.   So were --

12      A.   So I -- but yeah.

13      Q.   So were there any other

14   outreaches of a similar nature from

15   the Governor?

16           ATTORNEY ACKERMAN:  Object to

17   form.  And hold on because there's

18   privilege issues here.  Are you

19   talking about pre-litigation or

20   post-litigation?

21           ATTORNEY O'LAUGHLIN:

22   Pre-litigation.

23           ATTORNEY ACKERMAN:  Yeah,

24   pre-litigation, okay.

25           THE WITNESS:  And you're



1   complete my testimony with respect to

2   the communications with the Governor

3   regarding the sex offender registry

4   issue.

5          Q.   Okay.

6          A.   So that letter -- the date

7   that letter was sent, that E-mail

8   correspondence was sent to Attorney

9   Kellerhals and Attorney Rivers, I also

10   sent one to Governor Bryan, a similar

11   one.

12             But just explaining to him the

13   -- what the laws are, and that there

14   is a requirement that he comply with

15   providing proof.  And that my decision

16   was until that proof was provided,

17   that I would not be able to

18   consider -- I would not consider, you

19   know, any waiver.

20             I also indicated to him that

21   -- the reasons for it and the reasons

22   -- the reasons -- that the reason or

23   the purpose behind the statute.  And

24   that it's there to protect the

25   community and the importance of that.



```
 1              And I did that just so that,
 2   you know, that he can have an
 3   understanding.  I felt that he needed
 4   an understanding as to the importance
 5   and the magnitude of that requirement.
 6              And then he just responded,
 7   well, thank you for your -- well,
 8   I'm seeing what his response is.  But
 9   he was just -- he just said, Well,
10   thank you for your work on this.  And
11   after that, there was nothing.
12        Q.  And the response from the
13   Governor, was that in E-mail form as
14   well?
15        A.  Yes.  That was E-mailed to
16   me.
17        Q.  Okay.  Was anyone copied on
18   that E-mail?
19        A.  No.
20        Q.  Do you still have a copy of
21   that E-mail?
22        A.  I might have a printed
23   version, but -- I might.
24        Q.  Okay.  Was this request that
25   you received from the Governor, were
```



 1   occurred soon after I came on.  So in

 2   that sense, probably around the same

 3   time.

 4            (BY ATTORNEY O'LAUGHLIN):

 5        Q.  And so did that background

 6   research and investigation you were

 7   doing into Epstein impact the way in

 8   which you viewed the Governor's

 9   request to you?

10            ATTORNEY ACKERMAN:  Object to

11   form.

12            THE WITNESS:  No, I wouldn't

13   say that impacted it.  Just the fact

14   that the request was made on behalf of

15   Jeffrey Epstein, a sex offender,

16   through the Governor instead of the

17   regular channels was -- was mainly

18   what was concerning with respect to

19   that.

20            (BY ATTORNEY O'LAUGHLIN):

21        Q.  Right.  But weren't you

22   finding through your own research that

23   he wasn't just a registered sex

24   offender.  There seemed to be a lot

25   more information out there about his



1  misconduct, correct?

2        A.  Well --

3             ATTORNEY ACKERMAN:  Object to

4  form.

5             THE WITNESS:  Well, there were

6  allegations, yes, definitely.

7  Allegations of what happened before.

8  Remember, he's not just a registered

9  sex offender.  He's a convicted child

10  -- a child molester, a predator.  I

11  don't -- you know, so that was in and

12  of itself sufficient to raise concern

13  for me.

14             The fact that all of this

15  other stuff was coming in, I'm still

16  in the process of processing it,

17  actually, and looking it up and all of

18  that.  It may have -- you know, at the

19  time maybe it was part of why I wanted

20  to make sure that it's legitimate

21  business.

22             And I didn't see that, you

23  know, anything -- any proof that the

24  business would have -- was legitimate.

