# EXHIBIT 266

```
 1            UNITED STATES DISTRICT COURT FOR THE

 2                SOUTHERN DISTRICT OF NEW YORK

 3               CASE NUMBER:  22-CV-10904-JSR

 4                     ACTION FOR DAMAGES

 5
     GOVERNMENT OF THE UNITED STATES      )
 6   VIRGIN ISLANDS,                      )
                                          )
 7                           Plaintiff,   )
                                          )
 8   VS.                                  )
                                          )
 9   JP MORGAN CHASE BANK, N.A.,          )
                                          )
10                           Defendant.   )
                                          )
11   -------------------------------------

12

13

14

15              VIDEO RECORDED DEPOSITION OF

16                      VINCENT FRAZER

17                  THURSDAY, JULY 13, 2023

18

19

20
     REPORTED BY:
21
     DENISE D. HARPER-FORDE
22   Certified Shorthand Reporter (CSR)
     Certified RealTime Reporter (CRR)
23   Certified LiveNote Reporter (CLR)
     Registered Professional Reporter (RPR)
24   Notary Public (FLORIDA)

25
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                ATTORNEY ACKERMAN:  Object to
 2   form.
 3                THE WITNESS:  Sorry.
 4                ATTORNEY ACKERMAN:  Go ahead
 5   and give your answer.
 6                THE WITNESS:  No.
 7                (BY ATTORNEY NEIMAN):
 8        Q.   Okay.  After you became
 9   Attorney General in 2007, what do you
10   recall of the nature of any matters
11   relating to Mr. Epstein that you dealt
12   with?
13        A.   The only matters I dealt with
14   Mr. Epstein was when he was required
15   to register on the Virgin Islands
16   sexual offender registry, and his
17   counsels made requests for certain
18   accommodations in terms of his
19   reporting requirements.
20        Q.   Well, who was his counsel?
21        A.   His counsel was Maria Hodge,
22   co-counsel, and Daniel sic Indyck --
23   Indyke I believe is his name, were the
24   lawyers.
25        Q.   Okay.  And we'll get into this
```



1    Q.  Do you remember there being a
2    time when you were just having phone
3    calls back and forth, and there was
4    reluctance to have something in
5    writing related to Mr. Epstein?
6        A.  No, I don't recall it.
7        Q.  All right.  Now the topic, if
8    you look up in the next E-mail up in
9    the chain between Mr. Epstein and Ms.
10   De Jongh, you see there's a reference
11   to an interstate compact and about who
12   will supervise probationers.  Do you
13   see that?
14           ATTORNEY ACKERMAN:  Object to
15   form.
16           THE WITNESS:  Okay.  I see
17   what -- I see the reference to
18   compact.
19           (BY ATTORNEY NEIMAN):
20       Q.  All right.  Do you have any
21   recollection of any discussion related
22   to the supervision of Mr. Epstein
23   being transferred from Florida to the
24   Virgin Islands?
25       A.  No, I don't.



