# EXHIBIT 9

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

# EXPERT REPORT OF BRIDGETTE CARR

June 16, 2023

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## TABLE OF CONTENTS

I.     PROFESSIONAL BACKGROUND AND QUALIFICATIONS ..................................... 1

II.    FACTS OR DATA CONSIDERED ................................................................................ 2

III.   METHODOLOGY USED ............................................................................................. 3

IV.   OPINIONS ...................................................................................................................... 3

     A.    Human Trafficking Presents In Different Ways But Has The Same Core Elements ................................................................................................................. 3

     B.    One Common Theme In Human Trafficking Is The Targeting Of Vulnerable People To Victimize ............................................................................................. 6

     C.    Human Trafficking Typologies And Red Flags Can Be Helpful When Assessing Potential Human Trafficking ................................................................................. 8

     D.    Jeffrey Epstein Directed A Sex Trafficking Venture ............................................. 13

          1.    Jeffrey Epstein Engaged In Commercial Sex With Girls Under The Age of 18 .................................................................................................................. 14

          2.    Jeffrey Epstein Used Fraud, Force, And/Or Coercion To Induce Girls And Young Women To Perform Commercial Sex Acts ..................................... 17

     E.    JPMorgan's Due Diligence Indicates Epstein Was Involved In Sex Trafficking. 27

     F.    Jes Staley's Communications With Epstein Show Red Flags For Human Trafficking .......................................................................................................... 47

     G.    Jeffrey Epstein's JPMorgan Accounts Show Signs Of Human Trafficking ........ 51

          1.    Large Cash Withdrawals ............................................................................. 53

          2.    Round-Dollar Wire Payments to Women .................................................. 54

          3.    Payments To Individuals Supporting Epstein's Sex Trafficking Venture 55

          4.    Private Air Travel ....................................................................................... 56

          5.    MC2 Model Management .......................................................................... 57

     H.    Jeffrey Epstein's Sex Trafficking Venture Relied On Many Individuals And Entities—Including JPMorgan—To Operate ....................................................... 59

     I.    JPMorgan Had A Unique Opportunity To Intervene And Help Epstein's Victims Who Banked With JPMorgan—Including ███ .................................................. 64

     J.    Compensation For The Harms Victims Suffered Should Reflect The Severity, Scope, And Duration Of The Abuse They Suffered ............................................ 72

     K.    JPMorgan Should Implement Meaningful Injunctive Relief To Prevent Future Participation In Sex Trafficking Ventures ........................................................... 75

V.     CONCLUSION ............................................................................................................. 77

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## I.    PROFESSIONAL BACKGROUND AND QUALIFICATIONS

1.    My name is Bridgette Carr. The Government of the United States Virgin Islands ("USVI") in this matter has retained me as an expert in human trafficking and specifically sex trafficking in the United States. My resume is attached as Exhibit A. I am being compensated for my work in this matter, and a list with my compensation rates is attached as Exhibit B.

2.    I reserve the right to supplement or amend my opinion in light of any further allegations, documents, depositions, or expert reports that may be prepared, provided, or may occur subsequent to this report.

3.    I am a member in good standing of the Michigan Bar. I am a Clinical Professor of Law and Co-Director of the Human Trafficking Clinic + Lab ("Clinic") at the University of Michigan Law School. I founded the Clinic at the University of Michigan Law School in 2009. It was the first law school clinic in the United States dedicated to representing victims[1] of human trafficking. The Clinic provides a variety of free legal services to victims of human trafficking. We serve victims of labor and/or sex trafficking regardless of age, gender, or national origin.

4.    Prior to joining Michigan Law School full-time in 2009, I spent fall 2008 as a visiting professor in Michigan Law School's clinical program and winter 2009 teaching Immigration Law and International Human Rights Law at the University of Toledo College of Law.

5.    For the 2007-2008 academic year, I worked at the University of Notre Dame Law School. At Notre Dame, I developed and established the Immigrant Rights Project in Notre Dame's clinical program. I taught Immigration Law and, in the Immigrant Rights Project, I represented foreign national clients in need of humanitarian immigration relief, including foreign national trafficking victims.

6.    Prior to joining the University of Notre Dame Law School, I was an Assistant Clinical Professor at Ave Maria School of Law ("Ave Maria") when it was based in Ann Arbor, Michigan. At Ave Maria, I founded the Asylum and Immigrant Rights Law Clinic. During my three years at Ave Maria, I represented foreign nationals in need of humanitarian immigration relief. It was during this time that I first provided legal representation to human trafficking victims. This representation focused on immigration relief and victim-witness rights advocacy for the victims in what would become *United States v. Maksimenko*, No. 05-80187 (E.D. Mich.) (forced labor of Ukrainian J-1 students in Detroit area strip clubs). The *Maksimenko* case was one of the first—if not the first— federally prosecuted cases in the state of Michigan after the passage of the Trafficking Victims Protection Act in 2000.

---

[1] I use the word "victims" here and throughout my report because it is a term of art. My use of the term is not meant to disempower people who have survived human trafficking.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

7.     In addition to the hundreds of trafficking victims I have represented through my work in clinics, I also provide paid and pro bono guidance on human trafficking cases for lawyers in the United States. This has included paid consultations for both labor trafficking and sex trafficking cases predominantly in the civil context. I have not previously testified as an expert at trial or deposition.

8.     I have published on the issue of human trafficking in academic journals and a legal casebook. I was the lead author for the first legal casebook in the United States on human trafficking law.[2] I have been published in both legal and non-legal academic publications on the topic of human trafficking. A list of all publications I have authored in the previous 10 years is attached as Exhibit C.

9.     I have given hundreds of speeches, presentations, and trainings on human trafficking during my career. I am unable to meet the number of requests I receive to provide presentations or trainings on human trafficking. As a result of these requests and the need for high quality evidence-based training on human trafficking, my colleague from the University of Michigan School of Nursing and I created the Human Trafficking Collaborative ("Collaborative") at the University of Michigan. The Collaborative is a partnership between the Clinic and the University of Michigan School of Nursing to educate the public, including healthcare providers and advocates, about human trafficking. Dr. Munro-Kramer and I created an online training module for healthcare providers to help them address human trafficking in healthcare settings.[3] The module has been available since February 2021. Thousands of individuals have taken the training.

10.    I have provided training and technical assistance to law professors in both the United States and abroad to assist in the creation of legal clinics serving human trafficking victims. I have helped multiple programs develop their training materials to educate law students about human trafficking and represent human trafficking victims.

11.    Over the past fifteen years, I have been interviewed and quoted by a variety of media outlets about human trafficking.

## II.    FACTS OR DATA CONSIDERED

12.    I considered facts and data from this case, including documents the parties produced, one victim interview, expert reports, and depositions, in addition to the documents I cite in my report. I also relied on the expert reports in this case, including the forensic accounting conducted by Jorge Amador. A comprehensive list of the materials I relied upon is attached as Exhibit D.

---

[2] Bridgette Carr, Anne Milgram, Kathleen Kim, and Stephen Warnath, *Human Trafficking Law and Policy,* LexisNexis (1st ed. 2014).

[3] Bridgette Carr, Dr. Munro-Kramer, Human Trafficking Training Module for Healthcare Providers and Advocates, https://humantrafficking.umich.edu/education/continuing-education-module/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## III.   METHODOLOGY USED

13.     In this matter I am offering my expert testimony regarding human trafficking, specifically sex trafficking and how it presents in cases in the United States, the typical signs of human trafficking, the power dynamics at work in human trafficking, and how victim vulnerabilities are identified and exploited. I apply my knowledge of human trafficking to the documents, depositions, victim statements, and other information to assess whether Jeffrey Epstein's behavior and victims' experiences are consistent with human trafficking of minors or adults through force, fraud, or coercion, and whether the information identified by or available to JPMorgan Chase Bank, N.A. ("JPMorgan") reflects red flags of trafficking.

14.     First, I review authoritative literature in the field of human trafficking to identify generally accepted and reliable typologies and indicators of human trafficking. I then apply these typologies and indicators to the documents and testimony that I reviewed, including documents and financial information available to, reviewed by, or created by JPMorgan. These included due diligence documents; information about Epstein's activities, such as the 2006 Probable Cause Affidavit, that were publicly and contemporaneously available; testimony, statements, and other documents related to individuals who participated in the Epstein Victim Compensation Program or otherwise identified as victims of Jeffrey Epstein, including Jane Doe; and an interview I conducted with an Epstein victim known to and banked by JPMorgan. I then assess, based on my professional experience and expertise, whether this information is consistent with typologies and indicators of human trafficking, including the use of force, fraud, or coercion.

15.     I offer such expert testimony to assist the Court in its determination of whether JPMorgan is civilly liable based on my knowledge, skill, education, experience, and training. I have arrived at this testimony by applying the principles and methods commonly used in the field of human trafficking in the United States, as well as through the knowledge and expertise I have gained as an academic and lawyer who has been providing legal representation to human trafficking victims and practicing, teaching, and writing in this field since 2006.

## IV.   OPINIONS

### A.   Human Trafficking Presents In Different Ways But Has The Same Core Elements

16.     Human trafficking presents in different ways, but, at its core, human trafficking involves a trafficker targeting vulnerable individuals and compelling them into service. Trafficking is a crime of exploitation, not movement, and as such victims may be United States citizens, undocumented migrants, legal permanent residents or any other foreign nationals with either immigrant or nonimmigrant status in the United States. The age of victims varies from the very young to the elderly.

3

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

17.    The Trafficking Victims Protection Act ("TVPA"), which was enacted in the United States in 2000, was the first comprehensive federal legislation specifically addressing human trafficking. Prior to the passage of the TVPA, prosecutors relied on the laws against involuntary servitude, debt peonage, and slavery to protect individuals compelled into service.

18.    The passage of the TVPA coincided with similar efforts at the international level to protect victims of what many were calling "modern day slavery." In the same year Congress passed the TVPA, the United Nations adopted the Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children ("Palermo Protocol").[4]

19.    The TVPA defines several terms that I will reference throughout my report. I define them here for clarity.

20.    The TVPA created two categories for what is collectively known as "human trafficking" or, in the language of the statute, "severe forms of trafficking in persons." They are defined as:

   a.    The recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such an act has not attained 18 years of age; or

   b.    The recruitment, harboring, transportation, provision or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage or slavery.[5]

These two definitions are commonly known as sex trafficking (part "a" above) and labor trafficking (part "b" above). Used together, sex trafficking and labor trafficking are commonly known as "human trafficking."[6] Throughout this report, I will use those terms in accordance with these definitions unless otherwise specified.

---

[4] United Nations General Assembly, *Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention against Transnational Organized Crime* (Nov. 15, 2000), https://www.refworld.org/docid/4720706c0.html.
[5] 22 U.S.C. § 7102(11).
[6] *See* Hilary Axam and Jennifer Torrito Leonardo, *Human Trafficking: The Fundamentals*, at 3. (U.S. Department of Justice Nov. 2017). Chapter 77, which is titled "Peonage, Slavery, and Trafficking in Persons," proscribes over a dozen distinct criminal violations, and none of them is captioned "human trafficking." None, in fact, even includes the term "human trafficking." Thus, the term does not reference a specific statutory violation, but rather denotes more broadly the category of conduct criminalized throughout Chapter 77, the essence of which is compelling or coercing another person to perform labor, services, or commercial sex acts."

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

21.     The definition of sex trafficking differs depending on the age of the victim. While both definitions require a victim to be accessed[7] by a trafficker, according to the TVPA, if an individual is under 18 years old, the inducement of a commercial sex act is the only other element needed to satisfy the definition of sex trafficking. For individuals 18 and over, sex trafficking exists when there is access plus a commercial sex act and force, fraud, or coercion were used to bring about the commercial sex act.

22.     Sex trafficking requires a "commercial" sex act. Sexual abuse without a commercial aspect does not meet the definition. A commercial sex act is a sex act "on account of which anything of value is given to or received by any person."[8] It does not require money or cash to be exchanged.

23.     Many popular culture depictions of human trafficking include extreme physical violence or kidnapping. Prior to the passage of the TVPA, a criminal charge of involuntary servitude required use or threatened use of physical force or legal coercion.[9] However, many cases of human trafficking do not contain force or even fraud. Victims are frequently coerced into trafficking; however, sometimes the coercion is solely psychological. The TVPA defines coercion as:

   a.     Threats of serious harm to or physical restraint against any person;

   b.     Any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

   c.     The abuse or threatened abuse of the legal process.[10]

   Serious harm includes: physical, nonphysical, psychological, financial or reputational harms.[11]

24.     "Serious harm" is defined as any of the harms listed above that are "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing [labor or commercial sexual activity] in order to avoid incurring that harm."[12]

---

[7] By "access" I am referring to the list of actions in the statute by which a trafficker can interact with the victim to satisfy the definition: recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting. *See* 22 U.S.C. § 7102(11).

[8] 18 U.S.C. § 1592(e)(3).

[9] *See U.S. v. Kozminski*, 487 U.S. 931, 952 (1988).

[10] 22 U.S.C. § 7102(3).

[11] 18 U.S.C. § 1591(e)(5).

[12] 18 U.S.C. § 1589(c)(2) (labor trafficking); 18 U.S.C. § 1591(e)(5) (sex trafficking).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**B.      One Common Theme In Human Trafficking Is The Targeting Of Vulnerable People To Victimize**

25.      Based on my experience and literature in the field, traffickers target vulnerable people for victimization. This is the case for two reasons: 1) to exploit individuals for the labor or commercial sexual services they seek; and 2) to protect themselves from prosecution.

26.      Vulnerability is expressed in myriad ways and must be assessed in the context of the real or perceived power of the trafficker. Polaris Project, a nonprofit organization focused on preventing human trafficking, published the first National Survivor Study in January 2023.[13] The National Survivor Study, which is relied upon by people who work in the field of human trafficking, found that:

> The vast majority of trafficking survivors faced trauma, abuse, poverty, mental health challenges, and other struggles in childhood. To assess the linkages between these vulnerabilities and survivors, the [National Survivor Survey] adapted the widely used CDC-Kaiser Permanente Adverse Childhood Experiences (ACEs) questionnaire to fit the context of human trafficking.[14]

> For the National Survivor Study, these experiences were organized into the six categories listed below. Respondents reported experiencing each at an alarming rate:

> 1. Experienced poverty: 83 percent
> 2. Ran away from home: 69 percent
> 3. Experienced abuse (physical, sexual, emotional): 96 percent
> 4. Experienced substance abuse and mental health challenges: 93 percent
> 5. Lived with someone who experienced substance abuse and mental health challenges: 93 percent
> 6. Other family or household instability: 96 percent[15]

27.      The experiences of my clients are consistent with the findings of Polaris's National Survivor Study. Most of my clients experienced abuse or poverty before they were trafficked.

28.      These vulnerabilities, as well as strategies used by traffickers to exploit them, mean that trafficking can occur without physical restraint. Based on my experience, myths and misconceptions about human trafficking abound. One myth, which, in my opinion, often prevents identification of victims, is that trafficking victims will have no physical

---

[13] *In Harm's Way: How Systems Fail Human Trafficking Survivors, Survey Results from the First National Survivor Study*, Polaris Project (Jan. 2023), https://polarisproject.org/wp-content/uploads/2023/06/In-Harms-Way-How-Systems-Fail-Human-Trafficking-Survivors-by-Polaris.pdf.

[14] *Id*. at 10.

[15] *Id*.

6

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

freedom of movement.[16] Based on my experience, victims may have freedom of movement and access to money.

29.     Another misconception is that victims will be deprived of financial resources or appear to be financially deprived. While financial deprivation does occur in trafficking cases, in other cases traffickers may expect their victims to maintain a certain look, shop, obtain beauty services, and receive money for shopping or gifts for their birthday. For example, I saw evidence that Epstein paid for clothes, haircuts and spa services.[17] This is likely because Epstein wanted the women to look a certain way and was consistent with the trafficking venture.

30.     Further, many victims may stay—even if they are physically able to leave—because of the trafficker's emotional manipulation.[18] In my work, I have found victims may feel they are in a loving or reciprocally affectionate relationship with their traffickers while being exploited. For example, in *United States v. Maksimenko,* Aleksander Maksimenko used sexual coercion and other tactics to exploit the victims while describing his relationship as consensual and romantic:

> Defendant maintains that he and Y.S. were involved in a consensual, romantic relationship. After the first encounter, they had sex several times per week until Y.S. left. Defendant says he considered Y.S. to be his girlfriend and considered leaving his wife for her. Y.S. acknowledges that she did not continue to fight Defendant, but she says that she acquiesced because she felt that "it would happen anyway" and she thought that it would not hurt if she did not fight. Purportedly because he viewed Y.S. as a girlfriend, Defendant says he bought her jewelry and other gifts on numerous occasions, paid for breast implants, moved her to a newer apartment when she complained about her existing one, purchased new furniture, and gave her money and took her out for her birthday. Y.S. denies that Defendant was "romantic" with her.

---

[16] Emily Brady et al., *Photographing Modern Slavery: Recommendations for Responsible Practice.*, Univ. of Nottingham Rights Lab (Dec. 2019), https://www.nottingham.ac.uk/research/beacons-of-excellence/rights-lab/resources/reports-and-briefings/2019/november/photographing-modern-slavery.pdf.

[17] JPM-SDNYLIT-00152748.

[18] *The Typology of Modern Slavery Defining Sex and Labor Trafficking in the United States*, Polaris Project, at 11 (Mar. 2017) https://polarisproject.org/wp-content/uploads/2019/09/Polaris-Typology-of-Modern-Slavery-1.pdf ("Typology") ("Traffickers often condition victims to believe they are the only ones who care for them, manipulating an attachment bond that makes the decision to leave the trafficker extremely difficult.").

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

But, she acknowledges that he gave her jewelry for her birthday after she had been working for him for two years.[19]

This "consensual romantic relationship" took place within these methods of control according to Maksimenko:

[He] explained that he controlled the women through the following: lectures and explanations, holding immigration over their heads, fear of the police and holding debts over the women's heads. [He] also said that we, meaning he and [co-conspirator], held their identity documents. [He] also admitted to using intimidation and threatening to "kick their ass". [sic] [He] also said that if he had to he would put a hand on one of the women to tug them out the door. Because of all of these things, according to [him], the girls were not able to say no to him.[20]

31.     The techniques of control Maksimenko used are consistent with my experience. In many cases, I have seen victims fear the police or fear they will be ignored.[21] Additionally, in my experience, the perceived or real power of their trafficker makes the victims afraid they will be harmed.

**C.      Human Trafficking Typologies And Red Flags Can Be Helpful When Assessing Potential Human Trafficking**

32.     Human trafficking exists in many forms in the United States, but there is no reliable evidence-based estimate of the prevalence of human trafficking in the United States. One source for verifiable data on human trafficking is the National Human Trafficking Hotline operated by Polaris, which is a highly regarded nonprofit, non-governmental organization that works to combat and prevent sex and labor trafficking in North America. While the Hotline data is limited to situations in which individuals reach out to the Hotline, which means it almost certainly underreports the incidence of human trafficking, the data gathered by the Hotline nonetheless provides useful information about human trafficking in the United States.

