## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case Number: 1:22-cv-10904-JSR |
| JPMORGAN CHASE BANK, N.A. | ) ) | |
| Defendant/Third-Party Plaintiff. | ) ) | |
| JPMORGAN CHASE BANK, N.A. | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| JAMES EDWARD STALEY | ) ) | |
| Third-Party Defendant. | ) ) | |

## GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS'
## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO EXCLUDE EXPERT OPINIONS OF
## KIMBERLY MEHLMAN-OROZCO, JOSEPH FONSECA, AND CARLYN IRWIN

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

LEGAL STANDARD.................................................................................................... 3

ARGUMENT ................................................................................................................ 5

    I.   Dr. Mehlman-Orozco's Testimony Should Be Stricken in Whole or Significant Part....... 5

        A.  Dr. Mehlman-Orozco's Testimony Should Be Excluded In Its Entirety Because She Is Not Qualified to Serve As an Expert On Human Trafficking. ..................................... 6

        B.  Dr. Mehlman-Orozco Lacks Expertise Regarding Financial Regulations and Standards........................................................................................................ 8

        C.  Dr. Mehlman-Orozco Offers Opinions That Contradict the Plain Language of the TVPA. ........................................................................................................ 10

        D.  Dr. Mehlman-Orozco's Opinions Regarding Secondary Exploitation and Misidentification Are Irrelevant and Unfounded........................................................ 12

    II.  The Court Should Strike the Proposed Expert Opinions of Joseph Fonseca. ................... 14

        A.  Background Facts................................................................................................ 15

        B.  Mr. Fonseca is Not Qualified to Provide Expert Testimony on Uses of ▮ in Federal Trafficking Investigations.............................................................. 19

        C.  Mr. Fonseca's Opinions About What Federal Law Enforcement Would Have Done are Not Based on Sufficient Facts.............................................................. 21

    III. The Court Should Exclude Carlyn Irwin's Opinions Related to Economic Development Commission Benefits. .......................................................................................... 23

        A.  Ms. Irwin's EDC-Related Opinions Are Irrelevant. .................................................. 24

        B.  Ms. Irwin Lacks Sufficient Qualifications to Opine Regarding EDC Procedures. .... 25

        C.  Ms. Irwin Should Not Be Permitted To Testify Regarding a Potential "Improper Motive." ........................................................................................................ 27

CONCLUSION............................................................................................................ 29

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*523 IP LLC v. CureMD.com*,
   48 F. Supp. 3d 600 (S.D.N.Y. 2014) ...................................................................... 3

*Coffey v. C.I.R.*,
   663 F.3d 947 (8th Cir. 2011) ............................................................................ 26

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)............................................................................................ 4

*Davis v. Carroll*,
   937 F. Supp. 2d 390 (S.D.N.Y. 2013) ......................................................... 4, 9, 24, 25

*Disabled in Action v. City of N.Y.*,
   360 F. Supp. 3d 240 (S.D.N.Y. 2019) ............................................................ 23, 25

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   No. 11-CV-6201, 2015 WL 640875 (S.D.N.Y. Feb. 16, 2015)................................. 10

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)....................................................................................... 3, 23

*Highland Cap. Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................. 25, 27, 28, 29

*In re Ephedra Prods. Liab. Litig.*,
   393 F. Supp. 2d 181 (S.D.N.Y. 2005) ................................................................. 3

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   No. 05-MD-1720 (MKB), 2022 WL 15053250 (E.D.N.Y. Oct. 7, 2022)............................. 10

*In re Platinum-Beechwood Litig.*,
   469 F. Supp. 3d 105 (S.D.N.Y. 2020) ................................................................. 28

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) .......................................................... 25, 28, 29

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)....................................................................................... 4, 8

*Lamar Advert. Co., v. Zurich Am. Ins. Co.*,
   533 F. Supp. 3d 332 (M.D. La. 2021).................................................................. 10

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................. 7

*Olin Corp. v. Lamorak Ins. Co.*,
   332 F. Supp. 3d 818 (S.D.N.Y. 2018) ............................................................ 6, 20

*Primavera Familienstifung v. Askin*,
   130 F. Supp. 2d 450 (S.D.N.Y. 2001) ................................................................. 3

*Red Hawk, LLC v. Colorforms Brand LLC*,
   No. 20-CV-9032 (VEC), 2022 WL 16570948 (S.D.N.Y. Nov. 1, 2022) .............................. 12

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) ............................................................... 13, 28

*SEC v. Lek Sec. Corp.*,
   370 F. Supp. 3d 384 (S.D.N.Y. 2019) ............................................................. 12

*State of N.Y. v. UPS, Inc.*,
   160 F. Supp. 3d 629 (S.D.N.Y. 2016) ............................................................. 25

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
   878 F.2d 791 (4th Cir. 1989) ..................................................................... 7

*U.S. v. Glynn*,
   578 F. Supp. 2d 567 (S.D.N.Y. 2008) .............................................................. 4

*United States v. Dukagjini*,
   326 F.3d 45 (2d Cir. 2003) ................................................................... 20, 25

*United States v. Scop*,
   846 F.2d 135 (2d Cir. 1988) .................................................................... 13

*United States v. Tin Yat Chin*,
   371 F.3d 31 (2d Cir. 2004) ...................................................................... 3

## **Statutes**

18 U.S.C. §§ 1581-1597 ............................................................................ 1

18 U.S.C. § 1591 .............................................................................. 1, 10

18 U.S.C. § 1591(a)(1) ........................................................................... 11

18 U.S.C. § 1591(a)(2) ............................................................................ 1

18 U.S.C. § 1591(d) .............................................................................. 1

18 U.S.C. § 1595(a) ............................................................................. 12

18 U.S.C. § 1595(d) ........................................................................... 1, 12

29 V.I.C. § 701 *et seq.* ................................................................................................................ 26

**<u>Rules</u>**

Fed. R. Evid. 702 .................................................................................................... 6, 10, 12

Fed. R. Evid. 702(a)-(b) ..................................................................................................... 3

**<ins>INTRODUCTION</ins>**

Plaintiff, the Government of the United States Virgin Islands (the "Government"), alleges that Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") facilitated and benefitted from the criminal sex-trafficking of Jeffrey Epstein in violation of the Trafficking Victims Protection Act, 18 U.S.C. §§ 1581-1597 ("TVPA"). The TVPA provides a state attorney general a right of civil action as *parens patriae* to protect the interests of state residents that have been threatened or adversely affected by any person who violates 18 U.S.C. § 1591. *See* 18 U.S.C. § 1595(d). The Government alleges that JPMorgan knowingly participated in and benefitted from Epstein's sex-trafficking venture by holding his accounts, processing payments to victims and recruiters, and ███████████████████████████████████████████████, in violation of 18 U.S.C. § 1591(a)(2). Second Amended Complaint (Dkt. 119) ("2AC"), ¶¶102-119 (Count One). The Government also alleges that JPMorgan's █████████████████████████████████ ███████████ constitutes unlawful obstruction of TVPA enforcement, in violation of 18 U.S.C. § 1591(d). 2AC, ¶¶147-168 (Count Five). The Government seeks an injunction, damages, equitable relief, and attorneys' fees and costs as appropriate relief under section 1595(d).

