# Exhibit 2

```
 1            UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
    GOVERNMENT OF THE UNITED    )
 3  STATES VIRGIN ISLANDS       )
                                )
 4        Plaintiff,            )
                                )
 5  vs.                         ) 1:22-cv-10904-JSR
                                )
 6  JPMORGAN CHASE BANK, N.A.,  )
                                )
 7        Defendant/Third-      )
          Party Plaintiff.      )
 8  _____   )
    JPMORGAN CHASE BANK, N.A.   )
 9                              )
          Third-Party          )
10        Plaintiff,           )
                                )
11  vs.                         )
                                )
12  JAMES EDWARD STALEY,        )
                                )
13        Third-Party          )
          Defendant.           )
14
              FRIDAY, JUNE 30, 2023
15
      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16  ███████████████████████████████████████████
17                    - - -
18        Videotaped deposition of Kimberly
    Mehlman-Orozco, Ph.D., held at the offices of
19  WilmerHale, 2100 Pennsylvania Avenue NW,
    Washington, DC, commencing at 8:37 a.m.
20  Eastern, on the above date, before Carrie A.
    Campbell, Registered Diplomate Reporter and
21  Certified Realtime Reporter.
22
23                    - - -
24        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
25            deps@golkow.com
```

Confidential - Pursuant to Protective Order

```
 1     non-profits.  So, for example, the Empower
 2     Her Network, I provide -- provided guidance
 3     on data collection in an advisory capacity,
 4     but I wasn't compensated for that.
 5               So -- and I've served on task
 6     forces to provide guidance on -- but I think
 7     that's listed elsewhere in my CV actually,
 8     so...
 9               But to the best of my
10     knowledge, these are all the paid positions.
11          Q.    So your first job that you list
12     here is CEO of Break the Chain?
13          A.    Yes.
14          Q.    What is Break the Chain?
15          A.    That is my company that
16     provides training and technical assistance
17     for businesses as well as the role in which I
18     accept expert witness appointments.
19          Q.    And you also have a role as the
20     executive director of Freedom Light, correct?
21          A.    Yes, uh-huh.
22          Q.    What is Freedom Light?
23          A.    It is a not-for-profit that is
24     aimed as providing training and technical
25     assistance specifically for businesses.  So
```

Confidential - Pursuant to Protective Order

1    that is a part-time role, no more than ten

2    hours per week.  But I would say more often

3    than not, less than -- less than that.

4         Q.    You mention that you provide

5    training and technical services through Break

6    the Chain, and you then also provide training

7    through Freedom Light; is that correct?

8         A.    Correct.

9         Q.    What's the difference between

10   the training you provide at Break the Chain

11   and the training you provide at Freedom

12   Light?

13        A.    So Freedom Light is

14   specifically oriented towards private

15   businesses.  The training through Break the

16   Chain is -- it can be law enforcement.  It

17   could be anybody.

18             But specifically through

19   Freedom Light, we're actually producing a --

20   the most recent thing is producing a video

21   that can be incorporated into training

22   curriculum for businesses.

23             Through that capacity in

24   Freedom Light, our largest client, our main

25   client, has been doing reoccurring trainings

Confidential - Pursuant to Protective Order

1    sort of the historical evolution of documents

2    related to commercial sex.

3              So, for example, I have an

4    original copy of the Maiden Tribute of Modern

5    Babylon, which is a, you know, a newspaper

6    from the late 1800s that was one of the first

7    times there was a mass dissemination on, you

8    know, quote/unquote, human

9    trafficking-related issues.

10              I have books from the early

11    1900s, like, from Dance Hall to White

12    Slavery, which talks about what in the early

13    1900s they thought led to sex trafficking.

14              So things like that, you know,

15    to conduct research and to better understand

16    how this issue has evolved over time, and the

17    implications current laws have on businesses

18    and how they have had implications on

19    businesses and business-related practices

20    over the last hundred years.

21         Q.     And what do you do with that

22    research?

23         A.     So as I had mentioned, one of

24    the things that I'm working on through

25    Freedom Light is a third book that would be

Confidential - Pursuant to Protective Order

```
 1      focused on specifically businesses as well as
 2      evolution and intersection between commercial
 3      sex and sex trafficking.  It's been a work in
 4      progress.  And so a lot of that primary
 5      material would go into that book and would be
 6      deemed -- I would consider authoritative text
 7      specifically geared towards informing
 8      businesses about this pernicious crime and
 9      how -- you know, what is the evidence base to
10      combat it, and some of the issues and
11      barriers and challenges to address this
12      issue.  So the book is one.
13               I've written op-eds, some with,
14      like, my -- I think some of them have been
15      with the hat of Freedom Light and some, you
16      know, with the hat of Break the Chain.  But
17      dissemination of evidence-based information,
18      I think, would be key, but also informing and
19      creating evidence base for the trainings.
20               Unfortunately, a lot of the
21      trainings on the market currently have
22      misinformation that I think misinforms
23      businesses, which is problematic.  And so
24      providing a stronger evidence base to educate
25      businesses on this issue, I think, is
```

Confidential - Pursuant to Protective Order

1    important, and that's part of what the

2    research is done to inform.

3         Q.    How many trainings have you

4    developed through Freedom Light?

5         A.    So, like, how many trainings

6    have I developed, what do you mean by that?

7    For, like, different types or just different

8    industries or, like, specific products?

9         Q.    So when I went to Freedom

10   Light's website --

11        A.    Yeah.

12        Q.    -- there was a section I think

13   on training or materials, and it said "coming

14   soon."

15        A.    So that is mostly -- the

16   "coming soon" element is where -- that's

17   where we're going to put links to the

18   dissemination platform for that video that

19   has that been in production for the last two

20   years or so.  So we created a video that -- I

21   don't remember the name of the platform that

22   we're disseminating through, but specifically

23   it's, you know, through -- it'll have a link

24   on our website to that specific dissemination

25   platform.

1          A.      Yes.

2          Q.      So we talked about Break the

3    Chain.  We talked about Freedom Light.

4                  What was your role at Mahn,

5    Mehlman & Associates?

6          A.      The same things, doing expert

7    witness work and training and technical

8    assistance for businesses.

9          Q.      So your name is in the title.

10   I assume that you founded Mahn, Mehlman &

11   Associates?

12         A.      Yes.

13         Q.      And who is Mahn?

14         A.      Jessie Mahn.  She's an

15   immigration attorney.

16         Q.      And you are not an attorney,

17   correct?

18         A.      No, ma'am.

19         Q.      So you had Mahn, Mehlman &

20   Associates from the fall of 2016 to the

21   winter of 2018, correct?

22         A.      I believe so.

23         Q.      And why did you discontinue

24   Mahn, Mehlman & Associates?

25         A.      Jessie ended up moving across

Confidential - Pursuant to Protective Order

```
 1                    Again, it was a while ago, but

 2    essentially educating them on the human

 3    trafficking subject and some of the barriers

 4    to successful identification and

 5    intervention, things of that nature.

 6         Q.    Was this subcontracting work

 7    full-time?

 8         A.    No.

 9         Q.    How many hours a week would you

10    spend as a subcontractor for Rand

11    Corporation?

12         A.    I do not remember.

13         Q.    Was it less than 20 hours a

14    week?

15         A.    I don't remember.

16         Q.    Prior to your work

17    subcontracting at the Rand Corporation, you

18    list the Justicia Institute.

19                    Did you found this institute?

20         A.    Yes.

21         Q.    Why did you found it?

22         A.    I honestly don't remember sort

23    of the reasons why I founded it, but I think

24    my recollection is to bridge the gap between

25    policy and action.  There was a huge gap
```

1    the coursework in 2009, but I don't think I

2    turned in my master's thesis until, like, the

3    fall of 2009.  So I think the official

4    graduation date is winter of 2010.  Like,

5    January of 2010, something like that.

6         Q.     And what is your graduation

7    date with your doctor of philosophy?

