# Exhibit 4

GOVERNMENT OF THE UNITED STATES
VIRGIN ISLANDS,

      Plaintiff,

v.

JPMORGAN CHASE BANK, N.A.,

      Defendant/Third-Party Plaintiff.

---

JPMORGAN CHASE BANK, N.A.,

      Third-Party Plaintiff,

v.

JAMES EDWARD STALEY,

      Third-Party Defendant.

UNITED STATES
DISTRICT COURT
FOR THE
SOUTHERN DISTRICT
OF NEW YORK

Case No. 22-cv-10904-JSR

# Expert Report of Special Agent Joseph Fonseca, FBI (Retired)
## on behalf of
## JPMorgan Chase Bank, N.A.

**June 23, 2023**



EXHIBIT 1
WIT: Fonseca
DATE: 7-6-23
C. Campbell, RDR CRR CSR #13921

## Table of Contents

**Qualifications - FBI Special Agent Joseph Fonseca (Retired)** ....................................................3

**Summary of Opinions:** ................................................................................................................4

**FBI Investigative Approach to Sex Trafficking:** ........................................................................6

    The Sex Trafficking Investigation - Initiation of an Investigation and the Investigative
Process .............................................................................................................................................6

    Victim Identification and Recovery ..............................................................................................7

    The Role of Money and Financial Transactions in Sex Trafficking Investigations .................8

**How SARs and CTRs are Distributed Within the FBI** ................................................................9

**Relative similarities between Jeffrey Epstein charges and Ghislaine Maxwell's trial** ..........10

**Evidence Against Epstein in Palm Beach Investigation** ...........................................................11

    Investigation by the Palm Beach Police Department and Florida State Authorities ..............12

    FBI Investigation and Non-Prosecution Agreement.................................................................14

**Conclusion #1:** ████████████████████████████████
████████████████████ ..................................................................**17**

**Conclusion #2:** ████████████████████████████████
████████████ ..................................................................................**20**

**Conclusion #3: Financial records have limited utility in investigations similar to those
conducted into Epstein, and Epstein's transactions would not have fit within the typical
trafficking investigation**..............................................................................................................**22**

**Appendix A**

    Curriculum Vitae, Special Agent Joseph Fonseca, FBI (Retired)

**Appendix B**

    Materials Reviewed

**Qualifications - FBI Special Agent Joseph Fonseca (Retired)**

1. My name is Joe Fonseca and I am a retired Federal Bureau of Investigation Special Agent (FBI SA). I served as an FBI SA while assigned to the FBI offices in Atlanta, Washington, D.C., Thailand, and at the FBI Academy.

2. My twenty-three-year career was spent investigating crimes against children and violent crimes, with the majority of my career served in the Atlanta field office.

3. During my career, I served as the Atlanta FBI Crimes Against Children Coordinator (CACC), investigating crimes involving human trafficking, child sexual exploitation, child pornography, international parental kidnapping, and other crimes involving children and women. With regularity, I applied the FBI's protocols developed for use in investigating these crimes. Certain of the FBI protocols, for which I was trained, involved understanding the dynamic of interviewing sexually exploited women and children and gathering evidence necessary to prove the elements of the crimes that had been committed.

4. While serving as the Atlanta office CACC, I worked to create the Metro Atlanta Child Exploitation Task Force (MATCH) in 2007, combining the expertise of over 50 Georgia law enforcement and other governmental agencies. In this capacity, I directed multi-faceted investigations involving domestic child prostitution and human trafficking. These investigations combined the collaborative knowledge and experience of many agencies to be able to identify patterns of trafficking, such as methods of transportation and those subjects most likely to conspire to commit the crimes. These subjects would include owners of businesses such as restaurants, hair salons, day spas, and agricultural farming.

5. In 2006, I was selected to serve as one of thirty-six original members of the FBI's newly created Child Abduction Rapid Deployment Team (CARDT). I subsequently served as a CARDT team leader for several years through 2014, responding to multiple child abductions in the U.S. and abroad. My experiences included assisting the Government of Tajikistan with the disappearance of young children who were being trafficked out of their country.

6. Towards the later years of my career, I was selected as a Supervisory Special Agent and Child Sex Tourism Program Manager within the FBI's Crimes Against Children Major Case Coordination Unit in Washington, D.C. in 2014. I directed the development of protocols to uncover the structuring of finances used for webcam sexual exploitation cases involving Americans and children outside of the U.S.

7. I left Washington, D.C. in 2016 and accepted a position as the FBI's first Crimes Against Children Assistant Legal Attaché. I was assigned to Thailand for 3 years where I served as the Regional Assistant Legal Attaché, responsible for investigations and training in matters of human trafficking and crimes against children in eleven SE Asian countries. As an example, I have worked with the Thai and Cambodian police to develop best practices for following financial trails, to include the identification of bank accounts used solely for the buying and selling of children in Thailand and Cambodia. These cases in SE Asia involved trafficking for labor, sexual servitude, and child sex tourism. The training programs I created and managed included the use of internet

programs designed to identify the transfer of child sexual abuse material, additionally known as child pornography.

8. I have investigated cases involving the transport and exploitation of women and children across the U.S. border, state lines, and in other countries. I have had the opportunity to assist in the prosecution of more than 100 sexual exploitation cases, with many culminating in trials.

9. I have trained with numerous foreign law enforcement officers and learned of different trafficking techniques to gain an understanding how certain trafficking crimes and crimes against children can be investigated and prosecuted in the U.S. I have investigated these trafficking and crimes against children cases with the assistance of financial records obtained from businesses (hotels, car rental companies, apartment complexes, etc.), financial institutions, money providers (companies such as Western Union and MoneyGram), and prepaid debit cards (such as GreenDot).

10. In 2021, I finished my FBI career as a Counselor for new agent trainees at the FBI Academy in Quantico, Virginia.

11. I am being compensated for my review, analysis, and time in this case at a rate of $125.00 per hour.

12. My compensation is not contingent upon offering any specific opinions or on the outcome of this matter.

**Summary of Opinions:**

13. I was engaged by Wilmer Cutler Pickering Hale and Dorr LLP (Counsel), counsel for JPMorgan Chase Bank, N.A. (JPMC or the Bank) to provide an expert opinion and potentially expert testimony in the matter of *Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A.*, No. 22-cv-10904 (JSR) (S.D.N.Y.) (the Epstein Litigation).

14. I have reviewed the Second Amended Complaint filed by the Government of the United States Virgin Islands (USVI) in this case and understand that it alleges that JPMC intentionally obstructed the federal government's enforcement of the Trafficking Victims Protection Act, 18 U.S.C. § 1591, against Jeffrey Epstein ████████████ ████████████████████████ and "permitting" Epstein to withdraw large amounts of cash from his accounts.[1] Counsel requested that I provide an opinion regarding ████████████████████████████████████████████ ████████████████████████████████████████████

15. In my opinion, based on my review of the materials identified in Appendix B to this Report and my years of experience investigating crimes against children and sex trafficking cases as a Special Agent for the FBI, ████████████████████████ ████████████████████████████████████████████

---

[1] Second Amended Complaint, ¶¶ 147-168, *Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A.*, No. 22-cv-10904 (JSR) (S.D.N.Y.), Dkt. No. 120.

████████████████████████████████████████████████████
███████████████████████████████████████ My conclusion is informed by the allegations about Epstein's conduct, particularly the allegations about his use of relatively small amounts of cash to compensate women for sexual experiences, the evidence available to investigators in their investigation into Epstein from 2005-2008, publicly available information about Epstein that law enforcement would have been aware of, including allegations in the media about his conduct, ██████████████████████████████ ██████████████████████████████████████████████████████

16. To begin with, over the course of my career, I have never relied on a SAR while investigating a person on charges of sex trafficking. The simple reason for this is due to the victim-centered approach the FBI utilizes when conducting an investigation into sex trafficking.

17. The victim-centered approach to investigating sex trafficking cases focuses on making sure the victim feels safe, secure, and stable. Once victims are safely recovered and supported, they are then able to provide the most important piece of evidence in a sex trafficking case – their testimony. Victim testimony is essential to describe the manner and method of a victim's trafficking, the relevant details of their exploitation and abuse, and anything of value given to or received by any person for a sex act by the victim. In the typical sex trafficking case, investigators would then work to find the best evidence to corroborate the various aspects of the victim's testimony in order to prove sex trafficking-related charges.

