# Exhibit 5

```
 1                UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
     GOVERNMENT OF THE UNITED      )
 3   STATES VIRGIN ISLANDS         )
                                   )
 4         Plaintiff,              )
                                   )
 5   vs.                           ) 1:22-cv-10904-JSR
                                   )
 6   JPMORGAN CHASE BANK, N.A.,    )
                                   )
 7         Defendant/Third-        )
           Party Plaintiff.        )
 8   _____)
     JPMORGAN CHASE BANK, N.A.     )
 9                                 )
           Third-Party             )
10         Plaintiff,              )
                                   )
11   vs.                           )
                                   )
12   JAMES EDWARD STALEY,          )
                                   )
13         Third-Party             )
           Defendant.              )
14
                  THURSDAY, JULY 6, 2023
15
        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16                       - - -
17            Videotaped deposition of Special
     Agent Joseph Fonseca, FBI (Retired), held at
18   the offices of WilmerHale, 250 Greenwich
     Street, New York, New York, commencing at
19   9:07 a.m. Eastern, on the above date, before
     Carrie A. Campbell, Registered Diplomate
20   Reporter and Certified Realtime Reporter.
21
22
23                       - - -
24           GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
25              deps@golkow.com
```

Confidential Pursuant to Protective Order

```
 1          accounts to see if they were making
 2          money, and we'd subpoena those
 3          records.
 4   QUESTIONS BY MR. PENDELL:
 5          Q.    How about with a large sex
 6   trafficking operation?  Do you think that
 7   financial information would be useful in a
 8   large sex traffic operation?
 9               MR. BOUCHOUX:  Objection to the
10          form.
11               THE WITNESS:  I -- if we follow
12          the approach that we use to
13          investigate sex trafficking cases, I
14          would think not.
15   QUESTIONS BY MR. PENDELL:
16          Q.    When you say "the approach that
17   we use," you're speaking from your
18   experience, correct?
19          A.    Yes.  Using our approach to
20   interviewing our victims, and as the case
21   develops, starting to --
22          Q.    You understand there are other
23   FBI agents who may have used a different
24   approach in investigating sex trafficking
25   operations; is that fair?
```

```
 1                MR. BOUCHOUX:  Objection to the
 2       form.
 3                THE WITNESS:  I have no idea.
 4   QUESTIONS BY MR. PENDELL:
 5       Q.    Well, let me ask you.  Did you
 6   read the report of Mr. -- former FBI Special
 7   Agent Shaun O'Neill in this case?
 8       A.    I did.
 9       Q.    Okay.  And according to Special
10   Agent O'Neill, his experience with regards to
11   investigating sex trafficking operations and
12   using banking, financial records to do that
13   is different than yours; is that fair?
14       A.    Are you talking about his
15   expert opinion?
16       Q.    Yeah.  Based on his report.
17       A.    It is fair for a very important
18   reason.  In the human trafficking cases that
19   it appears he worked were labor trafficking
20   cases, not child sex trafficking cases, given
21   his career where he was in the FBI.  So it's
22   not unusual if he decided there's a different
23   way to work his labor trafficking cases.
24       Q.    Do you know whether he was ever
25   involved in any child sex trafficking cases?
```

Confidential Pursuant to Protective Order

1  A. Given his résumé -- I don't
2  know if he ever was, but given his résumé, I
3  would say it's highly unlikely.
4  Q. But sitting here today, you
5  can't say one way or another; is that fair?
6  A. I cannot.
7  Q. Okay. Have you ever heard of
8  something called a currency transaction
9  report?
10 A. I have now, yes.
11 Q. And that's sometimes
12 abbreviated as a CTR?
13 A. That's correct.
14 Q. And you say you have now,
15 meaning that since your retention and work on
16 this case, you've heard of a CTR?
17 A. That is correct.
18 Q. And had you heard of it prior
19 to your work in this case?
20 A. Not that I recall, no.
21 Q. Okay. And can you tell me
22 generally your understanding as what a CTR --
23 of what a CTR is?
24 A. Generally a banking document
25 that provides some form of information on

```
 1    finances, I guess.
 2         Q.    Can you tell me what triggers
 3    the obligation for a financial institution
 4    like JPMorgan to file a CTR?
 5         A.    I have no idea.
 6         Q.    Can you tell me what is
 7    required to be disclosed by a financial
 8    institution like JPMorgan in a currency
 9    transaction report?
10         A.    I do not know.
11         Q.    Does a currency transaction
12    report require a financial institution like
13    JPMorgan to disclose the identification of an
14    account holder?
15         A.    I don't know that.
16         Q.    How about the identification of
17    all the signatories to an account at issue?
18         A.    I don't know that either.
19         Q.    Do you know who at a financial
20    institution prepares a CTR?
21         A.    No, I don't.
22         Q.    I'm going to represent to you
23    that between 2002 and 2013 there's evidence
24    in this case that JPMorgan filed
25    approximately 150 currency transaction
```

