# Exhibit 7



Irwin Exhibit

1

7/6/23  Jennifer Dunn, RMR, CRR

# Government of the United States Virgin Islands

## v.

# JPMorgan Chase Bank, N.A.;

# JPMorgan Chase Bank, N.A.

## v.

# James Edward Staley

Expert Report of Carlyn Irwin

Carlyn Irwin

Senior Advisor

Cornerstone Research

June 23, 2023

Confidential—Subject to Protective Order

# Table of Contents

I.  Introduction ........................................................................................... 1

   A.      Summary of Conclusions ............................................................1

   B.      Relevant Parties to My Work ......................................................2

   C.      Assignment ................................................................................4

   D.      Summary of Qualifications .........................................................5

   E.      Information Considered and Relied Upon in Forming My Opinions ....................6

   F.      Professional Standards Applicable to My Work in this Matter ................6

   G.      Compensation ............................................................................7

II.  Summary of Financial Trust's and Southern Trust's Participation in USVI's EDC Program ................................................................................. 7

   A.      EDC's Mission and Structure ....................................................7

   B.      Overview of Financial Trust's Participation in the IDC/EDC Program (1999–2012) .........................................................................9

   C.      Overview of Southern Trust's Participation in the EDC Program (2013–2018)...15

III.  Summary of Findings and Opinions with Respect to USVI Tax Benefits ....................... 21

   A.      USVI Gave Mr. Epstein Over $300 Million in Tax Breaks ..................................22

   B.      Giving Mr. Epstein $300 Million in Benefits Made No Economic Sense............22

   C.      USVI Failed to Ask Questions or Develop an Appropriate Basis to Support Extending the $300 Million in Benefits.................................................24

   D.      USVI and EDC's Ongoing Monitoring of Financial Trust and Southern Trust Did Not Support its Continuation of Benefits to Epstein Over a Twenty-Year Period...........29

   E.      The Lack of An Economic Rationale or Effort to Develop an Appropriate Basis For The $300 Million in Benefits Suggests Other Factors Influenced The USVI's Grants ...............................................................................32

IV.  Summary of Findings with Respect to Certain USVI's Expert Opinions ....................... 34

   A.      USVI's Experts' Conclusions Regarding Revenue Earned by JPMC from Customers Potentially Associated with Mr. Epstein Are Contradictory and Not Supported by Appropriate Analysis ....................................................34

   B.      Mr. Amador's Opinion Regarding Mr. Epstein's Account Structure is Unsupported.........................................................................36

Confidential—Subject to Protective Order

## I.      Introduction

1.      I have been retained by Wilmer Cutler Pickering Hale and Dorr LLP, counsel for JPMorgan Chase Bank, N.A., ("JPMC") to provide expert testimony in the matter Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A. and JPMorgan Chase Bank, N.A. v. James Edward Staley.[1]

### A.      Summary of Conclusions

2.      From my review of the record evidence, I conclude that the United States Virgin Islands ("USVI") gave Mr. Epstein's companies, Financial Trust Company, Inc ("Financial Trust") and Southern Trust Company, Inc. ("Southern Trust"), over $300 million in tax breaks.

3.      The cost of those tax breaks to USVI dwarfed any economic benefits the territory received in return.

4.      USVI's Economic Development Commission ("EDC") ignored Financial Trust's and Southern Trust's consistently unfavorable cost / benefit analyses and failed to ask questions or gather information to justify the granting of these benefits.

5.      These shortcomings continued through the twenty-year period that USVI officials were supposed to be monitoring Mr. Epstein's companies through his participation in their tax incentive program.

6.      USVI's current claims that Southern Trust was not a legitimate company are based on facts that were readily and uniquely available to USVI.

7.      The extending of benefits without any clear economic basis and without USVI asking the appropriate questions to develop a basis for extending them suggests there is some other reason why Mr. Epstein was given $300 million in tax incentives by USVI and is consistent with the possibility that these benefits were granted as part of an improper quid-pro-quo exchange between Mr. Epstein and USVI officials.

---

[1] Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A, Case 1:22-cv-10904-JSR, Second Amended Complaint and Demand for a Jury Trial, April 12, 2023 (the "Complaint"); JPMorgan Chase & Co., N.A., v. James Edward Staley, Case No. 1:22-cv-10904-JSR, Third-Party Complaint, March 8, 2023 ("Third-Party Complaint").

8.      USVI's Experts' conclusions regarding revenue earned by JPMC from customers potentially associated with Mr. Epstein are contradictory and not supported by appropriate analysis.

9.      Mr. Amador's opinion regarding the complexity of Mr. Epstein's account structure is unsupported.

## B.      Relevant Parties to My Work

10.     The parties that are relevant to my analyses and testimony include the entities and individuals listed below.

      a.   JPMC is a national banking association formed under the laws of the United States with its main office in Columbus, OH.[2]

      b.   USVI are a group of Caribbean islands and an unincorporated and organized territory of the United States.[3]

      c.   EDC is a subsidiary of the Virgin Islands Economic Development Authority, a semi-autonomous governmental instrumentality created and governed pursuant to 29 VIC § 1101.[4]  It is my understanding that the EDC's predecessor was USVI's Industrial Development Commission ("IDC").[5]

      d.   Mr. Jeffrey Epstein was a resident of USVI.  In July 2006, Mr. Epstein was arrested in Florida for solicitation of prostitution.[6]  In June 2008, Mr. Epstein pled guilty to one count of soliciting prostitution and one count of soliciting prostitution from a minor.[7]  He was sentenced to 18 months in a Florida jail, and after serving 13 months of his sentence, he was released from jail on probation.[8]

---

[2] JPMorgan Chase & Co., SEC Form 10-K for the fiscal year ended December 31, 2022, filed on February 21, 2023, pp. 1, 33; Third Party Complaint, ¶ 4.
[3] "Virgin Islands," *The World Factbook*, available at https://www.cia.gov/the-world-factbook/countries/virgin-islands/.
[4] United States Virgin Islands Economic Development Authority, FY2009 Annual Report, pp. 5, 7; 29 VIC § 1101.
[5] See VI-JPM-000018359–387 at 359.
[6] Associated Press, "A Timeline of the Jeffrey Epstein, Ghislaine Maxwell Scandal," *U.S. News & World Report*, June 28, 2022, available at https://www.usnews.com/news/politics/articles/2022-06-28/a-timeline-of-the-jeffrey-epstein-ghislaine-maxwell-scandal.
[7] Associated Press, "A Timeline of the Jeffrey Epstein, Ghislaine Maxwell Scandal," *U.S. News & World Report*, June 28, 2022, available at https://www.usnews.com/news/politics/articles/2022-06-28/a-timeline-of-the-jeffrey-epstein-ghislaine-maxwell-scandal.
[8] Associated Press, "A Timeline of the Jeffrey Epstein, Ghislaine Maxwell Scandal," *U.S. News & World Report*, June 28, 2022, available at https://www.usnews.com/news/politics/articles/2022-06-28/a-timeline-of-the-jeffrey-epstein-ghislaine-maxwell-scandal; VI-JPM-000032669–725 at 723.

Mr. Epstein returned to USVI in July 2010, and as a result of his crimes, he became a registered sex offender in USVI.[9]  He died in 2019 while incarcerated in New York related to additional sexual misconduct allegations.[10]

e.  Financial Trust was a USVI-based S-Corporation wholly owned by Mr. Epstein and a recipient of IDC/EDC tax exemptions from 1999 through 2012.[11]

f.  Southern Trust was a USVI-based S-Corporation wholly owned by Mr. Epstein and was a recipient of EDC tax exemptions from 2013 through 2018.[12]

g.  Ms. Stacey Plaskett served as General Counsel for the EDC from 2007 through 2014 and currently serves as a non-voting delegate to the United States House of Representatives from USVI.[13]  She participated in the EDC's analysis and discussions regarding the 2009 extension of Financial Trust's award and the 2013 award to Southern Trust.[14]

h.  Mr. Albert Bryan served as Chairman of the EDC from 2007 through 2014 and is the current Governor of the United States Virgin Islands.[15]  He became Governor in January 2019.[16]  He voted to approve Southern Trust's award in 2013.[17]

i.  Ms. Cecile de Jongh was an employee of Financial Trust and Southern Trust and its EDC compliance contact person.[18]  From January 2007 through January 2015 she also served as First Lady of USVI—that is, the wife of the then Governor of USVI.[19]

---

[9] Deposition of Inais Borque, May 26, 2023 ("Borque Deposition"), 72:19–73:25, 90:8–91:5.
[10] Associated Press, "A Timeline of the Jeffrey Epstein, Ghislaine Maxwell Scandal," *U.S. News & World Report*, June 28, 2022, available at https://www.usnews.com/news/politics/articles/2022-06-28/a-timeline-of-the-jeffrey-epstein-ghislaine-maxwell-scandal.
[11] VI-JPM-000012940–956; VI-JPM-000012922–939; VI-JPM-000012885–921; VI-JPM-000012850–884; VI-JPM-000012816–849; VI-JPM-000012743–815; VI-JPM-000012722–742; VI-JPM-000012689–721; VI-JPM-000012630–688; VI-JPM-000013335–372; VI-JPM-000013219–334; VI-JPM-000013122–218; VI-JPM-000013087–121; VI-JPM-000012996–3086.
[12] VI-JPM-00007315–406; VI-JPM-00007407–473; VI-JPM-00007474–533; VI-JPM-00007534–587; VI-JPM-00007588–662; VI-JPM-00007663–719.
[13] "Biography, Congresswoman Stacey E. Plaskett," *U.S. House of Representatives*, available at https://plaskett.house.gov/biography; "Biography, Stacey Plaskett Campaign," *Plasket for Congress*, available at https://plaskettforcongress.org/biography.
[14] VI-JPM-000018918–926; VI-JPM-000018934–945.
[15] Deposition of Governor Albert Bryan, Jr., June 6, 2013 ("Bryan Deposition"), 18:2–19:9; 276:7–11
[16] "Biography, Governor Albert Bryan Jr.," *U.S. Virgin Islands Government*, available at https://www.vi.gov/governor-bryan/.
[17] VI-JPM-000018551–571 at 570; Deposition of Cecile de Jongh, May 29, 2023 ("Cecile de Jongh Deposition"), 77:5–14 ("Q: You couldn't get the tax exemptions without the governor personally signing off?  A: Correct.").
[18] Deposition of Margarita Benjamin, May 26, 2023 ("Benjamin Deposition"), 101:7–19; Cecile de Jongh Deposition, 10:20–22, 12:9–14, 14:21–24.
[19] Benjamin Deposition, 101:7–19.

j.  Mr. John de Jongh, Jr. was the Governor of USVI from January 2007 until January 2015.[20]  In 2013, he approved Southern Trust's award of economic benefits.[21]

## C.  Assignment

11.  As part of my work on this matter, I was asked to do the following:

a.  Analyze and evaluate the tax incentives awarded by USVI's IDC/EDC to Financial Trust and Southern Trust during the period 1999–2018.

b.  Calculate the dollar amount of tax benefits provided by the IDC/EDC to Mr. Epstein.

c.  Calculate the dollar amount of taxes and other economic benefits received by USVI associated with the tax incentives provided to Mr. Epstein's USVI-based companies.

d.  Analyze the IDC/EDC's projected and actual cost vs. benefit ratios associated with its decisions to provide tax incentives to Mr. Epstein's USVI-based companies.

e.  Assess how the costs/benefits of Mr. Epstein's awards compared to representations made in his companies' applications to the IDC/EDC.

f.  Analyze the economic impact of the IDC/EDC's awards on Mr. Epstein, his businesses, and USVI.

g.  Assess the work done by IDC/EDC in connection with evaluating, extending benefits to, and monitoring of, Mr. Epstein's companies.

h.  Assess and respond to certain opinions set forth by experts retained by USVI.

12.  The opinions expressed in this report and portions of the information presented in the accompanying exhibits are my opinions as of the date of this report.  At the request of counsel, I may amend or supplement this report and the accompanying exhibits as a result of developments

---

[20] "Virgin Islands Gov. John de Jongh, Jr.," *National Governors Association*, available at https://www.nga.org/governor/4796-2/.
[21] United States Virgin Islands Economic Development Authority, Annual Report Fiscal Year 2013, October 1, 2012 to September 30, 2013, p. 13.

prior to or at trial, including, but not limited to, the discovery of new evidence, expert discovery, and the testimony of other witnesses in deposition or trial.

13.     At trial, I anticipate using demonstratives that may include, but are not limited to, selected exhibits attached to this report, documents reviewed in connection with their preparation, enhanced graphic versions of selected exhibits included in this report, and additional graphics illustrating concepts included in this report.

### D.     Summary of Qualifications

14.     I am a senior advisor with Cornerstone Research, an economic and financial consulting firm where I serve as an expert witness and consultant.  I have been retained as an expert witness and have provided testimony in federal and state courts, international arbitration, and other venues.  As an expert and as a consultant, I have analyzed financial, economic, and accounting issues, prepared valuations and damages claims, and conducted financial forensic analysis.  In doing so, I have worked on matters involving intellectual property disputes, including patents, copyrights, trademarks, and trade secrets, as well as cases involving allegations of breach of contract, unfair business competition, false advertising, and fraud.  In addition, I have been retained by clients to analyze data to reconstruct financial records, estimate profitability, and assess the consistency and reliability of data.  I have testified and previously qualified as an expert regarding economic damages, valuation, accounting, and forensic accounting issues.

15.     Prior to joining Cornerstone Research, I was employed as a litigation consultant with the accounting firm of PricewaterhouseCoopers (formerly Price Waterhouse) from 1994 to 2002. From 1992 to 1994 I served as the assistant controller for a law firm where I was primarily responsible for, among other things, maintaining the general ledger, producing the firm's financial statements, and assisting the executive committee with strategic analyses.

16.     I hold a Bachelor of Arts degree from the University of California at Santa Barbara where I graduated with honors.  I have an MBA from the University of Southern California.  I am also a Certified Public Accountant and a Certified Fraud Examiner, and I am Certified in Financial Forensics, Certified in Enterprise and Intangible Valuation, and Accredited in Business Valuation by the American Institute of Certified Public Accountants.  A current copy of my *curriculum vitae*, including a list of the matters in which I have provided expert testimony over the last four years, is attached as **Appendix A**.

