# Exhibit 8

Confidential - Pursuant to Protective Order

```
 1                UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
     GOVERNMENT OF THE UNITED        )
 3   STATES VIRGIN ISLANDS,          )
                                     )
 4           Plaintiff,              )
     vs.                             )   1:22-cv-10904-JSR
 5                                   )
     JPMORGAN CHASE BANK, N.A.,      )
 6                                   )
             Defendant/Third-        )
 7           Party Plaintiff.        )
     _____)
 8                                   )
     JPMORGAN CHASE BANK, N.A.,      )
 9                                   )
             Third-Party            )
10           Plaintiff,              )
     vs.                             )
11                                   )
     JAMES EDWARD STALEY,            )
12                                   )
             Third-Party            )
13           Defendant.             )
14                    THURSDAY, JULY 6, 2023
15         CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
                            —  —  —
16
             Remote Videotaped Deposition of CARLYN IRWIN,
17
     taken pursuant to notice and conducted at the location of
18
     the witness in the State of California, commencing at
19
     9:01 a.m., Pacific Time, on the above date, before Jennifer
20
     A. Dunn, Registered Merit Reporter, Certified Realtime
21
     Reporter, California, Illinois & Texas Certified Shorthand
22
     Reporter, and Missouri Certified Court Reporter.
23                          —  —  —
24                   GOLKOW LITIGATION SERVICES
             P:  877.370.3377 | F:  917.591.5672
25                      deps@golkow.com
```

Confidential - Pursuant to Protective Order

 1     Q    Prior to working on this case, had you ever

 2   visited the Virgin Islands?

 3     A    I've been to St. John.

 4     Q    When were you in St. John?

 5     A    It was part of a cruise.  I'm going to date

 6   myself.  1998.

 7     Q    That's not dating yourself too bad.

 8          Did you visit the Virgin Islands in connection

 9   with your work on this case?

10     A    I did not.

11     Q    Okay.  Prior to working on this case, had any of

12   your expert work involved the Virgin Islands?

13     A    I don't believe so.

14     Q    Prior to working on this case, had you performed

15   any work involving tax benefits awarded by the Virgin

16   Islands Government?

17     A    No.

18     Q    Prior to working on this case, had you performed

19   any work involving tax benefits awarded by any other U.S.

20   territory?

21     A    No.

22     Q    Before working on this case, did you have any

23   familiarity with the tax benefits that are addressed in your

24   report?

25     A    No.

Confidential - Pursuant to Protective Order

```
 1    our partners was involved with.

 2           So there were always, you know, one-off things

 3    that we were being asked to do in addition to our litigation

 4    casework.

 5           And when I say "litigation," that also includes

 6    some bankruptcy work.  It was kind of both -- both sides of

 7    that were included in that department.

 8       Q    So during your time at PricewaterhouseCoopers,

 9    what percentage of your time would you say was spent on

10    litigation work as opposed to those other tasks?

11       A    Over eight and a half years, probably 85 percent

12    of my time was in litigation.

13       Q    Did any of your work at PricewaterhouseCoopers

14    involve human trafficking?

15       A    No.

16       Q    Have you ever worked for a governmental entity or

17    agency?

18       A    I've worked -- in my casework, I've worked on

19    behalf of government agencies like the SEC, but I've never

20    worked for.

21       Q    Okay.  You've never been an employee of a

22    governmental entity or agency?

23       A    Correct.

24       Q    You have done litigation consulting or expert

25    opinions for the SEC; is that -- is that correct?
```

Confidential - Pursuant to Protective Order

```
 1      A     Yes.  That's disclosed in my -- in my CV.

 2      Q     Have you done litigation work for any other

 3   governmental entity or agency other than the SEC?

 4      A     Not that I can think of.

 5      Q     Have you ever worked for the Government of the

 6   Virgin Islands?

 7      A     No.

 8      Q     Have you ever worked for a tax authority?

 9      A     No.

10      Q     Have you ever done any litigation work or

11   consulting for a tax authority?

12      A     No.

13      Q     So in your opinions, when you say you're relying

14   on your experience, you're not relying on any experience

15   gained as a government employee; is that right?

16      A     That's correct.

17      Q     And you're not relying on someone else's

18   experience as a government employee, correct?

19      A     That's correct.

20      Q     You're not relying on any experience you gained

21   working for the Virgin Islands or another tax authority,

22   correct?

23      A     Correct.

24      Q     And you're not relying on someone else's

25   experience in those roles, correct?
```

