UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 1, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>   -v-<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>      Defendant/Third-Party Plaintiff,<br>   -v-<br><br>JAMES EDWARD STALEY,<br><br>      Third-Party Defendant. | 22-cv-10019 (JSR) |

| | |
|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS,<br><br>      Plaintiff,<br><br>   -v-<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>      Defendant/Third-Party Plaintiff,<br>   -v-<br><br>JAMES EDWARD STALEY,<br><br>      Third-Party Defendant. | 22-cv-10904 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

On April 24, 2023, third-party defendant James Staley ("Staley")
moved to dismiss the third-party complaint filed by defendant/third-
party plaintiff JPMorgan Chase Bank, N.A. ("JPMorgan") against him in

1

each of the above-captioned cases. After full consideration of the parties' written submissions and oral arguments, the Court denied Staley's motion by a "bottom-line order" dated May 24, 2023. This Opinion reconfirms the Court's ruling and explains the reasoning behind it.

## I.  **Background**

This third-party action arises from two complaints filed against JPMorgan, one by an anonymous woman -- Jane Doe -- and the other by the Government of the United States Virgin Island ("USVI").[1] Both complaints challenged JPMorgan's role in allegedly facilitating the sex trafficking operation of Jeffrey Epstein. The Court assumes familiarity of the allegations of those underlying complaints, which are discussed more fully in the Court's Opinion and Order, dated May 1, 2023. After these two complaints were consolidated, JPMorgan filed the aforementioned third-party complaint ("JPMC Complaint"). The JPMC Complaint claims, in essence, that to the extent JPMorgan is liable to Doe and/or to the USVI, Staley is liable to JPMorgan.

The allegations of these various complaints, to the extent relevant to the instant motion, are as follows.

When Epstein first became a client of JPMorgan, Staley was the head of JPMorgan's private banking division. Doe FAC ¶ 125. From 2001 to 2009, Staley was the Chief Executive Officer of JPMC's Asset Management line of business. JPMC Compl. ¶ 16. In 2009, Staley became

---

[1]     The amended first-party complaints in the underlying Doe and USVI actions are referred to as "Doe FAC" and "USVI FAC", respectively.

the Chief Executive Officer of JPMC's Corporate and Investment Banking line of business. *Id.*

Plaintiffs allege that Staley and Epstein were close personal friends and that Staley knew of Epstein's sex-trafficking venture. For example, they allege that Staley "personally observed Doe as a sex trafficking and abuse victim," "personally spent time with young girls whom he met through Epstein on several occasions," "personally visited young girls at Epstein's apartments located at 301 East 66th Street," "personally observed Epstein around young girls," and personally observed "Epstein sexually grab young women in front of him." JPMC Compl. ¶¶ 22, 24, 26 (citing Doe FAC ¶¶ 115, 128, 226, 227). Plaintiffs also allege that Staley himself sexually assaulted Jane Doe. *Id.* ¶ 27; Doe FAC ¶ 107.

Staley allegedly furthered Epstein's sex trafficking operation by "us[ing] his clout within JPMorgan to make Epstein untouchable," JPMC Compl. ¶ 28 (citing Doe FAC ¶ 132), "repeatedly thwart[ing] JPMC's efforts to sever ties with Epstein," *Id.* (citing Doe FAC ¶¶ 184, 188), and playing "a role in convincing JPMC to maintain Epstein as a JPMC client." *Id.* ¶ 33 (citing USVI FAC ¶¶ 47, 52-63, 71-73). JPMorgan alleges that, to the extent plaintiffs' allegations are true, Staley actively concealed the truth about Epstein's sex trafficking operation from JPMorgan and "repeatedly abandoned the interests of JPMC in pursuit of his own personal interests and benefits and those of Epstein." *Id.* ¶¶ 39, 42.

In its third-party complaint, JPMorgan claims that Staley is liable to JPMorgan to the extent that JPMorgan is liable to plaintiffs. Specifically, JPMorgan asserts four claims against Staley for, (1) indemnification, (2) contribution, (3) breach of fiduciary duty and (4) violation of the faithless servant doctrine.

## II.  Discussion

### A.  "Shotgun Pleading"

Staley's first argument can be quickly dispensed with. He argues JPMorgan's complaint is not well-pled because it seeks indemnification and contribution on plaintiffs' federal _and_ state-law claims in unified causes of action against Staley. Staley contends that this and other less-well-specified deficiencies in the JPMC Complaint represent impermissible "shotgun pleading." Staley Mem. at 7-8.

Contrary to Staley's suggestion, there is no strict requirement that JPMorgan separate its claims in the manner Staley argues. Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 10(b), in turn, specifies that "each claim founded on a separate transaction or occurrence -- and each defense other than a denial -- must be stated in a separate count," but only "[i]f doing so would promote clarity." Fed. R. Civ. P. 10(b); _see Original Ballet Russe v. Ballet Theatre_, 133 F.2d 187, 189 (2d Cir. 1943) ("Under Rule 10(b) a separation of claims into separate counts is mandatory only when necessary to facilitate clear presentation.").

