**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS, <br><br>                 Plaintiff, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A., <br><br>                 Defendant/Third-Party Plaintiff. | Case No. 22-cv-10904 (JSR) |
| JPMORGAN CHASE BANK, N.A., <br><br>                 Third-Party Plaintiff, <br><br> v. <br><br> JAMES EDWARD STALEY, <br><br>                 Third-Party Defendant. | |

**JPMORGAN CHASE BANK, N.A.'S MEMORANDUM OF LAW IN OPPOSITION TO
UNITED STATES VIRGIN ISLANDS' MOTION TO EXCLUDE EXPERT OPINIONS
OF KIMBERLY MEHLMAN-OROZCO, JOSEPH FONSECA, AND CARLYN IRWIN**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT ................................................................................................. 1

I.   DR. KIMBERLY MEHLMAN-OROZCO'S TESTIMONY SHOULD NOT BE STRICKEN ........... 1

    A.   Dr. Mehlman-Orozco Is Eminently Qualified To Serve As An Expert On Human Trafficking ........................................................................ 2

    B.   Dr. Mehlman-Orozco Does Not Stray Outside The Scope Of Her Expertise ................................................................................... 5

    C.   Dr. Mehlman-Orozco's Opinions Are Correct And Relevant ......................... 6

II.  JOSEPH FONSECA'S TESTIMONY SHOULD NOT BE STRICKEN ......................................... 9

    A.   Mr. Fonseca Is Qualified To Provide Expert Testimony On Uses Of SARs In Federal Trafficking Investigations ................................................. 9

    B.   Mr. Fonseca's Opinions On What Federal Law Enforcement Would Have Done Are Grounded In Fact ......................................................... 14

III. CARLYN IRWIN'S TESTIMONY RELATED TO ECONOMIC DEVELOPMENT COMMISSION BENEFITS SHOULD NOT BE STRICKEN ............................................... 18

    A.   Ms. Irwin's EDC-Related Opinions Are Relevant ........................................ 19

    B.   Ms. Irwin Is Sufficiently Qualified To Offer Her Proffered Opinions ............ 21

    C.   Ms. Irwin Does Not Purport To Testify Regarding Motive ............................ 23

CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Metro North Commuter Railroad Co.*,
  882 F.2d 705 (2d Cir. 1989)..................................................................................23

*Arista Records LLC v. Lime Group LLC*,
  2011 WL 1674796 (S.D.N.Y. May 2, 2011) .........................................................12

*Cartier Saada S.A. v. Bank of America, N.A.*,
  2022 WL 195598 (S.D.N.Y. Jan. 21, 2022) ............................................................9

*City of New York v. FedEx Ground Package System, Inc.*,
  314 F.R.D. 348 (S.D.N.Y. 2016) ...........................................................................19

*Figueroa v. Boston Scientific Corp.*,
  254 F. Supp. 2d 361 (S.D.N.Y. 2003).....................................................................14

*Frankel-Ross, v. Congregation Ohr HaTalmud*,
  2016 WL 4939074 (S.D.N.Y. Sept. 12, 2016).........................................................9

*Highland Capital Management, L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005).....................................................................22

*Highland Capital Management, L.P. v. Schneider*,
  551 F. Supp. 2d 173 (S.D.N.Y. 2008).....................................................................24

*In re Zyprexa Products Liability Litigation*,
  489 F.Supp.2d 230 (E.D.N.Y. 2007) ......................................................................22

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
  2006 WL 2128785 (S.D.N.Y. July 28, 2006) .........................................................11

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d Cir. 1995)....................................................................................22

*Olin Corp. v. Lamorak Insurance. Co.*,
  332 F. Supp. 3d 818 (S.D.N.Y. 2018).................................................................4, 5

*Packard v. City of New York*,
  2020 WL 1479016 (S.D.N.Y. Mar. 25, 2020) ...........................................11, 12, 17

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ..............................................................................23

*Securities and Exchange Commission v. Revelation Capital Management, Ltd.*,
215 F. Supp. 3d 267 (S.D.N.Y. 2016) ....................................................................21

*Specialty Minerals, Inc. v. Pluess-Staufer AG*,
395 F. Supp. 2d 109 (S.D.N.Y. 2005) ....................................................................19

*Stagl v. Delta Air Lines, Inc.*,
117 F.3d 76 (2d Cir. 1997) ....................................................................................12

*State of New York v. United Parcel Service, Inc.*,
160 F. Supp. 3d 629 (S.D.N.Y. 2016) ...................................................................19

*Stelman v. United States*,
2016 WL 5315196 (Sept. 21, 2016) ......................................................................14

*Tiffany (NJ) Inc. v. eBay, Inc.*,
576 F. Supp. 2d 457 (S.D.N.Y. 2007) ...................................................................21

*Town of Halfmoon v. General Electric Co.*,
2016 WL 866343 (N.D.N.Y. Mar. 3, 2016) ..........................................................24

*United States v. Bhula*,
2022 WL 17618483 (D. N.M. Dec. 13, 2022) .........................................................4

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir. 2003) ....................................................................................13

*United States v. Tin Yat Chin*,
371 F.3d 31 (2d Cir. 2004) ....................................................................................21

*Valentin v. New York City*,
1997 WL 33323099 (E.D.N.Y. Sept. 9, 1997) ......................................................21

*Washington v. Kellwood Co.*,
105 F. Supp. 3d 293 (S.D.N.Y. 2015) ...............................................................11, 12

*Wechsler v. Hunt Health Systems, Ltd.*,
381 F. Supp. 2d 135 (S.D.N.Y. 2003) ...............................................................11, 12

**Rules, Regulations, Statutes**

18 U.S.C. § 1591(a) ....................................................................................................6, 7

Bank Secrecy Act, 31 U.S.C. 5311 *et seq.*.............................................................5, 6, 9

Fed. R. Evid. 702 ................................................................................................ *passim*

## PRELIMINARY STATEMENT

USVI's motion is an attempt to blind the jury, not protect it from impermissible expert opinion. Each expert targeted by USVI has extensive experience in the field in which they offer their opinion. Each opinion pertains directly to the issues USVI has placed at the center of its case. And each opinion abides the guardrails established for experts under Rule 702—they each *assist* the court and factfinder, not usurp them. Dr. Mehlman-Orozco, for example, leverages nearly two decades of experience as a sex-trafficking expert to explain the *context* of JPMC's purported knowledge of Epstein's crimes—context that will allow the jury to weigh USVI's § 1591 allegations stripped of fallacious 20/20 hindsight. Mr. Fonseca leverages decades of experience as an FBI agent to explain the *context* of FBI-led sex-trafficking investigations—context that will allow the jury to weigh USVI's "obstruction" allegations stripped of conjecture and hypotheticals. Ms. Irwin leverages decades of experience as an accountant to explain the *context* of USVI's decision to grant Epstein financial windfalls—context that will allow a jury to weigh its own conclusions as to USVI's motives and purposes.

