# EXHIBIT 1

```
 1            UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
    GOVERNMENT OF THE UNITED    )
 3  STATES VIRGIN ISLANDS       )
                                )
 4       Plaintiff,             )
                                )
 5  vs.                         ) 1:22-cv-10904-JSR
                                )
 6  JPMORGAN CHASE BANK, N.A.,  )
                                )
 7       Defendant/Third-       )
         Party Plaintiff.       )
 8  _____)
    JPMORGAN CHASE BANK, N.A.   )
 9                              )
         Third-Party           )
10       Plaintiff,            )
                                )
11  vs.                         )
                                )
12  JAMES EDWARD STALEY,        )
                                )
13       Third-Party           )
         Defendant.            )
14
                FRIDAY, JUNE 30, 2023
15
      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16  ████████████████████████████████████████████
17                    - - -
18            Videotaped deposition of Kimberly
    Mehlman-Orozco, Ph.D., held at the offices of
19  WilmerHale, 2100 Pennsylvania Avenue NW,
    Washington, DC, commencing at 8:37 a.m.
20  Eastern, on the above date, before Carrie A.
    Campbell, Registered Diplomate Reporter and
21  Certified Realtime Reporter.
22
23                    - - -
24        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
25             deps@golkow.com
```

Confidential Pursuant to Protective Order

```
 1              Q.     Have you spent more than

 2      150 hours?

 3              A.     I'm not sure, but I would think

 4      so.

 5              Q.     More than 200 hours?

 6              A.     I don't know.

 7              Q.     How many hours do you plan to

 8      spend on this case in the future?

 9                     MS. ELLSWORTH:  Object to the

10              form.

11                     THE WITNESS:  Whatever amount

12              of hours are required to do my due

13              diligence and do what's required of me

14              as an expert.

15      QUESTIONS BY MS. BOGGS:

16              Q.     And you said you have not

17      submitted any invoices for this case, or you

18      just haven't submitted your final invoice?

19              A.     No invoices.  It's just been on

20      such a tight turnaround that I just haven't

21      had the time to submit it yet.

22              Q.     What do you do for a living?

23              A.     I serve as an expert witness in

24      human trafficking cases.  I provide training

25      and technical assistance for law enforcement.
```

Confidential Pursuant to Protective Order

```
 1      that is a part-time role, no more than ten
 2      hours per week.  But I would say more often
 3      than not, less than -- less than that.
 4           Q.     You mention that you provide
 5      training and technical services through Break
 6      the Chain, and you then also provide training
 7      through Freedom Light; is that correct?
 8           A.     Correct.
 9           Q.     What's the difference between
10      the training you provide at Break the Chain
11      and the training you provide at Freedom
12      Light?
13           A.     So Freedom Light is
14      specifically oriented towards private
15      businesses.  The training through Break the
16      Chain is -- it can be law enforcement.  It
17      could be anybody.
18                  But specifically through
19      Freedom Light, we're actually producing a --
20      the most recent thing is producing a video
21      that can be incorporated into training
22      curriculum for businesses.
23                  Through that capacity in
24      Freedom Light, our largest client, our main
25      client, has been doing reoccurring trainings
```

Confidential - Pursuant to Protective Order

1      for a dating website and then also working

2      with tech companies to try to find artificial

3      intelligence and machine-learning

4      technologies to automate screening protocols

5      specifically for online platforms, so how

6      they can screen and automate ways in which

7      they potentially identify, I guess, instances

8      that might be at risk for trafficking.

9              So, for example, we had worked

10     on a beta version of screening online review

11     forums that were used by commercial sex

12     consumers, screening those for mentions of a

13     particular business and see if there was a

14     way that we can automate that to produce

15     reports for that particular business.

16             So the beta version that we

17     used, we had done an auto -- I think it's a

18     machine-learning technology that was

19     automatically scraping a website by the name

20     of USA Sex Guide.  But there were some issues

21     with security, and also it was duplicating

22     the scraping effort, so we were trying to

23     work through that.

