# EXHIBIT 56

# DEPARTMENT OF JUSTICE



# OFFICE OF
# PROFESSIONAL RESPONSIBILITY

# EXECUTIVE SUMMARY OF REPORT

Investigation into the
U.S. Attorney's Office for the Southern District of Florida's
Resolution of Its 2006–2008 Federal Criminal Investigation of
Jeffrey Epstein and Its Interactions with Victims during the Investigation

November 2020

# EXECUTIVE SUMMARY

The Department of Justice (Department) Office of Professional Responsibility (OPR) investigated allegations that in 2007-2008, prosecutors in the U.S. Attorney's Office for the Southern District of Florida (USAO) improperly resolved a federal investigation into the criminal conduct of Jeffrey Epstein by negotiating and executing a federal non-prosecution agreement (NPA). The NPA was intended to end a federal investigation into allegations that Epstein engaged in illegal sexual activity with girls.[1] OPR also investigated whether USAO prosecutors committed professional misconduct by failing to consult with victims of Epstein's crimes before the NPA was signed or by misleading victims regarding the status of the federal investigation after the signing.

## I.   OVERVIEW OF FACTUAL BACKGROUND

The Palm Beach (Florida) Police Department (PBPD) began investigating Jeffrey Epstein in 2005, after the parents of a 14-year-old girl complained that Epstein had paid her for a massage. Epstein was a multi-millionaire financier with residences in Palm Beach, New York City, and other United States and foreign locations. The investigation led to the discovery that Epstein used personal assistants to recruit girls to provide massages to him, and in many instances, those massages led to sexual activity. After the PBPD brought the case to the State Attorney's Office, a Palm Beach County grand jury indicted Epstein, on July 19, 2006, for felony solicitation of prostitution in violation of Florida Statute § 796.07. However, because the PBPD Chief and the lead Detective were dissatisfied with the State Attorney's handling of the case and believed that the state grand jury's charge did not address the totality of Epstein's conduct, they referred the matter to the Federal Bureau of Investigation (FBI) in West Palm Beach for a possible federal investigation.

The FBI brought the matter to an Assistant U.S. Attorney (AUSA), who opened a file with her supervisor's approval and with the knowledge of then U.S. Attorney R. Alexander Acosta. She worked with two FBI case agents to develop a federal case against Epstein and, in the course of the investigation, they discovered additional victims. In May 2007, the AUSA submitted to her supervisors a draft 60-count indictment outlining charges against Epstein. She also provided a lengthy memorandum summarizing the evidence she had assembled in support of the charges and addressing the legal issues related to the proposed charges.

For several weeks following submission of the prosecution memorandum and proposed indictment, the AUSA's supervisors reviewed the case to determine how to proceed. At a July 31, 2007 meeting with Epstein's attorneys, the USAO offered to end its investigation if Epstein pled guilty to state charges, agreed to serve a minimum of two years' incarceration, registered as a sexual offender, and agreed to a mechanism through which victims could obtain monetary damages. The USAO subsequently engaged in additional meetings and communications with Epstein's team of attorneys, ultimately negotiating the terms of a state-based resolution of the federal investigation, which culminated in the signing of the NPA on September 24, 2007. The

---

[1]    As used in this Report, including in quoted documents and statements, the word "girls" refers to females who were under the age of 18 at the time of the alleged conduct.  Under Florida law, a minor is a person under the age of 18.

NPA required Epstein to plead guilty in state court to the then-pending state indictment against him and to an additional criminal information charging him with a state offense that would require him to register as a sexual offender—specifically, procurement of minors to engage in prostitution, in violation of Florida Statute § 796.03.   The NPA required Epstein to make a binding recommendation that the state court sentence him to serve 18 months in the county jail followed by 12 months of community control (home detention or "house arrest").   The NPA also included provisions designed to facilitate the victims' recovery of monetary damages from Epstein.   In exchange, the USAO agreed to end its investigation of Epstein and to forgo federal prosecution in the Southern District of Florida of him, four named co-conspirators, and "any potential co-conspirators."   Victims were not informed of, or consulted about, a potential state resolution or the NPA prior to its signing.

