# EXHIBIT 67

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS,<br><br>          Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>          Defendant/Third-Party Plaintiff. | Case No. 22-cv-10904-JSR<br><br><br><br>JURY TRIAL DEMANDED |
| JPMORGAN CHASE BANK, N.A.,<br><br>          Third-Party Plaintiff,<br><br>v.<br><br>JAMES EDWARD STALEY,<br><br>          Third-Party Defendant. | |

## JPMORGAN CHASE BANK, N.A.'S THIRD-PARTY COMPLAINT AGAINST JAMES EDWARD STALEY

Pursuant to Federal Rule of Civil Procedure 14(a), Defendant JPMorgan Chase Bank, N.A. ("JPMC"), by its undersigned counsel, files this Third-Party Complaint against Third-Party Defendant James Edward "Jes" Staley ("Staley") for indemnity, contribution, breach of fiduciary duty, and breach of the faithless servant doctrine. In support, JPMC alleges as follows:

### PRELIMINARY STATEMENT

1.     On December 27, 2022, Plaintiff the Government of the United States Virgin Islands ("the USVI") filed this action entitled *Government of the United States Virgin Islands v. JP*

*Morgan Chase Bank, N.A.*, Case No. 22-cv-10904-JSR (S.D.N.Y.). The USVI filed a First Amended Complaint on January 10, 2023 ("USVI Complaint"). Dkt. 17 (attached as Ex. A). JPMC moved to dismiss that complaint (Dkt. 39) and has not yet filed an answer.

2.      This Court consolidated this case for pretrial purposes with a case brought against JPMC by Jane Doe 1 ("Doe") on behalf of herself and others, *Doe v. JPMorgan Chase Bank, N.A.*, 22-cv-10019-JSR (S.D.N.Y.). Doe filed a First Amended Complaint on January 13, 2023 ("Doe Complaint") (attached as Ex. B). JPMC has moved to dismiss that complaint and has not yet filed an answer.

3.      This Third-Party Complaint references unproven allegations in the Doe Complaint and the USVI Complaint. To be clear, JPMC does not admit those allegations, denies all liability, and disputes both Doe's and the USVI's right to recover under the law from JPMC. Rather, *if* JPMC is responsible for any damages to Doe, it is entitled to recover the entire amount of any damages from Staley as indemnification or a percentage of those damages in contribution. JPMC also brings independent claims against Staley for breach of fiduciary duty and violation of the faithless servant doctrine.

## PARTIES

4.      JPMC is a national bank whose main office is located in Columbus, Ohio, as designated in its Articles of Association.

5.      On information and belief, third-party defendant Staley is a citizen and resident of New York, New York.

## JURISDICTION

6.      This Court has subject matter jurisdiction over JPMC's third-party claims under 28 U.S.C. § 1367(a) because they are so related to Doe's claims that they form part of the same case or controversy under Article III of the United States Constitution.

7.     Section 1367(b) does not divest this Court of supplemental jurisdiction because Doe has asserted claims under federal law, and this Court has jurisdiction over those claims under 28 U.S.C. § 1331.

8.     This Court has supplemental jurisdiction over JPMC's third-party claims against Staley because: (i) its claims do not raise novel or complex issues of state law; (ii) its claims do not predominate over Doe's claims; and (iii) no exceptional circumstances compel this Court to decline jurisdiction. 28 U.S.C. § 1367(c).

## VENUE

9.     Venue is proper in this district under the doctrine of ancillary venue.

10.    Venue is also proper in this district as Staley is a resident of this district, and a substantial part of the property and events that are the subject of the action are situated in this district.

## DOE'S COMPLAINT

11.    Doe seeks damages from JPMC for herself and other individuals allegedly exploited by Jeffrey Epstein ("Epstein") under New York intentional tort law, New York negligence law, and the federal Trafficking Victims Protection Act ("TVPA"). Ex. B, ¶¶ 286–490.

12.    Doe alleges, among other things, that she was a victim of Epstein's "sex trafficking scheme" and that "from 2006 through 2013, Epstein sexually abused Jane Doe 1 on a number of occasions in New York, Florida, New Mexico, and the United States Virgin Islands." *Id*., ¶¶ 94–99.

13.    JPMC denies Doe's tort allegations that it: knew of or committed some overt act in furtherance of Epstein or others battering Doe; acted intentionally to cause Doe emotional distress; caused her injuries; or had a duty to her to protect her from Epstein's acts. JPMC also denies Doe's

TVPA allegations that it: "perpetrate[d]" sex trafficking; "participate[d]" in an Epstein sex-trafficking venture; "knowingly" received benefits from any alleged participation; or knew that an Epstein venture trafficked Doe. JPMC also denies that: it aided or abetted any alleged acts unlawful under the TVPA; attempted to aid or abet or otherwise participate in the alleged sex trafficking venture; conspired to participate or benefit from the alleged sex trafficking venture; or obstructed any investigation into the alleged sex trafficking venture. JPMC has moved to dismiss Doe's complaint because it is without legal merit, and it will more fully detail its factual denials of Doe's claims if it is required to answer her complaint.

## THE USVI'S COMPLAINT

14.    The USVI seeks damages from JPMC under four claims: (1) a claim for participating in a sex trafficking venture under the TVPA(18 U.S.C. §§ 1591(a)(2) and 1595(d)); (2) a claim under its own civil RICO statute (14 V.I.C. §§ 604(e) and 605(a)) for participating in an enterprise which violates the TVPA; (3) a claim under its civil RICO statute for violating the Bank Secrecy Act (31 U.S.C. § 5322(a)); and (4) a claim under its deceptive business practices act. Ex. A, ¶¶ 92–136.

15.    JPMC denies the USVI's allegations that it: knowingly benefited from or participated in a sex-trafficking venture; engaged in racketeering or an otherwise criminal organization; engaged in unfair competition; or failed to abide by federal banking laws. JPMC has moved to dismiss the USVI's complaint because it is without legal merit, and it will more fully detail its factual denials of the USVI's claims if it is required to answer the USVI's complaint.

## JAMES STALEY

16.    From 1979 to 2013, JPMC employed Staley in various positions. From 2001 to 2009, Staley was the Chief Executive Officer of JPMC's Asset Management line of business. In

2009, Staley became the Chief Executive Officer of JPMC's Corporate and Investment Banking line of business.

17.     At all times during his employment, Staley had a duty of loyalty to JPMC, and he was required to act in good faith in JPMC's best interests. That duty required Staley to refrain from activities that he knew would damage JPMC, either financially or reputationally, and to report to JPMC any facts or knowledge relevant to his duties that could affect JPMC's reputation or that was relevant to JPMC's decisions to retain a client whose business with JPMC might damage that reputation. Instead, if the allegations of Doe and the USVI are true, Staley repeatedly abandoned the interests of JPMC and served his own and Epstein's interests.

18.     Beginning in at least 2006 through 2012, Staley signed a written affirmation each year entitled "Code of Conduct [year] Affirmation Record." In each of those affirmations, Staley pledged: "I agree, as a condition of employment, to remain in compliance with the Code and the supplemental policies that apply to me, all as amended from time to time."

19.     Each version of the JPMC Code of Conduct in effect from 2006 through 2012 emphasized that all JPMC employees must "conduct the firm's business in accordance with the highest ethical standards, respecting the firm's customers, suppliers, and other business counterparties, dealing responsibly with the firm's assets, and complying with applicable legal and regulatory requirements."

20.     JPMC's Code of Conduct also expressly prohibited, among other things, engaging in outside activities that, even if outside the scope of employment, "reflect adversely on JPMorgan Chase or give rise to a real or apparent conflict of interest with your duties to the firm."

21.     Upon his departure from JPMC in 2013, Staley executed an Agreement and Release with JPMC in which he agreed to continue to be bound by the JPMC's Code of Conduct and also

5

affirmed that he had advised the Company of all facts of which he was aware that he believed may

constitute a violation of the Company's Code of Conduct and/or the Company's legal obligations.

### DOE'S ALLEGATIONS

22.     Doe alleges that "Staley knew without any doubt that Epstein was trafficking and

abusing girls" and that "all of [Epstein's] staff, including his main attorney and accountant, worked

full time to conceal the illegal operation." Ex. A, ¶ 128.

23.     Doe repeatedly alleges in her complaint that JPMC knew of or participated in Ep-

stein's sex trafficking venture "through Staley." *See, e.g., id.*, ¶ 200 ("Not only was JP Morgan

(through Staley) well aware of the allegations, but JP Morgan (through Staley) knew the identities

of co-conspirators and many of the victims."); *see also id.*, ¶¶ 135, 164, 205–206, 230–231, 239,

327–328, 360.

24.     Doe also alleges, "Staley had observed victims personally, and he was aware that

Epstein was shelling out millions of dollars to attorneys to take on these well-founded allegations."

*Id.*, ¶ 200.

25.     Doe alleges that Staley "personally observed Doe as a sex trafficking and abuse

victim at times including through his departure from JP Morgan in 2013." *Id.*, ¶ 115.

26.     Doe further alleges that Staley "personally spent time with young girls whom he

met through Epstein on several occasions"; "personally visited young girls at Epstein's apartments

located at 301 East 66th Street"; "personally observed Epstein around young girls"; and personally

observed, "Epstein sexually grab young women in front of him." *Id.*, ¶ 227; *see also id.*, ¶ 226.

27.     Doe alleges that "one of Epstein's friends used aggressive force in his sexual assault

of her and informed Jane Doe 1 that he had Epstein's permission to do what he wanted to her." *Id.*,

¶ 107. Upon information and belief, Staley is this person, who she described as a "powerful financial executive" she had historically been afraid to identify.

28.     Doe also alleges that Staley promised to "use his clout within JP Morgan to make Epstein untouchable." *Id.*, ¶ 132. She claims that despite his alleged knowledge of the sex trafficking scheme, Staley repeatedly thwarted JPMC's efforts to sever ties with Epstein. *Id.*, ¶¶ 184, 188.

## THE USVI'S ALLEGATIONS

29.     The USVI alleges that between 2008 and 2012, Staley had "a close personal relationship and 'profound' friendship" with Epstein, and that their correspondence "even suggest[s] that Staley may have been involved in Epstein's sex-trafficking operation." Ex. A, ¶ 53.

30.     Further, the USVI alleges that Staley visited Epstein's residence in Palm Beach in January 2009 and that this visit corresponded with Epstein wiring $2,000 to a woman with an Eastern European surname. *Id.*, ¶ 54.

31.     In addition, the USVI alleges after Staley emailed Epstein in late August 2009 that he would be in London a week later, Epstein asked whether Staley would need anything during his visit, and Staley replied, "Yep." *Id.,* ¶ 55. According to the USVI, on August 31, 2009, Epstein wired $3,000 to the same Eastern European woman. *Id.*

32.     The USVI alleges that on July 10, 2010, Staley emailed Epstein, "Maybe they're tracking u?? That was fun. Say hi to Snow White." Epstein responded, "what character would you like next." Staley replied, "Beauty and the Beast….." Epstein responded, "well one side is available." Ex. A, ¶ 61.

33.     In its First Amended Complaint, the USVI alleges that Staley had knowledge of Epstein's sex trafficking venture, as well as a role in convincing JPMC to maintain Epstein as a JPMC client. *See, e.g., id.*, ¶¶ 47, 52–63, 71–73.

7

## STALEY CONCEALED HIS PERSONAL ACTIVITIES WITH EPSTEIN AND HIS CONFLICT OF INTEREST WITH JPMC

34.     While JPMC held discussions regarding Epstein, Staley was apparently in regular contact with Epstein. However, Staley never disclosed to anyone at JPMC that he had witnessed, was aware of, or participated in any of the activities described in paragraphs 22 through 33.

35.     In 2013, JPMC "terminated its relationship with Epstein." Ex. A, ¶ 50.

36.     At no point did Staley disclose to JPMC, nor did JPMC otherwise know, the information about Staley's personal activities contained in paragraphs 22 through 33.

37.     Staley did not disclose this information despite having a fiduciary duty to do so and JPMC asking him to offer his views as to whether JPMC should retain Epstein as a client.

38.     Even upon his departure from JPMC, and in spite of his explicit affirmation that he had reported to JPMC any violations of the Code of Conduct, Staley did not disclose to JPMC the information about his personal activities contained in paragraphs 22 through 33.

39.     Instead, Staley repeatedly abandoned the interests of JPMC in pursuit of his own personal interests and benefits and those of Epstein.

40.     Staley's failure to disclose the information alleged—although JPMC does not admit that Doe's and the USVI's allegations are true—was a direct and proximate cause of JPMC's decision to continue to do business with Epstein until 2013.

41.     In addition, Staley's abandonment of the interests of JPMC in favor of his own personal interests and benefits and those of Epstein was a direct and proximate cause of JPMC's decision to continue to do business with Epstein until 2013.

42.     Accordingly, to the extent that Staley knew of, participated in, or witnessed sexual abuse associated with Epstein and did not report it to, actively concealed it from, or misrepresented his knowledge to JPMC, Staley, not JPMC, is responsible for any injuries Epstein may have caused

8

to the USVI, even though the alleged knowledge, participation, and observations were not in connection with the performance of his duties for JPMC.

## COUNT I: INDEMNIFICATION

43.     JPMC repeats and realleges paragraphs 1 through 42 hereof as if fully set forth herein.

44.     JPMC is not liable to the USVI or any other person for any of the claims, if true, made by the USVI in its complaint.

45.     As an employee of JPMC, Staley had a preexisting relationship with JPMC sufficient to give rise to a common-law duty to indemnify JPMC for any liability JPMC may have based on Staley's conduct.

46.     The USVI seeks to hold JPMC liable based in substantial part on the acts or omissions of Staley, whom the USVI alleges was the primary actor (along with Epstein) responsible for its injuries.

47.     If the USVI is successful on its claims, Staley is solely liable to the USVI, or liable to JPMC for all sums awarded to the USVI and against JPMC, if any, at trial.

48.     Should the USVI succeed on any of its claims—and JPMC denies that it is liable to the USVI —Staley is liable to JPMC by way of indemnification for all damages awarded to the USVI, together with costs, attorneys' fees, and such other relief as the Court deems just and appropriate.

## COUNT II: CONTRIBUTION

49.     JPMC repeats and realleges paragraphs 1 through 48 hereof as if fully set forth herein.

50.     Courts in the United States Virgin Islands have recognized a common law right to contribution.

51.     Contribution is also permitted under the TVPA.

52.     In its First Amended Complaint, and through the ongoing discovery process, the USVI alleges that Staley had knowledge of Epstein's purported sex trafficking venture, as well as a role in convincing JPMC to maintain Epstein as a JPMC client. *See, e.g.*, Ex. A, ¶¶ 47, 52–63, 71–73.

53.     If the USVI is successful on its claims—and JPMC denies that it is legally liable to the USVI —Staley's actions caused or substantially contributed to any resulting damages.

54.     If the USVI is successful on its claims—and JPMC denies that it is legally liable to the USVI — Staley is solely liable to the USVI, jointly and severally liable to the USVI, or liable to JPMC for all sums awarded to the USVI and against JPMC, if any, at trial.

55.     Should the USVI succeed on any of its claims—and JPMC denies that it is legally liable to the USVI —Staley is liable to JPMC by way of contribution for all damages awarded to the USVI, jointly and severally, together with costs, attorneys' fees, and such other relief as the Court deems just and appropriate.

## COUNT III: BREACH OF FIDUCIARY DUTY.

56.     JPMC repeats and realleges paragraphs 1 through 55 hereof as if fully set forth herein.

57.     Under New York law, an employee owes a fiduciary duty to their employer. That duty requires the employee to exercise the utmost good faith and loyalty in the performance of his duties at all times and to refrain from acting in any manner inconsistent with his agency or trust.

58.     Staley owed a fiduciary duty to JPMC.

59.     Based on the allegations of Doe and the USVI—which JPMC does not admit and has not yet answered—as well as the additional facts alleged herein, Staley continuously breached

his fiduciary duty, acting against the interests of JPMC and in his own personal interests and benefits and those of Epstein.

60.     Staley breached his fiduciary duty by engaging in inappropriate conduct in his personal dealings with Epstein outside the scope of his employment that was harmful to JPMC's reputation and that posed a conflict of interest. By failing to report to, or fraudulently concealing from, JPMC relevant facts that he knew and actions he observed relating to Epstein, including with respect to JPMC's evaluations of Epstein's banking relationship, Staley harmed JPMC.

61.     On the basis of the allegations of Doe and the USVI and the additional facts alleged herein, Staley affirmatively misrepresented the true facts of his and Epstein's personal interactions and activities to JPMC and repeatedly provided misleading information to JPMC when vouching for Epstein's character and conduct.

62.     Staley's failure to report material facts to JPMC continued for years, from at least 2000 through his departure from JPMC in 2013, through to the filing of this complaint.

63.     Staley's breach of fiduciary duty was a direct and proximate cause of JPMC's decision to continue to do business with Epstein until 2013.

64.     As a result of Staley's breach of fiduciary duty, JPMC suffered adverse publicity from press coverage of the lawsuits from Doe and the USVI.

65.     In addition to damages for the cost of defending Doe's and the USVI's actions, in the event JPMC has to pay any amounts in damages, Staley's breach of fiduciary duty will have caused those losses.

66.     In light of Staley's intentional and outrageous conduct in failing to disclose pertinent information and abandoning JPMC's interests in favor of his own and Epstein's personal interests, JPMC is entitled to punitive damages.

11

## COUNT IV: VIOLATION OF THE FAITHLESS SERVANT DOCTRINE

67.     JPMC repeats and realleges paragraphs 1 through 66 hereof as if fully set forth herein.

68.     An employee owes a duty of utmost loyalty to his employer.

69.     An employee who is faithless in the performance of his services breaches the duty of loyalty, and he is not entitled to receive compensation for those services.

70.     Based on the allegations of Doe and the USVI—which JPMC does not admit and has not yet answered—as well as the additional facts alleged herein, Staley breached his duty of loyalty and acted as a faithless servant to JPMC.

71.     On the basis of the allegations of Doe and the USVI and the additional facts alleged herein, Staley abandoned the interests of JPMC and served his own and Epstein's interests.

72.     As noted above, Staley failed to report his knowledge of and personal conduct with Epstein to JPMC and instead consistently and misleadingly vouched for Epstein's good character and conduct while JPMC was deliberating on whether JPMC should continue to do business with Epstein.

73.     On the basis of the allegations of Doe and the USVI and the additional facts alleged herein, Staley's activities constitute misconduct that rises to the level of a breach of a duty of loyalty or good faith.

74.     Staley's activities based upon Doe's and the USVI's allegations and the additional allegations alleged herein demonstrate that Staley substantially violated the JPMC Code of Conduct in a way that permeated his service to JPMC in material and substantial part.

75.     On the basis of the allegations of Doe and the USVI and the additional facts alleged herein, Staley's acts of disloyalty occurred repeatedly, lasted for years, and persisted despite numerous opportunities to correct them.

12

76.     Staley's acts of disloyalty also occurred in his primary area of responsibility.

77.     On the basis of the allegations of Doe and the USVI and the additional facts alleged herein, Staley persisted for years—from at least 2006 until his departure from JPMC in 2013—in protecting Epstein in the face of attempts by JPMC to end the company's relationship with Epstein, omitted material information, made misrepresentations in the process, and continued to do so.

78.     As a result of Staley's faithless service, JPMC is entitled to recover all compensation paid to Staley during the time period of his disloyalty.

79.     In light of Staley's intentional and outrageous conduct in failing to disclose pertinent information and abandoning JPMC's interests in favor of his own and Epstein's personal interests, JPMC is entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing, Defendant/Third-Party JPMC prays for judgment against Staley as follows:

1.  In the event JPMC is found liable for any of the USVI's claims in this action, for indemnity against Staley for all damages awarded to the USVI;

2.  In the event JPMC is found liable for any of the USVI's claims in this action, for contribution against Staley for his proportionate share of the amount awarded to the USVI;

3.  For all damages caused to JPMC by Staley's breach of fiduciary duty, including any damages awarded to the USVI or Doe and JPMC's costs of defending those actions;

4.  For all compensation paid to Staley during the time period of his disloyalty, from at least 2006 through 2013;

5.   For punitive damages for Staley's breach of fiduciary duty and violation of the faithless servant doctrine;

6.  For all costs and attorneys' fees associated with this third-party action; and

13

7. For such other such relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

JPMC demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: March 8, 2023

Respectfully submitted,

**MASSEY & GAIL LLP**

/s/ Leonard A. Gail
Leonard A. Gail (*pro hac vice*)
Rachel Morse (*pro hac vice*)
Caitlin Kovacs (*pro hac vice*)
50 East Washington Street, Suite 400
Chicago, IL 60602
(t) (312) 283-1590
lgail@masseygail.com
rmorse@masseygail.com
ckovacs@masseygail.com

**WILMER CUTLER PICKERING HALE AND DORR LLP**

/s/ Felicia H. Ellsworth
Felicia H. Ellsworth
John J. Butts
60 State Street
Boston, MA 02109
(t) (617) 526-6000
(f) (617) 526-5000
felicia.ellsworth@wilmerhale.com
john.butts@wilmerhale.com

Boyd M. Johnson III
Robert L. Boone
Hillary Chutter-Ames
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888
boyd.johnson@wilmerhale.com
robert.boone@wilmerhale.com
hillary.chutter-ames@wilmerhale.com

Ronald C. Machen
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363
ronald.machen@wilmerhale.com

*Attorneys for JPMorgan Chase Bank, N.A.*

# Exhibit A

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS | ) | Case Number: 1:22-cv-10904 JSR |
| | ) | |
| PLAINTIFF, | ) | **ACTION FOR DAMAGES** |
| | ) | JURY TRIAL DEMANDED |
| V. | ) | |
| | ) | |
| JPMORGAN CHASE BANK, N.A. | ) | |
| | ) | |
| DEFENDANT. | ) | |

**FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL**

Plaintiff Government of the United States Virgin Islands ("Government") files this Complaint against JPMorgan Chase Bank, N.A. ("JP Morgan") for violations of Trafficking Victims Protection Act, 18 U.S.C. §§ 1591 to 1595, the Virgin Islands Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. §§ 600 to 614, and the Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 301 to 336, and in support thereof alleges as follows:

**PARTIES**

1.      The Attorney General of the United States Virgin Islands (hereinafter "Virgin Islands") brings this *parens patriae* action on behalf of the Plaintiff, Government of the Virgin Islands, pursuant to 15 U.S.C. § 1595(d) and 3 V.I.C. § 114 and her statutory authority to enforce the laws of the Virgin Islands and protect public safety.

2.      The Attorney General, pursuant to her authority to represent the Government of the United States Virgin Islands, also acts on behalf of, and with the lawfully delegated authority of, the Virgin Islands Department of Licensing and Consumer Affairs under 12 V.I.C. § 327 in regard to Count Four of the Government's Complaint alleging violations of the Virgin Islands Consumer

Fraud and Deceptive Business Practices Act.

3.      This action stems from an enforcement action the Government filed against the Estate of Jeffrey E. Epstein, the Co-Executors of the Estate, and various entities relating to Jeffrey Epstein ("Epstein"), under the Virgin Islands' Criminally Influenced and Corrupt Organizations Act ("CICO Act"), *see Government of the U.S. Virgin Islands v. Indyke et al.*, Case No. ST-20-CV-14 (Super. Ct. V.I. Jan. 15, 2020). The Attorney General brings this action, after presenting her findings to JP Morgan in September 2022, in her ongoing effort to protect public safety and to hold accountable those who facilitated or participated in, directly or indirectly, the trafficking enterprise Epstein helmed. The investigation revealed that JP Morgan knowingly, negligently, and unlawfully provided and pulled the levers through which recruiters and victims were paid and was indispensable to the operation and concealment of the Epstein trafficking enterprise. Financial institutions can connect—or choke—human trafficking networks, and enforcement actions filed and injunctive relief obtained by attorneys general are essential to ensure that enterprises like Epstein's cannot flourish in the future.

4.      Defendant JPMorgan Chase Bank, N.A. is an American multinational investment bank and financial services company headquartered in New York City and incorporated in Delaware.

5.      At all relevant times, JP Morgan engaged in business in the Virgin Islands, including, but not limited to, the acts and practices described herein.

6.      As described below, based on documents reviewed and interviews conducted by the Government, JP Morgan knowingly facilitated, sustained, and concealed the human trafficking network operated by Jeffrey Epstein from his home and base in the Virgin Islands, and financially benefitted from this participation, directly or indirectly, by failing to comply with federal banking

regulations, ████████████████████████████████. JP Morgan facilitated and concealed wire and cash transactions that raised suspicion of—and were in fact part of—a criminal enterprise whose currency was the sexual servitude of dozens of women and girls in and beyond the Virgin Islands. Human trafficking was the principal business of the accounts Epstein maintained at JP Morgan.

7.     Upon information and belief, JP Morgan turned a blind eye to evidence of human trafficking over more than a decade because of Epstein's own financial footprint, and because of the deals and clients that Epstein brought and promised to bring to the bank. These decisions were advocated and approved at the senior levels of JP Morgan, including by the former chief executive of its asset management division and investment bank, whose inappropriate relationship with Epstein should have been evident to the bank. Indeed, it was only after Epstein's death that JP Morgan belatedly complied with federal banking regulations regarding Epstein's accounts.

