**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case Number: 1:22-cv-10904-JSR |
| | ) |
| JPMORGAN CHASE BANK, N.A. | ) |
| | ) |
| Defendant/Third-Party Plaintiff. | ) |
| _____ | ) |
| | ) |
| JPMORGAN CHASE BANK, N.A. | ) |
| | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JAMES EDWARD STALEY | ) |
| | ) |
| Third-Party Defendant. | ) |
| _____ | ) |

**GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS'**
**REPLY MEMORANDUM IN SUPPORT OF MOTION TO**
**EXCLUDE EXPERT OPINIONS OF KIMBERLY MEHLMAN-**
**OROZCO, JOSEPH FONSECA, AND CARLYN IRWIN**

## <u>TABLE OF CONTENTS</u>

ARGUMENT ...................................................................................................................... 1

I.   Dr. Mehlman-Orozco's Testimony Should Be Stricken in Whole or Significant Part ....... 1

A. Dr. Mehlman-Orozco Is Far From "Eminently Qualified." ....................................... 1

B. Dr. Mehlman-Orozco's Opinions Are Outside Her Proposed Expertise ..................... 2

C. Dr. Mehlman-Orozco Offers Irrelevant Opinions That Contradict the Law. .............. 3

II.  Joseph Fonseca is Not Qualified and Lacks Factual Basis to Opine on How Federal Law
Enforcement Would Have Used ███████████████████ ....................... 5

III. The Court Should Exclude Carlyn Irwin's Opinions. ......................................................... 9

A. Ms. Irwin's EDC-Related Opinions are Irrelevant. ..................................................... 9

B. Ms. Irwin's Qualifications Do Not Match the Substance of Her Opinions. ................ 10

C. Ms. Irwin May Not Opine as to Motive. ..................................................................... 12

CONCLUSION .................................................................................................................... 12

# TABLE OF AUTHORITIES

## Cases

*Bazile v. City of N.Y.*,
  215 F. Supp. 2d 354 (S.D.N.Y. 2002) ........................................................................ 6

*Coach, Inc. v. Kmart Corps.*,
  756 F. Supp. 2d 421 (S.D.N.Y. 2010) ....................................................................... 9

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ............................................................................................... 7, 11

*Highland Cap. Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) ..................................................................... 11

*Highland Cap. Mgmt., L.P. v. Schneider*,
  551 F. Supp. 2d 173 (S.D.N.Y. 2008) ..................................................................... 12

*In re Rezulin Prod. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..................................................................... 12

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................ 2, 11

*SEC v. Collector's Coffee Inc.*,
  552 F. Supp. 3d 427 (S.D.N.Y. 2021) ..................................................................... 10

*Stagl v. Delta Air Lines, Inc.*,
  117 F.3d 76 (2d Cir. 1997) ........................................................................................ 6

*State of N.Y. v. UPS, Inc.*,
  160 F. Supp. 3d 629 (S.D.N.Y. 2016) ................................................................. 9, 10

*Taylor v. Evans*,
  1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) ............................................................ 12

*Town of Halfmoon v. General Electric Co.*,
  2016 WL 866343 (S.D.N.Y. Mar. 3, 2016) ............................................................ 12

*U.S. v. Philip Morris Inc.*,
  300 F. Supp. 2d 61 (D.D.C. 2004) ..................................................................... 9, 10

*United States v. Bhula*,
  2022 WL 17618483 (D. N.M. Dec. 13, 2022) .......................................................... 2

*United States v. Woods*,
  2020 WL 6508909 (D.N.M. Nov. 5, 2020) ............................................................... 2

*United States v. Xing*,
  No. 2:20-cr-00228-FMO (C.D. Cal. May 23, 2023)............................................................... 2

*Washington v. Kellwood Co.*,
  105 F. Supp. 2d 293 (S.D.N.Y. 2015) ........................................................................................ 6

*Wechsler v. Hunt Health Sys., Ltd.*,
  381 F. Supp. 2d 135 (S.D.N.Y. 2003) ....................................................................................... 6

