# Exhibit 9

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
     GOVERNMENT OF THE UNITED      )
 3   STATES VIRGIN ISLANDS         )
                                   )
 4        Plaintiff,               )
                                   )
 5   vs.                           ) 1:22-cv-10904-JSR
                                   )
 6   JPMORGAN CHASE BANK, N.A.,    )
                                   )
 7        Defendant/Third-         )
          Party Plaintiff.         )
 8   _____   )
     JPMORGAN CHASE BANK, N.A.     )
 9                                 )
          Third-Party             )
10        Plaintiff,               )
                                   )
11   vs.                           )
                                   )
12   JAMES EDWARD STALEY,          )
                                   )
13        Third-Party             )
          Defendant.               )
14
                  FRIDAY, JUNE 30, 2023
15
        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16   ████████████████████████████████████████████████
17                    - - -
18           Videotaped deposition of Kimberly
     Mehlman-Orozco, Ph.D., held at the offices of
19   WilmerHale, 2100 Pennsylvania Avenue NW,
     Washington, DC, commencing at 8:37 a.m.
20   Eastern, on the above date, before Carrie A.
     Campbell, Registered Diplomate Reporter and
21   Certified Realtime Reporter.
22
23                    - - -
24          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
25              deps@golkow.com
```

Confidential - Pursuant to Protective Order

```
1    the country, and I think she's in Oregon or

2    Washington State now, and just didn't have

3    the time to dedicate to it.

4         Q.    Did Ms. Mahn, did she practice

5    law through Mahn, Mehlman & Associates?

6         A.    She did not.  She had her own

7    law firm.

8         Q.    How much income did you earn

9    through Mahn, Mehlman & Associates?

10        A.    I don't recall.

11        Q.    Was that the majority of your

12   income from 2016 to 2018?

13        A.    I don't believe so.

14        Q.    What do you believe the other

15   sources of income were during that time?

16        A.    I don't remember.  I don't

17   recall.

18        Q.    Prior to Mahn, Mehlman &

19   Associates, you worked for Rand Corporation,

20   correct?

21        A.    I did not work for them, but I

22   did -- like, they subcontracted to me, I

23   think, for writing some grants.  So I wasn't

24   an employee; I was a subcontractor.

25        Q.    And how did you get that work?
```

```
 1          A.      This was a while ago.  My best

 2   recollection is they reached out to me, and

 3   they wanted a subject matter expert on human

 4   trafficking because they did not have

 5   somebody employed with that subject matter

 6   expertise.

 7          Q.      And what does that mean, to be

 8   a subject matter expert for Rand Corporation?

 9   What did you do?

10          A.      Provided my expertise in an

11   advisory capacity on human trafficking

12   related to the grants that they were

13   submitting for, which were related to human

14   trafficking.

15          Q.      So you did grant writing or you

16   advised someone who was actually writing

17   proposals for grants?

18          A.      They had somebody writing the

19   grants.  And I don't remember if I

20   contributed to any of the grant writing, but

21   basically providing them citations,

22   information, issues, limitations, some advice

23   on data collection methods, survey design,

24   statistical analysis, is my best

25   recollection.
```

```
 1                   Again, it was a while ago, but
 2      essentially educating them on the human
 3      trafficking subject and some of the barriers
 4      to successful identification and
 5      intervention, things of that nature.
 6          Q.     Was this subcontracting work
 7      full-time?
 8          A.     No.
 9          Q.     How many hours a week would you
10      spend as a subcontractor for Rand
11      Corporation?
12          A.     I do not remember.
13          Q.     Was it less than 20 hours a
14      week?
15          A.     I don't remember.
16          Q.     Prior to your work
17      subcontracting at the Rand Corporation, you
18      list the Justicia Institute.
19                   Did you found this institute?
20          A.     Yes.
21          Q.     Why did you found it?
22          A.     I honestly don't remember sort
23      of the reasons why I founded it, but I think
24      my recollection is to bridge the gap between
25      policy and action.  There was a huge gap
```

Confidential - Pursuant to Protective Order

1    the coursework in 2009, but I don't think I

2    turned in my master's thesis until, like, the

3    fall of 2009.  So I think the official

4    graduation date is winter of 2010.  Like,

5    January of 2010, something like that.

6            Q.    And what is your graduation

7    date with your doctor of philosophy?

8            A.    August of 2012 is the best of

9    my recollection.

10           Q.    And did you earn your master of

11   arts as part of the overall Ph.D. program at

12   George Mason?

13           A.    Sorry, say that again.

14           Q.    Sure.

15                 The criminology degree at

16   George Mason, the Ph.D. program, did it have

17   an option for you to earn your master's, or

18   were those two totally separate programs?

19           A.    Two totally separate programs.

20   So I applied and completed, I think -- so I

21   applied, completed my bachelor degree.

22   Applied, and I had not yet completed my

23   master's when I applied for the Ph.D. program

24   and was accepted.  But they were -- they had

25   separate -- I mean, I have separate degrees.

Confidential Pursuant to Protective Order

```
 1                 I think this should be a

 2      complete list.

 3          Q.     Are all of these publications

 4      published in peer-review journals?

 5          A.     No.  Clearly not.

 6          Q.     How many of these are published

 7      in peer-review journals?

 8          A.     So on page 90, the Projected

 9      Heros, Self-Perceived Manipulators, that's

10      published in a peer-review journal article.

11      That's one.

12                 I think the two articles, the

13      Mentions of Dental Hygiene and Decisions in

14      Dentistry, I think those are two peer-review

15      journal articles.  So that's three.

16                 The Safe Harbor Legislation for

17      Juvenile Victims of Sex Trafficking on

18      page 91, that's a peer-review journal

19      article.

20                 My book is not a peer-reviewed

21      journal article, but it was reviewed by

22      peers.  So it was reviewed by Louise Shelley.

