N8VBVIRO

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   GOVERNMENT OF THE UNITED
3  STATES VIRGIN ISLANDS
                    Plaintiffs
4            v.                           22 Civ. 10904 (JSR)
   JPMORGAN CHASE BANK N.A., *et*
5  *al*,
                    Defendants
6  ------------------------------x

7                                        ORAL ARGUMENT
                                         New York, N.Y.
8

9                                        August 31, 2023

10                                       4:00 p.m.

11  Before:

12                    HON. JED S. RAKOFF

13                                       District Judge

14                         APPEARANCES

15  OFFICE OF THE ATTORNEY GENERAL
        Attorneys for Plaintiff USVI
16  MIMI LIU
    DAVID I. ACKERMAN
17  LINDA SINGER

18  WILMER CUTLER PICKERING HALE & DORR LLP
        Attorneys for Defendant JPMorgan Chase Bank NA
19  FELICIA ELLSWORTH
    ALAN SCHOENFELD
20  JOHN BUTTS

21

22

23

24

25

```
N8VBVIRO
```

 1              (Case called)

 2              THE DEPUTY CLERK:  Will the parties please identify

 3    themselves for the record.

 4              MS. LIU:  Mimi Liu on behalf of plaintiff, the

 5    Government of the United States Virgin Islands.

 6              MS. SINGER:  Linda Singer for the Virgin Islands.

 7              MR. ACKERMAN:  David Ackerman for the Virgin Islands.

 8              MS. ELLSWORTH:  Good afternoon, your Honor.  Felicia

 9    Ellsworth for JPMorgan Chase.

10              MR. SCHOENFELD:  Alan Schoenfeld for JPMorgan Chase.

11              MR. BUTTS:  John Butts for the JPMorgan Chase.

12              THE COURT:  Welcome.  And I'm ready to hear argument

13    on the cross-motions for summary judgment.  Now to some extent

14    they are two sides of the same coin, in some of the aspects,

15    but not in all.  Nevertheless, to maintain some sort of order,

16    why don't we start with the Virgin Islands's motion, and then

17    we'll turn shortly thereafter to JPMorgan's motions.  I don't

18    want anyone to recite at any great length what's in your

19    briefs.

20              I thank you for their excellent briefs, but it was 80

21    pages and I did manage to read them all without falling asleep.

22    And so really this is your opportunity to address matters and

23    issues that were not fully addressed in your brief, either

24    because they were raised in someone's else reply papers or for

25    whatever reason.  Let me hear first from moving counsel.

N8VBVIRO

        1           MS. LIU:  May it please the Court.  Mimi Liu on behalf

        2     of plaintiff, Government of the US virgin Islands.  I will be

        3     arguing our motion for summary judgment on the Trafficking

        4     Victims Protection Act claims, and my colleague Mr. Ackerman

        5     will be arguing our motion on the affirmative defenses, your

        6     Honor.

        7           THE COURT:  Okay.

        8           MS. LIU:  In its order on the motion to dismiss, the

        9     Court said that the plaintiffs adequately allege knowledge,

     10     participation and benefit to show JPMorgan participated in

     11     Epstein's sex trafficking venture in violation of 1591(a)(2).

     12           THE COURT:  So they dispute, among other things,

     13     knowledge and intent, and almost always those are jury

     14     questions.  Why can they be disposed of on summary judgment

     15     here?

     16           MS. LIU:  Your Honor, no reasonable juror could find

     17     that JPMorgan did not know or did not recklessly disregard that

     18     its client Jeffrey Epstein was engaged in sex trafficking.  In

     19     your motion to dismiss order, you said that it is sufficient

     20     that JPMorgan was aware of Epstein's convictions for sex crimes

     21     and ignored numerous red flags associated with Epstein's

     22     accounts.

     23           The undisputed facts show that JPMorgan knew, not only

     24     at the time of his convictions in 2008, but two years earlier

     25     in 2006, that Epstein had engaged in sex crimes involving

N8VBVIRO

minors.  The evidence shows that Epstein confessed all but the

ages to Jes Staley, and Jes Staley turned around and reported

it to Mary Erdoes, and that is corroborated in a written email.

    The ages were undeniable from the reports that were

based on police documents that JPMorgan reviewed in 2006.

Compliance staff later acknowledged that Epstein was "known to

pay cash for his massages, and minors aren't the issue," which

is precisely what was reported in the news in 2006.  And then

when we get to the question of JPMorgan ignoring numerous red

flags, they did more than that, your Honor.

    In 2019, the filing with the department of treasury

after Jeffrey Epstein was dead identifies more than $1 billion

in transactions for Epstein that the bank says are related to

human trafficking dating back to 2003, $1 billion in

transactions related to human trafficking dating back to 2003.

By 2006, the bank thus had reams of financial information

related to Jeffrey Epstein that corroborated his sex crimes

involving children.

    THE COURT:  So what about the argument that your

adversary makes that, that doesn't preclude them from offering

ordinary banking services?  Even convicted felons are entitled

to avail themselves of ordinary business.  They could buy

groceries.  They could buy land.  And in this case, they can

have bank accounts, so why isn't that preclude summary

judgment?

N8VBVIRO

             MS. LIU:  Well, again, in your motion to dismiss

1

2    order, your Honor, you identified a number of categories where

3    the Court said, these are sufficient to show that JPMorgan

4    engaged in active non-routine or non-ordinary banking services.

5            THE COURT:  Yes, and that was on motion to dismiss

6    taking everything in your favor.  But the question now is

7    whether you have established that through undisputed evidence

8    that no reasonable juror could find to the contrary.

9            MS. LIU:  Yes.  In addition, the New York banking

10   regulator looked at a number of categories as well, and the New

11   York banking regulator said vis-a-vis Deutsche Bank that these

12   are examples of activity that fall outside ordinary banking

13   services.  And we have proven on summary judgment starting with

14   the fact that JPMorgan has admitted that it handled more than

15   $1 billion in suspicious transactions, again related to human

16   trafficking for Epstein over a 16-year period from 2003 to

17   2019.

18           And just to put that $1 billion number in context,

19   your Honor, in their counterstatement of undisputed material

20   facts at paragraph 19, JPMorgan argues that $900 million of

21   funds flowed through Epstein's accounts at JPMorgan from 2003

22   to 2013.  This means that Epstein's entire business with

23   JPMorgan and JPMorgan's entire business with Jeffrey Epstein

24   was human trafficking.

25           JPMorgan was a full service bank for Jeffrey Epstein's

N8VBVIRO

|       |                                                                 |
|-------|-----------------------------------------------------------------|
| 1     | sex trafficking.  If you look at the *Canosa* case that we     |
| 2     | discussed at the motion to dismiss stage, it talks about        |
| 3     | facilitating sex trafficking on the front-end and then covering |
| 4     | it up the back-end, which allows ongoing sex trafficking, that  |
| 5     | is precisely this case.  On the front-end, JPMorgan after       |
| 6     | knowing that Jeffrey Epstein had engaged in felony sex crimes   |
| 7     | with children handled  $4 million in payments to girls and      |
| 8     | women, many with Eastern European names, and over $5 million in |
| 9     | cash withdrawals which it repeatedly tied to his felony sex     |
| 10    | crimes.                                                         |
| 11    | That's $9 million in transactions which JPMorgan                |
| 12    | argues on reply is a drop in the bucket relative to the $900    |
| 13    | million in funds that flowed through Epstein's accounts at      |
| 14    | JPMorgan.                                                       |
| 15    | But if you take that $9 million -- and this is a bank,          |
| 16    | and this is a bank reviewing as part of their due diligence all |
| 17    | of the news reports and the police documents -- if you take     |
| 18    | that $9 million, your Honor, and you divide it by the couple of |
| 19    | hundred dollars that Epstein was known to pay a victim, and the |
| 20    | couple of hundred dollars that Epstein was known to pay the     |
| 21    | young women who recruited that victim, you get more than 20,000 |
| 22    | unlawful sex acts facilitated by JPMorgan.                      |
| 23    | Again, I would submit, no reasonable juror could find           |
| 24    | that JPMorgan did not participate in Jeffrey Epstein's sex      |
| 25    | trafficking venture.                                            |

N8VBVIRO

1          THE COURT:  Okay.  Let me interrupt you.  We're going

2     to sort of go back and forth just to try to keep aspects of

3     these motions completed.  So let me, just on what you've argued

4     so far, let me hear from defense counsel, then we'll come right

5     back to you.

