**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS, <br><br>       Plaintiff, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A., <br><br>       Defendant/Third-Party Plaintiff, <br><br> v. <br><br> JAMES EDWARD STALEY, <br><br>       Third-Party Defendant. | Case No. 22-cv-10904 (JSR) |
| JANE DOE, individually and on behalf of all others similarly situated, <br><br>       Plaintiff, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A., <br><br>       Defendant/Third-Party Plaintiff, <br><br> v. <br><br> JAMES EDWARD STALEY, <br><br>       Third-Party Defendant. | Case No. 22-cv-10019 (JSR) |

**JPMORGAN CHASE BANK, N.A.'S LOCAL CIVIL RULE 56.1(B) RESPONSE TO**
**THIRD-PARTY DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

    Pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1, Defendant/Third-Party Plaintiff

JPMorgan Chase Bank, N.A. ("JPMC" or "JPMorgan") hereby responds to the *Third-Party*

*Defendant James Staley's Local Rule 56.1 Statement of Undisputed Material Facts In Support Of Summary Judgment.  See* Dkt. 310.[1]  JPMC incorporates by reference the below *JPMorgan Chase Bank, N.A.'s Local Civil Rule 56.1(b) Counterstatement of Additional Material Facts* ("CSMF") and the supporting exhibits cited therein.  JPMC further incorporates into its responses its objection that Third-Party Defendant James E. Staley's cited materials cannot be presented at trial in a form that would be admissible as evidence.  All allegations contained in headings, which are not supported by a citation to admissible evidence, are also disputed for the reasons set forth in the accompanying responses to paragraphs.[2]

## I.    PARTIES

1.    *James E. "Jes" Staley (Mr. Staley) worked at JPMorgan Chase Bank, N.A. from 1979 to 2013 and held several senior positions in the later part of his tenure.*

> **JPMC Response:** Undisputed.

2.    *JPMorgan Chase Bank, N.A. (JPMorgan) is a national bank whose main office is located in Columbus, Ohio, as designated in its Articles of Association.*

> **JPMC Response:** Undisputed.

## II.    STALEY'S TENURE AT JPMORGAN

3.    *Mr. Staley became head of JPMorgan's Private Bank in 1999.  Ex. 1, at 27:24-28:3.*

> **JPMC Response:**  Undisputed.

4.    ████████████████████████████████████████████████████

████████████████████████ *Ex. 2, at 45:18-47:8; 78:21-79:12.*

---

[1] Staley filed his motion for summary judgment and supporting materials in both Case No. 22-cv-10904 (JSR) and Case No. 22-cv-10019 (JSR).  All docket entry numbers herein refer to Case No. 22-cv-10904 (JSR).

[2] Unless otherwise specified, all citations in this document to "JPMC Ex. __" refer to exhibits filed by JPMC in opposition to Mr. Staley's motion for summary judgment.  Citations herein to "Staley Ex. __" refer to exhibits submitted by Mr. Staley in support of his motion for summary judgment.

**JPMC Response:** Undisputed that Staley testified  ███████ Disputed to the extent the underlying fact, which is supported only by Staley's deposition testimony, requires a credibility determination.

5.   ██████████████████████████████████████████████████

██████████████████████████████████████ *Ex. 2, at 45:18-50:14; 248:16-249:1.*

**JPMC Response:** Undisputed that Staley testified as such. Disputed to the extent the underlying fact, which is supported only by Staley's deposition testimony, requires a credibility determination.

6.   *Mr. Staley did not have a relationship with Epstein before meeting with him in or around*

*2000. Ex. 2, at 45:18-50:14.*

**JPMC Response:** Disputed. Staley testified that he first met Jeffrey Epstein in the mid-1990's at the offices of The Limited. JPMC Ex. 1 at 54:17-55:6.

7.   *Mr. Staley became CEO JPMorgan's Asset and Wealth Management division in 2001. Ex.*

*2, at 11.*

**JPMC Response:** Undisputed.

8.   *Mr. Staley became CEO of JPMorgan's Investment Bank in 2009. Ex. 2, at 11:16-12:6.*

**JPMC Response:** Undisputed.

9.   *Mr. Staley ended his employment with JPMorgan in January 2013. Ex. 3.*

**JPMC Response:** Undisputed that the cited document from January 8, 2013, states that Staley would be "leaving JPMorgan Chase to join BlueMountain Capital Management." Disputed insofar as Staley's actual employment with JPMC ended in February 2013. JPMC Ex. 2 at -144_R; JPMC Ex. 3 at -392.

10.   *Epstein introduced Mr. Staley* ██████████ *Ex. 2, at 86:19-88:4.*

**JPMC Response:** Undisputed that Staley testified to being introduced to ████ ████ by Epstein. Disputed if and insofar as Staley appears to contend that any introduction to ██████ was the equivalent of a referral of a client by Epstein to the bank. JPMC Ex. 1 at 386:14-17 ("I don't think [Epstein] referred clients to the bank. I met clients through him, but I don't think he was making a referral."). Disputed if and insofar as Staley appears to contend that this fact supports an inference that Epstein referred ██████ to be a client of the Private Bank or introduced other JPMC employees to ██████. JPMC Ex. 4 at 182:20-183:16

(testifying that he has "not seen any evidence or any documents that would indicate that Jeffrey Epstein was involved in bringing ███████ to JPMorgan as a Private Bank client"); JPMC Ex. 5 at 189:16-190:16 (testifying that Epstein never introduced him to ████ nor offered to introduce him to ████); JPMC Ex. 6 at 391:17-392:15 (testifying that JPMC did not "need Jeff Epstein to talk to ████ ████).

11.   *Epstein introduced Mr. Staley* ███████████████ *Ex. 2, at 86:19-88:13.*

**JPMC Response:** Undisputed that Staley testified to being introduced to ████ ███████ by Epstein. Disputed if and insofar as Staley appears to contend that any introduction to ███████ was the equivalent of a referral of a client by Epstein to the bank. JPMC Ex. 1 at 386:14-17 ("I don't think [Epstein] referred clients to the bank. I met clients through him, but I don't think he was making a referral."). Further disputed as to materiality in light of the fact that JPMC is not aware of any evidence in the record that ███████ is a client of the Private Bank.

12.   *Epstein introduced Mr. Staley* ██████████████ *Ex. 2, at 86:19-87:6.*

**JPMC Response:** Undisputed that Staley testified to being introduced to ████ ███ by Epstein. Disputed if and insofar as Staley appears to contend that any introductions to ███████ were the equivalent of referrals of clients by Epstein to the bank. JPMC Ex. 1 at 386:14-17 ("I don't think [Epstein] referred clients to the bank. I met clients through him, but I don't think he was making a referral."). Disputed if and insofar as Staley appears to contend that this fact supports that Epstein referred ███████████ to be clients of the Private Bank or introduced other JPMC employees to them. JPMC Ex. 7 at 52:21-53:18 (testifying that ███████████ were already clients of the Private Bank when Epstein purported to be advising them).

13.   *Mr. Staley used his corporate email account to communicate with Epstein. Ex. 2, at 254:4-21, 385:5-12; Ex. 4, at -1998-2019.*

**JPMC Response:** ███████████████████████████████████████████████████████████████████████████████ JPMC Ex. 8; JPMC Ex. 9 at -394-395; JPMC Ex. 10; JPMC Exs. 11, 12. Otherwise, undisputed.

### III.   RELEVANT POLICIES AND PRACTICES AT JPMORGAN

14.   *At the relevant times, JPMorgan had policies implementing its Anti-Money Laundering*

*(AML) and Sponsorship Policies known as the Anti-Money Laundering/Know Your Client Policy*

*(KYC).  Ex. 5, at -9752; Ex. 6, at -162-163.*

> **JPMC Response:** Undisputed to the extent that these policies were in place during
> the relevant times.  Disputed if and insofar as Staley appears to contend that the
> cited policies represent the entire universe of AML and KYC practices during the
> relevant time period.

15.   *The policy's principles included that:*



*x. 6, at -164.*

> **JPMC Response:**  Undisputed that the cited policy contains the quoted language.
> Disputed   insofar   as   Staley   omits   the   fourth   principle   which   reads,
> ██████████████████████████████████████████████ Staley Ex. 6
> at -164.  Disputed if and insofar as Staley appears to contend that the cited policy
> or its principles represent the entire universe of AML and KYC practices during
> the relevant time period.

16.   *The client sponsorship policy required generally that* ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ *Ex. 6, at -164-165; Ex. 7, at 57:25-*

*58:10.*

**JPMC Response:** Undisputed that the quoted language appears in the cited sponsorship policy ███████████████████████████████ Staley Ex. 6 at -162. Further disputed if and insofar as Staley appears to contend that the cited policy represents the entire universe of AML and KYC policies or practices during the relevant time period.

17. *The due diligence outlined in the policy required that* █████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

*Ex. 6, at -164-167; Ex. 8, at 61:9-24; Ex. 9, at-1937; Ex. 10, at 155:20-157:7.*

**JPMC Response:** Undisputed that bankers were expected t█████████████████

Disputed if and insofar as Staley appears to suggest that█████████████████████

███████████████taley Ex. 11 at -571.█████████████████████████████████

Staley Ex. 6 at -167; Staley Ex. 11 at -571.

18. █████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████*Ex. 6, at -0170; Ex. 8, at 79:14-80:2; Ex. 10, at 461:9-16; Ex. 7, at 54:20-23.*

████████████████████████████████████████████████████████████████████

██████████*Ex. 7, at 54:16-19; Ex. 11, at -570.*

**JPMC Response:** Disputed if and to the extent that Staley appears to assert that ████████████████████████████████████████████████████████████████████ While certain JPMC executives had authority to exit a client, in practice, exit decisions were a collective process and not made unilaterally at JPMC.  JPMC Ex. 13 at 155:4-156:10, 196:5-10, 199:12-

201:12; JPMC Ex. 14 at 36:15-18, 46:22-47:8; JPMC Ex. 7 at 141:1-2, 143:12-25, 216:8-217:10; JPMC Ex. 15  at 110:17-111:2, 122:22-124:1.

