# EXHIBIT 6

```
 1            UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
    GOVERNMENT OF THE UNITED     )
 3  STATES VIRGIN ISLANDS        )
                                 )
 4        Plaintiff,             )
                                 )
 5  vs.                          ) 1:22-cv-10904-JSR
                                 )
 6  JPMORGAN CHASE BANK, N.A.,   )
                                 )
 7        Defendant/Third-       )
          Party Plaintiff.       )
 8  _____  )
    JPMORGAN CHASE BANK, N.A.    )
 9                               )
          Third-Party            )
10        Plaintiff,             )
                                 )
11  vs.                          )
                                 )
12  JAMES EDWARD STALEY,         )
                                 )
13        Third-Party            )
          Defendant.             )
14
             FRIDAY, MAY 26, 2023
15
      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16
17                     - - -
18            Videotaped deposition of James
    Dimon, held at the offices of JPMorgan Chase,
19  383 Madison Avenue, New York, New York,
    commencing at 9:02 a.m. Eastern, on the above
20  date, before Carrie A. Campbell, Registered
    Diplomate Reporter and Certified Realtime
21  Reporter.
22
23                     - - -
24        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
25            deps@golkow.com
```

Confidential Pursuant to Protective Order

```
 1              regulations have changed, requirements

 2         have changed.

 3    QUESTIONS BY MR. BOIES:

 4         Q.    Who were the experts at the

 5    time that you're referring to?

 6         A.    Steve Cutler would be the

 7    primary one that I would refer to, and he had

 8    a whole team of people, some of whom had been

 9    for -- in the prosecutor's and the Department

10    of Justice.  He had been the SEC enforcement

11    chief, and very many capable people in

12    compliance and experts in AML sanctions, et

13    cetera.

14         Q.    Is it fair to say that you

15    believe the bank should have done what

16    Mr. Cutler concluded was the appropriate

17    thing to do?

18              MR. BUTTS:  Objection.  Same

19         instruction.

20              You may answer.

21              THE WITNESS:  Cutler was the

22         ultimate authority.  It didn't mean

23         that because he didn't like something

24         he wouldn't allow a businessperson to

25         make a different judgment call.
```

```
 1                    If he had felt that it had gone
 2          over the line, he would have kicked it
 3          out, and he had the authority to do
 4          it.
 5                    So, yes.
 6     QUESTIONS BY MR. BOIES:
 7          Q.    Well, I'm not sure I understand
 8     that answer.
 9                    You said that the experts were
10     the people in charge when Jeffrey Epstein was
11     a customer of the bank.
12                    Correct?
13          A.    Yes.
14          Q.    And I asked you who those
15     experts were, and you said Mr. Cutler.
16                    Correct?
17          A.    A team of experts.
18          Q.    What?
19          A.    A team of experts.  I said
20     compliance, legal, AML, people who would have
21     been in enforcement, people who would have
22     been out of the DOJ prosecution.  He was the
23     most senior of them --
24          Q.    Okay.
25                    MR. BUTTS:  Let him finish.
```

