# EXHIBIT 7

Confidential - Pursuant to Protective Order

```
 1           UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
    GOVERNMENT OF THE UNITED    )
 3  STATES VIRGIN ISLANDS       )
                                )
 4       Plaintiff,             )
                                )
 5  vs.                         ) 1:22-cv-10904-JSR
                                )
 6  JPMORGAN CHASE BANK, N.A.,  )
                                )
 7       Defendant/Third-       )
         Party Plaintiff.       )
 8  _____ )
    JPMORGAN CHASE BANK, N.A.   )
 9                              )
         Third-Party           )
10       Plaintiff,            )
                                )
11  vs.                         )
                                )
12  JAMES EDWARD STALEY,        )
                                )
13       Third-Party           )
         Defendant.            )
14
              TUESDAY, JULY 18, 2023
15
    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16                   - - -
17           Videotaped deposition of Catherine
    Keating, held at the offices of White &
18  Case LLP, 1221 Avenue of the Americas, New
    York, New York, commencing at 10:38 a.m.
19  Eastern, on the above date, before Carrie A.
    Campbell, Registered Diplomate Reporter,
20  Certified Realtime Reporter, Illinois,
    California & Texas Certified Shorthand
21  Reporter, Missouri, Kansas, Louisiana & New
    Jersey Certified Court Reporter.
22                   - - -
23           GOLKOW LITIGATION SERVICES
                  877.370.DEPS
24              deps@golkow.com
25
```

Confidential - Pursuant to Protective Order

```
 1    Epstein at the time that you were the head of

 2    the US private bank?

 3              MR. COHEN:  Objection to form.

 4    QUESTIONS BY MR. WOHLGEMUTH:

 5         Q.    You can answer unless he

 6    instructs you not to answer.

 7              MR. COHEN:  Yeah, that's --

 8         that's -- just so the ground rules are

 9         clear, you can answer any question

10         unless I instruct you not to.

11              THE WITNESS:  Okay.

12              MR. COHEN:  Not because he says

13         it, because I say it.  But he's still

14         right.

15              THE WITNESS:  All right.

16    QUESTIONS BY MR. WOHLGEMUTH:

17         Q.    So I'll just reask the

18    question, and he can object again if he

19    wants.

20              While you were the head of the

21    US private bank, did you understand

22    Mr. Staley to have a relationship with

23    Jeffrey Epstein?

24         A.    I did.

25         Q.    And what did you understand
```

Confidential Pursuant to Protective Order

1    that relationship to be?

2         A.    I understood that he had a, you

3    know, professional business relationship with

4    him.

5         Q.    Did you ever have any concerns

6    about the relationship that Mr. Staley

7    appeared to have with Mr. Epstein?

8         A.    I don't recall being concerned

9    about the nature of the relationship.

10        Q.    Did Mr. Staley have other

11   relationships with private banking clients?

12             MR. COHEN:  Objection to form.

13   QUESTIONS BY MR. WOHLGEMUTH:

14        Q.    You can answer.

15        A.    Yes.

16        Q.    Did you have other

17   relationships where Mr. Staley was the

18   primary point of contact for the private

19   banking client?

20        A.    I can't recall.  It could have

21   been the case.  I can't recall.

22        Q.    Would you agree with me that

23   while you were the head of the US private

24   bank, Mr. Staley was the closest JPMorgan

25   executive with Mr. Epstein?

Confidential - Pursuant to Protective Order

1      Q.      And what did Steve Cutler --

2      A.      I met with him.

3      Q.      Oh, sorry.

4      A.      In person.

5      Q.      I appreciate that.

6              What did Steve Cutler say in

7   this meeting about Epstein?

8      A.      I recall Steve listening to me

9   and telling me he was going to engage with

10  Jes and Mary.

11     Q.      And did he ever engage with Jes

12  and Mary, to your knowledge?

13     A.      I believe that he did.

14     Q.      And how do you know that?

15     A.      I just believe that he did.

16     Q.      I take it then you were not

17  firsthand part of these conversations?

18     A.      I was not present, huh-uh.

19     Q.      And when you say "Mary," are

20  you talking about Mary Erdoes or Mary Casey?

