# EXHIBIT 13

1    UNITED STATES DISTRICT COURT FOR THE
          SOUTHERN DISTRICT OF NEW YORK
2                    - - -

3  GOVERNMENT OF THE UNITED        : Case Number:
   STATES VIRGIN ISLANDS          : 1:22-cv-
4          Plaintiff,             : 10904-JSR
           v.                      :
5  JPMORGAN CHASE BANK, N.A.       :
           Defendant/Third-Party   :
6          Plaintiff.              :
   _____
7  JPMORGAN CHASE BANK, N.A.       :
           Third-Party Plaintiff, :
8          v.                      :
   JAMES EDWARD STALEY             :
9          Third-Party Defendant. :

10

                    - - -
11              APRIL 28, 2023
              HIGHLY CONFIDENTIAL
12                   - - -

13          Videotaped deposition of

14  KEVIN McCLEEREY, taken pursuant to

15  notice, was held at the law offices of

16  Porzio, Bromberg & Newman, P.C., 100

17  Southgate Parkway, 3rd Floor, Morristown,

18  New Jersey 07960, commencing at

19  9:13 a.m., on the above date, before

20  Amanda Dee Maslynsky-Miller, a Certified

21  Realtime Reporter and Notary Public in

22  and for the State of New York.

23                  - - -
          GOLKOW LITIGATION SERVICES, INC.
24        877.370.3377 ph| 917.591.5672 fax

1    Q.   Given your experience in

2  risk management, did you believe that

3  Mr. Epstein presented an intolerably high

4  reputational risk to the bank?

5          MR. BUTTS:  Objection to

6       form.

7          You may answer.

8          THE WITNESS:  Mr. Epstein

9       represented a reputational risk to

10      the firm.  My group did not have

11      any responsibility for onboarding

12      or exiting any clients.  That was

13      the business's role.

14  BY MS. OLIVER:

15      Q.   I think my question was a

16  little different, which was, did you

17  personally believe that Mr. Epstein

18  presented an intolerably high

19  reputational risk to the firm?

20          MR. BUTTS:  Objection to

21      form.

22          You may answer.

23          THE WITNESS:  I don't know

24      what "intolerable" means.  People

1   relationship approach.

2          Q.     Got it.  Thank you.

3          A.     That's how I interpret it.

4          Q.     Did you have an

5   understanding as to why Ms. Keating and

6   Ms. Verdon wanted to escalate the

7   relationship up the chain to more senior

8   officers within the asset and wealth

9   management group?

10         A.     He had pled guilty.  They

11  wanted to make sure that senior

12  management was fully aware of the current

13  status of Mr. Epstein.

14         Q.     Why would senior management

15  need to be aware of Mr. Epstein's current

16  status?

17         A.     Well, he was now considered

18  a felon.  According to the sponsorship

19  policy, Mr. Staley and Mr. -- the head of

20  the legal department at the time, I

21  believe Mr. Cutler, had to approve the

22  relationship to keep the relationship, as

23  he was now a convicted felon.

24                So it was important

1   before -- the people who were below the

2   level of Mr. Staley and Mr. Cutler were

3   fully informed as to the current status

4   of his guilty plea.

5        Q.    If Ms. Keating had wanted to

6   exit Mr. Epstein from the bank at this

7   point, did she have the authority to do

8   so?

9        A.    Yes.  She was in charge of

10  the business, yes.

11       Q.    And if Ms. Casey had wanted

12  to exit Mr. Epstein from the bank at this

13  point, did she have the authority to do

14  so?

15       A.    Yes.

16       Q.    Was it your understanding

17  that Ms. Casey wanted to keep Mr. Epstein

18  as a client of the bank at this point?

19       A.    I don't recall any

20  conversations from Mary Casey at any

21  meeting about that.

22       Q.    Is there a reason that

23  you're aware of that Ms. Casey would have

24  chosen to escalate the decision to more

1   wanted to exit the client, she had the

2   authority to do so, correct?

3            MR. BUTTS:  Objection.

4            You may answer.

5            THE WITNESS:  If the

6        people -- if the head of the

7        business at the time, Catherine

8        Keating, agreed to exit the

9        relationship, then the client

10       would have been exited.

11  BY MS. OLIVER:

12       Q.    So Mary Casey did not have

13  the authority to exit a client?

14       A.    She could recommend the

15  exiting of a client, but most likely she

16  would elevate the discussion to her

17  market manager and the head of the

18  business.

19       Q.    Well, you said "most

20  likely."

21            Was she required to escalate

22  the decision to the market manager?

23       A.    I think that would be normal

24  course of a supervisor, manager role -- a

1          her recommendation.

2     BY MS. OLIVER:

3          Q.     And if at the end of that

4     meeting she said, I do not approve and

5     accept sponsorship of Jeffrey Epstein,

6     what would have happened?

7          A.     It would have been escalated

8     up.  She was --

9          Q.     To whom?

10          A.     Catherine Keating.  She was

11     the head of the business.

12          Q.     So Catherine Keating had the

13     ability to say, Mary Casey, I don't care

14     whether you approve and accept

15     sponsorship of Jeffrey Epstein, we're

16     retaining him as a client and you're

17     going to be compelled to continue to

18     affirm sponsorship of him?

19               MR. BUTTS:  Objection to

20          form.  Objection.

21               You may answer.

22               THE WITNESS:  I don't think

23          Catherine Keating would assign a

24          banker to a client if the banker

1    was not comfortable with that

2    client.  I think Catherine Keating

3    would try to understand what was

4    the nature of Mary Casey's

5    concerns and whether she agreed

6    with those concerns or not.

7        She was the head of the U.S.

8    business.  She was responsible for

9    all the clients within the

10    business.  And she would make the

11    decision.

12        Deciding to exit and then

13    how you execute the exit is

14    another process, too.  Clients

15    have complex investments, assets.

16    It's not just a banking account,

17    send a person a letter and they go

18    to another bank.  So it involved

19    some discussion about how to do

20    that as well.

21    BY MS. OLIVER:

22        Q.   So supposing Catherine

23    Keating agreed with Mary Casey and

24    believed that Mr. Epstein should be

1    exited from the bank, did Jes Staley have

2    the authority to retain him as a

3    client --

4         A.    Well, Jes --

5         Q.    -- despite that?

6         A.    Jes Staley was in charge of

7    asset and wealth management.  He was the

8    senior-most person heading that line of

9    business.  From what we understood, Jes

10   Staley had a business relationship with

11   Mr. Epstein, and he weighed on whether to

12   keep the client or exit.

13        Q.    Are you aware that at a

14   certain point in time Mr. Staley left

15   asset and wealth management and became

16   the head of the investment bank?

17        A.    Yes.

18        Q.    Do you know when that

19   happened?

20        A.    I believe sometime in 2009.

21        Q.    September 2009 sound about

22   right?

23        A.    Yes.

24        Q.    Mr. Morris was Mr. Epstein's