# EXHIBIT 18

```
 1            UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
    GOVERNMENT OF THE UNITED     )
 3  STATES VIRGIN ISLANDS        )
                                 )
 4       Plaintiff,              )
                                 )
 5  vs.                          ) 1:22-cv-10904-JSR
                                 )
 6  JPMORGAN CHASE BANK, N.A.,   )
                                 )
 7       Defendant/Third-        )
         Party Plaintiff.        )
 8  _____    )
    JPMORGAN CHASE BANK, N.A.    )
 9                               )
         Third-Party            )
10       Plaintiff,              )
                                 )
11  vs.                          )
                                 )
12  JAMES EDWARD STALEY,         )
                                 )
13       Third-Party            )
         Defendant.             )
14
              WEDNESDAY, JULY 12, 2023
15
    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16                    - - -
17            Videotaped deposition of
    Mary Erdoes, held at the offices of
18  Williams & Connolly, 650 Fifth Avenue, Suite
    1500, New York, New York, commencing at
19  9:04 a.m. Eastern Time, on the above date,
    before Carrie A. Campbell, Registered
20  Diplomate Reporter and Certified Realtime
    Reporter.
21
22
                      - - -
23
            GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
25
```

```
 1          Q.      So you're talking about
 2   documents that you've reviewed with your
 3   lawyers in connection with this litigation.
 4   That's where you're getting the vouching
 5   from?
 6               MR. JOHNSON:  Objection.
 7               THE WITNESS:  No.  You asked me
 8        about my testimony, and I was
 9        responding to the conversa -- the --
10        what we were reviewing.
11               I am not aware, because I was
12        not in any of the discussions that I
13        recall, about the review of Mr. Staley
14        and Mr. Epstein, and the relationship
15        that Mr. Epstein had with the firm.
16   QUESTIONS BY MR. WOHLGEMUTH:
17          Q.      So let me put it this way.  No
18   one was there in 2013 to vouch for
19   Mr. Epstein, correct?
20          A.      No one had a senior
21   relationship with Mr. Epstein like Mr. Staley
22   did.
23          Q.      Okay.
24          A.      And when Mr. Staley left the
25   firm, there was no one there to give the
```

1    reasons why we would want to keep Mr. Epstein

2    as a client of the firm.

3        Q.    But you don't know whether

4    Mr. Staley in fact gave those reasons prior

5    to 2013, because you were not a part of the

6    discussions, correct?

7        A.    I don't recall being part of

8    the reviews of Mr. Epstein's relationship.

9        Q.    You used the word "vouch."

10   That's an interesting word.

11           Have you used that word to

12   describe Mr. Staley's conduct vis-à-vis

13   Mr. Epstein at any time prior to your

14   deposition?

15       A.    I don't know what you mean.

16       Q.    Okay.  Can you recall ever

17   saying to anyone, outside of your deposition,

18   prior to the time you started preparing for

19   your deposition, Mr. Epstein was vouched for

20   by Mr. Staley?

21       A.    I don't recall any discussions.

22       Q.    And are you aware that

23   Mr. Cutler happened to use the same word,

24   "vouch," in his testimony?

25           MR. JOHNSON:  Objection.

Confidential - Pursuant to Protective Order

1          Q.     Okay.  Are you -- you're aware

2     that Mr. Staley actually told JPMorgan's

3     legal team that they should talk to Epstein

4     and Epstein's lawyers; isn't that correct?

5          A.     I am not aware of that.

6          Q.     So you've said, I think a

7     couple times, Mr. Staley was Mr. Epstein's

8     client coverage person or client sponsor; is

9     that correct?

10         A.     He was --

11                MR. JOHNSON:  Objection.

12                THE WITNESS:  I --

13                MR. JOHNSON:  You can answer.

14                THE WITNESS:  Sorry.

15    QUESTIONS BY MR. WOHLGEMUTH:

16         Q.     You can answer.

17         A.     Mr. Staley was the most-senior

18    representative and relationship person for

19    Mr. Epstein.

20         Q.     So that's what I want to probe.

21    I want to probe exactly what you mean by

22    client coverage person or client sponsor.

23                I understand what you just said

24    to be that Mr. Staley was the most-senior

25    person at JPMorgan who was closest to

Confidential Pursuant to Protective Order

1    bank, correct?

2         A.    I did.

3         Q.    And so here's the general

4    counsel -- strike that.

5              Mr. Cutler at this time was the

6    general counsel of JPMorgan?

7         A.    Yes.

8         Q.    So here's the general counsel

9    of JPMorgan telling you, head of asset and

10   wealth management, there's a private

11   client -- there's a private banking client

12   that we should not do business with, period,

13   and you didn't take any action because you

14   were not his client coverage person?

15             MR. JOHNSON:  Objection.

16             THE WITNESS:  I don't know what

17        that means.

18   QUESTIONS BY MR. WOHLGEMUTH:

19        Q.    Okay.  Well, when you -- when

20   Mr. Cutler told you, as the head of asset and

21   wealth management business, Mr. Epstein is

22   not a person we should do business with,

23   period, why didn't you, as the overseer of

24   the private bank, throw him out of the bank?

25        A.    I wasn't responsible for

Confidential Pursuant to Protective Order

```
1     Mr. Epstein's relationship with the bank.
2          Q.     But you were responsible for
3     the private bank, correct, ma'am?
4          A.     Correct.
5          Q.     And so why, as the person
6     responsible for the private bank, wouldn't
7     you execute on Mr. Cutler, who is the general
8     counsel of the bank's, wishes?
9          A.     I don't know what Mr. Cutler's
10    wishes were.
11         Q.     Okay.
12         A.     None of us wanted to do
13    business after having a lawsuit with someone
14    who sues you.  And there's a process by which
15    people review accounts, and I'm not
16    responsible for his account, and I don't
17    recall being part of those discussions.
18         Q.     Well, after Mr. Cutler -- well,
19    strike that.
20              Do you take -- did you
21    understand Mr. Cutler's point about putting
22    Mr. Epstein behind us and him, Mr. Epstein,
23    not being a person we should do business
24    with, as a commentary on Mr. Cutler not
25    wanting to do business with someone who had
```

Confidential Pursuant to Protective Order

1    threatened to sue JPMorgan?

2         A.    Again, I don't know what

3    Mr. Cutler was thinking.  I don't remember

4    talking to Mr. Cutler about it.

5         Q.    Okay.  Well, I'm asking what

6    you understood about Mr. Cutler's words here.

7               Did you understand that

8    Mr. Cutler was just referring to the somewhat

9    lengthy and difficult settlement process with

10   Mr. Epstein?

11        A.    I didn't -- I don't know what I

12   was thinking at the time.

13        Q.    Okay.  Well, I take it -- well,

14   strike that.

15             (Erdoes Exhibit TX89 marked for

16             identification.)

17   QUESTIONS BY MR. WOHLGEMUTH:

18        Q.    I'm going to show you what I'm

19   going to mark as TX89.

20             Okay.  TX89 is an e-mail string

21   with the top e-mail from you to Mr. Epstein

22   in July of 2011, correct?

23        A.    Correct.

24        Q.    And it's actually July 26,

25   2011, correct?