# EXHIBIT 19

Confidential - Subject to Protective Order

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
     GOVERNMENT OF THE UNITED     )
 3   STATES VIRGIN ISLANDS        )
                                  )
 4        Plaintiff,              )
                                  )
 5   vs.                          ) 1:22-cv-10904-JSR
                                  )
 6   JPMORGAN CHASE BANK, N.A.,   )
                                  )
 7        Defendant/Third-        )
          Party Plaintiff.        )
 8   _____)
     JPMORGAN CHASE BANK, N.A.    )
 9                                )
          Third-Party            )
10        Plaintiff,              )
                                  )
11   vs.                          )
                                  )
12   JAMES EDWARD STALEY,         )
                                  )
13        Third-Party            )
          Defendant.             )
14
                 MONDAY, JULY 10, 2023
15
     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16                      - - -

17            Videotaped deposition of Stephen M.
     Cutler, held at the offices of Milbank LLP,
18   55 Hudson Yards, New York, New York,
     commencing at 12:33 p.m. Eastern, on the
19   above date, before Carrie A. Campbell,
     Registered Diplomate Reporter, Certified
20   Realtime Reporter, Illinois, California &
     Texas Certified Shorthand Reporter, Missouri,
21   Kansas, Louisiana & New Jersey Certified
     Court Reporter.
22                      - - -

23            GOLKOW LITIGATION SERVICES
                     877.370.DEPS
24                  deps@golkow.com

25
```

Confidential - Subject to Protective Order

1   proceeding, but I think it was enough to make

2   people feel that indeed Mr. Staley had

3   communicated with the media beyond what he

4   was authorized to do.

5        Q.     Were there allegations of

6   improper conduct by Mr. Staley in connection

7   with the London Whale incident that were

8   unrelated to these unauthorized

9   communications?

10       A.     I don't think so.

11       Q.     Between 2007 and 2012, what was

12  your understanding of Mr. Staley's

13  relationship with Jeffrey Epstein?

14       A.     My understanding at that time

15  was that he had a close business

16  relationship, that he was the primary

17  interface with Mr. Epstein among JPMorgan

18  personnel, that he liked Mr. Epstein, that he

19  trusted Mr. Epstein, and he thought highly of

20  Mr. Epstein.

21       Q.     In your experience, did

22  Mr. Staley's views of Mr. Epstein evolve over

23  time between 2007 and 2012?

24       A.     I don't remember that.

25       Q.     To your knowledge, how did

Confidential - Subject to Protective Order

1   Mr. Staley come to know Mr. Epstein?

2        A.     I don't know.

3        Q.     Do you know how long they had

4   known each other?

5        A.     I believe they had known each

6   other since before I arrived at JPMorgan,

7   which was in 2007.

8        Q.     Did you understand Mr. Staley

9   to be personal friends with Epstein?

10       A.     I don't think I thought of them

11  as personal friends.  I know that sometimes

12  the line between sort of client relationship

13  and personal relationship can get blurry at

14  times, and this one may have been one of

15  those relationships where that line was

16  blurry.  But I really thought of them as

17  business colleagues, but close business

18  colleagues.

19       Q.     Did you understand at the time

20  that that line may have been blurry?

21       A.     I know that Mr. Staley had a

22  close business relationship, and that's how I

23  would have thought of it at the time.

24       Q.     Did you understand Mr. Staley

25  to have a closer relationship with

Confidential - Subject to Protective Order

1  Mr. Epstein than with other clients of the

2  bank?

3       A.     I think so.  Certainly he had a

4  closer relationship with Mr. Epstein than he

5  did with some other clients.  I don't know

6  that his relationship -- I didn't know at the

7  time that his relationship with Mr. Epstein

8  was markedly different from other clients

9  with whom Mr. Staley had a close business

10  relationship.

11       Q.     To your knowledge, did

12  Mr. Staley and Mr. Epstein socialize with one

13  another?

14       A.     I don't think I knew one way or

15  another.  I don't remember knowing.

16       Q.     To your knowledge, did

17  Mr. Staley visit Mr. Epstein's house in

18  New York?

19       A.     I think that occurred.  I think

20  that there was enough of a close relationship

21  that Mr. Staley did visit Mr. Epstein, and I

22  believe I was aware of that at the time.

23  Yes.

24       Q.     What was your understanding of

25  how many times he had visited Mr. Epstein's

Confidential - Subject to Protective Order

1    house?

2        A.    I don't think I had an

3    understanding of that.

4        Q.    To your knowledge, did

5    Mr. Staley visit Epstein's property in the

6    Virgin Islands?

7        A.    I don't remember.

8        Q.    What about --

9        A.    I now know that to be the case

10   from things that I've read, but I don't

11   remember whether I knew that at the time.

12       Q.    What about his property in New

13   Mexico?

14       A.    I would say no.

15       Q.    You were not aware that he had

16   visited the property in New Mexico?

17       A.    I don't think I knew there was

18   a property in New Mexico, and that's why I

19   think I can say I was unaware that he visited

20   it.

21       Q.    In your experience, is it

22   unusual for JPMorgan bankers to meet with

23   clients outside of JPMorgan's offices?

24       A.    I don't think it's -- I don't

25   think it's highly unusual.

1      Q.      That was a fairly common

2  occurrence?

3      A.      I wouldn't say that either.  I

4  don't know that it was common, but I wouldn't

5  say it was rare either.

