# EXHIBIT 113

```
 1       IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
      GOVERNMENT OF THE            :
 3    UNITED STATES VIRGIN         :
      ISLANDS,                     :   CASE NO.
 4                                 :   1:22-CV-10904
        Plaintiff,                 :   -JSR
 5                                 :
             v.                    :
 6                                 :
      JPMORGAN CHASE BANK,         :
 7    N.A.,                        :
                                   :
 8    Defendant/Third Party        :
      Plaintiff.                   :
 9   _____        :
      JPMORGAN CHASE BANK,         :
10    N.A.,                        :
                                   :
11    Third Party Plaintiff,       :
                                   :
12           v.                    :
                                   :
13    JAMES EDWARD STALEY,         :
                                   :
14    Third Party Defendant.       :

15      CONFIDENTIAL - ATTORNEYS' EYES ONLY
                     -  -  -
16                May 3, 2023
                     -  -  -
17
                        Videotaped deposition
18    of WILLIAM D. LANGFORD, taken pursuant to
      notice, was held at the law offices of
19    Boies Schiller Flexner LLP, 55 Hudson
      Yards, New York, New York, and remotely,
20    beginning at 9:37 a.m., on the above
      date, before Michelle L. Gray, a
21    Registered Professional Reporter,
      Certified Shorthand Reporter, Certified
22    Realtime Reporter, and Notary Public.

23            GOLKOW LITIGATION SERVICES
           877.370.3377 ph| 917.591.5672
24                deps@golkow.com
```

```
 1   that -- that is a fair characterization
 2   of the initiative?
 3           A.    Yes.
 4           Q.    Okay.  Okay.  You can put
 5   that aside.
 6                 In looking at the
 7   transactional activity associated with
 8   human trafficking.  Would you agree that
 9   cash is an important red flag of
10   potential trafficking?
11                 MR. KRAUSE:  Objection.
12                 THE WITNESS:  So, again, I
13           need to go back to what we were
14           looking at.  The cash components
15           of it, we were focused,
16           appropriately so, on the business
17           of trafficking.  That is, people
18           who set up the criminal enterprise
19           to capture, imprison, move, and
20           sell the services, right, and
21           generate the criminal proceeds,
22           just like drug trafficking.
23                 So what we -- what we
24           focused on, you know, it wasn't --
```

1          the cash usage actually wasn't all
2          that helpful, but it was, rather,
3          other indicia that we actually
4          found where you could start to
5          link it to people who were
6          promoting the trafficking, the
7          prostitution for example, using
8          otherwise benign retail accounts.
9          That was really the focus -- ended
10         up finding, I should say.
11   BY MS. SINGER:
12         Q.   Okay.  And so, again, I want
13   to focus not just on what you were doing,
14   what you were implementing at JPMorgan in
15   the human trafficking initiative, but
16   kind of the learnings that cash is
17   specifically suggestive of human
18   trafficking.
19              Do you agree with that
20   statement?
21              MR. KRAUSE:  Objection.
22              THE WITNESS:  So again,
23         partially.  What we were looking
24         for, what I really wanted to find,

```
 1          know.
 2               But at the end of the day,
 3          withdrawal of cash is a withdrawal
 4          of cash.  And so especially small
 5          dollars, wealthy people withdraw
 6          cash.  They do a lot of different
 7          things.
 8               So it's in contrast,
 9          perhaps, to the receipt of
10          information, the criminal
11          enterprise like we talked about.
12          So it presents more of a
13          challenge.
14               MS. SINGER:  So move to
15          strike that answer.
16    BY MS. SINGER:
17       Q.   I appreciate it.  But I
18    think it was different than my question.
19               And I want to ask the
20    question again, which is, the fact that
21    Jeffrey Epstein, from whatever source,
22    right, The New York Times article, the
23    supporting documents, was known to pay
24    cash to girls who he was sexually abusing
```

