# EXHIBIT 115

```
 1   UNITED STATES DISTRICT COURT FOR THE
 2   SOUTHERN DISTRICT OF NEW YORK
 3   ----------------------------------------X
 4   Jane Doe 1, individually and on behalf of
     all others similarly situated,
 5
 6                    Plaintiff,        Case No.
                                        1:22-cv-10019 (JSR)
 7          v.
 8   JPMorgan Chase Bank, N.A.,
                      Defendant.
 9   ----------------------------------------
10   GOVERNMENT OF THE UNITED STATES
     VIRGIN ISLANDS,
11                                      Case No.
                                        1:22-cv-10904 (JSR)
12                    Plaintiff,
13          v.
14   JPMORGAN CHASE BANK, N.A.,
15                    Defendant
16   ----------------------------------------
17     ** CONFIDENTIAL PORTION UNDER SEPARATE COVER **
18           ** DEPOSITION OF MARY ERDOES **
19              Wednesday, March 15, 2023
20
21
22
23   Reported by:
24   Angela M. Shaw-Crockett, CCR, CRR, RMR
```

```
 1       Q.   How was it that you were involved in 2013?
 2            Why is it that in 2013 you do get
 3   involved?
 4       A.   I remember being part of the
 5   high-risk-client review with Mr. Epstein's account
 6   during the summer of 2013, and Jes Staley was no
 7   longer at the firm, and Jes Staley was the most
 8   senior client coverage person for Mr. Epstein.
 9            And there was no one there to vouch for
10   Mr. Epstein.  And I made the decision that it was --
11   we were exiting the relationship with Mr. Epstein.
12       Q.   You mentioned cash withdrawal activities
13   in his account.
14            Was that something new in 2013, or do you
15   know whether that occurred in earlier years as well?
16       A.   I remember, in 2013, going in-depth on the
17   client analysis, the relationship with Mr. Epstein,
18   asking a lot of questions and recognizing that there
19   were large cash outflows.  And we promptly exited
20   the account thereafter.
21       Q.   You mentioned media reports; that is, that
22   you said it was activities in his accounts -- and, I
23   guess, those are the cash withdrawals.
24            What media reports were you referring to?
```

 1               Did you take some comfort prior to 2013,

 2      by having Mr. Staley as his sponsor, that these

 3      issues -- well, withdrawn.

 4               What did you mean by "He no longer had

 5      Mr. Staley to be his sponsor in the bank"?

 6           A.   Mr. Staley was Mr. Epstein's advocate in

 7      the bank and was the senior relationship manager for

 8      Mr. Epstein.  And so I just wasn't involved in those

 9      conversations.  And without someone there,

10      advocating for Mr. Epstein and the situation that I

11      viewed, I was exiting Mr. Epstein.

12           Q.   Do you know whether Justin Nelson was

13      advocating on behalf of Mr. Epstein?

14           A.   I don't recall Mr. Nelson being part of

15      the conversation.

16           Q.   Okay.  Do you recall whether there was

17      anybody else in 2013 that was advocating for his

18      termination other than you?

19           A.   I don't recall who was in the meetings,

20      but I recall it was a group of people.

21           Q.   Last part of that email, which is

22      Exhibit 30, says "Agree.  We'll work on those this

23      weekend for us to knock back and forth."

24               Do you remember receiving anything further

 1      A.    No.

 2      Q.    It's not something that you would ever
 3   hope anyone at the bank would condone, right?

 4      A.    Correct.

 5      Q.    And if the bank was aware or became aware
 6   that Jeffrey Epstein was abusing young girls or
 7   women, you would recommend that he be terminated as
 8   a client at the bank, correct?

 9      A.    I wasn't -- I wasn't part of those
10   conversations, and there's -- those conversations
11   have lots of facts and circumstances around them.
12   So it would just -- it would depend.

13      Q.    I must have asked a bad question.  So my
14   question is hypothetically, if you were to learn and
15   believe that Jeffrey Epstein was sexually abusing
16   children and young women, would it be your position
17   that Jeffrey Epstein should be terminated as a
18   client at the bank?

19      A.    If I learned and believed that he was
20   sexually abusing young children, yes, he would be --
21   I would ask to have him exited from the bank.

22      Q.    And if you hypothetically learned that
23   Jeffrey Epstein was running a particular type of
24   sexual abuse scheme where he was inviting young

 1   hush payments to victims and recruiters and things

 2   of that nature, correct?

 3        A.   Those two things, unfortunately, never

 4   came together in my mind.

 5        Q.   Okay.  It's not until right now that we're

 6   having this discussion that things are kind of

 7   starting to -- the puzzle is coming together?

 8             MR. JOHNSON:  Objection.

 9             You can answer.

10        A.   At the time, the concern was the cash

11   payments, and at the time, the cash payments were

12   related to airplane usage.

13             And never at the time was that something

14   that I was connecting in my mind with anything to do

15   with any of the allegations of what he may or may

16   not have done, and I wasn't aware of any ongoing

17   things that Mr. Epstein was doing, and the two

18   things never -- they never came to my mind to

19   connect them.

20   BY MR. EDWARDS:

21        Q.   With respect to the cash payments, if you

22   believed that he was withdrawing cash because that's

23   the way -- that's the way it was necessary to make

24   payments for jet fuel, that's not somebody that you

```
 1   the specifics were.
 2        Q.   When you were hearing the allegations over
 3   time, let's say -- do you remember when
 4   Jeffrey Epstein was first arrested in 2006?
 5        A.   Yes.
 6        Q.   And because of the nature of the charges,
 7   that it's allegedly sex with minors, that's a big
 8   deal, right, for a client?
 9        A.   Any allegation is taken very seriously.
10        Q.   But if it's an allegation of trespassing,
11   it's taken less seriously than sex with a minor?
12        A.   I can't judge the seriousness with which
13   they take it.
14        Q.   Okay.  Did you speak with Jes Staley in
15   the 2006 time period about the fact that
16   Jeffrey Epstein had been arrested?
17        A.   I remember Jes discussing that -- I sort
18   of don't know where or when -- that his
19   characterization of Jeffrey was very different than
20   the press situation.  And -- yeah, that's what I
21   remember.
22        Q.   Did you know that Jes was going to visit
23   Jeffrey at various houses of his?
24        A.   So I remember the email that I think we
```