# EXHIBIT 142

```
 1        UNITED STATES DISTRICT COURT FOR THE
              SOUTHERN DISTRICT OF NEW YORK
 2                       - - -

 3    GOVERNMENT OF THE UNITED        : Case Number:
      STATES VIRGIN ISLANDS           : 1:22-cv-
 4          Plaintiff,                : 10904-JSR
            v.                        :
 5    JPMORGAN CHASE BANK, N.A.       :
            Defendant/Third-Party     :
 6          Plaintiff.                :
      _____
 7    JPMORGAN CHASE BANK, N.A.       :
            Third-Party Plaintiff,    :
 8          v.                        :
      JAMES EDWARD STALEY             :
 9          Third-Party Defendant.    :

10
                         - - -
11                  MAY 24, 2023
                 HIGHLY CONFIDENTIAL
12                       - - -

13            Videotaped deposition of

14    STEPHEN CUTLER, taken pursuant to notice,

15    was held at the law offices of Boies

16    Schiller Flexner LLP, 55 Hudson Yards,

17    New York, New York, commencing at

18    9:40 a.m., on the above date, before

19    Amanda Dee Maslynsky-Miller, a Certified

20    Realtime Reporter and Notary Public in

21    and for the State of New York.

22                       - - -
          GOLKOW LITIGATION SERVICES, INC.
23       877.370.3377 ph| 917.591.5672 fax
                 deps@golkow.com
24
```

Stephen Cutler - Highly Confidential

BY MS. LIU:

Q. But you do remember and you reviewed documents that reminded you, or refreshed your recollection, Mr. Cutler, correct, that on multiple occasions, as the top lawyer at the company, you said to business, I do not want this person, Jeffrey Epstein, as a client of the bank, correct?

A. I know that I said that in 2011. I do.

Q. But he remained a client of the bank until August of 2013, correct?

A. Or thereabouts, yes.

Q. Who overruled you?

MR. GAIL: Objection.

BY MS. LIU:

Q. Mr. Cutler --

A. I don't know if it was a

1  matter of being overruled, but I believe
2  that Mr. Staley and -- and others in the
3  business decided that we should retain
4  Mr. Epstein as a client, notwithstanding
5  my concerns that his continuing to have
6  an account at JPMorgan created a
7  reputational risk for the firm.
8       Q.   And who are the others that
9  you mentioned?
10      A.   Well, I don't think that an
11 account for a private bank customer gets
12 retained unless the private bank wants to
13 retain the account and the head of asset
14 management, to whom the private bank
15 reports, wants to retain that account.
16           And then I know in this case
17 Mr. Staley remained involved, given that
18 he was a primary relationship with the
19 account.
20      Q.   The head of asset management
21 at the time was Mary Erdoes, correct?
22      A.   Correct.  Sorry, in 2011,
23 we're talking about, yeah.
24           MS. LIU:  It's 1 o'clock.

1                You wrote that, correct?

2       A.    Yes.

3       Q.    Why did you write "it's

4  another to be paying him"?  What did you

5  mean by that?

6       A.    I'll reiterate what I said

7  before.  I think that, essentially, would

8  make Mr. Epstein our business partner,

9  and I didn't think, given the

10 reputational issues, that JPMorgan ought

11 to be business partners with Mr. Epstein.

12      Q.    Do you recall that that

13 Gates Foundation project that Mary

14 Erdoes, Jes Staley and with which you

15 were at least partially involved with

16 Jeffrey Epstein, ultimately didn't go

17 through?

18      A.    Again, that's my

19 recollection, that we did not do --

20 JPMorgan did not do a Gates Foundation

21 project.

22                       - - -

23             (Whereupon, Exhibit

24       Cutler-26, JPM-SDNYLIT-00136260,

1   Jeffrey Epstein walking the halls or in
2   the elevator at JPMorgan?
3        A.   I don't remember doing that
4   or those precautions having been taken.
5        Q.   Do you know if your
6   secretary or assistant would recall
7   seeing Jeffrey Epstein or greeting
8   Jeffrey Epstein during that meeting?
9        A.   I have no idea.
10       Q.   Do you recall that you had a
11  meeting scheduled -- a next meeting
12  scheduled with Jeffrey Epstein a month
13  later?
14       A.   So I -- I remember two
15  communications with Epstein.
16       Q.   Okay.
17       A.   So two -- two meetings.  I
18  don't remember whether the second, so the
19  one after this one, I don't remember
20  whether it was an actual in-person
21  meeting or not.
22            I've now seen the calendar
23  entry suggesting that it was going to be
24  a meeting.  I just don't remember if, in

