N96QgovO

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   GOVERNMENT OF THE UNITES
     STATES VIRGIN ISLANDS
 4
                       Plaintiff
 5
              v.                          22 Civ. 10904 (JSR)
 6                                        Oral Argument

 7   JP MORGAN CHASE BANK N.A. et
     al.
 8
                       Defendants
 9
     ------------------------------x
10                                        New York, N.Y.
                                          September 6, 2023
11                                        10:15 a.m.

12   Before:

13                     HON. JED S. RAKOFF

14                                        District Judge

15                        APPEARANCES

16   MOTLEY RICE
          Attorneys for Plaintiffs
17   DAVID I. ACKERMAN
     LINDA SINGER
18   ELIZABETH BOGGS
     WILLIAM H. NARWOLD
19
     WILMER HALE
20        Attorneys for Defendants
     FELICIA H. ELLSWORTH
21   ERIC HAWKINS

22

23

24

25
```

N96QgovO

<pre>
 1                (In open court; case called)

 2                THE COURT:  Counsel, please state your appearances.

 3                MS. SINGER:  Linda Singer for the United States Virgin

 4     Islands.

 5                MS. BOGGS:  Elizabeth Boggs for the United States

 6     Virgin Islands.

 7                MR. ACKERMAN:  David Ackerman for United States Virgin

 8     Islands.

 9                MR. NARWOLD:  Bill Narwold, Motley Rice for USVI.

10                MS. ELLSWORTH:  Felicia Ellsworth for JP Morgan Chase,

11     joined by my colleague Eric Hawkins, both from Wilmer Hale.

12                THE COURT:  My courtroom deputy is absent today and my

13     law clerks are even apparently more technologically challenged

14     than I am, which is saying a good deal, but we need to move

15     this along.

16                So this is argument on the challenges under *Daubert*.

17     So my preliminary view is that none of these witnesses should

18     be admitted in any respect.  It looks to me like they are

19     mostly either irrelevant, or testifying about matters that are

20     exclusively for the Court, or testifying about matters that are

21     solely within the prerogative of the jury.  So I am inclined to

22     strike them all.  But I will give you each an opportunity to

23     talk me out of it.

24                I will ask each side to pick which of their experts

25     they think is most clearly admissible, and tell me why.
</pre>

N96QgovO

1                    So starting with the government of the Virgin Islands.

2                    MS. BOGGS:  Good morning, your Honor.  Professor Carr

3       is our human trafficking expert and all --

4                    THE COURT:  So why is trafficking an issue in this

5       case?  It's not in the statute, is it?

6                    MS. BOGGS:  Yes, your Honor.  Sex trafficking, we need

7       to establish that there was a sex trafficking --

8                    THE COURT:  Wait a minute.  Let's take a look, what is

9       it, it's 18 U.S.C. -- give me the section again.

10                   LAW CLERK:  1591.

11                   THE COURT:  I'm sorry?

12                   LAW CLERK:  1591.

13                   THE COURT:  1591.  Thank you.

14                   So I don't see anywhere in the actual language of the

15      statute the word "trafficking."  It is in the title.  Of

16      course, the law of the United States has been clear for a

17      hundred years that the titles are irrelevant.  So I don't see

18      anywhere in the statute any reference to the term

19      "trafficking."  Moreover, if it were in the statute, it would

20      be a legal term whose definition would be left to the exclusive

21      province of the Court.

22                   MS. BOGGS:  Your Honor, there are factual

23      determinations that need to be made about whether the

24      commercial sex was engaged in through force, fraud or coercion

25      for adults or whether there was just commercial sex with minors

1    under the statute.

2          THE COURT:  Those are everyday terms that a jury can

3    determine when properly instructed by the Court.  I don't know

4    why we need an expert.

5          MS. BOGGS:  Your Honor, in other cases they have used

6    experts to educate the jury about what human trafficking --

7          THE COURT:  Well, those are other cases not binding on

8    me.

9          MS. BOGGS:  So in sex trafficking cases, there are a

10   lot of misconceptions about sex trafficking and what it looks

11   like.  For example, there are a lot of misconceptions that

12   human trafficking victims are going to not have freedom of

13   movement; that they're going to be locked in a room; that --

14          THE COURT:  So that is a question of law.  If you

15   wanted -- I, frankly, am not sure you're right in your

16   assumption, but assuming you were, you would be entitled to an

17   instruction to the jury that force, fraud, coercion or whatever

18   doesn't mean that they didn't have freedom of movement or

19   something like that.  That's a question of law.  I don't see

