# FILED UNDER SEAL

# EXHIBIT 88

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK

   GOVERNMENT OF THE            :
   UNITED STATES VIRGIN         :
   ISLANDS,                     :   CASE NO.
                                :   1:22-CV-10904
   Plaintiff,                   :   -JSR
                                :
         v.                     :
                                :
   JPMORGAN CHASE BANK,         :
   N.A.,                        :
                                :
   Defendant/Third Party        :
   Plaintiff.                   :
   _____   :
   JPMORGAN CHASE BANK,         :
   N.A.,                        :
                                :
   Third Party Plaintiff,       :
                                :
         v.                     :
                                :
   JAMES EDWARD STALEY,         :
                                :
   Third Party Defendant.       :
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

July 13, 2023

- - -

Videotaped deposition of JOHN R. DUFFY, taken pursuant to notice, was held at Wilmer Hale, Seven World Trade Center, New York, New York, beginning at 9:17 a.m., on the above date, before Michelle L. Gray, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public.

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

1  those subsequent checkpoint meetings
2  prior to this August 4, 2011, meeting?
3        A.    Not that I recall.
4        Q.    Okay.  Skipping down to the
5  section, "Excerpts From the Press."
6              The first sentence there
7  says, "Committee members reviewed recent
8  press releases, summarized below," right?
9        A.    Yes.
10       Q.    And going to the next page,
11 at the very end, if you see, it says,
12 "Conclusion:  The client will remain
13 flagged as high risk and we will proceed
14 with business as usual.  The client will
15 remain a 'banking' client only."
16             Correct?
17       A.    That's what it says.
18       Q.    Is that your understanding
19 of the conclusion of the rapid response
20 meeting?
21       A.    It is.  It is.  What's --
22 what's different from this, from the
23 documents we were just looking at, is
24 that the reviewed press releases were

1  different than some of the documents that
2  you walked me through previously.
3       Q.   But you don't have any
4  reason to think that those documents that
5  were e-mailed to you weren't provided to
6  you?
7       A.   I -- like I said, don't have
8  a recollection of it.  Don't doubt that
9  they were provided by the Morgan system.
10           But as it relates to the
11 reputational risk meeting, these are the
12 excerpts that we reviewed, obviously,
13 from.
14      Q.   It says those were the ones
15 that were reviewed during the meeting,
16 right?
17      A.   Yeah.  Correct.
18      Q.   It doesn't say that other
19 documents weren't circulated previously,
20 right?
21      A.   It does not.
22      Q.   Okay.  And -- so at the end
23 of the August 4, 2011, reputational risk
24 committee meeting, the decision was made

1    who take out cash regularly, we
2    look for it to be consistent with
3    what was expected for that
4    account.  And the DDR is the
5    mechanism for setting the
6    expectation of activity in an
7    account.  And Mr. Epstein's cash
8    withdrawals were consistent with
9    the expectations as set by his
10   DDR.
11 BY MR. SCHIFFMANN:
12       Q.   So to answer my question,
13 you did not -- you were not concerned
14 about any aspect of his cash usage while
15 you were CEO of the U.S. Private Bank?
16       A.   I was curious about it.  I
17 asked him about it.
18       Q.   But you were not concerned
19 about it?
20       A.   No.  We spoke about it.  He
21 gave me an answer, which was it was for
22 jet fuel.  I took him at his word and
23 felt like I covered that with him.
24       Q.   And when he told you that,

1  you believed him?
2       A.   I did.
3       Q.   Did you ever think he was
4  being dishonest with you?
5       A.   No, I did not.
6       Q.   So did you always take
7  Mr. Epstein at his word?
8       A.   We didn't talk that often.
9  But on that -- on that matter in
10 particular, yes.
11      Q.   Do you remember ever not
12 taking him at his word during any of your
13 conversations?
14      A.   They were limited, so no.
15      Q.   Did you ever discuss your
16 concerns -- well, withdrawn.
17           Did you ever discuss
18 Mr. Epstein's use of cash with Mary
19 Erdoes?
20      A.   Yes.
21      Q.   And what do you remember
22 about -- well, when was that
23 conversation?
24      A.   I don't recall.

