# FILED UNDER SEAL

# EXHIBIT 99

```
 1      UNITED STATES DISTRICT COURT FOR THE
            SOUTHERN DISTRICT OF NEW YORK
 2                   -  -  -

 3   GOVERNMENT OF THE UNITED     : Case Number:
     STATES VIRGIN ISLANDS        : 1:22-cv-
 4         Plaintiff,             : 10904-JSR
           v.                     :
 5   JPMORGAN CHASE BANK, N.A.    :
           Defendant/Third-Party  :
 6         Plaintiff.             :
     _____
 7   JPMORGAN CHASE BANK, N.A.    :
           Third-Party Plaintiff, :
 8         v.                     :
     JAMES EDWARD STALEY          :
 9         Third-Party Defendant. :

10
                     -  -  -
11                 MAY 24, 2023
                 HIGHLY CONFIDENTIAL
12                   -  -  -

13             Videotaped deposition of

14   STEPHEN CUTLER, taken pursuant to notice,

15   was held at the law offices of Boies

16   Schiller Flexner LLP, 55 Hudson Yards,

17   New York, New York, commencing at

18   9:40 a.m., on the above date, before

19   Amanda Dee Maslynsky-Miller, a Certified

20   Realtime Reporter and Notary Public in

21   and for the State of New York.

22                   -  -  -
           GOLKOW LITIGATION SERVICES, INC.
23         877.370.3377 ph| 917.591.5672 fax
                 deps@golkow.com
24
```

1  you know that there was a federal

2  non-prosecution agreement, you just don't

3  know when you knew that?

4        A.    I know at a certain point I

5  understood that there was a federal

6  non-pros agreement.  I can't tell you

7  exactly when.  And I can't tell you that

8  I knew precisely what the terms of it

9  were.

10       Q.    But you knew at some point

11  while you were general counsel at

12  JPMorgan and Jeffrey Epstein was a client

13  of the bank; is that fair?

14       A.    I believe I knew that there

15  was a non-pros agreement.

16       Q.    Okay.  You can put that

17  document away.

18             Do you recall, in 2008,

19  after Jeffrey Epstein pled guilty to the

20  child sex offenses, that private bank

21  wanted to exit Jeffrey Epstein as a

22  client of the bank?

23       A.    I do not.

24                   -  -  -

1          MR. GAIL:  Objection.

2          THE WITNESS:  I don't know

3     why you don't think it would make

4     any sense, but I could -- I could

5     conceive of -- if I had been

6     involved in approval in '08, I

7     could also conceive, in 2011,

8     having this view.

9  BY MS. LIU:

10         Q.    What happened between

11  possibly your approving him in 2008 and

12  your having this view in 2011,

13  Mr. Cutler?

14         A.    Well, among other things, I

15  think we would have seen the non-pros

16  agreement.  We would have reviewed a lot

17  of press that arose, I want to say in the

18  2010, early 2011 period.  We had some

19  direct experience with him in connection

20  with the claims that he was raising

21  against Bear Stearns.

22              And so I think whatever

23  judgment I had had in 2008, clearly by

24  this date in 2011, I did not believe that

1  Jeffrey Epstein should be a client of the

2  firm.

3      Q.   The press that arose said he

4  was being investigated for child sex

5  trafficking and human trafficking,

6  correct?

7      A.   I don't remember the

8  precise, but -- the precise parameters of

9  the press, but I remember there was a

10 series of articles about a new

11 investigation.  There were articles that

12 I remember pointed that he was -- he had

13 resolved claims with -- with a very large

14 number of women.

15          And, yeah, so I remember

16 those being among the articles, you know,

17 that we saw in 2010 or '11.

18     Q.   Who is Nina Shenker?

19     A.   At this point, she was the

20 general counsel of the asset management

21 business.

22     Q.   She was Mary Erdoes's

23 general counsel, correct?

24     A.   I'd never put it that way,

1  I'll represent to you, and you can -- you

2  can check me on this, 7/21/11, when you

3  say, I would like to put it and him

4  behind us, not a person we should do

5  business with period, was a Thursday.