25  And that's why I was looking for that



```
 1  specific information that there would
 2  be legitimate purposes for him to want
 3  to go to these countries.
 4            (BY ATTORNEY O'LAUGHLIN):
 5       Q.  So you were particularly
 6  sensitive to a request regarding
 7  Epstein from the Governor because at
 8  the same time you were seeing all of
 9  this reporting through your own
10  investigation, correct?
11       A.  I wouldn't say --
12            ATTORNEY ACKERMAN:  Objection
13  --
14            THE WITNESS:  -- that it was
15  --
16            ATTORNEY ACKERMAN:  Hold on,
17  Attorney George.
18            Objection to form, misstates
19  prior testimony, argumentative.
20            THE WITNESS:  Yeah, I didn't
21  say I was particularly sensitive with
22  respect to that.  It was just -- just
23  that just coming from the Governor a
24  request of Jeffrey Epstein that was --
25  that should have come directly to the
```



1    Attorney General.

2              But going towards him, he gave

3    me the impression that he was using

4    political influence to try to get a

5    result, a favorable result that he

6    wanted.

7              Any other -- even if it was

8    another sex offender and the Governor

9    came to me, I would have been like um,

10   you know, because it -- the correct

11   channels would be, well, go and, you

12   know, you make your request to the

13   Attorney General's Office.

14              (BY ATTORNEY O'LAUGHLIN):

15     Q.  Were there any other instances

16   of the Governor reaching out regarding

17   Epstein through what you viewed as the

18   incorrect channels?

19              ATTORNEY ACKERMAN:  Object to

20   form and -- object to form.  You can

21   answer.

22              THE WITNESS:  Yeah.  This

23   sounds like the question you asked me

24   before we went on break.  I don't know

25   if it's any different.  But as I was



 1   saying, that there was -- I don't

 2   recall any conversation or anything

 3   where the Governor reached out since

 4   that, you know, last communication.

 5   And which is why I indicated there was

 6   a response to my letter to him that

 7   ended the communication.  Nothing else

 8   after that pre-litigation.

 9            (BY ATTORNEY O'LAUGHLIN):

10       Q.  Did the position that you took

11   in response to the Governor's request

12   regarding Jeffrey Epstein's sex

13   offender monitoring impact your

14   standing with the Governor?

15            ATTORNEY ACKERMAN:  Object to

16   form.

17            THE WITNESS:  At that time I

18   don't know with respect to how he

19   perceived it, but his response to

20   my decision was just thank you for the

21   work you did on it, and that's it.

22            (BY ATTORNEY O'LAUGHLIN):

23       Q.  Knowing what you know now, do

24   you think it impacted your standing?

25            ATTORNEY ACKERMAN:  Objection



 1   to form.

 2          THE WITNESS:  I believe at the

 3   beg- -- I believe it's likely.

 4          (BY ATTORNEY O'LAUGHLIN):

 5      Q.  Why?

 6          ATTORNEY ACKERMAN:

 7   Objection.

 8          THE WITNESS:  It's likely that

 9   it did because I was doing something

10   where I was, you know, doing my work

11   and doing my job without respect to

12   any political interference or

13   anything.  And he did not ask -- he

14   did not tell me what decision to make,

15   but at the same time for whatever -- I

16   don't know how it would have impacted

17   him.

18          But I think that it could have

19   because I am always determined to

20   stand for what it is that I believe is

21   right based on my -- on my position as

22   to having make law enforcement

23   decisions.  And I make them

24   irrespective of anything as far as who

25   the people are or what -- or whatever



 1  political influence or power they may

 2  have.

 3              And maybe that might have been

 4  the first time that he might have been

 5  faced with that.  I don't know what

 6  his response was, but I will say that

 7  it could be very well the beginning of

 8  -- of that and it could have impacted

 9  it.

10              (BY ATTORNEY O'LAUGHLIN):

11       Q.  Do you think that your

12  approach of standing for what is right

13  impacted your career as the Attorney

14  General of the USVI?

15              ATTORNEY ACKERMAN:  Objection.

16  No.  Objection.  This is well outside

17  the scope.  This has no relation to

18  the topics.  I am instructing the

19  witness not to answer.  This has

20  nothing to do with the sex offender

21  registry.

22              ATTORNEY O'LAUGHLIN:  Okay.

23  Let's go to the Court, David.

24              ATTORNEY ACKERMAN:  Let's go

25  what?