1    Q.  If you look at the next E-mail
2  up in the chain, you'll see that it's
3  from Ms. De Jongh on April 9th at 9:18
4  A.M.  Ms. De Jongh writes, "Thanks.
5  Sending again to John.  Vincent is off
6  island and government closed for
7  Easter weekend until Tuesday.  Can you
8  believe it?  John will E-mail to
9  Vincent."
10        Do you see that?
11   A.  Yes, I see it.
12   Q.  Any recollection of Mr. De
13  Jongh E-mailing something related to
14  the interstate compact and Mr. Epstein
15  to you?
16   A.  No.
17   Q.  Did you have both a work
18  E-mail and a personal E-mail in this
19  time period, 2009?
20   A.  Probably did.
21   Q.  And what was your personal
22  E-mail in that time period?
23   A.  Vinfra@msn.com.
24   Q.  Do you still have access to
25  that E-mail account?



```
 1   they -- I no longer have access to
 2   those accounts.
 3              (BY ATTORNEY NEIMAN):
 4        Q.   Okay.  And you don't recall
 5   what the E-mail addresses were?
 6        A.   No.
 7        Q.   All right.
 8        A.   Why?
 9        Q.   What's that?
10        A.   Oh, okay.  I thought you asked
11   me why.
12        Q.   No.  No, no.  If you don't
13   recall, you don't recall.
14              Do you know whether Ms. De
15   Jongh or Mr. De Jongh ever E-mailed
16   you on your personal E-mail address?
17        A.   I don't believe it is very
18   likely I -- that Governor De Jongh may
19   have because we were friends before he
20   was Governor.  It's not likely I would
21   have any E-mails from Cecile de Jongh
22   regarding this topic.  I don't believe
23   there would be.
24        Q.   Let me just make sure I
25   understand your answer.  You do
```



```
 1   worked out between Darren, Maria
 2   Carbon and Anderson."
 3            Do you see that?
 4        A.  Yes.
 5        Q.  As do you have any reason to
 6   doubt, sir, that there was a
 7   compromise amendment that the Attorney
 8   General's Office could support that
 9   was worked out by Darren, Maria Carbon
10   and Anderson?
11            ATTORNEY ACKERMAN:  Objection
12   to form.
13            THE WITNESS:  Yes.
14            (BY ATTORNEY NEIMAN):
15        Q.  I'm sorry.  Yes, you have
16   reason to doubt or --
17        A.  No.  I don't doubt it that --
18   that there was a compromise as to the
19   acceptable amendment.
20        Q.  Right.  So there was a
21   compromise worked out as to an
22   acceptable amendment between the
23   counsel for Mr. Epstein and the
24   counsel for you, correct?
25        A.  Yes.
```



```
 1        Q.   All right.  "Then the sponsor
 2   can introduce the bill with the
 3   amendments."
 4             That's Russell as well.  Do
 5   you see that?
 6        A.   Yes.
 7        Q.   And Russell was the sponsor of
 8   the bill, correct?
 9        A.   Yes.
10        Q.   All right.  And then it says,
11   "Dowe and White will speak to Russell
12   this morning to get him to support the
13   amendments."
14             Do you see that?
15        A.   Yes.
16        Q.   Who are Dowe and White?
17        A.   Two Senators.
18        Q.   Okay.  Do you remember what
19   happened from this point forward with
20   the legislation?
21        A.   No.
22        Q.   All right.  Do you remember
23   what happened from this point forward
24   with the legislation?
25        A.   No.
```



```
 1        Q.  Do you recall changing your
 2   mind about what you had said you would
 3   support?
 4        A.  I don't recall what happened
 5   after.
 6        Q.  I'm sorry.  I couldn't hear
 7   that, sir.
 8        A.  I don't recall.  It was 12
 9   years ago.
10        Q.  Sure.
11            ATTORNEY NEIMAN:  Let's take a
12   look then at a document we'll mark as
13   18?  A document we'll mark as Exhibit
14   17.
15            (Whereupon, Defendant's
16             Exhibit No. 17, E-mail dated
17             June 27, 2012, was marked for
18             identification)
19            THE WITNESS:  Thank you.
20            (BY ATTORNEY NEIMAN):
21        Q.  All right.  So, sir, if you
22   take a look at Exhibit 17, it's
23   another E-mail exchange between Ms. De
24   Jongh and Mr. Epstein.  Do you see
25   that?
```



800.211.DEPO (3376)
EsquireSolutions.com

1  say nothing is really a bit beyond the
2  pale of acceptable behavior.  He
3  agreed."
4           Do you see that?
5      A.   Yes.
6      Q.   Do you recall having any
7  discussion with either Ms. De Jongh or
8  Mr. De Jongh about the fact that you
9  had changed your mind, but hadn't
10 given notice to them of that?
11     A.   I don't recall.
12     Q.   Do you recall Ms. -- ever
13 agreeing with Ms. De Jongh that some
14 behavior you had engaged in was beyond
15 the pale?
16          ATTORNEY ACKERMAN:  Objection
17 to form.
18          THE WITNESS:  I don't recall
19 having a conversation with her about
20 it.
21          (BY ATTORNEY NEIMAN):
22     Q.   All right.  Do you ever recall
23 having any discussion with Mr. De
24 Jongh about -- in this time period,
25 June of 2012, related to the sex