33.     Polaris analyzed cases of human trafficking documented through the Hotline and their BeFree Textline. The analysis included more than 32,000 cases of human trafficking recorded between December 2007 and December 2016. From this analysis, they created a typology of trafficking in the United States which includes 25 types of human

---

[19] *U.S. v. Maksimenko*, 2007 U.S. Dist. Lexis 45615, at *11–12 (E.D. Mich. June 25, 2007) (internal citations omitted).

[20] *Id.*

[21] Amy Farrell, Meredith Dank, Ieke de Vries, Matthew Kafafian, Andrea Hughes, & Sarah Lockwood, *Failing Victims? Challenges of the Police Response to Human Trafficking*, Criminology & Public Policy (July 31, 2019), https://doi.org/10.1111/1745-9133.12456.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

trafficking.[22] Each human trafficking typology has its "own business model, trafficker profiles, recruitment strategies, victim profiles, and methods of control that facilitate human trafficking."[23] The report acknowledges that situations of human trafficking may involve both sex and labor trafficking and a trafficker may engage in more than one typology.

34.    While, in my experience, the typologies are not perfect and do not fully capture individual situations, they provide a guide for the types of cases most often identified in the United States. I have represented clients who fit into many of these typologies. In my experience, multiple typologies may be present in a single trafficking venture.

35.    Applying these typologies, Epstein's behavior fits into multiple human trafficking typologies, including:

   a.    Residential: Residential sex trafficking recognizes a form of trafficking which occurs "within private households used…for commercial sex." In this typology, economic hardship is often used as a basis for the exploitation and "sex trafficking within residences informally used as brothels typically involves child victims."[24]

   b.    Escort Services: This typology includes commercial sex acts "…that primarily occur at a temporary indoor location."[25] The trafficker profile ranges from individuals, often intimate partners, to coordinated networks. In this typology, victims are often recruited through fraud whether it's "…fraudulent job offers, such as fake modeling contracts" or by the trafficker pretending to have affection for the victim.[26] The majority of victims are United States citizen women and girls. Traffickers use a variety of methods of control in this typology including conditioning "…victims to believe they are the only ones who care for them, manipulating an attachment bond that makes the decision to leave the trafficker extremely difficult."[27]

   c.    Illicit Massage, Health, & Beauty:[28] In this typology, a façade of legitimacy for massage, health, and beauty services conceals that "…their primary business is the sex and labor trafficking of women trapped in these businesses."[29] The trafficker profile for these cases includes on-site managers which "…tend to be women of the same ethnicity and may have been trafficked themselves in these

---

[22] Typology at 5.
[23] *Id.*
[24] *Id.* at 18.
[25] *Id.* at 10.
[26] *Id.* at 11.
[27] *Id.* at 11.
[28] The "Illicit Massage, Health, & Beauty" typology includes both sex trafficking and labor trafficking. I have focused my analysis in this case on sex trafficking, however there are also labor trafficking elements present in the materials I reviewed.
[29] Typology at 12.

9

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

businesses before becoming part of the larger trafficking network."[30] To control the victims in these cases, they may be forced to live on-site and have their movement monitored.

    d.    Arts and Entertainment: This typology includes a number of industries; however, for this case, I focused on modeling. "In the modeling industry, foreign and U.S. citizen women can be fraudulently recruited…with exaggerated job offers and fake immigration benefits."[31] Traffickers may be "recruiters and executives in model management companies"[32] and they may control victims through sexual abuse and harassment.

    e.    Personal Sexual Servitude:[33] In this typology, payment is not always cash and the "line between ongoing sexual abuse and personal sexual servitude is complex."[34] Trafficker profiles and recruitment vary, although victims "may be 'sold' by a family member to a trafficker."[35] Traffickers use multiple forms of control including ongoing sexual assaults, threats, and isolation.[36]

36.    Since the passage of the TVPA, a number of organizations, both governmental and nongovernmental, have created indicator or red flag lists to increase identification of human trafficking victims[37]. The majority of these lists are based on characteristics of previously identified cases of human trafficking, and the lists often share similar indicators.

37.    Indicators usually include caveats about the limitations of their use such as: presence or absence of indicators is not definitive proof of human trafficking; not all indicators are present in every human trafficking situation; the list is not exhaustive; and no single indicator is, by itself, conclusive of human trafficking but signals the need for follow up. The Department of State indicators note that sometimes individuals will first recognize something is wrong but not have a label for it: "Knowing indicators of human trafficking and some follow up questions will help you act on your gut feeling that something is

---

[30] *Id.* at 13.

[31] *Id.* at 51.

[32] *Id.* at 52.

[33] I have included the "Personal Sexual Servitude" typology because, based on my review of the materials, I believe this typology applies to one of the victims described below. However, I did not find that this typology was a widespread pattern in this case.

[34] Typology at 36.

[35] *Id.* at 37.

[36] *Id.*

[37] *See, e.g.*, *Recognizing the Signs*, National Human Trafficking Hotline https://humantraffickinghotline.org/en/human-trafficking/recognizing-signs; *Spot the Signs*, Stop the Traffik, https://www.stopthetraffik.org/what-is-human-trafficking/spot-the-signs/; *What Are the Signs of Human Trafficking?*, Freedom Network USA, https://freedomnetworkusa.org/the-issue/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

wrong and report it."[38] While all of these caveats are appropriate, there is one indicator which, if present, unequivocally meets the federal definition of sex trafficking: if a minor is involved in a commercial sex act. Two of the three sets of indicators below list this as an indicator.

38.     In the table below I have included the human trafficking indicators[39] from: 1) the Department of Homeland Security;[40] 2) the Department of State;[41] and 3) the Department of Health and Human Services, Administration for Children and Families Office.[42] These indicators are representative of the types of indicators relied upon by experts within the field of human trafficking.

| AGENCY | INDICATORS |
| --- | --- |
| **Department of Homeland Security** | Does the person appear disconnected from family, friends, community organizations, or houses of worship? |
| | Has a child stopped attending school? |
| | Has the person had a sudden or dramatic change in behavior? |
| | **Is a juvenile engaged in commercial sex acts?** |
| | Is the person disoriented or confused, or showing signs of mental or physical abuse? |
| | Does the person have bruises in various stages of healing? |

---

[38] *Identify and Assist a Trafficking Victim*, U.S. Dep't of State, https://www.state.gov/identify-and-assist-a-trafficking-victim/.

[39] I have provided a sampling of typical indicator lists under United States law. The most widely accepted indicator list under international law is the *Operational Indicators of Trafficking in Human Beings*, International Labor Office (Sept. 2009), https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication /wcms_105023.pdf. Based on a Delphi survey implemented by the International Labour Organization and the European Commission and published in 2009, it is a set of indicators based on consensus from a wide group of experts. The indicators are based on the international definition of human trafficking as defined in the United Nations' Palermo Protocol. There are many similarities between the definitions of human trafficking in the Palermo Protocol and the TVPA.

[40] *Indicators of Human Trafficking*, U.S. Dep't of Homeland Security, https://www.dhs.gov/blue-campaign/indicators-human-trafficking.

[41] *Identify and Assist a Trafficking Victim*, U.S. Dep't of State, https://www.state.gov/identify-and-assist-a-trafficking-victim/.

[42] *Adult Human Trafficking Screening Tool and Guide*, Dep't of Health & Human Servs. Admin. for Children & Families, (Jan. 2018), https://www.acf.hhs.gov/sites/default/files/documents /otip/adult_human_trafficking_screening_tool_and_guide.pdf.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| | Is the person fearful, timid, or submissive? |
| | Does the person show signs of having been denied food, water, sleep, or medical care? |
| | Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, *e.g.*, where they go or who they talk to? |
| | Does the person appear to be coached on what to say? |
| | Is the person living in unsuitable conditions? |
| | Does the person lack personal possessions and appear not to have a stable living situation? |
| | Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures? |
| **Department of State** | Living with employer |
| | Poor living conditions |
| | Multiple people in cramped space |
| | Inability to speak to individual alone |
| | Answers appear to be scripted and rehearsed |
| | Employer is holding identity documents |
| | Signs of physical abuse |
| | Submissive or fearful |
| | Unpaid or paid very little |
| | **Under 18 and in prostitution** |
| **Department of Health and Human Services, Administration for Children and Families Office** | *Generally* |
| | Is with a person who speaks for them |
| | Is unsure of day, date, month, year |
| | Moves frequently |
| | Not in control of personal identification |
| | Doesn't know where they live |
| | Story doesn't make sense; seems scripted |
| | Not allowed to come and go at will |
| | Wears the same clothes over and over |
| | Seems afraid to answer questions |
| | Works long hours; exhausted; hungry |
| | Someone else controls their money |
| | Odd living/work space (may include tinted windows, security cameras, barbed wire, people sleeping/living at worksite) |

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| | Can't move freely; attached to someone |
| | Owes a debt to employer |
| | ***Sex Trafficking*** |
| | Works in the commercial sex industry: escort, exotic dancer, "prostitute," "massage" |
| | Signs of having sex with multiple people |
| | Has pimp: male, female, boyfriend, husband |
| | Tattoos or branding of ownership |
| | Uses language of the sex industry |
| | Inappropriate clothing for venue or weather |
| | Physical abuse, drugs/alcohol, malnourished |

    **D.**    **Jeffrey Epstein Directed A Sex Trafficking Venture**

39.    My opinion is that Jeffrey Epstein directed a sex trafficking venture, which JPMorgan seemingly does not contest.[43]

40.    I believe Epstein's trafficking is textbook human trafficking; however, the stage and scope of his sex trafficking venture is unique. In my experience, the majority of traffickers do not have access to the wealth and capital available to Epstein. Nonetheless, the trafficking Epstein engaged in and the power and control he exerted over his victims is consistent with both academic literature on sex trafficking and other sex trafficking ventures I have analyzed in my casework.

41.    My opinion that Epstein directed a sex trafficking venture is supported by the information I outline below that was known by or knowable to JPMorgan at the time, and is underscored by the 2019 indictment of Epstein on charges of sex trafficking conspiracy and sex trafficking[44] and Ghislaine Maxwell's 2022 federal conviction for her decade-long role in assisting, facilitating, and participating in Epstein's "abuse of minor girls by,

---

[43] *Jane Doe 1 v. JPMorgan Chase Bank, N.A.*, No. 22-cv-10019, May 26, 2023 Hr'g Tr. at 19:3 (Counsel for JPMorgan: "I think the way the Court could use those grand jury findings would be to ascertain something not contested, which is Mr. Epstein was engaged in horrendous criminal activity, including sex trafficking. That's not something being contested at all by JPMorgan."); Kevin Breuninger et al., *JPMorgan prepared to pay $290 million in settlement with Jeffrey Epstein victims*, CNBC (June 12, 2023), https://www.cnbc.com/2023/06/12/jpmorgan-reaches-settlement-with-epstein-victim-in-lawsuit.html ("'We all now understand that Epstein's behavior was monstrous, and we believe this settlement is in the best interest of all parties, especially the survivors, who suffered unimaginable abuse at the hands of this man,' JPMorgan said in a separate statement Monday morning.")

[44] *U.S. v. Jeffrey Epstein*, 19 Cr. 490, Sealed Indictment, https://www.justice.gov/usao-sdny/press-release/file/1180481/download.

13

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

among other things, helping Epstein recruit, groom, and ultimately abuse victims known to Maxwell and Epstein to be under the age of 18."[45]

### 1. Jeffrey Epstein Engaged In Commercial Sex With Girls Under The Age of 18

42.   In my opinion, Jeffrey Epstein engaged in commercial sex with girls under the age of 18.

43.   I reviewed a police incident report dated July 19, 2006, which detailed the Palm Beach Police Department's investigation into Epstein.[46] The incident report provides evidence of a pattern consistent with a sex trafficking venture. It shows that girls under the age of 18 and young women were recruited under the false pretense that they would provide a massage (or even a naked massage with limited touching) to Epstein for cash. Epstein then engaged in sexual acts with these girls for which he paid them cash. For example:

a.      ███[47] had just turned 17 when a friend asked her if she wanted to provide a massage and make $200.[48] During the massage, Epstein tried to touch ███'s buttocks, but ███ told Epstein that made her uncomfortable. ███ massaged Epstein while naked, and Epstein gave ███ $200. Epstein explained to ███: "I know you're not comfortable, but I'll pay you if you bring some girls." He told her "the younger the better." ███ told the police that she once brought a 23-year-old female to Epstein, and Epstein said she was "too old."[49]

b.      A woman reported that her 14-year-old stepdaughter ("Jane Doe") may have been molested in Palm Beach by a wealthy man. When police spoke with Jane Doe, she said ███ brought her to Epstein's house. Jane Doe was told to give Epstein a massage. Epstein instructed her to remove her clothes. Epstein then masturbated while Jane Doe gave him a massage. Epstein paid Jane Doe $300 and ███ $200 for bringing her.[50]

---

[45] *U.S. v. Ghislaine Maxwell*, 20 Cr. 330, Sealed Indictment, https://www.justice.gov/usao-sdny/press-release/file/1291491/download.

[46] JDoe_DBAG_005374 ("2006 PBPD Incident Report").

[47] In order to maintain their privacy, I will not use victims' full names in my report unless and when it is necessary. I will refer to victims either by their first and last initials or by the designation given to them in court documents or law enforcement records (*e.g.*, "Jane Doe No. 1"). For anyone named as a potential co-conspirator by the federal government I have used their name for clarity purposes only unless I have interviewed them determined they are a victim.

[48] 2006 PBPD Incident Report at 28.

[49] *Id.*

[50] *Id.* at 29.

14

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

c.     Alfredo Rodriguez, who worked as a property manager for Epstein in Palm Beach from at least 2004-2005,[51] was interviewed by police and "stated that it was his responsibility to keep the identity of the masseuses private. Mr. Epstein had a massage in the morning and one in the afternoon."[52] Rodriguez did not know the age of the girls showing up to provide massages but told the police he felt they "were very young"[53] and high school age.[54] He felt there was more than massage going on. He cleaned up after the massages and "would discover massager/vibrators and sex toys scattered on the floor. He also said he would wipe down the vibrators and sex toys and put them away in an armoire."[55] Rodriguez referred to himself as a "human ATM machine."[56] Epstein ordered Rodriguez to "maintain a minimum balance of $2,000 dollars on him at all times" so he could give cash to the girls and women who "massaged" Epstein.[57]

d.     Juan (sometimes also referred to as "John") Alessi, Epstein's employee for eleven years from approximately 1990 or 1991 through 2002,[58] told police that Epstein "had up to three massages a day." "Each masseuse that visited the house was different. Alessi stated that towards the end of his employment, the masseuses were younger and younger."[59] Alessi told police he sometimes set up massage tables in Epstein's bedroom or bathroom and at times "would have to wash off a massager/vibrator and a long rubber penis, which were in the sink after the massage."[60]

e.     Maria Alessi, who worked for Epstein from 1994 through 2002,[61] told police "that two or three girls would come during the day and provide the massages." She said the girls who arrived looked "young in age."[62]

f.     During the police search of Epstein's residence, they found:

     i.     "several photographs of young naked teenage girls;"[63]

---

[51] Jane Musgrave, *Epstein Journal's Findings Could Resurrect Case*, Palm Beach Post (Sept. 17, 2019), https://www.palmbeachpost.com/story/news/2019/09/17/epstein-journals-findings-could-resurrect-case/2645154007/.

[52] 2006 PBPD Incident Report at 51.

[53] *Id.* at 71.

[54] JDoe_DBAG_005816.

[55] 2006 PBPD Incident Report at 71.

[56] *Id.*

[57] *Id.* at 71.

[58] VI-JPM-000089979.

[59] 2006 PBPD Incident Report at 57.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.* at 44.

ii. a "massage table…located in the master bedroom;"[64] and

iii. telephone message books with messages for Epstein, including messages with the first names of girls, dates, and telephone numbers. This included names the police recognized from victim interviews. "The body of the messages was time of the day that they called for confirmation of 'work.'" Other names and numbers included these messages: "'I have girls for him' or 'I have 2 girls for him.' These messages were taken by [REDACTED] [REDACTED]."[65]

44. The witness accounts in the police incident report appear highly credible, because they are consistent, confirm each other, and were corroborated by, among other things, Epstein's staff and, reportedly, cell phone records and phone messages retrieved from Epstein's trash, and credit card records.

45. On July 19, 2006, following the Palm Beach Police Department's investigation, Epstein was indicted for Felony Solicitation of Prostitution in the Fifteenth Judicial Circuit in Florida.[66]

46. On September 24, 2007, Epstein entered into a Non-Prosecution Agreement ("NPA") with the United States Attorney's Office in the Southern District of Florida.[67] The agreement acknowledged the federal investigation into offenses that may have been committed by Epstein from 2001 through approximately September 2007. These included multiple offenses involving illicit sexual conduct involving minors and an investigation into sex trafficking. Specifically, "knowingly, in and affecting interstate and foreign commerce, recruiting, enticing, and obtaining by any means a person, knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act . . . ."[68]

47. The NPA identified potential co-conspirators of Epstein "including but not limited to [REDACTED]."[69] The NPA stated: "[I]f Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees it will not institute any criminal charges against any potential co-conspirators of Epstein."[70]

48. The NPA deferred all federal investigations, including the sex trafficking investigation, "in favor of prosecution by the State of Florida."[71]

---

[64] *Id.* at 44.
[65] *Id.* at 59.
[66] JDoe_JPMC_004535 at 42.
[67] JDoe_DBAG_005165 ("Non-Prosecution Agreement" or "NPA").
[68] NPA at 2.
[69] *Id.* at 5.
[70] *Id.*
[71] *Id.* at 2.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

49. On June 30, 2008, Epstein pled guilty in the 15th Judicial Circuit in Palm Beach County to one count of "Felony Solicitation of Prostitution" and one count of "Procuring Person under 18 for Prostitution." As part of the plea Epstein was to have "no unsupervised contact with minors" and was "designated as a Sexual Offender" under Florida law.[72]

50. At the time of Epstein's charge, "Procuring a Person under 18 for Prostitution" was defined as: "A person who procures for prostitution, or causes to be prostituted, any person who is under the age of 18 years commits a felony of the second degree."[73] This law was repealed in 2014 by Fla. HB 989, which was "an act relating to human trafficking."

51. In my experience, it is not uncommon for states to initially pass human trafficking legislation and then later integrate their human trafficking legislation with preexisting laws on prostitution like Florida did in 2014. If Epstein's crimes had been charged after 2014, the procuring count would not have been available. If the same type of charge were used, Epstein likely would have been charged under one of Florida's human trafficking laws.