In response to the Government's claims, JPMorgan has disclosed proposed opinion testimony from four expert witnesses. Three of them, however, offer opinions that are well outside their expertise or otherwise objectionable and should be excluded.

JPMorgan proposes to offer the opinions of Kimberly Mehlman-Orozco, whose academic training is in criminology with a focus on immigration, on whether Epstein's victims were subject to trafficking, whether ████████████████████████, and whether the Government and/or certain plaintiffs' lawyers are engaged in "secondary exploitation" of Epstein's victim. Dr. Mehlman-Orozco lacks the credentials to offer these opinions, as she has little

education or experience in human trafficking, relying largely upon her experience gained as an expert in previous cases.  Compounding the problems, she offers opinions regarding financial regulations and standards—an area in which she possesses no expertise whatsoever—and also offers bizarre opinions regarding human trafficking that contradict the plain language of the TVPA.  The Court should exclude Dr. Mehlman-Orozco's opinions in their entirety, or, in the alternative, strictly limit her testimony to specific areas that are scientifically valid and in which the Court determines she possesses the requisite expertise.

JPMorgan also disclosed the opinions of Joseph Fonseca, a retired federal law enforcement agent, on whether ██████████████████████████████████████████ ████████████████████████████.  Although Mr. Fonseca has experience in law enforcement, he lacks the requisite experience to opine regarding ██████ in this case.  He never used SARs in his work and did not know what they were until JPMorgan retained him for this case.  He also disclaimed knowledge regarding the practices of other investigators, further demonstrating the lack of factual basis for his opinions.

Finally, JPMorgan plans to rely upon the opinions of Carlyn Irwin, a forensic economist who works primarily as an expert witness, concerning tax benefits Epstein received from the Virgin Islands Economic Development Commission ("EDC").  As established in prior briefing, these benefits are irrelevant to the issues in this case because JPMorgan's fault shifting affirmative defenses are not cognizable at law.  Moreover, Ms. Irwin offers testimony well outside her expertise as an economist, criticizing or opining on the efforts of the EDC in granting and monitoring the tax benefits, even though she has no relevant experience either with these types of tax benefits in general or with the activities of government agencies.  She also, impermissibly, offers rank speculation about the motives of public officials.

As detailed below, each of these experts' opinions should be excluded in whole or significant part due to lack of qualification, insufficiency of supporting facts or data, unreliable scientific methodology, and/or irrelevance to the case.

## LEGAL STANDARD

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; [and] (b) the testimony is based on sufficient facts or data . . ." Fed. R. Evid. 702(a)-(b).

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). The Court then must "ensure that the expert will actually be testifying on issues or subject matter within his or her area of expertise." *523 IP LLC v. CureMD.com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014) (cleaned up).

In assessing the sufficiency of the facts or data supporting an expert's opinion, the Court must ensure there is not "too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Although some "gaps or inconsistencies in the reasoning leading to the opinion go to the weight of the evidence, not to its admissibility[,]" *In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 189 (S.D.N.Y. 2005) (Rakoff, J.) (cleaned up), it is part of the Court's gatekeeping function under Rule 702 to ensure that "expert testimony has 'a traceable, analytical basis in objective fact.'" *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 522 (S.D.N.Y. 2001) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998)).

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court held that Federal Rule of Evidence 702's requirement that "an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590. *Daubert* sets forth certain criteria that a district court may consider in assessing the reliability of scientific expert testimony, including: "(1) whether the expert's theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error' in the theory's application and 'the existence and maintenance of standards controlling the technique's operation'; and (4) the 'general acceptance' of the theory or technique in the relevant scientific community. *U.S. v. Glynn*, 578 F. Supp. 2d 567, 570 (S.D.N.Y. 2008) (Rakoff, J.) (quoting *Daubert*, 509 U.S. at 593-94). *Daubert* also "made clear that its list of factors was meant to be helpful, not definitive." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999). In assessing the reliability of a *non-scientific* expert's methodology, the Court "*may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141 (emphasis in original).

"Expert testimony must also be relevant under Rule 401 and must not be unfairly prejudicial under Rule 403." *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013). "It is black letter law that under *Daubert*, trial judges are charged with ensuring that expert testimony is relevant to the task at hand." *Id.* at 420 (cleaned up).

## ARGUMENT

**I.      Dr. Mehlman-Orozco's Testimony Should Be Stricken in Whole or Significant Part.**

Dr. Mehlman-Orozco holds herself out as an expert on human trafficking—but breathtakingly offers the opinion—plainly contrary to the TVPA—that rather than being trafficked, some minors *choose* to engage in commercial sex for money and are not actually trafficked.  Declaration of David I. Ackerman in Support of the Government of the United States Virgin Islands' Motion to Exclude Expert Opinions of Kimberly Mehlman-Orozco, Joseph Fonseca, and Carlyn Irwin (filed herewith, hereinafter "Decl."), Ex 1 at 67.  JPMorgan has hired her to offer over twenty opinions in this case on wide ranging topics—some of which stray far from human trafficking.  Decl., Ex. 1 at 14-16.  Given her unsupportable opinion, it is unsurprising that she lacks any meaningful academic credentials relating to human trafficking and has minimal experience in the field outside her work as a fulltime expert witness.  Nonetheless, she stretches what little expertise she claims to have to opine on unrelated topics, such as banking regulations and standards, which even Dr. Mehlman-Orozco admits are "not [her] areas of expertise."  Decl., Ex. 2 at 113:6-19.

Dr. Mehlman-Orozco also puts forth—without any support—an incredibly narrow knowledge standard for the TVPA that is also inconsistent with law and improper for expert testimony, under which almost no financial institution could be found liable.  Dr. Mehlman-Orozco further offers irrelevant opinions regarding "secondary exploitation"—a concept she invents without any empirical support—and misidentification of human trafficking victims seemingly to impermissibly impugn the Government's witnesses and motives for bringing this law enforcement action.

For these reasons, Dr. Mehlman-Orozco's testimony should be excluded in its entirety.  In the alternative, Dr. Mehlman-Orozco's testimony should be limited solely to the areas for which she claims to have expertise (human trafficking), and her opinions regarding legal standards, which are not only improper but erroneous, should be stricken because they are unhelpful and would serve only to mislead and confuse the jury and thereby unfairly prejudice the Government.

### A.  Dr. Mehlman-Orozco's Testimony Should Be Excluded In Its Entirety Because She Is Not Qualified to Serve As an Expert On Human Trafficking.