8         A.     August of 2012 is the best of

9    my recollection.

10        Q.     And did you earn your master of

11   arts as part of the overall Ph.D. program at

12   George Mason?

13        A.     Sorry, say that again.

14        Q.     Sure.

15               The criminology degree at

16   George Mason, the Ph.D. program, did it have

17   an option for you to earn your master's, or

18   were those two totally separate programs?

19        A.     Two totally separate programs.

20   So I applied and completed, I think -- so I

21   applied, completed my bachelor degree.

22   Applied, and I had not yet completed my

23   master's when I applied for the Ph.D. program

24   and was accepted.  But they were -- they had

25   separate -- I mean, I have separate degrees.

Confidential - Pursuant to Protective Order

1    They were not joint programs whatsoever.

2         Q.    What did you do in between 2005

3    and when you began your master of arts

4    program?

5         A.    I was a GED adult basic

6    educational workplace essential skills

7    teacher for a period of time at the adult

8    detention center at Princeland County jail.

9              I don't remember if I was

10   teaching at the time.  So I've taught on and

11   off at George Mason, undergrad classes.

12             I taught at University of

13   Maryland-College Park from around 2012 to

14   around 2014 or so.

15        Q.    Under the doctor of philosophy,

16   where you list your doctor of philosophy

17   degree, it states, "Dissertation:  The

18   'Crimmigration' Effect: An analysis of 287(g)

19   and Latino/a representation in the US

20   juvenile justice system."

21             Do you see that on your CV?

22        A.    Yes, ma'am.

23        Q.    Did you mention human

24   trafficking in your dissertation?

25        A.    No.  So I had -- I had taken

```
 1    graduate-level coursework on human

 2    trafficking with a woman by the name of

 3    Louise Shelley, who is one of the few

 4    professors that actually had classes,

 5    specific graduate classes, on trafficking at

 6    the time.  I had asked her to do a -- my

 7    dissertation on human trafficking.

 8                However, since there wasn't

 9    any -- I came from a very heavily

10    quantitative department, and there was no

11    quantitative data collection on human

12    trafficking available at the time.  As I'm

13    sure you're aware, the FBI's Uniform Crime

14    Report didn't even have a data point on

15    trafficking until 2013, which I think was

16    published in 2014.

17                So for that reason, I was told

18    by my program that I could not do my

19    dissertation on trafficking, and -- even

20    though Dr. Shelley was somebody who was

21    willing to provide oversight for that

22    doctoral dissertation.

23                So I did something that I

24    thought was not too far, too far removed,

25    looking at, you know, immigration and
```

1    erroneous criminalization, but it wasn't

2    something that was possible to have been done

3    in 2012 because of the lack of quantitative

4    data.

5         Q.    Under your dissertation, your

6    CV states, "Expertise:  Human trafficking,

7    human smuggling, immigration, survey methods

8    and systematic review."

9              Do you see that?

10        A.    Yes, ma'am.

11        Q.    What does that mean,

12   "expertise" here?

13        A.    I would say it's my subject

14   matter area of expertise.  So I think that I

15   had some expertise and background in each of

16   those specific subjects.

17             For example, I took several

18   classes where I had to do -- in as well as

19   part of my graduate research positions where

20   I had to do systematic reviews.  In one class

21   I did a meta-analysis from those systematic

22   reviews and formally trained in survey

23   research methods.  And I have utilized that

24   in my research where I have done it on human

25   trafficking since then.

Confidential - Pursuant to Protective Order

```
 1                    Immigration, human smuggling,

 2     human trafficking, those are all sort of

 3     related to the courses that I took,

 4     graduate-level courses, during my current --

 5     during my graduate education.

 6          Q.    So this is your

 7     self-description right here under expertise.

 8     This is not a certification --

 9          A.    Oh, correct.

10          Q.    -- given to you by George

11     Mason, correct?

12          A.    Yes.

13                I apologize for interrupting

14     you again.  I'm so sorry.

15          Q.    That's okay.  It's sort of

16     natural conversation.  This is an unnatural

17     format.  I get it.

18                You mentioned that you took

19     graduate-level classes relating to human

20     trafficking.

21                Which classes are those?

22          A.    I don't remember offhand.  This

23     was ten -- over ten years ago.  I know that

24     Dr. Louise Shelley was working on her book on

25     human trafficking at the time of my class,
```

```
 1    and I believe we actually reviewed a version
 2    of it that was prior to publication.
 3              So she had a class that was
 4    specific -- my recollection, it was called
 5    human smuggling and human trafficking,
 6    something like that.  So that was one class.
 7              I took classes on foreign
 8    nationals and crime, which focused on human
 9    trafficking.
10              I don't remember each and every
11    class that talked about trafficking at the
12    time because, again, it was a burgeoning
13    subject that criminologists were looking at,
14    other than Louise Shelley.  Louise Shelley
15    was somebody who had been looking at it for a
16    number of years, specifically in Europe, as
17    well as in the United States.
18              But what comes to mind just
19    mostly immediately is Dr. Shelley's class is
20    wholly focused on human trafficking and
21    smuggling.
22              But I know that there were
23    several other classes.
24    Q.    You taught at a couple of
25    universities.  You mentioned that earlier,
```

1    correct?

2         A.    Yes, ma'am.

3         Q.    Okay.  Did you ever have a

4    tenured or a tenure track position at a

5    university or college?

6         A.    No, ma'am.

7         Q.    These are all adjunct

8    positions, correct?

9         A.    I think -- I don't know if it

10   would be considered adjunct.  I think for

11   University of Maryland I was considered an

12   instructor, but it was not tenure track.

13              And for Mason, I think it was

14   adjunct for sure.

15        Q.    So under teaching experience

16   here, is this a complete list of the classes

17   that you taught at a college or university?

18        A.    The best of my recollection,

19   yes.  I believe so.

20        Q.    So the first class that you

21   taught at Prescott College says, "Surviving

22   and Thriving Beyond Sex Trafficking," right?

23        A.    It's not the first class I

24   taught, but it's the first one listed in

25   this -- in my CVs, yes, that's correct.

1          Q.     And you taught that class for

2     one semester, correct?

3          A.     Correct.  And it was more of a

4     directed study class with a Ph.D. candidate.

5     So it wasn't a course of students.

6          Q.     You said "candidate."  It was

7     just a one-on-one?

8          A.     A Ph.D. candidate, somebody who

9     had not yet finished their Ph.D. who was

10     going through the process to become a Ph.D.

11          Q.     But you said "candidate,"

12     singular.  Does that mean it was one student?

13          A.     Oh, correct.

14          Q.     The rest of the classes that

15     you mention here, are any of them -- did any

16     of them relate to human trafficking?

17          A.     I incorporated human

18     trafficking material into all of my classes.

19     So I wouldn't say -- just -- same thing with

20     the courses that I took at Mason.  Only one

21     of them was entirely focused on human

22     trafficking, which was Dr. Shelley's, but

23     there were several other classes where human

24     trafficking was incorporated into the

25     material.

Confidential - Pursuant to Protective Order

1          So Social Inequality Crime and

2     Justice talked about human trafficking in

3     that.