18. Based on my experience as an FBI SA, SARs are not useful in sex trafficking or crimes against children investigations because they are unlikely to directly corroborate a victim's testimony or provide evidence of the sex trafficking of a victim. Without direction from a victim alleging the existence of a trafficking operation and describing the manner and method of payment in a way that reasonably matches the transaction activity that potentially could be flagged in a SAR, law enforcement would be unable to determine whether a cash or wire transaction that may be reported in a SAR was related to any trafficking activity. ██████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████

19. It is also my opinion that investigators have an obligation to affirmatively recover evidence they believe is relevant to their investigation. As such, if the FBI had continued to investigate Epstein's conduct following his Florida state conviction in June 2008, and believed that further evidence of his financial activity was relevant to that investigation, there was enough information available to law enforcement both ██████████████████████████████████████████████████████ ███████████████████████████████████████ and in the public record to allow investigators to evaluate Epstein's activity and, more importantly, to know that they should look to JPMC as a source of additional financial information if they felt it was necessary. Specifically, the FBI would have known at all times after 2008 that it could send a

---

[2] I have also reviewed, relied upon, and agree with the conclusions in the expert report of Teresa A. Pesce.

grand jury subpoena for financial records to JPMC related to Epstein's accounts.  My understanding is that the FBI never sent such a subpoena to JPMC █████████████████

20. In my experience, a financial institution would not be in a position to identify which of certain Epstein funds may have been used for the purpose of paying his victims as part of an alleged sex trafficking operation any earlier than the FBI would have, if at all.

**FBI Investigative Approach to Sex Trafficking:**

21. Though each investigation into sex trafficking[3] presents its own unique facts and challenges, the initiation of a sex trafficking investigation and the investigative processes used by the FBI in these kinds of cases are generally consistent.

*The Sex Trafficking Investigation - Initiation of an Investigation and the Investigative Process*

22. Regardless of what kind of trafficking behavior is at issue, sex trafficking investigations, or cases, are opened by the FBI after receiving some form of complaint. In most instances, that complaint comes from a victim.

23. Complaints are received in several ways.  The FBI might receive a complaint from a victim directly from an email sent to a field office or to the Internet Crime Complaint Center (IC3) email site operated by FBI Headquarters in Washington, D.C., a phone call, traditional letters mailed from the U.S. Post Office, or even from a "walk-in" – a complainant who arrives at an FBI office in person.  Complaints are also often referred to the FBI by state and local law enforcement agencies, non-governmental organizations, or the National Human Trafficking Resource Center Hotline.[4]

24. Sources also play a major role in providing eyes and ears on the street and are relied upon to provide information relative to sex trafficking when they witness signs of the sexual abuse or exploitation of a victim.  These sources typically include hotel employees, apartment managers, and maintenance personnel at these locations who physically see the victim and directly observe signs of sex trafficking.[5]

25. Once a complaint is received, the FBI will open a sex trafficking investigation.  An FBI sex trafficking investigation, similar to other FBI investigations, is organized in a particular fashion, following protocols developed over time and by using proven best-practices.  There is a start and finish that incorporates the same functions along the way. This process is identified as follows:

---

[3] For purposes of this report, "sex trafficking" will be used throughout and is defined as the process whereby someone is compelled to engage in a commercial sex act through the use of force, fraud, or coercion or as a minor.
[4] *Human Trafficking*, FBI.gov (last visited 6/17/2023), https://www.fbi.gov/investigate/violent-crime/human-trafficking.
[5] *See id.*

    a.   Receiving a complaint;

    b.   Identification of the victim(s), subject(s) and customer(s);

    c.   Interviewing victims;

    d.   Producing subpoenas to obtain records;

    e.   Collecting evidence;

    f.   Indicting and arresting a subject or subjects;

    g.   Convicting a subject or subjects; and

    h.   Assisting with the process of healing the victim(s).

26. Though, as explained below, the evidence which may be material to a sex trafficking investigation varies some depending on the nature of the trafficking behavior at issue, sex trafficking investigations share a common element: they are dependent on and driven by the credible statements of victims or eye-witnesses.

*Victim Identification and Recovery*

27. The primary goal of a sex trafficking investigation is the safe and secure recovery of victims. The FBI describes this approach as a "victim-centered, trauma-informed response."[6]

28. Victims of sex trafficking are predominantly female.[7]  Some victims are recruited directly into sex trafficking operations.  This can happen in a variety of ways, including from schools, on the internet through websites such as Facebook, and on phone applications such as Instagram.  These victims traditionally are girls who have low self-esteem, come from a broken family or a foster family, or who have been in and out of juvenile detention centers.[8]  Other victims, typically foreign nationals, may have been lured or deceived into a sex trafficking enterprise on promises of, among other things, high-paying jobs or U.S. citizenship and freedom, only to be brought into the U.S. by their trafficker and forced into prostitution or other forms of sexual exploitation.[9]

---

[6] *Id.*

[7] Global Report on Trafficking in Persons 2020, United Nations Office on Drugs and Crime, at 4 (2020), https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf (For every 10 victims detected globally, five are adult women and two are girls.");  *see also* Asa Renger, *Trafficking in women and girls is moving online due to COVID-19*, UN Women (Dec. 8, 2020), https://www.unwomen.org/en/news/stories/2020/12/op-ed-trafficking-in-women-and-girls-is-moving-online-due-to-covid-19 ("Women and girls represent 72 percent of all trafficking victims globally, and 77 percent of detected female victims are trafficked for the purpose of sexual exploitation.").

[8] *What is Human Trafficking?* U.S. Department of Justice (Sept. 28, 2022), https://www.justice.gov/humantrafficking/what-is-human-trafficking#:~:text=There%20is%20no%20single%20profile,education%20level%2C%20or%20citizenship%20status.

[9] *Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity*, FinCEN (Oct. 15, 2020), https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf

29. The success of an investigation into and prosecution of traffickers almost always depends on the identification and recovery of credible victims who are willing to come forward and speak with law enforcement. Thus, identifying, recovering, and supporting these victims is the necessary first step in a human trafficking investigation. To that end, the FBI works with social services, victim assistance programs, and non-governmental organizations to facilitate victim recovery and ensure that victims feel safe, secure, and stable.[10]

30. Victim interviews serve as the primary source of information about the trafficking venture. The victim will be asked to identify the trafficker and describe the trafficking operation, including, for example, what hotels she has stayed at, if there are other victims, and where the trafficker can be found. Once the FBI receives credible information from a victim, investigators then work to secure evidence to corroborate the victim's statements through subpoenas, search warrants, and interviews with other victims or witnesses that may be identified.

31. In a sex trafficking investigation, important pieces of evidence investigators may look for include physical evidence of sex trafficking, such as condoms or clothing, as well as photos advertising the victims in online advertisements for sexual services through online sites such as Craigslist, Backpage, or MyRedBook, and any communications between the victim and her trafficker. Investigators will also likely look to interview employees at hotels and car rental agencies, family members, and the customers who paid the victims to have sex with them to corroborate the victim's claims.

### _The Role of Money and Financial Transactions in Sex Trafficking Investigations_

32. Evidence of financial or bank account records is not essential to a sex trafficking investigation, particularly ones that are focused on a subject that has directly abused or sexually exploited a victim. Essentially, these subjects can be found guilty of trafficking if there is sufficient evidence that the subjects were the recipient of something of value directly from their exploitation of the victim, such as a sex act, forcing the victim to serve as personal domestic worker, or a similar labor relationship. In my experience, account records from banking institutions need not be, and are not ordinarily, used as evidence in these cases.

33. Generally speaking, however, financial records or bank account statements may be relevant to an investigation in two primary respects.

34. First, in investigating subjects who may be operating a sex trafficking enterprise, investigators may look for financial records that might evidence proceeds from criminal activity and efforts to launder those proceeds through financial institutions. Thus, relevant evidence could include high volumes of round-dollar cash deposits, structuring of cash deposits to avoid reporting requirements, or multiple interstate transactions on the same account. Investigators may also look for cash deposits reported as business

---

[10] Larry Alvarez, M.S. & Jocelyn Canas-Moreira, *A Victim-Centered Approach to Sex Trafficking Cases*, Law Enforcement Bulletin, FBI.gov (Nov. 9, 2015), https://leb.fbi.gov/articles/featured-articles/a-victim-centered-approach-to-sex-trafficking-cases

income on accounts connected to high-risk industries, such as massage parlors or nail salons.[11]

35. Although many of the underlying transactions related to a sex trafficking enterprise are conducted in cash, in my experience, sex trafficking cases do not typically involve the opening or use of traditional bank accounts.  In many cases, sex traffickers have used money providers such as Western Union or MoneyGram to send the proceeds of the trafficking enterprise to others.  Other sex traffickers utilize prepaid or debit cards, such as GreenDot, that allow the trafficker to remotely withdraw payments that are added to the card in connection with the trafficking of a victim.[12]  Some traffickers simply hold onto cash they receive as payment in connection with the trafficking of a victim and store it in a safe or convert it into goods such as cars or real estate.[13]

36. Second, financial records may also be relevant to the extent they show accounts being used in ways that might be indicative of a sex trafficking operation.  For example, investigators may be interested in excessive transportation-related transactions, such as plane, train, or bus tickets, or rental cars.  Similarly, excessive hotel charges or transactions that might reflect the payment of a victim's cost of living may be relevant to a sex trafficking investigation.  Evidence of these transactions could be used to corroborate the testimony of victims who identify the manner and methods of their exploitation and trafficking.[14]

37. The primary tool for investigators to uncover this sort of evidence is through the issuance of a subpoena.

## How SARs and CTRs are Distributed Within the FBI

38. From my experience, I am aware that the FBI works with FinCEN to access and review SARs and CTRs filed by financial institutions.  Since at least 2005, the FBI has been able to index, search and sort information contained in SARs and CTRs, including names mentioned in SAR narratives, social security numbers, phone numbers, and addresses.[15]

39. Once the information in a SAR or CTR is indexed and available in the FBI's database, agents and case teams investigating a subject will be able to search for and retrieve that information as needed.  Intelligence analysts employed by the FBI and assigned to work on certain cases would run searches on subjects or specific data about a subject through the internal database and would be able to retrieve SARs, CTRs, and other available information, and provide relevant information to investigators.