Confidential Pursuant to Protective Order

```
 1    reports regarding cash withdrawals from
 2    accounts associated with Mr. Epstein.
 3             My question for you is, have
 4    you reviewed all of the CTRs in this case?
 5        A.   I have thumbed through the CTR
 6    report, yes.
 7        Q.   Do you know -- are you able to
 8    particularly point to the ones that you
 9    reviewed versus didn't review?
10        A.   No, I'm not.
11        Q.   Would you need to see them in
12    order to say, I've seen this before or not
13    seen it before?
14        A.   That would be helpful, yes.
15        Q.   Do you know if they're all
16    listed in your reliance material or is a
17    subsection of them?
18        A.   Offhand, I do not know.
19        Q.   Okay.  How did you make the
20    determination as to which ones you were going
21    to flip through?
22        A.   It was contained as two
23    documents that held them all, so I went
24    through those two documents.
25        Q.   Okay.  Do you know how many of
```

Confidential Pursuant to Protective Order

```
 1    the CTRs that you reviewed even mentioned
 2    Mr. Epstein's name?
 3          A.    I do not.
 4          Q.    You didn't look for that?
 5          A.    I don't recall how many said
 6    his name.
 7          Q.    But did you look -- did you
 8    look specifically for that information?
 9          A.    I did not.  I just thumbed
10    through them to see -- basically see what the
11    documents were.  I had never seen them
12    before.
13          Q.    Okay.  Have you heard of
14    something called a suspicious activity
15    report?
16          A.    I have heard of that now as
17    well.
18          Q.    Okay.  And am I correct also
19    that you heard that now in association with
20    this litigation?
21          A.    That's correct.
22          Q.    Prior to this litigation, had
23    you ever heard of a suspicious activity
24    report?
25          A.    I had not.
```

```
 1        Q.    Prior to this litigation, had
 2   you ever seen a suspicious activity report?
 3        A.    I don't believe I had, no.
 4        Q.    Okay.  Are you able to tell me
 5   what triggers the obligation of a financial
 6   institution like JPMorgan to file a
 7   suspicious activity report?
 8              MR. BOUCHOUX:  Objection to the
 9        form.  Outside the scope of the
10        opinion.
11              THE WITNESS:  No.  There is
12        some reporting requirement, but I
13        don't know what that is.
14   QUESTIONS BY MR. PENDELL:
15        Q.    That's outside your area of
16   expertise; is that fair?
17        A.    That is correct, yes.
18        Q.    Okay.  Are you able to describe
19   for me any of the information that is
20   required to be disclosed in a suspicious
21   activity report?
22        A.    I am not.
23        Q.    Okay.  That's outside your
24   expertise as well?
25        A.    Correct.
```

Confidential Pursuant to Protective Order

```
 1        Q.    Do you have any idea how a
 2   suspicious activity report is different, if
 3   at all, from a CTR?
 4        A.    I don't.
 5        Q.    Do you know who at a financial
 6   institution such as JPMorgan is responsible
 7   for preparing a suspicious activity report?
 8        A.    Potentially the same people
 9   that prepare the CTRs, but I'm not -- I do
10   not know for sure.
11        Q.    And when you say "potentially,"
12   that's -- you're guessing?
13        A.    Guessing.
14        Q.    But you don't know one way or
15   the other?
16        A.    I don't.
17        Q.    Do you know if a financial
18   institution like JPMorgan is excused from
19   filing a suspicious activity report if it
20   files a CTR?
21              MR. BOUCHOUX:  Objection to the
22         form.  Outside the scope of the
23         opinion.
24              THE WITNESS:  I don't know.
25
```

```
 1    QUESTIONS BY MR. PENDELL:
 2         Q.    Do you understand that
 3    suspicious activity reports are not just
 4    limited to cash activity?
 5              MR. BOUCHOUX:  Objection to the
 6         form.
 7              THE WITNESS:  I don't know that
 8         as well.
 9    QUESTIONS BY MR. PENDELL:
10         Q.    Okay.  Does the fact that a
11    financial institution has not received a
12    subpoena excuse a financial institution from
13    reporting suspicious activity to law
14    enforcement via a SAR?
15              MR. BOUCHOUX:  Objection to the
16         form.  Outside the scope of the
17         opinion.
18              THE WITNESS:  I have no idea.
19    QUESTIONS BY MR. PENDELL:
20         Q.    Okay.  Are you aware of whether
21    banking regulators provide guidance to banks
22    on the importance of filing suspicious
23    activity reports?
24         A.    I'm not aware of that as well.
25         Q.    Okay.  So it's fair to say if I
```