### E.      Information Considered and Relied Upon in Forming My Opinions

17.      In conducting my analyses and forming my opinions, I have approached my work from an economic and financial perspective.  I have relied on information from sources reasonably relied upon by experts in my field, as well as my own professional judgment and expertise.  In addition, I have relied upon my education, experience, and training in accounting, finance, economics, and general business subject matters.  As part of my work in this matter, I have considered and relied upon the following categories of information:

   a.  Various pleadings in this matter including interrogatory responses from USVI;

   b.  The applications for tax incentives submitted by Mr. Epstein's USVI-based companies to the IDC/EDC;

   c.  Transcripts of IDC/EDC meetings in which Mr. Epstein's applications, requested awards and expected cost / benefit ratios were discussed;

   d.  Annual submissions by Mr. Epstein's USVI-based companies to the IDC/EDC that detail the economic benefits he received (referred to by the EDC as "costs") and economic benefits USVI received associated with his two awards;

   e.  Income tax returns submitted by Financial Trust and Southern Trust to the IDC/EDC as part of their annual reporting;

   f.  IDC/EDC prepared analyses of the actual costs/benefits of the awards to Financial Trust, Southern Trust, and other EDC award recipients;

   g.  Publicly available information contained on the EDC's website;

   h.  Deposition testimony of USVI witnesses; and

   i.  USVI news coverage related to the IDC/EDC awards to Mr. Epstein and his USVI-based businesses.

18.      A complete list of the information I considered is attached as **Appendix B.**

### F.      Professional Standards Applicable to My Work in this Matter

19.      The American Institute of Certified Public Accountants publishes professional standards applicable to my work on this engagement.  In general, those standards require CPAs engaged in litigation services to:  (i) maintain integrity and objectivity; (ii) only undertake engagements that are expected to be completed with professional competence; (iii) exercise due professional care

in performing the services; (iv) adequately plan and supervise the performance of the services; and (v) obtain sufficient relevant data to provide a reasonable basis for the conclusions.[22]  I have complied with these professional standards in this engagement.

### G.    Compensation

20.    With respect to this matter, Cornerstone Research shall be compensated at $960 per hour for my time spent in preparation and support of my opinions, and Cornerstone Research shall also be compensated for my colleagues who worked on this matter under my direction.  Neither my compensation nor my colleagues' compensation is contingent or based on the content of my opinions or the outcome of this matter.

## II.    Summary of Financial Trust's and Southern Trust's Participation in USVI's EDC Program

### A.    EDC's Mission and Structure

21.    The EDC is charged by the Virgin Islands Economic Development Authority "with promoting the growth, development and diversification of the economy of the United States Virgin Islands by developing the human and economic resources of the Territory, preserving job opportunities for residents of the U.S. Virgin Islands, and promoting capital formation to support industrial development in the Territory."[23]  In an effort to achieve its economic development goals, the EDC offers approved businesses a 90% exemption that can be applied toward U.S. federal income taxes and a 100% exemption from USVI gross receipt taxes.[24]  In return, USVI stands to benefit from the jobs these businesses create on the island, tourism they bring to the island, contributions they make to local charities, and capital expenditures they entrust with local suppliers.[25]  USVI's 30(b)(6) witness, Ms. Margarita Benjamin, the Managing Director of the EDC, testified in her deposition that "[w]hen an applicant comes and receives [EDC]

---

[22] "Statement on Standards for Forensic Services No. 1," *AICPA*, available at https://www.aicpa.org/resources/download/statement-on-standards-for-forensic-services.  Early application is permissible.
[23] United States Virgin Islands Economic Development Authority, FY2012 Annual Report, p. 11.
[24] "Tax Incentives: How Do They Work?" *United States Virgin Islands Economic Development Authority*, available at https://usvieda.org/residents/grow/edc-tax-incentives/tax-incentives-how-do-they-work.
[25] See, e.g., VI-JPM-000032792.

incentives…the[re] would be new indirect and induced activities [in USVI] as a result of their entry into the marketplace."[26]

22.     Mr. Epstein owned two USVI companies that received EDC tax benefits:  Financial Trust Company and Southern Trust Company.  Financial Trust was wound down in 2012 and replaced by Southern Trust, a new USVI-based company.[27]  In 2012–2013, at the time when the EDC was evaluating Mr. Epstein's application for benefits associated with Southern Trust, the EDC was comprised of two principal units: (i) the Applications Division and (ii) the Compliance Division.[28]  The Applications Division was tasked with reviewing applications for economic development tax exemptions and making recommendations to USVI governor.[29]  The Compliance Division "monitors beneficiaries to ensure that they comply with the terms and conditions of their certificates and with other requirements of law."[30]  According to its 2012 Annual Report, the EDC Applications Division staff were trained to analyze the amount of tax exemptions offered in relation to economic development benefits brought to USVI.[31]  The EDC reported that its Application Division is "focused on enhancing the cost-benefit analysis tools used in the application evaluation process to ensure that all qualitative and quantitative data are appropriately collected to comprehensively ascertain fiscal and economic implications."[32]  The EDC discussed in its fiscal year 2013 Annual Report its objective to "update software with Cost-Benefit Model information to create transparency in the application and selection process."[33]

23.     The EDC, on an annual basis, prepares reports detailing new awards and the performance of existing award recipients.  Information regarding performance of existing recipients is collected from annual submissions submitted by recipient USVI businesses and may be subject to verification by the Compliance Division through, for example, site visits.

---

[26] Benjamin Deposition, 25:13–20.
[27] JPM-SDNYLIT-00149653–658 at 653–654.
[28] United States Virgin Islands Economic Development Authority, FY2012 Annual Report, p. 11.
[29] United States Virgin Islands Economic Development Authority, FY2012 Annual Report, pp. 11, 13.
[30] United States Virgin Islands Economic Development Authority, FY2012 Annual Report, p. 11.
[31] United States Virgin Islands Economic Development Authority, FY2012 Annual Report, p. 13.
[32] United States Virgin Islands Economic Development Authority, FY2011 Annual Report, p. 12.
[33] United States Virgin Islands Economic Development Authority, Annual Report Fiscal Year 2013, October 1, 2012 to September 30, 2013, p. 12.

### B.    Overview of Financial Trust's Participation in the IDC/EDC Program (1999–2012)

24.     Financial Trust applied for tax exemptions offered by USVI's IDC in 1998.[34]  Financial Trust's application disclosed the following information:

  a.  Financial Trust was 100% owned by Mr. Epstein.[35]

  b.  Mr. Epstein served as a Director and President.[36]

  c.  It planned to employ ten USVI residents in addition to Mr. Epstein.[37]

  d.  Financial Trust planned to "establish and conduct a 'designated service business,' providing economic and management consulting services, as described in Section 703(g)(4) of The Virgin Islands Industrial Development Program."[38]

  e.  Financial Trust planned to provide "a broad range of financial and economic consulting, money management, investment advisory and fiduciary services for its clients."[39]

  f.  Financial Trust was forecasting revenues of $3 to $6 million per year and Net Profit Before Taxes of $2 to $4 million per year over the next 5 years.[40]

25.     On September 7, 1999, the IDC met in Executive Session to discuss Financial Trust's application among other matters.  The meeting was transcribed by Porter's Court Reporting.[41] The meeting minutes noted the following:

  a.  Based on the standard formula used by the IDC at the time, it was projected that Financial Trust would generate a cost / benefit ratio of 1 to 1.3.  This indicates that for every $1.00 of tax break/benefits that was given Financial Trust (and Mr. Epstein as he was the sole owner of this pass-through company), USVI expected to receive $1.30 of economic benefits in the form of increased local employment, local tax receipts, and local investment.[42]

---

[34] VI-JPM-000018359–387 at 359.
[35] VI-JPM-000018359–387 at 361.
[36] VI-JPM-000018359–387 at 385.
[37] VI-JPM-000018359–387 at 362.
[38] VI-JPM-000018359–387 at 368.
[39] VI-JPM-000018359–387 at 368.
[40] VI-JPM-000018359–387 at 380.
[41] VI-JPM-000018885–917.
[42] VI-JPM-000018885–917 at 888–889.

    b.  A cost / benefit ratio of 1 to 1.2 was referred to as "an acceptable ratio."[43]

    c.  It was expected that Financial Trust's ratio would improve upon making certain future capital expenditures.[44]

    d.  As a condition of the award, the committee required that Financial Trust contribute the greater of $45,000 or 1% of Financial Trust's gross receipts to charity, scholarships and local co-op marketing.[45]

26.    The committee approved the following benefits to be awarded to Mr. Epstein and Financial Trust for the next 10 years:

    a.  Exemption of 100% of local real estate taxes;

    b.  Exemption of 100% of USVI gross receipts taxes; and

    c.  Exemption of 90% of USVI income taxes.[46]

27.    As a participant in the program, Financial Trust was required to complete and submit an annual reporting package to the IDC.   In November 2000, Financial Trust reported:

    a.  It earned $43.0 million of Gross Sales Eligible for Tax Benefits in 1999.[47]

    b.  It earned $42.8 million of Ordinary Income (that would otherwise be subject to income taxes).[48]

    c.  It paid gross wages of only $180,000 (paid to Mr. Epstein).[49]

    d.  Financial Trust (and Mr. Epstein) received $15.6 million of income tax benefits and $1.7 million of Gross Receipts tax benefits in 1999.[50]

28.    During discovery, USVI produced spreadsheets detailing the "costs" versus the "benefits" of the EDC program.[51]   The EDC's actual cost / benefit analysis for 1999 indicated the following:

---

[43] In the September 7, 1999 Executive Session, Mr. Francois Dominique, a Special Assistant in the IDC, stated that "one to 1.2" was accepted by the IDC "over the years" as "an acceptable ratio."  See VI-JPM-000018885–917 at 885, 889.  Governor Albert Bryan stated in his June 6, 2023 deposition that "a good return on investment from that tax benefits [USVI was] given" was "[d]efinitely at least one and a half, two, would be good."  See Bryan Deposition, 47:9–20.

[44] VI-JPM-000018885–917 at 889.

[45] VI-JPM-000018885–917 at 916.

[46] VI-JPM-000018885–917 at 915–916.

[47] VI-JPM-000012940–956 at 942.

[48] VI-JPM-000012940–956 at 942.

[49] VI-JPM-000012940–956 at 942.

[50] VI-JPM-000012940–956 at 940.

[51] VI-JPM-000032792; VI-JPM-000032774; VI-JPM-000032775; VI-JPM-000032776; VI-JPM-000032777; VI-JPM-000032778; VI-JPM-000032779; VI-JPM-000032780; VI-JPM-000032781; VI-JPM-000093343; VI-JPM-000041911; VI-JPM-000093344; VI-JPM-000093345; VI-JPM-000093346; VI-JPM-000093347; VI-JPM-000037451; VI-JPM-000037452; VI-JPM-000020120; VI-JPM-000020331; VI-JPM-000093348.

   a.  The EDC provided Financial Trust with $17.3 million of tax benefits in 1999 (this was a direct benefit to Mr. Epstein as Financial Trust was a Subchapter S pass-through entity).[52] This $17.3 million of tax breaks was referred to as the "cost" to USVI of the Financial Trust award.[53]

   b.  USVI received $623,430 of economic "benefits."[54]

   c.  Financial Trust reported no donations to USVI charities.[55]

   d.  As a result, the EDC determined that Financial Trust's cost / benefit ratio for 1999 was $1 to $0.04, indicating that for every dollar of tax breaks that USVI gave to Financial Trust, USVI received only $0.04 of economic benefits.[56]

29.    Fiscal year ending December 31, 2000, was Financial Trust's first full year in the IDC/EDC program.  Financial Trust submitted its annual reporting package to the IDC in October 2001.[57] Financial Trust reported:

   a.  It earned $64.4 million of Gross Sales Eligible for Tax Benefits in 2000.[58]

   b.  It employed 10 people and paid gross wages of $569,421 ($240,000 paid to Mr. Epstein and $329,421 paid to the other employees).[59]

   c.  It received $28.4 million of tax benefits in 2000, due to its ability to avoid paying $2.6 million of Gross Receipts taxes and $25.8 million of income taxes to USVI.[60]

30.    The EDC's actual cost / benefit analysis for 2000 indicated the following:

   a.  The EDC provided Financial Trust with $28.4 million of tax benefits in 2000 (this was a direct benefit to Mr. Epstein as Financial Trust was a Subchapter S pass-through entity).[61] This $28.4 million of tax breaks was referred to as the "cost" to USVI of the Financial Trust award.[62]

   b.  USVI received $8.1 million of economic "benefits" in the form of:

---

[52] VI-JPM-000032792, tab *Benefits*.
[53] VI-JPM-000032792, tab *Benefits*.
[54] VI-JPM-000032792, tab *Procurement*.
[55] VI-JPM-000032792, tab *Contribution*.
[56] VI-JPM-000032792, tab *Benefits*.
[57] VI-JPM-000012922–939 at 922.
[58] VI-JPM-000012922–939 at 924.
[59] VI-JPM-000012922–939 at 922, 924.
[60] VI-JPM-000012922–939 at 922.
[61] VI-JPM-000032774, tab *Benefits;* VI-JPM-000012922–939 at 924.
[62] VI-JPM-000032774, tab *Benefits*.

      i.   $569,000 of wages paid to Financial Trust's employees;[63]

     ii.   $6.7 million of income and employment taxes collected;[64]

    iii.   $609,000 of local purchases;[65] and

    iv.   A $243,000 double-count of employment taxes.[66]

  c.  Financial Trust reported charitable gifts of only $189,500, well below the 1% of Financial Trust's gross receipts of $64.4 million required.[67]

31.     According to the EDC's calculations, the 2000 actual cost / benefit ratio for Financial Trust was for every $1 of cost (tax breaks given away to Financial Trust), USVI received only $0.29 of benefits (taxes received, local employment, and local purchases).[68]

32.     In 2001, Financial Trust's actual results continued to fall well below the acceptable levels discussed by the IDC when it approved Financial Trust's application.  For example, the EDC's 2001 cost / benefit analysis reported the following:

  a.  The EDC provided Financial Trust with $23.1 million of tax breaks in 2001 (EDC's "cost").[69]

  b.  Associated with this cost, USVI only received $1.14 million of "benefits."[70]

  c.  Financial Trust made charitable contributions of only $29,520, well below the 1% of Financial Trust's gross receipts of $46.8 million discussed by the committee.[71]

33.     According to the EDC's calculations, the 2001 cost / benefit ratio for Financial Trust was for every $1 of cost (tax breaks given away to Financial Trust), USVI received only $0.05 of benefits (taxes received, local employment, and local purchases).[72]

34.     This pattern of "costs" (tax breaks provided to Financial Trust and Mr. Epstein) significantly exceeding the benefits received by USVI continued in 2002–2006.  Over this five-year period, Mr. Epstein received another $152 million of tax breaks from the EDC program. See **Exhibit 1**.