Confidential - Pursuant to Protective Order

```
 1      A    That's right.

 2                MR. ACKERMAN:  We've been going about an

 3           hour.  Why don't we take a quick break.

 4                THE VIDEOGRAPHER:  Off the record, 10:09 a.m.

 5                (Off the record at 10:09 a.m.)

 6                THE VIDEOGRAPHER:  On record, 10:21 a.m.

 7      BY MR. ACKERMAN:

 8      Q    All right.  We're back on the record, Ms. Irwin.

 9      I think we were talking about your CV.  And you've got a

10      large section entitled:  "Testimony Experience."

11                Do you see that?

12      A    Yes.

13      Q    All right.  How many cases do you work on in a

14      given year?

15      A    Gosh.  It depends.

16                I would say at any given point in time I have at

17      least three active cases meeting on a weekly basis I'm

18      working on them.

19                At some points in time, it's as many as 10 active

20      cases.  So it's hard to say over the course of the year how

21      many cases I work on.

22                I also could work on a case in -- starting five

23      years before I actually testify.  I have at least one of

24      those on my -- on my resumé.

25                So that particular case lasted more than 10 years,
```

Confidential  Pursuant to Protective Order

```
 1                    MR. O'LAUGHLIN:  Objection to the extent it

 2        calls for a legal conclusion.

 3                    THE WITNESS:  Yes.  I'm certainly not here to

 4        opine about any legal issues.

 5                    What I am aware that Ms. Bess described the

 6        certificate -- the granting of the certificate as a,

 7        quote, contract, but, of course, that's not a legal

 8        interpretation.

 9   BY MR. ACKERMAN:

10        Q    Are you aware of whether there's any statute or

11   regulation that specifies whether tax incentives are

12   contractual in nature?

13                    MR. O'LAUGHLIN:  Objection to the extent it

14        calls for a legal conclusion.

15                    THE WITNESS:  I'm not aware one way or the

16        other.

17   BY MR. ACKERMAN:

18        Q    Would you agree that the Economic Development

19   Commission exercises discretion in granting benefits?

20        A    I agree that they apply discretion in their

21   recommendations to either approve or deny tax incentives.

22                    Again, I think technically how it works is the

23   governor ultimately approves it.

24        Q    Is the grant of benefits by -- or is the grant of

25   benefits by the Virgin Islands Government automatic if
```

Confidential - Pursuant to Protective Order

```
1    certain criteria are met?

2         A    Not that I'm aware of.

3         Q    Would you agree that the Economic Development

4    Commission exercises judgment in deciding whether or not to

5    award or recommend tax benefits?

6         A    I would say that that is one of the things.  They

7    do exercise judgment, as well as establish -- gather facts

8    about companies that apply for the tax benefits.

9         Q    Does the Economic Development Commission have to

10   determine what is in the public interest in connection with

11   its responsibilities?

12        A    I'm aware that it -- what's best for the public

13   interest is part of what is discussed and even articulated

14   in an application, and then what is discussed by the EDC in

15   the granting of and extending a tax incentive benefits and,

16   of course, the basis of that statement is limited to my

17   review of EDC minutes solely for Financial Trust and

18   Southern Trust, because the minutes with respect to other

19   companies was not provided by the USVI, so those were not

20   available to me.

21        Q    Are you aware whether there's a statute that

22   states that the EDC should determine whether a grant of

23   benefits is in the public interest?

24        A    I'm not aware one way or the other.

25        Q    Did you look for a statute like that?
```