Here, there is no need for JPMorgan to separate the federal and state claims into multiple counts. Staley's argument is premised on the differing legal theories that would apply to the respective counts, not that they arise from "separate transaction[s] or occurrence[s]." Fed. R. Civ. P. 10(b). And even setting that aside, the JPMC Complaint is sufficient to provide Staley with notice of the factual and legal bases for the relief JPMorgan is seeking, as evidenced, indeed, by Staley's detailed description on this motion to dismiss of the various claims at issue.

**B.  Availability of Contribution & Indemnification Under TVPA**

Staley argues that JPMorgan is categorically prohibited from seeking contribution or indemnification for plaintiffs' claims made pursuant to the Trafficking Victims Protection Act ("TVPA") because Congress did not provide for either contribution or indemnification in the statute, either expressly or by implication. JPMorgan responds that (a) an implied right to seek contribution and indemnification does exist under the TVPA, and (b) regardless, it is entitled to seek contribution and indemnification under state law. The Court addresses each of these arguments in turn. As explained below, the Court agrees there is no implied right of contribution or indemnification under the TVPA, but also finds that the TVPA does not preempt JPMorgan's state law claims for contribution and indemnification.

1.  The TVPA Does Not Contain an Implied Right to Seek Contribution/Indemnification.

Nothing in the TVPA expressly creates a right to obtain contribution or indemnification. JPMorgan argues, however, that Congress implicitly intended to create such a contribution/indemnification right when it enacted the TVPA.

In a pair of cases in 1981, the Supreme Court established the framework for analyzing a claim that a federal statute implicitly creates a right of contribution. *See Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL–CIO*, 451 U.S. 77 (1981); *Texas Indus., Inc. v. Radcliff Materials, Inc*., 451 U.S. 630 (1981). In each case, the court concluded that the federal statute(s) at issue did not create such a right. *See Nw. Airlines*, 451 U.S. at 91-92 (finding no right to contribution for Title VII and Equal Pay Act violations); *Texas Industries*, 451 U.S. at 639-42 (finding no right to contribution for Sherman Act violations).

To analyze this claim, these cases applied the framework, prevalent at the time, for determining whether "a federal statute that does not expressly provide for a particular private right of action [may] nonetheless implicitly [have] created that right." *Nw. Airlines*, 451 U.S. at 91.[2] Framing the inquiry as one of congressional intent, the Supreme Court identified the relevant factors as "the language of the statute itself, its legislative history, the underlying purpose

---

[2]    These cases also recognized the possibility that the Supreme Court might craft a right to contribution as a matter of federal common law, rather than imply the existence of one from the text of the statute, but declined to do so. JPMorgan appears to concede that creation of a body of federal common law would be inappropriate here, and accordingly the Court does not address this argument. *See* JPMorgan's Opp. at 7-8.

and structure of the statutory scheme, and the likelihood that Congress intended to supersede or to supplement existing state remedies." *Id.*; *Texas Industries*, 451 U.S. at 639 (similar).

The Supreme Court in *Northwest Airlines*, found that the employers did not have a right to contribution, relying on the absence of any indication of an intent to create one in the text or legislative history of Title VII or the Equal Pay Act, the fact that employers were plainly not the parties intended to be protected by their acts, and the "comprehensive character of the remedial scheme expressly fashioned by Congress," which the court found to be "strong[] evidence[] [of] an intent not to authorize additional remedies." *Nw. Airlines*, 451 U.S. at 93-94. The Court in *Texas Industries* relied on similar considerations to conclude that no implied right of contribution existed for violations of the Sherman Act. *See Texas Industries*, 451 U.S. at 639-42.

Moreover, subsequent to 1981, the Supreme Court has "adopted a far more cautious course before finding implied causes of action". *Ziglar v. Abbasi*, 582 U.S. 120, 132 (2017). Whereas prior to that time, "the Court assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose," the Supreme Court subsequently concluded these policy considerations alone were not enough and that the "determinative question is one of statutory intent." *Id.* at 132-33 (internal quotation marks omitted). Consistent with this trend, courts applying the framework established by *Northwest Airlines* and *Texas Industries* have been "reluctant to

recognize a right of contribution as a matter either of federal common law or of [implication by] statute." *Anderson v. Griffin*, 397 F.3d 515, 523 (7th Cir. 2005) (collecting cases).

Applying these principles here, the Court has little difficulty concluding there is no implied right to contribution or indemnification under the TVPA, since both the TVPA's text and legislative history are totally silent as to the availability of such rights.

2.    The TVPA Does Not Preempt JPMorgan's Right to Seek Contribution and Indemnification Under State Law.

The absence of a cause of action for contribution or indemnification created by the TVPA does not, however, end the matter. JPMorgan argues that state law offers an independent basis to obtain contribution and indemnification even for what are ultimately damages arising from a violation of a federal statute. The parties dispute the proper framework for assessing this argument. Staley contends the analysis is no different than that involved in assessing whether an implied cause of action exists under the TVPA and that the framework discussed above is the sole means by which a party may prove it is entitled to contribution or indemnification under a federal statute that does not expressly provide such a right. JPMorgan disagrees that any such categorical rule exists, and instead argues that where state law creates a right of contribution or indemnification from parties similarly situated to those here, the question is whether the federal statute that gives rise to liability preempts the state-law right to contribution or indemnification.