USVI unsurprisingly does not want its allegations tested by any audience apprised of the full picture. It has thus manufactured shotgun allegations against the experts' qualifications, and taken aim at strawmen arguments. Each argument fails. The motion should be denied.

## ARGUMENT

### I.   DR. KIMBERLY MEHLMAN-OROZCO'S TESTIMONY SHOULD NOT BE STRICKEN

Dr. Mehlman-Orozco is one of the nation's top sex-trafficking experts. Her report and testimony lay bare the multiple deficiencies at the core of USVI's case—including that Epstein's crimes (while horrible) were not typical of sex trafficking, and that based on objective and reliable indicia, JPMC could not have known of any "sex-trafficking venture," let alone have benefitted from knowingly participating in any such venture. USVI has no answer to Dr. Mehlman-Orozco's

1

analysis that USVI's case (and the opinions of its experts) are built on impermissible hindsight and confirmation bias, among other fallacies.  Instead, it weakly (and prejudicially) besmirches her credentials—and then quibbles with non-issues in her report solely to have something to attack. Each argument avoids the heartland of Dr. Mehlman-Orozco's experience and opinion, and each is of little moment.

### A.   Dr. Mehlman-Orozco Is Eminently Qualified To Serve As An Expert On Human Trafficking

USVI opens its brief with a half-hearted effort to undermine Dr. Mehlman-Orozco's qualifications, baselessly asserting that a leading criminologist, social scientist, author, trainer, and consultant on human trafficking identification and investigation "is not an academic or practitioner in the field of human trafficking."  Mem. 6.  The argument can be quickly dispatched by a cursory review of Dr. Mehlman-Orozco's curriculum vitae.  Dr. Mehlman-Orozco is a Ph.D. graduate from one of the nation's top criminology programs.  Dkt. 292-1 (hereinafter "Mehlman-Orozco Report") at 7.  She (in contrast to USVI's proposed sex-trafficking expert, Bridgette Carr) is a trained social scientist steeped in empirical methods, including qualitative and quantitative data collection and statistical analyses that cut across disciplines and will assist the jury's understanding of the case. Ex. 1  at 54:5-25; 322:15-18; Mehlman-Orozco Report 5-9.[1]  And applying her formal education, experience and training, Dr. Mehlman-Orozco has made the study of human trafficking the centerpiece of her career.  She is the author of *Hidden in Plain Sight: America's Slaves of the New Millennium*, a pathbreaking book built on extensive field research—including interviews with human trafficking victims and convicted human traffickers—and that has since been integrated into the Advanced Human Trafficking Law Enforcement Class used to train law enforcement

---

[1] "Ex _" refers to the exhibits appended to the Declaration of Felicia H. Ellsworth, filed herewith.

across the country.  Mehlman-Orozco Report 5.  She has served as a human trafficking subject matter expert for the RAND Corporation.  Mehlman-Orozco Report 6.  She has published research on human trafficking in peer-reviewed journals and has served as an invited peer reviewer for articles on human trafficking, as well as for the Office of Justice Programs' National Institute of Justice's FY 2022 Research and Evaluation on Trafficking in Persons.   Mehlman-Orozco Report 7-9; Ex. 1 at 63:6-64:23.  Not only has she trained law enforcement agencies in human trafficking identification for investigations, but she teaches human trafficking material in CLEs for attorneys as well as for security professionals.   Mehlman-Orozco Report 6.  Dr. Mehlman-Orozco's qualification as an expert in human trafficking on the basis of her "knowledge, skill, experience, training, or education" are clear beyond cavil.  Fed. R. Evid. 702.

USVI's arguments to the contrary do not withstand even light scrutiny.  First, USVI claims that Dr. Mehlman-Orozco's "primary area of academic study was not human trafficking," Mem. 6, straining to downplay the extensive focus on human trafficking that imbued her graduate coursework and later peer-reviewed research.  Dr. Mehlman-Orozco studied under Dr. Louise Shelley, a pioneering scholar on human trafficking issues.  Ex. 1 at 52:25-54:4; 55:18-56-23.  She completed "several" courses on the subject, including a class taught by Dr. Shelley that was "wholly focused on human trafficking and smuggling."  *Id.* at 56:18-23.  After completing her doctorate, Dr. Mehlman-Orozco taught courses such as "Surviving and Thriving Beyond Sex Trafficking," "Human Rights and Justice," and "Foreign Nationals and Crime," whose coursework either focus on or significant incorporate trafficking material.  Mehlman-Orozco Report 87-88. USVI seeks to mischaracterize her academic career by cherry-picking courses it erroneously claims were "wholly unrelated or not specific to human trafficking," Mem. 6, ignoring that Dr. Mehlman-Orozco "incorporated human trafficking material into all of [her] classes," Ex. 1 at

58:14-25, and that students interested in human trafficking sought out her classes because "that was [her] subject matter area of expertise," *Id.* at Tr. 61:18-62:1.  The only reason Dr. Mehlman-Orozco's 2012 dissertation did not focus on human trafficking (a fact USVI dwells on) was because the "the FBI's Uniform Crime Report didn't even have a data point on trafficking until 2013"—a fact that discredits USVI's theory of JPMC's pre-2013 liability, not Dr. Mehlman-Orozco's credentials.  *Id.* at 53:8-54:4.  And even if Dr. Mehlman-Orozco's "primary training" was not human trafficking—which it was—she nonetheless is qualified based on the education, training, scholarship, and expertise accumulated over "the course of her career."  *See Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 832 (S.D.N.Y. 2018).