24             But it was never ultimately,

25     you know, disseminated even in beta version.

```
 1              A.      She is on the board, and she

 2       works for that law firm, so she's a member of

 3       the board.

 4              Q.      And what is her -- sorry, go

 5       ahead.

 6              A.      Oh, and she also serves as

 7       treasurer.

 8              Q.      And other than being the

 9       treasurer, what is her connection to Freedom

10       Light?

11              A.      She serves on the board.

12              Q.      And does she perform any

13       services for Freedom Light, other than

14       serving on the board?  Does she help develop

15       the trainings?

16              A.      No.  She doesn't help -- I

17       mean, she gives feedback on the videos and, I

18       mean, serves in a capacity that would be akin

19       to a board.  So she meets with the board

20       and gives feedback on moving forward.

21                      So, for example, I think right

22       now she's looking at the dissemination

23       software of where we're going to publish the

24       online training.  She gives -- because she

25       works for a law firm, she does some advisory
```

Confidential - Pursuant to Protective Order

1    They were not joint programs whatsoever.

2         Q.    What did you do in between 2005

3    and when you began your master of arts

4    program?

5         A.    I was a GED adult basic

6    educational workplace essential skills

7    teacher for a period of time at the adult

8    detention center at Princeland County jail.

9              I don't remember if I was

10   teaching at the time.  So I've taught on and

11   off at George Mason, undergrad classes.

12             I taught at University of

13   Maryland-College Park from around 2012 to

14   around 2014 or so.

15        Q.    Under the doctor of philosophy,

16   where you list your doctor of philosophy

17   degree, it states, "Dissertation:  The

18   'Crimmigration' Effect: An analysis of 287(g)

19   and Latino/a representation in the US

20   juvenile justice system."

21             Do you see that on your CV?

22        A.    Yes, ma'am.

23        Q.    Did you mention human

24   trafficking in your dissertation?

25        A.    No.  So I had -- I had taken

Confidential Pursuant to Protective Order

1    graduate-level coursework on human

2    trafficking with a woman by the name of

3    Louise Shelley, who is one of the few

4    professors that actually had classes,

5    specific graduate classes, on trafficking at

6    the time.  I had asked her to do a -- my

7    dissertation on human trafficking.

8              However, since there wasn't

9    any -- I came from a very heavily

10   quantitative department, and there was no

11   quantitative data collection on human

12   trafficking available at the time.  As I'm

13   sure you're aware, the FBI's Uniform Crime

14   Report didn't even have a data point on

15   trafficking until 2013, which I think was

16   published in 2014.

17             So for that reason, I was told

18   by my program that I could not do my

19   dissertation on trafficking, and -- even

20   though Dr. Shelley was somebody who was

21   willing to provide oversight for that

22   doctoral dissertation.

23             So I did something that I

24   thought was not too far, too far removed,

25   looking at, you know, immigration and

Confidential Pursuant to Protective Order

```
 1     erroneous criminalization, but it wasn't

 2     something that was possible to have been done

 3     in 2012 because of the lack of quantitative

 4     data.

 5           Q.     Under your dissertation, your

 6     CV states, "Expertise:  Human trafficking,

 7     human smuggling, immigration, survey methods

 8     and systematic review."

 9                 Do you see that?

10           A.     Yes, ma'am.

11           Q.     What does that mean,

12     "expertise" here?

13           A.     I would say it's my subject

14     matter area of expertise.  So I think that I

15     had some expertise and background in each of

16     those specific subjects.

17                 For example, I took several

18     classes where I had to do -- in as well as

19     part of my graduate research positions where

20     I had to do systematic reviews.  In one class

21     I did a meta-analysis from those systematic

22     reviews and formally trained in survey

23     research methods.  And I have utilized that

24     in my research where I have done it on human

25     trafficking since then.
```

Confidential - Pursuant to Protective Order

1          Immigration, human smuggling,

2    human trafficking, those are all sort of

3    related to the courses that I took,

4    graduate-level courses, during my current --

5    during my graduate education.