The signing of the NPA did not immediately lead to Epstein's guilty plea and incarceration, however.   For the next nine months, Epstein deployed his extensive team of prominent attorneys to try to change the terms that his team had negotiated and he had approved, while simultaneously seeking to invalidate the entire NPA by persuading senior Department officials that there was no federal interest at issue and the matter should be left to the discretion of state law enforcement officials.   Through repeated communications with the USAO and senior Department officials, defense counsel fought the government's interpretation of the NPA's terms.   They also sought and obtained review by the Department's Criminal Division and then the Office of the Deputy Attorney General, primarily on the issue of federal jurisdiction over what the defense insisted was "a quintessentially state matter."   After reviewing submissions by the defense and the USAO, on June 23, 2008, the Office of the Deputy Attorney General informed defense counsel that the Deputy Attorney General would not intervene in the matter.   Only then did Epstein agree to fulfill his obligation under the NPA, and on June 30, 2008, he appeared in state court and pled guilty to the pending state indictment charging felony solicitation of prostitution and, pursuant to the NPA, to a criminal information charging him with procurement of minors to engage in prostitution. Upon the joint request of the defendant and the state prosecutor, and consistent with the NPA, the court immediately sentenced Epstein to consecutive terms of 12 months' incarceration on the solicitation charge and 6 months' incarceration on the procurement charge, followed by 12 months of community control.   Epstein began serving the sentence that day, in a minimum-security Palm Beach County facility.   A copy of the NPA was filed under seal with the state court.

On July 7, 2008, a victim, identified as "Jane Doe," filed in federal court in the Southern District of Florida an emergency petition alleging that the government violated the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, when it resolved the federal investigation of Epstein without consulting with victims, and seeking enforcement of her CVRA rights.[2]   In responding to the petition, the government, represented by the USAO, revealed the existence of the NPA, but did not produce it to the petitioners until the court directed it to be turned over subject to a protective order; the NPA itself remained under seal in the federal district court.   After the initial filings and hearings, the CVRA case was dormant for almost two years while the petitioners pursued civil cases against Epstein.

---

[2]      Emergency Victim's Petition for Enforcement of Crime Victim's [*sic*] Rights Act, 18 U.S.C. Section 3771, *Doe v. United States,* Case No. 9:08-cv-80736-KAM (S.D. Fla. July 7, 2008).   Another victim subsequently joined the litigation as "Jane Doe 2."

Soon after he was incarcerated, Epstein applied for the Palm Beach County Sheriff's work release program, and the Sheriff approved his application. In October 2008, Epstein began spending 12 hours a day purportedly working at the "Florida Science Foundation," an entity Epstein had recently incorporated that was co-located at the West Palm Beach office of one of Epstein's attorneys. Although the NPA specified a term of incarceration of 18 months, Epstein received "gain time," that is, time off for good behavior, and he actually served less than 13 months of incarceration. On July 22, 2009, Epstein was released from custody to a one-year term of home detention as a condition of community control, and he registered as a sexual offender with the Florida Department of Law Enforcement. After victims and news media filed suit in Florida courts for release of the copy of the NPA that had been filed under seal in the state court file, a state judge in September 2009 ordered it to be made public.

By mid-2010, Epstein reportedly settled multiple civil lawsuits brought against him by victims seeking monetary damages, including the two petitioners in the CVRA litigation. During the CVRA litigation, the petitioners sought discovery from the USAO, which made substantial document productions, filed lengthy privilege logs in support of its withholding of documents, and submitted declarations from the AUSA and the FBI case agents who conducted the federal investigation. The USAO opposed efforts to unseal various records, as did Epstein, who was permitted to intervene in the litigation with respect to certain issues. Nevertheless, the court ultimately ordered that substantial records relating to the USAO's resolution of the Epstein case be made public. During the course of the litigation, the court made numerous rulings interpreting the CVRA. After failed efforts to settle the case, the parties' cross motions for summary judgment remained pending for more than a year.

In 2017, President Donald Trump nominated Acosta to be Secretary of Labor. At his March 2017 confirmation hearing, Acosta was questioned only briefly about the Epstein case. On April 17, 2017, the Senate confirmed Acosta's appointment as Labor Secretary.