## JURISDICTION, VENUE, AND RELATED CASE

8.     This action is brought pursuant to and based on federal and Virgin Islands statutes, including the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1591 to 1595 ("TVPA"), and the federal Bank Secrecy Act, 31 U.S.C. §§ 5311 to 5336 and its implementing regulations ("BSA").

9.     This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Government's TVPA and BSA-based causes of action arise under federal law.

10.    This Court has supplemental jurisdiction over the Government's Virgin Islands law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to those arising under or based on federal law as to form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court is an "appropriate district court of the United States" in which for the Government to obtain appropriate relief under 18 U.S.C. § 1595(d) and venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant maintains its principal place of business within this judicial district, so that this Court may exercise general personal jurisdiction over Defendant, and because many of the alleged acts and omissions of Defendant giving rise to the Government's claims took place within this judicial district, so that this Court may exercise specific personal jurisdiction over Defendant.

12.     Pursuant to Local Civil Rule 1.6(a), the undersigned believe that this action is related to *Doe 1 v. JP Morgan Chase & Co.*, No. 1:22-cv-10019 (S.D.N.Y. Nov. 24, 2022), because both actions arise from a common nucleus of operative fact involving Defendant JP Morgan's alleged participation, directly or indirectly, in Epstein's sex-trafficking venture by facilitating payments to women and girls, channeling funds to Epstein to fund the operation, and concealing Epstein's criminal conduct by failing to comply with federal banking regulations.

## BACKGROUND

## I.     JP Morgan's Federal and State Legal Requirements

13.     JP Morgan is subject to federal laws, including the BSA and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 ("USA PATRIOT Act"), which amended certain BSA regulations.

14.     Under both the BSA and USA PATRIOT Act, JP Morgan is required to implement adequate, risk-based anti-money laundering ("AML") policies and systems to detect and prevent money laundering or other use of the institution's services to facilitate criminal activities. This includes, but is not limited to, maintaining a due diligence program, filing suspicious activity

reports ("SARs") when the financial institutions detect suspicious behavior and currency transaction reports ("CTRs") for currency transactions or series of currency transactions that exceed $10,000 in a 24-hour period, preventing structuring or assistance with structuring of transactions undertaken for the purpose of evading federal reporting requirements, and maintaining systems to prevent money laundering.

15.     The FDIC and the other federal banking regulators, including the Federal Reserve Board and Office of the Comptroller of the Currency, formed an interagency organization known as Federal Financial Institutions Examination Council ("FFIEC").

16.     To provide further guidance to banks on what BSA compliance requires, FFIEC published a Bank Secrecy Act/Anti-Money Laundering Examination Manual ("BSA Manual"). The BSA Manual explains that an effective SAR program is essential:

> Suspicious activity reporting forms the cornerstone of the BSA reporting system. It is critical to the United States' ability to utilize financial information to combat terrorism, terrorist financing, money laundering and other financial crimes. Examiners and banks should recognize that the quality of SAR content is critical to the adequacy and effectiveness of the suspicious activity reporting system.[1]

17.     Pursuant to the BSA Manual, "[p]roper monitoring and reporting processes are essential to ensuring that the bank has an adequate and effective BSA compliance program. Appropriate policies, procedures, and processes should be in place to monitor and identify unusual activity."[2] When a bank detects suspicious activity, it is required to report that information within 30 days to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). The reporting requirement ensures that the government is able to monitor and act

---

[1] FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual, Suspicious Activity Reporting at 1 (2014)
https://bsaaml.ffiec.gov/docs/manual/06_AssessingComplianceWithBSARegulatoryRequirements/04.pdf.
[2] *Id*. at 2.

when alerted to potential illegal conduct.

18.     Appendix F of the BSA Manual includes examples of suspicious transactions that may indicate money laundering, terrorist financing, or fraud, including:

    a.     Funds transfer activity is unexplained, repetitive, or shows unusual patterns;

    b.     The currency transaction patterns of a business show a sudden change inconsistent with normal activities;

    c.     Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals;

    d.     Currency is deposited or withdrawn in amounts just below identification or reporting thresholds;

    e.     Regarding nonprofit or charitable organizations, financial transactions occur for which there appears to be no logical economic purpose or in which there appears to be no link between the stated activity of the organization and the other parties in the transaction;

    f.     Funds are sent or received via international transfers from or to higher-risk locations.

19.     In addition, the CICO Act, 14 V.I.C. § 600, incorporates violations of Virgin Islands Law and federal felonies, which includes the BSA's criminal-liability provisions.

## II.     Jeffrey Epstein's Criminal Conduct

20.     Jeffrey Epstein was a resident of the Virgin Islands.

21.     In 2008, Epstein pled guilty to one count of solicitation of prostitution with a minor in Palm Beach, Florida. As a result of that conviction, Epstein was forced to register as a sex offender in the Virgin Islands.

22.     Epstein was a Tier 1 offender under Virgin Islands law based upon his Florida conviction of procuring a minor for prostitution.

23.     On January 15, 2020, the Government filed a lawsuit against Jeffrey Epstein's estate and related individuals and entities for violation of the CICO Act, 14 V.I.C. §§ 600 to 614, and civil conspiracy, which the Government recently settled. As laid out in the Government's Second Amended Complaint, ST-20-CV-14, ("SAC") (attached as Exhibit 1), Epstein created a network of companies and individuals who participated in, directly or indirectly, and conspired with him in a pattern of criminal activity related to the sex trafficking, forced labor, sexual assault, child abuse, and sexual servitude of these young women and children. SAC ¶¶ 43-75. Epstein and his associates trafficked underage girls to the Virgin Islands, held them captive, and sexually abused them, causing them grave physical, mental, and emotional injury. *Id*.

24.     To accomplish this criminal activity, Epstein formed an association in fact with both companies and non-profit organizations that he owned and operated, as well as individuals, who were willing to participate in, directly or indirectly, facilitate, and conceal Epstein's criminal activity in exchange for Epstein's bestowal of financial and other benefits, including sexual services and forced labor from victims. *Id*. ¶¶ at 157-195.

25.     In October 2012, the Southern Trust Company—one of the companies Epstein owned—applied for economic benefits from the Virgin Islands Economic Development Commission ("EDC") so the company could provide "cutting edge consulting services" in the area of "biomedical and financial informatics." *Id*. ¶¶ 157-158. Southern Trust Company received a 10-year package of economic incentives running from February 1, 2013 until January 31, 2023 that included a 90% exemption from income taxes and 100% exemptions from gross receipts, excise, and withholding taxes in the Virgin Islands. *Id*. ¶ 159.

26.     Southern Trust, in fact, appeared to perform no informatics or data-mining services during this period. Instead, Southern Trust funded the Epstein Enterprise (defined below), acting as a conduit for payment to foreign women, credit cards, airplanes and other instrumentalities. *Id*. ¶¶ 167-173.

27.     This illicit association of Epstein, businesses, and his associates constitutes what is referred to herein as the "Epstein Enterprise." Specifically included in the Epstein Enterprise were the following companies and non-profit organizations, all of which had accounts with JP Morgan: 2013 Butterfly Trust, Coatue Enterprises, LLC, C.O.U.Q. Foundation, Enhanced Education, Financial Trust Company, Inc., HBRK Associates, Inc., Hyperion Air, Inc, JEGE, Inc., JEGE, LLC, NES, LLC, Plan D, LLC, Southern Financial, LLC, and Southern Trust Company.

28.     Epstein used his wealth and power to create the Epstein Enterprise, which engaged in a pattern of criminal activity by repeatedly procuring and subjecting underage girls and young women to unlawful sexual conduct, sex trafficking, and forced labor.

29.     Many of these women, particularly after Epstein's conviction in 2008, were trafficked from Eastern Europe. As the Government explained in its Second Amended Complaint, these women were recruited and, in several instances, required to marry other Epstein victims in order to maintain their immigration status and their availability to Epstein. *Id*. ¶¶ 62- 63, 78, 86.

30.     As also alleged in the Second Amended Complaint, recruiters and victims were paid in cash or through entities set up by Epstein and/or his associates. *Id*. ¶ 100. Many of these companies were shell companies, that existed merely to transfer money to other accounts, or to shelter Epstein's assets from judgment. *Id*. ¶ 116.

31.     Epstein's lawyer, Darren K. Indyke, and accountant, Richard Kahn, now the Co-Executors of Epstein's Estate, authorized or directed many of the transactions in JP Morgan accounts

held by Epstein or related entities. *Id*. ¶¶ 8-10, 76-117.

32.     Epstein and the Epstein Enterprise continued trafficking and sexually abusing young women and female children until Epstein was arrested by federal law enforcement authorities on July 6, 2019 on federal charges for the sex trafficking of minors.

33.     Epstein was found dead on August 10, 2019 while in custody in a federal detention center in New York on charges for sex-trafficking crimes. *Id*. ¶ 7.

## ALLEGATIONS

### I.     Jeffrey Epstein Was an Extremely High-Risk Customer

34.     Jeffrey Epstein's reputation as a sex trafficker and abuser of women and girls was well-known and well-publicized for more than a decade before his death.

35.     Between 2005 and 2013, there were numerous press reports that Epstein sexually abused women and girls.

36.     In March 2005, there were press reports that Epstein paid a 14-year old girl in Palm Beach, Florida for a "massage" and then molested her. Following these allegations, multiple underage girls, many of them high school students, told police that Epstein also hired them to give sexual massages.

37.     Throughout 2006—when Epstein was arrested in Palm Beach, Florida for solicitation of a minor—there was extensive press regarding the nature and extent of Epstein's sexual offenses, including the existence of dozens of victims.

38.     In 2008, Epstein pled guilty to sexual offenses in Palm Beach, Florida, including soliciting a minor for prostitution. Epstein was sentenced to 18 months in jail and was required to register as a sex offender.

39.     In 2009, the non-prosecution agreement between Epstein and the United States

became public. It revealed allegations that Epstein may have used interstate commerce to induce minors to engage in prostitution, engaged in illicit sexual conduct with minors, and trafficked minors.

40.     In 2010, press reports noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought "young girls . . . often from Eastern Europe" to the United States on Epstein's private jets.[3]

## II.     JP Morgan Knew Epstein Was a Felon, Registered Sex Offender, and Alleged Child Trafficker

41.     JP Morgan did business with Jeffrey Epstein from as early as 1998 to 2013. In that time, JP Morgan serviced approximately fifty-five Epstein-related accounts collectively worth hundreds of millions of dollars.

42.     On information and belief, based on the Government's review of financial records, information from and regarding victims of Epstein's trafficking, and other publicly available information, at least 20 individuals paid through JP Morgan accounts were victims of trafficking and sexual assault in Little St. James, New York, and/or other Epstein properties. These women were trafficked and abused during different intervals between at least 2003 and July 2019, when Epstein was arrested and jailed, and these women received payments, typically multiple payments, between 2003 and 2013 in excess of $1 million collectively. Epstein also withdrew more than $775,000 in cash over that time frame from JP Morgan accounts, especially significant as Epstein was known to pay for "massages," or sexual encounters, in cash. Financial information also reflects payments drawn from JP Morgan accounts of nearly $1.5 million to known recruiters, including to the MC2 modeling agency, and another $150,000 to a private investigative firm.

---

[3] Conchita Sarnoff, *Jeffrey Epstein Pedophile Billionaire and His Sex Den*, The Daily Beast (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den.

43.     JP Morgan knew early on that Epstein was an extremely high-risk client but decided, at multiple points during the relationship, to continue servicing Epstein's accounts because of his vast wealth and connections with other high net worth individuals.

44.     In 2006, JP Morgan's Global Corporate Security Division found "[s]everal newspaper articles . . . that detail the indictment of Jeffrey Epstein in Florida on felony charges of soliciting underage prostitutes." At that time, JP Morgan decided to continue doing business with Epstein but concluded his account "should be classified as high risk" and require special approval.

45.     In a 2010 internal email, JP Morgan's risk management division discussed new allegations against Epstein: "See below new allegations of an investigation related to child trafficking – are you still comfortable with this client who is now a registered sex offender." Another JP Morgan employee responded: "In my short tenure working on the account these stories pop up including these from the summer."

46.     In January 2011, JP Morgan's AML compliance director requested re-approval for the bank's relationship with Epstein from JP Morgan's then-General Counsel "in light of the new allegations of human trafficking . . ." Another JP Morgan employee responded: "I thought we did that in approving a $50 million new line of credit last month?"

47.     In JP Morgan's January 2011 review of Epstein's accounts, the bank concluded there were "no material updates" but noted:

>   A few news stories during 2010 connects Jeffrey Epstein to human trafficking. The coverage team . . . all met to discuss the situation and agreed to enhance monitoring and document a discussion with the client. Jes Staley discussed the topic with Jeffrey Epstein who replied there was no truth to the allegations, no evidence and was not expecting any problems. We will continue to monitor the accounts and cash usage closely going forward.

48.     In March 2011, JP Morgan's Global Corporate Security Division reported: "Numerous articles detail various law enforcement agencies investigating Jeffrey Epstein for

11

allegedly participating, directly or indirectly, in child trafficking and molesting underage girls. Jeffrey Epstein has settled a dozen civil lawsuits out of court from his victims regarding solicitation for an undisclosed amount." The report also identified the following "derogatory information":

    a. "Jean Luc Brunel, owner of MC2 Model Management and Jeffrey Epstein engaged in racketeering that involved luring in minor children for sexual play for money. In addition, Brunel was a frequent passenger on Epstein's private jet and often visited Epstein in jail."

    b. "MC2 Model Management received $1 million from Epstein in 2005. It is unknown if the money was given as a secret investment or payment for services as a procurer."

49. In August 2011, when conducting a Know-Your-Customer review, JP Morgan flagged an account relating to Ghislaine Maxwell—Epstein's former companion who recently was sentenced to 20 years in prison for conspiring with Epstein to sexually abuse minors. Maxwell wanted to set up an account for her "personal recruitment consulting business." In an internal email, JP Morgan's AML Director asked: "What does she mean by personal recruitment?? Are you sure this will have nothing to do with Jeffrey? If you want to proceed, I suggest that we flag this as a High Risk Client."

50. In 2013—the year that JP Morgan terminated its relationship with Epstein—JP Morgan flagged in Epstein's history that "[p]er bank policy, felons [like Epstein] are considered high risk and require additional approval."

51. JP Morgan's banking relationship with Epstein was known at the highest levels of the bank. For instance, an August 2008 internal email states, "I would count Epstein's assets as a probable outflow for '08 ($120mm or so?) as I can't imagine it will stay (pending Dimon review)."

12

## III.    Head of JP Morgan's Private Bank Had Close Personal Relationship With Epstein

52.    Former senior executive, Jes Staley ("Staley"), developed a close relationship with Epstein when Staley was the head of JP Morgan's Private Bank, which is a segment of JP Morgan's business dedicated to extremely wealthy clients with at least $10 million in assets.

53.    Between 2008 and 2012, Staley exchanged approximately 1,200 emails with Epstein from his JP Morgan email account. These communications show a close personal relationship and "profound" friendship between the two men and even suggest that Staley may have been involved in Epstein's sex-trafficking operation. They also reveal that Staley corresponded with Epstein while Epstein was incarcerated and visited Epstein's Virgin Islands residence on multiple occasions.  Epstein even advised Staley in connection with Staley's salary negotiations at JP Morgan in July of 2008.

54.    On December 30, 2008, Epstein and Staley discussed via email Staley's visit to Epstein's residence in Palm Beach, Florida. Epstein wrote that he would not be home the following Sunday, but that Staley was welcome to use the house. Staley replied that he would instead make arrangements to visit Epstein in Palm Beach in early January. On January 8, 2009—around the time of Staley's scheduled visit to Palm Beach—Epstein wired $2,000 from his JP Morgan account to a woman with an Eastern European surname.

55.    Between August 27 and 29, 2009, Staley communicated via email to Epstein that he would be in London in a week. Epstein inquired whether Staley would need anything while in London, and Staley replied, "Yep." On August 31, 2009, Epstein wired $3,000 from his JP Morgan account to the same Eastern European woman Epstein paid in January 2009.

56.    Staley sent an email to Epstein on November 1, 2009, when Epstein was incarcerated and Staley was presumably visiting Little St. James, saying:

13

So when all hell breaks lo[o]se, and the world is crumbling, I will come here, and be at peace. Presently, I'm in the hot tub with a glass of white wine. This is an amazing place. Truly amazing. Next time, we're here together. I owe you much. And I deeply appreciate our friendship. I have few so profound.

57.    On December 4, 2009, Staley told Epstein via email: "I realize the danger in sending this email. But it was great to be able, today, to give you, in New York City, a long heartfelt, hug."

58.    The next day, Epstein wrote to Staley, "you were with Larry, and I had to put up with . . ." and attached a picture of a young woman (shown below). Staley quipped, "don't tell me a French wine." Epstein replied, "always thoughts of alcohol."



59.    On December 20, 2009, Epstein sent an email to Staley that was blank except for a picture of a young woman (shown below).



60.     On January 15, 2010, Staley emailed Epstein, referring to Little St. James, "Arrived at your harbor. Someday, we have to do this together."

61.     In July 2010, Staley sent an email to Epstein, saying: "Maybe they're tracking u? That was fun. Say hi to Snow White." Epstein responded: "[W]hat character would you like next?" When Staley said "Beauty and the Beast", Epstein replied: "well one side is available."

62.     None of the emails between Epstein and Staley were flagged in connection with risk reviews of Epstein's accounts. Moreover, JP Morgan allowed Staley to remain a decision-maker on Epstein's accounts. JP Morgan even tasked Staley to discuss the human trafficking allegations with Epstein.

63.     In July 2013—several months after Staley left JP Morgan to join another financial institution—JP Morgan's Compliance Officer terminated JP Morgan's relationship with Epstein.

64.     At the time of Epstein's death in 2019, Staley was the Chief Executive Officer of Barclays; however, Staley stepped down from that position in November 2021 after British

financial regulators concluded an investigation into Staley's characterization of his relationship with Epstein.

## IV.   JP Morgan Ignored Obvious Red Flags Relating to Epstein's Accounts

65.    Despite JP Morgan's claims that it would closely monitor Epstein's accounts, JP Morgan ignored numerous red flags related to Epstein's accounts and failed to comply with federal banking regulations.

66.    Between 2003 and 2013, Epstein and/or his associates used Epstein's accounts to make numerous payments to individual women and related companies. Among the recipients of these payments were numerous women with Eastern European surnames who were publicly and internally identified as Epstein recruiters and/or victims. For example, Epstein paid more than $600,0000 to Jane Doe 1, a woman who—according to news reports contained in JP Morgan's due diligence reports—Epstein purchased at the age of 14. Like other women who received payments from Epstein, Jane Doe 1 listed Epstein's apartments on 66th Street in New York City as her address, which should have been a red flag to JP Morgan.

67.    Epstein and/or his associates also made significant cash withdrawals and 95 foreign remittances with no known payee. For example, Hyperion Air, Inc.—the Epstein-controlled company that owned Epstein's private jet—issued over $547,000 in checks payable to cash purportedly for "fuel expenses when traveling to foreign countries." Additionally, between January 2012 and June 2013, Hyperion converted more than $120,000 into foreign currency. Many of these cash withdrawals either exceeded the $10,000 reporting threshold or were seemingly structured to avoid triggering the reporting requirement. This is particularly significant since it is well known that Epstein paid his victims in cash. SAC ¶ 100.

68.    In addition, Epstein and/or his representatives appeared to be misusing JP Morgan

accounts for Epstein's purported charitable organizations, including the C.O.U.Q. Foundation and Enhanced Education. Epstein made payments from these accounts with no clear nexus to the organization's charitable purpose. For example, Epstein and/or his representative used the C.O.U.Q. Foundation account to pay $29,464.66 to three young women, including two known victims, and over $20,000 to a company called Phoenix Realty Home Inc. Similarly, Epstein and/or his representative used the Enhanced Education fund to pay $124,232 to Leslie Wexner and $15,000 to ███████████ and ███████████, a firm owned by Epstein's reportedly prior girlfriend.

69.     Each of these red flags was serious; together, they suggest a pattern of potentially illegal conduct that should have prompted action by JP Morgan. Despite this, JP Morgan's 2013 compliance report describes "nothing unusual" in Epstein's account transactions, confirms that Epstein's transaction activity appears "reasonable, normal, and expected for the type of business or industry in which the client engages", and denies that any "unusual . . . activity" was detected, noting that "Compliance reviews activity regularly." Moreover, the frequency of Epstein's payments and the fact that the vast majority of account activity was payments to women and cash withdrawals rather than business activity should have been enough to trigger action.

70.     Even as late as May 2013—mere months before JP Morgan terminated Epstein's account—JP Morgan provided lines of credit to Epstein of up to $50 million.

## V.     Epstein Brought Additional High Net Worth Clients to JP Morgan

71.     In addition to his own holdings with JP Morgan, Epstein helped, or promised to help, Staley recruit ultrawealthy clients to JP Morgan. A few examples are laid out below.

72.     In 2004, Epstein introduced Staley to Glenn Dubin, the owner of Highbridge Capital Management—one of the country's largest hedge funds. This laid the groundwork for JP

Morgan's acquisition of Highbridge—a move that helped catapult Staley's career.

73. In 2011, Epstein and Staley had extensive discussions regarding the creation of a "very HIGH profile" donor advised fund ("DAF"), which is an investment account established to support charitable organizations, headed by the ████████████. Epstein pitched the ███ DAF as an "exclusive club" with a minimum $100 million donation where JP Morgan would act as the fiduciary.

**VI.    JP Morgan's ████████████████████████████████████
        Reveals Systematic Failures**

74.    ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████.

75.    ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

76.    Further, it does not appear from the Government's investigation that JP Morgan engaged in any investigation of the source of Epstein's funds. For example, in 2012, an internal

email from JP Morgan identified the following questions for Epstein regarding his account activity:

> QUESTION: For checking account:
> Review the activity for the period overall and explain how the client's transactions profile agrees with or doesn't agree with expectations for the client based on the client relationship (purpose of accounts, occupation, business activity, etc.[)]
> Compliance reviewed regularly
>
> Questions for Asset/brokerage Account:
> What is the purpose/intended use of the account(s)? Please provide a detailed description of how the Client Direct Asset/Brokerage Account(s) will be used by the client.
> Investments/trading/wealth accumulation
> **Review the activity for the period overall and explain how the client's transaction profile agrees with or doesn't agree with expectations for the client based on the client relationship (purpose of accounts, occupation, business activity, etc.):
> Compliance reviewed regularly

Yet, there is no evidence that JP Morgan pursued or received a response from Epstein even though JP Morgan was required to conduct this minimum level of due diligence pursuant to 31 C.F.R. § 1010.620(b)(3).

77.    JP Morgan also seemingly did no due diligence on the nature of the various business entities for which it held accounts for Epstein, which appear to have no legitimate business purpose and, upon information and belief, were part of Epstein's criminal enterprise in the Virgin Islands.

78.    In January 2013—the year JP Morgan terminated Epstein's accounts—the Office of the Comptroller of the Currency ("OCC") entered into a consent order with JP Morgan regarding deficiencies in the bank's overall program for BSA/AML compliance. The OCC found— consistent with the Government's findings here—that JP Morgan failed to develop adequate due diligence on customers and failed to comply with federal banking regulations. In fact, the OCC noted that JP Morgan "failed to identify significant volumes of suspicious activity".[4]

79.    After JP Morgan terminated Epstein's accounts, Epstein moved his accounts to

---

[4] NYSDFS Consent Order at 2-4 (Jan. 14, 2013), https://www.occ.treas.gov/news-issuances/news-releases/2013/nr-occ-2013-8a.pdf.

Deutsche Bank from 2013 to 2018.

80. The New York State Department of Financial Services ("NYSDFS") investigated Deutsche Bank for failures to monitor Epstein's accounts. On July 6, 2020, the NYSDFS and Deutsche Bank entered into a Consent Order with a $150 million penalty, which stated, in relevant parts:

    a.    "The Bank's fundamental failure was that, although the Bank properly classified Mr. Epstein as high-risk, the Bank failed to scrutinize the activity in the accounts for the kinds of activity that were obviously implicated by Mr. Epstein's past. The Bank was well aware not only that Mr. Epstein had pled guilty and served prison time for engaging in sex with a minor but also that there were public allegations that his conduct was facilitated by several named co-conspirators. Despite this knowledge, the Bank did little or nothing to inquire into or block numerous payments to named co-conspirators, and to or on behalf of numerous young women, or to inquire how Mr. Epstein was using, on average, more than $200,000 per year *in cash*."

    b.    "Whether or to what extent those payments or that cash was used by Mr. Epstein to cover up old crimes, to facilitate new ones, or for some other purpose are questions that must be left to the criminal authorities, but the fact that they were suspicious should have been obvious to Bank personnel at various levels. The Bank's failure to recognize this risk constitutes a major compliance failure."

    c.    "These errors are unacceptable in the context of a major international bank

and inexcusable in the context of the heightened scrutiny that should have occurred in the monitoring of a high-risk customer."

81.     The NYSDFS also found fault with Deutsche Bank's failure to obtain answers regarding Epstein's use of his accounts to pay women with Eastern European surnames: "In a May 2018 email, a compliance officer submitted an inquiry . . . about payments to the accounts of women with Eastern European surnames at a Russian bank, and asking for an explanation of the purpose of the wire transactions and Epstein's relationship with the counterparties."[5]

82.     JP Morgan's failures to appropriately monitor Epstein's accounts and comply with federal banking regulations are even more egregious than Deutsche Bank's failures because JP Morgan failed to demonstrate even basic due diligence and continued its relationship with Epstein for over a decade, despite the glaring indications of criminal activity.