## ARGUMENT

I.     **Dr. Mehlman-Orozco's Testimony Should Be Stricken in Whole or Significant Part.**

      A.      **Dr. Mehlman-Orozco Is Far From "Eminently Qualified."**

JPMorgan's attempt to inflate Dr. Mehlman-Orozco's credentials crosses the line. Dr. Mehlman-Orozco is not offering "expertise built over a lifetime" or "leverag[ing] nearly two decades of experience." Dkt. 300 ("Opp.") at 6, 1. She graduated with her Ph.D. in criminology in August 2012. Declaration of Paige Boggs ("Boggs Decl."), Ex. 9 (Dep. excerpts) at 51:6-9. To the extent she has experience in human trafficking beyond the two graduate-level classes she identified, even JPMorgan concedes it occurred after obtaining her doctorate degree. Opp. at 2-5.

JPMorgan's description of Dr. Mehlman-Orozco's post-graduate work is similarly overblown. For example, JPMorgan highlights that she "served as a human trafficking subject matter expert for the RAND Corporation" and "published research on human trafficking in peer-reviewed journals." Opp. at 3. But Dr. Mehlman-Orozco testified that she only worked as a part-time subcontractor for Rand Corporation to provide grant assistance. Boggs Decl., Ex. 9 at 41:18-43:15, 63:6-64:7. And JPMorgan also fails to acknowledge that two of her four peer-reviewed articles ("Identifying Victims of Human Trafficking" and "Human Trafficking: Red Flags for Dental Professionals")—for which Dr. Mehlman-Orozco is listed as the "third author"—are identical articles published under different titles in dentistry journals. Boggs Decl., Ex.9 at 63:6-64:7, 344:7-345:13; Boggs Decl., Ex. 10 ("Identifying Victims of Human Trafficking").

Further, by Dr. Mehlman-Orozco's own admission, writing a book does not make someone a subject matter expert. Her book, "The Jihadi Next Door: How ISIS Is Forcing, Defrauding, and Coercing Your Neighbor into Terrorism," is based on "interviews with convicted terrorists" and "in-depth research" and purports to "provide[] unprecedented information that can be used to actually combat terrorism." Boggs Decl., Ex. 11 ("Red Flags"). Yet, Dr. Mehlman-Orozco

testified that she was "not an expert on terrorism whatsoever." Boggs Decl., Ex. 9 at 64:11-65:4. Likewise, Dr. Mehlman-Orozco's writing a book that includes interviews with human traffickers and victims does not make her a human trafficking expert.

Lastly, Dr. Mehlman-Orozco's prior expert testimony and trainings to law enforcement are not sufficient to make her an expert. Opp. at 4-5. The question before this Court is what education, training, or experience **qualifies** Dr. Mehlman-Orozco to provide expert advice—not how many times she has purportedly given expert advice. *See, e.g., Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 615 (S.D.N.Y. 2007) (prior "accept[ance] as an expert witness . . . would not be a sufficient indication of qualifications for a court exercising its gatekeeper function under *Daubert*."). Not surprisingly, as discussed above, JPMorgan's response to this question is quite thin. The Court should therefore exclude Dr. Mehlman-Orozco's testimony.

### B.   Dr. Mehlman-Orozco's Opinions Are Outside Her Proposed Expertise.

Dr. Mehlman-Orozco's proffered testimony exceeds the scope of her proposed expertise. In the cases JPMorgan cites—all criminal cases in which Dr. Mehlman-Orozco testified on behalf of human trafficking victims—Dr. Mehlman-Orozco's testimony was far narrower than the testimony she intends to offer here. *See* Opp. at 4-5 (citing *People v. Abdur-Razzaq*, 77 N.Y.S.3d 842, 843, 846 (N.Y. Sup. Ct. 2018) (proffered testimony related to "trauma bonding between sex traffickers and their victims and the coercive control techniques utilized by traffickers"); *United States v. Woods*, 2020 WL 6508909, at *2 (D.N.M. Nov. 5, 2020) (proffered testimony related to: (1) the clandestine nature of human trafficking crimes; (2) the trauma bonds formed between human trafficking victims; and (3) trafficking victims' various reactions to trauma bonding with their captors); *United States v. Bhula*, 2022 WL 17618483, at *3 (D. N.M. Dec. 13, 2022) (same); *United States v. Xing*, No. 2:20-cr-00228-FMO (C.D. Cal. May 23, 2023), Dkt. 549 at 5 (proffered

testimony related to "the areas of sex trafficking and prostitution").  JPMorgan does not identify a single case where Dr. Mehlman-Orozco testified about human trafficking in the financial industry. Further, JPMorgan concedes that Dr. Mehlman-Orozco does not have expertise in "banking regulations."  Opp. at 5.