23      It was reviewed by John Cotton Richmond, who

24      is a former prosecutor.  They provide blurbs,

25      like, on the back.  So it wasn't a
```

Confidential - Pursuant to Protective Order

1    peer-review process, but it's a hybrid

2    academic/commercial press.  So there was, I

3    think, a vetting of the information to some

4    degree.

5              So I'd say four if you're only

6    counting the journal -- four if you're only

7    counting the journal articles.

8         Q.    When you say your "book," do

9    you mean Hidden in Plain Sight?

10        A.    Yes, ma'am.

11        Q.    You wrote another book called

12   The Jihadi Next Door: How ISIS is Forcing,

13   Defrauding and Coercing Your Neighbor into

14   Terrorism, correct?

15        A.    Correct.

16        Q.    Does that book relate to human

17   trafficking?

18        A.    No, it doesn't relate to human

19   trafficking, but it does discuss how the

20   methods of recruitment into organized crime

21   such as terrorism can -- are tangentially

22   similar to methods of recruitment control

23   used by traffickers.

24        Q.    So does the word "trafficker"

25   or "trafficking" appear in your book?

Confidential   Pursuant to Protective Order

```
 1              A.      I do not recall.  I mean, at a
 2      very minimum it might be in the bio about me
 3      because, you know, I'm not an expert on
 4      terrorism whatsoever.
 5              Q.      If you look at page 93 --
 6              A.      Uh-huh.
 7              Q.      -- you list Scholarly
 8      Presentations.
 9              A.      Uh-huh.
10              Q.      These are presentations that
11      you've given; is that correct?
12              A.      Yes, I think so.  Or that I've
13      given alongside somebody else.
14              Q.      And why do you call them
15      scholarly presentations?
16              A.      I think because of the ac -- or
17      the audience is more academic as opposed to
18      general public.
19              Q.      You also have a subject called
20      other presentations.
21                      What's the difference between
22      scholarly presentations and other
23      presentations?
24              A.      I think the other presentations
25      were more for, like, nonacademic audiences
```

Confidential - Pursuant to Protective Order

```
 1                   VIDEOGRAPHER:  The time is
 2         11:23 a.m.  We're back on the record.
 3    QUESTIONS BY MS. BOGGS:
 4         Q.     We were talking about your
 5    background earlier.
 6                You've never investigated or
 7    prosecuted trafficking in connection with any
 8    law enforcement agency, correct?
 9         A.     What do you mean by
10    investigated?  That I've never investigated
11    as a law enforcement officer?
12         Q.     Correct.
13         A.     As I mentioned earlier, I'm not
14    a law enforcement officer, but I have worked
15    in collaboration with law enforcement to
16    catalyze investigations.
17         Q.     What do you mean, catalyze
18    investigations?
19         A.     To, I guess, provide them with
20    information to start an investigation.  So to
21    provide them with information that they might
22    not be aware of, that might be a situation
23    that is at a high risk of trafficking.
24                So if you want -- would you
25    like me to give a couple of examples?
```

Confidential - Pursuant to Protective Order

```
1              Q.     Yes, please.

2              A.     Okay.  So -- and I talk about

3      this in a number of my media articles.  There

4      was an instance in Virginia where there was

5      an individual who was actually in Virginia on

6      pretrial release for malicious wounding

7      against another woman.

8                    I just through happenstance saw

9      him throw a woman out of a car.  I alerted

10     law enforcement.  It turns out this

11     individual was being investigated for a sex

12     trafficking operation.  And the woman who he

13     threw out of the car that I helped rescue at

14     one point had been shot at point-blank range

15     in the leg.  It required a vascular

16     transfusion.

17                   I, you know, tell this anecdote

18     in my books and a number of other media

19     reports.