6          MS. ELLSWORTH:  Thank you, your Honor, Felicia

7     Ellsworth for JPMorgan. I'll start where the Court did,

8     knowledge is a key element of the US Virgin Islands claim here.

9     Knowledge is almost never susceptible to disposition on summary

10    judgment, and it certainly is not here.  There's sworn

11    testimony from multiple JPMorgan current employees and former

12    employees that the US Virgin Islands took testimony from, each

13    of whom to a person testified they did not have knowledge.

14         THE COURT:  Let me raise an issue that I don't think

15    was raised clearly by your adversary, but that won't stop me.

16    So if we look at section 1595(a) for lawsuits not brought by

17    the state, but by individuals, civil lawsuits, the knowledge

18    requirement there is knew or should have known, as opposed to

19    the criminal section, which it's knew or recklessly

20    disregarded.  Should have known sounds awfully much like

21    negligence.  So if all they have to show is negligence, are

22    they not entitled to summary judgment?

23         MS. ELLSWORTH:  That's not all they have to show, your

24    Honor.  *Parens patriae* plaintiff under 1595(d) -- and I don't

25    think the US Virgin Islands has disputed this fact --

N8VBVIRO

1          THE COURT:  No, they haven't.  You're correct in that,

2     but --

3          MS. ELLSWORTH:  It's knowledge or reckless --

4          THE COURT:  -- but I'm infamously activist judge, so

5     I'm raising it independently.

6          MS. ELLSWORTH:  When you look at 1595(d), it

7     incorporates only the section 1591, the criminal provision.  So

8     what the 1595(d), which is the *parens patriae* action, it says

9     that a state has reason to believe that an interest of the

10    residents of the state is threatened or adversely effected by

11    any person who violates section 1591, and that's the criminal

12    provision.

13         THE COURT:  Yeah, but the question would be -- and you

14    may well be right on that.  I'm not suggesting necessarily to

15    the contrary.  But since this is a civil action, why shouldn't

16    section (d) be read in the context of the primary civil action

17    requirement set forth in (a)?

18         MS. ELLSWORTH:  I don't think it should be because I

19    don't think that's what Congress set out.  Congress set out and

20    incorporated.  Congress could have chosen to add a *parens

21    patriae* cause of action to 1595(a), for example; but instead it

22    quite explicitly added this section (d) separately and

23    incorporated only the criminal underlying conduct which would

24    be knowledge or reckless disregard.  I think the statutory

25    structure is fairly clear.  I also don't think it particularly

N8VBVIRO

1    matters in purpose of your Honor deciding today's motion.

2              THE COURT:  The statute is clear?  This is the

3    Congress of the United States, they never write clear statutes.

4    We know that.

5              MS. ELLSWORTH:  I think the construction that your

6    Honor can make of the statute should not be difficult to

7    understand that what Congress --

8              THE COURT:  Let's assume you're right about that.  I

9    just wanted to flag that issue.  Go back to the point you

10   wanted to make.

11             MS. ELLSWORTH:  If I could raise one more point on the

12   scienter standard. I just want to make clear. We point this out

13   in our affirmative motion.  I'm happy to address it then.  But

14   prior to 2008, the standard has to be just knowledge, not even

15   reckless disregard given the timing when that was added to the

16   statute.  But in any event, I come back to the question that

17   the Court ask my adversary to begin with, which is this is

18   simply not an issue that is susceptible to determination on

19   summary judgment.  It is not the case that no reasonable juror

20   could find that there wasn't knowledge or reckless disregard

21   depending on the timing here.

22             There is hotly disputed testimony and evidence.  There

23   is, as I said, testimony from JPMorgan current and former

24   employees disclaiming knowledge.  That testimony would be

25   subject to a credibility determination by the jury as to

N8VBVIRO

| | |
|---|---|
| 1 | whether or not in fact the information that the US Virgin |
| 2 | Islands has pointed to and that Ms. Liu pointed you to today |
| 3 | was information that JPMorgan considered and found that there |
| 4 | was some reason to even suspect that there was something that |
| 5 | would be an actual violation of the TVPA. |
| 6 | THE COURT:  Okay.  Let me go back to plaintiff's |
| 7 | counsel.  We're going to go back and forth with apologies. |
| 8 | Anything further before we turn to the other prong of your |
| 9 | motion that your colleague is going to address, anything |
| 10 | further you wanted to say on this prong? |
| 11 | MS. LIU:  Only, Judge, to clarify in terms of your |
| 12 | question about constructive knowledge in 1595.  We did argue at |
| 13 | the motion to dismiss stage at footnote one in our opposition |
| 14 | brief, which is docket 49, that a constructive knowledge |
| 15 | standard applies also to the government's civil case under |
| 16 | 1595. |
| 17 | THE COURT:  This is not a question of constructive |
| 18 | knowledge.  That's a different issue. |
| 19 | MS. LIU:  Or knew or should have known. |
| 20 | THE COURT:  Okay. So in your view you haven't waived |
| 21 | that argument? |
| 22 | MS. LIU:  We have not waived that argument.  And, in |
| 23 | fact, the point that we made there is that if you look at the |
| 24 | legislative history of 1595(d), it's clear that Congress wanted |
| 25 | to give extra litigation leverage to individuals and more |

N8VBVIRO

1   resources to pursue civil prosecution against sex trafficking.

2           So obviously Congress did not intend to apply a higher

3   scienter standard to a *parens patriae* action than it did to the

4   original civil action.

5           THE COURT:  That may or may not be, why shouldn't

6   Congress or why couldn't Congress have rationally decided, if

7   it's an individual is a victim, we're going to make it a

8   negligent standard; but if it's a state with all the force that

9   a state brings and with assertion by the state that it's

10  bringing a, if you will, quasi-criminal case, we're not going

11  to apply that lower standard.  Why wouldn't that be a possible

12  interpretation of what Congress did?

13          MS. LIU:  I just don't think that there's anything

14  including the legislative history would be to the contrary in

15  1595(d) to suggest that Congress wanted to apply a criminal

16  scienter standard to a civil action by the government.

17          And if I could just clarify one point.  Ms. Ellsworth

18  mentioned the knowledge or reckless disregard pre-2008.  That

19  goes to a different point.  That knowledge or reckless

20  disregard goes to knowledge or reckless disregard of sex

21  trafficking.  This particular knew or should have known

22  standard goes to the participation in the venture.  These are

23  two different scienter standards.

24          THE COURT:  Let me hear from your colleague then on

25  the next prong.

N8VBVIRO

1          MR. ACKERMAN:  Thank you, your Honor.  May it please

2     the Court.  David Ackerman for the Virgin Islands.  The Court

3     expressed skepticism in denying JPMorgan's motion to strike

4     these affirmative defenses, and those concerns were

5     well-founded.  Despite having taken expansive discovery of the

6     Virgin Islands, including the depositions of three current or

7     former governors and three former Attorneys General and

8     receiving nearly a hundred thousand pages in discovery,

9     JPMorgan's attempts to blame the USVI have no merit in law or

10    in fact.  The Court received voluminous briefing, but nowhere

11    --

12         THE COURT:  You needn't remind me of that.

13         MR. ACKERMAN:  I thought using the word "voluminous"

14    may have triggered a memory, your Honor.  But nowhere in these

15    reams of documents are there facts that show any knowledge of

16    human trafficking or red flags by any USVI government official.