19.     ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████  *Ex. 6, at -164; Ex. 12, at -576; Ex. 13, at -159.*

**JPMC Response:**  Undisputed except if and insofar as Staley appears to contend that the cited policies represent the entire universe of AML and KYC policies during the relevant time period and to the extent the statement does not reflect the important role that other senior leadership at the bank may have with respect to JPMC's due diligence process.  JPMC Ex. 7 at 41:5-43:8.  *See* CSMF ¶¶ 86-90.

20.     *JPMorgan had additional policies and procedures for clients who were designated "high risk." Ex. 11.*███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

**JPMC Response:** Undisputed that the quoted language appears in the cited policy. Disputed if and insofar as Staley appears to contend that the cited policy represents the entire universe of AML and KYC policies and procedures during the relevant

time period.  Further disputed to the extent that Staley omits language from JPMC's high risk policy clarifying that ███████████████████████████████████ Staley Ex. 11 at -571.

21.   ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ *Ex. 6, at -170; Ex. 1, at 88:19-89:19.*

> **JPMC Response:** Undisputed that █████████████████████████████
> ████████████████████████████. Disputed if and insofar as Staley
> appears to contend that the cited policy represents the entire universe of AML and
> KYC policies and practices during the relevant time period.  Further, disputed if
> and to the extent that Staley appears to suggest that this policy applied to clients
> outside the Private Bank as unsupported by the cited document.

22.   *Risk management and compliance also had account monitoring roles at least for high-risk*

*clients.  Ex. 11, at -571; Ex. 14, at -938-939.* ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ *Ex. 11, at -571.*

> **JPMC Response:**  Undisputed that under the cited policies ██████████████
> █████████████████ Disputed to the extent Staley omits that the high risk policy explicitly noted
> █████████████████████████████ Staley Ex. 11 at -571.  Disputed if and
> insofar as Staley appears to contend that the cited policies represent the entire
> universe of AML and KYC policies and practices during the relevant time period.
> Further, disputed if and to the extent that Staley appears to suggest that this policy
> applied to clients outside the Private Bank as unsupported by the cited documents.

23.   *JPMorgan's policy for identifying and investigating unusual or suspicious activity*

*instructed that* ████████████████████████████████████

████████████████████████████████████████████████████████



*Ex. 9, at -134.*

*Ex. 9, at -134.*

**JPMC Response:** Undisputed that the cited policy contains the quoted language. Disputed to the extent Staley omits the policy's conclusion that ███████████ ████████████████████████████████ Staley Ex. 9 at -134.

24. ███████████████████████████████████████████████████████████

████████████████████████████████████ *Ex. 9, at -138; Ex. 15, at 25:22-26:4; Ex.*

*10, at 82:19-83:7; 100:1-102:19.* ████████████████████████

██████████████████████████████████████ *Ex. 15,*

*at 27:5-16; Ex. 10, at 99:13-24.* ██████████

███████████████████████████████████ *Ex. 15, at*

*257:16-258:16; Ex. 10, at 485:8-486:24.* ████████████

████████████████████████ *Ex. 10, at 104:11, 485:8-486:24.*

**JPMC Response:** Undisputed.

25.   *Mr. Staley did not have responsibilities to conduct due diligence on any individual private*

*banking clients while he was head of the Private Bank or Asset & Wealth Management, or CEO*

*of the Investment Bank. Ex. 1, at 44:8-47:17.*

**JPMC Response:** Disputed. JPMC's due diligence process was comprehensive and holistic, and senior executives, like Staley was at the time, had important roles to play in the process. Staley was Epstein's primary contact and was intimately involved in Epstein's due diligence process, including by communicating directly with Epstein about concerns JPMC employees had stemming from news stories connecting Epstein to sex crimes. JPMC Ex. 7 at 41:5-43:8, 119:10-13; JPMC Ex. 16; JPMC Ex. 15 at 63:8-65:3. *See* CSMF ¶¶ 56-62, 86-90. Moreover, any

employee who learned of client misconduct that could negatively impact the reputation of the bank had an obligation to share that information. *See, e.g.*, JPMC Ex. 17.

26. 

*Ex. 7, at 58:13-24.*

**JPMC Response:**

JPMC Ex. 15 at 21:11-24; JPMC Ex. 7 at 23:20-24:4; JPMC Ex. 5 at 32:8-12, 42:8-16.

27.

*Ex. 7, at 16:17-19:25; Ex. 16, at -617-622.*

**JPMC Response:** Disputed insofa

JPMC Ex. 15 at 21:11-24; JPMC Ex. 7 at 23:20-24:4; JPMC Ex. 5 at 32:8-12, 42:8-16.

28.

*Ex. 7, at 18:14-19:13; Ex. 17, 747:14-750:9; Ex. 18, at - 722-766; Ex. 19, at -008-011.*

**JPMC Response:**

JPMC Ex. 15 at 21:11-24; JPMC Ex. 7 at 23:20-24:4; JPMC Ex. 5 at 32:8-12, 42:8-16.

29.

*Ex. 20, at 180:15-24.*

*Ex. 20, at 326:1-330:23.*

**JPMC Response:**  Disputed ███████████████████████████

██████████████████████ Mr. Cutler's approval (or, potentially, the approval of the JPMC Chief Risk Officer) was also required for JPMC to retain a client convicted of a felony.  Staley Ex. 5 at -758, -759. ███████████████████

██████████████████████████████ Staley Ex. 20 at 326:21-25; 328:7-10; 329:23-330:22; JPMC Ex. 7 at 34:6-13, 79:1-6; 86:7-87:4; JPMC Ex. 18 at 112:5-114:14; JPMC Ex. 19 at 110:25-111:8, 117:7-17, 118:23-119:6, 122:6-132:16.  Where no legal or compliance concern was at issue, it was appropriate for a JPMC businessperson, such as Staley, to decide whether to retain the client. JPMC Ex. 6 at 326:21-327:4, 333:15-334:5.  *See* CSMF ¶ 120.

## IV.   JPMORGAN'S RELATIONSHIP WITH EPSTEIN

30.   ██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ *Ex. 21, at -203; Ex. 22, at 30:24-31:9, 195:8-18; Ex. 71.*

**JPMC Response:**  Undisputed  that  Staley  Ex.  21  states  that  the  ████████ ██████████  Disputed to the extent the cited exhibit does not support the assertion that ████████████████ Staley Ex. 21 at -204.  Otherwise, undisputed.

31.   ████████████████████████████████████████████████ *Ex. 23.*

**JPMC Response:**  Undisputed.

32.   ████████████████████████████████████████████████

*Ex. 24, at 6:17-8:8.*

**JPMC Response:**  ████████████████████████████████

██████████████████████████████ *See* JPMC Ex. 20; JPMC Ex. 21.  *See also* CSMF ¶ 79.

33.   ████████████████████████████████████████████████

████ *Ex. 25, at 7:22-25, 56:17-23; Ex. 12, at -577.*

**JPMC Response:**  ███████████████████████████████

██████████████████████████████████████████████████



Staley Ex. 6.  *See also* CSMF ¶ 76.

34.

*Ex. 26, at 11:12-17; Ex. 12, at -577.*

**JPMC Response:**

Staley Ex. 6.  *See also* CSMF ¶ 75.

35.   *Ex. 26,*

*at 26:17-18.*

**JPMC Response:**  Undisputed.

36.   *Ex. 12, at*

*-577.*   *Ex. 12, at -*

*577.*   *Ex. 12, at -577.*

*Ex. 12, at -*

*577.*   *Ex.*

*12, at -577.*

**JPMC Response:**  Undisputed that

Disputed if and to the extent Staley appears to contend that these facts support an
inference that DDR approvals were a decision point that could lead to the exit of
Epstein from the bank.   Ms. Keating testified that "[n]ot approving a DDR isn't
how you exit a client."  JPMC Ex. 7 at 141:1-2; *see* JPMC Ex. 15 at 110:17-111:2.

Staley Ex. 12 at -575.  JPMC employees viewed their approval
of Epstein's DDRs as carrying out the decision to retain Epstein as a client.  JPMC
Ex. 7 at 140:13-18, 141:12-23; 142:25-143:10; JPMC Ex. 15 at 242:16-20; 243:8-
12.  *See* CSMF ¶¶ 87-90.

37.

*Ex. 27, at -977; Ex. 28, at -554-555.*

**JPMC Response:**  Undisputed that ████████████████████████
████████████████████

Disputed if and to the extent Staley appears to contend that these facts support an inference that DDR approvals were a decision point that could lead to the exit of Epstein from the bank.  Ms. Keating testified that "[n]ot approving a DDR isn't how you exit a client." JPMC Ex. 7 at 141:1-2███████████████████████
████████████████████████████████████████ Staley Ex. 12 at -575. JPMC employees viewed their approval of Epstein's DDRs as carrying out the decision to retain Epstein as a client.  JPMC Ex. 7 at 140:13-18, 141:12-23; 142:25-143:10; JPMC Ex. 15 at 242:16-20; 243:8-12.  *See* CSMF ¶¶ 87-90.

38. ████████████████████████████████████████████████████

████████████████████████████████ *Ex. 1, at 157:23-58:13.*

**JPMC Response:**  Disputed.  The cited deposition testimony of JPMC's corporate designee Francis Pearn establishes only ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
JPMC Ex. 22 at 157:23-158:13.  *See also* JPMC Ex. 19 at 16:12-20 (testifying that he was not aware that Mr. Staley visited Epstein's property in New Mexico).

39. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ *Ex. 68.*

**JPMC Response:**  Undisputed.

## V.    JPMORGAN'S RESPONSE TO DEROGATORY INFORMATION REGARDING EPSTEIN

40. *Epstein was indicted in Florida state court for felony solicitation of prostitution on July 19, 2006.  Ex. 30.*

**JPMC Response:**  Disputed to the extent the cited document does not support the assertion that Epstein was indicted on July 19, 2006.  Otherwise, undisputed.



41.