CONFIDENTIAL - Pursuant to Protective Order

```
 1          A.     He had the right to do the

 2    second, and he had the right to do the first.

 3          Q.     Okay.  So there is --

 4                 MR. BUTTS:  David, please let

 5          him finish.

 6                 THE WITNESS:  In his judgment,

 7          he would make that decision.

 8    QUESTIONS BY MR. BOIES:

 9          Q.     Okay.  So he could --

10                 MR. BUTTS:  Are you finished?

11                 THE WITNESS:  Yes.

12                 MR. BUTTS:  Okay.  Now your

13          turn.

14    QUESTIONS BY MR. BOIES:

15          Q.     So he could decide to let the

16    businessperson make the call not to terminate

17    Mr. Epstein, even though he believed that

18    Mr. Epstein should be terminated; is that

19    fair?

20                 MR. BUTTS:  Objection.  Asked

21          and answered.

22                 THE WITNESS:  I think it was

23          quite clear because you're kind of

24          changing my meaning.

25                 If he thought it rose to the
```

```
 1          level -- an excess level, he would

 2          have said, you can't.

 3              If he didn't, sometimes he

 4          said, my advice is you shouldn't do

 5          it, but it's your call.

 6   QUESTIONS BY MR. BOIES:

 7      Q.     And what this excess level is

 8   that you refer to is not anything that's

 9   written down; that's just a question of

10   judgment, right?

11      A.     There's a group of people who

12   review these things, and they all -- I think

13   they all know at the end of the day that if

14   there's a dispute, he is the final arbiter.

15      Q.     Didn't you just tell me that he

16   might think somebody ought to be terminated,

17   but he had the right to say to the

18   businessperson, it's your call, if you don't

19   want to terminate him, let him continue to be

20   a customer?

21              MR. BUTTS:  Objection.  Asked

22          and answered.

23              THE WITNESS:  It's the weight

24          of the scale.  People disagree, and he

25          doesn't think it hit the level where
```

CONFIDENTIAL - Pursuant to Protective Order

```
 1         A.    You've got to read the stuff

 2   that's come out.  That's --

 3              MR. BUTTS:  Yeah, I think you

 4        have the record.  He's not here to

 5        translate what he's learned from us.

 6              MR. BOIES:  Well --

 7              THE WITNESS:  Maybe he doesn't

 8        know.

 9              MR. BUTTS:  Yeah.  I -- either

10        you or your team has the same

11        discovery we have.

12              MR. BOIES:  Well, but he's --

13              THE WITNESS:  There are

14        terrible -- there are terrible --

15              MR. BOIES:  He's the chief

16        executive, and I'm not.

17              THE WITNESS:  There are

18        terrible allegations, which, if true,

19        meant that he knew a lot of things

20        sometime during that period that we

21        didn't.  And I would include in that

22        Steve Cutler and Mary Erdoes.

23   QUESTIONS BY MR. BOIES:

24        Q.    But what I'm trying to get at

25   is, what are those serious allegations?
```

1    it was in January of 2013 that JPMorgan

2    entered into a cease and desist consent order

3    with the Office of the Comptroller of

4    Currency?

5         A.    I don't recall the date, but,

6    yes, I do remember the consent order, yeah.

7         Q.    And does that refresh your

8    recollection in any way as to whether this

9    report to you may have been related to that

10   consent cease and desist order?

11             MR. BUTTS:  Objection to form.

12             You may answer.

13             THE WITNESS:  I don't remember,

14        but it may have been what prompted me

15        to ask.

16   QUESTIONS BY MS. SINGER:

17        Q.    Okay.  We can put that document

18   aside.

19             All right.  Were you aware,

20   Mr. Dimon, of efforts at JPMorgan to launch a

21   donor-advised fund with Bill Gates and The

22   Gates Foundation?

23        A.    Only as a result of this --

24   these lawsuits.

25        Q.    Okay.  So at no time --

Confidential  Pursuant to Protective Order

```
 1          A.     Or what came out with Epstein

 2    before.

 3          Q.     So prior to 2015, were you

 4    aware of efforts at JPMorgan to launch a

 5    donor-advised fund with Bill Gates through

 6    The Gates Foundation?

 7          A.     I don't -- I was not, no.

 8          Q.     Okay.  So I take it you also

 9    were not aware that Jeffrey Epstein played a

10    role in those discussions?

11               MR. BUTTS:  Objection.

12               You may answer.

13               THE WITNESS:  Oh, absolutely I

14          was not aware.  Nor do we need Jeff

15          Epstein to talk to Bill Gates.

16    QUESTIONS BY MS. SINGER:

17          Q.     Were you aware that Mary Erdoes

18    and Jes Staley had regular communications

19    with Jeffrey Epstein about that donor-advised

20    fund?

21          A.     I am now.

22               MR. BUTTS:  Objection.

23    QUESTIONS BY MS. SINGER:

24          Q.     And were you aware that the

25    hope was that donor-advised fund would reach
```