21     A.      Mary Erdoes.

22     Q.      So we covered this 2011

23  conversation with Mr. Staley about Epstein.

24             Can you remember any other

25  specific conversations with Mr. Staley about

1    concern about retaining Mr. Epstein as a

2    client, those conversations would occur

3    within the private bank team, and

4    conversations would also be had with Jes.

5         Q.    Do you recall what Mr. Staley

6    said in those conversations?

7         A.    I can't specifically recall

8    what he said, but I do recall from time to

9    time when there were concerns and more

10   information was desired, that Jes would talk

11   to him.

12        Q.    "Him" being Epstein?

13        A.    Yes.

14        Q.    And then report back what

15   Epstein said?

16        A.    Yes, through the -- through the

17   chain in the process.

18        Q.    So he would -- Mr. Staley's job

19   would be to obtain information from

20   Mr. Epstein and report it back to the team

21   that the team could then use to make its

22   decision; is that fair?

23              MR. JOHNSON:  Objection.

24   QUESTIONS BY MR. WOHLGEMUTH:

25        Q.    You can also answer.  They both

Confidential Pursuant to Protective Order

```
 1    have the right to object, so you can answer.

 2         A.     Can you ask the question again?

 3         Q.     Sure.

 4                I want to make sure I

 5    understand your testimony.

 6                It sounds like what Mr. Staley

 7    was doing was obtaining information from

 8    Epstein and reporting it back to the team.

 9         A.     He may -- I'm not sure that I

10    would call it obtaining information.  It may

11    have been asking questions to hear what his

12    response was.

13         Q.     So he would ask Epstein

14    questions and then report back what Epstein's

15    response was; is that fair?

16         A.     I think so.

17         Q.     Isn't that what you would

18    expect Mr. Staley to do?

19                MR. COHEN:  Objection to form.

20                THE WITNESS:  What would I

21    expect him to do?

22    QUESTIONS BY MR. WOHLGEMUTH:

23         Q.     I said, isn't that what you

24    would expect Mr. Staley to do?  If you have a

25    question, he goes and asks Epstein and then
```

1    tells you what Epstein said?

2         A.    He talked to Jeffrey Epstein

3    and so did the client team.

4         Q.    But that process of Mr. Staley

5    taking questions, asking them of Mr. Epstein

6    and then reporting back what Epstein says,

7    that's not inappropriate, correct?

8         A.    It's not inappropriate.

9         Q.    You had the authority while you

10   were the head of the US private bank to exit

11   a private banking client, fair?

12        A.    I did.  We employed a process

13   to do that.

14        Q.    The head of asset and wealth

15   management was not a part of that process; is

16   that fair?

17        A.    That actually depends.  That

18   depends.

19        Q.    Did the head of the investment

20   bank have the authority to terminate a US

21   private banking client?

22        A.    No.

23        Q.    Are you aware of any US --

24   strike that.

25             Are you aware of any policies

Confidential Pursuant to Protective Order

```
 1        Q.      Is that a pretty significant
 2    source of new business for the bank,
 3    referrals from existing clients?
 4        A.      It was a relevant source of new
 5    business.
 6        Q.      Did Epstein, to your knowledge,
 7    serve as a referral source for private
 8    banking clients?
 9        A.      I recall that he served another
10    private banking client for a period of time.
11        Q.      Is that Les Wexner?
12        A.      Yes.
13        Q.      So I understand that he served
14    Les Wexner for a period of time.  But do you
15    have any recollection about whether he served
16    as a referral source for additional private
17    banking clients, setting aside Wexner?
18        A.      I don't know.  I don't recall
19    that he referred other people that became
20    clients.  I don't recall that.
21        Q.      Do you recall Mr. Epstein
22    referring other people who were just
23    prospective clients?
24        A.      There may have been occasions
25    like that.
```