6      Q.      It's not something that would

7  pique your attention?

8      A.      I don't think so.  I think for

9  close business relationships, there would be

10  socializing and, you know, business lunches

11  or dinners or entertainment outside of

12  JPMorgan's premises.

13      Q.      You used the term "close

14  business relationship."

15              What do you mean by that?

16      A.      I mean a business relationship

17  that was more than perfunctory or one in

18  which the JPMorgan person would call once a

19  quarter.  I had the sense that it was closer

20  than that.

21      Q.      Did you have the sense that

22  they were in daily communication?

23      A.      No.

24      Q.      Did you have the sense that

25  they were in weekly communication?

Confidential - Subject to Protective Order

```
 1         A.      I don't think so.  I don't
 2    think I thought about frequency of
 3    communication.
 4         Q.      What was your understanding of
 5    Mr. Staley's position vis-à-vis the bank's
 6    Epstein relationship?
 7         A.      I don't know what you mean.
 8         Q.      Who, to your understanding,
 9    oversaw the Epstein relationship in the 2007
10    to 2011 time period?
11         A.      Well, I think -- as I said
12    before, I think Mr. Staley was the primary
13    interface with Mr. Epstein.  That was, from
14    my perspective, consistent throughout the
15    time that I was -- had any involvement in the
16    Epstein account.  But there would be others
17    at the firm that were also a part of the
18    relationship between JPMorgan and
19    Mr. Epstein.
20         Q.      Who were those others?
21         A.      Mary Erdoes.  I can't remember
22    who the heads of the private bank would have
23    been when Ms. Erdoes acceded to the head of
24    asset management, but whoever those people
25    were.
```

Confidential - Subject to Protective Order

1   my impression at the time was, I don't think

2   Mr. Staley cared much about whether my

3   position was independent or not independent.

4   He just wanted me to come out to the same

5   conclusion that Mr. Staley was expressing to

6   me, that Mr. Epstein should remain a client

7   of the firm.

8          Q.     But Mr. Staley never did

9   anything to prevent you from formulating your

10  own independent judgment about Epstein,

11  correct?

12         A.     Not that I was aware of.

13                Did he tell me everything he

14  knew?  I don't know.  That's part of what

15  this lawsuit is about, I suspect.

16                But was I aware that Mr. Staley

17  was throwing roadblocks in my way?  I was

18  not.

19         Q.     Mr. Staley never encouraged you

20  not to review information relating to

21  Mr. Epstein's accounts, correct?

22                MR. GAIL:  Objection.

23                THE WITNESS:  I don't remember

24      that.

25

Confidential - Subject to Protective Order

1        not trying to -- I'm just trying to

2        understand the distinction.

3                MR. GAIL:  It was young.

4                MR. WARREN:  Let me --

5                MR. EDELMAN:  Why don't you ask

6        a new question.

7                MR. WARREN:  Thank you.

8   QUESTIONS BY MR. WARREN:

9        Q.    You would have expected

10  Mr. Staley to tell you if he saw young women

11  at Epstein's properties?

12       A.    I would have.  I would have

13  expected Mr. Staley to tell me about any

14  activity that in light of Mr. Epstein's

15  conviction might have cast doubt on whether

16  there were continuing issues of concern.

17       Q.    And the presence of young women

18  in Mr. Epstein's -- at Mr. Epstein's

19  properties is one of those things you would

20  have expected him to tell you?

21       A.    It might depend on a bunch of

22  other circumstances as well.  And, for

23  example, what were those women doing, and

24  what interaction did Mr. Staley have with

25  them, and what interactions did Mr. Staley

Confidential - Subject to Protective Order

1       A.      Not that I can recall.

2       Q.      Did you have any conversations

3   with Mr. Staley about Mr. Epstein in 2010?

4       A.      No.

5       Q.      Did you have any conversations

6   with anyone at JPMorgan about Mr. Epstein in

7   those two years?

8       A.      I'm trying to remember the

9   timeline.  He was convicted or pled guilty in

10  2008.  I don't believe I had conversations

11  with people at JPMorgan about Mr. Epstein in

12  2009 and 2010.  I think -- I think it wasn't

13  until 2011 that I had discussions about

14  Mr. Epstein.

15      Q.      And the 2011 discussions arose

16  when Mr. Langford brought the issue to your

17  attention?

18      A.      That's how I remember it.

19      Q.      What happened when Mr. Langford

20  brought the Epstein relationship to your

21  attention in 2011?

22      A.      What I remember is Mr. Langford

23  raising the issue about Mr. Epstein and the

24  press surrounding Mr. Epstein.  I think

25  Mr. Langford also talked about the

Confidential - Subject to Protective Order

1    anti-trafficking initiative.

2            I also remember at the same

3    time talking to Mr. Staley, and I think it

4    was following Mr. Langford raising the issue

5    with me.  I think Mr. Staley, passing along a

6    request of Mr. Epstein's, asked that we

7    contact Mr. Epstein's lawyer.

8            As I recall it, Mr. Staley

9    thought that the lawyer would vouch for

10   Mr. Epstein in some way, and maybe it was to

11   speak to the question of whether there was,

12   in fact, an ongoing investigation.