1   customer, shortly before the break.
2              So if corporate compliance
3   or AML Ops wanted -- wanted Epstein
4   terminated, and the Private Bank
5   disagreed, what would happen?
6        A.   So to answer that question,
7   we need to distinguish.
8              In the context of a question
9   of reputational risk, I -- my view is,
10  and doctrine, I would have a vote but
11  would not be a decisive vote.
12             To the extent it involved
13  active ongoing violations of law and
14  someone disagreed with me, then I would
15  escalate above that line of business up
16  to CEO, up to board of directors, up to
17  and including resignation, if it didn't
18  resolve as I thought it should.
19       Q.   Okay.  And by CEO, you mean
20  CEO of JPMorgan, Jamie Dimon?
21       A.   If that were the case, yes.
22       Q.   Okay.  And who would -- what
23  would be the chain of escalating?  So
24  before you got to Jamie Dimon, who would

1  you go to?
2      A.   So, again, that wasn't this
3  case.
4      Q.   Yep.
5      A.   But if I ever had a
6  situation where I had said it's time to
7  exit, the line of business said no, I
8  would first go to Steve Cutler, who would
9  have been my boss at the time.  If Steve
10 Cutler disagreed and didn't convince me
11 otherwise, then I would push it up
12 further, probably to Jamie at that point.
13 And then if I still felt like I wasn't
14 getting heard and it was an active
15 ongoing issue, then I would go to the
16 board.
17
18
19
20
21
22
23
24

1   there was such a meeting, that there
2   would be documents about it, correct?
3           A.    I would expect there would
4   be documents, yeah.
5           Q.    Okay.  All right.  So the
6   conclusion reports, "Further meetings
7   held with Jes Staley to discuss LOB
8   decision for re-approval."
9                 Do you know what Jes
10  Staley's position was within JP -- within
11  JPMorgan as of January 7, 2011?
12          A.    Yes.
13          Q.    What was his position?
14          A.    He was the head of the
15  investment bank.
16          Q.    So why was Jes Staley being
17  consulted about Jeffrey Epstein when Jes
18  Staley was the head of the investment
19  bank?
20          A.    I can only say what I
21  understood and was told.  I was told, as
22  I mentioned, that Epstein was Jes
23  Staley's client.
24          Q.    And it says, "Banker Paul

1         Q.    In any other context had
2   anyone explained it to you?
3         A.    Not -- in terms of why we
4   didn't terminate?
5         Q.    That's right.
6         A.    Well, here, it was to refer
7   to Jes, to have that discussion.
8   Speaking with Jes at the later time
9   was -- Jes's view was he didn't do it,
10  shouldn't have pled guilty, et cetera,
11  wasn't responsible for it.  So that's --
12  that's what I was told, in the context of
13  the retention or decision not to
14  terminate, I should say.
15        Q.    Okay.  So in -- prior to
16  this meeting on January 7th, because the
17  conversation, I think, with Jes Staley
18  and Epstein was after this meeting.
19  Prior to this meeting, did you have an
20  understanding why Private Bank didn't
21  want to exit or hadn't exited Jeffrey
22  Epstein?
23        A.    I don't -- I don't recall
24  specifically, no.

1  transactions enlightening as compared to
2  countless stories related to his
3  escapades.  Lots of salon, lingerie
4  shops, drug stores, NY, Palm Beach, and
5  in St. Thomas (his place of residence).
6  Plus lots of videos like Girls Gone Wild
7  and some other shops not fit for my good
8  Catholic upbringing.  The transactions
9  are old, '05 to '08.  Besides frequent,
10 frequent spa like charges it has died
11 down.  Surprised she was never
12 subpoenaed."
13             Have I read that correctly?
14      A.    Yes.
15      Q.    Based on your understanding
16 of human trafficking and the knowledge
17 you had gained through the initiative,
18 you recognized those charges may not have
19 been escapades but, potentially, human
20 trafficking, correct?
21             MR. KRAUSE:  Objection.
22             THE WITNESS:  Yeah, well, in
23       many respects it's inconsistent
24       with the types of things that we