1  fact, it was a meeting or there was a
2  call.  I do remember having one, and then
3  there was going to be a second.
4        Q.    Okay.  So you had the first
5  meeting, he says, I'm a good guy, don't
6  hate me, Prince Andrew, Bill Gates, Glenn
7  Dubin --
8        A.    I don't remember --
9        Q.    -- he dropped a bunch of
10 names --
11       A.    I don't remember which names
12 he mentioned, but he mentioned a lot of
13 names of a lot of people that he
14 considered his friends and confidants.
15 That -- that much I remember.  I just
16 don't remember which ones.
17       Q.    And were you persuaded by
18 Jeffrey Epstein at this meeting?
19       A.    No.  I do remember
20 thinking -- or I do remember telling him,
21 I'm going to think about it.
22             And I remember thinking at
23 the time, he is smooth.  He is -- you
24 know, he can be persuasive.  And now, you

Case 1:22-cv-10904-JSR   Document 326-142   Filed 09/08/23   Page 8 of 17
Stephen Cutler - Highly Confidential

1  know, with the benefit of 20/20
2  hindsight, I can see that he managed to
3  charm a lot of people along the way.
4           So I do remember, at the
5  conclusion of the meeting, thinking,
6  okay, I'm going to think about this some.
7       Q.   Okay.
8       A.   But it didn't -- he didn't
9  change my mind.  And I -- I think I must
10 have communicated, all right, I'm going
11 to think about it.
12      Q.   And when do you think,
13 relative to that meeting, you arranged to
14 have a second meeting with him?
15      A.   I only know this from having
16 looked at a couple of the documents.  I
17 mean, I think it turned out to be six
18 weeks later.
19      Q.   Okay.  So you told him, I'm
20 going to think about it.
21           Do you recall if in between
22 those two meetings you had any
23 conversation with Mary Erdoes about your
24 meeting?

1      A.   I don't remember doing that.
2      Q.   Do you remember if you had
3  any conversation with Jes Staley about
4  your meeting?
5      A.   I don't remember doing that
6  either.  It is possible that I told him,
7  I met with him, I'm going to -- I'm going
8  to think about it, I'm going to meet with
9  him again.  I just don't -- I just don't
10 remember.
11     Q.   Do you recall if you had any
12 conversation with Jamie Dimon about your
13 meeting with Jeffrey Epstein?
14     A.   I don't believe I did.
15     Q.   Do you recall if you had any
16 conversations with anyone else about --
17 with anyone about your meeting with
18 Jeffrey Epstein?
19     A.   I don't -- it's possible I
20 did, I just don't -- I just don't have a
21 recollection of that.
22     Q.   Okay.  But you recall you
23 were going to think about it.
24          Did you, in fact, think

1  about it, or was that just something you
2  said to end the meeting?
3       A.   I do remember thinking about
4  it some.  So I -- I don't know that I
5  thought at the end of that meeting, boy,
6  I'm going to change my mind, or there's a
7  good chance I'm going to change my mind.
8            But I -- I think I genuinely
9  thought, okay, I'll do a little bit of
10 thinking about this.  And I didn't tell
11 him in that meeting, you know, no way, no
12 how.
13           And then that's when I
14 remember having this thought about, you
15 know, what would I say to -- what would I
16 say to women at JPMorgan?  What would
17 I -- you know, what would I say beyond
18 that?
19           And I thought -- I thought
20 there was -- I concluded that there was,
21 in fact, a reputational risk that the
22 firm shouldn't take.
23      Q.   Do you know if you talked to
24 Jonathan Schwartz about the meeting?

1      A.    I don't remember doing that.
2            I'm actually trying to
3   remember if Schwartz was still at
4   JPMorgan at that time.
5      Q.    So what was Jeffrey Epstein
6   trying to convince you -- what were you
7   going to think about, whether or not
8   you're going to tell Mary Erdoes or Jes
9   Staley or the business in general, you
10  know, I'm not going to stand in the way
11  of this guy staying on as a client; is
12  that -- is that what he was trying to
13  convince you to say?
14     A.    Again, I think he was just
15  trying to convince me that he was a
16  decent guy.  That, notwithstanding this
17  terrible past and the conviction, that he
18  wasn't as terrible as all that.
19     Q.    Why is --
20     A.    I don't -- I don't -- what I
21  don't remember is, you know, was he
22  trying to convince me that he should be
23  part of the Gates Foundation thing, that
24  he should be a client of the firm, that,

1  you know, in general, the firm shouldn't
2  shy away from, you know, maintaining a --
3  I just don't remember.
4         Q.   Okay.  So do you -- you
5  recall there was a second meeting,
6  whether in person or over the phone; is
7  that fair?
8         A.   A second -- a second
9  communication.
10        Q.   And what -- what happened in
11 that second communication?
12        A.   I don't remember.  I know I
13 had come to the conclusion that I was not
14 changing my advice.  Whether I
15 communicated that to him, I don't
16 remember.
17             It would not be crazy for me
18 to say, I'm not telling him what I think,
19 I'm telling my -- I'm telling the people
20 who represent my client what I think.
21        Q.   So at no point following
22 those two meetings do you recall ever
23 advising, recommending, saying to the
24 bank, we should retain Jeffrey Epstein as

1  a client?