20   it's a question for an expert at all.

21          MS. BOGGS:  I appreciate that --

22          THE COURT:  If 500 experts testified that in their

23   opinion that was or was not an element of force, fraud or

24   coercion, I would have to strike all 500.  They were invading

25   my province to tell the jury what the law is.

N96QgovO

1          MS. BOGGS:  Well, I think there's the law force,

2     fraud, and coercion, but what does that look like.  In the

3     example I gave you --

4          THE COURT:  What do you mean what does that look like?

5     That's for factual evidence.  These are not terms that are

6     exactly unknown to everyday citizens.  Force, fraud, coercion

7     are terms that every member of the jury, every jury I've ever

8     had, understands from their everyday experience.  But if they

9     need a more specific definition like fraud involves

10    misrepresentations or something like that, that's a legal

11    question, not an expert question.

12         MS. BOGGS:  **So, your Honor, I appreciate that, but in**

13    **other cases there has been a view that it's been helpful to the**

14    **jury to hear, for example, the bonds that can form and the**

15    **relationships or that victims may not act or look how you would**

16    **expect a victim to act.  Having that on-the-ground information**

17    **about what human trafficking looks like, for example, having a**

18    **victim who may think she is --**

19         THE COURT:  Let me make sure I understand the

20    argument.  The argument is the functional equivalent if someone

21    was on trial for murder, you think an expert could be admitted:

22    Ladies and gentlemen, although I'm not speaking to the facts of

23    this case per se, because I have no personal knowledge of the

24    facts of this case, as an expert on murder, I want to tell you

25    how murders are often carried out.  I can't believe any court

N96QgovO

1    in the United States would admit that, and certainly it doesn't

2    meet *Daubert*.

3              MS. BOGGS:  Your Honor, I think that's a distinct

4    scenario.  Here, sex trafficking is not very well understood so

5    the examples I have given you, there are a lot of popular

6    misconceptions, and that's something that both of the proffered

7    experts in this case agree --

8              THE COURT:  I don't agree.  I don't know what their

9    basis is for saying that.  But, in any event, as I say, if a

10   jury is under what you believe is a misconception, then you're

11   entitled to instruction to clean up or counteract those

12   misconceptions.  Those are misconceptions about the meaning of

13   the statutory terms, which is a question of law.

14             MS. BOGGS:  Well, Professor Carr will also talk about

15   red flags that are used in the field to see whether there's

16   human trafficking and to identify potential human trafficking,

17   and that's an industry standard that is also helpful to have an

18   expert's testimony so that we can identify particular red flags

19   in JP Morgan documents.

20             THE COURT:  Wait a minute this goes now to what JP

21   Morgan should have doped out?

22             MS. BOGGS:  Well, it goes to that there were -- in the

23   field of human trafficking, there are certain red flags that

24   are indicative of human trafficking and whether or not -- first

25   establishing what those red flags.

N96QgovO

1      THE COURT:  Red flags indicative of human trafficking.

2   Remember, trafficking is not in the statute.  So you think you

3   need an expert to tell what there -- there are red flags of

4   force, fraud, coercion, threats?  Why isn't that just everyday

5   evidence about what happened in this case?

6      MS. BOGGS:  Your Honor, for example, one of the things

7   that Professor Carr opines about is that JP Morgan's role in

8   setting up an account for young models at a private bank on

9   behalf of Jeffrey Epstein or at his request was indicative of

10   sex trafficking because the modeling industry is one way that

11   girls are sometimes recruited into sex trafficking and how that

12   should be a red flag for sex trafficking at a financial

13   institution.

14      THE COURT:  So what element of your causes of action

15   is that related to?

16      MS. BOGGS:  It relates both to the existence of a sex

17   trafficking venture that there was commercial sex engaged in

18   with force, fraud, or coercion or minors --

19      THE COURT:  So with respect to that, Mr. Epstein's

20   activity, the evidence is Mr. Epstein's activity, not whether

21   it suggested something in the abstract that was a red flag of

22   improper sex activity.  Either he did it or didn't, which, to

23   be frank, I don't think should be very difficult for you to

24   prove in this case.  But in any event, the relevant thing is

25   what he did.  Okay.

N96QgovO

```
1          So then we turn to your second element, which is what

2    you think the bank should have figured out, right?