1    A.    What I agree to is I had
2  reputational issues with Mr. Epstein as a
3  result of he being a felon and a sex
4  offender.
5    Q.    And would you agree that
6  being a felon and a sex offender and
7  somebody who pled guilty to the
8  solicitation of a 14-year-old for
9  commercial sex does not necessarily
10 affect Mr. Epstein's willingness or
11 ability to pay?
12         MR. JOHNSON:  Objection.
13         THE WITNESS:  I don't know.
14 BY MS. LIU:
15   Q.    You recall that you were
16 asked a number of questions about, I
17 think, what we can now refer to as the
18 cash or fuel explanation that was given
19 by Mr. Epstein?
20   A.    Yes.
21   Q.    Do you recall when you got
22 that explanation?
23   A.    I don't recall exact date,
24 no.

1      Q.   And you recall you testified
2  that the explanation was that he needed
3  cash to pay for fuel when he was
4  traveling to foreign countries, correct?
5      A.   That's correct.
6      Q.   And then I think there was
7  some discussion about potentially there
8  being some OFAC countries; do you recall
9  that?
10     A.   That was mentioned, yes.
11     Q.   And what is an OFAC country?
12     A.   I'm not going to remember
13 the actual words behind that.  But I
14 think it's the Office of Foreign Accounts
15 and Currency Control, something like
16 that.
17     Q.   And what does it mean to say
18 that Mr. Epstein travels to foreign
19 countries, including certain OFAC
20 countries?  What does that mean?
21     A.   In -- I will give you my
22 recollection.
23          To my recollection,
24 countries on the OFAC list are prohibited

1  from -- for U.S. banking institutions to
2  do business there and U.S. corporations
3  to do business there.
4         Q.    And at the time you received
5  this explanation, did you ask him
6  specifically what countries are you
7  traveling to?
8         A.    I don't recall.
9         Q.    And is it fair to say, then,
10 that you did not also ask him what
11 OFAC -- what countries on the OFAC list
12 are you traveling to?
13        A.    I don't recall.
14        Q.    And are you aware of what
15 countries in Eastern Europe are on the
16 OFAC list or were on the OFAC list at
17 that time?
18        A.    I don't recall.
19        Q.    So you do recall that there
20 was derogatory information reported
21 within the bank that Mr. Epstein was
22 known to fly women for trafficking
23 purposes from Eastern Europe to the
24 United States, correct?

1 line, it says, "Mr. Epstein will continue
2 to be a banking-only client," correct?
3      A.   It says that.
4      Q.   He was not exited from the
5 bank at this time, correct?
6      A.   That's correct.
7      Q.   And if you could turn back
8 to the first page.  You'll see under
9 "Nature of Existing Relationship," the
10 second paragraph says, "During the period
11 of March 2010 to December 2010, there
12 were eight large cash withdrawals
13 totaling $240,000."
14           Do you see that?
15      A.   I do.
16      Q.   And do you know, during that
17 period, whether Mr. Epstein was on house
18 arrest?
19      A.   One, I do not know that.
20 And two, during that period of time, I
21 was not in charge of the U.S. Private
22 Bank.
23      Q.   So is it fair to say that
24 you never asked Mr. Epstein, after you

received the cash for fuel explanation --
or you never looked into whether or not
that explanation made sense, given that
he had spent a considerable number of
years in jail and then on house arrest?

        MR. JOHNSON: Objection.

        THE WITNESS: Could you repeat your question, please.

        MS. LIU: Can I have that question read back.

        (Whereupon, the court reporter read back the requested portions of the transcript.)

        THE WITNESS: That explanation, to me, was taken at face value and post the conversation with Mr. Epstein. Many of his cash activities, as recommended to him for his aviation fuel needs, were switched to his aviation account, Hyperion.

BY MS. LIU:

    Q.    Taken at face value, meaning you didn't do any digging into whether or

1  not that explanation made sense?  You
2  just took Mr. Epstein at his word,
3  correct?
4        A.    I took Mr. Epstein at his
5  word.  And then following that, his cash
6  activity for fuel came out of the
7  Hyperion account, and that made sense.
8        Q.    It came out of the Hyperion
9  account at your suggestion, correct?
10       A.    Well, it came -- if he is
11 using money, his money for aviation
12 purposes, it's common sense and good
13 advice to give a client advice to make
14 sure that money comes out of your
15 aviation account so that when you're
16 accounting for your aviation expenses,
17 they are well documented.
18       Q.    But you knew that the money
19 was simply being transferred into the
20 aviation account a few days before it was
21 then taken out of the aviation account,
22 correct, Mr. Duffy?  That's what the
23 documents in this case show?
24             MR. JOHNSON:  Objection.