6          A.     Okay.

7          Q.     And the him, just so it's

8  perfectly clear for the record, is

9  Jeffrey Epstein, correct?

10         A.     I believe that's right.

11                      -   -   -

12                (Whereupon, Exhibit

13         Cutler-23,

14         JPM-SDNYLIT-00754982-984, 7/22/11

15         E-mail, was marked for

16         identification.)

17                      -   -   -

18  BY MS. LIU:

19         Q.     I'm showing you what's been

20  marked as Exhibit-23.

21                So you'll see the top e-mail

22  on Exhibit-23 is from Nina Shenker to

23  Mary Erdoes on 7/22/2011 --

24         A.     I see it.

1    Q.    -- the next day, correct?

2          She writes, Imagine lots to

3    do upon your return to U.S. and for next

4    week.

5          Do you see that?

6    A.    Yes.

7    Q.    And then there's a redacted

8    portion.  And then the next line says,

9    FYI, Steve, at conclusion of JE approval,

10   asked when we are off-boarding JE.  I

11   reminded him that we have the other

12   matter outstanding.

13         Do you see that?

14   A.    I do.

15   Q.    What was the JE approval?

16   A.    I don't know.  I mean, I

17   could make an assumption that it related

18   to this lawsuit, but I don't know.

19   Q.    So the day before you said

20   to Mary Erdoes, I want to put him behind

21   us?

22   A.    Correct.

23   Q.    Not a person we should do

24   business with?

1       A.      Correct.

2       Q.      Do you believe that Nina

3   Shenker is referring to an approval of

4   Jeffrey Epstein that predated July 21st,

5   2011?

6               MR. GAIL:  Objection.

7               MR. EDELMAN:  Objection to

8       form.

9               THE WITNESS:  I'm sorry, an

10      approval of him as a client?

11  BY MS. LIU:

12      Q.      Yes.

13      A.      No.

14      Q.      Okay.  Let me understand.

15              What do you believe, FYI

16  Steve, at conclusion of JE approval,

17  asked when we are off-boarding JE?

18      A.      I -- I don't think I would

19  have said when are we off-boarding him if

20  we were speaking about an approval of his

21  account.  It just -- the two things in

22  conjunction don't make sense to me.

23              I would think, just based on

24  the juxtaposition of Exhibit-22 versus

Stephen Cutler - Highly Confidential

1  Exhibit-23 that it's somehow the approval

2  of the settlement.

3        Q.    I see.

4              Steve, at the conclusion of

5  the Jeffrey Epstein settlement approval?

6        A.    I -- that makes more sense

7  to me.

8        Q.    Okay.

9        A.    I don't remember it.

10        Q.    Okay.  Fine.  Just want to

11  try to understand what you think it

12  means.

13              So -- asked when we are

14  off-boarding Jeffrey Epstein.

15              That's consistent with your

16  telling Mary Erdoes and others in the

17  e-mail before this is not a person we

18  should be doing business with?

19              MR. GAIL:  Objection.

20              THE WITNESS:  Well, I think

21        the notion of off-boarding

22        somebody that I don't think we

23        should be doing business with, I

24        see how those things are

1          consistent, yes.

2    BY MS. LIU:

3          Q.    And it's also consistent

4    that JPMorgan retained Jeffrey Epstein as

5    a client to deal with the Bear Stearns

6    litigation that Jeffrey Epstein had,

7    correct?

8          A.    I don't know that.

9          Q.    Because then she writes, I

10   reminded him that we have the other

11   matter outstanding.

12              Do you see that?

13         A.    I do.

14         Q.    So we had the one, it's been

15   approved, settlement is done.  But Steve,

16   from Nina, we've got that other

17   litigation with Jeffrey Epstein.

18              Do you recall that?

19         A.    I don't.

20         Q.    Do you recall the Zwirn

21   Highbridge Dubin litigation?

22         A.    I've now seen documents that

23   remind me there was -- there was another

24   claim that Epstein had.

1        embarked upon was the only reason,

2        or even a primary reason, to exit

3        Mr. Epstein.

4    BY MS. LIU:

5        Q.    You had already decided

6    there were other reasons?

7        A.    Yeah.   I don't think I was

8    oblivious to the issue that William

9    raised.  But I -- in my own mind, I don't

10   remember it as being the core of the --

11   of the issue that drove my conclusion.