800.211.DEPO (3376)
EsquireSolutions.com

1   offender notification legislation?
2        A.   I don't recall.
3        Q.   Now let's just go back for a
4   moment, if we could, sir, to tab -- to
5   Exhibit 17, which was the text --
6        A.   Oh.
7        Q.   -- of the proposed -- one of
8   the -- one of the proposed compromise
9   that had the language about the
10  Attorney General's discretion.
11            Do you see that?
12            ATTORNEY ACKERMAN:  No, I
13  don't -- I don't think you have the
14  right exhibit number.
15            ATTORNEY NEIMAN:  Oh.
16            ATTORNEY ACKERMAN:  15 maybe?
17            ATTORNEY NEIMAN:  15.
18            ATTORNEY NEIMAN:  Oh, yeah.
19  You're right, Exhibit 15.  I'm sorry.
20            (BY ATTORNEY NEIMAN):
21       Q.   Do you have Exhibit 15 in
22  front of you, sir?
23       A.   Yes.
24       Q.   And you can see that this was
25  one of the proposals that we've



1  broader knowledge from?
2       A.   We research it.
3       Q.   What did you do to research
4  it?
5       A.   I had my staff research it.
6       Q.   What did they tell you?
7       A.   What did they tell me?
8       Q.   Yeah.
9       A.   That he was an international
10 financier, that he did -- he'd go all
11 over the world.  He did business,
12 provided funding, gave financial
13 advice and all of that nature of
14 things that he did.
15      Q.   Did the --
16      A.   For the specific as to his
17 day-to-day activity and a list of all
18 that he does with these folks, no, I
19 didn't have that, but I had enough to
20 understand his business activity was
21 one that he did a lot of traveling.
22      Q.   Okay.  Did the staff tell you
23 that there were public reports of his
24 abuse of more than 40 women?
25      A.   At the time in 2012, 2011,



1   report related to a July 15th, or July
2   16th, 2015 visit to Mr. Epstein.  Do
3   you see that?
4           A.   I'm sorry?
5           Q.   I said this relates to a July
6   2015 visit.  Do you see that on the
7   second page?
8           A.   Yes.
9           Q.   Were you still the Attorney
10  General at this time?
11          A.   No.
12          Q.   Okay.  When did you cease to
13  be the Attorney General?
14          A.   January of 2015.
15          Q.   Did you ever hear that
16  representatives of Mr. Epstein were
17  denying access to Mr. Epstein's island
18  to the monitors?
19          A.   I never heard that.
20          Q.   What would have been an
21  appropriate response by the new
22  Attorney General if they learned that
23  Mr. Epstein's team was denying entry
24  to the monitors?
25               ATTORNEY ACKERMAN:  Objection



```
 1   to form.
 2               THE WITNESS:  What would be
 3   the response?
 4               (BY ATTORNEY NEIMAN):
 5         Q.  What would be an appropriate
 6   response?
 7               ATTORNEY ACKERMAN:  Objection
 8   to form.
 9               THE WITNESS:  I can -- I can
10   say what I would do.
11               (BY ATTORNEY NEIMAN):
12         Q.  Yeah.  What would you do?
13         A.  What I would do is then we
14   would have to take a more aggressive
15   visit --
16         Q.  I take it it would not --
17         A.  -- that -- that allows even
18   for the charge and filing of a
19   complaint in the court --
20         Q.  Okay.
21         A.  -- if is persistent, ongoing.
22         Q.  All right.  Sir, can you tell
23   us what you did to prepare for today's
24   deposition?
25         A.  I met with my counsel.
```



```
 1        Q.  All right.  Mr. Frazer, how
 2   long have you known Mr. De Jongh?
 3        A.  Personally since 2000- --
 4   2004.
 5             ATTORNEY ACKERMAN:  Make sure
 6   you keep your voice up.
 7             THE WITNESS:  Oh, I'm sorry.
 8             Yeah.  Yeah, since about
 9   2004.
10             (BY ATTORNEY NEIMAN):
11        Q.  And do you consider him a
12   friend?
13        A.  Yes.
14        Q.  How did you become Attorney
15   General?
16        A.  He selected me.
17        Q.  All right.  And do you know
18   why?
19        A.  If I know why?
20        Q.  Yes.
21        A.  He knew me, and he had
22   confidence in my judgment and my
23   ability as a lawyer.
24             ATTORNEY NEIMAN:  All right.
25   I have no further questions for you at
```