52. In my opinion, the charge Epstein pled guilty to in Florida in 2008, "Procuring a Person under 18 for Prostitution," satisfies the definition of sex trafficking under the TVPA (*i.e.*, solicits commercial sex with a person under the age of 18) and is consistent with the investigation into sex trafficking crimes under the TVPA mentioned in the NPA. Stephen Cutler, who was JPMorgan's General Counsel from January 2007 until roughly the end of 2015, acknowledged that solicitation of someone under the age of 18 for commercial sex is a criminal act under the TVPA.[74]

53. On November 17, 2011, a New York court found "clear and convincing evidence," including the probable cause affidavit prepared by Florida law enforcement authorities, sufficient for a level three sex offender adjudication for Epstein for his "sex offenses in Florida."[75] The Court held: "The evidence before the SORA hearing court established that defendant committed multiple offenses against a series of underage girls. The girls were brought to defendant's home to provide "massages" that led to very serious sex crimes."[76]

### 2. Jeffrey Epstein Used Fraud, Force, And/Or Coercion To Induce Girls And Young Women To Perform Commercial Sex Acts

54. In my opinion, Jeffrey Epstein used fraud, force, and/or coercion to induce girls and young women to perform commercial sex acts.

---

[72] JDoe_DBAG_006690 at 20.

[73] Fla. Stat. § 796.03.

[74] Stephen Cutler Dep. (May 24, 2023) at 21:12-20; 90:7-93:4.

[75] *People v. Epstein*, 933 N.Y.S. 2d 239, 240 (N.Y. App. Div. 2011).

[76] *Id.*

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

55.     Although I believe Epstein routinely used fraud, force, and/or coercion—regardless of the victim's age, for any individuals under the age of 18, these elements are not required to find sex trafficking occurred under the TVPA.

56.     To support this opinion and my analysis below, I have included representative examples, including statements of girls and young women which describe their experiences. It is common in the field of human trafficking to rely on the reports of victims to analyze potential human trafficking ventures. Many of the statements I reviewed were strikingly similar in their pattern of recruitment and exploitation, reinforcing their credibility.

57.     Based on my review of the victim statements, it appears that Epstein or others acting under his direction recruited economically vulnerable girls and young women for commercial sex under the false pretense of receiving payment for providing a massage. Based on my experience, recruiting economically vulnerable girls and young women is common in sex trafficking situations. Below is a sampling of instances I reviewed which demonstrate this vulnerability:[77]



---

[77] Many of the documents I reviewed were redacted so I am unable to say how many victims met this criterion; however, I am unaware of any victim who described herself as economically stable.

[78] JDoe_JPMC_000723 at 000794.

[79] *Id*. at -000756.

[80] In the hearing, this Jane Doe was not given a Jane Doe number by the court. Based on my accounting in the transcript, she would be Jane Doe No. 10.

[81] JDoe_JPMC_000753 at 000829.

[82] In the hearing, this Jane Doe was not given a Jane Doe number by the court. Based on my accounting in the transcript, she would be Jane Doe No. 11.

[83] *Id*. at 000831.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



e.    ████ met Epstein in 2002 when she was 16 years old. According to the complaint she filed against Epstein and ██████, ██ was an "economically poor and vulnerable child" who was recruited by another minor and told "she could make $300 cash by giving an old man a massage on Palm Beach."[86]

f.

g.

h.

i.

---

[84] *Id.*

[85] *Id.* at 000832.

[86] JPM-SDNYLIT-00099549; *M.J. v. Jeffrey Epstein and Sarah Kellen*, No. 9:10-cv-81111, DE_1_Complaint-1902 at 7 (S.D. Fla. Sept.17, 2010) ("M.J. Compl.").

[87] JDoe_JPMC_000753 at -000774.

[88] *Id.* at -000790.

[89] ████00000378.

[90] ████ Dep. (Mar. 3, 2023) at 131.

[91] *Id.* at 214.

[92] *Id.* at 135.

[93] ████00000120 at -00000122.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

███████████████████████████████████████████

██████████████████████████████████████.[94]

58.     In addition, in my experience, immigration status can be another source of vulnerability for potential victims. In my conversation with ███, she said ██████████████████████████████████████████████████████████. Many of the women to whom Epstein made payments have Eastern European surnames, suggesting they may also be immigrants. It is well known—including by JPMorgan—that Eastern Europe is a source country for human trafficking victims.[95]

59.     According to the materials I reviewed, young girls and women were fraudulently recruited to perform paid "massages," "modeling," or other forms of work; however, in most instances, Epstein required sexual acts as part of the work. This fraud was perpetuated by the language used to recruit young girls and women to his home and even in the physical set-up he created in his home. At Epstein's residence, the young girls and women were taken to an interior, private space with a massage table. Excerpts from these victims' accounts are as follows:

    a.     ███ was told by another minor that if she gave "an old man a massage,"[96] she could make $300. The minor who recruited ███ called Epstein and scheduled ███'s trip to Epstein's house. During the call Epstein spoke with ███ and invited her. When ███ arrived, ██████ showed her to the massage room. ███ was not trained in massage and told Epstein. Epstein instructed ███ on how he liked his massage and then sexually assaulted her.

    b.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

    c.     ████████████████████████████████████████████████████████████

---

[94] ███_000456 at -000474.
[95] Trafficking in Persons Report U.S. Dep't of State (2009), https://2009-2017.state.gov/j/tip/rls/tiprpt/2009/index.htm; JPM-SDNYLIT-00174047.
[96] M.J. Compl. at 7-10.
[97] VI-JPM-000001756 at 31 (Virginia Giuffre Dep. (May 3, 2016) at 113:18-117:12).
[98] *Id.*

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



d.

.100

60.   Based on the materials I reviewed, many of the young girls and women experienced violence, threats of violence, or otherwise feared serious harm would occur if they did not do what Epstein wanted, including engaging in commercial sex. For example:

a.



.104

.105

99 This information came from interview with ▆▆▆ described in Section IV.I.
100 ▆▆ 000456 at -000473.
101 ▆▆▆ 00000378 at 00379.
102 *Id.*
103 *Id.*
104 *Id.*
105 ▆▆▆ 00000001.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



b.

c.  [111]

d.  Against ⬛'s wishes, Epstein forced a sexual act upon her during the massage. "…Epstein, while masturbating with his right hand, reached out his left hand and grabbed [⬛'s] vagina and butt over her clothes. [⬛] pushed [Epstein's] hand away and told him repeatedly not to touch her like that. Epstein was persistent in his attempt to grab [her] vagina and continued to grab her vagina and butt on multiple occasions after she told him not to."[112] Epstein paid ⬛ $300 in cash after this assault.

61.  Based on the materials I reviewed, in some cases, Epstein would coerce young girls and women into commercial sex by making them believe he cared about them. In my experience, this is a common tool of traffickers, which is especially effective when victims have been abused or harmed within their own families before they meet the trafficker.

a.  

---

[106] ⬛ Dep. (Mar. 3, 2023) at 132.
[107] *Id.* at 133.
[108] JDoe_JPMC_000753 at 000796.
[109] In the hearing, this Jane Doe was not given a Jane Doe number by the court. Based on my accounting in the transcript, she would be Jane Doe No. 11.
[110] JDoe_JPMC_000753 at 000832.
[111] *Id.* at 000833.
[112] M.J. Compl. at 8.
[113] ⬛00000060 at -00000075.
[114] *Id.* at -00000065.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



.," 118

b.

c.

d.

," 121

62. Epstein also coerced his victims into commercial sex by establishing control over their lives and emotionally manipulating them. For example:

a.



---

115 ▮▮▮00000378 at 00398.
116 ▮▮▮00000060 at 00063.
117 ▮▮▮00000378 at 00379.
118 *Id.*
119 JDoe_JPMC_000753 at 000796.
120 JDoe_JPMC_000753 at 000826.
121 ▮ Dep. (May 5, 2023) at 78.
122 ▮▮▮00000378 at 00398.
123 ▮▮▮00000060 at -00000077.
124 *Id.* at -00000066.
125 ▮▮▮00000378 at 00398.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



b.

c.

d.

63.     When in the Virgin Islands, Epstein had another layer of control over his victims due to the remoteness of his island. My understanding, based on my conversation with one of his victims mentioned in Section IV.I, is that once on the island, the women had no means to leave the island without Epstein's permission.

---

126 ▮ Dep. (Mar. 3, 2023) at 134.
127 *Id.* at 108, 129.
128 ▮ 000001 at -000003.
129 ▮ Dep. (May 5, 2023) at 77.
130 ▮ 000456 at -000471.
131 JDoe_JPMC-007449 at 07460.

24

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



."

64.     It is my expert opinion that the victim stories I reviewed exhibited a pattern of force, fraud, and/or coercion; however, for any individuals under the age of 18 these elements are not required to find sex trafficking occurred.

65.     Based on my review of the materials, Epstein paid girls and young women in both cash and other types of financial support for sexual acts, which is consistent with the definition of inducing a commercial sex act under the TVPA. For example:

   a.     During the Florida police investigation in 2005, a victim recounted that a teen recruiter who worked for Epstein said the more "you do the more you are paid."[132]

   b.     Many of the young girls and women who Epstein victimized mentioned being paid between $200-$300 dollars for a single session with Epstein with the pay increasing based on the sexual acts induced.[133]

   c.      ."[135]

   d.     [136]

   e.     [137]

66.     The fact that some of the victims did not resist the commercial sex is not inconsistent with human trafficking. In my experience, victims of human trafficking frequently do not fight back, say no, run away, try to escape, or even tell someone they need help. The

---

[132] 2006 PBPD Incident Report at 34.
[133] *See E.W. v. Jeffrey Epstein*, No. 2008 CA 028058, Compl. (Fl. Cir. Ct. 15th Cir. Palm Beach Cnty, Fla.); *Jane Doe II v. Jeffrey Epstein et al.*, No. 09-cv-80469-KAM, ECF No. 1 (S.D. Fla.), *Jane Doe v. Jeffrey Epstein*, 08-cv-80893-KAM, ECF No. 1 (S.D. Fla.), *Jane Doe No. 102 v. Jeffrey Epstein*, 09-cv-80656-KAM, ECF No. 1 (S.D. Fla.); *L.M. v. Jeffrey Epstein*, No. 09-cv-81092-KAM, ECF No. 1 (S.D. Fla.); , *M.J. v. Jeffrey Epstein*, 10-cv-81111, ECF No. 1 (S.D. Fla.); *Jane Doe 43 v. Jeffrey Epstein et al.*, No. 17-cv-00616-JGK-SN (S.D.N.Y.).
[134] Estate_JPM018245.
[135] *Id.*
[136]  Dep. (May 5, 2023) at 89.
[137]  Dep. (Mar. 3, 2023) at 115–120.

25

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

power dynamics inherent in human trafficking situations mean that victims may not believe that they are able to leave or worthy or capable of freedom or may believe that they or their families will be punished if they try to leave. That does not make their participation voluntary.[138]

67.   Based on my experience working with human trafficking victims, many victims of trafficking are afraid to seek help or talk to law enforcement. They may fear the real or perceived power or connections of their trafficker or worry they may not be believed. The statements made by some of the young girls and women in this case are in line with my previous experiences and it is reasonable in my opinion for individuals in their situation to perceive Epstein as powerful and worry about retaliation or not being believed. For example:



a.

b.

c.

d.

---

[138] In international law even explicit consent to trafficking does not negate the illegal behavior of the trafficker. It was the "...general agreement among participating States that consent of the victim should not be an issue in determining whether or not the crime of trafficking had been established." *See Issue Paper: The Role of 'Consent' In The Trafficking In Persons Protocol*, United Nations Office on Drugs & Crime (2014), https://www.unodc.org/documents/human trafficking/2014/UNODC_2014_Issue_Paper_Consent.pdf.

[139] ████ 00000060 at 00065.

[140] ████ 00000001 at 00020.

[141] ████ 00000060 at -00000066.

[142] ████ Dep. (May 5, 2023) at 90–91.

[143] *Id.* at 66.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



."[144]

e.  According to Epstein's pilot, David Rodgers, ▆ was transported via Epstein's private plane with Prince Andrew.[145]

**E.  JPMorgan's Due Diligence Indicates Epstein Was Involved In Sex Trafficking**

68.  JPMorgan's own due diligence files regarding Epstein contain many red flags for sex trafficking. For each year below, I list a few representative examples of the type of information JPMorgan had and explain how it was indicative of sex trafficking.

**2003**

69.  On May 21, 2003, Mary Rieth (Casey), Managing Director, sent an email to Paul LaHiff, Managing Director, referencing a Due Diligence Report (DDR) about Financial Trust (one of Epstein's companies) and a Vanity Fair Article.[146] I believe Ms. Rieth/Casey was referencing an article Vanity Fair published in March of 2003 about Epstein. The article contains red flags for human trafficking. For example:

> Epstein is known about town as a man who loves women—lots of them, mostly young. Model types have been heard saying they are full of gratitude to Epstein for flying them around, and he is a familiar face to many of the Victoria's Secret girls. One young woman recalls being summoned by Ghislaine Maxwell to a concert at Epstein's town house, where the women seemed to outnumber the men by far. "These were not women you'd see at Upper East Side dinners," the woman recalls. "Many seemed foreign and dressed a little bizarrely."[147]

70.  The reference to young women—particularly the one woman who was "summoned" to Epstein's town house—and models is a red flag for human trafficking. It is particularly indicative of both the escort services and the arts and entertainment (modeling) typologies of human trafficking, both of which involve commercial sex. In my opinion, the arts and entertainment typology is the closest fit because this article suggests that Epstein has a sexual relationship with and is transporting foreign women who are in the United States under the pretense of modeling.

---

[144] *Id.* at 87.

[145] *Giuffre v. Maxwell*, No. 18- 2868 (2d Cir.), ECF No. 283, ("Unsealed Maxwell Documents") at 292 (David Rodger Dep. (June 3, 2016) 138:22-25).

[146] Mary Casey Dep. (Apr. 7, 2023) Ex. 3.

[147] *Id.*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

71.     Another indicator of commercial sex and human trafficking is that Epstein engaged in extensive cash transactions. In 2003 alone, JPMorgan noted over $175,000 in cash transactions in Epstein's personal JPMorgan account.[148] In addition, Epstein made nearly $177,000 in payments to women in 2003.[149]

**2004**

72.     On February 8, 2004, JPMorgan opened accounts in its Private Bank for two young women (███ and ███) as a "favor" to Epstein.[150] The circumstances surrounding these account openings contain many red flags for sex trafficking, including that the DDRs for both women contain similar information provided by someone other than the women themselves.[151] For example:

   a.     The DDRs for both women state the information contained in the reports were provided by "Epstein advisor, Eric Ganey," not the women themselves.

   b.     JPMorgan's DDRs fail to include a date of birth for ███ and ███, which is particularly suspicious given their young age.

   c.     Both DDRs claim the women have a net worth of $100,000 through modeling assignments. They also note that Epstein often supports emerging models and has agreed to guarantee their credit card applications.

   d.     ███'s DDR states she is "a Slovakian citizen who came to the US for modeling work" and that Epstein "knows her personally." It further states that ███'s social security number "could not be confirmed as belonging to [███]."

   e.     ███'s DDR also states that: "Mary [Erdoes] will meet with her as soon as possible. She has met several times with Jeffrey Epstein." However, Mary Erdoes later testified she never met with ███

73.     As mentioned earlier in my report, government agencies that publish trafficking indicators agree that having someone provide information for the victim or not letting the victim speak for themselves is a classic sign of human trafficking. Further, based on my experience, opening a bank account for a foreign national female model without a date of birth or any government issued documentation, and having all her personal information supplied by a potential employer/sponsor is a red flag for human trafficking. In my opinion, the information in this DDR combined with the media report from the year prior about potentially transporting young foreign models increases the severity of this red flag.

---

[148] Expert Report of Jorge Amador ("Amador Report") at 25.
[149] *Id.*, Ex. F.
[150] JPM-SDNYLIT-00036564; JPM-SDNYLIT-00149696.
[151] *Id.*

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

74.     Also, JPMorgan noted $840,000 in cash transactions from Epstein's JPMorgan accounts in 2004—a sign of commercial sex and red flag for human trafficking.[152] Also in 2004, Epstein made over $161,000 in payments to women, including more than $36,000 to █████ and more than $17,000 to █████[153]

**2005**

75.     In 2005, JPMorgan identified over $900,000 in cash transactions from Epstein's personal JPMorgan account.[154] During this same time, Epstein also made more than $192,000 in payments to women.[155]

**2006**

76.     By at least July 26, 2006, JPMorgan's internal emails reflect discussion of Epstein's 2006 indictment for Felony Solicitation of Prostitution in Florida. On July 25, 2006, Lee Spelman, Managing Director of U.S. Equity, emailed Jes Staley, saying: "Did you read Page 6 today? Blurb about JE soliciting a minor."[156]

77.     On July 26, 2006, Mary Casey sent an email to Jes Staley with a link to a July 26, 2006 PalmBeachPost.com article about Epstein's indictment that had several red flags for sex trafficking.[157] The PalmBeachPost.com article opens with "Palm Beach billionaire Jeffrey Epstein paid to have underage girls and young women brought to his home, where he received massages and sometimes sex…" The article lays out in detail evidence from police documents, including:

   a.     A college student gave Epstein a naked massage and then "brought him six girls, ages 14 to 16, for massage and sex-tinged sessions" at Epstein's home.

   b.     A 27-year-old Epstein employee, █████, would arrange the sessions and prepare the massage table.

   c.     Police obtained statements from five alleged victims and 17 witnesses. Police contend Epstein "had sex with the girls" on three occasions.

   d.     █████ met Epstein at age 17 and was recruited to massage him. Epstein told her he would "pay her to bring him more girls—the younger the better." She stated she once brought a 23-year-old woman to him and "Epstein said she was too old…." She brought six girls to Epstein and said the girls were paid $200 for each session.

---

[152] Amador Report at 25.
[153] *Id.*, Ex. F.
[154] *Id.* at 25.
[155] *Id.*, Ex. F.
[156] JPM-SDNYLIT-00000183.
[157] Mary Casey Dep. (Apr. 7, 2023) Ex. 5.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

    e.    One 14-year-old victim recounted the details of her encounter in February 2005 including being paid $300 for a massage in her bra and panties. For bringing this child to Epstein, ███ received $200.

    f.    Police scoured the trash from Epstein's house and found notes with names and phone numbers, sex toys and female hygiene products. Notes stated that one female could not "come over at 7 p.m. because of soccer. Another said a girl had to work Sunday—'Monday after school?' And still another note contained the work hours of a girl, saying she leaves school at 11:30 a.m. and would come over the next day at 10:30 a.m."

78.    On July 26, 2006, Mary Erdoes emailed Staley and said the PalmBeachPost.com article was "so painful to read."[158] Staley responds, "I went and saw him last night. I've never seen him so shaken. He adamantly denies the ages." At his deposition, Staley clarified that Epstein denied the age of his victims but not the actual conduct.[159] Staley further testified that he relayed this information to JPMorgan.