To be admissible under Rule 702, expert testimony must come from someone who is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 831 (S.D.N.Y. 2018) (Rakoff, J.). Dr. Mehlman-Orozco has none of these characteristics.  She is not an academic or practitioner in the field of human trafficking.  Her degrees are in criminology, but she relies on her limited graduate coursework in human trafficking as basis for her "expertise."  Decl., Ex. 2 at 54:5-56:23. Although she represents otherwise, Dr. Mehlman-Orozco's primary area of academic study was not human trafficking.  Dr. Mehlman-Orozco wrote the dissertation for her 2012 Ph.D. in criminology on "immigration and erroneous criminalization"—not human trafficking.  Decl., Ex. 2 at 51:6-9, 52:15-54:4; Decl., Ex. 1 at 87.  She relies on having taken "several" graduate-level courses relating to human trafficking—an insufficient basis for an expert's opinions, but even that is untrue. Dr. Mehlman-Orozco could only identify two classes at her deposition: "Human Smuggling and Human Trafficking" and "Foreign Nationals and Crime," the latter of which was not specific to human trafficking.  Decl., Ex. 2 at 55:18-56:23.  In addition, her teaching experience is limited to part-time instructor or adjunct positions where she largely taught classes wholly unrelated or not specific to human trafficking (*e.g.*, Intro to Criminal Justice, Race and Crime, Law of Corrections).  Decl., Ex. 2 at 56:24-62:10; Decl., Ex. 1 at 87-88.

6

Nearly all Dr. Mehlman-Orozco's "research experience" is either not specific to human trafficking or stems from her role as an expert witness. Decl., Ex. 1 at 87. But, "it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989); *see also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 615 (S.D.N.Y. 2007) (noting that prior "accept[ance] as an expert witness . . . would not be a sufficient indication of qualifications for a court exercising its gatekeeper function under *Daubert*."). Dr. Mehlman-Orozco is a professional expert who started offering expert testimony straight out of school. She testified that she has been disclosed as an expert in 48 cases from 2016 to 2023. Decl., Ex. 2 at 78:22-79:18; Decl., Ex. 1 at 96-99. In 2012—the same year she graduated with her Ph.D. in Criminology—Dr. Mehlman-Orozco founded the Justitia Institute (a now defunct organization). Decl., Ex. 2 at 43:16-20; Decl., Ex. 1 at 88. Among other services, the Justitia Institute offered "[e]xpert testimony at criminal court cases involving immigrants or victims of human trafficking." Decl., Ex. 3 at 1. One of the Justitia Institute's projects involved writing to seventeen convicted terrorists serving time in federal prison to "better understand their crime through their eyes"—seemingly research for Dr. Mehlman-Orozco's book, "The Jihadi Next Door: How ISIS is Forcing, Defrauding, and Coercing Your Neighbor Into Terrorism." Decl., Ex. 2 at 64:11-65:4; Decl., Ex. 3 at 4. Another project analyzed the effects of in-state tuition for non-citizens in Maryland. Decl., Ex. 3 at 2.

Dr. Mehlman-Orozco has established multiple entities for the purpose of providing expert witness and consulting services. In 2016, she formed Mahn, Mehlman & Associates to offer expert witness services and "training and technical assistance for businesses." Decl., Ex. 2 at 40:4-12; Decl., Ex. 1 at 88. In 2018, Dr. Mehlman-Orozco established Break the Chain to provide expert witness services and "training and technical assistance for businesses." Decl., Ex. 2 at 17:11-18;

Decl., Ex 1 at 88.  In 2019, she established Freedom Light, a nonprofit that provides "training and technical assistance specifically for businesses"[1] and through which she is writing a book—tentatively titled "Innocent Villains and Guilty Heroes: the Truth Behind America's Failing War on Sex Trafficking"—about "how sometimes there are companies and organizations that can be scapegoated." Decl., Ex. 2 at 17:22-18:3, 33:21-35:2, 160:15-161:13; Decl., Ex. 1 at 88.

Dr. Mehlman-Orozco has minimal formal training or education relating to human trafficking and nearly all her experience stems from paid engagements as an expert witness.  Expert witnesses are granted "testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" *Kumho Tire*, 526 U.S. at 148.  Dr. Mehlman-Orozco's eight years of experience testifying as an expert witness cannot itself form a reliable basis for testimony.  Thus, the Court should exclude Dr. Mehlman-Orozco's testimony in its entirety.

**B.    Dr. Mehlman-Orozco Lacks Expertise Regarding Financial Regulations and Standards.**

Dr. Mehlman-Orozco readily concedes that she is not an expert in banking regulations or the Bank Secrecy Act and that, prior to this case, she has not even consulted with or testified on behalf of any financial institution regarding human trafficking.  Decl., Ex. 2 at 108:11-21; 109:8-15.  She testified: "[E]verything related to financial service guidelines and regulations, that is not my areas of expertise." *Id*. at 113:6-19.  In fact, prior to this case, Dr. Mehlman-Orozco admits she had never heard of a SAR or currency transaction report ("CTR"). *Id*. at 114:20-115:11.

---

[1] Dr. Mehlman-Orozco testified that only five individual businesses have hired her to conduct trainings.  Decl., Ex. 2 at 132:5-19.  Yet, she refused to disclose the name of a single client, stating: "I can provide you with a name, but I'm going to refrain from doing so out of concerns related to privacy of whether there is an NDA or a protective order in place." *Id*. at 133:21-136:19.

Nonetheless, despite having no relevant experience or expertise, Dr. Mehlman-Orozco opines that JPMorgan complied with banking regulations and standards. For example, she states in her report that JPMorgan ███████████████████████████████████ ██████████ Decl., Ex. 1 at 18. She offers the conclusory opinion that: "[b]ased on my expertise on human trafficking, the policies, procedures, and internal controls used by JPMC were consistent with those employed by others in the financial services industry." Decl., Ex. 1 at 14, 45-50.

Dr. Mehlman-Orozco also offers law enforcement opinions that are outside her expertise and unsupported by literature. She downplays the importance of JPMorgan ████████████ ████████████. For example, she opines that ██████████████████████████████ ████████████ would not have had a statistically significant effect on the prevalence of sex trafficking or the identification of victims or offenders generally or on the identification of Epstein's victims or to an intervention or prevention to Epstein's crimes. Decl., Ex. 1 at 16, 51-52. She also claims there is no evidence to suggest that Epstein's crimes would have been prevented if JPMorgan had ████████████████████████████████████ ██████. Decl., Ex. 1 16, 18-22.