4          Law and Justice Around the

5     World talked about human trafficking in that.

6          Human Rights Injustice talked

7     about human trafficking in that.

8          Intro to Criminal Justice, I

9     don't remember if I talked about human

10    trafficking in that one.

11         Race and Crime, if we did talk

12    about trafficking in that it would be

13    specifically oriented towards the

14    racialization of human trafficking crimes in

15    the United States and how they've been

16    interpreted and processed over time.

17    Q.    But you're not sure if you

18    talked about human trafficking or race and

19    crime; is that right?

20    A.    I'm not -- I don't recall.

21    This was a while ago.  So this was almost ten

22    years ago, so I don't recall.

23         But I know for certain in Human

24    Rights and Justice, Law and Justice Around

25    the World and Social Inequality Law and

```
 1    Justice.
 2         Q.     What about Law of Corrections?
 3         A.     I don't know.  I don't think
 4    so.
 5         Q.     About what Foreign Nationals in
 6    Crime?
 7         A.     The best of my recollection is
 8    yes.  I think that was actually a --
 9    actually, I'm going to say yes, definitively
10    yes, because that was a course that I
11    developed myself.  So this was not something
12    developed by the university; it was a course
13    that I developed.
14         Q.     And I'm assuming it's the same
15    as the course at George Mason with the same
16    title, in terms of the curriculum?
17         A.     I think both of them were
18    courses that I developed.
19         Q.     And what percentage of the
20    class related to human trafficking?
21         A.     I have no idea.  This was a
22    decade ago.  I don't remember.  And I mean,
23    it would just be purely speculative for me to
24    guess.
25         Q.     Less than 50 percent?
```

Confidential - Pursuant to Protective Order

```
 1              A.      For sure less than 50 percent.

 2              Q.      Less than 25 percent?

 3              A.      Possibly.  I mean, I don't

 4       remember, but I would say for certain less

 5       than 50.

 6              Q.      In the GED Workplace Essential

 7       Skills and Adult Basic Education, I'm

 8       assuming there's no human trafficking there,

 9       correct?

10              A.      No.  That was classes that I

11       taught to inmates at the jail.

12              Q.      The first three classes you

13       mentioned, Social Inequality Crime and

14       Justice, Law and Justice Around the World,

15       and Human Rights and Justice, what percentage

16       of those classes were devoted to human

17       trafficking?

18              A.      I don't remember.  I think some

19       students actually criticized for how much I

20       talked about human trafficking compared to

21       other professors.  I don't remember how much.

22       But that was my subject matter area of

23       expertise, and a lot of students were very

24       much interested in that topic, which is why

25       they took it from me as opposed to another
```

Confidential - Pursuant to Protective Order

```
1    professor.  I don't remember how much of the
2    material, though.
3         Q.    Was it less than 50 percent?
4         A.    I would say probably.
5         Q.    And other than the first class
6    that we talked about where it was a directed
7    study with a potential Ph.D. candidate, were
8    any of these classes on your list
9    graduate-level classes?
10        A.    No, they were not.
11        Q.    Looking now at page 89 of your
12   report --
13        A.    Uh-huh.
14        Q.    -- so on your CV under
15   Publications --
16        A.    Uh-huh.
17        Q.    -- is this a complete list of
18   your publications?
19        A.    So there's publications that
20   are separate from reports.  So it's not
21   everything that I've written, because there's
22   that second delineation, but let's see.
23              I think so.  I'm just trying to
24   see if the Projected Heros peer-reviewed
25   journal article is here.  Yeah, that's there.
```

```
 1                   I think this should be a

 2    complete list.

 3          Q.      Are all of these publications

 4    published in peer-review journals?

 5          A.      No.  Clearly not.

 6          Q.      How many of these are published

 7    in peer-review journals?

 8          A.      So on page 90, the Projected

 9    Heros, Self-Perceived Manipulators, that's

10    published in a peer-review journal article.

11    That's one.

12                   I think the two articles, the

13    Mentions of Dental Hygiene and Decisions in

14    Dentistry, I think those are two peer-review

15    journal articles.  So that's three.

16                   The Safe Harbor Legislation for

17    Juvenile Victims of Sex Trafficking on

18    page 91, that's a peer-review journal

19    article.

20                   My book is not a peer-reviewed

21    journal article, but it was reviewed by

22    peers.  So it was reviewed by Louise Shelley.

23    It was reviewed by John Cotton Richmond, who

24    is a former prosecutor.  They provide blurbs,

25    like, on the back.  So it wasn't a
```

Confidential - Pursuant to Protective Order

1    peer-review process, but it's a hybrid

2    academic/commercial press.  So there was, I

3    think, a vetting of the information to some

4    degree.

5            So I'd say four if you're only

6    counting the journal -- four if you're only

7    counting the journal articles.

8        Q.    When you say your "book," do

9    you mean Hidden in Plain Sight?

10       A.    Yes, ma'am.

11       Q.    You wrote another book called

12   The Jihadi Next Door: How ISIS is Forcing,

13   Defrauding and Coercing Your Neighbor into

14   Terrorism, correct?

15       A.    Correct.

16       Q.    Does that book relate to human

17   trafficking?

18       A.    No, it doesn't relate to human

19   trafficking, but it does discuss how the

20   methods of recruitment into organized crime

21   such as terrorism can -- are tangentially

22   similar to methods of recruitment control

23   used by traffickers.

24       Q.    So does the word "trafficker"

25   or "trafficking" appear in your book?

```
1              A.      I do not recall.  I mean, at a
2      very minimum it might be in the bio about me
3      because, you know, I'm not an expert on
4      terrorism whatsoever.
5              Q.      If you look at page 93 --
6              A.      Uh-huh.
7              Q.      -- you list Scholarly
8      Presentations.
9              A.      Uh-huh.
10             Q.      These are presentations that
11     you've given; is that correct?
12             A.      Yes, I think so.  Or that I've
13     given alongside somebody else.
14             Q.      And why do you call them
15     scholarly presentations?
16             A.      I think because of the ac -- or
17     the audience is more academic as opposed to
18     general public.
19             Q.      You also have a subject called
20     other presentations.
21                     What's the difference between
22     scholarly presentations and other
23     presentations?
24             A.      I think the other presentations
25     were more for, like, nonacademic audiences
```

Confidential    Pursuant to Protective Order

```
 1    murder.

 2         Q.    So when did you first serve as

 3    an expert witness?

 4         A.    On human trafficking?

 5         Q.    On any matter.

 6         A.    I don't remember what year that

 7    was.

 8         Q.    Was it before you earned your

 9    Ph.D.?

10         A.    I don't think so.

11         Q.    But you believe 2016 is the

12    first time that you served as an expert in a

13    trafficking case?

14              MS. ELLSWORTH:  Object to the

15         form.

16              THE WITNESS:  I don't -- it

17         wasn't the first time I served.  I

18         think 2016 was the first time I might

19         have been disclosed as an expert.

20         That's the best of my recollection.

21    QUESTIONS BY MS. BOGGS:

22         Q.    So from 2016 to 2023, the cases

23    that you have listed here, there are

24    46 cases; is that correct?

25         A.    You want me to count them?
```

1          Q.     Yes, if you can take a minute.

2          A.     Okay.  Yep, I count 46.

3          Q.     Okay.  And I think you

4    mentioned this earlier.  Your work in the Doe

5    v. JPMorgan case is not listed on your CV; is

6    that correct?

7          A.     Yes.  I think it might have

8    been just inadvertently omitted because of

9    the quick turnaround.