40. There may also be dedicated review teams who proactively review SARs and CTRs for names or other data such as dates of birth and social security numbers, driver's license

---

[11] *See* JPM-SDNYLIT-00174075; *see* Expert Report of Teresa A. Pesce, at 40, 52.
[12] *Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity*, FinCEN (Oct. 15, 2020), https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf
[13] *Id.*
[14] *Id.*
[15] *BSA: What Happens to Those SARs*, BankersOnline (Nov. 1, 2005), https://www.bankersonline.com/articles/111213.

numbers, or addresses that could match existing cases.  If there is a match for the data in an existing case, the normal course of action would then be to forward the SAR or CTR to the respective squad which had a possible open case related to any of the specific data identified in the SAR or CTR.  These review teams may also pass along SARs or CTRs to appropriate agencies or squads who decide that those documents on their own merit the opening of an investigation.[16]

41. 

42.

43. Based on my understanding that the FBI did not issue a subpoena for financial records to JPMC, it is my opinion that the FBI did not consider any such financial records held by JPMC to be helpful or necessary to its investigation.

**<u>Relative similarities between Jeffrey Epstein charges and Ghislaine Maxwell's trial</u>**

44. The victim-centered approach and the method of corroborating victim statements about the manner and method of their alleged trafficking is demonstrated in the recent trial of Epstein's own associate Ghislaine Maxwell.  Jeffrey Epstein was investigated by the FBI and subsequently indicted on sex trafficking and sex trafficking conspiracy charges.[18]  Maxwell was investigated by the FBI and subsequently indicted, and convicted, on sex trafficking and sex trafficking conspiracy charges that were similar to the federal charges brought against Epstein in 2019.[19]

45. I reviewed the documents in the public record related to the victims who testified in the Maxwell trial regarding how they were sexually exploited by Epstein.  Among other

---

[16] *See* Connecting the Dots … The Importance of Timely and Effective Suspicious Activity Reports, FDIC.gov (Dec. 28, 2021),
https://www.fdic.gov/regulations/examinations/supervisory/insights/siwin07/article03_connecting.html#drop16.
[17] In my experience working on cases involving sex trafficking and crimes against children, I was never provided with a SAR or CTR, nor have I ever worked on a case that was opened based on the filing of a SAR or CTR.
[18] Indictment, *United States v. Jeffrey Epstein,* 19 Crim 490 (SDNY 2019), https://www.justice.gov/d9/press-releases/attachments/2019/07/09/u.s._v._jeffrey_epstein_indictment_redacted_0.pdf
[19] *United States  v. Maxwell*, U.S. District Court, Southern District of New York, Criminal Docket for Case #: 1:20-cr-00330-AJN-1

things, the victims testified about being paid nominal amounts of cash following their sexual exploitation; however, the federal prosecutors and the FBI did not introduce financial records at trial to validate the victim's testimony.  Instead, they relied on the victim's testimony and the corroborating testimony of witnesses to introduce the fact of financial payments.[20]

46. To the extent financial records were used in the Maxwell trial, including records from JPMC, the focus was on connecting Maxwell and her accounts to Epstein through multi-million dollar transfers from Epstein to Maxwell.[21]  As has been true in my experience investigating sex trafficking, financial records were not used to demonstrate payments made to victims.

47. Although Jeffrey Epstein died before he could be convicted at trial, the Maxwell trial proceeded in the same manner I believe the trial against Jeffrey Epstein would have. Based on my experience, the Maxwell trial was also an exemplar of the evidence the FBI typically uses in a sex trafficking investigation and case.

48. To that end, at the Maxwell trial, victims testified as to their sexual exploitation and other witnesses corroborated the victim's testimony.  In addition, items such as clothing and pictures were entered as evidence during the Maxwell trial, as they would have been in a trial involving Epstein.

49. It is my belief the Epstein case mirrored the Maxwell case, and the FBI conducted an almost identical investigation to prosecute Ghislaine Maxwell for sex trafficking.  As evidenced by the trial testimony and exhibits, the federal prosecutors and FBI leading the Maxwell investigation did not rely on financial records to evidence any of the relatively small payments received by Maxwell's victims.

**Evidence Against Epstein in Palm Beach Investigation**

50. Based on my review of the records from the Palm Beach Police Department's and the FBI's initial investigation into Epstein between 2005 and 2008 (the Palm Beach Investigation), the investigation was consistent with my experience as an FBI special agent investigating sex trafficking and crimes against children and the analysis of such investigations explained above.

51. The Palm Beach Investigation uncovered substantial evidence that, in my view, could have supported a recommendation to charge Epstein with more serious federal offenses than the state charges for solicitation of prostitution and solicitation of a minor for prostitution to which he ultimately pleaded guilty and was sentenced to 18 months in jail.[22]

---

[20] *United States v. Maxwell*, Nov. 30, 2021 Tr. 301:23-302:14 (testimony of Epstein victim); *United States v. Maxwell*, Dec. 1, 2021 Tr. 231:6-233:6 (testimony of witness corroborating payments to victim);  *United States v. Maxwell*, Dec. 7, 2021 Tr. 96:13-98:4; *United States v. Maxwell*, Dec. 8, 2021 Tr. 45:5-14.

[21] *United States v. Maxwell*, Dec. 6, 2021 Tr. 142:11-188:25.

[22] U.S. Department of Justice Office of Professional Responsibility Investigation into the U.S. Attorney's Office for the Southern District of Florida's Resolution of Its 2006–2008 Federal Criminal Investigation of Jeffrey Epstein and Its Interactions with Victims during the Investigation, at 179 (11/2020), https://context-cdn.washingtonpost.com/notes/prod/default/documents/1c1f6649-226e-4afa-953e-826dee8de3b5/note/49b577fa-6ad8-415d-8efc-c553423af314. [hereinafter OPR Report].

*Investigation by the Palm Beach Police Department and Florida State Authorities*

52. The Palm Beach Investigation was opened following a phone call to law enforcement in March 2005 by a victim's stepmother, who believed that her 14-year-old stepdaughter had been molested by an older man based on conversations with another parent who overheard her own daughter's phone conversations about how the victim had been paid to have a sexual encounter with a 45-year-old man.[23]

53. Once the victim and her family agreed to speak to investigators, the victim was able to describe the circumstances of her exploitation and sexual assault.  Specifically, the victim told investigators that she was recruited by another young woman who drove her to and from Epstein's residence and who claimed she was paid for bringing the victim to Epstein.[24] The victim also described being led up to an upstairs room in Epstein's residence by his assistant and performing a massage on Epstein that turned sexual in nature for which she was paid $300.[25]  The victim was able to identify Epstein's picture in a photo lineup.[26]

54. Investigators then worked to corroborate the victim's story.  They recorded a phone call between the victim and her recruiter purporting to schedule another massage with Epstein on a specific date and time and organized trash pulls from Epstein's Palm Beach residence.[27]  In one of the trash pulls, investigators found a message left for Epstein from the recruiter stating that the victim would be able to "work" for him on the date and time arranged for in the recorded phone call.[28]

55. Investigators then spoke to the recruiter, who corroborated much of the victim's statement.[29] The recruiter described how she was also recruited and sexually exploited by Epstein, and how she recruited other girls to "work" for Epstein in exchange for small cash payments of approximately $200.[30]  The recruiter also told investigators she had brought approximately six different young girls to Epstein between the ages of 14 and 16, whom she identified.[31]

56. Investigators then set about contacting and interviewing the other identified victims. Generally speaking, they told investigators a similar story.  They knew the recruiter because they attended the same local high school.[32]  The recruiter would tell them they could make money by giving massages to Epstein, and brought them to Epstein's residence.[33]  The girls would see members of Epstein's staff while waiting for Epstein until his assistant would bring the victim upstairs while the recruiter waited in the kitchen.[34]  Many victims described the interior of Epstein's house, including