Confidential Pursuant to Protective Order

```
 1          Q.    Okay.  But other agents in
 2   other field offices may have used them and
 3   found them useful?
 4                MR. BOUCHOUX:  Objection to the
 5          form.
 6                THE WITNESS:  They may have
 7          used them.  I have no idea if they
 8          were useful or not.
 9   QUESTIONS BY MR. PENDELL:
10          Q.    So let me ask you this,
11   Mr. Fonseca.  So -- Fonseca.
12          A.    Most want to say Fonseca,
13   but --
14          Q.    Oh, Fonseca. Okay.  I
15   apologize.
16                You told me today that you
17   didn't even know what a suspicious activity
18   report was until you got involved in this
19   case.  So how do you know that they would not
20   have been useful in any of your
21   investigations, because you never even looked
22   at them previous?
23                MR. BOUCHOUX:  Objection to the
24          form.
25                THE WITNESS:  So my career, I
```

```
 1         would think, was fairly successful.  I
 2         followed tried and true protocols that
 3         we had with our victim-center approach
 4         of investigating cases of sex
 5         trafficking.
 6                 And I can say in my opinion
 7         that they're not -- it's not important
 8         because our cases were successful the
 9         way we worked them.  They didn't
10         require that type of documentation.
11                 So I think my experience speaks
12         to the success I had in my casework.
13   QUESTIONS BY MR. PENDELL:
14         Q.     And sitting here today, you
15   don't know whether or not other agents in
16   other field offices had success in their
17   investigations utilizing suspicious activity
18   reports; is that fair?
19                 MR. BOUCHOUX:  Objection to the
20         form.
21                 THE WITNESS:  I would have not
22         much idea on that.  And I say "not
23         much" because I didn't interact every
24         day with other offices, so that would
25         be fair.
```

Confidential Pursuant to Protective Order

1    financial records could possibly have helped
2    identify her as a co-conspirator earlier?
3           MR. BOUCHOUX:  Objection to the
4       form.
5           THE WITNESS:  Only than the
6       date of trial, I have no -- I have no
7       idea.
8    QUESTIONS BY MR. PENDELL:
9       Q.    Okay.  You mention in your
10   report at several places that financial
11   records are not useful in validating victim
12   testimony, but you agree that they can be
13   valuable for other purposes in an
14   investigation, right?
15      A.    Financial records could be in
16   other investigations, correct.
17      Q.    Well, setting aside other
18   investigations, even within a sex trafficking
19   investigation they may be useful for other
20   purposes other than validating victim
21   testimony, right?
22      A.    I'm trying to think of an
23   example where that would be true.
24      Q.    Well, I'll give you an example
25   here, the Maxwell case.  They used the

Confidential Pursuant to Protective Order

```
 1    records to show that she was a
 2    co-conspirator, didn't they?
 3              MR. BOUCHOUX:  Objection to the
 4         form.
 5              THE WITNESS:  Again, they used
 6         the records, yes.  Not being part of
 7         that trial, I don't know what that
 8         ended up proving.  But they did use
 9         the records, yes.
10    QUESTIONS BY MR. PENDELL:
11         Q.    Did you read the -- strike
12    that.
13              Did you see in the records that
14    you reviewed what she was actually convicted
15    of?
16         A.    Yes.
17         Q.    And one of the convictions, did
18    it involve being a co-conspirator with
19    Mr. Epstein?
20         A.    She was convicted of
21    conspiracy, yes.
22         Q.    Okay.  Do you know if the
23    investigators in that case used any of the
24    financial records to help identify additional
25    witnesses?
```