---

[63] VI-JPM-000032774, tabs *Procurement* and *Employment & Taxes*.
[64] VI-JPM-000032774, tabs *Procurement* and *Employment & Taxes*.
[65] VI-JPM-000032774, tab *Procurement*.
[66] VI-JPM-000032774, tabs *Procurement* and *Employment & Taxes*.
[67] VI-JPM-000032774, tabs *Contribution* and *Employment & Taxes*.
[68] VI-JPM-000032774, tab *Benefits*.
[69] VI-JPM-000032775, tab *Benefits*.
[70] VI-JPM-000032775, tab *Procurement*.
[71] VI-JPM-000032775, tabs *Contributions* and *Employment & Taxes*.
[72] VI-JPM-000032775, tab *Benefits*.

35.     In July 2006, Mr. Epstein was arrested for solicitation of prostitution.[73]  In June 2008, Mr. Epstein pled guilty to one count of soliciting prostitution and one count of soliciting prostitution from a minor.[74]  He ultimately served 13 months of his 18-month jail sentence.[75]

36.     In 2007, during the inception of what is commonly referred to as the Global Financial Crisis, Financial Trust reported significant losses.  For example, Financial Trust reported an Ordinary Business Income loss of over $10.5 million in its 2007 tax returns.[76]  This pattern of financial losses incurred by Financial Trust continued during 2008 through 2012.  See **Exhibit 1.**

37.     In 2009, Financial Trust's original 10-year tax benefits award was set to expire.  In January 2009, Financial Trust submitted an application to the EDC for modification/extension of its benefits.[77]  In February 2009, while Mr. Epstein was incarcerated in Florida, representatives of Financial Trust met with the EDC to request an extension of benefits as the original 10-year award was set to expire.  Per the February 12, 2009, meeting minutes:

   a.   Ms. Maria Tankenson Hodge and Mr. Darren Indyke represented Financial Trust.[78]

   b.   In September 2007, Mr. Epstein asked Mr. Indyke to "stand in for him at that time and for any period that he may be required to be absent from the territory."[79]

   c.   Financial Trust requested another 10 years of benefits.[80]

   d.   Financial Trust requested that the minimum number of local employees be reduced from 11 to 10.[81]

38.     On April 27, 2009, the EDC Board met to discuss Financial Trust's application, amongst other topics.  The meeting minutes indicate the following:

   a.   The cost / benefit of Financial Trust's request seemed "very unfavorable."[82]

---

[73] Associated Press, "A Timeline of the Jeffrey Epstein, Ghislaine Maxwell Scandal," *U.S. News & World Report*, June 28, 2022, available at https://www.usnews.com/news/politics/articles/2022-06-28/a-timeline-of-the-jeffrey-epstein-ghislaine-maxwell-scandal.
[74] Associated Press, "A Timeline of the Jeffrey Epstein, Ghislaine Maxwell Scandal," *U.S. News & World Report*, June 28, 2022, available at https://www.usnews.com/news/politics/articles/2022-06-28/a-timeline-of-the-jeffrey-epstein-ghislaine-maxwell-scandal.
[75] VI-JPM-000032669–725 at 723.
[76] VI-JPM-000012630–688 at 634.
[77] VI-JPM-000018918–926 at 920.
[78] VI-JPM-000016200–205 at 201.
[79] VI-JPM-000016200–205 at 202.
[80] VI-JPM-000016200–205 at 201–202.
[81] VI-JPM-000016200–205 at 201.
[82] VI-JPM-000018918–926 at 920.

    b.   Financial Trust's projected cost / benefit ratio was 0.19, indicating that for every $1.00 of cost (benefits given away to Financial Trust and Mr. Epstein) USVI received only $0.19 in benefits to USVI's economy.[83]

    c.   At the time, a ratio below 0.5 was called "unfavorable."[84]

    d.   The EDC discussed that it was projected that USVI would give away $40 million of tax breaks to Financial Trust and in return receive only $4–$7 million in benefits.[85]

    e.   The EDC raised concerns about how "the public" would react to Financial Trust's projected cost / benefit ratio.[86]

    f.   The EDC tabled consideration of Financial Trust's application.[87]

39.    On May 28, 2009, the EDC met again to discuss Financial Trust's request for an extension of benefits.  The meeting minutes reflect the following:

    a.   Financial Trust's current benefits were expiring in August 2009.[88]

    b.   Financial Trust was now requesting only a 5-year extension.[89]

    c.   After discussion, the EDC approved a 5-year extension under certain terms/conditions.[90]

40.    As a result of the continuing losses incurred by Financial Trust in 2009–2012, the value of the tax breaks awarded to Financial Trust in 2009 was minimal.  In total, from 2009 through 2012, Financial Trust received only $527,000 of additional tax breaks from the EDC program. See **Exhibit 1**.

41.    On April 4, 2012, Financial Trust notified the EDC that it would exit the program and no longer wished to receive benefits.[91]

42.    On January 31, 2014, the EDC sent a letter to Ms. de Jongh who was listed as the Office Manager at Financial Trust.[92]  The letter indicated that the EDC had recently completed a

---

[83] VI-JPM-000018918–926 at 920.
[84] VI-JPM-000018918–926 at 920.
[85] VI-JPM-000018918–926 at 920.
[86] VI-JPM-000018918–926 at 922.
[87] VI-JPM-000018918–926 at 924.
[88] VI-JPM-000018934–945 at 937.
[89] VI-JPM-000018934–945 at 937.
[90] VI-JPM-000018934–945 at 944–945.
[91] ESTATE_JPM018975–992 at 978.
[92] ESTATE_JPM018975–992.

"compliance review" of Financial Trust for the period January 1, 2009 through March 23, 2012.[93] The EDC concluded that Financial Trust was out of compliance with its capital investment requirement, and Special Conditions #1 and #2.[94]  According to the Compliance Report, Special Condition #1 was a requirement that Financial Trust would contribute the greater of $100,000 per year or 1% of the gross receipts tax exemption value.[95]  The Compliance Report also indicated that from September 2007 to December 2009, Mr. Epstein "relinquished" the title of Director/President to Mr. Indyke.[96]

### C.   Overview of Southern Trust's Participation in the EDC Program (2013–2018)

43.     In September 2012, Southern Trust, an S-Corporation wholly owned by Mr. Epstein, applied for tax exemptions from the EDC.[97]  Southern Trust claimed that its business objective was "to build an extensive DNA database and develop a data-mining platform for the database to be available through the internet."[98]  The application indicated that Southern Trust's "platform will be based on databases and information to be kept on servers located in the U.S. Virgin Islands, specifically St. Thomas."[99]

44.     The application indicated the Southern Trust planned to hire only 6 employees in total and be funded with $400,000 in initial capital.[100]  Mr. Epstein was to be the President and Chief Executive Officer with an annual salary of $200,000.[101]  Southern Trust disclosed that it intended to hire a "Chief Scientific Officer" with "a Ph.D. in Biomedical Informatics and/or a medical degree with conceivably another degree in Computer Technology or Engineering."[102]  In

---

[93] ESTATE_JPM018975–992 at 975.

[94] ESTATE_JPM018975–992 at 975.

[95] ESTATE_JPM018975–992 at 983.  It is unclear when the EDC modified Financial Trust's Special Condition #1 – as the meeting minutes from 1999 indicate that the Special Condition at the time of the award was "one percent of gross receipts or 45 thousand, whichever is greater will be donated to charity, scholarships and co-op marketing of the IDC…"  See VI-JPM-000018885–917 at 912–913.  As discussed above, 1% of Financial Trust's gross receipts would have required Financial Trust to contribute millions of dollars to USVI charities, whereas 1% of the gross receipts tax *exemption value* results in a much lower threshold as the exemption value was only 4.5% of gross receipts.

[96] ESTATE_JPM018975–992 at 991.  This was the period of time Mr. Epstein was incarcerated in Florida for sex crimes.  See Associated Press, "A Timeline of the Jeffrey Epstein, Ghislaine Maxwell Scandal," *U.S. News & World Report*, June 28, 2022, available at https://www.usnews.com/news/politics/articles/2022-06-28/a-timeline-of-the-jeffrey-epstein-ghislaine-maxwell-scandal.

[97] VI-JPM-000032669–725.

[98] VI-JPM-000032669–725 at 670.

[99] VI-JPM-000032669–725 at 681.

[100] VI-JPM-000032669–725 at 674, 675.

[101] VI-JPM-000032669–725 at 684, 701.

[102] VI-JPM-000032669–725 at 684.

addition, Southern Trust represented that a "large majority of [its] employees will have advanced degrees in fields such as Computer Science, Mathematics, Biomedical Informatics, and/or Finance."[103]  Appendix 21 to the application indicated that the four other employees of Southern Trust would be a "Data Base Manager," a "Technical Assistant," an "Accountant," and an "Administrative Assistant."[104]

45.     Southern Trust's EDC application also disclosed that Mr. Epstein was a convicted sex offender.  The application and its appendices disclosed the following:

> a.   Mr. Epstein had "been arrested or charged with [a] crime or offense" and "been the subject of an investigation conducted by [a] governmental agency/organization, court, commission, committee, grand jury, or investigatory body."[105]

> b.   "Mr. Epstein did face some legal difficulties relating to matters alleged to have taken place seven years ago exclusively within Palm Beach County, Florida.  The Palm Beach County Sheriff's Office and the Palm Beach County State Attorney commenced a local investigation of Mr. Epstein in 2005 relating to such matters.  An investigation was also conducted by the United States Attorney's Office for the Southern District of Florida and the Federal Bureau of Investigation in 2007 relating to the same local matters investigated by the Palm Beach authorities.  The Federal investigation was discontinued in 2008 without the issuance of any Federal changes.  Nothing for which Mr. Epstein was investigated had any relation whatsoever to the business or industry of Mr. Epstein or the Application."[106]

> c.   "Mr. Epstein pleaded guilty to and was convicted of one count of solicitation of prostitution and one count of procuring prostitution of a person under the age of 18.  He served 13 months of an 18-month sentence in the Palm Beach County Jail, following by enhanced probation, which he completed over two years ago.  There

---

[103] VI-JPM-000032669–725 at 685.
[104] VI-JPM-000032669–725 at 701.
[105] VI-JPM-000032669–725 at 679.
[106] VI-JPM-000032669–725 at 723.

have been no similar allegations or charges of any misconduct by Mr. Epstein since that period of time seven years ago."[107]

d.  "Beginning in 2007, civil tort claims arising out of the same or similar matters alleged in the Palm Beach investigations, all alleged to have occurred over seven years ago, were commenced against Mr. Epstein.  All but one of these tort claims were commenced in Federal District Court for the Southern District of Florida, or in the Florida Circuit Court of the 15th Judicial Circuit in and for Palm Beach County.  All of the cases commenced against Mr. Epstein arising out of the same or similar alleged conduct have been settled.  More details can be provided as necessary upon request."[108]

46.     The application also disclosed that Mr. Epstein was the sole owner of Southern Trust and that he had been the sole owner of Financial Trust, which "ha[d] been an EDC beneficiary for the past 13 years."[109]

47.     Southern Trust's EDC application stated that the "client base of and the product provided by the Applicant differ markedly from those of [Financial Trust], hence the desire to create a new entity that will meet all of the requirements of the EDC."[110]  Despite this representation, the application does acknowledge that some Financial Trust "employees may be transferred to" Southern Trust.[111]  According to the application, Southern Trust was projecting annual revenues of $3–$7 million over the next 5 years.[112]

48.     The EDC held a public hearing on November 15, 2012, to consider the tax incentive application submitted by Southern Trust.[113]  On January 2013, the EDC Board met in executive session to discuss Southern Trust's application.  The meeting minutes indicate the following:

a.  It was expected Southern Trust would receive approximately $1 million in tax benefits per year over the next 5 years.[114]

---

[107] VI-JPM-000032669–725 at 723.
[108] VI-JPM-000032669–725 at 723.
[109] VI-JPM-000032669–725 at 683.
[110] VI-JPM-000032669–725 at 682.
[111] VI-JPM-000032669–725 at 682. See also, Benjamin Deposition, 71:13–18 ("Mr. Jeffrey Epstein stated that they were closing out Financial Trust, or they had closed Financial Trust, and that some of the employees would be transferred over to the new company.").
[112] VI-JPM-000032669–725 at 712.
[113] Exhibit 1 to the Complaint, ¶ 158.
[114] VI-JPM-000018551–571 at 557.

    b.   The projected cost / benefit ratio was $1 to $3.9 – indicating that for every $1 of tax benefits given to Southern Trust, USVI was expected to receive $3.90 of economic benefits.[115]

    c.   This projected ratio was described as "favorable."[116]

    d.   The EDC Board approved a 10-year award to Southern Trust which included a 90% exemption from income taxes and a 100% exemption from gross receipts taxes, excise taxes, and withholding taxes in USVI.[117]

49.    On January 31, 2013, the EDC sent a letter to Southern Trust's attorney indicating that the EDC was recommending to the Governor of USVI a grant of benefits.[118]  On February 27, 2013, the EDC sent a letter to then Governor de Jongh indicating its recommendation to grant Southern Trust's award.[119]  Governor de Jongh approved the award on May 31, 2013.[120]

50.    Fiscal year ending December 31, 2013, was Southern Trust's first year in the EDC program.  In October 2014, Southern Trust submitted its annual reporting package to the EDC.[121] The 2013 reporting package indicated the following:

    a.   Southern Trust reported $51 million of Gross Sales Eligible for Tax Benefits.[122]

    b.   Southern Trust reported $50 million of Ordinary Business Income on its 2013 tax return.[123]

    c.   Southern Trust paid $545,000 of wages and benefits to seven employees.[124]

    d.   Southern Trust "paid" $2.1 million of income taxes to USVI (this was Mr. Epstein's net tax exposure from his 100% ownership of Southern Trust).[125]

    e.   Southern Trust received $21.8 million of tax benefits in 2013 due to the EDC award.[126]

---

[115] VI-JPM-000018551–571 at 560.
[116] VI-JPM-000018551–571 at 561.
[117] VI-JPM-000018551–571 at 568–571; "Tax Incentives: How Do They Work?" *United States Virgin Islands Economic Development Authority*, available at https://usvieda.org/residents/grow/edc-tax-incentives/tax-incentives-how-do-they-work.
[118] ESTATE_JPM014824–828 at 824.
[119] ESTATE_JPM020521–527 at 523–527.
[120] ESTATE_JPM020521–527 at 527.
[121] VI-JPM-000007315–406 at 315.
[122] VI-JPM-000007315–406 at 319.
[123] VI-JPM-000007315–406 at 319.
[124] VI-JPM-000007315–406 at 315, 319.
[125] VI-JPM-000007315–406 at 315.
[126] VI-JPM-000007315–406 at 315.