Confidential Pursuant to Protective Order

```
 1    spent in the Virgin Islands.  Designated charitable

 2    deductions are sometimes like -- well, I know for Financial

 3    Trust and Southern Trust, there were certain financial

 4    obligations for charitable deductions -- charitable

 5    donations, that was required by those companies.

 6            So those are the aspects of the program that I

 7    know are discussed.  Whether there is a checklist or some

 8    sort of document, procedural document that lays that all

 9    out, I don't know.

10        Q    Okay.  Let's look at -- in your report, page 2.

11    Your "Summary of Conclusions."

12        A    Yes.

13        Q    It's actually -- it's numbered page 1 of your

14    report.  It's -- I don't know why I wrote page 2 in my

15    outline because it's not page 2.

16            I thought maybe it was page 2 of the PDF, but it's

17    not even that.

18            So let's go to page 1 of your report, the Summary

19    of Conclusions, and this section sets forth the summary of

20    your opinions in this case, correct?

21        A    Yes.

22        Q    Okay.  So let's look at paragraph 3, which reads:

23    "The cost of those tax breaks to USVI dwarfed any economic

24    benefits the territory received in return."

25            Did I read that correctly?
```

Confidential - Pursuant to Protective Order

1    A    You did.

2    Q    Okay.  In terms of calculating, or did you --

3    strike that.

4         Did you perform any independent analysis to

5    determine the economic benefits that the territory received

6    in return for tax benefits granted to Mr. Epstein's

7    companies?

8    A    I relied on the data that was produced in this

9    litigation by the U.S. Virgin Islands.  That's the data I

10   relied upon.

11   Q    The data you relied upon are the cost-benefit

12   ratios, correct?

13   A    Correct.

14   Q    Okay.  Is there any other data that you relied

15   upon in calculating the economic benefits that the territory

16   received in return for tax benefits granted to Mr. Epstein's

17   companies?

18   A    No.  It was solely based on the data provided by

19   USVI in discovery in this matter.

20   Q    And when you say:  "Data provided by USVI," you're

21   referring only to the cost-benefit ratios, correct?

22   A    I'm referring to the Excel spreadsheets that laid

23   out various categories of benefits that went to the island

24   in terms of employment, expenses, taxes, et cetera.

25   Q    Okay.  And if you look at your Appendix B, those

1    Excel spreadsheets are listed under the heading "EDC

2    Cost/Benefit Analyses," right?

3         A    Yes.  Those are -- I believe all of those are

4    Excel spreadsheets that were produced in this matter.

5         Q    Okay.  Thank you.

6              What is your understanding of what the EDC's

7    cost-benefit ratio is?

8              Gina, we can take the document down for a bit.

9         A    My understanding is that the cost is the tax

10   benefits that are granted to the participant, meaning the

11   voided taxes, the foregone taxes by the U.S. Virgin Islands.

12             And the benefit is the financial resources spent

13   on the island either through employment, the purchasing of

14   goods and services, capital expenditures, building, things

15   of that nature.  I believe charitable deductions --

16   charitable donations are also included.

17        Q    Do you know how the cost-benefit ratio was

18   developed?

19        A    I do not.  But I do know that the ratio itself

20   that's provided in these Excel files, the formula was

21   applied inconsistently over -- from year to year.

22             So meaning for a period of years it was

23   calculated, including something in the denominator, and then

24   another year it was calculated excluding something from the

25   denominator and it fluctuated back and forth, but other

Confidential -- Pursuant to Protective Order

1    than -- other than that observation, I don't know.

2        Q    Do you know whether that cost-benefit ratio

3    changed over time in terms of how it was calculated?

4        A    So again, as I -- as I just said, it did -- it

5    apparently changed over time because -- and I can see --

6    because when we -- when we did a detailed analysis of the

7    ratios that were calculated, there -- and sometimes all of

8    the denominator included all of the various components, and

9    then in other years those components were excluded.

10            So let me give you an example.  The one I pulled

11    up is not the one I want.

12        Q    Are you pulling up documents as we're talking or

13    is it just your expert report?

14        A    I am, and I will definitely point you to it so

15    that we can -- it will be on the record as to what I'm

16    looking at.

17        Q    Okay.  Well, let's just talk -- let's just talk

18    about your expert report for right now.

19        A    Okay.

20        Q    So when you said you did a detailed analysis, you

21    just described a detailed analysis of the ratios that were

22    calculated.  What is that?