The Supreme Court has not had occasion to address this question,[3] and lower federal courts have been inconsistent about their treatment of claims seeking contribution for federal-law violations under state contribution and indemnification laws. Some federal courts appear to agree with Staley's position, concluding that "[w]hen an underlying claim arises under federal law, there is no claim for contribution [or indemnification] unless the operative federal statute provides one." Staley Mem. at 8; *see, e.g.*, *KBL Corp. v. Arnouts*, 646 F. Supp. 2d 335, 341 (S.D.N.Y. 2009) (collecting cases). These cases appear to treat the framework established by *Northwest Airlines* and *Texas Industries*, discussed *supra*, as the sole and exclusive means of finding a right to contribution or indemnification in the absence of an express Congressional authorization.

In contrast with this categorical approach, a distinct body of cases treat state-law claims seeking contribution or indemnification for a federal statutory violation as presenting a straightforward question of federal preemption. *See, e.g.*, *City of Los Angeles v. AECOM Servs., Inc.*, 854 F.3d 1149, 1160 (9th Cir. 2017) (concluding ADA and Rehabilitation Act did not preempt state-law indemnification claim); *Delaware & Hudson Ry. Co. v. Knoedler Mfrs., Inc.*, 781 F.3d 656, 662-67 (3d Cir. 2015) (concluding Locomotive Inspection Act did

---

[3]     Neither in *Northwest Airlines* nor *Texas Industries* was the Court directly presented with the argument that contribution (let alone indemnification, which was not at issue in either case) was available under state law; rather, in both cases the Court simply declined to recognize a right to seek contribution or indemnification directly under the applicable federal statute.
.

not preempt state-law contribution and indemnification claims); *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1006-07 (6th Cir. 2009) (concluding Commodities Exchange Act did not preempt state-law claim for indemnification, at least where party seeking indemnification prevailed in court below); *Foley v. Luster*, 249 F.3d 1281, 1286-88 (11th Cir. 2001) (concluding copyright act did not preempt indemnity claim against codefendant); *Clover Communities Beavercreek, LLC v. Mussachio Architects P.C.*, 2023 WL 3864965, at *4-6 (N.D.N.Y. June 7, 2023) (declining to dismiss claim seeking contribution for violations of Fair Housing Act under N.Y. C.P.L.R. Section 1401). Instead of asking whether Congress intended to create a right to contribution or indemnification, these courts ask whether Congress intended to eliminate such a right that was already created by state law.

The Court is persuaded that the latter approach is correct and best comports with Supreme Court precedent. Under that precedent, the Court cannot simply presume that Congress intended to preempt all state-law claims for contribution or indemnification that are based upon federal-law violations. *See U.S. Smokeless Tobacco Mfg. Co., LLC v. City of New York*, 703 F. Supp. 2d 329, 336 (S.D.N.Y. 2010) ("[T]he Supreme Court's 'preemption jurisprudence' 'explicitly rejects the notion that mere congressional silence on a particular issue may be read as pre-empting state law.'" (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 616 (1997) (Thomas, J., dissenting)); *see also AECOM Servs., Inc.*, 854 F.3d at 1156-50 (stating that inferring an intent to preempt state-law indemnification claim

from Congressional silence would "turn[] the presumption against preemption on its head"). Rather, "[w]hen addressing federal preemption questions, '[courts] have long presumed that Congress does not cavalierly pre-empt state-law causes of action,' and therefore 'start['s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (first quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), then quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)); *see also O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 85 (1994) ("[M]atters left unaddressed [by a federal statutory] scheme are presumably left subject to the disposition provided by state law."). Persuaded that this is the correct approach, the Court here must conduct a traditional preemption analysis to determine if it was Congress's intent for the TVPA to preempt state contribution and indemnification remedies.

A federal statute can preempt state law in one of three ways. First, a statute may contain an express preemption provision evincing an intent to displace state law. The TVPA contains no such provision and so express preemption is not relevant here. *See Marentette*, 886 F.3d at 117. Second, "field preemption" applies if Congress has occupied the field by creating a scheme so comprehensive that it "le[aves] no room for supplementary state regulation." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987) (internal quotation marks omitted). Third, a state law may be impliedly preempted where it is

impossible to comply with it and federal law, or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Marentette*, 886 F.3d at 117 (citation omitted).

Applying these principles, the Court concludes the TVPA does not preempt the state-law contribution or indemnification claims made here.