Second, USVI smears Dr. Mehlman-Orozco as an unqualified "professional expert," pointing to her extensive experience offering expert testimony in human trafficking cases and her work providing "training and technical assistance for businesses."  Mem. 7-8.  At the outset, Dr. Mehlman-Orozco's consulting work for private-sector clients and testimony in civil and criminal cases in both federal and state courts do not tarnish her qualifications, but burnish them.  As Dr. Mehlman-Orozco testified, this work has included self-evidently relevant experiences, from developing trainings for a dating website to consulting on efforts to identify trafficking risks on online platforms through AI technology, as well as consulting on trafficking interventions in the travel industry.  Ex. 1 at 18:13-19:23.  USVI also ignores altogether Dr. Mehlman-Orozco's extensive work "provid[ing] training and technical assistance to law enforcement," *id.* at 14:23-25; Mehlman-Orozco Report 5-6, as well as the fact that law enforcement agencies have been presented with her research on "human trafficking in the erotic massage industry," Mehlman-Orozco Report 6.  And while Dr. Mehlman-Orozco's qualifications speak for themselves, that she has been consistently qualified by courts to testify on human trafficking removes any doubt as to

her expertise. *E.g.*, *People v. Abdur-Razzaq*, 77 N.Y.S.3d 842, 846-847 (N.Y. Sup. Ct. 2018) ("Dr. Mehlman–Orozco is a researcher who has studied and written extensively on human trafficking. She has also testified as an expert witness in sex trafficking … [and] testified credibly[.]"); *United States v. Woods*, Dkt. 494 at 4, 1:17-cr-01235-WJ (D. N.M. Nov. 13, 2022) ("Dr. Mehlman-Orozco considers herself a leading expert in cases on sex trafficking and the Court agrees with that self-description."); *United States v. Bhula*, 2022 WL 17618483, at *3 (D.N.M. Dec. 13, 2022) ("The Court finds that Dr. Mehlman-Orozco is qualified to testify as an expert.  She possesses relevant advanced degrees, has published papers that are relevant to her field of study, and has testified as an expert in state and federal courts, including this Court."); *see Olin*, 332 F. Supp. 3d at 832 (considering whether proffered expert had previously been qualified to testify on relevant issues); Mehlman-Orozco Report 92-93 (listing prior expert engagements); *see also United States v. Xing*, Dkt. 549 at 5, 2:20-cr-00228-FMO (C.D. Cal. May 23, 2023) ("The government agrees that Dr. Mehlman-Orozco is qualified to testify on many topics relating to sex trafficking.").  In short, Dr. Mehlman-Orozco's state-of the-science methodology and expertise is routinely credited by courts in addition to the larger criminological and social scientific community, and must be credited here.

### B.    Dr. Mehlman-Orozco Does Not Stray Outside The Scope Of Her Expertise

Next, USVI attacks the strawman that Dr. Mehlman-Orozco lacks expertise in banking regulations.  Dr. Mehlman-Orozco does not "purport to be an expert" on banking regulations.  Ex. 1 at 108:11-14.  When asked about the very same quotes cribbed (without context) in USVI's brief (at 8-9), Dr. Mehlman-Orozco affirmed that she is not offering opinions on "whether JPMorgan complied with the Bank Secrecy Act" or whether "JPMorgan appropriately filed suspicious activity reports."  *Id.* at 277:13-278:2; 278:16-25.  To the extent that Dr. Mehlman-Orozco refers to the BSA, she relies on Teresa Pesce—who even USVI concedes has expertise in BSA/AML compliance.  *Id.* at  278:3-8; 278:16-25.  Moreover, as her report explains, Dr. Mehlman-Orozco

concludes that JPMC's policies, procedures, and internal controls *related to human trafficking* were consistent with industry standards, not by interpreting banking regulations, but by assessing the development of red flags and evidence-based and reliable practices *related to human trafficking* in the financial services industry.  Mehlman-Orozco Report 47-50.

At bottom, USVI's claim that Dr. Mehlman-Orozco "offers law enforcement opinions that are outside her expertise" is a transparent effort to exclude well-grounded conclusions with which USVI disagrees.  It cannot be disputed that Dr. Mehlman-Orozco has extensive experience consulting with law enforcement, including on issues of human trafficking identification and investigation.   Mehlman-Orozco  Report  5-6.   She  has  testified  that  she  has  "worked  in collaboration with law enforcement to catalyze investigations." Ex. 1 at 137:13-23.  Her testimony does not, as USVI insists, "downplay[] the importance of JPMorgan complying with the Bank Secrecy Act."  Mem. 9.  Instead, Dr. Mehlman-Orozco explains that the supposed "red flags" of "cash withdrawals and round-dollar wire payments" are unreliable indicia of human trafficking not rooted in state-of-the science research, and thus unlikely to catalyze law enforcement investigations. Mehlman-Orozco Report 51-52.  In fact, Dr. Mehlman-Orozco has "never seen an instance where cash payment … to a victim" has catalyzed an investigation or law enforcement intervention.  Ex. 1 at 65:19-24.  These opinions, offered in her capacity as an expert in human trafficking, do not stray impermissibly into areas outside the scope of Dr. Mehlman-Orozco's expertise—they lie at the heart of expertise built over a lifetime.

### C.    Dr. Mehlman-Orozco's Opinions Are Correct And Relevant

Finally, USVI avoids the thrust of Dr. Mehlman-Orozco's opinion and strains to attack three peripheral issues.

*First*, USVI tries to identify some discrepancy between Dr. Mehlman-Orozco's report and the scope of the TVPA.  As an initial matter, it will be this Court, not any expert, that will define

the law for the jury—just as JPMC explained with respect to USVI's attempt to deploy its own experts to opine on the TVPA and banking regulations.  Regardless, USVI is wrong that Dr. Mehlman-Orozco misstates the scope of 18 U.S.C. § 1591(a) as it pertains to minors.  At the outset of her report, Dr. Mehlman-Orozco correctly states that "[s]ex trafficking … is defined as when a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age."  Mehlman-Orozco Report 23.  She never deviates from this accurate statement of the law.  USVI falsely and inflammatorily suggests that Dr. Mehlman-Orozco minimizes the harms done to minors caught up in commercial sex acts.  But all it points to is a single sentence on page 67 of  Dr. Mehlman-Orozco's report—in a section that merely rebuts Carr's analysis—wherein she explains that "all minors involved in the commercial sex industry *should* be treated as persons in need of social services" (emphasis original), but that not all minors who engage in commercial sex necessarily meet the statutory definition of "trafficking" under 18 U.S.C. § 1591(a).  Both statements are true.  All minors caught up in this "industry" are victims.  But not every one of them has necessarily been "caused to engage in a commercial sex act" "in or affecting interstate or foreign commerce" by way of recruitment, enticement, harboring, transportation—or any of the other *actus rei* defined in § 1591(a).  And the actual point Dr. Mehlman-Orozco makes—both in her report and in her deposition—is simply that while "these children … should not be treated as consenting criminals whatsoever … the fact of the matter is that they … are not treated as [] victims of trafficking … by law enforcement, by courts, by appellate courts, by social services, by a number of entities."  Ex. 1 at 396:4-18.  USVI does not quibble with *that* point—it is clearly (and tragically) true.  And USVI's focus on a peripheral sentence at the end of Dr. Mehlman-Orozco's rebuttal, rather than on her actual

opinions, indicates only that it seeks to obfuscate the deficiencies Dr. Mehlman-Orozco identifies in USVI's case—not advance arguments susceptible to resolution under *Daubert*.