6          Q.    So this is your

7    self-description right here under expertise.

8    This is not a certification --

9          A.    Oh, correct.

10         Q.    -- given to you by George

11   Mason, correct?

12         A.    Yes.

13               I apologize for interrupting

14   you again.  I'm so sorry.

15         Q.    That's okay.  It's sort of

16   natural conversation.  This is an unnatural

17   format.  I get it.

18               You mentioned that you took

19   graduate-level classes relating to human

20   trafficking.

21               Which classes are those?

22         A.    I don't remember offhand.  This

23   was ten -- over ten years ago.  I know that

24   Dr. Louise Shelley was working on her book on

25   human trafficking at the time of my class,

1    and I believe we actually reviewed a version

2    of it that was prior to publication.

3              So she had a class that was

4    specific -- my recollection, it was called

5    human smuggling and human trafficking,

6    something like that.  So that was one class.

7              I took classes on foreign

8    nationals and crime, which focused on human

9    trafficking.

10             I don't remember each and every

11   class that talked about trafficking at the

12   time because, again, it was a burgeoning

13   subject that criminologists were looking at,

14   other than Louise Shelley.  Louise Shelley

15   was somebody who had been looking at it for a

16   number of years, specifically in Europe, as

17   well as in the United States.

18             But what comes to mind just

19   mostly immediately is Dr. Shelley's class is

20   wholly focused on human trafficking and

21   smuggling.

22             But I know that there were

23   several other classes.

24        Q.    You taught at a couple of

25   universities.  You mentioned that earlier,

Confidential - Pursuant to Protective Order

1          Q.      And you taught that class for

2    one semester, correct?

3          A.      Correct.  And it was more of a

4    directed study class with a Ph.D. candidate.

5    So it wasn't a course of students.

6          Q.      You said "candidate."  It was

7    just a one-on-one?

8          A.      A Ph.D. candidate, somebody who

9    had not yet finished their Ph.D. who was

10   going through the process to become a Ph.D.

11         Q.      But you said "candidate,"

12   singular.  Does that mean it was one student?

13         A.      Oh, correct.

14         Q.      The rest of the classes that

15   you mention here, are any of them -- did any

16   of them relate to human trafficking?

17         A.      I incorporated human

18   trafficking material into all of my classes.

19   So I wouldn't say -- just -- same thing with

20   the courses that I took at Mason.  Only one

21   of them was entirely focused on human

22   trafficking, which was Dr. Shelley's, but

23   there were several other classes where human

24   trafficking was incorporated into the

25   material.

1        A.      For sure less than 50 percent.

2        Q.      Less than 25 percent?

3        A.      Possibly.  I mean, I don't

4   remember, but I would say for certain less

5   than 50.

6        Q.      In the GED Workplace Essential

7   Skills and Adult Basic Education, I'm

8   assuming there's no human trafficking there,

9   correct?

10       A.      No.  That was classes that I

11  taught to inmates at the jail.

12       Q.      The first three classes you

13  mentioned, Social Inequality Crime and

14  Justice, Law and Justice Around the World,

15  and Human Rights and Justice, what percentage

16  of those classes were devoted to human

17  trafficking?

18       A.      I don't remember.  I think some

19  students actually criticized for how much I

20  talked about human trafficking compared to

21  other professors.  I don't remember how much.

22  But that was my subject matter area of

23  expertise, and a lot of students were very

24  much interested in that topic, which is why

25  they took it from me as opposed to another

Confidential - Pursuant to Protective Order

1    professor.  I don't remember how much of the

2    material, though.

3           Q.    Was it less than 50 percent?

4           A.    I would say probably.

5           Q.    And other than the first class

6    that we talked about where it was a directed

7    study with a potential Ph.D. candidate, were

8    any of these classes on your list

9    graduate-level classes?