In the decade following his release from incarceration, Epstein reportedly continued to settle multiple civil suits brought by many, but not all, of his victims. Epstein was otherwise able to resume his lavish lifestyle, largely avoiding the interest of the press. On November 28, 2018, however, the *Miami Herald* published an extensive investigative report about state and federal criminal investigations initiated more than 12 years earlier into allegations that Epstein had coerced girls into engaging in sexual activity with him at his Palm Beach estate.[3] The *Miami Herald* reported that in 2007, Acosta entered into an "extraordinary" deal with Epstein in the form of the NPA, which permitted Epstein to avoid federal prosecution and a potentially lengthy prison sentence by pleading guilty in state court to "two prostitution charges." According to the *Miami Herald*, the government also immunized from prosecution Epstein's co-conspirators and concealed from Epstein's victims the terms of the NPA. Through its reporting, which included interviews of eight victims and information from publicly available documents, the newspaper painted a portrait of federal and state prosecutors who had ignored serious criminal conduct by a wealthy man with powerful and politically connected friends by granting him a "deal of a lifetime" that allowed him both to escape significant punishment for his past conduct and to continue his

---

[3]     Julie K. Brown, "Perversion of Justice," *Miami Herald*, Nov. 28, 2018. https://www.miamiherald.com/news/local/article220097825.html.

abuse of minors.  The *Miami Herald* report led to public outrage and media scrutiny of the government's actions.[4]

On February 21, 2019, the district court granted the CVRA case petitioners' Motion for Partial Summary Judgment, ruling that the government violated the CVRA in failing to advise the victims about its intention to enter into the NPA.[5]  The court also found that letters the government sent to victims after the NPA was signed, describing the investigation as ongoing, "mislead [*sic*] the victims to believe that federal prosecution was still a possibility."  The court also highlighted the inequity of the USAO's failure to communicate with the victims while at the same time engaging in "lengthy negotiations" with Epstein's counsel and assuring the defense that the NPA would not be "made public or filed with the court."  The court ordered the parties to submit additional briefs regarding the appropriate remedies.  After the court's order, the Department recused the USAO from the CVRA litigation and assigned the U.S. Attorney's Office for the Northern District of Georgia to handle the case for the government.  Among the remedies sought by the petitioners, and opposed by the government, was rescission of the NPA and federal prosecution of Epstein.

On July 2, 2019, the U.S. Attorney's Office for the Southern District of New York obtained a federal grand jury indictment charging Epstein with one count of sex trafficking of minors and one count of conspiracy to commit sex trafficking of minors.  The indictment alleged that from 2002 until 2005, Epstein created a vast network of underage victims in both New York and Florida whom he sexually abused and exploited.  Epstein was arrested on the charges on July 6, 2019.  In arguing for Epstein's pretrial detention, prosecutors asserted that agents searching Epstein's Manhattan residence found thousands of photos of nude and half-nude females, including at least one believed to be a minor.  The court ordered Epstein detained pending trial, and he was remanded to the custody of the Bureau of Prisons and held at the Metropolitan Correctional Center in Manhattan.

Meanwhile, after publication of the November 2018 *Miami Herald* report, the media and Congress increasingly focused attention on Acosta as the government official responsible for the NPA.  On July 10, 2019, Acosta held a televised press conference to defend his and the USAO's actions.  Acosta stated that the Palm Beach State Attorney's Office "was ready to allow Epstein to walk free with no jail time, nothing."  According to Acosta, because USAO prosecutors considered this outcome unacceptable, his office pursued a difficult and challenging case and obtained a resolution that put Epstein in jail, forced him to register as a sexual offender, and provided victims with the means to obtain monetary damages.  Acosta's press conference did not end the controversy, however, and on July 12, 2019, Acosta submitted to the President his resignation as

---

[4]     *See, e.g.*, Ashley Collman, "Stunning new report details Trump's labor secretary's role in plea deal for billionaire sex abuser," *The Business Insider*, Nov. 29, 2018; Cynthia McFadden, "New Focus on Trump Labor Secretary's role in unusual plea deal for billionaire accused of sexual abuse," *NBC Nightly News*, Nov. 29, 2018; Anita Kumar, "Trump labor secretary out of running for attorney general after Miami Herald report," *McClatchy Washington Bureau*, Nov. 29, 2018; Emily Peck, "How Trump's Labor Secretary Covered For A Millionaire Sex Abuser," *Huffington Post*, Nov. 29, 2018; Julie K. Brown, et al., "Lawmakers issue call for investigation of serial sex abuser Jeffrey Epstein's plea deal," *Miami Herald*, Dec. 6, 2018.

[5]     *Doe v. United States,* 359 F. Supp. 3d 1201 (S.D. Fla., Feb. 21, 2019) (Opinion and Order, 9:08-80736-CIV-Marra).