83.     ███████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████.

84.     So, too, was JP Morgan's decision to allow Jes Staley to serve as an investigator and decision-maker with respect to Epstein's accounts, despite glaring red flags regarding Staley's relationship with Epstein, was a blatant failure of compliance.

## VII.    JP Morgan Fraudulently Concealed Its Continuing Violations

85.     JP Morgan's continuous illegal conduct has caused repeated and continuous injury.

86.     JP Morgan knew—including at the highest level of the bank—that Epstein was an extremely high-risk client. Between 2005 and 2013, there were myriad reports that Epstein sexually abused women and girls. In 2008, Epstein pled guilty to sexual offenses and registered as

---

[5] *Id*. at 15.

a sex offender. Despite JP Morgan's acknowledgement that it needed to closely monitor Epstein, JP Morgan ignored numerous red flags and failed to comply with federal banking regulations until years later after JP Morgan was no longer benefiting from Epstein's business.

87.     JP Morgan also engaged in a course of conduct aimed at fraudulently concealing its illegal conduct, including by failing to timely comply with federal banking regulations in order to profit from Epstein's wealth and connections.

88.     A key purpose of federal banking regulations is to give law enforcement real-time information so that it can act to detect violations of the law and protect public safety.

89.     The Government of the Virgin Islands did not know, and could not have known, that Epstein used JP Morgan to facilitate his trafficking enterprise or that JP Morgan turned a blind eye to unusual cash transactions and wires and failed to carry out or follow up on basic due diligence and to timely comply with federal banking regulations, as required by the law.

90.     Over more than a decade, JP Morgan clearly knew it was not complying with federal regulations in regard to Epstein-related accounts as evidenced by its too-little too-late efforts after Epstein was arrested on federal sex trafficking charges and shortly after his death, when JP Morgan belatedly complied with federal law.

91.     The continued illegal conduct by JP Morgan has caused repeated and continuous injury. JP Morgan's illegal conduct was not completed nor were all damages incurred until the wrongdoing ceased in August 2019 when JP Morgan began belatedly complying with federal banking regulations in regard to Epstein-related accounts.

## CAUSES OF ACTION

## COUNT ONE
### Participating in a Sex-Trafficking Venture
### Violation of Trafficking Victims Protection Act
### 18 U.S.C. §§ 1591(a)(2), 1595(d) (*Parens Patriae*)

92.    The Government restates and realleges paragraphs 1 to 91 of this Complaint as if fully set forth herein.

93.    The Government brings this Count as *parens patriae* on behalf of the residents and visitors of the United States Virgin Islands and pursuant to the Attorney General's express statutory authority.

94.    JP Morgan knowingly and intentionally participated in Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2) by facilitating payments to women and girls, channeling funds to Epstein to fund the operation, and concealing Epstein's criminal conduct by failing to comply with federal banking law.

95.    JP Morgan knowingly and intentionally benefitted financially from and received value for its participation in the sex-trafficking venture in which Epstein and his co-conspirators, with JP Morgan's knowledge or reckless disregard of the fact, would use means of force, threats of force, fraud, coercion, and a combination of such means to sexually abuse young women and underage girls, including by causing them to engage in commercial sex acts, in the Virgin Islands and elsewhere.

96.    Among the financial benefits that JP Morgan received for participating in and facilitating Epstein's sex-trafficking venture was the deposit of funds that Epstein—a Virgin Islands resident—and Epstein-controlled entities located in the Virgin Islands made to JP Morgan. JP Morgan profited from the use of these deposits. Epstein and Epstein-controlled entities located

in the Virgin Islands deposited these funds in exchange for JP Morgan's facilitation of and participation in Epstein's sex-trafficking venture.

97. Also, among the financial benefits that JP Morgan received for participating in and facilitating Epstein's sex-trafficking venture were referrals of business opportunities from Epstein and his co-conspirators. JP Morgan profited from, or expected to profit from, these referred business opportunities. Epstein referred business entities and business opportunities to JP Morgan in exchange for its facilitation of and participation in Epstein's sex-trafficking venture.

98. JP Morgan financially profited from the deposits made by Epstein and Epstein-controlled entities located in the Virgin Islands and from the business opportunities referred to JP Morgan by Epstein and his co-conspirators in exchange for its known facilitation of and implicit participation in Epstein's sex trafficking venture.

99. JP Morgan knew and recklessly disregarded and concealed the fact that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls for purposes of causing them to engage in commercial sex acts in violation of 18 U.S.C. § 1591(a)(1).

100. JP Morgan and its employees had actual knowledge that they were facilitating Epstein's sexual abuse and sex-trafficking conspiracy to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls to engage in commercial sex acts through the means of force, threats of force, fraud, abuse of process, and coercion.

101. Despite this knowledge, JP Morgan intentionally paid for, concealed, facilitated, and participated in Epstein's and his co-conspirators' violations of 18 U.S.C. § 1591(a), which JP Morgan knew and was in reckless disregard of the fact that Epstein and his co-conspirators would

use its bank accounts and financial transactions to coerce, defraud, and force young women and underage girls to engage in commercial sex acts.

102.     JP Morgan, through its employees and agents and their role in facilitating the financial aspect of Epstein's enterprise, actively facilitated or participated in the sex-trafficking conspiracy in which Epstein and his co-conspirators led young women and underage girls in the Virgin Islands and elsewhere to believe that they would be rewarded if they cooperated with Epstein and his co-conspirators and acquiesced to their demands.

103.     JP Morgan committed this affirmative conduct knowing or in reckless disregard of the fact that Epstein would use cash transactions and financial support provided by JP Morgan as a means to defraud, force, and coerce commercial sex acts from young women and underage girls.

104.     In addition to having actual knowledge that it was participating in and facilitating the Epstein sex-trafficking venture, JP Morgan also knew that it was participating in and facilitating a venture that was engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

105.     In exchange for facilitating and covering up Epstein's commercial sex trafficking, JP Morgan's employees received financial benefits and career advancement from JP Morgan.

106.     Facilitating and covering up Epstein's sex trafficking venture was a means for JP Morgan employees to obtain economic success and promotion within JP Morgan.

107.     JP Morgan's knowing and intentional conduct has caused serious harm to the Virgin Islands and its residents, including without limitation financial harm, by facilitating the commission of sexual abuse against young women and underage girls, including their engagement in commercial sex acts, in the Virgin Islands.

108.     JP Morgan's tortious conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex-trafficking venture operated in and from the Virgin Islands. JP Morgan's tortious conduct also evidenced a high degree of moral turpitude and demonstrated such wanton disregard for the safety of young women and underage girls in the Virgin Islands and elsewhere as to imply a deliberate indifference to its legal obligations.

109.     By virtue of these knowing and intentional violations of 18 U.S.C. § 1591(a)(2), JP Morgan is liable to the Government for all appropriate relief under 18 U.S.C. § 1595(d), including damages suffered by the Government and/or Epstein's victims, punitive damages, restitution, appropriate injunctive relief, fines, reasonable attorneys' fees, and all such other relief as the Court deems appropriate.

## COUNT TWO
### Criminal Activity—Participating, Directly or Indirectly, in a Sex-Trafficking Venture Violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(2), actionable under Virgin Islands Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. §§ 604(e) and 605(a)

110.     The Government restates and realleges paragraphs 1 to 109 of this Complaint as if funny set forth herein.

111.     The Virgin Islands Legislature enacted the CICO Act with the purpose to "curtail criminal activity and lessen its economic and political power in the Territory of the Virgin Islands by establishing new penal prohibitions and providing to law enforcement and the victims of criminal activity new civil sanctions and remedies." 14 V.I.C. § 601.

112.     At all times material herein, JP Morgan was a "person" identified in 14 V.I.C. § 604(l).

113. At all times material herein, Epstein and his co-conspirators were engaged in an illicit sex-trafficking "enterprise" as defined in 14 V.I.C. § 604(h).

114. At all times material herein, JP Morgan supported and/or was associated with the Epstein sex-trafficking enterprise by providing banking and payment-processing services to Epstein, who resided in the Virgin Islands, and Epstein-controlled entities that were located and/or incorporated in the Virgin Islands.

115. In providing banking and payment-processing services to Epstein and Epstein-controlled entities in return for profits realized both from Epstein's and Epstein-controlled entities' accounts and from receiving referrals by Epstein of other high-value banking clients, JP Morgan knowingly, intentionally, and willfully benefitted financially and by receiving things of value from its participation, directly or indirectly, in Epstein's sex-trafficking venture and enterprise, in violation of 18 U.S.C. § 1591(a)(2).

116. JP Morgan's knowing, intentional, and willful receipt of financial benefits and things of value from its facilitation and participation in Epstein's sex-trafficking venture and enterprise through the financial infrastructure it provided and concealed constitutes a felony under 18 U.S.C. § 1591(b) and "criminal activity" as defined in 14 V.I.C. § 604(e).

117. By knowingly, intentionally, and willfully receiving financial benefits and things of value from its participation, directly or indirectly, via financing in Epstein's sex-trafficking venture and enterprise, JP Morgan enabled Epstein to have ready and reliable access to and use of resources with which to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls for purposes of causing them to engage in commercial sex acts in the Virgin Islands and elsewhere. JP Morgan thereby unlawfully conducted and/or participated in,

directly or indirectly, the affairs of the Epstein sex-trafficking enterprise through a pattern of illegal activity in violation of 14 V.I.C. § 605(a).

118.    JP Morgan's illegal activity has caused serious harm to the Virgin Islands and its residents, including without limitation financial harm, by facilitating the commission of sexual abuse against young women and underage girls, including their facilitation and participation, directly or indirectly, in commercial sex acts, in the Virgin Islands.

119.    By virtue of this pattern of illegal activity in furtherance of the Epstein sex-trafficking enterprise, JP Morgan is liable to the Government for all appropriate civil remedies under 14 V.I.C. § 607, including treble damages suffered by the Government and/or Epstein's victims, civil penalties, restitution and/or disgorgement of ill-gotten gains, appropriate injunctive relief, attorneys' fees and costs, and all such other relief as the Court deems appropriate.

## COUNT THREE
**Criminal Activity—Willfully Failing To Comply With Federal Banking Law,
Violation of Bank Secrecy Act, 31 U.S.C. § 5322(a), as it incorporates
███████████████████████████, actionable under Virgin Islands
Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. §§ 604(e) and 605(a)**

120.    The Government restates and realleges paragraphs 1 to 119 of this Complaint as if fully set forth herein.

121.    The Virgin Islands Legislature enacted the CICO Act with the purpose to "curtail criminal activity and lessen its economic and political power in the Territory of the Virgin Islands by establishing new penal prohibitions and providing to law enforcement and the victims of criminal activity new civil sanctions and remedies." 14 V.I.C. § 601.

122.    At all times material herein, JP Morgan was a "person" as defined in 14 V.I.C. § 604(l).

28

123.    At all times material herein, Epstein and his co-conspirators were engaged in an illicit sex-trafficking "enterprise" as defined in 14 V.I.C. § 604(h).

124.    At all times material herein, JP Morgan was employed by and/or associated with the Epstein sex-trafficking enterprise by providing banking and payment-processing services to Epstein, who resided in the Virgin Islands, and Epstein-controlled entities that were located and/or incorporated in the Virgin Islands.

125.    In providing banking and payment-processing services to Epstein and Epstein-controlled entities, JP Morgan knowingly, intentionally, and willfully failed to comply with federal banking regulations in violation of 31 U.S.C. § 5322(a), ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████. From accounts maintained and served at JP Morgan, Epstein and Epstein-controlled entities received payments of large dollar amounts for no apparent business or other lawful purpose and made repeated cash payments, sometimes in amounts and patterns designed to evade federal reporting requirements, to young women and/or underage girls who were sexually abused and coerced into engaging in commercial sexual acts in the Virgin Islands and elsewhere.

126.    JP Morgan's knowing, intentional, and willful failure to comply with federal banking regulations constitutes a felony under 31 U.S.C. § 5322(a) and "criminal activity" as defined in 14 V.I.C. § 604(e).

29

127.    By knowingly, intentionally, and willfully failing to comply with federal banking regulations, JP Morgan enabled Epstein to have ready and reliable access to and use of resources with which to recruit, entice, harbor, transport, provide, obtain, and maintain young women and underage girls for purposes of causing them to engage in commercial sex acts in the Virgin Islands and elsewhere. JP Morgan thereby unlawfully conducted and/or participated in, directly or indirectly, the affairs of the Epstein sex-trafficking enterprise through a pattern of illegal activity in violation of 14 V.I.C. § 605(a).

128.    JP Morgan's illegal activity has caused serious harm to the Virgin Islands and its residents, including without limitation financial harm, by facilitating the commission of sexual abuse against young women and underage girls, including their engagement in commercial sex acts, in the Virgin Islands.

129.    By virtue of this pattern of illegal activity in furtherance of the Epstein sex-trafficking enterprise, JP Morgan is liable to the Government for all appropriate civil remedies under 14 V.I.C. § 607, including treble damages suffered by the Government and/or Epstein's victims, civil penalties, restitution and/or disgorgement of ill-gotten gains, appropriate injunctive relief, attorneys' fees and costs, and all such other relief as the Court deems appropriate.

**COUNT FOUR**
**Unfair Methods of Competition**
**Violation of Virgin Islands Consumer Fraud**
**and Deceptive Business Practices Act, 12A V.I.C. § 304**

130.    The Government restates and realleges paragraphs 1 to 129 of this Complaint as if fully set forth herein.

131.    Section 304 of Title 12A of the Virgin Islands Code provides that "[i]t is unlawful for any person to engage in unfair methods of competition . . . in the conduct of any trade or commerce."

132.    JP Morgan is a "person" as defined in 12A V.I.C. § 303(h).

133.    JP Morgan's provision of banking services and payment processing for Epstein and Epstein-controlled entities constitutes "[t]rade or commerce" as defined in 12 V.I.C. § 303(k).

134.    In return for knowingly and intentionally participating in, directly or indirectly, facilitating, and concealing by failing to comply with federal banking regulations regarding Epstein-related accounts, JP Morgan both profited from the use of the funds in their accounts and received referrals of other high-value business opportunities from Epstein and his co-conspirators.

135.    By receiving referrals of high-value business opportunities from Epstein and his co-conspirators in return for participating in, directly or indirectly, facilitating, and concealing by failing to comply with federal banking regulations regarding Epstein-related accounts, JP Morgan unlawfully and unjustly enriched itself at the expense of other banks that complied with their legal obligations. This conduct constitutes an unfair method of competition in violation of 12A V.I.C. § 304.

136.    By virtue of its knowing, intentional, and repeated acts constituting unfair competition, JP Morgan is liable to the Government for all appropriate civil remedies under 12A V.I.C. §§ 328 and 332, including damages, civil penalties awarded on a per-violation basis pursuant to 12A V.I.C. § 328(b), appropriate injunctive relief, attorneys' fees and costs, and all such other relief as the Court deems appropriate.

## REQUEST FOR RELIEF

The Government respectfully requests that the Court enter judgment in its favor, and against JP Morgan, as follows:

A.     That the Court award the Government compensatory, consequential, general, and nominal damages, as suffered by the Government and/or Epstein's victims, and punitive damages, all against JP Morgan in amounts to be awarded at trial;

B.     That the Court award the Government punitive and exemplary damages against JP Morgan in an amount to be determined at trial;

C.     That the Court order JP Morgan to pay appropriate fines to the Government pursuant to 18 U.S.C. § 1591(b) in amounts to be determined at trial;

D.     That the Court order JP Morgan to provide restitution of all ill-gotten gains to the Government pursuant to 18 U.S.C. § 1593 and 14 V.I.C. § 607(a)(6) and pursuant to 14 V.I.C. § 608(c)(4) to protect the rights of victims and innocent persons in the interest of justice and consistent with the purposes of the CICO Act, in amounts to be determined at trial;

E.     That the Court award the Government treble damages against JP Morgan pursuant to 14 V.I.C. § 607(c) in an amount to be determined at trial;

F.     That the Court order JP Morgan to pay appropriate civil penalties to the Government pursuant to 14 V.I.C. § 607(e) and 12A V.I.C. § 328(b) and pursuant to 14 V.I.C. § 608(c)(4) to protect the rights of victims and innocent persons in the interest of justice and consistent with the purposes of the CICO Act, in amounts to be determined at trial;

G.     That the Court enter an injunction pursuant to 14 V.I.C. § 607(a)(2) and 12A V.I.C. § 328(a)(2) to prevent further illegal conduct and any concealment of illegal conduct;

H.  That the Court order JP Morgan to provide disgorgement of all ill-gotten gains to the Government pursuant to 14 V.I.C. § 607(a)(6) and pursuant to 14 V.I.C. § 608(c)(4) to protect the rights of victims and innocent persons in the interest of justice and consistent with the purposes of the CICO Act, in amounts to be determined at trial;

I.  That the Court award the Government attorneys' fees and costs pursuant to 18 U.S.C. § 1595, 14 V.I.C. § 607(c), and 12A V.I.C. § 332 in amounts to be determined after trial; and

J.  That the Court award the Government and order JP Morgan to provide all such other relief as the Court deems appropriate.

### JURY DEMAND

The Government demands a jury trial on all issues so triable.

Dated: January 10, 2023

**CAROL THOMAS-JACOBS, ESQ.**
**ACTING ATTORNEY GENERAL**

/s/ *David I. Ackerman*
**DAVID I. ACKERMAN** (NYS Bar #4110839)
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 849-4962
dackerman@motleyrice.com

**CAROL THOMAS-JACOBS** (NYS Bar #2941300)
Admitted *Pro Hac Vice*
Acting Attorney General of the United States
Virgin Islands
Virgin Islands Department of Justice
34-38 Kronprindsens Gade
St. Thomas, U.S. Virgin Islands 00802
Tel.: (340) 774-5666 ext. 10101
carol.jacobs@doj.vi.gov

**LINDA SINGER** (NYS Bar #2473403)
Admitted *Pro Hac Vice*
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
lsinger@motleyrice.com

**PAIGE BOGGS**
Admitted *Pro Hac Vice*
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 386-9629
pboggs@motleyrice.com

# Exhibit B

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated | ) ) ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| Plaintiffs, | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| v. | ) | Case No.: 22-cv-10019-JSR |
| | ) | |
| JP Morgan Chase Bank, N.A., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | / | |

## <u>FIRST AMENDED INDIVIDUAL AND CLASS ACTION COMPLAINT</u>

Plaintiff Jane Doe 1 files this first amended individual and civil class action complaint for damages and other relief under (among other provisions of law) the United States federal anti-sex trafficking statute, 18 U.S.C. § 1591, *et seq.*—the Trafficking Victim Protection Act ("TVPA")—and for aiding and abetting, intentional infliction of emotional distress, and negligence related to sexual offenses as defined in article one hundred thirty of the penal law, pursuant to the New York Adult Survivors Act, N.Y. CPLR §214-j. The suit arises from Defendant JP Morgan Chase Bank, N.A.'s (hereinafter "JP Morgan") participation and intentional involvement in Jeffrey Epstein's widespread and well-publicized sex-trafficking operation, as well as the direct financial benefits it received therefrom.

JP Morgan knew that it was providing the financial lifeblood for Epstein's

1

international sex-trafficking organization from 1998 through August 2013. In exchange for that crucial financial support, JP Morgan knowingly and intentionally benefited and received things of value from Epstein and his sex-trafficking operation. And that crucial financial support allowed Epstein to successfully rape, sexually assault, and coercively sex traffic Jane Doe 1 and the numerous other members of the Class proposed below (the "Class"). JP Morgan knew that Epstein was regularly committing violations of New York Penal Law Art. 130, including, and especially, New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66, and acted to enable, aid and abet, and facilitate Epstein's commission of such offenses against countless young women, including Jane Doe 1 and Class Members.

JP Morgan also knew that Epstein would use means of force, threats of force, fraud, abuse of legal process, exploitation of power disparity, and a variety of other forms of coercion to cause young women and girls to engage in commercial sex acts. Knowing that it would earn millions of dollars in exchange for facilitating Epstein's sex abuse and trafficking, JP Morgan chose profits over following the law. Specifically, JP Morgan chose participating in and facilitating Epstein's sex-trafficking conspiracy for many years, including through the criminal investigation and incarceration of Jeffrey Epstein, in order to churn profits.

Jane Doe 1 makes the following allegations on information and belief and believes that substantial additional evidentiary support will exist for the allegations

set forth herein after a reasonable opportunity for discovery:

## I. JURISDICTION, VENUE, AND TIMELINESS

1.     This action is brought pursuant to various federal and state statues, including the federal TVPA, 18 U.S.C. § 1589 through § 1595. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. §1331, because Jane Doe 1—individually and on behalf of the other Class members—proceeds under the federal TVPA statute.

2.     This Court also has supplemental jurisdiction over the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

3.     This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. § 1595, in which to bring this action.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Epstein, his co-conspirators, and JP Morgan all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District.  In addition, Epstein sexually abused and trafficked Jane Doe 1 and members of the Class is this District.

4.     Often these acts of sexual abuse and commercial sex acts, committed by Jeffrey Epstein and certain select friends of his, took place in Jeffrey Epstein's

New York mansion, located within this District at 9 East 71st Street in New York City.  Epstein also used his New York mansion to harbor his victims and as a base from which to transport them to other locations outside of New York.

5.      A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District.

6.      This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that a plaintiff shall have ten years after the cause of action arose to file suit against any person who knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known violated the laws against sex trafficking.  This action is also timely because the conspiracy continued until recently.  This action is also timely under New York's Adult Survivor's Act, N.Y. CPLR § 214-j.

## II. PARTIES

7.      Jane Doe 1 is a U.S. citizen and was at all relevant times a resident of and domiciled in the State of New York.

8.      Plaintiff Jane Doe 1 is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

9.      Jane Doe 1 is also at serious risk of retaliatory harm because the co-conspirators who participated in the Epstein sex-trafficking venture had—and

4

continue to possess—tremendous wealth and power and have demonstrated a clear ability to cause her serious harm.

10.     Jane Doe 1's safety, right to privacy, and security outweigh the public interest in her identification.

11.     Jane Doe 1's legitimate concerns outweigh any prejudice to Defendant by allowing her to proceed anonymously.

12.     As discussed below, many other women are similarly situated to Jane Doe 1 and also need to proceed anonymously for the same reasons. The identities of most of these other women are known to Defendant.

13.     Defendant JP Morgan is a global financial institution headquartered in New York, New York.

14.     Defendant JP Morgan is licensed by the New York State Department of Financial Services to operate a foreign bank branch in the State of New York.

15.     Defendant JP Morgan currently conducts substantial business in this District and conducted substantial business at the time of events covered in this complaint.

16.     As one example of business conducted in this District, JP Morgan ordinarily trades shares on the New York Stock Exchange, located in this District. As another example, JP Morgan maintains branch banks within this District.

17.     JP Morgan's financial activities, including the events alleged herein,

were in and affecting interstate and foreign commerce. In connection with the acts alleged in this complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of national securities markets.

18.    JP Morgan is responsible, under United States law and otherwise, for the acts of its officers, directors, employees, and agents, including the acts described in this complaint. The acts alleged were committed by JP Morgan's officers, directors, employees, and agents were within actual and apparent scope of their employment and with the intention, at least in part, to benefit JP Morgan.

### III. INTRODUCTION

19.    Jeffrey Epstein's sex-trafficking venture operated in many respects as a sex-themed cult designed to ensnare vulnerable young women and indoctrinate them into Epstein's carefully constructed world in which Epstein was their messiah. Epstein and his co-conspirators preached the gospel of Epstein. Epstein's victims were taught to do what he said, and he would protect them; but disobey him, and he would punish them; and continue to disobey, and he would cause them serious harm from which they could never recover.

20.    Once in Epstein's clutches, each victim was taught and understood that she must be completely compliant with every demand Epstein had for her; otherwise,

6

she would certainly suffer serious reputational, financial, and psychological harm. By using these and other means of force, threats of force, fraud, threats of abuse of the legal process and coercion, Epstein and his co-conspirators sexually trafficked and sexually abused Jane Doe 1 and the other members of the Class.

21.     The Epstein sex-trafficking venture originated in the early 1990's. From its inception until Jeffrey Epstein's arrest by the FBI for sex trafficking in 2019 (and his subsequent death on August 10, 2019, by apparent suicide), the venture operated primarily for the purpose of luring young women and girls into a position where Jeffrey Epstein and his co-conspirators could coerce them to engage in commercial sex acts and commit sexual offenses against them. His venture also operated to conceal its sex trafficking from law enforcement organizations. And his venture provided financial and other benefits to those who assisted and enabled the venture.

22.     The Epstein sex-trafficking venture was well-structured from the beginning and grew increasingly more complex and powerful as it victimized more young women and as its relationship with Defendant JP Morgan grew.

23.     Epstein could not and did not act alone. He created and maintained his sex-trafficking venture with the assistance of other influential individuals and entities who knew he was sexually abusing and sexually trafficking young women and girls and provided support to facilitate his sexual abuse and sex trafficking

7

operation.