JPMorgan incorrectly argues that Dr. Mehlman-Orozco's "extensive experience consulting with law enforcement" qualifies her to testify about law enforcement investigations. When asked about her involvement with law enforcement investigations, Dr. Mehlman-Orozco described calling the police after witnessing suspected incidents of human trafficking.  Boggs Decl., Ex. 9 at 137:6-141:22.  For example, Dr. Mehlman-Orozco called the police when "through happenstance" she witnessed a human trafficker throw his victim out of a car.  *Id*. at 137:24-139:6. She also reported her nail salon for suspected human trafficking, which did not result in the filing of any criminal charges.  *Id*. at 396:21-400:7.  Instead, the business filed a two-million-dollar defamation lawsuit against Dr. Mehlman-Orozco.  *Id*.  These experiences do not qualify her to testify about the inner workings of human trafficking investigations—particularly ones that involve banking laws and practices and complex financial analysis.  Absent genuine, relevant training and experience, Dr. Mehlman-Orozco should not be permitted to opine about banking regulations and industry standards or the importance of Suspicious Activity Reports ("SARs") or Currency Transaction Reports ("CTRs") to government enforcement actions.

## C.    Dr. Mehlman-Orozco Offers Irrelevant Opinions That Contradict the Law.

JPMorgan attempts to distance itself from Dr. Mehlman-Orozco's irrelevant opinions by claiming they relate to "peripheral issues."  Opp. at 6.  If true, JPMorgan will not be prejudiced by the Court striking these opinions.  First, Dr. Mehlman-Orozco does not quibble, as JPMorgan suggests, about whether certain minors who engage in commercial sex meet the technical

3

definition of sex trafficking under the TVPA.  Opp. at 6-8.  She opined about the motivations of

minors who engage in sex trafficking and concluded that some choose—without being

"exploited"—to engage in commercial sex for money and others engage in "survival sex," which

she defines as an area "between trafficking and consent."  Dkt. 290-1 (Mehlman-Orozco Rpt.) at

67.  JPMorgan spends more than a page trying to walk back these comments.  Opp. at 6-8.  But it

cannot.  There is no sliding scale for sexual consent under the law.  And minors cannot consent to

sexual activity.  JPMorgan and Dr. Mehlman-Orozco try to confuse the issue by arguing minors

are sometimes treated as criminals rather than victims.  Opp. at 7.  That has nothing to do with the

facts of this case or how sex trafficking is defined under the TVPA.

       Second, the Government is not suggesting that knowledge is not required under the TVPA.

Opp. at 8.  But it rejects the overly narrow knowledge standard Mehlman-Orozco seeks to impose

as both inconsistent with law and outside the scope of proper expert opinion.  This case involves

far more than "subtle 'red flags.'"  Dkt. 290-1 at 51.  In 2006, JPMorgan's top executives knew

Epstein was arrested for engaging in prostitution with a minor.  Dkt. 238-22 (Staley to Erdoes

email) at 1.  In 2010—years before JPMorgan terminated its relationship with Epstein—

JPMorgan's top executives discussed Epstein may be under investigation for "child trafficking"

and "settled several lawsuits by teens who say they were lured to his palm beach mansion for

massages or [sex]," Dkt. 240-4 (Erdoes to Staley email) at 1, and observed a persistent pattern of

cash withdrawals, consistent with that conduct, Dkt. 225-56 (Amador Expert Rpt.) at 24-30.  Dr.

Mehlman-Orozco ignores these facts.