20                   In 2013 when she called the

21     police to attempt to extricate herself, she

22     was arrested.  So there's a headline from

23     Associated Press that says, prostitute calls

24     police on pimp.  So she called the police on

25     her sex trafficker.  She was arrested.
```

Confidential - Pursuant to Protective Order

1           I helped rescue this woman and

2    initiated the investigation.

3           So I directly called Detective

4    Bill Woolf, who I mentioned earlier, who

5    worked for Fairfax County Police at the time,

6    to initiate that investigation.

7           Another investigation that I

8    catalyzed, I think I discuss in my book, was

9    simply through reviewing online materials

10   published by commercial sex consumers.  There

11   were reports of a woman who was being

12   sex-trafficked.  She had mental disabilities,

13   mental handicaps, and there was an allegation

14   that she was being sex-trafficked by her --

15   by a family member.

16          Within a few hours of reporting

17   that, law enforcement had initiated a sting

18   and helped rescue this woman.  I talk about

19   that in the book.

20          Another instance that I think I

21   talk about in the book was a door-to-door

22   solicitation crew that was from North

23   Carolina that just, again through

24   happenstance, came to my door, and based off

25   of the material -- or the information that

Confidential - Pursuant to Protective Order

1    she shared, it was, at risk of exploitation,

2    reported to law enforcement.

3                   And so I had different levels

4    of involvement with each of those.  Some of

5    them I was more intimately related to or

6    involved with the investigation, for example,

7    the one with Bill Woolf.  But I think those

8    are a couple of examples of where I helped

9    catalyze investigations.

10        Q.    Other than these three

11   examples, have you worked with law

12   enforcement on any other specific cases?

13        A.    By "law enforcement" you mean

14   just police, not prosecutors?

15        Q.    Right.  I don't mean as an

16   expert witness.

17        A.    Right.

18        Q.    I just mean -- I think you had

19   said that you had helped save victims.  And I

20   was just wondering -- so you gave me three

21   examples.

22                   Are there any other victims

23   that you've worked with police to save?

24        A.    Those are three examples that

25   came to mind.  I know that we've worked in my

Confidential - Pursuant to Protective Order

1    capacity serving on, like, task forces, so,

2    like, the Prince William County human

3    trafficking task force, the Prince George's

4    County human trafficking task force.  I've

5    worked with law enforcement in those

6    capacities.

7              But as far as, like, specific

8    people that were rescued, I don't remember

9    any particular case that comes to mind.

10   Q.    In these three instances that

11   you just told me about, was the trafficker

12   eventually convicted?

13   A.    I don't know that I followed up

14   on any of them to know whether there was a

15   conviction.  So typically, I mean,

16   organizations like Polaris, they do the same

17   thing; they'll catalyze the investigation by

18   reporting information, but they have no data

19   on whether there's ultimately a conviction.

20   Q.    Have you ever been involved in

21   determining how to charge a case?

22   A.    No.

23   Q.    In reaching your opinions in

24   this case, do you rely on any training

25   materials that you conducted?

Confidential - Pursuant to Protective Order

1    Islands."

2                   Do you see that?

3         A.      Yes, ma'am.

4         Q.      Are you offering opinions about

5    whether government agencies appropriately

6    exercised discretion in enforcing the laws?

7         A.      I don't think I have levied

8    that opinion in my report.

9         Q.      Are you offering opinions about

10   what steps the United States Virgin Islands

11   took in regard to Jeffrey Epstein?

12        A.      I don't think that I have

13   leveled that opinion in my report.

14        Q.      Did you review any documents

15   regarding the United States Virgin Islands'

16   statutory authority?

17        A.      Not to my recollection.

18        Q.      Do you know what resources the

19   Government of the US Virgin Islands has at

20   its disposal?

21        A.      No, not offhand.

22        Q.      Do you know what the budget is

23   of the Virgin Islands Police Department?

24        A.      No, ma'am, not offhand.

25        Q.      Do you know whether the Virgin

Confidential Pursuant to Protective Order

1    Islands received any complaints regarding

2    Jeffrey Epstein?

3         A.    When you mean {sic} the Virgin

4    Islands, do you mean governmental

5    authorities --

6         Q.    Yes.

7         A.    -- or law enforcement

8    officials?

9         Q.    Yes, correct.

10        A.    I don't know.

11        Q.    Do you know the circumstances

12   under which the Virgin Islands Police

13   Department can gain access to private

14   property or a private island?

15        A.    No, I don't.

16        Q.    If we go back to page 18, that

17   second sentence restates, "Undeniable that

18   Epstein was a sexual predator who engaged in

19   illicit behavior to the physical and

20   emotional detriment of an unknown number of

21   women and children."

22              What do you mean by "physical

23   and emotional detriment"?

24        A.    I think from the testimony that

25   I have read and from the information that's

Confidential - Pursuant to Protective Order

1    MS. ELLSWORTH:  Object to the

2    form of the question.

3    THE WITNESS:  No.

4    (Mehlman-Orozco Exhibit 10

5    marked for identification.)

6    QUESTIONS BY MS. BOGGS:

7    Q.    I'm going to hand you a

8    document that's been marked as Mehlman-Orozco

9    Exhibit 10.

10   Do you recognize Exhibit 10?

11   A.    Yes.

12   Q.    What is it?

13   A.    It's an article that was

14   co-authored by two other individuals on, I

15   guess, the attempts to identify trafficking

16   in the field of dentistry.  It was published

17   in 20 -- August 2017.

18   Q.    And if you turn to page 7,

19   there are red flags for identifying human

20   trafficking here, correct?

21   A.    Yes.

22   Q.    So here you are in 2017, you're

23   recommending the use of red flags, correct?

24   A.    I am not recommending them, per

25   se, and I don't think that -- I think that

Confidential - Pursuant to Protective Order

```
1     this was more sort of -- I was a third author

2     on this, so I think those recommendations

3     were predominantly from the first two

4     authors.  And it's something that at the time

5     there wasn't really -- these were just coming

6     out, and it was more sort of raising

7     awareness.

8               So I think my contributions

9     were more so, for example, giving them the

10    information from Joan Reid on the entrapment

11    and enmeshment schemes as opposed to the

12    recommendations.  I think the recommendation

13    sections were more from Sheryl and Susan.

14               (Mehlman-Orozco Exhibit 11

15          marked for identification.)

16    QUESTIONS BY MS. BOGGS:

17          Q.    I'm handing you what's been

18    marked as Mehlman-Orozco 11.

19          A.    Uh-huh.

20          Q.    Do you recognize Exhibit 11?

21          A.    Yes.

22          Q.    What is it?

23          A.    It is a tweet from 2016 of the

24    DHS trafficking indicator card.

25          Q.    And you say, "Red flags of
```

```
 1      the issues related to secondary exploitation,
 2      but it also can -- I mean, yes, I think it
 3      covers a lot of -- sort of this general
 4      concept of secondary exploitation.
 5                  So in addition to the examples
 6      I gave, I mean, piggybacking other issues or
 7      other social initiatives off of trafficking
 8      in order to further an alternative or
 9      ulterior agenda could be a type of secondary
10      exploitation.  But I didn't think -- I don't
11      think I was really conceptualizing that, per
12      se, as secondary exploitation in the draft, I
13      guess, summary chapters.
14           Q.     How can you tell whether
15      someone is engaging in secondary exploitation
16      versus trying to sincerely help victims?
17           A.     How can I determine it?  It's
18      not something that I would determine.
19                  How can a person or an entity
20      or a trier of fact determine it?
21           Q.     That's correct.
22           A.     I think that that remains to be
23      seen.  I think that the purpose of me
24      bringing up secondary exploitation is to make
25      a trier of fact aware of this phenomenon and
```

1    between -- an in-between area between

2    trafficking and consent, but I would not

3    consider survival sex to be truly consenting.

4              So I think my opinion on that

5    issue is made very clear in the report.

6    Again, I think that these children should be

7    treated as persons in need of services,

8    social services.  They should not be

9    criminalized.  They should not be treated as

10   consenting criminals whatsoever.

11             But the fact of the matter is

12   that they -- despite what Ms. Carr says, they

13   are not treated as de facto victims of

14   trafficking.

15        Q.    Treated by whom?

16        A.    By law enforcement, by courts,

17   by appellate courts, by social services, by a

18   number of entities.

19        Q.    So earlier we were talking

20   about misidentification.

21             Have you ever been sued by a

22   business for defamation?

23        A.    Yes.

24        Q.    When?

25        A.    I think in 2015.