17         Your Honor, this is an important moment for both this

18    case and more fundamentally for the development of TVPA

19    enforcement law.  As the Court is aware, this is the first

20    civil attorney general, civil enforcement action brought under

21    the TVPA.  The government of the Virgin Islands, not Florida,

22    not New York, has stepped up to challenge the biggest bank in

23    the world over its enforcement practices.  And it has permitted

24    through significant discovery calculated to test the

25    government's resolve and shift attention away from the bank's

N8VBVIRO

1    own failings.

2            And the case law establishes, your Honor, that these

3    affirmative defenses are not cognizable at law and JPMorgan's

4    briefing barely disputes that fact.  The facts that JPMorgan

5    attempt to stitch together lack any fact tying government

6    action to Epstein's trafficking.

7            THE COURT:  Well, are you saying that even if JPMorgan

8    is able to prove that the Virgin Islands were culpable

9    initially in letting Mr. Epstein's misconduct go forward to a

10   certain point in time, that that is completely irrelevant to

11   any of the issues in this case?

12           MR. ACKERMAN:  What I'm saying, your Honor, is that

13   the affirmative defenses that JPMorgan has asserted are not

14   cognizable at law.  Whether they may be relevant at some other

15   stage could be a question, we don't think they are.  But the

16   issue before the Court now is simply the affirmative defenses,

17   and these affirmative defenses have no basis.

18           THE COURT:  All right.  Let me hear from again, with

19   apologies for interrupting, let me hear from defendant's

20   counsel.

21           MR. SCHOENFELD:  Thank you, your Honor. Alan

22   Schoenfeld for JPMorgan Chase.  USVI's lead argument I think is

23   one that the Court has already rejected cause the Court found

24   in the bottom line order in the motion to strike that those

25   claims were available, or those affirmative defenses were

N8VBVIRO

available as a matter of law.  And the Court did express

skepticism -- and I'm happy to allay the Court's skepticism

today.  But as a matter of law, *in pari delicto* and unclean

hands are clearly available to JPMorgan Chase to assert its

affirmative defenses to USVI's two TVPA claims. That's

consistent with the Court's holding in *Google* and *Facebook*,

which USVI never addresses, and both of which make clear that a

state government suing *parens patriae* under a federal statute

is a private actor susceptible to equitable defenses.

          So the only question on this motion for summary

judgment is whether there's any issue of disputed fact as to

whether USVI's misconduct precludes its claims that JPMC

knowingly benefited from participation or obstructed a federal

investigation into Epstein. And a jury could reasonably

conclude that USVI's decades-long entanglement with Epstein

precludes judgment in USVI's favor.  I'm happy to start with

knowledge.  USVI claims that unlike JPMC, "There's no evidence

that any government official or employee had knowledge of what

was occurring on Epstein's private Island."  But in 2007 --

          THE COURT:  I guess what I'm having a little trouble

is, it's one thing to say that their alleged involved in

complicity if you will, it effects the timeframe involved, it

effects perhaps the extent of the relief they're entitled to;

but I'm not sure I've seen any case on facts similar to this

where it's a total bar of their bringing an action at all.

N8VBVIRO

MR. SCHOENFELD:  We've asked two sets of affirmative
defenses.  The first is *in pari delicto* and unclean hands,
which I think would defeat the claims as a matter of law.  And
those are both well-established affirmative defenses that go to
liability.

THE COURT:  I'm just putting this in the context of a
state as opposed to an individual.  A state fails to prosecute
or take action against someone who's committing a crime within
their state, and they do that even though they knew or
recklessly disregarded that that person was committing that
misconduct.  And then they wake up and they say, you know, this
is really too much too far, and so they say we're going to
prosecute.  I don't know of any cases that says they can't
prosecute in that situation.

MR. SCHOENFELD:  This is a critical distinction, and
I'm glad your Honor raised it.  And this is exactly what the
Court held in both *UPS* and *FedEx* to mark the distinction
between the enforcement actions that the City of New York was
bringing under the CCTA, which is the something, something
Tobacco Act, and RICO.  And under the CCTA, the City had been
delegated enforcement authority by Congress to bring these
actions as a law enforcement authority.

And in those circumstances, the Court held that
unclean hands was not available as an affirmative defense,
including because the defendant couldn't challenge the

N8VBVIRO

1   government's discretionary law enforcement decision making.

2           That would apply if what we were talking about is

3   USVI's enforcement of the TVPA, but that's not why they're

4   here.  They have no authority to enforce the TVPA.  They have

5   the ability under 1595(d), which is what you were just

6   discussing with Ms. Ellsworth, to bring a claim *parens patriae*

7   to seek civil relief for injuries done to residents of the

8   US Virgin Islands.  That is not a law enforcement authority.

9   That is a private claim brought *parens patriae*, and that's

10  precisely what the Court says in *Google* and *Facebook*.

11          In both of those cases, states were coming in to

12  enforce the *Clayton Act* to stop a merger.  And the Court

13  said -- it's the SDNY in *Google* and the District of Columbia in

14  *Facebook* -- the Court said in both of those cases, Congress

15  chose not to give enforcement authority under the United States

16  Antitrust Laws to states and municipalities.  It did decide to

17  supplement the ability of private parties to enforce those laws

18  through the *Clayton Act*.  And in those cases, the states were

19  bringing those actions *parens patriae* to enjoin mergers and to

20  defeat other sorts of allegedly anti-competitive activity.

21          And the Court said, in those capacities where they are

22  not enforcing the anti-trust law, but instead seeking civil

23  relief against a merger, they are just as susceptible to a

24  *Laches* defense as any private actor.  So the distinction you're

25  drawing is absolutely right.  You can't bring a *Laches* claim,

N8VBVIRO

1   especially when there's an applicable statute of limitations

2   against the government to challenge its failure to prosecute,

3   its selection among discretionary prosecutorial options. That

4   is not why we're here.  That is not what the USVI is doing in

5   this case.  They are a private litigant, regardless of the fact

6   that they are suing *parens patriae*.

7          There are special standing rules that apply under

8   Article 3, and that's the *Snapp* line of case law.  But as far

9   as the role that they are occupying here, it's not a law

10  enforcement role.  So using *UPS* and *FedEx* as our models, the

11  actions brought under the CCTA are not the relevant actions.

12  It's the actions brought under RICO that are the relevant

13  actions, where they were suing as an aggrieved essentially

14  private party*, parens patriae*, and there they were susceptible.

15  The City in both cases were susceptible to the unclean hands

16  and *in pari delicto* defenses that *FedEx* and *UPS* had advanced.

17          THE COURT:  All right.  Let me go back to plaintiff's

18  counsel to respond, and then we'll go to the next issue.

19          MR. ACKERMAN:  Couple of responses, your Honor.  First

20  of all with respect to *UPS*.  What the *UPS* case says about

21  enforcing statutes is, they initially quote the *UPS* case

22  correctly.  It says the case law in the area of executive

23  discretion generally relates to a party's attempt to require

24  particular enforcement or hold a public entity responsible for

25  lack of an adequate enforcement.  But the case then observes

N8VBVIRO

1    courts have in numerous other instances declined to probe into

2    government actor's decision making in circumstances where the

3    government was acting in the sphere of enforcing public rights

4    in the public interest, and that is exactly what's happening

5    here.

6            THE COURT:  They just said it again here, they don't

7    think you, in this situation, are really enforcing public

8    rights.  You are enforcing the private rights of your citizens

9    that may not be enforceable by those citizens, and we'll get

10   later to the question of whether the settlement bears on that.

11   But what is the public right you are enforcing by your action?

12           MR. ACKERMAN:  This is a civil enforcement action,

13   your Honor.  And what Congress has given the USVI and all other

14   states is the authority to enforce this statute specifically.