*Ex. 8, at 65:9-66:15; Ex. 31, at -285-288.*

**JPMC Response:**

Staley Ex. 8 at 65:9-66:15.

42.

*Ex. 32.*

*Ex. 8, at 65:9-66:10.*

**JPMC Response:**  Undisputed that the cited

Staley Ex. 6 at -168.  *See also*
Staley Ex. 11.

43.     *Mr. Staley did not object to the determination of keeping Epstein solely as a banking client and on a reactive, client service basis.  Ex. 8, at 386:5-390:2; Ex. 2, at 123:13- 25.*

**JPMC Response:**  Undisputed.

44.     *Mr. Staley did not object to Epstein's designation as high-risk, nor did he ever ask anyone to change Epstein's high-risk designation.  Ex. 1, at 146:16-148:17.*

**JPMC Response:**  Undisputed.

45.

*Ex. 33.*

*Ex. 33.*

**JPMC Response:**  Disputed if and to the extent that Staley appears to suggest that
That
conclusion was necessarily written later as the contemporaneous "outcome" of the

14

meeting was that "Catherine will go back to JES to tell him we are uncomfortable with Epstein and do not want to go to Cutler for approval." JPMC Ex. 143. *See* CSMF ¶¶ 100-02.

46. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Ex. 34, at –787; Ex. 35; Ex. 36;*

*Ex. 37; Ex. 38, at 133:5-17.*

**JPMC Response:** Undisputed that ████████████████████████████

████████████████████████████████████ Disputed to the extent that Staley neglects his own involvement in the decision to retain Epstein. JPMC Ex. 24; JPMC Ex. 25. *See* CSMF ¶¶ 100-02.

47. ████████████████████████████████████████████████████████████████

████████████████████████████ *Ex. 37; Ex. 72, at -30-31.*

**JPMC Response:** Undisputed.

48. ████████████████████████████████████████████████████████████████

████████████████████████████████████ *Ex. 39, at - 305-306;*

*Ex. 40, at -738-742; Ex. 41, at -038-041; Ex. 42, at -661-666; Ex. 43, at - 816-17; Ex. 44; Ex. 45,*

*at -272-273; Ex. 46, at -30-31; Ex. 47, at -179-180.*

**JPMC Response:** ████████████████████████████████████████

████████████████████████

49. ████████████████████████████████████████████████████████████████

████████████████████████████████ *Ex. 48, at -305; Ex.*

*49, at -761-762; Ex. 50, at -519-520; Ex. 51; Ex. 52, at -651-660; Ex. 53.*

**JPMC Response:** ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

50. *Mr. Staley was unaware of Epstein's practice of withdrawing large amounts of cash. Ex.*

*2, at 30:12-31:3.*

**JPMC Response:**  Disputed.  Epstein emailed Mary Erdoes on September 7, 2011, relaying that "jes told me there was [an] [issue] reg cash with drawals" [sic]. JPMC Ex. 26; *see also* JPMC Ex. 27.

51. ███████████████████████████████████████████████████████

████████████████████████████████████████ *Ex. 3; Ex. 54, at -688-691.*

**JPMC Response:**  Disputed. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* at -688; *see also* JPMC Ex. 15 at 255:4-17.

52. ███████████████████████████████████████████████████████

████████████████████████████████████████████████ *Ex. 3; Ex. 55.*

**JPMC Response:**  Undisputed.

## VI.    JPMORGAN INQUIRIES INTO EPSTEIN AND MR. STALEY

53. *In July 2019, Epstein was arrested on a sex-trafficking charge.  Ex. 56, at iv.*

**JPMC Response:**  Undisputed.

54. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ *Ex. 57, at 9:2-11:15.*

**JPMC Response:** ██████████████████████████████████████

███████████████████████████ Staley Ex. 57 at 10:23-25. ████

████████████████████████████████████████████████████████

██████████████████ *Id.* at 10:13-19.

55. ███████████████████████████████████████████████████████

████████████████████████████████████ *Ex. 58; Ex. 4; Ex. 57,*

*at 19:2-11, 38:18-40:1.*

**JPMC Response:** Undisputed.

56. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ *Ex. 4, at -2000, -2005.*

**JPMC Response:** Undisputed.

57. ███████████████████████████████████████████

██████████████████████████████ *Ex. 61; Ex. 57, at 41:1-*

*44:25.*

**JPMC Response:**  Undisputed.

58. ███████████████████████████████████████████

████████████████████████████████████ *Ex. 57,*

*at 37:18-38:2, 41:3-45:8; Ex. 61, at -702.*██████████████

██████████████████████████████ *Ex. 59; Ex. 60; Ex.*

*29.*

**JPMC Response:** 

59. ███████████████████████████████████████████

██████████████████████████ *Ex. 58; Ex. 4; Ex. 57, at 19:2-11.*



**JPMC Response:**

Staley

Ex. 4 at -998, -012.

60.

*Ex. 4, at -2005.*

*Ex. 4, at -1998, -2000.*

**JPMC Response:**

Staley Ex. 4 at -005, -998, -000.

taley Ex. 4 at -998, -012.

61.

*Ex. 12, at -596; Ex. 62, at -903; Ex. 63, at -548.*

**JPMC Response:**

Staley Ex. 62 at -903; Staley Ex. 63 at -548.

62.

*Ex. 64, at -221-223; Ex. 57, at 22:21-23:4.*

**JPMC Response:** Undisputed.

63.



*Ex. 64, at 221-223.*

**JPMC Response:**

64.

*Ex. 64, at -221-223.*

**JPMC Response:**

taley Ex. 64 at -221

*d.* at -223.

*ee id.* at -223; JPMC Ex. 28 at 5.

65.

*Ex. 64, at 221-223.*



**JPMC Response:**

*See* Staley Ex. 64.

66.

*Ex. 57, at 8:21-9:15.*

**JPMC Response:**

JPMC Ex. 29 at 10:20-11:9.

*Id.* at 11:10-18.

67.

*Ex. 65, at -725.*

*Ex. 65, at -725*

**JPMC Response:**

JPMC Ex. 29 at 48:12-14.

JPMC Ex. 29 at 48:2-11; JPMC Ex. 30.

JPMC Ex. 29 at 27:5-28:20.

68.

*Ex. 61.*



**JPMC Response:**

Staley Ex. 61

JPMC Ex. 31 at -690

JPMC Ex. 31 at -691

JPMC Ex. 32 at -705; JPMC Ex. 33.

69. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ *EX. 66, at -580; Ex. 57, at 53:4-54:2.*

**JPMC Response:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
JPMC Ex. 29 at 53:24-54:2, 60:17-23; JPMC Ex. 34.

70. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Ex. 17, at 750:10-19; Ex. 7, at 20:17-20.*

**JPMC Response:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮ taley did not fully disclose the extent of his considerable relationship with Epstein, including to important decisionmakers within JPMC who believed Staley had only a close professional relationship with Epstein. JPMC Ex. 19 at 13:11-16:20, 17:21-18:3, 31:8-18; JPMC Ex. 7 at 119:5-13, 200:17-19, 23:20-24:4; JPMC Ex. 35 at 31:19-32:1. JPMC was not aware that Staley's relationship with Epstein extended far beyond professional matters. *See* JPMC Ex. 36 at 435:18-444:8; JPMC Ex. 37; JPMC Ex. 38; JPMC Ex. 39. *See* CSMF ¶¶ 6-43.

## VII.   THE CURRENT LITIGATION

71. *JPMorgan did not sue Mr. Staley before 2023. Ex. 67.*

**JPMC Response:** Undisputed.

72. *JPMorgan sued Mr. Staley in 2023, after it was sued by the Government of the U.S. Virgin Islands and the Jane Doe plaintiff. Ex. 67.*

**JPMC Response:** Undisputed.

73.   *The bank has identified seven instances starting in "late 2009 or early 2010" in which Mr.*

*Staley allegedly "vouch[ed]" for Epstein's character and conduct.  Ex. 68.*

>  **JPMC Response:**  Disputed.  JPMC stated that Staley "vouched for Epstein's good
>  character and conduct on ***at least*** the" specified seven occasions starting in late
>  2009 or early 2010.  Staley Ex. 68 at Resp. to Topic No. 25 (emphasis added).  *See*
>  CSMF ¶¶ 63-73.

74.   *The alleged "vouching" lists Mr. Staley telling other bank employees things like "that he*

*knew and trusted Epstein"; that Epstein "had paid his debt to society"; and that Mr. Staley had*

*"a good relationship with him."  Ex. 68.*

>  **JPMC Response:**  Undisputed that JPMC identified the quoted language as
>  examples of Staley's vouching for Epstein's character and conduct.  Disputed to
>  the extent Staley contends that his vouching for Epstein using this language during
>  these cited conversations was the extent of his defense of Epstein.  Staley was an
>  integral part of the Epstein relationship and JPMC employees relied on Staley's
>  judgment in making decisions related to Epstein's retention.  *See* JPMC Ex. 19 at
>  163:3-164:11, 38:12-16 ("I relied on, you know, Mr. Staley's sense of the client
>  because Mr. Staley was in close – had a close relationship with him."); JPMC Ex.
>  15 at 63:8-24. ("As a senior member of the firm and a member of the operating
>  committee, who continued to work on [Epstein's] account in some way or fashion,
>  some of it visible to me, some of it not visible to me, Jes was part of that
>  relationship.  And I would have expected, if there was something that I should have
>  known, he would have told me.  We relied upon Jes, in this instance and in . . .
>  others, as it related to his judgment about an account.  And in this case we're talking
>  about Mr. Epstein's account."); JPMC Ex. 18 at 50:20-22 ("No one had a senior
>  relationship with Mr. Epstein like Mr. Staley."); JPMC Ex. 7 at 119:10-13, 200:17-
>  19 ("Jes was the sort of de facto primary relationship person with Jeffrey Epstein.").
>  The evidence in the record also makes clear that it was Staley's advocacy that
>  prevented Epstein's exit from the Private Bank.  JPMC Ex. 40; JPMC Ex. 19 at
>  168:4-8; JPMC Ex. 40 at -897; JPMC Ex. 18 at 50:24-51:2 ("[W]hen Mr. Staley
>  left the firm, there was no one there to give the reasons why we would want to keep
>  Mr. Epstein as a client of the firm.").  *See* CSMF ¶¶ 63-73.