Confidential - Pursuant to Protective Order

```
 1        Q.      Who were the prospective
 2   clients?
 3        A.      I do think at one point he may
 4   have tried to refer ███████████████████ as
 5   prospective clients.
 6                I don't think that they became
 7   clients with him.
 8        Q.      When you say "with him," are
 9   you saying you don't think they became
10   clients of Epstein's?
11        A.      Correct.
12        Q.      They did, though, become
13   clients of the private bank, correct?
14        A.      I believe -- oh.
15                MR. BOUCHOUX:  Sorry.
16                THE WITNESS:  My general
17        recollection is that they were already
18        clients of the private bank.
19   QUESTIONS BY MR. WOHLGEMUTH:
20        Q.      Other than ██████████████,
21   can you think any other prospective clients
22   that Epstein referred to the private bank?
23        A.      I can't.
24        Q.      I'm going to show you, Tab 7,
25   what I'm going to mark as the first exhibit,
```

```
 1              Q.     Do you recall -- do you recall
 2     anything about Mr. Epstein as a personality?
 3     As a client?  Was he tough?
 4                     MR. COHEN:  Objection to form.
 5                     THE WITNESS:  I don't know.
 6     QUESTIONS BY MR. WOHLGEMUTH:
 7              Q.     You don't recall, like, Mary
 8     Casey or someone who talked with him
 9     frequently saying this guy is a jerk?
10                     MR. COHEN:  Objection to form.
11                     THE WITNESS:  No.
12     QUESTIONS BY MR. WOHLGEMUTH:
13              Q.     Okay.  Whose idea was it to
14     limit Mr. Epstein as a client?
15                     MR. COHEN:  Objection to form.
16                     THE WITNESS:  I don't recall
17         whose idea it was.
18     QUESTIONS BY MR. WOHLGEMUTH:
19              Q.     Do you recall Mr. Staley being
20     involved in those discussions?
21              A.     I know that Jes was involved in
22     the discussions.
23              Q.     Do you recall Mr. Staley
24     objecting to the limitations being placed on
25     Mr. Epstein at the private bank?
```

1          A.     I recall saying that I thought

2     there was significant reputation risk to the

3     bank if we continued to work with

4     Mr. Epstein, and that I was not supportive of

5     it and was not going to make the case to

6     Steve Cutler.

7          Q.     And what did Ms. Erdoes say in

8     response?

9          A.     I don't recall.

10              I know that she discussed it

11     with Jes -- I believe at the time she

12     reported to Jes in 2008.  That's what I

13     recall.

14          Q.     Did she ever tell you about

15     that conversation she had with Jes or --

16          A.     I don't recall.

17          Q.     I'm going to ask an

18     organizational question just to make sure I

19     have it straight.

20              In 2009, Ms. Erdoes gets

21     promoted to the head of asset and wealth

22     management, correct?

23          A.     Yes.

24          Q.     And she had been the head of

25     the private bank before that, correct?

1      "from" or "cc" e-mail accounts, correct?

2           A.    Correct.

3           Q.    Do you have any recollection of

4      Mr. Staley attending the rapid response

5      meeting in July of 2008?

6           A.    I don't.

7           Q.    Do you recall the result of the

8      meeting, other than the process had to play

9      out with Cutler?

10          A.    I recall that people in the

11     meeting were uncomfortable retaining him as a

12     client.  I was one of them.

13               We would escalate it to Mary,

14     and we would use the process that we used

15     when we were considering exiting a client,

16     which was to involve the senior risk officer

17     and the general counsel.

18          Q.    And Mr. Epstein was not exited

19     in July of 2008, correct?

20          A.    No.

21          Q.    Do you have any understanding

22     as to why he was not exited at that time?

23          A.    What I generally recall is that

24     when we initiated that process -- and again,

25     I was not involved in making a case to keep

Confidential Pursuant to Protective Order

```
 1    him -- that there were, I think, a number of

 2    conversations with Mary, Jes, risk, perhaps

 3    others and Steve, and that we were waiting

 4    for a while for a decision.

 5         Q.    "Steve" is Steve Cutler?

 6         A.    Correct.

 7         Q.    "Mary" is Mary Erdoes?

 8         A.    Correct.

 9               (Keating Exhibit TX227 marked

10         for identification.)

11    QUESTIONS BY MR. WOHLGEMUTH:

12         Q.    Tab 19.  I've handed what I've

13    marked as TX227.

14               Do you have it in front of you?

15         A.    Yes.

16         Q.    And TX227 is an e-mail string

17    with the top e-mail from Mary Erdoes to you

18    in August of 2008, correct?

19         A.    Yes.

20         Q.    And you can see that the e-mail

21    string begins with an e-mail from you to

22    Ms. Erdoes in August of 2008, and it says --

23    the subject line is, on my ME list.

24               Do you see that?

25         A.    Yes.
```

Confidential    Pursuant to Protective Order

1         A.      I don't recall him being

2    referred to as his friend.  I recall that we

3    all knew that Jes had the strongest

4    relationship with Jeffrey Epstein.