13           I do remember Mr. Staley asking

14   me to reach out to the lawyer for

15   Mr. Epstein.

16       Q.    And your understanding was that

17   he was doing that at the request of

18   Mr. Epstein?

19       A.    That's how I understood it.

20       Q.    Did Mr. Staley add his own

21   comments or thoughts at the time, or was he

22   merely conveying the request of Mr. Epstein?

23       A.    I think at this time and

24   subsequently Mr. Staley made clear that, you

25   know, Mr. Epstein had turned a page, he

1    had -- and these are words that Mr. Staley

2    used -- had paid his debt to society and that

3    we ought to be continuing to bank Mr. Epstein

4    at JPMorgan.

5         Q.    You recall Mr. Staley using

6    those words in 2011?

7         A.    The -- I definitively remember

8    the words "he paid his debt to society."

9              You know, do I remember the

10   other words precisely coming out of

11   Mr. Staley's mouth that way?  No, but those

12   words I remember.

13        Q.    But do you remember him using

14   those words generally, or you remember him

15   using them specifically in 2011?

16        A.    I believe it was in 2011.

17        Q.    Had he expressed a similar

18   sentiment in 2008?

19        A.    Well, in 2008, I don't think

20   the debt was paid, if you will.  I don't

21   think Mr. Epstein had served a sentence.

22              But in 2011, he had served a

23   sentence and, as I remember it, Mr. Staley

24   used those words.

25              (Cutler Exhibit TX38 marked for

Confidential - Subject to Protective Order

1    talked to Mr. Epstein's lawyers.

2               I can't remember what other

3    information was in the mix, but I think at

4    that point in time my view was there was too

5    much reputation risk associated with

6    Mr. Epstein.

7         Q.    Was your assessment of the

8    Epstein relationship based entirely on

9    reputation risk or did you also evaluate

10   legal risk and compliance risk?

11        A.    I don't remember legal risk or

12   compliance risk being presented to me as the

13   issue here; that the issue was one of

14   reputation.  And that's how it was framed for

15   me.

16        Q.    When you arrived at the view

17   that the bank should off-board Mr. Epstein,

18   who did you communicate that to?

19        A.    I remember communicating it to

20   Mr. Staley.  I believe I communicated it to

21   Mr. Langford and Mr. Schwartz and potentially

22   to Ms. Shenker.  I don't recall communicating

23   it to others.

24        Q.    What did Mr. Staley say when

25   you communicated that view?

Confidential - Subject to Protective Order

1  Steve is looking for the relationship to be

2  terminated, so I'm going to back out."

3          Do you see that?

4      A.    I do.

5      Q.    And Ms. Shenker responds, "Is

6  Jes going to talk to Mary to execute the

7  termination?"

8          Do you see that?

9      A.    I do.

10     Q.    And then Mr. Schwartz responds,

11 "I don't think he has any plans to do so.  He

12 understands that Steve is quite firm on the

13 subject and is stepping back and letting

14 AM/PB handle it as it sees fit."

15         Do you see that?

16     A.    I do.

17     Q.    Who do you understand AM to

18 reference in that e-mail?

19     A.    Asset management.

20     Q.    Do you recall that in April

21 of 2011 that Mr. Staley did, in fact, step

22 back from the Epstein relationship?

23     A.    I don't recall that.

24     Q.    You don't recall it one way or

25 the other?

Confidential - Subject to Protective Order

1    A.    I don't remember a point in

2  time in which I had any involvement in

3  Epstein in which Jes Staley was not involved.

4    Q.    Was there a point --

5    A.    Inclusive of the April time

6  period, the July time period that encompasses

7  the e-mail that we discussed earlier, and

8  then in subsequent involvement that I had

9  with the Epstein account, Mr. Staley was

10  involved every step of the way.

11    Q.    Was there a point when

12  Ms. Erdoes became increasingly involved in

13  the Epstein relationship?

14    A.    In 2011?  I just don't recall

15  that happening.

16    Q.    Was there any point in time

17  where Ms. Erdoes became increasingly involved

18  in managing the Epstein relationship?

19    A.    Well, I know when Mr. Staley

20  left the firm, at that point, I'm quite sure

21  that Ms. Erdoes became more involved than she

22  would have been previously.

23    Q.    So you have no recollection of

24  Ms. Erdoes being involved in the Epstein

25  relationship before Mr. Staley left the firm?

Confidential - Subject to Protective Order

1    or the other whether you were having

2    one-on-one phone calls with Ms. Erdoes about

3    the Epstein relationship in this same time

4    frame?

5         A.    I don't remember doing that,

6    and I would think I would remember if I did,

7    but I don't remember it.

8              But I see this, and I

9    certainly -- I have no reason to doubt that I

10   sent this e-mail that says, "I would like to

11   put it," meaning the litigation, "and him,"

12   meaning Epstein, "behind us.  Not a person we

13   should do business with, period."

14             And I communicated that to

15   Ms. Erdoes in this e-mail.

16        Q.    And Mr. Staley was not copied?

17        A.    He was not.

18        Q.    You testified, I think, that

19   you remember a couple of conversations with

20   Mr. Staley from 2011, one in the March, April

21   time frame, and then one in the latter part

22   of the year when he asked you to meet with

23   Mr. Epstein.

24             Is that right?

25        A.    Let me just make sure I'm clear

Confidential - Subject to Protective Order

1    about this.