1          saw in human trafficking.  You
2          know, having her own account,
3          providing money, providing
4          documented expenses.
5                  The human trafficking
6          enterprises that we were focused
7          on were designed to traffic the
8          individuals, keep them down, do --
9          do the business and keep it off
10         the radar.
11                 This was different.  I mean,
12         it's -- it's pretty -- I don't
13         like the behavior.  But it's
14         different from the typology of
15         human trafficking that we had been
16         focused on.
17   BY MS. SINGER:
18         Q.   Right.  Those enterprises
19   that you were looking at on the retail
20   side, correct?
21         A.   No, no, no.  No.  The
22   accounts were on the retail side.  It was
23   the enterprise of criminal enterprise,
24   right.

1  e-mail that Jes would be deciding the
2  next steps, correct?
3       A.    Yes.
4       Q.    Was it your understanding
5  that Jes Staley was the decisionmaker as
6  to whether Jeff Epstein would be exited
7  from the bank?
8       A.    So, again, I was escalating
9  my -- my position, my view, we should
10 exit Epstein, and told that Jes owned the
11 client relationship.
12            So from that perspective, I
13 suppose he would be the one to help make
14 that decision or to make that decision.
15      Q.    Do you know whether anybody
16 else at the bank, John Duffy or Mary
17 Erdoes, whether any of them said that it
18 shouldn't be Jes Staley's decision?
19      A.    I'm not aware of anybody
20 saying that, no.
21      Q.    All right.  And then if we
22 turn to the front page of this e-mail.
23 This is the part of the chain from Phil
24 DeLuca to Nina Nichols, cc'ing you.  And

```
1    to Phil DeLuca back on January 10th?
2         A.    To Phil, Nina, and Maryanne,
3    yeah.
4         Q.    Okay.  And just an
5    understanding what you meant here.  Is it
6    fair to say that you were -- that
7    modeling agencies was one piece of the
8    puzzle, but that you would want to know
9    more or -- tell me what you were saying.
10        A.    You know, so to frame the
11   entire context, one, I didn't need any of
12   this to recommend kicking him out of our
13   bank, period.
14              What I was asking for, is
15   there anything else we can point to.  Are
16   there any other linkages to ongoing
17   activity that could make this decision
18   even easier, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, that sort of thing.
20              The modeling agency is just
21   that it didn't tell us anything, and our
22   ability as a bank to know what's really
23   going on in a modeling agency is
24   extremely limited.  Especially, he is a
```

1  when he -- when he responded.  I don't
2  recall anybody else articulating a view
3  on exit at that time.
4        Q.    Did Catherine Keating speak
5  at all?
6        A.    I don't remember her
7  speaking.
8        Q.    And you said Jes Staley
9  responded.  What did he say?
10       A.    So Jes's response was, with
11 regard to the conviction, no, that was
12 not accurate, his lawyers are working to
13 get the conviction thrown -- or excuse
14 me, the plea, the plea, get the plea
15 thrown out, he didn't actually do that,
16 and that we should be talking to his
17 lawyers.
18       Q.    And how were things left --
19 and did you respond to Jes Staley, by the
20 way, when he said that?
21       A.    I don't remember specific
22 responses, but the takeaways were that we
23 would go and speak with Mr. Epstein's
24 attorney.

1            reputational component, would
2            include this, but not as specific
3            as that was the discussion and
4            Steve said no change.  I don't --
5            I don't know that that was
6            accurate or right.  I can't -- I'm
7            not aware of that, put it that
8            way.
9   BY MS. SINGER:
10       Q.   Were any -- was the
11  conversation that you had with Steve
12  Cutler, the one that you recall, did that
13  include any piece that was about legal
14  advice, ███████████████████████████████
15  ██████████████████████████████████████
16  any of those issues, or was it -- was it
17  entirely on the reputational side?
18       A.   My recollection, it was
19  based on the reputational side, because
20  that's what my point was.
21       Q.   Did you ever reach out to
22  outside counsel about how to handle
23  Jeffrey Epstein's accounts?
24       A.   I don't believe I ever did,