2        A.    Absolutely not.

3        Q.    Do you recall ever again
4  saying, as you had in July of 2011, we
5  should not do business with Jeffrey
6  Epstein?

7        A.    I believe at the conclusion
8  of these two meetings, I said to Jes
9  Staley, I don't believe we should be
10 doing business with him, I haven't
11 changed my mind.

12       Q.    Why did you say it to Jes
13 Staley?

14       A.    He was the primary interface
15 with me on Epstein, largely because I
16 think it was his client relationship.

17       Q.    And so you, as the general
18 counsel of JPMorgan, believed, based on
19 that, he was the appropriate person to
20 defer to related to a decision about
21 Jeffrey Epstein; is that fair?

22       A.    I mean, I -- you could --

23             MR. EDELMAN: Objection to
24       form.

```
 1              You can answer.
 2              THE WITNESS:  Okay.  You
 3       could argue it was Jes.  You could
 4       argue it was Mary.  I know they
 5       were communicating with one
 6       another about Epstein.
 7              I -- and maybe it was
 8       because my meeting or meetings
 9       with Epstein were done at the
10       behest of Staley that I felt like
11       that was primarily who I was
12       talking about.  I mean, you've
13       seen in documents I communicated
14       with Mary about the subject.
15              But my best recollection is,
16       following those meetings -- and
17       maybe it's because Jes sort of
18       said, would you please meet with
19       him?  Would you hear him out?  I
20       remember that, I remember that
21       phrasing, would you hear him out?
22              That I -- I think I would
23       have gone back to him.
24  BY MS. LIU:
```

1  Schwartz.

2      Q.   And do you recall what he
3  said to you or what you -- what you
4  remember about any conversations that
5  happened between someone at JPMorgan and
6  Ken Starr related to Jeffrey Epstein?

7      A.   My best recollection is we
8  were trying to ascertain whether there
9  was, in fact, an ongoing investigation,
10 that is, an investigation of, you know,
11 current conduct, or call it
12 post-conviction conduct.

13          And I don't remember the
14 result of the call with Starr, other than
15 we certainly didn't glean from that
16 communication that he thought there was
17 such an investigation.

18     Q.   Why was that the question
19 you were asking?

20     A.   I don't know if that was the
21 only question.  It may have been a
22 character reference kind of thing.

23          But at that time, I think we
24 were looking at the account again.  There

1  ongoing human trafficking through Jeffrey
2  Epstein?
3        A.    Here is what I was
4  interested in:  If Mr. Epstein was
5  continuing to engage in unlawful
6  activity, we didn't want him as a client.
7              We understood that he had
8  engaged in unlawful activity in the past.
9  That, itself, raised issues.  But we were
10 continuing to serve as his bank and
11 maintain his accounts.
12             If he was involved in --
13 in -- if he continued to be involved in
14 criminal activity, we did not want to
15 maintain those accounts.
16       Q.    And what did you do to
17 determine whether or not Jeffrey Epstein
18 was continuing to be involved in criminal
19 activity, namely human trafficking?
20       A.    Right.  I -- again, I would
21 not have personally been involved in
22 that.  But we had a compliance department
23 and an anti-money laundering function
24 with well-regarded people.  And I trusted

Stephen Cutler - Highly Confidential

```
 1   the relationship to be terminated.
 2              Is that consistent with your
 3   prior testimony that in 2011 you wanted
 4   Jeffrey Epstein to be terminated from the
 5   bank?
 6        A.   I think so.  I mean, I think
 7   this is -- this states that I wanted to
 8   exit the relationship, and I did.
 9        Q.   So then Nina Shenker says to
10   Jonathan Schwartz, Is Jes going to talk
11   to Mary to execute the termination?
12              Do you see that?
13        A.   I do.
14        Q.   And do you understand that
15   to be Mary Erdoes?
16              MR. GAIL:  Objection.
17              THE WITNESS:  I'd be
18        guessing along with you, but it
19        would make sense.
20   BY MS. LIU:
21        Q.   And then Jonathan Schwartz
22   says to Nina, I don't think he has any
23   plans to do so.  He understands that
24   Steve is quite firm on the subject and is
```