3          MS. BOGGS:  That's correct.  And so having an expert

4    talk through the role of how sex trafficking -- the red flags

5    and how it would present in these documents.

6          THE COURT:  Red flags to whom?  To bankers?

7          MS. BOGGS:  Correct, within JP Morgan.

8          THE COURT:  And which expert has the expertise in what

9    a banker should have perceived?

10          MS. BOGGS:  Well, Professor Carr can opine about red

11    flags in human trafficking and --

12          THE COURT:  Yeah, well, I -- yes, and then I -- again,

13    it seems to me you're making -- and both sides are making much

14    more complicated what is a straightforward issue.  Depending --

15    and it's still part of the summary judgment motions that I have

16    to decide, but either you're going to have to show the bank

17    knew or recklessly disregarded evidence that their money was

18    being used to promote sex trafficking or you're going to have

19    to show that they knew or should have known that it was being

20    done.  Under any of those standards, familiar standard

21    standards that have been part of the legal system for about a

22    thousand years, the question is what should a reasonable banker

23    in this position should have known, if it's the negligence

24    standard, or what should -- or what did in fact the banker know

25    or willfully disregard information actually given to him.
```

N96QgovO

1    On the latter, I don't see the relevance of the expert

2   at all.  On the former; that is to say the negligence standard,

3   I think the -- I don't see any of the experts really speaking

4   to that as opposed to just what they think in the abstract are

5   red flags of sex trafficking.

6    MS. BOGGS:  Your Honor, the role of Professor Carr

7   would be to explain to the jury what are the red flags of sex

8   trafficking and also look through JP Morgan's documents.  For

9   example, some of JP Morgan's own compliance policies talked

10  about sex trafficking and red flags for sex trafficking.  And

11  so that would be the role here is to offer that expertise and

12  explain what they should have been looking for when they're

13  reviewing documents and how those red flags appear in this

14  case.

15   THE COURT:  Do you agree that if I adopt on summary

16  judgment the argument made by your adversary, that the standard

17  is either that they knew or willfully -- recklessly disregarded

18  knowledge that their money was being used to promote sexual

19  misconduct, that what you just proffered would be irrelevant?

20   MS. BOGGS:  No, your Honor.  I think it would still be

21  helpful for the jury to be educated about the red flags of sex

22  trafficking so that they can identify along the documents of JP

23  Morgan --

24   THE COURT:  I think it's a complete diversion from the

25  facts of the case.  But, all right, I hear your arguments.

N96QgovO

1          Let me hear from defense counsel and their best shot.

2          MS. ELLSWORTH:  Thank you, your Honor.  We disclosed

3    four experts.  Only three have been challenged by the

4    government of the U.S. Virgin Islands --

5          THE COURT:  As you may know, under *Daubert*, the Court

6    has an independent duty to conduct a rigorous analysis, so it

7    doesn't matter whether it's been challenged or not.

8          MS. ELLSWORTH:  An expert they didn't challenge would

9    only be responsive to two of the experts that we challenged,

10    your Honor, and not Ms. Carr--

11          THE COURT:  So assuming I knock them out, two of yours

12    go.

13          MS. ELLSWORTH:  It would be one I think, your Honor.

14          In any event, the expert that has been challenged by

15    the U.S. Virgin Islands that you heard briefing on that I would

16    submit doesn't fall prey to the any of the problems that you

17    correctly identified I think with Ms. Carr's report would be

18    Joseph Fonseca.  He is a retired FBI agent who spent 20 plus

19    years conducting sex trafficking investigations.

20          THE COURT:  Hang on one second.  Let me look at my

21    notes on him.

22          MS. ELLSWORTH:  Your Honor, in particular, if the

23    Court does not grant our summary judgment motion on the

24    obstruction count, Mr. Fonseca's testimony would be

25    particularly relevant.  If the obstruction count is removed

N96QgovO

from the case, then I think we have to assess whether it would

be still be youthful to the jury to still hear from

Mr. Fonseca.

THE COURT:  I'm sorry.  I don't know why I'm having

trouble finding my notes on him but hang on.  There it is.

So as I understand it, he is going to say that based

on his prior experience as a special agent, that filing

additional SARs by JP Morgan would not have caused earlier

federal charges against Epstein to be filed.  Putting aside

completely the hearing that occurred in my court yesterday in

which representatives of several government prosecution

agencies; namely, the New York City Police Department, the

Alcohol Tobacco and Firearms Agency, and the U.S. Attorney's

Office, said that the reason they had investigated Mr. X, the

defendant in another case before me, was because of the SARs

filed by a little-known bank called JP Morgan Chase.  Putting

that all aside, as I understand it, he has no prior experience

with SARs.

MS. ELLSWORTH:  That's exactly the point, your Honor.

He has experience with sex trafficking investigations on behalf

of the Federal Bureau of Investigation.  I expect his

testimony, if allowed to be presented, would cover the types of

material and information that he found useful as a special

agent who conducted actual sex trafficking investigations,

including the type of financial information that they might go

1    out and seek in the course of an investigation, which would be

2    sought by subpoena and not by looking at regulatory filings

3    that might be might with another department.