12       Q.    Do you recall William

13   Langford saying to you, AML

14   investigations does not want -- believe

15   we should retain Jeffrey Epstein as a

16   client, in early 2011?

17       A.    I don't remember him

18   referring to AML investigations in

19   particular.  I think what he communicated

20   to me was concern about the reputational

21   issues.  Those concerns are heightened,

22   if you will, by the human trafficking

23   initiative that we're doing, given that

24   he was convicted of these crimes.

```
 1

 2

 3

 4

 5

 6

 7   BY MS. LIU:

 8        Q.    You can put that document

 9   away.

10             Mr. Cutler, are you aware

11   that in or around 2020, Deutsche Bank was

12   fined by the New York State Department of

13   Financial Services $150 million in

14   connection with its conduct related to

15   Jeffrey Epstein's accounts?

16        A.    I believe I read about that.

17                  -  -  -

18             (Whereupon, Exhibit

19        Cutler-39, No Bates, Department of

20        Financial Services Article, was

21        marked for identification.)

22                  -  -  -

23   BY MS. LIU:

24        Q.    So I'm going to hand you the
```

1    press release that was issued by the New

2    York State Department of Financial

3    Services.  It's Exhibit-39.

4                    And at the same time, I'm

5    going to hand you the actual consent

6    order by the New York State Department of

7    Financial Services.  And it's Exhibit-40.

8                    -  -  -

9                    (Whereupon, Exhibit

10          Cutler-40, No Bates, Consent Order

11          Under New York Banking Law 39 and

12          44, was marked for

13          identification.)

14                    -  -  -

15   BY MS. LIU:

16          Q.    I would ask you to first

17   take a look at Exhibit-40 and see if you

18   recall that being the consent order that

19   you recall reading?

20                 MR. GAIL:  Objection.  That

21          misstates.

22                 THE WITNESS:  I don't think

23          I ever read the consent order.

24   BY MS. LIU:

1    Q.    Oh, you --

2    A.    I think you --

3    Q.    -- read about this at the

4    time?

5    A.    I think you asked me if I

6    was aware of it.  And I believe I read

7    about it.

8    Q.    Fair enough.  I

9    misunderstood you.

10   A.    And I don't -- I don't

11   believe I've ever seen this document

12   before.

13   Q.    You can put that document

14   away.  I just want to look at the press

15   release, then.

16   A.    Okay.

17   Q.    So you'll see the title is,

18   Superintendent Lacewell Announces DFS,

19   Department of Financial Services, Imposes

20   a $150 Million Penalty on Deutsche Bank

21   in Connection with Bank's Relationship

22   with Jeffrey Epstein.

23         And it also mentions

24   something unrelated to Jeffrey Epstein.

1     Do you see that?

2     A.    I do.

3     Q.    And if you turn to the

4  second page of the document and you go to

5  the first full paragraph, With respect to

6  the case of Jeffrey Epstein, before the

7  bullets.

8     Do you see that?

9     A.    Yes.

10    Q.    All right.  The bank failed

11 to properly monitor account activity

12 conducted on behalf of the registered sex

13 offender, despite ample information that

14 was publicly available concerning the

15 circumstances surrounding Mr. Epstein's

16 earlier criminal misconduct.

17    Do you see that?

18    A.    I do.

19    Q.    The bank -- The result was

20 that the bank processed hundreds of

21 transactions totalling millions of

22 dollars that, at the very least, should

23 have prompted additional scrutiny, in

24 light of Mr. Epstein's history.

1          And then it lists a number

2    of things, correct?

3          A.    Yes.

4          Q.    All right.  Payments to

5    individuals who were publicly alleged to

6    have been Mr. Epstein's co-conspirators

7    in sexually abusing young women.

8          Do you see that?

9          A.    I do.

10          Q.    JPMorgan also made

11    payments -- handled payments from

12    Mr. Epstein's accounts to individuals who

13    are publicly alleged to have been

14    Mr. Epstein's co-conspirators in sexually

15    abusing young women, correct?