1    A.   Yes.
2    Q.   And so why did you do a
3    cleanup of your personal E-mails?
4    A.   When you're sitting there and
5    with the E-mail, you're reminded you
6    got 25,000 E-mails, and they go back
7    over years, and you getting a notice
8    to storage space needed.  So I
9    responded to that problem.  I deleted
10   everything that was necessary.
11   Q.   All right.  Thank you.
12        Attorney Frazer, during your
13   tenure as Attorney General, did you
14   ever grant special -- did you ever
15   grant special treatment to Mr. Epstein
16   because of his employment of Cecile de
17   Jongh?
18   A.   No.
19   Q.   Did Mr. Epstein's employment
20   of Cecile  de Jongh ever factor into
21   the decisions that you made regarding
22   Mr. Epstein?
23   A.   No.
24   Q.   Did you ever make decisions
25   with Mr. Ep- -- regarding Mr. Epstein



1   in order to curry favor with the
2   Governor?
3        A.   No.
4        Q.   When you were evaluating
5   Mr. Epstein's counsel's request for
6   waivers, did Mr. Epstein's employment
7   of Cecile de Jongh factor into your
8   decision at all?
9        A.   No.
10       Q.   Did Governor de Jongh's
11  opinion of your actions with respect
12  to those waivers factor into your
13  decision at all?
14       A.   His opinion, no.
15       Q.   Let's talk about, a little bit
16  about --
17       A.   Can I?
18       Q.   Yeah.  Do you need to explain?
19  Please explain.
20       A.   Whatever -- one, I didn't --
21  initially I didn't even know Cecile de
22  Jongh worked for Epstein.  So contrary
23  to what many may believe, it was --
24  it's not something that was widely
25  known.  I didn't know.



1           A.   Yes.
2           Q.   And does this letter contain
3    representations upon which you relied
4    in exercising your discretion to make
5    decisions regarding Mr. Epstein's
6    notification requirements?
7           A.   Yes.
8           Q.   Okay.
9           A.   This was included.
10          Q.   Okay.  I'm sorry.  You said
11   this was?
12          A.   Included, yes.
13          Q.   Okay.  If you would turn,
14   please, to page 2 of this letter --
15          A.   Uh-huh.
16          Q.   -- I want to direct your
17   attention to the paragraph that begins
18   first.  It's the first full paragraph
19   on that page.
20          A.   Yes.
21          Q.   Are you with me?
22          A.   Yes.
23          Q.   Okay.  The second -- yes.  The
24   second sentence of that paragraph
25   reads, "Mr. Epstein has followed the



1   same procedure in the State of
2   Florida, the very same jurisdiction of
3   Mr. Epstein's conviction which gave
4   rise to his registration requirement,
5   where Mr. Epstein is permitted to
6   provide E-mail notification of his
7   arrival and departure."
8           Did I read that correctly?
9       A.  Yes.
10      Q.  And is that a representation
11  upon which you relied in formulating
12  your decision --
13      A.  That representation --
14  however, remember that I also had my
15  staff to research the requirements
16  from Florida and New York, the two
17  particular jurisdictions that we were
18  dealing with Epstein.
19      Q.  Okay.  And if you look at the
20  next sentence, it reads, "Mr. Epstein
21  provides E-mail notification to the
22  State of New Mexico when he travels to
23  and from his vacation home in that
24  jurisdiction."
25          Did I read that correctly?