79.    During Mary Casey's deposition, she acknowledged that in 2006, when she sent the PalmBeachPost.com article to Staley, Epstein was withdrawing upwards of $30,000 per month in cash from his accounts.[160]

80.    Casey further acknowledged that in 2005—the year before she sent the PalmBeachPost.com article to Staley—Epstein made $50,000 in payments to ███ ███ from Epstein's JPMorgan accounts.[161]

81.    JPMorgan acknowledged over $935,000 in cash transactions in Epstein's JPMorgan accounts in 2006.[162] Epstein also made over $184,000 in payments to women in 2006.[163]

82.    In my opinion, the information in Casey's July 26, 2006 email combined with Epstein's JPMorgan banking activities are significant because they provide detailed information and corroboration of Epstein's role not just in sex trafficking, but a sex trafficking venture. The information described in the article about the police investigation is consistent with the types of trafficking signaled by the red flags in 2003 and 2004.

83.    On October 17, 2006, JPMorgan held a "Rapid Response Team meeting."[164] JPMorgan noted that Epstein had accounts with balances totaling approximately $32 million and

---

[158] JPM-SDNYLIT-00099334.

[159] James Staley Dep. (June 10, 2023) 17:3-21:12 (rough transcript); James Staley Dep. (June 11, 2023) 401:12-404:11 (rough transcript).

[160] Mary Casey Dep. (Apr. 7, 2023) at 71.

[161] Mary Casey Dep. (Apr. 7, 2023) Ex. 6; Mary Erdoes Dep. (Mar. 15, 2023) Ex. 7.

[162] Amador Report at 25.

[163] *Id.*, Ex. F.

[164] JPM-SDNYLIT-00127953.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"cash withdrawals are routinely made in amounts for $40,000 to $80,000 several times a month, which total over $750,000 year to date."[165]

84. Following the Rapid Response Team meeting, JPMorgan decided to keep Epstein on as "solely" a banking client.[166]

85. I also saw references to high level JPMorgan employees joking about Epstein's association with young girls.[167] For example, on August 27, 2006, Staley emailed Erdoes: "Last night went to the Huggy Bear concert. The age difference between husbands and wifes [sic] would have fit in well with Jeffrey. What a joke." Erdoes responded, "Oh, and what I meant to tell you about last night was they [sic] were a few people laughing about Jeffrey. One of the guys ran a unit of ███. Apparently ███████ has 8 assistant, one is more beautiful than the other (even though he's gay). Anyway, lots of comparisons to JE."

86. In my opinion, this is significant because JPMorgan employees at this meeting had consistent information starting in 2004 about Epstein's potential trafficking and use of cash in this venture. The new information in October 2006 was that Epstein was indicted for inducing minors into commercial sex acts. In my opinion, the indictment combined with the previous knowledge of accusations of Epstein's use of cash to pay for sex with minors plus the scope of his cash withdrawals are extremely strong, if not conclusive, indications of sex trafficking.

**2007**

87. In 2007, JPMorgan's internal emails continued to reflect discussions of Epstein's 2006 indictment, but it does not appear that JPMorgan acted on the information. On June 5, 2007, Marcus Sheridan, Managing Director,[168] sent an email to Mary Casey discussing what to do with Epstein's accounts. Sheridan said: "[E]veryone knows this is a hot potato with jes in the middle."[169]

88. On September 20, 2007, Lisa Waters, Managing Director, emailed Mary Erdoes an article about Epstein from Page Six.[170] It included excerpts from the Palm Beach police records, including:

a. "Palm Beach police records show that on March 15, 2005, a 14-year-old girl alleged she had visited Epstein's estate, where she partially stripped and gave him a massage during which he 'pulled out a purple vibrator' and used it on her in exchange for $300."

---

[165] *Id.*
[166] JPM-SDNYLIT-00127953
[167] JPM-SDNYLIT-0009937.
[168] JPM-SDNYLIT-00001395 at 9.
[169] JPM_SDNYLIT-00001693.
[170] JPM-SDNYLIT-00099501.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b.    "A further probe uncovered five young women who said Epstein had masturbated and touched their genitals during massage, the records state."

c.    "A woman named ▮▮ – who described herself as 'like a Heidi Fleiss' – later admitted bringing six girls between the ages of 14 and 16 to Epstein's house, according to cops."

89.    On September 20, 2007, Mary Erdoes emailed Staley regarding the Page Six column. She said, "It's actually on page 14 in the "page six" column. Epstein Rumored 15 months jail with 15 months home confinement. Then a few details of one of the nights-yuck."[171]

90.    On October 25, 2007, Stephen Cutler, JPMorgan's General Counsel, emailed JPMorgan employee Brent Taylor, and asked, "Did we close the loop on Jeffrey Epstein?"[172] Mr. Taylor responded, "Not yet. Sleazy allegations in NY Post articles notwithstanding, we are still waiting to get the facts which we expect will emerge when he pleads guilty as expected (which has not happened yet)."

91.    In 2007, JPMorgan identified $520,000 in cash transactions from Epstein's personal account.[173] Also in 2007, Epstein made more than $276,000 in payments to women from his JPMorgan accounts.[174]

92.    In my opinion, the articles and discussions among JPMorgan employees—particularly when coupled with the cash transactions and payments to women—are highly indicative of Epstein engaging in a sex trafficking venture, particularly the commercial sex with minors.

## 2008

93.    In 2008, JPMorgan's internal emails showed continued discussions of Epstein's 2006 indictment and eventual 2008 guilty plea.

94.    On January 4, 2008, Lisa Waters and Mary Casey emailed about Epstein's 2006 indictment and impending guilty plea.[175] Lisa Waters said Epstein's court date was "pushed to march while he tries to 'hammer out' details of his 18 month prison sentence followed by house arrest." Ms. Waters also said, "We need to have the felony he pleads guilty to. So march. No one wants him."

---

[171] JPM-SDNYLIT-00099500.
[172] JPM-SDNYLIT-00274272.
[173] Amador Report at 25.
[174] *Id.*, at Ex. F.
[175] JPM-SDNYLIT-00002141.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

95.    In a January 25, 2008 email to Mary Erdoes, Lisa Waters reported: "AP and reuters – 50mm lawsuit filed in fed ct-miami against JE- sexual abuse of a minor etc. etc."[176]

96.    JPMorgan had a Rapid Response Team meeting on July 15, 2008 after Epstein pled guilty in which they discussed JPMorgan's due diligence on Epstein.[177] The July 2008 updated derogatory information on Epstein noted: "On July 3, 2008 Jeffrey Epstein was sentenced to 12 months in jail for solicitation of a prostitute and six months for procuring a person under age 18 for prostitution. His jail sentence will be followed by 12 months of house arrest."[178] The memo from this meeting stated: "No change to relationship approach"[179] or "[c]ontinue discussion with management"[180] after this updated information was included depending on the version of the document.[181]

97.    In my expert opinion, Epstein pled guilty to facts which meet the definition of sex trafficking under the TVPA. JPMorgan's internal emails and documents show extensive discussion of these facts.

98.    JPMorgan noted that Epstein engaged in $460,000 in cash transactions in 2008 alone and over $3.8 million in cash transactions from 2003-2008.[182] Moreover, Epstein made over $302,000 in payments to women in 2008 and nearly $1.3 million in payments to women from 2003-2008.[183] These transactions, coupled with the other information contained in JPMorgan's due diligence files, are significant red flags for sex trafficking.

99.    

---

[176] JPM-SDNYLIT-00099550.

[177] JPM-SDNYLIT-00127944.

[178] *Id.*

[179] *Id.*

[180] Mary Casey Dep. (Mar. 15, 2023) Ex. 30.

[181] It is not clear which outcome was the final or controlling one from the documents I reviewed, so I am including both of the outcomes I saw in my review.

[182] Amador Report at 25.

[183] *Id.*, Ex. F.

[184] JPM-SDNYLIT-W-00026257 (Tab "HaloECI_CaseJournal", Row 3).

[185] William Langford Dep. (May 3, 2023) at 285:7–20.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



**2009**

100.   In 2009, JPMorgan identified $160,000 in cash transactions from Epstein's personal JPMorgan accounts.[186] Also in 2009, Epstein made over $272,700 in payments to women.[187]

**2010**

101.   In 2010, JPMorgan's documents show the bank continued to receive negative information about Epstein. Moreover, Epstein continued engaging in extensive cash transactions and made significant payments to women.

102.   On June 9, 2010, Bonnie Perry emailed Paul Morris and included Mary Casey and James Delassio with a subject line of "Jeffrey Epstein." Perry was regressing the DDR to Morris for additional information and noted monthly cash withdrawals for Epstein from $30,000-$50,000.[188] Two articles attached to the email include information about Epstein. For example:

a.   2007 plea deal included paying attorneys to negotiate settlements on behalf of 33 women who "told prosecutors [Epstein] had paid them for sexually charged massages at his Palm Beach mansion when some were as young as 14."[189]

Epstein signed a federal non-prosecution agreement "under which he would not be charged with related federal crimes if he successfully served out his time and abided by the conditions under the state charges."[190]

In my opinion, this information is significant because it signals the potential scope of Epstein's sex trafficking venture when combined with the information JPMorgan had about cash withdrawals.

---

[186] Amador Report at 25.

[187] *Id.*, Ex. F.

[188] JPM-SDNYLIT-00008237.

[189] JPM-SDNYLIT-00008238.

[190] JPM-SDNYLIT-00008239.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

103.    In a July 31, 2010 email, Mary Erdoes told Jes Staley: "The feds many not be quite done with (JE). Having just completed 13 months in a fl jail for solicing[sic] prost [sic] from a minor, he now might be under investig [sic] for other possible crimes, including whether there's any evidence of child trafficking. E has settled several lawsuits by teens who say they were lured to his palm beach mansion for massages or sx [sic]. The us AG in fl wouldn't comment. E's lawyer, jack Goldberger, says he know nothing of any probe, and 'they are not and should not be any pending criminal investigations.'"[191]

104.    JPMorgan's DDR for Epstein included an August 4, 2010 Gawker Media article titled *The Sex-Trafficking Model Scout*.[192] The article includes the following:

   a.    "Jeffrey Epstein, the billionaire financier who the FBI believes molested around 40 underaged girls"

   b.    ████████████████████████████████████████████████████████

   c.    Paying women to bring him "economically desperate" teenagers to give him massages "that often led to sexual contact"

   d.    Receiving two 12-year old French girls as a "birthday present"

   e.    Flagging Epstein's relationship with Jean Luc Brunel, owner of MC2 Modeling, and that Epstein, Maxwell, Brunel, Alfredo Rodriguez, and ████ used the agency to bring in minor girls for "sexual play for money."

   f.    References that the FBI is investigating MC2 and Brunel for "possibly engaging in sex trafficking"

   g.    Mentions Epstein's plea of soliciting sex with a minor and settling numerous civil lawsuits from victims

105.    JPMorgan acknowledged that Epstein engaged in more than $250,000 in cash transactions in 2010.[193] Epstein also in 2010 made over $325,000 in payments to women, including nearly $70,000 in payments to ████████ and over $25 million in payments to Ghislaine Maxwell—further evidence of potential recruitment activity.[194]

106.    Based on my experience, this email indicates and provides detail about some of the individuals involved in Epstein's sex trafficking venture and provides indicators from a number of the human trafficking typologies mentioned above: Residential, Illicit Massage, Arts and Entertainment, and Personal Sexual Servitude.

---

[191] JPM-SDNYLIT-00100251.
[192] JPM-SDNYLIT-00036580 at 00036596.
[193] Amador Report at 25.
[194] *Id.*, Ex. F.

36

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

107.    The information about ███ in this DDR is particularly troubling given that JPMorgan opened an account for her with little to no information—and none of the information JPMorgan did have was provided by ███ The information in the article about ███ being a ██████ is consistent with Personal Sexual Servitude typology.

108.    The information in this article about MC2 is also significant, because it provides more context for the 2003 Vanity Fair article about Epstein and his sourcing of victims. It also further supports the Arts and Entertainment typology I discussed earlier in my report.

109.    In addition, the information in this DDR reflects that, over time, the information about Epstein and his involvement in sex trafficking has not been resolved with his conviction and jail sentence but rather increased. This article references 40 underaged girls as victims, a modeling agency devoted to providing minors for sex, children given as a birthday present, and the existence of a potential personal sex slave purchased from her parents. These are all strong red flags that are highly indicative of a sex trafficking venture—particularly when combined with the significant cash transactions and payments to women.

110.    On November 9, 2010, Mary Casey emailed James Dalessio and Paul Morris and copied Kevin McCleerey with the subject "Re: Excerpts from recent articles."[195] In response to an email from James Dalessio the day before highlighting articles about new allegations against Epstein related to child trafficking, Dalessio asked if Morris and Erdoes were "still comfortable with this client who is now a registered sex offender?" Erdoes asked for the status of the investigation and inquired who should schedule a meeting. The articles include the following information:

   a.   Epstein may be under investigation for child trafficking and whether a modeling agency "run by a friend of the Wall Street investor … fed his appetite for underage foreign girls."[196]

   b.   New federal lawsuit against Epstein asking for more than $50 million in damages for alleged repeated sexual abuse when the victim was 16. The victim "███ alleges she was coerced into prostitution as a minor by Epstein, assisted by his employee ███████."[197]

   c.   Allegations by ███ that Epstein "has transferred and is transferring his assets overseas and elsewhere to conceal them from her."[198]

111.    In my opinion, JPMorgan had overwhelming evidence of Epstein's sex trafficking venture at this point from both from its own due diligence research and Epstein's

---

[195] JPM-SDNYLIT-00010814.
[196] Id.
[197] Id. at 00010815.
[198] Id.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

activities in his JPMorgan accounts. JPMorgan employees used either the terms "child trafficking" or "human trafficking" or the definition of sex trafficking in their communications regarding Epstein.

112. Further, multiple employees had concerns about JPMorgan's relationship with Epstein. In fact, none of JPMorgan's top compliance or legal advisors wanted to keep Epstein as a client, including Catherine Keating (CEO of JPMorgan's Private Bank),[199] Kevin McCleerey (Private Bank Risk Management),[200] John Duffy (CEO of JPMorgan's Private Bank),[201] Phillip Deluca (AML Manager),[202] William Langford (former Global Head of Compliance),[203] and Stephen Cutler (former General Counsel).[204] Moreover, William Langford believed at the end of 2010 to early 2011 that JPMorgan "should exit Epstein as a client"[205] because Epstein "pled guilty to soliciting sex with an underage girl. That was enough for me."[206]

**2011**

113. In 2011, JPMorgan's documents show a heightened amount of discussion regarding Epstein's involvement in sex trafficking and whether to retain him as a client.

114. At some point around January 2011, Langford requested a "responsor" of Epstein "in light of the new allegations of human trafficing [sic] which the firm has been actively assisting law enforcement in uncovering others engaged in this practice"[207]

115. On January 6, 2011—the day before JPMorgan held another Rapid Response meeting— Maryanne Ryan emailed Phillip Deluca, "BTW, 4 tomorrow is the rapid response meeting on Epstein, the sleazy PB client."[208] Deluca responded, "This is the guy who likes young girls, correct? Hope that they do not cave!!" This shows Epstein's sexual relationship with girls and young women was known internally at JPMorgan.

116. The notes from JPMorgan's January 7, 2011 Rapid Response team meeting state: "During the period of March 2010 to December 2010, there were eight large cash withdrawals totaling $240,000 where Currency Transaction Reports were filed."[209] Three press excerpts from July 2010-September 2010 (excerpted above) were also included in the report. These articles were about Epstein being under investigation for "other sex

---

[199] JPM-SDNYLIT-00002141.
[200] JPM-SDNYLIT-00269848.
[201] JPM-SDNYLIT-00269848.
[202] JPM-SDNYLIT-00194062
[203] William Langford Dep. (May 3, 2023) at 239:11-23.
[204] Stephen Cutler Dep. (May 24, 2023) at 394:24-395:8.
[205] William Langford Dep. (May 3, 2023) at 58–59.
[206] *Id.* at 59–60.
[207] JPM-SDNYLIT-00011965.
[208] JPM-SDNYLIT-00194062.
[209] JPM-SDNYLIT-00127930.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

crimes, including child trafficking," Epstein's completion of home arrest, and a lawsuit being filed against Epstein by a woman alleging Epstein abused her as a teen. The meeting notes indicate the conclusion of the Rapid Response Team was "[n]o change to relationship approach."

117.   JPMorgan also identified $290,000 in cash transactions from Epstein's personal JPMorgan account in 2011.[210] Epstein also made over $325,000 in payments to women in 2011.[211]

118.   In my opinion, these communications are concerning because JPMorgan had numerous markers of red flags for sex trafficking, including specific allegations of sex trafficking. The fact that the trafficking concerns were growing instead of receding is also concerning—particularly when coupled with ███████████████████████████ ██████████████████████████.[212]

119.   Maryanne Ryan summarized damning evidence from the Rapid Response meeting regarding Epstein in a January 7, 2011 email to Phillip Deluca and Arthur Middlemiss.[213] She said:

> This email is a summary of the Rapid Response meeting regarding Jeffrey Epstein. It involves an ask of William so I am sending it to you first. . . . Jeffrey Epstein is a friend of Jes S and Catherine feels that PB along with William should meet with him to explain the HT project and explain the banks recognition on the project and whether Epstein if further exposed could have a potential serious impact.
>
> Epstein was released in July from house arrest and the Palm Beach Post carried two articles saying DOJ may be investigating for child trafficking via a modeling agency he is part owner in. I think Catherine believes that after the briefing on HT that Jes would need to point blank ask Jeffrey the status of any criminal investigations. Catherine made sure we knew that no one on today's call was in favor of having retained him as a client. Seems it all is due to Jes's personal relationship. Note he has about 212 mil in the bank and some in JPMS (old Bear PCS)… I also spent a good deal of time looking at his assistant or young lady he brought over from Praque [sic] (or some place like that) account. She was involved in some of the detailed escapades. She opened accounts in PB sponsored by him. Oh my were her debit transactions enlightening as compared to countless stories related

---

[210] Amador Report at 25.
[211] Id., Ex. F.
[212] JPM-SDNYLIT-W-00026257 (Tab "HaloECI_CaseJournal", Row 3).
[213] JPM-SDNYLIT-00194067.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

> to his escapade. Lots of salon, lingerie shops, drug stores ny palm beach and in st thomas (his places of residence). Plus lots of video like girls gone wild and some other shops not fit for my good catholic upbringing! The transactions are old 05 to 08. Besides frequent spa like charges it has died down . Surprised she was never subpeoned[sic].

> The one new concerning thing is the one article about the DOJ investigation is saying they brought under age girls to the US via a modeling agency M2 that is owned by a guy named Brunel. Turns out the banker said today we extended Epstein a loan in relation to this modeling agency. It appears to be a legit modeling agency. If girls were exploited via their contract or arrangement it would be hard for us to tell.