"Rule 702 mandates that experts 'stay within the reasonable confines of their subject area, and cannot render expert opinion on an entirely differently field or discipline.' In other words, 'an expert qualified in one subject matter does not thereby become an expert for all purposes.'" *Davis*, 937 F. Supp. 2d at 413 (internal citations omitted). By her own admission, Dr. Mehlman-Orozco has no education, training, or experience regarding banking regulations and standards. She also lacks any expertise on law enforcement's utilization of ████ and CTRs and did not even speak with anyone in law enforcement when forming her opinions. Decl., Ex. 2 at 261:12-20. She should not be permitted to offer opinions relating to banking regulations and industry standards, including

the importance of SARs and CTRs to government enforcement actions, as those areas are, by her own admission, outside the scope of her proposed expertise.

###### C. Dr. Mehlman-Orozco Offers Opinions That Contradict the Plain Language of the TVPA.

Dr. Mehlman-Orozco offers two opinions that contradict the TVPA and therefore will not help the factfinder "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Courts typically exclude opinions that are contrary to the law because they are not helpful and likely to confuse a jury. *See, e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11-CV-6201, 2015 WL 640875, at *3 (S.D.N.Y. Feb. 16, 2015) ("Defendants' interpretation of Section 12(a)(2) is incorrect as a matter of law, and conclusions drawn therefrom cannot 'help the trier of fact . . . to determine a fact in issue.'"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2022 WL 15053250, at *23 (E.D.N.Y. Oct. 7, 2022) (opinions contrary to law are "not helpful to the factfinder and should be excluded"); *Lamar Advert. Co., v. Zurich Am. Ins. Co.*, 533 F. Supp. 3d 332, 344 (M.D. La. 2021) ("[I]t is obvious that a legal expert will not be permitted to give legal opinions which are contrary to the law or base his conclusions on an incorrect understanding of the law."). Dr. Mehlman-Orozco offers at least two such inadmissible opinions.

First, Dr. Mehlman-Orozco opines: "[N]ot all minors involved in the commercial sex industry are trafficked—some minors engage in survival sex and some minors are not *induced*, but rather engage in commercial sex for money." Decl., Ex 1 at 67 (emphasis in original). This opinion directly contradicts the TVPA (and the fact that she offers it further confirms Dr. Mehlman-Orozco's inadequate knowledge and experience regarding human trafficking). Section 1591 of the TVPA—titled "Sex trafficking of children *or* by force, fraud, or coercion"—defines sex trafficking to include circumstances where "means of force, threats of force, fraud, coercion .

10

. . or any combination of such means will be used to cause the person to engage in a commercial sex act, *or* that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act[.] " 18 U.S.C. § 1591(a)(1) (emphasis added).  Thus, under the TVPA, minors cannot consent or otherwise voluntarily engage in commercial sex—a fact Dr. Mehlman-Orozco admitted in her deposition.  Decl., Ex. 2 at 224:15-225:3.  The opinion should be excluded.

Second, Dr. Mehlman-Orozco misstates the standard for holding companies liable for sex trafficking under the TVPA.  She claims: "Establishing actual or constructive knowledge in a third party liability case involving a TVPRA claim would require, at a minimum, the availability of an evidence-based and reliable indicia."  Decl., Ex. 1 at 51-52.  She testified it was her "personal opinion" that business should not be "held to a higher standard than law enforcement" but, when pressed, could not identify the "standard" she believed applied to law enforcement.  Decl., Ex. 2 at 371:18-373:23, 307:8-315:19.  When asked whether there were any circumstances under which she believed a bank should be held liable under the TVPA, Dr. Mehlman-Orozco struggled to provide the narrowest of scenarios:

> I don't know of any cases off the top of my head, but a fact pattern that I would potentially imagine or can conceptualize is there was an overt disclosure by a trafficker to a teller saying that I'm involved with trafficking; my girls are going to be depositing cash into my account; I don't want any record of that.  Can you look the other way and allow them to -- and don't take their identification documents.
>
> And this particular teller takes the cash and deposit[s] it in accordance and receives additional money for that.  And maybe several other tellers are made aware of it, as well as the bank manager, and they all are sort of engaged in this conspiracy to look the other way and receive additional funding to look the other way while this person is, you know, putting their money into a particular bank account and maybe giving them advice on how to launder that money or kind of what the caps are of when they would be discovered.

*Id*. at 315:25-318:1.

Contrary to Dr. Mehlman-Orozco's personal opinion, the TVPA allows victims of sex trafficking and State Attorneys General to enforce the TVPA against "the perpetrator" *or* "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPA]."  18 U.S.C. § 1595(a), (d).  JPMorgan has not provided—and the Government is not aware of—any court that has interpreted the TVPA's knowledge requirement as narrowly as Dr. Mehlman-Orozco suggests.  Moreover, at least one court in the Southern District has struck expert opinions expressing "policy preferences"—like Dr. Mehlman-Orozco's— because "personal opinions about what the law is or should be invade the province of the court to instruct the jury on the law."  *SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 414 (S.D.N.Y. 2019). The Court should exclude this opinion as well.

### D.    Dr. Mehlman-Orozco's Opinions Regarding Secondary Exploitation and Misidentification Are Irrelevant and Unfounded.

Dr. Mehlman-Orozco offers opinions about secondary exploitation and misidentification that are completely irrelevant to any issue in this case.  Under Rule 702, "the threshold question is whether 'the proffered expert testimony is relevant." *Red Hawk, LLC v. Colorforms Brand LLC*, No. 20-CV-9032 (VEC), 2022 WL 16570948, at *3 (S.D.N.Y. Nov. 1, 2022) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  Irrelevant expert testimony fails the "helpfulness requirement" of Rule 702 and should not be admitted.

Dr. Mehlman-Orozco opines that sex trafficking claims, especially those made by third parties against third parties, are at high risk of secondarily exploiting the victims or the topic of trafficking by "proffering non-victims as trafficking survivors" or "blaming unwitting third parties for failed interventions by law enforcement."  Decl., Ex. 1 at 14, 83-84.  This opinion has no relevance to the issues in this case and is little more than a thinly-veiled attempt to impugn the

Government's witnesses and motives for bringing this law enforcement action—both of which are improper subjects for expert testimony and not relevant to any claim or defense. *See e.g.*, *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) ("As a general rule, 'inferences about the intent or motive of parties or others lie outside of the bounds of expert testimony.'"); *see also United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("The credibility of witnesses is exclusively for the determination by the jury").