10         Q.     And then obviously you're

11   serving as an expert in this case.  So

12   48 cases total during this time period; is

13   that fair?

14         A.     I believe so.  I'm just looking

15   to make sure some of the recent cases are

16   listed here.

17                Yeah, I think this is

18   everything.

19         Q.     Have you ever been asked not to

20   testify after you submitted an expert report

21   in a case?

22         A.     Asked not to testify?

23         Q.     Correct.

24         A.     I don't think so, but there are

25   many case -- like, I've never -- nobody said,

1    trafficking expert, he did not feel it was

2    necessary for me to testify.  So I didn't

3    ultimately testify in that case.

4         Q.    Have your opinions regarding

5    secondary exploitation ever been limited?

6         A.    Not to my knowledge.  I know

7    that there was a challenge on secondary

8    exploitation in the Pioro case, but because

9    it was getting ready to go for a motion for

10   summary judgment, I think, which the

11   defendants prevailed on, I don't think there

12   was ever any kind of debate or discussion of

13   that.

14        I do know, though, however,

15   recently in the United States v. -- the

16   United States of America v. Mei Xing, there

17   were -- so I was testifying on behalf of the

18   defense.  And the prosecutors, when I started

19   to talk about secondary exploitation, they

20   objected.  But it was overruled by the judge,

21   and I was ultimately allowed to discuss

22   secondary exploitation in that federal case.

23        Q.    Have your opinions in any

24   matters ever been voluntarily withdrawn?

25        A.    I think in the Pioro case they

Confidential Pursuant to Protective Order

1    with -- like, they withdrew the secondary

2    exploitation just because it was getting

3    ready to go for summary judgment.  And they

4    thought they would prevail, so they just

5    didn't want to waste time defending it, is my

6    recollection.

7          Q.    And who told you that they were

8    withdrawing it because they didn't want to

9    waste time defending it?

10               MS. ELLSWORTH:  Objection.

11               Again, a reminder not to

12          disclose conversations with counsel

13          who retained you.

14               THE WITNESS:  Yeah, I don't

15          think I can state.

16    QUESTIONS BY MS. BOGGS:

17          Q.    So your testimony is that the

18    counsel -- your testimony is that it's your

19    understanding that your opinion was withdrawn

20    because counsel didn't want to waste time

21    defending it, but you will not testify about

22    what counsel told you or your basis for that

23    statement; is that correct?

24          A.    No.  I probably could have

25    rephrased that.

```
 1                I'm speculating about why I
 2      think they withdrew it.  I just know that
 3      they withdrew it.
 4           Q.    So you don't know why they
 5      withdrew it?
 6           A.    No.  But my guess is that what
 7      I had said earlier.
 8           Q.    What is your guess based on?
 9           A.    Based off of where they were
10      procedurally in the case, and I would say
11      just overall understanding of the case and
12      where they were at.
13           Q.    Did you review the class
14      certification order in Doe v. JPMorgan?
15           A.    I don't recall, but I believe
16      it was provided to me and I saw it.  I don't
17      remember, though, for certain.
18                (Mehlman-Orozco Exhibit 3
19           marked for identification.)
20      QUESTIONS BY MS. BOGGS:
21           Q.    I'm handing you a document that
22      has been marked as Mehlman-Orozco Exhibit 3.
23                Do you recognize Exhibit 3?
24           A.    Yes, I do recognize it.
25           Q.    What is Exhibit 3?
```

Confidential - Pursuant to Protective Order

```
 1          A.      No, ma'am, I'm not.

 2          Q.      You're not a psychiatrist,

 3     correct?

 4          A.      That is correct.

 5          Q.      You're not a medical doctor,

 6     correct?

 7          A.      That is correct.

 8          Q.      You're not a mental health

 9     professional, correct?

10          A.      That is correct.

11          Q.      You are not an expert on

12     banking regulations, correct?

13          A.      That is correct.  I don't

14     purport to be.

15          Q.      And you're not an expert on

16     banking compliance, correct?

17          A.      That is correct.

18          Q.      You do not have any expertise

19     regarding the Bank Secrecy Act, correct?

20          A.      Again, I'm not an expert on

21     banking regulations.

22          Q.      Prior to this case, have you

23     ever worked in a financial institution?

24              MS. ELLSWORTH:  Object to the

25         form of the question.
```

```
 1                THE WITNESS:  What do you
 2        consider a financial institution?
 3   QUESTIONS BY MS. BOGGS:
 4        Q.     Let's make it easy.  A bank.
 5        A.     Yeah.  I worked for a mortgage
 6   company during undergrad, I think, at some
 7   point.
 8        Q.     Prior to this case, have you
 9   ever testified on behalf of a financial
10   institution?
11        A.     No.
12        Q.     Outside of this case, have you
13   ever consulted with a financial institution
14   in regard to human trafficking?
15        A.     No.  However, I was contacted
16   by somebody in Congress, some -- somebody who
17   wanted me to testify at a hearing of some
18   kind based off of anti-trafficking efforts
19   within the financial services industry.
20                I have really tried to look for
21   that e-mail.  I cannot find it.  But there
22   were -- there was verbal conversations.
23   There were e-mails exchanged.  This was many
24   years ago.  I want to say it could have been
25   around 2016 or so, but, again, I don't
```

Confidential - Pursuant to Protective Order

```
 1    regulatory requirements, I don't purport to
 2    be an expert on that.
 3              I think that there was another
 4    expert, Ms. Pesce, that was retained for
 5    those related issues.
 6         Q.    When you mentioned regulatory
 7    guidance and best practices, what are you
 8    referring to?
 9         A.    Again, everything related to
10    financial service guidelines and regulations,
11    that is not my area of expertise.
12              My area of expertise is
13    anti-trafficking initiatives and red flags.
14    So things related to that are what I'm
15    familiar with.
16              Again, I don't know how that
17    fits in within the grand scheme of regulatory
18    requirements.  That's out of the purview of
19    my expertise.
20         Q.    You said, "I'm obviously
21    familiar with the materials that have been
22    released since 2014 in the guidance documents
23    and whether they're considered best practices
24    and evidence-based practices, and I was aware
25    of those materials prior to my retention on
```

1    this case."

2                What materials are you

3    referring to there?

4        A.    My recollection is that there

5    were documents related to the banking

6    industry that were published by Polaris.

7    There are the FinCEN guidance documents.  I

8    mean, there are a number of materials that I

9    reference in my report that I was just

10   familiar with.

11               I'm familiar with general

12   guidance by the Department of Homeland

13   Security and the attempts to apply that

14   guidance to various businesses.

15               I think, again, just my area of

16   expertise is specifically focused on

17   trafficking.  How that's incorporated into

18   any other industry-specific guidance I think

19   is a different area of expertise.

20       Q.    Okay.    ███████████████████

21   █████████████████████████████████████

22   ████████████████████████████

23       A.    No, I don't think so.

24       Q.    Prior to working on this case,

25   had you heard of a suspicious activity

1    report?

2         A.    No, I don't think so.

3         Q.    Prior to working on this case,

4    had you heard of a currency transaction

5    report?

6         A.    No, I don't think so.

7         Q.    So I'm assuming you also, prior

8    to working on this case, had not seen a

9    currency transaction report.