---

[23] Palm Beach Investigation Incident Report, JDoe_DBAG_005374, at 005384.
[24] Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402, at 003402-003404.
[25] *Id*. at 003403-003404.
[26] Palm Beach Investigation Incident Report, JDoe_DBAG_005374, at 005390.
[27] Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402, at 003404.
[28] *Id.*
[29] *Id.* at 003404-003405.
[30] *Id.*
[31] *Id.* at 003405.
[32] *Id.* at 003406-003421
[33] *Id.*
[34] *Id.*

photographs of naked young women.[35]  The victims would give Epstein a massage, which turned sexual in nature, and at the end of the encounter would be paid a couple hundred dollars in cash.[36]  These victims would, in turn, serve as additional recruiters of other young girls for Epstein, following a similar pattern to their own victimization and expanding the network of victims and recruiters.[37]  Many of the victims also told investigators that Epstein was aware that they were minors, and would ask questions about high school and even had roses delivered to one victim at her high school following a play performance.[38]

57. In addition to cash payments, some victims described receiving more elaborate gifts from Epstein, such as rental cars to visit families,[39] "Christmas bonuses" via Western Union,[40] a new car,[41] spending money, and, on one occasion, a plane ticket.[42] Detectives were able to corroborate this information by tracing these purchases to members of Epstein's staff and/or his credit cards,[43] subpoenas issued to Western Union,[44] and handwritten notes describing the gifts.[45]

58. In all, detectives identified and spoke with no fewer than seventeen (17) victims.[46]

59. Consistent with my experience in these kinds of cases, detectives then sought to corroborate the statements of these victims.  They conducted trash pulls, and subpoenaed phone records and Epstein's private flight manifests.[47]  Detectives also compiled a significant file of news articles and media reports about Epstein, including a 2002 article in New York Magazine titled "Jeffrey Epstein: International Moneyman of Mystery" that mentioned his relationship with JPMC's Private Bank.[48]

60. They also interviewed members of Epstein's staff.  These employees told detectives that Epstein could receive multiple massages a day, that the masseuses looked young and possibly underage, and that they would clean up the rooms after these massages and find vibrators or other indications of sexual contact.[49]  One former employee told detectives that he was the person who arranged to deliver flowers to one victim and provide her with a rental car at Epstein's direction.[50]  That same member of Epstein's

---

[35] *See, e.g.*, *id.* at 003409; 003412; 003414.

[36] *Id.* at 003407-003411.

[37] *Compare id.* at 003410-003411 *with id.* at 003413 (showing one victim introducing a later victim to Epstein); *compare id.* at 003412 *with id.* at 003415 (same).

[38] *Id.* at 003418; *see also* JDoe_JPMC_003024, at 003028 (note on Epstein notepad to deliver flowers to high school after performance).

[39] *Id.* at 003411; *see also* JDoe_JPMC_003024, at 003027 (note on Epstein notepad regarding rental car for victim).

[40] *Id.* at 003417.

[41] JDoe_JPMC_006834, at 006844

[42] *Id.*

[43] Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402, at 003411.

[44] *Id.* at 003417.

[45] JDoe_JPMC_003024, at 003027-003028.

[46] *See* Palm Beach Investigation Incident Report, JDoe_DBAG_005374, at 005376-005381 (listing 17 victims).

[47] Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402, at 003404; 003423.

[48] JDoe_JPMC_006221, at 006269-006271. For the full article, *see* Landon Thomas, *Jeffrey Epstein: International Moneyman of Mystery*, New York Magazine (Oct. 28, 2002), https://nymag.com/nymetro/news/people/n_7912/.

[49] Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402, at 003422-003423; Alessi Statement to Palm Beach Police Department, JDoe_JPMC_004649, at 004737; 004739-004740; 004748.

[50] Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402, at 003423.

staff also noted that Epstein told him to keep approximately $2,000 in cash on him and corroborated victims' statements that they were paid in cash.[51]

61. Finally, detectives executed a search warrant on Epstein's Palm Beach residence. During the search, the investigators observed the layout and the design of the residence matched the victims' descriptions, including the location of a green and pink couch as well as numerous photographs of naked young girls.[52]  Investigators recovered phone messages that included the names and phone numbers of the victims and confirmation that they were looking for "work," a high school transcript of one of the victims, adult sex toys, soaps in the shape of male and female genitalia, a massage table, and massage oils.[53]  As part of the search of Epstein's residence, detectives came across signs that certain computer equipment, including electronic media storage devices, had been removed and was missing.[54]

62. Based on this evidence, detectives submitted a probable cause affidavit recommending charges for four counts of unlawful sexual activity with a minor and one count of lewd and lascivious molestation.[55] Rather than charge Epstein directly, Florida prosecutors presented his case to a grand jury, who indicted him on a single count of solicitation of prostitution.[56]

*FBI Investigation and Non-Prosecution Agreement*

63. In early 2006, Palm Beach detectives were concerned about the Florida prosecutors' handling of the case and referred the investigation to the FBI and the United States Attorney's Office for the Southern District of Florida.[57]

64. According to the U.S. Department of Justice Office of Professional Responsibility, which published a detailed report of its investigation into federal authorities' handling of the Palm Beach Investigation in October 2020, the federal investigation proceeded similarly to that of the Palm Beach detectives.

65. Federal authorities identified additional victims and reviewed flight manifests, telephone messages, and phone records that demonstrated travel and communication in interstate commerce.[58] Federal prosecutors also attempted to locate the computer equipment that was missing from Epstein's residence during the execution of the search warrant, but ended their investigation prematurely before that evidence could be recovered.[59]

---

[51] Palm Beach Investigation Incident Report, JDoe_DBAG_005374, at 005444.
[52] Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402, at 3419.
[53] *Id.* at 3419; Palm Beach Investigation Incident Report, JDoe_DBAG_005374, at 5418-19; JDoe_JPMC_003057; Search Warrant Property Receipt, JDoe_JPMC_003057, at JDoe_JPMC_003057-003087.
[54] Palm Beach Investigation Incident Report, JDoe_DBAG_005374, at 005436.
[55] Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402, at 003423.
[56] Florida State Indictment, JDoe_JPMC_004535, at JDoe_JPMC_004576.
[57] May 1, 2006 Letter from Michael S. Reiter to Barry E. Krischer, JDoe_JPMC_004780, at 004784.
[58] OPR Report, at 21.
[59] OPR Report, at 23, 45-47, 179.

66. Federal authorities also issued a subpoena for financial records from Bear Stearns.[60] They did not, however, issue a subpoena to JPMC despite the fact that Epstein's relationship with the JPMC Private Bank had been made public.[61]

67. After an investigation lasting approximately one year, the Assistant United States Attorney working on the case drafted a proposed 60-count federal indictment "that charged Epstein with various federal crimes relating to sexual conduct with and trafficking of minors."[62]

68. Federal prosecutors also engaged in extensive negotiations with Epstein's attorneys in crafting a plea deal.  Correspondence between the members of the United States Attorney's Office and Epstein's attorneys indicate that the United States Attorney's Office were well-aware of the identities of victims, Epstein's co-conspirators, and the various federal crimes with which Epstein and his co-conspirators could have been charged.[63] Indeed, the United States Attorney's Office, in negotiating federal charges to bring against Epstein with his attorneys in September 2007, noted that they intended to speak to both ████████████████████  Moreover, the Chief of the Child Exploitation and Obscenity Section of the Criminal Division of the United States Department of Justice reviewed submissions from Epstein's attorneys and from the United States Attorney's Office and found that there was a legitimate basis to proceed with a federal prosecution, including potentially on charges of sex trafficking.[65]

69. Ultimately, the United States Attorney's Office chose not to proceed with that indictment, and instead entered into a non-prosecution agreement with Epstein.  That non-prosecution agreement identified the potential federal charges against Epstein related to his conduct between 2001 and 2007, including violations of 18 U.S.C. § 1591.[66] The non-prosecution agreement deferred prosecution on these federal charges and required Epstein to plead guilty to state charges for solicitation of prostitution and solicitation of a minor for prostitution, which would require that he serve a prison sentence of approximately 18 months and have to register as a sex offender.[67]

70. The non-prosecution agreement also required Epstein to agree not to contest civil liability in private lawsuits brought by victims identified by the United States government.[68]  Though this list of identified victims is not set forth in the non-prosecution agreement itself, the OPR report and news media note that federal prosecutors had identified at least 33 victims of Epstein.[69]  Contemporaneous

---

[60] JPM-SDNYLIT-00373254–00373258.

[61] JPM-SDNYLIT-00373237.

[62] OPR Report, at 25.

[63] JDoe_JPMC_008428, at 008459.

[64] JDoe_JPMC_008428, at 008456; 008485.