51.     The EDC analyzed the actual 2013 cost / benefit of Southern Trust's EDC award.  The EDC's 2013 cost / benefit analysis produced in discovery indicated:

     a.   Southern Trust paid $545,000 to 7 employees.[127]

     b.   USVI received $166,000 of employment taxes.[128]

     c.   Southern Trust made $221,000 of local purchases.[129]

     d.   Total "Taxes & Duties Paid" by Southern Trust to USVI were $2.1 million.[130]

     e.   Thus, the economic benefits received by USVI in 2013 totaled $3.1 million.[131]

     f.   In return, EDC's "cost" $21.8 million of tax breaks provided to Southern Trust.[132]

52.     As a result, rather than generating the forecasted cost / benefit ratio of $1 of cost for every $3.90 in benefits received, Southern Trust's award resulted in an actual cost / benefit ratio of $1 of cost for every $0.14 of benefits in 2013.[133]

53.     The fiscal year ending December 31, 2014, was Southern Trust's second year in the EDC program.  In October 2015, Southern Trust submitted its annual reporting package to the EDC.[134] The 2014 reporting package indicated the following:

     a.   Southern Trust reported $70 million of Gross Sales Eligible for Tax Benefits.[135]

     b.   Southern Trust reported $67.5 million of Ordinary Business Income on its 2014 tax return.[136]

     c.   Southern Trust paid $791,000 of wages and benefits to eight employees.[137]

     d.   Southern Trust "paid" $6.1 million of income taxes to USVI (this was Mr. Epstein's net tax exposure from his 100% ownership of Southern Trust).[138]

     e.   Southern Trust received $37.9 million of tax benefits due to the EDC award.[139]

54.     The EDC analyzed the actual 2014 cost / benefit of Southern Trust's EDC award.  The EDC's 2014 cost / benefit analysis produced in discovery indicated:

---

[127] VI-JPM-000093347, tab *Employment & Taxes*.
[128] VI-JPM-000093347, tab *Employment & Taxes*.
[129] VI-JPM-000093347, tab *Procurement*.
[130] VI-JPM-000093347, tab *Employment & Taxes*.
[131] VI-JPM-000093347, tab Employment & Taxes and Procurement.
[132] VI-JPM-000093347, tab *Benefits*.
[133] VI-JPM-000093347, tab *Benefits*.
[134] VI-JPM-000007407–473 at 407.
[135] VI-JPM-000007407–473 at 410.
[136] VI-JPM-000007407–473 at 410.
[137] VI-JPM-000007407–473 at 407, 410.
[138] VI-JPM-000007407–473 at 407.
[139] VI-JPM-000007407–473 at 407.

    a.   Southern Trust paid $791,000 to 8 employees.[140]

    b.   USVI received $446,000 of employment taxes.[141]

    c.   Southern Trust made $550,000 of local purchases.[142]

    d.   Total "Taxes & Duties Paid" by Southern Trust to USVI were $6.1 million.[143]

    e.   Thus, the economic benefits received by USVI in 2014 totaled $7.9 million.[144]

    f.   In return, the EDC's "cost" was $37.9 million of tax breaks provided to Southern Trust.[145]

55.    As a result, rather than generating the forecasted cost / benefit ratio of $1 of cost for every $3.90 in benefits received, Southern Trust's award resulted in an actual cost / benefit ratio of $1 of cost for every $0.21 in benefits in 2014.[146]

56.    Southern Trust's 2015 annual reporting package reflected similar results.  The 2015 reporting package indicated the following:

    a.   Southern Trust reported $55 million of Gross Sales Eligible for Tax Benefits.[147]

    b.   Southern Trust reported $52.8 million of Ordinary Business Income on its 2015 tax return.[148]

    c.   Southern Trust paid $907,000 of wages and benefits to eight employees, including Mr. Epstein.[149]

    d.   Southern Trust "paid" $4.2 million of income taxes to USVI (this was Mr. Epstein's net tax exposure from his 100% ownership of Southern Trust).[150]

    e.   Southern Trust received $20.2 million of tax benefits due to the EDC award.[151]

57.    The EDC appears to have attempted to analyze the actual 2015 cost / benefit of Southern Trust's EDC award.  However, the 2015 cost / benefit spreadsheet produced in discovery is

---

[140] VI-JPM-000037451, tab *Employment & Taxes*.
[141] VI-JPM-000037451, tab *Employment & Taxes*.
[142] VI-JPM-000037451, tab *Procurement*.
[143] VI-JPM-000037451, tab *Employment & Taxes*.
[144] VI-JPM-000037451, tabs *Employment & Taxes* and *Procurement*.
[145] VI-JPM-000037451, tab *Benefits*.
[146] VI-JPM-000037451, tab *Benefits*.
[147] VI-JPM-000007474–533 at 477.
[148] VI-JPM-000007474–533 at 477.
[149] VI-JPM-000007474–533 at 474, 477.
[150] VI-JPM-000007474–533 at 474.
[151] VI-JPM-000007474–533 at 474.

incomplete and contains information that is contradicted by Southern Trust's 2015 reporting package.  For example:

  a.  The spreadsheet indicates that Southern Trust had "Gross Sales" of only $11.5 million, compared to $55 million of Gross Sales reported on the tax return.[152]

  b.  The spreadsheet indicates that Southern Trust paid no taxes or duties in 2015, compared to $4.2 million of reported taxes paid in the reporting package.[153]

58.     In 2016–2018, Southern Trust continued to receive benefits from the EDC program, but at much lower levels due to a significant decline in Southern Trust's revenues and profitability. See **Exhibit 1**.

## III.   Summary of Findings and Opinions with Respect to USVI Tax Benefits

59.     Between 1999 and 2018, USVI's EDC awarded Financial Trust and Southern Trust more than $300 million in tax benefits.  For those years in which Mr. Epstein's companies reported positive ordinary business income, the cost / benefit ratio of tax benefits to Financial Trust and Southern Trust was far lower than EDC's target ratio, as discussed further below:[154]

---

[152] VI-JPM-000037452, tab *Employment & Taxes*; VI-JPM-000007474–533 at 477.

[153] VI-JPM-000037452, tab *Employment & Taxes*; VI-JPM-000007474–533 at 474.

[154] Cost / benefit ratios are only shown for years in which Financial Trust or Southern Trust reported positive ordinary business income on the companies' Form 1120S.  In 2016–2018, Southern Trust continued to receive benefits from the EDC program, but at much lower levels due to a significant decline in Southern Trust's revenues and profitability. In addition, I noted that the 2015 cost / benefit spreadsheet is incomplete and contains information that is contradicted by Southern Trust's 2015 reporting package.  In the September 7, 1999 Executive Session, Mr. Francois Dominique, a Special Assistant in the IDC, stated that "one to 1.2" was accepted by the IDC "over the years" as "an acceptable ratio."  See VI-JPM-000018885–917 at 885, 889.  Governor Albert Bryan stated in his June 6, 2023 deposition that "a good return on investment from that tax benefits [USVI was] given" was "[d]efinitely at least one and a half, two, would be good."  See Deposition of Governor Albert Bryan, Jr., June 6, 2013 ("Bryan Deposition"), 47:9–20.  I present the lower of the target cost / benefit ratios for purposes of this table.  Actual cost / benefit ratios for Financial Trust and Southern Trust as listed in the *Benefits* tab of EDC's cost-benefit analysis spreadsheets.  See VI-JPM-000032792; VI-JPM-000032774; VI-JPM-000032775; VI-JPM-000032776; VI-JPM-000032777; VI-JPM-000032778; VI-JPM-000032779; VI-JPM-000032780; VI-JPM-000093347; VI-JPM-000037451; VI-JPM-000037452; VI-JPM-000020120; VI-JPM-000020331; VI-JPM-000093348.

| Year | Target Cost / Benefit Ratio | Cost / Benefit Ratio Reported by EDC |
|------|------------------------------|--------------------------------------|
| 1999 | 1.0 to 1.2 | 0.04 |
| 2000 | 1.0 to 1.2 | 0.29 |
| 2001 | 1.0 to 1.2 | 0.05 |
| 2002 | 1.0 to 1.2 | 0.12 |
| 2003 | 1.0 to 1.2 | 0.01 |
| 2004 | 1.0 to 1.2 | 0.02 |
| 2005 | 1.0 to 1.2 | 0.01 |
| 2006 | 1.0 to 1.2 | 0.02 |
| 2013 | 1.0 to 1.2 | 0.01 |
| 2014 | 1.0 to 1.2 | 0.01 |
| 2015 | 1.0 to 1.2 | 0.02 |
| 2016 | 1.0 to 1.2 | 0.38 |
| 2017 | 1.0 to 1.2 | 0.60 |
| 2018 | 1.0 to 1.2 | 1.54 |

## A.    USVI Gave Mr. Epstein Over $300 Million in Tax Breaks

60.    During the period 1999 through 2018, USVI's IDC/EDC gave Mr. Epstein over $300 million of tax breaks associated with his 100% ownership of Financial Trust and Southern Trust to incentivize him to conduct business in USVI.  Attached as **Exhibit 1** is a summary of: (i) the taxes and duties paid by Financial Trust and Southern Trust to USVI; and (ii) the reported value of the tax exemptions awarded to Mr. Epstein.  According to the tax returns submitted by Mr. Epstein's companies to the IDC/EDC each year, Mr. Epstein paid only $40.4 million of income taxes on over $567 million of Ordinary Business Income earned by Financial Trust and Southern Trust during the period 1999–2018.  This indicates that as a result of the IDC/EDC awards, Mr. Epstein's net effective income tax rate on $567 million of income earned by his USVI-based companies was only 7.1%.[155]

## B.    Giving Mr. Epstein $300 Million in Benefits Made No Economic Sense

61.    As discussed above, based on the methodology used by the IDC in 1999, it was projected that Financial Trust would generate a cost / benefit ratio of 1 to 1.3.[156]  This indicates that for

---

[155] $40,385,368 (income taxes paid 1999–2018) *divided by* $567,899,953 (ordinary business income 1999–2018) *equals* approximately 7.1%.  See **Exhibit 1**.
[156] VI-JPM-000018885–917 at 888–889.

every $1.00 of tax breaks that was to be given to Financial Trust (and Mr. Epstein as he was the sole owner of this pass-through company), USVI expected to receive $1.30 of economic benefits in the form of increased local employment, local tax receipts, and local investment.

62.     However, Financial Trust's actual cost / benefit was significantly below the IDC's projections and its so-called "acceptable ratio" of $1 to $1.20.[157]  As reflected in Financial Trust's annual reporting packages and the available EDC cost / benefit spreadsheets produced in discovery, Financial Trust's actual cost / benefit ratios in 1999–2001 were:

   a.   1999 ratio = $1 to $0.04;[158]

   b.   2000 ratio = $1 to $0.29;[159] and

   c.   2001 ratio = $1 to $0.05.[160]

63.     Each of these ratios calculated by the EDC were well below: (i) the forecasted ratio of $1 to $1.30 that was discussed by the committee at the time it was considering Financial Trust's application and (ii) the "acceptable" ratio of $1 to $1.20 discussed by the committee.

64.     Southern Trust's actual cost / benefit was similarly also significantly below the EDC's projections and its so-called "acceptable ratio" of $1 to $1.20.  For example, per the EDC's cost / benefit calculations produced in discovery, the actual cost / benefit in 2014 was only $1 to $0.21.[161]

65.     This ratio was well below: (i) the projected ratio that the EDC discussed when it decided to approve Southern Trust's award; (ii) the $1.00 to $1.20 "acceptable" level discussed by the EDC in 1999;[162] and (iii) the $1.00 to $0.50 "unfavorable" level discussed by the EDC in 2013.[163]

66.     Thus, from 1999 to 2018, neither Financial Trust nor Southern Trust came close to generating sufficient benefits to USVI to offset the tax incentives granted to Mr. Epstein and these companies let alone reach the thresholds the EDC considered "acceptable."  Based on the record, the EDC was aware of Mr. Epstein's companies' multi-year history of poor cost / benefit performance yet agreed to extend Financial Trust's certificate in 2009 and granted Southern Trust a new certificate in 2013 regardless.

---

[157] VI-JPM-000018885–917 at 889.
[158] VI-JPM-000032792, tab *Benefits*.
[159] VI-JPM-000032774, tab *Benefits*.
[160] VI-JPM-000032775, tab *Benefits*.
[161] VI-JPM-000037451, tab *Benefits*.
[162] VI-JPM-000018885–917 at 889.
[163] VI-JPM-000018918–926 at 920.

### C.    USVI Failed to Ask Questions or Develop an Appropriate Basis to Support Extending the $300 Million in Benefits

67.    USVI's EDC did not properly evaluate Mr. Epstein's applications for benefits and failed to ask him even the most basic questions based on information that was uniquely available to it about his companies.