23        A    So, in each year that we were provided the Excel

24    spreadsheets calculating the cost-benefit ratios, we could

25    see in the formulas what data was being pulled and included

1    in that calculation.

2           In some years -- well, over the years, components

3    that were pulled into the denominator, meaning the benefit

4    received, sometimes it included all the aspects of -- of

5    benefits that flowed back to the islands, and in other years

6    the denominator excluded something.

7           And I'm not sure if that was an error or that was

8    a policy change by the EDC in how they wanted to measure

9    their -- measure the actual benefits.

10    Q    Okay.  So you -- sorry.

11    A    It just appeared to us, based on our detailed

12    review, that the method of the calculation changed year over

13    year.  Not every year, but it fluctuated back and forth.

14          And that's all I can observe.  I don't know

15    whether it was policy change or it was a -- it was

16    intentional or if it was in error.

17    Q    When you said "the detailed analysis."

18          Did you create some -- some document or work paper

19    tracking the difference in the cost-benefit ratio?

20    A    Yes.  That's reflected in Table 2.  Sorry.  Not

21    Table 2.

22          There's a table in my report.  I don't know which

23    page it's on, but that -- that is a summary of the data that

24    we extracted from the Excel files for Financial Trust and

25    Southern Trust.

Confidential -- Pursuant to Protective Order

1       A       Correct.  They could differ.

2               For example, I don't know which year it is, but

3       what's in table -- the table on page 22, are the ratios that

4       were articulated or observed in the EDC's Excel files.

5       Q       Okay.

6       A       Regardless of how they were calculated.  And then

7       when we performed my analysis of the -- in the discussion

8       section of my report on -- on the various statistics, we

9       included, even if the EDC's formula that year excluded, say,

10      charitable donations, as in the denominator, we included it

11      in our recalculation.

12              So they could differ a little bit based on --

13      based on that, but that's fully disclosed in my report.

14      Q       Okay.  Are you offering any opinion as to whether

15      the cost-benefit ratios used by the EDC are accurate?

16      A       Accurate in what sense?

17      Q       Well, are you offering any opinion as to whether

18      those formulas used by the EDC are an appropriate measure of

19      the benefit to the Government of the Virgin Islands?

20      A       I'm -- no.  I am looking to the EDC and its own

21      definition of that -- of that metric.

22      Q       Okay.  Do you know whether the EDC only looks at

23      the formulas or whether the EDC considers other factors as

24      well?

25      A       I know in the meeting minutes they consider

1    paragraph 28, sub D, on page 11, that calculation, and the

2    same would be true for 2000, 2001.

3              What we are reporting here -- what I am reporting

4    here is -- could be the same that's included in the table --

5    in the table on page 22, but we recalculated these numbers,

6    including all of the benefits that were identified in the

7    Excel spreadsheet.

8              The data, the calculation that was done and showed

9    to the EDC, may have left off a piece in the denominator.

10    Q    So can you cite me in this section a year where

11    you are using your own independent calculation and not the

12    EDC's calculation?

13    A    Well, it wasn't -- I wouldn't characterize it as

14    my own independent.  It was -- we utilized the same formula

15    that the EDC utilized.

16              So, let's see if I can -- I will certainly point

17    you to where I'm -- I'm not seeing one that's jumping out at

18    me.

19              So an example would be in paragraph 52 on page 19.

20    Q    Okay.

21    A    In talking about 2013 for Southern Trust, when we

22    utilized the calculation that included employment, taxes and

23    procurement, we calculated a ratio of 1 to 0.14, whereas in

24    the information that was presented to the EDC, in its Excel

25    spreadsheet was .01.

Confidential Pursuant to Protective Order

1    correct?

2        A    That's correct.  That was -- that's one of the --

3    one of the instances.

4        Q    So what I'm trying to find out is, is your opinion

5    that the EDC failed to ask further questions at that hearing

6    or thereafter, or is your opinion that the EDC failed to ask

7    questions during the 10-year tenure of the original grant of

8    tax benefits?

9        A    I think both.

10       Q    Okay.

11       A    So the EDC grants the benefits in 2019 -- '99,

12   sorry, 1999.