For starters, the TVPA does not contain a comprehensive remedial scheme that would be disrupted by permitting JPMorgan's contribution or indemnification claim. The TVPA's civil remedial provision simply states that "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator . . . in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." 18 U.S.C. § 1595(a). Beyond this, the only other details Congress set forth were to provide for an automatic stay during the pendency of a criminal action under the TVPA, to specify the statute of limitations, and to grant the State attorneys general standing to bring *parens patriae* actions. *See id.* § 1595(b)-(d). Nowhere does the TVPA specify how such damages are to be calculated or how they are to be allocated. Nor did Congress impose treble damages which might indicate an intent to impose putative sanctions that should not be shifted to other parties. *Cf. Texas Industries*, 451 U.S. at 639.

This fact distinguishes the Second Circuit precedent upon which Staley relies. The decision in *Herman v. RSR Sec. Servs. Ltd.*, 172

F.3d 132 (2d Cir. 1999), which actually acknowledge that a preemption analysis was necessary, nevertheless concluded that the Fair Labor Standards Act ("FLSA") preempted any state-law claim for contribution or indemnification because its "remedial scheme [was] sufficiently comprehensive." *Id.* at 144. And while the opinion in *In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013), did declare in dicta that "it is settled in this Circuit that there is no claim for contribution unless the operative federal statute provides one," in support of this proposition it cited *Herman v. RSR Sec. Servs. Ltd.*, *id.* at 65, indicating that the statement was limited to that "field preemption" context. Indeed, what is more, the federal statutory scheme at issue in the *Madoff* case –- the Securities Investor Protection Act ("SIPA") -– similarly contained a comprehensive remedial scheme, as the district court in that case expressly found. *See Picard v. HSBC Bank PLC*, 454 B.R. 25, 38 (S.D.N.Y. 2011) ("Given that these payments are being made pursuant to a comprehensive statutory scheme, however, the Court concludes that the Trustee cannot rely on state law to seek contribution where a right to contribution is not expressly provided by a federal statute." (emphasis added)). Accordingly, the Second Circuit in *Madoff* did not address a circumstance where the remedial scheme was not comprehensive as is the case here.[4]

---

[4] Furthermore, the plaintiff seeking contribution in *Madoff* did not even argue that it was entitled to contribution for liability imposed by SIPA. *See* Brief for Trustee-Appellant, *In re Bernard L. Madoff Inv. Sec. LLC.*, No. 11-5044-bk., 2012 WL 506826, at *62-68 (2012) ("[T]he Trustee does not seek contribution for violations of SIPA or any other federal statute."). Rather, the plaintiff argued that it was seeking contribution for state-law violations –- a contention which the *Madoff* court rejected on substantive grounds. *See* 721 F.3d at 65 ("[T]he SIPA

Moreover, the purposes of the TVPA would not otherwise be frustrated by permitting contribution and indemnification. Congress enacted the TVPA "to prevent trafficking in persons, to ensure punishment of traffickers, and to protect their victims." H.R. Rep. No. 108-264(II) (2003), at *2. Permitting contribution or indemnification would not undermine these objectives where, as here, the state law rights are premised upon imposing financial liability on a party responsible, in whole or part, for the underlying conduct. Specifically, the New York state-law contribution claims here asserted do this by estimating the comparative responsibility of a party and assigning an amount of damages accordingly. Furthermore, common-law indemnification under the New York law applicable here shifts liability to a responsible party in a still more explicit manner, applying only where the third-party plaintiff seeking indemnification has been held liable without <u>any</u> personal fault (as, for example, in the case of a principle's vicarious liability for the acts of an agent). *See generally Santoro v. Poughkeepsie Crossings, LLC*, 180 A.D.3d 12, 16–17 (N.Y. App. Div. 2019) (describing distinct roles of contribution and indemnification). Shifting liability to a culpable party in this manner is perfectly consistent with the statutory scheme. *See AECOM Servs., Inc.*, 854 F.3d at 1160 (suggesting that prohibiting city's claim for indemnification from contractor who was responsible for

_____

payments for which Picard seeks contribution were not compelled by . . . state law").

violation of federal statute "would itself hamper the statutes' regulatory purpose").

Permitting claims for contribution and indemnification is particularly appropriate where, as here, the third-party complaint seeks relief from a third-party defendant who is also among the class of individuals whose conduct the statute is designed to regulate. If the complaints' allegations are accepted as true, plaintiffs presumably could have elected to sue Staley directly under the TVPA, seeking much of the relief they sought against JPMorgan. While the plaintiffs chose instead to pursue claims exclusively against JPMorgan, the fact Congress also authorized them to pursue claims against Staley under the TVPA demonstrates that permitting contribution or indemnification against him under state law would not disrupt the statutory scheme.

Staley nevertheless argues that permitting contribution or indemnification would "cut against the TVPA's mission to protect trafficking victims." Staley Mem. at 9. He first suggests that permitting contribution and indemnification claims will "complicate and add expense to victims' suits." Staley Br. at 10. But this is not actually the case here and, in any case, is readily cured in other cases. For starts, a claim an action for contribution or indemnification need not be brought in the same proceeding as the underlying complaint. While Federal Rule of Civil Procedure 14 allows for the joinder of such claims, it also grants district courts "considerable discretion in deciding whether to permit a third-party

complaint." *Too, Inc. v. Kohl's Dep't Stores, Inc.*, 213 F.R.D. 138, 140 (S.D.N.Y. 2003). Among the factors a court is to consider in resolving such a motion is "whether impleading would unduly delay or complicate the trial." *Id.* This discretion is sufficient to address any concerns that permitting third-party practice for TVPA claims will harm victims.