*Second*, and similarly, USVI takes issue with Dr. Mehlman-Orozco's commonsense observation that "establishing actual or constructive knowledge in a third party liability case involving a TVP[A] claim would require, at a minimum, the availability of an evidence-based and reliable indicia." Mehlman-Orozco Report 51. It is not clear what USVI's complaint with this sentence actually is. Again, USVI fails to identify any error in Dr. Mehlman-Orozco's substantive analysis in this section of her report—including that private businesses should not rely on unfounded or unsupported conjecture to conclude someone is engaged in sex trafficking, especially given the potential reputational harm caused to anyone falsely accused. *Id.* 52. But to any extent that USVI suggests that "constructive knowledge" of a TVPA violation can be established *without* "evidence" or "reliable indicia" of sex trafficking, the Court should decline that invitation to obvious legal error.

*Finally*, USVI complains that Dr. Mehlman-Orozco—citing not only her own extensive empirical research, training, and review of court documents, but also the peer-reviewed research in the field—observes the mere existence of a phenomenon known as "secondary exploitation," where trafficking victims can be further exploited and harmed by persons or entities either trying to profit from their pain or by those who manufacture claims of trafficking for their own advantage. Tellingly, despite misdirection concerning whether Dr. Mehlman-Orozco deployed adequate "methodology" for the observations both accepted in the field and that she makes from a lifetime of scholarship, USVI does not actually contest whether this phenomenon happens. And of course, it does. Rather, USVI transparently wishes to excise from reality any possible effect of its litigation on the very victims USVI claims to (but does not) represent. But this Court may be called upon

to weigh the equities of this case in crafting any kind of injunctive relief, and both the Court and jury may be called upon to assess USVI's own complicity when considering JPMC's affirmative defenses.  Whether the victims here are being secondarily exploited—a determination Dr. Mehlman-Orozco agrees she cannot and does not make—is nonetheless squarely relevant to both inquiries.  And regardless, no principle or case allows USVI to present only its version of reality to either the bench or jury.  Its motion essentially asks for exactly that and should be denied.

## II.  JOSEPH FONSECA'S TESTIMONY SHOULD NOT BE STRICKEN

Joseph Fonseca is a retired FBI special agent with decades of experience investigating crimes against children and sex trafficking of both children and adults.  Drawing from that extensive experience, Mr. Fonseca opines on the role of financial records and suspicious activity reports ("SARs") in sex-trafficking investigations generally, and the likely value (or lack thereof) of ████████████ to a sex-trafficking investigation into Epstein specifically.  In so doing, Mr. Fonseca concludes that █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████ Fonseca Report ¶ 15.  Sensing the risk this opinion poses to its theory of this case, USVI argues that Mr. Fonseca's proffered testimony should be excluded, claiming that: (1) Mr. Fonseca is not qualified to provide expert testimony on the use of SARs in federal trafficking investigations; and (2) his opinion on the likely affect ████████████████████████████ ████████████████████████████ is not based on sufficient facts.  Mem. 19-23.  Both arguments fail.

### A.  Mr. Fonseca Is Qualified To Provide Expert Testimony On Uses Of SARs In Federal Trafficking Investigations

USVI first seeks to exclude Mr. Fonseca's expert testimony by arguing that he is not qualified to opine on the use of SARs in federal trafficking investigations.  Specifically, USVI

argues that "Mr. Fonseca's experience gave him no understanding or awareness of SARs, CTRs, or bank reporting duties," and makes much of Mr. Fonseca's lack of familiarity with SARs and bank reporting obligations generally to challenge his qualifications.  Mem. 19.  USVI misses the point.

As JPMC has explained in its summary judgment briefing, USVI did not, and could not, bring claims for violations of the Bank Secrecy Act, 31 U.S.C. 5311 *et seq*. ("BSA") or to enforce any federal bank reporting obligations.  *See Cartier Saada S.A. v. Bank of Am., N.A.*, 2022 WL 195598, at *2 (S.D.N.Y. Jan. 21, 2022) ("'[I]t is now well settled that the anti-money-launder[ing] obligations of banks, as established by the Bank Secrecy Act … do not create a private cause of action.'") (quoting *Frankel-Ross v. Congregation Ohr HaTalmud*, 2016 WL 4939074, at *4 (S.D.N.Y. Sept. 12, 2016)).  As such, Mr. Fonseca does not offer an opinion as to SAR filing requirements or the sufficiency of SAR narratives under the BSA or any of its implementing regulations.  Instead, USVI chose to bring claims for alleged violations of the TVPA for participation in a sex-trafficking venture and intentional obstruction of a sex-trafficking investigation.  As part of those TVPA claims, USVI alleges that JPMC intentionally obstructed a federal sex-trafficking investigation into Epstein ███████████████████████ ██████   With respect to *those* claims, Mr. Fonseca offers his expertise in crimes against children and sex-trafficking investigations, and on the utility of certain kinds of evidence to those investigations.  Fonseca Report ¶¶ 14-15; Ex. 2 at 17:23-18:2.

Mr. Fonseca is plainly qualified for that purpose.  He spent his entire 23-year career with the FBI investigating crimes against children and violent crimes, including sex trafficking of both adults and children.  Fonseca Report ¶¶ 2-3; Ex. 2 at 28:14-18, 111:18-20.  He was trained in the FBI's investigative protocols and techniques and developed extensive experience applying those

protocols and techniques in the context of crimes against children and sex-trafficking investigations. Fonseca Report ¶ 3. Throughout the course of his career in the FBI, Mr. Fonseca served in a variety of investigative roles working with state, federal, and foreign law enforcement agencies in investigating crimes against children and sex trafficking. *Id.* ¶¶ 4-9. Mr. Fonseca worked as an investigator and a coordinator for a task force responsible for more than a dozen cases per week related to crimes against children and sex trafficking, Ex. 2 at 96:19-97:9. He helped create the Metro Atlanta Child Exploitation Task Force in conjunction with Georgia state law enforcement agencies in which he "directed multi-faceted investigations involving domestic child prostitution and human trafficking." Fonseca Report ¶ 4. He was selected to serve in the FBI's Child Abduction Rapid Deployment Team as a team leader, in which he worked on international child abduction and trafficking investigations. *Id.* ¶ 5. And he served as a Supervisory Special Agent and Child Sex Tourism Program Manager within the FBI's Crimes Against Children Coordination Unit where he "directed the development of protocols to uncover the structuring of finances used for webcam sexual exploitation cases." *Id.* ¶ 6. Mr. Fonseca also served as the FBI's first eCrimes Against Children Assistant Legal Attaché "responsible for investigations and training in matters of human trafficking and crimes against children in eleven [Southeast] Asian countries." *Id.* ¶ 7.