10          A.    No, they were not.

11          Q.    Looking now at page 89 of your

12   report --

13          A.    Uh-huh.

14          Q.    -- so on your CV under

15   Publications --

16          A.    Uh-huh.

17          Q.    -- is this a complete list of

18   your publications?

19          A.    So there's publications that

20   are separate from reports.  So it's not

21   everything that I've written, because there's

22   that second delineation, but let's see.

23                I think so.  I'm just trying to

24   see if the Projected Heros peer-reviewed

25   journal article is here.  Yeah, that's there.

1          I think this should be a

2    complete list.

3          Q.    Are all of these publications

4    published in peer-review journals?

5          A.    No.  Clearly not.

6          Q.    How many of these are published

7    in peer-review journals?

8          A.    So on page 90, the Projected

9    Heros, Self-Perceived Manipulators, that's

10   published in a peer-review journal article.

11   That's one.

12          I think the two articles, the

13   Mentions of Dental Hygiene and Decisions in

14   Dentistry, I think those are two peer-review

15   journal articles.  So that's three.

16          The Safe Harbor Legislation for

17   Juvenile Victims of Sex Trafficking on

18   page 91, that's a peer-review journal

19   article.

20          My book is not a peer-reviewed

21   journal article, but it was reviewed by

22   peers.  So it was reviewed by Louise Shelley.

23   It was reviewed by John Cotton Richmond, who

24   is a former prosecutor.  They provide blurbs,

25   like, on the back.  So it wasn't a

Confidential - Pursuant to Protective Order

1    peer-review process, but it's a hybrid

2    academic/commercial press.  So there was, I

3    think, a vetting of the information to some

4    degree.

5              So I'd say four if you're only

6    counting the journal -- four if you're only

7    counting the journal articles.

8         Q.    When you say your "book," do

9    you mean Hidden in Plain Sight?

10        A.    Yes, ma'am.

11        Q.    You wrote another book called

12   The Jihadi Next Door: How ISIS is Forcing,

13   Defrauding and Coercing Your Neighbor into

14   Terrorism, correct?

15        A.    Correct.

16        Q.    Does that book relate to human

17   trafficking?

18        A.    No, it doesn't relate to human

19   trafficking, but it does discuss how the

20   methods of recruitment into organized crime

21   such as terrorism can -- are tangentially

22   similar to methods of recruitment control

23   used by traffickers.

24        Q.    So does the word "trafficker"

25   or "trafficking" appear in your book?

Confidential - Pursuant to Protective Order

```
 1            A.      No, ma'am, I'm not.

 2            Q.      You're not a psychiatrist,

 3    correct?

 4            A.      That is correct.

 5            Q.      You're not a medical doctor,

 6    correct?

 7            A.      That is correct.

 8            Q.      You're not a mental health

 9    professional, correct?

10            A.      That is correct.

11            Q.      You are not an expert on

12    banking regulations, correct?

13            A.      That is correct.  I don't

14    purport to be.

15            Q.      And you're not an expert on

16    banking compliance, correct?

17            A.      That is correct.

18            Q.      You do not have any expertise

19    regarding the Bank Secrecy Act, correct?

20            A.      Again, I'm not an expert on

21    banking regulations.

22            Q.      Prior to this case, have you

23    ever worked in a financial institution?

24                 MS. ELLSWORTH:  Object to the

25          form of the question.
```

1                    VIDEOGRAPHER:  The time is

2          11:23 a.m.  We're back on the record.

3     QUESTIONS BY MS. BOGGS:

4          Q.     We were talking about your

5     background earlier.

6                    You've never investigated or

7     prosecuted trafficking in connection with any

8     law enforcement agency, correct?

9          A.     What do you mean by

10    investigated?  That I've never investigated

11    as a law enforcement officer?

12         Q.     Correct.

13         A.     As I mentioned earlier, I'm not

14    a law enforcement officer, but I have worked

15    in collaboration with law enforcement to

16    catalyze investigations.