Secretary of Labor.  In a brief oral statement, Acosta explained that continued media attention on his handling of the Epstein investigation rather than on the economy was unfair to the Labor Department.

On August 10, 2019, Epstein was found hanging in his cell and was later pronounced dead. The New York City Chief Medical Examiner concluded that Epstein had committed suicide.

As a result of Epstein's death, the U.S. Attorney's Office for the Southern District of New York filed a *nolle prosequi* to dismiss the pending indictment against Epstein.  On August 27, 2019, the district court held a hearing at which more than a dozen of Epstein's victims—including victims of the conduct in Florida that was addressed through the NPA—spoke about the impact of Epstein's crimes.  The court dismissed the Epstein indictment on August 29, 2019.

After Epstein's death, the federal district court in Florida overseeing the CVRA litigation denied the petitioners their requested remedies and closed the case as moot.  Among its findings, the court concluded that although the government had violated the CVRA, the government had asserted "legitimate and legally supportable positions throughout this litigation," and therefore had not litigated in bad faith.  The court also noted it expected the government to "honor its representation that it will provide training to its employees about the CVRA and the proper treatment of crime victims," as well as honoring its promise to meet with the victims.

On September 30, 2019, CVRA petitioner "Jane Doe 1" filed in her true name a petition for a writ of mandamus in the United States Court of Appeals for the Eleventh Circuit, seeking review of the district court's order denying all of her requested remedies.  In its responsive brief, the government argued that "as a matter of law, the legal obligations under the CVRA do not attach prior to the government charging a case" and thus, "the CVRA was not triggered in [the Southern District of Florida] because no criminal charges were brought."  Nevertheless, during oral argument, the government conceded that the USAO had not been "fully transparent" with the petitioner and had "made a mistake in causing her to believe that the case was ongoing when in fact the NPA had been signed."  On April 14, 2020, a divided panel of the Court of Appeals denied the petition, ruling that CVRA rights do not attach until a defendant has been criminally charged. On August 7, 2020, the court granted the petition for rehearing *en banc* and vacated the panel's opinion; as of the date of this Report, a briefing schedule has been issued, and oral argument is set for December 3, 2020.

## II.     THE INITIATION AND SCOPE OF OPR'S INVESTIGATION

After the *Miami Herald* published its investigative report on November 28, 2018, U.S. Senator Ben Sasse, Chairman of the Senate Judiciary Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, sent a December 3, 2018 letter to OPR, citing the *Miami Herald*'s report and requesting that OPR "open an investigation into the instances identified in this reporting of possible misconduct by Department of Justice attorneys."  On February 6, 2019, the Department of Justice Office of Legislative Affairs advised Senator Sasse that OPR had opened

an investigation into the matter and would review the USAO's decision to resolve the federal investigation of Epstein through the NPA.[6]

After the district court issued its ruling in the CVRA litigation, on February 21, 2019, OPR included within the scope of its investigation an examination of the government's conduct that formed the basis for the court's findings that the USAO violated the CVRA in failing to afford victims a reasonable right to confer with the government about the NPA before the agreement was signed and that the government affirmatively misled victims about the status of the federal investigation.

During the course of its investigation, OPR obtained and reviewed hundreds of thousands of records from the USAO, the FBI, and other Department components, including the Office of the Deputy Attorney General, the Criminal Division, and the Executive Office for U.S. Attorneys. The records included emails, letters, memoranda, and investigative materials.  OPR also collected and reviewed materials relating to the state investigation and prosecution of Epstein.  OPR also examined extensive publicly available information, including depositions, pleadings, orders, and other court records, and reviewed media reports and interviews, articles, podcasts, and books relating to the Epstein case.

In addition to this extensive documentary review, OPR conducted more than 60 interviews of witnesses, including the FBI case agents, their supervisors, and FBI administrative personnel; current and former USAO staff and attorneys; current and former Department attorneys and senior managers, including a former Deputy Attorney General and a former Assistant Attorney General for the Criminal Division; and the former State Attorney and former Assistant State Attorney in charge of the state investigation of Epstein.  OPR also interviewed several victims and attorneys representing victims, and reviewed written submissions from victims, concerning victim contacts with the USAO and the FBI.