24.     Epstein's sex-trafficking venture was not possible without the assistance and complicity of a financial institution—specifically, a banking institution—which provided special treatment to Jeffrey Epstein and the sex-trafficking venture, thereby ensuring its continued operation and sexual abuse and sex-trafficking of young women and girls.  Without the financial institution's participation, Epstein's sex trafficking scheme could not have existed and flourished.

25.     Epstein's victims were young women and girls, who suffered severe abuse as Epstein's sex-trafficking victims and who believed they had to remain loyal to the venture at all costs to survive.  Epstein victimized hundreds of young women and girls with the assistance of a wide network of co-conspirators, including JP Morgan.

26.     Epstein's sexual abuse and sex trafficking scheme was supported by virtually unlimited wealth, derived from select wealthy individuals who acted as the financial engine behind the sex-trafficking operation, in exchange for sexual and other benefits.

27.     Epstein masterfully assessed the specific needs and vulnerability of each of his targeted victims.  He then closed the trap on his victims with offers of money, food, shelter, medical care for them or family members, travel, schooling, and career opportunities.    Epstein groomed the young women and girls,

indoctrinating them to believe that the sexual abuse was normal.

28.     Epstein fraudulently represented to the victims that he would take care of them in various ways, which ultimately allowed Epstein to cause them to engage in commercial sex acts with himself and, on occasion, select others, as well as to create the opportunity for Epstein to sexually abuse them.

29.     The Epstein sex-trafficking venture's purpose included enticing, obtaining, harboring, and transporting the young victims without drawing unwanted attention from law enforcement.  The venture had everything a sex-trafficking organization needed—funding, infrastructure, the appearance of legitimacy, and a complicit banking institution.  It was by many accounts the most powerful and wealthiest sex-trafficking venture ever created.

30.     The Epstein sex-trafficking venture knowingly used means of force, threats of force, fraud, coercion (including threats of serious harm or physical restraint), and abuse of law and the legal process, to cause Jane Doe 1, and many dozens of others similarly situated women to engage in commercial sex acts.

31.     The Epstein sex-trafficking venture operated in and affected interstate and foreign commerce.  Epstein recruited, solicited, coerced, harbored, transported, and enticed some of his victims, including Jane Doe 1 and others similarly situated, to engage in commercial sex acts in, among other places, New York (including the Southern District of New York), Florida, the U.S. Virgin Islands, New Mexico,

Case 1:22-cv-01494-BSR Document 63 Filed 08/08/23 Page 61 of 181

England, and France.

32.    The Epstein sex-trafficking venture operated throughout the world from in and around (at least) 1998 through (at least) in and around August 10, 2019, when Epstein died by apparent suicide.  Thereafter, through at least July 2020, to and including the date of this complaint, members of the sex-trafficking venture continued to further the venture by concealing the activities and extent of the venture.

33.    The manner of operation for Epstein's particular sexual abuse and sex trafficking operation was widely publicized.  He would lure young girls or women to one of his luxurious mansions, under the guise of being a wealthy philanthropist, able to advance careers, education, or provide other life necessities, and once inside he would force his would-be victim into providing a massage that would turn sexual, and from there he would cause each of his unsuspecting victims to engage in a variety of commercial sex acts.

34.    Once in his presence, each victim knew it was no option to disobey Epstein.  It was well known and understood that he was one of the most powerful and connected people in the United States, able to help any of these young victims and capable and willing to seriously harm any of his victims.

35.    While Epstein's abuse began in the early 1990s with the use of his paramour turned madame, Ghislaine Maxwell ("Maxwell"), Epstein's appetite for

sexually abusing young women and girls grew over the years.

36.     By (at least) 1998, Epstein's sex trafficking venture had crystalized into criminal conspiracy.  By 1998, each victim was being directed to recruit other vulnerable victims and being paid handsomely, typically in cash, for each recruitment, creating a pyramid scheme of abuse.

37.     A Florida criminal investigation uncovered that the number of victims of Epstein's sex-trafficking conspiracy grew exponentially in and around the early 2000s.

38.     While Epstein did pay victims and his many co-conspirators using wire transfers and checks, because there were hundreds of victims, Epstein could not pay all of his victims with traceable wires.

39.     One primary reason why Epstein's sex-trafficking venture and conspiracy accumulated new victims at an alarming rate in the late 1990s and accelerated even faster by 2000 was Epstein's access to unlimited amounts of cash and his knowledge that he had a complicit bank—JP Morgan—through which he could operate his illegal abuse organization without fear of being reported to law enforcement.

40.     Without exorbitantly large amounts of cash, Epstein's operation could not effectively operate, as newly recruited victims were each paid hundreds of dollars in cash immediately after Epstein sexually abused them, as hush money.

11

41.     Each victim was also informed that she would be paid hundreds of dollars in cash for each additional victim she recruited, and Epstein made good on those promises of large cash payments to keep his victims quiet and complicit.

42.     The public documents and articles stemming from the 2006 arrest made abundantly clear that Epstein was doling out thousands of dollars in cash every single day as hush money to victims he was sexually abusing and to victims he was using to recruit additional victims.

43.     If Epstein paid every victim with wire transfers or checks and left a documented money trail, his illegal sexual abuse and sex trafficking operation would have been easily uncovered; however, with access to unlimited amounts of cash, Epstein was able to commit the most egregious sexual crimes many times a day without leaving a paper trail.

44.     Accordingly, Epstein's constant expansion of sexual abuse and trafficking required cash on hand for Epstein to pay each victim as hush money for the abuse she was suffering as well as each victim's finder's fee for bringing another victim.

45.     To access the large amount of cash needed to maintain his active sexual abuse of young women, it was essential that the financial institution where he banked be complicit in his operation, and more specifically that Epstein bank at a financial institution that would allow him to constantly withdraw cash from his accounts

12

without following anti-money laundering and reporting laws.

46.     To put it plainly, Epstein needed a bank that knew he was engaging in illegal activity and did not care, which Epstein had in JP Morgan.

47.     This scheme of paying victims to recruit other victims worked effectively for Epstein.  It not only allowed expansion through the recruitment of other victims in a pyramid scheme or spiderweb fashion, but it also gave each victim hope that she could avoid future sexual abuse—she could bring someone else who would get abused in her place.

48.     Epstein's aptitude as a sex-trafficker and appetite as a sexual abuser did not suffer because of his Florida incarceration in 2008.  Even while he was in jail in Florida, Epstein brazenly continued to sexually abuse young girls and women from his work-release office.

49.     Once out of jail and off work release, Epstein continued to collect young women and lure them through force, fraud, or coercion into one of his mansions, primarily his townhouse located at 9 East 71 Street, New York, NY, where he would sexually abuse each one.

50.     Epstein's sexual abuse and sex-trafficking operation continued as it had in the past, although it became more elaborate, creating more phony companies, opening more bank accounts, withdrawing excessive amounts of cash, and delivering money to victims through wires, payroll, direct deposits, and other means

13

known to his financial institution as evidence of the continuation of his criminal sex trafficking scheme.

51.     As time went by, especially after Epstein's Florida arrest, the news articles and lawsuits about his activities continued to mount.  More information became publicly available that Epstein was continuing to abuse young women and was using professionals on his payroll to help him conceal his illegal activity and give him ostensible cover as a purported well-connected money manager.

52.     As a registered sex offender discovered to be sexually abusing multiple young women each day through a pyramid-type recruiting scheme that required the transfer of millions of dollars to continue the operation, a complicit bank became more important than ever.

53.     As further detailed below, JP Morgan worked closely with Epstein through every step of the sex trafficking operation's expansion and growth in some of its most prolific of years—between around 1998 through 2013.

## IV. THE TRAFFICKING VICTIMS PROTECTION ACT

54.     The Trafficking Victims Protection Act (TVPA) outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States.  It is to be construed broadly because it serves a remedial purpose and uses intentionally broad language.

55.     The TVPA forbids, among other things, the following sex-trafficking

14

conduct:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a).

56.     The TVPA also forbids (among other things) conspiring to violate 18 U.S.C. § 1591.  18 U.S.C. § 1594(c).

57.     The TVPA also contains an explicit "civil remedy" provision which allows an individual who is a victim of a violation of Chapter 77 of Title 18 (*e.g.*, violation of 18 U.S.C. §§ 1591–94) to bring a civil action against the perpetrator and any person or entity who knowingly benefits, financially or by receiving anything of value from participation in an illegal sex-trafficking venture.  18 U.S.C. § 1595(a).

58.     Unlike the criminal penalties provisions in the TVPA, the civil

15

remedies provision contains a "constructive knowledge" provision. This provision allows a civil action to be brought not only against a person or entity who participated in a venture known to have engaged in illegal sex trafficking but also against a person or entity who participated in a venture that the person or entity should have known had engaged in illegal sex trafficking. 18 U.S.C. § 1595(a). This expansive provision is known as the "constructive knowledge" provision, which provides an alternative to proving actual knowledge as part of civil damages claim.

59.     In the paragraphs that follow, wherever Jane Doe 1 alleges that Defendant acted with actual knowledge, or in reckless disregard of the fact, that the Epstein sex-trafficking venture used means of force, threats of force, fraud, coercion, abuse of process, or some combination thereof to cause a person to engage in commercial sex acts, the Plaintiff also allege that, at a bare minimum, Defendant should have known that the Epstein sex-trafficking venture had used such means to engage in illegal sex trafficking in violation of 18 U.S.C. §§ 1591–94—*i.e.*, that they had constructive knowledge of Epstein's sex trafficking.

60.     In this complaint, Jane Doe 1 and other members of the Class also allege that JP Morgan was willfully blind to the fact that was facilitating and participating in Epstein's sex-trafficking venture.

## V. FACTUAL ALLEGATIONS

## A.     The Epstein Sex-Trafficking Venture and Conspiracy

61.    During all times relevant to this complaint, Jeffrey Epstein was an extraordinarily wealthy man with multiple residences in the United States, including a New York City mansion, a Palm Beach mansion, and an island in the U.S. Virgin Islands.

62.    Beginning in and around 1998 and continuing through the summer of 2019, Jeffrey Epstein knowingly established and ran a sex-trafficking venture and conspiracy in violation of 18 U.S.C. §§ 1591–95.  As part of the venture, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from all over the world to engage in commercial sex acts and to sexually abuse them.  Epstein and others also conspired to violate 18 U.S.C. § 1591.

63.    In creating and maintaining this network of victims in multiple states and in other countries to sexually abuse and exploit, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, recruiting victims, coercing victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the U.S. Virgin Islands.

64.    Epstein and his co-conspirators used Epstein's vast (yet mysterious) wealth and connections to other rich and powerful individuals to lure victims into his home for seemingly innocuous activity.  Victims were initially recruited to speak

17

with an allegedly philanthropic Epstein and provide "massages" to him.

65.     Epstein and his co-conspirators had perfected a scheme for manipulation and abuse of young females.  As part of the scheme, a female "recruiter" would approach a young female and strike up a conversation in an effort to quickly learn about the young female's background and any vulnerabilities they could expose.  The recruiter would then manipulate the young female into coming back to one of Epstein's residences by offering the young female something she needed.  At times, the recruiter's lure would be a modeling opportunity, money for education, help for the young female's family, and a whole host of other related offers depending on their target's situation.  Once in the residence, the recruiter and Epstein would work in concert to impress and intimidate the young female with displays of vast wealth, including having employees that were butlers and maids formally dressed around the house.  They would also strategically place photographs of very powerful political and social figures amongst photographs and art displaying nude females in an effort to normalize the sexual abuse.  They would normalize the sexual abuse by placing a massage table and spa related products around the massage area in an effort to legitimize the area where the abuse was set to occur.  Once abused, Epstein and his co-conspirators continued to manipulate the victims, using their financial power, promises, and threats to ensure that the victim returned as directed and remained compliant with their demands.

66.     Once at the home and trapped in Epstein's bedroom the victims would be instructed to remove their clothing.  Epstein would then force the massages to become increasingly sexual in nature, typically including one or more forced sex acts.  Epstein would use means of force, threats of force, or fraud to coerce the victims to participate in these sex acts and to cause them to return and continue to engage in commercial sex acts with him.  Epstein and his associates then paid his victims hundreds of dollars in cash for each sexual encounter.

67.     In this District and elsewhere, Epstein perpetuated this pattern of abuse in similar ways, hundreds of times.

68.     Moreover, Epstein actively encouraged and coerced his victims to become recruiters themselves, forcing them to recruit additional girls to be similarly sexually abused and causing the number of victims to grow exponentially.  Epstein incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each girl that they brought to Epstein.  In so doing, Epstein, through this system of paying victims to recruit others whom he would in turn pay to recruit others, created a sexual abuse and sex trafficking spider web and maintained a steady supply of new victims to exploit.

69.     Epstein was skilled at ascertaining his victim's greatest fears and aspirations and targeted those fears and aspirations to coerce and trap his victims into performing commercial sex acts and to be subject to sexual abuse.

19

70.     Among other things, Epstein sexually abused his many victims and caused his victims to engage in commercial sex acts, specifically sex acts for which his victims received things of value, including money, promises of educational and career advancement, a place to live, and promises that Epstein would provide various forms of assistance.

71.     Epstein provided things of value to his victims in order to coerce them to engage sex acts with him and on occasion his friends, co-conspirators, or other victims.

72.     As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators threatened that harm would come to victims if they did not comply with his demands that they perform commercial sex acts.

73.     As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands. These promises were a quid pro quo for the sex acts that occurred.

74.     As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators would give his victims money to stay quiet about the assault or as a "finder's fee" for bringing other young women.  Epstein would also provide them with living accommodations, clothing, education, or other necessities, exploiting the vulnerabilities of his often poor and underprivileged victims.

75. In addition to coercing commercial sex acts from his victims, Epstein also committed coercive sexual offenses against them as defined in New York Penal Law § 130, as described in greater detail below.

76. Throughout around 1998 through about July 2019, the Epstein's sex-trafficking venture recruited, solicited, enticed, harbored, obtained, provided, and transported hundreds of victims to cause them to engage in commercial sex acts with Epstein and Epstein's friends.

77. At all relevant times, Epstein maintained numerous apartment units at 301 East 66th Street in New York City, where Epstein's co-conspirators often stayed and which operated as stash houses where numerous victims were kept over the years.

78. JP Morgan knew of the 301 East 66th Street Epstein properties and knew that these units operated as victim stash houses.

79. In 2006, Jeffrey Epstein was arrested in Florida after state and federal law enforcement discovered that he had sexually abused more than 30 children in his Palm Beach, Florida mansion. During that investigation, the government concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of the TVPA and other federal laws, including 18 U.S.C §§ 2422(b), 2423(f), 2423(b), 2424 (e); 18 U.S.C § 371; 18 U.S.C §§ 1591(c)(1), 1591(a)(1), 1591(a)(2); as well as state crimes in violation of Florida Statutes §§

796.07 and 796.03, against dozens of young women.

80.     As a consequence of the Florida investigation, Epstein pled guilty to two felonies, was permanently labeled a "Registered Sex Offender," and was jailed in 2008.   Epstein also entered into a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of Florida barring his prosecution (and prosecution of his known and unknown co-conspirators) for violations of the TVPA and other sex offenses in Florida.  When the U.S. Attorney's Office entered into that non-prosecution agreement with Epstein, it had not received reports from JP Morgan about vast sums of cash that it was providing Epstein.  Nor did JP Morgan provide any other assistance in the investigation.

81.     Epstein's criminal case in Florida and the many related news reports left no doubt about Jeffrey Epstein and his extraordinary penchant for sex abuse and trafficking of young females.  For instance, it was reported that up until the time of his Florida arrest in July 2006, Epstein had been sexually abusing during that year and the previous year *three to four young females per day*; it was a full-time job for him.

82.     Beginning with his 2006 Florida arrest and for years moving forward, Epstein was embroiled in dozens of public lawsuits detailing his sexual abuse of females, and thousands of news stories circulated worldwide about his illegal sexual proclivities.

22

83. Epstein paid millions of dollars to settle sexual abuse lawsuits filed against him by many victims. The money used to make settlement payments was paid from Epstein-related entity accounts at JP Morgan. And while he was paying to settle these claims, Epstein was continuing to abuse new victims—all facts known to JP Morgan.

84. In addition to the many civil lawsuits seeking damages for sexual abuse, Epstein's victims also filed a public lawsuit against the Unites States under 18 U.S.C. § 3771, the Crime Victim's Rights Act ("CVRA"), further exposing Epstein's sexual crimes as well as his secret Non-Prosecution Agreement with the Federal Government.

85. Epstein recruited, solicited, enticed, harbored, obtained, provided, and transported his victims to cause them to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including using means of interstate communications (such as cell phones) and means of interstate and foreign travel (such as aircraft that he owned and controlled).

86. Epstein transported his victims in interstate and foreign commerce, including transportation to and from his mansion in this District.

87. The Epstein sex-trafficking venture transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, the U.S. Virgin Islands, and elsewhere, and in foreign commerce between the United

States and Europe, especially Eastern Europe.

88.    At all times relevant to this complaint, the Epstein sex-trafficking venture was a group of two or more individuals associated in fact, even if they were not a formal legal entity.  Indeed, members of the Epstein sex-trafficking venture referred to it as "The Organization." Epstein was continuously at the hub of The Organization, which operated throughout the times indicated in this complaint.

89.    On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of sex trafficking conspiracy and one count of sex trafficking for violations of 18 U.S.C. § 1591, in part due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street.  *See United States v. Jeffrey Epstein*, Case No. 1:19-cr-00490 (S.D.N.Y.).

90.    On July 8, 2019, Epstein was arrested pursuant to the New York Indictment.

91.    On August 10, 2019, prison guards found Epstein unresponsive in his Metropolitan Correctional Center jail cell, where was awaiting trial on the federal sex trafficking charges.  He was later pronounced dead from apparent suicide.

92.    In July 2020, Epstein's co-conspirator in the sex-trafficking venture, Maxwell, was arrested on federal sex-trafficking charges filed in the Southern District of New York.  The charges alleged that she had assisted, facilitated, and

contributed to Epstein's abuse of sex-trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims. *See United States v. Maxwell*, Case No. 1:20-cr-00330 (S.D.N.Y.).

93.    On December 29, 2021, after a weeks-long jury trial during which witnesses testified about Epstein's sex-trafficking operation in painstaking detail, Maxwell was found guilty on five federal sex-trafficking counts and is now serving nearly 20 years in federal prison for these crimes.

**B.    Consistent With Jeffrey Epstein's Uniform Pattern and Practice, Jane Doe 1 Was Forced to Engage in Commercial Sex Acts with Epstein by Means of Force, Fraud, and Coercion.**

94.    Jane Doe 1 was living with her mother when she met Jeffrey Epstein in 2006.

95.    At that time, Jane Doe 1 was a ballet dancer in New York. Another young female who had also fallen prey to Jeffrey Epstein's sex trafficking scheme recruited Jane Doe 1 to meet Epstein.

96.    Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe 1. Epstein and his co-conspirators constantly reminded Jane Doe 1 how powerful and important Epstein was. Jane Doe 1 was chastised if she refused Epstein's sexual demands and told she should be grateful that Epstein was willing to help her with her career and education. She came

to believe what she was told.

97.    The well-oiled Epstein sex abuse and trafficking venture included frequent statements to Jane Doe 1 and other victims by Epstein and his co-conspirators that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) medical and other life necessities would be denied victims if they, including Jane Doe 1, failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Jane Doe 1's and other victims' life necessities such as shelter or housing if she or they failed to perform those acts.

98.    Jane Doe 1 was exceptionally vulnerable to being victimized by Epstein.  His sex-trafficking venture targeted vulnerable young women and Jane Doe 1 was soon indoctrinated and unable to extricate herself.  Jane Doe 1 was sexually abused and trafficked by Epstein for several years.  Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants, lawyers, and other important people, were aware of the sex abuse, Jane Doe 1 was coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding.

99.    Over the ensuing years, from 2006 through 2013, Epstein sexually

26

abused Jane Doe 1 on a number of occasions in New York, Florida, New Mexico, and the United States Virgin Islands in direct violation of Article 130 of New York's Penal Law, including but not limited to the following:

   a. Sexual misconduct as defined in §130.20, inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff without Plaintiff's consent;

   b. Rape in the first degree as defined in §130.35, inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff by forcible compulsion;

   c. Criminal sexual act in the first degree as defined in §130.50, inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Plaintiff by forcible compulsion;

   d. Forcible touching as defined in §130.52, inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged in the forcible sexual touching of Plaintiff for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

   e. Sexual abuse in the third degree as defined in §130.66, inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Plaintiff by forcible compulsion.

100.   Jane Doe 1 was also coercively trafficked to Jeffrey Epstein's friends for commercial sex acts in this District.

101.   Epstein used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to cause Jane Doe 1 to engage in commercial sex acts.

102.   Epstein recruited Jane Doe 1 to cause and force her to engage in commercial sex acts in ways that were in and affecting interstate and foreign

commerce, including use of cell phones and means of interstate transportation (such as aircraft that he owned or controlled).

103. Epstein transported Jane Doe 1 from New York to other states to cause her to engage in commercial sex acts.

104. Jane Doe 1 wanted to escape from the Epstein sex-trafficking venture, yet Epstein and his supporting team of co-conspirators increased the tactics of fraud, force, or coercion to cause her to remain compliant in fulfilling Epstein's sexual demands.

105. Jeffrey Epstein controlled Jane Doe 1 financially, emotionally, and psychologically.  He used his knowledge of Jane Doe 1's aspirations, fears, and problems to manipulate her until she was completely controlled by and dependent upon him.

106. When Epstein went to jail for sex offenses in Florida, he maintained contact with Jane Doe 1.  He and employees of his business entities, which were created to support and legitimize Epstein's sexual abuse and sex-trafficking enterprise, including HBRK, NES, Financial Trust, and Florida Science Foundation, caused Jane Doe 1 to be transported to Florida to engage in commercial sex with Epstein in his Florida residence while on so-called "work release" from jail, while he was still wearing his ankle monitor.

107. There came a time when Epstein forced Jane Doe 1 to give massages to

28

certain of his powerful friends. During some of these massages Jane Doe 1 was sexually abused, by force and against her will, by Epstein's friends whom she had been required to massage. At least one of Epstein's friends used aggressive force in his sexual assault of her and informed Jane Doe 1 that he had Epstein's permission to do what he wanted to her. Out of fear, Jane Doe 1 has still not named this powerful financial executive publicly.

108. Epstein and his co-conspirators withdrew large sums of cash from JP Morgan to make cash payments to victims, including Jane Doe 1, in furtherance of the sex-trafficking operation.

109. Jane Doe 1 was regularly paid cash by Epstein or one of his co-conspirators that was withdrawn from one of Epstein's accounts at JP Morgan.

110. As alleged more fully below, JP Morgan knew that its accounts were being used for Epstein's sex-trafficking venture based on a number of facts, including but not limited to the identity of the individuals making the withdrawals and wire transfers, the vast size of the withdrawals and transfers, the identity of the recipients, the account opening activity, the pattern of the financial activity, the personal relationship between Epstein and at least one high-ranking executive with JP Morgan as detailed more thoroughly below, and Epstein's well-documented criminal history and involvement in trafficking.

111. Over the ensuing years, Epstein threatened Jane Doe 1 in many ways

including threatening that if she did not abide by his demands, she would lose contact with people she cared about and that those people would also suffer serious harm.

112.   Epstein would alternate promises and threats to secure Jane Doe 1's compliance with his demands, including demands that she engage in commercial sex acts with him and others.  In some instances, Epstein would pay Jane Doe 1 directly in cash obtained from JP Morgan for sex acts.

113.   Epstein and his co-conspirators continued to coerce Jane Doe 1 in various ways until her ultimate escape around the end of 2013.

114.   Epstein and his co-conspirators continued to coerce Jane Doe 1 to engage in commercial sex with Epstein, through the use of Epstein's force, fraud (such as false promises, including the continued promise to assist Jane Doe 1's sister medically) and coercion (making it clear that if she did not abide then she would suffer serious financial and reputational harm), through the end of 2013.

115.   James "Jes" Staley ("Staley"), the then-head of JP Morgan's private banking division, was a regular visitor of Epstein's during that period of time, through and beyond 2013, and personally observed Jane Doe 1 as a sexual trafficking and abuse victim at times including through his departure from JP Morgan in 2013.

## C.   JP Morgan's Role in the Sex-Trafficking Venture

## 1. Banking laws and regulations exist to prevent funding of criminal ventures.

116.   The Federal Bank Secrecy Act ("BSA") requires financial institutions

to have adequate anti-money laundering ("AML") policies and systems in place. New York state law also requires financial institutions to devise and implement systems reasonably designed to identify and report suspicious activity and block transactions prohibited by law.

117.   All regulated institutions are expected to configure systems based on their unique risk factors, incorporating parameters such as institution size, presence in high-risk jurisdictions, and the specific lines of business involved, and the institutions have an affirmative duty to ensure that their systems run effectively.

118.   In addition to having effective AML controls in place, it is also necessary for financial institutions to monitor their customers for the purpose of preventing their customers from facilitating criminal activity using the institutions' facilities.

119.   As part of preventing criminal activity, Know Your Customer ("KYC") and customer due diligence are critically important, and financial institutions must collect customer information at the time of establishing new relationships with clients, including as necessary to assess the risks associated with the client. To properly consider these risks, financial institutions must consider relevant factors such as the nature of the client's business, the purpose of the client's accounts, and the nature and duration of the relationship.