       Third, JPMorgan asserts that it is offering Dr. Mehlman-Orozco's secondary exploitation

opinion to assess "USVI's own complicity," Opp. at 8-9, despite her testimony that she is not

opining on whether the Government (or anyone) engaged in secondary exploitation and knows

nothing about the Government's investigation.  Boggs Decl., Ex. 9 at 380:14-18, 292:4-293:15.
The USVI's conduct in bringing this statutorily-authorized enforcement action is not at issue and
cannot, in any event, be measured based on unscientific and unfounded musings.  Further, not only
is the Government's conduct irrelevant (and highly disputed, *see* Dkt. 278 (Gov't MSJ Reply) at
11-15, but its motives are not within the appropriate scope of expert testimony.  *See* Dkt. 289
("Gov't Memo. of Law") at 12-13.  For these reasons, Dr. Mehlman-Orozco's irrelevant opinions,
including her opinions that contradict the law, should be stricken.

## II.     Joseph Fonseca is Not Qualified and Lacks Factual Basis to Opine on How Federal Law Enforcement Would Have Used ███████████████████

Mr. Fonseca opines that JPMorgan's █████████████████████████████
████████████████████████████████ would not have led federal law enforcement to
bring earlier or additional charges.  The Government showed how Mr. Fonseca is unqualified and
lacks sufficient factual basis to give these opinions based on his experience in law enforcement
when he did not know what a SAR was until after he retired and JPMorgan retained him or whether
or how other federal agents used the information SARs contain to investigate human trafficking.
*See* Gov't Memo. of Law at 14-23; Dkt. 290-5 (Fonseca Dep. Excerpts) at 123:22-124:3.
JPMorgan's arguments in opposition fail to establish that these opinions are admissible.

On qualification, JPMorgan asserts that "Mr. Fonseca offers his expertise in crimes against
children and sex-trafficking investigations, and on the utility of certain kinds of evidence to those
investigations" and that he "is plainly qualified for that purpose."  Opp. at 10.  He is not.  The
"certain kinds of evidence" JPMorgan references are ████, which are the focus of his opinions.
Dkt. 290-4 (Fonseca Rpt.) at 17, 20, 22.  JPMorgan nonetheless offers two reasons that his lack of
experience with the subject of his opinions is not disqualifying, neither of which has merit.

First, JPMorgan argues that Mr. Fonseca's qualification must be assessed at the general level of trafficking investigation, not based on the investigatory tool he addresses.  Opp. at 12-13 ("USVI offers no support for its granular qualification standard . . . .").  The cases JPMorgan cites, however, simply hold that an expert's knowledge of a general subject *may* encompass specific applications within the general subject area.[1]  They do not excuse an expert's demonstrated lack of experience or knowledge of the matter that is the focus of their opinions.[2]  More apposite is *Bazile v. City of N.Y.*, 215 F. Supp. 2d 354 (S.D.N.Y. 2002), which held that a putative expert with general experience in "supervision of law enforcement personnel" lacked the necessary experience to provide expert opinions on "conducting internal disciplinary investigations" or to assess discriminatory animus in a disciplinary matter.  *Id.* at 365, 381-82.  Here, too, JPMorgan cannot rely solely on Mr. Fonseca's general experience in trafficking investigation when he offers opinions focused on ███████████ without ever having used one and with no prior knowledge of what they are.

Second, seeming to recognize this, JPMorgan tries to make a virtue of Mr. Fonseca's lack of experience with SARs.  Opp. at 14 ("Mr. Fonseca's lack of experience with SARs *is* the point. . . .  Mr. Fonseca's testimony . . . explains to the jury how and why SARs *are not seen as important pieces of information by the FBI* in sex-trafficking investigations.") (second emphasis added).  This

---

[1] *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997) (mechanical engineering expert on interaction between machines and people could opine on safety of airport baggage delivery system despite lack of expertise in airport design); *Washington v. Kellwood Co.*, 105 F. Supp. 2d 293, 308-09 (S.D.N.Y. 2015) (accountant with extensive experience in business valuations is qualified to provide valuation opinion on apparel business despite lack of experience in apparel); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003) (CPA with 17 years' experience reviewing financial documents is qualified to analyze healthcare company's accounts receivable despite lack of experience in healthcare).