```
1          Q.     And what --

2          A.     Or maybe 2016.

3          Q.     And what was the nature of that

4    lawsuit?

5          A.     So I had gone to a nail salon

6    that there were two years' worth of

7    individuals who had claimed to have procured

8    commercial sex services at the nail salon.

9    They had described in detail, for example,

10   ejaculating on the hot towels at the nail

11   salon.

12                And because of the allegations

13   that were being made publicly online, I ended

14   up writing an opinion editorial in the

15   Washington Post about that, concealing the

16   name of the business but then talking about

17   the fact that there were multiple individuals

18   who had claimed publicly to have received and

19   procured commercial sex services over two

20   years at that particular nail salon.

21                And so I think the thesis of

22   the opinion editorial was discussing how

23   these allegations can happen even in, you

24   know, the nail salons that you patronize.

25                     I ended up doing an interview
```

```
1    with Fox News, Fox 5 local news, and Fox News
2    ended up, unbeknownst to me at the time and
3    without my consent, naming the business.  And
4    because of the naming of the business, they
5    ended up filing a lawsuit against me, which
6    was eventually dropped.
7                 As part of the depositions in
8    that particular matter, individuals did talk
9    about how they did not have licenses, how
10   other people were providing sexual services,
11   but not them.  So there was a lot that came
12   out during that particular case.
13                But I think it's a great case
14   to underscore the need to verify allegations
15   and verify them with empirically based
16   evidence.  Because at the time in which I
17   wrote that opinion editorial, it was common,
18   you know, accepted business practice to look
19   at allegations posted on commercial sex
20   consumer review forums to catalyze
21   investigations.
22                And it was something that
23   obviously it's difficult to prove, and
24   oftentimes people, even well-intentioned to
25   catalyze investigations on the basis of that
```

1    information, can be sued for defamation.

2              For example, Woolf Nader

3    {phonetic}, who is a sheriff in Florida, also

4    was similarly sued for defamation because of

5    catalyzing an investigation off of online

6    reviews by commercial sex consumers.

7         Q.    The Washington Post op-ed that

8    you wrote is not on your publication list,

9    correct?

10        A.    I don't know if it is or not.

11   It was written a while ago.

12        Q.    You also filed a lawsuit

13   against the business, correct?

14        A.    I did, but I non-suited it

15   because I didn't want to have to pay for an

16   attorney to move forward with that.

17        Q.    Did the day spa or anyone

18   associated with the day spa ever face

19   criminal charges?

20        A.    Yes.

21        Q.    When?

22        A.    Around that same time.  It was

23   a former masseuse.  The -- not for

24   trafficking, though.  It was, again, for, I

25   think, providing massage out a license, but

Confidential - Pursuant to Protective Order

1    they did face criminal charges.

2          Q.    So there was no sexually

3    related charge; is that correct?

4          A.    For providing sexually based

5    massage?

6          Q.    Correct.

7          A.    No.  Not to my knowledge.

8                (Mehlman-Orozco Exhibit 14

9          marked for identification.)

10   QUESTIONS BY MS. BOGGS:

11         Q.    I'm handing you what's been

12   marked as Mehlman-Orozco Exhibit 14.

13         A.    Uh-huh.

14         Q.    Do you recognize Exhibit 14?

15         A.    Yes.

16         Q.    What is it?

17         A.    It is the coverage over their

18   lawsuit against me.  Of the day spa's

19   lawsuit.

20         Q.    And you're quoted in this

21   article, correct?

22         A.    Yes.  I think my quote is on

23   page 3 of 4.

24         Q.    So did you speak with Fox 5 in

25   regard to this story?

EXHIBIT 10
WIT: M-Dr0240
DATE: 10.30.23
C. Campbell, RDR CRR CSR #13921

# Identifying Victims of Human Trafficking


dimensionsofdentalhygiene.com/article/identifying-victims-of-human-trafficking/

Sheryl L. Syme, RDH, MS Susan Camardese, RDH, MS Kimberly Mehlman-Orozco, PhD

<u>PURCHASE COURSE</u>

*This course was published in the August 2017 issue and expires August 2020. The authors have no commercial conflicts of interest to disclose. This 2 credit hour self-study activity is electronically mediated.*

**EDUCATIONAL OBJECTIVES**

After reading this course, the participant should be able to:

1. Discuss trends in human trafficking and the oral health professional's role in identifying, treating, and helping victims.
2. Explain the types of individuals that human traffickers target and tactics for manipulating victims.
3. Describe common oral injuries that trafficking victims present with, as well as reasons why victims typically underreport abuse.

Human trafficking is a rampant global health problem affecting a growing number of children and adults. On a worldwide basis, traffickers use fraud, coercion, threats, and deception to manipulate victims into various forms of exploitation, including domestic servitude, sex trafficking, sham marriages, forced labor, and criminal activity. Trafficking is identified as a form of slavery and a major, yet often hidden, crime involving the control of victims for the traffickers' economic gain.[1] Targeting potential victims who appear lost, disenfranchised, or in desperate situations, traffickers are adept at isolating victims from social support systems and creating dependence, limiting victims' movement to work settings, and hiding the signs of victimization. Human trafficking victims are often lured by promises of lucrative employment, stability, ability to obtain an education, a steady income to send home to support their families, or a loving relationship.[2]

While the stories of trafficked survivors often include accounts of trying to improve their lives or that of their families, and desires to migrate to areas that promise a better future, these individuals are not always migrants. Although transportation may be a control tactic to keep human trafficking victims in unfamiliar places, the defining characteristic is exploitation for profit, rather than being moved from one region to another.[1,3] Given the extent of the problem and that trafficked individuals may seek dental treatment, oral health professionals have a responsibility to recognize the signs that may indicate victimization and be prepared to provide appropriate treatment, resources, and referrals (Table 1).