15   And in these types of cases, such as *Phillip Morris*, when

16   states are proceeding as a civil enforcement authority –– and

17   *Phillip Morris* I think is very instructive because the

18   defendant in that case, the tobacco company, argued *in pari*

19   *delicto* defenses because the government failed to communicate

20   to the public its knowledge of the properties of nicotine; or

21   they relied on the conduct of government scientists; or the

22   department of defense was subsidizing cigarette sales.

23           It relied on regulatory decisions concerning the

24   creation of so-called safer cigarettes.  And the Court rejected

25   the unclean hands defense. It held, When as here, the

N8VBVIRO

| 1 | government acts in the public interest, the unclean hands |
| 2 | doctrine is unavailable as a matter of law. |
| 3 | THE COURT:  So I understand that point, but I'm |
| 4 | looking at subsection (d) of 1595, the section under which you |
| 5 | sue "In any case in which the Attorney General of the state has |
| 6 | reason to believe that an interest of the residents of that |
| 7 | state has been or is threatened or adversely affected by any |
| 8 | person who violates section 1591, the Attorney General of the |
| 9 | state is *parens patriae*, may bring a civil action against such |
| 10 | person on behalf of the residents of the state in an |
| 11 | appropriate district court of the United States to obtain |
| 12 | appropriate relief." |
| 13 | So the statute seems to contemplate that you're not |
| 14 | acting in the same way, for example, that the SEC might in a |
| 15 | civil action brought by the SEC; but rather more as, at least |
| 16 | so far as compensatory damages and the like are concerned, as |
| 17 | the representative of residence who for whatever reasons cannot |
| 18 | or have not brought their own actions.  Now it might be |
| 19 | different to the extent that you're seeking injunctive relief. |
| 20 | But with respect to -- and this unfortunately gets into the |
| 21 | next motion -- but as I said they are intertwined -- with |
| 22 | respect to the relief that is geared to compensating victims, |
| 23 | in this case residents of the state, why aren't you in that |
| 24 | respect at least acting as the equivalent of a private |
| 25 | representative? |

N8VBVIRO

           MR. ACKERMAN:  Your Honor, you have hit the nail on

the head, which is that there is overlap between these motions,

and I believe Ms. Liu was handling this point.  So what I would

say is that for certain UPS --

           THE COURT:  Take a guess at what she would have said.

           MR. ACKERMAN:  That's fair, your Honor.

           THE COURT:  Go ahead.

           MR. ACKERMAN:  I believe that was -- and with respect

to --

           THE COURT:  I'll tell you what, I won't put you on the

hook.  Ms. Liu, what did you want to say in that regard?

           MS. LIU:  So, Judge, you've already held at the motion

to dismiss stage in the challenge to our *parens patriae*

authority that the Virgin Islands has a quasi-sovereign

interest in assuring its residents it will act to protect them

from the harmful effects of criminal sex trafficking

enterprises flourishing in the islands.

           THE COURT:  You correctly quoted me, and I thought it

was a brilliant statement, but now we're getting -- and we are

getting now into the next series of motions while we're there,

but that may have to be distinguished depending on which kind

of relief you're seeking.

           I think there's a strong argument that if you're

seeking injunctive and declaratory relief, you're acting in the

public interest, as well as in the interest of the residents

N8VBVIRO

1  individually.  But when you're seeking compensatory damages,

2  I'm not sure why that's so.

3         MS. LIU:  So the case law, Judge, on this issue,

4  including in the Second Circuit in the *Purdue Pharma v.*

5  *Kentucky* case that is cited in I think both parties' papers

6  specifically says, If the Attorney General as *parens patriae* is

7  the real party in interest, which is determined by assessing

8  whether or not they have a quasi-sovereign interest, as this

9  Court has held the Attorney General here does, then the

10  question of what specific relief they're seeking does not

11  necessarily negate that *parens patriae* authority or interest.

12         So, for example, the *Purdue Pharma v. Kentucky* case,

13  injunctive relief was sought, civil penalties were sought, and

14  also damages to individual victims was sought.  And the Court

15  specifically said the fact that the primary purpose of this

16  case is to pursue the public interest or to act in the public

17  interest means that the add-on of additional request for

18  compensatory damages does not negate the overall *parens patriae*

19  nature of this matter.

20         That is a consistent holding in numerous cases that we

21  cite in our papers, including the *AU Optronics* case, the

22  *Balderas* case and other cases.

23         THE COURT:  What about the argument -- now we really

24  are getting into the other motion, but I think I have no choice

25  cause it logically follows.  What about if you're not entitled

N8VBVIRO

1   to compensatory damages cause they're duplicative of the class

2   action.  Assuming for the sake of argument that I approve the

3   class action settlement, what about that?

4          MS. LIU:  I would submit, Judge, that Congress -- so

5   the *Seneci* case, the Second Circuit case in *Seneci*, what that

6   case says is if all you're seeking in an AG case, all you're

7   seeking.  And the only thing sought there was compensatory

8   damages for individuals.  If that's all the AG is seeking,

9   we're going to have to question *parens patriae* standing. And

10  that's not all we're seeking.  And our primary purpose is the

11  quasi-sovereign interest of assuring residents that sex

12  trafficking will not continue to flourish in the US virgin

13  Islands.  But even the *Seneci* case says --

14         THE COURT:  Specifically -- I hear what you're saying,

15  but tell me exactly specifically what relief you are seeking

16  assuming for the sake of argument you're entitled to any and

17  all appropriate relief?

18         MS. LIU:  We are seeking injunctive and declaratory

19  relief.

20         THE COURT:  Injunctive against who?

21         MS. LIU:  We are seeking injunctive relief against

22  JPMorgan.

23         THE COURT:  To not do anymore banking with

24  Mr. Epstein.

25         MS. LIU:  No, Judge. Just as in the *Snapp* case where

N8VBVIRO

1    the action, the discriminate conduct occurred in 1978 ended.

2    The case was brought a year later in 1979.  The Supreme Court

3    said you can seek injunctive relief against this actor to

4    conform their conduct with the law.  So our injunctive relief

5    that we're seeking is requiring that JPMorgan conform its

6    conduct to the protections of the Trafficking Victims

7    Protection Act, which is precisely what the Supreme Court

8    occurred in the *Alfred Snapp* case.

9            THE COURT:  I know what you say they didn't do in the

10   past, but then, for example, they have subsequently filed SARs

11   and so forth.  What is it you're saying they're not doing now

12   that they need to be ordered to do?

13           MS. LIU:  Well, exactly like in the *Snapp* case where

14   the conduct had ended where the Court said, yes, but, in the

15   future we are going to enjoin you from violating the statute.

16   That is the same thing we are seeking here.  There is nothing

17   to suggest that short of Jeffrey Epstein's death in 2019,

18   JPMorgan would act in conformance with the Trafficking Victims

19   Protection Act.  Not vis-a-vis Jeffrey Epstein.  Obviously he's

20   dead, but vis-a-vis other clients going forward in the future.

21           The only reason that JPMorgan finally after 16 years

22   reported the billion dollars in suspicious transactions for

23   Jeffrey Epstein is because he was arrested, and then he was

24   dead.  This was a CYA reporting after 16 years of all of the

25   monies flowing in his JPMorgan accounts after he was dead.

N8VBVIRO

There is nothing -- and JPMorgan, as we've argued to the Court
in our letter brief, is a repeat offender.  They have been
fined countless times for violating the law.  There is nothing
to suggest that on its own JPMorgan is going to conform with
the law absent an injunction from this Court, which is
precisely what *Alfred Snapp* authorizes in terms of ongoing on
future conduct.

        In terms of past harm, which the statute clearly
recognizes, the only forms of relief available are compensatory
and punitive damages for individuals and civil penalties.
Civil penalties is no doubt a traditional law enforcement
remedy.  And civil penalties was in fact, your Honor, a remedy
at common law.