75.   *The bank does not contend that Mr. Staley was aware of Jeffrey Epstein's alleged sex*

*trafficking.  Ex. 69.*

>  **JPMC Response:**  JPMC objects to this statement as improper under Local Civil
>  Rule 56.1 on the ground that it is not a "fact" of the case but a characterization of
>  JPMC's legal arguments.  The record establishes that Staley had a close personal
>  relationship with Epstein and was privy to information concerning Epstein's

conduct ███████████████████████ that he did not share with JPMC.  *See, e.g.*, Staley Ex. 69 at Resp. to Topic 11; JPMC Ex. 36 at 435:18-444:8; JPMC Ex. 42.  *See* CSMF ¶¶ 6-43.  JPMC does not concede any argument as to Staley's personal knowledge with respect to Epstein's alleged sex trafficking.

76.    *Mr. Staley's asserted vouching for Epstein did not violate any policy at the bank.  Ex. 1, at*

*112:4-22.*

> **JPMC Response:**  Disputed.  Each version of the JPMC Code of Conduct in effect from 2006 through 2012 emphasized that all JPMC employees must "conduct the firm's business in accordance with the highest ethical standards, respecting the firm's customers, suppliers, and other business counterparties, dealing responsibly with the firm's assets, and complying with applicable legal and regulatory requirements." *E.g.*, JPMC Ex. 17.   JPMC's Code of Conduct also expressly prohibited, among other things, engaging in outside activities that, even if outside the scope of employment, "reflect adversely on JPMorgan Chase or give rise to a real or apparent conflict of interest with your duties to the firm." *E.g.*, JPMC Ex. 17.  JPMC employees are also "expected to conduct the firm's business in full compliance with both the letter and the spirit of the law, the Code, and any other policies and procedures that may be applicable." *E.g.*, JPMC Ex. 17.  A reasonable jury could conclude that Staley's ongoing advocacy for Epstein to be retained as a client, in the face of resistance by other members of the Private Bank, while withholding material information about one or more of Epstein's conduct ███████ ███████ and Staley's close personal relationship with Epstein and his affiliates failed to conform to both the letter and the spirit of the firm's high ethical standards.

> *See also* Staley Ex. 69 at Resp. to Topic 11;  JPMC Ex. 43; JPMC Ex. 44; JPMC Ex. 45; JPMC Ex. 46; JPMC Ex. 47; JPMC Ex. 48; JPMC Ex. 49; JPMC Ex. 50; JPMC Ex. 51 JPMC Ex. 17; JPMC Ex. 52; JPMC Ex. 53  JPMC Ex. 54.

77.    *The bank originally sought reputational damages, but it has dropped any claim to such*

*damages.  Ex. 70, at 8-9.*

> **JPMC Response:** Disputed to the extent that the cited document does not support the assertion that JPMC originally sought reputational damages but has dropped any claim to such damages.  Otherwise, undisputed.

78.    *JPMorgan seeks "the amount JPMorgan will pay to the [Doe class] to settle this action,*

*in the amount of $290,000,000.00."  Ex. 70, at 9.*

> **JPMC Response:** Disputed to the extent that the cited document does not support the assertion that JPMC is seeking "the amount JPMorgan will pay to the [Doe class] to settle this action, in the amount of $290,000,000.00."  Further disputed to the extent that Staley omits that JPMC seeks additional damages from Staley

23

beyond "the amount JPMorgan will pay to the [Doe class] to settle this action, in the amount of $290,000,000.00" JPMC Ex. 55 at 8-9; JPMC Ex. 56 at 13. Otherwise, undisputed.

## JPMORGAN CHASE BANK, N.A.'S LOCAL CIVIL RULE 56.1(B) COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS

1.      Jane Doe 1 testified tha █████████████████████████████████████

█████████████████████████████████ Jane Doe 1 further testified that she

█████████████████████████████  JPMC Ex. 57 at 140:6-149:20.  Jane Doe 1

testified that she ███████████████████████████  JPMC Ex. 57 at 151:9-20,

154:3-155:17.

2.      On July 7, 2021, Jane Doe 1 emailed ██████████████████████████

███████████████████████████████████████████████

████████████████████  JPMC Ex. 58.

3.      Staley testified that he ██████████████████████████████████

██████████████  Staley further testified that he did not ██████████████████

████████████████  JPMC Ex. 36 at 433:3-444:8.

4.      Staley testified that he did not "observe anything that caused [him] to question

whether Epstein was engaged in sex trafficking."  JPMC Ex. 36 at 522:19-22.

5.      Multiple women excluded Staley by name from releases they signed with the

Epstein Estate.  JPMC Ex. 59; JPMC Ex. 60.

## I.      Jes Staley Had a Close Personal Relationship With Epstein

*Staley Exchanged Suggestive Emails with Epstein About Women*

6.      On August 30, 2009, Epstein emailed Staley, "how long London? do you need

anything there?"  Staley responded, "Yep."  JPMC Ex. 61.

7.      On September 2, 2009, Epstein emailed ██████████████████████

█████████████████████████████████████████████████████████ JPMC

Ex. 62.

8.      On December 4, 2009, Epstein emailed Staley, "you were with larry , [sic] and I had to put up with . . . ." and attached the following suggestive photograph of a young woman:



JPMC Ex. 63; JPMC Ex. 64.

9.      That same day, Staley responded to Epstein, writing "Don't tell me a French wine."  JPMC Ex. 63.

10.     On December 20, 2009, Epstein emailed Staley the following photograph of a young woman:



JPMC Ex. 65; JPMC Ex. 66.

     11.     On June 16, 2010, Staley wrote to Epstein "[i]s she free tonight?"  Epstein

responded, "call me."  Staley replied, "I'm with A."  JPMC Ex. 67.

     12.     On July 9, 2010, Staley e-mailed Epstein, "That was fun. Say hi to Snow White."

Epstein responded, "what character would you like next."  Staley replied, "Beauty and the Beast

. . . ." Epstein responded, "well one side is availble [sic]."  JPMC Ex. 68.

*Staley Had a Close Personal Relationship with Epstein*

     13.     On August 3, 2008, Staley emailed Epstein shortly after he began serving his

criminal sentence and wrote, "Just thinking about you."  JPMC Ex. 69.

     14.     On February 26, 2009, Epstein sent an email ███████████████

████████████████████████████████████████████████████████████

████████████ JPMC Ex. 70.

     15.     On May 27, 2010, Epstein emailed ██████████████████████

███████████████████████████████████████████████ JPMC Ex. 71.

3

16.     On January 22, 2011, Epstein emailed ████████████████████████████

████████████████████████████████████████████   JPMC Ex. 72.

17.     On February 26, 2011, Staley emailed Epstein calling him "Family."  JPMC Ex.

73.

18.     On March 3, 2011, Epstein emailed Staley, writing, "Told you ----family."  Staley

responded the same day, writing "family."  JPMC Ex. 39.

19.     On March 4, 2011, Staley emailed Epstein saying that he counted Epstein "as one

of our deepest friends.  And most honest of people."  JPMC Ex. 38.

20.     On March 5, 2011, Epstein emails Staley in response, calling him "family."

JPMC Ex. 38.

21.     On March 7, 2011, Epstein emailed Staley saying "[I] forgot to say thanks . .

Family."  JPMC Ex. 74.

22.     On March 10, 2011, Epstein emailed Staley, writing "yup family  dont [*sic*]

worry."  JPMC Ex. 75.

23.     On March 18, 2011, Epstein emailed Staley saying "Dear family member,, don't

fret[.]"  JPMC Ex. 76.

24.     On May 3, 2011, Epstein emailed ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████   JPMC Ex. 77 (emphasis added).

25.     On May 19, 2011, Epstein emailed ██████████████████████████████

████████████████████   JPMC Ex. 78.

26.     On September 2, 2011, Epstein emailed ██████████████████████████

██████████████████████████   JPMC Ex. 79.

4

27.     On August 23, 2012, Staley emailed Epstein, writing, "I can't tell you how much your friendship has meant to me.  Thank you deeply for the last few weeks.  All will be fine, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ To my most cherished friend, Jes."  Epstein responded, "I appreciate you and your thoughts."  JPMC Ex. 80.

28.     Epstein named Staley ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ JPMC Ex. 81; JPMC Ex. 82.

*Epstein Provided Assistance with* ▮▮▮▮▮▮▮ *Graduate School Admissions*

29.     On April 27, 2009, Epstein emailed Staley, writing '▮▮▮ can meet have dinner lunch a weekend with any of the following seth lloyd mit quantum computing.. murray gell-man , santa-fe institute quarks ,, brian greene Columbia -string theory,, leonard Susskind ,, strings theory, lawrence krause,, origins institute phoenix arizona.. lee smolin perimiter institute, loop quantum gravity , she can see the large hadron collider in switzerland. private tour [sic]."  JPMC Ex. 83.

30.     Staley forwarded the email to ▮▮▮▮▮▮▮▮▮▮, writing "This is from uncle Jeffrey. Add Lisa Randell at Harvard."  JPMC Ex. 83.

31.     On October 24, 2009, Staley forwarded ▮▮▮▮▮ feedback Epstein provided on a draft of her scholarship essay.  JPMC Ex. 84.

32.     On January 11, 2010, ▮▮▮▮▮ forwarded to Staley an email exchange she had with Epstein, thanking him for inviting her to a physics conference in California.  JPMC Ex. 85.

33.     On September 24, 2010, Staley forwarded to Epstein an email from ▮▮▮▮▮ about a professor at Columbia University and asking Epstein if he could "get to this professor at Columbia."  On September 25, 2010, Epstein responded, "in a snap."  JPMC Ex. 86.