5         Q.      Did you have any details about

6    what the -- well, strike that.

7                 How did you know that it was a

8    strong relationship between Mr. Staley and

9    Mr. Epstein?

10        A.      He had known him for a long

11   time.  I think Mr. Epstein viewed him as his

12   relationship manager.  Jes would raise our

13   questions with him.

14        Q.      And eventually someone did meet

15   with Mr. Staley to discuss the HT project,

16   correct?

17        A.      I -- yes.

18        Q.      The HT is the human trafficking

19   project?

20        A.      Yes.

21        Q.      Can you just describe for me in

22   your own words what you remember that project

23   to be?

24        A.      What I remember is it was --

25   you know, from time to time the bank would do

Confidential -- Pursuant to Protective Order

1    Epstein in 2006?

2              MR. COHEN:  Objection to form.

3              MR. BOUCHOUX:  Objection to

4         form.

5    QUESTIONS BY MR. WOHLGEMUTH:

6         Q.    Strike that.

7              Why did you approve Jeffrey

8    Epstein's due diligence report in 2006?

9              MR. COHEN:  Objection to form.

10             THE WITNESS:  I don't recall

11        when in 2006 I approved it.

12   QUESTIONS BY MR. WOHLGEMUTH:

13        Q.    Why did you approve

14   Mr. Epstein's due diligence report in 2007?

15             MR. COHEN:  Objection to form.

16             THE WITNESS:  In 2007, I would

17        have approved it because we retained

18        him as a client.

19   QUESTIONS BY MR. WOHLGEMUTH:

20        Q.    But if you had not approved

21   him, that would have began the process of him

22   no longer being a client, correct?

23        A.    Not --

24             MR. BOUCHOUX:  Objection to

25        form.

```
 1                THE WITNESS:  Not approving a
 2        DDR isn't how you exit a client.
 3        Right?
 4    QUESTIONS BY MR. WOHLGEMUTH:
 5        Q.     Okay.  But you are the head of
 6    the US private bank and had the authority to
 7    exit private banking customers, correct?
 8        A.     Yes.
 9                MR. COHEN:  Objection to form.
10                THE WITNESS:  Yes.
11    QUESTIONS BY MR. WOHLGEMUTH:
12        Q.     Okay.  So then why didn't you
13    exit Mr. Epstein in 2007?
14                MR. COHEN:  Objection to form.
15                THE WITNESS:  In what year?
16    QUESTIONS BY MR. WOHLGEMUTH:
17        Q.     '07.
18        A.     '07.
19                I don't specifically recall.  I
20    recall that after he was charged, that the
21    collective decision was to retain him as a
22    client, treat him as high risk.  So that
23    would be why I approved it.
24        Q.     And why did you approve
25    Mr. Epstein's due diligence report in 2008
```

Confidential Pursuant to Protective Order

1    after he was convicted?

2         A.    I don't recall when in 2008 I

3    approved it.  I recall that after he was

4    convicted we -- because he was a felon, we

5    followed our process, we widened the circle

6    and escalated the issue.  But I don't recall

7    when during the year I would have approved

8    that DDR.

9         Q.    And why didn't you exit

10   Mr. Epstein after you heard about the

11   conviction?

12             MR. COHEN:  Objection to form.

13             THE WITNESS:  Because we met in

14        the private bank, concluded that we

15        were uncomfortable retaining him, and

16        then began the process of escalating

17        it and widening the circle, including

18        Mary Erdoes, Jes Staley, Steve Cutler

19        and the head of risk.

20   QUESTIONS BY MR. WOHLGEMUTH:

21        Q.    Who was the head of risk that

22   you're referring to?