2                  I think in the March, April

3    time period there were two conversations:

4    one in which Mr. Staley asked that we call

5    Mr. Epstein's lawyer, and then a subsequent

6    conversation in which I relayed my advice to

7    Mr. Staley that we should exit the account.

8    So call that the early 2011 time period.

9                  And then later in 2011, at

10   Mr. Staley's request, I met with Mr. Epstein.

11   That was -- the request was, would you please

12   hear him out.  Again, to be clear, the

13   request was from Mr. Staley was, would I

14   please hear out Mr. Epstein.

15       Q.    And you don't recall any

16   conversations with Mr. Staley in July of 2011

17   around the time period of these settlement

18   discussions?

19       A.    I don't.  It's possible that I

20   had one or more, but I don't have a specific

21   recollection.

22       Q.    What do you recall specifically

23   about the conversation in late 2011?

24                  MR. EDELMAN:  Which one?

25                  MR. WARREN:  The one you had

Confidential - Subject to Protective Order

1  you expressed to them about the Gates

2  Foundation arrangement?

3      A.    I think I need to consult with

4  JPMorgan's lawyers on privilege before I can

5  answer that question.

6              MR. EDELMAN:  Okay.

7              MR. WARREN:  Okay.

8              MR. GAIL:  Do you want to come

9         back?  Do you want to skip and do

10        other stuff, or do you want to break

11        and do this?

12             MR. WARREN:  Let's go to the

13        subsequent conversation about meeting

14        with Mr. Epstein, and then we'll come

15        back to the Gates Foundation.

16             THE WITNESS:  Okay.

17  QUESTIONS BY MR. WARREN:

18      Q.    So what do you recall about

19  that request to meet with Mr. Epstein in the

20  second half of 2011?

21      A.    Again, I remember those words,

22  "would you please hear him out."

23             And I -- the -- again, the

24  frame for this conversation was, I think --

25  I, Mr. Staley, think that we should maintain

Confidential - Subject to Protective Order

1    an account for Mr. Epstein.  Why don't you

2    hear him out.

3              That's the essence of the

4    conversation as I recall it.

5         Q.    Your recollection is that he

6    reiterated at that time specifically that he

7    thought the bank should maintain a

8    relationship with Epstein?

9         A.    Yes.  In one -- in one way or

10   another, that was the context for the request

11   that I hear out Mr. Epstein.

12        Q.    Why did he want to maintain

13   that relationship as expressed to you?

14        A.    I think Mr. -- as I understood

15   it at the time, Mr. Staley simply thought --

16   again, I'm repeating what I said earlier, and

17   I think what Mr. Staley expressed earlier in

18   the year, he paid his debt to society, he is

19   trusted by a lot of people.  It was in the

20   frame of, gee, it would somehow be unfair for

21   JPMorgan to jettison the Epstein account, and

22   won't you hear him out.

23        Q.    Did he say specifically what

24   Epstein was -- wanted to talk to you about?

25        A.    I actually don't remember.  I

Confidential - Subject to Protective Order

1    don't remember that.  It's possible he did,

2    but I don't remember him saying, he wants to

3    tell you about X, Y or Z.

4        Q.    And was your understanding at

5    the time that this was Mr. Staley's idea that

6    you sit down with Epstein or was this

7    Epstein's idea?

8        A.    I don't remember.  I don't

9    remember whether I thought it was -- and

10   Mr. Staley thought -- clearly thought it was

11   a good idea.  I don't -- I don't remember

12   whether I thought, gee, this was initiated by

13   Mr. Epstein or it was initiated by

14   Mr. Staley.  I can't remember.

15       Q.    Why do you say he clearly

16   thought it was a good idea?

17       A.    He wanted me to do it.

18       Q.    Why do you know he wanted you

19   to do it as opposed he's passing along a

20   request from Epstein?

21            MR. EDELMAN:  Objection to

22       form.

23            THE WITNESS:  The clear

24       sentiment that I got, in words or

25       substance, was, I'd like you to do

Confidential - Subject to Protective Order

 1          this.  I think he deserves a hearing.

 2    QUESTIONS BY MR. WARREN:

 3          Q.    And you subsequently met with

 4    Mr. Epstein?

 5          A.    I did.

 6          Q.    How many times?

 7          A.    I know I met with him in person

 8    once.  I then had a follow-up that I -- I

 9    just can't remember whether that follow-up

10    was in person or over the phone.

11          Q.    And what did you ultimately

12    conclude after those meetings?

13          A.    I concluded that I thought that

14    we should exit the account.

15          Q.    Did you communicate that to

16    Mr. Staley?

17          A.    I did.

18          Q.    When?

19          A.    Following the second meeting.

20          Q.    Which was when?

21          A.    I want to say a month after the

22    first meeting, thereabouts.  It could have

23    been six weeks, two months.

24          Q.    In late 2011?

25          A.    I think so.

Confidential - Subject to Protective Order

1       Q.      And when you communicated that

2    view to Mr. Staley, what did he say?

3       A.      I don't remember.  I know he

4    didn't agree with my view.  I just -- it

5    doesn't -- I can't -- I can't sum it up what

6    he said or communicated to me at that time.

7       Q.      Do you remember anything about

8    that conversation?

9       A.      I remember saying, I haven't

10   changed my mind.  I think it's a bad idea.  I

11   would not keep him as a client.