1    JPMorgan's line of business tried to
2    dissuade any of your colleagues from
3    filing a SAR relating to a customer?
4         A.    No.
5         Q.    At any point during your
6    time at JPMorgan, did you ever come to
7    believe that a SAR should be filed in a
8    particular instance, but where you
9    decided not to do so because the customer
10   was particularly large or valuable?
11        A.    No.
12        Q.    Are you aware of any
13   instance where anyone at JPMorgan thought
14   a SAR should be filed but failed to do so
15   because the client was particularly large
16   or valuable?
17        A.    No.
18        Q.    You testified earlier that
19   you never discussed ███████████████████
20   ██████████████████ between, I think it
21   was, 2008 and then your departure from
22   the bank.  Do you recall that?
23        A.    Yes.
24        Q.    Do you believe that Epstein,

1   to use your words, should go, because you

2   believed he was engaging in continued

3   illegal activity after his 2008 plea?

4       A.   No.

5 [redacted]

6 [redacted]

7 [redacted]

8 [redacted]

9 [redacted]

10 [redacted]

11 [redacted]

12 [redacted]

13 [redacted]

14 [redacted]

15 [redacted]

16 [redacted]

17 [redacted]

18 [redacted]

19       Q.   Fair to say your focus was

20 on the reputational risk of keeping

21 Epstein, [redacted]

22 [redacted]

23 you'd have focused on that, had you

24 thought there was, yes?

1      A.    Yes.

2      Q.    ████████████████████

3   ████████████████████████████

4   ████████████████████████████

5   ██████████  why were you discussing

6   Epstein with others at JPMorgan?

7      A.    Because I believed he should

8   not be a client of the bank because of

9   his plea and his reputational risk,

10  period.

11     Q.    Okay.  We've seen work

12  relating to Epstein by Maryanne Ryan.

13  You did or did not develop a good

14  understanding of Maryanne Ryan's

15  temperament and skills during your time

16  at JPMorgan?

17     A.    I did.

18     Q.    How skilled was Maryanne as

19  an investigator?

20     A.    One of the best.

21     Q.    You did or did not develop a

22  good understanding of Maryanne Ryan's

23  temperament through your time working

24  with her at JPMorgan?

 1   DeLuca, with the most recent e-mail dated
 2   January 14, 2011.
 3           Have I got that right?
 4       A.  Yes.
 5       Q.  Let's take a look at
 6   Ms. Ryan's e-mail to you on January 13th,
 7   I think in the beginning of the page.
 8           Do any of Ms. Ryan's
 9   findings indicate that JPMorgan is
10   participating in a sex trafficking ring?
11           MS. SINGER:  Objection.
12           THE WITNESS:  That JPMorgan
13       is?
14   BY MR. GAIL:
15       Q.  Yeah.
16       A.  No.
17       Q.  Why not?
18           MS. SINGER:  Objection.
19           THE WITNESS:  Again, she
20       outlines what she finds, right.
21       It doesn't establish a link
22       between JPMorgan and the operation
23       by Epstein of a sex trafficking
24       ring through the bank, on its

1          face, in my opinion.
2   BY MR. GAIL:
3        Q.   Do any of Ms. Ryan's
4   findings, as you see them there, indicate
5   that as of 2011 Epstein was using the
6   bank to perpetrate sex trafficking?
7             MS. SINGER:  Objection.
8             THE WITNESS:  So, again, the
9        findings that she cites are old.
10       In 2004, et cetera, she notes
11       that.  And notes, though, the
12       activity not continuing,
13       necessarily.
14  BY MR. GAIL:
15       Q.   You testified that you had a
16  call with Ken Starr following your
17  conversation with Jes Staley.  Do you
18  recall that?
19       A.   Yes.
20       Q.   Now, counsel for the U.S.
21  Virgin Islands referred to Epstein's
22  criminal defense attorney.  What was Ken
23  Starr's position at the time you were
24  speaking to him?