4           THE COURT:  I'm not sure what the relevance of this

5    is.  The question if I -- if Mr. Jones in my hypothetical

6    purposely fails to bring to the attention of a government

7    agency as required, suspicious or even criminal activity, and

8    does so for the purpose of making sure that the government writ

9    large never finds out about this activity, what more is needed

10   for obstruction?

11          MS. ELLSWORTH:  Well, I agree that that type of

12   purposeful conduct is what the U.S. Virgin Islands will have to

13   attempt to prove to make out their obstruction claim.  What

14   Mr. Fonseca would testify to would be whether additional -- the

15   theory, as I understand it, that the plaintiff will seek to

16   establish at trial is that had JP Morgan made additional

17   reports to the federal government, that somehow would have

18   spurred more investigation of Mr. Epstein or perhaps a sooner

19   investigation of Mr. Epstein.  So in response to that theory,

20   Mr. Fonseca' testimony --

21          THE COURT:  But if they are charging obstruction even

22   from a civil standpoint, they still have to show intent.

23          MS. ELLSWORTH:  Correct.

24          THE COURT:  So they have to show that the reason these

25   SARs were not filed was because it was believed it would -- it

1   might lead to government action, government criminal action.

2           MS. ELLSWORTH:  I think that's right, your Honor.  And

3   I won't re-argue the motion, but I don't see a world in which

4   they could possibly prove that.  Putting that to the side --

5           THE COURT:  So assuming that's what they have to show,

6   what does it matter what a guy in the FBI years ago would have

7   done or would not have done?

8           MS. ELLSWORTH:  Well, then I suppose if the

9   government -- if the plaintiff is held to not being allowed to

10  suggest to the fact-finder that filing additional reports would

11  have spurred some action, if they're not allowed to make that

12  argument, then maybe Mr. Fonseca's testimony which rebuts the

13  theory that additional federal reports would have somehow

14  spurred some different action, potentially then that testimony

15  would be --

16          THE COURT:  Well, yeah, I'm not going to deal today

17  with something that is implicit in any pretrial ruling that the

18  Court makes regarding evidence, which is if the door is opened

19  somehow by the other side, then stuff that is otherwise

20  irrelevant may become relevant.  That's true of motions in

21  limine, and it's true of a *Daubert* motion as well.

22          But at least operate assumption which I think I will

23  hear from the defense, but I think is very likely where I am

24  not going to come out, which is they've got to show obstruction

25  intent to carry their burden on the -- to some -- you know, it

1     may be -- intent may include reckless disregard, but I'm not

2     sure it would be in the obstruction area.  It probably would

3     just be intent straightforward, I don't see the relevance.

4                MS. ELLSWORTH:  Well, I think, again, most of our

5     experts are responsive to the testimony that the Virgin Islands

6     would put on.

7                THE COURT:  And I agree with you if I am persuaded

8     contrary to where I am leaning at moment to allow in some of

9     their experts, then to the extent your experts respond to what

10    I allow in, likely that your experts could be admitted too.

11    But at least at the moment I'm leaning the other way.

12                MS. ELLSWORTH:  And the last point I would make about

13    Mr. Fonseca, your Honor, is the testimony that he would provide

14    would -- putting aside the obstruction count, which may or may

15    not even be proceeding, to the extent the U.S. Virgin Islands

16    is arguing, as they have throughout this case, that the failure

17    by JP Morgan to file enough reports or to include certain

18    information in those reports somehow creates either

19    participation in or knowledge of a sex trafficking venture as

20    they have to prove under the participant beneficiary liability

21    count, then Mr. Fonseca's testimony about the fact that that

22    was not information he ever used in his 23 years in the FBI and

23    not information that would have been relevant to the actual

24    federal criminal investigation of the sex trafficking, I think

25    could have --

N96QgovO

1          THE COURT:  Just out of curiosity, what is his -- what

2    does it matter whether he personally would have used this stuff

3    or not?  He may have been a lousy investigator for all we know.

4    But his personal experience is not, I think, admissible under

5    *Daubert*.  Under *Daubert* he has to identify a methodology that

6    would be used by law enforcement generally or something like

7    that, and I am not hearing where he says that.

8          MS. ELLSWORTH:  Well, he's saying the FBI in his

9    division of the FBI this is what they did.  So there's not

10   testimony from the U.S. Virgin Islands that says here's what

11   the FBI, you know, have a current --

12         THE COURT:  Is that why they got so many cases wrong,

13   in all the instances of the Innocence Project has now shown

14   that they got wrong?  That's an unfair comment, but I couldn't

15   resist.

16         But so how does he say -- when he's saying in his

17   experience the FBI doesn't look at this stuff --

18         MS. ELLSWORTH:  He's saying that --

19         THE COURT:  -- and shame on the FBI if that's correct.

20   But anyway, if that's what he's saying, how does he know that?

21   Is that a policy of the FBI do not look at SARs?

22         MS. ELLSWORTH:  What he's saying is that the FBI has

23   at its disposal lots of resources to obtain information,

24   including financial information when it's conducting an

25   investigation, and that it does not use these types of treasury

N96QgovO