16          MR. GAIL:  Objection.

17          THE WITNESS:  Are you

18        referring to the non-pros

19        agreement, which refers to certain

20        people as potential

21        co-conspirators?

22    BY MS. LIU:

23          Q.    Yes.

24          A.    And I'm -- just based on

1  what you said here today and what you
2  have shown me, there are payments that
3  were made out of Epstein accounts to one
4  or more of those individuals.
5      Q.   Next bullet, Settlement
6  payments totalling over $7 million
7  dollars, as well as dozens of payments to
8  law firms totalling over $6 million for
9  what appears to have been the legal
10 expenses of Mr. Epstein and his
11 co-conspirators.
12          Do you see that?
13     A.   I do.
14     Q.   And you recall earlier this
15 morning I showed you a spreadsheet that
16 contained many payments, many in the
17 amount of $100,000, from Jeffrey
18 Epstein's accounts to law firms and
19 lawyers?
20          Do you recall that?
21     A.   I do.
22     Q.   The next bullet, Payments to
23 Russian models, payments for women's
24 school tuition, hotel and rent

1    expenses -- and rent expenses and,

2    consistent public allegations of prior

3    wrongdoing, payments directly to numerous

4    women with Eastern European surnames.

5              Do you see that?

6         A.    I do.

7         Q.    And you'll recall we looked

8    at a document that showed payments to

9    women whose names, you said, could be

10   Russian or could be Eastern European.

11             Do you recall that?

12        A.    I should clarify, I mean,

13   they could be Americans with those names.

14             But I get the point that

15   there are certain names that you might

16   associate with Russian heritage or

17   Eastern European heritage.

18        Q.    Next one, Periodic

19   suspicious cash withdrawals, in total,

20   more than $800,000 over approximately

21   four years.

22             Do you see that?

23        A.    I do.

24        Q.    And you recall we looked at

1    a SAR filing in 2013 that was reporting

2    excessive suspicious cash withdrawals

3    beginning in 2009 and continuing every

4    year until 2013, correct?

5         A.    Yes.

6               I mean, what I don't know is

7    whether the '09 payments -- or the '09,

8    '10 payments standing alone would have

9    been deemed suspicious, or when you got

10   to 2013, it was the totality of them

11   and/or the work that was done by the AML

12   team around those payments that resulted

13   in the filing of the SAR.

14        Q.    And then if you turn to the

15   next page, you'll see the second sentence

16   begins, For example, certain conditions

17   imposed upon the Epstein accounts by a

18   bank reputational risk committee,

19   conditions that, if followed, might have

20   detected and prevented many subsequent

21   suspicious transactions were either not

22   transmitted to the majority of the

23   account relationship team or were

24   misinterpreted by a compliance officer.

1          Do you see that?

2     A.    I do.

3     Q.    Okay.  So you'll recall that

4 I -- we talked about this condition that

5 was imposed following rapid response

6 meetings that Epstein was to be a banking

7 only client.

8          Do you recall that?

9     A.    I do.

10    Q.    And then you'll recall

11 later, in the Justin Nelson KYC, there

12 were numerous entries which referred to

13 him as an active brokerage client?

14    A.    Right.

15          I -- what I don't know is

16 whether that was contemplated within the

17 panoply of activities that could take

18 place at the bank.

19    Q.    And then --

20    A.    Nor do I know that any of

21 those activities or the -- you know, if

22 those activities hadn't been affected,

23 that would have allowed for detection and

24 prevention of suspicious transactions as

1 reflected in the sentence that you just

2 read.

3          Q.    And then after this section

4 I just read, related to Epstein, it moves

5 on to a different account, Don Esconia,

6 right?

7          A.    Yes.  I gather that the fine

8 imposed here was both for Epstein and for

9 other relationships that Deutsche Bank

10 had.

11          Q.    You can put that document

12 away.

13          MR. GAIL:  We've got you

14     with one minute left.

15          MS. LIU:  I have no further

16     questions, Mr. Cutler.  I

17     appreciate your time.

18          MR. GAIL:  Let me just

19     confer with my colleague, but I'm

20     sure we're done.

21          VIDEO TECHNICIAN:  Do you

22     want to go off the record?

23                 -  -  -

24          (Whereupon, a discussion off