> Bottom line we need W to meet with Jes to explain HT and then Jes could decide the next steps.

120.   In my opinion, this email contains multiple red flags for sex trafficking, including a very direct reference to trafficking ("child trafficking via a modeling agency [Epstein] is part owner in."). In my opinion, this exchange confirms JPMorgan's internal acknowledgement of Epstein's conduct as "trafficking" and JPMorgan's connection to the venture.

121.   On January 10, 2011, Philip Deluca emailed Nina Nichols and William Langford with the following statement about Epstein:

> He is alleged to be involved in the human trafficking of young girls and law enforcement is also allegedly investigating his involvement in this activity.[214]

122.   Based on my experience, the statement "alleged to be involved in the human trafficking of young girls and law enforcement is also allegedly investigating his involvement" is a glaring red flag for human trafficking. JPMorgan employees themselves framed their concerns about Epstein using the language from the TVPA.

123.   On January 14, 2011, Maryanne Ryan sent an email to William Langford and including Philip Deluca with the subject line "FW: Jeff Epstein."[215] The email referenced a Stand by Letter of Credit in the "name of Jeffrey Epstein for $1mm ($1mm o/s) to backstop a loan from Mellon United National (Miam sub of BNY Mellon) to MC2 Model Management, LLC." The email then said "some other interesting finds but no smoking guns." Some of the "interesting" information included:

---

[214] JPM-SDNYLIT-00152748_R.
[215] JPM-SDNYLIT-00152809.

40

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Epstein sponsored in the private bank "the opening of DDA accounts and a cc for "two 18 year olds (turned 19 days later) that appear to be part of his inner entourage. One is mentioned in many of the recaps of the escapades as a willing participant and assistant when hosting visitors. She has received about $450,000 since opening from Epstein…The willing participant had some lovely debit charges and spends a good deal at spa establishments. He did pay other girls, many models, no huge amounts. Sugar Daddy!"

124.    Based on my experience, this email has several red flags for trafficking. For a convicted sex offender who is being investigated for sex trafficking, the opening of accounts and a credit card for two 18-year-olds is a concern. Based on my review, one of the 18-year-olds referred to here is ███. ███[216] Even though this information is referenced in JPMorgan's own documents, the investigator here failed to make that connection. ███ █ ███. Based on my expertise in sex trafficking, it would not be uncommon for a victim of sex trafficking to be both abused and expected to participate in the sex trafficking venture itself. To my knowledge, ███ has never been indicted or charged with any crime related to Epstein's sex trafficking venture.

125.    Based on my experience, the term "Sugar Daddy" is a red flag for commercial sex acts and, depending on the context, for human trafficking. Although the term "sugar daddy" may imply or suggest a consensual relationship, there are examples of "sugar daddy" arrangements leading to sex trafficking.[217]

126.    On February 22 2011, Paul Morris asked JPMorgan's Global Security & Investigations group to conduct a background investigation on MC2 Model Management LLC in New York and media research on Epstein and J. Epstein and Co.[218] In its due diligence report, the Global Security & Investigations group noted the following derogatory information about MC2 Model:

"MC2 Model Management received $1million from Epstein in 2005. It is unknown if the money was given as a secret investment or payment for services as a procurer."[219]

"Jean Luc Brunel, owner of MC2 Model Management and Jeffery Epstein engaged in racketeering that involved luring in minor

---

[216] JPM-SDNYLIT-00036580 at 00036596.
[217] Meeghan Sheppard, *Exposing the Exploitative Realities of Sugar Dating*, Human Trafficking Search (2020), https://humantraffickingsearch.org/resource/exposing-the-exploitative-realities-of-sugar-dating/.
[218] JPM-USVI-00000593.
[219] JPM-USVI-00000594.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

children for sexual play for money. In addition, Brunel was a frequent passenger on Epstein's private jet and often visited Epstein in jail."[220]

127.     The report also showed the following about Jeffrey Epstein:

"Several newspaper articles were found that detail the indictment of Jeffrey Epstein in Florida on felony charges of soliciting underage prostitutes. Jeffrey Epstein served 13 months in jail.."[221]

"Jeffrey Epstein is required to register as a sex offender."[222]

"Numerous articles detail various law enforcement agencies investigating Jeffrey Epstein for allegedly participating in child trafficking and molesting underage girls."[223]

"Jeffrey Epstein has settled dozen civil lawsuits out of court from his victims regarding solicitation for undisclosed amount."[224]

128.     Again, the information in JPMorgan's due diligence is highly indicative of sex trafficking. It shows that law enforcement was investigating Epstein for sex trafficking and that multiple victims had filed lawsuits against Epstein.

129.     I also reviewed multiple emails in 2011 that show JPMorgan, as part of its due diligence on Epstein, reached out to Epstein's lawyers.

[.]"[225] As part of JPMorgan's process in deciding whether to keep Jeffrey Epstein as a client, someone from JPMorgan also talked to another of Epstein's lawyers, Jay Lefkowitz.[226]

130.     JPMorgan also spoke directly with Epstein about the allegations of sex trafficking. A DDR on Epstein signed by Catherine Keating on April 14, 2011[227] included this update in the summary of findings:

---

[220] *Id.*
[221] JPM-USVI-00000595.
[222] *Id.*
[223] *Id.*
[224] *Id.*
[225] ESTATE_005175.
[226] Stephen Cutler Dep. (May 24, 2023) at 354:12–357:8.
[227] JPM-SDNYLIT-00036570.

42

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

> "January 27, 2011 update: A few news stories during 2010 connects Jeffrey Epstein to human trafficking. The coverage team along with Catherine Keating and William Langford all met to discuss the situation and agreed to enhance monitoring and document a discussion with the client. Jes Staley discussed the topic with Jeffrey Epstein who replied there was no truth to the allegations, no evidence and was not expecting any problems. We will continue to monitor the accounts and cash usage closely going forward."[228]

131.   In my opinion, it is highly irregular to rely on denials from the alleged trafficker and his lawyers when investigating potential sex trafficking. In addition, it stands out that JPMorgan failed to reach out to its own customers, ███ or ███, for instance, or other women who received payments from Epstein, or the counsel of any of the women who sued Epstein in conducting a diligent investigation of Epstein's activities.

132.   In addition to speaking with Epstein and his lawyers, JPMorgan also reached out to law enforcement. On March 2011, Jonathan Schwartz, General Counsel of JPMorgan's Investment Bank, at the direction of JPMorgan's General Counsel, Stephen Cutler, contacted the United States Attorney for the Southern District of Florida "in an effort to determine whether there was an active criminal investigation into Epstein for alleged sex crimes. . . Schwartz spoke to the U.S. Attorney, but the U.S. Attorney did not disclose the existence of any such investigation."[229] In my experience, law enforcement frequently refuses to disclose the existence of human trafficking investigations and/or will not comment on open cases—a fact that Schwartz acknowledged in his email.

**2012**

133.   In 2012, JPMorgan had continued discussions about Epstein's use of cash. On March 27, 2012, John Duffy forwarded an email chain to Mary Erdoes.[230] The email chain discussed Epstein's cash withdrawals. Mr. Duffy said to Ms. Erdoes, "I previously spoke with JE about this activity. We'll need to discuss."

134.   On March 28, 2012, Duffy emailed Bonnie Perry about Epstein's cash withdrawals.[231] He said, "This is a better fact pattern than I thought. JE and I spoke about his pattern of cash withdrawals. His answer was "fuel payments in foreign countries"… Sounds like I still need to speak with him, however I did ask him to withdraw this cash from his aviation account for these payments. Clearly he is doing this."

---

[228] *Id.* at 00036575.
[229] JPMC First Supplemental Responses and Objections to Interrogatories in Lieu of Rule 30(b)(6) Deposition Testimony, Response to Topic 28.
[230] JPM-SDNYLIT-00136519.
[231] JPM-SDNYLIT-00230819.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

135.  In 2012, Epstein had $290,000 in cash transactions from his Hyperion Air account (which is the company that owned Epstein's aircraft).[232] Epstein also made over $225,000 in payments to women in 2012.[233]

136.  In my opinion and based on all the information JPMorgan had about Epstein by 2012, Epstein's explanation of cash being used for private air travel should have been a red flag for human trafficking. By 2012 Epstein had been criminally convicted for "Procuring a Person under 18 for Prostitution" and numerous JPMorgan employees had used the word "trafficking" in connection with Epstein. In my opinion, asking the suspected trafficker to explain a red flag is not a best practice when combatting human trafficking; additionally, accepting his answer of using cash for fuel payments in foreign airports should have been a concern based on what was known about him since 2003.

### 2013

137.  In 2013, JPMorgan's documents show continued discussion of Epstein and concerns regarding sex trafficking. The documents also show internal discussions about exiting Epstein, which JPMorgan eventually did.

138.  In a chat on what appears to be an internal messaging system between Philip DeLuca and Jessica Gomel on June 17, 2013 between 4:04 and 4:06pm, the following was said:

> Philip: I was just googling maryanne's perv . . . what a slime
>
> Jessica: ha -poor maryanne. Someone is going to hear us say that she have a perv
>
> Jessica: and totally misunderstand the message
>
> Jessica: what is his name? I want to google
>
> Philip: jeffrey Epstein
>
> Philip: He was a convicted sex offender and supposedly bought his way to a lesser sentencing. He paid a whole series of girls to stay quiet. The FBI is reportedly preparing to launch a new inquiry into Epstein after one of his under-age erotic masseuses, [▮], made a string of disturbing allegations about her role U.S detectives are said to be furious that Epstein, 58, escaped with only 13 months in jail for child sex offenses after he struck a plea bargain with prosecutors. The deal protected him from further prosecution for offences in Florida. But the significant of [▮]'s claims that under-age girls were moved abroad for sex is

---

[232] Amador Report at 25, 18-22.
[233] *Id.*, Ex. F.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

that she paves the way for the FBI to prosecute him for offences committed outside Florida under the Trafficking Victims Protection Act. PB did not want to keep him but due to his relationship with the old head of the PB (Jes Staley) they were over ruled.

Jessica: is Stanley till [sic] here?

Philip: no and I have to remove that comment[234]

139.   This discussion demonstrates that Epstein's sex trafficking was discussed at JPMorgan. It is also significant because Mr. DeLuca ties movement of underage girls abroad as a way he believes federal law enforcement could prosecute Epstein under the TVPA.

140.   ███████████████████████████████████
       ███[235]



---

[234] JPM-SDNYLIT-00100935.
[235] JPM-SDNYLIT-W-00026257 (Tab "HaloECI_CaseJournal", Row 26-27).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



141.    In 2013, Epstein engaged in more than $197,000 in cash transactions from his Hyperion account at JPMorgan.[236] He also paid more than $473,000 to various women in 2013.[237]

142.    

143.    I will note that JPMorgan's failure to tie the excessive cash withdrawals to Epstein's history of engaging in commercial sex with minors made it more difficult for JPMorgan to see this as a red flag for sex trafficking, which, when observed in the full context, it clearly is.

144.    Conversely, JPMorgan relied simply on negative media, which, in my opinion, contained red flags for sex trafficking, when it exited Ghislaine Maxwell. In December 2013, JPMorgan's rapid response tracker lists Maxwell and mentions a decision to exit her. The only reference is negative news, which is labeled as a "Human rights issue." It further notes "2011 Media alleging Maxwell solicited young girls for then boyfriend Jeffrey Epstein."[239]

145.    JPMorgan's documents also show that JPMorgan's top executives made the connection between Epstein's cash transactions and sex trafficking, which I believe is an appropriate connection to make. In fact, it appears JPMorgan communicated that connection as the main reason for exiting Epstein. In July 2013, Mary Erdoes and John Duffy discussed via email talking points for exiting Epstein from JPMorgan.[240] Duffy suggested the following talking points:

---

[236] Amador Report at 25.
[237] Id., Ex. F.
[238] JPM-SDNYLIT-W-00021995.
[239] JPM-SDNYLIT-00609197 at 2013 tab.
[240] JPM-SDNYLIT-00100966.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

1. The repetitive nature of your cash transactions is a problem for us and our relationship with you.
2. The regulatory standards in the banking industry continue to evolve with a very low tolerance for cash activity when combined with your personal history.
3. So, given the intersection of these circumstances we are in a uniquely challenged situation. Remediation is required and we need to ask you – in an orderly manner – to find another bank for your needs.

146.  In 2023—almost a decade after JPMorgan exited Epstein— JPMorgan's internal documents show JPMorgan concluded that Epstein was running a "sex trafficking ring" and made decisions to exit individuals connected to Epstein based on this reason.[241] For example, a Know Your customer Profile for Epstein's accountant, Richard Kahn, it states: "Customer was previously exited for RICHARD KAHN was a primary actor in the movement of EPSTEINs funds, employed as his longtime lawyer/accountant. KAHN is president of EPSTEINs charity, controlled the movement of EPSTEINs funds that potentially assisted in facilitating the sex trafficking ring, and is one of two executors of EPSTEINs will. Based on the aforementioned, we affirm the previous decision to exit the customer."

147.  In my opinion, JPMorgan's belated conclusion in 2023 that Epstein was engaged in sex trafficking was obvious for many years based on the red flags I identified.

**F.   Jes Staley's Communications With Epstein Show Red Flags For Human Trafficking**

148.  My review of Epstein's communications with Jes Staley reveals a close personal friendship which JPMorgan appears to confirm.

149.  In 2019, JPMorgan conducted a review regarding Staley's relationship with Epstein.[242] JPMorgan concluded that "Jes Staley appears to have a close relationship with Jeffrey Epstein, regularly communicating with him and seeking advice from him including while Epstein is incarcerated."

150.  The following are exchanges between Epstein and Staley which JPMorgan flagged in its review of Staley's relationship with Epstein:[243]

a.    On July 10, 2008, Staley wrote to Epstein, "I miss you. The world is in a tough place. Hang in there."[244]

---

[241] JPM-SDNYLIT-00184442.
[242] JPM-SDNYLIT-00901975.
[243] *Id.*
[244] *Id.*

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

b.    On September 29, 2008, Staley wrote to Epstein, "I hope you keep the island. We all may need to live there."[245]

c.    On December 30, 2008, Epstein wrote to Staley, "[S]unday will not work for me ., everyone is gone except the housekeepers, you are more than welcome to use the house. you will be well looked after, the chef from Paris is there."[246] Staley replies the next day, "I think I will head back. If something changes, let me know. Otherwise I've asked Rosa to make a date free in early January for me to visit the Palm Beach office and spend some time with you." Staley emailed again on December 31, 2008 to say, "I may try next week. Rosa, is there a day that works?"

d.    On August 27, 2009, Staley wrote to Epstein that he was on his boat and that he would be "[i]n London with Jamie, mid week."[247] Epstein wrote, "how long london? Do you need anything there?" Staley replied with "Yep."

e.    On November 1, 2009, Staley emailed Epstein. He said: "I owe you much. And I deeply appreciate our friendship. I have few so profound."[248]

f.    On December 4, 2009, Staley's email to Epstein said: "I realize the danger in sending this email. But it was great to be able, today, to give you, in New York City, a long heartfelt, hug."[249]

g.    On December 5, 2009, Epstein emailed Staley: "you were with larry , and I had to put up with…" and attaches the picture below.[250]

---

[245] JPM-SDNYLIT-00004240.
[246] JPM-SDNYLIT-00004661.
[247] JPM-SDNYLIT-00006171.
[248] JPM-SDNYLIT-00006592.
[249] JPM-SDNYLIT-00006713.
[250] JPM-USVI-00043990; JPM-SDNYLIT-00006715; JPM-SDNYLIT-00006716.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



151.   On December 20, 2009, Epstein emailed Staley nothing but a picture of a young woman.[251]



152.   In July 2010, Staley's email to Staley said: "Maybe they're tracking u? That was fun. Say hi to Snow White." Epstein responded: "[W]hat character would you like next?" When Staley said "Beauty and the Beast", Epstein replied: "well one side is available."[252]

---

[251] ESTATE_JPM001832.
[252] JPM-SDNYLIT-00008669.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

153.     In my opinion, these exchanges on JPMorgan business email should have been a red flag for JPMorgan. Epstein was a sex offender who continued throughout his time as a private bank client to withdraw significant amounts of cash and wire payments to women. During this same time, a JPMorgan employee was sending emails to Epstein that were at a minimum sexually suggestive.

154.     Based on my review of the materials, it appears that the personal relationship between Epstein and Staley was known to JPMorgan. In JPMorgan's due diligence file for Epstein, JPMorgan noted: "Epstein is well known to several JPM PB employees and senior management including Jes Staley."[253] Staley himself described the friendship in a 2009 JPMorgan email as "profound"[254]

155.     As an expert, I have never seen a best practice in identifying or preventing human trafficking that includes having someone with a "personal relationship" talk to the alleged trafficker and ask him/her if they are trafficking people or being investigated for trafficking.[255] The former head of JPMorgan's BSA/AML Compliance Program also admitted that he would not recommend asking clients if they are engaged in human trafficking as an effective method of preventing JPMorgan from facilitating human trafficking.[256] This is especially true given information, cited above, available to JPMorgan that Staley might have been in contact with women connected to Epstein. Also, in my opinion, accepting the denial of the alleged perpetrator perpetuates the underlying power dynamics which allow trafficking to exist, reflected in victims' statements that Epstein would not be investigated or prosecuted because of his connections and influence, also described above.

156.     On April 5, 2011, Jonathan Schwartz emailed Staley about Epstein.[257] He said, "I genuinely think it's best for Steve and AM to take it from here at this point without you having to weigh in on the ultimate decision." But it does not appear that Staley was prevented from participating in or recused himself from the process.

157.     In addition to Staley's personal relationship with Epstein, JPMorgan employees had significant interaction with Epstein due to what I understand to be the high touch nature of private banking. For example, Staley and a number of other JPMorgan employees visited Epstein's properties on multiple occasions. JPMorgan admitted that several JPMorgan employees visited Epstein's properties (*see* Figure 1 below).[258]

---

[253] JPM-SDNYLIT-00036258.

[254] JPM-SDNYLIT-00006592.

[255] JPM-SDNYLIT-00152756_R.

[256] Francis Pearn Dep. (Mar. 29, 2023) at 172:22–173:6.

[257] JPM-SDNYLIT-00373376.

[258] Mary Casey could not remember the names of the JPMorgan employees who accompanied her to the meetings with Epstein at his Manhattan townhouse. *See* JPMC Second Set of Interrogatory Responses on 30(b)(6) topics at 15.