In addition to being irrelevant, these opinions also are not based on a reliable methodology as required for scientific expert testimony. Secondary exploitation is a theory created by Dr. Mehlman-Orozco for litigation that does not appear to be reflected in academic literature or analysis. In fact, she has already voluntarily withdrawn an opinion based on this theory in another case. Decl., Ex. 2 at 98:4-100:12. Dr. Mehlman-Orozco's primary objective in putting forth this opinion appears to be to attack plaintiffs' lawyers. She notes in her report that one Epstein survivor "publicly accused attorney Brad Edwards [a plaintiffs' attorney who represented victims in a related case against JPMorgan] of actions consistent with secondary exploitation[.]" Decl., Ex. 1 at 34 n.100. When questioned about this statement at her deposition, Dr. Mehlman-Orozco coyly claimed she does not have any opinions about Brad Edwards and simply repeated the opinion of an alleged victim of Epstein. Decl., Ex. 2 at 165:8-167:9. She also admitted she may discuss plaintiffs' lawyers "feeding on trafficking cases . . . for the litigation advantages it offers" in her upcoming book. *Id*. Further, Dr. Mehlman-Orozco could not articulate a standard for determining when someone was engaged in secondary exploitation, which is key requirement of *Daubert*. *Id*. at 380:14-385:17. When asked how someone could determine that Dr. Mehlman-Orozco herself was not engaged in secondary exploitation, she offered the following highly subjective standard: "I just would welcome them to look at my body of work and who I am as a person." *Id*. For all

these reasons, Dr. Mehlman-Orozco's opinions regarding secondary exploitation should be stricken.

Dr. Mehlman-Orozco also opines that sex trafficking victims are frequently misidentified and that misidentification can lead to minors being erroneously criminalized or denied services and business being exposed to liability for civil rights violations and defamation.  Decl., Ex. 1 at 14, 23, 52.  In support of her opinion, Mehlman-Orozco cites to news articles about airlines falsely accusing customers of human trafficking.  *Id*. at 38-40.  But this opinion is untethered to any evidence in this litigation.  Dr. Mehlman-Orozco confirmed that she is not offering any opinions about whether Epstein's victims have been misidentified.  Decl., Ex. 2 at 297:9-19.  Thus, the opinion is irrelevant to any fact at issue in this case and should be excluded as well.

## II.   The Court Should Strike the Proposed Expert Opinions of Joseph Fonseca.

JPMorgan disputes that its conduct harmed or threatened the Government's interest in assuring the safety and well-being of its residents.  In support of this position, JPMorgan relies on the opinions of Joseph Fonseca, whom JPMorgan proffers as an expert on child trafficking investigation.  Mr. Fonseca opines that ███████████████████████████████████ ████████████████████████████████████ and that financial records are of limited utility in trafficking investigations.  Mr. Fonseca's primary asserted basis for being qualified to provide these opinions and for the opinions themselves is his personal experience and knowledge as a former Federal Bureau of Investigation ("FBI") Special Agent.

Mr. Fonseca's experience, however, is inadequate in two ways critical to these opinions. *First*, he opines that financial records and information are unimportant to trafficking investigation, but never used financial records in his own investigations and *did not even know what a SAR or CTR was* before JPMorgan retained him for this case.  *Second*, he provides opinions on ███████

███████████████████████████████████████████████████ when

he admits that *he has "no idea" whether or how other FBI agents besides himself use this type of information.*

Due to these limitations in his knowledge and experience, Mr. Fonseca is not qualified and lacks sufficient factual basis to opine on the utility of financial information and on what anyone besides himself would have done with this information in investigating Epstein. Mr. Fonseca's opinions therefore are not admissible expert testimony under Fed. R. Evid. 702.

### A. Background Facts

Mr. Fonseca was an FBI Special Agent from 1998 to 2021. Decl., Ex. 4 at 3 and Appx. A (c.v.). He spent most of his career in the FBI's Atlanta field office, where he was Atlanta FBI Crimes Against Children Coordinator. *Id.* at 3. In this position, he investigated crimes involving human trafficking, child sexual exploitation, child pornography, international parental kidnapping, and other crimes involving children and women. *Id.* He also served as a member of and team leader for the FBI's Child Abduction Rapid Deployment Team, and later as Supervisory Special Agent and Child Sex Tourism Program Manager in the FBI's Crimes Against Children Major Case Coordination Unit in Washington, D.C. and as the FBI's first Crimes Against Children Assistant Legal Attaché stationed in Thailand. *Id.*

Mr. Fonseca opines that JPMorgan's ███████████████████████████
████████████████████████████████, *id.* at 17-20, ████████████████
███████████████████████████████████████████████████
██████, *id.* at 20-22. He also opines that financial records have limited utility in investigations similar to those conducted into Epstein and that Epstein's banking transactions would not fit within a typical trafficking investigation. *Id.* at 22-24.

15

Mr. Fonseca's primary basis for these opinions is his personal experience as an FBI Special Agent.  He reports that, "[t]o begin with, over the course of my career, I have never relied on a SAR while investigating a person on charges of sex trafficking."  *Id.* at 5.  This approach did not reflect an informed decision.  Mr. Fonseca did not know what SARs were and never saw one during his FBI tenure or until after JPMorgan retained him for this case.  Decl., Ex. 5 at 123:22-124:3 ("Q. Prior to this litigation, had you ever heard of a suspicious activity report?  A. I had not. Q. Prior to this litigation, had you ever seen a suspicious activity report?  A. I don't believe I had, no.").  He also had no prior understanding of what CTRs were.  *Id.* at 120:7-20 ("Q. Okay.  Have you ever heard of something called a currency transaction report?  A. I have now, yes.  . . .  Q. And had you ever heard of it prior to your work in this case?  A. Not that I recall, no.").

Mr. Fonseca's current understanding of SARs, developed solely for this litigation, remains limited:

> Q. Okay.  Are you able to tell me what triggers the obligation of a financial institution like JPMorgan to file a suspicious activity report?
>
> . . .
>
> A. No.  There is some reporting requirement, but I don't know what that is.
>
> Q. That's outside of your area of expertise; is that fair?
>
> A. That is correct, yes.
>
> Q. Okay.  Are you able to describe for me any of the information that is required to be disclosed in a suspicious activity report?
>
> A. I am not.
>
> Q. Okay.  That's outside your area of expertise as well?
>
> A. Correct.
>
> Q. Do you have any idea how a suspicious activity report is different, if at all, from a CTR?

16

A. I don't.

. . .

Q. Do you know if a financial institution like JPMorgan is excused from filing a suspicious activity report if it files a CTR?

. . .

A. I don't know.

Q. Do you understand that suspicious activity reports are not just limited to cash activity?

. . .

A. I don't know that as well.

*Id.* at 124:4-126:8.

So, too, does Mr. Fonseca's current understanding of CTRs, which likewise was developed

solely for this litigation, remain limited:

Q. Okay.  And can you tell me generally your understanding . . . of what a CTR is?

A. Generally a banking document that provides some form of information on finances, I guess.

Q. Can you tell me what triggers the obligation for a financial institution like JPMorgan to file a CTR?

A. I have no idea.

Q. Can you tell me what is required to be disclosed by a financial institution like JPMorgan in a currency transaction report?

A. I do not know.

*Id.* at 120:21-121:10.