10              Is that fair?

11        A.    I don't believe so.

12        Q.    Are you familiar with FinCEN?

13        A.    Yes.

14        Q.    What is FinCEN?

15        A.    I don't know the specific, I

16   guess, definition or the role, but I know

17   that it's an enti -- or, like, basically the

18   FinCEN guidance produced guidance

19   documents -- or FinCEN-produced guidance

20   documentation related to best practices, what

21   they perceived as best practices, on human

22   trafficking.  So as far as what that

23   institution is or how they fit within the

24   financial services industry, that's out of my

25   expertise.

```
 1    to security within their particular business
 2    that'll learn from attending conferences on
 3    how to combat a certain issue.
 4              So, for example, you might have
 5    a security officer that oversees security
 6    within, like, a casino and how to identify
 7    trafficking within a casino.  That's one
 8    individual who has been, you know, contacting
 9    me.  They want the video version of the
10    training now after attending a conference.
11              And if we could pause, if this
12    is a good --
13         Q.    Sure.
14         A.    I don't if you want -- I'm
15    happy to --
16         Q.    Sure.  If I could ask you one
17    more follow-up question --
18         A.    Sure.
19         Q.    -- and then we can take a
20    break.
21              You said that less than five
22    businesses have contacted you for direct
23    training.
24              What are the names of those
25    businesses?
```

```
 1              A.     Again, I don't think I can tell
 2       you because of privacy agreements that were
 3       signed.
 4              Q.     So those --
 5              A.     That is my recollection.
 6              Q.     The five businesses made you
 7       sign NDAs?
 8                     MS. ELLSWORTH:  Object to the
 9              form.
10                     THE WITNESS:  I don't remember
11              it was exactly five, and I don't
12              remember -- again, I don't even know
13              for my case -- like, for the human
14              trafficking cases I've served on, some
15              of them have protective orders.  Like,
16              some of it has protective orders, some
17              of it has NDA, but, yes, I have signed
18              NDAs in the past, and I have been
19              contacted by companies that have had
20              me sign NDAs.
21                     So I'm thinking of one
22              specific -- I think there's two that
23              I'm thinking of specifically.  For the
24              other ones that I don't -- I don't
25              exactly know, and I just don't want to
```

 1          speak out of turn as far as whether

 2          there's an NDA or not.

 3     QUESTIONS BY MS. BOGGS:

 4          Q.     Okay.  So you cannot provide

 5     me -- you believe you cannot provide me a

 6     name today of any one of your clients for

 7     which you've conducted training; is that

 8     correct?

 9          A.     I can provide you with a name,

10     but I'm going to retrain from doing so out of

11     concerns related to privacy of whether there

12     is an NDA or a protective order in place.

13          Q.     So you are not agreeing to

14     provide me the name of a single client for

15     which you've conducted training; is that

16     fair?

17               MS. ELLSWORTH:  Objection.

18          She's made clear the basis for the

19          confidentiality.

20               THE WITNESS:  I would like to

21          tell you the names of them, but I'm

22          just concerned about privacy, and I

23          just don't want to violate any privacy

24          regulations.

25               I can tell you the industries.

```
 1              I mean, I've provided trainings in the
 2              dating -- dating industry, in -- I
 3              don't know how to -- another one is an
 4              app.  It's not a dating app.  It's
 5              another kind of an app.  But I don't
 6              want to give too much information
 7              because it's a well-known app.
 8        QUESTIONS BY MS. BOGGS:
 9              Q.    But no --
10              A.    I'm going to check, though,
11        during the break because one of them, there
12        might -- there might be a media article
13        related to it.  And if there is -- like,
14        again, there was an NDA on that, so I don't
15        know exactly what I can say if there is a
16        media article that references it.
17                    I will come back after the
18        break and let you know which business that
19        was.
20                    MS. BOGGS:  Okay.  We can go
21              off the record.
22                    VIDEOGRAPHER:  The time is
23              11:11 a.m., and we are going off the
24              record.
25                 (Off the record at 11:11 a.m.)
```

Confidential - Pursuant to Protective Order

1    sell the book in proposal form, so you don't

2    write the whole manuscript.  It's not like a

3    fiction book where you would write the whole

4    manuscript.  You write the proposal first

5    that has a detailed outline of each of the

6    chapters.

7                I've had, you know, different

8    iterations of proposals that I've worked on

9    over the years for this particular book, but

10   we're hopefully going to finish a book

11   proposal that will be shopped around to

12   publishers sometime over the summer.  So it's

13   still in progress, but I think it would be,

14   you know, submitted in the near future.

15        Q.     You said that your book is

16   about sex trafficking in businesses, correct?

17        A.     Not just sex trafficking, but

18   the intersection between the commercial sex

19   industry and sex trafficking in its

20   application to businesses, but also the

21   evolution, the historical evolution, over

22   time.

23                So one of the tentative titles

24   that I had thought about was something to the

25   effect of, Innocent villains and guilty

1    heros:  The truth behind America's failing

2    war on sex trafficking.  I think that was,

3    like, a tentative title that we were possibly

4    looking at.

5              But it's also very -- I mean,

6    it has a basis in history in the evolution of

7    the commercial sex industry and how sometimes

8    there are companies and organizations that

9    can be scapegoated, and there can be

10   organizations and companies and entities that

11   purport to be, I guess, heroes for victims,

12   but that's not necessarily how it plays out

13   behind the headlines, so...

14        Q.     In this book, who are the

15   innocent villains?

16        A.     I don't define anybody as an

17   innocent villain, per se.  There's not

18   somebody who is stated as an innocent

19   villain.

20        Q.     But what types of entities do

21   you believe are scapegoated?

22        A.     I wouldn't say I make a

23   conclusion that anybody is scapegoated, per

24   se, but if you look at -- so if you look at

25   the evolution of the commercial sex industry

1    of these allegations.  Not definitively

2    saying this person is an innocent villain or

3    this person is a guilty hero, but it's

4    talking about that evolution.

5         Q.    Do you talk about plaintiffs'

6    lawyers in your book?

7         A.    No.  I don't think so.

8         Q.    Do you intend to talk about

9    plaintiffs' lawyers in your book?

10        A.    What do you mean by plaintiffs'

11   lawyers?  Like, do you -- I mean, what do you

12   mean by that?

13        Q.    Sure.

14              So plaintiffs' lawyers are

15   typically lawyers who represent plaintiffs in

16   lawsuits.

17        A.    I know what they do.  Yeah.

18        Q.    But, yeah.  So what I mean by

19   that is you have some opinions in this case,

20   you know, about Brad Edwards and people who

21   represent victims or are bringing TVPA

22   claims.

23        A.    I have opinions about Brad

24   Edwards?

25        Q.    You have information about Brad

```
 1    Edwards in your complaint in the secondary
 2    exploitation section, correct?
 3         A.    I don't have --
 4              MS. ELLSWORTH:  Object to the
 5         form.
 6              You said "complaint."  I think
 7         you meant report.
 8              MS. BOGGS:  Yes.  Thank you.
 9              THE WITNESS:  I don't have any
10         opinions about Brad Edwards.
11              But does somebody who is an
12         alleged victim of Epstein has opinions
13         about Brad Edwards?  Yes.  ████
14         ████   does have opinions about Brad
15         Edwards.
16              Are there articles published by
17         plaintiff lawyers that I might
18         reference in the book?  Sure.  One
19         example of it is the article by Julie
20         Dahlstrom called Trafficking to the
21         Rescue, where she essentially talks
22         about feeding on trafficking cases as
23         trafficking cases for the litigation
24         advantages it offers.
25              There are also a number of
```

1          plaintiffs' attorneys who have

2          admitted to that.  Is it possible that

3          I'll talk about that in book?  Sure.

4               But I don't have any opinions

5          about Brad Edwards, and I don't think

6          I've levied any opinion in my merits

7          report about Brad Edwards or any

8          plaintiff attorney attached to this

9          case whatsoever.