[65] JDoe_JPMC_008428, at 008727-008731.

[66] Non-Prosecution Agreement, JDoe_JPMC_003010, at 003010-003011.

[67] Id. at 003010-003012.

[68] Id. at 003013; see also JDoe_JPM_008428, at 008546 (noting that the list the United States Attorney's Office was going to give Epstein's lawyers was a list of persons they had identified as victims).

[69] OPR Report, at 270 n.424; see also Jane Musgrave, Attorneys settle $2 million fee dispute with billionaire sex offender Jeffrey Epstein, Palm Beach Post (June 8, 2010, updated Apr. 1, 2012), https://www.palmbeachpost.com/story/news/2010/06/08/attorneys-settle-2-million-fee/7434535007/

correspondence between the United States Attorney's Office and Epstein's attorneys indicate that federal authorities were aware of up to as many as 40 different victims.[70]

71. Finally, the non-prosecution agreement provided that federal prosecutors would not charge certain of Epstein's potential co-conspirators, including ███████████ ████ Lesley Groff, and ███████████[71]

72. Notably, after the non-prosecution agreement was executed, federal authorities did little to enforce the already lenient terms.  For example, although the non-prosecution agreement required Epstein to use his "best efforts to enter his guilty plea and be sentenced not later than October 26, 2007,"[72] the then-United States Attorney agreed not to enforce that deadline and to permit Epstein to appeal the terms of the agreement to the Department of Justice.[73]  Indeed, even after the United States Attorney's Office notified Epstein that his participation in the work-release program was a breach of the agreement, federal authorities took no further action to either enforce the terms of the agreement or pursue federal charges.[74]

---

[70] JDoe_JPMC_008428, at 008593.
[71] Non-Prosecution Agreement, JDoe_JPMC_003010, at 003014.
[72] *Id.* at 003013.
[73] OPR Report, at 182.
[74] *Id.*

**Conclusion #1:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

73. As I understand it, USVI has alleged that JPMC allowed Epstein's abuse to continue and obstructed investigations into Epstein by, among other actions, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

74. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[77] The fact that Epstein was not arrested on the basis of all of this information, and JPMC never received a subpoena from federal authorities seeking additional information, is a strong indication that, consistent with my experience investigating sex trafficking cases, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

75. Second, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Law enforcement was in fact able to investigate, arrest, and successfully prosecute Epstein between 2005 and 2008 for conduct that occurred between at least 2004 and 2005. The public record is clear that federal authorities, including federal prosecutors and the FBI, were made aware of Epstein as a subject of a sex trafficking investigation by no later than May of 2006 when the case was referred to them by the lead detective working the Epstein case

---

[75] *See* JPM-SDNYLIT-W-00025790; JPM-SDNYLIT-W-00025792; JPM-SDNYLIT-W-00025791; JPM-SDNYLIT-W-00021932; JPM-SDNYLIT-W-00019086; JPM-SDNYLIT-W-00018180; JPM-SDNYLIT-W-00002185; FINCEN00000001-FINCEN00000699.

[76] *See* JPM-SDNYLIT-W-00025790; JPM-SDNYLIT-W-00025792; JPM-SDNYLIT-W-00025791; JPM-SDNYLIT-W-00021932; JPM-SDNYLIT-W-00019086; FINCEN00000001-FINCEN00000699.

[77] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* JPM-SDNYLIT-W-00025790; JPM-SDNYLIT-W-00025792; JPM-SDNYLIT-W-00025791. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ JPM-SDNYLIT-W-00021932. ▮▮▮▮▮▮▮▮▮▮▮ JPM-SDNYLIT-W-00019086. ▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* FINCEN00000001-FINCEN00000699.

in the Palm Beach Police Department.[78]  The federal investigation began at that point in time.[79]

76. During the course of the Palm Beach Investigation, federal prosecutors apparently considered, but chose not to pursue, federal sex trafficking charges against Epstein as part of a draft 60-count indictment.[80]  Instead, the United States Attorney's Office ended its investigation into Epstein prematurely, determined that a 2-year prison sentence would be sufficient, and entered into the non-prosecution agreement with Epstein that only provided for an 18-month sentence (of which he served 13) and permitted him to enjoy extraordinary privileges such as work release, despite it violating the terms of the already lenient agreement.[81]  Although the precise reason for that exercise of discretion by prosecutors is unknown, in my opinion, it is clear that it was not because of a lack of evidence of financial records ███████[82]

77. The conclusion by the USVI's expert, Shaun O'Neill, that, ████████████████████
████████████████████████████████████████████
████████████████████████████[83]  As an initial matter, and as I detail below, there was significant evidence of Epstein's criminal conduct beyond the critical statements of his alleged victims. ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████  None of that information was apparently relied on by the FBI to justify moving forward with federal sex trafficking charges, which were not actually brought against Epstein until 2019.

78. Nor was any financial information from JPMC or any other financial institution, in my opinion, necessary to support the FBI's investigation.  The non-prosecution agreement between Epstein and the U.S. Attorney's Office for the Southern District of Florida,

---

[78] OPR Report, at 18.

[79] The United States Attorney's Office formally initiated the case on May 23, 2006, but the FBI did not formally open a case on Epstein until July 24, 2006.  *See id.*, at 18, 21.

[80] *Id.* at 25.

[81] OPR Report, at 169-70, 181-82. I agree with the OPR Report's conclusion that this punishment agreed to by the United States Attorney's Office was "significantly disproportionate to the seriousness of Epstein's conduct" and "untethered to any articulable, reasonable basis." *Id.* at 181.

[82] According to the OPR Report, the then-United States Attorney for the Southern District of Florida, Alex Acosta, who approved the decision to pursue a state-based resolution of Epstein's case rather than federal charges, later explained the rationale for that decision.  Specifically, Acosta told the OPR that he was concerned "about some of the legal issues," including federal jurisdiction, concerns over the role of the federal government in intervening in state prosecutions, and the creation of negative precedent regarding the difference between prostitution and trafficking.  *Id.* at 37-39.  Acosta also stated that he had concerns about the effect of a federal trial on Epstein's victims, and how those victims would fare as witnesses if called to testify. *Id.*, at 37-39, 144-148.  Notably, he did not express concern about the sufficiency of the evidence in the case or the lack of financial records. The OPR Report found that many of these concerns were "misplaced." *Id.* at 183.

[83] Expert Report of Shaun O'Neill, at 11 (O'Neill Report).

[84] JPM-SDNYLIT-W-00025790; JPM-SDNYLIT-W-00025792; JPM-SDNYLIT-W-00025791; FINCEN00000001-FINCEN00000699.

[85] JPM-SDNYLIT-W-00021932.

which encompassed conduct by Epstein between 2001 and 2007, notes that the United States itself provided Epstein with "a list of individuals whom it ha[d] identified as victims" and for whose claims he could not contest civil liability.[86]  Indeed, subsequent media reports and findings by the Department of Justice Office of Professional Responsibility suggest that federal prosecutors had identified as many as 33 victims,[87] and possibly as many as 40.[88]  In other words, federal law enforcement was already aware of the identities of additional victims of Epstein from this period and, as such, knew the primary sources of evidence and information to pursue further investigation into Epstein's conduct. The FBI did not need ███████████████████████ ████████████████████████████████████████████████████████████

79. The case files from the Palm Beach Police Department also make clear that there was substantial evidence in the form of victim and witness statements to police, physical evidence recovered from trash pulls and a search of Epstein's mansion, and documentary evidence in the form of written messages, phone records, and travel records that could have been relevant to a sex trafficking charge.  First, a number of Epstein's victims had spoken with investigators and described how he had sexually exploited them.[89]  Second, detectives had spoken to witnesses who were able to corroborate the victim's testimony by testifying to the fact that they were paid money to recruit and bring victims to Epstein.[90]  Third, detectives had spoken to former members of Epstein's staff who could corroborate victims' statements that they were paid, that the massages turned sexual in nature, and that Epstein knew they were underage.[91] Finally, investigators had uncovered substantial physical and documentary evidence, including a high school transcript of one the victims, messages from victims left for Epstein scheduling appointments to "work," and lewd photographs of young-looking girls.[92]

80. Given this evidence, based on my experience working on sex trafficking and child exploitation cases, it is my opinion that financial records were neither required nor essential to the FBI investigation or federal prosecutors' decision to charge Epstein only with solicitation of a minor for prostitution instead of sex trafficking or other federal charges.  The best corroborating evidence of the victim's statements regarding payment was the statements of other victims and Epstein's own staff.  In my opinion, it would not have been through a series of leaps to connect small cash payments of $200 dollars to large monthly cash withdrawals of $40,000.  This is particularly so given that Epstein's attorneys readily conceded that victims were paid $200 in cash for massages that turned sexual in nature.[93]  As such, the proof of payment did not require further investigation, ██████████████████████████████████ █████████████████████████████████████████████

---

[86] Non-Prosecution Agreement, JDoe_JPMC_003010, at 003013.
[87] OPR Report, at 270 n.424.
[88] JDoe_JPMC_008428, at 008593.
[89] *See generally* Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402.
[90] *Id.* at 003405.
[91] *Id.* at 003422-23; Alessi Statement to Palm Beach Police Department, JDoe_JPMC_004649, at 004737; 004739-004740; 004748.
[92] Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402, at 003419; Property Receipt, JDoe_JPMC_003060.
[93] JDoe_JPMC_004649, at 004650.