68.    In awarding hundreds of millions of dollars in benefits to Mr. Epstein, USVI failed to perform even perfunctory examination of information that was uniquely available to it and ignored its own calculations that Mr. Epstein's companies were not conferring the promised economic benefits on USVI.  In 2009 and 2013, the awards to Mr. Epstein were ultimately approved by Governor de Jongh.  He approved these benefits while his wife, First Lady Cecile de Jongh, was the office manager for Mr. Epstein's companies and received a salary, bonuses, and other benefits, including tuition for their children, from Mr. Epstein.[164]  Based on my review of the record, I have not seen any evidence that USVI or the EDC employed any procedure to manage or investigate the real and/or perceived conflict of interest by Governor de Jongh's approval of tax benefits that directly benefitted his family.[165]  Governor de Jongh testified that no such measures were put in place.[166]

69.    Moreover, based on my review of the record, it does not appear that the EDC exercised their unique ability to investigate or ask questions of Mr. Epstein and his companies during hearings evaluating his businesses.  In 1999, when testifying in front of the EDC on behalf of Financial Trust Company, Mr. Epstein made exaggerated statements, including that "until only ten years ago . . . you actually had to be in New York City to do financial business."[167]  He also testified "my core business frankly is me"[168] but also stated he would "have at least ten employees at a minimum."[169]  The EDC did not ask for the names of Mr. Epstein's clients, nor why his statements were internally inconsistent and he needed ten additional employees to

---

[164] Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A, Case 1:22-cv-10904-JSR, JPMorgan Chase Bank, N.A.'s Opposition to USVI's Motion to Strike Affirmative Defenses, May 23, 2023 ("JPMC Opposition to Motion to Strike"), Exhibit 23, ESTATE_JPM024371; JPMC Opposition to Motion to Strike, Exhibit 25, ESTATE_JPM024548; JPMC Opposition to Motion to Strike, Exhibit 26, ESTATE_JPM024549; Deposition of Governor John de Jongh, May 30, 2023 ("John de Jongh Deposition"), 136:19–138:22; Cecile de Jongh Deposition, 10:20–22; 76:3–78:12.
[165] Bryan Deposition, 133:23–134:2.
[166] John de Jongh Deposition, 162:19–164:1.
[167] VI-JPM-000016248–270 at 253.
[168] VI-JPM-000016248–270 at 264.
[169] VI-JPM-000016248–270 at 256.

operate an investment advising business for which he would be the only advisor.  In addition, when Financial Trust applied for a renewal of EDC benefits for Financial Trust in February 2009, Mr. Indyke appeared on behalf of the company because Mr. Epstein was incarcerated in the United States.[170]  Based on my review of the record, the EDC did not ask where Mr. Epstein was, about his incarceration, or how he could continue to provide "a broad range of financial, economic and business consulting services" from jail.[171]  Moreover, the EDC did not ask about any of the company's clients.  Again, based on my review of the record, I am not aware if they discussed these topics in private or in the executive session.

70.      USVI also did not conduct checks on Financial Trust during the renewal period.  A January 2009 EDC due diligence report states that Mr. Epstein was registered as a financial services firm/investment advisory with the Commodity Futures Trading Commission ("CFTC"), the National Association of Securities Dealers ("NASD"), and the National Futures Association ("NFA").  Yet, I am not aware of anything in the record that indicates the EDC verified this.  In July 2011, a researcher with the Daily Beast confirmed that Financial Trust was never registered with any of those entities.[172]

71.      Nor does the record reflect that the EDC did anything to review—or even acknowledge— Mr. Epstein's criminal history during their granting of benefits to him despite it being laid out and included in his application.  In fact, the Chairman of the EDC from 2007 to 2014, current USVI Governor Albert Bryan, Jr., testified he was not aware of news in 2011 that Mr. Epstein had settled more than two dozen lawsuits and claims against him by teenagers who say they gave him sexually charged massages and/or sex in exchange for money despite the fact that this information was publicly available at the time the EDC was voting to renew tax benefits for Financial Trust.[173]  Mr. Bryan testified that the EDC was generally *less* concerned about the ethics and integrity of the owner of a business receiving EDC benefits if the business was up for renewal, as Financial Trust was after Mr. Epstein's arrest, because the EDC had a track record of

---

[170] VI-JPM-000016200–205 at 202; Associated Press, "A Timeline of the Jeffrey Epstein, Ghislaine Maxwell Scandal," *U.S. News & World Report*, June 28, 2022, available at https://www.usnews.com/news/politics/articles/2022-06-28/a-timeline-of-the-jeffrey-epstein-ghislaine-maxwell-scandal.
[171] VI-JPM-000016200–205 at 202.
[172] VI-JPM-000033049–063 at 051. Note that the NFA administers registration and examination of intermediaries on behalf of the CFTC.  See "Be Smart: Check Registration & Backgrounds Before You Trade," *CFTC*, https://www.cftc.gov/check.
[173] Bryan Deposition, June 6, 2013, 74:7–25; 75:1–13.

how the beneficiary had performed in the past to rely upon.[174]   However, based on my review of the record, Mr. Epstein's "track record" on performance was in fact "unfavorable."

72.      As discussed above, Financial Trust submitted an application for an extension in January 2009.[175]   On April 27, 2009, the EDC held an Executive Session to discuss the application during which Financial Trust's historically low "unfavorable" cost / benefit performance was discussed.[176]   Moreover, it was noted that the application stated that Financial Trust planned to make $4.93 million in expenditures, but it was anticipated that USVI would "forego nearly $40 million in tax revenues over the same five-year period."[177]   While this comparison "created some concerns,"[178] and there was further discussion regarding needing "support for the position" that they were "giving up more than [they] are getting,"[179] the motion was tabled until the next meeting in May 2009.[180]   During the May 2009 Executive Session, after agreeing to certain additional commitments from Financial Trust that did not materially change the company's forecasted cost / benefit performance, the EDC approved Financial Trust's application for a five year extension.[181]

73.      In 2012, Mr. Epstein submitted an EDC application for his new USVI-based company Southern Trust.[182]   Southern Trust's application flagged that Mr. Epstein was the sole owner of Financial Trust;[183] acknowledged that Mr. Epstein had been arrested and had been the subject of a government investigation;[184] and noted that some Financial Trust employees "may be transferred to" Southern Trust.[185]   Southern Trust's application claimed that Mr. Epstein and Financial Trust made "significant contributions to the [USVI] economy over the past 13 years."[186]   Southern Trust's EDC application also included a detailed appendix discussing his 2006 arrest, 2008 criminal conviction, and related civil tort claims.[187]

---

[174] Bryan Deposition, 38:6–13 (emphasis added).
[175] VI-JPM-000018918–926 at 920.
[176] VI-JPM-000018918–926 at 920.
[177] VI-JPM-000018918–926 at 920.
[178] VI-JPM-000018918–926 at 920.
[179] VI-JPM-000018918–926 at 921.
[180] VI-JPM-000018918–926 at 924.
[181] VI-JPM-000018934–945 at 944–945.
[182] VI-JPM-000032669–725.
[183] VI-JPM-000032669–725 at 679.
[184] VI-JPM-000032669–725 at 679.
[185] VI-JPM-000032669–725 at 682.
[186] VI-JPM-000032669–725 at 683.
[187] VI-JPM-000032669–725 at 723.

74.     Mr. Epstein testified in front of the EDC in November 2012 that Southern Trust would "organize[] mathematical algorithms" to create "computer generated solutions for medical problems" but also that it would "search[] the world's databases for what is the best investments . . . in a nanosecond."[188]  Mr. Epstein also testified that he needed "high level mathematicians" to "help program the computers" until the "computers themselves will help redesign some of the computer programs" and become "almost like a chemistry lab in the computer."[189]  Based on my review of the record, the EDC did not investigate or question Mr. Epstein regarding the reasonableness or feasibility of these claims.

75.     Mr. Epstein further testified that he would make money because "[s]ome will be outright purchases, probably the simple ones.  There will be leases for longer runs and most people will be coming back.  Sometime[s] if you want to know – just like a search engine in answer to one question.  So you get paid for that one piece of advice, ongoing advice or exclusive rights like drug companies might want to have for a specific answer."[190]  He also used an anecdote about French fries to explain how his business would work: "[W]hen you go in your computer it might target you for a specific type of advertisement because it knows that after you've been searching for French fries.  So they mine all the people in the area who is looking for French fries and said, you know, Randolph seems to like that.  So we'll send him a message."[191]  Mr. Epstein proposed to do genetic sequencing in the Virgin Islands to obtain medical data for his database "because it's so isolated" that "[y]ou are able to get much better data than ever before."[192]

76.     Based on my review of the record, the EDC did not press Mr. Epstein on any of these assertions or ask Mr. Epstein for any detailed information about Southern Trust's mission or plans.  For example, the EDC did not question Mr. Epstein about his purportedly established algorithms, names, and qualifications of the people he intended to employ to develop his proprietary DNA database, names of potential clients, or how he would obtain and analyze DNA information.  Furthermore, the EDC did not ask how Mr. Epstein would conduct genetic sequencing in USVI, nor how he planned to use that genetic sequencing to generate solutions to medical problems.  The EDC did ask if there were other companies attempting similar

---

[188] VI-JPM-000005898–908 at 900.
[189] VI-JPM-000005898–908 at 901, 902.
[190] VI-JPM-000005898–908 at 903.
[191] VI-JPM-000005898–908 at 902.
[192] VI-JPM-000005898–908 at 905.

endeavors, to which Mr. Epstein replied: "[t]here is a couple doing it in California.  Steve Jobs had a group that was trying to help him and it was a little too short."[193]  Based on my review of the record, the EDC asked no follow-up questions on this topic.

77.     Southern Trust's EDC application indicated that its business goal was to "build an extensive DNA database and develop a data mining platform" accessible via the Internet.[194] Southern Trust further claimed to be involved in "biomedical and financial informatics."[195] According to USVI's own forensic accounting expert, Mr. Jorge Amador, Southern Trust was not in fact performing work related to its stated purpose.[196]  Mr. Amador's opinion is based on a "review of Southern Trust's financial documents," these documents were filed with the EDC on a yearly basis.[197]  The documents Mr. Amador relied upon contain the same information that existed at the time of Southern Trust's application and the issues in them should have been flagged by the EDC.  Nevertheless, EDC did not raise any concerns and continued to provide benefits to Southern Trust until after Mr. Epstein was arrested in 2019.[198]  Indeed, even after Mr. Epstein's 2019 arrest, the EDC still did not take steps to terminate Mr. Epstein's benefits.  It was only after Mr. Epstein's death that his lawyer's came to EDC and themselves requested termination of benefits.[199]

78.     Despite Financial Trust's "unfavorable" cost / benefit performance from 1999 to 2009 and the expectation of continued poor performance, the EDC nevertheless decided to grant Financial Trust a five-year extension on its benefits in 2009 and then went on to grant additional economic benefits to Southern Trust from 2013 to 2018.

---

[193] VI-JPM-000005898–908 at 905, 906.
[194] VI-JPM-000032669–725 at 681.
[195] VI-JPM-000005898–908 at 899.
[196] Expert Report of Jorge Amador, June 16, 2023 ("Amador Report"), p. 72–73.
[197] Amador Report, p. 73–75.
[198] Associated Press, "A Timeline of the Jeffrey Epstein, Ghislaine Maxwell Scandal," *U.S. News & World Report*, June 28, 2022, available at https://www.usnews.com/news/politics/articles/2022-06-28/a-timeline-of-the-jeffrey-epstein-ghislaine-maxwell-scandal.
[199] Benjamin Deposition, 190:11–192:21.

**D.    USVI and EDC's Ongoing Monitoring of Financial Trust and Southern Trust Did Not Support its Continuation of Benefits to Epstein Over a Twenty-Year Period**

79.    Based on my review of the record, despite being a government entity with the ability to conduct audits and investigations, the EDC and USVI made only cursory attempts to monitor Financial Trust and Southern Trust after granting them EDC tax benefits.  The EDC Compliance Officer assigned to Mr. Epstein's entities, Ms. Sandra Bess, did not prepare the first compliance report for that business until April 2008, nine years after Financial Trust first became an EDC beneficiary in April 1999,[200] even though compliance reports were required annually.[201] Moreover, she did not prepare the second compliance report for Financial Trust until January 2014, almost six years after the first report.[202]

80.    During this process, Ms. Bess testified that she dealt with Ms. De Jongh, who served as the office manager of Financial Trust and Southern Trust.[203]  Ms. Bess testified that, at the time of these EDC site visits, Ms. De Jongh was also the wife of the Governor of USVI, and therefore was the acting First Lady of the Virgin Islands.[204]  Ms. Bess did not attempt to verify whether Southern Trust was engaged in the business activities they purported to perform during site visits; instead, she chose to rely on information in the annual report provided by Mr. Epstein and his staff.[205]  For instance, Ms. Bess did not do anything to verify that Southern Trust's alleged clients, or the "extensive DNA database" it was developing were real; instead, she chose to rely on representations of Southern Trust's employees.[206]

81.    Indeed, the inconsistencies in the reports Financial Trust and Southern Trust submitted to the EDC did not prompt the EDC compliance department to review any information outside of the information Mr. Epstein provided to verify that Mr. Epstein was in fact a resident of the Virgin Islands, as was required to be an EDC beneficiary.  This was true even while Mr. Epstein purported to be a USVI resident at the same time he was incarcerated in Florida.[207]  The EDC and USVI also ignored contradictory representations, including testimony that Mr. Epstein's business

---

[200] Deposition of Sandra Bess, May 18, 2023 ("Bess Deposition"), 24:8–10, 54:1–17.
[201] Bess Deposition, 15:12–13.
[202] Bess Deposition, 70:5–15; Bess Deposition, Exhibit 6.
[203] Bess Deposition, 36:12–23.
[204] Bess Deposition, 36:12–23.
[205] Bess Deposition, 40:19–41: 9.
[206] Bess Deposition, 46:2–47:15.
[207] Bess Deposition, 55:22–58:12.

Southern Trust was a new venture that would take some time to get up and running,[208] juxtaposed with his reported first-year sales of $51 million.[209]

82.     The EDC also ignored the fact that Financial Trust did not meet the required contributions to charity, scholarships, and local co-op marketing.  As a condition of the award, the IDC required that Financial Trust contribute the greater of $45,000 or 1% of Financial Trust's gross receipts to charity, scholarships, and local co-op marketing.[210]  According to Financial Trust's 1999 application, Financial Trust forecasted only average total revenues of $4.5 million per year over years 1–5.[211]  Thus, 1% of Financial Trust's forecasted gross receipts/revenues would be $45,000 per year.

83.     As discussed above, Financial Trust's actual revenues during the award period significantly exceeded the forecasted revenues reflected in its application.  In its application, Financial Trust projected its revenues would be only $12 million in years 1–3.[212]  However, Financial Trust's actual revenues in 1999–2001 were significantly higher:

     a.  In 1999, Financial Trust reported $43.0 million of Gross Sales Eligible for Tax Benefits.[213]

     b.  In 2000, Financial Trust reported $64.4 million of Gross Sales Eligible for Tax Benefits.[214]

     c.  In 2001, Financial Trust reported $46.8 million of Gross Sales Eligible for Tax Benefits.[215]

84.     As a result, in order for Financial Trust to meet the IDC's required charitable contribution of 1% of gross receipts, Financial Trust would have needed to make donations to USVI charities of over $1.5 million in 1999–2001.  However, EDC cost / benefit spreadsheets show that Financial Trust failed to meet this requirement.  For example: (i) in 1999, Financial Trust no charitable contributions;[216] (ii) in 2000, Financial Trust reported only $189,500 in charitable

---

[208] Bryan Deposition, 85:6–8; VI-JPM-000005898–908 at 902.
[209] VI-JPM-000007315–406 at 319.
[210] VI-JPM-000018885–917 at 916.
[211] VI-JPM-000018359–387 at 380.
[212] VI-JPM-000018359–387 at 380.
[213] VI-JPM-000012940–956 at 942.
[214] VI-JPM-000012922–939 at 924.
[215] VI-JPM-000012885–921 at 887.
[216] VI-JPM-000032792, tab *Contributions.*

contributions (approximately 0.3% of Gross Receipts);[217] and (iii) in 2001, Financial Trust reported only $29,520 in charitable contributions (approximately 0.06% of Gross Receipts).[218]  I have seen nothing in the record to explain why the IDC/EDC failed to require Financial Trust to comply with its requirement to donate 1% of Gross Receipts each year to USVI charities.