13            And the very first year the ratio comes back at

14   .04.  And there was no follow-up, why is this so low?

15            Then again, the next year it's now .29.  Again,

16   why is this so low?

17            So it's the -- I'm not aware of anything the EDC

18   did, with respect to Financial Trust or Southern Trust, in

19   response to these unfavorable cost-benefit calculations.

20       Q    Does the EDC have statutory authority to

21   renegotiate tax benefits based upon a low cost-benefit

22   ratio?

23            MR. O'LAUGHLIN:  Objection.  Calls for legal

24       conclusion.

25            MR. ACKERMAN:  She's opining about the

Confidential - Pursuant to Protective Order

1    available to USVI via the EDC, or through the EDC program.

2          There were facts about Southern Trust that the EDC

3    could have obtained compared to what was expected.  And that

4    was uniquely available to the EDC.

5      Q    So your challenge is to the EDC's failure to

6    follow-up; is that accurate?

7      A    Correct.

8      Q    Okay.

9      A    As well as -- well, specifically in this sentence,

10   it's rebutting the notion that USVI's claiming that Southern

11   Trust was not a legitimate company, but the EDC had the

12   ability to follow up with Southern Trust to test whether or

13   not it was a legitimate company and compared to its

14   application, the financial results are -- could indicate a

15   potential problem.

16     Q    You keep saying "the EDC had the ability to

17   follow-up with Southern Trust."

18          The EDC had the ability to perform compliance

19   reviews, correct?

20     A    Correct.

21     Q    Is there anything else the EDC had the ability to

22   do, in your opinion?

23     A    It's not an opinion.  I'm not aware of anything

24   else.  I'm aware that they had the ability to conduct

25   compliance reviews.

1  term, "without any clear economic basis," that's based on

2  the cost-benefit ratios that we discussed earlier, correct?

3      A    Correct.

4      Q    Is that -- is that based on any other evaluation

5  that you performed?

6      A    I think part of it might also be the noncompliance

7  with charitable donations.  But that's the only other thing

8  I can think of.

9      Q    Okay.  And then further down in the paragraph, you

10  note -- I'll just read the whole thing.

11          So it says:  "The extending of benefits without

12  any clear economic basis and without USVI asking the

13  appropriate questions to develop a basis for extending them

14  suggests there is some other reason why Mr. Epstein was

15  given $300 million in tax incentives by USVI and is

16  consistent with the possibility that these benefits were

17  granted as part of an improper quid pro quo exchange between

18  Mr. Epstein and USVI officials."

19          Did I read that correctly?

20      A    You did.

21      Q    Okay.  Are you opining that there was an improper

22  quid pro quo between the USVI and Mr. Epstein?

23      A    No.  As a CFE, a certified fraud examiner, my

24  understanding is that would be a legal conclusion and is

25  left up to the trier of fact.

```
 1   BY MR. ACKERMAN:

 2       Q    Then if you go to paragraph G.  There's a next one

 3   down.

 4            It says:  "Assess the work done by IDC, EDC, in

 5   connection with evaluating, extending benefits to, and

 6   monitoring of, Mr. Epstein's companies."

 7            Did I read that correctly?

 8       A    You did.

 9       Q    And is that part of your assignment in this case?

10       A    Yes.

11       Q    Okay.  So would you agree that you're basically

12   evaluating EDC's work to see if you agreed with their --

13   with their -- with their methodology and their decisions?

14               MR. O'LAUGHLIN:  Objection.

15               THE WITNESS:  I would say I'm assessing the

16           work that they performed relative to their own

17           benchmarks and standards.

18               So I'm not -- I'm not an expert in their

19           jobs.  I'm merely comparing and assessing what they did

20           relative to their own -- their own goals and their own

21           objectives.

22   BY MR. ACKERMAN:

23       Q    Were you determining whether EDC did anything

24   illegal?

25       A    No.
```

1    of Southern Trust's application for tax benefits?

2        A    Except the EDC granted the tax benefits in spite

3    of Financial Trust's poor performance, and a history of an

4    application's projections being not -- being off by a

5    magnitude of 10.