Staley also argues that the risk a single trafficker will be forced to bear the entire loss of a TVPA claim itself serves a deterrent function that contribution or indemnification would undermine. *See* Staley Mem. at 10. But the out-of-circuit decision Staley cites, *Anderson v. Griffin*, 397 F.3d 515 (7th Cir. 2005), does not support this contention. It is true that in that case, Judge Posner observed that "not knowing beforehand whom the plaintiff will go against, each potential defendant has an expectation of being the unlucky one, and that expectation performs the deterrent function." *Id.* at 523. This is true as far as it goes. But the point is not that contribution underlines the deterrent function of the TVPA, but only that contribution is unnecessary to achieve that goal ex ante.[5]

For the forgoing reasons, the Court concludes that the TVPA does not preempt JPMorgan's right to seek contribution or indemnification under New York law.

---

[5]     It is also worth noting that the economic analysis relied on by Judge Posner to justify a no-contribution rule rests on the assumption that all defendants are risk-neutral and, further, does not extend to claims based on strict liability, such as JPMorgan's indemnification claim. *See* Lewis A. Kornhauser & Richard L. Revesz, *Sharing Damages Among Multiple Tortfeasors*, 98 Yale L.J. 831, 860 (1989); Gary T. Schwartz, *The Hidden and Fundamental Issue of Employer Vicarious Liability*, 69 S. Cal. L. Rev. 1739, 1743 & n.20 (1996).

**C.    Indemnification Claim**

Beyond the threshold objections discussed above, Staley raises three additional challenges to JPMorgan's indemnification claim: "(1) JPMorgan's contractual indemnity of Mr. Staley precludes any claim for common law indemnification in favor of the bank; (2) both Doe's and USVI's complaints allege that JPMorgan was directly, not vicariously, liable for the misconduct; and (3) JPMorgan fails to allege that the decisions that caused plaintiffs' injuries were solely within Mr. Staley's province at the bank." Staley Mem. at 11-12.

1. Whether JPMorgan's Indemnity Bylaw Extinguished Its Right to Recover Against Staley.

In its corporate bylaws, JPMorgan committed to indemnify Staley "to the fullest extent permitted by applicable law." Dkt. 91-1 § 5.01. Staley contends that this bylaw constitutes a contract between himself and the bank, and that this "contractual indemnity between parties flowing only in one direction [i.e. from the bank to Staley] extinguishes [any] common law indemnity flowing in the other direction." Staley Mem. at 12.

The problem with Staley's argument is that the bylaw in question permits indemnification of Staley <u>only</u> to the "extent permitted by applicable law." The same bylaws go on to make clear that Delaware law supplies the "indemnification standards" to be employed. Dkt. 91-1 § 7.06. And Delaware law permits indemnification by a corporation to its officers' only "if the [officer] acted in good faith and in a manner the [officer] reasonably believed to be in or not opposed to

the best interests of the corporation." Del. Code Ann. tit. 8, §
145(a); *see Waltuch v. Conticommodity Servs., Inc.*, 88 F.3d 87, 93 (2d
Cir. 1996) (Delaware General Corporations Law Section 145 "must mean
that there is no power to indemnify [an officer] if he did not act in
good faith."). Because JPMorgan alleges Staley acted in bad faith and
not in the interest of the company here, Staley's alleged conduct
would fall outside of the indemnification bylaw.

Staley responds that he is not seeking indemnification from
JPMorgan, and so it is irrelevant whether Delaware law would permit
him to do so, but this misunderstands the basis of the rule upon which
his argument relies. The mere existence of a contract between the
parties concerning indemnification does not necessarily extinguish the
common-law right to indemnification. *See Felker v. Corning Inc.,* 682
N.E.2d 950, 953 (N.Y. 1997) ("[T]he ability of a contractor to limit
its contractual obligation to indemnify does not necessarily affect
its duty to provide indemnification under the common law."). JPMorgan
demands indemnification for conduct that is expressly carved out from
the indemnity it offered to Staley. By declining to indemnify Staley
for bad faith conduct, JPMorgan impliedly preserved its right to seek
indemnification from Staley for the same conduct.

2.    <u>Vicarious Liability of JPMorgan.</u>

Staley's second argument is that JPMorgan's indemnification claim
"fails because the plaintiffs' complaints seek to hold the bank liable
for its own actions, not as Mr. Staley's employer." Staley Mem. at 13.
Staley points to the fact that plaintiffs' claims are based, at least

in part, on conduct of the bank outside of Staley's control, such as JPMorgan's failure to follow AML laws or file timely suspicious activity reports ("SAR"). *Id.* at 13-14. In a similar vein, Staley's third argument -- which is really just a reframing of his second -- is that JPMorgan's indemnification claim should be dismissed because "it seeks to hold Mr. Staley accountable for actions outside the scope of his responsibilities at the bank." *Id.* at 14.