USVI makes no argument to the contrary. Instead, while apparently conceding Mr. Fonseca's ability to provide an expert opinion on "other facets of trafficking investigation[s]," Mem. 20, USVI argues that Mr. Fonseca is specifically unqualified to opine on the utility of ███ in sex-trafficking investigations because he had no experience with ███ prior to his work on this case and therefore could not make an informed decision that ███ were irrelevant, Mem 20. Again, this misses the point for at least two reasons.

*First*, USVI offers no support for its granular qualification standard, which is directly contrary to well-settled precedent that an expert "should not be required to satisfy an overly narrow test of his own qualifications." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (quoting *Valentin v. New York City*, 1997 WL 33323099 (E.D.N.Y. Sept. 9, 1997)). "[C]ourts in the Second Circuit liberally construe expert-qualification requirements in consideration of the '"thrust" of the Federal Rules and their general relaxation of the traditional barriers to opinion testimony.'" *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015) (quoting *United States v. Ulbricht*, 2015 WL 413318, at *7 (S.D.N.Y. Feb. 1, 2015)). To that end, the Second Circuit has long held that "Rule 702 does not demand that a witness's expertise be perfectly tailored to the facts of the case." *Packard v. City of New York*, 2020 WL 1479016, at *3 (S.D.N.Y. Mar. 25, 2020) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997)); *see also Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 142-43 (S.D.N.Y. 2003) ("Rule 702 does not require such specificity among the backgrounds of proposed expert witnesses"). Rather, "'[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.'" *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)).

With decades of experience investigating sex-trafficking cases, Mr. Fonseca is undoubtedly qualified to opine on how those cases are investigated by the FBI and the effect, if any, that certain evidence or information is likely to have on a sex-trafficking investigation. *See Packard*, 2020 WL 1479016, at *3 (retired police captain with 15 years' experience and extensive

experience training and observing police officers qualified to opine on "the effect that the provision

of training to police officers can be expected to have on their actions").  It does not matter that he

had no prior exposure to or understanding of SARs prior to this case.  In the context of a sex-

trafficking investigation, SARs are like any other source of information that an agent as

experienced as Mr. Fonseca may or may not consider relevant to their investigation.  They do not

require some special expertise to interpret—they are, in fact, created to aid law enforcement—and

the standards for maintaining, filing, or reporting any such records are both irrelevant and entirely

distinct from the question of what effect, if any, the information contained in those SARs can be

expected to have on a given sex-trafficking investigation.  At trial, USVI may wish to cross-

examine Mr. Fonseca on his experience with SARs or his views on the potential uses of SARs in

sex-trafficking investigations, but those are inquiries that go to the weight a jury may give his

testimony rather than its admissibility under Rule 702.  *See Stagl*, 117 F.3d at 82  (mechanical

engineer qualified as expert in "the interaction between machines and people" despite no specific

expertise in "airline terminal or baggage claim area design"); *see also Washington*, 105 F. Supp.

3d at 305 (holding expert qualified to testify in business valuations despite no experience in apparel

industry and that industry-specific inquiry "obviously goes to the weight of [the expert's]

testimony, not its admissibility"); *Wechsler*, 381 F. Supp. 2d at 142-43 (holding forensic

accountant qualified as expert despite no experience in health care industry and noting that

questions over lack of specific industry experience related to weight rather that admissibility of

testimony).[2]

---

[2] The lone case USVI cites in support of its argument, *United States v. Dukagjini*, 326 F.3d
45 (2d Cir. 2003), is inapposite.  That case concerned the admissibility of expert testimony
regarding the use of code words in drug transactions by a case agent who was also a fact witness
in the same criminal trial.  *See id.* at 53-56.  In noting the heightened risks of allowing a case agent

*Second*, Mr. Fonseca's lack of experience with SARs *is* the point. USVI alleges that JPMC intentionally obstructed a federal sex-trafficking investigation into Epstein ███████████████

██████████████ Yet Mr. Fonseca, who has spent decades conducting precisely these kinds of investigations, has never once "relied on a SAR while investigating a person on charges of sex trafficking," Fonseca Report ¶ 16, "never used a SAR as evidence or as a lead to pursue evidence in the course of an ongoing sex-trafficking investigation," *id.* ¶ 90, and never "opened an investigation for sex trafficking based upon the filing of a SAR," *id.* And Mr. Fonseca explains why: the FBI employs a victim-centered approach to sex-trafficking investigations, in which evidence is marshalled to corroborate and support the credible claims of victims. *Id.* ¶¶ 16-17. In his experience, financial records, including SARs, regarding activity in traditional bank accounts are not essential to that effort. *Id.* ¶¶ 32, 35, 90-97. Put simply, Mr. Fonseca's testimony, based on his specialized knowledge of how the FBI conducts sex-trafficking investigations acquired over decades as an FBI special agent responsible for sex-trafficking investigations, explains to the jury how and why SARs are not seen as important pieces of evidence by the FBI in sex-trafficking investigations. His testimony thus provides the jury with critical context in which to evaluate whether USVI has met its burden of proof on the elements of its obstruction claim. USVI's motion should be denied.

### B.    Mr. Fonseca's Opinions On What Federal Law Enforcement Would Have Done Are Grounded In Fact

USVI's remaining argument against Mr. Fonseca's proffered testimony fares no better. USVI argues that because Mr. Fonseca does not have universal knowledge of what evidence

---

to also function as an expert for the government, the court scrutinized the scope of the witness's expert opinions to differentiate them from "his beliefs about the defendant's conduct based upon his knowledge of the case" as the case agent. *Id.* at 53. That obviously has nothing to do with the scope of Mr. Fonseca's expertise here or how the Court should apply Rule 702's admissibility criteria.

investigators may or may not find useful in every conceivable sex-trafficking case, his expert opinion ███████████ is too speculative to be reliable.  Mem. 21-23.  That is, of course, not the test for reliability of expert testimony under Rule 702, which does "not preclude an expert from testifying on the basis of experience alone or in conjunction with other knowledge, training, skill, or education."  *Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361, 365 (S.D.N.Y. 2003).  Rather where, as here, a proffered expert relies on his personal experience as the basis for his opinion, he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Stelman v. United States*, 2016 WL 5315196, at *10 (Sept. 21, 2016) (quoting Fed. R. Evid. 702 Advisory Comm. Notes, 2000 Amendments).  Mr. Fonseca's proffered testimony easily surpasses that threshold.