17         Q.     What do you mean, catalyze

18    investigations?

19         A.     To, I guess, provide them with

20    information to start an investigation.  So to

21    provide them with information that they might

22    not be aware of, that might be a situation

23    that is at a high risk of trafficking.

24                    So if you want -- would you

25    like me to give a couple of examples?

1    with regards to -- I mean, again, it depends

2    on what you're talking about.  If you're

3    talking about human trafficking, victim

4    reporting, so reporting that they've been

5    victimized.

6                Oftentimes law enforcement will

7    intervene if they identify an advertisement

8    for commercial sex and reviews for commercial

9    sex online, that'll catalyze an

10   investigation.

11                You see interventions -- let's

12   see.  If there's surveillance of a particular

13   brothel where you're seeing individuals

14   coming in, for example, entirely male

15   clientele going to an erotic massage parlor,

16   it could be from a commercial sex consumer

17   reporting it, it could be a victim reporting

18   it.

19                There are a number of ways in

20   which a law enforcement agency might

21   intervene.  But I've never seen an instance

22   where cash payment from a -- to a victim,

23   I've never seen that catalyze an

24   investigation or intervention.

25          Q.    On page 19, the second to last

```
 1              THE WITNESS:  Again, as I
 2         mentioned, that I think that perhaps a
 3         greater disruptive impact on
 4         traffickers would be incapacitating
 5         them through long terms of
 6         incarceration.  But certainly impeding
 7         on their ability to make money and
 8         exploit their victims and earn money
 9         off of their victims and -- I think it
10         could have a -- also a great
11         disruptive impact, for certain.
12    QUESTIONS BY MS. BOGGS:
13         Q.    If you go back to your report
14    on page 18, you state, "In fact" -- and this
15    is sort of bottom middle, I'll call it.  "In
16    fact, the exact opposite is true, as his
17    alleged crimes continued for six years after
18    the cessation of his business relationship
19    with JPMC ███████████████████████████
20    ███████████████████████████████████
21    ██████████████ ."
22              Do you see that?
23         A.    Yes, ma'am.
24         Q.    You are not offering opinions
25    about whether JPMorgan complied with the Bank
```



```
1    it.  So I would assume that there would be
2    associated law enforcement records that I did
3    not see.
4         Q.    Does everybody always do what
5    they're supposed to do?
6              MS. ELLSWORTH:  Object to the
7         form of the question.
8              THE WITNESS:  Of course not.
9    QUESTIONS BY MS. BOGGS:
10        Q.    So it's possible that these
11   women could have saw a doctor and that the
12   doctor could have identified them or had
13   suspicions that they were a human trafficking
14   victim and never reported it, right?
15        A.    Again, as an empirically based
16   researcher, I'm going to rely upon Popper's
17   theory of falsifiability.  Anything is
18   possible.  So for certain, that is possible.
19        Q.    So you have no concrete
20   evidence -- strike that.
21              MS. BOGGS:  We can take a
22        break.
23              VIDEOGRAPHER:  Okay.  The time
24        is 3:22 p.m., and we're going off the
25        record.
```

Confidential - Pursuant to Protective Order

1    between -- an in-between area between

2    trafficking and consent, but I would not

3    consider survival sex to be truly consenting.

4              So I think my opinion on that

5    issue is made very clear in the report.

6    Again, I think that these children should be

7    treated as persons in need of services,

8    social services.  They should not be

9    criminalized.  They should not be treated as

10   consenting criminals whatsoever.

11             But the fact of the matter is

12   that they -- despite what Ms. Carr says, they

13   are not treated as de facto victims of

14   trafficking.

15        Q.    Treated by whom?

16        A.    By law enforcement, by courts,

17   by appellate courts, by social services, by a

18   number of entities.

19        Q.    So earlier we were talking

20   about misidentification.

21             Have you ever been sued by a

22   business for defamation?

23        A.    Yes.

24        Q.    When?

25        A.    I think in 2015.