OPR identified former U.S. Attorney Acosta, three former USAO supervisors, and the AUSA as subjects of its investigation based on preliminary information indicating that each of them was involved in the decision to resolve the case through the NPA or in the negotiations leading to the agreement.  OPR deems a current or former Department attorney to be a subject of its investigation when the individual's conduct is within the scope of OPR's review and may result in a finding of professional misconduct.  OPR reviewed prior public statements made by Acosta and another subject.  All five subjects cooperated fully with OPR's investigation.  OPR requested that all of the subjects provide written responses detailing their involvement in the federal investigation of Epstein, the drafting and execution of the NPA, and decisions relating to victim notification and consultation.  OPR received and reviewed written responses from all of the subjects, and subsequently conducted extensive interviews of each subject under oath and before a court reporter.  Each subject was represented by counsel and had access to relevant contemporaneous documents before the subject's OPR interview.  The subjects reviewed and provided comments on their respective interview transcripts and on OPR's draft report.  OPR

---

[6]     The federal government was closed from December 22, 2018, to January 25, 2019.  After initiating its investigation, OPR also subsequently received other letters from U.S. Senators and Representatives inquiring into the status of the OPR investigation.

carefully considered the comments and made changes, or noted comments, as OPR deemed appropriate; OPR did not, however, alter its findings and conclusions.

Finally, OPR reviewed relevant case law, statutes, regulations, Department policy, and attorney professional responsibility rules as necessary to resolve the issues presented in this case and to determine whether the subjects committed professional misconduct.

As part of its investigation, OPR examined the interactions between state officials and the federal investigators and prosecutors, but because OPR does not have jurisdiction over state officials, OPR did not investigate, or reach conclusions about, their conduct regarding the state investigation.[7]  Because OPR's mission is to ensure that Department attorneys adhere to the standards of professional conduct, OPR's investigation focused on the actions of the subject attorneys rather than on determining the full scope of Epstein's and his assistants' criminal behavior.  Accordingly, OPR considered the evidence and information regarding Epstein's and his assistants' conduct as it was known to the subjects at the time they performed their duties as Department attorneys.  Additional evidence and information that came to light after June 30, 2008, when Epstein entered his guilty plea under the NPA, did not affect the subjects' actions prior to that date, and OPR did not evaluate the subjects' conduct on the basis of that subsequent information.

OPR's investigation occurred approximately 12 years after most of the significant events relating to the USAO's investigation of Epstein, the NPA, and Epstein's guilty plea.  As a result, many of the subjects and witnesses were unable to recall the details of events or their own or others' actions occurring in 2006-2008, such as conversations, meetings, or documents they reviewed at the time.[8]  However, OPR's evaluation of the subjects' conduct was aided significantly by extensive, contemporaneous emails among the prosecutors and communications between the government and defense counsel.  These records often referred to the interactions among the participants and described important decisions and, in some instances, the bases for them.

## III.    OVERVIEW OF OPR'S ANALYTICAL FRAMEWORK

OPR's primary mission is to ensure that Department attorneys perform their duties in accordance with the highest professional standards, as would be expected of the nation's principal law enforcement agency.  Accordingly, OPR investigates allegations of professional misconduct against current or former Department attorneys related to the exercise of their authority to

---

[7]      In August 2019, Florida Governor Ron DeSantis announced that he had directed the Florida Department of Law Enforcement to open an investigation into the conduct of state authorities relating to Epstein.  As reported, the investigation focuses on Epstein's state plea agreement and the Palm Beach County work release program.

[8]      OPR was cognizant that Acosta and the three managers all left the USAO during, or not long after resolution of, the Epstein case, while the AUSA remained with the USAO until mid-2019.  Moreover, as the line prosecutor in the Epstein investigation and also as co-counsel in the CVRA litigation until the USAO was recused from that litigation in early 2019, the AUSA had continuous access to the USAO documentary record and numerous occasions to review these materials in the course of her official duties.  Additionally, in responding to OPR's request for a written response, and in preparing to be interviewed by OPR, the AUSA was able to refresh her recollection with these materials to an extent not possible for the other subjects, who were provided with relevant documents by OPR in preparation for their interviews.

investigate, litigate, or provide legal advice.[9]   OPR also has jurisdiction to investigate allegations of misconduct against Department law enforcement agents when they relate to a Department attorney's alleged professional misconduct.