120.   Financial institutions must also conduct KYC reviews for each client

relationship at intervals commensurate to the AML risks posed by the client, including reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified.

121.   Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may be liable under applicable laws if it maintains such a relationship despite repeated indications of facilitation of improper transactions.

**2. JP Morgan directly participated in Epstein's sex-trafficking venture.**

122.   With the encouragement of Staley, JP Morgan knowingly and intentionally participated in the Epstein sex-trafficking venture by (among other things) providing the financial underpinnings for Epstein to have ready and reliable access to resources—including cash—to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations.

123.   In or about 1998, in furtherance of his rapidly growing sexual abuse and sex trafficking operation, Epstein realized that he needed a reliable banking institution that would provide the necessary legitimate appearance for his operation, allow him to open many accounts for illegitimate companies, ignore red flags and

relevant state and federal banking laws, permit him to transfer money without questioning, allow him access to abundant cash, and to otherwise knowingly facilitate the commercial aspect of his commercial sex trafficking enterprise. Epstein found all of those things in JP Morgan.

124.   From about 1998 through 2013 (and following), JP Morgan knowingly and intentionally participated in the Epstein sex-trafficking venture by (among other things) providing the essential financial underpinnings for the venture.   It also financially benefited from that participation.   There can be no doubt that JP Morgan's conduct, as described below, was outrageous and intentional.

125.   Around 2000, Epstein developed a key relationship to expanding exploitative sexual abuse and his sex-trafficking operation when he began working with Staley, the then-head of JP Morgan's private banking division.

126.   Before meeting Staley, Epstein was a serial sexual abuser of young girls and women, with an insatiable desire to sexually abuse females that were, in his words, "the younger, the better."

127.   Before Staley, Epstein relied heavily on the massive wealth bestowed upon him primarily by one individual, Leslie (Les) Herbert Wexner ("Wexner"), to give him the appearance of grand importance while relying on his then-madame, Maxwell, to find and groom young women to be abused.

128.   It has been reported that Wexner claims Epstein stole the money from

him.  Nonetheless, the origin of Epstein's money was always a mystery, with Epstein claiming to be a money manager to a stable of clients who entrusted him with a minimum of $1 billion.  JP Morgan knew that was a lie.  Staley knew without any doubt that Epstein was trafficking and abusing girls and that all of his staff, including his main attorney and accountant, worked full time to conceal the illegal operation.

129.    However, Epstein could not expand his operation to the level it ultimately reached without a complicit financial banking institution that would ignore red flags and assist him in paying hundreds of young females in wire transfers and cash and allow him access to hundreds of thousands of dollars in cash to pay hush money to his growing number of victims.

130.    Staley was the key to making all of Epstein's depraved dreams of sexual abuse and sex trafficking of countless young women possible.  With his help, the number of victims of the Epstein sex-trafficking operation began to grow on a vertical trajectory beginning in and around 2000.

131.    When Epstein and Staley first teamed up, in or around 2000, Staley was the head of JP Morgan's private banking division and was later promoted to CEO of JP Morgan Asset Management in 2001.

132.    The relationship between Epstein and Staley was symbiotic and special.  Epstein agreed to bring many ultra-high wealth clients to JP Morgan, and in exchange, Staley would use his clout within JP Morgan to make Epstein

untouchable.

133.    Staley bragged within JP Morgan about Epstein's value to the bank and used his position in the bank to silence any critics of the relationship between JP Morgan and Epstein.

134.    This meant that JP Morgan would keep Epstein on as a client at all costs, including failing to act on any red flags and ultimately allowing him to run and grow an operation designed to sexually abuse and traffic countless young girls and women.

135.    Once Epstein had JP Morgan (through Staley) in his pocket, Epstein moved on to his next target, another known sexual abuser, Jean-Luc Brunel, a French model scout who had suffered public disgrace for serial sexual abuse of young females.

136.    Epstein enlisted Brunel to recruit new victims from all over the world, enticing them with promises of modeling careers before sexually abusing and trafficking them through a modeling agency Epstein and Brunel established called MC2.

137.    In 2019, Brunel was arrested in France for sex trafficking related to his relationship with Jeffrey Epstein and, like Epstein, was found hanging in his cell from an apparent suicide.

138.    There were several key figures who conspired and participated in

Epstein's international sex trafficking operation, most notably Ghislaine Maxwell, Les Wexner, Jean Luc Brunel, and Jes Staley, acting through and on behalf of JP Morgan.

139.   In later years, Deutsche Bank swapped in for JP Morgan and provided the necessary complicit financial institution for the operation, not coincidentally on-boarding Epstein's trafficking operation through a former JP Morgan banker, Paul Morris.

140.   These co-conspirators were essential to Epstein's operation.  Without Maxwell, Epstein would never have been able to recruit his first victims and bring them into his abusive lair.  Maxwell approached young, vulnerable victims and painted Epstein as an altruistic messiah who could help them.  Once the girls were in Epstein's clutches, Maxwell groomed them to make them feel comfortable being sexually exploited and abused.

141.   Without Brunel, Epstein would not have been able to expand his international recruiting of young victims and, specifically, aspiring models he could lure in with promises of opportunities.

142.   Without Wexner, Epstein's sex-trafficking operation could never have occurred to the extent that it did, as Epstein needed the appearance of extraordinary wealth to attract his victims and force them to stay silent.

143.   However, even with Wexner's funding of Epstein's operation,

36

Epstein's sexual abuse of hundreds of women would have been limited because the money trail from Epstein's accounts to the many victims and recruiters would have quickly exposed his illegal venture.

144.   Therefore, Epstein could not risk having a typical banking relationship where the bank might uncover something suspicious and report him to law enforcement.  The final essential ingredient Epstein needed to expand his sexual abuse of young women and sex trafficking enterprise was therefore a financial institution that would know—but not care—that Epstein was sexually abusing women on a daily basis and paying out millions in hush money.  Indeed, Epstein needed an institution that would in fact assist and participate in that activity, and that would support his enterprise and conceal it if he was ever caught.

145.   JP Morgan provided the final component Epstein needed, and Staley had a special relationship with Epstein and made sure Epstein and his illegal sexual abuse organization were absolutely protected by the bank.

146.   From the beginning of the Epstein/Staley relationship, Staley understood that Epstein's money was only a part of the incentive to protect Epstein's operation.

147.   During the Palm Beach Police Department's 2005 investigation into Epstein's sexual abuse of minor children, the detectives pulled message pads left by Epstein's assistant from his trash as well as a search warrant executed at Epstein's

Palm Beach, Florida mansion.

148.   According to those message pads, Staley was a frequent caller to Epstein's Florida home throughout the course of Epstein's banking relationship with JP Morgan.

149. On at least one occasion it appears Staley and Les Wexner called Epstein together.



150. As long as Epstein's money stayed at JP Morgan, Staley also knew that Wexner, Epstein's client who had turned over a power of attorney to Epstein, would likewise keep his money with JP Morgan. Wexner's money was said to amount to

39

over a billion dollars.

151.   Epstein made clear that Wexner was not the only JP Morgan client whose allegiance to the bank Epstein controlled. Staley knew that Epstein "collected people" and was close with many ultra-wealthy individuals that he could bring into the bank, and Epstein did bring additional customers to the bank in exchange for JP Morgan aiding and facilitating his international sex trafficking operation.  These new customers made JP Morgan even more profitable.  Along the way, Epstein gave credit for these new bank customers to Staley, which made Staley even more powerful within JP Morgan.

152.   Epstein controlled Staley like he did his many victims:  by flaunting his power and connections to the extremely wealthy.  Epstein made it clear to Staley that if JP Morgan ever decided to terminate its relationship with Epstein, the bank would lose Wexner and the other wealthy connections Epstein had promised JP Morgan.

153.   Staley and Epstein's relationship grew closer as the years went on.  In fact, during the criminal investigation into Epstein in 2005, Staley flew on Epstein's plane along with Sarah Kellen and Nadia Marcinkova, individuals who had bank accounts through Epstein at JP Morgan and who were publicly identified as Epstein's co-conspirators in trafficking offenses.

154.   Rather than merely providing routine banking for Epstein, JP Morgan

went far beyond what a non-complicit bank would have done and instead assisted Epstein in setting up the necessary financial structure to operate his sex-trafficking venture.

155.   Specifically, money was paid from Epstein affiliated JP Morgan accounts to victims of trafficking and to known Epstein co-conspirators.  Money was also withdrawn from Epstein affiliated JP Morgan accounts in cash to pay victims in furtherance of the sex trafficking operation.

156.   JP Morgan also deliberately failed to follow routine banking practices of review Epstein's accounts against the backdrop of the public information outing him as a serial sex abuser and reporting Epstein for what was obviously a sex trafficking operation he was running.  JP Morgan, for example, purposely and deliberately failed to timely file required Suspicious Activity Reports ("SARs") for large cash and other suspicious activities of Epstein.  In short, instead of providing ordinary and routine banking, JP Morgan instead assisted Epstein in covering up his past crimes and committing new ones.

157.   Acting on behalf of JP Morgan, Staley assured Epstein that the two were close friends and he would help Epstein and his operation in any way he could. JP Morgan advised Epstein strategically about opening new accounts for additional Epstein-related entities and assured him his cash needs would be satisfied— permitting Epstein to continue to pay hush money to victims that could harm Epstein

41

in the criminal investigation.

158.   JP Morgan chose not to cooperate with law enforcement and other investigations into Epstein's sex trafficking, because it knew it would be exposed as assisting in Epstein's scheme.

159.   During a trip to the U.S. Virgin Islands in January 2007, Jane Doe 1 was repeatedly raped and coerced into commercial sex.  She was paid $10,000 in hush money, which Epstein's agents apparently withdrew from JP Morgan in cash. Epstein told Jane Doe 1 he expected her to remain loyal to him and compliant, making clear that if she did not, then she would suffer serious harm.

160.   Epstein was one of the most coveted clients of JP Morgan because of the financial benefits he provided to JP Morgan and its officers and employees, including Staley.  Through the years, Staley helped accumulate other protectors of Epstein within JP Morgan.

161.   The New York Times reported in 2019 that Mary C. Erdoes, one of JP Morgan's highest-ranking executives intervened to keep Epstein as a client after he pled guilty to sex crimes and was registered a sex offender.

162.   With JP Morgan's complicity, Epstein was free to sexually abuse hundreds of women, paying millions in hush money, without the fear of detection by law enforcement.   Epstein used the support of a reputable institution—JP Morgan—to help cover up his sex-trafficking venture.

163.   JP Morgan cared about profiting and showed absolute loyalty to Epstein, including a willingness to violate banking laws, ignore multiple red flags of criminality, and participate directly in sex trafficking to enable Epstein to fulfill his abusive sexual appetite at the expense of countless vulnerable young women.

164.   As Epstein's criminal sex trafficking venture expanded, he needed more protection and support from JP Morgan.  Through Staley and others, Epstein became more deeply involved with JP Morgan, providing JP Morgan with more financial benefits.  And. as a quid pro quo, JP Morgan allowed Epstein to transfer massive amounts of hush money to his victims and recruiters.  JP Morgan allowed Epstein to withdraw hundreds of thousands of dollars in cash so that all the payments were not traceable (the most obvious red flag for any criminal enterprise).

165.   As another example of JP Morgan and Staley's benefit from assisting Epstein, a highly profitable deal for JP Morgan was the Highbridge acquisition.

166.   In 2004, when Epstein's sex trafficking and abuse operation was running at full speed, Epstein served up another big financial payday for JP Morgan.

167.   Epstein was close friends with Glenn Dubin, the billionaire who ran Highbridge Capital Management.

168.   Through Epstein's connection, it has been reported that Staley arranged for JP Morgan to buy a majority stake in Dubin's fund, which resulted in a sizeable profit for JP Morgan.  This arrangement was profitable for both Staley and JP

43

Morgan, further incentivizing JP Morgan to ignore the suspicious activity in Epstein's accounts and to assist in his sex-trafficking venture.

169. For example, despite that Epstein was not FINRA-certified, Epstein was paid more than $15 million for his role in the Highbridge/JP Morgan deal.

170. Moreover, Highbridge, a wholly-owned subsidiary of JP Morgan, trafficked young women and girls on its own private jet from Florida to Epstein in New York as late as 2012.

171. Staley and JP Morgan benefited from Epstein's sex-trafficking operation because, in exchange for JP Morgan's knowing participation in that operation, Epstein generated millions of dollars for JP Morgan, directly and indirectly. Because Staley was generally in charge of Epstein's JP Morgan accounts, he also benefited in the receipt of massages, private jet flights with victims or co-conspirators of the operation, and other things of value.

172. Over many years, some JP Morgan executives lobbied within JP Morgan to sever ties with Epstein due to the sex-trafficking allegations against him. JP Morgan's leadership ignored their pleas and ultimately decided each time to keep Epstein as a client. JP Morgan decided that, because it was receiving such large monetary benefits from Epstein, it would continue participating in the Epstein sex-trafficking venture by providing its financial infrastructure.

173. Epstein offered his business, and the many millions it generated,

exclusively to JP Morgan because JP Morgan was willing to knowingly aid Epstein's sex trafficking operation and to help conceal it. JP Morgan knew that if it stopped aiding and concealing the operation, it would lose Epstein's accounts and the substantial financial benefits resulting from handling those accounts.

174. In addition to housing Epstein's accounts, JP Morgan also housed accounts for numerous of Epstein's co-conspirators, including Epstein's main sex-trafficking madame, Maxwell, who is now serving 20 years in prison for sex-trafficking related to her participation in Epstein's operation.

175. In 2022, JP Morgan representative Patrick McHugh testified in Maxwell's criminal sex-trafficking trial that between 1999 and 2007, Epstein transferred approximately $31 million to Maxwell, an amount believed to be payment for her role in Epstein's sex trafficking venture.

176. In addition to the necessary financial infrastructure provided by JP Morgan, as late as 2012, a JP Morgan subsidiary company assisted with transporting certain Epstein sex-trafficking victims by private jet from Florida to Epstein in New York.

177. Ultimately, JP Morgan financially benefited by earning millions of dollars for its participation in the Epstein sex-trafficking venture.

178. Throughout its relationship with Epstein, JP Morgan violated numerous banking laws and regulations in order to conceal and continue its lucrative venture

facilitating the Epstein sexual abuse and sex-trafficking scheme.

179. For example, JP Morgan allowed Epstein and his agents to "structure" cash withdrawals to further the sex-trafficking venture.

180. As another example, JP Morgan failed to file with the federal government the required SARs that financial institutions must file with the Financial Crimes Enforcement Network ("FinCEN") whenever there is a suspected case of money laundering or fraud. Timely filing of these reports is required by the Bank Secrecy Act and related laws and regulations. These reports are tools that the federal government uses to detect and prosecute, among other illegal activities, sex trafficking in violation of the TVPA. While JP Morgan was providing Epstein vast sums of cash each year, it was required to timely file SARs about Epstein's suspicious and unusual cash transactions.

181. JP Morgan's failure to timely file SARs about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

182. A recent amended complaint filed by the government of the U.S. Virgin Islands against JP Morgan in this Court describes some of the red flags JP Morgan simply ignored:

> Between 2003 and 2013, Epstein and/or his associates used Epstein's accounts to make numerous payments to individual women and related companies. Among the recipients of these payments were numerous women with Eastern European surnames who were publicly and internally identified as Epstein recruiters and/or victims.

46

For example, Epstein paid more than $600,0000 to Jane Doe 1, a woman who—according to news reports contained in JP Morgan's due diligence reports—Epstein purchased at the age of 14. Like other women who received payments from Epstein, Jane Doe 1 listed Epstein's apartments on 66th Street in New York City as her address, which should have been a red flag to JP Morgan.

Epstein and/or his associates also made significant cash withdrawals and 95 foreign remittances with no known payee. For example, Hyperion Air, Inc.—the Epstein-controlled company that owned Epstein's private jet—issued over $547,000 in checks payable to cash purportedly for "fuel expenses when traveling to foreign countries." Additionally, between January 2012 and June 2013, Hyperion converted more than $120,000 into foreign currency. Many of these cash withdrawals either exceeded the $10,000 reporting threshold or were seemingly structured to avoid triggering the reporting requirement. This is particularly significant since it is well known that Epstein paid his victims in cash.

In addition, Epstein and/or his representatives appeared to be misusing JP Morgan accounts for Epstein's purported charitable organizations, including the C.O.U.Q. Foundation and Enhanced Education. Epstein made payments from these accounts with no clear nexus to the organization's charitable purpose. For example, Epstein and/or his representative used the C.O.U.Q. Foundation account to pay $29,464.66 to three young women, including two known victims, and over $20,000 to a company called Phoenix Realty Home Inc.

*Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A.*,

Case No. 22-cv-10904-JSR, Amended Complaint (Dkt. 16) at 16–17 (S.D.N.Y.

Jan. 10, 2023).[1]

183.   In taking the steps described above, JP Morgan obstructed, attempted to obstruct, and interfered with the federal government's enforcement of the TVPA, including the U.S. Attorney's Office for the Southern District of Florida's criminal investigation of Epstein in and around 2006 to 2008 and the U.S. Attorney's Office for the Southern District of New York's criminal investigation leading to his indictment in 2019.

184.   Over the many years of the venture between JP Morgan and Epstein, numerous JP Morgan executives, and several compliance officers, demanded that JP Morgan sever ties with Epstein and his criminal organization due to the public sex-trafficking allegations against Epstein.  But JP Morgan's leaders and those in control of those decisions were influenced by Staley to continue to support Epstein.  Given all the surrounding circumstances and Staley's knowledge, JP Morgan's decisions to support Epstein were made with knowledge that he was operating a sex-trafficking

---

[1] Jane Doe 1 hereby adopts by reference the substantive factual allegations regarding JP Morgan's participation in Epstein's sex-trafficking venture and conspiracy found the U.S. Virgin Islands' (USVI) Amended Complaint against JP Morgan into this Amended Complaint.  *See* Fed. R. Civ. P. 10(c).  A copy of that amended complaint is attached to this complaint as Exhibit 1.  With regard to issues concerning the scope and duration of JP Morgan's participation in the venture and conspiracy, as well as the nature of the venture and conspiracy, Jane Doe 1 relies on her own complaint.  Jane Doe 1 does not believe any of the substantive factual allegations by the USVI are inconsistent with hers.  But, if any inconsistency exists, Jane Doe 1 relies solely on her allegations.

venture and conspiracy.

185.   In 2013, due to the overwhelming publicity about Epstein's illegal sexual activities, and the departure of Staley from JP Morgan, JP Morgan realized that its claims to not knowing what Epstein was doing were no longer facially plausible.  Accordingly, and reluctantly, JP Morgan stopped being Epstein's banker.

186.   While JP Morgan stopped being Epstein's banker, it did not make a clean break of things by disclosing its actions in support of the conspiracy to the authorities.  Nor did it communicate its abandonment of its conspiring with Epstein and others in a manner reasonably calculated to reach Epstein's co-conspirators.

187.   While JP Morgan stopped being Epstein's banker, it continued to take subsequent actions to promote the venture and conspiracy.   For example, it deliberately and willfully continued to fail to timely file SARs about the suspicious activities it had seen.   And it continued to recommend Epstein as good client to others how inquired.

188.   After losing Staley, Epstein no longer had his primary protector at JP Morgan.  In order to continue to operate, Epstein would need to find a new bank.  As alleged in greater detail in another complaint pending before this Court, Epstein found that new bank to facilitate his sex trafficking venture—Deutsche Bank.  *See Jane Doe 1 v. Deutsche Bank Aktiengesellschaft et al.*, Case No. 22-cv-10018-JSR, Amended Complaint (S.D.N.Y. Jan. 13, 2023).

49

### 3. JP Morgan's knew about Epstein's sex-trafficking venture and conspiracy.

189. As explained above, between (at least) 2000 and 2005, Epstein provided clients to JP Morgan and, in exchange, JP Morgan allowed Epstein to do as he pleased with his JP Morgan accounts. JP Morgan directly aided Epstein's sex trafficking venture by allowing Epstein to engage in structuring violations and other financial maneuvers required to maintain and conceal his criminal enterprise. JP Morgan financially benefited from allowing Epstein to use his JP Morgan accounts to run his sex trafficking venture.

190. However, in 2006, Epstein's relationship with JP Morgan hit a snag when Epstein was publicly exposed for sexually abusing dozens of young women and girls, several as young as 14 years old. There were hundreds of pages of police reports and news articles revealing that Epstein was a serial sexual abuser and trafficker, and that his operation depended on his accessing nearly unlimited cash to use as payments to his victims.

191. With respect to the specific discoveries, the authorities found that some of the victims "went to Mr. Epstein's house only once, some went there as much as 100 times or more."

192. It was publicly revealed in the investigation that Epstein was sexually abusing three to four young females every single day of his life and that he was paying each victim hundreds of dollars in hush money, usually in cash.

193.    The criminal investigation also publicly revealed that Epstein was paying countless recruiters to constantly bring him more victims, making clear that quick access to cash at a financial institution was the lifeblood for his sex-trafficking venture.

194.    The money trail into Epstein's accounts was a dead giveaway that Epstein was engaging in crimes and the recipients of his money exposed the type of crimes.

195.    At this point (and earlier), JP Morgan knew that Jeffrey Epstein was an international sex trafficker.  To the extent JP Morgan could publicly feign plausible deniability before Epstein's arrest in 2006, thereafter its ability to play dumb thereafter was eviscerated, as the details of his daily sexual abuse of young females came to public light and when he ultimately was required to register as a sex offender.

196.    JP Morgan undoubtedly knew about Epstein's arrest in 2006.

197.    Because Epstein was so publicly exposed as a sex trafficker and abuser, one of his primary financial engines, Les Wexner, abandoned him and separated himself from Epstein.

198.    The federal criminal case against Epstein was under investigation from (at least) 2006 through 2008, when Epstein eventually entered his guilty plea, registered as a sex offender, and went to jail.

51

199. In the summer of 2008, Epstein's Non-Prosecution Agreement ("NPA") with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge to the NPA by two of his victims. Among other things, the agreement outlined the possible federal sex offense charges that could have resulted from the investigation, including TVPA charges.

200. Epstein's legal team also garnered significant publicity between 2006 and 2008, not only because of their well-known names but also the unusual number of them. Epstein hired Roy Black, Ken Starr, Jay Lefkowitz, Guy Lewis, Michael Tien, Lily Ann Sanchez, Gerald Lefcourt, Guy Fronstein, Jack Goldberger, and more. All of these lawyers were now on Epstein's payroll and millions of dollars were being shelled out to these attorneys from JP Morgan accounts to pay for his legal defense of the most heinous of sexual abuse allegations. Not only was JP Morgan (through Staley) well aware of the allegations, but JP Morgan (through Staley) knew the identities of co-conspirators and many of the victims. Staley had observed victims personally, and he was aware that Epstein was shelling out millions of dollars to attorneys to take on these well-founded allegations.

201. In 2008, around the same time Epstein was pleading guilty to felony sex offenses and registering as a lifetime sex offender, JP Morgan learned that another of its high value clients, Bernie Madoff, was running the largest Ponzi-scheme in modern history through his accounts at JP Morgan. This led to JP Morgan

52

reviewing its clientele with the directive of severing ties with any problematic customers.

202.   With indisputable publicly available knowledge that Epstein was a sexual offender who was using his wealth to run a sexual abuse and trafficking operation, any responsible bank providing only routine banking support would have cut ties with Epstein.

203.   However, rather than cut ties with Epstein, Staley, acting on behalf of JP Morgan and within the scope of his actual and apparent employment, personally visited Epstein when he was serving his jail sentence in Florida and arranged for an even tighter connection between JP Morgan and Epstein.

204.   After Epstein was released from his Florida incarceration, he picked up right where he left off—abusing young women on a daily basis, paying recruiters, and paying hush money to victims.  JP Morgan continued its supporting actions as well, continuing its role in Epstein's sex trafficking conspiracy and allowing it to continue to flourish.  Epstein continued abusing and trafficking with the same frequency as he had been for years, and he could do so because he had a bank that, even though it knew what he was doing, would not turn on him.

205.   After Staley went to visit Epstein in Florida while Epstein was incarcerated on sex offenses, Epstein and JP Morgan's relationship continued to grow through Staley.  Ultimately, after Epstein's release from jail, Staley and

Epstein spent significant time together at Epstein's townhouse in New York City. Staley also visited Epstein on his private island in the United States Virgin Islands— an island commonly dubbed "Pedophile Island." These visits were within the actual and apparent scope of Staley's employment at JP Morgan.

206. Acting through Staley and to protect its financial benefits from dealing with Epstein, JP Morgan made clear to Epstein that he could continue to fund his sexual abuse operation through JP Morgan and it would continue to conceal the illegal operation. JP Morgan and Epstein agreed, tacitly and otherwise, that Epstein could continue to fund his sex-trafficking venture through JP Morgan and JP Morgan would reap the financial benefits from its connection with Epstein.

207. After his arrest in 2008, dozens of public lawsuits were filed against Epstein, revealing greater details of Epstein's sexual abuse of young women.

208. The lawsuits detailed millions in payments that Epstein was making to recruiters, co-conspirators, cover-guys (such as his longtime fixer/lawyer and fixer/accountant), and his victims.