[2] *Stagl*, 117 F.3d at 81 ("In some circumstances, . . . a district court may properly conclude that witnesses are insufficiently qualified . . . because their expertise is too general or too deficient.").

"point" is wrong.  Mr. Fonseca cannot show that his lack of experience or knowledge of SARs

reflects an ███████████████████████████ when his knowledge also is limited to his

own experience.  *See* Dkt. 290-5 at 134:16-135:25 ("Q. . . . [Y]ou don't know whether or not

agents in other field offices had success in their investigations utilizing suspicious activity reports;

is that fair? . . .  A. I would have not much idea on that.").  Mr. Fonseca's ignorance of whether or

how other investigators used SARs only underscores that he is unqualified to offer the opinion that

"███████████████████████████████████████████████" Dkt. 290-

4 at 17, ¶ 74.  This testimony should be excluded.

JPMorgan fares no better in trying to construct a factual basis for Mr. Fonseca's opinion

that ████████████████████████████████████████████.

JPMorgan argues that Mr. Fonseca's experience investigating human trafficking without using

SARs *is* a factual basis for this opinion.  Opp. at 15 ("Specifically, he explains that he had worked

on investigations involving crimes against children and sex trafficking as an FBI special agent for

23 years . . . and never *once* used a SAR as evidence of as a lead . . . .") (emphasis in original)

(cleaned up).  This personal experience alone, however, cannot support his opinion about how

federal law enforcement would have acted when he does not know whether or how any other agent

besides himself used this type of information.  Dkt. 290-5 at 118:22-119:3 ("Q. You understand

there are other FBI agents who may have used a different approach in investigating sex trafficking

operations; is that fair?  . . .  A. I have no idea.").[3]

---

[3] JPMorgan tries to obscure this problem by claiming that the Government argues that Mr. Fonseca must "have universal knowledge of what evidence investigators may or may not find useful in every conceivable sex-trafficking case[.]"  Opp. at 14-15.  Not so.  But he must have *some* basis, other than his own say-so, to extrapolate from his personal experience to opinions on federal law enforcement as a whole.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Nor does Mr. Fonseca's discussion of the FBI's "victim-centered" approach to trafficking investigation, Opp. at 15-16, show that █████████████████████████████████ █████████████. This approach makes victim testimony "essential" or "most important" in a trafficking case. Dkt. 290-4 at 5, ¶ 17. It does not render SARs irrelevant or unimportant. *Id.* at 9, ¶ 36 (financial records may independently corroborate victims' testimony); *id.* at 11, ¶ 46 (federal law enforcement used financial records to connect Ghislaine Maxwell to Epstein).

Finally, Mr. Fonseca does not "reliably appl[y]" his experience "to the facts of this case." Opp. at 16. While he spills much ink discussing what little information JPMorgan *did* disclose before 2019, *see id.* at 17-18, he nowhere analyzes the contents of the █████████████ that are the subject of his opinions. The ███████████████████████████████████████████████ ███████████████████████████████████████████████████. Dkt. 221 (Gov't Statement of Undisputed Material Facts) at 118, ¶ 250. █████████████████████ ██████████████████████████████. *Id.* at 16-17, 24, ¶¶ 60-62, 103 (████████████████ █████████████). Mr. Fonseca's experience afforded him no basis to opine on ███████ ███████████████████████████████████████████████████████████ ████████. *See* Boggs Decl., Ex. 12 (Fonseca Dep. excerpts) at 106:14-20 (never worked on case with over 100 victims); *id.* at 110 (never worked on case where victim was paid $30,000). Indeed, he does not analyze or even acknowledge ██████████████████████████████████ anywhere in his report. Instead, he just █████████████████████████ Dkt. 290-4 at 4-6, 17-24.[4] This testimony should be excluded.

---

[4] When questioned on ██████████████, Mr. Fonseca ███████████████████████████████ ████████████████████████████████. Boggs Decl., Ex. 12 at 145:10-16 ("█ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████").