The United States is a key source, site of transport, and destination for trafficked individuals.[1] Reports of trafficking to the National Human Trafficking Hotline and Polaris BeFree Textline have been increasing in all 50 states and Washington, DC. The National Human Trafficking Hotline is partially funded by the US Department of Health and Human Services and is operated by Polaris, a nonprofit, nongovernmental anti-trafficking organization. While a lack of uniformity in reporting[4] and tracking victims in a universal database, as well as the clandestine nature of this criminal activity, creates challenges in identifying victims, the US Department of State estimates more than 26 million individuals are victims of human trafficking worldwide.[1] As regional and global markets increase for human

trafficking, so, too, does the need to identify trafficked individuals. Considering that health care providers may be among the few professionals to come in contact with these individuals, clinicians should be prepared to identify possible victims.

## TRAFFICKING TARGETS

### HUMAN TRAFFICKING CASE SCENARIOS

The following examples represent scenarios of human trafficking that oral health professionals may encounter. They also reflect individuals and relationships that do not necessarily fit stereotypic profiles of victims and perpetrators, which makes identification difficult.

Scenario 1: "B," a 15-year-old girl, is brought into a dental office as a new patient; she is accompanied by a woman who says she is her aunt and caring for her because B's mother and father died recently. Initially, B is seen by the dental hygienist to start the medical history and assessments. The aunt reports that she doesn't know details of B's medical history, except that she had an abortion this year, a sexually transmitted disease, and has some broken front teeth from falling down steps. The aunt also reports that B dropped out of school this year and has been difficult to manage. The girl appears shy and afraid of the aunt, and asks to use the restroom. The aunt appears nervous when B leaves with the dental hygienist, who has offered to show her to the restroom. The aunt follows them and yells at B to hurry up and repeatedly asks the dental hygienist what can be done to fix B's teeth so they can get back to work soon. After exiting the restroom, the dental hygienist asks B if she is OK or in need of assistance, but B is apprehensive and seems afraid of receiving help.

Scenario 2: "T," a 25-year-old petite woman, is brought into a dental office by a husband and wife who are among the longest tenured families in the practice. They report that T is an undocumented migrant and does not have any medical records, passport, or identification documents. She recently became a nanny for their twin 18-month-old sons, and the family explains they are willing to foot the bill to get her decayed teeth restored because she is such a wonderful help with their sons and "good child care is hard to find." The couple says that T's appearance frightens the children and embarrasses them in front of friends and family. She does not make eye contact and appears to have multiple faint bruises on her face, neck, and forearms. She appears to be unable to sit with her back against the dental chair. The couple reports the twin boys are quite rambunctious and a little rough on T. The couple states that they can speak for T in decisions made about her teeth.

Increasingly, it is recognized that dental providers may routinely encounter, but inadvertently overlook, individuals who are presently (or previously) victims of human trafficking. With this in mind, it is prudent for clinicians to watch for signs of abuse and/or human trafficking, and offer the appropriate treatment, counseling, resources, and referrals.

Labor trafficking victims are most often recruited through a job offer and represent approximately 11% percent of US victims, while sex trafficking accounts for 82% of victims in the US; of the latter, most are trafficked by their intimate partners.[5] In 2016, an estimated one out of six of the 18,500 runaway children reported to the National Center for Missing and Exploited Children were likely sex trafficking victims.[6]Children are often targeted through social networking and escort websites, and at bus and truck stops, train stations, youth centers, homeless shelters, schools, and malls—often within hours of displacement from their homes.[2,7,8] Youth entrapment and enmeshment schemes are frequently used in the sex trafficking of minors and resemble power and control techniques observed in other exploitative relationships, such as intimate partner violence (IPV), in which there are similarities in the victim and perpetrator dynamics.[9]

In both child sex trafficking and IPV, the trafficker/perpetrator gains control by isolating victims from outside social support and terrorizing victims through the use of emotional blackmail and/or physical and sexual violence.[9] Glamorizing and normalizing commercial sex are additional ways adolescents are enticed into sex trafficking, often by the trafficker's use of peers for recruiting. This may include peer recruiters who appear to be living the good life. Pervasive themes in the literature indicate that a female's age is her greatest vulnerability to being sex trafficked as a minor. Vulnerable populations include children in the child welfare system and foster care, runaways, homeless individuals, those living in impoverished communities seeking work, migrant workers, individuals with limited English skills, those with disabilities, socially marginalized individuals, people rooted in vulnerability to gender inequality situations, and those who identify as lesbian, gay, bisexual, transgender, or intersex.[1–4,8,10–15] Increasingly, reports indicate that traffickers are preying on those with intellectual or other disabilities and using drugs or withholding medication and health care to manipulate victims into commercial sex.[1,7,14] Branding and tattooing are common, and mark the trafficked person as property, enabling the trafficker to claim ownership of the victim and signal other pimps to stay away.

## CHALLENGES IN IDENTIFYING VICTIMS

Identifying victims poses a significant challenge to researchers and professionals who provide medical or dental care, interventions, and referral resources because trafficked children and adults rarely self-identify. Trafficked victims may underreport because they:[2,3]

- Lack access to legal or support services Fear retaliation from their traffickers against them or their families
- Have been conditioned to fear and distrust anyone other than their captors, including law enforcement or other authorities
- Fear the consequences of being identified as illegal immigrants or criminals, instead of victims
- Feel ashamed of their activities and how their families and communities will receive them if they return
- Feel a sense of hopelessness in escaping their captors and the emotional or financial indebtedness employed by their traffickers