        So I would submit that whether or not you read the
statute to authorize civil penalties, which we believe it
plainly does, civil penalties is a remedy at common law for
civil law enforcement.  And thus to the extent they say the
statute merely codifies the common law *parens patriae*
principles outlined in *Alfred Snapp*, it certainly codifies the
common law authority of Attorneys General in civil law
enforcement actions to seek civil penalties as we do here.

        THE COURT:  I know there's more you want to say, and
you will have that opportunity, but let me turn to defense
counsel.  And at this point, you're free to get into your
motions as well, because I think we can't avoid the interplay

N8VBVIRO

of those motions.

1

2         MS. ELLSWORTH:  Thank you, your Honor.  Let me start

3    where Ms. Liu just ended.  This is not a law enforcement

4    action.  This is not the US Virgin Islands proceeding as a law

5    enforcement entity enforcing its own law.  If they were trying

6    to enforce one of its territorial laws, then it could be a law

7    enforcement action.  It did try and bring such a case, and the

8    Court dismissed it.

9         THE COURT:  But the statute doesn't limit them to

10    that.  The statute says that they can, when they have reason to

11    believe that the interest of the residents of their state has

12    been or is threatened, they can bring a civil action.

13         MS. ELLSWORTH:  A *parens patriae* civil action, which

14    means they need to show injury, and the Court found that at the

15    motion to dismiss stage, they could survive a motion to dismiss

16    based on the articulation of injury that Ms. Liu read to you,

17    or maybe it was Mr. Ackerman, which was injury to the residents

18    of the US Virgin Islands.

19         But what we come to the Court with a motion for

20    summary judgment on the damages that they're seeking.  Let me

21    put the injunction relief to the side for a moment, but I'd

22    like to come back to it.  The damages that US Virgin Islands

23    purports to seek in this case are not damages that are tied to

24    that injury that they asserted in the motion to dismiss.

25         THE COURT:  What about your adversary mentioned what

N8VBVIRO

1   she called civil penalties.  In some of the briefing it's

2   referred to as punitive damages, but what about that?  In other

3   words, can't they -- even if they, for the sake of argument,

4   the victims were all totally compensated by the settlements

5   that are before me, their argument is, civil penalties still

6   need to be imposed.  Those have a quasi-punitive purpose that

7   is not served by mere compensatory damages.

8          You say, among other things in your papers, well,

9   there's a lot of law that says that if you can't show

10  compensatory damages, you can't get punitive damages; but I

11  wonder if that's really analogous to a situation where it's the

12  state suing *parens patriae*.

13         MS. ELLSWORTH:  I think it is.  On the compensatory

14  damages, just briefly, the compensatory damages that the US

15  Virgin Islands now seeks are the very type of damages that they

16  cannot seek as *parens patriae*.  They are individual victim

17  damages.  They call them victim damages.  It's simply not

18  cognizable under the *parens patriae* law, and that's *Seneci* and

19  that's the *Vacco* case.  I didn't hear Ms. Liu argue it.  It

20  really is not available to them under *Snapp* or under any *parens*

21  *patriae* doctrine.

22         Under civil penalties, again, Ms. Liu just said, civil

23  penalties are a traditional law enforcement mechanism, but this

24  is not law enforcement.  The TVPA section 1595(d) allows them

25  to bring a civil action*, parens patriae*, and allows them to

N8VBVIRO

1    seek appropriate relief.  That's not defined in the statute.

2              THE COURT:  I must say, I think that's -- of all the

3    questions, very interesting questions that you folks have

4    presented me with, one of the most interesting is, there's not

5    much indication, as near as I can tell from your briefs, as to

6    what Congress meant by appropriate relief.

7              MS. ELLSWORTH:  I'm not sure Congress elucidated at

8    much beyond putting those words into the statute, so that's the

9    job for the Court.  But I do think what the Court can look at

10   are a few different things.  The first is, *parens patriae* is

11   different than law enforcement.  And Mr. Schoenfeld spoke about

12   the *UPS* and the *FedEx* cases that draw the distinction between

13   the state acting as an enforcement agency when it is delegated

14   that authority by a federal statute, versus a state acting as

15   essentially a civil plaintiff when the only right of action

16   that it's given by a federal statute is as a civil plaintiff.

17             The TVPA does not delegate enforcement authority to

18   any state attorney general or the USVI.  What the TVPA allows

19   is a civil action that allows them to try and seek some from of

20   relief, whether it's injunctive or damages if they could show

21   them.  They have not articulated any damages that map onto the

22   interest to the territory that was articulated at the motion to

23   dismiss.

24             THE COURT:  Maybe I misunderstood their argument, but

25   I think the argument goes, at least in part, we want injunctive

N8VBVIRO

1    relief to make sure the bank doesn't undertake this alleged

2    misconduct in the future.  And we think under their

3    interpretation of the statute and the law that we can add on to

4    that civil penalties for the prior misconduct.  What about

5    that?

6          MS. ELLSWORTH:  Again, it's not contemplated by the

7    statute that they would have civil penalties.

8          THE COURT:  The question is, what is meant by

9    appropriate?

10         MS. ELLSWORTH:  Well, then I think appropriate relief

11   could be injunctive relief. It could be some form of damages if

12   there were damages that actually mapped onto the *parens patriae*

13   interest.  To allow them, particularly in the facts in this

14   case, to assert civil penalties or to award civil penalties

15   would be, as you just indicated, those are essentially like

16   punitive damages, that would be a retroactive application of

17   some sort of penalty to a provision that was added in 2018.

18   And the conduct of course that the US Virgin Islands challenges

19   here is conduct that dates back to the late '90s.

20         So I don't think that -- putting aside whether that's

21   actually even contemplated in the TVPA sort of writ large in

22   this case.  To have civil penalties applied for conduct that

23   predates the right of action under which the US Virgin Islands

24   precedes would be an improper retroactive penalty.

25         But I also think it's not sort of what the statute set

N8VBVIRO

out.  What the statute set out was to allow an Attorney General

to try and bring some form of civil action to the extent that

they had some separate form of damage to the territory, to the

quasi-sovereign interest.

         And the US Virgin Islands could have tried to prove

that form of damage.  And they had at various different points

theories and dollar amounts that were disclosed as being those

potential damages. They have withdrawn all that.  They are not

seeking relief for the actual injury that allowed them to bring

this suit as *parens patriae*, and that's why no form of monetary

damages is available to them in this case.

         I talked about compensatory damages briefly.  We

talked about civil penalties.  I do want to just note the US

Virgin Islands suggest that even if they can't get compensatory

damages, somehow maybe punitive damages would still be

appropriate.  That's frankly just incorrect, under both the

common law availability of punitive damages, which are only

when there is something compensatory, and under the

constitutional sort of ratio due process clause.  So I don't

think punitive damages could possibly be on the table either.

         Restitution and discouragement are two other forms of

damages that they have articulated.  Restitution would have to

be for some harm to the US Virgin Islands.  That's what

restitution is. Of course they have not articulated that. And

discouragement is only available to victims, and they don't

N8VBVIRO

1    claim to be a victim of anything either.  They claim to proceed

2    on behalf of the interest of the territory to try and vindicate

3    this quasi-sovereign interest.

4           Let me turn to the injunctive relief request because

5    you discussed that at some length with Ms. Liu.  I think the

6    Court's questions are the right ones which is, What is the US

7    Virgin Islands seeking to enjoin?  And what basis does it have

8    to believe that there is a need to enjoin anything?  The US

9    Virgin Islands has listed no evidence that sitting here today

10   JPMorgan Chase is not conducting itself in compliance with the

11   TVPA or with any of the federal anti-money laundering statutes

12   or any of the other sort of bank regulations that have form the

13   basis of some of their claims.

14          There's not a scintilla of evidence in the record that

15   suggest that there is lack of compliance today -- and I would

16   argue lack of compliance historically, but putting that to the

17   side.  There's no suggestion that there would be any need that

18   they could possibly make out the showing required for

19   injunctive relief, either balance of harms for some of the

20   reasons Mr. Schoenfeld was discussing relating to some of the

21   affirmative defense.