34.     On November 11, 2010, Epstein emailed Staley in response to an email chain about ███████████ application to Columbia University, writing "she can sit with Richard Axel when I get back, he won the Nobel prize .. he has guaranteed me."  JPMC Ex. 87.

35.     On January 19, 2011, Staley forwarded to Epstein an email exchange between a Columbia professor and ████████ regarding her GRE scores "not seem[ing] to be a problem according to my sources."  JPMC Ex. 88.

36.     Also on January 19, 2011, Epstein emailed Staley, writing "████ is now 70-30 up from 45-55."  JPMC Ex. 89.

*Staley Made Personal Visits/Vacations to Epstein Properties*

37.     Staley visited Epstein on July 25, 2006, a day after Epstein's indictment.  JPMC Ex. 90.

38.     On December 31, 2008, while Epstein was incarcerated, Staley made plans to visit Epstein in Palm Beach, Florida.  JPMC Ex. 91.

39.     On October 23, 2009, Epstein emailed ███████████████████████ ████████████████████████████████████████████ ███████████  JPMC Ex. 92.

40.     On October 30, 2009, Staley emailed Epstein asking if Epstein could go to Santa Fe, while Staley himself was at Epstein's New Mexico ranch.  Epstein responded, "not today."  JPMC Ex. 93.

41.     On November 1, 2009, Staley emailed Epstein from Epstein's Zorro Ranch in New Mexico, writing "So when all hell breaks lose [sic], and the world is crumbling, I will come here, and be at peace.  Presently, I'm in the hot tub with a glass of white wine.  This is an

amazing place.  Truly amazing.  Next time, we're here together. I owe you much.  And I deeply appreciate our friendship.  I have few so profound."  JPMC Ex. 37.

42.     On January 8, 2010, Epstein emailed Staley about a visit to his private island in USVI, writing, "my car and driver, , former dea armed. will pick you up in st thomas we have all the on field permits.. helicopter also availble for a tour around , ... remember I own the two big marinas.. yacht haven grand, in st thomas and the marina at red hook... you can use my atv's jet ski ,gym etc. , i will organize the harbor at Norman island if you like, in the bvil . as well as lunch at guana."  JPMC Ex. 94.

43.     On January 22, 2011, Staley emailed Epstein about a visit to Epstein's island in USVI, writing "What a paradise.  When I retire, I'm going to put a mooring in front of your dock for my boat[.]  Amazing place."  JPMC Ex. 95.

*Staley Shared Confidential Information With Epstein*

44.     Staley shared details of his salary negotiations with JPMC with Epstein, and sought his advice regarding the salary demands he would make of JPMC.  JPMC Ex. 96.

45.     On multiple occasions, Staley shared with Epstein confidential information about transactions the Bank was structuring or exploring.  JPMC Ex. 97; JPMC Ex. 98; JPMC Ex. 99; JPMC Ex. 100; JPMC Ex. 101; JPMC Ex. 102.

46.     Staley discussed the confidential status of other Bank clients with Epstein.  JPMC Ex. 103.

47.     Staley shared information protected by the attorney-client privilege about Epstein's ongoing litigation against JPMC with Epstein.  JPMC Ex. 104.

48.     Staley solicited feedback from Epstein on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮  JPMC Ex. 105.

49.     Staley kept Epstein informed about the status of the Bank's investigation into the allegations against him in ███████ March 2011.  JPMC Ex. 106; PMC Ex. 107.

*Staley Maintained a Close Relationship With Epstein Even After Leaving JPMC*

50.     Staley testified that he had last spoken to Epstein in either October or November 2015 because he became the CEO of Barclays.  JPMC Ex. 1 at 393:21-394:2.

51.     On October 17, 2015, Staley emailed ████████████████████

███████████████████████████████████

█████████████████████████ JPMC Ex. 108.

52.     On November 27, 2016, Epstein emailed Staley's ██████████, writing, "could you ask █████ [sic] if he would like to considered for treasury."  ████ responded that "[s]poke with him.  He said not yet, but thanks."  JPMC Ex. 109.

53.     On February 6, 2017, Epstein emailed ██████████, writing, "can you ask ████ ████ his opnion [sic] of veronique Weill she wants to join rothschild."  ████ responded, "He thinks she is great and is a big fan of hers.  Good recommendation for rothschild."  JPMC Ex. 110.

54.     On February 23, 2017, Epstein emailed ██████████████████████

██████████████████████████████

██████████████████ JPMC Ex. 111.

55.     On February 13, 2020, Barclays PLC issued a Director effectiveness assessment disclosing a regulatory investigation into Staley's relationship with Epstein.  The assessment stated that "Mr. Staley also confirmed to the Board that he has had no contact whatsoever with Mr. Epstein at any time since taking up his role as Barclays Group CEO in December 2015."  JPMC Ex. 112.  That same day, Staley told the U.K. press It has been very well known I had a

8

professional relationship with Jeffrey Epstein. It goes back to 2000 when I was asked to run the JP Morgan private bank and he was already a client when I joined the private bank. The relationship was maintained during my time at JP Morgan but as I left JP Morgan the relationship tapered off quite significantly. . . Obviously I thought I knew him well and I didn't. For sure, with hindsight with what we know now, I deeply regret having any relationship with Jeffrey." JPMC Ex. 23.

## II.     Staley Was Responsible for JPMC's Relationship With Epstein

### _Staley Was the Most Senior JPMC Employee Responsible for Epstein's Accounts_

56.     JPMC's former General Counsel, Stephen Cutler, testified: Q: "Between 2007 and 2012, what was your understanding of Mr. Staley's relationship with Jeffrey Epstein?" A: "My understanding at that time was that he had a close business relationship, that he was the primary interface with Mr. Epstein among JPMorgan personnel, that he liked Mr. Epstein, that he trusted Mr. Epstein, and he thought highly of Mr. Epstein." JPMC Ex. 19 at 13:11-20.

57.     The head of JPMC's Asset & Wealth Management division, Mary Erodes, testified that "Mr. Staley was the most-senior representative and relationship person for Mr. Epstein." JPMC Ex. 18 at 75:17-19. Ms. Erdoes further testified that "[n]o one had a senior relationship with Mr. Epstein like Mr. Staley did." JPMC Ex. 18 at 50:20-22.

58.     Former Global Head of Compliance, William Langford, testified that "Epstein was Jes Staley's client" and that "Jes owned the client relationship" with Epstein. JPMC Ex. 113 at 309:20-23, 336:4-14.

59.     Mary Casey, who was one of Epstein's private bankers in JPMC's Private Bank, testified that "Jes was one of the primary people to work with Jeffrey's account." JPMC Ex. 114 at 64:10-11.

60.     Former CEO of JPMC's U.S. Private Bank, John Duffy, testified that "Jes was the senior person on that [Epstein] relationship."  JPMC Ex. 15 at 62:3-5, 64:14-21, 143:9-17.

61.     William Sheridan, who was a market manager and region head for the Northeast region in JPMC's U.S. Private Bank while Epstein was a client, testified that "Jes was intimately involved in really every aspect of what we did with Jeffrey Epstein, and was viewed as the senior banker by virtue of the things that they did with respect to certain introductions of prospects, involvement in the [Highbridge] transaction."  JPMC Ex. 14 at 74:2-7.

62.     Catherine Keating, who preceded John Duffy as CEO of JPMC's U.S. Private Bank, testified "Jes was the sort of de facto primary relationship person with Jeffrey Epstein."  JPMC Ex. 7 at 200:17-19.  Keating further testified that she believed "Mr. Epstein viewed [Staley] as his relationship manager.  Jes would raise our questions with him."  JPMC Ex. 7 at 119:10-13.

*Staley Vouched for Epstein*

63.     Stephen Cutler, testified that "Jes Staley was vouching for [Epstein]."  JPMC Ex. 19 at 169:7-12.  Cutler further testified that Staley, in response to the desires of others that JPMC exit Epstein as a client, told him that Epstein had "turned a page" "paid his debt to society" "turned a corner" and "was on the straight and narrow."  JPMC Ex. 19 at 58:23-60:4, 163:3-164:11.

64.     Mary Erdoes testified that Staley "was Mr. Epstein's advocate in the [B]ank and was the senior relationship manager for Mr. Epstein."  JPMC Ex. 115 at 165:6-8.  Ms. Erdoes further testified that Staley had a "very different" characterization of Epstein than the press reports following his arrest.  JPMC Ex. 115 at 213:17-21.

65.     William Langford testified that, with respect to Epstein's conviction in 2008 on state charges for solicitation of prostitution and procurement of a minor for prostitution, Staley told him that Epstein "didn't do it, shouldn't have pled guilty, et cetera, wasn't responsible for it" and that Epstein's lawyers were working to get the guilty plea "thrown out."  JPMC Ex. 113 at 323:6-14, 370:10-17.

66.     Justin Nelson, another of Epstein's private bankers in the U.S. Private Bank, testified that he raised his concerns about Epstein to Staley prior to becoming Epstein's private banker and that Staley told him "that it was okay to do this and I trust [Epstein], have a good relationship with him" and that Nelson "accepted that and moved on."  JPMC Ex. 5 at 117:18-22.

67.     John Duffy testified that after recommending to Staley that the Bank exit Epstein as a client in 2011, "Jes rebuffed me, said, don't see the need for that.  I would trust Jeffrey with members of my family, his daughters."  JPMC Ex. 15 at 69:5-8.

68.     Lisa Waters, who led the supervisory management team in JPMC's U.S. and Global Private Bank, testified that Staley told her, "I did speak with him—Mr. Epstein—and he said it was a misunderstanding and he made a mistake.  And I do feel comfortable.  I have socialized with him and my family."  JPMC Ex. 116 at 106:24-107:23.

69.     William Sheridan testified that "our recommendations were to fire this client in 2008, but we were unable to execute on that because of Jes's stated comfort level with his client, and that somehow he had turned the corner, and that he would be comfortable in monitoring business activity closely.  So, unfortunately, this is why we are where we are in 2010 or 2011."  JPMC Ex. 14 at 184:21-185:5.