23        A.    I can't recall who it was at

24   the time.

25        Q.    And in 2009, is your answer

Confidential    Pursuant to Protective Order

```
 1     roughly the same for why you didn't exit

 2     Mr. Epstein?

 3              MR. COHEN:  Objection to form.

 4              THE WITNESS:  Yes.

 5     QUESTIONS BY MR. WOHLGEMUTH:

 6         Q.    And in 2010 and 2011?

 7              MR. COHEN:  Objection.

 8              MR. BOUCHOUX:  Objection to

 9         form.

10              THE WITNESS:  Yes.

11     QUESTIONS BY MR. WOHLGEMUTH:

12         Q.    You don't dispute, though, that

13     you had the authority as the head of the

14     private bank to exit a client that you would

15     have thought was bad for the client -- for

16     the private bank, correct?

17              MR. BOUCHOUX:  Objection to the

18         form.

19              THE WITNESS:  The reality is,

20         it was never a unilateral decision to

21         exit a client.  It's a serious

22         decision.  Clients are inclined to

23         escalate it if they don't like what

24         they're hearing, and so it was never a

25         unilateral decision to exit a client.
```

Confidential Pursuant to Protective Order

```
 1   testimony, Mr. Wohlgemuth asked you about

 2   Mr. Staley speaking to Jeffrey Epstein,

 3   correct?

 4              Just part of this retriggered

 5   examination, I think was what you called it;

 6   is that right?

 7        A.    Yes.

 8              MR. BOUCHOUX:  Objection to

 9        form.

10              THE WITNESS:  Oh, yes.

11   QUESTIONS BY MS. SINGER:

12        Q.    Okay.  And do you recall why

13   the decision was made that Mr. Staley should

14   have that conversation rather than, for

15   instance, somebody in risk management or

16   compliance?

17        A.    Jes was the sort of de facto

18   primary relationship person with Jeffrey

19   Epstein.

20        Q.    Did you expect that Jeffrey

21   Epstein would be forthcoming if -- when

22   Mr. Staley asked him about allegations of

23   trafficking?

24        A.    I don't -- I never met Jeffrey

25   Epstein.  I can't speculate.
```

Confidential - Pursuant to Protective Order

```
 1        A.      Yes.

 2        Q.      Okay.  And I think you

 3   testified that there were circumstances under

 4   which the bank should -- could certainly

 5   consider continuing to bank convicted felons,

 6   correct?

 7        A.      That's correct.

 8        Q.      But it's also the case that

 9   whether -- that continuing to bank a

10   convicted felon required JPMorgan to make it

11   an exception to its policies, correct?

12              MR. BOUCHOUX:  Objection.

13              THE WITNESS:  Our general

14        policy was not to have, you know, a

15        bank full of convicted felons.  That

16        was our policy.

17   QUESTIONS BY MS. SINGER:

18        Q.      Okay.  And Mr. Wohlgemuth also

19   asked you some questions about who had the

20   authority to terminate Jeffrey Epstein as a

21   customer.

22              Do you remember that?

23        A.      I do.

24        Q.      And I think you acknowledged

25   that as CEO of the private bank, you had the
```

Confidential -- Pursuant to Protective Order

 1    authority to exit Jeffrey Epstein, correct?

 2              MR. COHEN:  Objection to form.

 3              MR. BOUCHOUX:  Object.

 4              THE WITNESS:  We never acted --

 5         you know, the decision to exit a

 6         client is a serious one.  They are --

 7         it's generally not welcomed to them,

 8         and we -- it was a process.  It was

 9         never a unilateral decision by one

10         person.

11    QUESTIONS BY MS. SINGER:

12         Q.    So would it surprise you that

13    Steve Cutler testified that you had the

14    authority to exit Jeffrey Epstein as a

15    customer?

16              MR. COHEN:  Objection to form.

17              THE WITNESS:  I don't know if

18         it would surprise me.  That wasn't the

19         process that we followed.

20    QUESTIONS BY MS. SINGER:

21         Q.    And do you also disagree

22    with -- then with the testimony of JPMorgan's

23    30(b)(6) or its corporate representative,

24    Francis Pearn, that you were among the list

25    of people with the authority to terminate