12              I don't remember if Mr. Staley

13   said, that's outrageous.  I doubt he --

14   that's not -- that's not the way Jes would

15   speak.  I don't remember what he communicated

16   in response.

17              I know he didn't agree with my

18   advice.

19       Q.      Did he tell you why he was

20   seeking your advice?

21       A.      At that point?  I don't -- I

22   don't think so.  I -- no, he did not.

23       Q.      Did you tell Mr. Staley -- what

24   specifically did you tell him about

25   off-boarding Mr. Epstein?  Did you tell him

Confidential - Subject to Protective Order

1    the bank should do it?  The bank needed to do

2    it?

3          A.     I'm certain that I would have

4    said, I don't think we should maintain this

5    account.  I don't think I would have said, we

6    are required to exit this account.

7          Q.     After that conversation with

8    Mr. Staley, when was the next discussion you

9    had with him about Mr. Epstein?

10         A.     I don't recall having another

11   one.

12         Q.     So that may have been your last

13   conversation with Mr. Staley about

14   Mr. Epstein?

15         A.     It may have been.  It's

16   possible I had a subsequent one; I just don't

17   remember it.

18         Q.     You don't have any specific

19   recollection of either e-mail or voice

20   communications with Mr. Staley about Epstein

21   in 2012 or 2013?

22         A.     No, I do not.  And if there was

23   an e-mail, I suspect you would have it.

24         Q.     What happened with the Epstein

25   relationship in 2012?

Confidential - Subject to Protective Order

1   exit the account.

2           I don't know what Mr. Staley

3   did at that point, and I don't remember

4   why -- or what happened to cause the account

5   to remain open for 2012 and into 2013.

6       Q.      In 2011, both early 2011 and

7   late 2011 when you had these conversations

8   with Mr. Staley about the Epstein

9   relationship --

10      A.      Uh-huh.

11      Q.      -- in either of those

12  conversations, did you tell Mr. Staley that

13  the bank must off-board the Epstein

14  relationship?

15      A.      I don't think I would have put

16  it that way.  I don't think I at the time

17  would have said, gee, there's a legal

18  requirement that we off-board this account or

19  there's a legal impediment to maintaining the

20  account.

21              My view was, based on the

22  reputation associated with Mr. Epstein's

23  account and reputation risk associated with

24  the account, that we shouldn't.  But I don't

25  think I would have said, we must not.

Confidential - Subject to Protective Order

1      Q.     You never communicated to

2  Mr. Staley or anyone else that you were

3  revoking your approval for the account,

4  correct?

5      A.     I don't even think I thought

6  about the -- that as a thing.

7      Q.     Why not?

8      A.     Well, the approval was what it

9  was.  Now we were looking at the account for

10  reputation risk reasons.

11      Q.     What additional factors, you

12  know, weighed into your approval of him under

13  the felon policy in addition -- besides

14  reputational risk factors?

15      A.     I'm sorry, back in 2008?

16      Q.     Well, under the felon approval

17  policy at the bank, what was your

18  understanding of the factors that you were

19  supposed to consider in deciding whether to

20  approve a convicted felon?

21      A.     I'm not sure I understand the

22  question.

23              I'm going to say this --

24              MR. EDELMAN:  Okay.  Why don't

25      we get a new question that you

Confidential - Subject to Protective Order

1    understand.

2          THE WITNESS:  Okay.

3    QUESTIONS BY MR. WARREN:

4          Q.    You testified earlier that

5    you're familiar with the bank's felon

6    approval policy, right?

7          A.    Correct.

8          Q.    And under that policy, you were

9    required, or the chief risk officer was

10   required, to approve a relationship with a

11   convicted felon, correct?

12         A.    Correct.

13         Q.    What was your understanding of

14   the factors that you or the chief risk

15   officer were supposed to consider in deciding

16   whether to give that approval?

17         A.    I think it was pretty

18   open-ended.

19         Q.    What --

20         A.    I mean, the policy itself

21   didn't lay out factors.  No one ever said to

22   me, you must consider X or Y or Z.

23         Q.    What are the factors that you

24   actually considered when making that

25   determination under the policy?

Confidential - Subject to Protective Order

```
 1        A.     Back in 2008, I just don't
 2   remember.  I just don't remember.
 3        Q.     Was it -- do you think it would
 4   have been something beyond reputational risk
 5   factors?
 6              MR. GAIL:  Objection.
 7              THE WITNESS:  I don't know.
 8   QUESTIONS BY MR. WARREN:
 9        Q.     Had the reputational risk
10   situation materially changed from 2008 to
11   2011?
12        A.     I believe it had, actually.
13   The media coverage increased significantly.
14   The number of lawsuits that Mr. Epstein had
15   settled.
16        Q.     You had the authority at that
17   time to revoke the approval that you had
18   given in 2008, correct?
19              MR. GAIL:  Objection.
20              THE WITNESS:  I don't know
21        where you're getting that from.
22   QUESTIONS BY MR. WARREN:
23        Q.     You don't think you had the
24   approval to revoke -- you had the authority
25   to revoke your approval?
```

Confidential - Subject to Protective Order

1    A.    Again, I think that the -- as I

2  understood this policy, the requirement was

3  that the GC or chief risk officer approve at

4  the time of the -- of the conviction, or at

5  the time the account was entering the firm, I

6  suppose, if it were a previous conviction,

7  but didn't contemplate that you would, like,

8  have forever more a veto power over the

9  account.  That's not how I understood the

10  policy.  It certainly didn't get presented to

11  me that way.