```
 1    reports for a sex trafficking investigation.  Whatever the case
 2    is that your Honor had yesterday doesn't sound like it was a
 3    sex trafficking case.
 4             THE COURT:  No, it was an identity theft case, so
 5    the -- and I am, you know, that was a separate case, but I
 6    don't quite understand if -- supposing the SAR in my
 7    hypothetical had said:  We are very suspicious for the
 8    following reasons that Mr. Epstein is using our money to engage
 9    in sexual coercion of minors on a massive scale, and you're
10    saying that he will testify, "Oh, we couldn't care less.  We
11    don't want to know that.  We would totally ignore that.  We
12    wouldn't expect anyone to bring that -- in treasury to bring
13    that to our attention.  We don't do that kind of inquiry."  Is
14    that what he's going to say?
15             MS. ELLSWORTH:  No, your Honor.  I think what he would
16    testify to is that the way that a sex trafficking investigation
17    is conducted does not start nor finish nor is it particularly
18    aided by these reports to a completely different branch of
19    government that relate to financial regulations and not to sex
20    trafficking.  What a sex trafficking investigation looks like
21    is interviews with victims and subpoenaing potential third
22    parties that might have information.  JP Morgan never
23    received--
24             THE COURT:  We all know what a great job they did with
25    Mr. Epstein.  How many decades did they take to finally
```

1    identify his misconduct?

2            All right.  Thank you very much.  Let me hear from

3    plaintiff's counsel on the point just raised.

4            MS. ELLSWORTH:  Your Honor, do you want me to respond

5    to the argument about Ms. Carr or do you have on what you need

6    on Ms. Carr?

7            THE COURT:  Let me hear from the other side on the

8    point you've just raised.

9            MR. ACKERMAN:  David Ackerman.  Good morning, Judge.

10            On the point just raised, I think you did hit the nail

11    on the head when you mentioned that he's testifying about his

12    own experience because that is all that Mr. Fonseca is doing.

13    He admitted in his deposition he didn't know what other FBI

14    agents were doing in other FBI field offices.  I would also

15    note that although JP Morgan's briefing describes what they

16    claim is a truism, which is more information is better for law

17    enforcement, Mr. Fonseca for some reason is standing up and

18    saying the opposite, which is, well, we wouldn't want that

19    information.  So those are the responses that I have.

20            THE COURT:  Okay.  All right.  Yes?

21            MS. SINGER:  Your Honor, if I may speak to another of

22    the U.S. Virgin Islands' proposed experts Mr. Amador.

23            Linda Singer, by the way.

24            So Mr. Amador serves I think a particularly important

25    function in this case.  He is the certified forensic accountant

N96QgovO

presented by the U.S. Virgin Islands.  This case, as your Honor

is well aware, involves financial records spanning from 2002

through 2013 and then beyond.  Financial information is

contained in monthly financial statements for more than 130

different Epstein accounts.  As JP Morgan has acknowledged,

more a billion dollars of transactions flowed through those

accounts.  Mr. Amador is the expert who uses his professional

experience to frame those financial transactions which are

really at the heart of the U.S. Virgin Islands' case.  Those

are the kinds of voluminous records that particularly lend

themselves to an expert's presentation to the jury which would

otherwise have to sort through a dizzying array of financial

information.  Mr. Amador has presented those financial

transactions, including extensive cash payments, payments to

women, other forms of payment in charts that we think will be

particularly helpful to the jury.

            THE COURT:  So a couple of questions about Mr. Amador

first.  If I conclude as part of the rulings on summary

judgment that the standard is actual knowledge or reckless

disregard as opposed to negligence, what's the relevance of his

testimony?

            MS. SINGER:  I think what Mr. Amador does is present

to the jury exactly the information that was available and

actually presented by JP Morgan including in its 2019 filing,

which we talked about with the Court last week.  So I think he

1      is directly relevant to the reckless disregard standard.