50

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Figure 1: JPMorgan Employee Visits to Epstein Properties**

| Name | Number of Visits |
|---|---|
| **Manhattan, New York Townhouse** | |
| James (Jes) Staley | 8 visits |
| Justin Nelson | 12 visits |
| Thomas McGraw | 2 visits |
| David Frame | 1 visit |
| Paul Barrett | 1 visit |
| Chris French | 6 visits |
| Carolyn Reers | 1 visit |
| Mary Casey | 2-3 visits |
| Paul Morris | 3 visits |
| Jeffrey Matusow | 1 visit |
| Mary Erdoes | 2 visits |
| John Duffy | 1 visit |
| Jim Condren | 1 visit |
| Joanna Jagoda | 1 visit |
| **Little St. James (USVI)** | |
| James (Jes) Staley | 2 visits |
| **Zorro Ranch (New Mexico)** | |
| Justin Nelson | 1 visit |

158.   In my opinion, based on my review of the materials, these individuals likely had the opportunity to identify red flags for sex trafficking in Epstein's home(s), including potentially even observing Epstein's interactions with victims. For example, JPMorgan employee David Brigstocke, who JPMorgan did not identify as someone who visited Epstein's home, wrote in a September 12, 2012 email to Mary Erodes about someone's home: "Reminded me of JE's house, except it was more tasteful, and fewer nymphettes."[259]

**G.      Jeffrey Epstein's JPMorgan Accounts Show Signs Of Human Trafficking**

159.   In my opinion, the financial activity of Jeffrey Epstein's sex trafficking venture was present in JPMorgan banking services.

160.   During Epstein's relationship with JPMorgan, JPMorgan actively worked on anti-trafficking initiatives. "The ultimate goal of the JPMorgan human trafficking initiative was to safeguard JPMorgan from misuse by human traffickers."[260] From the vantage point of my experience in human trafficking, JPMorgan's approach to safeguarding itself

---

[259] JPM-SDNYLIT-00755203.
[260] JPM-SDNYLIT-00173973.

51

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

from trafficking was to search huge volumes of data from thousands of customers to identify whether they could see signs of human trafficking in the data. In other words, the goal of JPMorgan's human trafficking initiative was trying to find a needle in a haystack.

161.   JPMorgan had a project "to develop systemic controls designed to detect the Firm's use for illegal activity . . . as related to trafficking."[261] A report on the work of this project was issued in November 2010 *Human Trafficking Finance: Nature, Scope and Control Project.*[262] From its human trafficking initiative JPMorgan created what it called "typologies" to find such transactions. In my opinion, this type of searching was not needed in the case of Epstein's sex trafficking venture. Epstein was one of the high net worth clients at the private bank,[263] who JPMorgan knew was already suspected of sex trafficking. Epstein was a haystack of needles.

162.   Based on the documents I reviewed, the typology approach of JPMorgan's anti-trafficking work was framed around this belief: "Corporate AML acknowledged limitations on what the project could achieve, the principle one being that human trafficking-related financial activity often will not touch a domestic financial institution…Accordingly, to the extent that typologies could be identified associated with the physical movement of trafficked persons, Corporate AML decided they would be explored."[264] In my opinion, the reality of Epstein's sex trafficking venture reveals a flaw in this assumption. JPMorgan's institution was significantly touched by Epstein's human trafficking related financial substantial activity being domestic (*i.e.*, not cross border).

163.   Below, I will discuss the signs of sex trafficking that I found in Epstein's financial account activity. I will also note, when applicable, when a red flag would have been applicable using JPMorgan's own criteria from its anti-trafficking initiative—even though I believe JPMorgan's human trafficking initiative had severe limitations.

---

[261] *Id.*

[262] *Id.*

[263] Amador Report at 13-18; *See Raising the Standard In Private Banking Service*, JPMorgan, https://privatebank.jpmorgan.com/gl/en/o/raising-the-standard-in-private-banking-service ("Banking here is personal, and we work to gain a deep understanding of you and what's really important to you. With your unique goals and preferences always in mind, your team will move mountains to meet what the moment calls for."); *Personal Banking*, located at https://privatebank.jpmorgan.com/gl/en/services/banking/personal-banking ("Wealth can mean freedom and security, but managing it requires time and know-how. That's why J.P. Morgan Private Bank provides you with personalized services and a range of premium banking products for every aspect of your financial life. You'll have easy access to your money, when and where you need it, and an experienced Client Service team focused on you.").

[264] JPM-SDNYLIT-00173973.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 1. Large Cash Withdrawals

164.  In my review of the victim accounts, several of them mention multiple ways Epstein provided something of value in exchange for a sex act.[265] Almost all of the victims, including victim accounts from the 2006 indictment, mention being paid cash for a sexual act on one or more occasions. In addition, several of the victims mention being offered cash to recruit young girls for Epstein.

165.  Based on my review of the materials, Epstein used cash as an almost daily part of his sex trafficking venture. This is confirmed by the police interviews of three of his household staff as well as contemporaneous police interviews of victims from March 2005 to July 2006.[266]

166.  Moreover, JPMorgan's corporate representative testified that if a consumer had a history of excessive cash activity that would be a higher risk for human trafficking.[267]

167.  During the time period when Epstein was in Palm Beach, I estimate he was paying out, on average, between $400-$3,000[268] daily in cash for sexual acts from girls and young women. This does not include potential recruitment fees of $200 which were mentioned by numerous victims and in the Palm Beach police investigation. However, I was unable to determine how often recruitment fees were paid so I did not include them in the estimates below (*see* Figure 2).

### Figure 2: Epstein's Estimated Payments to Victims

| Estimated Daily Payments Per Victim | Estimated Monthly Payments to Victims for "Massages" | |
|---|---|---|
| | *2 Victims Per Day Estimate* | *3 Victims Per Day Estimate* |
| *Low Estimate ($200)* | $12,000 | $18,000 |
| *High Estimate ($1,000)* | $60,000 | $90,000 |

168.  Over the 11 years of private banking services provided to Epstein, JPMorgan documented over $5 million in Epstein's cash withdrawals (*see* Figure 3 below).

### Figure 3: JPMorgan's Reports of Epstein's Cash Withdrawals

| Year | Epstein #0438 | Epstein #0663 | Hyperion #4332 | NYSG #3130 | 116 East 65th St LLC#4235 | Total |
|---|---|---|---|---|---|---|
| 2003 | $175,310 | | | | | $175,310 |

---

[265] *See* 18 U.S.C. § 1591(e)(3).

[266] 2006 PBPD Incident Report

[267] Francis Pearn Dep. (Mar. 29, 2023) at 191:18–192:13.

[268] This amount reflects an assumption of two victims at the lowest sexual act pay rate of $200 per sex act and no payment for recruitment and then 3 victims at the highest rate I saw of $1000 and again no payment for recruitment.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | | | | | |
|---|---|---|---|---|---|
| 2004 | $840,000 | | | | | $840,000 |
| 2005 | $901,337 | | | $3,000 | | $904,337 |
| 2006 | $935,265 | | | $3,000 | | $938,265 |
| 2007 | $520,000 | | | $6,000 | | $526,000 |
| 2008 | $460,000 | | | $9,000 | | $469,000 |
| 2009 | $100,011 | $60,000 | | | $5,000 | $165,011 |
| 2010 | $223,397 | $30,000 | | | | $253,397 |
| 2011 | $200,000 | | $60,000 | | | $260,000 |
| 2012 | | | $290,000 | | | $290,000 |
| 2013 | | | $197,152 | | | $197,152 |
| **Total** | **$4,355,320** | **$90,000** | **$547,152** | **$21,000** | **$5,000** | **$5,018,472[269]** |

169.  The excerpts in previous sections of this report detail how Epstein targeted economically vulnerable girls and women. This is consistent with my experience and JPMorgan's own anti-trafficking work in identifying potential vulnerable populations who might be at risk for being recruited into human trafficking, including: "[t]hose living in poverty" and "women and families in debt."[270] For girls or women receiving these cash payments, these periodic, relatively low dollar payments were likely enough to be meaningful but not enough to allow them to become financially independent.

170.  It is my expert opinion that Epstein relied on cash for his sex trafficking. Based on my review of the materials cited above, Epstein relied, at least in part, on JPMorgan to obtain cash.

### 2.  Round-Dollar Wire Payments to Women

171.  JPMorgan's sex trafficking typology identified one indicator of sex trafficking as "[w]ire transfer activity inconsistent with customer's business, particularly international wires or round-dollar wires."[271] This is also consistent with my experience with sex trafficking.

172.  Throughout his time as a private banking client at JPMorgan, Epstein made at least $3 million in payments to 79 women. Many of these were round-dollar payments (*see* Exhibit E showing Epstein's payments to women).[272]

---

[269] The $21,707 difference between the Cash Transactions in Figure 7 ($5,040,178) and Figure 8 ($5,018,472) are due to: Account #0438 - a July 23, 2010 purchase of 10,000 EURO for $13,397.00 not recorded as cash, a July 23, 2010 withdrawal of $9,515.10 not reported on a CTR, and a February 3, 2009 CTR reflecting a January 13, 2009 transaction of $20,011 rather than $20,000 as reflected on check 1206; Account #4332 - a $1,600 due to check 1370 for the same amount dated 9/24/2012 not reported on a CTR; and Account #9169 - $27,000 of cash transactions not reported on CTRs.

[270] JPM-SDNYLIT-00174075 at 174076.

[271] *Id.* at 00174078.

[272] Exhibit E is the Amador Report Exhibit F.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

173.  Based on the materials I reviewed, Epstein used round number payments to women in his sex trafficking venture and relied, at least in part, on JPMorgan's banking services for these payments to women, which, according to JPMorgan's own guidelines, is a red flag for sex trafficking.

### 3.  Payments To Individuals Supporting Epstein's Sex Trafficking Venture

174.  Based on the materials I reviewed, Epstein employed a number of individuals who assisted him in his sex trafficking venture. I do not have enough information about the majority of the individuals identified below to determine whether they were co-conspirators of Epstein, victims of Epstein, or both.[273] However, for purposes of this report, I do not need to analyze each person and make a decision regarding their status, because the impact of JPMorgan's banking services to these individuals is in furtherance of Epstein's sex trafficking venture regardless of whether they are co-conspirators or victims.

175.  The 2007 NPA identifies Epstein's potential co-conspirators "including but not limited to ███████████████████████████]."[274] In 2022, Ghislaine Maxwell was sentenced to 20 years in prison for assisting, facilitating, and participating in Epstein's "abuse of minor girls by, among other things, helping Epstein recruit, groom, and ultimately abuse victims know to Maxwell and Epstein to be under the age of 18."[275] Her conviction was based on her actions between 1994 and 2004.

176.  Epstein referred Maxwell to JPMorgan, and she had authority over his JPMorgan personal checking account.[276] In addition, Epstein sponsored and provided all information for the opening of █████'s account at JPMorgan.[277]

177.  Epstein paid both Maxwell and the individuals named in the NPA as potential co-conspirators[278] from his JPMorgan accounts, including:

   a.  Ghislaine Maxwell: Between October 1999 and September 2022, Epstein paid Maxwell more than $25 million. *See* Exhibit F showing Epstein's payments to Maxwell.[279]

---

[273] In light of her conviction, I am confident Maxwell is a co-conspirator and based on my interview and explanation below, I believe ████ is a victim. However, inclusion in this section of anyone else is not an evaluation one way or the other of what role they played.
[274] NPA at 5.
[275] *Ghislaine Maxwell Sentenced To 20 Years In Prison For Conspiring With Jeffrey Epstein To Sexually Abuse Minors*, United States Attorney's Office, Southern District of New York, (June 28, 2022), https://www.justice.gov/usao-sdny/pr/ghislaine-maxwell-sentenced-20-years-prison-conspiring-jeffrey-epstein-sexually-abuse.
[276] JPM-SDNYLIT-00036396 at 00036397 and-00036400.
[277] JPM-SDNYLIT-00036564.
[278] NPA at 5.
[279] Exhibit F is Figure 15 from the Amador Report.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

      b.      ███████: Between 2003-2013, Epstein paid ████ at least $728,741.57 from JPMorgan accounts. *See* Exhibit G showing Epstein's payments to ████.[280]

      c.      ████: Between 2003-2013, Epstein paid ████ at least $767,772.64 from JPMorgan accounts. *See* Exhibit H showing Epstein's payments to ████[281]

178.    It is my expert opinion that Epstein could not have run his sex trafficking venture at the scope and scale he did without individuals assisting him. Epstein relied, at least in part, on JPMorgan to pay at least some of these individuals.

### 4. Private Air Travel

179.    In my opinion, when assessing for sex trafficking, it is reasonable to look closely at any forms of private airline transportation for someone who has been indicted and then later convicted of a crime which meets the federal definition of sex trafficking.

180.    JPMorgan's own anti-trafficking initiative highlighted the role of movement and transportation of human beings. JPMorgan's focus on movement of trafficked persons was included in its public discussions of its anti-trafficking initiative. One slide of a presentation at a money laundering enforcement conference in Washington, DC in October 2010 stated, "As a U.S. based FI with a primarily domestic depositor base and significant USD business footprint, JPMorgan focused efforts on cross-border human trafficking with the U.S. as a destination country for forced labor."[282]

181.    On June 17, 2013 JPMorgan employee Phillip Deluca specifically tied the transport of girls to potential liability under the TVPA: "…[b]ut the significance of ████'s claims that under-age girls were moved abroad for sex is that she paves the way for the FBI to prosecute him for offences committed outside Florida under the Trafficking Victims Protection Act."[283]

182.    JPMorgan also appears to have facilitated Maxwell's purchase of a Sikorsky helicopter in July 2007.[284] On June 15, 2007, Maxwell received a $7.4 million wire into her JPMorgan account 6312 from Epstein's Mellon Bank account.[285] On the same day, Maxwell transferred those same funds to Air Ghislaine, Inc.[286] JPMorgan account 4324. Then on June 18, 2007, $7,352,825.00 was transferred to Sikorsky Aircraft as a down payment for the purchase of a green helicopter – Sikorsky S76C.[287] According to the

---

[280] Exhibit G is Figure 9.3 from the Amador Report.
[281] Exhibit H is Figure 9.2 from the Amador Report.
[282] JPM-SDNYLIT-00174185 at 00174188.
[283] JPM-SDNYLIT-00100935.
[284] Amador Report at 46.
[285] *Id.*
[286] *Id.*
[287] *Id.*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Aviation Database, as of June 27, 2007, the helicopter with tail number N908GM was registered to Air Ghislaine, Inc.[288]

183.    A 2013 email from Maryanne Ryan to Kevin McCleerey, James Delessio and including Philip Deluca flagged some confusion about using cash for fuel, including: "You mentioned [the private bank] knew withdrawals were for fuel, seems odd that he would start paying cash for fuel in 2011, and since his jet probably follows him all over (NY-Florida to New Mexico)..why would all the check cashing for fuel occur in NY by the POA, wouldn't the withdrawals be where the plane or planes need fuel every place they take off from?"[289]

184.    Beginning in at least 2006, JPMorgan flagged Epstein's cash withdrawals as a potential source of concern.[290] In 2012, those cash withdrawals were labeled by Epstein as being used for fuel for his private air travel.[291] In my experience, and JPMorgan's own anti-trafficking initiative, this is a red flag, especially in the context of other information known about Epstein at the time.

185.    It is my expert opinion that Epstein used private air travel as part of his sex trafficking venture. Based on the materials I reviewed, Epstein relied, at least in part, on JPMorgan banking services to support his private air travel.

### 5.   MC2 Model Management

186.    In my opinion, Epstein's relationship with MC2 Model Management and its owner Jean-Luc Brunel was a red flag for human trafficking. Based on my review of JPMorgan's documents, JPMorgan's anti-trafficking initiative identified human trafficking concerns in regard to modeling agencies.[292] For example, in Appendix B of JPMorgan's summary of its human trafficking initiative titled "Human Trafficking Finance: Nature, Scope and Control Project" and dated November 2010, notes under "How are victims typically selected?" it includes "[j]ob or modeling agencies…"[293]

187.    In February 2004, JPMorgan accepted ▮▮ as a client at the request of Epstein.[294] The DDR for ▮▮ did not include a date of birth and stated in the summary of findings: "Jeffrey Epstein often supports models in the early stages of their careers. He has asked us the favor of opening a checking account for [▮▮▮] and he is guaranteeing her credit

---

[288] *Id*
[289] JPM-SDNYLIT-00194462.
[290] JPM-SDNYLIT-00127953.
[291] JPM-SDNYLIT-00020772.
[292] JPM-SDNYLIT-00151917.
[293] JPM-SDNYLIT-00173973; JPM-SDNYLIT-00174075.
[294] Epstein also made a similar request for ▮▮; I discuss her in a separate section below.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

card application."[295] Epstein used JPMorgan private banking services to pay ███ $36,049.30 from 2003-2013.[296]

188.    On March 1, 2011, Philip DeLuca sent an email to Maryanne Ryan that said, "Brunel 'ranks among the sleaziest people in the fashion industry. We're talking about a conveyor belt, not a casting couch. Hundreds of girls were not only harassed but molested.'"[297] This appears to be a quote from a July 22, 2010 article from the Daily Beast titled, "Jeffrey Epstein Pedophile Billionaire and His Sex Den."[298] The article also noted that, "According to a former bookkeeper, young girls were brought to the U.S. by MC2— often from Eastern Europe—then traveled on Epstein's private jets."

189.    In Maryanne Ryan's January 7, 2011 email to Phillip Deluca, she emphasized Epstein's connection to MC2 and modeling as a concern:

> This email is a summary of the Rapid Response meeting regarding Jeffrey Epstein…
> Epstein was released in July from house arrest and the Palm Beach Post carried two articles saying DOJ may be investigating for child trafficking via a modeling agency he is part owner in…
>
> The one new concerning thing is the one article about the DOJ investigation is saying they brought under age girls to the US via a modeling agency MC that is owned by a guy named Brunel. Turns out the banker said today we extended Epstein a loan in relation to this modeling agency. It appears to be a legit modeling agency. If girls were exploited via their contract or arrangement it would be hard for us to tell...[299]

190.    JPMorgan's April 2011 DDR for Epstein stated: "MC2 Model Management received $1 million from Epstein in 2005. It is unknown if the money was given as a secret investment or payment for services as a procurer,"[300] and "Jean Luc Brunel, owner of MC2 Model Management and Jeffrey Epstein engaged in racketeering that involved luring in minor children for sexual play for money. In addition, Brunel was a frequent passenger on Epstein's private jet and often visited Epstein in jail."[301]

---

[295] JPM-SDNYLIT-00149696.
[296] Amador Report, Ex. F.
[297] JPM-SDNYLIT-00100422.
[298] Conchita Sarnoff, *Jeffrey Epstein Pedophile Billionaire and His Sex Den*, Daily Beast (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den.
[299] JPM-SDNYLIT-00194067.
[300] JPM-SDNYLIT-00036570.
[301] *Id*, at 00036574.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

191.    In November 2012, Epstein transferred $25,000 from a JPMorgan account to MC2 Model Management.[302]

192.    