Mr. Fonseca also bases his opinions that ██████████████████████████

████████████████████████████████████████████████████████████

 *See* Decl., Ex. 4 at 17 ("████████

████████."). Here again, though, Mr. Fonseca circles back to his own personal

practice to explain the Epstein investigators' decisions. *Id.* ("The fact that Epstein was not arrested

on the basis of all this information, and JPMC never received a subpoena from federal authorities

seeking additional information, *is a strong indication that, consistent with my experience*

*investigating sex trafficking cases* ████████████████

████████████.") (emphasis added).

In providing and explaining this opinion, Mr. Fonseca makes clear both that the basis for

his opinions regarding JPMorgan and Epstein is his belief that ████████████

████████ and that the *sole* basis for this belief is his own personal practice:

> Q. You told me today that you didn't even know what a suspicious activity report
> was until you got involved in this case.  So how do you know that they would not
> have been useful in your investigations, because you never even looked at them
> previous?
>
> . . .
>
> A. So my career, I would think, was fairly successful.  I followed tried and true
> protocols that we had without victim-center[ed] approach of investigating cases of
> sex trafficking.  And I can say in my opinion that they're not – it's not important
> because our cases were successful the way we worked them.  They didn't require
> that type of documentation.  So I think my experience speaks to the success I had
> in my case work.
>
> Q. And sitting here today, you don't know whether or not other agents in other field
> offices had success in their investigations utilizing suspicious activity reports; is
> that fair?
>
> . . .

A. I would have not much idea on that.  And I say 'not much' because I didn't interact every day with other offices, so that would be fair.

Decl., Ex. 5 at 134:16-135:25; *see also id.* at 118:22-119:3 ("Q. You understand there are other FBI agents who may have used a different approach in investigating sex trafficking operations; is that fair? . . . A. I have no idea.").  He also admitted that prosecutors' evidence against Epstein co-conspirator Ghislaine Maxwell *did* incorporate financial records.  *Id.* at 161:24-162:9 ("Q. Well, I'll give you an example here, the [Ghislaine] Maxwell case.  They used the [financial] records to show that she was a co-conspirator, didn't they? . . . A. Again, they used the records, yes.  Not being part of that trial, I don't know what that ended up proving.  But they did use the records, yes.").

### B.   Mr. Fonseca is Not Qualified to Provide Expert Testimony on Uses of ▮ in Federal Trafficking Investigations.

JPMorgan proffers Mr. Fonseca as an expert based on his experience in the field of trafficking investigation.  Decl., Ex. 4 at 4 (opinion is "based on my review of the materials identified in Appendix B to this Report and my years of experience investigating crimes against children and sex trafficking cases as a Special Agent for the FBI").  Whether or not this experience might qualify him to provide other expert opinions within the subject of trafficking investigations, it does not qualify him to provide opinions on the utility of ▮ and financial records.

Mr. Fonseca's experience gave him no understanding or awareness of SARs, CTRs, or bank reporting duties.  It was not that he declined to use this type of evidence in trafficking investigations as a deliberate and well-founded choice.  He did not know what it was.  Decl., Ex. 5 at 123:22-124:3.  Even today, after JPMorgan prepared him to testify as an expert on this subject, he still has at best a limited understanding of what SARs are and what information they contain. *Id.* at 124:11-16 ("There is some reporting requirement, but I don't know what that is."); *id.* at

19

124:18-25 (unable to describe any of the information required to be disclosed in a SAR).  He therefore is not qualified to provide expert testimony on the utility of ██ in federal trafficking investigations.

Mr. Fonseca's experience with other facets of trafficking investigation, *see, e.g.,* Decl., Ex. 4 at 5 (describing approach to interviewing victims), does not qualify him as an expert on the uses of ██ in trafficking investigations, on which he has no experience and no pre-retention knowledge.  *See generally United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ("When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded."); *cf. Olin Corp.*, 332 F. Supp. 3d at 832 ("[C]ourts in this Circuit have stricken extraneous testimony where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of his expertise.") (cleaned up).  In *Dukagjini*, the Second Circuit ruled that a Drug Enforcement Administration agent called to testify as an expert on the meaning of code words used in narcotics trafficking could not permissibly testify as to the meaning of other ambiguous non-code words used in the same conversations.  326 F.3d at 55 ("Biggs's testimony offers two examples of how an expert on drug code can stray from the scope of his expertise.  First, he testified about the meaning of conversations in general, beyond the interpretation of code words.  . . .  Second, Biggs interpreted ambiguous slang terms that only at first glance might appear to be code or jargon.").  So here, Mr. Fonseca's experience with other trafficking investigation techniques does not qualify him to testify on uses of ██ or CTRs given his lack of experience or knowledge of either.

Mr. Fonseca's lack of experience with the uses of ██ in trafficking investigations shows in his opinions themselves.  After describing ████████████████████████ ████████████, Decl., Ex. 4 at 17, Mr. Fonseca does not and could not assess whether this

20

may have provided leads to additional evidence because he has no experience on which to do so. Instead, he retreats to the blanket conclusion that the investigators considered *all* ███ to be irrelevant.  *Id.* ("The fact that Epstein was not arrested on the basis of all of this information, and JPMC never received a subpoena from federal authorities seeking additional information is a strong indication that, consistent with my experience investigating sex trafficking cases, ███ ███████████████████████████████████████████████████████████").  Mr. Fonseca's experience afforded him no basis to form this conclusion.  As an investigator, he *did not* █████████████████████ since he did not know what they were.  He also did not know whether or how any other investigators used ████ in their investigations of trafficking.  Mr. Fonseca's lack of any experiential basis on which to assess the information that was available to investigators renders him unqualified to provide this opinion.

### C.    Mr. Fonseca's Opinions About What Federal Law Enforcement Would Have Done are Not Based on Sufficient Facts.

To the extent that Mr. Fonseca relies upon his experience as a trafficking investigator not just to qualify himself as an expert but also as a foundation for his opinions, this experience provides insufficient support for these opinions.

Specifically, Mr. Fonseca provides opinions about ████████████████████████



█████████████████████████████████████████  *See* Decl., Ex. 4 at 17 ("████████████████████████████████████████████"); *id.* ("███████████████████████████████████████████████████████"); *id.* at 20 ("███████████████████████████████████████████████████"); *id.* at 22 ("That law enforcement never sought additional records from JPMC . . . indicates, consistent with my experience investigating sex trafficking cases, that law enforcement

did not view these records as material evidence.").  Mr. Fonseca, however, expressly disavowed

having prior knowledge not only of what SARs and CTRs were or what information they provided,

but also of how any investigator *other than himself* conducted trafficking investigations.