10     QUESTIONS BY MS. BOGGS:

11          Q.    Other than the example you just

12     mentioned about Julie Dowel {sic}, do you

13     have any other examples about TVPA cases in

14     your book?

15          A.    Julie Dahlstrom.  It's

16     D-a-h-l-s-t-r-o-m.

17          Q.    Thank you.

18          A.    Yeah, no problem.

19               I think that was published in

20     the UC-Davis law review as well.

21               Any opinions about the --

22          Q.    Any other examples about TVPA

23     cases in your book?

24          A.    What do you mean by TV -- like,

25     just TVPA -- like -- well, so this isn't a

```
1              socioeconomic background, that, in and
2              of itself, does not equate to
3              trafficking.  Again, it has to involve
4              the force, fraud, coercion, deception,
5              threat or debt bondage.  I mean, one of
6              these elements needs to be there if she
7              is over the age of 18.  If she is not
8              over the age of 18, consent is not an
9              affirmative defense."
10             Do you see that?
11      A.     Yes, ma'am.
12      Q.     And that was your sworn
13   testimony, correct?
14      A.     Yes, ma'am.
15      Q.     And do you stand by that
16   testimony here?
17      A.     Yes, ma'am.  Absolutely.
18             And I think I state to that in
19   the report, consent is not an affirmative
20   defense for exploitation.
21             So a person who is exploited in
22   the commercial sex industry is a minor,
23   cannot consent to be exploited, and to have
24   an unfair benefit from their labor.
25             And I believe the preface to
```

Confidential - Pursuant to Protective Order

1    that answer, though -- the question was

2    regarding pimping-prostitute relationships,

3    so I want to put that in context.  But, yes.

4         Q.    What do you mean by that?  I'm

5    not sure I quite understand the context.

6         A.    So you had read out loud the

7    answer from page -- from line 13 to 18.

8         Q.    Right.

9         A.    You had read my answer, but the

10   question was:

11              "And I guess what I'm getting

12        at here is, let's say you have a pimp

13        who engages in a pimping relationship

14        with a young woman who is from a

15        rougher background, again, maybe drug

16        abuse, maybe psychological problems,

17        maybe a rough background.  Would you

18        view that disparity, the disparity in

19        power that results from the woman's

20        background, as itself sex trafficking?"

21              So the answer that you read was

22   in relation to -- it was in response to that

23   question.

24        Q.    Okay.  Let's look at page 73,

25   line 22.

1    appendix of my report of things I relied

2    upon.

3              I know that there was some

4    testimony after Epstein's death, that the

5    judge allowed testimony from several

6    individuals.  I read those transcripts.  I

7    read a number of transcripts for others in

8    affiliated or related cases.

9              I don't recall everything, but

10   I would just refer to the report and what I

11   cited.

12        Q.    Have you talked to law

13   enforcement about its investigation of

14   Epstein?

15        A.    Personally?

16        Q.    Yes.

17        A.    No.

18        Q.    Did you ask to speak with

19   anyone in law enforcement?

20        A.    No.

21        Q.    I think earlier you said you

22   have not interviewed any of Epstein's

23   victims.

24              Is that correct?

25        A.    That is correct.

1                    So I think that it's important

2        to know that, one, not all minors are

3        considered to be victims of trafficking, even

4        if they are involved in the commercial sex

5        industry.  But, two, even if they are

6        actually victims of trafficking, they're

7        frequently misidentified by trained

8        authorities with more investigative power.

9            Q.    Are you identifying -- are you

10       alleging that any victims have been

11       misidentified here?

12           A.    Again, I don't think that I --

13       I'm not making any legal conclusion of

14       whether somebody is a victim, a

15       co-conspirator or a non-victim.  But if you

16       look at trends, it is important to realize

17       that this is a common trend and a common

18       issue affecting trafficking cases, this

19       misidentification issue.

20                    And based off of the totality

21       of information, as well as the common threads

22       across cases, it is highly atypical for a

23       person receiving a significant financial

24       benefit to be considered in criminal courts

25       as a victim, only, and not also a

```
 1            A.      Are you being facetious?
 2    That -- no, of course not.
 3            Q.      So how can you say that no one
 4    at JPMorgan talked to any victim or received
 5    any overt disclosure?
 6            A.      There is no evidence in the
 7    record to suggest that, that I have reviewed.
 8            Q.      When you say here, "Plaintiffs
 9    and plaintiffs' named experts are attempting
10    to hold private businesses such as banks to a
11    higher standard," what is your basis for
12    that?
13            A.      Based off of the standard that
14    was in existence at the time for law
15    enforcement and their expectations to
16    intervene versus what was the expectation for
17    businesses at that time, but also the
18    hindsight bias and the confirmation bias
19    that's being applied in many cases, including
20    what appears to be happening in the present
21    matter, given the information that's in your
22    named expert's report.
23            Q.      What standard are you saying is
24    being applied?
25            A.      By standard is being applied?
```

1          Q.     You said "Based off of the

2     standard that was in the existence at the

3     time for law enforcement and their

4     expectations to intervene versus what the

5     expectation for businesses at that time, but

6     also" -- and then you talk about hindsight

7     bias.

8          A.     Okay.

9          Q.     What is the standard that was

10    in existence at the time for law enforcement?

11         A.     What was expected for law

12    enforcement generally understood at that time

13    to be a -- what should catalyze an

14    investigation and an arrest.  And at that

15    time it wasn't -- I mean, so it's applying

16    the generally understood information that was

17    available to law enforcement as well as the

18    generally understood standard and information

19    that was available to private businesses.

20               So, for example, to give you a

21    distinction, law enforcement, the majority of

22    law enforcement, were still not actively --

23    there wasn't mandated training on human

24    trafficking at that time.  And they -- most

25    of them misunderstood it.

1           In 2010, in fact, there wasn't
2     even a data point, not even a single data
3     point, on trafficking that was disseminated
4     by the FBI's Uniform Crime Report.  It wasn't
5     disseminated.
6           It wasn't collected until 2013
7     and disseminated in 2014.  And most law
8     enforcement agencies weren't even collecting
9     data.
10          And if you look at data from
11    Amy Farrell, who has conducted a number of
12    interviews with law enforcement officers, she
13    has published -- and I think she's actually
14    cited by your expert in her report -- she
15    talks about the high rates of
16    misidentification of trafficking, even by
17    trained law enforcement and untrained law
18    enforcement, and some of the organizational
19    institutional barriers to effectuating change
20    in the way they identify cases.
21          So I'm basing it off of a
22    wealth of information at the time, extant
23    peer-reviewed journal articles and research
24    on identification and misidentification, the
25    standards and the availability of evidence

1    and data, the participation in national data

2    collections and the dissemination of that

3    data, and just the availability of

4    information as a whole on how human

5    trafficking happens, and the ability of law

6    enforcement to identify and intervene.

7         Q.    So this is based on your

8    assessment of the literature at the time.

9    You're not pointing to some specific

10   standards.  You can't point me to best

11   practices in law enforcement in 2012; is that

12   correct?

13             MS. ELLSWORTH:  Object to the

14        form.

15             THE WITNESS:  Well, you also --

16        that's a difficult question to answer

17        because, as I'm sure you've read in my

18        report, I'm critical of best

19        practices.  Best practices are

20        oftentimes not evidence-based

21        practices and are based off of

22        misinformation.