81. Nonetheless, to the extent financial records would have been relevant to the 2006-2008 federal investigation, the FBI investigators knew to issue subpoenas to financial institutions for records if necessary, as demonstrated by the subpoena issued to Bear Stearns in August 2007.[94] By the time Epstein had pleaded guilty in June 2008, and even by the time the case was first referred to the FBI in 2006, the FBI was plainly aware that Epstein was a customer of JPMC. ███████████████████████ ████████████████████████████████████████████████ the case file indicates that Epstein had made donations to the Palm Beach Police Department via checks drawn from a Chase account.[95]  Moreover, Epstein's relationship with JPMC's Private Bank was also public knowledge, including in an article that was collected and maintained as part of Epstein's case file.[96] Had FBI investigators believed they required Epstein's financial records, they would have known by then that Epstein was a customer of JPMC and would have issued a subpoena to JPMC ████████████████████████████████ ███████████ They did not.[97]

82. Finally,



**Conclusion #2:** ████████████████████████████████████████ ████████████████████████

83. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

84. For example, if an investigation into Epstein continued, or a new investigation was begun, after Epstein's 2008 conviction, investigators would have been fully aware

---

[94] JPM-SDNYLIT-00373254–00373258.
[95] JDoe_JPMC_001608, at 001616; 001620.
[96] JDoe_JPMC_006221, at 006269.
[97] JPM-SDNYLIT-00373237.
[98] Indictment, *United States v. Jeffrey Epstein,* 19 Crim 490 (SDNY 2019), https://www.justice.gov/d9/press-releases/attachments/2019/07/09/u.s._v._jeffrey_epstein_indictment_redacted_0.pdf



85.

86. I also understand that

87. Moreover, I understand that between the date of Epstein's guilty plea and the end of 2015, including after JPMC had exited Epstein as a client, JPMC filed approximately 45 additional CTRs on Epstein's cash transactions or those of his known associates.[102] Even assuming Epstein's cash transactions would have been relevant to an investigation, these CTRs would have presented enough information to law enforcement to know where and how to inquire further into Epstein's financial activity.

88. ⬛⬛⬛⬛⬛⬛ multiple JPMC employees also affirmatively reached out to federal law enforcement.  For example, Jonathan Schwartz called the United States Attorney for the Southern District of Florida to inquire about whether Epstein was under any ongoing investigation for child sex trafficking.[103]  Similarly, Phil DeLuca

---

[99] JPM-SDNYLIT-W-00021932.
[100] JPM-SDNYLIT-W-00019086.
[101] JPM-SDNYLIT-W-00018180; JPM-SDNYLIT-W-00002185.
[102] FINCEN00000001-FINCEN00000699.
[103] JPM-SDNYLIT-00274542.

testified that he reached out to the FBI, spoke to someone named Tim Moyer, and then never heard back or received any follow-up.[104]

89. If evidence of financial records was important to an ongoing sex trafficking or child exploitation investigation into Epstein, and based on my experience it would not have been, federal investigators would have been well-aware that JPMC would have been a source for that information.  That law enforcement never sought additional records from JPMC by serving a subpoena or search warrant, following ███████████ ███████████████████████████████ (2) the filing of approximately 150 CTRs on Epstein's cash transactions; or (3) the inquiries by JPMC employees to law enforcement regarding Epstein, indicates, consistent with my experience investigating sex trafficking cases, that law enforcement did not view these records as material pieces of evidence.  Without direction from a victim alleging the existence of a sex trafficking operation and describing the manner and method of payment ████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████

**Conclusion #3: Financial records have limited utility in investigations similar to those conducted into Epstein, and Epstein's transactions would not have fit within the typical trafficking investigation.**

90. Financial records, and SARs and CTRs flagging certain financial activity, play a minor, if any, role in sex trafficking investigations.  In my 23-year career in the FBI, I have never used a SAR as evidence or as a lead to pursue evidence in the course of an ongoing sex trafficking investigation, nor have I ever opened an investigation for sex trafficking based upon the filing of a SAR. ████████████████████████████ ██████████████████████████████████████████████████

91. Almost all the of the critical information necessary to investigate a sex trafficking case, and hopefully secure the conviction of a suspect, comes from investigators' discussions with the victim.   The victim explains the manner and method in which they were trafficked, they identify their traffickers and abusers, they identify potential witnesses, and they may explain the way in which the trafficking enterprise operates.

92. Without a credible victim reporting the existence of an ongoing trafficking enterprise and describing the manner and method in which they were trafficked, I would be unable to look at a report of recent financial activity in a SAR or CTR and conclude that such activity was related to an unknown and unreported trafficking operation. While SARs and CTRs are not relevant in my experience to sex trafficking investigations, in other crimes against children cases, once I received information from a victim about their sexual abuse or the identity of their abuser, I would then look to

---

[104] DeLuca Tr. 150:12-152:24, 329:5-330:21.  In his Report, Mr. O'Neill states that this "raises more questions than it answers" and claims that Mr. DeLuca should have continued following up ███████████████████ O'Neill Report, at 18.  In my opinion, this is backwards.  Mr. DeLuca specifically raised questions with the FBI about Epstein.  As the law enforcement agency allegedly investigating Epstein, it was the FBI's responsibility to pursue leads to gather relevant evidence.  Because they did not, my conclusion is the same as Mr. DeLuca's – the FBI simply was not interested. DeLuca Tr. 330:17-:21.

subpoena relevant information from a financial institution to determine whether the suspect maintained accounts there and, if so, whether the records from those accounts corroborate the victim's statements.  Importantly, that information would be gathered based on affirmative steps taken by an investigator to gather financial information deemed relevant.  If investigators know where to properly look for relevant evidence, it is incumbent on them to do so if they believe it is necessary for the development of their case against the subject.  These affirmative steps to search for relevant evidence, including financial records, travel records, or phone records, would be taken to corroborate information received from the victims themselves.

93. In addition, when looking for financial activity that might be indicative of trafficking behavior or that corroborates a victims' statements, investigators would look primarily for certain kinds of transactions.  This includes large, round-dollar cash deposits into the account of the trafficker or the use of accounts associated with front businesses in high-risk industries that might reflect the proceeds of a criminal trafficking operation. Investigators would also look for specific kinds of uses of account funds, such as excessive purchases for transportation, hotels, or living expenses.  Generic and routine cash withdrawals would not likely trigger scrutiny from investigators.[105]

94. As I have noted above, without direction from a victim alleging the existence of a sex trafficking operation and describing the manner and method of payment in a way that reasonably matches the transaction activity flagged in a SAR, law enforcement would be unable to determine whether a cash or wire transaction that may be reported in a SAR was related to any trafficking activity.

95. This is particularly so with respect to an investigation into a wealthy individual like Epstein, where routine large cash withdrawals for which he had offered an explanation would be harder to connect to a trafficking operation and specific payments to specific victims.[106]  For this reason alone, ██████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████

96. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████  The FBI could certainly identify a withdrawal made by Epstein for $40,000 and try to suggest part of that withdrawal was used to pay several of his victims over a period of a few weeks.  In reality, however, attempting to prove a cash trail of several hundred dollars of payments to Epstein's victims when the subject, a person of considerable wealth, and who was capable of offering explanations for his cash expenditures, would not be practical nor reasonably likely to assist in securing a conviction.

97. Put differently, investigators would look to secure best evidence to prove the necessary elements of the charges being considered and corroborate the testimony of Epstein's

---

[105] Expert Report of Teresa A. Pesce, at 28 n.101, 40, 52.
[106] *Id.*

victims.  Based on my experience investigating these kinds of cases, ███████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████  Instead, the
FBI would consider a victim's statements regarding the amounts of cash she was paid,
and when and how she was paid that money, and then attempt to corroborate those
small payments and the other details of the victim's exploitation and abuse.  This is
precisely what investigators did in the Palm Beach Investigation through the
corroborating testimony of other victims, of recruiters, and of Epstein's former staff
who all identified similar cash payments made to young girls and women for sex acts.