85.     The EDC also failed to investigate the criminal allegations against Mr. Epstein, allegations that major news outlets frequently covered, and which were included in his Southern Trust application.  After Mr. Epstein was arrested in 2006, upon determining that the circumstances underlying the arrest were not "effectively connected" to Financial Trust nor "in the jurisdiction in the Virgin Islands," the EDC failed to generate a report, investigate the circumstances of the arrest, or perform any other type of investigation.[219]  Even after Mr. Epstein's arrest, EDC compliance employees testified they did not perform any additional investigation into Mr. Epstein because the charges against Mr. Epstein were "irrelevant to the certificate that was issued."[220]

86.     In the same vein, Southern Trust's application proposed that certain Financial Trust employees would also work for Southern Trust,[221] yet it provided no explanation for why the employees of a financial services company (Financial Trust), which at the time included the Governor's wife, Ms. De Jongh, would be qualified to work for a database company.  Based on the record, the EDC also did not notice that, of Southern Trust's $184 million in revenue from 2013 to 2017, $158 million came from a single customer—Mr. Leon Black.[222]  There is no explanation for how his large payments were in any way connected to sales based on a DNA database.

87.     In a Complaint filed against the Epstein Estate, USVI government has subsequently disclosed a number of additional warning signs that could and should have been discovered and addressed by the EDC during its monitoring of Mr. Epstein's companies, including:

> a.   Individuals supposedly employed by Southern Trust allegedly performed other personal services for Mr. Epstein.  Though he was reported by Southern Trust to

---

[217] VI-JPM-000032774, tabs *Contributions* and *Employment & Taxes.*
[218] VI-JPM-000032775, tabs *Contributions* and *Employment & Taxes.*
[219] Bryan Deposition, 22:4–10; 23:17–22.
[220] Bess Deposition, 26:15-24.
[221] VI-JPM-000032669–725 at 682.
[222] See Amador Report, p. 74, fn. 177.

be resident of the Virgin Islands, the network administrator/IT manager was issued a Florida driver's license which listed an address in Miami.  Further, the administrator allegedly served as Mr. Epstein's driver and picked up luggage and cargo from Mr. Epstein's private planes on his behalf.[223]

b.  "Another executive assistant lived at 301 E, 66th Street, Apartment 11B, New York, New York.  [Mr.] Epstein's address book lists various units in this building as providing 'Apt for models' and she is publicly identified as a model."[224]

a.  "During several time periods, Southern Trust Company affirmed to EDC that it had no employees who were non-residents, even though it employed non-residents."[225]

b.  USVI's complaint concludes that "it is clear that Southern Trust Company did not perform the 'informatics' business represented to the EDC and could not have generated the business income attributable to that business. Instead, upon information and belief, Southern Trust Company existed to secure tax benefits for Mr. Epstein, to employ individuals associated with the Epstein Enterprise, and to provide a source of income to support his criminal activities and properties in the Virgin Islands."[226]

88.    These issues identified by USVI in its complaint against the Epstein Estate are the sorts of facts that can easily be learned through basic checks and questions and should all have been discoverable by the EDC and USVI earlier.

> **E.    The Lack of An Economic Rationale or Effort to Develop an Appropriate Basis For The $300 Million in Benefits Suggests Other Factors Influenced The USVI's Grants**

89.    As discussed above, the goal of the EDA tax benefit program is to "drive growth, diversity, and employment in USVI" and USVI's economy.[227]   Consistent with that mission, the EDC Applications Division staff were trained to analyze the amount of tax exemptions offered in

---

[223] VI-JPM-000003873–981 at 895.
[224] VI-JPM-000003873–981 at 895.
[225] VI-JPM-000003873–981 at 895.
[226] VI-JPM-000003873–981 at 896.
[227] Deposition of Kenneth Mapp, May 24, 2023, 21:9–13.

relation to economic development benefits brought to USVI.[228]   Again, the EDC considered a cost / benefit ratio of 1 to 1.2 to be "an acceptable ratio."[229]

90.    Based on my review of the record, the EDC was aware that the cost-benefit ratios for Financial Trust fell well short of the EDC's stated goals.  In 1999, for every dollar of tax breaks that USVI gave to Financial Trust, USVI received only $.04 in economic benefits.[230]  In 2000, for every $1 of cost (tax breaks given away to Financial Trust), USVI received only $0.29 of benefits (taxes received, local employment, and local purchases).[231]  In 2001, for every $1 of cost (tax breaks given away to Financial Trust), USVI received only $0.05 of benefits.[232]  The EDC Board recognized this poor performance when it deliberated whether to extend EDC benefits to Financial Trust in 2009, noting that the cost / benefit of Financial Trust's request seemed "very unfavorable."[233]

91.    Moreover, granting EDC benefits to Southern Trust also failed to meaningfully spur investment and growth in USVI.  For example, in 2014, Southern Trust's award resulted in an actual cost / benefit ratio of $1 of cost for every $0.21 in benefits.[234]  .

92.    The EDC's grant of tax benefits to Mr. Epstein's USVI-based companies was contrary to its mission and conferred only paltry benefits to the residents of USVI.  The lack of economic sense raises the obvious question of why these benefits continued to be granted to Mr. Epstein's companies over a twenty-year period.

93.    I have reviewed the Motion to Strike Opposition filed by JPMC in this case and the supporting exhibits.  That filing lays out facts suggesting an improper quid-pro-quo relationship between Mr. Epstein and certain high-placed USVI officials with influence over the benefits.  For example, First Lady de Jongh received a salary, bonuses, and tuition payments for her children from Financial Trust and Southern Trust.[235]  Her husband, the Governor, signed off on

---

[228] United States Virgin Islands Economic Development Authority, FY2012 Annual Report, p. 13.
[229] VI-JPM-000018885–917 at 889
[230] VI-JPM-000032792, tab *Benefits*.
[231] VI-JPM-000032774, tab *Benefits*.
[232] VI-JPM-000032775, tab *Benefits*.
[233] VI-JPM-000018918–926 at 920.
[234] VI-JPM-000037451, tabs Employment & Taxes, Procurement, and Benefits.
[235] JPMC Opposition to Motion to Strike, Exhibit 23, ESTATE_JPM024371; JPMC Opposition to Motion to Strike, Exhibit 25, ESTATE_JPM024548; JPMC Opposition to Motion to Strike, Exhibit 26, ESTATE_JPM024549; John de Jongh Deposition, 136:19–138:22; Cecile de Jongh Deposition, 10:20–22; 76:3–78:12.

the benefits.[236]  In addition, Mr. Epstein gave money from Southern Trust to fund USVI Department of Planning and Natural Resources ("DNPR"), an agency whose support I understand he needed to receive permits for his construction activities.[237]  He also funneled a $15,000 donation from Southern Trust to Ms. Plaskett and a $10,000 donation to the Mapp-Potter Inaugural committee.[238]

94.      In my experience as a fraud investigator, where benefits granted by public entities on a private individual make no economic sense to the public entity, private payments and benefits to key decisionmakers involved in dispersing those benefits raise questions with respect to conflicts of interest and as to why the transactions occurred at all.  Here, such payments from Mr. Epstein could provide a plausible explanation as to why the EDC continually extended more than $300M in benefits to Mr. Epstein and his USVI-based companies over a twenty-year period without proper examination and without a strong economic reason to do so.

## IV.      Summary of Findings with Respect to Certain USVI's Expert Opinions

### A.      USVI's Experts' Conclusions Regarding Revenue Earned by JPMC from Customers Potentially Associated with Mr. Epstein Are Contradictory and Not Supported by Appropriate Analysis

95.      USVI experts Mr. Jonathon Rusch and Mr. Amador each provide different calculations of the revenue they claim was generated by JPMC from accounts associated with Mr. Epstein, which they each claim partially demonstrates the significance of Mr. Epstein's relationship with JPMC.  Messrs. Rusch and Amador both appear to base their calculation on JPMorgan Chase Bank, N.A.'s Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories, Response to Interrogatory No. 19 ("Interrogatory Response 19").  JPMC's Interrogatory Response 19 includes exhibits that show revenue from the Bank's Private Bank segment, among others, for 2009–2019.[239]  It appears that their opinions are based on aggregating

---

[236] Cecile de Jongh Deposition, 77:5–14 ("Q: You couldn't get the tax exemptions without the governor personally signing off?  A: Correct.").
[237] JPMC Opposition to Motion to Strike, Exhibit 2, ESTATE_JPM015326–327.
[238] JPMC Opposition to Motion to Strike, Exhibit 14, ESTATE_JPM016163; JPMC Opposition to Motion to Strike, Exhibit 17, ESTATE_JPM015733.
[239] Jane Doe 1, Individually and on behalf of all others similarly situated, vs. JPMorgan Chase Bank, N.A., JPMorgan Chase Bank, N.A.'s Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories, May 30, 2023 ("Interrogatory Response 19").

the total amount of revenue for certain Private Bank clients (albeit it appears Messrs. Rusch and Amador included different accounts and different timeframes).[240]  However, neither Mr. Rusch nor Mr. Amador provide any additional analysis to support their opinions that the revenue figures they calculate are relevant to accounts associated with Mr. Epstein and/or that these figures demonstrate the "significance" of the relationship between Mr. Epstein and JPMC.

96.     Mr. Rusch claims that "JPMorgan derived significant revenue from its dealings with Epstein."[241]  It appears Mr. Rusch based his claim by aggregating the total revenues generated from each customer listed in Interrogatory Response 19 for 2009–2019, yielding a total of $36.3 million.[242]  As such, Mr. Rusch's analysis indicates that each customer listed on Interrogatory Response 19 is directly linked to JPMC's "relationship with [Mr.] Epstein."[243]  This supposition is improper and unsupported.  Indeed, Interrogatory Response 19 states that it includes customers that "Plaintiff considers associated with Jeffrey Epstein, an Epstein-Related Entity, or an Epstein-Related Individual," and that the "inclusion of an account [in Interrogatory Response 19] is not a concession by JPMC that the account is actually an account of Mr. Epstein, associated with him, or that of an Epstein-related individual or entity."[244]  Mr. Rusch did not provide any support or analysis to demonstrates the link between Mr. Epstein and the approximately 30 revenue-generating customers included in Interrogatory Response 19.  In addition to Mr. Epstein, at most, 19 of those customers had accounts for which Mr. Epstein had signature authority or owned.[245]

97.     Mr. Amador appears to support his claims based in part on aggregating the total revenues generated from approximately 20 customers listed in Interrogatory Response 19 for 2009–2019.[246]  Mr. Amador's analysis indicates that JPMC "earned over $8.1 million in revenue from Mr. Epstein and the Epstein-related Entities from 2009–2014."[247]  The revenue included in Interrogatory Response 19 does not equal the profit earned, or loss incurred, by JPMC for any

---

[240] Mr. Rusch includes 45 revenue-generating customers from 2009–2019 in his total of Epstein and Epstein-Related Entities; some of which I understand the Bank contends are not "Epstein-Related."  Mr. Amador includes 22 revenue-generating customers from 2009–2014 in his total of Epstein and Epstein Related Entities.
[241] Expert Opinion Report of Jonathan J. Rusch, June 16, 2023 ("Rusch Report") at 27.
[242] Rusch Report, p. 27.
[243] Rusch Report, p. 27.
[244] Interrogatory Response 19, pp. 3–4.
[245] Interrogatory Response 19, pp. 3–4.
[246] Amador Report, p. 17; Interrogatory Response 19, Exhibit A.
[247] Amador Report, p. 17.

given customer.  As a result, Mr. Amador's revenue figure does not include any cost JPMC
incurs in the normal course of business such as compensation expense and other costs associated
with customer maintenance.  For example, Mr. Amador does not consider JPMC's compensation
expense, which ranged from 54.4% to 59.6% of non-interest revenue from 2009–2014.[248]  Thus,
Mr. Amador bases his analysis on revenue figures instead of profit (or loss) figures.

98.     Based on the lack of analysis performed by Messrs. Rusch and Amador, it is unclear what
basis they have to conclude that the revenue figures they calculate are relevant to accounts
associated with Mr. Epstein or that those figures indicate Mr. Epstein had a "significant"
business relationship with the Bank.

### B.     Mr. Amador's Opinion Regarding Mr. Epstein's Account Structure is Unsupported

99.      Mr. Amador asserts in his Report that "the sheer volume of the bank accounts
identified…have no apparent business justification.  Rather, they are used as instruments to
shuffle funds to affiliated entities and individuals."[249]  He also states Mr. "Epstein maintained and
overly complex organizational structure involving multiple entities."[250]  To support these
assertions, Mr. Amador focuses on Mr. Epstein's eight JPMC accounts and ten separate entities
related to Mr. Epstein's six personal aircraft.[251]  He also cites the fact that Mr. Epstein was
paying aircraft expenses out of his personal account.[252]  However, Mr. Amador has not only
failed to consider the legitimate reasons (e.g., liability reasons) why it would be necessary to
maintain this account structure related to the aircraft, but he has failed to conduct analysis
regarding the "shuffling of funds" he asserts was taking place.

100.    First, Mr. Amador's description of accounts related to Mr. Epstein's aircraft only relates
to ten of the 59 Epstein-Related accounts he identifies.  He also fails to compare Mr. Epstein's
account structure at JPMC to any comparable entity or individual to establish that the "sheer

---

[248] JPMorgan Chase & Co., SEC Form 10-K for the fiscal year ended December 31, 2011, filed on February 29,
2012, p. 178; JPMorgan Chase & Co., SEC Form 10-K for the fiscal year ended December 31, 2014, filed on
February 24, 2015, p. 172.
[249] Amador Report, p. 18.
[250] Amador Report, p. 18.
[251] Amador Report, pp. 18–20.
[252] Amador Report, p. 22.

volume" of accounts has no apparent business justification.  Without such a benchmark, Mr. Amador's "analysis" lacks context and his opinion is unsupported and speculative.