6        Q    So are you opining that they should not have

7    granted the benefits of the application?

8        A    No.  I think I said I'm not opining on whether or

9    not they should have.  I'm simply saying as part of my

10   review, I'm observing that they did, in spite of these other

11   factors that I discussed.

12       Q    So you're not opining on whether they should have

13   granted the certificate.  You're just criticizing their

14   decision to do so?

15            MR. O'LAUGHLIN:  Objection.  Misstates

16       testimony.

17            THE WITNESS:  I'm pointing to the decision as

18       part of my overall opinion regarding the potential

19       other factors that went into the EDC's decision to

20       extend benefits.  So it's -- it's one -- it's one of

21       the supporting observations for my overall conclusion.

22   BY MR. ACKERMAN:

23       Q    And your overall conclusion, again, is that there

24   is a possibility that other factors went into the EDC's

25   decision to extend benefits, right?

```
 1       A     Correct.

 2       Q     And you don't know what those other factors were,

 3  correct?

 4       A     I know that, as I state in my report, I'm aware of

 5  payments that benefited politicians, that benefited

 6  officials, and that those could be another factor, but I

 7  don't know the universe of potential factors.

 8       Q     You don't know whether those payments affected the

 9  decision, correct?

10       A     I don't.

11       Q     You stated it might -- it's possible, but you

12  don't know one way or the other, right?

13       A     It's possible.  A fraud examiner is not allowed to

14  testify about intent.

15             A fraud examiner simply -- and in this case I

16  didn't conduct a fraud investigation, that's not my --

17  that's not the role, you really can't do that in litigation,

18  but it's -- as I stated, my review of the record has given

19  me, you know, I've made several observations that suggest

20  there could be other reasons beyond the benefit to the USVI

21  as to why these benefits were extended over a 20-year

22  period.

23       Q     You said you didn't conduct a fraud investigation.

24  What do you mean by that?

25       A     So a fraud investigation, as defined by the
```

```
1   Association of Certified Fraud Examiners, is an entirely
2   different project.  It is someone that a company suspects
3   some sort of wrongdoing, whether it's an issue with the
4   financial reporting or whether it's a misappropriation of
5   assets, et cetera.
6           And then a fraud examiner would, once
7   understanding what the allegations are, what the concerns
8   are, would design a work plan to investigate those
9   allegations, document them, conduct interviews of
10  stakeholders and people who are involved in that aspect of
11  the business, and would ultimately, if -- if there was found
12  to be financial impact, quantify that to the best of that
13  their ability and then issue a report.
14          The report would -- typically goes back to, you
15  know, the audit committee of the company or the risk
16  management arm of the company, and then they decide what to
17  do with it from there.
18          So that's an entirely different exercise.
19  Q    Okay.  And then that's not what you did here,
20  right?
21  A    No.  It's -- in my -- I'm unaware of any
22  litigation where a fraud examiner could actually conduct a
23  fraud investigation because it would require access, open
24  access to underlying financial records.
25          It would require open access to witnesses outside
```

1   the context of a deposition, that type of thing.

2       Q    Okay.  Let's go to paragraph 67.

3            The first line of that reads:  "USVI's EDC did not

4   properly evaluate Mr. Epstein's applications for benefits,"

5   right, and it goes on:  "And failed to ask him even the most

6   basic questions based on information that was uniquely

7   available to it about his companies."

8            So is it correct here that you are criticizing the

9   EDC's evaluation of Mr. Epstein's applications?

10      A    I'm pointing out that there were inconsistencies

11  in the public hearing testimony that were not resolved.

12  That basically should have raised some sort of questions and

13  follow-up.

14           And moreover, when extending the benefits in 2009,

15  you know, there was discussion about concerns, dangerous

16  precedents, and based on my review of the record, none of

17  that was resolved before extending that application.  Excuse

18  me, extending that certificate.

19      Q    Did the same people who expressed those concerns

20  vote on the extension of the application?

21      A    Well, it was one month later after expressing

22  those concerns.  I would presume at least some of the same

23  people were voting.

24           I'm not aware that the EDC's membership or

25  committee completely turned over in a month between April