Staley is correct that, as a general matter, "a party cannot obtain common-law indemnification unless it has been held to be vicariously liable without proof of any negligence." *McCarthy v. Turner Constr., Inc.*, 953 N.E.2d 794, 801 (N.Y. 2011). Instead, "where a party is held liable at least partially because of its own negligence, contribution against other culpable tort-feasors is the only available remedy." *Santoro*, 180 A.D.3d at 16-17 (quotation omitted).

Staley's argument is not, however, resolvable on a motion to dismiss. While plaintiffs certainly do allege misconduct by JPMorgan that is independent from Staley, they also predicate their claims heavily on allegations of misconduct by Staley. Drawing reasonable inferences in JPMorgan's favor, the plaintiffs' complaints can be read as seeking to hold JPMorgan vicariously liable at least in part based on Staley's misconduct alone. It is possible that, at trial, the jury could decline to find that JPMorgan purposely engaged as a company in any misconduct but nevertheless reach the opposite conclusion as to Staley and hold JPMorgan vicariously liable on that basis. Were this to happen, JPMorgan would be entitled to indemnification.

Of course, the jury might also find the opposite, in which case contribution would be the appropriate remedy, but at this stage of the case JPMorgan is permitted to put forward its claims of indemnification and contribution in the alternative. *See, e.g.*, *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 308 (S.D.N.Y. 2010) (permitting third-party plaintiff's alternative allegations that (a) no agency relationship existed between it and third-party defendant, but (b) if relationship did exist, third-party plaintiff would be entitled to indemnification).

The same is true with respect to Staley's argument that he may not be held liable for acts "outside the scope of his responsibilities at the bank." Staley Mem. at 14. While there are certainly categories of alleged misconduct that were arguably outside of Staley's control, JPMorgan contests those allegations and could disprove them at trial, and could still be held subject to vicarious liability based on Staley's conduct, in which case JPMorgan could be entitled to common-law indemnification.

### D.   Contribution Claim

Staley also argues that JPMorgan's contribution claim should be dismissed for failure to state a claim. Under N.Y. C.P.L.R. § 1401, one person may claim contribution from another when they are "subject to liability for damages for the same personal injury." N.Y. C.P.L.R. § 1401; *see also Godoy v. Abamaster of Miami*, 754 N.Y.S.2d 301, 306 (N.Y. App. Div. 2003) ("Contribution is available where two or more tortfeasors combine to cause an injury and is determined in accordance

with the relative culpability of each such person." (internal quotation marks omitted)). There are, therefore, three elements of JPMorgan's contribution claim: (1) Staley breached a duty that he owed to either the plaintiffs or JPMorgan; (2) his breach caused an injury; and (3) the injury was the same injury for which JPMorgan is being held liable. *See Bellis v. Tokio Marine & Fire Ins. Co.*, 2002 WL 193149, at *17 (S.D.N.Y. Feb. 7, 2002). Staley argues JPMorgan has failed to adequately allege the first and third elements.

1. Breach of Duty

Initially, Staley argues that JPMorgan has failed to allege it breached a duty "owed to either the plaintiffs or JPMorgan." Staley Mem. at 15. JPMorgan responds that it has adequately alleged a breach of duty that Staley owed to the bank as its employee. As explained below, the Court finds JPMorgan has adequately such a breach of fiduciary duty by Staley.[6]

2. Same Injury

Staley further contends "JPMorgan has not adequately pleaded that Mr. Staley caused the same harm for which the bank has been sued." Staley Mem. at 15. Staley argues that "[t]he crux of the plaintiffs' complaints is that JPMorgan provided the 'financial lifeblood' of Epstein's sex trafficking ring, by providing access to limitless cash

---

[6]     If it were found that Staley violated a statutory duty imposed by the TVPA, that would also seem to satisfy the first element of the contribution claim. *See Oursler v. Brennan,* 884 N.Y.S.2d 534, 542 (2009) (reversing dismissal of contribution claim based on third-party defendants' violation of New York's Dram Shop Act). However, because JPMorgan does not argue that Staley breached a duty owing directly to plaintiffs, the Court does not reach this issue. *See* JPMorgan Opp. at 15.

and helping Epstein evade detection by ignoring banking regulations."
*Id.*

But the third element of the contribution claim focuses on the *injury* for which contribution is sought, not the conduct that caused that injury or produced the liability. *See Crow-Crimmins-Wolff & Munier v. Westchester Cnty.*, 455 N.Y.S.2d 390, 391 (N.Y. App. Div. 1982) ("Contribution rules apply to the third-party action even though the respective liabilities of the [parties] might rest on different grounds, since the same injury to defendant is involved in each instance."). JPMorgan alleges that Staley concealed Epstein's activities and his knowledge thereof from the bank, vouched for Epstein's character, and ultimately caused Epstein's retention as a client. JPMC Compl. ¶¶ 36-42. Those allegations plausibly allege that Staley directly contributed to Epstein's sex trafficking venture, to JPMorgan's role in that venture and, ultimately, to the injuries for which JPMorgan now seeks contribution. Staley's argument that he was not personally responsible for another aspect of JPMorgan's conduct -- the direct funneling of cash to Epstein -- might reduce his overall culpability for the injury, and hence the proportion of damages that Staley is liable for, but it does not undermine JPMorgan's claim as a matter of law.[7]

---

[7]    Staley argues that punitive damages are unavailable on a contribution claim. Staley Mem. at 16-17. JPMorgan concedes this point. JPMorgan Opp. at 16 n.2. Accordingly, to the extent JPMorgan seeks punitive damages pursuant to its contribution claim, that portion of the claim is dismissed.