Mr. Fonseca's report explains how his experience led to his conclusion that ███████████ ████████████████████████████████████████████████████████████████████ ████████  Specifically, he explains that he had worked on investigations involving crimes against children and sex trafficking as an FBI special agent for 23 years, collaborating with state, federal, and foreign law enforcement agencies to investigate these cases, and never *once* "used a SAR as evidence or as a lead to pursue evidence in the course of an ongoing sex trafficking investigation," and never "opened an investigation for sex trafficking based upon the filing of a SAR."  Fonseca Report ¶ 90.

Further, as already described, Mr. Fonseca's report explains how that experience provides a sufficient basis for his conclusions.  He explains, for example, the FBI's victim-centered investigative approach to sex-trafficking cases.  Fonseca Report ¶¶ 17, 27-31.  He explains how, using this approach, credible victim testimony is the foundation of any investigation, and that

investigators work from that testimony to marshal evidence that corroborates their claims. *Id.* ¶ 17. And he explains how and why, based on his experience, SARs reporting on transactions occurring in traditional bank accounts would not likely be useful in corroborating victim testimony with respect to sex trafficking, particularly in the context of investigations into a subject who "directly abused or sexually exploited a victim," and differentiates these sex-trafficking investigations from other kinds of trafficking behavior. *Id.* ¶¶ 32-37. He even explains that, where an investigator believes financial records may be relevant to an investigation, the primary method for acquiring and reviewing those records is through the issuance of a subpoena, not through the review of SARs. *See, e.g., id.* ¶¶ 19, 37.

And Mr. Fonseca explains in great detail how his experience is reliably applied to the facts of this case. He testified that, based on his review of the evidence and his experience, an investigation into Epstein would not have required anything "unusual," regardless of his wealth or the number of victims. Ex. 2 at 105:21-106:9, 106:25-107:4. He reviewed the available evidence from both the Palm Beach Police Department and the FBI's own investigation into Epstein and concluded that investigators had uncovered evidence against Epstein that corroborated victims' testimony and, based on his experience, could be used to support federal charges against Epstein without the need for ████ other financial records from JPMC— including, for example, the consistent testimony of at least 17 victims, statements from multiple corroborating witnesses, physical evidence recovered from a search of Epstein's home, the identities of up to 40 victims, flight manifests, phone records, and even subpoenas for financial records from other financial institutions. Fonseca Report ¶¶ 50-72. He then connects that conclusion to the facts of the case against Epstein, noting how federal authorities ended their investigation into Epstein prematurely while litigating the right to recover certain computer equipment that was missing from Epstein's

16

home, and how federal prosecutors had, based on the available evidence, drafted a 60-count federal indictment against Epstein relating to "sexual conduct with and trafficking of minors," but chose to instead enter into a non-prosecution agreement granting Epstein immunity specifically for violations of the TVPA in favor of a guilty plea on state charges for reasons entirely unrelated to the sufficiency of the evidence against Epstein. *Id.* ¶¶ 65-72, 78-80.

Having done all this, Mr. Fonseca then reviewed the actual ████ CTRs JPMC filed related to Epstein and, based on his experience, concluded they would not have been likely to affect any sex-trafficking investigation. Fonseca Report ¶ 74. Once again, Mr. Fonseca cogently explains why: none of the information in those reports would have helped corroborate victims' testimony or prove any claim against Epstein. *Id.* ¶ 80 ("The best corroborating evidence of the victim's statements regarding payment was the statements of other victims and Epstein's own staff. In my opinion, it would not have been though a series of leaps to connect small cash payments of $200 … to large monthly cash withdrawals of $40,000. This is particularly so given that Epstein's attorneys readily conceded that victims were paid $200 in cash for massages that turned sexual in nature."). That is not merely speculation as USVI claims. Rather, as Mr. Fonseca would explain to a jury based on his experience, investigators had evidence that Epstein was a client of JPMC through ████ CTRs, media reports, donation checks Epstein wrote to the Palm Beach Police Department, and even from inquiries JPMC itself made with federal authorities about Epstein, *id.* ¶¶ 81, 88-89, and if those investigators believed JPMC's records were relevant to their investigation, it would be incumbent on them to acquire those records proactively through a subpoena, *id.* ¶¶ 19, 92. As Mr. Fonseca explains, that federal authorities never sought those records from JPMC until after Epstein's arrest in 2019 is, in his experience, "a strong indication

that … ███████████████████████████████████████████████ *Id.*
¶ 74.[3]

USVI may wish to challenge Mr. Fonseca on whether or not other investigators have used SARs in their investigations.  But, once again, that question goes to the weight of Mr. Fonseca's testimony, not its admissibility.  *See Packard*, 2020 WL 1479016, at *4-5 (expert testimony of retired police captain reliable where based on his "experience, the NYPD procedure manual, and review of the evidence in [the] case").  USVI is free to cross-examine Mr. Fonseca at trial on that question, but it is not a proper basis to exclude his testimony in the first instance under Rule 702. USVI's motion should be denied.

## III.   CARLYN IRWIN'S TESTIMONY RELATED TO ECONOMIC DEVELOPMENT COMMISSION BENEFITS SHOULD NOT BE STRICKEN

Carlyn Irwin is a Certified Public Accountant and a Certified Fraud Examination with over two decades of experience analyzing economic, financial, causation, and accounting issues in the context of damages claims, valuing businesses, and conducting financial forensic analysis.  She seeks to offer expert testimony regarding the $300 million of tax incentives offered by the USVI Economic Development Commission to Financial Trust and Southern Trust, Epstein's wholly owned companies, between 1999 and 2018.  Dkt. 292-6 ("Irwin Report.").  USVI again claims this is somehow improper for three reasons, none of which has merit.