In its investigations, OPR determines whether a clear and unambiguous standard governs the challenged conduct and whether a subject attorney violated that standard.   Department attorneys are subject to various legal obligations and professional standards in the performance of their duties, including the Constitution, statutes, standards of conduct imposed by attorney licensing authorities, and Department regulations and policies.   OPR finds misconduct when it concludes by a preponderance of the evidence that a subject attorney violated such a standard intentionally or recklessly.   Pursuant to OPR's analytical framework, when OPR concludes that (1) no clear and unambiguous standard governs the conduct in question or (2) the subject did not intentionally or recklessly violate the standard that governs the conduct, then it concludes that the subject's conduct does not constitute professional misconduct.   In some cases, OPR may conclude that a subject attorney's conduct does not satisfy the elements necessary for a professional misconduct finding, but that the circumstances warrant another finding.   In such cases, OPR may conclude that a subject attorney exercised poor judgment, made a mistake, or otherwise acted inappropriately under the circumstances.   OPR may also determine that the subject attorney's conduct was appropriate under the circumstances.[10]

## IV.   ISSUES CONSIDERED

In this investigation, OPR considered two distinct sets of allegations.   The first relates to the negotiation, execution, and implementation of the NPA.   The second relates to the USAO's interactions with Epstein's victims and adherence to the requirements of the CVRA.   The two sets of issues are described below and are analyzed separately in this Report.

### A.   The Negotiation, Execution, and Implementation of the NPA

In evaluating whether any of the subjects committed professional misconduct, OPR considered whether any of the NPA's provisions violated a clear or unambiguous statute, professional responsibility rule or standard, or Department regulation or policy.   In particular, OPR considered whether the NPA violated standards relating to (1) charging decisions, (2) declination of criminal charges, (3) deferred or non-prosecution agreements, (4) plea agreements, (5) grants

---

[9]      28 C.F.R. § 0.39a(a)(1).   OPR has authority to investigate the professional conduct of attorneys occurring during their employment by the Department, regardless of whether the attorney left the Department before or during OPR's investigation.   Over its 45-year history, OPR has routinely investigated the conduct of former Department attorneys.   Although former Department attorneys cannot be disciplined by the Department, OPR's determination that a former Department attorney violated state rules of professional conduct for attorneys could result in a referral to an appropriate state attorney disciplinary authority.   Furthermore, findings resulting from investigations of the conduct of Department attorneys, even former employees, may assist Department managers in supervising future cases.

[10]      In some instances, OPR declines to open an investigation based upon a review of the initial complaint or after a preliminary inquiry into the matter.   In December 2010, one of the attorneys representing victims in the CVRA litigation raised allegations that Epstein may have exerted improper influence over the federal criminal investigation and that the USAO had deceived the victims of Epstein's crimes about the existence of the NPA.   Pursuant to its standard policy, OPR declined to open an investigation into those allegations at that time in deference to the then-pending CVRA litigation.

of immunity, or (6) the deportation of criminal aliens. The potentially applicable standards that OPR considered as to each of these issues are identified and discussed later in this Report. OPR also examined whether the evidence establishes that any of the subjects were influenced to enter into the NPA, or to include in the NPA terms favorable to Epstein, because of an improper motive, such as a bribe, political consideration, personal interest, or favoritism. OPR also examined and discusses in this Report significant events that occurred after the NPA was negotiated and signed that shed additional light on the USAO's handling of the Epstein investigation.

### B.     The District Court's Conclusion That the USAO Violated the CVRA

To address the district court's adverse judicial findings, OPR assessed the manner, content, and timing of the government's interactions with victims both before and after the NPA was signed, including victim notification letters issued by the USAO and the FBI and interviews conducted by the USAO. OPR considered whether any of the subject attorneys violated any clear and unambiguous standard governing victim consultation or notification. OPR examined the government's lack of consultation with the victims before the NPA was signed, as well as the circumstances relating to the district court's finding that the USAO affirmatively misled Epstein's victims about the status of the federal investigation after the NPA was signed.

## V.     OPR'S FINDINGS AND CONCLUSIONS

OPR evaluated the conduct of each subject and considered his or her individual role in various decisions and events. Acosta, however, made the pivotal decision to resolve the federal investigation of Epstein through a state-based plea and either developed or approved the terms of the initial offer to the defense that set the beginning point for the subsequent negotiations that led to the NPA. Although Acosta did not sign the NPA, he participated in its drafting and approved it, with knowledge of its terms. During his OPR interview, Acosta acknowledged that he approved the NPA and accepted responsibility for it. Therefore, OPR considers Acosta to be responsible for the NPA and for the actions of the other subjects who implemented his decisions. Acosta's overall responsibility for the government's interactions or lack of communication with the victims is less clear, but Acosta affirmatively made certain decisions regarding victim notification, and OPR evaluates his conduct with respect to those decisions.