209. Through the civil lawsuits, evidence (such as the previously referenced message pads) taken from Epstein's trash by police or through prior search warrants, as well as flight logs and black books began to publicly surface, shedding further public light on the expansiveness of Epstein's sex-trafficking operation.

210. Through the lawsuits, other relevant information also became public

54

and was widely published: Epstein had no college degree, he had never obtained any specialized license, none of the companies with whom he was associated had any legitimate business structure or purpose, and he had no documented expertise that would provide the requisite skill or knowledge to amass his vast wealth.

211. Epstein's victims' court challenge against Epstein's federal NPA also continued between 2008 and 2013 (and beyond) and attracted significant media attention. Indeed, between around 2006 and 2013, hundreds of press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators, including Lesley Groff, Sarah Kellen, and Nadia Marcinkova. Some articles reported that Kellen and Marcinkova had invoked their Fifth Amendment right against self-incrimination.

212. Additionally, press reports during this time noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped develop with his friend and known sexual abuser, Jean Luc Brunel, brought "young girls . . . often from Eastern Europe" to the U.S. on Epstein's private jets.

213. At all times material hereto, JP Morgan was aware of the foregoing information and more about Epstein's sex trafficking activities. When some executives on the board at JP Morgan recommended cutting ties with Epstein, Staley made strong and successful arguments, leading to JP Morgan keeping Epstein as a

customer.

214.   In support of maintaining its relationship with Epstein, JP Morgan's CEO of private banking, Mary Erdoes, argued that Epstein was too valuable of a client to let go and played a pivotal role in maintaining the relationship.

215.   Upon information and belief, internal documents also reflect JP Morgan's knowledge of the extensive publicly available information about Epstein's sex-trafficking scheme.

216.   JP Morgan, including its CEO Jamie Dimon and the highest levels of the bank, made the decision to monitor the public news being disseminated about Epstein, knew that Epstein had been arrested for sexual offenses against young women, knew that Epstein was a registered sex offender, knew that Epstein's co-conspirators like Ghislaine Maxwell were involved in the sex trafficking operation, knew that Epstein had paid to settle a number of civil lawsuits related to sexual abuse of underage girls, and still made an intentional decision to keep Epstein on as a client.

217.   JP Morgan, including its CEO Jamie Dimon and the highest levels of the bank, knew of Jes Staley's personal involvement with Epstein and yet still allowed Staley to remain a decision maker for JP Morgan on Epstein accounts.

218.   Even before the sexual abuse investigation in Florida, media reports raised questions about the facts that nobody knew how Epstein made his fortune nor what he did to continue making the millions of dollars needed to support his life.

219. Media reports also appeared about Epstein's prior SEC violations in his job at Bear Stearns arose. A former business partner of Epstein's, Steven Hoffenberg, even explained how Epstein assisted him in running a massive Ponzi scheme that landed Hoffenberg in prison. JP Morgan was aware of these and other reports.

220. Epstein, it was reported, claimed to be a financial bounty hunter and money manager to those who would entrust him with $1 billion or more, yet JP Morgan, with access to Epstein's accountants, knew Epstein's stated profession was a lie.

221. Despite the false rumors he had created to conceal his true "business," Epstein was exposed as literally nothing other than a sex trafficker and abuser of young females, a fact easily discernible by any responsible financial institution with whom he was banking.

222. For JP Morgan, a sophisticated financial institution legally responsible for complying with Know Your Customer laws and other banking obligations, the details of Epstein's sexual abuse and trafficking were not a surprise. Even so, JP Morgan never cooperated in any civil or criminal case against Epstein, because to do so would reveal JP Morgan's complicity in Epstein's operation.

223. For example, in 2009, one of Jeffrey Epstein's sexual abuse victims served a subpoena on JP Morgan in connection with a civil case. JP Morgan refused

to comply with the subpoena, making it abundantly clear whose side JP Morgan was on.

224.   JP Morgan never timely filed required SARs about Epstein's suspicious transactions, including large cash transactions, which would have revealed to law enforcement authorities the sex-trafficking venture.

225.   Fearful that Epstein could turn on the bank for its participation in the sex-trafficking venture, JP Morgan (and its agent, Staley) remained incentivized to maintain and grow the relationship and to assist in concealing Epstein's suspicious and illegal banking practices.

226.   To be clear, during his years as a top executive at JP Morgan, Staley was not only one of Epstein's closest pals, but more importantly, he was a frequent visitor at Epstein's townhouse, including visiting the massage room; Staley met many of Epstein's trafficking victims, including Jane Doe 1; Staley visited the Epstein-owned victim stash house apartments at 301 East 66 Street, and Staley personally observed the sexual abuse of young women, including Jane Doe 1. These actions were within the scope of Staley's employment at JP Morgan.

227.   Staley was well aware that Epstein was running a sex trafficking venture, based on that facts that he:  (1) went to Epstein's house in New York many times; (2) personally spent time with young girls whom he met through Epstein on several occasions; (3) personally visited young girls at Epstein's apartments located

at 301 East 66th Street; (4) personally visited Epstein on his island; (5) was frequently calling and emailing with Epstein; (6) personally observed Epstein around young girls, (7) personally observed Epstein sexually grab young women in front of him; and (8) even visited Epstein in Florida while Epstein was serving his jail sentence. All of these circumstances, and more, gave Staley direct and actual knowledge that Epstein was engaged in sex-trafficking venture.

228.   As a result of Staley's direct and actual knowledge of Epstein's sex-trafficking venture, JP Morgan had direct and actual knowledge of Epstein's sex-trafficking venture.

229.   Due to Staley's knowledge, JP Morgan knew that Epstein had no job and still helped open dozens of accounts for Epstein, allowing him to transfer money with no underlying legitimate business operation.

230.   Through Staley and other officers and employees, JP Morgan saw that Epstein's JP Morgan accounts were almost exclusively used to pay for:  (1) living and travel expenses; (2) expenses related to apparent criminal activity; (3) lawyers relating to his Florida criminal case; (4) lawyers defending civil lawsuits (including paying for all of the witnesses' and co-conspirators' attorneys); (5) sex-abuse victim settlements; (6) private investigators to investigate sex abuse victims; and (7) extravagant lifestyles for his many co-conspirators.

231.   Through Staley and other officers and employees, JP Morgan:  (1) knew

that Epstein was always surrounded by young women and girls; (2) knew Epstein's stated public profession of financial advisor was false; (3) knew Epstein had no real expertise in business investing; (4) knew that his accounts, including many business accounts, had underlying legitimate business activity; (4) saw Epstein's regular, suspicious, and large cash withdrawals; (5) saw Epstein's frequent payments to known co-conspirators; (6) knew that Epstein was funding a modeling agency with Jean-Luc Brunel (an already exposed sexual abuser); (7) knew that Epstein was making regular transfers in even, hundred-dollar increments; (8) knew that Epstein was arrested in Florida and required to register as a sex-offender; (9) knew that Epstein's co-conspirators had bank accounts at JP Morgan associated with his accounts; and (10) knew that Epstein's madame, Ghislaine Maxwell, was paid millions of dollars by Epstein.

232. JP Morgan had awareness of all the facts listed in the previous paragraphs because, among other things, Staley, in the course his employment at JP Morgan, regularly visited Epstein's home in Manhattan, Epstein's Island, and Epstein's victim stash house on East 66th Street.

233. During a 2019 investigation by the UK Financial Conduct Authority into Staley's relationship with Epstein, JP Morgan produced more than 1,200 emails exchanged between Staley and Epstein between 2008 and the end of Staley's tenure at JP Morgan. These emails were accessible to JP Morgan and written in Staley's

capacity as an officer and employee of JP Morgan. All of the information contained in those emails is imputed to JP Morgan, including information about sexual and related topics. These emails show, among other things, the close personal relationship between Epstein and Staley, that Epstein and Staley communicated and visited while Epstein was incarcerated, and that Staley visited Epstein's private island on multiple occasions.

234.   Despite knowledge of Epstein's illegal trafficking operation and the fact that one of JP Morgan's top executives being so in bed with the operation, JP Morgan continued to aid Epstein in his sex trafficking enterprise.

235.   JP Morgan, through its agents and employees such as Staley, had direct and specific knowledge that Epstein was operating a sex-trafficking venture and that he needed extraordinary banking infastructure from JP Morgan to successfully operate that illegal venture.

236.   JP Morgan also knew that Sarah Kellen and Nadia Marcinkova, women with Epstein-facilitated bank accounts at JP Morgan whom Staley knew well, were involved in the trafficking.

237.   Importantly, in January 2007, in the heart of the federal criminal investigation, Epstein trafficked Jane Doe 1 to the U.S. Virgin Islands where she was repeatedly raped. Not coincidentally, she was taken on Epstein's private jet—the same one Staley traveled on—with Sarah Kellen and Nadia Marcinkova, the same

JP Morgan account-holding passengers Staley traveled with and who were identified by the U.S. Government as Epstein's criminal co-conspirators.

238.   JP Morgan also knew from the press that Epstein was a registered sex offender who was always surrounded by young girls.  Even so, JP Morgan conspired with Epstein to assist him to operate the financial side of the sex-trafficking scheme.

239.   JP Morgan knew, through Staley and other information, without any doubt that Epstein was a serial abuser and that sex-trafficking was his everyday lifestyle.  JP Morgan also knew that without the bank's complicity, Epstein could not pay for commercial sex acts, for co-conspirators, for his co-conspirators' lawyers, for his own legal dream team, or for his private planes to traffic women to his New York mansion and island to abuse.

240.   Numerous of Epstein's co-conspirators had JP Morgan accounts tied to Epstein accounts.  During the time when Kellen and Marcinkova were publicly outed as co-conspirators of Epstein's, they each had JP Morgan accounts that were noted as Epstein-related accounts, putting JP Morgan on clear notice that the criminal organization Epstein was running through the bank was an expansive one of sexual abuse and trafficking.

241.   MC2, the Epstein/Brunel modeling agency that was used to expand the trafficking scheme internationally, was funded through JP Morgan loans on Epstein accounts.  This agency was started at a time when Brunel had already been publicly

62

ostracized from other known modeling agencies because he was a child sex abuser, a fact which JP Morgan was aware.

242.   All of Epstein's connections that were known to JP Morgan were either very wealthy individuals, companies that had no verifiable legitimate purpose, internationally known sex-abusing model scouts, publicly identified co-conspirators in the Epstein sex trafficking operation the crimes of which were identified in a public non-prosecution agreement, and young women and girls who could not possibly have a legal and legitimate connection to Epstein.  JP Morgan knew all of this against the backdrop of their client—Epstein—having no professional expertise or legitimate business with legitimate banking needs.

243.   JP Morgan worked with Epstein to open new accounts in the name of companies that had no plausible legitimate purpose, move money from one account to another to mask payments to sexual abuse victims or co-conspirators, make wire transfers to trafficking recruiters, and worked with Epstein's agents to make his sex trafficking conspiracy less obvious to law enforcement authorities and others.

244.   It is well known—and JP Morgan did know—that a large number of cash transactions by a customer can be an indicator of criminal activity generally and sex trafficking in particular, and JP Morgan knew Epstein was a sex trafficker constantly needing access to large amounts of cash.

245.   Payments to victims of sex trafficking are often made in cash to avoid

leaving a "paper trail" for law enforcement or other investigators to follow.

246. Forced sexual exploitation of victims has been estimated to generate approximately $100 billion in yearly illicit profits, according to a recent study (2018) by the Financial Action Task Force entitled "Financial Flows from Human Trafficking."

247. Given the illegal nature of sex trafficking, individuals perpetrating the crime, as well as laundering the proceeds of that crime, may be identifiable by observing financial transactions and information obtained by financial institutions in the course of conducting their customer due diligence and the behavior of offenders.

248. Sex trafficking organizations have the need for large amounts of cash because many illegal transactions are often necessary to keep the organization functioning. The techniques that financial institutions use to detect other criminal enterprises using their accounts can also be employed to detect sex trafficking. For example, sex trafficking organizations often use assets for money laundering (such as cash, real estate, cars, etc.) that other criminal organizations use.

249. Sex trafficking organizations may also make cash deposits and withdrawals below customer identification thresholds to avoid triggering additional scrutiny or bank reporting requirements. Sex trafficking organizations may also use multiple accounts to disguise the nature of their illegal transactions, thereby "laundering" the funds involved.

250. One indicator of sex trafficking can be media coverage of an account holder's activities relating to sex trafficking.

251. Another indicator of sex trafficking can be recurring payments for transportation of logistics service in the late night or early morning. A similar indicator can be significant payments for transportation or logistics (car rental, taxi, and ride sharing service transactions).

**4. Epstein used JP Morgan accounts for the sex-trafficking venture, and JP Morgan knowingly and directly benefits from the venture.**

252. Over the course of the relationship, Epstein and his representatives used JP Morgan accounts to send dozens of wires, directly and indirectly, to co-conspirators in the sex-trafficking venture.

253. Over the course of the relationship, Epstein and his representatives also obtained vast sums of cash from JP Morgan to fund the sex-trafficking venture.

254. JP Morgan was aware that the recipients of some of these wire transfers and cash described in the previous paragraphs were to Epstein's co-conspirators and that the wire and cash transfers were in furtherance of the Epstein sex-trafficking venture.

255. JP Morgan was aware that known co-conspirators of Epstein also had JP Morgan accounts.

256. Epstein used JP Morgan accounts to pay, through wire transfers and in cash, for coerced commercial sex acts by Jane Doe 1 and other Class Members.

65

257.   Given JP Morgan's knowledge about Epstein's past sex trafficking, its continuation of its financial relationship with Epstein was, at a minimum, in reckless disregard of the fact that Epstein was using means of force, threats of force, fraud, coercion (and a combination of such means) to cause Epstein's victims to engage in commercial sex acts.

258.   If a financial institution decides to do business with a high-risk client, that institution is required to conduct due diligence commensurate with that risk and to tailor its transaction monitoring to detect suspicious or unlawful activity based on what the risk is.  JP Morgan knowingly, intentionally, deliberately, and maliciously failed to do so with regard to its relationship with Epstein.

259.   JP Morgan was well aware not only that Epstein had pled guilty and served prison time for engaging in sex with a minor but also that there were public allegations that his conduct was facilitated by several named co-conspirators.

260.   Despite its knowledge, JP Morgan deliberately did little or nothing to inquire into or block numerous payments to named co-conspirators, and to or on behalf of numerous young women, or to inquire how Epstein was using hundreds of thousands of dollars per year in cash.  JP Morgan intentionally failed to conduct this basic inquiry, knowing that an inquiry would reveal the sex-trafficking scheme. Instead, it chose to continue to financially benefit from its relationship with Epstein and his co-conspirators.

261.   Hush money, financial compensation to recruiters, and compensation to victims was integral to Epstein's scheme, without which his sex-trafficking conspiracy could not effectively operate.  The ability to send wire transfers and cash to young females was critical to Epstein's ability to coerce his victims into commercial sex acts.

262.   Suspicious wire transfers and withdrawals of millions of dollars in cash are basic hallmarks of any major criminal enterprise.  A bank that would allow Epstein to operate in this blatant criminal fashion was necessary for him to continue to operate his sex-trafficking conspiracy and for the continued abuse of hundreds of young women.

263.   In January 2013 – the year JP Morgan terminated Epstein's accounts— the Office of the Comptroller of the Currency ("OCC") entered into a consent order with JP Morgan regarding deficiencies in the bank's overall program for BSA/AML compliance.  The OCC found that JP Morgan failed to develop adequate due diligence on customers and failed to comply with federal banking regulations. In fact, the OCC noted that JP Morgan "failed to identify significant volumes of suspicious activity."[2]

264.   Before JP Morgan became Epstein's banker, Epstein was only able to

---

[2]   *See* NYSDFA Consent Order at 2–4 (Jan. 14, 2013), https://occ.treas.gov/news-issuances/news-releases/2013/nr-occ-2013-8a.pdf.

abuse young women sporadically and in fear of being caught. Once JP Morgan became Epstein's banker, it eliminated that fear, agreeing and conspiring with Epstein to ensure that the suspicious money trail that would reveal Epstein's operation would be concealed.

265. JP Morgan's desire to maintain its profitable relationship with Epstein led it to avoid taking steps that would have documented its involvement in Epstein's sex-trafficking venture.

266. JP Morgan knowingly and intentionally benefited financially and in other ways from its participation in Epstein's sex-trafficking venture, with knowledge, or with reckless disregard of the fact, that Epstein used means of force, threats of force, fraud, and coercion (and combinations thereof) to force young women and girls into engaging in commercial sex acts.

267. As recounted throughout this complaint, JP Morgan financially benefited by earning millions of dollars from its participation in the Epstein-sex-trafficking venture. The benefits that JP Morgan received came directly from its participation in the sex-trafficking venture and because of its participation in that venture. In other words, there was a causal relationship between JP Morgan's conduct furthering Epstein's sex-trafficking venture and its receipt of the financial benefits with actual (and constructive) knowledge of that causal relationship.

268. By facilitating and financing Epstein's commercial sex acts in interstate

and foreign commerce, JP Morgan earned interest, commissions, fees, and other financial benefits directly from its connection with Epstein, Epstein-related entities, and others acting in concert with Epstein. Epstein provided those financial benefits to JP Morgan precisely because it was facilitating his sex-trafficking venture—and JP Morgan knew that was the reason that Epstein was providing them with those financial benefits.

269. JP Morgan benefited by receiving things of value from its participation in the Epstein sex-trafficking venture. Among the various things of value it received were (1) connections with Jeffrey Epstein, his co-conspirators, and his wealthy friends and associates; (2) additional deposits from Epstein, his co-conspirators, and his wealthy friends and associates; (3) the opportunity to earn financial benefits from the funds that had been deposited with it. JP Morgan knowingly and intentionally received these things of value as a direct result of its participation in the Epstein sex-trafficking venture and because it was furthering Epstein's sex-trafficking venture.

270. JP Morgan knowingly and intentionally financed Epstein's illegal sex-trafficking venture. JP Morgan knew that if it did not finance Epstein's illegal sex-trafficking venture, then it would lose valuable Epstein-related accounts. Faced with the choice between profiting from Epstein's sex-trafficking venture or following the law, JP Morgan chose to profit.

271. In violation of various banking laws and regulations, including various

"Know Your Customer" and anti-structuring laws, JP Morgan regularly authorized cash withdrawals and deposits for the Epstein sex-trafficking venture, which allowed Epstein, his co-conspirators, and those they directed to conduct the business of the sex-trafficking venture.

272.   JP Morgan's knowing and intentional banking law violations allowed Epstein and his various corporations to stay "under the radar" and continue the sex trafficking operation without close scrutiny or interference.

273.   Among the young women and girls whose sex trafficking and sex abuse JP Morgan participated in, benefited from, aided and abetted, and furthered were Jane Doe 1 and the Class Members.

### D.   The Statute of Limitations

274.   The statute of limitations under the TVPA is ten years after the cause of action arose, or ten years after the victim reaches eighteen years of age, if the victim was a minor at the time of the alleged offense. 18 U.S.C. § 1595(c)(1), (2). The TVPA causes of actions for Jane Doe 1, and the other Class Members, arose within ten years of the filing of this complaint.  Epstein's sex-trafficking venture constituted a criminal conspiracy and a sex-trafficking venture that operated continuously from around 1998, through and including September 2013, and up to and following Epstein's death in 2019.  The conspiracy and venture undertook criminal actions in violation of the TVPA throughout those years, including 2013

and after, thereby automatically bringing all actions in furtherance of the conspiracy and venture within TVPA's statute of limitations.

275.   The New York Adult Survivors Act has opened up a one-year revival window for the statute of limitations regarding intentional and negligent torts connected to violations of the New York Penal Law Chapter 130.  *See* New York State, Governor Hochul Signs Adult Survivors Act, Governor Kathy Hochul (May 24, 2022), https://www.governor.ny.gov/news/governor-hochul-signs-adult-survivors-act ("For many survivors, it may take years to come to terms with the trauma of sexual assault and feel ready to seek just.").

## VI. CLASS ACTION ALLEGATIONS

276.   Jane Doe 1 brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of herself and the following Class:

> All women who were sexually abused or trafficked by Jeffrey Epstein during the time when JP Morgan maintained bank accounts for Epstein and/or Epstein related-entities, which included January 1, 1998, through in or about August 2013, both dates inclusive, and continuing to the time of Epstein's death on August 10, 2019 (the "Class Period").

277.   Jane Doe 1 reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

278.   <u>Numerosity</u>:  The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1).  The exact size of the Class

and the identities of the individual Class members are ascertainable through records maintained by the Epstein Estate and JP Morgan, including but not limited to JP Morgan's records for Epstein-related accounts (*e.g.*, account ledgers reflecting payments from Epstein to Class members).

279.  Typicality:  Jane Doe 1's claims are typical of the claims of the other Class members she seeks to represent.  The claims of Jane Doe 1 and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of JP Morgan's participation in, conspiring to join in, and funding of the Epstein's sexual abuse and Epstein's sex-trafficking venture.

280.  Commonality:  There are many questions of law and fact common to the claims of Jane Doe 1 and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3).  Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

281.  Common questions of fact and law affecting Class members include, but are not limited to, the following:

     a.  Whether the Epstein sex-trafficking venture and conspiracy caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1);

     b.  Whether the Epstein sex-trafficking venture and conspiracy recruited,

enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce;

c.  Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means, to sexually abuse the victims and to cause victims to engage in commercial sex acts;

d.  Whether JP Morgan knowingly and intentionally assisted, facilitated, and supported the Epstein sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

e.  Whether JP Morgan benefited financially or by receiving things of value from its participation in a venture which has engaged in sex trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

f.  Whether JP Morgan knew or should have known that the Epstein sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a);

g.  Whether JP Morgan was part of conspiracy to violate 18 U.S.C. § 1591(a), in violation of 18 U.S.C. § 1594(c); and

h.  Whether JP Morgan committed intentional and negligent acts or omissions that facilitated sexual abuse which would constitute a sexual offense as defined in article 130 of New York Penal Law committed

73

against such persons who were eighteen years of age or older.

282.   Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

283.   <u>Adequacy</u>:  Jane Doe 1 will fairly and adequately represent and protect the interests of the other Class members she seeks to represent. Jane Doe 1 has retained counsel with substantial experience in prosecuting complex litigation and class actions.  Jane Doe 1 and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so.  Neither Jane Doe 1 nor her counsel have any interests adverse to those of the other Class members.

284.   This action has been brought and may properly be maintained as a class action against JP Morgan pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from JP Morgan's records.

285.   <u>Superiority</u>:  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

     a.   Joinder of all Class Members is impracticable;

b.  The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for JP Morgan and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

c.  Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

d.  Absent a class action, Class Members will continue to suffer losses and be aggrieved and JP Morgan will escape liability for its criminal and tortious conduct and be able to continue to violate New York and federal law without remedy;

e.  Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f.  Jane Doe 1 and her counsel are unaware of any class action brought against JP Morgan by victims for the violations alleged in this action;

g.  The forum is desirable because Jane Doe 1 conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

75

h.  This action presents no difficulty that would impede its management by the Court as a class action.

## VII. CAUSES OF ACTION

### COUNT I
### AIDING, ABETTING, AND FACILITATING
### BATTERY

286.  Plaintiff Jane Doe 1 realleges and incorporates by paragraphs 1 – 285, as if fully set forth in this Count.

287.  Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

288.  Between about 1998 and 2013, in this District in New York, Jeffrey Epstein intentionally committed batteries and other intentional tortious conduct, including crimes in violation of New York Penal Law Chapter 130 such as New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66 (hereinafter "Chapter 130 crimes"), against Jane Doe 1 and the Class Members. Epstein committed the intentional tortious conduct and crimes against Jane Doe 1 and Class Members and when they were 18 or older.  As described throughout this complaint, Epstein intentionally and non-consensually touched Jane Doe 1 and the Class Members in a harmful and offensive manner that resulted in substantial injuries, including damages from physical and psychological injury, extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and

76

invasion of privacy.

289.   The resulting injuries that Jane Doe 1 and the Class Members suffered include injuries directly and proximately suffered as a result of sex offenses committed by Epstein and other co-conspirators and criminalized under article 130 of the New York Penal Laws.   The offenses included sexual intercourse without consent and oral sexual conduct without consent, forbidden by New York Penal Law § 130.20.   The offenses included forcible touching of sexual or other intimate parts without consent, forbidden by New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66.

290.   Regardless of when the tortious conduct (*e.g.*, battery) and Chapter 130 Crimes were committed by Epstein, the conduct and crimes are now civilly actionable, regardless of any statute of limitations to the contrary, because they are covered by the one-year "look back" window in New York Adult Survivors Act. *See* N.Y. C.P.L.R. § 214-j.

291.   Between about 1998 and 2013, JP Morgan knowingly and intentionally aided, abetted, and facilitated Epstein's intentional tortious conduct (*e.g.*, battery), through Chapter 130 Crimes recounted in the preceding paragraphs of this Count. Because JP Morgan criminally aided, abetted, and facilitated Epstein's conduct and crimes in violation of Chapter 130, it is vicariously and otherwise liable for damages caused by the conduct and crimes.

292.   Between about 2000 and 2013, when it provided substantial assistance to Epstein, JP Morgan was well aware of its important and substantial role as a part of Epstein's intentionally tortious and illegal activity in committing Chapter 130 Crimes.