III.    **The Court Should Exclude Carlyn Irwin's Opinions.**

   A.    **Ms. Irwin's EDC-Related Opinions are Irrelevant.**

JPMorgan offers nothing in its opposition to establish the relevance of Ms. Irwin's opinions, all of which relate to JPMorgan's legally deficient affirmative defenses.

JPMorgan relies again entirely on the Court's one-page Order (Dkt. 215) denying the Government's Motion to Strike to claim the Court has already ruled on this issue, but it continues to mischaracterize the Court's ruling.   In particular, JPMorgan ignores: (1) the Court's pronouncement that it was "skeptical that some or all of the defenses will survive judgment" (*id*.); (2) the Court's decision that the defenses "should not be stricken *as a matter of pleading*" (*id.*) (emphasis added); and (3) previously-cited caselaw establishing that denial of a motion to strike does not establish the legal sufficiency of the defenses for purposes of summary judgment.  *See, e.g., State of N.Y. v. UPS, Inc.*, 160 F. Supp. 3d 629, 638 (S.D.N.Y. 2016) (notwithstanding "[d]enial of the motion [to strike] with regard to any defense … The Court may later determine that such defense may not, as a matter of law or fact, be available."); *U.S. v. Philip Morris Inc.*, 300 F. Supp. 2d 61, 68 n.5 (D.D.C. 2004) (prior denial of motion to strike "did not preclude the Government from seeking summary judgment as to any of these same defenses.").  Moreover, JPMorgan's recitation of the standard on a motion to strike cites *only one prong* of the three-prong test, even though all three prongs must be met.  *See, e.g., Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 425-26 (S.D.N.Y. 2010) ("If a court determines that a defense is legally sufficient, the court must next determine whether inclusion of the defense would prejudice the plaintiff.").

Further, JPMorgan's attempt to limit *UPS* and its progeny to situations concerning "a government entity's decision-making as to when and under what circumstances to enforce a statue" misrepresents that decision.  Opp. at 20 (quoting *UPS*, 160 F. Supp. 3d at 640). Two paragraphs later, *UPS* confirms that: "Courts have, in *numerous other instances*, declined to probe into

9

government actors' decision-making in circumstances where the government was acting in the sphere of enforcing public rights in the public interest," making clear that the doctrine extends beyond mere enforcement of statutes.  *UPS*, 160 F. Supp. 3d at 641 (emphasis added); *see also U.S. v. Philip Morris*, 300 F. Supp. 2d at 75 ("When, as here, the Government acts in the public interest the unclean hands doctrine is unavailable as a matter of law.").  As explained in prior briefing, these defenses are not legally cognizable, and Ms. Irwin's opinion is therefore irrelevant.

### B.    Ms. Irwin's Qualifications Do Not Match the Substance of Her Opinions.

JPMorgan offers straw man arguments in attempting to rescue Ms. Irwin's opinions.  The Government does not challenge Ms. Irwin's *bona fides* as an economist.  The problem lies in the fact that JPMorgan hired an economist to offer opinions outside her scope of expertise and to speculate as to the propriety of the EDC's conduct of its business.  Nothing in JPMorgan's Opposition rebuts this point.

Indeed, JPMorgan's description of Ms. Irwin's work confirms that her opinions are unhelpful here. "[E]xpert testimony is inadmissible when it addresses 'lay matters which a jury is capable of understanding and deciding without the expert's help.'"  *SEC v. Collector's Coffee Inc.*, 552 F. Supp. 3d 427, 430-31 (S.D.N.Y. 2021) (quoting *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)).  JPMorgan concedes that Ms. Irwin merely recalculated the Economic Development Commission's ("EDC") cost-benefit ratios, and then proceeded to offer a wide variety of opinions, including "observ[ations of] what transpired"[5] or comparing the ratios to testimony from other witnesses.[6]  None of this employs Ms. Irwin's economic expertise.

---

[5] Dkt. 301-3 (Irwin Dep. Excerpts) at 118:9.
[6] *Id.* at 96:18-21.