- Do not identify that they are victims of human trafficking

## PSYCHOLOGICAL AND PHYSICAL COSTS

Traffickers use intimidation and emotional entrapment to control victims, including violence against the individual or their families and friends, threats of deportation, confiscation of identification documents, shaming or guilt, and trauma-bonding (in which the trafficked person fears the trafficker, yet feels

relieved to be taken care of, offered employment, and allowed to live). Trafficked individuals are routinely exposed to "seasoning"[16] tactics, such as withholding food, water, sleep, or social contact, and psychological trauma that enabled the trafficker to achieve submission, increase dependence, and reduce resistance.

## TABLE 1. Resources for Seeking Help or Reporting Human Trafficking

| Resources | Purpose |
|---|---|
| National Human Trafficking Hotline 888-373-7888 | 24/7 Toll-free national anti-trafficking hotline and resource center providing assistance with service providers and placement resources; operated by the nongovernmental Polaris Organization funded by the federal government |
| Local police department, 911, or local contact number | Call for immediate safety, advising and protection concerns |
| Department of Homeland Security Blue Campaign to End Human Trafficking dhs.gov/blue-campaign/victim-centered | Provides legal assistance, special T-Visa authorization for victims of human trafficking and victim support; provides immigration relief to nonUnited States citizens of human trafficking |
| Polaris Project website and resource center polarisproject.org | Nonprofit, nongovernmental organization working directly with victims, Polaris hosts the National Human Resource Center crisis hotline and BeFree Textline: text HELP or INFO to BeFree (233733) |
| US Immigration and Customs Enforcement Homeland Security Investigations (HSI) 866-347-2423 (866-DHS-2-ICE) or report online using the HSI tip form ice.gov/webform/his-tip-form | US Immigration and Customs Enforcement/Homeland Security Investigations investigates human trafficking and arrests traffickers; call if clinicians notice suspicious activity in the practice or community |

Psychological entrapment often prevents victims from escaping, even when opportunities arise.[17] Victims and survivors may experience multiple psychological conditions, including severe post-traumatic stress disorder, rape trauma syndrome (series of emotional, physical, and behavioral reactions experienced by rape victims), and child sexual abuse accommodation syndrome (in which children go through five stages of response to ongoing abuse, including secrecy, helplessness, accommodation, delayed disclosure, and retraction). In addition, victims may have anxiety and/or nervous disorders, psychosomatic syndromes, eating disorders, personality disorders, depression, substance abuse issues (and subsequent addiction), and thoughts of self-harm or suicide.[3,8,11,18]

Victims of human trafficking frequently present to medical and dental facilities with a variety of physical health needs, including injuries from violence, head and neck trauma, sexually transmitted diseases (STDs), dental or orofacial conditions, and malnutrition.[19,20] Other common presenting factors include substance use and/or addiction, oral lesions associated with STDs, multiple pregnancies, and forced abortions. Physical injuries to trafficked individuals are often inflicted to the head and face, including teeth and jaw fractures and mandibular dislocations;[3,11,21] consequently, demand for dental care is one of many common needs of trafficked victims.[22,23]

Neglected health conditions—such as uncontrolled asthma, hypertension, diabetes, malnourishment, obesity, addiction, untreated skin infections/lesions, untreated caries and periodontal conditions—and withholding medication or noncompliance with recommended therapies may be signs that trafficked individuals are being prevented from accessing care.

## ROLE OF ORAL HEALTH PROFESSIONALS

Victims may present for dental services as a result of restricted access to dental hygiene products or deleterious effects on oral health from sex or labor work, as well as for cosmetic purposes. Additionally, a sex trafficker's interest in seeking cosmetic dental services would most likely stem from a desire to

make the victim more attractive to clients. Thus, the responsibility of identification relies on the provider's ability to recognize the sometimes subtle signs of victimization and follow up with focused questions to assess immediate treatment and referral needs. That said, the role of oral health professionals in assisting victims of human trafficking has not been extensively discussed in the literature.[20,24,25] In some cases, oral health professionals may be the first responders in rendering care to trafficked individuals.[24] A survey of US-based survivors of human trafficking shows that while being trafficked, 26.5% were seen by a dentist, along with other health care providers, but few victims were identified by these clinicians.[26]

Signs of abuse or other indicators of human trafficking warrant a one-on-one conversation without the presence of the victim's attendant. The online version of this article includes case scenarios and signs to aid in victim identification, in addition to sample questions that can be used to assess whether a patient may be a victim. While not an exhaustive list, the questions may prove helpful in the assessment process.

In recognition of the suspected frequency with which (as yet unidentified) trafficking victims are being seen in health care facilities, efforts to educate clinicians about human trafficking have increased in the past 10 years.[3,13,21,27] At the same time, documentation of the health consequences and risks of human trafficking is improving, as is science's understanding of the gaps in health care providers' knowledge about this growing problem.[18,19,23,28,29] Oral health professionals,[20,24] mental health workers,[28] emergency room professionals,[29,30] gynecologists or other specialty physicians,[3,11,21] and nurses and midwives[16,19] would all benefit from training designed to increase recognition of trafficking victims so an interdisciplinary response can be initiated.

## TABLE 2. Human Trafficking Assessment Questions*

| Clinicians should identify their interest in helping and avoid sounding judgmental when asking the following screening questions: |
|---|
| 1. Are you living and working in a safe place? Where and when do you sleep? |
| 2. Have you ever been pressured to do something that you didn't want to do or were uncomfortable doing? |
| 3. Have you ever been threatened or intimated by someone? If so, what did this person say would happen to you? |
| 4. Are you able to come and go freely at home and work? |
| 5. What happens if you leave or talk of leaving home or work? |