22          But more importantly, there is no suggestion that

23   there is a need to have an injunction from a court that says

24   follow the law when they haven't elucidated any evidence that

25   JPMorgan is not following the law.

N8VBVIRO

1          THE COURT:  I think their argument at least in part as

2     I understood from what Ms. Liu just had to say was, you didn't

3     file SARs in her view purposely because you were accommodating

4     Mr. Epstein's misconduct, because it was lucrative for you to

5     do so.

6          Then when finally things just got impossibly out of

7     hand, the publicity was too bad or whatever, you, in her view,

8     belatedly filed those SARs almost -- she would argue --

9     admitting thereby that you should have filed them sooner.  And

10    that that shows a pattern of behavior that needs to be enjoined

11    going forward.  Those are not the Court's arguments one way or

12    the other.  I'm just trying to articulate what I understood her

13    to be saying.

14         MS. ELLSWORTH:  I think that that argument as

15    articulated by US Virgin Islands is simply contravened by the

16    facts.  There are six filings made with the treasury department

17    during the course of the relationship between JPMorgan and

18    Jeffrey Epstein that predate that final post-death filing that

19    Ms. Liu was talking about.

20         So the suggestion that there were no filings at all is

21    imply incorrect.  And the suggestion that there is a need to

22    have some kind of follow the law injunction from this Court for

23    the bank to have an adequate compliance program, again there

24    have been no facts adduced to suggest that sitting here today

25    in 2023, the compliance program is not squeaky clean.

N8VBVIRO

1          So I don't think that you can just say, well, I think

2     you did something not as well as you should have 20 years ago,

3     and so today the Court's going to enter an injunction without

4     knowing that you're not doing things perfectly appropriately

5     today.  The time for facts is now, and they have not elucidated

6     them.  If I could just be heard briefly, we also moved on the

7     obstruction claim.

8          THE COURT:  Yes, and we need to hear from your

9     adversary on that as well, but go ahead.

10          MS. ELLSWORTH:  Indeed, but since I have the

11     microphone, I'll start.  We moved that summary judgment should

12     enter in JPMorgan's favor on the obstruction claim.  Let me

13     give a few different reasons why I think that is.

14          THE COURT:  Possession of the microphone is a weapon

15     not to be lightly disregarded.

16          MS. ELLSWORTH:  And not to be abused, so I'll be

17     brief.  The US Virgin Islands does not have standing for an

18     obstruction claim.  The Court allowed the Doe class obstruction

19     claim to proceed pass the motion to dismiss stage because the

20     Doe class claim to be victims of the alleged obstruction of a

21     federal TVPA investigation.  Virgin Islands hasn't claim nor

22     could it that it was a victim of an alleged obstruction of a

23     TVPA investigation.

24          It hasn't argued any harm, but more importantly it

25     hasn't suggested that somehow it was a victim.  And it's only a

N8VBVIRO

1    victim of obstruction that can in fact bring a claim under the

2    TVPA for that obstruction.  The harm, to the extent that there

3    was a harm beyond the individual victims, it would be to the

4    federal government to the extent there was an obstruction.  So

5    I think there's sort of threshold standing problem with the US

6    Virgin Islands obstruction claim.

7           The second point I would make is, they have not put

8    forth any evidence that there was in fact a federal

9    investigation to obstruct.  They have not identified, oh, there

10   was an investigation in 2010, and somehow that was obstructed

11   or impeded by conduct or lack of conduct by JPMorgan Chase.

12   They haven't met that second predicate act.

13          And then even more easily on the summary judgment

14   standard, they have not and cannot --

15          THE COURT:  What about the arguments -- this goes back

16   to the SARs -- that there would or a reasonable jury could

17   conclude that there would have been an investigation had they

18   timely filed the SARs that she says you didn't file in a timely

19   fashion; and that therefore the effect of the failure to make

20   timely filings was an obstruction in the same way that, say,

21   destroying evidence before the government knows about the

22   underlying crime constitutes obstruction.

23          MS. ELLSWORTH:  Again, it's a counterfactual argument,

24   and that's the problem with the argument.  There were failings

25   made with the treasury department, and there was no response or

N8VBVIRO

action taken by the federal government in response to filings

made in 2002, 2003, 2008, 2013, 2015 and 2016.  So the

suggestion that filing more than those particular reports would

have somehow spurred an investigation is I think contravened by

the fact that the things that were filed did not spur an

investigation.

I would also point out that the obstruction count

requires an intentional act.  It requires an intent to impede

an investigation.  We again have the opposite here.  What the

testimony and the evidence in the record before you shows is

that JPMorgan Chase employees made inquiries of the federal

government about whether or not an investigation was ongoing

against Mr. Epstein.

And they were either told Can't confirm or deny, or

they were told by lawyers for Epstein that no investigation was

ongoing.  So inquiring about the existence of an investigation

is the polar opposite of trying to obstruct.

THE COURT:  I'm not sure that I need to or should give

any weight to the inquiries of Epstein's lawyers.  When you say

the bank says to a crook, Are you under investigation,

Mr. Crook.  Not me.  The inquiries of the government are

typically responded to as you indicated with, We're not going

to comment one way or the other.

MS. ELLSWORTH:  But again, what this all goes to is

whether there was intentional conduct.  It doesn't matter

N8VBVIRO

1    whether it was right or wrong if an investigation was ongoing

2    or not.

3        THE COURT:  My point is couldn't a reasonable jury

4    determine that the inquiries of Mr. Epstein's lawyers in that

5    regard was simply, to use plaintiff's counsel colorful phrase,

6    as CYA --

7        MS. ELLSWORTH:  With apologies, your Honor.

8        THE COURT:  -- approach as opposed to a sincere

9    approach.

10       MS. ELLSWORTH:  I don't think sincerity matters for

11   purposes of obstruction.  They need to show an intentional

12   attempt to impede an investigation, and the conduct that I've

13   just described is the opposite of that.  It's an attempt to

14   determine if there's an investigation ongoing, as opposed to an

15   attempt to hide evidence, destroy evidence, sort of all the

16   typical obstruction type conduct.

17       The last point I would make on the obstruction claim

18   is just to point out that again we have a 2008 retroactivity

19   problem.  So the obstruction cause of action was added to the

20   TVPA in December of 2008, so any conduct that predates that on

21   which the US Virgin Islands would seek to rely cannot be a

22   basis for a liability under obstruction.  Anything after 2008,

23   that could potentially be a basis, but pre-2008 conduct is off

24   the table for that purpose.

25       THE COURT:  Thank you very much.  Let me hear now

N8VBVIRO

1    again from the Virgin Islands.

2        MS. LIU:  Thank you, your Honor. I just want to be

3    clear on this issue about *parens patriae* being essentially the

4    government acting as a private actor is completely contrary to

5    all of the case law and the common law as it relates to *parens*

6    *patriae* authority which is specifically the language used in

7    1595(d).

8        *Parens patriae* means parent of the country or parent

9    of the state.  The Attorney General is the one who can act as

10   *parens patriae* because they can act in a law enforcement

11   capacity to prosecute crimes civilly and criminally, but

12   civilly here including crimes as heinous as child sex

13   trafficking.

14       The very nature of *parens patriae* is the state acting

15   as a civil law enforcer.  Otherwise, it is not the real party

16   and interest for purposes of a *parens patriae*'s action, and

17   that's where you get into a number of these --

18       THE COURT:  Well, that may be true as to *parens*

19   *patriae* actions generally, but here of course the statute

20   speaks of the interest of the residents, not the interest of

21   the state independent of the interest of the residents.  So I'm

22   not totally sure whether there's a distinction to be made there

23   or not.