*JPMC Employees and Executives Relied on Staley's Views About Epstein*

70.     Stephen Cutler testified that he "absolutely" relied on Jes Staley's views in evaluating the Bank's relationship with Epstein because Staley was a "respected member of the operating committee" and knew Epstein.  JPMC Ex. 19 at 167:1-19.

71.     John Duffy testified that the Private Bank "relied upon Jes" and "his judgment" about Epstein's accounts.  JPMC Ex. 15 at 63:19-24.  Duffy further testified that Staley had the "final word" and was the "final court of appeal" on matters concerning Epstein's accounts. JPMC Ex. 15 at 82:11-16, 118:2-9.

72.     William Sheridan testified that "Jes called the shots in terms of our business dealings with Epstein and the decision to retain him as a client."  JPMC Ex. 14 at 74:15-18. Sheridan further testified that "[t]here were no substantive decisions made with respect to Jeffrey Epstein without Jes's input."  JPMC Ex. 14 at 126:23-25.

73.     William Langford testified that he was told that "Jes owned the client relationship" and "from that perspective, I supposed he would be the one to help make that decision or to make that decision."  JPMC Ex. 113 at 336:4-14.

### III.     Staley Played an Active Role in the Coverage of Epstein's Accounts

74.     Stephen Cutler testified that, with respect to Epstein's accounts, "Staley was involved every step of the way," and was "putting his stamp on the question of whether we should—how we should interact with Mr. Epstein."  JPMC Ex. 19 at 103:20-104:10, 141:17-145:10.

*Staley Approved or Selected Epstein's Coverage Teams*

75.     On December 7, 2001, Tad Smith sent an email to Staley with the subject "Jeffrey Epstein," writing, "Jennifer Mitchell would like to transfer the Epstein and Wexner relationship to my team.  I thought Mary Reith would be a good banker to help Laurie Cameron and me cover

Jeffrey.  She is smart, aggressive and I think would be able to interact well w/ Jeffrey.  Is this O.K. w/ you?  We would like to have a quick sit down w/ you to review our relationship w/ Jeffrey."  That same day, Staley responded, "Mary would be great."  JPMC Ex. 117.

76.     On March 9, 2010, Mary Casey sent an email to Staley, copying Staley's assistant, Rosa da Silva, and Paul Morris, who had become Epstein's new private banker, with the subject "Jeffrey Epstein," writing, "Jes – just a quick note to let you know that Jeffrey is now set up for business in the Private Bank (incl w/ an ISDA) on the GIO desk.  Paul Barrett and Jeff Matusow are co-covering him on the GIO desk and Paul Morris will be his banker.  Paul is a former investment banker from Barclays who joined our team last year.  I'll make sure you get to meet him soon.  So Jeffrey is well covered and hopefully the relationship will grow from here. We'll keep you posted."  JPMC Ex. 118.

77.     On April 9, 2010, Epstein emailed Staley, writing "paul morris seems nice , but not very experienced,. is he really the person you want to cover me, [sic]"  JPMC Ex. 119.

78.     On October 4, 2012, Mary Casey emailed John Duffy with the subject, "Jeffrey Epstein note," writing, "John – whichever option we choose, we should definitely run it by Jes first to ensure he's on board.  Let me know when to reach out or if you want to put a call into him this morning.  Thanks again for your help on this one.  I welcome your thoughts!"  JPMC Ex. 120.

79.     On October 10, 2012, John Duffy emailed Staley, writing, "We need a new banker for J. Epstein.  Paul Morris left to join DB.  We have a banker with lots of Wall St experience under his belt who has thick skin.  Do you want/need to meet him first?"  Staley responded, "How about Justin?"  Duffy answered, "Could work – I think he is quick to say 'yes'

to clients and with JE that worries me a bit – we would need to coach him on that.  If you prefer to go with him we will provide the needed 'education.'"  JPMC Ex. 21.

80.     On December 17, 2012, Mary Casey sent Justin Nelson an email with the subject "Epstein account move," writing, "Justin – just a quick heads up that Jeffrey's account relationship will now be moving over to you as we start the new 'metric' year.  Best of luck – always happy to help here if I can as issues come up."  JPMC Ex. 20.

*Epstein Raised Concerns or Issues Concerning His JPMC Accounts With Staley*

81.     On May 6, 2010, Epstein emailed Staley, writing, "fyi,, almost every position put on by the oig group is down subsatnailly [sic].. in two weeks im [sic] off 6 million."  Staley responded, "Do you mean GIO?"  Epstein answered, "yes."  Staley told Epstein he was "talking to them now" and Epstein responded, "be gentle,, I should have simply ignored their advice , and kept my own."  JPMC Ex. 121.

82.     On August 24, 2010, Paul Barrett emailed Epstein about his investments.  That same day, Epstein replied to the email, copying Staley, writing, "yen? ,, so far jpm recomendations [sic] are a disater [sic]."  JPMC Ex. 122.

83.     On December 21, 2010, Epstein forwarded an email from other JPMC employees to Staley with the subject, "Fwd: DivStoxx," writing, "fyi .. you can see why I am frustrated with this group."  JPMC Ex. 123.

84.     On March 11, 2011, Epstein emailed Staley, writing, "is there a problem with the letttr [sic] of credit in favor of the modeling agency,, I was just told that Paul morris is not returning my guys calls.  I called him twice myself today , , If you get a chance , nothing urgent."  JPMC Ex. 124.

85.     On September 7, 2011, Epstein emailed ████████████████████████

████████████████████ JPMC Ex. 27.

*Staley's Views and Approvals of Epstein Informed JPMC's Due Diligence Process*

86.     On January 27, 2011, Paul Morris emailed James Dalessio with the subject,

"DDR addition for Jeffrey Epstein," writing, "Jim, I was planning to add the following update,

let's talk tomorrow. Thanks.  January 27, 2011 update:  A few news stories during 2010 connects

Jeffrey Epstein to human trafficking.  The coverage team along with Catherine Keating and

William Langford all met to discuss the situation and agreed to enhance monitoring and

document a discussion with the client.  Jes Staley discussed the topic with Jeffrey Epstein who

replied there was no truth to the allegations, no evidence and was not expecting any problems.

We will continue to monitor the accounts and cash usage closely going forward."  JPMC Ex. 16.

87.     Catherine Keating testified that she approved Epstein's DDR in 2007 "because we

retained him as a client."  JPMC Ex. 7 at 140:13-141:23.  Keating further testified that "[n]ot

approving a DDR isn't how you exit a client."  JPMC Ex. 7 at 141:1-2.

88.     John Duffy testified that "the basis of my approving [Epstein's] DDR was my

conversation with Mr. Staley."  JPMC Ex. 15 at 117:9-17.  Duffy further testified that his

approval of Epstein's DDRs "reflects my conversations with Mr. Staley as an operating

committee member and someone who has a fiduciary responsibility to the Bank, its clients, its

shareholders."  JPMC Ex. 15 at 118:11-16.  Duffy further testified that a refusal to approve a

DDR would "not necessarily" have resulted in the exit of that client.  JPMC Ex. 15 at 110:17-

111:2.

89.     Mary Casey testified that Catherine Keating would have approved Epstein's

DDRs after taking reasonable steps which "would include conversations, particularly with Mr.

Staley, who knew Mr. Epstein best."  JPMC Ex. 125 at 541:10-20.  Casey further testified that Staley "would be part of the diligence I would do" regarding the approval of Epstein's DDRs. JPMC Ex. 125 at 559:19-560:19.

90.    William Sheridan testified he signed-off on language in a DDR in 2011 which stated "our view is that Mr. Epstein has served his time and has completed his duties to society," despite his own disagreement "because this was a conclusion reached by senior management." Sheridan further testified that he did not ask anyone to revise that language because "it was discussed amongst a number of my private bank colleagues, including Catherine Keating and John Duffy.  And I think we all felt fairly strongly, going back to 2008, we never should have been in this position in 2011.  That the correct decision would have been to offboard him as a client in 2008.  But that – that was not done because of one individual named Jes Staley."  JPMC Ex. 14 at 177:13-178:10.  Sheridan also testified that a refusal to sign a DDR for a client or prospective client would "not necessarily" mean the client had to be exited from the Bank. JPMC Ex. 14 at 36:15-18.

## IV.    Staley Interfered With JPMC's Efforts to Investigate or Exit Epstein

91.    On July 26, 2006, Mary Erdoes forwarded a news article about Epstein's arrest to Staley, writing "so painful to read."  The same day, Staley responded, "I went and saw him last night.  I've never seen him so shaken.  He also adamently [sic] denies the ages."  JPMC Ex. 90.

92.    On October 17, 2006, following news of Epstein's arrest for felony solicitation of prostitution under Florida state law, JPMC documented a series of internal discussions about its relationship with Epstein.  The "rapid response team" memorandum states: "After internal discussions with Jes Staley, Mary Erdoes, Catherine Keating, John Duffy, and Mary Casey, it was decided that we will keep Mr. Epstein solely as a banking client and on a 'reactive,' client

service basis.  We will not proactively solicit new investment business from him."  JPMC Ex. 126.

93.     Catherine Keating testified, "I know that Jes was involved in the discussions." JPMC Ex. 7 at 68:19-22.

94.     On October 5, 2007, Anne Verdon emailed Shawna Gilmore-Orr, Tamyka Clarke, Lisa Waters, and Vincenza Lucignano, writing, "Hi – Brent says that JES would like to have a meeting with Mary Erdoes, Brent, me, and and [sic] Lisa re Jeffrey Epstein next week. Vincenza, can you coordinate please?"  JPMC Ex. 127 at -1895; *see also* JPMC Ex. 128.

95.     On January 4, 2008, Lisa Waters sent Mary Casey an email writing, "Tonight's post was a source for updated info.  Page 6 confirms epstein's court date is 'pushed to march while he tries to "hammer out" details of his 18 month prison sentence following by house arrest.'"  Casey responded, "Interesting – I am going to speak to Mary next week about moving him.  When is the decision due to be made by Cutler – now not until March?"  Water answered, "We need to have the felony he pleads guilty to. So march.  No one wants him."  JPMC Ex. 158.