12         And so the -- in 2011, the

13  question was, did we think that this was --

14  from a reputation risk perspective, did we

15  think it was okay to maintain that account.

16  And my view was, I didn't.  And I

17  communicated that.

18    Q.    You didn't understand the felon

19  approval policy to give you and the chief

20  risk officer veto power over accounts

21  relating to convicted felons?

22    A.    Forever more?

23         MR. EDELMAN:  Objection.  Form.

24         THE WITNESS:  No, I did not.

25         If that's what the policy

Confidential - Subject to Protective Order

1          contemplated, it would have said that.

2     QUESTIONS BY MR. WARREN:

3          Q.    Well, the policy doesn't say

4     anything about a one-time approval either,

5     does it?

6          A.    Well --

7                MR. GAIL:  Objection.

8                MR. EDELMAN:  Objection to

9          form.

10               THE WITNESS:  You know, I think

11         that's what the policy means.

12    QUESTIONS BY MR. WARREN:

13         Q.    That's how you interpreted the

14    policy?

15               MR. EDELMAN:  Objection to

16         form.

17    QUESTIONS BY MR. WARREN:

18         Q.    That's how you interpreted the

19    policy?

20         A.    I never understood --

21               MR. EDELMAN:  Well, do you have

22         the policy in front of you?

23               THE WITNESS:  I don't.

24               MR. EDELMAN:  Is this --

25               THE WITNESS:  Yeah.

Confidential - Subject to Protective Order

1          MR. EDELMAN:  You may want to

2      take a look at the policy.

3          THE WITNESS:  Okay.  I actually

4      don't have that.

5          MR. EDELMAN:  Is it -- do I

6      have it?

7          THE WITNESS:  Is this the copy?

8          MR. GAIL:  It's Cutler 5.

9          MR. EDELMAN:  It's page 7.

10         THE WITNESS:  Yeah, I -- as I

11      read this, I would say it does not

12      contemplate that you -- that one

13      serving in the role as general counsel

14      or chief risk officer has forever

15      more, after a decision is made to

16      accept a client, to then reject the

17      client based on this policy.

18  QUESTIONS BY MR. WARREN:

19      Q.    Is there language in here that

20  you read to provide for a one-time approval

21  and no subsequent re-approval?

22      A.    I -- it doesn't say anything

23  about re-approval, and it contemplates the

24  approval.  I would naturally read that to be

25  a one-time approval.

Confidential - Subject to Protective Order

1              And I would also add, by

2     practice, it simply didn't work the way

3     you're suggesting.  No one on any client came

4     to me and said, ah, okay, now you should

5     withdraw your approval, and if you don't

6     reapprove, we can't do the account.  Or you

7     should revoke your approval.  No one ever

8     suggested that to me.

9         Q.     So your understanding in 2011

10    was that you did not have the authority to

11    off-board the Epstein account?

12        A.     Not based on the considerations

13    that were framed for me and at issue in 2011,

14    no.  I didn't have that singular authority.

15        Q.     If you believed that the

16    business was making a decision inconsistent

17    with the best interests of JPMorgan, what in

18    your mind was the proper recourse?

19             MR. GAIL:  Objection.  Form.

20             THE WITNESS:  As a hypothetical

21        matter?

22             Yeah.  If the business

23        disagreed with me about a judgment

24        that I had, it -- the recourse that I

25        had might depend on the nature of the

Confidential - Subject to Protective Order

1  issue at hand.

2  And again, if -- you know,

3  there invariably would be times where

4  the business wouldn't necessarily

5  agree with my judgment, and I'd say,

6  okay. I mean, I suppose you do that

7  every day as a lawyer, too. There are

8  times when you will say, well, I think

9  this, but I understand. If you want

10 to do something else, you can do it.

11 It's not illegal. I wouldn't do that.

12 You might -- you know, along

13 the spectrum, you might say, you know,

14 absolutely not. Over my dead body.

15 You might say, it's illegal, in which

16 case I think I would have the final

17 word.

18 But, you know, again, there may

19 be occasions where you would say, I

20 understand; we have a difference; I

21 think this; you think differently.

22 There might be an occasion

23 where I would say, I think this, you

24 think differently, and, you know, I'm

25 going to do something about that

Confidential - Subject to Protective Order

1    because I think differently.

2              There might be an occasion

3    where I'd say, I think differently

4    because I think it's unlawful.

5    QUESTIONS BY MR. WARREN:

6         Q.    In the context of reputational

7    risk concerns, there could be reputational

8    risks that you considered so grave that you

9    would escalate your concerns to someone else,

10   fair?

11        A.    I could.  I don't remember

12   circumstances where that occurred, but I

13   suppose I could.

14             I mean, you could escalate any

15   issue.

16        Q.    Your concerns with the Epstein

17   relationship, fair to say, weren't so

18   significant that you thought it was worth

19   escalating them above Mr. Staley and

20   Ms. Erdoes?

21        A.    I wouldn't characterize it that

22   way, but I -- in fact, I didn't escalate it.