2               THE COURT:  Well, also, I mean, for example, as part

3      of his testimony, as I understand it, is that Mr. Epstein's

4      payments to lawyers were suspicious because they seemed like a

5      large amount of legal fees.  What possible relevance is that

6      and how is he arriving at that opinion?  I would have thought

7      that counsel in this case are being paid such a huge amount

8      that we also should be very suspicious of all the lawyers in

9      this case.

10              MS. SINGER:  If only, your Honor.  We do not have that

11     problem, unfortunately.

12              So Mr. Amador serves two functions:  One is the basic

13     presentation organization of the financial information.  The

14     second is based on his experience as a certified forensic

15     accountant, he does identify unusual or exceptional

16     transactions.  He presents a range of them that in particular

17     would have been available to the financial professionals and

18     compliance officials at JP Morgan.  The first is cash, of

19     obvious significance in Mr. Epstein's case, given his known

20     history of paying for victims and recruiters with cash.  The

21     payments to women, which he observes, based again on his

22     experience as a certified forensic accountant, were

23     inconsistent with Epstein's business activities.  And then he

24     also does talk about attorneys in a particular regard in light

25     of the other transactional information that was present in this

N96QgovO

1    case, but also the trend of it.  And that's what Mr. Amador

2    talks about.

3         So one of the questions obviously at play in the

4    obstruction count is whether there was an ongoing

5    investigation.  I would point out, by the way, that Exhibit 4

6    to Ms. Ellsworth's declaration in this case also includes

7    information that that was an ongoing investigation because it

8    notes that victims were being interviewed, or at least one

9    victim in 2011.  But put that aside, Mr. Amador is able to

10   observe based on his analysis of the financial records that if

11   he wasn't engaged -- if Epstein was not engaged in ongoing

12   traffic, then you would expect his legal expenses to decline

13   over time, but they didn't.  And that itself was a red flag to

14   JP Morgan that he continued to engage in conduct and was the

15   subject of ongoing investigation.

16        And Mr. Amador explained that that is the kind of

17   trend information both that he as a forensic accountant, and he

18   cites to standards that he applies, the American Association --

19   I'm sorry -- AICPA standards for forensic services.  He also

20   cites to the FFIEC manual which points to the red flags that

21   banks should observe in monitoring or conducting due diligence

22   of financial accounts.  And, again, excuse me, I lost my train

23   of thought.  But, again, that goes directly to the reckless

24   disregard standard in this case, although we stand by our

25   argument that while we meet reckless disregard that the

N96QgovO

1    standard here ought to be negligence for the --

2              THE COURT:  I haven't resolved that yet.  I will

3    though as part of the summary judgment motion.

4              Okay.  Let me hear from defense counsel.

5              MS. ELLSWORTH:  So as to Mr. Amador, your Honor, as

6    Ms. Singer just indicated, he purports to conduct a comparative

7    analysis of things that should have been suspicious or highly

8    unusual is another opinion he purports to offer, payments out

9    of the Epstein accounts without actually comparing them to

10   anything.  He didn't compare Mr. Epstein's account activity to

11   any other account activity at the bank or to any other account

12   activity that he was familiar with in the course of his work.

13   He's a CPA.  He's not a banker.  The idea that somehow this

14   flow of funds, the trend, whatever it is that he purports to

15   identify, is suspicious or unusual, he doesn't have a basis to

16   make those sort of judgments or to offer that type of opinion

17   experience-wise.  He also provides no comparator.  So he

18   provides no suggestion that here's an account of similar

19   magnitude of funds, but we see fewer payments to lawyers, or

20   the payments to names that sound female are less than names

21   that sound male.  He didn't even look at whether there were

22   male-sounding names that received payments out of the Epstein

23   account, and of course there were.  So the whole sort of