193.    Jean Luc Brunel committed suicide in February 2022 when he was incarcerated in France in connection with an investigation into the rape of minors and trafficking of minors for sexual exploitation.[304]

194.    In my opinion, Epstein used MC2 Model Management as part of his sex trafficking venture. Based on the materials I reviewed, Epstein relied, at least in part, on the financial services of JPMorgan to support MC2 Model Management.

## H.    Jeffrey Epstein's Sex Trafficking Venture Relied On Many Individuals And Entities—Including JPMorgan—To Operate

195.    Based on my experience and as the human trafficking typologies described above illustrate, sex trafficking operations are organized in different ways, ranging from one individual to multi-level organized crime rings. After reviewing the materials in this case, it is my opinion that Epstein did not act alone. Rather, he directed a number of individuals to run a sex trafficking venture which recruited young girls and women to perform commercial sex acts often through coercion, force, or fraud.

196.    I have included excerpts below to demonstrate some of the roles of additional participants in his sex trafficking venture. This is not meant to be an exhaustive list but rather examples of the type of evidence I relied on in reaching this opinion.

197.    The NPA identified potential co-conspirators of Epstein "including but not limited to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."[305] The terms of the NPA state "if Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees it will not institute any criminal charges against any potential co-conspirators of Epstein."[306]

---

[302] JPM-SDNYLIT-00054521.

[303] JPM-SDNYLIT-W-00000001 at 00000175.

[304] The Associated Press, *Jeffrey Epstein Associate Jean-Luc Brunel Is Found Dead in a French Jail Cell*, NPR (Feb. 19, 2022), https://www.npr.org/2022/02/19/1081961087/jeffrey-epstein-jean-luc-brunel-dead.

[305] NPA at 5.

[306] *Id*.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

198.    Based on the materials I reviewed, Epstein paid Maxwell and some of the individuals named as potential co-conspirators in the NPA,[307] including:

    a.    Ghislaine Maxwell: Between October 1999 and September 2022 alone, Epstein paid Maxwell $23.3 million. *See* Ex. F.[308]

    b.    ██████████: Between 2003-2013, Epstein paid ████ at least $728,741.57 from JPMorgan accounts. *See* Ex. G.[309]

    c.    [████]: Between 2003-2013, Epstein paid ████ at least $632,772.64 from JPMorgan accounts. *See* Ex. H.[310]

199.    There were multiple public articles detailing both ████'s and Maxwell's involvement in Epstein's sex trafficking venture. For example:

    a.    In October 2007, *New York Post* reported in multiple articles that Palm Beach police alleged that "Epstein's assistant, ████████, helped arrange massage sessions."[311]

    b.    In 2011, a *Vanity Fair* article noted that ████████ had refused to answer questions in a deposition about Prince Andrew's involvement with Epstein's schemes, citing her Fifth Amendment right to remain silent.[312]

    c.    A 2006 *Gawker* article described ████ as one of "Jeffrey Epstein's besties," and "Epstein's assistant, helping the billionaire financier and alleged perv to procure underage girls . . . for masturbatory massages, and escorting the girls in and out of his Palm Beach mansion."[313]

---

[307] *Id.*

[308] Exhibit F is Figure 15 from the Amador Report.

[309] Exhibit G is Figure 9.3 from the Amador Report.

[310] Exhibit H is Figure 9.2 from the Amador Report.

[311] Dan Mangan, *'Unhappy Ending' Plea Deal*, N.Y. Post (Oct. 1, 2007), https://nypost.com/2007/10/01/unhappy-ending-plea-deal/; Dareh Gregorian, *I Was Teen Prey of Pervert Tycoon*, N.Y. Post (Oct. 18, 2007), https://nypost.com/2007/10/18/i-was-teen-prey-of-pervert-tycoon/.

[312] *Prince Andrew: Ties to Jeffrey Epstein and His Tenuous Position in 'the Firm'*, Vanity Fair (June 29, 2011), https://www.vanityfair.com/news/2011/06/prince-andrew-ties-to-jeffrey-epstein-and-his-tenuous-position-in-the-firm.

[313] *Jeffrey Epstein Gets Off With a Little Help From His Friends*, Gawker (July 27, 2016), https://www.gawker.com/190237/jeffrey-epstein-gets-off-with-a-little-help-from-his-friends.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

d.    A 2009 *Gawker* article described ▮▮▮ as "Epstein's former assistant, who allegedly helped him with the logistics of his massages, etc. from underage girls."[314]

e.    In 2011, a *Daily Mail* article named ▮▮▮ as "the chief fixer who brought Epstein a succession of under-age girls for sex."[315]

f.    A 2011 *Daily Mail* article stated that Ghislaine Maxwell "has been accused of procuring for Epstein young women who were then paid for sexual favours, and even farmed out to his friends. One of them was [▮▮▮], an American girl who was 17 when she was flown to London, where she met Prince Andrew and spent time with him alone."[316]

g.    Another 2011 *Daily Mail* article described Maxwell as "[b]ankrolled by Epstein," and detailed ▮▮▮'s account of being approached by Maxwell to massage Epstein when ▮▮▮ was 15. The article mentioned that Maxwell once joked to ▮▮▮ that because she was 17, Epstein would "soon have to trade her in." It also included a photo of Prince Andrew with his arm around an underage ▮▮▮, with Maxwell smiling in the background.[317]

h.    In 2011, a *Mirror* article accused Maxwell of procuring "several young girls" for Epstein.[318]

200.   Based on the materials I reviewed, Epstein relied, in part, on others to recruit and obtain victims for his sex trafficking venture, including:

---

[314] Hamilton Nolan, *Jeffrey Epstein Kept Company in Jail By His Alleged Lesbian Sex Slave*, Gawker (July 22, 2009), https://www.gawker.com/5320323/jeffrey-epstein-kept-company-in-jail-by-his-alleged-lesbian-sex-slave,

[315] Stephen Wright, *Prince Andrew Named in Sex Quiz But Billionaire Pervert's Girl Aides Refuse to Say if They Even Know Royal*, Daily Mail (Mar. 7, 2011), https://www.dailymail.co.uk/news/article-1363701/Prince-Andrew-named-sex-quiz-Jeffrey-Epsteins-aides-refuse-say-know-royal.html.

[316] Catherine Ostler, *Unsavoury Association: How Robert Maxwell's Daughter 'Procured Young Girls' for Prince Andrew's Billionaire Friend*, Daily Mail (Mar. 5, 2011), https://www.dailymail.co.uk/news/article-1363247/Unsavoury-association-How-Robert-Maxwells-daughter-procured-young-girls-Prince-Andrews-billionaire-friend.html.

[317] Tom Leonard, *Prince Andrew Risks Losing Ambassador Job as Girl in Underage Sex Case Reveals Meeting Him*, Daily Mail (Mar. 2, 2011), https://www.dailymail.co.uk/news/article-1361296/Prince-Andrew-risks-ambassador-job-underage-sex-case-girl-reveals-meeting-him.html.

[318] Vincent Moss, *Prince Andrew: David Cameron's Adviser Gives Dressing Down to Duke of York Over Links to Billionaire Child Sex Offender Jeffrey Epstein*, Mirror (Mar. 6, 2011) https://www.mirror.co.uk/news/uk-news/prince-andrew-david-camerons-adviser-114577.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

a.     Ghislaine recruited ▉▉[319] and also took ▉▉ with her when she would go places to "try and pick up girls to bring back…"[320]

b.     Maxwell asked Tony Figueroa, a friend of ▉▉, if he had "found any other girls just to bring to Jeffrey…Pretty much every time there was a conversation with any of them, it was either asking [▉▉▉] where she was at, or asking her to get girls, or asking me to get girls."[321]

c.     ▉▉ described bringing multiple young girls to Epstein for payment.[322] ▉▉ was originally approached by a friend who asked if she wanted to make money by providing a massage. ▉▉'s friend and someone named "Tony" picked ▉▉ up and took her to Epstein's house. Upon arriving at Epstein's house, she was introduced to Epstein and a woman named ▉▉ (likely ▉▉▉▉▉▉). During the massage, Epstein tried to touch ▉▉ but she stopped him. Epstein said he understood she was not comfortable but would pay her if she brought over some girls. He told her "the younger the better." ▉▉ later brought several girls to his house who were then sexually assaulted by Epstein. Epstein paid her $200 for each girl she brought to massage Epstein.

d.





---

[319] VI-JPM-000001756 at 31 (Virginia Giuffre Dep. (May 3, 2016) at 113:18-117:12).

[320] Unsealed Maxwell Documents at 53 (Tony Figueroa Dep. (June 24, 2016) 88:12-24).

[321] Unsealed Maxwell Documents at 65 (Tony Figueroa Dep. (June 24, 2016) 200:5-24).

[322] 2006 PBPD Probable Cause Affidavit Incident Report at 1-4, 14.

[323] ▉▉ Dep. (May 5, 2023) at 77.

[324] *Id.* at 84.

[325] *Id.* at 86.

[326] *Id.* at 88.

[327] ▉▉ Dep. (Mar. 3, 2023) at 93.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



f.   In the Palm Beach police investigation, the police obtained the cell phone records of ██████████ and found "numerous telephone calls were made between ██████ ███ and the victims."[330]

201.   Based on the materials I reviewed, Ghislaine Maxwell instructed some of the victims in Epstein's sexual act preferences. For example:

a.

b.

c.



202.   Further, as noted above, it appears that Epstein used MC2 Model Management and his relationship with the owner Jean Luc Brunel to procure girls and young women.

203.   Based on the materials I reviewed, Epstein relied, in part, on others to transport victims to multiple locations for his sex trafficking venture. For example:

a.   At times Epstein employee Juan Alessi would pick up ██████ and bring her to Epstein's house.[334] He observed her bringing friends to Epstein's home.[335] Alessi

---

[328] *Id.* at 120–124.
[329] ██ Dep. (Mar. 3, 2023) at 115–120.
[330] JDoe_DBAG_005816 at 5824.
[331] ██ Dep. at 198.
[332] ██ Dep. at 198.
[333] 2006 PBPD Probable Cause Affidavit at 11–12.
[334] Unsealed Maxwell Documents at 22 (John Alessi Dep. (June 1, 2016) at 103:4-104:14).
[335] *Id.*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

also took ▮▮▮▮ and Epstein to the airport where Epstein's private jet was parked. His wife would drive the staff and luggage.[336]

b.   The flight logs kept by Epstein's pilot David Rodgers show he transported multiple females to various locations owned or controlled by Epstein, including:



i.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,[337]

ii.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,[338]

iii.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,[339] and

iv.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[340]

204.   JPMorgan also played a critical part in Epstein's sex trafficking venture by giving Epstein access to banking services. This includes, as noted throughout my report, allowing Epstein to withdraw $5 million in cash over 11 years and making more than $3 million in payments to women, including payments to women who JPMorgan's documents identified as co-conspirators and/or victims.[341] It also includes providing a letter of credit for MC2 Model Management.[342]

**I.   JPMorgan Had A Unique Opportunity To Intervene And Help Epstein's Victims Who Banked With JPMorgan—Including ▮▮▮▮[343]**

205.   As mentioned above, in my opinion, Epstein's behavior during his time as a JPMorgan customer involved several human trafficking typologies. Most of Epstein's victims were not JPMorgan customers; however, in a few cases they were. In this section, I am

---

[336] *Id.*
[337] ESTATE_000077.
[338] ESTATE_000149 at 0149.
[339] *Id.*
[340] *Id.* at 0157.
[341] Amador Report at 25, Ex. F; NPA at 5.
[342] JPM-SDNYLIT-00152809.
[343] ▮▮▮▮ told me that her name when she entered the United States was "▮▮▮▮▮▮▮▮▮" and she later changed her name to ▮▮▮▮▮▮▮▮. This combination of "▮▮▮▮" and "▮▮▮▮" appears throughout JPMorgan's documents, the NPA, and sometimes the media. I do not believe "▮▮▮▮▮▮▮▮" was ever her legal name.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

focusing on one victim, ▆▆▆, because in my opinion, she represents multiple human trafficking typologies employed by Epstein and multiple red flags were present in JPMorgan's own records and communications about her.

206.   On May 23, June 12, and June 15, 2023, I interviewed ▆▆▆ Information in this section can be attributed to my interview with her unless I have cited to a document or other piece of evidence. In my interview, I found ▆▆▆ to be credible and, based on my interview, the materials I reviewed in this case, and my experiences, I believe she is a victim of Epstein's sex trafficking venture. Her experience also confirms that Epstein engaged in an ongoing sex trafficking enterprise that relied upon JPMorgan's services and cooperation. I have summarized her experiences below to illustrate what I learned from her which informed my conclusion.



---

[344] JPM-SDNYLIT-00013546 (JPMorgan's DDR for Epstein states that Brunel's agency was called "Karin Paris")

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



---

[345] JPM-SDNYLIT-00036564.

[346] *Id.*; JPM-SDNYLIT-00128557 (defines Decision Maker (DM) as "[t]he client with the most influence over a relationship. The Decision Maker distinction is assigned by the client sponsor. Note that the Decision Maker does not necessarily have transaction authority over the rest of the client/accounts in the relationship.").

[347] JPM-SDNYLIT-00036564.

66

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



---

[348] JPM-SDNYLIT-00036564 at 6565.

[349] *Id.*

[350] Mary Casey Dep. (Apr. 7, 2023) at 138.

[351] ESTATE_JPM005238. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ."

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



[352] I was not taking notes during this meeting and this is my best recollection of what words she used. My understanding from the interview was that Epstein meant the $1 million to MC2 Model was what he had to pay to obtain or keep her and now she owed him that same amount.
[353] JPM-USVI-00000594.
[354]

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



207.    Based on my review of the materials produced in this case and my conversation with ███, her experiences are consistent with the human trafficking typologies of personal sexual servitude, arts and entertainment (modeling), and escort services excerpted above. I also identified several instances of Epstein using fraud, force, and/or coercion to get ███ to engage in commercial sex.

---

[355] JPM-SDNYLIT-00030057.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

208.



209. Based on the materials I reviewed, JPMorgan Private Banking employees never spoke with ████ They never confirmed her account information or asked her about any of the information they knew about her from their due diligence research. However, even if we ignore everything I learned from ████ and look only at JPMorgan's own due diligence and its own human trafficking typology, there were multiple documented indicators or red flags of ████'s human trafficking.

    a.     JPMorgan's anti-trafficking initiative identifies being "████████" as a way "victims are typically selected."[358] ████████████████████[359]

    b.     JPMorgan's human trafficking typology also lists "job or modeling agencies" under how "victims are typically selected."[360] In ████'s DDR, JPMorgan listed her net worth as $100,000 "through modeling assignments" and that "…Epstein often provides support to emerging models." [361]

    c.     In 2011, after Epstein's plea and the NPA, a JPMorgan email noted a letter of credit in Epstein's name to backstop a loan to MC2 Model Management and then said "some other interesting finds but no smoking guns." [362] Some of the "interesting" information included:

> Epstein sponsored in the private bank "the opening of DDA accounts and a cc for "two 18 year olds (turned 19 days later) that appear to be part of his inner entourage. One is mentioned in many of the recaps of the escapades as a willing participant and assistant when hosting visitors. She has received about $450,000 since opening from Epstein…The willing participant had some lovely debit

---

[356] JPM-SDNYLIT-00013546 at -00013562.
[357] Typology at 37.
[358] JPM-SDNYLIT-00174075.
[359] JPM-SDNYLIT-00036580 at 00036596.
[360] JPM-SDNYLIT-00174075.
[361] JPM-SDNYLIT-00036564.
[362] JPM-SDNYLIT-00152809.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

> charges and spends a good deal at spa establishments. He
> did pay other girls, many models, no huge amounts. Sugar
> Daddy!" [363]

210.    Based on my experience, this 2011 email is illustrative of the many indicators of █████
        trafficking missed by JPMorgan. By the time this email was sent in 2011, according to
        the executive summary of a 2011 JPMorgan document, Epstein:

- Was required to register as a sex offender. [364]
- Was indicted on "felony charges of soliciting underage prostitutes" [365] and had
  settled a "dozen civil lawsuits out of court from his victims regarding
  solicitation…" [366]
- Had "various law enforcement agencies investigating [him] for allegedly
  participating in child trafficking and molesting underage girls." [367]
- Was described as "engaged in racketeering that involved luring in minor children
  for sexual play for money" alongside MC2 Model Management owner Jean Luc
  Brunel. [368]
- Was known to have given MC2 Model Management $1 million in 2005 and the
  money was either a "secret investment or payment for services as a procurer." [369]

211.    
        [370]

212.    Recently, multiple Epstein victims wrote public letters to JPMorgan's executives,
        including Mary Erodes and CEO Jamie Dimon. [371] In one letter, █████ wrote, "Why did
        [the victims] get picked apart publicly when the reality is you and many more knew
        something and didn't speak up?! How did the unexplained cash withdrawals not get
        reported?" In another letter, █████ wrote, "[A]ll of the crimes he committed required cash

---

[363] *Id.*

[364] JPM-USVI-00000594

[365] JPM-USVI-00000595

[366] JPM-USVI-00000594

[367] JPM-USVI-00000594.

[368] JPM-USVI-00000592.

[369] JPM-USVI-00000592.

[370] JPM-SDNYLIT-00036564.

[371] Shannon Thaler, *Jeffrey Epstein Victims Plead with JPMorgan Execs to Admit They Knew about Abuse*, N.Y. Post (June 6, 2023), https://nypost.com/2023/06/06/jeffrey-epstein-victims-plead-with-jpmorgan-execs-to-admit-they-knew-about-abuse/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and your bank should have recognized that what he was doing was criminal and illegal."
She also said, "Knowing full well that your bank and your bank alone had information to
corroborate what dozens of kids like me were saying about the cash that he used to lure
us in, abuse us and keep us quiet, you never notified law enforcement who were
investigating his crimes." A third unidentified woman wrote to JPMorgan: "Why did you
let him stay at your bank after you knew the horrible things that he had done to so many
little girls."

213.    In my experience, opportunities to talk with current trafficking victims and potentially
        intervene in human trafficking situations are rare; however, JPMorgan had that
        opportunity with ████ in 2004. In fact, JPMorgan wrote in the DDR for ████ that Mary
        Casey would talk to her.[372] However, Mary Casey testified that she never talked to
        ████.[373] The basic questions asked in vetting a new customer – where ████'s money
        came from, how she knew Epstein, what her work, residence in the United States, and
        expected financial activities would be – could have provided JPMorgan with information,
        or additional grounds for suspicion, that would have been helpful in deciding on its own
        relationship with Epstein and/or making a report to law enforcement. I know from other
        cases I have worked on that this type of opportunity to interact with a victim during their
        exploitation can lead to rescue and law enforcement involvement.