When counsel for the Government questioned him about possible uses of SARs or other

financial information in trafficking investigations, Mr. Fonseca's answers made clear that he was

speaking *and could speak* only for himself:

> Q. How about with a large sex trafficking operation?  Do you think that financial
> information would be useful in a large traffic operation?
>
> . . .
>
> A. I – if we follow the approach that we use to investigate sex trafficking cases, I
> would think not.
>
> Q. When you say "the approach that we use," you're speaking from your
> experience, correct?
>
> A. Yes.  Using our approach to interviewing our victims, and as the case develops
> starting to –
>
> Q. You understand there are other FBI agents who may have used a different
> approach in investigating sex trafficking operations; is that fair?
>
> . . .
>
> A. I have no idea.

Decl., Ex. at 5 118:5-119:3; *see also id.* at 135:14-25 (Q. And sitting here today, you don't know

whether or not other agents in other field offices had success in their investigations utilizing

suspicious activity reports; is that fair?  . . .  A. I would not have much idea on that.  And I say 'not

much' because I didn't interact every day with other offices, so that would be fair.").  Indeed, even

when questioned about federal prosecutors' use of financial records in obtaining the conviction of

Ghislaine Maxwell as one of Epstein's co-conspirators, Mr. Fonseca retreated to his own

investigations as a limit to the scope of his knowledge.  *Id.* at 161:24-162:9 ("Q. Well, I'll give

you an example here, the Maxwell case.  They used the records to show that she was a co-conspirator, didn't they?  . . .  A. Again, they used the records, yes.  Not being part of that trial, I don't know what that ended up proving.  But they did use the records, yes.").

Having disavowed knowledge of whether or how trafficking investigators other than himself may have used SARs, Mr. Fonseca lacks sufficient facts or data upon which to opine on

████████████████████████████████████████████████████████████████████████████

████████.  *See generally Disabled in Action v. City of N.Y.*, 360 F. Supp. 3d 240, 247 (S.D.N.Y. 2019) ("'Expert testimony should be excluded if it is speculative or conjectural . . . .'") (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *see also Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  Since the facts Mr. Fonseca relies upon are those of his own investigations and no others, he lacks sufficient facts or data on which to opine on ██████████ ████████████████████████████████████████████████████████████████████ (of which he had no understanding as an investigator in any event).  For this additional reason, Mr. Fonseca's expert opinions should be excluded.

## III.    The Court Should Exclude Carlyn Irwin's Opinions Related to Economic Development Commission Benefits.

JPMorgan offers Carlyn Irwin, a professional expert witness, to, among other things, "[a]nalyze and evaluate the tax incentives awarded by" the EDC and to "[a]ssess the work done by IDC/EDC in connection with evaluating, extending benefits to, and monitoring of, Mr. Epstein's companies." Decl., Ex. 7 at 4.  Her opinions related to tax benefits awarded to Epstein's companies are irrelevant for the reasons described in the Government's summary judgment

briefing.[2]  But, even if they were relevant, Ms. Irwin is utterly unqualified to give them because, by her own admission, she is "not an expert in [the EDC personnel's] jobs[,]" she has no prior experience evaluating these or similar tax benefits, and she had no familiarity with these types of tax benefits prior to assembling her opinion in this case.  Decl., Ex. 8 at 28:14-25; 96:11-21.

Ms. Irwin is an economist, but her opinions stray well into inadmissible territory in order to do counsel's bidding criticizing the EDC's procedures and decisions.   To the extent she performed any "analysis," she refused to "characterize it as my own independent" analysis, but rather was merely replicating the EDC's own calculations of its cost-benefit ratios.  Decl., Ex. 8 at 72:10-18.  Her report consists nearly entirely of reciting the cost-benefit ratios and then criticizing the EDC for its actions or inactions.

Where, as here, "an expert . . . purports to offer opinions beyond the scope of [her] expertise, courts strike the extraneous testimony, as the admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case."  *Davis*, 937 F. Supp. 2d at 413.  While the Court need not exclude the entirety of Ms. Irwin's opinions, it should restrict her testimony solely to economic matters for which she may be qualified.  To the extent testimony regarding EDC benefits is relevant (and it is not), the Court should not permit Ms. Irwin to offer opinions regarding the adequacy of EDC procedures or conduct.

### A.     Ms. Irwin's EDC-Related Opinions Are Irrelevant.

The parties have extensively briefed the relevance of evidence related to the tax benefits awarded Epstein's companies, and the Government does not seek to repeat that argument unnecessarily.  "The decision whether to collect taxes from third parties constitutes a protected

---

[2] *See* Gov't Mem. of Law in Support of Mot. for Summary Judgment [Dkt. 218] at 27-30, 35-38; Gov't Reply Mem. in Support of Mot. for Summary Judgment [Dkt. 278] at 11-15.

policy choice as to whether and as to whom to take enforcement action. … This sort of enforcement falls in the heartland of a State's broad discretion in the area of law enforcement decision-making" and "these defenses are never cognizable as a matter of law as to any claim." *State of N.Y. v. UPS, Inc.*, 160 F. Supp. 3d 629, 644-45 (S.D.N.Y. 2016).  Notably, Ms. Irwin acknowledged in her deposition that the EDC "appl[ies] discretion in their recommendations to either approve or deny tax incentives" and that the Commission "do[es] exercise judgment" in making its decisions. Decl., Ex. 8 at 58:18-59:8.

As pertains to expert testimony, "[t]he threshold question for the Court is whether the 'proffered testimony is relevant.'"  *Disabled in Action*, 360 F. Supp. 3d at 244 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).  Irrelevant testimony offered by an expert fails the "helpfulness" prong of the *Daubert* prong and is therefore inadmissible.  *See, e.g., Davis*, 937 F. Supp. 2d at 420; *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 473 (S.D.N.Y. 2005); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004).  Because JPMorgan's affirmative defenses challenging the Government's conduct are not cognizable, the proffered expert opinions related to that conduct are irrelevant and should be excluded.

**B.    Ms. Irwin Lacks Sufficient Qualifications to Opine Regarding EDC Procedures.**

As argued above, "[w]hen an expert is no longer applying [her] extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded." *Dukagjini*, 326 F.3d at 54. That is precisely the case here.

Ms. Irwin has a master's degree in accounting and finance and "[m]ore than twenty-five years of litigation consulting and expert witness experience."  Decl., Ex. 6 at 1.  But she has no experience with territorial tax benefits or the inner workings and procedures of governmental

agencies.  She summed it up best during her deposition, freely conceding that, with respect to the EDC, "I'm not an expert in their jobs." Decl., Ex. 8 at 96:11-21.

Prior to beginning work on this case, Ms. Irwin admitted she had no "familiarity with the tax benefits that are addressed" in her report.  Decl., Ex. 8 at 28:22-25.  None of her prior expert work involved tax benefits awarded by the Virgin Islands or any other U.S. territory, *id.* at 28:11-21, which differ from state tax benefits because they are federally-authorized and, unlike state tax benefits, are memorialized in a contractual certificate that obligates the beneficiary to make certain contributions to the territory and satisfy certain conditions of employment of territorial residents.[3] She has never been an employee of any governmental entity or agency. *Id.* at 44:21-46:1.  She has never worked for a tax authority; nor has she ever performed litigation consulting or work for such an authority. *Id.*  Indeed, during her deposition, Ms. Irwin acknowledged that she was not relying on her own experience or anyone else's experience in forming her opinions. *Id.* at 45:20-46:1.