23             I could certainly cite to you

24        to the existence and availability of

25        information in 2008, 2010, versus, you

Confidential - Pursuant to Protective Order

1    know, more recently.  I have been an

2    invited presenter to the Police

3    Executive Research Forum, for example,

4    to talk about the evolution of this

5    information and the availability to

6    law enforcement.

7         So it's a combination of

8    factors, but I would not say as an

9    evidence-based, you know,

10   identification or expectation, there

11   is not one in existence for law

12   enforcement.

13        There were some best practices,

14   I think, that came out possibly after

15   2010.  Again, I'd have to refer to

16   some of the materials that I would

17   cite in the report.  I'm not going to

18   be able to cite to everything from

19   memory.

20   QUESTIONS BY MS. BOGGS:

21        Q.    Sure.

22        But I guess my question is,

23   when you say "standard," I guess -- I'm a

24   lawyer, so a standard is when you're looking

25   at whether a practice is unfair, you look at

```
 1      these three factors.  So when you say
 2      "standard," you're not referring to some
 3      objective standard that can be applied, some,
 4      you know, black letter law standard.  You're
 5      talking about something a little more
 6      subjective.
 7                  Is that fair?
 8                  MS. ELLSWORTH:  Objection to
 9            the form of the question.
10                  THE WITNESS:  It's an
11            interesting question you're asking,
12            just because of the nature of the
13            allegations in this particular case.
14                  There is no such standard, even
15            currently.  Even as I sit here today,
16            there is no such standard for
17            businesses or for law enforcement.
18                  And to that effect, one of the
19            things that I do cite to is actually
20            an article that was recently published
21            by the Journal of Human Trafficking
22            that was produced by scholars -- or I
23            think the research was conducted by
24            scholars at Harvard, which identified
25            there is no evidence base to support
```

Confidential Pursuant to Protective Order

```
1              the efficacy of the Department of

2              Homeland Security indicia.

3                   So there is no standard that I

4              can point to you that I would say is

5              reliable as an evidence base.

6    QUESTIONS BY MS. BOGGS:

7         Q.    I guess my question is more

8    basic.  You're referring to a standard.  I

9    don't get what standard you're talking about.

10   Because you're saying no standard exists, but

11   you're talking about standards.

12                  You say, what was expected for

13   law enforcement generally understood at that

14   time -- sorry.  "Based off the standard that

15   was in existence at the time for law

16   enforcement and their expectations to

17   intervene versus what was the expectation for

18   businesses at the time."

19                  And I'm just trying to figure

20   out what standard or expectations you're

21   imposing.  Because if I could see, okay, it's

22   the 2014 standard from this agency, I can

23   pull it and I can see what the standard is.

24   But I'm having a hard time figuring out what

25   standard you're applying.
```

1              A.     I'm --

2                     MS. ELLSWORTH:  Just object to

3              the form.

4                     Sorry.  Go ahead.

5                     THE WITNESS:  The standard I'm

6              applying is the generally accepted

7              understanding from experts within the

8              field on the expectations for law

9              enforcement at that time and the

10             information that's available.

11                    So I'm trying to find a way

12             that I can further explain what that

13             means, but I cannot point you to a

14             specific document and say -- I'm

15             sorry, I forget your name.

16       QUESTIONS BY MS. BOGGS:

17             Q.     Paige.

18             A.     Paige.  I can't say, Paige,

19       this is the standard that was at the time,

20       because it didn't exist.  It was just

21       generally understood of what was a common

22       thread and theme as far as the standard

23       operating procedures and practices across law

24       enforcement agencies.

25                    Same thing as I can talk about

1    what was the standard or was generally

2    accepted across businesses at that time, and

3    the evolution and understanding and

4    availability of best -- quote/unquote, best

5    practice indicia and either the reliability

6    or lack thereof on the basis of extant data.

7              If you're looking at kind of --

8    if you wanted me to cite to what a standard

9    was or what was generally accepted

10   information, one thing that I'm pretty sure I

11   cite to in here is in 2011, The Campbell

12   Collaboration did a systematic review of

13   human trafficking interventions and evaluated

14   the reliability of the evidence base of them

15   and found that they were mostly of low

16   quality, and there wasn't anything that, you

17   know, stated it worked as far as being an

18   intervention to prevent trafficking of

19   persons.

20             Also, whenever it's a good time

21   to take a break.

22        Q.    Sure.  But if we could go five

23   more minutes, that would be great.

24        A.    Yeah, sure.  Great.

25        Q.    Are there any circumstances

Confidential - Pursuant to Protective Order

1    under which you think a bank should be held

2    responsible under the TVPA?

3        A.    In any -- are you saying in any

4    realm -- like any circumstance?  Is there a

5    circumstance when a private business,

6    including a bank, should be held to -- should

7    be liable under the TVPA?

8        Q.    That's correct.

9        A.    Yes, I can conceptualize

10   situations where that should be -- that would

11   probably be deemed appropriate.

12       Q.    Can you give me a fact pattern?

13            MS. ELLSWORTH:  Object to the

14       form.

15            THE WITNESS:  I don't know of

16       any cases off the top of my head, but

17       a fact pattern that I would

18       potentially imagine or can

19       conceptualize is there was an overt

20       disclosure by a trafficker to a teller

21       saying that I'm involved with

22       trafficking; my girls are going to be

23       depositing cash into my account; I

24       don't want any record of that.  Can

25       you look the other way and allow them

Confidential - Pursuant to Protective Order

```
 1              to -- and don't take their
 2              identification documents.
 3                    And this particular teller
 4              takes the cash and deposit it in
 5              accordance and receives additional
 6              money for that.  And maybe several
 7              other tellers are made aware of it, as
 8              well as the bank manager, and they all
 9              are sort of engaged in this conspiracy
10              to look the other way and receive
11              additional funding to look the other
12              way while this person is, you know,
13              putting their money into a particular
14              bank account and maybe giving them
15              advice on how to launder that money or
16              kind of what the caps are of when they
17              would be discovered.
18                    I mean, I'm just coming --
19              making something up as I go along.  I
20              haven't seen a particular case, but I
21              think, you know, it would more likely
22              than not involve some sort of an overt
23              disclosure, or if not, there would be
24              something that is more of an active
25              facilitation that you would see in
```

```
 1              criminal convictions or prosecutions.

 2      QUESTIONS BY MS. BOGGS:

 3          Q.      If you look at page 29, you

 4      have a section on misidentification by health

 5      care providers.

 6          A.      Yes.

 7          Q.      Okay.  At the end --

 8                  MS. ELLSWORTH:  29, did you

 9      say?

10                  MS. BOGGS:  Yes, of her report.

11                  MS. ELLSWORTH:  Thank you.

12      QUESTIONS BY MS. BOGGS:

13          Q.      If you look at the last

14      paragraph, it states, "While the red flags of

15      trafficking that can be screened for in

16      medical fields are not empirically supported

17      by rigorous and reliable research, they are

18      beginning to be referred to as best practices

19      and are being included in trainings and

20      published guidance.  For example, best

21      practice indicia may include pelvic trauma,

22      neglected care and even tattoos indicating

23      ownership or sex work, which include names,

24      dollar signs, references to money, and

25      tattoos on the neck or pelvis, among others.
```

1    doesn't really apply to this case because

2    that wasn't what was happening.  The alleged

3    victims were not depositing cash into

4    Epstein's account, according to the

5    allegations.

6         Q.    You say, "At a minimum, there

7    has to be an availability of an

8    evidence-based and reliable indicia," but

9    then you say earlier that no reliable indicia

10   existed at this time.