98.  ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████  The relationship between
Epstein and ███████████ was public knowledge and ██████████ alleged role in the
sexual exploitation of victims was documented in the case file.[107]  Likewise, as the non-
prosecution agreement makes clear, federal authorities were also aware of ██████
████████ and had identified her as a "potential co-conspirator" against whom they
agreed not to bring any charges.[108]

99.  Indeed, ████████████████████████████████████████████████████
██████████████████████████████  Epstein was not arrested until 2019, and for conduct
that occurred between 2002 and 2005 – not 2006 and 2007.  And I am not aware of any
action or investigation against ████████████

100.  ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████  the Bank also contacted both the FBI and the United States Attorney's Office to
specifically inquire about Epstein and did not receive any follow-up, inquiry, or
subpoena for records until after Epstein's 2019 arrest.  Further, based on my experience
investigating sex trafficking cases and crimes against children, ██████████████████
████████████  these investigations are instead driven by the credible statements of victims
and the supporting direct evidence investigators find corroborating the victims' claims.
Because federal law enforcement authorities knew the identity of up to 40 victims and
had substantial evidence corroborating the consistent claims of those victims by at least
2007 when Epstein signed his Non-Prosecution Agreement with the United States
Attorney's Office for the Southern District of Florida, ████████████████████████
████████████████████████████████████████

---

[107] Palm Beach Police Department Probable Cause Affidavit, JDoe_JPMC_003402, at 003412-13.
[108] Non-Prosecution Agreement, JDoe_JPMC_003010, at 003014.

**Signature**

I declare, under the penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Signed this 23rd day of June, 2023:

Joseph Fonseca

# Appendix A

Curriculum Vitae,

Special Agent Joseph Fonseca, FBI (Retired)

**Joe Fonseca**

**FBI Career (1998-2021)**
➤ *Counselor*, FBI Academy, Quantico, Virginia (2020 - 2021)
➤ *Assistant Legal Attaché*, SE Asia Region, Bangkok, Thailand (2016-2019)
➤ *Supervisory Special Agent*, Violent Crimes Against Children Section, FBI HQ (2014-2016)
➤ *Special Agent* assigned to the Atlanta FBI Field Office (Aug. 1998-2014)
➤ *Coordinator*, Metro Atlanta Child Exploitation Task Force (MATCH) (2007-2014)
➤ *Team Leader*, Child Abduction Rapid Deployment Team (CARDT) (2006-2014)
➤ *Coordinator*, Atlanta FBI Crimes Against Children Program (1999-2014)
➤ *Member*, Violent Crimes Major Offender Squad (1999-2014)
➤ *Member*, Evidence Response Team (ERT) (1999-2003)
➤ *Member*, Counterintelligence Squad (1998-1999)

**Post FBI Career (2021-present)**
➤ *Team Adam Consultant*, National Center for Missing & Exploited Children, Alexandria, Virginia (2021)
➤ *Physical Security Consultant,* Odin Enterprises (2022-present)
➤ *Private Investigator,* (2023-present)

**Training Received**
➤ ERT training (Crime Scene Photography, Beginner/Advanced ERT, Beginner/Large-Scale Post Blast, and Human Scent Detection (1999-2003)
➤ Safe Streets Survival Training (2003)
➤ Child and Adolescent Forensic Interviewing of Children (2002, 2014, 2017)
➤ Innocence Lost National Initiative Training Conference (2007-2012)
➤ Child Abduction Rapid Deployment Team (CARDT) Training (2007-2012)
➤ Various FBI training regarding the exploitation of children to include Protecting Victims of Child Prostitution (Beginner and Advanced Training), National Center for Missing and Exploited Children, Alexandria, VA
➤ Numerous trainings received on search and seizure, interview and interrogation, and physical security protocols

**Experience**
➤ Participated in the investigation of hundreds of cases involving violent crime, sex trafficking, extortion, personation, and others
➤ Investigated, arrested, and prosecuted subjects for cases originating in international waters and foreign countries
➤ Investigated the case and assisted with the Federal death penalty trial of the U.S. vs. Brian Richardson in Atlanta, 2012
➤ Investigated the mysterious disappearance of children/young adults in the U.S. as a member of the FBI's CARDT
➤ Represented the U.S. at the request of the Tajikistan government to assist in the disappearance of children in Tajikistan
➤ Traveled to Thailand to assist in investigation of a serial killer case involving subject Ting Tang aka Nui
➤ Successfully recovered kidnapped U.S. children from locations in foreign countries
➤ Worked undercover investigations in Cambodia, the Philippines, Thailand, and Brazil
➤ Guided NGOs in SE Asia on the proper methods for securing evidence and rules of testimony
➤ Worked alongside other Special Agents in providing a protection detail for U.S. Attorney General Eric Holder
➤ Developed and executed operation plans with SE Asian governments to arrest American fugitives as set forth in MLATs
➤ Deployed to the Pentagon and Ground Zero crimes scenes in Sept. 2001 and Feb. 2002, respectively, recovering human remains, documents, and terrorism evidence
➤ Coordinated dozens of ERT crime scenes, recovering latent prints, collecting explosive materials, and other evidence
➤ Prepared for and testified in 22 Federal trials and numerous State trials regarding violent crime and crimes against children matters
➤ Interviewed thousands of witnesses, subjects, and victims in the course of conducting criminal and background investigations
➤ Selected as the FBI's First Crimes Against Children Assistant Legal Attaché

**Leadership, Training Provided, Panel Presentations, Awards**
➤ Instructed local and federal prosecutors, medical professionals, social workers, educators, and child protective service employees on the issues surrounding the commercial sexual exploitation sub-culture and the exploitation of children for commercial gain
➤ Trained FBI agents and local/state law enforcement agencies on the complexities of the commercial sexual exploitation of children
➤ Provided training on International Parental Kidnapping to officials from foreign countries, including Japan, Brazil, Lebanon, and others
➤ Developed a course on *Protecting Our Children* in public for schools, church and civic groups, and recreation organizations
➤ Selected as a guest speaker at World Day for the Prevention of Child Abuse (Kennesaw State University, 2012, 2013), Safety in Our Schools (Macon and Columbus, GA, 2012, 2013), and the International Homicide Investigators Association (New Orleans, 2012)
➤ Guest speaker on panels discussing kidnappings at venues including Clayton State University, Emory University's Barton School of Law, Atlanta CW69, CNN, and commentary for cases presented on *Forensic Files, Dateline,* and *The Oxygen Network*
➤ Qualified as an expert witness on the topic of the Commercial Sexual Exploitation of Children (State of Georgia vs. Dwayne Shaw, 2013; State of Georgia vs. Kynne Shuler et al, 2014)
➤ Guest speaker in SE Asia on numerous panel discussions on the topic of knowing your surroundings in foreign places (2017-2019)
➤ Created an FBI training program for SE Asian law enforcement entitled Combatting Online Facilitated Crimes Against Children (COFCAC), to combat the online sexual exploitation of children
➤ Trained more than 1,000 foreign law enforcement partners on interviewing techniques, evidence collection and online investigations
➤ Selected as an FBI Academy counselor to provide guidance, counseling, and training to FBI new agent trainees
➤ U.S. Attorney's Award, Northern District of Georgia (2013)
➤ Royal Thai Police and Department of Special Investigation awards for Excellence in Investigations (2014) and Distinguished Service (2019)

# APPENDIX B. Materials Reviewed and Considered[1]

- Public Records of *State of Florida v. Jeffrey Epstein*, Case Numbers 06CF00945AMB and 08CF009381AMB, https://sa15.org/public-records/;

- JDoe_DBAG_005374;

- JDoe_JPMC_003402;

- JDoe_JPMC_003027 to JDoe_JPMC_003028, excerpted from JDoe_JPMC_003024;

- JDoe_JPMC_003737; JDoe_JPMC_003770; JDoe_JPMC_003778; JDoe_JPMC_003785; JDoe_JPMC_003792; JDoe_JPMC_003822; JDoe_JPMC_003841, excerpted from JDoe_JPMC_003781;

- JDoe_JPMC_006834;

- JDoe_JPMC_006269 to JDoe_JPMC_006271, excerpted from JDoe_JPMC_006221;

- JDoe_JPMC_004731 to JDoe_JPMC_004758, excerpted from JDoe_JPMC_004649;

- JDoe_JPMC_003057;

- JDoe_JPMC_004576, excerpted from JDoe_JPMC_004535;

- JDoe_JPMC_004784, excerpted from JDoe_JPMC_004780;

- JDoe_JPMC_004650 to JDoe_JPMC_004651, excerpted from JDoe_JPMC_004649;

- JDoe_JPMC_003010;

- JPM-SDNYLIT-00173973;

- JPM-SDNYLIT-00174047;

- JPM-SDNYLIT-00174075;

- JPM-SDNYLIT-00174085;

- JPM-SDNYLIT-00173999;

- JPM-SDNYLIT-00174008;

---

[1] Even if not included in this list, I also relied upon any other documents cited in my report.