101.    Second, Mr. Amador has not presented any analysis of any "shuffling of funds" between the aircraft-related accounts or any of Mr. Epstein's other accounts.  He merely points to the fact that Mr. Epstein utilized his personal JPMC account(s) to pay for some aircraft expenses.  Mr. Amador does not explain why this fact supports his opinion that Mr. Epstein's account structure was unusual, rendering his opinion baseless and speculative.

102.    Third, there are potential legitimate reasons why it is not unusual to have separate entities hold title to different aircraft.  For example, for liability purposes, it is best practice (and financial institutions and/or insurance companies often recommend) that ownership of significant assets be owned by separate legal entities.  This is done not only to protect the value of one aircraft should liabilities be generated from another aircraft, but also to maintain corporate formalities.

103.    Mr. Amador has failed to present any analysis to support his opinions.  He has also failed to consider the nature and scope of Mr. Epstein's businesses and asset holdings.

Executed on this 23rd day of June 2023

_____
                        Carlyn Irwin

**Appendix A**

# CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE
## Senior Advisor

**Cornerstone Research**
555 W. 5th Street, 38th Floor • Los Angeles, CA  90013
213.553.2533 • fax 213.553.2699
cirwin@cornerstone.com

## ACADEMIC BACKGROUND

| 1992 | **University of Southern California** | Los Angeles, California |
| | *M.B.A., Accounting and Finance* | |
| 1989 | **University of California, Santa Barbara** | Santa Barbara, California |
| | *B.A., Organizational Psychology, Cum Laude* | |

## RANGE OF EXPERIENCE

More than twenty-five years of litigation consulting and expert witness experience, including analyzing economic, financial, causation, and accounting issues in context of damages claims, valuing businesses, class certification, and conducting financial forensic analysis in a wide variety of commercial disputes. Has experience in broad range of industries including real estate, medical devices, healthcare, technology, entertainment, consumer products, textiles, and financial and professional services.  Has worked with clients and counsel throughout the litigation process during all phases of the litigation process.  Examples of testimony and casework experience include:

- Financial Forensic Analysis—Reconstructing financial records, tracing transactions through corporate reporting systems, and reviewing financial records (including tax returns) to assess consistency and reliability as part of corporate investigation, complex civil and criminal litigation involving white collar matters, as well as allegations of fraudulent conveyances, breach of contract, money laundering, pyramid schemes, RICO, and fraud.  Have provided expert testimony regarding solvency, financial misstatements, fraudulent/preferential transfers, indications of fraudulent transactions and schemes, and misappropriation of assets.

- Contract and Tort Claims—Analyzing loss causation and damages issues and performing business valuations in breach of contract and tort causes of action, including breach of fiduciary duty, alter ego, Lanham Act violations, false advertising, and unfair business competition.  Has analyzed compensatory damages as well as claims for statutory and restitution or disgorgement damages.

- Intellectual Property Disputes—Addressing damages issues in patent, copyright, and trademark infringement as well as trade secret misappropriation disputes.  Specific expertise in estimating lost profits, unjust enrichment, and reasonable royalty damages, including analysis of loss causation and apportionment issues, as well as the application of "Most Favored Licensee" clauses.

- Valuation Services – Providing opinions of value for businesses, intellectual property, and other intangible assets in the context of litigation, economic loss analyses, and partnership disputes.

**Appendix A**

**CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE**
**Senior Advisor**

---

**PROFESSIONAL ACCREDITATIONS**

- Certified Public Accountant (CPA), California, State Board of Accountancy, April 2001

- Certified in Financial Forensics (CFF), American Institute of Certified Public Accountants, July 2008 (inception of credential)

- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners, March 2011

- Accredited in Business Valuation (ABV), American Institute of Certified Public Accountants, August 2015

- Certified in Entity and Intangible Valuations (CEIV), American Institute of Certified Public Accountants, January 2018

**PROFESSIONAL AND BUSINESS HISTORY**

| | | |
|---|---|---|
| 2002–Present | **Cornerstone Research, Inc.**<br>*Senior Advisor (2015-present)*<br>*Principal (2002-2015)* | Los Angeles, California |
| 1994–2002 | **PricewaterhouseCoopers**<br>*Director (2000-2002)*<br>*Manager/Principal (1997-2000)*<br>*Senior Consultant (1994-1997)* | Los Angeles, California |
| 1992–1994 | **Mitchell Silberberg & Knupp**<br>*Assistant Controller* | Los Angeles, California |
| 1991–1992 | **University of Southern California School of Business**<br>*Professor's Assistant, Finance Department* | Los Angeles, California |

**TESTIMONY EXPERIENCE:**

- Provided deposition testimony (April 2023) in a dispute related to workman's compensation premiums filed in the Superior Court of California, County of Riverside.  Opinion related to accuracy of calculations assuming per diem payments for certain employees should be considered renumeration.  (*State Fund Insurance Fund v. ReadyLink Healthcare, Inc.*)

- Testified in deposition (January 2023) in a trade secret misappropriation, unjust enrichment, and tortious interference matter filed in United States District Court, District of Nevada.  Analyzed and rebutted plaintiff's damages claims and reasonable royalty analysis for the alleged trade secrets.  (*Newmark Group, Inc., et al. v. Avison Young (Canada) Inc., et al.*)

- Provided deposition testimony (January 2023) in a trade secret misappropriation and breach of contract dispute filed in United States District Court, Eastern District of Pennsylvania.  Analysis included rebuttal of plaintiff's damages claims based on head start unjust enrichment.  (*Le Tote, Inc. v. Urban Outfitters, Inc. et al.*)

**Appendix A**

**CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE**
**Senior Advisor**

---

**TESTIMONY EXPERIENCE (CONTINUED)**

- Provided deposition (April 2021) and trial (June 2022) testimony in a breach of contract and misappropriation of trade secrets matter filed in United States District Court, Southern District of California. Analysis included rebuttal of plaintiffs' damages claims and estimating lost profits to Counterclaimant and valuing Counterdefendant's unjust enrichment. (*Workplace Technologies Research, Inc. v. Project Management Institute*)

- Testified in deposition (October 2021) and trial (March 2022) in a trade secret misappropriation dispute filed the United States District Court for the Northern District of California. Scope of opinion included assessing reasonableness of plaintiff's unjust enrichment and reasonable royalty opinions and providing alternative calculations for damages. (*Comet Technologies, et al. v. XP Power, LLC*)

- Provided deposition testimony (March 2022) in a post-acquisition dispute alleging reasonably equivalent value was not paid for the acquisition of an independent physician's association (IPA). Scope of opinion included reviewing plaintiff's expert's analysis and assessing the reasonableness of underlying assumption, as well as opining on if the plaintiff was harmed by the transaction. (*SmartMed, Inc. v. FirstChoice Medical Group, Inc., et al.*)

- Testified in deposition (January 2022) in a dispute alleging multiple causes of action, including misappropriation of trade secret, trademark infringement, defamation, unfair competition, etc. filed in the United States District Court for the Northern District of California involving the movement of employees among competitors in the custom label industry. Scope of opinion included assessing the reasonableness of plaintiff's expert opinions regarding lost profits and unjust enrichment and providing alternative calculations for damages. (*The Best Label Company, LLC v. Custom Label & Decal, LLC, et al*)

- Provided deposition testimony (December 2021) during the class certification phase of a fraud/RICO matter filed by a putative class of individuals in the United States District Court for the Eastern District of New York. Analysis included feasibility and reliability of methodology for calculating damages on a class wide basis using ACH data provided by the ODFI and payday loan information for potential class members. *(Deborah Moss v. First Premier Bank)*

- Provided deposition testimony (September 2021) in a class action securities litigation filed in the United States District Court for the Western District of Pennsylvania. Scope of assignment included assessing reasonableness of plaintiffs' expert analysis of pro forma accounting adjustments and lost profits but for the alleged misleading public statements. (*Christakis Vrakas, et al. v. United States Steel Corporation, et al.*)

- Testified in deposition (May 2021) in a breach of contract matter filed in the Chancery Court of Delaware. Calculated lost profits from lost product sales. (*DBT Transportation Services v. Vaisala, Inc.*)

**Appendix A**

**TESTIMONY EXPERIENCE (CONTINUED)**

- Testified in depositions (January 2020, April 2021) in a matter filed in Superior Court of the State of California, County of Los Angeles involving the breach of partnership/participation agreements and allegations of fraud.  Performed an accounting of payments due under the participation agreement and provided rebuttal analyses under the terms of the asserted partnership.  (*RadioSurgery Solutions, LLC, et al. v. Select Healthcare Solutions Fund II, LLC, et al.*)

- Provided deposition testimony (April 2021) in a securities fraud matter involving the offering and sale of investments in an EB-5 Immigration Investor Program filed in United States District Court, Central District of California.  Offered opinions on flow of funds and amounts paid compared to the representations of the Private Offering Memorandum and calculated amount of funds that had been misappropriated.  (*Securities and Exchange Commission v. Charles C. Liu, et al.*)

- Testified in deposition (February 2021) in a breach of contract and misappropriation of trade secrets matter involving the issuance of a medical marijuana/cannabis license in Florida filed in the Superior Court of the State of Washington.  Calculated damages in the form of the fair market value of the medical marijuana license, the development costs of the trade secrets, and a reasonable royalty for the trade secrets.  (*Left Coast Ventures, Inc. v. Bill's Nursery, Inc., et al.*)

- Provided deposition testimony (January 2021) in a fraud matter involving the offer and sale of securities, issuance of cryptocurrency, and operating a pyramid scheme as part of a multi-level marketing company filed in the United States District Court, Central District of California.  Offered opinions regarding the flow of funds, the underpayment of compensation to distributors, the ability of the company to continue operations, and the pecuniary gain of the defendant.  (*Securities and Exchange Commission v. Daniel Pacheco, et al*)

- Testified in deposition (April 2020) in a class action matter alleging violations of the Equal Pay Act and Title VII of the Civil Rights Act of 1964 filed in the United States District Court, Central District of California, Western Division.  Conducted forensic accounting analysis of revenue earned by and payments made to members of the US Soccer Men's and Women's national teams.  (*Alex Morgan, et al. v. United States Soccer Federation, Inc.*)

- Provided deposition testimony (January 2020) in a litigation filed in the United States District Court, Central District of California involving allegations of violation of the Lanham Act and interference with prospective economic advantage.  Analyzed damages and provided rebuttal opinions regarding opposing expert's calculations of lost profits and unjust enrichment.  (*Multiple Energy Technologies v. Hologenix, LLC*)

- Provided testimony in deposition (January 2020) in a matter involving claims of theft of trade secrets, tortious interference, and conspiracy filed in the Circuit Court of Cook County, Illinois.  Analyzed damages and provided rebuttal opinions regarding opposing expert's calculations of lost profits, unjust enrichment, and reasonable royalties.  (*Newmark Group, Inc., et al. v. Avison Young (Canada) Inc., et al.*)

**Appendix A**

### CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE
### Senior Advisor

---

**TESTIMONY EXPERIENCE (CONTINUED)**

- Provided testimony in arbitration (November 2019) in a breach of contract matter involving the rights to distribute the film *American Made* in mainland China.  Analysis included reasonableness of estimated foreign box office revenue, structure of "waterfall" payments to interested parties, as well as providing rebuttal testimony regarding Claimant's damages claim.  (*Beijing Galloping Horse Film Co. v. CCP Film Holdings, LLC, et al.*)

- Testified in depositions (August 2019, October 2019) and at trial (October 2019) in a matter involving claims of breach of fiduciary duty, breach of oral contract, fraud, etc. against the co-founder of a privately-held, e-commerce firm which sells women's and children's footwear filed in the Superior Court of the State of California, County of Los Angeles.  Scope included investment analysis of funds misappropriated and expected damages associated with unpaid taxes.  (*Dikla Gavrieli Unatin v. Kfir Gavrieli*, and associated cross-claims on behalf of Dean K. Unatin)

- Testified in matters (August 2019) for Ford Motor Company alleging fraud, negligence, and violation of the Song-Beverly Act against an automaker.  Reviewed and commented on opposing expert's analysis, observations, and calculation of compensatory and punitive damages associated with Ford's PowerShift/DPS6 transmission.

    o Deposition (August 2019):  *Mark Pendante v. Ford Motor Company,* United States District Court, Central District of California

    o Deposition (August 2019):  *Yvonne and Salvador Quintero v. Ford Motor Company,* United States District Court, Central District of California

- Provided deposition testimony (August 2019) in a Lanham Act matter involving country of origin claims for radio-frequency prevention loss labels for a matter filed in the United States District Court, Southern District of Florida.  Analysis included an assessment of the materiality of the allegedly false statement as well as calculation of revenue associated with the sales of the relevant labels.  (*ALL-Tag Corporation v. Checkpoint Systems, Inc.* and associated counterclaim)

- Testified in deposition (April 2019) and arbitration (July 2019) in a breach of sub-license matter involving patents for compact florescent light technology filed with the American Arbitration Association.  Analyzed the economic consequences of a "Most Favored Licensee" provision to amounts owed by licensee.  (*Beacon Point Capital, LLC v. Philips Electronics North America Corporation*)

- Provided deposition testimony (June 2019) in a fraud and breach of fiduciary duty matter filed in the United States Bankruptcy Court, Central District of California, Riverside Division.  Affirmative analysis and testimony included assessing solvency of land development and home building operations, as well as evaluating the companies' compliance with debt covenants.  Rebuttal testimony addressed reasonableness of Trustee's experts' opinions regarding the valuations of the assets, methodology for consolidating intercompany transactions, and calculations of damages in the form of deepening insolvency, wasteful disbursements, and unjust enrichment.  *Richard K. Diamond, Chapter 7 Trustee v. Empire Partners, Inc. et al.*)

**Appendix A**

CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE
Senior Advisor

---

**TESTIMONY EXPERIENCE (CONTINUED)**

- Testified in deposition (May 2019) as part of proceedings related to a motion for preliminary injunction filed in the Circuit Court of Jackson County, Missouri Kansas City Division and in the Court of Chancery for the State of Delaware.  Analysis and opinions related to the ability to calculate damages assuming breach of contract, tortious interference, etc. and provide rebuttal analysis regarding opposing expert's opinions regarding irreparable harm.  (*Mountain West Series of Lockton Companies, LLC, et al. v. Alliant Insurance Services, Inc., and related matters*)

- Provided testimony in deposition (May 2019) in a matter involving claims of theft of trade secrets, tortious interference, and conspiracy filed in the Superior Court for the District of Columbia.  Analyzed damages and provided rebuttal opinions regarding opposing expert's calculations of lost profits, unjust enrichment, and reasonable royalties.  (*BGC Partners, Inc. et al. v. Avison Young (Canada) Inc., et al.*)

- Testified in deposition (October 2018) and arbitration (February 2019) in a matter involving claims of breach of contract, breach of confidentiality, and fraud, etc. filed before the Judicial Arbitration and Mediation Society in Los Angeles.  Estimated damages and provided rebuttal opinions regarding opposing expert's calculations of lost profits.  (*DAS Group Professionals, Inc. v. Tesla, Inc., and related counterclaims*)

- Testified in several matters (March 2019) for Ford Motor Company alleging fraud, negligence, and violation of the Song-Beverly Act against an automaker.  Reviewed and commented on opposing expert's "fraud examination," analysis of indicia of fraud, other observations, and calculation of compensatory and punitive damages associated with Ford's 6.0L Navistar engine.