### E.    Employment Law Claims[8]

Staley argues that JPMorgan's first-party claims for breach of fiduciary duty and under the faithless servant doctrine should also be dismissed for failure to state a claim.

#### 1.    Statute of Limitations

Staley first argues that both of JPMorgan's employment claims are time-barred by New York's three-year statute of limitations. Staley Mem. at 18-20. JPMorgan argues that Delaware, rather than New York, law applies to its breach of fiduciary duty claim (although it concedes New York law applies to its faithless servant claim). JPMorgan Opp. at 18-20. The Court need not resolve this choice-of-law question, because it finds the outcome is the same under New York and Delaware law.

"[T]he statute of limitations is normally an affirmative defense, on which the defendant has the burden of proof." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004) (internal citation omitted). "As a result, a claim should only be dismissed on a motion to dismiss based on a statute of limitations defense if the factual allegations in the complaint clearly show that the claim is untimely, and if drawing all reasonable inferences in favor of the plaintiff, the court concludes that the plaintiff's own factual allegations prove the defendant's statute of limitations defense." *Sec. & Exch. Comm'n v.*

---

[8]    Because the Court declines to dismiss JPMorgan's claims for indemnification and contribution, the Court need not dismiss JPMorgan's employment law claims pursuant to Federal Rule of Civil Procedure 14(a). *See* Staley Mem. at 15-17.

*Fiore*, 416 F. Supp. 3d 306, 330–31 (S.D.N.Y. 2019) (internal quotation marks omitted).

Here, disputes of fact exist concerning Staley's limitations defense, making it inappropriate for resolution on a motion to dismiss. Both New York and Delaware law recognize that the "discovery rule" applies to claims that allege fraud. This rule extends the statute of limitations for "two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8); *see Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004) (limitations period tolled "where the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of."). JPMorgan alleges that Staley actively concealed his activities, and that JPMorgan did not discover his alleged misconduct until Doe and USVI brought suit. *See* JPMC Compl. ¶¶ 36–42. Accordingly, JPMorgan contends that the discovery rule extends the applicable statute of limitations, and its claims are timely.

Staley responds that public news reporting from 2018 and in 2019 following Epstein's arrest put JPMorgan on inquiry notice about Staley's supposed misconduct and should have at least led JPMorgan to investigate. Staley Mem. at 8. But the public scrutiny of Epstein in 2018 and 2019 that Staley identifies did not, on its face, reveal any of <u>Staley's</u> alleged misconduct relating to Epstein. Whether JPMorgan was nevertheless aware of Staley's involvement by that point, or

possessed sufficient facts to be on inquiry notice, presents "a mixed question of law and fact" that the Court cannot resolve at this stage of the litigation. *Berman v. Holland & Knight, LLP*, 66 N.Y.S.3d 458, 458 (N.Y. App. Div. 2017) (quotation omitted) (concluding IRS deficiency letter that did not specifically mention defendant did not place plaintiff on inquiry notice); *see also Sargiss v. Magarelli*, 12 N.Y.3d 527, 532, (2009) ("Where it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts."); *Wal-Mart*, 860 A.2d at 314 (where the limitations defense "poses issues that require a more developed record," it is "improperly disposed of on a motion to dismiss.").

### 2. Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty, a plaintiff need only allege the existence of a fiduciary relationship and misconduct resulting in a breach of that duty. *See Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020); *Est. of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011). To the extent JPMorgan's claim is predicated on fraudulent conduct, it must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires the "circumstances constituting [the] fraud" be plead "with particularity." *See* JPMorgan Opp. at 21-22 (conceding Rule 9(b) applies).

Staley argues that JPMorgan has failed to allege with particularity the circumstances surrounding the allegedly fraudulent conduct. A review of JPMorgan's third-party complaint, as well as the Doe FAC and USVI FAC, demonstrates that, to the extent JPMorgan's allegations are predicated on an alleged fraud, they are sufficient to satisfy Rule 9(b).