First, USVI argues that Ms. Irwin's testimony is irrelevant, but USVI offers nothing but retread legal arguments regarding its supposed immunity to equitable defenses that this Court has already rejected.  Second, USVI challenges Ms. Irwin's qualifications to serve as an expert, but her accreditation as a Certified Public Accountant, a Certified Fraud Examination, and further

---

[3] Indeed, USVI's own proffered expert, a former FBI special agent who spent his entire career in Miami and West Palm Beach, concedes that his office never once looked at ███████ ███████████████████████████  *See* Dkt. 295, at 30.

certifications in financial forensics, enterprise and intangible valuation, and business valuation speak for themselves.  Last, USVI mischaracterizes Ms. Irwin's testimony to focus on the motivations and intent of USVI officials, but her report only observes that USVI continued to grant Epstein's companies benefits despite consistently underperforming cost-benefit ratios.  It says nothing about motive or intent.[4]

### A.      Ms. Irwin's EDC-Related Opinions Are Relevant

USVI's headline argument for excluding Irwin's testimony is relevance.  It claims that her "opinions awarded to Epstein's companies are irrelevant" because "JPMorgan's affirmative defenses challenging the Government's conduct are not cognizable."  Mem. 24-25.  That familiar refrain is a reprise of USVI's failed motion to strike JPMC's affirmative defenses, which identically argued that those defenses were "not cognizable as a matter of law." Dkt. 139 at 11. The Court rejected that argument, reserving resolution of whether JPMC's affirmative defenses against USVI bar or limit JPMC's liability for summary judgment and trial.  Dkt. 215.  Because JPMC's affirmative defenses would have been stricken if there was "no question of fact that might allow the defense to succeed," the Court has necessarily already held that the subject of Ms. Irwin's testimony—the USVI grant of $300 million in tax incentives to Epstein-owned companies—is relevant as a matter of law.  *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 111 (S.D.N.Y. 2005).

Indeed, Ms. Irwin's testimony only bolsters the Court's decision.  USVI's argument again relies again on *State of New York v. UPS, Inc.*, 160 F. Supp. 3d 629 (S.D.N.Y. 2016), to argue that Ms. Irwin's testimony is an impermissible collateral challenge of a "protected policy choice,"

---

[4] In a separate section of her report, Ms. Irwin also offered expert opinions disputing conclusion reached by USVI experts Jonathan Rusch and Jorge Amador.  Irwin Report ¶¶ 95-103. Because USVI only seeks to exclude Ms. Irwin's "Opinions Related to Economic Development Commission Benefits," Mem. 23, the admissibility of these other opinions is undisputed.

Mem. 25.  But as JPMC has already explained, Dkt. 159 at 16-19, *UPS* and related case law immunizes only "a government entity's decision-making as to when and under what circumstances to enforce a statute." *UPS*, 160 F. Supp. 3d at 640; *see also City of New York v. FedEx Ground Package Sys., Inc.*, 314 F.R.D. 348, 356 (S.D.N.Y. 2016) (noting "the existence of a basic principle against allowing a party to dictate 'when and under what circumstances' a particular law is to be enforced or not enforced") (citation omitted).  Ms. Irwin's proffered testimony has nothing to do with the enforcement of any statute or regulation; it addresses only the economic rationale of the tax benefits USVI granted.  *See, e.g.*, Ex. 3 at 35:6-9 (Q: "Did you review any other Virgin Islands' statutes or regulations in forming your opinions?" A: "Only the background material about the EDC program that I cite in my report.").

What is more, the Court will not find an opinion from Ms. Irwin in her report or deposition transcript as to whether USVI *should* or *should not have* granted the tax benefits, as USVI suggests. Rather, at her deposition, Ms. Irwin repeatedly testified that she had no opinion as to that question. *See, e.g.*, Ex. 3 at 137:18-119 (A: "I don't have an independent opinion that they shouldn't have approved this."); *id.* 121:8-9 (A: "[]I'm not opining on whether or not they should have … ."); *id.* 118:6-118:7 (A: "I don't have an opinion about that one way or the other."); *id.* 118:16-17 (A: "I don't have an opinion about that one way or the other.").  Ms. Irwin further explained that she was providing economic context for the EDC's decisions, which aids the factfinder in reaching their own conclusions regarding the significance of the tax benefits.  *See, e.g., id.* 118:17-21 ("I'm simply noting that there is this track record of … unfavorable and concerning ratios, and they gave the same person a certificate for another 10 years."); *id.* 137:19-21 (A: "I'm just observing they approved it in spite of all of these other things and concerns"); *id.* 118:9 (A: "I'm just observing what transpired").

In fact, USVI itself—in a futile "gotcha" attempt—highlights that Ms. Irwin testified she was "not an expert in [the EDC personnel's] jobs." Mem. 24 (quoting Ex. 3 at 96:18-19). USVI claims this "concession" demonstrates that Ms. Irwin is not sufficiently qualified to serve as an expert regarding the EDC benefits. But USVI conveniently omits what comes next: Ms. Irwin explains that she *need not* be an expert in their jobs because her testimony does not question the decisions that USVI officials made but rather "compar[es] and assess[es] what they did relative to their own—their own goals and their own objectives." Ex. 3 at 96:18-21. Even on its own terms, USVI's claim that Ms. Irwin's testimony second-guesses the discretionary judgments of a sovereign finds no basis in the record and should be rejected.

### B.    Ms. Irwin Is Sufficiently Qualified To Offer Her Proffered Opinions

USVI next pivots to Ms. Irwin's qualifications. In particular, USVI highlights that Ms. Irwin had "no [prior] familiarity with the tax benefits that are addressed in her report" and that "[n]one of her prior work involved tax benefits awarded by the Virgin Islands or any other U.S. territory." Mem. 26. USVI likewise faults Ms. Irwin for having "never worked for a tax authority" and having "never been an employee of any governmental entity or agency." *Id.*

USVI's gerrymandered set of qualifications fundamentally misunderstands the nature of the *Daubert* inquiry. There is no requirement that an expert witness have prior expertise in the very facts of a case before working on it; otherwise, a qualified expert would be exceedingly rare. Rather, Rule 702 simply requires that the witness be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007) ("[A]ny of [the] five forms of qualifications will satisfy the rule."). The court examines "the totality of the witness's background" in order to determine whether they have the "educational background or training in a relevant field," *SEC v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016), and then "compare[s] the area in which the witness

has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

Ms. Irwin clears this bar with ease. She is a Certified Public Accountant and Certified Fraud Examiner, and she is further certified or accredited in financial forensics, enterprise and intangible valuation, and business valuation. Irwin Report ¶ 16. It is no surprise that for over twenty-five years, courts have permitted Ms. Irwin to serve as an expert witness "analyzing economic, financial, causation, and accounting issues in the context of damages claims, valuing business, [] and conducting financial forensic analysis." Irwin Report Appx. A at 1. Ms. Irwin is more than sufficiently qualified to opine that (1) USVI granted Financial Trust and Southern Trust Company over $300 million in tax incentives, *Id.* ¶ 2; (2) USVI granted these benefits despite "consistently unfavorable cost / benefit analyses," *id.* ¶ 4; and (3) the "extending of benefits without any clear economic basis and without USVI asking the appropriate questions … suggests there is some other reason" why the benefits were granted, *id.* ¶ 7, among other subsidiary conclusions. In short, Ms. Irwin's qualifications and opinions fit like hand and glove.