### A.     Findings and Conclusions Relating to the NPA

With respect to all five subjects of OPR's investigation, OPR concludes that the subjects did not commit professional misconduct with respect to the development, negotiation, and approval of the NPA. Under OPR's framework, professional misconduct requires a finding that a subject attorney intentionally or recklessly violated a clear and unambiguous standard governing the conduct at issue. OPR found no clear and unambiguous standard that required Acosta to indict Epstein on federal charges or that prohibited his decision to defer prosecution to the state. Furthermore, none of the individual terms of the NPA violated Department or other applicable standards.

As the U.S. Attorney, Acosta had the "plenary authority" under established federal law and Department policy to resolve the case as he deemed necessary and appropriate, as long as his decision was not motivated or influenced by improper factors. Acosta's decision to decline to initiate a federal prosecution of Epstein was within the scope of his authority, and OPR did not

find evidence that his decision was based on corruption or other impermissible considerations, such as Epstein's wealth, status, or associations.  Evidence shows that Acosta resisted defense efforts to have the matter returned to the state for whatever result state authorities deemed appropriate, and he refused to eliminate the incarceration and sexual offender registration requirements.  OPR did not find evidence establishing that Acosta's "breakfast meeting" with one of Epstein's defense counsel in October 2007 led to the NPA, which had been signed weeks earlier, or to any other significant decision that benefited Epstein.  The contemporaneous records show that USAO managers' concerns about legal issues, witness credibility, and the impact of a trial on the victims led them to prefer a pre-charge resolution and that Acosta's concerns about the proper role of the federal government in prosecuting solicitation crimes resulted in his preference for a state-based resolution.  Accordingly, OPR does not find that Acosta engaged in professional misconduct by resolving the federal investigation of Epstein in the way he did or that the other subjects committed professional misconduct through their implementation of Acosta's decisions.

Nevertheless, OPR concludes that Acosta's decision to resolve the federal investigation through the NPA constitutes poor judgment.  Although this decision was within the scope of Acosta's broad discretion and OPR does not find that it resulted from improper factors, the NPA was a flawed mechanism for satisfying the federal interest that caused the government to open its investigation of Epstein.  In Acosta's view, the federal government's role in prosecuting Epstein was limited by principles of federalism, under which the independent authority of the state should be recognized, and the federal responsibility in this situation was to serve as a "backstop" to state authorities by encouraging them to do more.  However, Acosta failed to consider the difficulties inherent in a resolution that relied heavily on action by numerous state officials over whom he had no authority; he resolved the federal investigation before significant investigative steps were completed; and he agreed to several unusual and problematic terms in the NPA without the consideration required under the circumstances.  In sum, Acosta's application of federalism principles was too expansive, his view of the federal interest in prosecuting Epstein was too narrow, and his understanding of the state system was too imperfect to justify the decision to use the NPA.  Furthermore, because Acosta assumed a significant role in reviewing and drafting the NPA and the other three subjects who were supervisors left the USAO, were transitioning to other jobs, or were absent at critical junctures, Acosta should have ensured more effective coordination and communication during the negotiations and before approving the final NPA.  The NPA was a unique resolution, and one that required greater oversight and supervision than Acosta provided.

B.      **Findings and Conclusions Relating to the Government's Interactions with Victims**

OPR further concludes that none of the subject attorneys committed professional misconduct with respect to the government's interactions with victims.  The subjects did not have a clear and unambiguous duty under the CVRA to consult with victims before entering into the NPA because the USAO resolved the Epstein investigation without a federal criminal charge.  Significantly, at the time the NPA was signed, the Department did not interpret CVRA rights to attach unless and until federal charges had been filed, and the federal courts had not established a clear and unambiguous standard applying the CVRA before criminal charges were brought.  In addition, OPR did not find evidence that the lack of consultation was for the purpose of silencing victims.  Nonetheless, the lack of consultation was part of a series of government interactions with victims that ultimately led to public and court condemnation of the government's

treatment of the victims, reflected poorly on the Department as a whole, and is contradictory to the Department's mission to minimize the frustration and confusion that victims of a crime endure.