293.   As a direct and proximate result of Epstein's tortious conduct and crimes, which JP Morgan knowingly and intentionally aided, abetted, and facilitated, Jane Doe 1 and the Class Members have in the past suffered, and in the future will continue to suffer, substantial damages, including damages from physical and psychological injury, extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

294.   At the time of Epstein's batteries, intentionally tortious conduct, and crimes against Jane Doe 1 and the Class Members, JP Morgan was well aware of Epstein's sex-trafficking venture and that its concrete steps in furtherance of the venture were aiding, abetting, and facilitating his batteries, tortious conduct, and crimes.

295.   At the time of Epstein's crimes against Jane Doe 1 and the Class Members, JP Morgan knowingly provided substantial assistance in Epstein's tortious conduct and crimes.  That knowing substantial assistance went beyond mere knowledge and approval of Epstein's wrongdoing.  For example, JP Morgan knowingly and intentionally provided the cash and the financial support that made

it possible for Epstein to commit the coercive sex offenses described in the preceding paragraphs in this Count. Without that cash and financial support, Epstein could not have committed his tortious conduct and crimes—a fact that JP Morgan knew.

296. JP Morgan knowingly and intentionally committed both substantial acts in support of Epstein and substantial deliberate omissions in support of Epstein. For example, JP Morgan deliberately omitted to take important steps (such as timely filing SARs) that substantially assisted Epstein to commit his crimes against Jane Doe 1 and Class Members in violation of New York Penal Law Chapter 130.

297. In aiding, abetting, and facilitating Epstein's intentional tortious conduct and crimes, JP Morgan could readily foresee direct and proximate injury to Jane Doe 1 and the Class Member. JP Morgan should have foreseen direct and proximate injury from its actions and inactions to Jane Doe and the Class Members. Indeed, JP Morgan did foresee injury to Epstein's victims, including Jane Doe 1 and Class Members.

298. In aiding, abetting, and facilitating Epstein's tortious conduct and crimes, JP Morgan committed intentional torts directed against Jane Doe 1 and the Class Members. JP Morgan's aiding, abetting, and facilitating Epstein's tortious conduct and crimes were its own wrongful acts and omissions. JP Morgan had a duty not to commit tortious conduct and crimes—specifically aiding, abetting, and facilitating New York sex crimes as described above— directed against Jane 1 and

79

the Class Members.

299. As a result of the foregoing, JP Morgan is liable civilly for damages it directly, tortiously, and criminally caused to Jane Doe 1 and the Class Members. Jane Doe 1 and the Class Members according are entitled to bring a cause of action for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of JP Morgan's aiding, abetting, and facilitating Epstein's tortious conduct and crimes described above and for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of Epstein's tortious conduct and crimes.

300. By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, JP Morgan is liable to Jane Doe 1 and other Members of the Class for punitive damages.

## COUNT II
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

301. Plaintiff Jane Doe 1 realleges and incorporates by paragraphs 1 – 285, as if fully set forth in this Count.

302. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

303. As a direct and proximate result of aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of Chapter 130, JP Morgan

80

intentionally inflicted emotional distress against Jane Doe 1 and the Class Members.

304.   JP Morgan's actions, described above, constitute extreme and outrageous conduct that shocks the conscience.   For example, JP Morgan intentionally and knowingly participated in Epstein's sex-trafficking venture, as outlined above. JP Morgan had a legal duty not to participate in, facilitate, or aid and abet Epstein's sex-trafficking venture and Epstein's Chapter 130 Crimes.

305.   JP Morgan's conduct was especially extreme and outrageous due to Jane Doe 1 and the Class Members' particular vulnerabilities as targets of a sex-trafficking venture.

306.   JP Morgan intended to cause, and did cause, Jane Doe 1 and the Class Members severe emotional distress.   At the very least, JP Morgan recklessly disregarded a substantial probability that its actions in aiding, abetting, and facilitating Epstein's sex crimes would cause Jane Doe 1 and the Class Members severe emotional distress.

307.   Because JP Morgan intentionally inflicted extreme emotional distress on Jane Doe 1 and the Class Members, it is liable to Jane Doe 1 and the Class Members for damages they suffered as a direct and proximate result.

308.   As a direct and proximate result of JP Morgan's conduct, Jane Doe 1 and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme

emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. JP Morgan's aiding, abetting, and facilitating Epstein's sex crimes in violation of Chapter 130 directly and proximately caused Epstein's sex crimes.

309.   By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, JP Morgan is liable to Jane Doe 1 and other Members of the Class for punitive damages.

**COUNT III**
**NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE TO PREVENT PHYSICAL HARM**

310.   Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 285, as if fully set forth in this Count.

311.   Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

312.   In addition to any duties that might arise as a financial institution (alleged in the next Count, below), JP Morgan owed a duty to Jane Doe 1 and the Class Members to exercise reasonable care to avoid conduct that created a risk of physical harm to them.  JP Morgan's duties included a duty to exercise reasonable care to avoid conduct that would combine with Epstein's crimes, and permit Epstein's crimes, in violation of Chapter 130.

313. JP Morgan's own conduct in providing financial and other support for Epstein's sex trafficking venture set forces in motion that directly and proximately injured and caused physical harm to Jane Doe 1 and the Class Members. These forces that JP Morgan set in motion caused Epstein's intentional tortious conduct and Chapter 130 Crimes against Jane Doe 1 and the Class Members, causing physical harm and in themselves constituted physical harm to Jane Doe 1 and the Class Members. JP Morgan owed Jane Doe 1 and the Class Members a duty not to set those forces in motion because they unreasonably created a risk of physical harm.

314. JP Morgan reasonably could foresee, and did in fact foresee, that its negligent failure to prevent physical harm would result in physical harm to Jane Doe 1 and the Class Members. JP Morgan owed a duty to prevent that physical harm.

315. JP Morgan failed to act objectively reasonably in failing to take precautions to prevent Epstein's intentional tortious conduct and sex-trafficking and sex crimes in violation of Chapter 130, which were committed against Jane Doe 1 and the Class Members. If JP Morgan had acted reasonably to prevent physical harm, it would not have supported and allowed Epstein's tortious conduct and sex-trafficking and sex crimes to occur. JP Morgan owed Jane Doe 1 and the Class members a duty to act objectively reasonably.

316. At the time of JP Morgan's own negligent conduct, JP Morgan both realized and should have realized the likelihood that it was creating an opportunity

for Epstein to commit intentional tortious conduct and Chapter 130 Crimes against Jane Doe 1 and the Class Members. Indeed, JP Morgan knew that its own conduct was necessary to create Epstein's opportunities to engage in that conduct and commit those crimes. JP Morgan owed Jane Doe 1 and the Class Members a duty not to create those opportunities for Epstein.

317. JP Morgan's breaches of its legal duties were the direct—*i.e.*, the but-for—cause of physical and psychological injuries to Jane Doe 1 and the Class Members. Without JP Morgan's breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to JP Morgan.

318. Jane Doe 1 and the Class Members were easily within the zone of foreseeable harm from the JP Morgan's negligent acts and omissions. JP Morgan's negligent acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact. Tragically, Jane Doe 1 and the Class Members fell within that zone.

319. Because of JP Morgan's negligent failure to prevent physical harm to Jane Doe 1 and the Class Members, it is liable to Jane Doe 1 and the Class Members for damages suffered as a direct and proximate result.

320. As a direct and proximate result of JP Morgan's negligent failure to prevent physical harm, Jane Doe 1 and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical

injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. JP Morgan's aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of Chapter 130 directly and proximately caused Epstein's sex crimes.

321. By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, JP Morgan is liable to Jane Doe 1 and other Members of the Class for punitive damages.

<b><u>COUNT IV</u></b><br><b>NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE AS A BANKING INSTITUTION PROVIDING NON-ROUTINE BANKING</b>

322. Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 285, as if fully set forth in this Count.

323. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

324. JP Morgan owed a duty to Jane Doe 1 and the Class Members not to knowingly provide non-routine banking support and assistance for Epstein that it knew, and reason to know, would lead to and support intentional tortious conduct and Chapter 130 Crimes by Epstein against Jane Doe 1 and the Class Members.

325. As described in detail above, JP Morgan did not merely provide routine banking support for Epstein. Instead, it participated in, aided and abetted, and

85

facilitating his sex-trafficking venture and his commission of intentional tortious conduct and Chapter 130 crimes. JP Morgan also knew, and was willfully blind to the fact, that it was going beyond providing routine banking support but instead facilitating Epstein's sex-trafficking venture and his commission of tortious conduct and Chapter 130 crimes.

326. As an example, in providing hundreds of thousands of dollars in cash to Epstein and his co-conspirators in circumstances where it knew that the cash would be used to facilitate coercive sex acts, JP Morgan took substantial actions outside the scope of a routine, lawful, and ordinary customer relationship.

327. As another example, JP Morgan deliberately failed to follow numerous banking requirements in connection with financial dealings with Epstein, including AML rules, KYC rules, and anti-structing rules. In deliberately ignoring and failing to follow those rules, JP Morgan acted in a non-routine way to facilitate and support Epstein's and his co-conspirators' intentional torts, sex-trafficking, and commission of Chapter 130 Crimes. JP Morgan, through Staley, knew that Epstein was abusing females sexually on a daily basis and through that knowledge, developed a special relationship with Epstein. As a banking institution providing the necessary infrastructure to the sex trafficking operation, JP Morgan developed a special relationship with Epstein and thus undertook an obligation to protect others from his abuse.

328. Likewise, JP Morgan, acting through Staley, having observed Jane Doe 1 in circumstances indicating sexual abuse and trafficking, and whose relationship with Epstein was always maintained for the benefit of JP Morgan, owed a duty to protect the victims from the abuse of Jeffrey Epstein about which Staley, on behalf of JP Morgan, was well aware.

329. JP Morgan also owed Jane Doe 1 and the Class Members a duty of care because it affirmatively and intentionally chose not to investigate Epstein's suspicious banking activities even after being confronted with explicit information that Epstein was using JP Morgan to further a sex-trafficking venture harming Jane Doe 1 and the Class Members. JP Morgan chose not to do so because it knew what the investigation would reveal, and that it would need to end its lucrative relationship with Epstein as a result of the investigation. Once JP Morgan had information about Epstein's use of JP Morgan for a sex-trafficking venture, and once it knew or has reason to know that it was providing material support to that venture, it owed a duty of care to investigate suspicious banking activity.

330. But for JP Morgan, Epstein could not have successfully run and expanded his sexual abuse organization. Epstein could not have abused the hundreds of victims that he did without JP Morgan.

331. JP Morgan failed to act objectively reasonably by failing to comply with relevant banking laws and regulations with regard to its interactions with

Epstein and his co-conspirators.  JP Morgan owed a duty to Jane Doe 1 and the Class Members to act objectively reasonably in its interactions with Epstein and his co-conspirators and to exercise reasonable care to prevent them from engaging in foreseeable tortious and criminal activity by using JP Morgan's exceptional and non-routine banking infrastructure.

332.   JP Morgan owed a legal duty to Jane Doe 1 and the Class Members to act objectively reasonably and to not deliberately ignore banking obligations, including KYC and AML laws and regulations described above, so as to provide Epstein and others with an opportunity to engage in tortious conduct, coercive sex-trafficking and Chapter 130 Crimes.

333.   Under KYC, AML, and related laws and regulations, JP Morgan had special duties not ignore tortious conduct and crimes being committed by its customers—duties above and beyond any duties that the general public may have. The inquiries that banks must make include duties to inquire about specific individuals who banks know are being harmed.  The regulations establish a duty of care that must be followed by banks, including JP Morgan.  These duties exist at least in situations where a bank is knowingly going beyond offering routine banking for its customers and instead offers banking infrastructure specially adapted to facilitate tortious conduct and crimes.

334.   JP Morgan also owed Jane Doe 1 and the Class Members a duty of care

88

because it knew, and had reason to know, that Epstein and his co-conspirators were using JP Morgan to facilitate a sex-trafficking venture, raising a duty to make a reasonable inquiry about suspicious activity.

335.  JP Morgan owed Jane Doe 1 and the Class Member a duty not to deliberately and purposely fail to file SARs—filings which would have alerted federal authorities to Epstein's and his co-conspirators' illegal activities, including committing Chapter 130 Crimes.

336.  JP Morgan also owed Jane Doe 1 and the Class Members a duty to prevent physical harm to them when confronted with explicit information that Epstein and his co-conspirators were using JP Morgan's non-routine banking to further a sex-trafficking venture harming Jane Doe 1 and the Class Members.  Once JP Morgan had information about Epstein's use of JP Morgan for a sex-trafficking venture that was physically harming Jane Doe 1 and the Class Members, it owed them a duty of care to investigate and prevent Epstein's and his co-conspirators' suspicious, tortious, and criminal activities.

337.  In the exercise of reasonable care, JP Morgan and its employees knew, and should have known, of the dangerous propensities of Jeffrey Epstein and his co-conspirators to commit intentional torts and violations of article 130 of New York Penal Law against women and girls with whom he was in close proximity, including Jane Doe 1 and the Class Members.

89

338.   JP Morgan breached its legal duties to Jane Doe 1 and the Class Members as described above.  JP Morgan's breach of its duties led to it failing to prevent Epstein from committing intentional torts and Chapter 130 Crimes against Jane Doe 1 and the Class Members.  JP Morgan realized that Epstein were committing intentional torts and Chapter 130 Crimes against Jane Doe 1 and the Class Members.  The criminal activity that harmed Jane Doe 1 and the Class Members included foreseeable intentional torts as well as TVPA and Chapter 130 Crimes committed by the Epstein.

339.   As a direct and proximate result of the breach of legal duties by JP Morgan, Jane Doe 1 and the Class Members repeatedly suffered direct and foreseeable injuries from Epstein and his co-conspirators, including injuries from federal and state sexual offenses (including sexual assaults) and resulting emotional distress, mental pain and suffering, and other physical, psychological, and other injuries.

340.   The breaches of JP Morgan's legal duties were the direct—*i.e.*, the but-for—cause of these physical and psychological injuries to Jane Doe 1 and the Class Members.  Without JP Morgan's breaches of its legal duties, those injuries would not have occurred.  The injuries that occurred were readily foreseeable to JP Morgan.

341.   The injuries that Jane Doe 1 and the Class Members suffered included injuries directly and proximately suffered while they were adults who were present

90

in this District. These injuries are permanent in nature and Jane Doe 1 and the other Class Members will continue to suffer these losses in the future.

342. JP Morgan could reasonably foresee that their actions and omissions in facilitating Epstein's sex trafficking enterprise would lead to intentional torts and sex offenses against Jane Doe 1and the Class Members. Indeed, JP Morgan was aware, and should have been aware, that Epstein was a high risk to commit sex offenses against young women and girls.

343. Jane Doe 1 and the Class Members were easily within the zone of foreseeable harm from JP Morgan's negligent acts and omissions. JP Morgan's acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing intentional torts and sex crimes against young women with whom he was in contact. Tragically, Jane Doe 1 and the Class Members fell within that zone.

344. While the foregoing allegations easily make out a clear case of negligence, this case does not involve mere negligence. Instead, Defendants' tortious conduct in this case evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. It also involved outrageous and intentional acts and omissions, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. JP Morgan's tortious conduct was directed

91

specifically at Jane Doe 1 and other Members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

345. As a result of JP Morgan's negligent actions and omissions described in this Count, Jane Doe 1 and the Class Members have sustained both general and specifical damages from physical and psychological injury in substantial amounts.

346. By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, JP Morgan is liable to Jane Doe 1 and other Members of the Class for punitive damages.

## COUNT V
## KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595

347. Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 285, as if fully set forth in this Count.

348. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

349. JP Morgan knowingly and intentionally benefitted, financially and by receiving things of value, from participating in, assisting, supporting, and facilitating an illegal coercive sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

350. JP Morgan took many concrete steps to aid and participate in Epstein's

sex-trafficking venture. Among the concrete steps that JP Morgan took to aid Epstein was providing vast sums of cash, which made the sex-trafficking venture possible. Providing Epstein with large sum of U.S. currency caused JP Morgan to receive financial benefits. JP Morgan's willingness to provide large amounts of cash to Epstein was the quid pro quo for it receiving financial benefits from Epstein.

351. The cash that JP Morgan provided was necessary for Epstein to coerce Jane Doe 1 as well as other Class Members to engage in commercial sex acts. The cash directly formed part of the commercial nature of the sex acts. The cash was also a necessary and required part of Epstein's recruitment of Jane Doe 1 and other victims of his sex-trafficking venture. By providing cash that JP Morgan knew would be used to fund the sex trafficking venture, JP Morgan actively participated in the recruitment of victims of the venture.

352. The cash that JP Morgan provided went far beyond providing routine banking opportunities for a client. It was far from routine for JP Morgan to provide substantial sums of cash per year to Epstein, who did not have an apparent legitimate need for such extravagant sums. Moreover, the circumstances in which Epstein was requesting such large amounts were far from routine and raised numerous "red flags"—taking it well outside routine circumstances.

353. JP Morgan providing large sums of cash to Epstein, under the circumstances of this case, was entirely inconsistent with the ordinary duties of a

93

bank or its employees.

354.   The reason that JP Morgan ignored the numerous red flags about Epstein was to receive financial benefits from Epstein and his sex-trafficking venture.  JP Morgan knew that it would gain far-from-routine financial benefits by ignoring the red flags associated with Epstein and by participating in his sex-trafficking venture.

355.   Among the concrete steps that JP Morgan took to aid and participate in the Epstein sex-trafficking venture were opening up numerous accounts at JP Morgan for Epstein, his related entities, and associates.  By opening these accounts, JP Morgan received many benefits from participating in Epstein's venture.  The opening of these accounts was affirmative conduct that caused JP Morgan to receive those benefits.

356.   Among the concrete steps that JP Morgan took to aid the Epstein sex-trafficking venture, between about 2000 and continuing through about August 2013, JP Morgan concealed its delivery of vast sums of cash (likely hundreds of thousands of dollars) to Epstein and his associates.  In order to benefit from the Epstein sex-trafficking venture, JP Morgan willfully failed to timely file required SARs with the federal government, because doing so would imperil its ability to profit from the sex-trafficking venture.  JP Morgan's concealment of the cash transactions caused it to receive financial benefits through continuation of the Epstein sex-trafficking

venture.

357.   Among the concrete steps that JP Morgan took to aid the Epstein sex-trafficking venture were its failure to follow AML requirements.  This failure was not just passive facilitation, but a deliberate omission by JP Morgan.  This omission was specific act of concealment, which allowed Epstein to continue funding his sex-trafficking venture through suspicious transactions that would have otherwise been prevented.

358.   By taking the concrete steps outlined above (along with the others alleged in this complaint), JP Morgan knowingly participated in sex trafficking and furthered the Epstein sex-trafficking venture.  The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success.  The concrete steps above constituted active engagement by JP Morgan in Epstein's sex-trafficking venture.

359.   JP Morgan knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking venture, in which Epstein, with JP Morgan's knowledge, or its reckless disregard of the fact, that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe 1, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

360.   JP Morgan actually knew, through Staley and other officers and

employees, that it was participating in a particular sex-trafficking venture—*i.e.*, the coercive Epstein sex-trafficking venture outlined above. JP Morgan's knowledge went far beyond having an abstract awareness of sex trafficking in general. Indeed, JP Morgan discussed internally Epstein's specific sex trafficking and the large amounts of cash that JP Morgan was giving him. Thus, JP Morgan did not simply fail to adequately detect signs of Epstein's sex trafficking; it did detect multiple signs of Epstein's coercive sex-trafficking venture and continued to participate in the venture. JP Morgan knew that the venture was on-going, which was why Epstein required vast sums of cash.

361. JP Morgan's actions extend well beyond a situation of failing to train its staff about recognizing the warning signs of sex trafficking. JP Morgan's employees did recognize the signs of Epstein's sex trafficking. Indeed, JP Morgan's employees knew about Epstein's sex-trafficking venture. But JP Morgan decided to continue facilitating the Epstein sex-trafficking venture rather than ending its participation in the venture.

362. Among the signs that JP Morgan was facilitating Epstein's sex trafficking venture were those facts that came to the attention of JP Morgan's employees discussed above, which caused those employees to escalate issues regarding Epstein's coercive sex-trafficking venture to more senior levels.

363. Among the signs that JP Morgan was facilitating Epstein's sex

trafficking venture were those facts that came to the attention of JP Morgan were those facts that came to its attention through Jes Staley's observations of Epstein's sex trafficking. Because of those observations, Staley—and JP Morgan—knew to a certainty that Epstein was engaged in sex trafficking.

364. JP Morgan's actual knowledge extended to the fact that specific individual women and girls were being coercively sex trafficked by Epstein between the time of his on-boarding and the termination of its relationship with Epstein. Even if JP Morgan did not know all the names of Epstein's victims, it knew that specific victims (*e.g.*, Jane Doe 1) of a specific trafficker (Epstein) at a specific time period (various dates between 2000–2013 and following) existed and were being forced to engage in commercial sex acts. It also knew that some of the victims had eastern European surnames. JP Morgan was on notice, and knew, that such victims were being coercively trafficked by Epstein's sex-trafficking venture.

365. One of JP Morgan's officers, Jes Staley, also knew the names of the many of Epstein's sex trafficking victims.

366. JP Morgan helped to conceal the names of Epstein's victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking venture. Among the ways in which JP Morgan helped to conceal the venture's existence was by providing the cash necessary for the venture to avoid leaving a visible "paper trail."

97

367.   JP Morgan's concealment included failing to follow through on enhanced monitoring that was required for someone like Epstein.  JP Morgan failed to implement that enhanced monitoring specifically to help conceal Epstein's ongoing sex-trafficking.  JP Morgan knew that if it implemented that enhanced monitoring, it would have to stop providing Epstein with the cash needed to run his sex-trafficking venture.

368.   JP Morgan's concealment included failing to file required SARs for Epstein's suspicious cash transactions.

369.   In addition to having actual knowledge that it was participating in Epstein's sex trafficking venture, JP Morgan had constructive knowledge that it was participating in Epstein's sex trafficking venture.  JP Morgan also had constructive knowledge that Jane Doe 1, as well as other Members of the Class, were being coercively sex trafficked by Epstein.  Its constructive knowledge extended to the names of Epstein's victims, because Epstein and his associates knew the names of the victims. Staley also the knew the names of many of the victims.

370.   JP Morgan had constructive knowledge of Epstein's sex-trafficking venture because of specific acts by Epstein that put it on notice of a particular and ongoing sex trafficking venture.  Among the specific acts were Epstein's use of vast sums of cash in circumstances that prompted JP Morgan employees to specifically raise questions about Epstein's sex-trafficking.

371.   Also among the specific acts giving rise to constructive knowledge were the facts that associates of Epstein made numerous cash withdrawals from JP Morgan accounts.  The circumstances of these withdrawals gave the bank notice that "structuring" was occurring to avoid alerting federal authorities.

372.   Among the financial benefits that the JP Morgan received for participating in and facilitating Epstein's sex-trafficking venture were the deposit of funds that Epstein and Epstein-controlled entities made to JP Morgan.  JP Morgan profited from the use of these deposits. Epstein and Epstein-controlled entities deposited these funds in exchange for JP Morgan's facilitation and participation in the sex trafficking venture, including its willingness to provide large amounts of cash in suspicious circumstances and to allow "structuring" of withdrawals to avoid triggering reporting requirements.

373.   Among the financial benefits that JP Morgan received for participating in Epstein's sex-trafficking venture was referral of business opportunities from Epstein and his co-conspirators.  JP Morgan profited from these referred business opportunities. Epstein referred business entities and business opportunities to JP Morgan in exchange for its facilitation and participation in the sex trafficking venture.  These referrals were a quid pro quo for JP Morgan's participation in the sex-trafficking venture.

374.   JP Morgan financially profited from the deposits made by Epstein and

Epstein-controlled entities and from the business opportunities referred to JP
Morgan by Epstein in exchange for its facilitation and participation in Epstein's sex
trafficking venture.

375. JP Morgan knowingly received financial benefits in return for its
assistance, support, and facilitation of Epstein's sex-trafficking venture. JP Morgan
knew that if it stopped providing assistance, support, and facilitation of Epstein's
sex-trafficking venture, it would no longer receive those benefits.

376. JP Morgan knew, and was in reckless disregard of the fact, that it was
Epstein's pattern and practice to use the channels and instrumentalities of interstate
and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and
transport young women and underage girls for purposes of causing commercial sex
acts, in violation of 18 U.S.C. § 1591(a)(1).

377. JP Morgan and its employees had actual knowledge that they were
facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit,
entice, coerce, harbor, transport, obtain and provide Jane Doe 1 as well as other
Members of the Class, into commercial sex acts, through the means of force, threats
of force, fraud, abuse of process, and coercion, and a combination of all these means.

378. Despite such knowledge, JP Morgan intentionally paid for, facilitated,
and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which JP Morgan
knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud,

and force Jane Doe 1, as well as other Members of the Class, to engage in commercial sex acts.

379.  JP Morgan, through its employees and agents (including Staley), actively participated in the sex trafficking conspiracy and led Jane Doe 1, as well as other Class Members, to believe that they would be rewarded if they cooperated and acquiesced to Epstein's coercive demands.