These arguments confirm that JPMorgan seeks to use Ms. Irwin to present impermissible *ipse dixit* opinions that are untethered to any economic analysis she performed. *See, e.g., Malletier*, 525 F. Supp. 2d at 642 ("The court does not fulfill its gatekeeper function if it simply accepts the *ipse dixit* of an expert."). Ms. Irwin's "economic" analyses are limited to calculating the total tax benefits awarded (which required mere addition) and recalculating the EDC's cost-benefit ratios (which she refused to characterize as her "own independent" analysis).[7] Yet she continues on to offer expansive opinions that the EDC granted tax benefits "without any clear economic basis," that it didn't "ask[] the appropriate questions," and that the evidence "suggests there is some other reason" for its grant of the benefits, without identifying or demonstrating any methodology for these conclusions. Opp. at 23.

Ms. Irwin concedes that she lacks any expertise or experience in these types of tax benefits. *See* Gov't Memo. of Law at 25-26. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *Joiner*, 522 U.S. at 146. That is precisely the problem here. Ms. Irwin's economic expertise may support her *calculations*, but she may not then offer untethered opinions regarding the propriety of government conduct unrelated to her area of her expertise. She did not design a model to determine the economic impact of the tax benefits; she recreated the EDC's mathematical calculations and then proceeded to parrot counsel's arguments with the imprimatur of an expert. An expert may not "be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence," as JPMorgan seeks to do here. *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005).

---

[7] Dkt. 290-8 (Ackerman Decl., Ex. 8) at 72:10-18.

### C.        Ms. Irwin May Not Opine as to Motive.

Finally, JPMorgan concedes that experts may not testify as to a party's motive, but nevertheless argues that Ms. Irwin may opine that granting of tax benefits "was 'consistent with the possibility that these benefits were granted as part of an improper quid-pro-quo exchange.'" Opp. at 24 (quoting Irwin Report ¶ 7).  She may not.  Such testimony is not only impermissibly speculative, it is an "inference[] about the intent or motive of parties" that "lie[s] outside the bounds of expert testimony." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004).  In *Rezulin*, the court excluded "speculative inferences about intent" that—like Ms. Irwin's here—"improperly … assume[d] the role of advocates for the [party's] case." *Id.* Irwin's "musings as to [the EDC's] motivations would not be admissible if given by any witness—lay or expert." *Taylor v. Evans*, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997).

JPMorgan's cited caselaw does not salvage Ms. Irwin's speculation.  In *Highland Capital Management, L.P. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008), the court permitted the economic expert to testify regarding "industry custom and practice" and "lost business damages," but *precluded* opinions "on a party's state of mind" (like those Ms. Irwin offers here). *Id.* at 182. In *Town of Halfmoon v. General Electric Co.*, 2016 WL 866343 (S.D.N.Y. Mar. 3, 2016), the expert testified as to whether costs were "incurred in response to a threat to human health." *Id.* at *15.  He was not offering rank speculation as to why those costs *may have been* incurred (as Ms. Irwin does here).  The opinion should be excluded.

### CONCLUSION

For the reasons set forth herein and in the Government's moving papers, the Government's Motion to Exclude should be granted.

Dated: August 31, 2023

**ARIEL SMITH, ESQ.**
**ATTORNEY GENERAL**

By counsel,

/s/ *Elizabeth Paige Boggs*

**ELIZABETH PAIGE BOGGS**
Admitted *Pro Hac Vice*
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
pboggs@motleyrice.com

**VENETIA VELAZQUEZ**
Admitted *Pro Hac Vice*
Acting Chief, Civil Division
Virgin Islands Department of Justice
Office of the Attorney General
213 Estate La Reine, RR1 Box 6151
Kingshill, St. Croix
U.S. Virgin Islands 00850
Tel: (340) 773-0295 ext. 202481
venetia.velazquez@doj.vi.gov

**DAVID I. ACKERMAN**
**LINDA SINGER** (Admitted *Pro Hac Vice)*
**MIMI LIU** (Admitted *Pro Hac Vice*)
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 232-5504
dackerman@motleyrice.com
lsinger@motleyrice.com
mliu@motleyrice.com

*Attorneys for Plaintiff Government of the*
*United States Virgin Island*

13