| 6. Do you have access to any money or the money you earn? Has anyone taken some or all of your money, or held your money with promises to keep it safe? |
| 7. Do you owe money to someone? Are you in debt to someone and how are you paying off the debt? |
| 8. Does someone control, supervise and/or monitor you and your work? |
| 9. Has your communication with others been restricted or cut off? Have you ever had a phone or computer? What happened to those items? |
| 10. Do you have days off from work and what do you do on your days off? Are you allowed to take breaks at work? If you are not feeling well, are you able to take time off from work? |
| 11. Has someone ever controlled your access to food and drink, health care, and/or medications? |
| 12. Has someone ever taken your identification papers, passport, or other personal documents? |

*Adapted from The Polaris Project. Human Trafficking. Recognize the Signs. 2017. Available at: polarisproject.org/recognize-signs.

## CLINICAL STRATEGIES

Separating the patient from the third party accompanying him or her to the health visit is a crucial first step in conducting screening questions about human trafficking. A third party's refusal to allow the patient to be alone with the provider may indicate that he or she is not concerned with obtaining the best care for the patient, but instead fears being divulged as a trafficker. The patient can be asked if he or she requires an interpreter or prefers a male or female clinician. It is also up to the clinician's judgment to enlist interpreter services if the provider suspects impaired communication is affecting the ability to provide necessary health care. The denial of interpreter services by the individual accompanying the patient may be another red flag indicating victimization.

Clinicians should not inquire about trafficking-specific details, but should know their state-mandated reporting laws for children and adults, as well as vulnerable adults, and when weapons are involved. Oral health professionals are mandated to report their suspicions of abuse and neglect perpetrated against children younger than 18, regardless of consent. Detailed documentation of craniofacial injuries and other injuries identified during the dental examination should include descriptions, locations, duration, and information pertaining to the cause.

If a patient divulges that he or she is a victim, the oral health professional must establish rapport, acknowledge the presence of trauma symptoms, respect an adult's decision on whether he or she is ready and able to self-report, and attend to the individual's immediate needs and safety. Clinicians should not divulge personal addresses or contact information, or attempt to harbor the trafficked person. Unless legally mandated, providers should not contact authorities without consent of an adult trafficking victim; instead, oral health professionals are advised to encourage self-reporting and refer the patient to the appropriate support services.[19]

If the victim's personal decision is in contrast with the health care provider's, a trauma-informed approach enables the trafficked individual to feel in control and respected, perhaps for the first time.[31] Establishing this level of trust may provide an opportunity for the victim to potentially return when he or she is ready to escape the trafficking situation.[29]

**TABLE 3.** Red Flags for Identifying Human Trafficking*

### Indicators for Individual(s) in Question

**Work Conditions**
- Is restricted in coming and going places as he/she wishes
- Is under age 18 and providing commercial sex acts
- Is in the commercial sex industry and has a handler/manager or pimp
- Wages are low or nonexistent or paid only through tips
- Works excessively long hours with little or no breaks
- Experiences strict rules or works under severe restrictions
- Was recruited with false promises regarding the work he/she would be involved in and promises for a better life, education, higher paying job, or exciting opportunities
- Works all the time but is unable to pay off debt to trafficker
- Works or lives in settings marked by high security measures (cameras, boarded or opaque windows, bars on window and doors)

**Psychological Signs**
- Fearful, anxious, depressed, or nervous/paranoid (looking around before talking)
- Extreme startle response
- Exhibits combative behaviors as a defense mechanism
- Become anxious and appears distrustful of law enforcement when brought up in conversation
- Doesn't make eye contact and appears very submissive or overly emotionally attached to third party
- Extreme dependence on the third party for living arrangements, drugs, affection
- Emotionless, withdrawn posture

**Physical Signs**
- Unmet health and dental care needs
- Appears malnourished and dehydrated
- Branding or tattooing in highly visible areas of body to show other pimps that he/she is owned by another pimp
- Appears to have been physically and/or sexually abused, physically restrained, confined or tortured
- Reports an unusually high number of sexual partners
- Self-inflicted injuries
- Addiction to substances
- Chronic medical conditions
- Multiple, new, or recurrent sexually transmitted diseases
- Presents with injuries from inadequate personal protective equipment in the workplace

**Lack of Autonomy and Self-Determination**
- Has few or no personal belongings
- Doesn't control own money, finances, and doesn't have a financial/bank account
- Lack of passport, immigration, or identification documents; turned them over to his/her handler, trafficker, employer, or another person
- Is not permitted to speak or must seek permission to speak from third party attending appointment who does all the talking, insists on being present or translating, and overrides the conversation with needs for cosmetic treatment and not overall health care needs
- Has been renamed to show ownership by trafficker or to attract more buyers

**Lack of Connectedness, Social Outlets, and Long-Range Plans**
- Claims to be just visiting and unable to convey where he/she is living
- States an unverifiable residential address
- Doesn't know where he/she is; lack of knowledge of what city, town or even state he/she is in
- No sense of time
- Lacking social contacts outside of handler/trafficker; out of touch with family and friends
- Doesn't express long-range goals or plans for future
- Difficulty in explaining what he/she does for fun or socially
- Doesn't discuss inviting friends over to place of residence

• Doesn't discuss inviting friends over to place of residence

**Other**
• Age appears falsified or discrepancy between reported and suspected age
• A large discrepancy in age of victim to trafficker
• Accompanied by controlling and demanding person
• Accompanied by third party who is interested in obtaining cosmetic dental work to improve victim's appearance (as in sex trafficking) only and not interested in long-term treatment plan or preventive care