24       MS. LIU:  There absolutely is because if you look at

25   *Alfred Snapp*, it distinguishes between three layers.  One, the

N8VBVIRO

1  state acting in its pure sovereign capacity while the *parens*

2  *patriae* case.  The state acting in its quasi-sovereign capacity

3  protecting the general interest of a substantial segment of its

4  population, that is the interest of its residents.  And here

5  the Court has said, assuring its residents that it will be

6  protected from ongoing sex trafficking flourishing in the

7  Virgin Islands is exactly a quasi-sovereign interest of the

8  residents.

9        THE COURT:  If that's so, accepting that for the

10  moment, that gets you to injunctive relief.  It doesn't get you

11  to damages.

12        MS. LIU:  That gets us, we submit, your Honor, not

13  only to injunctive relief under the common law, but also

14  declaratory relief and civil penalties.

15        Now when you get to the question of, Can you also

16  authorize in a *parens patriae* case compensatory and punitive

17  damages to individuals, the answer is yes.  The Second Circuit

18  in *Seneci* said under common law *parens patriae*, we are not

19  going to determine their standing when you're seeking merely

20  damages on behalf of individuals.  But, the Court said, citing

21  to the *Frito Lay* case, the legislature can authorize under

22  *parens patriae* authority the additional remedy of pursuing

23  compensatory or punitive damages.

24        THE COURT:  But here we have all the injured members

25  of the class settled.  They of course could have sought -- and

N8VBVIRO

undoubtedly would have sought if the case had gone forward --

punitive damages.  They accepted a settlement that, if I

approve it, will very fully compensate the whole class of

victims.  So what's left for you to seek in that regard?

MS. LIU:  Before I answer that question, Judge, just

two more quick points on the *parens patriae* issue.  I would

submit to the Court in the *AU Optronics* case.  In that case the

Court I think summarized it nicely by saying *parens patriae*

representation is analogous to, for example, the role of the

EEOC.  I think you asked about the SEC.

But what the Court says and what many of these cases

say is *parens patriae* authority is the state Attorney General

or state law enforcer acting in the role of a civil law

enforcement agency.  And in fact in that case the Court said,

or other regulator, when it brings a case on behalf of a

segment of the public or in the interest of its residents.

So *parens patriae* is recognized as a civil law

enforcement or regulatory action, and we thus submit, for

example, as the New York banking regulator issued $150 million

civil penalty against Deutsche Bank for its relationship with

Epstein, such a similar civil penalty can be awarded here.

But to answer your question, Judge, as to individual

victim damages.  First of all, Congress has in numerous

examples that we cite, and also cited by defendants, authorized

under *parens patriae* authority for State Attorneys General the

N8VBVIRO

ability to seek money damages for individuals, in addition to

injunctive relief civil penalties and other forms of relief.

          As far as I know, not a single one of those statutes

has been struck down as improperly allowing the Attorney

General in its *parens patriae* authority to seek civil damages

on behalf of individuals.

          Going back to the *Seneci* case, citing to *Frito Lay*.

What *Frito Lay* says -- and this is the Second Circuit in *Seneci*

citing to the Ninth Circuit.  What *Frito Lay* says is, State

legislatures or Congress can use its legislative power and

determine that within *parens patriae* authority one form of

relief that can be sought is compensatory or punitive damages

for victims.  And that is one of form of relief we are seeking

here under the statute.

          In terms of your questions about double recovery or

duplicative relief, that does not go to the question of whether

or not in the first instance Attorneys General under 1595(d)

have the authority to seek that relief.  That is what happened

in this particular case.  What happens in any particular case

cannot determine whether or not the authority existed.  So

these are two different questions.

          And in fact in their reply brief, JPMorgan argues the

question of *parens patriae* authority is analytically distinct

from what relief can be sought in a particular action.  So I

would submit, we can seek it.  The plain language of the

N8VBVIRO

statute allows it.  The legislative history supports it.  And

then when it comes before your Honor in the situation that's

present here, which may not be present in every case, there

could be an example where the Doe victims did not come forward.

They did not seek their own relief.  And then what would the

Court say.  You can't interpret 1595(d) differently in terms of

authority based on what happens in any particular case.

So the only question becomes, Can you seek it?  Yes,

you can.  And to what extent would a jury after a trial, if

there is a trial in this case, award in terms of compensatory

and punitive damages.  They may award $280 million, in which

case it then falls to the Court -- you can look at *EEOC v.*

*Waffle House* before the Supreme Court to decide what's the

offset.

THE COURT:  Again, just for the sake of argument, if

the only relief you can seek is injunctive relief, declaratory

relief and civil penalties, is it a jury trial?

MS. LIU:  I believe that civil penalties, your Honor,

as I mentioned -- and there's a Supreme Court case from 1987

called *Tull*.  I think it's *Tull v. United States*.  I think what

that case says is that a civil penalty was a remedy at common

law.  And because it's a remedy at common law, I believe

liability can be determined by a jury.  I don't want to get

ahead of myself here, but I think it's the case that perhaps

the judge can determine the amount of the civil penalty, but

N8VBVIRO

1    that a jury can hear the case and assess liability in that

2    context.

3         THE COURT:  All right.  Well, we don't need to reach

4    perhaps that issue on these motions.  Only in my nightmares do

5    I see this as a bench trial.  So, anyway, let me hear from

6    defense counsel.

7         MS. ELLSWORTH:  So, your Honor, just to make a few

8    points in response to Ms. Liu's argument.  The first is that

9    the cases where *parens patriae* actions were viewed more akin to

10   law enforcement actions that Ms. Liu was citing to, the *Purdue*

11   case, the *AU Optronics*.  Those are all cases where there were

12   states pursuing under their own state laws.

13        THE COURT:  You made that point before, and I think

14   it's an important point, but I understand that point.

15        MS. ELLSWORTH:  So when they're enforcing their own

16   state law, it's just a different in kind.  On the question of

17   injunctive relief -- and I do think the Court needs to think

18   about, again, what is the interest that is being articulated

19   here.  And in particular, Does the US Virgin Islands even have

20   standing to seen an injunction here.

21        So the interest that's been articulated is protecting

22   the residents from the harm of potential sex trafficking.  They

23   have not identified any actual concrete or particularized

24   injury that such future harm might befall the residents of the

25   US Virgin Islands or any territory; nor that that potential

N8VBVIRO

1    harm might be redressed by the injunction that apparently they

2    would be seeking.  And although I don't think it's before you

3    on summary judgment as to the form of injunctive relief, if

4    any, of course liability would need to be established first.

5         But what I've heard articulated is, comply with the

6    law.  Comply with the TVPA.  And there's no suggestion that

7    that would redress whatever harm it is that they articulated at

8    the motion to dismiss stage, and they purport to continue to

9    articulate here.

10        I do want to go back to the civil penalties point

11   because I think it's important, and I hear the Court sort of

12   grappling with whether or not that's available here.  It is a

13   traditional law enforcement penalty.  It's called a civil

14   penalty, right, or a fine.  That's by its nature punitive.

15        I'll point out the retroactivity point again, but

16   again that is not what Congress authorized State Attorneys

17   General to do here, didn't authorize State Attorney General to

18   enforce the TVPA as some law enforcement entity.

19        Congress knows how to do that. It has done that in

20   other federal statutes where it delegates some enforcement

21   authority to a State Attorney General.  That is not what

22   Congress did in the TVPA.  It knows how to do it, and it didn't

23   do it here.  And so for the Court to interpret the 1595(d) to

24   allow that type of punitive action by a non-law enforcement

25   entity would, I think, be both improper under the TVPA, but

N8VBVIRO

1    would also be impermissibly retroactive for any conduct that

2    predates 2018.

3              On the question of compensatory damages to victims.

4    That's just flatly unavailable to a *parens patriae* plaintiff.

5    It cannot be individual damages.  And Ms. Liu has said a few

6    different times that *Seneci* said, well, if that's all you're

7    seeking, then that's the problem.  But whether or not that's

8    all that the US Virgin Islands is seeking, it is still

9    unavailable as a form of relief under *parens patriae*.