96.     On June 30, 2008, Epstein ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████   JPMC Ex. 130.

97.     On July 1, 2008, Lisa Waters sent an email to George Lencyk and Theresa Schnepf with the subject, "Fw: epstein," writing "Jes would like to retain as a client so AnnVerdon [sic] or Kevin will need to go through the process."  JPMC Ex. 131.

98.     On July 15, 2008, Kevin McCleerey, a risk manager in JPMC's U.S. Private Bank, forwarded an email with the subject "Fw: Rapid Response Memo – Epstein" to Anne Verdon, then General Counsel to JPMC's U.S. Private Bank, writing "FYI Jes spoke to Lisa

17

Waters and told her he wants to keep his accounts.  Lisa is on vacation and cannot join today."
JPMC Ex. 132.

99.     On July 15, 2008, JPMC employees held a rapid response meeting to discuss
Epstein's relationship following his guilty plea.  JPMC Ex. 133.

100.    Following the July 15, 2008 rapid response meeting, it was decided that
"Catherine [Keating] will go back to JES to tell him we are uncomfortable with Epstein and do
not want to go to Cutler for approval."  JPMC Ex. 134.

101.    William Sheridan testified that there was "a very strong preference to exit this
relationship.  But that – that was out of our hands.  And that – that – that decision rested largely
with Jes Staley."  JPMC Ex. 14 at 125:4-7.

102.    In December 2008, a DDR for an account opened for Epstein noted that, "Jes
Staley conferred with Stephen Cutler and the decision was made to keep Mr. Epstein as a client."
JPMC Ex. 24.

103.    In response to new negative media on Epstein, JPMC held another rapid response
meeting on January 7, 2011.  JPMC Ex. 129.

104.    At the January 7, 2011 rapid response meeting, Catherine Keating "made sure"
that the meeting participants knew that nobody at the meeting "was in favor of having retained
[Epstein] as a client," but that it was all "due to Jes's personal relationship."  JPMC Ex. 135 at -
31040.

105.    The outcome of the January 7, 2011 meeting was for, "discussions to be held with
William and Nina to determine how to approach the issue with Jes Staley, who is friends with
Epstein.  He needs to understand the potential backlash to the firm given all of the work done to
root out clients involved in human trafficking."  JPMC Ex. 134.

106.     Following that meeting, "PB discussed the Epstein relationship with Jes Staley, who called Mr. Epstein to discuss the human trafficking allegations in press [sic], which he claimed were without merit."  JPMC Ex. 136. "Further meetings [were] held with Jes Staley to discuss LOB decision for re-approval."  JPMC Ex. 137.

107.     On January 10, 2011, Maryanne Ryan sent an email to William Langford, Phillip DeLuca, and Nina Nichols with the subject, "Re: Jeffrey Epstein," writing, in part, "Seems PB was not so thrilled with retaining him, it was all due to Jes."  JPMC Ex. 135.

108.     On January 14, 2011, Catherine Keating and William Langford met with Staley to discuss Epstein.  JPMC Ex. 138.

109.     William Langford testified that during this meeting, with respect to Epstein's conviction in 2008 on state charges for solicitation of prostitution and procurement of a minor for prostitution, Staley stated that Epstein "didn't do it, shouldn't have pled guilty, et cetera, wasn't responsible for it" and that Epstein's lawyers were working to get the guilty plea "thrown out."  JPMC Ex. 113 at 323:6-14, 370:10-17.  Langford further testified that the "takeaways" from his meeting with Staley "were that we would go and speak with Mr. Epstein's attorney."  JPMC Ex. 113 at 370:21-24.

110.     On January 20, 2011, Epstein's assistant, Lesley Groff, emailed Staley's assistant, Rosa da Silva, with the subject, "Jeffrey Epstein – Ken Starr," writing, "Hi Rosa.  Jeffrey requested I send you Ken Starr's office phone number at Baylor University."  That same day, da Silva forwarded the message to Stephen Cutler.  JPMC Ex. 139.

111.     On February 9, 2011, Staley forwarded an email ██████████████████ ████████████████████████████████████████████████████████████ JPMC 106.

112.     On March 7, 2011, Stephen Cutler emailed Jonathan Schwartz, then-General Counsel to JPMC's Investment Bank, with the subject, "[d]id you go back to Jes re:" writing, "Ken Starr's best friend?"  That same day, Schwartz replied, "Yes and didn't get anything back from him, so I just called him again.  He said he'll call Epstein and get me a live name and number for a current lawyer.  The recent headlines (re FBI reopening its investigation in Daily Mail and NY Post over the weekend, and guilt-by-being-friends stories about Prince Andrew and former President Clinton) aint [sic] great.  Cc'ing William."  JPMC Ex. 140.

113.     On March 20, 2011, Epstein emailed Staley, writing, "I [a]m working on getting steve cutler the comfort he needs."  Staley responded, "Agree."  JPMC Ex. 107.

114.     Stephen Cutler recommended exiting Epstein as a client in March or April 2011.  JPMC Ex. 141; JPMC Ex. 142 at 395:6-8.

115.     On August 4, 2011, JPMC held a fourth rapid response meeting about the Bank's relationship with Epstein.  JPMC Ex. 143.

116.     The outcome of the August 4, 2011 rapid response meeting was for "Duffy to reach out to Jes Staley and advise that we exit while things are a bit settled."  JPMC Ex. 134.

117.     On August 19, 2011, John Duffy met with Staley to discuss the Bank's relationship with Epstein.  JPMC Ex. 144.

118.     John Duffy testified that at his meeting with Staley, he (Duffy) recommended exiting Epstein, but that "it was very clear from that conversation with Jes, Jes wanted Mr. Epstein to remain a client."  Duffy further testified that "the last thing I said to Jes about it was, well, Jes, if I were asked why is Jeffrey Epstein a client of the Bank at this stage, I would have to answer, because of Jes Staley."  JPMC Ex. 15 at 67:8-75:10.

119.    Stephen Cutler testified that Staley asked Cutler to "hear [Epstein] out," and the "at the behest of Staley," he met with Epstein twice in the fall of 2011, during which Epstein tried to convince Cutler that "he was a decent guy."  Cutler further testified that he did not change his mind about Epstein at these meetings.  JPMC Ex. 142 at 312:10-320:23; JPMC Ex. 19 at 114:18-119:23.

120.    Stephen Cutler further testified that Epstein would have been exited as a client of JPMC if not for Staley vouching for him.  JPMC Ex. 19 at 167:21-169:12.

## V.    Setting Staley Apart, JPMC Employees Did Not Know of Epstein's Misconduct

121.    Jamie Dimon testified, "There are terrible allegations, which, if true, meant that he knew a lot of things sometime during that period that we didn't.  And I would include in that Steve Cutler and Mary Erdoes."  JPMC Ex. 6 at 357:17-22.

*JPMC Employees Investigated Epstein's Cash Activity*

122.    In 2011, Epstein informed Paul Morris, his private banker at the time, that his cash withdrawals were to pay for fuel expenses for his personal airplane when traveling to foreign countries.  JPMC Ex. 137.

123.    In August 2011, after becoming CEO of JPMC's Private Bank, John Duffy investigated Epstein's cash usage.  JPMC Ex. 145.

124.    In 2011 and 2013, John Duffy spoke to Epstein about his cash withdrawals and business activities.  JPMC Ex. 27; JPMC Ex. 146; JPMC Ex. 147. JPMC 15 at 225:13-226:10.

125.    Epstein informed John Duffy that his cash withdrawals were for fuel expenses for his personal airplane when traveling to foreign countries.  JPMC 15 at 207:12-16, 212:11-20; JPMC Ex. 148.

126.     Duffy believed Epstein's explanation that he used the cash withdrawals to purchase aviation fuel.  JPMC Ex. 15 at 176:18-177:5, 345:23-346:7; JPMC Ex. 148.

127.     Bonnie Perry testified that Epstein's explanation that he used the cash withdrawals to purchase aviation fuel "seemed reasonable."  JPMC Ex. 149 at 187:2-21.

128.     With respect to ████████████████, Phillip DeLuca testified that,███████ ████████████████████████████████████ JPMC Ex. 150 at 298:24-299:1.

129.     Maryanne Ryan testified that ████████████████████████ ██████████████████ and that █████████████████████████ ██████████████████████████████████████ ████████████████ JPMC Ex. 151 at 133:22-134:10, 208:24-209:2.

130.     John Duffy testified: "I wasn't concerned about [Epstein's] use of cash.  Large clients use cash in different ways.  They are different than, you know, the average person on Main Street. . . . It wasn't – it wasn't outsized in relation to what clients of Mr. Epstein's net worth or asset base has.  And it wasn't unusual, as it related to what was expected in that account, and he was pretty consistent in the use of that."  JPMC Ex. 15 at 174:15-175:10.

131.     Francis Pearn, JPMC's former Global Chief Compliance Officer sitting by designation as the Bank's Corporate Representative, testified: "I have seen very large amounts of cash be taken out of the bank by Private Bank clients over my time at the bank."  JPMC Ex. 22 at 153:21-24.

132.     William Langford testified that large cash withdrawals were not the focus on the use of cash as part of JPMC's Human Trafficking Initiative, which was focused on "the business of trafficking. That is, people who set up the criminal enterprise to capture, imprison, move, and

sell the services, right, and generate the criminal proceeds, just like drug trafficking."  JPMC Ex. 113 at 169:12-170:10.

*JPMC Employees Investigated Other Epstein Account Activity*

133.    JPMC employees investigated Epstein's account activity, including his involvement with MC2 Models Management.  As part of that investigation, AML investigator Maryanne Ryan noted that MC2 "appear[ed] to be a legit modeling agency."  JPMC Ex. 135.

134.    William Langford stated that the modeling agency "really tells us little" about any "possible linkages between the JPM accounts and bad activity."  JPMC Ex. 135.

135.    Langford testified that "[t]he modeling agency is just that it didn't tell us anything, and our ability as a bank to know what's really going on in a modeling agency is extremely limited."  JPMC Ex. 113 at 356:20-24.