23   I understood that someone could have a

24   different view than I had.  I articulated a

25   strong view, that I didn't think we should do

Confidential - Subject to Protective Order

1    it.

2              I couldn't say to Mr. Staley, I

3    think what you're doing is illegal, and I

4    didn't think it was -- at the time, based on

5    what I knew, I didn't think it was

6    absolutely, incredibly, awfully the worst

7    decision ever made.  I understood that he

8    could have a different view, and he did.

9        Q.    And you thought that his view

10   was not so unreasonable that it warranted

11   escalating it to someone else?

12       A.    I don't remember escalating it.

13   I understood that he had a different view

14   than I did, and I didn't think it was crazy.

15   I disagreed with it, and I told him I

16   disagreed with it.

17       Q.    Did you talk to Ms. Erdoes

18   about her views on whether the relationship

19   should be off-boarded?

20       A.    Again, I don't remember a

21   direct communication, but you pointed out the

22   e-mail in which I clearly expressed that

23   sentiment.  I don't remember having an actual

24   in-person or on-the-phone dialogue about it.

25   I just don't remember.  It's possible that I

Confidential - Subject to Protective Order

1    to try to find that document so I can remind

2    myself.

3          Q.    Of course.  It was Cutler 31.

4          A.    Okay.  Yep.  I got it.  Hold

5    on.

6          Q.    And I apologize.  I said a few

7    days.  It's three weeks later.

8          A.    Okay.

9          Q.    But you don't have any

10   recollection one way or the other of whether

11   Ms. Erdoes became more involved in the

12   Epstein relationship in the weeks and months

13   after Ms. Staley {sic} said he was going to

14   step back?

15              MR. EDELMAN:  Objection to

16         form.

17              THE WITNESS:  Well, I don't

18         actually know that Mr. Staley said he

19         was going to step back.  And I know

20         Mr. Staley didn't step back.

21              I don't know if Ms. Erdoes

22         stepped up her involvement, and I

23         don't know whether this communication

24         or series of e-mails I had with

25         Ms. Erdoes relates to whether we were

Confidential - Subject to Protective Order

1      going to maintain the account or what

2      our position was on settling

3      litigation with Mr. Epstein.  I just

4      don't -- or something else.  I just

5      don't know.

6   QUESTIONS BY MR. WARREN:

7      Q.    And your basis for saying that

8   Mr. Staley didn't step back from the Epstein

9   relationship after April of 2011 is that you

10  had -- is that he came to you in late 2011

11  and asked you to speak with Mr. Epstein at

12  Mr. Epstein's request?

13     A.    Certainly that.  I also don't

14  remember him ever saying to me, I'm out.  I'm

15  not going to participate in the Epstein

16  relationship.

17            And I certainly, now having

18  seen some of the e-mail communications, don't

19  see an e-mail response from him to any

20  communication that I'm sending about Epstein

21  saying, please don't copy me on these because

22  I want nothing to do with this.

23            So I had no indication that

24  Mr. Staley ever somehow recused himself or

25  removed himself from the Epstein account.

Confidential - Subject to Protective Order

1     Q.    So your testimony is that if

2  Mr. Staley were stepping back, he should have

3  told you not to copy him on any future

4  correspondence?

5     A.    He sure should have.

6          MR. EDELMAN:  Objection.

7     Objection to the form.

8          THE WITNESS:  Yes, he should

9     have.  That is my view.

10         If he -- if he was somehow

11     recusing himself or was not to be

12     involved, then he should have said,

13     I'm out on this.  Don't include me in

14     these e-mails.

15  QUESTIONS BY MR. WARREN:

16     Q.    Where does the word "recuse"

17  come from?

18     A.    Well, I just gave it to you.

19     Q.    Okay.

20     A.    But, look, if he was somehow

21  removing himself from consideration of the

22  account, the disputes that JPMorgan had with

23  the account, I would expect that he would

24  say, I am not to be involved.

25     Q.    But you don't know one way or

Confidential - Subject to Protective Order

1   the other whether he was in actuality

2   deferring to the judgment of Ms. Erdoes or

3   others about what to do with the Epstein

4   account?

5           MR. EDELMAN:  Objection to

6       form.  Asked and answered at length.

7           THE WITNESS:  It was my

8       impression that he was not deferring

9       to anybody, but actually in some ways

10      he was putting his stamp on the

11      question of whether we should -- how

12      we should interact with Mr. Epstein.

13          So I had the impression that

14      was the opposite of removal from

15      consideration or deference to others.

16  QUESTIONS BY MR. WARREN:

17      Q.    And the basis for the statement

18  you just made is that in late 2011 he asked

19  you to speak with Mr. Epstein?

20          MR. GAIL:  Asked and answered.

21          THE WITNESS:  Among other

22      things.

23  QUESTIONS BY MR. WARREN:

24      Q.    What were the other things?

25      A.    Yeah.  I remember --

1          MR. EDELMAN:  Asked and

2     answered.

3          THE WITNESS:  -- communications

4     during the summer that he was involved

5     in about the Gates Foundation, about

6     litigation, and I just do not have any

7     recollection of his -- of his somehow

8     stepping away or stepping back, or use

9     whatever formulation you want to.  I

10    didn't think he was ever doing that.