24   comparative analysis that he purports to offer is both not

25   grounded in any reliable methodology but also not something on

1   which he has any basis --

2           THE COURT:  It's a very funny argument that I

3   understand plaintiffs are saying, well, it's just one aspect of

4   his opinion, and I will look at all aspects, but to say that a

5   lot of payments to lawyers is somehow proof of anything, you

6   know, so it's clear that Donald Trump hasn't committed any

7   crime because he never pays his lawyers, so -- but we will

8   regard that comment as facetious.

9           So, anyway, the -- but I understand your point.  Okay.

10          Is there anything further that any one wanted to say

11  before we conclude this hearing?  Yes?

12          MS. SINGER:  Your Honor, if I may just briefly respond

13  to counsel's points on that.

14          THE COURT:  Yes.

15          MS. SINGER:  JP Morgan cites no authority for the

16  proposition that a forensic analysis has to be comparative, and

17  I think there is none.  In fact, the fact that everybody is

18  doing something, as I frequently told my children, is not proof

19  that it is an appropriate thing to do.  You look at --

20          THE COURT:  Are you offering yourself as an expert?

21          MS. SINGER:  No.  My children would certainly come in

22  as adverse witnesses on that point.

23          You can certainly have conduct that is suspicious,

24  unusual, or exceptional in light of the prior history of that

25  customer in terms of their business purpose and in terms of the

1    bank's own knowledge.  So I think the idea that this needed to

2    be comparative is simply unfounded.

3           I want to respond to the point on men because I know

4    JP Morgan extends -- takes issue with that in their briefing.

5    Mr. Amador does testify that there was no trend with regard to

6    men that he observed in his analysis of data, and that in fact

7    the payments to men were smaller, they weren't round dollar and

8    repetitive, or of that kind of significant in volume, which I

9    think again goes to the point of why Mr. Amador's detailed

10   knowledge and expertise is useful to the jury to address those

11   kinds of misassertions.

12          In terms of other experts to present to your Honor,

13   taking your invitation very briefly, I do want to address the

14   U.S. Virgin Islands banking expert Professor Rush.  And I

15   would, by the way, point your Honor to -- with hesitancy point

16   your Honor to any legal cases, as I know you are so familiar

17   with them, but *Sharkey v. JP Morgan* case is another case

18   against this defendant makes just this point; that there the

19   expert testified as to what conduct included "red flags of

20   possible fraud and/or money laundering in the financial

21   industry including incomplete due diligence, suspicious fund

22   transfer activity" --

23          THE COURT:  If I understand Mr. Rush's proposed

24   testimony, he is going to say that he looked at all of your

25   evidence, and that he concluded that it showed that Mr. -- I'm

1    sorry -- that the defendants had committed one violation or

2    another, and, I mean, that's the ultimate question for the

3    jury, is it not?

4            MS. SINGER:  I don't believe so, your Honor.  I think

5    what Professor Rush does importantly is explain, based on

6    regulatory guidance, prudent banking practice, and JP Morgan's

7    own policies and procedures, first, again, what the red flags

8    of suspicious financial activity are that regulators advise

9    banks to monitor.  These are reflected in complicated guidance

10   from regulators like the federal financial institutions

11   examination council which is not going to be familiar to

12   members of the jury.  He explains what a financial institution

13   is expected to do when it observes those red flags.  He

14   explains why SARs were untimely and inadequate in this case,

15   the importance of SARs to financial regulators.  All of those

16   things are the kinds of evidence or expertise --

17           THE COURT:  Let me make sure I understand.  Is he

18   saying that a banking employee would have seen these red flags

19   or is he saying that if they had had a better are detection

20   program in place, then they would have seen these red flags?

21           MS. SINGER:  He is saying that they would have seen

22   these red flags.

23           THE COURT:  So what's his basis for saying all of

24   that?