        **J.      Compensation For The Harms Victims Suffered Should Reflect The
                 Severity, Scope, And Duration Of The Abuse They Suffered**

214.    In the U.S. legal casebook, *Human Trafficking Law and Policy*, the authors describe the
        role of civil litigation in human trafficking cases as: "...a powerful tool in the United
        States for addressing the growing problem of modern-day slavery, both at national and
        at global levels. As of 2013, there had been approximately 80 human trafficking civil
        actions filed…A majority of these cases have proceeded in the absence of criminal
        prosecution, indicating that the civil remedy has served as not only a compensatory tool,
        but also an important deterrence tool, filling a gap left by the criminal justice system
        …"[374] In my experience, this is still true about cases in the decade since 2013: civil
        litigation cases frequently occur in the absence of criminal prosecution.[375]

---

[372] JPM-SDNYLIT-00036564 at 36566.

[373] Mary Casey Dep. (Apr. 7, 2023) at 136:14–138:13.

[374] *Supra* note 2 at 273.

[375] In its 2022 report, *Using Civil Litigation to Combat Human Trafficking*, the Human
Trafficking Legal Center reported that since the passage of the civil remedy and as of December
31, 2021 there were 539 human trafficking civil actions filed in federal court. The report ends
with this statement "[f]or trafficking survivors, the civil remedy has become – and continues to
be – an essential tool to hold traffickers accountable in the federal courts." Merrick M. Black,
*Using Civil Litigation to Combat Human Trafficking: Federal Human Trafficking Civil
Litigation: 2021 Data Update*, Human Trafficking Legal Center (Sept, 2022) at 5, 24.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

215.   In this case, the Epstein Estate has already paid some damages through a process known as the Epstein Victims' Compensation Program ("EVCP"), and its approach can be used to help evaluate damages in this case.

216.   In my experience, it is extremely hard to use a point system or formula for sexual abuse or human trafficking harms. 
 ,"376

217.   ████████████████████████ 377 ████████████████████
████████████████████████████.378 The EVCP process was only for the sexual abuse perpetuated by Epstein, and did not fully compensate or claim to fully compensate claimants for those harms. More fundamentally, it also did not purport to compensate for harms created by the broader sex trafficking venture led by Epstein. The EVCP process also required individuals who accepted compensation to waive their right to further claims "relating to such allegations of sexual abuse against the Estate, related entities and/or related individuals."379 Some victims may not have wanted to sign away these rights and others may have been afraid to come forward or worried about the stigma and shame they might feel if their information was made public. ███████████████
████████████████████████████████████████████████████380 In my opinion, these worries of fear, shame, and stigma are likely preventing victims from coming forward still to this day.

218.   In my opinion, creation of a compensation fund provides a model to compensate for the harms suffered by victims trafficked in, from, or to the U.S. Virgin Islands. One way to think about the amount needed in such a fund would be to identify an average victim compensation amount and approximate the number of victims trafficked to the U.S. Virgin Islands.

219.   One approach that I recommend is to identify an average victim compensation amount by utilizing a reasonable daily compensatory damage for emotional distress amount per victim and multiply that number by the duration of the abuse and the number of victims.381 This does not mean I recommend giving each victim who was trafficked in

---

376 Jordana Feldman Dep. (May 1, 2023) at 83:2–4.
377 EVCP00000006.
378 According to documents prepared by the EVCP, ████████████████████
████████████████████████████████████████████████████
██████.
379   Epstein   Victim   Compensation   Program,   *Protocol*   (May   29,   2020)   at   7,
https://www.epsteinvcp.com/documents/4.
380 EVCP00000006.
381 This approach has been utilized by courts to assess a labor-trafficking victim's emotional distress damages. *See, e.g.*, *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1173–74 (D. Kan. 2018).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

the U.S. Virgin Islands this amount; rather, it is my opinion this is a reasonable proxy for assessing how much money per victim would be needed to set up such a fund.

220.    In my opinion, it is impossible to know the full scope of Epstein's sex trafficking venture or to identify every victim of his trafficking. However, it is possible to come up with a reasonable proxy for the number of victims trafficked in, from, or to the U.S. Virgin Islands based on the materials produced in this case.

221.    It is difficult to piece together the exact arrival and departure of all victims to Epstein's residence in the U.S. Virgin Islands, because, according to my conversation with ████, some women arrived and left solely on commercial flights, and some traveled one way on Epstein's private plane but left commercially, and at least one flew in and out of St. Barts. Additionally, even if all the victims had only traveled on Epstein's private plane, it does not appear a flight log was always kept.[382]

222.    While the passenger manifests are not complete, they are still revealing. I reviewed the passenger manifests for Epstein's plane with the tail number N908JE for 2005 and 2007.[383] Based on my review, I found approximately 22 trips either to or from the U.S. Virgin Islands for 2005 and 34 trips for 2007. If I thought a trip was a same-day trip from and to another island, I did not include the return trip in my tally. From this same review of the passenger manifests, I counted approximately 21 females who were flown to or from the U.S. Virgin Islands in 2005, and 13 in 2007.[384] I recognized some of the names as known Epstein victims from other materials I reviewed in this case. A few of the names from 2005 appeared in 2007 as well; however, I counted 10 females in 2007 who I could not identify on trips in 2005. Bringing in new females is consistent with the sex trafficking pattern Epstein established.

223.    Based on my review of flight logs, payments to women, and my interview with ████,[385] it is reasonable to assume 10 new female victims were trafficked in, from, or to the U.S. Virgin Islands per year as part of Epstein's sex trafficking venture.

224.    Based on that information, I estimate that Epstein trafficked 10 unique individuals to the U.S. Virgin Islands each year between 2002 and 2013, except for 2008 and 2009 when Epstein was incarcerated or under house arrest, or a total of 100 women.

---

[382] Unsealed Maxwell Documents at 257 (David Rodgers Dep. (June 3, 2016) at 103:10-22) (explaining that at least one of Epstein's pilots did not keep a flight log).

[383] I picked these years because the flight logs seemed more complete than other years.

[384] For the total number of potential female victims, I did not include Ghislaine Maxwell or females traveling in family units with individuals I assumed were male relatives (e.g., ████ ████████████), I did not include an individual listed as "nanny" or someone referred to as "JP," nor did I include Larry Visoski's (pilot) family members. I did include individuals without a name but listed as "female".

[385] ████ told me she traveled to the USVI many times with Epstein. She said it was so many times she was could not even estimate because it was such a regular occurrence.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

225.    Additionally, counsel provided a ███████████████████████████
        ███████████████████ That establishes a minimum floor for the number of
        individuals trafficked to the U.S. Virgin Islands. That list is attached as Exhibit I.

226.    If a compensation fund were established for victims trafficked in, from, or to the U.S.
        Virgin Islands by Epstein's sex trafficking venture, it is my opinion that an analysis
        similar to the EVCP should be used to determine damages on an individual basis in order
        to award funds. To most effectively ensure deterrence, any funds remaining after
        awarding compensatory damages to victims would then be distributed cy pres to
        organizations that focus on combatting human trafficking or sexual abuse.

227.    Using the average daily compensatory damage for emotional distress award multiplied
        by the number of trafficking victims in the U.S. Virgin Islands in paragraph 158 or 159
        and the average number of days that each victim was abused would produce a reasonable
        measure of compensatory damages in this case.

228.    It is my opinion that if the jury finds JPMorgan liable for violating the TVPA and awards
        punitive damages, the amount of the award should be set at the highest level to reflect
        the duration of JPMorgan's knowledge and facilitation of Epstein's trafficking, the
        severity, scope, and duration of the abuse victims suffered, and the substantial need for
        deterrence.

        **K.      JPMorgan Should Implement Meaningful Injunctive Relief To Prevent
                  Future Participation In Sex Trafficking Ventures**

229.    The role of JPMorgan in this case is not unique. Banks are frequently used by traffickers
        as tools to aid in their trafficking or to exploit their victims. In my experience and
        according to the National Survivor Study, financial abuse is often part of human
        trafficking. "Financial abuse by exploiters was reported by a majority of respondents."[386]
        This abuse may include, like in this case, opening bank accounts or applying for credit
        cards. It may also include taking out loans, applying for government assistance, and
        misuse of personal identification for financial purposes.[387]

230.    As the National Survivor Study highlights, this type of exploitation by traffickers and
        aided by financial institutions makes victims extremely vulnerable, even after their
        trafficking ends, because it limits or even prevents their ability to access basic financial
        tools.[388] Trafficking victims, even after their exploitation, are twice as likely to be
        unbanked in comparison with the U.S. population.[389] This is consistent with my

---

[386] *In Harm's Way: How Systems Fail Human Trafficking Survivors, Survey Results from the
First National Survivor Study*, Polaris Project (Jan. 2023), https://polarisproject.org/wp-
content/uploads/2023/06/In-Harms-Way-How-Systems-Fail-Human-Trafficking-Survivors-by-
Polaris.pdf, at 37.
[387] *Id*.
[388] *Id*.
[389] *Id*. at 38.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

experiences in representing and advocating for trafficking victims and with ▮▮▮'s experience. After ▮▮▮ was exited by JPMorgan, she struggled to access basic banking services. I believe, to prevent recurrence of the failures I observed, JPMorgan should work with human trafficking experts and individuals who have been victims of trafficking to develop special accommodations or banking products and protocols to address the unique needs trafficking victims face after being exploited and financially abused. This may, as the National Survivor Study suggests, include "providing access to bank accounts without overdraft fees and penalties."[390]

231.    To further prevent recurrence of the failures I observed, JPMorgan should review its private banking relationship with Epstein and identify missed opportunities to prevent human trafficking, and implement changes that could prevent such missed opportunities from occurring in the future. This review should include participation by individuals who have been victims of trafficking (lived experience experts) and non-law enforcement human trafficking experts. Only a small percentage of human trafficking cases are prosecuted in the United States. Relying solely on the perspective of law enforcement to understand human trafficking may result in too narrow of a focus.

232.    I also believe that JPMorgan should prevent the opening of accounts in the private bank without independent confirmation of basic identifying details from the customer. JPMorgan should also not rely solely on a potential trafficking sponsor in opening new accounts.

233.    In my opinion, to prevent recurrence of the failures I observed, JPMorgan should collaborate with human trafficking experts, including at least one that is not from law enforcement and those with lived experience, to develop human trafficking training based specifically on the unique risks of human trafficking inherent in the private banking relationship and to commit to sharing this training within JPMorgan.

234.    In addition, I recommend that JPMorgan prohibit the participation of any employee who has a personal relationship with a private banking client in the decision to retain or exit that client.

235.    Finally, I believe JPMorgan should also provide an opportunity for any of Epstein's victims to present information, in whatever form the victims choose to provide it, about the harm they experienced and the ways in which the bank could have intervened to identify or address their abuse. If the victims agree, JPMorgan should share that information with bankers and compliance personnel throughout JPMorgan. Further, I believe JPMorgan should compensate the victims for their time at the same rate as other human trafficking experts.

---

[390] *Id.* at 39.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

V.      CONCLUSION

236.    Given the above facts and principles and my expertise in the area, I herein state the
        following summary opinions:

   a.      Human trafficking presents in different ways but has the same core elements;

   b.      One common theme in human trafficking is the targeting of vulnerable people to
           victimize;

   c.      Human trafficking typologies and red flags can be helpful when assessing
           potential human trafficking;

   d.      Jeffrey Epstein directed a sex trafficking venture in which he recruited
           economically vulnerable girls and young women and with force, fraud, or
           coercion, or because they were minors, compelled them to perform commercial
           sex acts;

   e.      JPMorgan's own due diligence indicates Epstein was involved in sex trafficking;

   f.      Jes Staley's communications with Epstein showed red flags for human
           trafficking;

   g.      Jeffrey Epstein's JPMorgan accounts showed signs of human trafficking;

   h.      Jeffrey Epstein's sex trafficking venture relied on many individuals and entities—
           including JPMorgan—to operate;

   i.      JPMorgan had a unique opportunity to intervene and help Epstein's victims who
           banked with JPMorgan—including ███;

   j.      Compensation for the harms victims suffered should reflect the severity, scope,
           and duration of the abuse they suffered, as assessed herein; and

   k.      JPMorgan should implement meaningful injunctive relief to prevent future
           participation in sex trafficking ventures.

237.    I reserve the ability to supplement or amend my opinions, to state further opinions, or to
        rebut any subsequent allegations, depositions, expert reports, etc. that might arise in these
        matters.

Respectfully submitted, this 16th day of June 2023.

*Bridgette Carr*

Bridgette Carr

77

# Exhibit A

# BRIDGETTE CARR
Clinical Professor of Law
University Of Michigan Law School

███████████████

## EDUCATION

**University of Michigan Law School**                                          Ann Arbor, MI
Juris Doctor, *Cum Laude*
December 2002

**University of Notre Dame**                                                   Notre Dame, IN
Bachelor of Arts, *Cum Laude*
May 1998

## ACADEMIC PROFESSIONAL EXPERIENCE

**Clinical Professor – University of Michigan Law School**                     Ann Arbor, MI
**Co-Director, Human Trafficking Clinic and Lab**
September 2011 – Present (Clinical Assistant Professor 2011-2013)

> Teach and supervise law students providing direct legal representation to victims of human trafficking. Direct and facilitate a social justice innovation lab with graduate students from multiple disciplines to address the root causes of human trafficking.

**Associate Dean for Strategic Initiatives – University of Michigan Law School**   Ann Arbor, MI
August 2018 – June 2021

> Provided academic and administrative oversight for a multidisciplinary program involving graduate and professional schools, including curriculum development, personnel, and strategic planning decisions. Created a problem-solving bootcamp used program-wide.

**Adjunct Clinical Assistant Professor – University of Michigan Law School**    Ann Arbor, MI
**Director, Human Trafficking Clinic**
**Domestic and South Africa Externship Supervisor**
July 2009 – August 2011

> Developed and directed the Human Trafficking Clinic and the Human Trafficking Law Project. Taught and supervised law students providing direct legal representation to victims of human trafficking and students in externship courses.

**Associate Clinical Professor of Law – Notre Dame Law School**                Notre Dame, IN
**Director, Immigrant Rights Project**
July 2007 – June 2008

> Developed and established the Immigrant Rights Project Clinic. Taught and supervised law students providing direct legal representation to indigent asylum seekers, immigrant victims of domestic violence and victims of human trafficking.

**BRIDGETTE CARR**
Clinical Professor of Law
University Of Michigan Law School
███████████████

**Assistant Clinical Professor of Law – Ave Maria School of Law**             Ann Arbor, MI
**Director, Asylum and Immigrant Rights Law Clinic**
October 2006 – July 2007

> Directed the Asylum and Immigrant Rights Law Clinic. Taught and supervised law students providing direct legal representation to individuals seeking humanitarian immigration relief.

**Assistant Clinical Professor of Law – Ave Maria School of Law**             Ann Arbor, MI
June 2004 – September 2006

> Developed and established the law school's first clinical program. Taught and supervised law students providing direct legal representation to individuals seeking humanitarian immigration relief.

**PROFESSIONAL EXPERIENCE**
**Survivor Reentry Project – Expert Consultant**           Michigan
November 2015 – November 2017

**United Nations Office on Drugs and Crime -- Expert Consultant**     Remote Work
January 2014 – May 2014

**Associate Attorney – Miller, Canfield, Paddock & Stone, P.L.C.**       Michigan
January 2003 – May 2004

**SELECTED PUBLICATIONS**

Bridgette Carr, Anne Milgram, Kathleen Kim, and Stephen Warnath, *Human Trafficking Law and Policy,* LexisNexis (1st ed. 2014)

Munro-Kramer, M. L., Beck, D. C., Martin, K. E., & Carr, B. A. (2022). *Understanding Health Facility Needs for Human Trafficking Response in Michigan*, NATIONAL INSTITUTES OF HEALTH (Nov. 3, 2022).

White, Anna & Guikema, Seth & Carr, Bridgette, *Why are You Here ? Modeling Illicit Massage Business Location Characteristics with Machine Learning*, JOURNAL OF HUMAN TRAFFICKING 1-21 (Oct. 4, 2021).

Munro-Kramer, Michelle & Beck, Dana & Choi, Kristen & Singer, Rebecca & Gebhard, Annemarie & Carr, Bridgette, *Human Trafficking Victim's Service Needs and Outcomes: An Analysis of Clinical Law Data*, JOURNAL OF HUMAN TRAFFICKING, No. 6, 95-108 (Apr. 1, 2019).

**BRIDGETTE CARR**
Clinical Professor of Law
University Of Michigan Law School

██████████████████

*When Federal and State Systems Converge: Foreign National Human Trafficking Victims within Juvenile and Family Courts*, Juv. & Fam. Ct. J. 63, No.1 (Winter 2012)

*Examining the Reality of Foreign National Child Victims of Human Trafficking in the United States*, 37 Wash. U. J.L. & Pol'y 183 (2011)

*Special Symposium Feature: Successes and Failures in International Human Trafficking Law: Introduction*, 33 Mich. J. Intl. L. 33 (2011)

*Incorporating a "Best Interests of the Child" Approach into Immigration Law and Procedure*, 12 Yale Hum. Rts. & Dev. L.J. 120 (2009)

*We Don't Need to See Them Cry: Eliminating the Subjective Apprehension Element of the Well-Founded Fear Analysis for Child Refugee Applicants*, 33 Pepp. L. Rev. 535 (2006)

**<u>BAR ADMISSIONS</u>**

State of Michigan

## ERRATA SHEET FOR EXPERT REPORT OF BRIDGETTE CARR

1.   Footnote 47 should be modified as follows: "In order to maintain their privacy, I will not use victims' full names in my report unless and when it is necessary. I will refer to victims either by their first and last initials or by the designation given to them in court documents or law enforcement records (*e.g.*, "Jane Doe No. 1"). For anyone named as a potential co-conspirator by the federal government I have used their name for clarity purposes only unless I have interviewed them and determined they are a victim."

2.   Paragraph 72(e) should be modified as follows: ███████ DDR also states that: 'Mary [~~Erdoes~~ Casey] will meet with her as soon as possible. She has met several times with Jeffrey Epstein.' However, Mary ~~Erdoes~~ Casey later testified she never met with ███████

3.   Paragraph 86 should be modified as follows: "In my opinion, this is significant because JPMorgan employees at this meeting had consistent information starting in 2004 about Epstein's potential trafficking and use of cash in this venture. The new information discussed in the October 2006 Rapid Response Team Meeting was that Epstein was indicted for inducing minors into commercial sex acts. In my opinion, the indictment combined with the previous knowledge of accusations of Epstein's use of cash to pay for sex with minors plus the scope of his cash withdrawals are extremely strong, if not conclusive, indications of sex trafficking."

4.   Paragraph 227 should be modified as follows: "Using the average daily compensatory damage for emotional distress award multiplied by the number of trafficking victims in the U.S. Virgin Islands in paragraph ~~158~~ 224 or ~~159~~ 225 and the average number of days that each victim was abused would produce a reasonable measure of compensatory damages in this case."

_Bridgette Carr_
Bridgette Carr

_7/6/23_
Date