Yet, despite having ***no*** relevant work or professional experience, Ms. Irwin opines that the EDC "ignored Financial Trust's and Southern Trust's consistently unfavorable cost/benefit analyses and failed to ask questions or gather information."  Decl., Ex. 7 at 4.  She criticizes the EDC for failing to conduct compliance reviews. *Id.* at 29.  And she criticizes the EDC for failing to "follow up with Southern Trust to test whether or not it was a legitimate company."  Decl., Ex. 8 at 87:5-15.

None of these opinions are admissible.  Ms. Irwin's credentials as an economist do not grant her license to opine regarding the propriety of a government agency's procedures or decision-

---

[3] *See, e.g., Coffey v. C.I.R.*, 663 F.3d 947, 949 (8th Cir. 2011) (describing the Virgin Islands "mirror code" tax structure and noting that "Congress has authorized a unique development program for the USVI" permitting tax incentives); 29 V.I.C. § 701 *et seq.* (describing the tax incentive program).

making.   Nor do they authorize her to contend that EDC board members should have asked different questions at public hearings.   Decl., Ex. 8 at 77:4-9.   She identifies no methodology in her report that she used to arrive at these conclusions.   Indeed, to the extent Ms. Irwin performed any computational "analysis" (aside from reviewing documents in the record), it was limited to recalculating the EDC's cost-benefit rations, and she confirmed, "I wouldn't characterize it as my own independent [analysis]."   Decl., Ex. 8 at 72:10-18.

"While an expert must of course rely on facts or data in formulating an expert opinion, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."   *Highland Cap. Mgmt.*, 379 F. Supp. 2d at 469.   That is precisely what JPMorgan seeks to do here.   Ms. Irwin's *economic analysis* was limited to re-calculating the EDC's cost-benefit ratios based upon the data contained in the EDC's spreadsheets.   Decl., Ex. 8 at 63:22-65:4, 66:20-67:9.   She is not offering any opinion as to whether those formulas are an appropriate measure of the economic benefit derived from the tax incentives.   Decl., Ex. 8 at 70:17-21.   Ms. Irwin's opinions concerning what *actions* the EDC should have taken based upon those ratios (which, in and of themselves, represent an oversimplification of the EDC decision-making process, which recognizes economic benefits beyond job creation) are outside her area of expertise and should be excluded.

## C.   Ms. Irwin Should Not Be Permitted To Testify Regarding a Potential "Improper Motive."

Compounding the errors reflected above, JPMorgan relies on Ms. Irwin to opine that the EDC's conduct "is consistent with the possibility of that these benefits were granted as part of an improper quid-pro-quo exchange between Mr. Epstein and USVI officials."   Decl., Ex. 7 at 1.   Not only is Ms. Irwin unqualified to offer this opinion for the reasons set forth above, but this opinion represents rank speculation regarding motive that *no* expert is qualified to give.

"[E]xperts may not offer opinions regarding the intent or motive of parties as part of their analysis.  As a general rule, '[i]nferences about the intent or motive of parties or others lie outside of the bounds of expert testimony.'"  *Scott v. Chipotle Mexican Grill*, 315 F.R.D. at 45 (quoting *Rezulin*, 309 F. Supp. 2d at 547); *see also In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 115 (S.D.N.Y. 2020) (Rakoff, J.).  At least one court in this district has characterized an expert speculating as to a party's motive as "improperly . . . assum[ing] the role of advocates" because such testimony lacks "basis an any relevant body of knowledge or expertise" and would be inadmissible if offered by a lay witness.  *Rezulin*, 309 F. Supp. 2d at 546.  As another court explained, "[w]hatever expertise [an expert] may possess, no expert may 'supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence.'"  *Highland Cap. Mgmt.*, 379 F. Supp. 2d at 469 (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001)).

Ostensibly aware of this precedent, JPMorgan seeks to protect Ms. Irwin's opinion by having her confirm that she is not actually opining as to the existence of an "improper quid-pro-quo."  Decl., Ex. 8 at 90:21-25.  She merely claims that such an arrangement was "possible," and concedes that she "do[esn't] know the universe of potential factors" that could have affected the EDC's decision.  *Id.* at 121:12-122:7.  Although Ms. Irwin references "payments that benefited politicians" as one such factor, she doesn't know whether those payments *actually affected* any EDC decision.  *Id.* at 122:2-10.  Indeed, even though Ms. Irwin is a "certified fraud examiner" (*Id.* at 90:21-25), she offers this opinion when she "didn't conduct a fraud investigation" because this "would require access, open access to underlying financial records" that she claims she did not have in this case.  *Id.* at 122:11-124:1.

"None of this speculation is admissible." *Highland Cap. Mgmt.*, 379 F. Supp. 2d at 469. "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *Rezulin*, 309 F. Supp. 2d at 547.  Ms. Irwin may not avoid the well-established bar precluding experts from testifying as to the motives of parties by couching her opinions as identifying "a possibility."  If any expert testimony is permitted concerning EDC decisions, it should not seek to attribute or suggest motives for the EDC's conduct.  To the extent the EDC's motives are relevant (which they are not), the subject matter "constitutes lay matter that the fact-finder can understand without the assistance of experts." *Id.* at 550.

## CONCLUSION

For all of the reasons set forth, the Court should exclude the expert opinions of Kimberly Mehlman-Orozco, Joseph Fonseca, and Carlyn Irwin.

Dated: August 18, 2023

**ARIEL SMITH, ESQ.**
**ATTORNEY GENERAL**

By counsel,

/s/ *David I. Ackerman*
**DAVID I. ACKERMAN**
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 849-4962
dackerman@motleyrice.com

**VENETIA VELAZQUEZ**
Admitted *Pro Hac Vice*
Acting Chief, Civil Division
Virgin Islands Department of Justice
Office of the Attorney General
213 Estate La Reine, RR1 Box 6151
Kingshill, St. Croix
U.S. Virgin Islands 00850
Tel.: (340) 773-0295 Ext. 202481
venetia.velazquez@doj.vi.gov

**LINDA SINGER** (Admitted *Pro Hac Vice*)
**MIMI LIU** (Admitted *Pro Hac Vice*)
**PAIGE BOGGS** (Admitted *Pro Hac Vice*)
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
lsinger@motleyrice.com
mliu@motleyrice.com
pboggs@motleyrice.com

*Attorneys for Plaintiff Government of the*
*United States Virgin Islands*