11            Correct?

12        A.    At a minimum, if it's a third

13   party without direct involvement without an

14   overt disclosure case.

15        Q.    Let's look at page 188 of your

16   book, and that is Mehlman-Orozco Exhibit 6.

17        A.    (Witness complies.)

18        Q.    Let's look at the last full

19   paragraph on page 188.

20            You say, "Anti-trafficking

21   legislation should not be designed to hold

22   third-party businesses accountable if they

23   are not directly involved.  It is extremely

24   difficult to identify human trafficking

25   offenses.  Even police misidentify victims

1    with frequency.  As such, we shouldn't expect

2    business owners to be able to discern the

3    difference.  Instead, legislation should

4    facilitate partnerships and information

5    exchange to assist police investigations."

6              Do you see that?

7        A.    Yes.

8        Q.    Do you still hold that opinion?

9        A.    So that I guess breaking it

10   down sentence by sentence, "Anti-Trafficking

11   legislation should not be designed to hold

12   third-party businesses accountable if they

13   are not directly involved."

14             If there is no venture, there

15   is no direct involvement, they are not

16   complicit.  They are not facilitating.  And I

17   think there is -- I mean, again, this is my

18   personal opinion, that there -- I don't think

19   that there is a reason why they should be

20   held to a higher standard than law

21   enforcement.

22             So I go on to say that "It is

23   extremely difficult to identify human

24   trafficking offenses.  Even police

25   misidentify victims with frequency."

1          That also stands true for a

2    variety of different businesses.  Despite the

3    interventions that they put in place, they

4    cannot completely eradicate trafficked labor

5    or source materials from trafficking because

6    it's very difficult to identify.

7          "As such, we shouldn't hold" --

8    "we shouldn't expect business owners to be

9    able to discern the difference."

10          I think without reliable

11    indicia, I think expecting them to discern

12    the difference when law enforcement can't

13    even do that themselves, I think it's a

14    Sisyphean task, and I think it's very

15    difficult.  And I don't think that that's

16    appropriate given the clandestine nature of

17    these crimes.

18          "Instead, legislation should

19    facilitate partnerships and information

20    exchanged to assist police investigations."

21          I agree with that, that

22    partnership's important, and I think that's a

23    goal for many pieces of legislation.

24    Q.    Okay.  Let's look at the first

25    full sentence on page 189.

Confidential Pursuant to Protective Order

1    the issues related to secondary exploitation,

2    but it also can -- I mean, yes, I think it

3    covers a lot of -- sort of this general

4    concept of secondary exploitation.

5              So in addition to the examples

6    I gave, I mean, piggybacking other issues or

7    other social initiatives off of trafficking

8    in order to further an alternative or

9    ulterior agenda could be a type of secondary

10   exploitation.  But I didn't think -- I don't

11   think I was really conceptualizing that, per

12   se, as secondary exploitation in the draft, I

13   guess, summary chapters.

14         Q.    How can you tell whether

15   someone is engaging in secondary exploitation

16   versus trying to sincerely help victims?

17         A.    How can I determine it?  It's

18   not something that I would determine.

19              How can a person or an entity

20   or a trier of fact determine it?

21         Q.    That's correct.

22         A.    I think that that remains to be

23   seen.  I think that the purpose of me

24   bringing up secondary exploitation is to make

25   a trier of fact aware of this phenomenon and

1    this concern that's raised among others

2    within the field.

3              I think an ultimate

4    determination -- it's the same sort of thing

5    that's being developed with delineating when

6    a victim of trafficking or somebody who

7    facilitates the victimization of others can

8    be perceived as a co-conspirator as opposed

9    to a victim of a particular crime.

10             So that -- that's being, I

11   guess, determined in courts across the

12   country.

13             Same thing with whether

14   something is consistent with secondary

15   exploitation or not.  I think it's looking at

16   the totality of the information, and it's

17   looking at whether something is consistent

18   with a sincere expression of information

19   versus, you know, potentially being motivated

20   by ulterior objective.

21        Q.    You tell victim stories as part

22   of your work, correct?

23        A.    I think that I do bring

24   anecdote into some of my work, for sure.

25        Q.    And you make a substantial

Confidential - Pursuant to Protective Order

1    portion of your living from human trafficking

2    work, correct?

3              MS. ELLSWORTH:  Object to the

4         form of the question.

5              THE WITNESS:  Again, as an

6         expert within this field, this is my

7         area of expertise, so I do make money

8         off of human trafficking.

9              But to the extent -- if you're

10        attempting to insinuate that I'm

11        engaged in secondary exploitation,

12        that's one of the reasons why I make a

13        point to be the only expert who

14        actively volunteers my time and serves

15        as a pro bono expert to survivors of

16        trafficking, because I don't take any

17        money from survivors.  I would never

18        accept money from survivors.

19              And I make a point to also

20        donate my money to survivors to help

21        them thrive post-rescue, not just my

22        money but my time as well, and to give

23        them opportunities to thrive

24        post-rescue.

25              So I understand, again, given

1           your position, what you might be

2           trying to insinuate, but I think it's

3           very different what I do and the

4           information that I try to produce and

5           my philanthropic pro bono efforts when

6           it comes to survivors.  I don't stand

7           to gain, and I don't want to gain,

8           anything off of a survivor, ever,

9           because of what they've been through.

10              So I think that, you know, I

11          completely understand the basis for

12          your question, but I vehemently

13          disagree.

14      QUESTIONS BY MS. BOGGS:

15          Q.   Well, I'm not saying it.  I'm

16  asking a question.

17              What I'm asking is, how can you

18  tell -- you're saying that you're not

19  exploiting human trafficking survivors.

20              What I'm saying is, how can --

21  how can you tell?  How can you differentiate?

22              So someone might view that you

23  are engaging in secondary exploitation,

24  correct, and then you would deny it?

25              So who determines that?

1          MS. ELLSWORTH:  Object to the

2      form.

3          THE WITNESS:  I would invite

4      anybody who thinks that I am engaged

5      in secondary exploitation to look at

6      my body of work and to look at the

7      amount of time that I've dedicated to

8      assisting survivors.

9          I would invite anybody who

10     would make any allegation like that

11     against me to look at the totality of

12     the information behind what I do.

13         I think that one of the reasons

14     why I tend to be a very compelling

15     expert is because I testify

16     truthfully, and I testify on base of

17     state-of-the-science research, and I

18     think my intentions come across in how

19     I convey information.

20         I am an objective party, or I

21     try to be.  Again, that's how I'm

22     trained as a social scientist, to

23     objectively evaluate information

24     that's put before me.

25         And I think that anybody who

1          would make an accusation like that of

2          me, then I just welcome them to look

3          at my body of work and who I am as a

4          person.  So...

5     QUESTIONS BY MS. BOGGS:

6          Q.     You said that you're the only

7     expert witness who does pro bono work?

8          A.     I am the only person that I

9     know of that has served as a pro bono expert

10    witness.

11                Now, I know people volunteer

12    their time in a variety of capacities, but as

13    serving as an actual expert witness in court,

14    I think I'm the only one that I know of.

15                Now, not to say that there

16    aren't others.  There possibly could be, but

17    I'm the only one that I know of.

18                MS. ELLSWORTH:  Could I just

19         get a time check real quick, please?

20                VIDEOGRAPHER:  6 hours,

21         34 minutes.

22                MS. BOGGS:  Thank you.

23    QUESTIONS BY MS. BOGGS:

24         Q.     Let's look at Exhibit 4.

25         A.     Which one?  I don't know --