- JPM-SDNYLIT-00174000;

- JPM-SDNYLIT-00174095;

- JPM-SDNYLIT-00174087;

- JPM-SDNYLIT-00174185;

- JPM-SDNYLIT-00174198;

- JPM-SDNYLIT-00174084

- JPM-SDNYLIT-00174083;

- JPM-SDNYLIT-00174201;

- JPM-SDNYLIT-00173993;

- JPM-SDNYLIT-00173997;

- JPM-SDNYLIT-00173965;

- JPM-SDNYLIT-00173996;

- JPM-SDNYLIT-00173967;

- JPM-SDNYLIT-00173970;

- JPM-SDNYLIT-00195672;

- JPM-SDNYLIT-00003027_R;

- JPM-SDNYLIT-00003790_R

- JPM-SDNYLIT-00274774;

- JPM-SDNYLIT-0027477;

- JPM-SDNYLIT-00274779;

- JPM-SDNYLIT-00274781;

- JPM-SDNYLIT-00127928;

- JPM-SDNYLIT-00127930;

- JPM-SDNYLIT-00127944;

- JPM-SDNYLIT-00127953;

- JPM-SDNYLIT-W-00031038;

- JPM-SDNYLIT-00274542;

- JPM-SDNYLIT-00373103;

- Deposition Transcript of Philip DeLuca, *Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A.*, No. 22-cv-10904 (JSR) (S.D.N.Y.) (dated April 19, 2023);

- Exhibit 7 to the Deposition of Mary Casey, *Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A.*, No. 22-cv-10904 (JSR) (S.D.N.Y.) (dated April 7, 2023);

- Expert Report of Teresa A. Pesce;

- U.S. Department of Justice Office of Professional Responsibility Investigation Into the U.S. Attorney's Office for the Southern District of Florida's Resolution of Its 2006–2008 Federal Criminal Investigation of Jeffrey Epstein and Its Interactions with Victims During the Investigation (11/2020). https://context-cdn.washingtonpost.com/notes/prod/default/documents/1c1f6649-226e-4afa-953e-826dee8de3b5/note/49b577fa-6ad8-415d-8efc-c553423af314.;

- Federal Criminal Statutes (Title 18, Sections 371, 1591, 2251, 2421, 2422, 2423, and 2425);

- Indictment, United States District Court, Southern District of New York Criminal Docket for Case *United States v. Epstein*, 1:19-CR-00490-RMB;

- Docket Report, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Transcript of Conference dated July 14, 2020, Dkt. 93, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Transcript of Conference dated April 23, 2021, Dkt. 261, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Transcript of Conference dated October 21, 2021, Dkt. 459, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Transcript of Conference dated November 1, 2021, Dkt. 465, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Transcript of Conference dated November 10, 2021, Dkt. 467, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Transcript of Conference dated November 15, 2021, Dkt. 529, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Transcript of Conference dated November 23, 2021, Dkt. 536, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Transcript of Conference dated March 8, 2022, Dkt. 645, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Transcript of Conference dated June 28, 2022, Dkt. 737, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Transcript of Hearing dated November 23, 2021, Dkt. 739, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated November 29, 2021, Dkt. 741, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated November 30, 2021, Dkt. 743, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated December 1, 2021, Dkt. 745, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated December 2, 2021, Dkt. 747, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated December 3, 2021, Dkt. 749, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated December 6, 2021, Dkt. 751, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated December 7, 2021, Dkt. 753, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated December 8, 2021, Dkt. 755, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated December 9, 2021, Dkt. 757, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated December 10, 2021, Dkt. 759, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated December 16, 2021, Dkt. 761, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

-   Jury Trial Transcript dated December 17, 2021, Dkt. 763, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Jury Trial Transcript dated December 18, 2021, Dkt. 765, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Jury Trial Transcript dated December 20, 2021, Dkt. 767, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Jury Trial Transcript dated December 21, 2021, Dkt. 769, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Jury Trial Transcript dated December 22, 2021, Dkt. 771, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Jury Trial Transcript dated December 27, 2021, Dkt. 773, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Jury Trial Transcript dated December 28, 2021, Dkt. 775, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Jury Trial Transcript dated December 29, 2021, Dkt. 777, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Sentencing Transcript dated June 28, 2022, Dkt. 779, *United States v. Maxwell*, 1:20-CR-00330-AJN (S.D.N.Y.);

- Docket Report, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 6, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 6-1, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 6-2, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 11, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 11-1, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 11-2, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 11-3, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 18, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 20, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 23, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 23-1, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 24, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 25, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 25-1, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 25-2, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 32, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 32-1, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 36, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 40, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 42, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- Dkt. 53, *United States v. Epstein*, 1:19-CR-00490-RMB (S.D.N.Y.);

- JPM-SDNYLIT-00373254;

- JDoe_JPMC_008546, excerpted from JDoe_JPMC_008428;

- JDoe_JPMC_008456;

- JDoe_JPMC_008457 to JDoe_JPMC_8459, excerpted from JDoe_JPMC_008428;

- JDoe_JPMC_008485 to JDoe_JPMC_008487, excerpted from JDoe_JPMC_008428;

- JDoe_JPMC_008727 to JDoe_JPMC_008731, excerpted from JDoe_JPMC_008428;

- JDoe_JPMC_008593, excerpted from JDoe_JPMC_008428;

- JDoe_JPMC_001616, excerpted from JDoe_JPMC_001608;

- JDoe_JPMC_001620, excerpted from JDoe_JPMC_001608;

- JPM-SDNYLIT-W-00025790;

- JPM-SDNYLIT-W-00025792;

- JPM-SDNYLIT-W-00025791;

- JPM-SDNYLIT-W-00021932;

- JPM-SDNYLIT-W-00019086;

- JPM-SDNYLIT-W-00018180;

- JPM-SDNYLIT-W-00002185;

- JPM-SDNYLIT-W-00017133

- JPM-SDNYLIT-W-00000001

- FINCEN00000001;

- FINCEN00000361;

- FINCEN00000406;

- FINCEN00000410,

- FINCEN00000413;

- FINCEN00000683;

- FINCEN00000689;

- FINCEN00000700;

- Second Amended Complaint, Dkt. No. 120, *Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A.*, No. 22-cv-10904 (JSR) (S.D.N.Y.);

- Human Trafficking, FBI.gov (last visited 6/17/2023), https://www.fbi.gov/investigate/violent-crime/human-trafficking;

- Global Report on Trafficking in Persons 2020, United Nations Office on Drugs and Crime (2020), https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf;

- Asa Renger, *Trafficking in women and girls is moving online due to COVID-19*, UN Women (Dec. 8, 2020), https://www.unwomen.org/en/news/stories/2020/12/op-ed-trafficking-in-women-and-girls-is-moving-online-due-to-covid-19;

- What is Human Trafficking? U.S. Department of Justice (Sept. 28, 2022), https://www.justice.gov/humantrafficking/what-is-human-trafficking#:~:text=There%20is%20no%20single%20profile,education%20level%2C%20or%20citizenship%20status;

- *Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity*, FinCEN (Oct. 15, 2020), https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf;

- Larry Alvarez, M.S. & Jocelyn Canas-Moreira, *A Victim-Centered Approach to Sex Trafficking Cases*, Law Enforcement Bulletin, FBI.gov (Nov. 9, 2015), https://leb.fbi.gov/articles/featured-articles/a-victim-centered-approach-to-sex-trafficking-cases;

- The United States Department of Justice, Justice News, "Georgia Couple Pleads Guilty to Human Trafficking Charges", https://www.justice.gov/opa/pr/georgia-couple-pleads-guilty-human-trafficking-charges, July 8, 2011;

- JPM-SDNYLIT-00174075;

- *BSA: What Happens to Those SARs*, BankersOnline (Nov. 1, 2005), https://www.bankersonline.com/articles/111213;

- Connecting the Dots … The Importance of Timely and Effective Suspicious Activity Reports, FDIC.gov (Dec. 28, 2021), https://www.fdic.gov/regulations/examinations/supervisory/insights/siwin07/article03_connecting.html#drop16;

- Indictment, *United States v. Jeffrey Epstein,* 19 Crim 490 (SDNY 2019), https://www.justice.gov/d9/press-releases/attachments/2019/07/09/u.s._v._jeffrey_epstein_indictment_redacted_0.pdf

- Jane Musgrave, *Attorneys settle $2 million fee dispute with billionaire sex offender Jeffrey Epstein*, the Palm Beach Post (June 8, 2010, updated Apr. 1, 2012), https://www.palmbeachpost.com/story/news/2010/06/08/attorneys-settle-2-million-fee/7434535007/

- Landon Thomas, *Jeffrey Epstein: International Moneyman of Mystery*, New York Magazine (Oct. 28, 2002) https://nymag.com/nymetro/news/people/n_7912/.