  - Deposition (March 2019):  *Corey McKinnon v. Ford Motor Company*, Superior Court of the State of California, County of Riverside

  - Deposition (March 2019):  *Evelia Arroyo v. Ford Motor Company,* Superior Court of the State of California, County of Riverside

**PROFESSIONAL MEMBERSHIPS**

- Member, California Society of Certified Public Accountants, including Forensic Services Section

- Member, American Institute of Certified Public Accountants, including Forensic and Valuation Services Section

- Member, Association of Certified Fraud Examiners

**Appendix A**

**CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE**
**Senior Advisor**

---

## SPEAKING ENGAGEMENTS

- University of Southern California, Dornsife College of Letters, Arts & Science, ECON 434: Economic Analysis of Law (ECON 434), Guest Lecturer, April 2021

- University of California, Los Angeles, UCLA School of Law, Accounting and Financial Skills for Lawyers (Law 434), Guest Lecturer, November 2020

- University of Southern California, Leventhal School of Accounting, PACT Luncheon, Guest Speaker, Fall 2018

- Lost Profits and Damages Calculation: Everything You Need to Know in 2018, The Knowledge Group, Panelist, January 2018

- Cornerstone Research, Consumer Finance Class Actions and Enforcements, Moderator, November 2016

- University of Southern California, Leventhal School of Accounting, Accounting Ethics, Guest Speaker, Spring 2016 and Fall 2016

## FIRM-WIDE SERVICE

- Cornerstone Research, Writing Coach, 2021 to present

- Cornerstone Research, Analyst Compensation Committee, 2007 to 2014

- Cornerstone Research, Risk Management Committee, 2002 to 2007

## AWARDS & RECOGNITION

- Who's Who Legal: Investigations – Forensic Accountants, Global Investigations Review (2018-2022)

## COMMUNITY ENGAGEMENT

- National Charity League, Inc., Fullerton Chapter, Patroness (2021 to present)

- National Charity League, Inc., Fullerton Chapter, Treasurer and Member of Board of Directors (2022 to present)

**Appendix B**

# Documents and Information Considered

**Legal Pleadings**

JPMorgan Chase & Co., N.A., v. James Edward Staley, Case No. 1:22-cv-10904-JSR, Third-Party Complaint, March 8, 2023

Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A, Case 1:22-cv-10904-JSR, Second Amended Complaint and Demand for a Jury Trial, April 12, 2023

Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A, Case 1:22-cv-10904-JSR, JPMorgan Chase Bank, N.A.'s Opposition to USVI's Motion to Strike Affirmative Defenses, May 23, 2023 and Exhibits

Jane Doe 1, Individually and on behalf of all others similarly situated, vs. JPMorgan Chase Bank, N.A., JPMorgan Chase Bank, N.A.'s Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories, May 30, 2023


**Expert Reports**

Expert Opinion Report of Jonathan J. Rusch, June 16, 2023

Expert Report of Jorge Amador, June 16, 2023


**Depositions and Related Exhibits**

Deposition of Sandra Bess, May 18, 2023 and Exhibits

Deposition of Kenneth Mapp, May 24, 2023

Deposition of Inais Borque, May 26, 2023 and Exhibits

Deposition of Margarita Benjamin, May 26, 2023 and Exhibits

Deposition of Cecile de Jongh, May 29, 2023 and Exhibits

Deposition of Governor John de Jongh, May 30, 2023 and Exhibits

Deposition of Governor Albert Bryan, Jr., June 6, 2023 and Exhibits


**Annual Reports Submitted by Financial Trust and Southern Trust to EDC**

VI-JPM-000012940

VI-JPM-000012922

VI-JPM-000012885

VI-JPM-000012850

VI-JPM-000012816

VI-JPM-000012743

VI-JPM-000012722

VI-JPM-000012689

VI-JPM-000012630

VI-JPM-000013335

VI-JPM-000013219

VI-JPM-000013122

VI-JPM-000013087

VI-JPM-000012996

VI-JPM-000007315

VI-JPM-000007407

VI-JPM-000007474

**Appendix B**

# Documents and Information Considered

VI-JPM-000007534
VI-JPM-000007588
VI-JPM-000007663

## EDC Annual Reports

United States Virgin Islands Economic Development Authority, FY2009 Annual Report
United States Virgin Islands Economic Development Authority, FY2010 Annual Report
United States Virgin Islands Economic Development Authority, FY2011 Annual Report
United States Virgin Islands Economic Development Authority, FY2012 Annual Report
United States Virgin Islands Economic Development Authority, Annual Report Fiscal Year 2013, October 1, 2012 to September 30, 2013
United States Virgin Islands Economic Development Authority, Annual Report Fiscal Year 2014, October 2013 to September 2014
United States Virgin Islands Economic Development Authority, Annual Report 2015
United States Virgin Islands Economic Development Authority, 2016 Annual Report, October 1, 2015 to September 30, 2016
United States Virgin Islands Economic Development Authority, 2017 Annual Report
Virgin Islands Economic Development Authority, FY2018 Annual Report, October 1, 2017 – September 30, 2018

## EDC Cost / Benefit Analyses

VI-JPM-000032792
VI-JPM-000032774
VI-JPM-000032775
VI-JPM-000032776
VI-JPM-000032777
VI-JPM-000032778
VI-JPM-000032779
VI-JPM-000032780
VI-JPM-000032781
VI-JPM-000093343
VI-JPM-000041911
VI-JPM-000093344
VI-JPM-000093345
VI-JPM-000093346
VI-JPM-000093347
VI-JPM-000037451
VI-JPM-000037452
VI-JPM-000020120
VI-JPM-000020331
VI-JPM-000093348

## Other Produced Documents

ESTATE_JPM014824

**Appendix B**

# Documents and Information Considered

ESTATE_JPM018975

ESTATE_JPM020521

JPM-SDNYLIT-00149653

VI-JPM-000003873

VI-JPM-000005898

VI-JPM-000005919

VI-JPM-000016200

VI-JPM-000016248

VI-JPM-000017983

VI-JPM-000018005

VI-JPM-000018359

VI-JPM-000018551

VI-JPM-000018885

VI-JPM-000018918

VI-JPM-000018934

VI-JPM-000019063

VI-JPM-000032669

VI-JPM-000033049

**Public Materials**

Associated Press, "A Timeline of the Jeffrey Epstein, Ghislaine Maxwell Scandal," *U.S. News & World Report*, June 28, 2022, available at https://www.usnews.com/news/politics/articles/2022-06-28/a-timeline-of-the-jeffrey-epstein-ghislaine-maxwell-scandal

JPMorgan Chase & Co., SEC Form 10-K for the fiscal year ended December 31, 2011, filed on February 29, 2012

JPMorgan Chase & Co., SEC Form 10-K for the fiscal year ended December 31, 2014, filed on February 24, 2015

JPMorgan Chase & Co., SEC Form 10-K for the fiscal year ended December 31, 2022, filed on February 21, 2023

29 VIC § 1101

"Be Smart: Check Registration & Backgrounds Before You Trade," *CFTC,* https://www.cftc.gov/check

"Biography, Congresswoman Stacey E. Plaskett," *U.S. House of Representatives,* available at https://plaskett.house.gov/biography

"Biography, Stacey Plaskett Campaign," *Plasket for Congress,* available at https://plaskettforcongress.org/biography

"Biography, Governor Albert Bryan Jr.," *U.S. Virgin Islands Government,* available at https://www.vi.gov/governor-bryan/

"Statement on Standards for Forensic Services No. 1," *AICPA,* available at https://www.aicpa.org/resources/download/statement-on-standards-for-forensic-services

"Tax Incentives: How Do They Work?" *United States Virgin Islands Economic Development Authority,* available at https://usvieda.org/residents/grow/edc-tax-incentives/tax-incentives-how-do-they-work

"Virgin Islands," *The World Factbook,* available at https://www.cia.gov/the-world-factbook/countries/virgin-islands/

**Appendix B**

## Documents and Information Considered

"Virgin Islands Gov. John de Jogh, Jr.," *National Governors Association,* available at
https://www.nga.org/governor/4796-2/

***Note: Even if not included in this list, I also considered and relied upon any other documents cited in my report or exhibits.***

Confidential—Subject to Protective Order

4

**Exhibit 1**
**Analysis of Economic Development Commission Credits**

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Subtotal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Taxes and Duties Paid** | | | | | | | | | | | | | | | |
| Gross Receipts | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $400 | $400 | $0 | $800 |
| Real Property Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Excise Taxes | 227 | 3,047 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,274 |
| Income Taxes | 1,731,411 | 6,461,932 | 2,747,483 | 3,085,634 | 2,859,613 | 3,411,196 | 1,488,733 | 3,951,894 | 0 | 0 | 0 | 0 | 112,046 | 1,432,123 | 27,282,065 |
| Customs Duties | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Taxes | 750 | 750 | 132,719 | 132,844 | 100,541 | 83,247 | 43,927 | 2,274 | 1,297 | 1,447 | 1,297 | 1,297 | 1,447 | 0 | 503,837 |
| **Total Taxes Paid** | **$1,732,388** | **$6,465,729** | **$2,880,202** | **$3,218,478** | **$2,960,154** | **$3,494,443** | **$1,532,660** | **$3,954,168** | **$1,297** | **$1,447** | **$1,297** | **$1,697** | **$113,893** | **$1,432,123** | **$27,789,976** |
| **Value of Tax Exemptions** | | | | | | | | | | | | | | | |
| Gross Receipts | $1,720,270 | $2,576,380 | $1,872,615 | $3,827,492 | $2,820,564 | $2,540,174 | $1,069,972 | $2,645,828 | $160,297 | $0 | $4,000 | $3,600 | $5,225 | $0 | $19,246,417 |
| Real Property Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Excise Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income Taxes | 15,582,699 | 25,845,200 | 21,217,187 | 37,080,724 | 26,215,499 | 27,424,383 | 15,036,447 | 33,392,783 | 0 | 0 | 0 | 0 | 90,757 | 423,407 | 202,309,086 |
| Customs Duties | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Value of Exemptions** | **$17,302,969** | **$28,421,580** | **$23,089,802** | **$40,908,216** | **$29,036,063** | **$29,964,557** | **$16,106,419** | **$36,038,611** | **$160,297** | **$0** | **$4,000** | **$3,600** | **$95,982** | **$423,407** | **$221,555,503** |
| **Federal Tax Return (Form 1120S)** | | | | | | | | | | | | | | | |
| Net Sales | $43,006,739 | $64,409,495 | $46,815,387 | $95,687,311 | $70,514,094 | $63,504,348 | $26,749,299 | $66,145,711 | $4,007,430 | ($45,692,249) | $100,000 | $100,000 | $125,000 | $0 | $435,472,565 |
| Ordinary Business Income | $42,765,787 | $62,752,301 | $44,183,279 | $93,122,211 | $67,773,535 | $61,638,638 | $37,586,420 | $89,909,941 | ($10,552,859) | ($64,729,152) | ($16,904,387) | ($22,278,483) | ($9,635,609) | ($1,612,922) | $374,018,700 |

*Financial Trust Company, Inc. (1999–2012)*

Confidential—Subject to Protective Order

**Exhibit 1**
**Analysis of Economic Development Commission Credits**

| | Southern Trust Company, Inc. (2013–2018) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Subtotal | Total |
| **Taxes and Duties Paid** | | | | | | | | |
| Gross Receipts | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $800 |
| Real Property Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Excise Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,274 |
| Income Taxes | 2,143,371 | 6,089,662 | 4,207,361 | 299,580 | 71,340 | 291,989 | 13,103,303 | 40,385,368 |
| Customs Duties | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Taxes | 1,297 | 491 | 750 | 790 | 450 | 3,947 | 7,725 | 511,562 |
| **Total Taxes Paid** | $2,144,668 | $6,090,153 | $4,208,111 | $300,370 | $71,790 | $295,936 | $13,111,028 | $40,901,004 |
| | | | | | | | | |
| **Value of Tax Exemptions** | | | | | | | | |
| Gross Receipts | $2,550,000 | $3,500,000 | $2,749,999 | $0 | $400,000 | $0 | $9,199,999 | $28,446,416 |
| Real Property Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Excise Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income Taxes | 19,290,340 | 34,360,298 | 17,441,640 | 111,932 | 124,031 | 47,996 | 71,376,237 | 273,685,323 |
| Customs Duties | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Value of Exemptions** | $21,840,340 | $37,860,298 | $20,191,639 | $111,932 | $524,031 | $47,996 | $80,576,236 | $302,131,739 |
| | | | | | | | | |
| **Federal Tax Return (Form 1120S)** | | | | | | | | |
| Net Sales | $51,000,000 | $70,000,000 | $54,999,980 | $0 | $8,000,000 | $0 | $183,999,980 | $619,472,545 |
| Ordinary Business Income | $50,227,528 | $67,529,822 | $52,793,729 | $4,751,300 | $17,058,555 | $1,520,319 | $193,881,253 | $567,899,953 |

Source:  VI-JPM-000012940; VI-JPM-000012922; VI-JPM-000012885; VI-JPM-000012850; VI-JPM-000012816; VI-JPM-000012743; VI-JPM-000012722; VI-JPM-000012689;
VI-JPM-000012630; VI-JPM-000013335; VI-JPM-000013219; VI-JPM-000013122; VI-JPM-000013087; VI-JPM-000012996; VI-JPM-000007315; VI-JPM-000007407;
VI-JPM-000007474; VI-JPM-000007534; VI-JPM-000007588; VI-JPM-000007663

Confidential—Subject to Protective Order