JPMorgan alleges that Staley acknowledged in writing that he had a duty to act in JPMorgan's best interests, to avoid conflicts of interest, and to avoid any activities that would damage JPMorgan either financially or reputationally, when he signed a written affirmation of the company's code of conduct. *See* JPMC Compl. ¶¶ 17-21. As explained above, Staley allegedly breached these commitments, and his duty of loyalty, by directly facilitating and participating in Epstein's misconduct. *See* JPMC Compl. ¶¶ 22, 24, 26, 27; Doe FAC ¶¶ 115, 128, 226, 227. JPMorgan alleges that Staley concealed Epstein's misconduct from JPMorgan, "used his clout within JP Morgan to make Epstein untouchable," "repeatedly thwarted JPMC's efforts to sever ties with Epstein," JPMC Compl. ¶ 28 (citing Doe FAC ¶¶ 132, 184, 188), and played "a role in convincing JPMC to maintain Epstein as a JPMC client." *Id.* ¶ 33 (citing USVI FAC ¶¶ 47, 52-63, 71-73). Placing Epstein's interest before that of JPMorgan in this manner appears to be a classic example of a breach of the duty of loyalty. *See* Restatement (Second) of Agency § 394 ("[A]n agent is subject to a duty not to act or to agree to act during the period of his agency for persons whose

interests conflict with those of the principal in matters in which the agent is employed . . . .").

While Staley also takes issue with JPMorgan's allegations with respect to causation, JPMorgan's theory is sufficiently clear to survive a motion to dismiss. JPMorgan alleges that Staley's fiduciary duty breach "was a direct and proximate cause of JPMC's decision to do business with Epstein until 2013," and that Staley's breach caused JPMorgan to suffer both adverse publicity (for which it seeks reputational damages) and the cost of litigation from the Doe and USVI lawsuits. JPMC Compl. ¶¶ 63-65. Drawing all reasonable inferences in JPMorgan's favor, as the Court must at this stage of litigation, JPMorgan has plausibly alleged a causal connection between Staley's purported breach and JPMorgan's injury.

### 3. Faithless Servant Doctrine

An agent may be liable as a faithless servant if either (a) the agent commits "misconduct . . . that rises to the level of a breach of a duty of loyalty or good faith," *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 202 (2d Cir. 2003); or (b) the employee "substantially violates the contract of service such that it permeates the employee's service in its most material and substantial part." *Stefanovic v. Old Heidelberg Corp.*, 2022 WL 3928370, at *7 (S.D.N.Y. Aug. 31, 2022) (quotation omitted). Under the doctrine, a "principal is entitled to recover from his unfaithful agent any commission paid by the principal." *Phansalkar*, 344 F.3d at 200 (quotation omitted). As explained above, the Court concludes JPMorgan has adequately alleged

a breach of fiduciary duty. Those allegations are also sufficient to support a claim under the faithless servant doctrine.

Staley nevertheless argues that the faithless servant doctrine should be limited to circumstances "that put a company and its employee at *financial* odds," Staley Reply at 10, such as "embezzlement, improperly competing with the current employer, or usurping business opportunities." Staley Mem. at 24. It is true that "[c]ourts in this circuit have generally found that minor misconduct does not constitute the type of persistent pattern of disloyalty that courts have found necessary to bring conduct within the confines of the [faithless servant] doctrine," *Stefanovic*, 2022 WL 3928370, at *7, and that as a result, the doctrine has <u>typically</u> been limited to the categories of misconduct Staley identifies.[9] But the allegations in cases involving such "minor misconduct" stand in stark contrast to those at issue here, where a high-level executive is alleged to have engaged in highly inappropriate conduct that spanned almost a decade and exposed JPMorgan to substantial potential civil and criminal liability. Put simply, if plaintiffs' allegations are proven true, Staley cannot possibly be said "to [have] exercised the utmost good faith and loyalty in the

---

[9]     *See, e.g.*, *Ebel v. G/O Media, Inc.*, 2021 WL 2037867, at *6 (S.D.N.Y. May 21, 2021) (dismissing faithless servant claim alleging employee sought to manufacturer basis for departure "to trigger the good-reason provision of her employment contract, and improperly received and maintained confidential and privileged documents"); *Stefanovic*, 2022 WL 3928370, at *8 (dismissing claim alleging employee "alter[] tips from customers approximately twelve times over two years" because "'petty pilfering' of the type considered here has repeatedly been found insufficient to support a faithless servant claim"); *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 470 (S.D.N.Y. 2008) ("Nor can it be, as Gristede's apparently supposes, that every routine termination for sexual harassment or credit card fraud necessarily raises faithless servant claims.").

performance of his duties." *W. Elec. Co. v. Brenner*, 360 N.E.2d 1091, 1094 (1977).

## III.  **Conclusion**

For the foregoing reasons, the Court hereby denies Staley's motion to dismiss in its entirety.

*     *     *     *     *

On August 10, 2023, the Court stayed the deadline to file motions for summary judgment relating to third-party claims pending issuance of this Opinion. Those deadlines are hereby reset as follows: motions for summary judgment respecting third-party claims shall be filed on or before August 25, 2023; answering papers by September 8, 2023; and reply papers by September 15, 2023. Oral argument on any such motion will be held on Monday, October 2, 2023, at 4:00 P.M.

SO ORDERED.

New York, NY
August 18, 2023

JED S. RAKOFF, U.S.D.J.