USVI's argument that Ms. Irwin should be disqualified because she had no prior familiarity with the very USVI tax benefits at issue here, or because she had never worked in a tax authority, are simply neither here nor there. "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007). Any remaining "quibbles" with Ms. Irwin's qualifications are "properly explored on cross-examination" and go to her "testimony's weight and credibility—not its admissibility." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

Finally, USVI puzzlingly argues that Ms. Irwin's analysis is so simple that it violates the principle that "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005). Put aside the contradiction between complaining Ms. Irwin's analysis it too simple and also that she's unqualified. The fact is Ms. Irwin did not simply summarize the historic cost-benefit ratios that the EDC provided itself. Although Ms. Irwin "relied on the data that was produced" by USVI, she "performed [] the calculations independently" and, in doing so, she corrected for inconsistencies in how EDC had performed the calculation historically, including by counting different categories of economic benefits for different years. Ex. 3 at 64:8-9; *id.* 69:16-17; *id.* 73:1-3 (A: "And the reason for that is in that spreadsheet, the EDC, for whatever reason, didn't include certain benefits in the denominator."). After compiling an accurate record of the cost-benefit ratios for the tax incentives offered to Epstein's companies, Ms. Irwin then opines that the "extending of benefits without any clear economic basis" and "without USVI asking the appropriate questions … suggests there is some other reason" why "Mr. Epstein was given $300 million in tax incentives." Irwin Report ¶ 7.

Ms. Irwin's opinions, which draw upon her deep expertise in accounting, fraud, and financial forensics, goes far beyond addressing "lay matters which a jury is capable of understanding" on its own. *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). And because her opinions are directed to matters within her specialized knowledge, they are plainly admissible under Rule 702.

### C.    Ms. Irwin Does Not Purport To Testify Regarding Motive

Lastly, USVI argues that Ms. Irwin's proffered testimony should be excluded because it represents "rank speculation regarding motive that *no* expert is qualified to give." Mem. 27. JPMC surely agrees that "experts may not offer opinions regarding the intent or motive of parties as part

of their analysis"—indeed, that principle is a basis for excluding several of USVI's experts, as JPMC explained in its *Daubert* motion. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016). Ms. Irwin does no such thing.

To the contrary, Ms. Irwin opines that the "extending of benefits without any clear economic basis and without USVI asking the appropriate questions" was "*consistent with the possibility* that these benefits were granted as part of an improper quid-pro-quo exchange." Irwin Report ¶ 7 (emphasis added). At her deposition, Ms. Irwin further confirmed that she was not "opining that there was an improper quid pro quo between USVI and Mr. Epstein" because "[a]s a CPA, a certified fraud examiner" she understood that is "left up to the trier of fact." Ex. 3 at 90:21-25. Ms. Irwin consistently stressed that she did not know whether Epstein's payments to USVI officials "affected the decision" of those officials to grant his companies tax incentives, even cautioning USVI's counsel that a "fraud examiner is not allowed to testify about intent" when probed to do so. *Id.* at 122:8-10; *id.* 122:13-14. Instead, she was merely stating "there's a possibility" of such relationship based upon "the EDC's own standards that they articulate, their own formula that they set forth, to evaluate" the benefits. *Id.* at 91:3-4; *id*. 91:16-18.[5]

Whether a quid-pro-quo relationship ultimately existed is a question for the jury to answer when allowed to see USVI officials face-to-face at trial. Ms. Irwin's analysis simply arms the jury with "the tools to make a determination" of that issue—namely, a financial analysis of the tax incentives USVI offered Epstein's companies for over two decades. *Highland Cap. Mgmt., L.P.*

---

[5] USVI makes much ado about the fact that Ms. Irwin testified that she "didn't conduct a fraud investigation" in this case. Mem. 28. But, as Ms. Irwin explained, a "fraud investigation" is a term of art referring to "an entirely different exercise" than expert testimony, where "a company suspects some sort of wrongdoing" and then brings in a fraud examiner "to investigate those allegations, document them, conduct interviews of stakeholders," etc. Ex. 3 at 122:25-123:18. Ms. Irwin also explained that she had never heard of a "fraud investigation" occurring in the context of litigation. *Id.* at Tr. 123:21-124:1.

*v. Schneider*, 551 F. Supp. 2d 173, 182 (S.D.N.Y. 2008); *see, e.g.*, *Town of Halfmoon v. Gen. Elec. Co.*, 2016 WL 866343, at *16 (N.D.N.Y. Mar. 3, 2016) (rejecting argument that proffered expert opinion concerned the "motivations and intent" of key decision-makers when it was "based on a review of the paper trial created by" the plaintiff and examined "whether or not any documentary evidence produced in discovery substantiat[ed]" plaintiff's purported rationale for its action). USVI is apparently aware of this—and so it bizarrely accuses Ms. Irwin of *deliberately avoiding* any commentary on motive.  Mem. 28-29.  But following a rule is a strange way of breaching it. Because Ms. Irwin's proffered opinion leverages her financial acumen to help the jury reach its own conclusions regarding motive, it lies in the heartland of expert testimony and should not be excluded.

## CONCLUSION

USVI's motion should be denied.

Dated: August 25, 2023

Respectfully submitted,

**MASSEY & GAIL LLP**

**WILMER CUTLER PICKERING
     HALE AND DORR LLP**

Leonard A. Gail (*pro hac vice*)
Rachel Morse (*pro hac vice*)
50 East Washington Street, Suite 400
Chicago, IL 60602
(t) (312) 283-1590
lgail@masseygail.com
rmorse@masseygail.com

/s/ *Felicia H. Ellsworth*
Felicia H. Ellsworth
John J. Butts
Andrés O'Laughlin
60 State Street
Boston, MA 02109
(t) (617) 526-6000
(f) (617) 526-5000
felicia.ellsworth@wilmerhale.com
john.butts@wilmerhale.com
andy.olaughlin@wilmerhale.com

**JONES DAY**

Bethany K. Biesenthal (*pro hac vice*)
110 North Wacker Drive
Suite 4800
Chicago, IL 60606
(t) (312) 269-4303
(f) (312) 782-8585
bbiesenthal@jonesday.com

Boyd M. Johnson III
Robert L. Boone
Alan E. Schoenfeld
Christopher Bouchoux
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888
boyd.johnson@wilmerhale.com
robert.boone@wilmerhale.com
alan.schoenfeld@wilmerhale.com
christopher.bouchoux@wilmerhale.com

Charlotte Taylor
51 Louisiana Ave. NW
Washington, DC 20001
(t) (202) 879-3872
(f) (202) 626-1700
ctaylor@jonesday.com

*Attorneys for JPMorgan Chase Bank,
N.A.*