OPR determined that none of the subjects was responsible for communications sent to certain victims after the NPA was signed that described the case as "under investigation" and that failed to inform them of the NPA.  The letters were sent by an FBI administrative employee who was not directly involved in the investigation, incorporated standard form language used by the FBI when communicating with victims, and were not drafted or reviewed by the subjects. Moreover, the statement that the matter was "under investigation" was not false because the government in fact continued to investigate the case in anticipation that Epstein would not fulfill the terms of the NPA.  However, the letters risked misleading the victims and contributed to victim frustration and confusion by failing to provide important information about the status of the investigation.  The letters also demonstrated a lack of coordination between the federal agencies responsible for communicating with Epstein's victims and showed a lack of attention to and oversight regarding communication with victims.

After the NPA was signed, Acosta elected to defer to the State Attorney the decision whether to notify victims about the state's plea hearing pursuant to the state's own victim's rights requirements.  Although Acosta's decision was within his authority and did not constitute professional misconduct, OPR concludes that Acosta exercised poor judgment when he failed to make certain that the state intended to and would notify victims identified through the federal investigation about the state plea hearing.  His decision left victims uninformed about an important proceeding that resolved the federal investigation, an investigation about which the USAO had communicated with victims for months.  It also ultimately created the misimpression that the Department intentionally sought to silence the victims.  Acosta failed to ensure that victims were made aware of a court proceeding that was related to their own cases, and thus he failed to ensure that victims were treated with forthrightness and dignity.

OPR concludes that the decision to postpone notifying victims about the terms of the NPA after it was signed and the omission of information about the NPA during victim interviews and conversations with victims' attorneys in 2008 do not constitute professional misconduct. Contemporaneous records show that these actions were based on strategic concerns about creating impeachment evidence that Epstein's victims had financial motives to make claims against him, evidence that could be used against victims at a trial, and were not for the purpose of silencing victims.  Nonetheless, the failure to reevaluate the strategy prior to interviews of victims and discussions with victims' attorneys occurring in 2008 led to interactions that contributed to victims' feelings that the government was intentionally concealing information from them.

After examining the full scope and context of the government's interactions with victims, OPR concludes that the government's lack of transparency and its inconsistent messages led to victims feeling confused and ill-treated by the government; gave victims and the public the misimpression that the government had colluded with Epstein's counsel to keep the NPA secret from the victims; and undercut public confidence in the legitimacy of the resulting agreement.  The overall result of the subjects' anomalous handling of this case understandably left many victims feeling ignored and frustrated and resulted in extensive public criticism.  In sum, OPR concludes that the victims were not treated with the forthrightness and sensitivity expected by the Department.

## VI.    ORGANIZATION OF THE REPORT

The Report is divided into three chapters.  In Chapter One, OPR describes the relevant federal, state, and local law enforcement entities involved in investigating Epstein's criminal conduct, as well as the backgrounds of the five subjects and their roles in the events in question. OPR provides a brief profile of Epstein and identifies the defense attorneys who interacted with the subjects.

In Chapter Two, OPR sets forth an extensive account of events relating to the federal investigation of Epstein.  The account begins with the initial complaint in March 2005 by a young victim and her parents to the local police—a complaint that launched an investigation by local law enforcement authorities—and continues through the mid-2006 opening of the federal investigation; the September 2007 negotiation and signing of the NPA; Epstein's subsequent efforts to invalidate the NPA through appeals to senior Department officials; Epstein's June 2008 guilty plea in state court; and, finally, efforts by the AUSA to ensure Epstein's compliance with the terms of the NPA during his incarceration and until his term of home detention ended in July 2010.  After describing the relevant events, OPR analyzes the professional misconduct allegations relating to the decisions made regarding the development and execution of the NPA.   OPR describes the relevant standards and sets forth its findings and conclusions regarding the subjects' conduct.

Chapter Three concerns the government's interactions with victims and the district court's findings regarding the CVRA.  OPR describes the relevant events and analyzes the subjects' conduct in light of the pertinent standards.

OPR sets forth the extensive factual detail provided in Chapters Two and Three, including internal USAO and Department communications, because doing so is necessary for a full understanding of the subjects' actions and of the bases for OPR's conclusions.