380.  JP Morgan's affirmative conduct was committed knowingly, and in reckless disregard of the facts, that Epstein would use cash and financial support provided by JP Morgan as a means of defrauding, forcing, and coercing sex acts from Jane Doe 1 as well as other Members of the Class.  JP Morgan's conduct was outrageous and intentional.

381.  In addition to actual knowledge that it was participating in and facilitating the Epstein sex-trafficking venture, JP Morgan also should have known that it was participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

382.  In exchange for facilitating and covering up Epstein's commercial sex trafficking, the JP Morgan's officers and employees (including Staley) advanced in their careers at JP Morgan and received financial benefits therefrom by securing the JP Morgan-Epstein relationship.

383.  Facilitating and covering up Epstein's sexual trafficking and

misconduct was a means of obtaining economic success and promotion within the JP Morgan hierarchy.

384.   JP Morgan's knowing and intentional conduct has caused Jane Doe 1 and the other Members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

385.   JP Morgan's knowing and intentional conduct has caused Jane Doe 1 and the other Members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

386.   This case does not involve mere fraud.  Instead, JP Morgan's criminal conduct in violating the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  JP Morgan's criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  JP Morgan's criminal conduct was directed specifically at Jane Doe 1 and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

387.   JP Morgan's outrageous and intentional conduct in this case is part of a pattern and practice of JP Morgan profiting by undertaking illegal "high risk, high

reward" clients.

388.   By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, JP Morgan is liable to Jane Doe 1 and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

389.   By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, JP Morgan is liable to Jane Doe 1 and other members of the Class for punitive damages.

## COUNT VI
## PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(1), 1595

390.   Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 285, as if fully set forth in this Count.

391.   Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

392.   JP Morgan knowingly and intentionally, through various means, participated in, perpetrated, assisted, supported, facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

393.   Among other things, JP Morgan knowingly and intentionally, through various means, recruited, enticed, provided, obtained, advertised, and solicited by various means Jane Doe 1, as well as other Class Members, knowing that Epstein

103

would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe 1, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

394.  JP Morgan and its officers and employees (including Staley) had actual knowledge that they were perpetrating and facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe 1 as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

395.  Despite such knowledge, JP Morgan intentionally paid for, facilitated, perpetrated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which JP Morgan knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe 1, as well as other Class Members, to engage in commercial sex acts.

396.  As part of perpetrating TVPA violations and enticing and recruiting victims, between on or about 2000 and August 2013, JP Morgan concealed its delivery of vast sums of cash to Epstein and his associates.

397.  As part of perpetrating TVPA violations, JP Morgan also willfully failed to file required SARs with the federal government.

398.  JP Morgan's affirmative conduct was committed knowing, and in

reckless disregard of the facts, that Epstein would use cash and the financial support provided by JP Morgan as a means of defrauding, forcing, and coercing sex acts from Jane Doe 1 as well as other Class Members. JP Morgan's conduct was outrageous and intentional.

399.  JP Morgan's knowing and intentional conduct has caused Jane Doe 1 and the other Class Members serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

400.  JP Morgan's knowing and intentional conduct has caused Jane Doe 1 and the other Members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

401.  This case does not involve mere fraud. Instead, JP Morgan's criminal conduct in perpetrating TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. JP Morgan's criminal conduct (including Staley conduct on behalf of JP Morgan) also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. JP Morgan's criminal conduct was directed specifically at Jane Doe 1 and other members of the Class, who were the victims of Epstein's sexual abuse and sex-

trafficking organization.

402. JP Morgan's outrageous and intentional conduct in this case is part of a pattern and practice of JP Morgan profiting by undertaking illegal and "high risk, high reward" clients.

403. By virtue of its knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, JP Morgan is liable to Jane Doe 1 and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

404. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, JP Morgan is liable to Jane Doe 1 and other members of the Class for punitive damages.

## COUNT VII
### AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595

405. Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 285, as if fully set forth in this Count.

406. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

407. Acting through its officers and employees (including Staley), JP Morgan aided, abetted, and induced Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

106

408.   Under 18 U.S.C. § 2, JP Morgan is punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when it aided, abetted, procured, and induced Epstein's sex-trafficking venture and sex trafficking of Jane Doe 1, as well as other Class Members.

409.   Under 18 U.S.C. § 2, JP Morgan committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, and inducing Epstein's and his conspirators sex-trafficking venture and sex trafficking of Jane Doe 1, as well as other Class Members.  As a consequence, Jane Doe 1, as well as other members of the Class, are victims of JP Morgan's criminally aiding, abetting, and inducing Epstein's violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2). These actions were in and affecting interstate and foreign commerce.

410.   The crimes that JP Morgan aided and abetted are (1) Epstein's perpetrating of coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(1), and (2) Epstein's co-conspirators' knowingly benefitting from coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(2). These crimes were in and affecting interstate and foreign commerce.

411.   Epstein's co-conspirators benefitted financially and received things of value from their participation in the Epstein sex-trafficking venture, including payments and other compensation from Epstein. The co-conspirators who benefitted

107

financially include Ghislaine Maxwell, Lesley Groff, Sarah Kellen, Adriana Ross, and Nadia Marcinkova.

412.   Acting through its officers and employees (including Staley), JP Morgan itself directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing a sex-trafficking venture and the sex trafficking of Jane Doe 1, as well as other Class Members.  JP Morgan itself directly violated Chapter 77 by committing and perpetrating these violations.

413.   Among other things, JP Morgan aided, abetted, and induced Epstein's sex-trafficking venture and sex trafficking of Jane Doe 1, as well as other Class Members, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe 1, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

414.   By aiding, abetting, and inducing Epstein's sex-trafficking venture and sex trafficking of Jane Doe 1, as well as other Class Members, JP Morgan knowingly benefited, both financially and by receiving things of value, from participating in Epstein's sex-trafficking venture.

415.   JP Morgan and its officers and employees had actual knowledge that they were aiding, abetting, and inducing Epstein's sexual abuse and sex trafficking

conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe 1 as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion. JP Morgan knew, and should have known, that Epstein had engaged in acts in violation of the TVPA.

416. Despite such knowledge, JP Morgan intentionally paid for and aided, abetted, procured, and induced Epstein's and his co-conspirators violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations of those laws under 18 U.S.C. § 2. JP Morgan knew, and acted in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe 1, as well as other Class Members, to engage in commercial sex acts.

417. JP Morgan's affirmative conduct of aiding, abetting, procuring, and inducing Epstein's and his co-conspirators' violations was committed knowingly, and in reckless disregard of the facts, that Epstein would use cash and financial supported provided by JP Morgan as a means of defrauding, forcing, and coercing sex acts from Jane Doe 1 as well as other Class Members. JP Morgan's conduct was outrageous and intentional.

418. Acting within this District and in attempting to further the Epstein sex-trafficking venture, after various times between about 1998 and 2013, JP Morgan knowingly and intentionally took substantial and significant steps to aid and abet

Epstein's sex trafficking venture, including opened various brokerage accounts for Epstein and Epstein-related individuals and entities. These accounts were in and affecting interstate and foreign commerce

419.   JP Morgan's knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Jane Doe 1 and the other Class Members serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

420.   JP Morgan's knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Jane Doe 1 and the other Class Members harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

421.   This case does not involve mere fraud. Instead, JP Morgan's criminal conduct in aiding, abetting, and inducing Epstein's TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  JP Morgan's criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  JP Morgan's criminal conduct was directed specifically at Jane Doe 1 and other members of the Class, who

were the victims of Epstein's sexual abuse and sex trafficking organization.

422.  JP Morgan's outrageous and intentional conduct in this case is part of a pattern and practice of JP Morgan profiting by undertaking illegal "high risk, high reward" clients.

423.  By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, JP Morgan is liable to Jane Doe 1 and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

424.  By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, JP Morgan is liable to Jane Doe 1 and other members of the Class for punitive damages.

## COUNT VIII
### CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(c), 1591, 1595

425.  Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 285, as if fully set forth in this Count.

426.  Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

427.  JP Morgan intentionally conspired with others, including Epstein and his other co-conspirators, by agreement and understanding, to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2) & 1591(d), and to further Epstein's sex-trafficking venture to coerce commercial sex acts from Jane Doe 1 and other Class Members, all in

violation of 18 U.S.C. § 1594(c). JP Morgan officers and employees (*e.g.*, Staley) directly conspired with Epstein himself to further the sex-trafficking venture.

428.   JP Morgan's conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and JP Morgan thereby violated Chapter 77, Title 18.  JP Morgan's conspiracy directly, proximately, and foreseeably harmed Jane Doe 1, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways.  JP Morgan's conspiracy victimized Jane Doe 1 and the other members of the Class.

429.   JP Morgan's conspiracy to violate 18 U.S.C. 1591(d) was forbidden by 18 U.S.C. § 1594(c), and JP Morgan thereby violated Chapter 77, Title 18.  JP Morgan's conspiracy directly, proximately, and foreseeably harmed Jane Doe 1, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways.  JP Morgan's conspiracy victimized Jane Doe 1 and the other Members of the Class.

430.   JP Morgan conspired with Epstein and his other co-conspirators to further the Epstein sex-trafficking venture and with the purpose of facilitating Epstein's illegal sex trafficking.  JP Morgan had actual knowledge of Epstein's sex-trafficking venture.  JP Morgan acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2), that is, with consciousness of the nature of Epstein's sex-trafficking venture and with the specific intent to further venture.  JP Morgan and

112

Epstein had a meeting of the minds as to the essential nature of the plan.

431.   JP Morgan's conspiracy with Epstein was part of its participation in his sex-trafficking venture.  Without JP Morgan agreeing to facilitate the venture (by, for example, conspiring to keep the existence of cash disbursals secret), Epstein would not have been a position to move forward with his sex-trafficking venture and to recruit and entice victims of the venture.

432.   JP Morgan also conspired with Epstein and his other co-conspirators to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d).  The conspiracy included an agreement to keep Epstein's sex-trafficking venture secret or, at least, concealed to the greatest extent possible.  Among the means for keeping the venture secret were paying for the commercial sex acts in cash, structuring cash withdrawals in a way to avoid detection, and JP Morgan's failing to timely file SARs of Epstein's suspicious activities.

433.   Further actions regarding JP Morgan's conspiracy to obstruct TVPA enforcement are outlined in Count X (obstruction) below in paragraph 472-86, which are hereby incorporated by reference as if set forth in full in this Count.

434.   Within this District, JP Morgan intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating

113

the recruiting, enticing, coercing, harboring, transporting, and inducing and forcibly causing Jane Doe 1 and other Class Members to engage in commercial sex acts, through providing financial support for the Epstein sex-trafficking venture. A number of those acts were committed by JP Morgan's officer, Jes Staley, acting within the actual and apparent scope of his employment to further JP Morgan's interests.

435. Among the many overt acts intentionally committed by JP Morgan in furtherance of the sex-trafficking venture were creating and maintaining a special and unusual financial relationship between JP Morgan and Epstein within this District designed to facilitate Epstein's sex-trafficking. The relationship went far beyond providing routine banking opportunities.

436. Acting within this District and in furtherance of the Epstein sex-trafficking venture, on or about August 19, 2013, JP Morgan opened various brokerage accounts for Epstein-related companies. JP Morgan knew, and should have known, that opening these accounts would facilitate Epstein's coercive sex trafficking.

437. In furtherance of the Epstein sex-trafficking venture, between about 200 and August 2013, JP Morgan opened numerous financial accounts for Epstein, his related entities, and associates. The accounts were in and affecting interstate and foreign commerce. These accounts were opened within this District.

114

438.    In furtherance of the Epstein sex-trafficking venture, between about 2000 and August 2013 and following, JP Morgan concealed its delivery of vast sums of cash to Epstein and his associates.  Among its affirmative acts of concealment, JP Morgan willfully failed to timely file required SARs with the federal government.

439.    JP Morgan deliberately and purposely omitted to timely file appropriate SARs about Epstein's cash transactions, wrongful omissions that were actions in furtherance of its conspiracy.

440.    JP Morgan's actions in furtherance of Epstein's conspiracy were intertwined with Epstein's sex-trafficking venture, as the funding for the sex-trafficking venture (and particularly cash for the venture) were essential tools for Epstein to commit coercive commercial sex acts.

441.    It was part of the conspiracy that JP Morgan would financially benefit from providing financial support for the Epstein sex-trafficking venture.  JP Morgan did financially benefit from its participation in the venture, including receiving valuable deposits and business opportunities from Epstein.

442.    JP Morgan's participation in furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, JP Morgan intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Jane Doe 1 and other Class Members through its affirmative and overt acts supporting Epstein. JP Morgan knew, and was in reckless disregard of the fact, that means of

115

force, threats of force, fraud, coercion, and a combination of such means would be used by Epstein and his other co-conspirators to cause Jane Doe 1 and other Class Members to engage in commercial sex acts.

443. JP Morgan knew, acted in reckless disregard of the fact, and should have known, that its conspiracy would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe 1 and other Class Members.

444. The conspiracy that JP Morgan joined had specific knowledge that Jane Doe 1, as well as other Members of the Class, were being coercively sex trafficked by Epstein. The conspiracy's knowledge extended to the names of Epstein's victims, because Epstein and his co-conspirators knew the names of the victims, including Jane Doe 1's name. JP Morgan, through its officer Jes Staley, also new many of the names of the victims.

445. JP Morgan conspired to violate 18 U.S.C. § 1591(a) with Epstein and through its affirmative acts and substantial support to Epstein committed, perpetrated, and directly and proximately caused Jane Doe 1 and other Class Members to engage in commercial sex acts through means of force, threats of force, fraud, coercion, and a combination of such means.

446. In addition to acting with knowledge that they were conspiring to support the Epstein sex-trafficking venture, JP Morgan benefited financially from

116

conspiring to participate in the Epstein sex-trafficking venture, which JP Morgan knew and should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2), as well as obstruction of the enforcement of the TVPA in violation of 18 U.S.C. § 1591(d).

447. JP Morgan's conspiracy has caused Jane Doe 1 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the conspiracy and the harm resulting from conspiracy was foreseeable.

448. JP Morgan's conspiracy has caused Jane Doe 1 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

449. This case does not involve mere fraud. Instead, JP Morgan's criminal conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. JP Morgan's conspiracy also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. JP Morgan's conspiracy was directed specifically at Jane Doe 1 and other members of the Class, who were the victims of Epstein's sex trafficking organization.

117

450.    By virtue of these violations of 18 U.S.C. § 1594(c) JP Morgan is liable to Jane Doe 1 and the other Members of the Class for the damages they sustained and reasonable attorneys' fees under 18 U.S.C. § 1595.

451.    By virtue of its intentional and outrageous conspiracy to violate 18 U.S.C. §§ 1594(c), JP Morgan is liable to Jane Doe 1 and other members of the Class for punitive damages under 18 U.S.C. § 1595.

## COUNT IX
## ATTEMPT TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(a), 1591, 1595

452.    Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 285, as if fully set forth in this Count.

453.    Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

454.    JP Morgan intentionally attempted to violate 18 U.S.C. § 1591(a)(1) and (a)(2), and to further Epstein's sex-trafficking venture to coerce commercial sex acts from Jane Doe 1 and other Class Members, all in violation of 18 U.S.C. § 1594(a).

455.    JP Morgan officers and employees, including Staley, deliberately took substantial steps to attempt to violate 18 U.S.C. § 1591(a)(1) & (a)(2) within this District.

456.    JP Morgan deliberately took substantial steps toward attempting to

118

violate 18 U.S.C. § 1591(a)(1) & (a)(2), by providing substantial financial support for the Epstein sex-trafficking venture. The financial support included hundreds of thousands of dollars in cash.

457. Among the many substantial steps taken by JP Morgan to deliberately attempt to violate 18 U.S.C. § 1591(a)(1) & (a)(2) were creating a special and unusual financial relationship between JP Morgan and Epstein within this District that was designed to, and did, facilitate Epstein's sex-trafficking venture and the sex trafficking of Jane Doe 1, as well as other Members of the Class.

458. In attempting to further the Epstein sex-trafficking venture, between about 2000 and August 2013, JP Morgan opened numerous accounts for Epstein, his related entities, and associates. The accounts were in and affecting interstate and foreign commerce. JP Morgan opened the accounts within this District for the purpose of attempting to facilitate Epstein's sex-trafficking venture.

459. In opening numerous accounts for Epstein, his related entities, and associates, JP Morgan took a substantial step toward benefitting from participating in Epstein's sex-trafficking venture. JP Morgan also took other substantial, concrete steps toward benefitting from the venture.

460. It was part of the attempt to violate 18 U.S.C. 1591(a) that JP Morgan would financially benefit from participating in and providing financial support for the Epstein sex-trafficking venture. JP Morgan did financially benefit from its

participation in the venture, including receiving valuable deposits from Epstein and Epstein-related entities into JP Morgan.

461.   JP Morgan's attempt to violate the TVPA by furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, JP Morgan intentionally and willfully caused Epstein's commission of sexual abuse and commercial sex acts with Jane Doe 1 and other Class Members through its affirmative and overt acts supporting Epstein.

462.   JP Morgan knew and acted in reckless disregard of the fact, that its acts and conduct attempting to support and facilitate Epstein would lead to sexual abuse and unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe 1 and other Class Members.

463.   In addition to acting intentionally and with knowledge that they were supporting the Epstein sex-trafficking venture, JP Morgan benefited financially from attempting to participate in the Epstein sex-trafficking venture which JP Morgan should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2).

464.   This case does not involve mere fraud.  Instead, JP Morgan's criminal conduct in attempting to violate the TVPA was outrageous and intentional, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization.  JP Morgan's criminal attempts also evinced a

high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. JP Morgan's criminal attempt was directed specifically at Jane Doe 1 and other members of the Class, who were the victims of Epstein's sex trafficking organization.

465. JP Morgan's conduct has caused Jane Doe 1 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. This harm was a direct, proximate, and foreseeable result of JP Morgan's attempt in violation of 18 U.S.C. § 1594(a).

466. By virtue of these violations of 18 U.S.C. § 1594(a), JP Morgan is liable to Jane Doe 1 and the other Members of the Class for the damages they sustained and reasonable attorneys' fees under 18 U.S.C. § 1595.

467. By virtue of its intentional and outrageous attempt to violate 18 U.S.C. § 1594(a), JP Morgan is liable to Jane Doe 1 and other members of the Class for punitive damages under 18 U.S.C. § 1595.

## COUNT X
### OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. § 1591(d)

468. Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 285, as if fully set forth in this Count.

469. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

470.   JP Morgan and its officers and employees (including Staley) knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d).  This activity is hereinafter referred to collectively simply as "obstruction."

471.   JP Morgan's obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and JP Morgan thereby violated Chapter 77, Title 18.  JP Morgan's obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Jane Doe 1, as well as other members of the Class, by directly resulting in them coercively being caused to engage in commercial sex acts and in other ways.

472.   As outlined above, the United States Department of Justice (including the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 8, 2019.  On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. The federal criminal investigation of Maxwell included investigation of possible

122

violations of the TVPA.

473. By providing financing for Epstein's sex trafficking organization from about 2000 through about August 2013, and concealing its actions thereafter, JP Morgan obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein. To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of those charges was delayed by JP Morgan's actions. Because of that delay, Jane Doe 1 as well as other members of the Class, were coercively caused to engage in commercial sex acts.

474. As one example of how JP Morgan obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, JP Morgan provided large amounts of cash to Epstein and his associates so that the coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies. JP Morgan provided large amounts of cash to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

475. As another example of how JP Morgan obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, JP Morgan did not follow AML and anti-structuring reporting requirements found in the Banking Secrecy Act and other laws. These requirements included an

obligation that JP Morgan would review transactions in the Epstein's JP Morgan accounts for a determination of whether they involved suspicious transactions. If JP Morgan had observed these requirement imposed by law, then it would have prevented many of the subsequent transactions committed by the Epstein sex-trafficking venture. JP Morgan knowingly did not follow these requirements because it knew that doing so would have prevented Epstein's secret cash transactions that were necessary to his sex-trafficking operation escaping knowledge of federal investigative and prosecuting agencies. Without JP Morgan's cash, Jane Doe 1, as well as other members of the Class, would not have been coercively forced to engage in commercial sex act.

476. As another example of how JP Morgan obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, JP Morgan failed to timely file with the federal government the required SARs that financial institutions must file with FinCEN whenever there is a suspected case of money laundering or fraud. Timely filing of these reports is required by the Bank Secrecy Act and related laws and regulations. These reports are tools that the federal government uses to detect and prosecute, among other illegal activities, sex trafficking in violation of the TVPA. By failing to timely file the required SARs regarding Epstein's cash transactions, JP Morgan obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA

124

by concealing from the federal government's attention Epstein's cash transaction in aid of sex trafficking.

477.   JP Morgan can disclose its failure to file appropriate SARs without disclosing the existence of a SAR.  JP Morgan is not protected from liability for failure to file a required SAR.

478.   JP Morgan's failure to timely file SARs about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

479.   If JP Morgan had filed timely required SARs about Epstein's sex-trafficking venture with the federal government, the appropriate federal agencies would have been well positioned to investigate Epstein's sex-trafficking venture's TVPA violations.  JP Morgan's failure to timely file the required SARs obstructed the federal government's ability to investigate those TVPA violations, including violations harming Jane Doe 1 and other Class Members.  If JP Morgan had timely filed the required SARs, it would have prevented the continuation of Epstein's sex trafficking venture, which required the ability to secretly use cash to payoff victims.

480.   By providing large amounts of cash to Epstein and his associates, JP Morgan intended and knew that Epstein's coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies for some period of time.  JP Morgan provided large amounts of cash to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal

125

liability for violating the TVPA.

481.  JP Morgan's obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly.  For example, JP Morgan knew that Epstein was high risk—specifically, high risk to violate the TVPA through continuing criminal sex trafficking activities.

482.  JP Morgan was well aware that Epstein had pleaded guilty and served prison time for engaging in sex with a minor—a crime closely connected with sex trafficking in violation of the TVPA.  JP Morgan was also well aware that there were public allegations that his illegal conduct was facilitated by several named co-conspirators.  But JP Morgan concealed from the federal government its numerous cash payments to those co-conspirators. JP Morgan continued its affirmative conduct of providing cash to Epstein so that he could make those cash payments to his co-conspirators with knowledge that such cash transaction did not produce a clear paper trail.  JP Morgan's intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

483.  JP Morgan's relationship with Epstein in providing to his sex-trafficking venture with vast sums of cash each year went far beyond a normal (and lawful) banking relationship.  JP Morgan knew, and intended, that its relationship with Epstein would go far beyond a normal banking relationship.  JP Morgan knew

126

that its decision to beyond a normal banking relationship with Epstein obstructed the ability of federal law enforcement and prosecuting agencies to enforce the TVPA.

484.   JP Morgan's obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful and, therefore, JP Morgan intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Jane Doe 1 and other Class Members through its obstruction supporting the concealment of Epstein's sex-trafficking venture. JP Morgan knew that Epstein and his other co-conspirators would use means of force, threats of force fraud, coercion, and a combination of such means to cause Jane Doe 1 and Class Members to engage in commercial sex acts.

485.   JP Morgan knew, acted in reckless disregard of the fact, and should have known, that its obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe 1 and other Class Members.

486.   JP Morgan's obstruction has caused Jane Doe 1 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.  That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

487.   JP Morgan's obstruction has caused Jane Doe 1 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of

the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

488.   This case does not involve mere fraud.  Instead, JP Morgan's criminal conduct in obstructing enforcement of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  JP Morgan's obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  JP Morgan's obstruction was directed specifically at Jane Doe 1 and other members of the Class, who were the victims of Epstein's sex trafficking organization.

489.   By virtue of these violations of 18 U.S.C. § 1591(d), JP Morgan is liable to Jane Doe 1 and the other Members of the Class for the damages they sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. JP Morgan perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

490.   By virtue of its intentional and outrageous obstruction to prevent enforcement of the TVPA, in violation 18 U.S.C. § 1591(d), JP Morgan is liable to Jane Doe 1 and other members of the Class for punitive damages by operation of 18 U.S.C. § 1595.

## VIII. REQUEST FOR RELIEF

128

Jane Doe 1 respectfully requests that the Court enter judgment in her favor, and against JP Morgan, as follows:

a. That the Court certify the Class, name Jane Doe 1 as Class Representative, and appoint her lawyers as Class Counsel;

b. That the Court award Plaintiff and the other members of the Class compensatory, consequential, general, nominal, and punitive damages against Defendant in an amount to be determined at trial;

c. That the Court award punitive and exemplary damages against Defendant in an amount to be determined at trial;

d. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e. That the Court award pre- and post-judgment interest at the maximum legal rate; and

f. That the Court grant all such other and further relief as it deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: January 13, 2023

Respectfully Submitted,
EDWARDS POTTINGER, LLC

By: */s/ Bradley Edwards*

129

Bradley J. Edwards
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
(954)-524-2820
Fax: (954)-524-2822
Email: brad@epllc.com

EDWARDS POTTINGER
Brittany N. Henderson
1501 Broadway
Floor 12
New York, NY
(954)-524-2820
Fax: (954)-524-2820
Email: brittany@epllc.com

David Boies
Boies Schiller Flexner LLP
55 Hudson Yards
New York, New York
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
E-mail: dboies@bsfllp.com

Sigrid McCawley
*Pro Hac Vice*
Boies Schiller Flexner LLP
401 E. Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: smccawley@bsfllp.com