• Accompanied by third party who offers to pay for all dental work in cash

*\* Adapted from The Polaris Project. Human Trafficking. Recognize the Signs. 2017. Available at: polarisproject.org/recognize-signs.*

## REFERRALS AND RESOURCES

Compared to other victimized groups, relatively few resources and long-term sustainable services exist for individuals identified as victims of human trafficking.[7,17] Trauma-informed programming is essential to the recovery of survivors, and requires an approach that effectively focuses on the physical and mental health consequences of human trafficking.[3,17,32] Table 1 provides resources for those who seek help or wish to report suspected cases of human trafficking. Dental teams need to become familiar with local resources, such as housing, legal assistance, and trauma-informed care providers, as well as their intake requirements.

## CONCLUSION

Human trafficking is a global public health problem, and oral health professionals are well positioned to play an important role in identifying and lending support to victims. Given the likelihood that oral health professionals will encounter victims who are seeking treatment under a variety of circumstance, they should be prepared to identify, respond, and refer for intervention.

Clinicians should use the red flag indicators, screening questions, and specific general and oral health presentations commonly associated with trafficking-related injuries as triggers for interventions. Oral health care is an important component of the interdisciplinary care necessary for addressing trafficking victims' psychological and physical needs.

## REFERENCES

1. U.S. Department of State. Trafficking In Persons Report June 2016. Available at: state.gov/documents/organization/258876.pdf. Accessed July 17, 2017.
2. U.S. Department of Justice. National Strategy to Combat Human Trafficking January 2017. Available at: justice.gov/humantrafficking/page/file/922791/download. Accessed July 17, 2017.
3. Miller-Perrin C, Wurtele SK. Sex trafficking and the commercial sexual exploitation of children. *Women & Therapy.* 2017;40:123–151.
4. O'Brien JE, White K, Rizo CF. Domestic minor sex trafficking among child welfare-involved youth: an exploratory study of correlates. *Child Maltreat.* 2017;22:256–274.
5. Polaris Project. Human Trafficking. The Victims and Traffickers. Available at: polarisproject.org/victims-traffickers. Accessed July 17, 2017.
6. National Center for Missing and Exploited Children. Child Sex Trafficking. Available at: missingkids.org/1in6. Accessed July 17, 2017.

7. U.S. Department of Justice. The National Strategy for Child Exploitation Prevention and Interdiction. A Report to Congress—April 2016. Available at: justice.gov/psc/file/842411/download. Accessed July 17, 2017.
8. Cole J, Sprang G. Sex trafficking of minors in metropolitan, micropolitan, and rural communities. *Child Abuse Negl*. 2015;40:113–123.
9. Reid JA. Entrapment and enmeshment schemes used by sex traffickers. *Sex Abuse*. 2016;28:491–511.
10. National Human Trafficking Resource Center. 2015 National Human Trafficking Resource Center (NHTRC) Data Breakdown United States Report 1/1/2015–12/31/2015. Available at: humantraffickinghotline.org/sites/default/files/NHTRC%202015%20United%20States%20Report%20-%20USA%20-%2001.01.15%20-%2012.31.15_OTIP_Edited_06-09-16.pdf. Accessed July 17, 2017.
11. Macias-Konstantopoulos W. Human trafficking: the role of medicine in interrupting the cycle of abuse and violence. *Ann Intern Med*. 2016;165:582–588.
12. Cole J, Sprang G, Lee R, Cohen J. The trauma of commercial sexual exploitation of youth: a comparison of CSE victims to sexual abuse in a clinical sample. *J Interpers Violence*. 2016;31:122–146.
13. Jimenez M, Jackson AM, Deye K. Aspects of abuse: commercial sexual exploitation of children. *Curr Probl Pediatr Adolesc Health Care*. 2015;45:80–85.
14. Varma S, Gillespie S, McCracken C, Greenbaum VJ. Characteristics of child commercial sexual exploitation and sex trafficking victims presenting for medical care in the United States. *Child Abuse Negl*. 2015;44:98–105.
15. Gibbs DA, Hardison Walters JL, Lutnick A, Miller S, Kluckman M. Sevices to domestic minor victims of sex trafficking: Opportunities for engagement and support. *Child Youth Serv Rev*. 2015;54:1–7.
16. Hachey LM, Phillippi JC. Identification and management of human trafficking in the emergency department. *Adv Emerg Nurs J*. 2017;39:31–51.
17. Logan TK, Walker R, Hunt G. Understanding human trafficking in the United States. *Trauma Violence Abuse*. 2009;10:3–30.
18. U.S. Department of State. United States Advisory Council on Human Trafficking Annual Report 2016. Available at: state.gov/j/tip/263114.htm. Accessed July 17, 2017.
19. Dovydaitis T. Human trafficking: the role of the health care provider. *J Midwifery Womens Health*. 2010;55:462–467.
20. Nuzzolese E. Human trafficking: role of oral health care providers. *J Forensic Odontostomatol*. 2014;32:1–8.
21. Lederer L, Wetzel C. The health consequences of sex trafficking and their implications for identifying victims in healthcare facilities. *Annals of Health Law*. 2014;23:61–91.
22. Greenbaum VJ. Commercial sexual exploitation and sex trafficking of children in the United States. *Curr Probl Pediatr Adolesc Health Care*. 2014;44:245–269.
23. Chaffee T, English A. Sex trafficking of adolescents and young adults in the United States: Healthcare provider's role. *Curr Opin Obstet Gynecol*. 2015;27:339–344.
24. O'Callaghan MG. Human trafficking and the dental professional. *J Am Dent Assoc*. 2012;143:498–504.
25. Blackiston L. Saving a life: Recognizing the signs of human trafficking, abuse, and neglect. *RDH*. 2011;31:1–8.

26. Chisolm-Straker M, Baldwin S, Gaïgbé-Togbé B, Ndukwe N, Johnson PN, Richardson LD. Health care and human trafficking: we are seeing the unseen. *J Health Care Poor Underserved*. 2016;27:1220–1233.
27. Baldwin SB, Eisenman DP, Sayles JN, Ryan G, Chuang KS. Identification of human trafficking victims in health care settings. *Health Hum Rights*. 2011;13:1–14.
28. Powell C, Dickens K, Stoklosa H. Training U.S. health care professionals on human trafficking: where do we go from here? *Med Educ Online*. 2017;22:1267980.
29. Grace AM, Lippert S, Collins K, et al. Educating health care professionals on human trafficking. *Pediatr Emerg Care*. 2014;30:856–861.
30. Schwarz C, Unruh E, Cronin K, Evans-Simpson S, Britton HE, Ramaswamy M. Human trafficking identification and service provision in the medical and social service sectors. *Health Hum Rights*. 2016;18:181–192.
31. Hemmings S, Jakobowitz S, Abas M, et al. Responding to the health needs of survivors of human trafficking: a systematic review. *BMC Health Serv Res*. 2016;16:320.
32. Hopper E. Trauma-informed psychological assessment of human trafficking survivors. *Women & Therapy*. 2017;40:12–30.

*Featured image by STEVANOVICIGOR/ISTOCK/GETTY IMAGES PLUS*

From *Dimensions of Dental Hygiene*. August 2017;15(8):47-50.