10             And the Court said it itself in the motion to dismiss

11   ruling, which is that the interest that allows the US Virginia

12   Islands to proceed forward here is an interest that cannot be

13   redressed by an individual plaintiff, and that's not what the

14   compensatory damages that they purport to seek here would be.

15             And again I point out as the Court has, to the extent

16   that they had some right to seek those damages, which they do

17   not, those victims have been fully compensated by the two

18   settlements.

19             THE COURT:  Although theoretically, I doubt this will

20   occur, theoretically if 50 people opted out on those

21   settlements, and they were all residents of the Virgin Islands,

22   we might have an interesting issue, but I think that's an

23   unlikely scenario.

24             MS. ELLSWORTH:  I think it is too, your Honor.  I

25   think that is an entirely theoretical question, but the

N8VBVIRO

question did embed an important point, which is residents of
the Virgin Islands would be the only types of potential victims
that the US Virgin Islands might be able to seek compensatory
damages for.

 Again, those damages aren't available, but even if
they were.  And they have not articulated or identified who
those individuals might be.

 But more importantly, it's both categorically
unavailable released by the settlement if it is ultimately
approved and unnecessary.  Those damages have been fully
compensated by the settlements reached that the Court is
currently considering.

 THE COURT:  Okay.  I want to hear both from
plaintiff's counsel on what we've just been discussing, but
also on anything else you want to raise because in a moment of
foolishness I scheduled another matter to follow this matter,
and I don't want to keep the lawyers in that matter waiting too
long.

 Let me hear from plaintiff's counsel, and then we'll
give defense counsel a final say as well.

 MS. LIU:  Thank you, your Honor, just a few points.
If you look at the legislative history of 1595(d), it's clear
that Congress was contemplating that State Attorneys General
would act as civil law enforcement in this case.

 The language in one section allege history that we

N8VBVIRO

cite in the briefing, We have begun to change the issue of

resources to go after the perpetrators of these heinous crimes

in a much better way by allowing State Attorneys General to

actually prosecute these crimes.  "Prosecute" that is not a

word that is used, except when you are referring to the State

Attorneys General's law enforcement powers.  We are doing

something in the law that says we need more prosecutes.  We

need more investigators.

Again, those are terms used when Congress is intending

that Attorneys General are acting in their civil law

enforcement capacity.  "Let's unleash those in the states to

help us address this growing problem throughout our country.  A

problem that they previously referred to as these heinous

crimes."

Clearly the intent of Congress was to have State

Attorneys General, the law enforcement entities in state --

THE COURT:  You're saying that, as to your adversary's

argument, that this would only apply if they were enforcing

state laws, that the statute on its face in effect says they

are enforcing federal law?

MS. LIU:  Right.  And Congress has done this numerous

times where they've invoked State Attorneys General *parens*

*patriae* authority to enforce a federal law civilly, and for

this precise reason, to allow more prosecutes to go after these

type of crimes.

N8VBVIRO

And in the briefing we talk about other congressional
enactments that protect children; for example, where Congress
has specifically sought the help of state law enforcement to
enforce and prosecute these type of heinous crimes against
perpetrators like JPMorgan.

I will also provide to you, your Honor --

THE COURT:  And you might along the same lines say or
argue perhaps that this made special sense in a situation where
victims who are residents of a particular state or territory
are often, by the nature of these crimes, people who are
hesitant to come forward have many impediments to bearing their
souls so to speak; and so that it would be particularly
appropriate to have the state as a quasi-prosecutor through
civil action in those situations.

MS. LIU:  Absolutely, Judge.  And that's precisely
what has happened here.  If you look at the statements of
undisputed facts, I believe it's in JPMorgan's facts, it is
noted by one of the parties that the EDCP identified, for
example, a certain number of victims that it could identify.

Of course it's very hard to ensure that you've
identified all of the victims in this kind of case,
particularly as you said, where Jeffrey Epstein really was able
to hide out on these two Islands that were miles off the shore
of St. Thomas.

But the EDCP identified a certain number of victims.

N8VBVIRO

And, in fact, not all those victims came forward.  There may be
a number of absent class members who did not fall within the
class period whose claims are released.  And that is precisely,
even in this particular case, the reason that state AGs are
here.  We can get those damages for those victims, put them in
a fund.  And if at some point years down the road those victims
come forward, they can still claim those funds as opposed to
having them released.

I would also note that there is a long line of cases,
Judge, where the situation that's happened here has happened in
cases involving government enforcement actions; namely, private
party settlements seeking to release government claims.  And
the Third Circuit, the Eighth Circuit, the Seventh Circuit, the
Eleventh Circuit, have all said that is not permitted.

In the *Kwasny* case, 853 F.3d 87; the *Kratville* case,
796 F.3d 873; the *Hartigan* case, 816 F.2d, 1177.  Those cases
say -- and I'm quoting, That private settlements cannot
preclude the government "From later seeking additional or more
full restitution or any other remedy.  Private settlements
cannot release the claims of government."

Again, your Honor can determine at a later stage, if
there's an offset merited here. We are not arguing for double
recovery.  But to the extent, again, there are absent class
members, or a jury decides that punitive damages should be
awarded, which are not included in the proposed settlement, why

N8VBVIRO

1    shouldn't the victims benefit from those awards?  Why should

2    JPMorgan get the windfall of not having to pay those punitive

3    damages or those absent class members or those additional

4    compensatory damages that a jury decides is properly awarded to

5    the hundreds of victims at issue in this case particular case?

6            THE COURT:  Okay.  Thank you so much.  Let me hear

7    from defense counsel.

8            MS. ELLSWORTH:  Just a few things, and I'll bring that

9    last point up first.  The claims the government is asserting

10   here are not the claims of victims for their own damages.  What

11   the government is trying to assert here is a quasi-sovereign

12   interest in protecting the residents of the territory, so

13   nothing that would be released by the settlement should effect

14   the government's claims.

15           The government has different claims, and I think

16   that's some of what the Court and the parties have been

17   grappling with here is trying to define what in fact is the

18   government claiming, and is there any injury in fact that they

19   can claim based on that articulation.

20           As to whether the TVPA should be read to infer some

21   power for a state Attorney General to actually act as a

22   prosecutor, as an enforcing entry.  Congress knows how to do

23   that explicitly.

24           When it wants to do that, it does so explicitly using

25   that language. That is not what it did in the TVPA.  And I

N8VBVIRO

1    don't think that a snippet of either a floor statement or a

2    Senate report can change the plain language of the statute

3    which does not delegate any enforcement authority.  It doesn't

4    amend the criminal provision of the TVPA that only the federal

5    government can enforce.  It adds a civil *parens patriae* right

6    of action for State Attorneys General, and that's it.

7

8              And the last point I would make is that, the governor

9    of the Virgin Islands here has to identify what interest it is

10   that it's trying to vindicate.  And it identified that interest

11   as the harm to residents from sex trafficking.

12             Now before the Court it needs to come forward with

13   some evidence that there is in fact harm in the future to

14   residents from sex trafficking, or that there is some

15   cognizable compensatory harm in the past to its residents, its

16   quasi-sovereign interest.  And it's come forth with neither at

17   this last stage in the litigation, and that's what I think is

18   the important factual point for the Court to focus on.

19             THE COURT:  All right.  So I thank all counsel for

20   this excellent and very helpful argument.  I remind everyone

21   that if the case goes forward to trial, he trial is set for

22   October 23rd, and that is a firm fixed final and unmoveable

23   date, so you need to know the results of these motions

24   substantially before that.

25             I will undertake worst case to get you my rulings on

N8VBVIRO

1   these motions by the end of September, but I'm going to try to

2   do much better than that.  At least maybe I'll get you a bottom

3   line order to be followed by an opinion.  Meanwhile, I'll take

4   everything under advisement, and my thanks again to the

5   excellent counsel in this case.  That concludes this

6   proceeding.

7               (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25