136.    On January 13, 2011, Maryanne Ryan emailed Langford and Phillip DeLuca regarding her investigation into Epstein, in which she concluded that there were "no smoking guns."  JPMC Ex. 152.

137.    Among the conclusions reached by Maryanne Ryan in her investigation was that Epstein had sponsored the opening of accounts for two adult women, including one described as a "willing participant" in the "recaps of the escapades."  JPMC Ex. 152.

138.    Maryanne Ryan did not ███████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ JPMC Ex. 151 at 139:7-18.

139.    Maryanne Ryan did not view these transactions as "underhanded," ██████████ ████████████████████████ at the time.  JPMC Ex. 151 at 225:5-231:12.

140.    William Langford testified that this activity was "in many respects . . . inconsistent with the types of things that we saw in human trafficking.  You know, having her own account, providing money, providing documented expenses.  The human trafficking enterprises that we were focused on were designed to traffic the individuals, keep them down, do—do the business and keep it off the radar.  This was different. I mean it's—it's pretty—I don't like the behavior.  But it's different from the typology of human trafficking that we had been focused on."  JPMC Ex. 113 at 325:15-326:16.

141.    William Langford further testified that ██████████████████████████ ████████████████████████████████████ JPMC Ex. 113 at 488:9-18.

### *JPMC Employees Did Not Believe Epstein's Transactions Were Related to His Misconduct*

142.    Paul Morris testified that it "never occurred" to him that Epstein was withdrawing cash "for the payment related to sexual abuse or sex trafficking" and he had "absolutely not, never heard" anyone at JPMC indicate a suspicion that Epstein's cash withdrawals were being used or could be used for sexual abuse or sex trafficking.  JPMC Ex. 153 at 337:15-338:4.

143.    John Duffy testified: "I had no reason to believe that Mr. Epstein—and at no point in time did I believe Mr. Epstein was committing criminal acts through JPMorgan, such as sex trafficking."  JPMC 15 at 365:3-8.

144.    Maryanne Ryan also noted that Epstein "pa[id] other girls, many models no huge amounts" and described Epstein as a "Sugar Daddy."  JPMC Ex. 152.  Ryan testified that she understood the term "sugar daddy" to mean "[s]omebody that likes to spend his money on ladies" but that she did not believe it "impl[ied] financial support in exchange for sexual favors." JPMC Ex. 151 at 229:12-22.

145.    William Langford testified that Maryanne Ryan's findings in her investigation of Epstein's account activity did not "establish a link between JPMorgan and the operation by Epstein of a sex trafficking ring through the bank, on its face, in my opinion." JPMC Ex. 113 at 492:19-493:1.  Langford further testified that he did not believe that Epstein "was engaging in continued illegal activity after his 2008 plea." JPMC Ex. 113 at 487:24-488:4.

146.    Stephen Cutler testified that, "If Mr. Epstein was continuing to engage in unlawful activity, we didn't want him as a client." JPMC Ex. 142 at 363:3-15.

147.    Mary Erdoes testified: "[T]he concern was the cash payments, and at the time, the cash payments were related to airplane usage.  And never at the time was that something that I was connecting in my mind with anything to do with any of the allegations of what he may or may not have done, and I wasn't aware of any ongoing things that Mr. Epstein was doing, and the two things never – they never came to my mind to connect them." JPMC Ex. 115 at 182:10-19.  Erdoes further testified that if she had "learned and believed that [Epstein] was sexually abusing young children, yes, he would be – I would ask to have him exited from the bank." JPMC Ex. 115 at 180:19-21.

*JPMC Employees Did Not Know Whether Epstein Was Under Investigation*

148.    On February 17, 2011, Jonathan Schwartz and William Langford spoke with Epstein attorney Ken Starr. ████████████████████████████████████████ ████████████████████████████████ JPMC Ex. 154; JPMC Ex. 142 at 351:7-17.

149.    On March 9, 2011, Jonathan Schwartz discussed with Stephen Cutler the need to determine where "there's actually a live federal investigation" into Epstein.  JPMC Ex. 155 at -274529.

150.    On March 15, 2011, Jonathan Schwartz emailed Stephen Cutler that he contacted Epstein attorney Jay Lefkowitz to inquire whether there was any such investigation.  Mr. Schwartz testified that Mr. Lefkowitz "reported [] that to his knowledge there was not an active investigation of his client.  But as you would expect someone sophisticated like him to say, you know, we don't necessarily know."  JPMC Ex. 35 at 39:17-25, 40:1-6.  As to any suggestion in the media of an ongoing investigation, "according to Jay, [they] don't seem to have any basis."  JPMC Ex. 155 at -274528.

151.    On or about March 22, 2011, Jonathan Schwartz spoke to the United States Attorney for the Southern District of Florida, who did not disclose any investigation into Epstein.  JPMC Ex. 156; JPMC Ex. 157 at 18.

152.    JPMC also reached out to the FBI to ask for a contact at the agency to determine whether there was any ongoing investigation into Epstein.  The FBI never returned the phone call.  JPMC Ex. 157 at 19; JPMC Ex. 150 at 151:19-152:24; 329:5-330:21.

153.    William Langford testified that he recommended exiting Epstein as a client due to reputational risk concerns and not legal concerns or concerns about Epstein's account activity.  JPMC Ex. 113 at 436:10-20, 488:5-489:10.  Langford further testified that he did not believe that Epstein "was engaging in continued illegal activity after his 2008 plea."  JPMC Ex. 113 at 487:24-488:4.  Langford also testified that had he believed there were ongoing violations of law and others disagreed over exiting a client, he would have escalated that decision to JPMC's board of directors.  JPMC Ex. 113 at 283:6-284:16.

154.    Stephen Cutler recommended exiting Epstein as a client and refraining from engaging in further business with him due to the reputational risk he created for the Bank.  JPMC Ex. 142 at 209:24-210:7, 299:6-11; JPMC Ex. 19 at 76:2-6.

155.    Maryanne Ryan testified that she and Phillip DeLuca advocated exiting Epstein as a client because "[h]e was a reputational risk to the bank."  JPMC Ex. 151 at 70:24-71:17, 129:12-18.

156.    Mary Casey, "escalated concerns for reputational risk."  JPMC Ex. 114 at 34:10-14, 93:4-6.

157.    Phillip DeLuca testified that AML Investigations' recommendation to exit Epstein was based on "reputational risk."  JPMC Ex. 150 at 85:6-10.

158.    With respect to Epstein's status as a client, John Duffy testified: "I was of the opinion his reputational risk was not worth having him as an account, that's correct."  JPMC Ex. 15 at 125:5-7.

159.    Kevin McCleerey testified that "Mr. Epstein represented a reputational risk to the firm."  JPMC Ex. 13 at 38:8-10.

160.    Justin Nelson testified that he understood that Epstein was terminated as a client due to considerations of "reputational risk."  JPMC Ex. 5 at 8:6-9.

## VI.    JPMC Exited Epstein Shortly After Staley Left the Bank

161.    On January 8, 2013, JPMC employees received a "[m]essage from Jamie Dimon" with the subject "Jes Staley" and which stated that Staley was leaving JPMC to join BlueMountain Capital Management.  The same day, Phillip DeLuca forwarded the message to Maryanne Ryan, writing, "Should we get rid of Epstein now?"  Ryan responded, "As a matter of fact, at W's [William Langford's] going away hje [sic] told me Jes was on his way out.  He mentioned to PJ the case.  So, I think in a few weeks, I will circulate again for discussion."  JPMC Ex. 159.

162.     Mary Erdoes testified that she exited Epstein as a client when "Jes Staley was no longer at the Firm, and Jes Staley was the most senior client coverage person for Mr. Epstein. And there was no one there to vouch for Mr. Epstein.  And I made the decision that it was – we were exiting the relationship with Mr. Epstein."  JPMC Ex. 115 at 61:4-11.  Erdoes further testified that "when Mr. Staley left the Firm, there was no one there to give the reasons why we would want to keep Mr. Epstein as a client of the Firm."  JPMC Ex. 18 at 50:24-51:2.

163.     John Duffy testified that in August 2013, "Mr. Staley had left the Bank.  He was no longer a sponsor or vouching for Mr. Epstein.  And we chose to terminate the relationship at that point in time."  JPMC Ex. 15 at 370:2-6.  Duffy further testified that "there was a process" to exiting Epstein that took time to execute.  JPMC Ex. 15 at 371:11-19.

Dated: September 8, 2023

Respectfully submitted,

**MASSEY & GAIL LLP**

Leonard A. Gail (*pro hac vice*)
Rachel Morse (*pro hac vice*)
50 East Washington Street, Suite 400
Chicago, IL 60602
(t) (312) 283-1590
lgail@masseygail.com
rmorse@masseygail.com

**JONES DAY**

Bethany K. Biesenthal (*pro hac vice*)
110 North Wacker Drive
Suite 4800
Chicago, IL 60606
(t) (312) 269-4303
(f) (312) 782-8585
bbiesenthal@jonesday.com

Charlotte Taylor
51 Louisiana Ave. NW

**WILMER CUTLER PICKERING
    HALE AND DORR LLP**

/s/ *Felicia H. Ellsworth*
Felicia H. Ellsworth
John J. Butts
Andres O'Laughlin
60 State Street
Boston, MA 02109
(t) (617) 526-6000
(f) (617) 526-5000
felicia.ellsworth@wilmerhale.com
john.butts@wilmerhale.com
andy.olaughlin@wilmerhale.com

Boyd M. Johnson III
Robert L. Boone
Alan E. Schoenfeld
Christopher Bouchoux
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Washington, DC 20001
(t) (202) 879-3872
(f) (202) 626-1700
ctaylor@jonesday.com

(t) (212) 230-8800
(f) (212) 230-8888
boyd.johnson@wilmerhale.com
robert.boone@wilmerhale.com
alan.schoenfeld@wilmerhale.com
christopher.bouchoux@wilmerhale.com

*Attorneys for JPMorgan Chase Bank, N.A.*