11 QUESTIONS BY MR. WARREN:

12    Q.    If Mr. Staley didn't need your

13 approval for the Epstein relationship, why

14 did you understand he was coming to you for

15 your views in 2011?

16    A.    You'll have to ask Mr. Staley

17 that.

18    Q.    I'm asking what was your

19 understanding at the time of why Mr. Staley

20 was coming to you, if your approval didn't

21 matter.

22    A.    Well, I think my advice should

23 have mattered, and maybe he was concerned

24 that I would, in fact, at some point say,

25 absolutely not, you cannot, not you should

Confidential - Subject to Protective Order

1    that you were relying on?

2              In other words --

3         A.    I think I understand the

4    question.  I think I relied on Mr. -- look,

5    I trusted Mr. Staley.  You asked me before

6    did I have reason to believe Mr. Staley would

7    lie.  Or -- those aren't your exact words,

8    but in substance, I did not.

9              I think I relied on, you know,

10   Mr. Staley's sense of the client because

11   Mr. Staley was in close -- had a close

12   relationship with him.

13             I think I relied on

14   Mr. Staley's view that it was important that

15   Mr. Epstein had all of these relationships

16   with others in the world at large.  You know,

17   I think I used the shorthand before, sort of

18   important people in the financial sector who

19   placed their trust in Mr. Epstein.  I mean,

20   that came directly from Mr. Staley.

21             I don't remember Mr. Staley

22   saying to me, you know, X or Y or Z, except

23   that at some point Mr. Staley said, look, he

24   has -- not in words, but in substance, he's

25   turned a corner.  He's turned a page.  He

Confidential - Subject to Protective Order

1    served his time.

2              I mean, I -- you know, would

3    you characterize those as facts?  I don't

4    know.  But, you know, Mr. -- it was important

5    to me that Mr. Staley felt quite strongly, in

6    a way that I thought was genuinely felt by

7    him, that Mr. Epstein had served his

8    sentence, paid his debt to society, was now

9    doing the -- was on the straight and narrow

10   and, again, had all of these other people who

11   relied on him.

12        Q.    But you ultimately disagreed

13   with Mr. Staley's views of Mr. Epstein,

14   right?

15        A.    I did.

16        Q.    So is it fair to say that you

17   considered Mr. Staley's views, as you just

18   expressed, but ultimately didn't rely on them

19   and rejected them?

20        A.    No, I don't think -- well, at

21   the end of the day, I disagreed with

22   Mr. Staley.

23              Did I -- was it -- was it

24   unimportant to me that Mr. Staley thought,

25   this is someone we should do business with?

Confidential - Subject to Protective Order

 1                    THE WITNESS:  I did rely on his

 2          views.

 3                    Again, I reached a judgment

 4          that was not the same judgment that

 5          Jes reached.  But did I rely on his

 6          views?  Absolutely I did, and I think

 7          quite appropriately.

 8                    He was a respected member of

 9          the operating committee.  He had run

10          the asset management business.  He

11          had -- he was running the investment

12          bank.  He knew this client.

13                    So those views were important

14          to me and I think formed an important

15          backdrop for my ultimate advice, even

16          though, again, it wasn't the advice

17          that Jes would have wanted to hear and

18          even though it was a conclusion that

19          Jes didn't agree with.

20    QUESTIONS BY MR. WARREN:

21          Q.    Would your ultimate advice have

22    been different if Mr. Staley hadn't expressed

23    his own personal views about the Epstein

24    relationship?

25          A.    It might have been, actually.

Confidential - Subject to Protective Order

1    Q.    How so?

2    A.    Because it might have been a

3    stronger articulation of the advice.

4          Or let me actually put it this

5    way.  If Jes had not had a strong view about

6    maintaining Epstein as a client, we simply

7    wouldn't have done it, period.  They wouldn't

8    have needed to come to me at all.

9    Q.    Right.

10         My question is --

11   A.    The only reason I was involved

12   at all is that Jes felt so strongly that we

13   should continue to do business with

14   Mr. Epstein.  That's why -- that's why people

15   came to me.

16   Q.    My question is whether your

17   ultimate -- your view of Mr. Epstein would

18   have been any different had Jes not expressed

19   his own views.

20         MR. GAIL:  Asked and answered.

21         MR. WARREN:  Asked.

22         THE WITNESS:  No, I think I --

23   I think I've also answered the

24   question.  I think it might have

25   affected the -- you know, how far

Confidential - Subject to Protective Order

1     along the spectrum the "we should not

2     do business" would have gone.

3   QUESTIONS BY MR. WARREN:

4     Q.    So there was some conceivable

5   world in which you may have insisted that

6   Epstein be removed as a client in 2011?

7     A.    I think if there was no one at

8   the bank who was willing to stand up and

9   vouch for the guy, I think we would have

10  exited the account.  I do.

11          And Jes Staley was vouching for

12  him.

13          (Perry Exhibits 30 and 31

14    introduced.)

15  QUESTIONS BY MR. WARREN:

16    Q.    I'm going to show you two

17  documents which were previously marked as

18  Exhibits 30 and 31 in the Bonnie Perry

19  deposition.

20    A.    I know we took a break not long

21  ago, Mr. Warner, but after -- and I don't

22  need to do it while these documents are in

23  front of me, but after we get through these

24  two documents, I'd love a bathroom break.

25    Q.    That's fine.