25           MS. SINGER:  He summarizes and explains --

1              THE COURT:  Is he a former banking employee?

2              MS. SINGER:  Not of JP Morgan, your Honor.  He was a

3      former compliance official at Wells Fargo, and he was the chair

4      of the interagency task force responsible for financial

5      enforcement in the federal government, so he understands these

6      issues as a regulator, as a prosecutor --

7              THE COURT:  Well, no, no.  But I don't think a

8      regulator or prosecutor is relevant to what you just told me.

9      If his testimony is to say that a reasonable bank employee

10     would have seen these suspicious activities, which, by the way,

11     that would only be relevant if the standard was negligence, but

12     assuming for the moment the standard was negligence, then that

13     has to be based on his knowledge and experience of what a bank

14     employee would be called upon to see, do, whatever; not upon

15     what a law professor what see, do, or whatever or what someone

16     handling some commission would see, do, or whatever.

17             MS. SINGER:  Except, your Honor, to the extent that as

18     a regulator and prosecutor, and he was also head of corruption

19     and bribery at Wells Fargo, so did work in the private sector

20     in compliance, and as an academic understands what an effective

21     BSA—AML compliance program identifies to a bank, and that is

22     confirmed by the evidence that he will point to that shows that

23     it was observed.  So it is framing the red flags that would

24     have been evident to JP Morgan and then organizing the facts

25     that provide the basis for that opinion.

1                THE COURT:  All right.  Let me hear briefly from

2       defense counsel, and then I have another matter, telephone

3       conference at 11:00, so we need to bring this to a close.

4                MS. ELLSWORTH:  Thank you, your Honor.  I'll be brief.

5                Professor Rush is, like several of the other disclosed

6       experts of the U.S. Virgin Islands, serving merely as a

7       mouthpiece for counsel.  He goes through emails and documents

8       and tells a narrative that is the U.S. Virgin Islands' theory

9       of the case.  That is not the province of an expert.  It is the

10      province of a fact-finder to look at those materials.

11               He also does not have experience in evaluating the

12      effectiveness or adequacy of BSA or AML compliance programs.

13      He was a federal prosecutor in fraud.  He didn't do BSA-AML

14      compliance reviews.  If he did, he did maybe one or two.  Then

15      spent three years at Wells Fargo relatively recently, so not

16      during the time period in question when allegedly these

17      so-called red flags would have been apparent to JP Morgan.  So

18      I think the testimony is improper for a variety of reasons.

19               The first is it does not provide any expertise or

20      helpfulness to the jury.  It is simply a recitation of evidence

21      that the jury can weigh itself.

22               Secondly, he doesn't actually have the relevant

23      expertise to provide the opinions he purports to offer.

24               And the third is to the extent he offers an opinion

25      that is within the province of expert testimony, it would be

N96QgovO

1    simply that the BSA-AML program at JP Morgan prior to 2013 was

2    not as good as it could have been, which would simply be a

3    negligence-type opinion which has no relevant to the claims in

4    this case which require, as your Honor questioning has

5    demonstrated, a knowing and intentional obstruction of some

6    sort of investigation, or a knowing and intentional violation

7    of the BSA as opposed to here we're talking about the TVPA.

8          The last point I would note is he also has this

9    impermissible attempt to calculate what the criminal sentence

10   would be under the United States Sentencing Guidelines.  The

11   Court doesn't really need any help with that at all, but at a

12   minimum, that should certainly not be presented to the jury.

13         THE COURT:  Yes, and I will put out of my mind when

14   addressing that particular question the fact that, as I have

15   stated at least 200 times now on the record, I regard the

16   Sentencing Guidelines as totally irrational.  But that's a

17   separate issue.

18         Very good.  Thanks so much.

19         (Adjourned)

20

21

22

23

24

25